UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

UNITED STATES OF AMERICA                    :

         - against -                                      :

FAHD HUSSAIN, et al.,                             :

                    Defendants.    :

------------------------------------------------------------- x

12 Cr. 45 (RJS)

## GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Amy Lester
Jessica A. Masella
Assistant United States Attorneys
 -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

UNITED STATES OF AMERICA                        :

     - against -                                            :

                                                 12 Cr. 45 (RJS)

FAHD HUSSAIN, et al.,                            :

                          Defendants.     :

---------------------------------------------------------------- x

**GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER
OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS**

     The Government respectfully submits this memorandum of law in further opposition to the motions filed by defendants Dwayne Barrett and Jermaine Dore requesting the suppression of (1) evidence recovered from a cellular telephone belonging to Barrett (the "Barrett Cellphone"), and other electronic evidence relating thereto; and (2) physical evidence recovered during the search of an apartment located at 3983 Carpenter Avenue, Bronx, New York (the "Carpenter Ave. Apartment"), where Dore was arrested.  In light of the evidence presented at the suppression hearing in this matter, the defendants' motions should be denied because Barrett voluntarily gave law enforcement consent to search the Barrett Cellphone, and both Dore and his girlfriend, Janiel Brown, voluntarily consented to a search of the Carpenter Ave. Apartment.

<u>**The Evidence at the Hearing**</u>

     The Court held a hearing on this matter on May 29, 2012, at which the Government presented the testimony of three witnesses:  Detective Dennis Kruse of the New York City Police Department ("NYPD"), Special Agent Michael Zeppieri of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and Deputy United States Marshal William Dundon.  Dore

called one witness, his girlfriend, Janiel Brown.  Barrett did not call any witnesses.  Two exhibits were introduced into evidence: the Barrett Cellphone, which was entered into evidence by the Court as Government Exhibit 4, and a written report by Detective Craig Crisfield, which was introduced by Barrett as Exhibit 3501-Z.

      **A.**      **The January 9, 2012 Stop of the Mercedes and Interview of Barrett**

On January 9, 2012, Barrett was stopped by Detective Kruse while driving a 2003 Mercedes Benz in Yonkers, New York.  (Tr. 10, 15-16 (Kruse)).[1]  The Mercedes driven by Barrett that day had come to the attention of Detective Kruse and other members of the NYPD when it was identified on a surveillance video and picked up by a license plate reader in the vicinity of a car-jacking and homicide that took place on December 12, 2011 in Mount Vernon, New York.  (Tr. 8-11 (Kruse)).  On the surveillance video, two men are seen exiting the Mercedes and approaching the minivan in which the homicide victim's body was later found. (Tr. 10-11 (Kruse)).  Detective Kruse also learned that the Mercedes had been stopped by other members of the NYPD in mid-November 2011 based on a report that it was following another car.  (Tr. 11-14 (Kruse)).  Barrett was driving the Mercedes on that occasion, accompanied by another individual.  (Tr. 13-14 (Kruse)).  By running the registration for the Mercedes and conducting other address checks, Detective Kruse determined that the Mercedes was registered to a woman named Felicia Lake, who had filed a domestic incident report against Barrett in the past, and who lived at 18 Hancock Street, in Yonkers, New York.  (Tr. 14-15 (Kruse)).  Based on that information, Detective Kruse began canvassing for the Mercedes and conducting surveillance in attempt to locate it and its driver.  (Tr. 15 (Kruse)).

---

[1] "Tr." refers to the transcript of the hearing held on May 29, 2012.

When Detective Kruse and his partner, Sergeant O'Rourke, stopped the Mercedes around 12:00 p.m. on January 9, 2012 near 18 Hancock Street, they asked Barrett to step out of the car and accompany them to the 47th Precinct Detective Squad.  (Tr. 16, 18 (Kruse)).[2]  Barrett asked whether he was under arrest, and Detective Kruse said, "[N]o, . . . we are just going to go and have a conversation at the 47[th Precinct]."  (Tr. 40 (Kruse)).  Barrett agreed to go with them. (Tr. 17 (Kruse)).  Detective Kruse frisked Barrett for weapons, placed Barrett in handcuffs for safety purposes, and he and Sergeant O'Rourke transported Barrett to the 47th Precinct in their unmarked police vehicle.  (Tr. 17, 33 (Kruse)).  Another officer drove the Mercedes from Yonkers to the 47th Precinct.  (Tr. 28, 34 (Kruse)).[3]  Once they reached the Precinct, Detective Kruse placed Barrett in an interview room, removed his handcuffs, and offered him something to eat or drink.  (Tr. 18-19, 34 (Kruse)).  Detective Kruse and Detective Craig Crisfield, with whom Detective Kruse was working the case, told Barrett that he was driving a vehicle that was wanted in connection with a possible homicide, and proceeded to ask him questions.  (Tr. 9, 19 (Kruse)).[4]  According to Detective Kruse, Barrett was "very calm," "cooperative," and willingly answered their questions.  (Tr. 20 (Kruse); *see also* Tr. 39-40 (Kruse)).  However, Barrett did ask "how long it would take . . ., how long would he be [there]" at the Precinct.  (Tr. 20 (Kruse)). Detective Kruse told Barrett that "he wasn't going to be under arrest, that he would be able to

