```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                        12 Cr. 45 (RJS)

 5   FAHD HUSSAIN,
     JERMAINE DORE,
 6   DWAYNE BARRETT,
     TAIJAY TODD,
 7   TAMESHWAR SINGH,
                                          Conference
 8              Defendants.

 9   ------------------------------x

10                                        New York, N.Y.
                                          October 24, 2012
11                                        3:30 p.m.

12   Before:

13          HON. RICHARD J. SULLIVAN

14
                                          District Judge
15

16          APPEARANCES

17

     PREET BHARARA
18        United States Attorney for the
          Southern District of New York
19   MICHAEL D. MAIMIN
     JESSICA A. MASELLA
20        Assistant United States Attorneys

21

     RONALD L. GARNETT
22        Attorney for Defendant Hussein

23

     ALICE L. FONTIER
24        Attorney for Defendant Dore

25

     JAMES M. ROTH
```

1          Attorney for Defendant Barrett

2

STEVEN BRILL
3          Attorney for Defendant Todd

4

GEORGE VOMVOLAKIS
5          Attorney for Defendant Singh

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE CLERK:  For the government?

3          MR. MAIMIN:  Michael Maimin and Jessica Masella for

4    the government.  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          For defendants, we will start with Mr. Hussain.

7          MR. GARNETT:  Your Honor, I was informed by the

8    marshals at 3:30 that my client had refused to come to the

9    court today.

10          THE COURT:  Yes, I have been advised of the same

11    thing.

12          MR. GARNETT:  Ronald L. Garnett for Mr. Fahd Hussain.

13          THE COURT:  Good afternoon to you, Mr. Garnett.  We'll

14    talk about that in a moment.

15          For the next defendant, Mr. Jermaine Dore.

16          MS. FONTIER:  Good afternoon, your Honor.  Alice

17    Fontier on behalf of Mr. Dore, who is also in custody but not

18    present today.

19          THE COURT:  The word that I have is that he refused to

20    leave his cell to come to today's court appearance.

21          MS. FONTIER:  I was informed of the same by the

22    marshals, your Honor.

23          THE COURT:  Good afternoon to you, Ms. Fontier.

24          Next, Dwayne Barrett.

25          MR. ROTH:  Mr. Barrett is here with me, James Roth.

4

 1           THE COURT:  Mr. Roth, good to see you.  Mr. Barrett.

 2    Good afternoon.  Mr. Roth, you have shaved your mustache.  It

 3    was a long time you had that mustache.  You look very handsome.

 4           MR. ROTH:  Thank you.

 5           THE COURT:  Next we have Mr. Todd.

 6           MR. BRILL:  Judge, good afternoon.  Sullivan & Brill

 7    by Steven Brill for Mr. Todd.

 8           THE COURT:  Mr. Todd, good afternoon to you.

 9           DEFENDANT TODD:  Good afternoon.

10           THE COURT:  Finally, we have Mr. Singh.

11           MR. VOMVOLAKIS:  George Vomvolakis for Mr. Singh.  Mr.

12    Singh is here seated to my left.

13           THE COURT:  Mr. Vomvolakis and Mr. Singh, good

14    afternoon.

15           DEFENDANT SINGH:  Good afternoon, your Honor.

16           THE COURT:  We are here in connection with defense

17    motions.  Two motions have been made, motions by Mr. Dore and

18    Mr. Singh.  The nonpresence of Mr. Hussain I don't think poses

19    much of a problem, since he didn't have a motion anyway.  He

20    should be here.

21           Next time if this happens I guess I will issue a force

22    order that requires the marshals to put on all that gear and go

23    out and bring somebody here.  People have to be here.  You

24    can't just not show up.  Hopefully it doesn't get to that

25    point.  I don't think the nonpresence of Mr. Hussain should

1    prevent us from doing anything.

2          I'm not sure that the nonpresence of Mr. Dore poses

3    any more of a problem.  It's his motion, but we are here to

4    resolve a purely legal issue.  I think the statute or the rule,

5    Rule 43 of the Federal Rules of Criminal Procedure, doesn't

6    require a defendant to be present where the conference or

7    hearing is on a legal question.  The motions here are legal in

8    nature.  That is my view.  It is certainly my intention to go

9    forward with those motions and to rule on them today.

