D345dor1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           12 CR. 45 (RJS)

 5   JERMAIN DORE and DWAYNE
     BARRETT,
 6
                   Defendants.
 7
     ------------------------------x
 8

 9                                        March 4, 2013
                                          9:45 a.m.
10

11   Before:

12                   HON. RICHARD J. SULLIVAN,

13                                        District Judge

14
                         APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY
25
```

D345dor1

1          (Case called)

2          THE COURT:  Was there a problem today with clothing?

3          MS. FONTIER:  Your Honor, I am Alice Fontier on behalf

4    of Mr. Dore.  It just came to our attention that his family was

5    not able to bring him clothing so we brought clothing -- well,

6    Ms. Stafford brought clothing to Court this morning.  So, he is

7    being dressed this morning.  And I spoke to Kristin Coleman in

8    legal at MCC and she has made arrangements to make sure we can

9    bring the extra clothing to MCC at lunch today so there won't

10   be any further issues.

11         THE COURT:  All right.

12         Mr. Barrett?

13         MR. ROTH:  He is putting his tie on now.  I may have

14   to assist him, but he has his clothing.  I had it delivered to

15   MCC after a little struggle, but.

16         THE COURT:  Have a seat.

17         You can put your tie on Mr. Barrett, you don't have to

18   stop.  You can do that, okay?

19         I got something from Mr. Roth this morning asking to

20   add two names to the list of individuals and entities that

21   might be named as witnesses; is that right, Mr. Roth?

22         MR. ROTH:  Yes.

23         THE COURT:  I will add them, obviously, but I already

24   printed up all the questionnaires and there is, like, a hundred

25   of them, so.

D345dor1

1          MR. ROTH:  I apologize, your Honor.  It was just in

2     continued review of the 3500 that these names came up and in an

3     abundance of caution I wanted to add them.

4          THE COURT:  Do you think these are people whose names

5     will come up during the trial.

6          MR. ROTH:  They are people the defense may call as

7     witnesses.

8          THE COURT:  What is Rodriguez' first name?

9          MR. ROTH:  Judge, it is not indicated in the report.

10    I will endeavor to get it from the government or my own

11    resources.

12         THE COURT:  Well, this is a Sergeant Raul Rodriguez

13    from the New Rochelle Police Department.

14         MR. ROTH:  It is not him.

15         THE COURT:  Is it NYPD?

16         MR. ROTH:  Yes.

17         THE COURT:  Does the government know who this person

18    is?  I would rather not say Police Officer Rodriguez because

19    that's likely going to read lead to a lot more positive answers

20    than if we have a first name.

21         MS. MASELLA:  Your Honor, we don't know off the top of

22    our head.  We were not planning to call him as a witness.

23         THE COURT:  All right, but you have a report that you

24    have seen a reference?

25         MR. ROTH:  That they supplied to us.

D345dor1

1          THE COURT:  Can you show the government the report?

2          MR. ROTH:  Absolutely; but it doesn't have his first

3      name, it doesn't have his shield number.

4          THE COURT:  But whoever wrote the report is presumably

5      available to the government and can tell us who that person is

6      so let's do that so that I have a name that I will be reading

7      to the jury.  Okay?

8          MS. MASELLA:  Your Honor, we will have to make a quick

9      phone call.

10         THE COURT:  We can do that at the break.  I think we

11     have time before the jury gets here because on a Monday they're

12     getting oriented so they're getting information and seeing a

13     film.  They usually are not ready until a little after 10:00.

14         The other thing I wanted to cover was the timing of

15     the Daubert hearing.  So, the government sent a letter

16     indicating that their witness would be available sometime this

17     week, right?

18         MS. MASELLA:  Yes, your Honor.  I have spoken with

19     Detective Fox.  We would propose -- I mean, he is fairly

20     available during this week either in the morning or in the

21     afternoon before or after the court day.  In speaking with

22     Ms. Fontier we thought that Thursday might be best, either in

23     the morning before the jury arrives or to have them arrive a

24     little bit later, or in the afternoon and sending them home a

25     little bit earlier.  Detective Fox can do other one.

D345dor1

