D355dor1                        trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                        12 CR. 45 (RJS)

5   JERMAIN DORE and DWAYNE
    BARRETT,
6
                    Defendants.
7
    ------------------------------x
8

9                                            March 5, 2013
                                             12:40 p.m.
10

11  Before:

12                      HON. RICHARD J. SULLIVAN,

13                                           District Judge

14
                              APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  JESSICA MASELLA
         AMY LESTER
18       Assistant United States Attorneys

19  ALICE L. FONTIER
         Attorney for Defendant Dore
20       -and-
    LAW OFFICES OF YING STAFFORD
21  BY:  YING STAFFORD

22  HURWITZ, STAMPUR & ROTH
         Attorneys for Defendant Barrett
23  BY:  JAMES M. ROTH
         -and-
24  SIMON & PARTNERS, LLP
    BY:  KENNETH C. MURPHY
25

1            (Trial resumed;

2            THE COURT:  Have a seat.

3        It is now 12:40.  So, I could swear them now and then

4    give them my preliminary instructions now and then we break for

5    lunch and then we hit the ground running right after lunch with

6    the openings, or we could take an earlier lunch and then come

7    back at like 1:30 or 1:45 and I will do preliminary

8    instructions and go straight to the openings then.

9            Anybody have a preference?

10           MS. FONTIER:  The latter is my preference, and I would

11   like to raise one issue just prior to the openings.

12           THE COURT:  Yes.  Okay.  What is the issue?

13           MS. FONTIER:  Ms. Brown, Janiel Brown, who will be

14   testifying, the government alerted us to a potential area of

15   testimony that we would object to which is that at least it is

16   in her 3500 material that at a point when they were -- she

17   states that she and Mr. Dore were fighting she also stated that

18   he hit her with a broomstick at some point.  We don't believe

19   that that is relevant testimony and think it is overly

20   prejudicial and it is just not necessary at this point.

21           So, I did want to raise that issue certainly -- I

22   don't know if the government would intend to open on those

23   facts.

24           THE COURT:  Do you plan to open on that?

25           MS. LESTER:  No, your Honor.  Certainly not.

D355dor1                          trial

1        THE COURT:  We can deal with that later.  It could be

2    conceivably relevant as to bias or motive.

3        MR. ROTH:  Judge, I do have a slight horse in the race

4    because if she's going to be characterized in a certain way

5    down the road in terms of her testimony and her bias for or

6    against Mr. Dore it affects my client as well.  So, I don't

7    know if you are prepared to rule on that or if the government

8    is going to prove that up in terms of --

9        THE COURT:  Well, let's ask this question.  Is the

10   government intending to introduce testimony about this act of

11   violence -- domestic violence I guess is what it is?

12       MS. LESTER:  Yes, we are, your Honor.

13       THE COURT:  For what purpose?

14       MS. LESTER:  Your Honor, there is a series of text

15   messages between Ms. Brown and Mr. Dore.  The incident that

16   Ms. Fontier referred to where Mr. Dore hits Ms. Brown with a

17   broomstick is actually a crucial conversation between them via

18   text message in which Ms. Brown threatens to go to the police

19   because he has hit her with a broomstick.  And so, Mr. Dore

20   responds that if she does go to the police he in turn will tell

21   the police that she was his driver for robberies and he will

22   tell them about at least one specific robbery that she was

23   involved in.

24       THE COURT:  There is obviously relevance there so what

25   is the defense position?

D355dor1                              trial

1          MS. FONTIER:  Your Honor, I certainly may need to

2     review the text messages.  When I read through them it was not

3     that clear to me that that was the conversation that was being

4     had.  I don't think it goes back and forth that directly but --

5     I mean, I think that testimony could be elicited that they were

6     arguing or that they fought but I just think the violent act is

7     just overly prejudicial and doesn't actually add anything to

8     her testimony.

9          THE COURT:  Well, it certainly provides context for

10    the text, it sounds like.

11         Look.  The government is not going to open on it so I

12    think we can discuss whether or not there should be some

13    limiting of the testimony or a limiting instruction when the

14    testimony comes in.  But, I don't think we can resolve this now

15    and I do want to have the jury come back before they wonder

16    what is going on.

17         So, Mr. Roth, you are not going to open on that act of

18    domestic violence?

19         MR. ROTH:  I will not, your Honor.

20         THE COURT:  Okay.  And you are not either then, right,

21    Ms. Fontier.

22         MS. FONTIER:  No.  Certainly not, your Honor.

23         THE COURT:  So, I think it won't affect the openings.

24         So, anybody else have a preference?  I am inclined to

25    swear them now because that will make them sort of feel like

D355dor1                              trial

1   they're locked in and then we will -- then I will excuse them

2   for lunch and do preliminary instructions at 1:45.  Does that

3   sound good?  Then we will go straight to openings.

4              MS. FONTIER:  Your Honor, I don't know if your Honor

5   is planning to add it into the preliminary instructions, but

6   there are two jurors that are seated now and in the 12 who did

7   raise some serious time concerns.  So, I don't know if you are

8   going to address that or say anything.

9              THE COURT:  Well, I hadn't planned to say much of

10  anything other than trial is going to start and we are going to

11  sit four days a week for pretty full days and see where we are

12  in terms of time.  I hadn't planed to say anything other than

13  what you have seen.

14             MS. FONTIER:  Okay.

15             THE COURT:  All right.  So let's bring them in.  We

16  will swear them in and I will excuse them for lunch.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  So, we will get this down.  I think the

3    best thing to do is probably line up in order in the jury room

4    and then come in that way and that way you can sort of quickly

5    hit your seats without climbing all over each other.  It is a

6    little tight in there, especially with the monitors, but you

7    will figure that out.  And I think generally when you come in,

8    come in along the window and then come in through the doors

9    that way.  There is another door closer to the window.  It is

10   easier, you don't have to pass through as many people.  Okay?

11             So, what we are going to do now is I'm going to have

12   you take your oath as jurors so I'm going to ask you all to

13   stand and raise your right hands.

14             (Jury of 12 and 3 alternates was impaneled and sworn)

15             THE COURT:  So, what we are going to do now is I'm

16   going to excuse you for lunch.  You are now the jury so this is

17   the real deal.  It took us a little while to pick a jury but it

18   was an important process and fair process so now you are jurors

19   and are alternates.  So, if you can be back here ready to go at

20   1:45, that's an hour, that will give you time to eat.  There is

21   a lot of places around, I think you probably went there

22   yesterday.  There is no shortage of places along Worth Street

23   and also up into Chinatown.  Don't use the cafeteria because

24   that's where -- the lawyers and parties use that.  I don't want

25   you bumping into each other.

D355dor1                              trial

1              Again, if you see any of the folks from the courtroom

2       when you are out at lunch or coming back into the building

3       don't acknowledge them, don't say anything.  It is not being

4       rude or impolite, you are following my instructions.

5              When you come back after lunch I will then give you

6       preliminary instructions on what it means to be a juror and how

7       the trial will proceed.  And after that we will start the

8       trial.

9              So, with that, then I will see you at 1:45.

10             All rise for the jury.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D355dor1                         trial

1             (Jury not present)

2             THE COURT:  Have a seat.

3             Anything else we should cover before we break for

4     lunch?

5             MS. MASELLA:  No, your Honor.

6             MR. ROTH:  Nothing from the defense.

7             MS. FONTIER:  Thank you, your Honor.

8             THE COURT:  So, I will see you back here at, let's say

9     1:40.  Okay?  Thanks.

10             I have another matter, so if you can clear out as

11     quickly as you can, that would be appreciated.  But don't leave

12     the courtroom for maybe a couple of minutes, give the jurors

13     time to get out.  So, clear the space here but don't leave the

14     courtroom for at least a few minutes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D35Wdor2

                        AFTERNOON SESSION

                           1:40 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Are we all set?

 5          MS. FONTIER:  One moment, please, your Honor.

 6          THE COURT:  I'll give the preliminary instructions and

 7   then we'll go right to openings.  Is anybody using

 8   demonstratives?

 9          MS. FONTIER:  I will not be.

10          MR. ROTH:  Neither will I.

11          MS. LESTER:  Nor will I.

12          THE COURT:  Let's bring in the jury.

13          (Jury present)

14          THE COURT:  Why don't you just remain standing until

15   everybody gets in.  I think that's the way we usually do it.

16          Okay.  Have a seat.  I hope you had a nice lunch.  And

17   as I said, you can bring water.  Was there water and drinks and

18   things in the jury room?  Good.  Okay.  And we'll take an

19   afternoon break, and I expect we'll have some snacks, and

20   cookies and fruit I usually order.  If it's not to your liking,

21   let US know.  We'll try to make sure that you are comfortable.

22          Now that you have been sworn, I will going to give you

23   some preliminary instructions to guide you in your

24   participation as jurors in this trial.  I'm going to read some

25   of it, and my reason for doing that is because some of these

D35Wdor2

instructions on the law are important and require a certain

amount of precision, I want to make sure I don't misstate the

law in any way.  So if parts of it are read, I apologize for

breaking my eye contact with you, but understand why.

As jurors, it's your duty to find from the evidence

what the facts are.  You, and you alone, are the judges of the

facts.  From that you decide what happened.  You decide what

happened from the evidence presented at trial, from the

exhibits presented at trial.  You will then have to apply those

facts to the law as I give it to you.  As I said before, you

must follow the law as I give it to you, even if you don't

agree with the law as I explain it to you.

Nothing that I say or do during this trial is intended

to indicate in any way what your verdict should be.  So don't

speculate as to what I may be thinking.  You are the judges of

the facts.  I'm the judge of the law, and we don't interfere

with each other.  Okay?  So you accept the law as I give it to

you and you decide the facts without any interference from me.

The evidence from which you will find the facts will

consist of the testimony of the witnesses and documents and

other things that might be introduced as exhibits at trial.

There may also be what are called sometimes stipulations, and

they're just agreements between the lawyers to certain facts.

You are to accept those facts as true when there's a

stipulation, although it's still for you to decide how much

1    weight, if any, to give to those facts.

2              Certain things are not evidence, and I want to go

3    through some of those now.  These are things that must not be

4    considered by you as evidence as you deliberate in this case.

5              Statements, arguments, and questions of the lawyers

6    are not evidence.

7              Objections to questions are not evidence.  Right?

8    You've all seen TV:  "Objection."  Lawyers have an obligation,

9    a duty, to object when they believe that there's evidence being

10   offered that's in violation or contrary to the rules of

11   evidence, so they will say objection sometimes.  And then I

12   will rule on those objections.  So you shouldn't be influenced

13   by the fact that a lawyer made an objection.  Nor should you be

14   influenced by my ruling on it.  Don't worry about that.

15   Objection just means that the witness stops and then I rule,

16   and, depending on how I rule, the witness either answers or we

17   move on.  Okay?  If the objection is sustained, you've all

18   heard that term, "sustained," that means the witness will not

19   be permitted to answer the question and you should disregard

20   the question.  Ignore it completely.  If the objection is

21   overruled, that means simply that the witness will be permitted

22   to answer the question and you should treat that answer like

23   any other answer.  The fact that there was an objection doesn't

24   make it more or less important.  Okay?

25             If you are instructed that an item of evidence is

D35Wdor2

being received for a limited purpose only, then you must follow

my instruction on that, and I'll give you instructions as we

go.  If I strike an answer or if I instruct you to disregard an

answer, then that testimony is not evidence and may not be

considered by you.  All right?  So you have to consciously say

I'm not going to consider that, the judge told me to disregard

it, so I won't consider that as the evidence.  So I expect you

to follow that instruction.

         Anything that you see or hear outside the courtroom is

not evidence and must be disregarded.  Your verdict must be

based solely on the evidence presented here in this courtroom

during this trial.

         One of the most important tasks you have as a juror is

to evaluate the credibility of the witnesses, the witnesses who

will testify here in this courtroom, from this witness stand.

It will be up to you to decide which witnesses to believe,

which witnesses not to believe, and how much of any witness'

testimony to accept as true.  I will give you some guidelines

for determining credibility of witnesses at the end of the

case.  In the meantime, please listen carefully to the

witnesses as they testify and bear in mind that you'll be

called upon to evaluate their credibility and their

truthfulness when you deliberate.  So pay careful attention,

and, at the end of that process, at the end of this process,

when you're deliberating, you'll have to consider who was

1    telling the truth, who was not telling the truth, who you

2    believe, and how much weight to give to the testimony.

3          Under the law, as I told you before, a defendant in a

4    criminal case is presumed innocent.  He cannot be found guilty

5    of the crimes charged unless the jury, after having heard all

6    the evidence in the case, unanimously decides that the evidence

7    proves the defendant guilty beyond a reasonable doubt.

8          In a criminal case, the burden of proof remains with

9    the prosecution, the government, the folks at the front table.

10   For the jury to return a verdict of guilty as to the

11   defendants, the government must prove that each of the

12   defendants is guilty beyond a reasonable doubt.  A person

13   charged with a crime has absolutely no burden to prove that he

14   is not guilty, and if the defendants choose not to present any

15   proof, that decision cannot be held against them and may not

16   enter into your deliberations at all.

17         Now, a few words about the conduct of this trial.

18   First, during the trial, you are not to discuss the case with

19   anyone, nor are you to permit anyone to discuss it with you.

20   Until you retire to the jury room at the end of the case to

21   deliberate, you're simply not to talk about the case.  Don't

22   even discuss the case with each other until you begin your

23   actual deliberations.  So there will be breaks and you'll go

24   into the jury room, don't discuss it.  Don't say, What did you

25   think of his testimony, or, What did you think of her

D35Wdor2

1    testimony, or, Wow, that was pretty interesting, wasn't it.  I

2    don't want you to consider or discuss or begin your

3    deliberations now.  All that's for later.  Right now, you're

4    just observing.  You can go back in there and chat about all

5    sorts of things.  You're such interesting people, plenty of

6    things to talk about, but don't discuss the case until you have

7    heard all the evidence, until you have heard the arguments from

8    the lawyers in summation, until you have heard my instructions

9    on the law.  Until that point, you're really not in a position

10    to be forming hard opinions and to be deliberating prematurely.

11        If you see the lawyers or the witnesses or the court

12    staff in the hallway or elevators, as I told you before, don't

13    speak to them and they won't speak to you.  Again, they're not

14    being impolite; you're not being impolite.  The goal here is to

15    avoid any opportunity for improper contact, and just as

16    importantly it's to avoid any appearance of improper contact.

17    Right?  If someone saw you talking to one of the lawyers and

18    laughing and just chatting away, they may not know what you

19    were talking about.  It may just have been about a ballgame or

20    the weather, but it might look bad.  It looks like there's

21    something improper going on.  That's the reason we want to

22    avoid any appearance of improper contact.  That's why I

23    instruct them not to talk to you and I instruct you not to talk

24    to them at all for the duration of the trial.  Okay?

25        Second, don't read or listen to anything touching on

D35Wdor2

1 this case in any way.  As I said before, I don't know if this

2 case will generate any publicity, but if it does, you're

3 instructed not to read, listen to, or watch any news reports or

4 other reports about the case.  Okay?  You should not be

5 influenced by anything you might hear or see outside the

6 courtroom.  So if you're reading the newspaper and you see an

7 article that touches on this -- again, this is hypothetical, I

8 don't know if this is the case -- quickly move to a different

9 article or different part of the paper and let me know

10 afterwards.  Don't discuss it or let anyone else know what you

11 saw.  Tell my law clerk, Mr. Halegua, whom you've met, and

12 he'll tell me, and we'll follow up.  Again, I don't know if

13 this will happen, but I will tell you what to do if it does

14 happen.

15    If anybody should try to talk to you about this case,

16 bring that to my attention as well by telling Mr. Halegua.  Do

17 not tell anyone else, not even your fellow jurors.  If someone

18 reached out to you, you saw something, you heard something, you

19 stumbled across it, whatever it was, don't tell each other.

20 Just tell him and then I'll follow up and whatever it is we'll

21 deal with it.  If you've seen something you shouldn't have

22 seen, I don't want you sharing it with other people because you

23 could taint their mind, so be mindful of that.

24    Don't talk about or read about the facts or

25 circumstances of this case on any social networking sites.

D35Wdor2

1    Don't go to Facebook.  Don't go to MySpace.  Don't "Tweet"

2    about it on Twitter.  A lot of people want to talk about their

3    interesting experiences, and there are entire social media

4    dedicated to this, and I understand it's kind of interesting.

5    But this is not proper for that.  If you were to do that, it

6    would mean that I would probably have to declare the trial as a

7    mistrial and we would have to start all over because you really

8    can't be deliberating, you can't be communicating, you can't be

9    talking about the case until you're in your formal

10   deliberations.

11         There have been some cases where, in fact, jurors have

12   not complied with that instruction and it resulted in trials

13   having to be done over.  Take that very seriously.  Don't be

14   tempted.  Parallel to that is don't do any research or any

15   investigation online or elsewhere.  It's tempting to do that,

16   Oh, the judge, let's see what else he does or what he's about,

17   let's find out about these lawyers, see about the witnesses,

18   don't do that.  Don't do any kind of Internet searches.  Don't

19   do any kind of searches at all.  Don't go to the locations that

20   you've heard about in court.  I don't want you doing any

21   investigations, any inspections of any kind.  Again, that could

22   compromise the entire trial.

23         The evidence is what comes in at this trial, in this

24   courtroom.  And that's what you're limited to, and that's

25   enough.  That's enough for you as jurors and you should be

1    focused on that.

2                Fourth, if at any point in the trial you recognize

3    someone in the courtroom, including a friend or a significant

4    other, just somebody you know, let us know that.  There is

5    nothing improper about that.  It's a public courtroom.

6    Everybody is welcome to come in, and so it's not that they

7    would be doing anything wrong; it's just that there may be

8    times when we're having conversations outside of your presence

9    and if you have a friend or some other person who is in the

10   audience, they may not realize that they shouldn't tell you

11   about that later.  They will not have been here for parts of

12   the trial where you got instructions from me.  Just let us know

13   if you know someone in the courtroom and we will take

14   precautions if there are any precautions to be taken.  So let

15   us know if anybody is here to pick you up or if you are going

16   to get together afterwards.  It's fine if they come, just let

17   us know.

18               Finally, don't form any opinion until all the evidence

19   is in.  Keep an open mind throughout the trial.  I'm going to

20   remind you of that almost at every break.  I'll say: Don't

21   discuss the case.  Keep an open mind.  You'll get bored of me

22   saying it, but it's important that I repeat it because I don't

23   want you to forget.  Don't decide any facts until after you

24   have heard all the evidence, until after you have heard the

25   closing arguments of the lawyers, until after you have heard;

1   my instructions on the law because until then you are really in

2   no position to form hard opinion.

3          You are permitted to take notes during the trial.

4   I'll hand out notepads before we start with the openings.  I'll

5   give you a pen.  I'll give you a pad.  You should write your

6   name on the pad if you want to take notes.  You don't have to

7   take notes, if you want to take notes, only take notes in the

8   pad.  Write your name on the outside of the pad so no other

9   juror confuses their notes with your notes, and, at the end of

10  the day, leave your notes in the jury room.  We'll collect them

11  and keep them safe so no one can get to them, and we'll return

12  them to you the next day.  But don't take them home with you

13  and don't share them with anybody else.

14          Remember, any notes that you take are for your use

15  only, and they're only to be used as an aid to your memory.

16  Your memory is what controls.  If you do take notes, be careful

17  not to get so involved in taking notes that you're missing half

18  the testimony.  At some point, in school, we all did that, we

19  were taking so many notes we were missing half the lecture.

20  Don't get so involved that you're not able to catch the

21  testimony.  We have a court reporter here.  We have the best

22  court reporters in the world, we really do.  They're the best

23  in their field, and their job is to take it all down.  There

24  will be a transcript at the end of this case.  If there is

25  anything you want to hear, any testimony you want to read or

D35Wdor2

1    have read back, we can get it for you, and I'll give you

2    instructions about that.  Your notes can be helpful.  If you

3    want to take notes, perfectly fine.  But remember, they're an

4    aid to your memory.  If there is any dispute between your notes

5    and another juror's notes or between your notes and another

6    juror's memory, the notes don't break the tie.  The only thing

7    that breaks the tie is the transcript.  If you have questions

8    about what exactly was the testimony, let us know, and we'll

9    give you the testimony and you can decide.  But, again, that's

10   only when you're in deliberations, not before.