---

[2] While Detective Kruse testified that he had his gun drawn during the car stop, he did not point it at Barrett or display it in such a way that it would have been visible to Barrett.  (Tr. 22 (Kruse)).  Detective Kruse did not recall seeing Sergeant O'Rourke's gun being drawn during the car stop.  (Tr. 22 (Kruse)).

[3] The Mercedes was vouchered as evidence and an inventory search was conducted of its contents as part of the vouchering process.  (Tr. 28 (Kruse)).

[4] Neither Kruse nor Crisfield were armed while questioning Barrett.  (Tr. 21 (Kruse)).

leave," but did not provide an exact time frame because "[he] didn't know exactly." (Tr. 20 (Kruse)). Detective Kruse told Barrett that he "appreciated his cooperation" in the meantime. (Tr. 20 (Kruse)). At some point during the interview, Barrett told Detective Kruse that he had a childcare issue in terms of someone being available to pick up his child, and Detective Kruse's recollection was that "somebody was trying to accommodate him." (Tr. 41 (Kruse)).

At approximately 6:00 p.m., Detective Kruse asked Barrett about the cellular telephone that had been sitting on the front passenger seat of the Mercedes during the car stop, which Detective Kruse had retrieved from the Mercedes once the car was brought to the Precinct. (Tr. 23, 34, 43 (Kruse)). Specifically, Detective Kruse asked Barrett "if I could have consent to look in his phone, if he would mind if I looked in his phone." (Tr. 24 (Kruse); *see also* Tr. 26, 43 (Kruse)). Barrett responded, "OK," or "Give me the phone." (Tr. 24, 44 (Kruse); *see also* Tr. 27 (Kruse)). Detective Kruse "told [Barrett] that it was locked. [Barrett] said, give it to me, I'll unlock it," and proceeded to unlock the cellphone. (Tr. 24 (Kruse); *see also* Tr. 27, 43 (Kruse)). While Barrett was unlocking the phone, he received an incoming phone call from Felicia Lake. (Tr. 24, 43 (Kruse)). Barrett told Lake that he was at the police station and asked her if she was coming down. (Tr. 24 (Kruse)). Detective Kruse spoke to Lake as well, and asked her to give his name when she arrived at the Precinct. (Tr. 24-25 (Kruse)). After the phone call ended, the cellphone re-locked, so Barrett unlocked the phone again and handed it to Detective Kruse. (Tr. 25, 27 (Kruse)). Detective Kruse then left the interview room and gave the phone to Special Agent Zeppieri from the ATF. (Tr. 25, 27 (Kruse)). Detective Kruse told Agent Zeppieri that Barrett had given him consent to search the phone. (Tr. 46-47 (Kruse); 54 (Zeppieri)). Agent Zeppieri began to look through the contents of the phone, taking notes as he did so, but then

4

handed the phone to another detective from the 47th Precinct who downloaded the contents onto a disc for later review.  (Tr. 56, 63, 76 (Zeppieri)).

Some time later, after 8:00 p.m., Agent Zeppieri entered the interview room, along with Detective Crisfield and ATF Special Agent Ayesha Winston, in order to ask Barrett further questions.  (Tr. 57-58 (Zeppieri)).  Specifically, Agent Zeppieri testified that approximately five to ten minutes after entering the interview room, he "asked [Barrett] for permission to search his phone.  [Barrett] replied, no, why should I give you permission if I've already given the other officer permission to search the phone."  (Tr. 59 (Zeppieri)).  Agent Zeppieri understood this to mean that Barrett had given law enforcement consent to search the phone.  (Tr. 60 (Zeppieri)).  According to Agent Zeppieri, Barrett was calm during this exchange, although he was upset at other times during the interview, and gave vague and evasive answers to questions about where he lives, where he was born, what he does for a living, and his use of the Mercedes.  (Tr. 59, 61 (Zeppieri)).