10          Do you have a different view, Ms. Fontier?

11          MS. FONTIER:  Not entirely, your Honor.  The reason I

12    didn't file a reply is because I tried to find a way around the

13    standing issue.  The question of whether Mr. Dore would file an

14    affidavit or not is not entirely a question of law and one that

15    I am not necessarily comfortable saying, without him here, that

16    he absolutely does not want to do that.

17          THE COURT:  The time to file motions has come and

18    gone.  I set a schedule.  I don't think that a defendant, or

19    anybody, is free to just sort of say now I'm going to decide to

20    engage.  We'll talk about that motion more, but I think we are

21    under law fine with proceeding.  Does the government have a

22    different view?

23          MR. MAIMIN:  Your Honor, we do not believe that there

24    are any factual disputes, at least certainly with respect to

25    Mr. Dore's motion.  Should any arise during argument that leads

1    to some sort of factual issue, at that point we can reevaluate

2    whether we should proceed.

3         I agree with your Honor.  I understand Ms. Fontier's

4    statement that if she wants to seek leave to file in the

5    future, she doesn't want to make that request now.  But that is

6    a request that she could make in the future and, as your Honor

7    pointed out, of course, it is entirely within the Court's

8    discretion whether to grant such leave or to hold the parties

9    to the motion schedule previously established.

10        THE COURT:  Rule 43 says that there are certain

11   instances where a defendant's presence is required.  Those

12   include the initial appearance, the initial arraignment, and

13   the plea, every trial stage, including jury impanelment and the

14   return of the verdict.  I'm not sure that a pretrial conference

15   counts as a trial stage.  And then sentencing.  Arguably, it is

16   not required under 43(a).

17        If this is considered trial stage, there nevertheless

18   is an exception recognized for waiver.  "A defendant who was

19   initially present at trial waives the right to be present under

20   the following circumstances:  When the defendant is voluntarily

21   absent after the trial has begun."

22        If we are considering pretrial conferences a stage of

23   trial and the defendants have declined to come out of their

24   jail cells, I think that would constitute a waiver.  But I

25   don't think we even need to get there, frankly.

1          MR. MAIMIN:  Just to add for the record, I believe

2     there is another carve-out in Rule 43 that a defendant's

3     presence is not required for conferences or matters where only

4     legal issues will be decided.

5          THE COURT:  That one I have already relied on.  That

6     applies here regardless.  I think we are fine with proceeding.

7     I don't want to beat this to death.  The defendants who are

8     here, thank you, for taking this seriously.  I wouldn't think I

9     would have to tell you that.  I try to treat you all

10    courteously and I appreciate it when you do the same for me.

11         Defendants who don't show up or who persistently

12    require the Court to deal with things like this, if we ever get

13    to a point where there is a sentencing, I think these are

14    relevant factors to consider.  This is neither here nor there

15    now.  Each of the defendants is presumed innocent and we are

16    going to proceed to trial in December.

17         Let's deal with the motions.  The first motion is a

18    motion from Mr. Dore to suppress the historical cell site

19    evidence that was collected in the case.  Ms. Fontier, I

20    reviewed your brief, the government response.  Is there

21    anything else you would like to say?  I'm happy to hear from

22    you if you would like.

23         MS. FONTIER:  No, your Honor.  Again, I do think that

24    the standing issue is a legitimate concern.  An affidavit was

25    not filed.  But I do stand by the legal background of it, and I

8

1    do believe that in this case, because of the scope of the cell

2    site evidence that was obtained well over a year, that it goes

3    into the search and they should have had probable cause for

4    this, which they did not.

5            I also would note that the affidavit that was filed,

6    even under the Stored Communications Act, the SCA, is to my

7    mind wholly deficient.  It is a conclusion.  They essentially

8    say there are crimes, there were phones, we want to have this

9    information, it will help us.  There is nothing else outside of

10   that to tie Mr. Dore to any of these offenses.