```
 1   Ms. Fontier has a slight preference for the afternoon but the
 2   government can do either one.
 3             THE COURT:  I'm not sure that is going to work for me.
 4   Thursday is not a great day.  Wednesday afternoon is a better
 5   day at the end of the court day.  We can finish at 5:00 I
 6   guess.
 7             How long do we think the hearing will be?
 8             MS. MASELLA:  I would anticipate that Detective Fox'
 9   direct testimony would probably be 30 to 40 minutes.
10             THE COURT:  Maybe Wednesday at 4:30.  Can we do that.
11             MS. MASELLA:  That's fine, your Honor.
12             THE COURT:  Ms. Fontier, does that work for you?
13             MS. FONTIER:  That's fine, your Honor.
14             THE COURT:  Mr. Roth?
15             MR. ROTH:  Yes.  That's fine, Judge.
16             THE COURT:  So let's, Aaron, just put that down so we
17   don't forget.
18             So let's talk about openings.  How long do you think
19   the openings are going to be?
20             MS. LESTER:  Your Honor, the government's opening will
21   be approximately 12 to 15 minutes.
22             THE COURT:  Okay.
23             And then Ms. Fontier?
24             MS. FONTIER:  It will be similar, your Honor.
25             THE COURT:  And Mr. Roth?
```

D345dor1

1              MR. ROTH:  Similar as well, Judge.

2              THE COURT:  So, then we should have no trouble getting

3    to those today, and then I presume we will be getting to some

4    witnesses today.  So, who are the first witnesses up?

5              MS. MASELLA:  Your Honor, the government will be

6    calling Jesse Singh and then two police officers, Officers

7    Villanueva and Segarra.  We provided those names to the

8    defense.

9              THE COURT:  Who are the people again?

10             MS. MASELLA:  Jesse Singh, and then Officer

11   Villanueva, Carlos; and then Officer Luis Segarra.

12             THE COURT:  And if we had openings, I don't know how

13   long it will take us to pick a jury, but if we open at 2:00 do

14   you think that will take us through the end of the day, those

15   three witnesses?

16             MS. MASELLA:  They are fairly brief, your Honor.  We

17   are prepared with additional witnesses after that if we finish

18   those as well.

19             THE COURT:  I don't know how long we are going to go

20   but I don't want to have a sort of stopping early just because

21   the government, in the first instance, mischaracterized whether

22   we would finish a particular witness.  So, make sure you are

23   being conservative in your estimates as to how long everything

24   is going to take and that you have your witnesses here and

25   ready to go.

D345dor1

1          MS. MASELLA:  Yes, your Honor.

2          THE COURT:  Any questions about jury selection?

3          MR. ROTH:  Before we get there, Judge, just two

4     outstanding matters that I was conferring with the government

5     about.

6          THE COURT:  Okay.

7          MR. ROTH:  I made a request of the government to

8     produce what has been designated in the NYPD reports as a

9     pattern file of complaining witnesses -- pattern instant file

10    from the NYPD.

11         THE COURT:  I'm not sure I'm following you.

12         MR. ROTH:  This is my understanding from the NYPD.

13    When there is a series of crimes where there is some

14    similarities either in victims or perpetrators or areas, they

15    create a file and they designate it as such while in the course

16    of the investigation of those instances or potential

17    perpetrators as they go along and investigate the case.  That

18    file number has appeared in one or more of the UF-61s and the

19    DD-5s that have been produced in this case.  I think that that

20    is something that is germane to this investigation.  It is my

21    understanding that's part of the way the investigation unfolded

22    and that witnesses who are testifying, law enforcement officers

23    in particular, may have accessed -- presumably accessed that

24    file and acted with information that was contained in that

25    file.

D345dor1

1          THE COURT:  Well, I mean, I'm not sure that that is

2      true.  I don't know what your basis for thinking that is.  I

3      mean, the fact that there is a file some place that the NYPD

4      kept doesn't necessarily make it something that should be

5      either Rule 16 discovery or Giglio impeachment 3500.  So,

6      unless there is an articulable basis for saying that it is one

7      of those, I'm not sure --

8          MR. ROTH:  It would seem to me inexplicable if a

9      detective who is investigating a series of robberies and trying

10     to make connections between the victims or the perpetrators

11     does not source that particular file that is -- concerns this

12     pattern that was ultimately solved, as the government believed,

13     in the fashion of this indictment.

14         THE COURT:  Look.  I don't know.  If the witness

15     reviewed these materials then, in connection with their

16     testimony, then I think that would obviously have to be

17     produced.

18         Are you saying something else?

19         MR. ROTH:  No, that's what I'm saying.  That's

20     specifically what I'm saying.

21         THE COURT:  I assume the government understands what

22     its obligations are with respect to 3500 Giglio impeachment

23     material.

24         MR. ROTH:  For instance, Judge, I heard today for the

25     first time that there were some lineups conducted that we do

D345dor1

1  have some information on -- not lineups, I say photo arrays,

2  where some of the people who were mentioned in that pattern act

3  file were shown, in this case, to victims.

4          So, it seems to me that it was sourced -- that file

5  was sourced in the course of this investigation by witnesses

6  who were going to testify about this investigation.

7          THE COURT:  I'm not sure if sourced is different than

8  reviewed.

9          MR. ROTH:  Reviewed.  I'm saying reviewed.  How did

10  they get the pictures to put in a photo spread?

11          THE COURT:  Well, I don't know.

12          What is the government's response?

13          MS. LESTER:  Your Honor, I think first of all it may

14  be a bit of a misnomer to be talking about a pattern file.  Our

15  understanding from speaking with NYPD is that certain cases

16  were designated as being part of a similar pattern based on

17  victimology in this case, that is, specifically a contact