11          During the course of the trial, exhibits will be

12   received in evidence.  You'll hear "Exhibit 16 is received."

13   They'll be marked by exhibit number.  If there is any exhibit

14   at the end of the case during deliberations that you'd like to

15   see, let us know, and we'll send the exhibit back into the jury

16   room and you can look at it and examine it as you think

17   appropriate.

18          At the end of the trial, bear in mind I'm going to

19   give you a list of all the witnesses who testified with their

20   proper spellings.  I'm going to give you a list of all the

21   exhibits that have been received.  So take notes if you'd like,

22   but you don't have to worry about, Oh, I forgot what the

23   exhibit was or I forgot the name of that witness because I'll

24   give you all of that.  It will be available to you in the jury

25   room.  You'll have the names and you'll have the exhibits.

D35Wdor2

```
1              Now, we're about to begin this trial.  Our typical day
2   will begin at 9:30 a.m.  Let me ask you -- some of you are
3   traveling distances to get here; those of you from Westchester
4   and north and west of Westchester have a long way to go, and
5   I'm sympathetic -- but make sure you get here on time.  Make
6   sure you're ready to go at 9:30.  I promise that I'll make sure
7   we're ready to go at 9:30, and if we each keep that promise,
8   then we'll be able to be efficient and use the time to its
9   maximum potential.
10             If any of you are late, it means we all have to wait.
11  All of you, your fellow jurors, court reporters, judges,
12  lawyers, everybody else will have to wait.  So, if you are
13  running late and you can call, then please call.  I'll make
14  sure you have Mr. Halegua's number so you can call us if you're
15  running late, but hopefully you won't even have to do that
16  because you will have built in some buffer time that will allow
17  to you get here on time.  I will make sure that in the mornings
18  we have coffee and some breakfast stuff.  So if you get here
19  early, you'll be comfortable at least.  That will be available
20  to you and might be an extra incentive to make sure you're here
21  in plenty of time.  But 9:30 is when I want to start so we can
22  use the whole morning.
23             We'll go from 9:30 until one, which is when we take
24  our typical lunch break.  We'll probably have one short
25  bathroom break in the middle of the morning and then we'll
```

D35Wdor2

usually pick up from two until 5:30 in the afternoon.  And we
might take a short break in the afternoon as well, and maybe
there will be some days we might end a little earlier because I
have other matters and I can't squeeze them in other times.  I
worked through lunch today.  I try to schedule things before
you're here, while you're at lunch, after you leave, so it
doesn't interfere with your time.  But there are some cases
where I have to do things at 4:30 or 5:00.  I'll let you know
when that is, but presume 5:30 is when we'll finish.  We won't
go past 5:30 unless I give you plenty of warning and unless
it's okay with all of you.  We'll be ending at 5:30 today.

          Let me tell you how the trial will proceed.  First
we're going to have opening statements.  The government will
make an opening statement.  After that, I expect the attorney
for each of the defendants will make an opening statement, but
they're not required to make an opening statement.

          The opening statements are not proof, they're not
evidence, they're not arguments.  They're simply outlines of
what the attorneys believe the evidence will show.  And they're
given to help you follow the evidence as it comes in later.  So
if you think of it as a preview to a movie, that's what the
opening is.

          After the opening statements, the government will
present its case.  The government will call its witnesses, and
after each witness testifies on direct examination, then the

D35Wdor2

1    lawyers for the defendants will have an opportunity to

2    cross-examine those witnesses.  You've all seen it on TV, you

3    know how that goes.  After the defendants have cross-examined

4    the witnesses, then there might be a little bit of what's

5    called redirect examination, then after that maybe

6    recross-examination, but each of them gets shorter and shorter

7    as it goes.

8           Following the government's case, after they've rested,

9    the defendants then will have an opportunity to present the

10   case.  But they don't have to.  Again, they have no burden.

11   The defendant is presumed innocent and the defendant,

12   therefore, has no obligation to produce any evidence

13   whatsoever.  But if the defendants wish to present a defense

14   case, then the defense witnesses will testify on direct

15   examination.  Then the government will cross-examine them, and

16   we'll have a little bit of redirect, a little bit of recross.

17          After the defense rests, then we will have summations.

18   Okay?  Summations, you've all seen on TV, are the closing

19   arguments.  That's the lawyers' opportunity to summarize the

20   evidence and to give their closing arguments, their

21   interpretation of what the evidence showed.

22          Now, again, what the lawyers argue is helpful.  It's

23   designed to be useful to you.  But it's not evidence, and you

24   should scrutinize the evidence when you're deliberating.  What

25   the lawyers say doesn't matter.  What you think happened is

43

D35Wdor2

1    based on the evidence.  That is the key.  Following the

2    summations, I will then give you instructions on the law, and

3    you will then finally retire to begin your deliberations.

4    That's how the trial goes.

5         You have a tremendously important job as jurors in

6    this system.  The Constitution recognizes you as officers.  Our

7    system of justice is predicated on jurors being the finders of

8    fact, so that's your job.  It's to determine the facts.  You,

9    not me, you alone are the judges of the facts.  So, pay careful

10   attention throughout the trial.  If you're having difficulty

11   hearing or seeing, you need to stretch or need a break, you'll

12   let us know, but the trial is now about to begin.  So with

13   that, I'm going to turn it over to the government.

14        Who is giving the opening statement?

15        MS. LESTER:  I am, your Honor.

16        THE COURT:  Ms. Lester, however you want to set up the

17   courtroom will be fine.

18        Let me give you pads.  I'm sorry.  Don't start, Ms.

19   Lester.  And pens.  Okay.  Everybody has a pad?  Everybody have

20   a pen?  Hang on to those pens.  With sequestration, it might be

21   the last pen you see.  No.  We have pens; I'm joking.  Just

22   remember to put your names on the front cover and leave them

23   here at the end of the day, not here in the jury box, but in

24   the jury room.

25        All right.  With that, we'll begin with the opening

D35Wdor2                         Opening – Ms. Lester

1    statements.

2              MS. LESTER:  Thank you, your Honor.

3              THE COURT:  Ms. Lester, you may proceed.

4              MS. LESTER:  Good afternoon.

5              In 2011 and early 2012, a violent robbery crew

6    terrorized victims in the Bronx, Mount Vernon, and

7    Pennsylvania.  The two men sitting here before you today,

8    Jermaine Dore and Dwayne Barrett, are the defendants in this

9    case, and they were the core members of this robbery crew.

10   Dore and Barrett, along with others, carried out numerous

11   violent robberies between August 2011 and January 2012.  Nearly

12   every day during the period, they were out on the street

13   looking for their victims, following them, gathering

14   information about their routines, and actually committing

15   robberies during that time, robberies during which they

16   brutally assaulted their victims, brandished knives, and fired

17   guns.  Ultimately, during one robbery that took place in

18   December of 2011, the defendants shot and killed one of their

19   victims because he refused to hand over his money.

20              That's why we're here today, ladies and gentlemen.

21   For committing these robberies, Dore and Barrett are charged in

22   an indictment with multiple violations of federal criminal

23   laws.  They're both charged with participating in a conspiracy,

24   that's just an agreement, to commit robberies.  They're also

25   charged with two specific robberies and firearms and murder

1    charges relating to those specific robberies.

2                During the course of this trial, you're going to hear

3    the evidence that proves that they committed these crimes

4    beyond a reasonable doubt.

5                So, how did Dore and Barrett's crew operate?  Well,

6    during the trial, you'll learn that they usually targeted their

7    victims based on information they received from the owner of a

8    local store in the Bronx.  This was a man named Fahd Hussain,

9    who they knew as Ali or Mo.  The victims were often people who

10   did business with Hussain, and he would give Dore and Barrett

11   important details about the victims, where they lived or worked

12   and when they would be carrying large amounts of cash.

13               Dore and Barrett would use this information to conduct

14   surveillance of their victims before actually robbing them,

15   following them as they went about their daily business,

16   tracking their movements, and looking for the best time to

17   strike.

18               Barrett, you'll learn, almost always drove his car, a

19   dark blue Mercedes-Benz sedan.  He was usually the planner and

20   the driver for the robberies, but he was also willing to do

21   whatever he needed to do to make sure that the robberies

22   succeeded.  Barrett was also in charge of the robbery proceeds,

23   and he would divide up the money amongst the crew members.

24               Now, Dore was the one who often carried out the

25   hand-to-hand violence against the victims in many of the

1    robberies, punching victims, forcing them to the ground, even

2    shooting and killing one victim.  Together, with the other

3    members of the crew, they were out on the streets looking for

4    victims to rob nearly every day for months on end.

5           I'm going to give you a few examples of the robberies

6    you'll hear about during the course of the trial.  You're going

7    to hear about a robbery that took place in the Bronx on an

8    unusually snowy day in October 2011.  You'll hear that Dore,

9    Barrett, and other members of the robbery crew robbed the owner

10   of a poultry market in the Bronx.  This was a man who knew Fahd

11   Hussain.  The robbery crew staked out the victim's home on

12   Radcliff Avenue for several hours, sitting in Barrett's

13   Mercedes sedan.  Then they followed him when he went to the

14   local mosque for evening prayers, and they abducted him outside

15   the mosque.  The robbers drove the victim from the mosque to a

16   street near his house and took his keys so that one of them

17   could enter the house and steal his money.

18          Another robber kept the victim hostage in the minivan,

19   but what they didn't know is that the victim's brother and two

20   young nephews were at the house waiting for the victim to

21   return from the mosque.  The robbers held the victim's

22   relatives hostage, down with a gun, while they ransacked the

23   house looking for money.  They eventually made off with $15,000

24   in cash.

25          These robbers didn't confine themselves to the Bronx.

D35Wdor2                          Opening - Ms. Lester

1    You'll also hear about a robbery that took place in August

2    2011, many, many miles away, in Matamoras, Pennsylvania.   Dore

3    and Barrett, along with two other people, drove all the way

4    from the Bronx to Matamoras in order to rob the owner of a gas

5    station as he made his weekly trip to the bank to deposit cash.

6    The robbers assaulted the victim and made off with $45,000 in

7    cash.

8            These robberies were typical of how the crew worked.

9    They worked together to plan deliberate, violent attacks on

10   their unsuspecting victims.   They had weapons on hand to carry

11   out the attacks, including baseball bats, knives, and guns, and

12   they didn't hesitate in using them.   That was certainly the

13   case in December 2011, during a robbery that took place in

14   Mount Vernon that resulted in a murder.

15           Dore and Barrett followed the victim as he went about

16   his business that morning, tracking him from a hotel in the

17   Bronx where he was staying.   When the victim took a taxi from

18   the hotel to Mount Vernon, Dore and another member of the crew

19   hijacked the taxi, drove off with the victim still in the back

20   seat, and shot and killed him after he threw the money out of

21   the moving vehicle.   These are just three of the robberies that

22   you'll hear about during the course of the trial, just three

23   examples of the robberies that Dore, Barrett, and their crew

24   attempted and carried out every day for months.

25           Now, you might be asking yourselves what type of

D35Wdor2                          Opening - Ms. Lester

1    evidence you are going to hear.  There are three types of

2    evidence that we'll offer to prove this case:  Witness

3    testimony, physical evidence, and evidence related to the cell

4    phones used by the defendants and the other robbers.

5         In terms of witnesses, you're going to hear firsthand

6    from many of the victims of these robberies.  Most of them,

7    you'll learn, are small business owners dealing largely in cash

8    and selling items like cigarettes or telephone calling cards.

9    They will tell you how they were going about their usual

10   business when, all of a sudden, they were attacked and robbed.

11   Some of the victims were violently punched and beaten by the

12   robbers and others were threatened with knives or guns.

13        Now, as you might expect, these witnesses probably

14   will not be able to identify the defendants as the people who

15   robbed them.  You'll learn that the robbers wore masks most of

16   the time.  Many of the victims were violently assaulted and

17   feared for their lives during the robberies, but they'll tell

18   you what they remember and what they saw during the robberies.

19        You'll also hear from law enforcement witnesses,

20   including police officers who responded to the robbery scene

21   and to the scene of the murder in this case.

22        In addition, you're going to get an insider's view of

23   how the robbery crew operated and what Dore and Barrett did

24   during the robberies from people who know firsthand because

25   they also participated in some of the robberies.  These

D35Wdor2                          Opening – Ms. Lester

1     witnesses might refer to Dore and Barrett as well as the other

2     members of the crew by their nicknames because that's how they

3     knew them.  Dore was Blaqs and Barrett was Tall Man.  These

4     inside witnesses will give you details about the robberies that

5     you could never get from victims or police officers; how Dore

6     and Barrett planned the crimes, why they targeted particular

7     victims, and what they did to keep from getting caught.  These

8     inside witnesses will tell you that they were with Dore and

9     Barrett when they committed some of the robberies that you'll

10    hear about during the trial, and they'll also tell you that

11    Dore and Barrett told them about other robberies that they did

12    when these witnesses weren't present.

13            Now, a word about these witnesses.  They've admitted

14    their own involvement in robberies and have entered into

15    agreements were with the government to provide information and

16    testimony at this trial.  Now, you'll certainly be troubled by

17    their conduct.  After all, they're going to tell you that they

18    participated in robberies, and you may not agree with the

19    decisions that they've made.  But what's important is that you

20    listen to their testimony as you would to any other witness and

21    use your common sense to evaluate it against the other evidence

22    in the case.

23            When they're testifying, ask yourselves:  Is their

24    testimony consistent with the other evidence in the case?  Does

25    it make sense?  When you do that, we submit that you will find

1    that their testimony is backed up by the other independent

2    evidence in the case, from the testimony of the victims, to the

3    other evidence linking the defendants to these robberies.

4         Now, besides witnesses, as I mentioned, you'll see

5    many cases of physical evidence, including shell casings

6    recovered at the scene of two of the robberies, masks and

7    gloves, photographs of Barrett's Mercedes-Benz, surveillance

8    video that captures some of the robberies, photographs and maps

9    of the robbery locations, and cell phones used by the

10   defendants.  And you'll learn that Dore, Barrett, and the other

11   robbery crew members frequently used their cell phones while

12   committing the robberies to communicate with each other and

13   with Fahd Hussain about the victims.

14        As I just mentioned, you'll see some of these actual

15   cell phones, but we're also going to present evidence relating

16   to the phone calls that were made by Dore, Barrett, and the

17   other crew members.

18        Now, I want to let you know in advance that this

19   evidence is going to be especially detailed, and you may not

20   understand the significance of it right away.  You're going to

21   hear from witnesses at the phone companies that kept the

22   records for the cell phones used by the robbers.  These are

23   called call detail records.  They show the calls made to and

24   from the phones.  But the records also include what's called

25   cell site information, and that's data that shows which cell

1    phone towers were used during a particular call at a particular

2    time.

3            Later in the trial, after you've heard about the

4    dates, times, and locations of the robberies, you'll hear from

5    a summary phone witness.  This witness is going to show you

6    maps that plot the locations of the towers used by the robbers'

7    phones at a particular time and on a particular date using that

8    cell site data I just talked about.  I'm going to ask you to be

9    patient as the evidence comes in because by the end of the

10   summary witness' testimony, you'll understand the significance

11   of the cell site evidence.  Again, you'll have heard about the

12   dates, times, and locations from the victims and other

13   witnesses, and then you'll be able to compare that information

14   to the cell site locations, the towers that were used by the

15   defendants' phone on those same dates and times.

16           As you might expect from what I've said so far, most

17   of the evidence in this trial isn't going to come in all at

18   once or in chronological order.  Instead, it's going to come in

19   in bits and pieces, one witness at a time, and, in most

20   instances it's going to take a few witnesses for you to get a

21   full picture of what happened on that particular date at a

22   particular time.  But when we come to the end of the case and

23   you've seen all the evidence and heard the closing arguments,

24   you will be convinced that these defendants are guilty of the

25   charges against them.

1          It's probably obvious to you from what I've said so

2     far this is a very serious case, and, like all criminal trials,

3     it's an important trial, both for the government and for the

4     defendants.  And as jurors, you have important

5     responsibilities, too.  Pay close attention to the evidence as

6     it comes in, and listen carefully to the witnesses' testimony

7     and to Judge Sullivan's instructions on the law.

8          Finally, use your common sense to guide you, the same

9     common sense that you rely on in making important decisions in

10    your own lives.  Rely on your common sense and your life

11    experience as you watch the trial and use it to help you weigh

12    the credibility of the witnesses.  If you do all these things,

13    the defendants will get a fair trial, and, if you do all these

14    things, at the end of the trial, you will return the only

15    verdict that is consistent with the evidence and with justice,

16    that the defendants are guilty of the crimes charged in the

17    indictment.

18          Thank you.

19          THE COURT:  Thank you, Ms. Lester.

20          We'll now hear from Ms. Fontier on behalf of Mr. Dore.

21          MS. FONTIER:  Yes, your Honor.  Thank you.

22          Good afternoon, ladies and gentlemen.

23          Ladies and gentlemen, the government is making a lot

24    of assumptions.  Their case has a lot of conjecture, and you're

25    going to hear some very unreliable testimony.

D35Wdor2                           Opening - Ms. Fontier

1        Now, at the end of this case, you will have heard from

2   many victims.  You will have heard from many police officers.

3   I believe that you will have heard overwhelming evidence that

4   these crimes occurred.  But what you will also hear is a

5   distinct lack of evidence that Jermaine Dore is the person who

6   committed these offenses.  At the end of this case, that is the

7   question that I will ask you to decide, whether the government

8   has proved beyond a reasonable doubt that it is Jermaine Dore

9   that actually committed those offenses.

10       Now, the government is going to rely, as you just

11  heard, on cell phone records, cell tower maps, and the

12  testimony of cooperating witnesses.  They're resorting to their

13  cooperating witnesses because the victims and the police

14  officers cannot identify Mr. Dore as the person who committed

15  these offenses.

16       Now, there are some facts, as I said, that will not be

17  in dispute.  You're going to hear evidence of about 17

18  robberies, I believe.  We will not dispute that these robberies

19  occurred over the course of a year and a half, in the Bronx,

20  White Plains, Yonkers, various different places.  You're also

21  going to hear that in December, during the course of one of

22  these robberies, a person was killed.  We will not dispute

23  those facts.

24       Also not in dispute is the fact that Mr. Dore knows

25  Mr. Barrett, that they spoke on the phone, that they have

1     ridden in a car together, that they're friends.  You'll see

2     their phone records.  You'll see that they called each other

3     regularly.  But Mr. Dore knowing Mr. Barrett does not equal Mr.

4     Dore and Mr. Barrett committing crimes together.  That's an

5     assumption that the government wants you to make.  But being

6     friends with someone, knowing someone, does not make you

7     guilty.

8             So, now, without identifications of Mr. Dore, again,

9     the government is turning to two cooperating witnesses.  The

10    first is Patrick Taylor.  Mr. Taylor will take this witness

11    stand and tell you that he committed some of these robberies,

12    the robberies you're going to hear evidence about.  He's also

13    going to admit that he is a big-time marijuana dealer.  And

14    then he's going to point at Mr. Dore and accuse him of

15    committing these crimes, too.  He's going to do that because

16    he's looking for a get-out-of-jail-free card.  Mr. Taylor is

17    someone with a motive to lie, and I will ask you at the end of

18    this case to judge his credibility and whether that motive

19    overcame his truth telling.

20            The second witness that is cooperating with the

21    government that you'll hear from is Janiel Brown.  Now, Janiel

22    Brown and Mr. Dore were dating until very recently.  Janiel

23    Brown was actively participating in this case from the time of

24    his arrest in January of 2012.  You will hear her testify on

25    this stand.