Barrett did not testify at the hearing.  Rather, he relied on the statements set forth in his affidavit in support of his motion to suppress.  In his affidavit, Barrett states that, while he was at the 47th Precinct, "An officer brought in a cell phone recovered from the car . . . [and] asked if they could search the phone.  I did not give permission to search the phone."  (Barrett Aff. ¶¶ 9-10).  Barrett also states that "some hours after [he] was initially questioned, [he] was further questioned by another group of officers," one of whom "asked if he could search my phone and I said no."  (Barrett Aff. ¶¶ 11, 13).

**B.      The January 19, 2012 Arrest of Jermaine Dore and Search of the Carpenter Avenue Apartment**

On January 19, 2012, at approximately 6:15 a.m., Agent Zeppieri, Deputy Marshal Dundon, and other law enforcement agents participated in Dore's arrest at a house located on Carpenter Avenue in the Bronx.  (Tr. 65, 81-82 (Zeppieri); 93 (Dundon)).  Dore's girlfriend, Janiel Brown, was also present during Dore's arrest.  (Tr. 105 (Brown)).  The house in which Dore and Brown lived was a multi-family house divided into several, smaller single room apartments.  (Tr. 66 (Zeppieri); 107 (Brown)).  Law enforcement agents encountered Dore near the top of the stairs on the second floor of the house, which consisted of a series of single-room apartments centered around a kitchen.  (Tr. 68, 85 (Zeppieri); 95-96, 100 (Dundon); 112-13 (Brown)).  While other law enforcement agents conducted a security sweep of the second floor, Agent Zeppieri placed Dore in handcuffs, read Dore his *Miranda* warnings from a card, and then asked him "if there are any guns or any drugs in this house or anything that could harm us."  (Tr. 68-69, 86 (Zeppieri); 96-97 (Dundon); 108, 114 (Brown)).  Dore said no.  (Tr. 69 (Zeppieri); 97 (Dundon)).  Agent Zeppieri then asked "if we could take a look around, and he said yes."  (Tr. 69-70, 87-88 (Zeppieri); 97 (Dundon)).  A few minutes later, Agent Zeppieri asked Brown the same questions he posed to Dore – whether "there were any guns, drugs, or anything that could harm us in the apartment" and whether "we could take a look around" – and she responded no to the first question and yes to the second.  (Tr. 71, 89 (Zeppieri)).[5]  Brown was not handcuffed and

---

[5] According to Brown, the "officer," presumably Agent Zeppieri, said to her, "[I]s there anything illegal in here that I should know about?" to which she answered, "[N]o."  (Tr. 108, 113 (Brown)).  Brown denies providing consent to search the bedroom she shared with Dore.  (Tr. 109-10, 113-14 (Brown)).  Brown also testified that she did not hear agents ask Dore for permission to search the bedroom, nor did she hear Dore consent to such a request.  (Tr. 109-10 (Brown)).

was respectful in her demeanor during this conversation.  (Tr. 71 (Zeppieri)).  The search of the

bedroom shared by Dore and Brown took approximately ten or fifteen minutes, during which

time Dore and Brown stayed in the kitchen.  (Tr. 72 (Zeppieri)).  Neither Dore nor Brown made

any statements or expressed any concerns to the agents during the search.  (Tr. 73 (Zeppieri); 98-

99 (Dundon); 115 (Brown)).  Once the search was completed, Agent Zeppieri showed Brown the

items that law enforcement intended to take from the premises, which included a laptop

computer.  (Tr. 73 (Zeppieri)).  Brown told Agent Zeppieri that she wanted to keep her laptop

because she needed it for school.  (Tr. 73-74 (Zeppieri); 116 (Brown)).  Agent Zeppieri reviewed

the contents of the computer with Brown and decided that he would not seize the laptop.  (Tr. 74,

90 (Zeppieri); 116-17 (Brown)).

Dore did not testify at the hearing, and did not submit an affidavit in support of his

motion to suppress.

## Discussion

### I.  Law Enforcement Obtained Consent to Search the Barrett Cellphone and the Carpenter Avenue Apartment

#### A.  Applicable Law

The Fourth Amendment "generally requires police to secure a warrant before conducting

a search."  *Maryland* v. *Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*).  Searches "conducted

outside the judicial process, without prior approval by judge or magistrate, are *per se*

unreasonable under the Fourth Amendment—subject only to a few specifically established and

well-delineated exceptions."  *Katz* v. *United States*, 389 U.S. 347, 357 (1967).  However, "one of

the specifically established exceptions to the requirements of both a warrant and probable cause

is a search that is conducted pursuant to consent." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973). An "individual may consent to a search, thereby rendering it reasonable." *United States* v. *Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "To ascertain whether consent is valid, courts examine the totality of the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Id*.