11           I don't think it even meets the specific and

12   articulable facts.  I do stand by that.  I would hope that your

13   Honor would actually decide those issues outside of the

14   standing question.

15           THE COURT:  Thank you.

16           Any response from the government?

17           MR. MAIMIN:  Very briefly, your Honor.  In light of

18   the apparent concession on the standing issue, I don't think

19   that it is necessary to go into anything else, which would

20   fundamentally be academic in the circumstances.

21           THE COURT:  I am an academic.  I teach.

22           MR. MAIMIN:  That's true, as do I, although my

23   students may disagree as to whether I'm an academic.  In light

24   of that, unless your Honor would like further discussion of

25   other things, I think it is so rapidly dealt with by the

9

Caghusc

 1    standing issue that there is no need to take further time with

 2    the Court.

 3         THE COURT:  I'm prepared to rule.  I think the first

 4    issue is the standing issue.  The defendant has the burden of

 5    establishing standing.  That burden is met only by submitting

 6    an affidavit either from the defendant or someone else with

 7    personal knowledge.  That is the case law, and this is quite

 8    clear from the circuit and throughout the district.  <u>United</u>

 9    <u>States v. Watson</u>, 404 F.3d 163 is but one example.

10         The defendant cannot simply rely on the government's

11    arguments or expected proof to establish that he owned or used

12    the phones.  Here Mr. Dore has not submitted an affidavit

13    averring that the phones at issue were his or that he had a

14    subjective expectation of privacy in the historical cell site

15    evidence related to those phones.

16         Two of those phones have no subscriber information.

17    The third has a different subscriber information, which appears

18    to be false, which would appear to weigh against any subjective

19    expectation of privacy.  The absence of any affidavit to the

20    contrary, I am prepared to find that there is a lack of

21    standing and the motion should be therefore denied.

22         The constitutional arguments I think are interesting

23    ones.  The argument is that the act is unconstitutional as

24    applied in this case.  I am, frankly, persuaded by the

25    reasoning of the district court in the District of Maryland in

1   the case of <u>United States v. Graham</u>, 846 F.Supp.2d 384, which I

2   think comes out a little differently than some of the Eastern

3   District cases.

4        I think the arguments relied on by Dore are really

5   focused not on the law as it currently stands but really on

6   arguments that are perhaps evolving as a result of concurrence

7   in the <u>United States v. Jones</u>, which was decided last term.

8   But I don't think the Supreme Court has gotten there yet.  The

9   Supreme Court in <u>Jones</u> certainly did not adopt the mosaic

10  theory upon which the D.C. Circuit relies in the lower case,

11  <u>United States v. Maynard</u>.

12       Even assuming that that mosaic theory is a valid

13  theory, I don't think it applies to historical cell site

14  information.  I think there is a real distinction to be made

15  between GPS monitoring, which is what was at issue in the D.C.

16  Circuit case, and historical cell site information.  One is, I

17  think, far more intrusive than the other.  I think expanding

18  the mosaic theory to include cell site information of the sort

19  that is at issue here would be overly broad, I don't think it

20  is justified, and I'm certainly not prepared to do it.

21       In addition, the issue of third-party disclosure I

22  think also eliminates any reasonable expectation of privacy.

23  This is a situation where these are cell site records that are

24  voluntarily disclosed to the phone company.  A customer has no

25  reasonable expectation of privacy in business records held by a

Cachuse
11

third party.  That is the Supreme Court in <u>Smith v. Maryland</u>,

442 U.S. 735.

Here the government obtained the cell site data from a

third-party provider, very different than the <u>Jones</u> case that

was decided last term in the Supreme Court, where the

government affixed the GPS device on the vehicle, in essence

trespassing.  That is what Justice Scalia went off on, the fact

that there was a physical trespass, a physical intrusion.

There was no physical intrusion here.  The government simply

asked T-Mobile to produce the business records, and that's what

ended up happening.