18  between the victims and Fahd Hussain.  But, when Mr. Roth is

19  speaking of a file that was sourced in some way, to our

20  knowledge there is no sort of master file, rather there was an

21  indication within reports relating to specific incidents that

22  they might be part of this same pattern in that the victim had

23  a contact or a knowledge or a friendship with Fahd Hussain.

24          The one incident that Mr. Roth mentioned at the end

25  where two people who are not defendants in this case were shown

D345dor1

1    to the victims as part of photo arrays.  We did turn those

2    photo arrays over.  We will review the file to see if there are

3    any reports discussing how those individuals came to be

4    included in the arrays.  If there are such reports we will

5    certainly turn those over.  But, in terms of any other witness

6    statements or Giglio, impeachment material, the government

7    believes it has turned over everything that it is obligated to

8    turn over.

9         THE COURT:  Mr. Roth, you have teed it up.  The

10   government knows its obligations.  If there is anything that

11   the witness has reviewed in connection with their testimony,

12   you should get it.  It sounds like you will.

13        MR. ROTH:  Judge, one more thing.

14        THE COURT:  Yes.

15        MR. ROTH:  It has come to our attention in the course

16   of reviewing the 3500 material that a rather key witness,

17   Mr. Abdullah who was at the scene of the car abduction that led

18   to the homicide, was a C.I. -- my understanding is he was a

19   C.I. not just for the ATF but various other federal and state

20   law enforcement agencies for a period of over 10 years.  I had

21   made an earlier request for that.

22        THE COURT:  Request for what?

23        MR. ROTH:  Well, any Giglio that is contained within

24   that file concerning prior criminal acts of the witness who

25   will be testifying, payments made to him by the various

D345dor1

1    agencies, and it is my understanding that the government has

2    been, for some time, trying to obtain that information.  Of

3    course, we're at the point where we are opening now so

4    hopefully we will have use of it, but I have urged the

5    government to provide that as quickly as they can obtain it.  I

6    think we are entitled to it.

7              THE COURT:  Okay.

8              Government?  What is your response to that?  I assume

9    they are.  He is going to testify, he either has been paid or

10   got a break in sentencing or a non-pros or something.  I assume

11   that is going to be relevant to his testimony, right?

12             MS. LESTER:  Yes, your Honor.  Some of that

13   information is contained in the 3500 through our debriefing of

14   Mr. Abdulla but let me back up for a moment and say first of

15   all this is a victim witness, obviously he is not implicated in

16   the crime in any way although he was engaged in an illegal

17   transaction at the time of the robbery that is an untaxed

18   cigarette transaction.  We will elicit on direct that he was a

19   C.I. for several agencies including the ATF for a period of

20   time.  We have been in discussion with agencies to try to

21   review his C.I. files and gather the relevant information so

22   that we can turn it over to the defense.

23             Again, in the 3500 we have already turned over some

24   information that he has provided to us about how much money he

25   was paid and over what period of time.  But, certainly, we

D345dor1

1    understand our obligations in terms of Giglio material and we

2    are working to make that available and will turn it over as

3    soon as we have it.

4            THE COURT:  Well, I don't know when he is going to

5    testify but let's, hopefully, resolve this as quickly as we

6    can.

7            Speaking of openings, I'm not sure what the government

8    is planning to say, if anything, with respect to the expert who

9    is going to be the subject of the Daubert hearing, but if there

10   is any question we should vet that now so that there is no

11   surprises.

12           MS. LESTER:  We don't plan on mentioning the

13   ballistics at all in our opening, your Honor.

14           THE COURT:  That makes it easy.

15           Let's talk about jury selection, okay?  What I intend

16   to do is after some very brief preliminaries I will call the

17   first 36, I will put 19 in the box, I will then use the first

18   three rows, if we can get maybe the first two and a half rows

19   on my left we should be able to get at least six, probably

20   seven in those, so we will probably use three or at least two

21   and a half of those.  That's where I will put the prospective

22   jurors.  I will then ask the questions that are designed to see

23   if there are any people who need to be struck for cause.  Once

24   we have qualified all 36 then I will do the pedigree

25   information which is useful to you in exercising peremptories.

D345dor1

1   I have given the parties extra peremptories since there is two

2   defendants so 12 total for the defense, seven total for the

3   government; and then one for the government, one for the

4   defense in terms of alternates.  Okay?  We are going to have

5   three alternates for the trial.

6            Every once in a while it is necessary to have a side

7   bar or a conference in the robing room with jurors who are not

8   comfortable speaking about certain things, or my concern is

9   that they might be too comfortable speaking about certain

10  things that could potentially taint the rest of the jury.  So,

11  I mean, we can either do that in the robing room which is a

12  little tight, or we can do it at the side bar which is not

13  ideal either, but the first question is what do the defendants

14  wish to do?  If they want to be present they obviously have a

15  right to, although sometimes the concern of defense lawyers,

16  understandably, is that jurors may be less candid when a

17  defendant is right next to them in a room.

18           So, your call.  Whatever you think, but let me know if

19  we have implications for how we do this logistically.

20           (Defendants and counsel conferring)

21           MS. FONTIER:  Your Honor, Mr. Dore would waive his

22  right to be present at the side bars or in the robing room.

23           THE COURT:  And that is quite customary, Mr. Dore, so

24  that is fine.

25           MR. ROTH:  Similarly, your Honor.

D345dor1