1          Now, this will not be the first time that she's sat in
2     this witness stand.  In a previous proceeding, she testified
3     for Mr. Dore.  She took that stand and said that the agents in
4     this case were not telling the truth.  She swore under oath,
5     just like she will when she talks to you, that the agents in
6     this case were not telling the truth.  At the end of that
7     proceeding, these prosecutors argued that she was not a
8     credible witness.  The witness that they're going to put on the
9     stand to testify against Mr. Dore, these two same prosecutors
10    have already said she did not tell the truth in court.
11         MS. LESTER:  Objection, your Honor.
12         THE COURT:  Objection as to what you're going to
13    argue?  Sustained.
14         MS. FONTIER:  This is a witness who has already
15    testified and who the government has already claimed is not
16    credible when she testifies in court.  That is Janiel Brown.
17    That is their cooperator.
18         Now, at the end of this, as I said, you are going to
19    be able to ask to evaluate the evidence.  You're going to have
20    to look at all of the evidence, and you will hear an
21    instruction from the Court at the end that evidence is not
22    about the quantity, but it's about the quality.  And when you
23    hear a great quantity of evidence about robberies occurring,
24    you still must decide if the government has proved beyond a
25    reasonable doubt, through reliable evidence, that Mr. Dore is

1    actually the person who committed these crimes.

2            You're also going to be told that it's not just the

3    evidence that's presented, but it's the lack of evidence.  And

4    in this case, there's a very significant lack of evidence that

5    Mr. Dore is actually the person that committed these offenses.

6    No. 1, something that I've already touched on, you're going to

7    hear from multiple victims, upwards of 20, testifying about 17

8    different robberies.  And now the government has already said

9    sometimes the people that committed these robberies wore masks.

10   Sometimes they didn't.

11           Also, listen to the descriptions of the people that

12   were given by these victims.  They either do not describe Mr.

13   Dore or are so vague as to describe any average-sized black

14   man.  You will not hear one of these victims who was face to

15   face with their robber say that Mr. Dore is the person that

16   committed this offense.  That's a serious lack of evidence.

17           The second is that over the course of a year and a

18   half, as each of these robberies was committed, they were

19   investigated by various agencies, the NYPD, Yonkers PD, the

20   ATF.  You're going to hear from many police officers, many

21   special agents, about the thorough investigation that went into

22   these offenses.  In all of those different crimes, they do not

23   have one single fingerprint left by Mr. Dore.

24           Now, similarly, through all of their investigation,

25   their forensic work, they don't have a piece of DNA evidence

 1    tying Mr. Dore to these offenses.  Not a hair, not a piece of

 2    spit, not anything.  And it's more though than the fact that

 3    this DNA just does not exist because in the homicide, in the

 4    December 12 robbery that led to the death of this individual,

 5    there was DNA recovered from the car.  The car, you will learn,

 6    where the body was found, and from the windows and from various

 7    different places inside the car, DNA was recovered.  Samples

 8    were taken.  They were sent to a lab, and it was negative for

 9    Mr. Dore.  He was affirmatively not the person who left the DNA

10    in the car.  So that lack of evidence is very compelling.

11          So no victim identifications, no fingerprints, no DNA.

12    All of these things are a lack of evidence that you should

13    consider.  And I just want to jump back a second to the cell

14    phone because this is a case very much about the cell phone.

15          The government is going to present times and places of

16    robberies and then maps of cell towers, and say that Mr. Dore

17    was using these cell towers, but wait until you have heard all

18    of the evidence about the cell towers and you see all of these

19    maps because the maps that the government will present to you

20    as if they are a road map of these crimes occurring are not

21    nearly as clear and compelling as they want you to believe.

22    These towers were constantly in use by Mr. Dore and others,

23    towers in the same area, in different areas, were in use at

24    similar times.  It doesn't demonstrate what the government

25    wants you to believe it demonstrates.

1          They have to rely on that and the testimony of these

2     cooperating witnesses because there is a lack of real reliable

3     evidence of Mr. Dore's identification as the person that

4     committed these offenses.

5          I believe that at the end of this case, there will be

6     only one verdict that is supported by the evidence, and that is

7     that Mr. Dore is not guilty of any of these offenses.

8          Thank you.

9          THE COURT:  Thank you, Ms. Fontier.

10          Now we'll hear from Mr. Roth on behalf of Mr. Barrett.

11          MR. ROTH:  Thank you, your Honor.

12          Good afternoon.

13          I can only imagine what you're thinking here as

14     jurors.  What can Mr. Roth and my colleague, Mr. Murphy, do in

15     light of all this evidence that the government says it has?

16     What can we do to defend Mr. Barrett?  What can we do to get an

17     acquittal?  What can we do as jurors now except retire to the

18     jury room and, if we believe them, vote guilty?

19          Well, the judge told you before, told you

20     individually, he'll tell you again, that the starting point for

21     the inquiry that you have as fact finders -- you're the fact

22     finders; the judge is the person who presides and gives you the

23     law that you must follow -- is the presumption of innocence.

24     Despite what the government has said, and the judge told you

25     straight out, there's not a word of what they said that's

1   actually evidence.  So you have the presumption of innocence

2   and the starting point is very simple.  You all have to be able

3   to look across the room and look at Mr. Barrett in the eye and

4   say I presume you to be innocent.  That's the starting point.

5   And that stays with him throughout the entire trial and goes

6   with him right into the jury room itself.

7          So how did this case get to federal court?  The

8   government alluded to it a little.  There was a rash of violent

9   robberies in Westchester and the NYPD couldn't solve them.

10  There came a time when there was a homicide involved, in the

11  course of an illegal cigarette transaction.  The state called

12  in the feds.  When you call in the feds, it's like calling in

13  the cavalry.  They have all those resources.  Some of you have

14  seen those shows, the CSIs, all that comes in with the ATF.

15  All that technology.

16         But at the end of the day, and my colleague alluded to

17  it, what did it produce?  What hard evidence did it produce

18  that Mr. Barrett is guilty of these crimes?  And, by the way,

19  when you review the evidence, I ask you to remember that

20  there's two trials here within the one trial.  Each defendant,

21  Mr. Dore and Mr. Barrett, deserves their separate attention and

22  you each are going to be asked to vote on verdicts with respect

23  to each of their guilt or innocence.

24         You've already heard that they're going to try to

25  convict him on cell site evidence, supposed sightings.  We will

1   hear about this Mercedes-Benz that he was observed in.  The

2   Mercedes-Benz is the car of his baby's mother.  They're trying

3   to convict him on the association with some other people, and

4   the word, I think, the government used was "cooperator" to

5   refer to Patrick Taylor.  Or witness, they referred to him as a

6   witness.  My colleague referred to him as a cooperator.

7   There's other names, which we'll get to, that he can be

8   referred to in the course of this trial, and I'll tell you why.

9         They also rely on the word of Janiel Brown, this

10  disgruntled girlfriend, who was subpoenaed into this courthouse

11  and under the threat of compulsion and under the threat of

12  going to jail for the rest of her life, and the threat of

13  sitting in this chair, agreed to testify against Mr. Dore and

14  Mr. Barrett.  But, again, where is the hard proof?  There is no

15  written confession by Mr. Barrett.  There's no oral confession

16  by Mr. Barrett.  There's no video confession by Mr. Barrett.

17        Cell site evidence, as you've heard, only tends to

18  prove where a person associated with a phone, what cell tower

19  that phone used.  Nothing more.  It's not like a wiretap.  A

20  wiretap, when two people are talking, you can listen in, in

21  essentially real time, to what's happened, what's transpiring,

22  what one person's saying to the other person.

23        I concur with my colleague.  These are very heinous

24  crimes, reprehensible.  Nobody condones these crimes.  That's

25  not what you're here for, to pass judgment on the crimes.  To

1    say that they've been committed, you will hear testimony and

2    there will be cross-examination.  There may certainly be some

3    questions and issues as to how a particular crime occurred.

4    But we don't deny that the crime itself occurred.  The judge

5    has told you before that the burden of proof here is the proof

6    of guilt beyond a reasonable doubt.

7            I'm sure many of you have sat on civil cases before.

8    It's a different burden of proof than in a civil case.  In a

9    civil case, what you're talking about is monetary damages.

10   There's a car accident.  One person hits the other person and

11   there may be injuries, and you're fighting over how much money

12   one party, the plaintiff or the defendant, is going to get.

13   And the burden of proof in that is by a preponderance greater

14   than 50 percent of the proof, to win the case.

15           Well, you've heard from the government.  You've heard

16   from the judge that the stakes here are much higher.  Couldn't

17   be higher.  Somebody lost their life in the murder, and two

18   gentlemen's lives are on the line here now.  So the scales of

19   justice just don't require proof a little bit over 50 percent

20   of the preponderance.  It's proof beyond a reasonable doubt.

21           There's not one robbery victim of however many they

22   bring in here who is going to take the witness stand, swear

23   under oath, point a finger at Mr. Barrett and say, That's the

24   man that robbed me.  It's not going to happen because there's

25   no credible proof that they did.  Who is going to put a gun in

1    his hand?  Not a victim.  Who is going to put a knife in his

2    hand?  Not a victim.  The only persons who could possibly try

3    to put a gun in the hand or will try to put a gun in his hand

4    in exchange for their bid for freedom and leniency from this

5    Court, will be cooperator Patrick Taylor.  He's also known as

6    Squeak or Spooky.  And maybe Janiel Brown.  And Janiel Brown,

7    if you believe anything that she has to say, she's up to her

8    eyeballs in this crime.  And you'll hear that she made a deal.

9           She made a deal with the government, this government

10   that's prosecuting this case, for a total walk.  She was facing

11   potentially life imprisonment.  She made a deal.  She testified

12   and she could come out scot-free.  Forget no jail for life, but

13   no imprisonment and no record.

14          When you look for what we call proof that the

15   government has, the government was talking about Mr. Barrett

16   was divvying up the proceeds of the crime, the fruits of the

17   crime.  Well, you listen to the record and see what, if any,

18   evidence there is, whatsoever, of what we call unexplained

19   wealth in this case, whether there's jewelry found on his

20   person or in the search of his home when he's arrested from the

21   alleged robberies.  The only thing that's found is $1,500 in

22   the home of his girlfriend, who is a working woman, Ms. Felicia

23   Lake.

24          (Continued on next page)

25

1          MR. ROTH:  Now Mr. Barrett is a tall man.  There is

2     some testimony on the street of being nicknamed the giant.  He

3     is 6'7" or taller.  That's, in basketball terms, that's not a

4     point guard, that's a power forward or beyond.  He is a big

5     man.  And I submit to you that despite what the government says

6     that the robbers were wearing masks, if this man -- I will ask

7     you to stand for just a sec -- if this man was robbing you, he

8     would have a presence over you, his voice would be booming over

9     you and you would feel him in your presence.

10          There is no witness except perhaps Spooky or Squeak

11     who could come in here because he knows that there is missing

12     evidence in the government's case that would put him at a

13     robbery scene.

14          And by the way, the government, they're very

15     intelligent, experienced prosecutors.  This case was set for

16     this trial date a long, long time ago.  They analyzed their

17     case, they built their case, and a month ago when they realized

18     that they didn't have solid evidence against Mr. Barrett they

19     signed up Patrick Taylor as a cooperator.  Patrick Taylor is a

20     cooperator because they needed him.  Then what happened?  When

21     they knew his testimony still wasn't filling in all the holes

22     in exchange for promises of leniency, then they signed up his

23     ex-girlfriend just this month.  Just within the last week they

24     made that deal with her, they basically gave her the court

25     house to come in here and try to help convict Mr. Dore.

D355dor3                          Opening - Mr. Roth

1           If the government's premise in part is why Mr. Barrett

2    can't be ID'd by these victims is that he was driving the

3    getaway car.  Well, if people were running out of the car that

4    he was driving -- and by the way, that Mercedes Benz is not his

5    car, the car is Ms. Lake's car.  It is registered to Ms. Lake,

6    there is no crime in a working woman buying a used Mercedes.

7    And I say in that car there is no crime that he gave rise to,

8    for instance, Mr. Dore, the association is nothing criminal.

9           The testimony will also show that Ms. Lake did not

10   give him the exclusive use of that Mercedes Benz, that she lent

11   it to other men.

12          You can't convict a car.  But they're saying he's only

13   just the wheel man, that's why nobody can see him.  But if

14   people are going out of that car, coming back with robbery

15   proceeds, driving around casing the joint, why aren't there

16   fingerprints in that car?  Why isn't there DNA in that car?

17   They went through that entire car.  Now, conveniently maybe

18   they'll have a cooperator come in here, Taylor or Janiel and

19   say, oh, they wiped that car down.  They know they watch CSI,

20   they must have wiped that car down to get rid of everything.

21          Well, listen to the facts when it comes to the murder

22   where there is a homicide in a van and ask if the people -- and

23   I defy you after the case is over -- to prove beyond a

24   reasonable doubt who shot that unfortunate man in that van.

25   But listen to the evidence from crime scene about the search of

1    that van and see if the way that van was left is consistent

2    with people who wipe down cars for prints.  Because in that

3    van, we know that now, crime scene got there and found a dead

4    body; there is money secreted in various parts of the van.  A

5    lot of money the robbers obviously didn't take.  There is a

6    shell casings.  Everybody knows you pick up your shell casings

7    after you commit a crime.  But the people who perpetuated that

8    murder and robbery did not do that.

9            I want to touch on a piece of evidence that is

10   significant, will be important that the government did not

11   touch on and that's a rap video that you will see and it is a

12   video that the government is going to play that shows

13   Mr. Barrett in the Mercedes in question -- not his, Ms. Lake's

14   Mercedes -- and at least two other people in the car who are

15   supposedly part of this robbery crew.  And you will see in that

16   video, very distinctly, that they put on masks, they apparently

17   are wearing gloves, and it looks like they're loading guns and

18   then they get out of the car, they follow somebody in, it looks

19   like they're robbing somebody.  They take a bag from somebody,

20   throw it down and run into the car.  There is music and

21   everything else to that.

22           The government is going to ask you to draw certain

23   assumptions from that video as they are going to ask you to

24   draw certain assumptions from a lot of facts in this case.

25           Now, it is true that if you didn't see this video in

1       the context like you'll see it here on the screen with the

2       overlay and it is a produced video, rap video, and you were

3       just driving by, it is fair to say that you would look like

4       somebody's committing a robbery.  But, it will be clear to you

5       after you see it that it was nothing more than a rap video.

6              And another thing that's illustration from that piece

7       of evidence and how you have to evaluate evidence, it is your

8       responsibility, if you look at that video you'll be able to see

9       what looks like real -- two real automatic weapons -- looks

10      like to you, as laypeople, because whatever you have seen from

11      jury or even if you have seen some guns.

12             But the bottom line is if you were asked to convict on

13      proof beyond a reasonable doubt whether the weapons in that

14      video were real or not, you couldn't do it because it's

15      impossible to tell despite the fact that it looks like they're

16      real weapons.

17             Mr. Barrett is not denying that he knew some of the

18      people that you'll hear testimony about including a fellow

19      named Taget Todd who was in that video.  In fact, he knows

20      Spooky or Spook, the cooperator.  He knows him because Spook,

21      as you have heard from my colleague, is a pot dealer.  Big pot

22      dealer.  Not small-time pot dealer but sold hundreds of pounds,

23      kilos, hundreds of kilos over the course of his life.  Over a

24      thousand kilos.  And he used to sell Mr. Barrett liked pot and

25      there is a house you will hear in Mount Vernon a so-called

1      party house, people hung around, listened to music and smoked

2      joints and Mr. Barrett had a relationship with him and from

3      time to time would buy some pot from him.

4              He knows Hussain from the store but association is not

5      a crime.  You are going to hear about this man Fahd Hussain or

6      Moe.  He operated a store but it was really a true den of

7      iniquity.  People came into his store as customers or suppliers

8      and it is true they came out as victims.  But Spooky was part

9      of that web of criminals and Mr. Barrett was not.  There is no

10     honor, you will hear, amongst Hussain and the people that he

11     dealt with.  There was another fellow here who you are going to

12     hear a lot of testimony about, Mr. Singh, who operated a little

13     jewelry kiosk in that store who is up to his eyeballs with

14     Hussain.  Hussain, who is married, four kids, had a child with

15     Singh's sister and then set up his brother-in-law to be robbed.

16             My point is he, Spooky, they're only interested in

17     self-dealing and getting ahead for themselves and nothing short

18     of that.

19             Speaking of Spooky, you are going to hear that he made

20     a deal with the government.  It is all going to come out.  And,

21     you know, some people think it is impolite to call a cooperator

22     a rat.  Actually, in some ways it is a compliment and the

23     reason that cooperators became known as rats in some ways is

24     because they are like rats in terms of survival.  You can try

25     to kill them, you can try to use all different types of means,

1    but they know how to hustle and get over.  And that's exactly

2    what Mr. Taylor did in this case.  He was face mandatory prison

3    time on this case.  He was facing a maximum of life

4    imprisonment.  Instead, he made a deal with the government in

5    hope of getting leniency from this court in exchange for his

6    testimony.

7         You are going to hear testimony from police witnesses

8    and special agents.  They just asked you during the voir dire

9    can you accept police testimony.  We know -- and not hold it to

10   either different standard either for, favor it or be prejudiced

11   it against it.  All I am asking you is that when a police

12   officer testifies that that badge does not become a badge of

13   truth and ask yourself when the police officer takes the

14   witness stand, does he have any professional reason to tailor

15   or color or shade his testimony in this case whether it be for

16   promotion or otherwise?  Ask yourself whether he has any

17   personal relationship with the parties that would get him to

18   shade or color his testimony.

19        And the same thing is true with the special agents and

20   that's what they're called.  You don't make their testimony any

21   more special than any other civilian witness that you hear.

22        The civilian witnesses, again, ask yourself, whether

23   they, when they take the witness stand, have any particular

24   motive to falsify or color their testimony in a certain way.

25   You are going to hear testimony that many of the civilians were

1     involved in criminal acts themselves and now they're called

2     upon and asked to testify for the government.  Ask yourself

3     whether they might color their testimony in such a way to curry

4     favor with the government.

5              At the end of the day the Judge told you that you are

6     the fact finders alone.  You will determine whether or not a

7     witness is lying and the judge will tell you if you determine

8     that a witness lied about a material fact that you can

9     disregard that portion of the witness' testimony or the entire

10    testimony of that witness.  Just like if you had lunch today at

11    the restaurant and you got some vegetable soup and there is

12    some rotten vegetables in it.  You'll have to pick out the

13    vegetables and eat the soup or throw the whole thing away.  And

14    that's what you can do with the testimony of any witness you

15    find falsely testified about something.

16             You have heard that the defense has no burden of proof

17    and it is easy to say these words because we're lawyers and the

18    Judge has said them before and he is reading off of his sheet,

19    but you're the ones that have to breathe life into it.  Many of

20    you may be sitting there saying if I was in that hot seat with

21    Mr. Barrett and I was falsely accused I would be jumping up and

22    testifying and proclaiming my innocence.  But a courtroom, as

23    Judge Sullivan emphasized time and time again, is a different

24    set of rules.  It is not like a presidential debate where you

25    get to hear one side and you get to hear another side and you

1    get to make a decision.  You will hear.  The fact that we may

2    not call a witness or we may not call Mr. Barrett to the stand,

3    the Judge will tell you you can't hold that against him, you

4    can't draw a negative inference, but our defense may be

5    contained in the proof or the lack of proof, the answers to the

6    questions that I asked on cross-examination.

7            This is the only time that I'm going to get to address

8    you directly until I stand up at the end and we do our

9    summations, and at that time I'm confident that when I do

10   address you again during summations, I will ask you to return

11   the only verdict that will be consistent with the evidence, and

12   that's a verdict of not guilty.

13            Thank you.

14            THE COURT:  All right.  Thank you, Mr. Roth.

15            We are now going to begin the testimony.  Okay?

16   Mr. Ferguson, are you okay?

17            A JUROR:  Yes.

18            THE COURT:  Does anybody need a break or can we roll

19   right into the testimony?