"Recent Supreme Court decisions emphasize . . . that the issue of reasonableness is to be measured by an objective standard." *Id*. In making that determination, courts ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991) (quoting authority omitted). "[T]he ultimate question is whether 'the officer had a reasonable basis for believing that there had been consent to search.' " *Garcia*, 56 F.3d at 423 (citing authority omitted). Moreover, consent need not be expressed only verbally, it can also "be found from an individual's words, acts or conduct." *Krause* v. *Penny*, 837 F.2d 595, 597 (2d Cir. 1988).

Some of the factors that bear upon the voluntariness of the search include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent," *United States* v. *Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (citations omitted), as well as the personal characteristics of the defendant (such as age, education, and experience), *see United States* v. *Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990), and the length of detention and the nature of the questioning, *see United States* v. *Arango-Correa*, 851 F.2d 54, 57 (2d Cir.

8

1988).  As a general matter, no one factor is sufficient on its own to merit a finding of

involuntariness.  *See Schneckloth*, 412 U.S. at 226-27; *see also, e.g.*, *United States* v. *Puglisi*, 790

F.2d 240, 243-44 (2d Cir. 1986).  In fact, the Second Circuit has frequently approved of consent

searches even in cases where several factors, including the defendant being in police custody,

might seem to favor a finding of coerciveness.  *See, e.g., United States* v. *Gray*, 283 Fed. Appx.

871, 873 (2d Cir. 2008) (summary order) (upholding finding that consent was voluntarily given,

despite the presence of multiple agents and the fact that agents had broken a glass window while

knocking on it, which agents then used to gain access to a common hallway); *United States* v.

*Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (defendant had been arrested and handcuffed by five

or six officers with guns drawn); *United States* v. *Moreno*, 897 F.2d 26, 33 (2d Cir. 1990)

(defendant had been arrested and handcuffed and he spoke broken English), *abrogated on other*

*grounds as recognized in Ruggiero* v. *Krzeminski*, 928 F.2d 558 (2d Cir. 1991); *Arango-Correa*,

851 F.2d at 56-58 (defendant had been arrested, detained, strip-searched, and questioned for five

hours prior to giving consent); *United States* v. *Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987)

(defendant had been arrested with force and questioned for several hours, and officers had

threatened to disrupt his home if he did not cooperate with them); *Puglisi*, 790 F.2d at 243-44

(defendant had been frisked and arrested by agents with weapons drawn).  As the Court

summarized in *Garcia*, "Consent to a search has been found despite formal arrest, and such

additional aggravating circumstances as handcuffing of a suspect, the presence of six law

enforcement officers in his home, and their assurance that they would remain indefinitely and

secure a search warrant if consent were withheld."  56 F.3d at 423 (citations omitted); *see also*

*Yu-Leung*, 910 F.2d at 41 (collecting cases).

Although "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, it may be a factor in ascertaining whether the consent was coerced." *Garcia*, 56 F.3d at 423. In addition, consent is generally not voluntary if it is given only in acquiescence to a claim of lawful authority, and a claim by a law enforcement officer that he has a warrant, or can get one if necessary, can render consent involuntary. *See*, *e.g.*, *Bumper* v. *North Carolina*, 391 U.S. 543, 548-9 (1968); *United States* v. *Weidul*, 325 F.3d 50, 54 (1st Cir. 2003).

**B.       Barrett Consented to the Search of His Cellphone**

Detective Kruse's testimony regarding his interactions with Barrett at the 47th Precinct establishes that Barrett voluntarily consented to the search of his cellphone, and that a reasonable person would not have understood Barrett's consent to be limited in any way. Moreover, Barrett's later interaction with Special Agent Zeppieri confirms that Barrett provided consent to search the cellphone to Detective Kruse.

The evidence at the hearing demonstrated that the circumstances of Barrett's interview at the Precinct were not coercive. When Detective Kruse and Sergeant O'Rourke first stopped Barrett in the Mercedes, Detective Kruse had his gun drawn, but not in such a way that it would have been visible to Barrett. (Tr. 22). Detective Kruse testified that Barrett got out of the car when asked, and agreed to accompany them to the 47th Precinct to answer questions. (Tr. 18-19). While Barrett was handcuffed for safety purposes when he was transported to the Precinct, Detective Kruse removed the handcuffs as soon as they arrived at the interview room, and offered Barrett food and drink. (Tr. 17, 18-19). Detective Kruse testified that Barrett was "very calm" and "cooperative" in response to his questions. (Tr. 20). Neither Detective Kruse nor Detective Crisfield were wearing their weapons while questioning Barrett. (Tr. 21). During the

10

encounter, Detective Kruse repeatedly told Barrett that he was not under arrest and would be able to leave at the end of the interview. (Tr. 17, 20). Detective Kruse also recalled that someone at the Precinct was making an effort to assist Barrett with an issue relating to picking up his child at a certain time. (Tr. 41).