With respect to the length of time that was at issue

here, Ms. Fontier mentions that it was over a year that the

cell site orders were in effect.  I guess it was November 2010

to January 2012, 438 days I think.  The government argues that

the results with respect to the Dore phones were more limited

and covered a period of only 86 days.  I think there is

something to be said for that argument.  <u>United States v. Caro</u>,

468 U.S. 705, 712, the Supreme Court back in the '80s focused

on the actual as opposed to the potential invasions of privacy

for Fourth Amendment purposes.  So I think I'd be inclined to

agree with that.

In any event, I think the good faith exception to the

warrant requirement would apply.  The weight of judicial

authority holds that section 2703(d) may be used to compel cell

1   site records possessed by a third-party provider without

2   intruding on the Fourth Amendment.

3        Another issue raised was with respect to whether the

4   historical cell site evidence was sufficient to satisfy the

5   specific and articulable facts test under the Stored

6   Communications Act, whether the affidavit was.  I think it is

7   worth noting that the exclusionary rule does not apply to

8   alleged violations of section 2703(d).

9        Section 2708 says, "The remedies and sanctions

10  described in this chapter are the only judicial remedies and

11  sanctions for nonconstitutional violations of this chapter."

12  Then, the Stored Communications Act offers remedies and

13  sanctions of the following sort:  Criminal sanctions, civil

14  causes of action, and administrative discipline.  It does not

15  provide for suppression as a remedy.  I think that alone would

16  make suppression improper.  Either way, I think the specific

17  and articulable fact standard is certainly less than probable

18  cause, though other judges I guess have argued otherwise,

19  perhaps in dicta.

20       In any event, the motion is denied.  I think standing

21  alone is a basis to get there.  Even if Mr. Dore had submitted

22  an affidavit, I think it would still be a loser.  Although,

23  given I think Justice Sotomayor's concurrence in <u>Jones</u>, who

24  knows what could happen in a couple of years, Ms. Fontier.  So

25  I commend the effort.

1          MR. ROTH:  Judge, for the record, I along with others

2     and Ms. Fontier indicated joining in the motion to the extent

3     that it was applicable.

4          THE COURT:  Yes.  I wasn't clear how it was

5     applicable.  You didn't submit an affidavit either, right?

6          MR. ROTH:  I think you found implicitly that Barrett

7     had standing with respect to his phone, which subsequently

8     historically cell site information was tracked from her phone

9     to his phone and vice versa.  I think you held that he had

10    standing that the phone was taken from him on the day that he

11    was brought into the precinct, not taken from him but from the

12    car, in your ruling.

13         THE COURT:  Has he submitted an affidavit indicating

14    that is his phone, that he has a private ownership interest an

15    expectation of privacy in the phone?  Am I missing something?

16         MR. ROTH:  No.  That was the phone that your Honor

17    ruled he gave to consent to, and I thought implicit in that

18    ruling -- he did do an affidavit in conjunction with the

19    earlier suppression hearing when he said there was a phone

20    taken from the Mercedes that he was driving.

21         THE COURT:  I guess the second half of my ruling

22    covers Mr. Barrett.

23         MR. ROTH:  Yes, I understand.

24         THE COURT:  Maybe I didn't connect the dots.  Did you

25    connect the dots, Mr. Maimin?

```
 1              MR. MAIMIN:  I'm afraid that I did not connect the

 2    dots, and I haven't looked at that affidavit.  I think in

 3    addition it would have to say not only was it his phone but

 4    also aver a subjective interest in the data stored by T—Mobile

 5    or whichever phone company that phone was attached to.  But I

 6    think again, to beat on a word, it's academic in light of the

 7    second part of your Honor's ruling.

 8              THE COURT:  I think you agree with that.

 9              MR. ROTH:  Yes.

10              THE COURT:  The second part.

11         The next motion is Mr. Singh's motion.  Mr. Singh has

12    requested severance.  He is concerned about prejudicial

13    spillover, spillover that would be sufficiently severe to

14    outweigh the judicial economy that would be realized by trying

15    the co-conspirators together.  Mr. Vomvolakis, I'm happy to

16    hear from you if there is anything you would like to say beyond

17    what is in your papers.

18              MR. VOMVOLAKIS:  No, Judge.  We are going to rely on

19    our submission.

20              THE COURT:  Does the government have anything they

21    would like to add?

22              MS. MASELLA:  Nothing to add, your Honor, unless the

23    Court has any questions.

24              THE COURT:  I think it is fairly straightforward.

25    Motions of this sort get made frequently, and I can understand
```

1   why they get made.  But it is a high standard.  Mr. Singh is

2   charged with acting with all the other defendants in a single

3   conspiracy, a single robbery conspiracy count, as well as

4   related violations of 924(c) gun counts related to the robbery

5   conspiracy.