```
 1              THE COURT:  There will be a transcript, you can see
 2      what is in there and your lawyers will keep you apprised, but
 3      that means that we can then move in and out of the robing room
 4      as needed.  We may not need to, but I think there is a chance
 5      we will need to.
 6              Anything else about jury selection?
 7              MS. MASELLA:  No, your Honor.
 8              THE COURT:  No.  All right.
 9              Defense counsel?
10              MS. FONTIER:  No, your Honor.
11              MR. ROTH:  No, your Honor.
12              THE COURT:  So, we will call down to see where they're
13      at.  In the meantime, why doesn't everybody use the rest rooms
14      because once we get going I don't want to take any breaks.
15              Mr. Dore, you are not wearing a tie which is fine, but
16      if you would like a tie I can probably get you one.  Do you
17      have a preference?
18              MR. ROTH:  I can certainly get him one at lunchtime
19      too, if he wants.
20              MS. FONTIER:  We have ties, your Honor, but the shirt
21      we have is too tight for his neck.
22              THE COURT:  You look fine.  You look quite nice.  I
23      don't think a tie is essential but I wasn't sure if you had
24      one.  I have extras if you did.  Okay?
25              MS. FONTIER:  Thank you very much though, your Honor.
```

D345dor1

1          (Pause)

2          THE COURT:  It sounds like the jury will not be ready

3     for another half hour or so, that he have just started watching

4     the video.  So, they'll call when they're on their way so for

5     now everyone can rest easy.  I'm going to go to the robing room

6     but I won't go far, okay?  Don't you go far either.

7          (Recess)

8          (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D34Wdor2