20            Let's do that then.  Government, your first witness.

21            MS. MASELLA:  Your Honor, the government calls Jesse

22   Singh.

23    JASPAL SINGH,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

D355dor3

1              THE WITNESS:  Jaspal, J-A-S-P-A-L, Singh.

2              THE COURT:  You may proceed, Ms. Masella.

3              MS. MASELLA:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MS. MASELLA:

6    Q.  Good afternoon, Mr. Singh.

7              In addition to your given first name do you use any

8    nicknames?

9    A.  Jesse.

10   Q.  Jesse?

11   A.  Yes.

12   Q.  Mr. Singh, how are you employed currently?

13   A.  I work part-time right now.

14   Q.  What kind of work do you do part-time?

15   A.  I'm managing a gas station.

16   Q.  Where is the gas station that you manage?

17   A.  30 Mount Vernon Avenue.

18   Q.  What city is that in, sir?

19   A.  That's in Mount Vernon, Westchester.

20   Q.  How long have you been working at 30 Mount Vernon Avenue at

21   the gas station?

22   A.  Two years.

23   Q.  And what did you do before that?

24   A.  I also managing the gas station in the Bronx.

25   Q.  Where is that gas station located?

D355dor3                          J. Singh – direct

1   A.   2947 Jerome Avenue, Bronx.

2   Q.   Is there some relationship between the gas station in the

3   Bronx and the gas station in Mount Vernon?

4   A.   Yes.   The same owner.

5   Q.   For how long, approximately going back, have you been

6   working for the same owner managing these two gas stations?

7   A.   About 17 years.

8   Q.   Now, focusing on the Mount Vernon gas station for a moment,

9   what is the name of that business?

10  A.   Mount Vernon?

11  Q.   Yes.

12  A.   Mount Vernon Service Center.

13  Q.   And what kind of business is it?

14  A.   Gas station, repair shop and a C store -- convenience

15  store.

16  Q.   What kind of products, in addition to gas, are sold at the

17  service station and the convenience store?

18  A.   Cigarettes, candy, soda, small merchandise.

19  Q.   For that gas station in Mount Vernon, where are the gas

20  suppliers located?

21  A.   New York and New Jersey.

22  Q.   What portion of the business from that gas station is cash

23  proceeds as opposed to credit cards or debit card proceeds?

24  A.   About 60 and 40.

25  Q.   Which is 60 and which is 40?

D355dor3                          J. Singh - direct

1   A.   60 cash and 40 credit.

2   Q.   Can you describe for the jury how the cash proceeds of the

3   Mount Vernon gas station are generally handled?

4   A.   Twice a week we take all the cash and bring it to the other

5   location --

6             MR. ROTH:  Judge, I would just ask that he testify in

7   the first person.

8             THE COURT:  We as opposed to?

9             MR. ROTH:  I.

10            THE COURT:  Well, were there other people who work at

11  the store?

12            THE WITNESS:  Yes.

13            THE COURT:  How many other people?

14            THE WITNESS:  Three people.

15            THE COURT:  All right.  So, what is the question?

16  BY MS. MASELLA:

17  Q.   Mr. Singh, what role do you have with respect to handling

18  the cash proceeds of the Mount Vernon service station?

19  A.   I pick up the cash to drop off to the other station.

20  That's it.

21  Q.   The other station in the Bronx?

22  A.   Yes.

23  Q.   How many times per week do you do that?

24  A.   Two times.

25  Q.   And how much cash do you typically carry on one of these

D355dor3                         J. Singh - direct

1   trips?

2   A.   About $25,000 to $30,000.

3   Q.   And what happens to the cash after you bring it to the

4   Bronx service station?

5   A.   They pick it up from there, they take it to the office and

6   count it and take it to the bank.

7   Q.   Mr. Singh, did there ever come a time when you called

8   police officers in connection with your business at the Mount

9   Vernon Service Center?

10  A.   I'm sorry?

11  Q.   Did there come a time when you called police officers in

12  connection with your business at the Mount Vernon Service

13  Center?

14  A.   Yeah.

15        I pick up the cash, I was going to the Bronx location.

16  As soon I left from there I see the black Mercedes behind me

17  and I make a left turn, they was behind me, and I stop at the

18  light and they stopped behind me like 200 feet, like they were

19  coming too close.  And the second traffic light they did the

20  same thing, they parked to the, like right side -- you know,

21  they pulled to the right side as soon as I stop at the light.

22  Third traffic light they did the same thing.  And then I take

23  the highway from there and they was behind me on the highway.

24  Then I got off at the next exit and I make a right turn and

25  they were behind me.  Then other traffic light I make a left

D355dor3                           J. Singh - direct

1   turn, the Mercedes car still behind me, then I panicked and I

2   call the police at that time.

3   Q.  Let me back you up for a second, Mr. Singh.

4           First of all, can you tell us when this was, what

5   month and year that you are describing?

6   A.  In November 2011.

7   Q.  Approximately what time of day?

8   A.  About 10:30, 11:00.

9   Q.  In what area geographically were you when you first noticed

10  this Mercedes?

11  A.  As soon I left from the station and about three, four, five

12  blocks up I noticed that.

13  Q.  At that time were you able to see anything about the

14  occupants of the Mercedes?

15  A.  Soon I make a left turn I thought it was regular car coming

16  behind me and as soon I stop at the first traffic light and

17  they pulled to the right corner and they park and then I more

18  careful, you know?  And after that I, every time I stop they

19  were doing same thing so I feel suspicious a little bit.  And

20  then after that I take the highway and then I call the police,

21  you know, after.

22  Q.  Did you notice what type of Mercedes it was?

23  A.  It was a black Mercedes.

24  Q.  Do you know anything about the model of the car, the type

25  of car?

D355dor3                         J. Singh - direct

 1   A.  It looks like S class 430 or 500.

 2   Q.  How long, approximately, would you say that you noticed

 3   this car behind you?

 4   A.  How long?  When it takes me about 15 to 20 minutes to get

 5   to that station and soon I left the station I notice that that

 6   car was behind me and I was about 15 blocks from -- to reaching

 7   that gas station and then I called the police when they were

 8   still behind me.

 9   Q.  And when you say you called the police, who in particular

10   did you call?

11   A.  I called Carlos V --

12           THE COURT:  Do you know how to spell it?

13           THE WITNESS:  No, I don't know.

14   Q.  Are you -- do you personally know that officer, sir?

15   A.  Yes.

16   Q.  How is it that you know him?

17   A.  I like at the gas station, the Bronx location 15 years and

18   I do repair work, tire repair work for police cars at that

19   location.

20   Q.  And is that officer one of the officers who got car repairs

21   at your Bronx location?

22   A.  Yes.

23   Q.  When you called him did you actually speak with him on the

24   phone?

25   A.  When?

D355dor3                           J. Singh - direct

1    Q.  When you called the police officer, did you actually make

2    contact and speak with him on the phone?

3    A.  Yes.  I called first time, he didn't pick up the phone; I

4    called back again and then he pick up the phone.

5    Q.  After speaking with that police officer, what did you do

6    next?

7    A.  After I speak to him and he tell me where they are located

8    and then I call also my gas station or my cousin's brother, he

9    is supposed to pick up the money, and I call them, I said there

10   was a Mercedes car behind me and then I say I am not going to

11   go to the gas station.  And when I reach to the gas station I

12   make a right turn and the police officer was from there about

13   five blocks away and they was waiting for me, you know, to get

14   there.

15   Q.  Where was the police officer located, in what area?

16   A.  Jerome and Moshulu Parkway.

17   Q.  What did you do when you got to the area of Jerome Avenue

18   and Moshulu Parkway?

19   A.  I stop, and I think when they stopped the Mercedes car and

20   then they tell me to leave.

21   Q.  Did you observe the Mercedes car stop in that area?

22   A.  Yes.  I look.

23   Q.  At that time did you observe anything about the occupants

24   of the car?

25              Did you observe anything about the occupants of the

D355dor3                          J. Singh - direct

1  Mercedes when it stopped?

2  A.  I don't understand what you mean occupants.

3  Q.  I will rephrase, sir.

4         Did you see any of the -- any people get out of the

5  Mercedes?

6  A.  Yes.  The driver, I saw him when he coming out.  As soon

7  they tell me to leave I look back and I saw the driver coming

8  out from the car.

9  Q.  And could you describe for us what the driver looked like?

10  A.  He was tall, male, black male, you know.

11  Q.  Can you approximate how tall he was?

12  A.  I would say about six, 6 and a half feet.  Six and half.

13  Q.  Six and a half feet?

14  A.  Yeah.

15         MS. MASELLA:  One moment, your Honor.

16         (Pause)

17         MS. MASELLA:  Your Honor, no further questions for

18  Mr. Singh at this time.

19         THE COURT:  All right.

20         Cross-examination.  Mr. Roth, you are going to go

21  first?

22         MR. ROTH:  Thank you.

23         THE COURT:  Okay.

24  CROSS EXAMINATION

25  BY MR. ROTH:

D355dor3                         J. Singh - cross

1   Q.  Good afternoon, Mr. Singh.

2   A.  Good afternoon.

3   Q.  If there is any question that I ask you that you don't

4   understand, please just ask me to rephrase it before you answer

5   that question.  Okay?

6   A.  Sure.

7   Q.  You indicated, sir, that you know the police officer that

8   you called on the telephone that day in November?

9   A.  Who I call?

10  Q.  Yes.

11  A.  Yes.

12  Q.  And you know him -- you may not know how to spell or

13  pronounce his last name but you know him as Carlos; is that

14  fair to say?

15  A.  Yes.

16  Q.  And you indicated that you know Carlos from Carlos coming

17  in the shop; is that right?

18  A.  Yes.

19  Q.  And the police fleet where their cars get serviced there;

20  is that correct?

21  A.  Yes.

22  Q.  Is that the extent of your relationship with Carlos?  In

23  other words, do you know him more than from him coming in the

24  shop?

25  A.  Yes.  He come into the shop and then we, after that, yes,

D355dor3                        J. Singh - cross

1    we go to the retirement parties, I meet them a couple times.

2    Q.  You meet Carlos?  You go out with him socially?

3    A.  Not socially, but I go out with him for sometimes dinner,

4    yes.

5    Q.  Oh.

6         So how many times do you go out to dinner with Carlos,

7    this police officer?

8    A.  How many times like in a week or how many times in a year?

9    Q.  We can start with a week and then we will work our way up.

10   A.  No, not a week, maybe a couple times a year.  You know?

11   Q.  Okay.  And what occasions are these?  You said retirement

12   parties for other police officers?

13   A.  Yes.

14   Q.  And he invites you?

15   A.  Yeah.  They invite me because they all coming to me for

16   repair of fleet cars, you know?

17   Q.  Do you have to pay for that ticket or do they pay for your

18   ticket?

19   A.  For?

20   Q.  For the ticket for the retirement parties?

21   A.  Like if they everybody chip in, then I have to pay.

22   Q.  Who else is chipping in?

23   A.  All police officers.

24   Q.  So you chip in just like another police officer chips in?

25   A.  Like, yes.  They invite everybody, you know, all their

 1  friends.

 2  Q.  But you have to pay your way?

 3  A.  Yes.

 4  Q.  Sometimes does he pay for you when you go out?

 5  A.  No.

 6  Q.  And that's -- part of the reason for that is because you

 7  say you have a business relationship with him, is that right?

 8  A.  Not a business relationship.  I mean, they just know me

 9  because they come in to do repairs with me sometimes.

10  Q.  You are friends with him, is that fair to say, with Carlos?

11  A.  Yes.

12  Q.  Other than retirement parties, do you go out to have dinner

13  with him on occasions?

14  A.  Not really.

15  Q.  Well --

16  A.  Some, yeah.

17  Q.  Help us:  Not really?

18  A.  Sometimes like I say, yes, I go one or two times, you know?

19  Q.  And is that with your wife or his wife or just with other

20  guys?

21  A.  Other guys.

22  Q.  And where do you go when you go?

23  A.  We go to the local restaurant.

24  Q.  Which is what?  Which restaurant is that?

25  A.  Local restaurant, any restaurant in the Bronx, you know.

D355dor3                              J. Singh - cross

1  Q.  What is the last one you went to with him?

2  A.  Last I went to, I think in New Rochelle.  In New Rochelle.

3  Q.  And what was the name of that New Rochelle restaurant?

4  A.  I forgot the name of the restaurant.

5  Q.  And the last time you went out to dinner with him on a

6  social occasion, who paid the bill that time?  That wasn't a

7  retirement party, right?

8  A.  Everybody chipped in.

9  Q.  Everybody chips in.

10        Now, you said there is no professional relationship.

11  Do you also service the car of -- the Police Officer Carlos'

12  personal car?

13  A.  Yes.

14  Q.  Oh, he brings that into your shop?

15  A.  Yes.

16  Q.  And how many times -- what kind of car does he have;

17  Carlos?

18  A.  He have a Ford exhibition.

19  Q.  And how many times do you service that car for him?

20  A.  Every time he need a New York State inspection and he bring

21  it in I do the state inspection.

22  Q.  What about repairs?

23  A.  Our repair, if you need minor oil change, like that stuff,

24  we do there.

25  Q.  And do you give him any special break?

D355dor3                         J. Singh - cross

1   A.  No.  Same price he pays.

2   Q.  And does he give you a PBA card?

3   A.  No.

4   Q.  You never got a PBA card from him?

5   A.  PBA card, yes.  Sometimes he give me once a year.

6   Q.  Once a year.  Okay.

7           And what is your understanding, sir, of what you can

8   do with that PBA card?

9   A.  I don't know.  He just give it to me, you know?

10  Q.  Do you keep it in your wallet?

11  A.  Yeah.

12  Q.  Do you have it in your wallet today?

13  A.  Yes.

14  Q.  Why do you keep it in your wallet?

15  A.  Because he give it to him.

16  Q.  Well, he can give you lots of things, you don't keep it in

17  your wallet?

18          THE COURT:  Is that a question?

19          MR. ROTH:  I apologize, your Honor.  I will withdraw

20  that.

21  Q.  Is it your understanding, sir, that if you get stopped by

22  police officers you can show that PBA card?

23  A.  I don't know.

24  Q.  Is that PBA card, does that have his shield on it?

25  A.  I didn't check.  I didn't know.

D355dor3                          J. Singh - cross

1   Q.  Do you have -- could you take it out now?

2   A.  I don't have the card now.

3   Q.  Do you have your wallet with you?

4   A.  Yes.

5   Q.  Now, have you ever been robbed before?

6   A.  Never.

7   Q.  But you make these cash hauls all the time, is that

8   correct?

9   A.  Yes.

10  Q.  Anyone else in your gas station been robbed before?

11  A.  Never.

12  Q.  You carry $25,000 or more in cash; is that right?

13  A.  Yes.

14  Q.  That's a lot of cash, right?

15  A.  Yes.

16  Q.  Is it fair to say that's the only time that you carry that

17  kind of cash around?

18  A.  Only?

19  Q.  Time.  You don't personally carry around $25,000?

20  A.  No.  Never.

21  Q.  So, I assume you sort of are very careful when you are

22  carrying that cash around?

23  A.  Yes.

24  Q.  And you are fearful of possibly being robbed I guess; is

25  that fair to say?

D355dor3                         J. Singh - cross

1    A.  Yes.  I am very careful when I have the cash on me.

2    Q.  So you always are looking around to see if there is

3    anything suspicious; that's what you are looking for, right?

4    A.  Yes.

5    Q.  And tell me where this Mercedes was the first time that you

6    saw it that day.

7    A.  That was on Mount Vernon Avenue and Bronx River Road.

8    Q.  How many cars were between the Mercedes and yourself when

9    you first saw it?

10   A.  Right behind me.

11   Q.  Right behind you.

12       And you came to a light and then what happened?

13   A.  I stop at the light and that car is supposed to be stopped

14   right behind me.  It didn't stop right behind me, it stopped

15   like 200 feet.  You see the empty spot on the side, they pull

16   right there.  You know?

17   Q.  Was there a car in front of you at this time?

18   A.  At this time, no.

19   Q.  And then did another car come behind you after the Mercedes

20   pulled over?

21   A.  No.  No.

22   Q.  And then this went on for a period of time?

23   A.  Three lights.

24   Q.  And that's when you called Carlos, is that right?

25   A.  No.  I crossed the three lights and then I take the highway

D355dor3                         J. Singh - cross

1   and I take the highway and I still see the Mercedes car behind

2   me and that's like less than a mile.  Next I got out after off

3   and there was a traffic light, and I make a right turn there

4   and then there is other traffic light when I make a right.  I

5   make a left turn and when I make a left turn the car was still

6   behind me and then I called Carlos.

7   Q.  And how did you call him?  Did you have a --

8   A.  Cell phone.

9   Q.  Cell phone.  You just dialed the cell phone in the car?

10  A.  Yes.

11  Q.  How many other cars at that point were between you and the

12  Mercedes?

13  A.  They were right behind me.

14  Q.  The whole time he was right behind you?

15  A.  Yes.

16  Q.  In other car?

17  A.  On the highway they were speeding behind me.  As soon as I

18  change the line they were changing the line.

19  Q.  And do you recall the actual date that this happened, sir?

20  A.  November -- that was a Monday -- I think it was 14, 2011.

21  Q.  November 14th.  How do you remember that day?

22  A.  I remember that day, yes.

23  Q.  My question, sir, is how do you remember now, some years

24  later, that date, November 14th, 2000?

25  A.  I still remember because that's shocking for me.  That day

D355dor3                          J. Singh - cross

1   I still remember.

2   Q.  That date, November 14th, stayed in your head?

3   A.  Yes.

4   Q.  Well, let me ask you this, sir.

5           Do you recall sometime after the incident getting a

6   telephone call from a detective, Detective Kruse -- Dennis

7   Kruse -- concerning the incident?

8   A.  Yes.  A couple weeks later.

9   Q.  And he asked you about the incident what happened that day;

10  is that fair to say?

11  A.  Yes.

12  Q.  And he asked you could that have been on the -- do you

13  recall exactly when that was?  Could it have been in December

14  about a month later, December 14th, that he called you,

15  Detective Kruse?

16  A.  Couple weeks later, yes, he called me, but I'm not sure if

17  it is December.  I'm not sure.

18  Q.  Okay.

19          And, do you recall him asking you when the event

20  happened, when this happened?

21  A.  Yeah.  He asked me --

22  Q.  That's the one question.  Do you recall him asking you when

23  this occurred, the car was following you, supposedly?

24  A.  He called me -- I'm sorry.  Say that again.

25  Q.  He called you --

D355dor3                          J. Singh - cross

1    A.   Yes.

2    Q.   -- to ask you questions about this event.

3    A.   Yes.

4    Q.   And he asked you during that conversation when did the

5    event happen.  Do you recall that?

6    A.   Yes.

7    Q.   And, do you recall telling Detective Kruse that it happened

8    November 28th, 2011, not November 14th, 2011?

9    A.   I don't remember saying that.

10   Q.   Is it possible that you said that?

11   A.   I don't remember.  No.

12   Q.   You were interviewed in this case by the prosecutors who

13   are seated at the table, Ms. Lester.  Do you recall that?

14   A.   Yes.

15   Q.   And that was her office, is that right?

16   A.   Yes.

17   Q.   And that was just the end of January, is that correct, of

18   this year?

19   A.   Yes.

20   Q.   And at that time do you recall she asked you to describe

21   the driver of that Mercedes that day?

22   A.   Yes.

23   Q.   And, do you recall she asked you to describe the height of

24   the driver?

25   A.   Yes.

D355dor3                           J. Singh – cross

1   Q.  And do you recall saying, in response to her question, he

2   was over six feet?

3   A.  Yeah.  Over six feet, yes.

4   Q.  But you never said 6'5", is that correct?

5   A.  I don't remember.  I think it was over six feet, yes.

6   Q.  But my question is do you ever recall telling Ms. Lester

7   that he was over 6'5" or six feet and a half?