The fact that Detective Kruse drew his gun during the stop of the Mercedes, as well as the fact that Barrett was handcuffed, do not necessarily establish coercion. *See Ansaldi*, 372 F.3d at 129 (upholding consent to enter house where defendant was arrested outside at gunpoint by five or six officers, handcuffed, given *Miranda* warnings, and then asked whether he would like to provide pedigree information inside or outside the house); *Yu-Leung*, 910 F.2d at 41 (factors such as handcuffing of suspect, the presence of six law enforcement officers in home, and assurance that they will remain indefinitely until obtaining search warrant do not necessarily vitiate consent). Even assuming Barrett was in custody once he had been detained at the Precinct, that fact in isolation also cannot demonstrate that his consent was coerced. *See United States* v. *Watson*, 423 U.S. 411, 424-25 (1976) (person may give consent even if in custody); *United States* v. *Vasquez-Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979) (per curiam) ("[T]he fact of custody alone is not enough to demonstrate involuntariness of consent."); *United States* v. *Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) (fact that defendant is "under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion"); *see also United States* v. *Tortorello*, 533 F.2d 809, 814 (2d Cir. 1976). Nor is the amount of time that Barrett was detained at the Precinct prior to giving consent determinative on its own. *See Arango-Correa*, 851 F.2d at 57 (five-hour detention did not vitiate consent where defendant was well-treated and "not subjected to the kind of intensive interrogation over many hours or days which

11

would overwhelm the frightened prisoner"). Rather, Barrett's consent must be considered in light of the "totality of all the circumstances" surrounding his interview. *Schneckloth*, 412 U.S. at 227.

The evidence at the hearing demonstrated that it was in the context of Barrett's general cooperation with the investigation and his willingness to answer questions that he agreed to unlock his cellphone for Detective Kruse. Barrett was "very calm" and "cooperative" during his interaction with Detective Kruse. (Tr. 20). When Detective Kruse brought Barrett's cellphone into the interview room, he testified that he asked Barrett "if I could have consent to look in his phone, if he would mind if I looked in his phone." (Tr. 24; *see also* Tr. 26, 43). Barrett responded, "OK," or "Give me the phone." (Tr. 24, 44; *see also* Tr. 27). Detective Kruse "told [Barrett] that it was locked. [Barrett] said, give it to me, I'll unlock it," and proceeded to unlock the cellphone. (Tr. 24; *see also* Tr. 27, 43). After Barrett received an incoming phone call from Felicia Lake, Barrett unlocked the phone again and handed it to Detective Kruse. (Tr. 25, 27). Barrett's willing unlocking of the cellphone in response to Detective Kruse's requests demonstrates his implied consent to a search of the phone's contents. *See United States* v. *Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (defendant consented to search of bag's contents when, in response to officers' request to examine bag, defendant removed it and handed it to them); *United States* v. *Fernandez-Jimenez*, No. 03 Cr. 1493 (RPP), 2004 WL 1598653, at *5 (S.D.N.Y. July 16, 2004) (defendant consented to search of closed bags inside trunk of car when he responded to request to search by opening the trunk); *United States* v. *Genao*, 281 F.3d 305, 310 (1st Cir. 2002) (defendant's volunteering that he had a key to apartment and showing police how key worked indicated willing cooperation, and thus consent to search); *see also United States* v.

*Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) ("consent . . . 'can be found from and individual's words, acts or conduct'") (citation omitted).[6]    The logical conclusion, and what a reasonable person would have understood from Barrett's conduct, is that Barrett voluntarily consented to a search of the cellphone's contents.  *See United States* v. *Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.").

Barrett was not simply acquiescing to a show of authority by Detective Kruse; he knew how to refuse consent, as indicated by his later exchange with Special Agent Zeppieri.  Agent Zeppieri testified that when he asked Barrett for consent to search the cellphone, Barrett said, "[N]o, why should I give you permission if I've already given the other officer permission to search the phone."  (Tr. 59).  Barrett's statement also confirms that he had in fact provided consent to search the cellphone to Detective Kruse.[7]

## C.    The Cellphone's Contents Are Subject to the Inevitable Discovery Doctrine

Even assuming *arguendo* that Barrett did not voluntarily consent to a search of his cellphone, the inevitable discovery doctrine provides an alternative basis for the denial of

---

[6] To the extent that the Court takes into consideration the statements in Barrett's affidavit submitted in support of his motion, *see United States* v. *Thompson*, No. 10 Cr. 94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) (defendant's "hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much in the absence of corroboration, whether from the defendant or otherwise"), it is worth noting that Detective Kruse's testimony on this point is not directly contradicted by the contents of that affidavit.  In his affidavit, Barrett states that he "did not give permission to search the phone." (Barrett Aff. ¶ 10).  However, Barrett does not say that he did not unlock the cellphone for Detective Kruse.