6          I think the law is very clear that evidence of a

7   larger conspiracy in which Mr. Singh participated would not

8   constitute prejudicial spillover.  It's one conspiracy.  The

9   case frequently cited for that proposition is a Second Circuit

10  case, United States v. Rosa, 11 F.3d 315, 341.

11         Mr. Singh relies on an insider trading case, United

12  States v. McDermott, where the Second Circuit reversed the

13  conviction of a defendant for conspiracy to commit insider

14  trading because there was "no record evidence suggesting that

15  McDermott's agreement with the tippee encompassed a broader

16  scope than the two of them."  That's McDermott, 245 F.3d 133,

17  138.  I think the cases are readily distinguishable.

18         Here there is I think clearly sufficient evidence to

19  demonstrate the existence of a conspiracy.  McDermott basically

20  changed or altered the then-existing law with respect to an

21  insider trading conspiracy.  But here we have a very different

22  conspiracy alleged.  It's a robbery conspiracy that is set

23  forth, existed over a period of time with multiple members who

24  engaged in multiple robberies.  I think it is a readily

25  distinguishable case.

1         To prove a single conspiracy, the government needs

2    only to show that the defendants agreed to participate in what

3    they knew to be a collective venture toward a common goal.

4    That's <u>United States v. Washington</u>, 48 F.3d 78, 80.

5         That agreement may be tacit rather than explicit, and

6    the government need not show that a particular defendant was

7    aware of all the contours of the conspiracy or all of the other

8    co-conspirators so long as they agreed on the essential nature

9    of the plan.  That's <u>United States v. Maldonado Rivera</u>, 922

10   F.3d 934, 963, all Second Circuit cases.

11        Where there is sufficient evidence to show the

12   existence of a conspiracy, the government is entitled to show

13   the entire range of evidence of the conspiracy against each

14   defendant.  That's a quote from <u>United States v. Nersesian</u>, 824

15   F.2d 1294, 1304.

16        A single conspiracy is not transformed into multiple

17   conspiracies merely by virtue of the fact that it may involve

18   two or more phases or spheres of operation so long as there is

19   sufficient proof of mutual dependence and assistance.

20        Here Mr. Singh is alleged to have participated in

21   carrying out at least one of the robberies described as an

22   overt act in Count One, is alleged to have been involved in the

23   planning, surveillance, and gathering of information in

24   connection with the robberies carried out by the robbery crew.

25   It seems to me that that is sufficient to make it appropriate

1    for all the defendants to be tried together.

2             I don't think Mr. Singh would be unduly prejudiced by

3    a joint trial in which the other conspirators were involved in

4    further crimes.  The law is clear that differing levels of

5    culpability and proof are inevitable.  It is not unusual in a

6    multidefendant trial.  And standing alone, that is not a

7    sufficient basis for a separate trial.

8             In addition, judicial efficiency, which is something

9    the Court should weigh, I think in this case weighs strongly in

10   favor of trying the defendants together.  Multiple trials would

11   involve significant duplication of efforts, would burden the

12   Court, would burden the parties.  In a court system that is

13   stretched to the limit, that would be inappropriate.  I think

14   the burden on victim witnesses would also be severe.  This is a

15   Hobbs Act robbery conspiracy, so victims would have to testify

16   multiple times.

17            I also think that a limiting instruction would be

18   sufficient to cure any problems with respect to acts that were

19   engaged in by some co-conspirators but not by Mr. Singh.  I'll

20   certainly entertain if there is an appropriate limiting

21   instruction during the trial or before the trial.

22            I don't think the posed argument that Mr. Singh has an

23   interest in a speedy trial that compels his severance is

24   appropriate where we have trial scheduled for December.  I

25   think we are barely a month away.