```
 1              (In open court)

 2              THE COURT:  Have a seat.

 3              I think the jury is assembling as we speak.  There are

 4     a couple of names I wanted to just make sure I understood or

 5     know how to pronounce.  The first is Dean Gjivivoch.

 6              MS. MASELLA:  That's our best guess too, your Honor.

 7              THE COURT:  George Grape.  Is it Grape, like the

 8     fruit?

 9              MS. MASELLA:  Correct.

10              THE COURT:  Ahmed Mswara, am I pronouncing that right?

11              MS. MASELLA:  Yes.

12              THE COURT:  Dr. Monica Smiddy is from the Office of

13     the City Medical Examiner.  Is that what OCME is?

14              MS. MASELLA:  Yes.

15              THE COURT:  Office of the City Medical Examiner.

16     Okay.  Those were the questions I have.

17              Any other thoughts about the names of the witnesses?

18     William Rodriguez is the police officer who was referenced this

19     morning by Mr. Roth, I'm told.  Do you agree?  You have no

20     reason to disagree, I guess.  Right?

21              MR. ROTH:  Right.

22              THE COURT:  Anything else before the jury gets here?

23              MR. ROTH:  Yes.  In the interim, the government has

24     revealed to us that Janiel Brown will be a witness, and they

25     revealed to us that there were certain ex parte conversations
```

D34Wdor2

1    in that regard, and also in regard to a protective order

2    regarding the 3500 material, in terms of, it has been turned

3    over just now --

4                   THE COURT:  Right.

5                   MR. ROTH:  -- for attorney's eyes only, and I just

6    wanted to bring it to the attention of the Court so the Court

7    could explain that to Mr. Barrett.  He's very concerned that

8    we, the lawyers, are holding something back from him.  I have

9    discussed it with him, but I have told him I can't give him

10   copies of that.  He was concerned.  That's my understanding of

11   the Court's direction.

12                  THE COURT:  I think there was correspondence, I think

13   it was late Thursday and then an ex parte conference with one

14   of the government lawyers on Friday, and, at that time, I made

15   it clear that if there were safety concerns, then those should

16   be addressed, but I wanted the witness to be disclosed as early

17   as possible and certainly in advance of openings.  So that

18   sounds like it's happened.

19                  With respect to 3500 material, that has been provided,

20   I understand.  Right?

21                  So I don't know whether we talked about or resolved an

22   attorney's-eyes-only issue or a protective order.  So if we

23   want to talk about that now, I guess we can.

24                  Are there jurors out there?  Don't let them in yet.

25                  MS. FONTIER:  Your Honor, just to clarify, obviously

D34Wdor2

1    we were informed that he would affirmatively be testifying this

2    morning, and I stated that I would agree to a protective order,

3    if that's the right words for it, but that if the government

4    would provide the 3500 material now so that I had time to

5    process it prior to the opening, that I would agree that it

6    would be for attorney's eyes only at this point, until we would

7    have any sort of further discussion and decide when I can show

8    it to Mr. Dore or if it can be given to him, a copy of him, or

9    given -- I can't speak today, which is a bad thing.  Or if I

10   may ever provide an actual copy to him.

11          But I did agree that I would, for this morning, have

12   it for attorney's eyes only.

13          THE COURT:  Maybe it's best to have the lawyers look

14   at it and if they object to the conditions that the government

15   has attached on the early disclosure of 3500 material, we can

16   take that up.  Remember that the Court can require the

17   government to produce 3500 material in advance of the cross,

18   basically, or in advance of the direct, at the conclusion of

19   the direct, but it's the usual practice to make those things

20   available sooner so defense counsel can prepare.  I haven't

21   seen it yet.  I gather it's in my binder as well.  I haven't

22   seen it.  So if there are portions of it that would be

23   disclosing sensitive information, then I think that should

24   probably be redacted and made attorney's eyes only or redacted

25   out altogether, but I'm not sure why all of it should be

D34Wdor2

<table>
<tr><td>1</td><td>attorney's eyes only, or, frankly, I'm not even sure what's in</td></tr>
</table>

1   attorney's eyes only, or, frankly, I'm not even sure what's in

2   there.

3            MR. ROTH:  I did a quick run-through right now.  I'm

4   not sure what could be sensitive.  We knew who the person is,

5   we have had contact, everything else, with her.

6            THE COURT:  Is there an objection at this point then,

7   Mr. Roth?  You're just alerting me to the possibility of

8   further discussion on the topic?

9            MR. ROTH:  Yes.

10           THE COURT:  I think that's fair.  So I don't think we

11  need to resolve anything before we bring in the jury, or even

12  before openings, necessarily.  But if you disagree, then let me

13  know.

14           Okay.  Are they here?  Not yet.  So what we're going

15  to do is we'll seat the jury.  Is there a friend or family

16  member here of the defense?

17           MR. ROTH:  Yes.  That is the family -- well, it's the

18  mother of my client's child.

19           THE COURT:  That's fine.  Okay.  She has a right to be

20  here and is very welcome to be here.  When we bring in the

21  jury, if we could ask your client's mother to sit on the back

22  bench towards the corner, just because I want to put the

23  prospective jurors in the box, in the gallery.  You certainly

24  have a right to be here.  I just want to make sure I can put

25  the jurors all next to each other.  Actually, the bench against

D34Wdor2

1   the wall, that one there, I think that's probably best.  That

2   way I can get the most jurors seated all in a row.  Thanks.

3          All right.  So once the jurors are here, my law clerk

4   will seat them.  I'll then come out and then we'll start the

5   examination of the prospective jurors.

6          Anything before I step off?  No, okay.  So let's keep

7   everybody in the courtroom.

8          MS. FONTIER:  Your Honor, I don't know if it's

9   possible, if Mr. Brown -- I'm sorry, if Mr. Dore can be taken

10  in the back and not his codefendant so I may have a chance to

11  speak privately with him.

12         THE COURT:  All right.

13         MS. FONTIER:  If that's possible, just for the moment.

14         THE COURT:  Okay.  That's fine.  Let's not bring

15  anybody in.  Let's not bring in jurors until Mr. Dore is back.

16         (Jury selection ensued)

17

18

19

20

21

22

23

24

25