8   A.  Maybe.  Yeah.

9   Q.  Maybe?  You're not so sure?

10  A.  I mean it is over six feet; six and a half or seven.  It

11  was tall.

12  Q.  Seven feet?

13  A.  Six and a half.  About that height, yes.

14  Q.  So, is it your testimony now that you believe you may have

15  told her that he was seven feet?

16  A.  Over six feet.

17  Q.  Over six feet.  That's your best recollection?

18  A.  Yes.

19  Q.  You never said specifically 6'5"?

20  A.  No.

21          MR. ROTH:  I have no further questions.

22          THE COURT:  Ms. Fontier or Ms. Stafford?

23          MS. STAFFORD:  No question.

24          THE COURT:  No questions.

25          Any redirect?

D355dor3                          J. Singh - cross

1              MS. MASELLA:  No, your Honor.

2              THE COURT:  Mr. Singh, you may step down.  Thank you.

3              (Witness steps down)

4              THE COURT:  Next witness.

5              MS. MASELLA:  Your Honor, the government calls Carlos

6    Villanueva.

7     CARLOS VILLANUEVA,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10             THE COURT:  Mr. Villanueva, if you could move up a

11   little closer to the microphone and then slow down a tad when

12   you talk.  You're a New Yorker, we all talk fast but my court

13   reporter, who is great, only has 10 fingers.

14             Okay, Ms. Masella, you may proceed.

15             MS. MASELLA:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MS. MASELLA:

18   Q.  Good afternoon, sir.

19   A.  Good afternoon.

20   Q.  How are you employed?

21   A.  By the New York City Police Department.

22   Q.  And what is your title with the New York City Police

23   Department?

24   A.  Police officer.

25   Q.  Is that also known as NYPD, by the way?

D355dor3                        Villanueva - direct

1   A.  Yes, ma'am.

2   Q.  How long have you been a police officer with the NYPD?

3   A.  19 years.

4   Q.  In what area have you been assigned during your 19 years as

5   a police officer?

6   A.  The 52nd Precinct in the Bronx.

7   Q.  Can you describe for the jury what area the 52nd Precinct

8   in the Bronx covers?

9   A.  It covers from Fordham Road in the Bronx up to areas of

10  East 233rd Street and from Webster Avenue pretty much to Jerome

11  Avenue.

12  Q.  What are your current duties as a police officer in the

13  52nd Precinct?

14  A.  I currently work in the school unit.

15  Q.  What do you do as a member of the school unit?

16  A.  Basically we try to deter any activities that are going on

17  around outside the school, pick up truants and try to prevent

18  gang assaults usually outside of dismissals around schools.

19  Q.  Approximately how long have you been assigned to the school

20  unit in the 52nd Precinct?

21  A.  Almost 10 years.

22  Q.  Officer Villanueva, do you know an individual named Jesse

23  Singh?

24  A.  Yes, I do.

25  Q.  How do you know that individual?

D355dor3                              Villanueva – direct

1   A.  He is a friend of mine and a business owner of a business

2   that is inside the confines of the 52nd Precinct.

3   Q.  Which business is that?

4   A.  It is a gas station.  I think it had a few different names,

5   Sunoco, Citgo, located on Bedford and Jerome.

6   Q.  Have you ever used that gas station for either gas or car

7   repairs personally?

8   A.  Yes.

9   Q.  When you say he is a friend of yours, can you generally

10  describe their friendship with him?

11  A.  He has been in the area approximately, I think, 1996.  We

12  also take the police cars to get fixed there for spare tires or

13  flat tires -- tire repair.

14          I have, off-duty, had dinner and socially spent time

15  with Jesse.

16  Q.  Did there come a time when you received a phone call from

17  Jesse Singh in connection with your duties as a police officer?

18  A.  Yes.

19  Q.  When was that?

20  A.  November of 2011.

21  Q.  Do you remember the exact date in November?

22  A.  November 14, 2011.

23  Q.  Do you recall approximately what time you received this

24  phone call?

25  A.  Sometime after 1:00 p.m.

1  Q.  In what area were you when you received that call?

2  A.  I was actually on East 208th Street and Moshulu Parkway --

3  Moshulu Parkway North.

4  Q.  Were you working at the time?

5  A.  Yes, ma'am.

6  Q.  Were you by yourself or were you with another police

7  officer?

8  A.  I was with another police officer.

9  Q.  Who was that?

10  A.  Police Officer Luis Segarra.

11  Q.  And what were you and Police Officer Segarra doing at that

12  time?

13  A.  Basically we were going over a plan to just cover the

14  dismissal which we normally do every day.  I was actually

15  talking with some of my other co-workers and my supervisor.

16  Q.  And when you say dismissal, you are referring to school

17  dismissal?

18  A.  Yes.

19  Q.  Were you in a car or on foot at that time?

20  A.  When I received the phone call I was on foot next to my

21  car.

22  Q.  And after you -- when you received the phone call from

23  Jesse Singh, did you speak with him at that time?

24  A.  Initially I got a phone call and I didn't pick up because I

25  was talking with my supervisor and my co-workers regarding our

1   plan, and then shortly after I received another phone call and

2   it was a little unusual for Jesse to call me back right away

3   again after calling me and me not picking up the call.

4   Q.  So, at that time did you speak with him?

5   A.  Yes.

6   Q.  Now, after you spoke with Jesse Singh on the telephone,

7   what did you do next?

8   A.  After speaking with Jesse I basically, what he was telling

9   me on the phone I was -- I went into the street and I told him

10  to stay on the phone with me, he was giving me some information

11  regarding --

12          MR. ROTH:  Objection to what he was saying.

13          THE COURT:  I'm not sure that is necessarily hearsay

14  but -- well, what was the question.

15  Q.  After speaking with Jesse Singh, what did you do next?

16          THE COURT:  Let's be responsive to the question; what

17  did you do next?

18  A.  We pulled over a vehicle.

19  Q.  In what area did you pull ore the vehicle?

20  A.  East 208th Street and Jerome.

21  Q.  Can you describe the vehicle that you pulled over?

22  A.  It was a black Mercedes Benz.

23  Q.  What type of Mercedes was it?

24  A.  I'm not sure.  It was definitely a four-door.  I don't know

25  the exact numbers of the type of Mercedes Benz it was.

D355dor3                         Villanueva - direct

1    Q.  Do you remember whether it was a sedan or SUV-type car?

2    A.  Definitely sedan.

3    Q.  At the time you pulled over the Mercedes, did you see

4    Mr. Singh's car at that time?

5    A.  Yes.

6    Q.  Where was that?

7    A.  He had actually went by me as I was talking to him on the

8    phone and he parked on East 208th Street and Jerome about,

9    maybe seven or eight car lengths behind me.

10   Q.  Where was the Mercedes in relation to Mr. Singh's car when

11   you first saw those cars?

12   A.  Approximately four or five car lengths behind Mr. Singh's

13   car.

14   Q.  Were there any cars in between Mr. Singh's car and the

15   Mercedes?

16   A.  Yes.

17   Q.  Approximately how many cars?

18   A.  Maybe two or three.

19   Q.  Now, after you pulled over the Mercedes, what did you do

20   next?

21   A.  I asked the driver to turn off the vehicle.  After that I

22   asked the driver to step out of the vehicle.  I asked the

23   driver for his credentials, driver's license, any paperwork for

24   the vehicle, and he presented me with the credentials of the

25   vehicle and his driver's license.

D355dor3                        Villanueva - direct

1   Q.  While you were -- how many occupants were there in the

2   Mercedes?

3   A.  Two.

4   Q.  And while you were speaking with the driver, what was

5   happening with respect to the passenger?

6   A.  My partner was talking to the passenger.

7   Q.  Now, you said that you asked the driver for his

8   credentials?

9   A.  Yes.

10  Q.  Did he provide them?

11  A.  Yes.

12  Q.  Specifically what did he provide?

13  A.  If I recall correctly it was the driver's license and the

14  insurance card.

15  Q.  And, did the driver's license appear to be in order?

16  A.  Yes, ma'am.

17  Q.  Do you recall the name of the driver?

18  A.  Dwayne Barrett.

19  Q.  And, do you recall what the driver or Mr. Barrett looked

20  like?

21  A.  He is a male black, pretty tall, definitely over six feet,

22  6'2", 6'3", somewhere in that area.  If I had to guess his

23  weight, somewhere around 230, 240 pounds.

24  Q.  After he provided his driver's license and insurance card,

25  what did you do next?

1    A.  I asked him if he had anything in the car that he shouldn't

2    have, and he told me no.

3    Q.  Did you ask him any questions after that?

4    A.  I asked him if I could check the car and he told me yes.

5    Q.  And by check the car, what did you mean by that?

6    A.  Basically just check the inside of the car, the floor, the

7    seats, the back seats.  And then after I checked that I asked

8    him can I check the trunk.  He said yes.  I asked him do you

9    have anything to hide?  He said no.

10   Q.  Can you describe what you did as you conducted a search of

11   the car and what, if anything, you noticed?

12   A.  When I searched the car I did notice at least two cell

13   phones on the console of the front part of the car.  I did

14   notice a car seat in the back seat.  I noticed a pair of

15   sneakers in the back seat.  I also noticed a female size, like

16   a medium size softball bat in the back.

17   Q.  Can you describe the bat that you noticed in the back seat?

18   A.  Basically it was aluminum from the contact part of the bat,

19   and if I recall correctly it was a royal bluish also besides

20   the aluminum part which is silver, and it was like a female

21   because usually the male bats are a little longer, the female

22   bats they're smaller and lighter.  I play softball so I knew

23   that it was a female softball bat.

24   Q.  Other than the cell phones and the bat that you're

25   describing, did you notice anything else either in the --

1   within the car or within the trunk area of the car?

2   A.  When I checked the trunk there was a much smaller bat, like

3   one of those souvenir bats they give you at Yankee Stadium.  I

4   did notice a do-rag -- a black do-rag and I did notice a black

5   winter type ski mask in the back in the trunk.

6   Q.  Are you able to provide a description of the person who was

7   a passenger that day in the car?

8   A.  I do remember him being a male black, thinner and shorter

9   than the driver.  That's pretty much -- I had most of my

10  attention to the driver.

11  Q.  Now, Officer Villanueva, when you were collecting

12  information from the driver, did you ask him for his telephone

13  number as well?

14  A.  I think I did on the report that I filled out, I wrote that

15  information.

16  Q.  Sitting here today, do you remember the telephone number

17  that he gave you?

18  A.  Not by memory, no.

19  Q.  When you refer to the report that you filled out, what

20  specifically are you talking about?

21  A.  A UF-250 report, stop and frisk report.

22  Q.  What is a UF-250 stop and frisk report?

23  A.  It is usually a report that we complete when we stop

24  somebody and we ask them questions for any period or amount of

25  time regarding a possible crime being committed.

1            MS. MASELLA:  May I approach, your Honor?

2            THE COURT:  You may.

3    Q.  I'm showing the witness what has been marked for

4    identification as 3538-B.

5            MR. ROTH:  May I object at this time?  I think she

6    said that it was required to refresh his recollection.  I don't

7    know what it is being offered for now.

8            THE COURT:  It is not being offered, I don't think.

9    She is just showing it to him.

10           MR. ROTH:  Okay.

11           THE COURT:  Right?  You are just showing it to the

12   witness?

13           MS. MASELLA:  Correct, your Honor.

14           THE COURT:  Okay.

15   BY MS. MASELLA:

16   Q.  Officer, 3538-B which is the document marked in front of

17   you, what is that document?

18   A.  That is the front part of the stop, question and frisk

19   report.

20           THE COURT:  Say that again?

21   A.  The stop, question and frisk report; the UF-250.

22   Q.  And did you fill that out close in time to the point at

23   which you obtained the information from Mr. Barrett in

24   connection with the car stop?

25           THE WITNESS:  Can I see it?

D355dor3                         Villanueva - direct

1          THE COURT:  Yes.  You can look at it.

2   A.  Yes.  This is the one I filled out.

3   Q.  And, did you fill it out at or around the time you

4   conducted the car stop?

5   A.  Yes, ma'am.

6   Q.  And when you filled it out were you taking care to be

7   accurate and careful in recording the information?

8   A.  Absolutely.

9          MS. MASELLA:  Your Honor, I would offer this as a

10  recorded recollection so that the witness could read a portion

11  of it into the record.

12         THE COURT:  Any objection?

13         MR. ROTH:  I have no objection, your Honor.

14         THE COURT:  Okay.  So, that's fine.  You can -- you

15  are going to ask him to read a portion of the document to the

16  jury, correct?

17         MS. MASELLA:  Correct, your Honor.

18         THE COURT:  Go ahead.

19  BY MS. MASELLA:

20  Q.  Officer Villanueva, if you are able to read the writing in

21  the area that indicates the phone number that Mr. Barrett gave

22  you, could you read that for the jury?

23  A.  Yes.  The number is 347-883-8414.

24         MS. MASELLA:  One moment, your Honor.

25         (Pause)

D355dor3                         Villanueva - direct

1           MS. MASELLA:  No further questions, your Honor.

2           THE COURT:  Any cross-examination?

3           MR. ROTH:  Yes, your Honor.  Thank you.

4           THE COURT:  Can I see that Exhibit?  Thank you.

5   CROSS EXAMINATION

6   BY MR. ROTH:

7   Q.  Good afternoon, Officer.

8   A.  Good afternoon, sir.

9   Q.  Officer Villanueva, if there is any question that I pose to

10  you that you don't understand, please ask me to rephrase it

11  before you answer that question, okay?

12  A.  Yes, sir.

13  Q.  This is not the first time you have testified, is that

14  correct?

15  A.  No, sir.

16  Q.  How many times have you testified before in court?

17  A.  In my 19 years, maybe 15 or 20.

18  Q.  And you prepared for this testimony today, is that correct?

19  A.  Yes, sir.

20  Q.  And you prepared by going over your testimony with the

21  government, is that correct?

22  A.  Yes, sir.

23  Q.  You met with them, right?

24  A.  Yes, sir.

25  Q.  And they asked you some questions and they said these are

1   the questions we are going to be asking you and you went

2   through the answers you would be giving.  Is that fair to say?

3   A.  Yes, sir.

4   Q.  You just did a little dry rehearsal, is that fair to say?

5   A.  They asked me basically what happened and I just explained

6   to them what I could remember.

7   Q.  They asked a question, you gave an answer, you were

8   rehearsing for today's testimony; is that fair?

9             MS. MASELLA:  Objection.

10            THE COURT:  To the characterization of rehearsing?

11            MS. MASELLA:  Yes.

12            THE COURT:  Sustained.

13  BY MR. ROTH:

14  Q.  How many times did you meet with them practicing your

15  testimony?

16  A.  I would say twice.

17  Q.  Do you recall when that was, sir?

18  A.  I had notification a while back.  I'm trying to think.  A

19  few weeks ago?  Don't know the exact date, I think it was

20  sometime in February and a little earlier today.

21  Q.  So, it could have been around February 12th or so of this

22  year that you met with the government?

23  A.  It is possible, sir.  I don't know the exact date.

24  Q.  And you indicated, sir, that you had a personal and

25  business relationship with the gas station manager Jesse Singh,

1   is that correct?

2   A.  Yes, sir.

3   Q.  And explain to us, if you will, your professional

4   relationship with him.

5   A.  My professional relationship is basically we –– we're ––

6   the NYPD is registered with his gas station in order to get the

7   type of tire repair, whether it be a blow out, a flat tire or

8   even to change it from an old tire it a new tire, with his gas

9   station.

10  Q.  And you indicated on direct examination that in addition to

11  that you have your personal car repaired there, is that

12  correct?

13  A.  Yes, sir.

14  Q.  And what is the extent of the repairs that Mr. Singh

15  performs on your car?

16  A.  Basically an inspection, oil change, had brakes done.  I

17  think a tune-up also.  Just wear and tear on the car.

18  Q.  And you indicated, sir, that you have a personal

19  relationship with him in addition to the professional

20  relationship; is that correct?

21  A.  Yes, sir.

22  Q.  And what does that consist of?

23  A.  Basically, phone calls from time to time.  I pass by when

24  I'm working to check in to make sure everything is okay.  If

25  ever, like I said, a tire or anything like that, anything where

D355dor3                              Villanueva - cross

1    I would, like I said I would pass by if there was any type of

2    crime that was committed at the business or something like that

3    he would call me and seek advice and I would give him advice.

4    Q.  That sounds sort of like a professional relationship?

5    A.  Maybe I misunderstood.  Yes.

6    Q.  I was asking about your personal relationship.

7    A.  My personal relationship, besides getting my personal car

8    fixed there, I have had dinner with Jesse numerous times, had

9    social visits.  Actually, I have visited the gas station after

10   work and pretty much just hung out with him sometimes.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D35Wdor4                          Villanueva - cross

1    BY MR. ROTH:

2    Q.  And he goes to functions, police functions with you, is

3    that fair to say?

4    A.  Yes, sir.

5    Q.  On how many occasions?

6    A.  I would say a couple.  I'm not, I don't, I'm not the only

7    one that has a personal relationship with Jesse, but there's

8    other police officers that have retirement parties,

9    fund-raisers, things like that.  I would say, over the years,

10   definitely over ten times.

11   Q.  Would you say it's fair to characterize your relationship

12   as you have his back and he has your back?

13   A.  Yeah, I guess I would.  Yeah.

14   Q.  And have you given him a PBA card ever on occasion?

15   A.  Yes, sir.

16   Q.  On how many occasions?

17   A.  I tried to give him one every year.  I don't know.  I

18   wouldn't be able to say I gave it to him every year since I've

19   been a police officer, but definitely on numerous occasions.

20   Q.  And when you gave Mr. Singh your PBA card for him, what did

21   you tell him he could do with that card?

22   A.  Just a, I just told him it's a courtesy card, in case he

23   was ever pulled over by the police for anything, that he can

24   show it so that he has a friend on the police department.

25   Q.  Officer, you used the word "courtesy."  And what courtesy

D35Wdor4                          Villanueva - cross

1   could Mr. Singh expect to have extended to him in the event

2   that he was pulled over by a police officer and showed your PBA

3   card to him?

4           MS. MASELLA:  Objection.

5           THE COURT:  What was your understanding as to the

6   courtesy that would accorded to a card like that?

7   A.  Basically, at times when a police officer pulls over a

8   motorist for an infraction and the driver pulls out one of

9   these PBA cards, a lot of times, police officers would warn and

10  admonish, meaning not necessarily give the motorist a summons

11  because he's a friend or family of a police officer.

12  Q.  Is that, in fact, your individual practice, sir, based on

13  the 18 years you've been on the New York Police Department?

14  A.  Yes, sir.

15  Q.  Is it your understanding that that's a condoned practice,

16  meaning that it's an official policy that's condoned by your

17  superiors?

18  A.  No, sir.  Just a courtesy.

19  Q.  That's not my question.

20  A.  I don't understand the question then, sir.

21  Q.  Is it your understanding that you have the authority when

22  you stop somebody for an infraction, a moving violation, if

23  they show you a PBA card that you can say, Okay, you're a

24  friend of the cops, go on your way?

25  A.  To the police officers, in their discretion, yes, sir.

D35Wdor4                          Villanueva - cross

1   Q.  And you've been told that by a superior?

2   A.  By my colleagues.  Other police officers.

3   Q.  Sir, the police department has a line of command, is that

    fair to say?

5   A.  Yes, sir.

6   Q.  Do you take your marching orders, so to speak, from your

7   colleagues or from your commanding officer?

8   A.  From my immediate supervisor, my commanding officer.

9   Q.  So my question to you, Officer, is:  Does your commanding

10  officer either condone that policy or tell you that that policy

11  is okay as a matter of law?

12  A.  No, sir.

13  Q.  Is that something you do on your own?  Is that fair to say?

14  A.  Yes, sir.

15  Q.  You were breaking the law, is that fair to say?

16  A.  No, sir.

17  Q.  Now, this stop, this car stop, was a couple years ago, is

18  that right?