[7] Again, this testimony is not contradicted by the statements in Barrett's affidavit, in which he says that when he was asked "by [one of] another group of officers . . . if he could search my phone . . . I said no." (Barrett Aff. ¶¶ 11, 13).

Barrett's motion to suppress.  The inevitable discovery doctrine allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix* v. *Williams*, 467 U.S. 431, 444 (1984).  "For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct." *United States* v. *Eng*, 971 F.2d 854, 859 (2d Cir. 1992), *aff'd*, 997 F.2d 987 (1993); *see Murray*, 487 U.S. at 539; *see also Nix*, 467 U.S. at 448; *United States* v. *Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (suppression must be denied if there is a "high level of confidence that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means").  Proof of inevitable discovery requires "demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Nix*, 467 U.S. at 444 n.5, 445; *see Eng*, 997 F.2d at 990.

In *United States* v. *Cabassa*, the Second Circuit laid out four factors to consider in making an inevitable discovery determination: (1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; (2) the strength of the probable cause at the time entry occurred; (3) whether a warrant was ultimately obtained after the illegal entry; and (4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."  62 F.3d 470, 473 & n.2 (2d Cir. 1995); *see also Lavan*, 10 F. Supp. 2d at 388.  On the first factor, the Second Circuit has noted:

First, the extent of completion relates directly to the question of

14

> whether a warrant would have in fact issued; ultimate discovery
> would obviously be more likely if a warrant is actually obtained.
> Second, it informs the determination of whether the same evidence
> would have been discovered pursuant to the warrant.  If the process
> of obtaining a search warrant has barely begun, for example, the
> inevitability of discovery is lessened by the probability, under all of
> the circumstances of the case, that the evidence in question would
> no longer have been at the location of the illegal search when the
> warrant actually issued.

*Cabassa*, 62 F.3d at 473.  In cases where a warrant did in fact ultimately issue on probable cause,

courts in this Circuit have generally found that discovery was inevitable even given a prior

unlawful entry.  *Compare, e.g., Whitehorn*, 829 F.2d at 1232-33 (inevitable discovery where

warrant later issued); *United States* v. *Moldofsky*, No. 00-CR-388 (RPP), 2000 WL 1818564, at

*7 (S.D.N.Y. 2000) (same), *with Cabassa*, 62 F.3d at 473 (discovery not inevitable where "[i]n

the instant matter, unlike *Whitehorn*, the government never actually obtained a warrant").

In this case, the Government eventually obtained search warrants for the contents of the

Mercedes, including any locked and closed containers therein, and for the cellular telephones

seized from all of the defendants upon their arrest on January 19, 2012.  Thus, it is evident that

the Government would have been able to search the contents of the Barrett Cellphone whether it

had simply remained inside the Mercedes at the Precinct until the search warrant was executed,

or whether it had been returned to Barrett on January 9, 2012 and seized upon his arrest ten days

later.

### D.     Dore and Brown Consented to the Search of the Carpenter Avenue Apartment

The circumstances of the agents' encounter with Dore and Brown demonstrate

that both gave their voluntary consent, and a reasonable person would have understood that, for the agents to search the bedroom in the Carpenter Ave. Apartment that was shared by the two.[8]

In addition, both Dore's and Brown's continuing conduct throughout the agents' search indicates that neither ever changed their minds, sought to stop the search, or sought to limit the scope of the search in any way.  That continuing conduct, in addition to the initial verbal consent, provides further evidence that consent for the search was given, and that it was voluntary.

Both Special Agent Zeppieri and Deputy United States Marshal Dundon testified that Dore gave clear consent for the search of the bedroom he and Brown occupied within the Carpenter Ave. Apartment.  Both testified that, a short time after Dore's arrest, Agent Zeppieri read Dore his *Miranda* rights, and then asked Dore whether there were any dangerous items around, such as guns or drugs, and whether "we could look around."  (Tr. 69-70, 87-88 (Zeppieri); 97 (Dundon)).  Dore immediately agreed.  (*Id*.).  Agent Zeppieri testified that he also posed the same questions to Brown, and that she also agreed that the agents could "look around." (Tr. 71, 89 (Zeppieri)).  From this exchange, a reasonable person would have understood that the agents could search the apartment, and that the consent for a search included at least the places where dangerous items, such as guns or drugs, might be found.   Because "guns," "drugs," and "dangerous items" were the specific objects of Agent Zeppieri's inquiry, and because both Dore and Brown agreed, without limitation, that the agents could look around, it is reasonable for the agents to have understood that they could look anywhere in the apartment where those items could be found, including conducting a complete search of the bedroom shared by Dore and

---

[8]  Based on the further evidence presented by Dore at the hearing, the Government agrees that Dore has standing to challenge the search of the Carpenter Ave. Apartment.