1          So I am going to deny the motion respectfully with

2     respect to Mr. Singh's request for a severance.

3          That handles the pretrial motions.  Well, the ones I

4     have.  I still may be getting motions or submissions with

5     respect to Mr. Todd's motions.  I have already set a separate

6     schedule for that.

7          MR. BRILL:  That's right.

8          THE COURT:  Is there anything else we should be

9     covering today?

10         MR. MAIMIN:  Just so we and defense counsel know, with

11    respect to Mr. Todd's motions, assuming there are submissions

12    and those go forward, will your Honor want all defendants here

13    or just Mr. Todd for oral argument?

14         THE COURT:  I think just Mr. Todd.  I scheduled this

15    conference with everybody because it had been a while since we

16    had all been together and I don't like it to go long.  I wanted

17    to make sure everybody was here, recognizing perhaps that some

18    defendants would not be making motions.  With respect to Mr.

19    Todd's motion, though, I think there is no need to pull

20    everybody back.  Anyone who wants to come would be welcome to

21    come.  We haven't scheduled that.

22         MR. MAIMIN:  I want to say that's November 7th.

23         THE COURT:  I think that's right.  If there is going

24    to be a hearing, we may need to tweak that, right?

25         MR. MAIMIN:  That's right.  Although right now our

1   intent, if those motions go forward, we think that it is likely

2   that we would concede to a hearing on one of the issues and

3   object to a hearing on another issue, which would limit the

4   length of the hearing.

5           THE COURT:  I scheduled it for 4:30 on a Wednesday.

6   We have to decide.  I'm going to need guidance from you folks

7   on this, whether an hour, an hour and 15 minutes tops is going

8   to be enough time to hold a hearing on the disputed issue.

9           MR. MAIMIN:  We will put into our papers how many

10  witnesses we expect.

11          THE COURT:  Mr. Brill, focus on that as well.  I'm not

12  sure if you're planning to call witnesses, but you have a sense

13  that you will want to cross some of these folks and you may

14  want to call some of your own people.

15          MR. BRILL:  Yes.  When we were discussing the date and

16  your Honor was gracious enough to grant me some time, we did

17  take into consideration that the witnesses would appear.

18  Frankly, I thought it was 3:30 and that we would have time.

19          THE COURT:  I have a trial going that week.

20          MR. BRILL:  All right.  Whenever the Court is able,

21  I'm prepared to engage in that hearing.  I did let the

22  government know that there is at least one witness that I

23  intend to call.  They are aware of her.  In fact, she submitted

24  an affirmation to the original motions.

25          THE COURT:  I haven't looked at the submission since

1    we last met.  Am I still awaiting a reply?

2              MR. BRILL:  I don't think so.  I just want to make

3    clear.  The government has said if the submissions go forward.

4    Just so I'm clear, I'm only a week into this, but my

5    understanding is that Ms. Bank did indeed file pretrial motions

6    with respect to the suppression of a cell phone that was

7    allegedly found in Mr. Todd's home and in addition post-arrest

8    statements that occurred subsequent to the arrest.  My feeling,

9    and I've told this to the government, is that I stand by those

10   motions and I'm prepared to move forward with the submissions.

11             THE COURT:  You haven't responded yet, right?

12             MR. MAIMIN:  We have not responded yet.  As part of

13   the adjournment, your Honor adjourned the submission schedule.

14   The only reason I'm saying that is because Mr. Brill was new to

15   the case.  I never want to presume what he is going to decide

16   to do.

17             THE COURT:  Thank you.

18             MR. BRILL:  I appreciate that.

19             THE COURT:  Your response and your reply.  Tell me

20   what you think we're going to need in terms of the hearing.  I

21   think 4:30 might be cutting it pretty close.  If we need to

22   find another day with a larger block of time, we'll have to try

23   to do that.

24             MR. BRILL:  That may make sense.

25             THE COURT:  I'll wait to see what I get from you and

 1    then we will be in touch.  None of the other defendants have to

 2    come, but you're welcome to come.  If you want to watch that

 3    motion, that's fine with me.