19  A.  Approximately a year and a half ago.

20  Q.  It was November 2011, is that right?

21  A.  Yes, sir.

22  Q.  How many car stops have you made since then?

23  A.  Too many to give an actual number, but, I don't know,

24  somewhere, year and a half, I would say somewhere between maybe

25  20 or 30.

D35Wdor4                    Villanueva - cross

1   Q.  Is it fair to say, sir, that you've been given strict

2   protocol or rules and regulations concerning car stops that you

3   make, how to conduct yourself during those car stops?

4   A.  Are you referring to my training, sir?

5   Q.  Yes, your training.

6   A.  Yes, sir.

7   Q.  And you trained a long time ago, is that fair to say?

8   You're almost ready to retire now; you have 18 in, right?

9   A.  19.

10  Q.  19, okay.

11          THE COURT:  But who's counting?

12          THE WITNESS:  I am.

13  BY MR. ROTH:

14  Q.  You have one more to go, right?

15  A.  That's it.

16  Q.  That's it.

17      So you were trained at the academy sort of a long time ago,

18  I think, but is it fair to say that you more recently have been

19  trained in how to conduct car stops and fill out the 250, as

20  you refer to it?

21  A.  From time to times at roll calls, after roll call, the

22  supervisors will give us a brief training, any updates

23  regarding car stops or procedures, if there's any changes, from

24  time to time.  And based on those kind of things, I usually

25  address my car stops accordingly.

D35Wdor4                        Villanueva - cross

1   Q.  You follow the rules and regulations concerning car stops?

2   A.  Yes, sir.

3   Q.  And is it fair to say, sir, that the stop-and-frisk car

4   stops and car stops like this and these forms, the 250s, you're

5   aware that it's been a very big item in the news recently?

6   A.  Recently, yes, sir.

7   Q.  And your department, your commanding officers, have

8   addressed that issue in terms of the importance of filling out

9   paperwork correctly, is that right?

10  A.  Yes, sir.

11  Q.  And you try to follow that the best you can, is that

12  correct?

13  A.  The best I can, sir.

14  Q.  And when you say addressed in the news, you've been an

15  officer -- I'm sorry, the whole time in the Bronx?

16  A.  Yes, sir.

17  Q.  You're familiar with the expression "driving while black,"

18  are you not?

19          THE COURT:  I didn't hear the expression.  What is it?

20          MR. ROTH:  Driving while black.

21          THE COURT:  Driving while black?

22          MR. ROTH:  While black, yes.

23          MS. MASELLA:  Objection, your Honor.

24          THE COURT:  No.  Are you familiar with it?

25          THE WITNESS:  Not necessarily.

D35Wdor4                    Villanueva - cross

1   A.  I mean, I don't know exactly what that means.

2   Q.  You've never heard about people complaining that they were

3   pulled over just because they were black, driving?

4   A.  I've heard that, yeah, but not in that exact statement that

5   you just stated.

6   Q.  And one of the important things is to document why somebody

7   is pulled over, is that right?

8   A.  Yes.  To document why I was pulled over, is what you're

9   saying, sir?

10   Q.  Yes.  The reason you pull somebody over on a car stop.

11   A.  Usually we document that in the 230, UF250 if we fill that

12   out, or in the memo book.

13   Q.  Would you explain to the members of the jury what a memo

14   book is?

15   A.  A memo book is a book that we keep and you write down

16   pretty much your assignment, the date, your assignment, the

17   tour that you do, if you work any different assignments besides

18   the regular tour of duty, whatever your assignment is, if you

19   work -- I'm sorry.  If you work a specific parade, all those

20   type of things, pretty much just a log of everything that you

21   do throughout the day, what your assignment is, vehicle

22   inspections, and things like that.

23   Q.  Do you put other significant events there?

24   A.  Yes.  Usually if you respond to a radio run, you put that

25   in also.

D35Wdor4                         Villanueva - cross

1   Q.  And on the date in question, when you pulled over the

2   Mercedes and you took Mr. Barrett out of the front seat of the

3   car, was that done at gunpoint?

4   A.  I do remember taking out my gun, out of my holster when the

5   vehicle was being, was approaching me, because I was on foot.

6   I would say yes, sir.

7   Q.  And you took him out of the car, you asked -- you ordered

8   him out of the car, and did you make him spread eagle on the

9   car?

10  A.  No, sir.

11  Q.  Did you --

12  A.  I holstered my weapon once he turned the car, the vehicle

13  off, and he proceeded out of the car, when I asked him to.  And

14  I don't remember exactly, if I, like you say, spread eagle,

15  with his back towards me or his front towards me on the car.  I

16  can't remember if I did that or not.

17  Q.  Do you recall patting him down, frisking him?

18  A.  Yes, sir.

19  Q.  What were the results of the frisk?

20  A.  If I recall correctly, he had sweat pants on.  He just gave

21  me his credentials.  I don't remember him having anything else

22  on him.

23  Q.  There was certainly no contraband on him, is that fair to

24  say?

25  A.  I did not recover any, sir.

D35Wdor4                        Villanueva - cross

1    Q.  And you said you went through his paperwork earlier, on

2    direct examination, is that correct?

3    A.  Yes, sir.

4    Q.  By the way, on direct, you indicated you were aware of his

5    name, is that correct, Mr. Barrett?

6    A.  After I got his driver's license.

7    Q.  And you remembered that name for a year and a half later?

8    A.  Yes, sir.

9    Q.  You pretty good with names?

10   A.  Pretty good.

11   Q.  Are you pretty good with recalling specifics, although

12   you've done many car stops, this particular car stop?

13   A.  Yes, sir.

14   Q.  You remember all the details about that?

15   A.  Pretty much.

16   Q.  And, Officer, you're pretty good with heights and weights,

17   from your experience, 18 years as a police officer?

18   A.  Pretty good.

19   Q.  And how tall are you, sir?

20   A.  I'm five eight.

21   Q.  Five eight.  You indicated that Mr. Barrett, the driver,

22   was, I think you said six three or six four.  Is that correct?

23   A.  Approximately, yeah.

24   Q.  That's your approximation, is that correct?

25   A.  Yes, sir.

1              MR. ROTH:  I'd ask, with the assistance of the

2      government, if we could publish 3538B that was introduced.

3      That's the same as the government exhibit number -- I'm sorry.

4              MS. MASELLA:  It was only admitted for recorded

5      recollection.

6              THE COURT:  Yes.  It's not in evidence.

7              MR. ROTH:  Okay.

8      Q.  Do you recall what height was listed on Mr. Barrett's

9      driver's license?

10     A.  Not off the top of my head.

11     Q.  And if you saw your 250, would that perhaps refresh your

12     recollection?

13     A.  Yes, sir.

14             MR. ROTH:  If I may approach the witness, Judge.

15             THE COURT:  You may.

16     BY MR. ROTH:

17     Q.  Oh, you still have one up there?

18             THE COURT:  He's got it right there.

19             MR. ROTH:  I'm sorry.

20     Q.  Could you take a moment and see if that refreshes your

21     recollection as to what height Mr. Barrett was, you recorded

22     his height as?

23     A.  Yes, sir.  It says six feet seven inches.

24             THE COURT:  Does that refresh your recollection?  Do

25     you have a memory of this now, or are you just reading?

 1              THE WITNESS:  No.  I was just reading.  I have a
 2   recollection by looking at the 250.
 3   BY MR. ROTH:
 4   Q.  Do you have any question, I mean, whether he was really
 5   true six seven or not?
 6   A.  No, sir.
 7   Q.  You indicated, sir, that you saw certain items in the car
 8   that day.  Did you indicate anywhere on the UF250 that you saw
 9   a baseball bat?
10   A.  No, sir.
11   Q.  Did you indicate anywhere on the 250 that you saw a ski
12   mask?
13   A.  There is a second, the back part of this.  I don't know if
14   I might have wrote it on the back of that.
15   Q.  I'll hand you, I didn't know the government hadn't given
16   you the second page.  It's a two-page document, for the sake of
17   completeness.
18              THE COURT:  What are we calling this?  Are we calling
19   this 3538B2?
20              MR. ROTH:  It was still marked the same.  It's the
21   same number.
22              THE COURT:  All right.  So 3538B2.
23   BY MR. ROTH:
24   Q.  See if this is what you were referring to, the second page
25   of the 250.

1    A.  Yes, sir.

2    Q.  You were just saying that there is a spot on that 250,

3    which is a form, to record the contents of anything that you

4    recover, any contraband, and you weren't sure that day whether

5    or not you recorded the ski mask or the baseball bat, is that

6    correct?

7    A.  Yes, sir.

8    Q.  If you look at that, does that refresh your recollection as

9    to whether on the date in question, November 14, 2011, you, in

10   fact, indicated that you had seen a ski mask, a black winter

11   ski mask, and a softball bat?

12   A.  According to the report, it's not listed on here.

13   Q.  That's your report, right?

14   A.  Yes, sir.

15   Q.  And when you say "listed," there's a specific place for

16   different types of weapons or any other contraband, is that

17   correct?

18   A.  Yes, sir.

19   Q.  Did you record Mr. Barrett's address at that time?

20   A.  Yes, sir.

21   Q.  And what did you record it as, if you recall?

22   A.  By referring to the document, you're saying?

23   Q.  If you don't have an independent recollection of it --

24   A.  I do not.

25   Q.  If that would help refresh your recollection --

D35Wdor4                    Villanueva - cross

1    A.  It would.

2    Q.  -- I would ask you to review it?

3    A.  It says --

4          THE COURT:  Does that refresh your recollection?  Do

5    you have any recollection of what he told you, or do you just

6    have a writing that you took down?

7          THE WITNESS:  I have a writing that I took down on the

8    report.

9          THE COURT:  And it was fresh at the time you wrote it

10   then?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Based on information you got from the

13   individual, or from a document, what?

14         THE WITNESS:  From the driver's license.

15         THE COURT:  From the driver's license.  Okay.

16         So you want him to read it as a recorded recollection?

17         MR. ROTH:  Please.

18         THE WITNESS:  600 Warburton Avenue, Yonkers, New York,

19   zip code 10701, apartment second floor.

20   BY MR. ROTH:

21   Q.  And, by the way, you didn't record anything regarding a

22   black 'do-rag in the trunk of the car, is that right?

23   A.  On the report, no, sir.

24   Q.  And that is after you searched, with your partner, the

25   entire interior of that car, is that correct?

D35Wdor4                          Villanueva - cross

1    A.  Yes, sir.

2    Q.  Under the floor mats and in the side compartments and in

3    the trunk, is that right?

4    A.  Yes, sir.

5    Q.  And Mr. Barrett said, Go right ahead, search my car, you

6    have my consent, is that correct?

7    A.  Yes, sir.

8    Q.  And you asked him, Do you have anything to hide, and he

9    said no, is that correct?

10   A.  Yes, sir.

11   Q.  Did you ever observe the odor of marijuana that day?

12   A.  Yes, sir.

13   Q.  Did you indicate that in the report?

14   A.  No, sir.

15   Q.  Well, how did you observe the odor of marijuana, sir?

16   A.  Just the smell.

17   Q.  When did you observe the odor of marijuana?

18   A.  When I approached the vehicle.

19   Q.  How do you characterize that smell?

20   A.  Just, it's a certain scent.  I don't know how I would

21   describe it.  Just over the years of working as a police

22   officer and smelling it numerous times, and it's a strong scent

23   of -- I don't know how I would describe the scent, sir.

24             THE COURT:  Do we need a description of the scent?

25             MR. ROTH:  No.  That's unclear enough.

1   Q.  So I assume when you opened the door or he got out of the

2   car or rolled down the window and you smelled what you thought

3   was marijuana, you searched the car for marijuana, is that fair

4   to say?

5   A.  Yes, sir.

6   Q.  And did you find any loose marijuana?

7   A.  No, sir.

8   Q.  Did you find any what we call roaches or burnt joints?

9   A.  No, sir.

10  Q.  It's a crime, is it not, to operate a vehicle under the

11  influence of drugs?  Is it not?

12  A.  Yes, sir.

13  Q.  And that day, did you make Mr. Barrett, the operator of

14  that vehicle, perform any sobriety tests?

15  A.  No, sir.

16  Q.  You certainly didn't arrest him for driving while

17  intoxicated on drugs, is that fair to say?

18  A.  No, sir.

19          THE COURT:  Wait.  It's not fair to say, or it is fair

20  to say?

21          THE WITNESS:  It's fair to say that I did not arrest

22  him.

23  BY MR. ROTH:

24  Q.  Do you recall, Officer, being -- I'm sorry.  Withdrawn.

25          Do you recall after the incident receiving a telephone

D35Wdor4                        Villanueva - cross

1    call from a Detective Kruse who was investigating this

2    incident?

3    A.  Yes, sir.

4    Q.  And is it fair to say that Detective Kruse asked you what

5    transpired during this car stop?

6    A.  Yes, sir.

7    Q.  And you told him, I guess, tell me if I'm wrong, what you

8    thought was significant or important about that car stop, is

9    that correct?

10   A.  Yes, sir.

11   Q.  Is it fair to say that when Detective Kruse asked you the

12   details of that car stop, you never mentioned anything about a

13   black winter ski mask in the trunk of that car?

14   A.  I'm sorry, sir?  The question again, please.

15   Q.  Did you tell Detective Kruse when he questioned you about

16   the incident, the car stop, sometime after the car stop, that

17   you found a black winter ski mask in that car?

18   A.  Yes, sir.

19   Q.  You told him that?

20   A.  Yes, sir.

21   Q.  Positive?

22   A.  Positive.

23   Q.  And did you tell him you found a 'do-rag?

24   A.  I think so, sir.

25   Q.  And did you tell him you found a baseball bat?

D35Wdor4                         Villanueva - cross

```
1    A.  I think so, sir.

2    Q.  By the way, did you voucher those items?

3    A.  No, sir.

4    Q.  So you didn't take the items out of the car --

5    A.  I did not.

6    Q.  -- to put in police property?

7    A.  No, sir.  I didn't voucher the items.

8    Q.  Did you take a picture of them with your cell phone?

9    A.  No, sir.

10   Q.  So the police department doesn't have those items?

11   A.  You're speaking about the 'do-rag and the ski mask?

12   Q.  Yes.

13   A.  No, sir.

14   Q.  And they don't have the baseball bat?

15   A.  No, sir.

16   Q.  Did you ask Mr. Barrett, the driver, where he was going

17   that day?

18   A.  I recall asking him where he was coming from.  I don't

19   remember if I asked him where he was going.

20   Q.  And did he respond, if you recall?

21   A.  Yes, sir.

22   Q.  What was his response?

23   A.  He --

24            THE COURT:  Wait.  Is this hearsay?

25            MS. MASELLA:  Objection.
```

1           MR. ROTH:  Withdrawn, your Honor.

2           THE COURT:  Okay.  Sustained.

3    BY MR. ROTH:

4    Q.  Officer, you didn't put Mr. Barrett under arrest that day,

5    did you?

6    A.  No, sir.

7    Q.  Was there anything else in the trunk of the car, if you

8    recall?

9    A.  Besides the ski mask, the 'do-rag, and the small miniature

10   type bat, I don't recall anything else being in the trunk, sir.

11   Q.  And that conversation you had with Detective Kruse, that

12   was only on the phone; you never met with him personally?

13   A.  That is correct, sir.

14   Q.  On your memo book entries that day, did you record anything

15   about those items you say you saw in the car that day?

16   A.  No, sir.

17           MR. ROTH:  I have no further questions.

18           THE COURT:  All right.

19           Ms. Stafford.

20           MS. STAFFORD:  No questions, your Honor.

21           THE COURT:  Any redirect?

22           MS. MASELLA:  Briefly, your Honor.

23           THE COURT:  Yes.

24   REDIRECT EXAMINATION

25   BY MS. MASELLA:

D35Wdor4                    Villanueva - redirect

1    Q.  Officer Villanueva, do you recall that on cross-examination

2    you were asked a number of questions about your memory of this

3    event and specific things that happened that day?

4    A.  Yes, sir.  Yes, ma'am.  I'm sorry.

5    Q.  That's all right.

6              Is there a reason why this particular incident sticks

7    in your mind?

8    A.  Yes.  Jesse being a good friend of mine and due to the

9    phone call, nature of the phone call, I felt -- I'm sorry.

10   What was the question?

11   Q.  Is there a reason why this sticks in your mind?  And then

12   explain the reason.

13   A.  Because Jesse's a very good friend of mine and the nature

14   of the phone call, that's why it sticks out more than other car

15   stops.

16             MS. MASELLA:  Thank you, Officer.

17             MR. ROTH:  Nothing.

18             THE COURT:  You can step down, Officer.  Thank you.

19             (Witness excused)

20             THE COURT:  Ladies and gentlemen, why don't we take a

21   short afternoon break.  Don't discuss the case, and keep an

22   open mind, of course.

23             There should be stuff back there.  I'm also going to

24   ask Mr. Halegua to go back with you and just start getting your

25   contact information, cell phones and phones numbers in case we

D35Wdor4                         Villanueva - redirect

1    have to contact you because of the weather, or something,

2    maybe.  And I also want to make sure you have the phone number

3    to my chambers, so if you need to call, for whatever reason,

4    you know who to call.  We'll resume in about ten minutes.

5    Okay?

6              Ms. Joachim, if you would hold back for a second,

7    thanks.

8              (Jury excused)

9              THE COURT:  Okay.  Have a seat.

10             All right.  Ms. Joachim, we talked several times about

11   your travel schedule, and that's fine.  I mean, I don't know

12   how fast this trial will go.  But if it goes past your travel

13   schedule, I'll excuse you.  I have alternates.  But I don't

14   know that it will go past that.  I think I'm going to presume

15   maybe we'll get this done and you'll be able to deliberate and

16   participate fully as a juror.  That's the reason why I have not

17   excluded you, and I just don't want you to worry about it

18   between now and then.  Okay?

19             JUROR:  Great.

20             (Juror excused)

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Have a seat.  I took that up with her just

3    because Ms. Joachim had mentioned to my law clerk that she was

4    very concerned that it hadn't registered with us.  We talked

5    about it a couple of times, so I just wanted to put her at ease

6    so she wasn't worked up or distracted.

7          Anything in connection with that exchange that anybody

8    wants to discuss?  No.  Okay.

9          MS. FONTIER:  Not at the moment, your Honor.  But if

10   we get to that point, we'll reserve argument as to --

11         THE COURT:  As to whether to excuse her, you mean?

12         MS. FONTIER:  Whether to excuse her or take a break,

13   as we discussed.

14         THE COURT:  We'll talk about it.  But we certainly are

15   aware that there are certain people who have travel plans, so

16   we'll discuss that if and when we get to that.

17         Let's take a short break.  You guys can use the

18   restroom, get a drink.  We'll pick up again in six minutes.

19         (Recess)

20

21

22

23

24

25

D35Wdor4                          Villanueva – redirect

1              (In open court; jury present)

2              THE COURT:  Just remain standing until everybody sits.

3    We'll just give Ms. Joachim back her notebook.  You forgot

4    that.

5              Okay.  Have a seat.

6              The government will now call its next witness.

7              MS. MASELLA:  The government calls Luis Segarra.

8              THE COURT:  If you could, just please stand and raise

9    your right hand.

10    LUIS SEGARRA,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13             THE COURT:  Officer, just keep your voice up, move a

14    half an inch or two closer to that mike.

15             You may proceed, Ms. Masella.

16             MS. MASELLA:  Thank you, your Honor.

17    DIRECT EXAMINATION

18    BY MS. MASELLA:

19    Q.  Good afternoon, Officer Segarra.

20    A.  Good afternoon.

21    Q.  How are you employed, sir?

22    A.  With the New York City Police Department.

23    Q.  How long have you been with the NYPD?

24    A.  For 19 years.

25    Q.  What is your title with the NYPD?

D35Wdor4                           Segarra - direct

1    A.  Police officer.

2    Q.  What is your current assignment with the NYPD?

3    A.  28 Precinct in Manhattan.

4    Q.  What area, approximately, in Manhattan?

5    A.  Harlem.

6    Q.  What were you doing before you were assigned to the 28th

7    Precinct?

8    A.  I was in the 52nd Precinct, school unit.

9    Q.  How long were you in the 52nd Precinct in the school unit?

10   A.  18 years.

11   Q.  When did that end?

12   A.  May 16 of 2012.

13   Q.  You mentioned that you were in the school unit.  What are

14   your duties in connection with being a police officer in the

15   school unit?