Brown.  *See United States* v. *Padilla*, 986 F. Supp. 163, 169 (S.D.N.Y. 1997) (SAS) (where

defendant says to agents that they can "look anywhere, you will see there is no drugs, there is no

guns" the defendant indicated consent to search the apartment for guns and drugs).

Although these verbal exchanges with Dore and Brown when the agents initially entered

the apartment were somewhat brief and informal, these verbal exchanges were sufficient to

indicate consent; there are no particular words or phrases that are required to communicate

consent.  Here, neither Dore nor Brown did or said anything indicating that they hesitated before

consenting to the search, neither refused consent to search, and neither placed any limit on the

scope of the agents' search.  Thus, both Dore's and Brown's statements, agreeing to allow the

agents to "look around," constitute valid verbal consent to search.  *See*, *e.g.*, *United States* v.

*Fuentes*, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at *5 (S.D.N.Y. Aug. 10, 2007) (finding that

defendant's "permission to 'look around,'. . . if voluntarily made, is reasonably construed as

consent to conduct a search").  Indeed, courts in this district have found consent where an

individual's oral statements were much less clear, for example, where an individual did not even

verbally indicate consent but only implicitly gave consent through his actions.  *See*, *e.g.*, *United*

*States* v. *Carreno-Arias*, No. 02 Cr. 885 (WHP), 2002 WL 31890949, at *5 (S.D.N.Y. Dec. 27,

2002) (defendant's consent valid where agents asked if they could "look around" and defendant

opened door, let agents in, and did not object); *United States* v. *Lee*, No. 96 Cr. 299 (RPP), 1996

WL 391877, at *3-4 (S.D.N.Y. July 12, 1996) (where defendant does not verbally indicate

consent but hands shopping bag to agents, defendant has given consent for search of the shopping

bag).  Nor does the fact that the agents did not ask Dore for written consent change this result.

"[I]t is of no significance that [the defendant's] consent to search was oral and not written."

*United States* v. *Anderson*, No. S1 04 Cr. 1131 (JFK), 2005 WL 497778, *3 (S.D.N.Y. Mar. 3, 2005).

Moreover, after the initial conversation with Agent Zeppieri, both Dore and Brown were present within the small apartment for the approximately ten to fifteen minutes that it took the agents to complete the search, and neither Dore nor Brown raised any objection to the ongoing search or sought to limit it in any way.   (Tr. 72-73 (Zeppieri); 115 (Brown)). Indeed, even after the search was completed, Brown allowed Agent Zeppieri to have further access to her personal items; she provided access to the files on her laptop computer and she provided Agent Zeppieri with the password for her personal cellphone.  (Tr. 73-74 (Zeppieri); 116-117 (Brown)).  Thus, the evidence at the hearing demonstrated that Brown not only initially consented to the search and did not object to the search while it was ongoing, but that she even provided further information, including access to her computer and her cellphone password, in order to allow the agents to conduct an even more detailed search.  Brown's conduct in continuing to allow the agents access to these items further indicates her ongoing consent to the entire search process.

Balanced against the sworn testimony of two witnesses demonstrating that both Dore and Brown consented to search of the Carpenter Ave. Apartment, Dore has presented the testimony of Brown, through both a written affidavit and live testimony at the hearing, in which Brown asserts that she did not give consent for the agents to search her apartment and that she did not hear Dore do so either.  As an initial matter, it is notable that Dore did not testify or submit an affidavit in support of his suppression motion.  Instead, he rests his motion on the factual assertions made by his girlfriend, Janiel Brown.  Although Brown testified that neither she nor

18

Dore consented to the search of the Carpenter Avenue Apartment, her testimony is not credible in light of the testimony to the contrary by Agent Zeppieri and Deputy United States Marshal Dundon.

The testimony of the two sworn law enforcement witnesses (Agent Zeppieri and Deputy United States Marshal Dundon) was credible in all respects and these two witnesses were consistent with each other on all material issues.  First, both witnesses testified in a candid and straightforward manner.  It is clear from their testimony that both agents, who have each been employed in federal law enforcement for more than ten years, conducted the arrest of Dore and the search of the Carpenter Ave. Apartment in a professional manner, and Dore does not allege otherwise.  (Tr. 49 (Zeppieri); 92 (Dundon)).  Neither of the agents has any motive to testify less than credibly in this case.  One of the agents, Deputy United States Marshal Dundon, was only present to assist the ATF agents with Dore's arrest that day and did not have any continuing role with respect to the investigation of Dore after the day of his arrest.  (Tr. 92-93 (Dundon)). Second, the testimony of both witnesses was entirely consistent with each other as to all material issues, including their description of Dore's arrest, the fact that he was read his *Miranda* rights by Agent Zeppieri, and the oral exchange between Agent Zeppieri and Dore indicating Dore's consent for the search.