 4         MR. ROTH:  My client has already accepted that

 5    invitation to come, your Honor.

 6         THE COURT:  Mr. Barrett, if you want to be there,

 7    that's fine.  It's scheduled now for November 7th at 4:30.  If

 8    that changes, we'll let Mr. Roth know and he'll let you know.

 9    Nobody else has to decide today, but you are welcome to come.

10    Just let the government know, because the government will have

11    to put in a slip.

12         Anything else you wish cover today?  Mr. Garnett?

13         MR. GARNETT:  Yes, your Honor.  It is with deep regret

14    that I bring this to the Court's attention.  It is a completely

15    failure on my part and an inconvenience, would be an

16    inconvenience to the Court and all parties.  I was well aware

17    of our trial date of December 3rd.  Through inadvertence

18    totally and exclusively my own responsibility -- a murder-for-

19    hire trial with five defendants before Judge Marrero was

20    originally scheduled for June.  Through my own inadvertence, it

21    was changed by an order of the court.  Draft by the government,

22    by the way, but endorsed by Judge Marrero.  The trial was

23    adjourned to November 26th.  It was adjourned for several

24    months because of a pregnancy of one assistant and then a death

25    in the other assistant's family, mother, I believe.

```
 1              I didn't pick up that order until I was told last week

 2      that the case was on for November 26th.  I immediately went to

 3      ECF.  It wasn't a specific order filed.  It was a letter that

 4      was endorsed by Judge Marrero adjourning the case.

 5      Unfortunately, no communication occurred between myself and

 6      other parties to the case.  I was totally unaware of it until a

 7      few days ago.

 8              This trial, the murder for hire trial, is expected to

 9      go at least three weeks, maybe four.  I discussed it with Ms.

10      Fontier.  She has reaffirmed her trial in San Diego in January

11      but suggested that it this trial might be held in the beginning

12      of the month before she has to leave.

13              THE COURT:  Beginning of January?

14              MR. GARNETT:  In January.  I did not have a chance to

15      discuss with other counsel what their schedules are, and I

16      assume that we all have schedules.  But this particular one is

17      totally and exclusively my own failure to do so.  I regret that

18      very deeply.  I'm not certain that that is sufficient to

19      overcome the problem.

20              THE COURT:  I'm not sure that it is going to be

21      possible to get everybody else on board with a date.  I will

22      tell you I have Part I duty in January.  If everybody wanted to

23      move to early January, I could see about switching my duty.

24      Otherwise, I can't do Part I and a trial.  I would have to move

25      something.
```

 1            I'm reluctant to move it given what we have talked

 2      about.  If everybody else is amenable and available for the

 3      first two weeks of January, I guess that's an option.  You

 4      don't have to decide today.  Why don't you talk it over.  I

 5      don't think there is much point in doing this now.

 6            MR. GARNETT:  The other option I was prepared to make,

 7      given that Mr. Hussain is not involved in any of the pretrial

 8      motions and has no standing on the issues which have been

 9      raised, should your Honor wish that I resign from that

10      representation because of this conflict, another attorney would

11      have sufficient time I believe in a month to prepare.

12            THE COURT:  I don't know if a month would do it.

13            Do you want to say something, Mr. Maimin?

14            MR. MAIMIN:  Yes, two things.  One is Ms. Masella and

15      I were talking to Mr. Garnett about this.  We remembered that

16      we had heard something from one of the attorneys on the Judge

17      Marrero trial about the trial possibly being adjourned.  We

18      were thinking of when it was adjourned to November 26th, if

19      there was discussion among some of the defense counsel about

20      adjourning it again.  First of all, this may end up playing

21      itself out, and we would ask to have time to go to speak to

22      them and find out.

23            THE COURT:  Why don't you guys all talk.  I know Mr.

24      Singh in particular has been anxious to get this show on the

25      road.  I don't blame him.  I'm anxious to do the same.  A month

 1  probably wouldn't kill anybody, but at the same time I'm

 2  sensitive to that request.