16   A.  We deal with all the calls that we get from the schools,

17   all the crime that happens in school.  And dismissal also.

18   Q.  Do you know an individual named Jesse Singh?

19   A.  Yes, I do.

20   Q.  How do you know that individual?

21   A.  He basically owned a shop where they do repairs for the

22   precinct, the tire shop, you know, for the tires, and minor

23   things that happen to the police cars.

24   Q.  Where was that shop located?

25   A.  That's Bedford Park and Jerome.

1  Q.  Have you yourself used that shop for car repairs on

2  occasion?

3  A.  Yes, we have.

4  Q.  I want to direct your attention now to November 14 of 2011.

5  Were you working that day?

6  A.  Yes, I was.

7  Q.  Were you working alone or with a partner?

8  A.  My partner and the school team.

9  Q.  Who was that?

10 A.  The school team.

11 Q.  I'm sorry?

12 A.  My partner, Officer Villanueva.

13 Q.  What was his first name?

14 A.  Carlos.

15 Q.  What were you doing that day?

16 A.  At that time?

17 Q.  Yes.

18 A.  Basically, we were just tacking up with the sergeant.  She

19 was just letting us know about the gangs after the school

20 dismissal, in the area.

21 Q.  Did there come a time that day when your partner, Officer

22 Villanueva, received a phone call?

23 A.  Yes.

24 Q.  Approximately what time was that?

25 A.  I would say dismissal time, from 12:30 to one, something

1    like that.

2    Q.  In the afternoon?

3    A.  Yes.

4    Q.  In what area were you at that time?

5    A.  I was on Mosholu Parkway and Jerome Avenue.

6    Q.  Were you in a car or on foot?

7    A.  We were on foot at the time.

8    Q.  After your partner, Officer Villanueva, received that phone

9    call, what did you and your partner do?

10   A.  Basically, my partner told Jesse to drive to our location,

11   and so we could check out the car that was following.  And

12   after that, the car that was following stopped at the red

13   light, and we basically approached the vehicle.

14   Q.  Did you observe Jesse Singh drive by in his car?

15   A.  Yes, I did.

16   Q.  And can you describe the vehicle that you observed that you

17   pulled over?

18   A.  It was a black Mercedes-Benz.

19   Q.  Can you provide a further description of the type of model,

20   or anything like that?

21   A.  I'm not good at that when it comes to cars.  But it was a

22   black Mercedes.

23   Q.  And the first time that you saw the black Mercedes, where

24   was it in relation to Mr. Singh's car?

25   A.  It was behind the, a car that was stopped at the red light.

1   Q.  The Mercedes was?

2   A.  On -- right.

3   Q.  Where did you pull over the Mercedes?

4   A.  Right on the Mosholu, it would be the southeast side of

5   Mosholu Parkway, and Jerome Avenue.

6   Q.  How many occupants were in the Mercedes at that time?

7   A.  It was two.

8   Q.  What did you do during the car stop?

9   A.  I basically approached the vehicle and we had the vehicle

10  come basically to the service side, so that it was, you know,

11  to prevent spill back of vehicles, so basically had the, both

12  the motorist and the passenger exit the vehicle.

13  Q.  Once the driver and the passenger came out of the vehicle,

14  what did you do at that point?

15  A.  I did a quick, quick pat down, make sure he had no weapons.

16  And asked for the identification.

17  Q.  Are you referring to the driver or the passenger?

18  A.  The passenger.

19  Q.  You spoke primarily with the passenger?

20  A.  Yes, I did.

21  Q.  What was the result of your pat down on the passenger?

22  A.  He didn't have anything on him, any weapons, and he

23  basically didn't have identification either.  So ...

24  Q.  When he did not have an identification, did you do anything

25  else to attempt to identify him?

1   A.  Well, I basically asked him for a phone number from a

2   relative or something just to prove who he was and where he

3   lived, and he gave me the number to his girlfriend, which I

4   tried calling twice and nobody picked up.

5   Q.  Did you ask the passenger for a name?

6   A.  Yes, I did.

7   Q.  Do you recall what name he provided?

8   A.  It was Jermaine Otto.

9   Q.  Can you spell the last name, please?

10  A.  O-T-T-O.

11  Q.  Did you ask him for a date of birth?

12  A.  Yes, I did.

13  Q.  Sitting here today, do you recall what that was?

14  A.  I can't.

15  Q.  You do not recall?

16  A.  No.

17  Q.  At the time of the car stop, did you prepare any paperwork?

18  A.  We did a UF250, yes, stop and frisk.

19  Q.  What is a UF250?

20  A.  Basically, when you suspect someone to have committed or

21  about to commit a crime and you stop them, so you basically

22  fill out that form.

23  Q.  What kinds of information do you put on the form?

24  A.  Name, address, date of birth, description of the crime

25  that's suspected, and that's about it.

1   Q.  Did you fill out a UF250 in this case?

2   A.  Yes, I did.

3   Q.  Did you do it at or around the time that you made the car

4   stop?

5   A.  At around the time.

6   Q.  And did you attempt to be careful and accurate in recording

7   information that you received from the passenger?

8   A.  Yes, I did.

9           MS. MASELLA:  May I approach, your Honor.

10          THE COURT:  You may, and you don't have to ask.

11          MS. MASELLA:  Thank you.

12          THE COURT:  Everybody can approach.

13  BY MS. MASELLA:

14  Q.  I'm showing you, Officer, what's been marked as 3540B for

15  identification.  Take a moment to look at it.  Do you recognize

16  that document, Officer?

17  A.  Yes.  Yes, I do.

18  Q.  What is the document?

19  A.  It's a UF250, stop, question, and frisk.

20          MS. MASELLA:  Your Honor, at this time, I would ask

21  that it be entered as a recorded recollection and that the

22  witness be permitted to read portions from it.

23          THE COURT:  Any objection?

24          MS. STAFFORD:  As long as it's just going to be read,

25  your Honor.

1          THE COURT:  Yes.  So just certain portions.  You'll

2     identify which portions you want read?

3          MS. MASELLA:  Yes, your Honor.

4          THE COURT:  Go ahead.

5     BY MS. MASELLA:

6     Q.  Officer Segarra, I'm looking at the UF250 in front of you,

7     can you tell what date of birth the passenger provided when you

8     asked him for that information?

9     A.  Yes.  It's January 1, 1986.

10    Q.  Thank you.

11         MS. MASELLA:  One moment.

12         No further questions at this time, your Honor.

13         THE COURT:  Any cross-examination?

14         MS. STAFFORD:  Yes, your Honor.

15    CROSS-EXAMINATION

16    BY MS. STAFFORD:

17    Q.  Good afternoon, Officer Segarra.

18    A.  Good afternoon.

19    Q.  As Ms. Masella was asking you questions, you did fill out

20    this report very carefully, right?

21    A.  Yes, I did.

22    Q.  And accurately, as you recall?

23    A.  Yes.

24    Q.  And can you take a look at the report, where it describes

25    the age and the height of the individual?

1    A.   Okay.

2    Q.   What do you have recorded as the height?

3    A.   Six foot.

4    Q.   When you stopped the vehicle that day, Officer Segarra,

5    does it say anywhere in your report that there were any

6    firearms found?

7    A.   No.

8    Q.   Does it say anywhere in your report that there were any ski

9    masks found?

10   A.   Not in my report, no.

11   Q.   Any, an aluminum bat?

12   A.   No.

13   Q.   A 'do-rag?

14   A.   No.

15   Q.   Was there any indication of a strong odor of marijuana?

16   A.   On the form?

17   Q.   On the form.

18   A.   No.

19            MS. STAFFORD:  No further questions, your Honor.

20            THE COURT:  Okay.  Any redirect?

21            I'm sorry.  Mr. Roth.

22            MR. ROTH:  Thank you, Judge.

23   CROSS-EXAMINATION

24   BY MR. ROTH:

25   Q.   Good afternoon, Officer.

1   A.  Good afternoon, sir.

2   Q.  If you don't understand a question that I'm posing to you,

3   please let me know and I'll rephrase it, before you answer.

4   A.  Okay.

5   Q.  When you did that car stop on that day, do you recall the

6   exact date?

7   A.  Yes.  It was November 14 of last year.

8   Q.  And do you recall that as you sit here, as you're seated

9   here now, or just from looking at the form?

10  A.  Going back to my memo book.

11  Q.  And in your memo book, do you record significant events

12  that transpired during the course of your shift?

13  A.  Yes, I do.

14  Q.  Do you record any contraband in your memo book to reflect

15  any contraband that was found that day?

16  A.  No.

17  Q.  Were there any other police officers besides yourself and

18  Police Officer Villanueva there that day?

19  A.  Yes.

20  Q.  And do you recall the names of those police officers?

21  A.  Yes, I do.

22  Q.  And could you share that with us?

23  A.  Officer Kennedy, Officer Rodriguez, Sergeant Freddoloso,

24  Officer Villanueva, and Officer Velez and Officer -- I just

25  can't remember the last person.

1    Q.  That's a lot of officers.  Did you call for backup?

2    A.  No.

3    Q.  Did they just happen -- how did those officers come to the

4    scene?

5    A.  Because we were having a meeting with the sergeant at the

6    time, at that location.

7    Q.  And so did all those officers actually come over and

8    supervise your car stop?

9    A.  No.  We all in the same unit, so we do dismissal, because

10   of Clinton High School and the high crime around that area.

11   Q.  No.  I appreciate that, Officer.  What I'm saying to you is

12   when you were taking apart that car that day, were those other

13   officers that you just mentioned there, present?

14   A.  Yes.

15   Q.  So they watched you search the car, is that fair to say?

16   A.  I didn't search the car.

17   Q.  Did you see your fellow officer, Villanueva, search the

18   car?

19   A.  Yes.

20   Q.  What, if anything, were you doing with the passenger or the

21   driver at the time that the car was being searched?

22   A.  Just keep an eye on him.

23   Q.  Were they handcuffed?

24   A.  No.

25   Q.  Did you have any weapon drawn?

D35Wdor4                          Segarra - cross

1   A.  In the beginning, yes.  At the beginning of the car stop,

2   yes.  Not after they came out of the car.

3   Q.  So when you stopped the car, you stopped it at gunpoint and

4   you said, Stop, get out of the car?

5   A.  No.  When you say at gunpoint, I'm not pointing my gun at

6   the person.  I just have it out of my holstered.

7   Q.  So you have it unholstered by your side?

8   A.  Right, that's correct.

9   Q.  And your partner as well has it unholstered by his side?

10  A.  That's correct.

11  Q.  Any other officers approach the car that day --

12  A.  No.

13  Q.  -- with their gun unholstered?

14  A.  No.

15  Q.  Did you know Mr. Singh before this day?

16  A.  Yes, I do.

17  Q.  You said that the police department has their cars serviced

18  there, is that correct?

19  A.  Yes, our precinct.

20  Q.  Your precinct?

21  A.  Right.

22  Q.  You're the 52?

23  A.  At the time, 52 Precinct, yes.

24  Q.  How long have you been an officer?

25  A.  19 years.

1    Q.  Do you have just a professional relationship with

2    Mr. Singh?

3    A.  Professional and personal also.

4    Q.  And what's the personal relationship?

5    A.  Well, he's been around since I came out of the academy,

6    basically two years after I came out the academy, so, yeah, we

7    became friends.

8    Q.  Could you describe for the members of the jury the nature

9    of that friendship?

10   A.  He basically comes out to the, when we have an event,

11   retirement party, he comes out and just participates and shows

12   up at the party, stuff like that.

13   Q.  He contributes to the --

14   A.  Meaning that he shows up and someone will just retire and

15   he wants to go there and show respect.

16   Q.  Right.  But also, besides showing his moral support for

17   them, he actually contributes out of his pocket?

18   A.  Never seen that, no.

19                    (Continued on next page)

20

21

22

23

24

25

D355dor5                          Segarra – cross

1   BY MR. ROTH:

2   Q.  He gets a free ticket to the retirement party?

3   A.  He pays for his ticket.

4   Q.  So it does come out of his pocket and he pays for his

5   ticket?

6   A.  Yes.

7   Q.  And you personally, sir, do you have your car serviced

8   there, your personal car?

9   A.  No.

10  Q.  Have you ever given him a PBA card?

11  A.  Yes.

12  Q.  On how many occasions?

13  A.  I would say maybe a couple of years in a row.

14  Q.  When you give Mr. Singh that PBA card, your PBA card, what

15  do you tell him when you give it to him?

16  A.  What do I tell him when I give it to him?  I give it to

17  him.  To me it comes naturally.  Here you go.

18  Q.  And have you had any discussion with him about what he can

19  do with your PBA card that you give him?

20  A.  It is just a courtesy thing.

21  Q.  What is your understanding of what the courtesy is?

22  A.  Basically show him, giving him a card that has my shield

23  number on it.

24  Q.  With your shield number, you pointed to the shield on your

25  uniform now?

1    A.   Right.

2    Q.   What is your expectation of what he can do with that?

3    A.   Hang it on the wall, basically, because that's what he

4    does.  He basically pasted them on the wall.  Everyone who

5    knows him, they give him a card and he tapes it to the wall.

6    Q.   He doesn't carry it in his wallet?

7    A.   I don't know if he does.

8    Q.   Now, did you see the contents of the trunk that day?

9    A.   Yes, I did.

10   Q.   And were any of the contents of the trunk vouchered that

11   day?

12   A.   No.

13   Q.   You say no like it is obvious they wouldn't have been

14   vouchered, is that fair to say?

15   A.   Right.

16   Q.   Because there wasn't any contraband, is that fair to say?

17   A.   That's right.

18   Q.   And did you photograph the contents of the trunk?

19   A.   No.

20   Q.   Did you voucher anything from the interior of the car?

21   A.   What do you mean voucher everything?

22   Q.   You didn't see any contraband anywhere in the interior

23   compartment of that car, is that fair to say?

24   A.   No.  I didn't.

25   Q.   You testified you have a clear memory that the car was a

1   black Mercedes; is that correct?

2   A.   That's correct.

3   Q.   Did there come a time, sir, approximately a year and a half

4   after the incident in 2011, November 14th, that you were called

5   down to the U.S. Attorney's office in connection with this

6   case?

7   A.   No.

8   Q.   Were you ever prepared at all for your testimony today?

9   A.   No.

10   Q.   You never spoke to either one of these assistants?

11   A.   To date?

12   Q.   To date.

13   A.   Yes, I did speak to them.

14   Q.   Did you speak to him --

15   A.   I didn't prepare for this but I did speak to them.

16   Q.   So they didn't ask you what questions they would be asking?

17           THE COURT:   Rephrase that question.

18   Q.   When you spoke to -- was it either one of these assistants

19   here?

20   A.   Uh-huh.   Yes.

21   Q.   And was the case agent there as well?

22   A.   Yes.

23   Q.   What was the content of your conversation with them prior

24   to testifying today?

25   A.   Basically, if I recall, the 250.

D355dor5                          Segarra - cross

1    Q.  And, prior to your testimony in this courtroom today, were

2    you -- did you come down here with Mr. Singh?

3    A.  Yes, I did.

4    Q.  You came down here with Mr. Singh and did you come down

5    here with Officer Villanueva as well?

6    A.  Yes, I did.

7    Q.  The three of you came down here together?

8    A.  Yes, we did.

9    Q.  And, prior to testifying were you all in the same room in

10   the witness room together prior to testifying?

11   A.  Yes, we were.

12   Q.  And there is no question in your mind what this case that's

13   on trial, the nature of the case, is that correct?

14   A.  Correct.

15   Q.  You knew sometime after the incident that you participated

16   in the car stop on November 14th, 2011, that subsequently there

17   had been an arrest made and there was a federal prosecution, is

18   that correct, concerning that incident or people involved in

19   that incident?

20   A.  I don't understand.  I don't understand what you are trying

21   to say, sir.  I'm sorry.

22   Q.  Did you know the connection or any connection between that

23   car stop and the case that is on trial right here in federal

24   court before you came down here?

25   A.  Yes.

D355dor5                              Segarra – cross

1    Q.  Didn't Jesse and Officer Villanueva, they knew that there

2    had been a prosecution that was connected to that car stop and

3    that car?

4              MS. MASELLA:  Objection.

5              THE COURT:  Sustained.

6    Q.  To your knowledge, do you know whether any police officer

7    made any report whatsoever regarding a mask or a do-rag or

8    anything else being recovered from the car that day?

9    A.  No.

10   Q.  You don't know or you are not aware of it?

11   A.  I'm not aware of that.

12             MR. ROTH:  I have no further questions.

13             THE COURT:  Okay.

14             Any redirect?

15             MS. MASELLA:  No, your Honor.

16             THE COURT:  Okay.  You can step down.  Thank you very

17   much, Officer.

18             Government, your next witness?

19             MS. MASELLA:  One moment, your Honor.

20             (Pause)

21             MS. MASELLA:  Your Honor, the government calls Djujka

22   Krco.

23    DJUJKA KRCO,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

D355dor5                         Segarra – cross

 1              THE COURT:  State your name and spell your name, first
 2     and last, for the record.
 3              THE WITNESS:  Djujka Krco.
 4              THE COURT:  All right.  And you better spell those.
 5              THE WITNESS:  D J-U-J-K-A.
 6              THE COURT:  And last name?
 7              THE WITNESS:  K-R-C-O.
 8              THE COURT:  K-R-C-O.  And pronounced Krco?
 9              THE WITNESS:  Krco.
10              THE COURT:  All right.
11              You are going to have to help me with that.  Keep your
12     voice up nice and loud.
13              THE WITNESS:  Okay.
14              THE COURT:  And slow enough so that the court reporter
15     can get everything down.  Thank you.
16              You may proceed, Ms. Masella.
17              MS. MASELLA:  Thank you, your Honor.
18     DIRECT EXAMINATION
19     BY MS. MASELLA:
20     Q.  Good afternoon.
21     A.  Good afternoon, ma'am.
22     Q.  How are you employed?
23     A.  What did you say?
24     Q.  How are you employed?
25     A.  I'm self-employed.

D355dor5                          Krco - direct

1  Q.  You are self-employed.

2         Can you describe your business, please?

3  A.  Sure.  I start a business in '94 with me and my husband.

4  We open wholesaler like the supplying small grocery store with

5  cigarettes, candy and restaurant supply.

6  Q.  Does your business have a name?

7  A.  My business has a name, Krcho, K-R-C-H-O.  We put the H

8  because it is pronounced in America for the people, for the

9  business.

10  Q.  And who owns that business today?

11  A.  Today owns the business, me and my husband.

12  Q.  Do you have other employees?

13  A.  No.

14  Q.  Where is the business located?

15  A.  4465 Bronx Boulevard and 239 Street in the Bronx, zip code

16  10470.

17  Q.  Can you describe what physical building is at that

18  location?

19  A.  Building is like commercial building and the two floors,

20  like the two different businesses there, just --

21  Q.  And do you know what section of the Bronx that is?

22  A.  I don't understand what you are asking.

23  Q.  Do you know what section or neighborhood in the Bronx that

24  area is?

25  A.  I quite don't understand that question.  I'm sorry.

1    Q.   That's okay.  I will move on.

2    A.   Okay.

3    Q.   What types of products do you sell?

4    A.   Cigarettes, candy, paper bags, shopping bags and some paper

5    cups, coffee.  Stuff like that.

6    Q.   And to what customers do you sell these products?

7    A.   I selling these products only to the customer who has a

8    cigarette license and registered business.  I'm only to do

9    business to business.  We are not open to the public.