Balanced against that testimony, Dore has offered only the testimony of Janiel Brown. Brown's testimony should not be credited, because it is inconsistent with the weight of the other evidence at the hearing and because she has a strong motive to provide false testimony in this case.

As an initial matter, Brown's testimony that she never heard Dore give consent for the

agents to search should be entitled to little weight.  It is not clear that Brown was even in a

position to hear, or that she did overhear every statement exchanged between Dore and Agent

Zeppieri.  At the time when Agent Zeppieri asked Dore for permission to look around the

apartment, Dore was standing near the top of the stairs, at the entryway to the apartment, while

Brown was in the kitchen.  (Tr. 69-70 (Zeppieri); 97-98 (Dundon)).  Although all witnesses

testified that the apartment was a relatively small one, with a short distance between those two

locations, there was a lot of activity going on inside the apartment at that time.  There were at

least four occupants present, there were at least six agents present, and the agents inside had just

completed conducting a security sweep, all of which likely resulted in some noise and confusion.

(Tr. 68-69 (Zeppieri); 96-97 (Dundon)).  Accordingly, the evidence makes clear that Brown was

not necessarily in a good position to overhear every word spoken between Agent Zeppieri and

Dore, and she may have missed the brief verbal exchange indicating Dore's consent for the

search.

       In addition, Brown's testimony at the hearing should not be credited because it is

inconsistent with the testimony of both agents on the subject of the verbal consent.  With respect

to her own statements on the day of the arrest, Brown admits that an agent asked her whether

there was anything illegal inside the apartment, but that she was never asked if the agents could

look around the apartment.  (Tr. 113-114 (Brown)).  With respect to Dore's statements, Brown

stated that she was within "arm's reach" of Dore while the agents were talking to him and that

she never heard them ask Dore for permission to search the apartment.  (Tr. 109 (Brown)).

Brown's testimony is directly contradicted by the testimony of both law enforcement agents,

which was consistent with each other in all material respects, and her testimony should not be credited on this basis.

In addition, Brown has a strong motive to give false testimony here.  Brown described her relationship with Dore as a "pretty close" personal relationship and described Dore as her "partner."  (Tr. 117-118 (Brown)).  Brown and Dore have been dating for approximately ten months, they are still dating now, and they shared the room in the Carpenter Ave. Apartment. (Tr. 111 (Brown)).  Brown understands that Dore is potentially facing a long jail sentence as a result of the charges in this case, she understands that he is charged with other individuals who she knows to be his associates, and, indeed, Dore has been detained on these charges since January 2012.  (Tr. 117-118 (Brown)).  Where, as here, a witness has a close personal relationship with the defendant, the credibility of her testimony "must be viewed in light of [her] motivation in the case."  *United States* v. *Harris*, No. 11 Cr. 92 (RPP), 2011 WL 3273241, at *12 (S.D.N.Y. July 27, 2011) (finding testimony of defendant's friend less credible and entitled to less weight than that of law enforcement witnesses, because the friend "has a motivation to assist his friend in evading prosecution by testifying in his favor"); *United States* v. *Thomson*, No. 10 Cr. 94 (JSR), 2010 WL 3069668, at *3 (S.D.N.Y. July 29, 2010) (finding testimony of defendant's brother not credible based on his guarded and evasive responses to questioning and his "obvious motive to say that he did not consent to the officers' entry, as testifying to the contrary would aid the Government's prosecution of his older brother").  Taken together, Brown's close personal relationship with Dore, coupled with her understanding that he potentially faces serious charges and a long jail sentence give her a motive to testify falsely here in order to help Dore prevail on his suppression motion.

21

## Conclusion

For the reasons stated above, the Court should deny the defendants' motions to suppress.

Dated: New York, New York
June 15, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     s/   Amy Lester
Amy Lester
Jessica A. Masella
Assistant United States Attorneys
(212) 637-2416/2288

22

<u>CERTIFICATE OF SERVICE</u>

AMY LESTER deposes and says that she is employed in the Office of the United States

Attorney for the Southern District of New York.

That on June 15, 2012, she caused to be served a copy of the foregoing Government's

Post-Hearing Memorandum of Law in Further Opposition to Defendants' Motions to Suppress,

by filing it via the Electronic Case Filing system.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Executed on:   New York, New York
                June 15, 2012


                                                    s/ Amy Lester
                                            Amy Lester