 3          I don't know about the other lawyers, whether that

 4  might not even be possible for them.  Why don't you folks all

 5  talk it over and see what you come up with.  If we need to talk

 6  further, send me a letter, and we can either get on the phone

 7  or I can bring you back.

 8          MR. MAIMIN:  Certainly.  Were we to go in January, I

 9  think your Honor would lose me.  As your Honor is aware, I have

10  a six-to-eight-week trial starting the first week of February.

11  I think that would probably cut it too close.

12          THE COURT:  This is going to be a two-week trial?

13          MR. MAIMIN:  That's right, your Honor.  I certainly

14  would like some time to prep for that trial.

15          THE COURT:  This may be academic anyway.  We would

16  start January 7th.  That's the first Monday in January.  It

17  might be cutting it too close for you.  Confer with each other

18  and let me know if there is a consensus or not.  Anybody who

19  wants to be heard on this can send me a letter.  I won't make

20  you do a joint letter.  Send me a letter making a request.

21          MR. ROTH:  Judge, the only other thing is we still

22  have in abeyance the issue of no death or death.

23          THE COURT:  Yes.  What is going on with that?

24  Excellent point.  Thank you.

25          MS. MASELLA:  Your Honor, I was checking in this week

1   with the folks in Washington.  They have informed me that the

2   case has moved out of the capital case unit, which is the first

3   step that ordinarily takes the longest amount of time.  It's

4   been fully signed off on and moved out of that unit.  It is now

5   in the Deputy Attorney General and Attorney General's office

6   awaiting signatures.

7           Their best estimate is that we will definitely have an

8   answer by the middle of November, although it is my

9   understanding that that is the most conservative estimate, and

10  it could come any time between now and the middle of November.

11          THE COURT:  The defendants who are in the death-

12  eligible counts are who?

13          MS. MASELLA:  Mr. Dore and Mr. Barrett.

14          THE COURT:  It's highly unlikely that there is going

15  to be a directive from the Attorney General that you should be

16  seeking the death penalty.  But if that were the case, then I

17  likely would be severing the nondeath-eligible defendants.

18  Right?

19          MS. MASELLA:  We certainly would have that discussion.

20  It would at the very minimum affect the timing because there

21  are a whole slew of other motions that become relevant.

22          THE COURT:  That would be the reason for the

23  severance.

24          MS. MASELLA:  Correct.

25          THE COURT:  Anybody who is a nondeath-eligible

 1   defendant, there is no reason why they should be waiting for

 2   that process to get resolved.  In any event, again, it might

 3   not be more than a hypothetical at this point.  You don't think

 4   there will be a final world until the middle of November?

 5          MS. MASELLA:  They told us mid November.  It is my

 6   understanding that that is the outside and that it will likely

 7   come earlier.  I will, of course, inform the Court and counsel

 8   the minute that we hear anything.  I will also periodically

 9   check on the status and let the Court and counsel know if there

10   is any change to the estimated timing.

11          THE COURT:  I don't know what to do to sort of light a

12   fire under the Attorney General or the Deputy Attorney General.

13   There are individual lives and lawyers' lives and court dockets

14   and schedule calendars that are going to require them to

15   decide.  I think they have to get out of the Washington mindset

16   and start deciding things.

17          MS. MASELLA:  I agree, your Honor.

18          THE COURT:  If you can stress that.  I'm not sure what

19   I can order anybody, but I'm going to start thinking about what

20   I can do, because this wreaks havoc on the ability to maintain

21   a docket.  I have a lot of other cases that will be affected by

22   this decision, not to mention the defendants themselves being

23   highly affected by this decision.

24          We have to be quicker.  What is the point of having a

25   speedy trial right if the government can just sort of decide to

Carosus

1    take the slow train on whether or not they are going to seek

2    certain penalties?  That's end of speech at this point.

3            Anything else we should cover today?  Let me thank the

4    marshals and thank the court reporter as well.  Have a good

5    day.  If anyone wants a transcript, you can get that.  I will

6    approve that on an expedited fashion just because it is

7    probably good to get this moving.

8            Ms. Fontier, Mr. Garnett, tell your clients that they

9    have got to show up.

10           (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25