10   Q.   So you sell to other businesses?

11   A.   Yes.

12   Q.   Do you know if all of the products that you sell are

13   manufactured in New York State or also out of New York State?

14   A.   Only what I selling is from the New York State.  I'm second

15   chain -- chain in the circumstance.  I'm not stamping license,

16   I'm like the sub-jobbers, that means I buy cigarette from the

17   company who is stamping like the HRA from Long Island, I get

18   them over here to Manhattan.  That's my supplier.  And candy I

19   buying also from the Sultana who is over here also located in

20   the Bronx.

21   Q.   Are you familiar with a business located at 4194 White

22   Plains Road in the Bronx?

23   A.   Yes, I do.  That is my customer before.  When he sell

24   cigarette he buy from me cigarette about four years before,

25   then he losing cigarette license.  Whatever it is he happened,

D355dor5                              Krco - direct

1   he changed owner or something, then he don't buy from me

2   anymore.

3   Q.  Do you know the name of that customer?

4   A.  No, I don't.

5   Q.  Do you know the name of the business located at that

6   address, 4194 White Plains Road?

7   A.  Before when they buy from me that's 1M Stationery.

8   Q.  1M Stationery?

9   A.  Yes, but they changing every year name of the business,

10  owner of the business.  Usually we collecting every year like

11  the license from them.  But we never actually asking for the

12  name owner or something like that.  We got like the number,

13  customer number, then we recognize like that and the license

14  but it is not in the license name, only business name.

15  Q.  And how long has that business been a customer of yours?

16  A.  When he buy from me he was the buying about maybe two,

17  three years, then he stopped.

18  Q.  And when was the most recent time that the customer at 4194

19  White Plains Road purchased items from your business?

20  A.  I really don't know.

21  Q.  I want to direct your attention now to January 7th of 2012.

22  Were you working that day?

23  A.  Yes, I do.

24  Q.  What were you doing?

25  A.  That was the Saturday.  I'm open from 8:00 to 2:00.  I

1    closed my business and I delivered order for one of my

2    customers in the Yonkers.  I delivered that, collect money, sat

3    down into my car, take the highway and go shopping for my home

4    like the groceries, whatever I needed; food, fruit and veggies.

5    Q.  What kind of car were you driving that day?

6    A.  Toyota Silver RAV 4.

7    Q.  And approximately what time did you finish the delivery in

8    Yonkers and then go shopping for yourself?

9    A.  Probably I finish with the Yonkers I'm not sure exactly

10   time, but possibly 2:15, 2:20 because that's very close to me

11   is a couple of blocks.

12   Q.  And then to what area do you go after that?

13   A.  After that I go in the area Pelham Parkway in the Bronx

14   Lydig Avenue what is possibly about 3 or 4 miles from my

15   business and probably 2 miles from my house.

16   Q.  How long were you in the area of Pelham Parkway and Lydig

17   Avenue?

18   A.  I was there probably about one hour in the three different

19   locations shopping in the super market, fruit and veggies, one

20   small market.  So, I'm in the car and driving home.

21   Q.  Approximately what time do you think you went home from the

22   area of Lydig Avenue?

23   A.  About 15 to 4:00.

24   Q.  So 3:45?

25   A.  Yeah.

D355dor5                         Krco - direct

1    Q.   And where is your home?

2    A.   185 East 206th Street.

3    Q.   And approximately what time did you arrive in that area?

4    A.   About 15 to 4:00 I reached there.

5    Q.   What were you carrying with you inside of your car that

6    day?

7    A.   In the back of my car it is a lot of shopping stuff.  I

8    have big purse what is in this time in the trunk of my car.  I

9    have next to me one big wallet where is the money what, but I

10   took part of the money from the delivery, pay bills, probably

11   $1,000, maybe more, my money, but I really don't know how much

12   I spent what is there of that was in the small shopping bag

13   next to the seat next to me.  Everything else in the back in

14   the car you could -- behind me, probably about 20 shopping

15   bags.

16   Q.   And other than the money that you described in the small

17   bag that was next to you, do you have any other money in the

18   car?

19   A.   I have other money in the car.  In my big purse what is

20   there when I go shopping I put under in the trunk hiding and my

21   wallet over here in the small bags and money in the wallet.

22   Q.   Approximately how much money do you think that you had in

23   your purse that day?

24   A.   $1,000 I know I have it because I put all of them hundreds

25   the guy pay me.  He paid me about $1,800 and he give me

D355dor5                         Krco - direct

1    thousand single that I had in the trunk in the big bag and the

2    rest of them, small of them, I put in the -- in there in my

3    wallet.

4    Q.   When you say that was from the money that the guy paid you,

5    referring to the delivery that you had made?

6    A.   Yes.  I got all the $1,800 this day.

7    Q.   That was part of your business proceeds?

8    A.   Yes.  And I have some of my money that I spent it.  What I

9    don't spend it I really -- actually, I don't even know,

10   honestly.

11   Q.   When you got into the area of your house, where did you

12   park your car?

13   A.   When I got in my area I always drive when I shopping,

14   parking in the front of my door if I have room.  I didn't have

15   room.  I go a little bit down about four or five cars, it is

16   like the small street, it is like the empty lot.  It is the

17   another side has a couple of buildings.

18   Q.   Do you know the name of that street is?

19   A.   St. George's Cross.

20          Then, as soon as I park my car -- as soon as I open my

21   door gentleman already put the leg that you can't close door.

22   He put a hand in my face.  He wearing mask with gloves and he

23   started pushing me back in the car.  I want to get out.

24   Another gentleman, he go around my car with a knife with a

25   button like that, is in my car.  When I see him in my car I go

D355dor5                         Krco - direct

1    crazy.  I started screaming I want to get out but gentleman

2    wrestling with me, he want to push me back.  He hit me first

3    time.  I even don't know in the blink of the eyes it is maybe

4    20, 30 seconds everything happened.  I don't know how, I just

5    pushing him and get out.  And I was the very scared because my

6    building is this side but guy is still in my car second.  I

7    couldn't go across, I started running differently.  When I

8    running there because one lady already, thank God, see and call

9    the cops, neighbor.  I started running but guy chasing me,

10   grabbed me again, hit me right here.  I could see it in the

11   heaven's sky, stars.  I don't know how is that happened.

12             Then, after that --

13             THE COURT:  Let me -- let's ask some questions.  We

14   want to avoid narrative answers so wait for the next question.

15             THE WITNESS:  Okay.

16   Q.  How many individuals were there that approached you in your

17   car?

18   A.  One of them approach over here, other go behind and get in

19   my car; two people.

20   Q.  And you said that they were wearing masks, correct?

21   A.  Yes.

22   Q.  Are you able to provide any description of these two

23   individuals?

24   A.  That's the two male, not too big, not too small, bigger

25   than me, not so heavy, maybe 170 pounds.  Something like that.

D355dor5                         Krco - direct

1    Q.  Other than masks do you recall any of the other clothing

2    that they were wearing?

3    A.  Black of them.  Black clothes.

4    Q.  How many times were you hit?

5    A.  Two times.

6    Q.  Was that both by the first individual or by both

7    individuals?

8    A.  No, no.  Just person who approach me.  Person with the

9    knife in the car, he just searching there and I was out and the

10   car in the car, he still in the car.

11   Q.  In what part of the body were you hit?

12   A.  He hit me over here first time and second time he hit me

13   over here.

14   Q.  Just for the record, you are pointing to different areas.

15   Could you tell us in words what area you are pointing to?

16   A.  Behind my ear.

17   Q.  Behind your ear?

18   A.  Yes.

19   Q.  And also --

20   A.  Yes.  Over here and over here.

21   Q.  The top of your forehead?

22   A.  Yes.

23   Q.  You also said that the second person had a knife.  Can you

24   describe what the knife looked like?

25   A.  I only saw it when he press the button and knife coming

D355dor5                         Krco - direct

 1   out.  That's the only thing what I see.

 2   Q.  And what was that person doing inside of your car?

 3   A.  He is the one who took my wallet, he is the one who took my

 4   key.  What I had behind me, floor mat from the houses, they

 5   took my key from houses, they took my key from garage, from my

 6   business.  They took all of my keys.  They took all of my

 7   wallet, credit cards, everything.  He searched there and he

 8   took forever he find but he never touched any groceries.

 9   Q.  So, aside from your wallet and your keys, were any other

10   items taken in?

11   A.  Yes.  In my wallet is a lot of pictures, credit card,

12   driver license, social security number.  Everything.

13   Q.  What about the purse in the back of your car, was that item

14   taken?

15   A.  They didn't -- they didn't find that.

16   Q.  Did you report this robbery to the police?

17   A.  Yes, I do.

18   Q.  Ms. Krco, how did you feel during the robbery?

19             MS. STAFFORD:  Objection.

20   A.  Very bad.

21             MR. ROTH:  Objection, your Honor.

22             THE COURT:  Sustained as to form.  Next question.

23   BY MS. MASELLA:

24   Q.  After this robbery did you have any concerns with respect

25   to your business?

D355dor5                          Krco - direct

1    A.  I have to close my business.  I can't work anymore.  I

2    can't look over my shoulder every time.

3             MS. STAFFORD:  Objection, your Honor.

4             THE COURT:  Overruled, but let's move on.

5             MS. MASELLA:  One moment, your Honor.

6             (Pause)

7             MS. MASELLA:  No further questions, your Honor.

8             THE COURT:  Cross-examination, Ms. Stafford?

9             MS. STAFFORD:  Yes.  Thank you, your Honor.

10   CROSS EXAMINATION

11   BY MS. STAFFORD:

12   Q.  Good afternoon, Ms. Krco.  I just have a few questions for

13   you.

14   A.  Okay.

15   Q.  About how tall are you?

16   A.  5.6.

17   Q.  5'6"?

18   A.  Yeah.

19   Q.  And you said the persons that robbed you that day were

20   about your height or a little bit shorter?

21   A.  No.  I think a little bit bigger.

22   Q.  A little bit bigger.

23   A.  Yes.  Bigger than me.

24   Q.  And you spoke to the police shortly after that robbery,

25   didn't you?

D355dor5                         Krco - cross

1    A.  Yes, I did.

2    Q.  And you tried to be as accurate as possible when you spoke

3    to them, isn't that correct?

4    A.  Yes.

5    Q.  And that's because you wanted the police to apprehend the

6    people who robbed you, right?

7    A.  Yes.

8    Q.  Do you recall describing the two men that robbed you as

9    black males about 5'7"?

10   A.  I can't say they black.  They had black mask.

11   Q.  And you also met with the prosecutors in this case, didn't

12   you?

13   A.  With who?

14   Q.  With Ms. Masella prior to testifying here today?

15   A.  Oh, yes.  I did.

16   Q.  And, when you spoke to her you were aware that there were

17   other people in the room, other individuals, other prosecutors,

18   other agents?  Do you recall anybody else being in the room?

19   A.  When?

20   Q.  When you spoke to Ms. Masella?

21   A.  With other people?  No.

22   Q.  Do you recall when you were speaking to Ms. Masella if

23   anyone was taking notes while you were speaking?

24   A.  I really didn't even pay attention did she taking any notes

25   or not.  I just talked with her.

D355dor5                          Krco - cross

1   Q.  When you described this event that day do you recall

2   telling her that the gloves -- you recall the robbers wearing

3   that day, being cheap leather?

4   A.  Yes, I did.

5            MS. STAFFORD:  Thank you.  No further questions.

6            THE WITNESS:  You're welcome.

7            THE COURT:  Mr. Roth?

8            MR. ROTH:  No questions, your Honor.

9            THE COURT:  Any redirect?

10           MS. MASELLA:  No, your Honor.

11           THE COURT:  You can step down.  Thank you Ms. Krco.

12           THE WITNESS:  Can I say one more?

13           THE COURT:  No.  There is no question pending.  But,

14   thank you for your time.

15           THE WITNESS:  You're welcome.

16           THE COURT:  Do you have another witness here?

17           MS. LESTER:  We can put on another witness, if your

18   Honor would like.

19           THE COURT:  How long is the witness?

20           MS. LESTER:  We can put on a really quick ATF witness.

21           THE COURT:  Let's do that.  Let's call one more

22   witness.  We are on a roll.

23           MS. LESTER:  The government calls ATF agent Jose Ruiz.

24    JOSE RUIZ,

25       called as a witness by the Government,

D355dor5                              Krco - cross

 1           having been duly sworn, testified as follows:

 2                 THE COURT:  State your name and spell your name, first

 3       and last for the record.

 4                 THE WITNESS:  I'm Jose Ruiz.  J-O-S-E, R-U-I-Z.

 5                 THE COURT:  Okay, Mr. Ruiz, that sounds perfect, just

 6       the right distance right volume right pace.

 7                 You may proceed, Ms. Lester.

 8                 MS. LESTER:  Thank you, your Honor.

 9       DIRECT EXAMINATION

10       BY MS. LESTER:

11       Q.  Good afternoon.

12       A.  Good afternoon.

13       Q.  Where do you work?

14       A.  With the Bureau of Alcohol, Tobacco and Firearms.

15       Q.  Is that known as the ATF?

16       A.  Yes.

17       Q.  And what is your title there?

18       A.  Special agent.

19       Q.  How long have you been a special agent with ATF?

20       A.  Since July of 2000.

21       Q.  And what are your duties and responsibilities as a special

22       agent?

23       A.  I conduct investigations into firearms trafficking, gangs,

24       violent crimes.

25       Q.  Directing your attention to January 19th of last year, do

D355dor5                         Ruiz – direct

1   you recall whether you were working that day?

2   A.   Yes.

3   Q.   What was your assignment on that day?

4   A.   I was a party of the arrest team.

5   Q.   Do you recall who you were planning to arrest that day?

6   A.   Jermaine Dore.

7   Q.   And do you know in fact whether Mr. Dore was arrested on

8   that day?

9   A.   Yes, he was.

10  Q.   Do you recall where the address -- I'm sorry, where the

11  arrest took place, generally?

12  A.   In the Bronx.

13  Q.   And, do you recall what time it was that the arrest took

14  place?

15  A.   It was approximately 6:00 a.m.

16  Q.   What was your role in the execution of the arrest, if any?

17  A.   I was just part of the arrest team that made entry into the

18  residence and assisted with the arrest.

19  Q.   Do you know whether there were any searches conducted?

20  A.   Yes.

21  Q.   Were you involved in that in any way?

22  A.   Yes, I was.

23  Q.   Could you please describe for the jurors what you did?

24  A.   I assisted in the search of a bedroom in the apartment.

25  Q.   Do you recall what, if anything, you found during the

D355dor5                           Ruiz - direct

1    search?

2    A.   We found a couple of cell phones, ski masks and gloves.

3    Q.   What did you do with those items that you recovered?

4    A.   We turned them over to our, like, vault coordinator and

5    asset forfeiture team so they can enter it into our case

6    management system and into our vault.

7    Q.   Is that your usual procedure with respect to items that are

8    seized during searches?

9    A.   Yes.

10   Q.   I put before you what's been marked for identification as

11   Government Exhibits 72, 73 and 74.  Could you take a look at

12   those for me?

13        Looking first at Government Exhibit 72, do you

14   recognize that item?

15   A.   Yes.  It is a cell phone that we took from the residence.

16   Q.   And how do you know that it's the cell phone that was

17   actually taken from the residence that day?

18   A.   From the evidence label, it was the defendant's name is on

19   it and the date that we took it, and I remember the phone

20   because of the cracks on it.

21   Q.   And now, directing your attention to Government Exhibit 73,

22   what is that item?

23   A.   A cell phone and a charger.

24   Q.   Do you recognize that?

25   A.   Yes.

D355dor5                        Ruiz - direct

1    Q.  How do you recognize it?

2    A.  It's the cell phone.  Again, just from looking at it I

3    remember taking that and the date that it was taken, the

4    address and the name of the defendant.

5    Q.  And directing your attention now to Government Exhibit 74;

6    do you recognize that?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's the ski masks and the gloves that we took from the

10   residence.

11           MS. LESTER:  Your Honor, the government offers

12   Government's Exhibits 72, 73 and 74.

13           THE COURT:  Any objection?

14           MS. STAFFORD:  No objection.

15           MR. ROTH:  No, your Honor.

16           THE COURT:  Okay, so Government's Exhibits 72, 73 and

17   74 are received.

18           (Government's Exhibits 72, 73 and 74 received in

19   evidence)

20           MS. LESTER:  Your Honor, may we show the jury the

21   contents of Government Exhibit 74; the ski mask and gloves?

22           THE COURT:  Yes, you may.

23           MS. LESTER:  Is your preference that I hold it up?

24           THE COURT:  You can hold it up or give it to them.

25           A JUROR:  May we take it out and look at it?

1           THE COURT:  Right.  No objection.  It is not sealed.

2           Are there more questions?

3           MS. LESTER:  No.  I have no further questions.

4           THE COURT:  No further questions.

5           Cross-examination, Ms. Stafford.

6           MS. STAFFORD:  Your Honor, it is potentially going to

7     be at least 15 minutes.

8           THE COURT:  Why don't we do this.  Why don't we break.

9     We will break today.  I will let you look at it again tomorrow,

10    folks, but rather than start a cross that we can't finish, it

11    is a smooth breaking point right now, we have had a full enough

12    day.  I think you folks have been working hard so you can leave

13    that there.  Thank you, Ms. Correia.

14          Tomorrow we are going to start at 9:30.  Make sure you

15    are here at 9:30 and we can use the whole morning and keep this

16    trial moving so we can use the momentum.

17          Don't discuss the case with anyone.  Don't do any

18    research or anything like that.  Keep an open mind.  We are at

19    the very beginning of the case, still a lot to do, still have

20    to hear my instructions on the law which that's the last thing

21    before you get the case, so I don't want you making spot

22    decisions or making any kind of findings at this stage.  Way

23    too early for that.

24          Okay?  Have a good night and I will see you tomorrow

25    at 9:30.  Be here before 9:30.  We will have coffee and stuff

1    in the room.  Bring your note books.  Leave them there and

2    Mr. Halegua will collect them from you.

3            Tomorrow morning go straight into the jury room.  It

4    will be open from the hall.  You can go straight in there and

5    make yourself comfortable and we will bring you out at 9:30.

6    Have a good night.

7            All rise for the jury.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D355dor5                          Ruiz - direct

 1              (Jury not present)

 2              THE COURT:  Have a seat.

 3              Let's give the jurors five minutes or so to file out

 4  so we don't bump into them.

 5              Same thing for you, Agent, if you don't mind, if you

 6  can be here around 9:15 and get you up in the stand and ready

 7  to go at 9:30.  Okay?

 8              Anything we need to cover before we break for the day?

 9              MS. FONTIER:  No.  Thank you, your Honor.

10              THE COURT:  No.  Okay so tomorrow if everybody can be

11  ready by 9:15 and that way we have a buffer too.  So, give the

12  jurors a couple minutes.

13              (Adjourned to 9:30 a.m., Wednesday, March 5, 2013.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                        Page
 3   JASPAL SINGH
 4   Direct By Ms. Masella . . . . . . . . . . . .71
 5   Cross By Mr. Roth  . . . . . . . . . . . . .78
 6   CARLOS VILLANUEVA
 7   Direct By Ms. Masella . . . . . . . . . . . .90
 8   Cross By Mr. Roth  . . . . . . . . . . . . 101
 9   Redirect By Ms. Masella  . . . . . . . . . 121
10   LUIS SEGARRA
11   Direct By Ms. Masella . . . . . . . . . . 125
12   Cross By Ms. Stafford  . . . . . . . . . . 132
13   Cross By Mr. Roth  . . . . . . . . . . . . 133
14   DJUJKA KRCO
15   Direct By Ms. Masella . . . . . . . . . . 143
16   Cross By Ms. Stafford  . . . . . . . . . . 153
17   JOSE RUIZ
18   Direct By Ms. Lester . . . . . . . . . . . 156
19                    GOVERNMENT EXHIBITS
20   Exhibit No.                          Received
21    72, 73 and 74  . . . . . . . . . . . . . 159
22
23
24
25
```