D365dor1                          trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        12 CR. 45 (RJS)

JERMAINE DORE and DWAYNE
BARRETT,

                    Defendants.

------------------------------x

                                          March 6, 2013
                                          9:30 a.m.

Before:

                    HON. RICHARD J. SULLIVAN,

                                          District Judge

                         APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
BY:   JESSICA MASELLA
        AMY LESTER
        Assistant United States Attorneys

ALICE L. FONTIER
        Attorney for Defendant Dore
        -and-
LAW OFFICES OF YING STAFFORD
BY:   YING STAFFORD

HURWITZ, STAMPUR & ROTH
        Attorneys for Defendant Barrett
BY:   JAMES M. ROTH
        -and-
SIMON & PARTNERS, LLP
BY:   KENNETH C. MURPHY

D365dor1                          trial

1                (Trial resumed; jury not present)

2                THE COURT:  Anything to cover before we bring the

3      witness in?  We are still waiting on one juror.

4                MS. LESTER:  Your Honor, I think there are some issues

5      with respect to Janiel Brown, the issue that counsel raised

6      yesterday about the fact that Mr. Dore was abusive towards

7      Ms. Brown on several occasions.  One of those occasions the

8      government explained is, gives context to some of the text

9      messages back and forth between Ms. Brown and Mr. Dore but the

10     government --

11               THE COURT:  When is she going to testify?

12               MS. LESTER:  We expect she will testify today, later

13     today.

14               In light of the defense's openings in which they

15     really attacked the character of Ms. Brown and her incentive to

16     lie in this case, the government feels now that it is entitled

17     to explore the nature of the relationship with Mr. Dore

18     including any physical abuse because it provides background and

19     understanding of the nature of their relationship, her

20     motivation in getting involved in the robbery conspiracy and,

21     you know, her --

22               THE COURT:  Is it your contention she got involved in

23     the robbery conspiracy because she was physically abused?

24               MS. LESTER:  Well, your Honor, I think that the

25     relationship was one of coercion and fear to some extent, and

1    that part and parcel of that was the physical abuse.

2            THE COURT:  What exhibits are the e-mails that make

3    reference to this that you say this provides context for?

4            MS. LESTER:  The text messages are Exhibit 73 --

5    they're actually contained in 73A.  We haven't printed it out

6    for you but I have a printout that I can share with you.  And

7    we can put it on the screen actually, if that's easier.

8            THE COURT:  While you are looking for those, I

9    received some subpoenaed materials which were delivered to the

10   Court in response to a subpoena that was issued by Mr. Todd who

11   is no longer in the case.  I don't know if those subpoenas were

12   issued jointly by the defendants or whether this is something

13   that just Mr. Todd was focused on.

14           Do you guys have any knowledge of that?

15           MR. ROTH:  No, Judge.

16           THE COURT:  No.  Okay, so.

17           MR. ROTH:  But if it is for the defendants we will --

18           THE COURT:  Well, I mean, I'm not sure that you get

19   sort of whatever was going on with Mr. Todd, different

20   defendants have different defense theories, perhaps.  So, if it

21   was jointly undertaken, yeah, I will make it available to you.

22   If it is not jointly undertaken, then I won't.

23           MR. MURPHY:  Can you tell us who the respondent

24   parties are who produced it?  The police department or?

25           THE COURT:  Are you okay with me saying?  The subpoena

D365dor1                          trial

1    was issued ex parte, right?

2            MR. ROTH:  At this point --

3            THE COURT:  It is the New Rochelle Police Department,

4    it relates to -- do you want me to tell you what it relates to?

5    Relates to records and reports in connection with the robbery

6    reported on October 11th, 2011.  So.

7            MR. ROTH:  Thank you, your Honor.

8            THE COURT:  So you were going to hand me up some

9    exhibits?  We are waiting on three jurors, apparently.

10           Okay, I can't make head or tails of this so I don't

11   know who is sending to whom, I don't know what is being

12   discussed.

13           MS. LESTER:  Your Honor, and actually maybe we can put

14   it up on the screen, if possible, it is number 324, I

15   believe -- or 524.  It is from the phone number ending in 5031

16   and text no. 524.

17           So, your Honor, this spreadsheet is an extraction and

18   ATF Agent John McKenna will explain physical extraction from

19   Ms. Brown's iPhone from all the text messages between that

20   phone and a phone number ending in 5031 that was used by

21   Jermaine Dore.  And this Excel spreadsheet puts all of those

22   text messages in chronological order without including any

23   other text messages that may have come in between from

24   different numbers.

25           So, we've highlighted portions that we intend to

1    introduce.  Here are text messages starting on December 25th in

2    which Ms. Brown and Mr. Dore are having an argument.

3              THE COURT:  These are all communications from Mr. Dore

4    or --

5              MS. LESTER:  Yes.  So I believe, Ms. Gray, if you will

6    scroll back over to the left?

7         I believe these are all from Mr. Dore's phone.  If you

8    can see in the column where it says party at the top it says

9    from and then the 704-756-5031 number and "Hun" is the

10   designation in Ms. Brown's phone for Mr. Dore so those

11   highlighted messages are from Mr. Dore to Ms. Brown

12             THE COURT:  Okay.

13             MS. LESTER:  So, in the second message, 525, he says:

14   *Then you want talk about a call cops.  Am not having in that be*

15   *it a no no.*  That's why she will testify about what she

16   understood these text messages to mean, but essentially they

17   had had a fight, had hit her with a broomstick and she had

18   threatened to call the police on him.  Then, a little bit

19   further down, if you could scroll down a little bit, he says to

20   her in the text messages at 138 and 16 seconds:  *Just so you*

21   *know, if you call them, I will tell them you was my driver.*

22   *Word.*  So, he's threatening her that if she goes to the cops

23   about the incident where he hit her, then he's going to tell

24   them that she drove for him.

25             If you can scroll down a bit more, Ms. Brady, to a

D365dor1                         trial

1   robbery.

2          And then it is a little more explicit, the message at

3   140 and 31 seconds where he says: *Good.  And tell them just*

4   *know if they come to my, I will tell them about PA and the*

5   *other B.*  PA is a reference to a robbery that took place in

6   Pennsylvania in which Ms. Brown participated.  She drove

7   Mr. Dore to that robbery.

8          THE COURT:  All right.  I'm going to allow it.  I will

9   give a limiting instruction so think about what that

10  instruction should be.  Mr. Dore is not charged with a domestic

11  violence or domestic assault and this is all for why there is

12  context.

13         MS. LESTER:  Your Honor, there is two other short

14  issues with respect to Ms. Brown, one of which came up

15  yesterday.  In the openings Ms. Fontier made reference to the

16  prosecutors in this case and what their views were of

17  Ms. Brown's testimony at the suppression hearing and whether

18  she was credible.  We believe that was improper, we objected.

19  Your Honor sustained the objection.

20         THE COURT:  If you argued she was not credible you

21  don't think they can use your arguments against you?

22         MS. LESTER:  I don't know how they can, your Honor.  I

23  don't think that is proper.

24         THE COURT:  I'm not sure I agree with you.

25         Ms. Stafford?

D365dor1                     trial

1              MS. STAFFORD:  Your Honor, I just wanted to address

2      the -- just ensure that her testimony was going to be limited

3      to the text messages and not a narrative of.

4              THE COURT:  Well, she is going to explain the context

5      for these messages.  She is going to explain why she was going

6      to potentially call the cops.  So, I'm going to allow her to

7      explain that she had an altercation with Mr. Dore in which he

8      hit her and so she threatened to call the police.  I don't see

9      how else she can tell that story.

10             MS. STAFFORD:  It would be limited to just that?

11             THE COURT:  I don't think we need to get into much

12     more than that.  Are you contemplating more than that?  Are you

13     going to get into other incidents of abuse?

14             MS. LESTER:  No, your Honor.  We can limit it to that.

15             THE COURT:  All right.  So I want to get the jury in

16     here because when they're on time or close to on time I want to

17     reward them and not keep them waiting.  So.

18             MS. LESTER:  We can probably address this at a break.

19             THE COURT:  I think we can.

20             MS. LESTER:  May I have my text messages back?  Thank

21     you.

22             THE COURT:  Then I received an ex parte request from

23     Ms. Stafford last night.  I don't want to get into the details

24     of it.  I don't think there is sufficient particularity or any

25     basis that's offered to indicate why those materials would be

D365dor1                          trial

1   relevant or likely to lead to impeachment material.  So, if you

2   have more skin to put on those bones, I'm happy to hear you,

3   but you can't just use a request like that as a fishing

4   expedition and without more I don't see how I can include

5   anything other than just, *eh, maybe we will find something*.

6   Think about it, we don't have to deal with it right now.  So,

7   I'm denying it without prejudice to renewal if you can give me

8   some more facts.  If we need to do that at a side bar or in the

9   robing room, we can do that.

10           MS. STAFFORD:  Thank you, your Honor.

11           THE COURT:  Let's bring in the jury.  Let's get the

12   witness in here right away.

13           MS. LESTER:  Your Honor, when we broke yesterday the

14   jurors were about to look at Exhibit 74 which are the masks and

15   gloves.

16           THE COURT:  So we will let them do that but then we

17   will start the cross.

18           MS. LESTER:  Okay.  Thank you.

19           (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Have a seat.  Good morning, ladies and

3     gentlemen.  Was there coffee and stuff in there for you?

4          THE JURY:  Yes.  Thank you.

5          THE COURT:  Was it all right?

6          THE JURY:  Yes.

7          THE COURT:  Let me know if it is not up to snuff and

8     we will do what we can to make it better.

9          So, we are getting a little bit of a late start, not

10    terrible, but just keep in mind, I have the lawyers get here

11    early so we can do things efficiently outside of your presence

12    so we are not taking up your time.  If you are not ready to go

13    at 9:30, then we'll take on subjects that I might otherwise

14    have reserved for another time so that we can use the time

15    properly.  That means if you then, five or 10 minutes later are

16    here, I'm not necessarily going to be in a position to just

17    drop everything that we are doing and that means you will end

18    up waiting.  So, again, do what you can to make sure you are

19    here on time, ready to go at 9:30, and I promise we will keep

20    our end of the bargain.

21         We are now going to resume the testimony of Agent Ruiz

22    but first I'm going to let you look at the exhibits that I

23    think only Ms. Correia and perhaps Ms. Joachim got to see

24    yesterday and those were the items that were marked Government

25    Exhibit?

1            MS. LESTER:  74, your Honor.

2            THE COURT:  So, you can take a look at those.  We

3     won't start the cross-examination until each of you has had a

4     chance to examine them.  These are in evidence, they'll be

5     available to you in the jury room if you would like to see them

6     during deliberations so you don't have to spend a ton of time

7     with them, but you can take a quick look.

8            They tell me there is a problem in the rest rooms?

9            THE JURY:  Yes.

10            THE COURT:  This is my courtroom for a little longer.

11     I moved across the street, I have a different courtroom across

12     street but it is not nearly as big as this courtroom.  So, I

13     have not had that problem before but we will do what we can to

14     fix it.  All right?

15            So, we will now have the cross-examination of Agent

16     Ruiz by -- Ms. Stafford, you are going to start?

17            MS. FONTIER:  I am, your Honor.

18            THE COURT:  Oh.  Ms. Fontier, I'm sorry.

19      JOSE RUIZ, resumed.

20     CROSS EXAMINATION

21     BY MS. FONTIER:

22     Q.  Good morning, Agent Ruiz.

23     A.  Good morning.

24     Q.  It is Agent, am I right?

25     A.  Yes.

D365dor1                         Ruiz - cross

1   Q.  Agent Ruiz, you testified very briefly obviously on direct

2   regarding the recovery of three items, the cell phones and the

3   gloves and masks; is that correct?

4   A.  Yes.

5   Q.  Those were recovered pursuant to a search on January 19th

6   of last year, correct?

7   A.  Yes.

8   Q.  And that search took place at 3983 Carpenter Avenue?

9   A.  I don't remember the exact address but it was on that date.

10  It was in the Bronx.

11  Q.  Do you remember if it was on Carpenter Avenue?

12  A.  By the evidence labels it was Carpenter Avenue.

13  Q.  This is in evidence and it is fair to say that this

14  evidence label states address 3983 Carpenter Avenue, Bronx, New

15  York; yes?

16  A.  Yes.

17  Q.  And that is where this search took place, correct?

18  A.  Yes.

19  Q.  So, when you went to 3983 Carpenter Avenue that was at

20  about 6:00 in the morning?

21  A.  Approximately, yes.

22  Q.  And you went there to process an arrest warrant for

23  Jermaine Dore, correct?

24  A.  Yes.

25  Q.  And when you arrived you were not alone?

D365dor1                              Ruiz - cross

1    A.  No.

2    Q.  You were in a team with about nine other people?

3    A.  I don't remember exactly how many, but there were a few of

4    us.

5    Q.  There were multiple agents that were present?

6    A.  Yes.

7    Q.  There were also U.S. Marshals that were present?

8    A.  That's correct.

9    Q.  And you went to that address because you believed that

10   Jermaine Dore lived there, correct?

11   A.  Yes.

12   Q.  He wasn't on the lease however, right?

13   A.  I don't know.

14   Q.  You went there because you had information, though, that he

15   was staying there?

16   A.  That's the information we had.

17   Q.  When you arrived there the location is a two-story house,

18   correct?

19   A.  Yes.

20   Q.  Were you the first one to enter or when did you enter the

21   building?

22   A.  I wasn't the first but I don't remember exactly the order I

23   went in.

24   Q.  You entered the building as a group, though?

25   A.  Yes.

D365dor1                          Ruiz - cross

1    Q.  And this is not a private house, correct?

2    A.  If I remember it was -- it was a house but it was a

3    multiple family house.  I don't know if it is two-family or

4    what, but it wasn't like a one-family private house.

5    Q.  There were multiple apartments in this building, correct?

6    A.  Yes.

7    Q.  And where you encountered Jermaine Dore was on the second

8    floor?

9    A.  Yes.

10   Q.  And did you enter as part of the group and go up to the

11   second floor or did you stay behind?

12   A.  I went up to the second floor with the group.

13   Q.  So, when you went up to the second floor there is a locked

14   door at the top of the stairs there, correct?

15   A.  Yes.

16   Q.  And did you knock on the door or did someone else?

17   A.  Somebody else.

18   Q.  So, after you knocked on the door, what happened at that

19   point, after someone knocked on the door?

20   A.  I remember us making entry and searching, clearing the

21   house.

22   Q.  A door was opened, though, by someone that lived in the

23   house, correct?

24   A.  I don't remember.  I wasn't at the front so I don't know

25   who opened it.

D365dor1                          Ruiz - cross

1   Q.  Do you recall knocking the door down?

2   A.  I don't -- I wasn't at the front.  I don't remember us --

3   if we did or we didn't.

4   Q.  So, once you enter the apartment, though, what did you

5   first see?

6   A.  It was just an apartment with rooms and --

7   Q.  Do you recall what it looked like?

8   A.  Not off the top of my head.  Not anymore.

9   Q.  Do you recall walking into the second floor?

10  A.  Yes.

11  Q.  And there were bedrooms off to your right, correct?

12  A.  I don't remember exactly how it was set up.

13  Q.  Do you remember seeing a kitchen in front of you?

14  A.  Yes.

15  Q.  And do you remember additional bedrooms to your left?

16  A.  I really don't remember exactly how it was set up.

17  Q.  Do you remember seeing more than one person that morning

18  that lived in that building, in those apartments?

19  A.  Yes.

20  Q.  And you saw Jermaine Dore, correct?

21  A.  I don't remember if I actually got to see him because I had

22  to cover another door so I don't remember if I was actually --

23  if I actually got to see him that day right there when we

24  arrested him.

25  Q.  Did you see Janiel Brown?

D365dor1                    Ruiz - cross

1   A.  Yes.

2   Q.  Did you speak to Janiel Brown?

3   A.  Not at the beginning.  Eventually we spoke to her briefly.

4   Q.  So, when you first came into the apartment obviously you

5   don't exactly remember, but it is fair to say that Jermaine

6   Dore was present, correct?

7   A.  Yes.

8   Q.  He was arrested?

9   A.  Yes.

10  Q.  And was he placed under arrest as the team entered or at

11  some late later point?

12  A.  I couldn't tell.  I don't remember exactly how, the order.

13  Q.  What was your role when you walked in then?  What were you

14  assigned to do?

15  A.  I was part of the arrest team.  We were assisting clearing

16  the house, making sure there -- went looking for Jermaine Dore.

17  Q.  So, as you entered when you say you cleared the house is

18  that to check for other people that might be present?

19  A.  Yeah.  Check other people in for our safety to make sure

20  nobody else is there.

21  Q.  And did you find anyone else?

22  A.  Me personally?  No.

23  Q.  Did you or members of your team that you saw find anyone

24  else in the home?

25  A.  I don't remember.  I just remember Janiel and -- Janiel

D365dor1                         Ruiz - cross

1   Brown and Jermaine Dore.

2   Q.  Would you agree that the second floor of this house was

3   broken up into separate rooms that were rented individually?

4   A.  Yes.

5   Q.  And Jermaine Dore and Janiel Brown lived in a single room

6   in this apartment, correct?

7   A.  Yes.

8   Q.  And there was -- they shared a kitchen on the second floor?

9   A.  Yes.

10  Q.  There was a shared bathroom?

11  A.  Yes.

12  Q.  But they were only living in a single room, correct?

13  A.  Yes.

14  Q.  And you actually conducted the search of that room, yes?

15  A.  That's correct.

16  Q.  When you entered the bedroom was Mr. Dore in the room?

17  A.  No.

18  Q.  Was Janiel Brown in the room?

19  A.  She was not.

20  Q.  Now, when you first entered to begin the search of the

21  room, do you recall what the room looked like?

22  A.  There was a bed and there were -- there was a bed and just,

23  like, your basic room.

24  Q.  And it was not a large room, correct?

25  A.  No, it wasn't.

1    Q.  Just a basic, small bedroom?

2    A.  Yes.

3    Q.  And a window?

4    A.  I believe so.

5    Q.  So there is a bed, a dresser; was there a closet, do you

6    remember?

7    A.  I don't remember.

8    Q.  There was a TV in the room?

9    A.  Again, I don't remember that.

10   Q.  But you would describe it as just a basic bedroom?

11   A.  Yes.

12   Q.  When you went there, again, obviously you don't remember

13   how Mr. Dore was arrested but do you recall there being a

14   struggle?

15   A.  I don't remember that.

16   Q.  Do you recall him trying to flee?

17   A.  I don't recall that.

18   Q.  To the best of your memory, was Mr. Dore cooperative?

19   A.  I mean, I didn't speak to him.  I didn't see him really, so

20   I don't remember if he was or wasn't.

21   Q.  If members of your team had to chase Mr. Dore you would

22   recall that, yes?

23   A.  Yes.

24   Q.  If Mr. Dore jumped out of the window you would recall that,

25   yes?

1   A.  Yes.

2   Q.  So, fair to say those things didn't happen?

3   A.  No.  They didn't.

4   Q.  Now, when you searched the room you conducted a thorough

5   search, right?

6   A.  Yes.

7   Q.  And you were looking for evidence of a crime, correct?

8   A.  Yes.

9   Q.  And you were told what the allegations against Mr. Dore

10  were before you went there, right?

11  A.  Yes.

12  Q.  So you were looking for evidence that would fit those

13  allegations, right?

14  A.  That's correct.

15  Q.  And when you went into the room in your thorough search you

16  looked on top of the bed, right?

17  A.  Yes.

18  Q.  You looked under the bed?

19  A.  Yes.

20  Q.  You looked in the dresser?

21  A.  Yes.

22  Q.  You looked in the closet?

23  A.  If there was a closet, yes.

24  Q.  You went through the clothes that were there?

25  A.  Yes.

1    Q.  You went through Janiel Brown's clothes?

2    A.  Yes.

3    Q.  And you went through Mr. Dore's clothes?

4    A.  Yes.

5    Q.  You found gloves, right?

6    A.  That's correct.

7    Q.  These are in evidence.  Now, these are the gloves that you

8    found, correct?

9    A.  Yes.

10   Q.  And you know that because you vouchered them and placed

11   them in this bag, correct?

12   A.  Yes.

13   Q.  Now, again, this search was conducted on January 19th,

14   correct?

15   A.  Yes.

16   Q.  That was winter?

17   A.  Yes.

18   Q.  Winter in New York City, right?

19   A.  Yes.

20   Q.  Cold, generally?

21   A.  Yep.

22   Q.  And these are cotton gloves, right?

23   A.  Yes.

24   Q.  These appear to me to be the kind of glove you can by for

25   $3 in Chinatown, right?

D365dor1                    Ruiz - cross

1   A.  Yes.

2   Q.  Just common, cotton gloves, is that correct?

3   A.  Yes.

4   Q.  And then there is what appear to be a slightly larger size

5   of the same type of glove, correct?

6   A.  Yes.

7   Q.  Same type of common cotton glove, right?

8   A.  Yes.

9   Q.  And then what is also taken is just a cotton mask, correct?

10  A.  Yes.

11  Q.  And these are also sold commonly, correct?

12  A.  Yes.

13  Q.  There is nothing special about each of these?

14  A.  No.

15  Q.  They were recovered, again, in January, right?

16  A.  Yes, they were.

17  Q.  Now, you also admitted into evidence, I believe, two cell

18  phones that you found, right?

19  A.  Yes.

20  Q.  And those were found inside of the room, correct?

21  A.  Yes.

22  Q.  You also at one point found a laptop, correct?

23  A.  Yes.

24  Q.  Do you recall what type of laptop that was?

25  A.  No.  Just a laptop.

D365dor1                              Ruiz - cross

1    Q.  That laptop was not vouchered though, correct?

2    A.  No, it wasn't.

3    Q.  And that was not vouchered because Janiel Brown said it was

4    hers, right?

5    A.  Yes.

6    Q.  And you actually -- was it she turned the laptop on and

7    showed you her school work on it, correct?

8    A.  Yes.

9    Q.  And that's how you accepted that it was hers?

10   A.  Yes.

11   Q.  Now, these gloves and masks that you recovered, after you

12   took them you put them in this bag, right?

13   A.  The evidence team put them in the bags, the people that

14   vouchered them.

15   Q.  To your knowledge was anything else done with these?

16   A.  Not to my knowledge.

17   Q.  They weren't sent to a lab at any point?

18   A.  I don't know.

19   Q.  And, to your knowledge -- well, is it fair to say that you

20   don't know if these are Janiel Brown's?

21   A.  They were in the room.

22   Q.  And Mr. Dore and Janiel Brown stayed in the same room,

23   correct?

24   A.  Yes.

25   Q.  So they could belong to her?

D365dor1                    Ruiz - cross

1    A.  I mean, they could.

2    Q.  Now, during this thorough search of the room that you said

3    you did, the items that are in evidence here are what you

4    seized at that point, correct?

5    A.  Yes.

6    Q.  So, also fair to say then that you did not find a gun in

7    that room?

8    A.  No.

9    Q.  You did not find a knife?

10   A.  No.

11   Q.  You did not find a bat?

12   A.  No.

13   Q.  You didn't recover any other type of weapon?

14   A.  No.

15   Q.  Again, you were executing an arrest warrant for someone

16   accused of robberies, correct?

17   A.  Yes.

18   Q.  You didn't find money?

19   A.  We did find some money but it -- Janiel Brown said it was

20   her money.

21   Q.  So you didn't recover any amounts of cash that you entered

22   into evidence here, right?

23   A.  No.

24   Q.  And you didn't find any jewelry that did not belong to

25   Janiel Brown, correct?

D365dor1                         Ruiz - cross

1    A.  No.

2    Q.  You didn't recover any other expensive products, right?

3    A.  No.

4    Q.  Nothing of value was found in that room?

5    A.  Not that I remember.  No.

6           MS. FONTIER:  Your Honor, I have nothing further at

7    this time.

8           THE COURT:  Okay.

9           Mr. Roth?

10          MR. ROTH:  Thank you, your Honor.

11   CROSS EXAMINATION

12   BY MR. ROTH:

13   Q.  Good morning, Agent Ruiz.

14   A.  Good morning.

15   Q.  If you don't understand a question that I pose to you,

16   please ask me to rephrase it before you answer it, okay?

17   A.  Okay.

18   Q.  You were a member of the team that executed the arrest

19   warrant that day, is that correct?

20   A.  Yes.

21   Q.  And I take it, sir, you said that there were a number of

22   people -- U.S. Marshals, other special agents -- who were

23   members of that team that day; is that correct?

24   A.  Yes.

25   Q.  And prior to the execution of the arrest warrant that day,

D365dor1                         Ruiz - cross

1   is it fair to say, sir, that you had a tactical meeting?

2   A.  Yes.

3   Q.  And, could you explain to the members of the jury what a

4   tactical meeting is?  In this situation, in this context.

5   A.  We give an overview of the case, we hand out assignments

6   that, on what we're going to be doing at the arrest warrant, at

7   the location, and you assign like which is the nearest hospital

8   and so forth.

9   Q.  And when you say "we," is there not a commanding officer

10  who makes those determinations and gives those assignments?

11  A.  Yes.  The on-scene commander.

12  Q.  And who was it that day?

13  A.  It was our group supervisor.

14  Q.  And who was your group supervisor?

15  A.  Michael Zeppieri.

16  Q.  And, sir, what is the purpose of that tactical meeting?

17  A.  Again, to assign -- give assignments and give an overview

18  of the case.

19  Q.  What was your particular assignment on that day?

20  A.  I was on the arrest team.

21  Q.  Simply the arrest team?

22  A.  Yes.

23  Q.  You were not on the evidence collection team?

24  A.  We didn't have a search warrant, so no.

25  Q.  So you didn't anticipate encountering any items that you

D365dor1                              Ruiz - cross

1    might seize?

2    A.  We did, but we didn't assign search teams for that.

3    Q.  You have been on how many tactical raids, if you will, or

4    executing search warrants or arrest warrants in your years as

5    an ATF member?

6    A.  Hundreds.

7    Q.  Hundreds.  Okay.

8             And it is common, is it not, when you execute what you

9    say is an arrest warrant to -- in the course of executing an

10   arrest warrant, to gather evidence in connection with that

11   case?

12   A.  It depends.

13   Q.  Well, it depends on whether you see evidence that you

14   believe may be, in some way, however tenuously connected to the

15   case, you seize it.  Is that fair to say?

16   A.  Yes.

17   Q.  And that's what happened in this case, is that correct?

18   A.  We obtained a consent to search the room and we searched

19   the room.

20   Q.  Well, that's another way that you come -- the ATF comes in

21   situations like this to gather evidence, although you came in

22   on an arrest warrant you obtained consent to search the house,

23   is that correct?

24   A.  Yes.

25   Q.  And that happens very often when the ATF comes in in

1    masses --

2              MS. LESTER:  Objection, your Honor.

3              THE COURT:  I'll allow a little of this.  I'm not sure

4    of the relevance, but go ahead.

5    Q.  So, it was not unusual was it, sir, to anticipate that some

6    evidence might have been gathered in the course of the

7    execution of the arrest warrant that day?

8    A.  Yes.

9    Q.  Yes, meaning it was unusual, or it was not unusual?

10   A.  Yes, we could believe that we could have gotten evidence

11   that day.  There was a chance.

12   Q.  I wasn't clear from either your direct testimony or your

13   cross-examination as to whether or not you personally recovered

14   from the apartment that day Government Exhibit 74, the gloves

15   and the mask.

16   A.  Yes, I did.

17   Q.  And, sir, have you received training in evidence gathering?

18   A.  Yes.

19   Q.  And what's the nature of that training?

20   A.  In our basic training we have an evidence class that we

21   take.

22   Q.  And how many hours is that, sir?

23   A.  I don't remember exactly how many hours.

24   Q.  Well, how many days, roughly?

25   A.  I couldn't tell you.  I mean it's been over 13 years.  It's

D365dor1                          Ruiz - cross

1   been 13 years, approximately.

2   Q.  Oh, okay.

3           Was that before or after the O.J. case, if you recall?

4           MS. LESTER:  Objection, your Honor.

5           THE COURT:  You can answer.  Do you recall?

6   A.  It was after.

7   Q.  You know the O.J. case?

8   A.  Yes.

9   Q.  And you have had no refresher courses whatsoever in

10  evidence gathering in, since -- you have been on the job since

11  2000, is that correct?

12  A.  Yes.

13  Q.  And prior to that were you in law enforcement?

14  A.  Yes.

15  Q.  In what capacity, sir?

16  A.  I was an agent with immigration.

17  Q.  So my question, sir, is since your initial -- do you call

18  it academy training?  Is that what you call it?

19  A.  Yes.

20  Q.  Have you received any refresher courses concerning evidence

21  gathering?

22  A.  No.

23  Q.  And in the courses that you did take did they -- did the

24  academy and your instructors teach you how to gather evidence

25  at crime scenes and preserve it in such a way to preserve the

D365dor1                    Ruiz - cross

 1   integrity of the evidence gathered?

 2   A.  Yes.

 3   Q.  And describe for the members of the jury what that consists

 4   of, how to handle evidence that you gather.

 5           MS. LESTER:  Objection, your Honor.

 6           THE COURT:  Overruled.  I will allow it.

 7           THE WITNESS:  Can you repeat the question?

 8           MR. ROTH:  I will ask that it be read back.

 9           (Record read)

10   A.  We have to use gloves, we place it in bags.  I don't know

11   what else.

12   Q.  So, did you use gloves to gather this evidence that day,

13   Government Exhibit 74?

14   A.  I don't remember if we did or didn't.

15   Q.  Well, you keep on saying, Agent Ruiz, you don't remember

16   whether we did or didn't.  I'm asking specifically, sir, you

17   were the one who testified that you gathered Government Exhibit

18   74 that morning in that apartment?

19   A.  I don't remember if I had it -- if I was wearing gloves or

20   not.

21   Q.  So it is possible you didn't?

22   A.  It is possible.

23   Q.  So, the purpose, again, of wearing gloves, is so that your

24   fingerprints don't get on the exhibits?  Is that fair to say?

25   A.  Yes.

D365dor1                        Ruiz - cross

1   Q.  And is it fair to say, sir, that part of the other reason

2   is so that your genetic material doesn't transfer to the

3   exhibit that you're picking up?  The evidence?

4   A.  Yes.

5   Q.  And if you weren't wearing gloves then you would, of

6   course, compromise the exhibit; is that fair to say?

7   A.  Yes.

8   Q.  Did you submit Government Exhibit 74 -- the gloves and the

9   mask -- to your laboratory for processing for either

10  fingerprints or DNA matter?

11  A.  I don't know if they did or didn't.

12  Q.  But my question is, sir, did you submit it?

13  A.  It's not my case so I did not.

14  Q.  But you handed this off to your superiors, is that correct?

15  You handed this off to your superiors after it was vouchered?

16  A.  We handed it off to whoever the people that were handling

17  entering our evidence into our case management system and

18  putting it in our vault.

19  Q.  Well, Agent Ruiz, you keep on saying "we."  I'm only

20  concerned with did you put this in the vault?

21  A.  No.

22  Q.  So you didn't have continuous custody of this exhibit

23  before it went into the vault, is that fair to say?

24  A.  Yes.

25  Q.  So you don't know who put it into the vault, is that

D365dor1                         Ruiz - cross

1    correct?

2    A.  No.  I don't know who put it into the vault.

3    Q.  But you didn't?

4    A.  I did not.

5            MR. ROTH:  I have no further questions, your Honor.

6            THE COURT:  Any redirect?

7            MS. LESTER:  No, your Honor.

8            THE COURT:  You may step down, Agent.  Thank you.

9            Government, your next witness.

10           MS. LESTER:  Your Honor, the government calls Special

11   Agent John McKenna.

12    JOHN MCKENNA,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15           THE COURT:  Mr. McKenna, maybe scoot up a little bit,

16   that should do it.  Thank you.

17           Who is handling this witness?

18           MS. LESTER:  I am, your Honor.

19           THE COURT:  Okay.  Let's go.

20   DIRECT EXAMINATION

21   BY MS. LESTER:

22   Q.  Good morning, sir.

23   A.  Good morning.

24   Q.  Where do you work?

25   A.  I'm a special agent with the Bureau of Alcohol, Tobacco and

D365dor1                          McKenna - direct

1   Firearms.

2   Q.  Is that known as ATF?

3   A.  Yes.

4   Q.  And are you part of any particular group or team within

5   ATF?

6   A.  Yes, I am.

7   Q.  What's that?

8   A.  I'm currently assigned to a group that's called the

9   Electronics Crime Task Force.

10  Q.  Do you have any special training as part of your work in

11  that group?

12  A.  Yes, I do.  In regard to that I'm tasked with analyzing

13  digital media so I have attended several training programs

14  which include basic data recovery program offered by the

15  National White Collar Crime Center.  I'm currently in a

16  training program with the U.S. Department of Defense in regard

17  to the acquisitioning analysis of digital media.  I'm a member

18  of the International Society of Computer Forensic Examiners and

19  as part of being a member I have attended training and a

20  certification to become a certified computer examiner.  I have

21  also attended training in regard to cell phones, specifically

22  by a company called Mobile Forensics, Inc., which discussed the

23  technology of cell phone handsets and cell phone networks, and

24  it also gave me an overview of several different softwares and

25  hardware programs that are utilized in the acquisition and

1    analysis of cell phones.  I have also attended training by a

2    company called Cell Bright which is the primary tool I am

3    currently using, again in the analysis and acquisition of cell

4    phones.  I am also a member of the High-technology Crime

5    Investigation Association which is an international group of

6    forensic examiners, and as part of being a member of the local

7    chapter they have ongoing training.

8    Q.  What are your duties and responsibilities as a special

9    agent within that group?

10   A.  It is to assist case agents with their criminal

11   investigations.  When they recover or seize or come across

12   digital media, they will bring the media to me and I will

13   process it for them, acquire the data from the media and assist

14   in the analysis of that data.

15   Q.  What types of digital media are you referring to?

16   A.  It could be computer hard drives, networks, thumb drives,

17   digital cameras, cell phones, SIM cards, tablets.  Anything

18   that can electronically hold data.

19   Q.  Are you ever asked to preserve materials that are found on

20   the internet?

21   A.  Yes.

22   Q.  Can you explain that a little bit?

23   A.  In the preservation of data it is a little bit different

24   than conducting a forensic examination.  When I'm asked to

25   preserve something at the date and time that I'm asked to

D365dor1                          McKenna - direct

1    preserve it it is typically accessible on the internet to the

2    public for anybody to view.  So, I will use a software tool or

3    some other means to observe the data and then just make a copy

4    of it as it can be seen at that date and time.

5    Q.  Prior to testifying here today were you asked to download

6    or copy some files from the internet in connection with a

7    robbery investigation?

8    A.  Yes.

9    Q.  What were you asked to copy from the internet?

10   A.  I was asked to copy a YouTube video and a Facebook page.

11   Q.  And did you do that using the methods you just described?

12   A.  Yes.

13   Q.  I'm showing you what's been marked Government's Exhibits 30

14   and 31.  Could you take a look at those?

15   A.  Okay.

16   Q.  Do you recognize those?

17   A.  Yes, I do.

18   Q.  What are they?

19   A.  Government Exhibit 30 is a DVD of the preservation of a

20   YouTube video called "The Joy," and Government Exhibit 31 is a

21   DVD in regard to the preservation of a Facebook website page

22   titled "Biggs Da Mayor."

23   Q.  Are those two disks -- or how do those two disks relate to

24   what you were asked to preserve from the internet in regard to

25   the robbery investigation?

D365dor1                          McKenna - direct

1   A.   In regard to the YouTube video, the case agent had directed

2   me to that particular video called "The Joy," and on my

3   computer in my office I went to that website, I searched for

4   that particular video, and then utilized a program to make a

5   copy of that video.

6   Q.   And what about the Facebook page?

7   A.   The Facebook page, again, the same case agent had directed

8   me to this particular Facebook page, I navigated to it, and

9   then utilizing the web browser itself it has a save feature

10  where it will copy the entire page and save it into one

11  document.

12              MS. LESTER:  Your Honor, the government would offer

13  Government's Exhibits 30 and 31.

14              THE COURT:  Any objection.

15              MS. STAFFORD:  Subject to connection?

16              MS. LESTER:  No.

17              MS. STAFFORD:  No objection, your Honor.

18              MR. ROTH:  The same.  The same.

19              THE COURT:  Wait?  I think she said not subject to

20  connection.

21              MR. ROTH:  The Facebook, we have no problem with that.

22              THE COURT:  No problem.  So, just the Facebook or

23  Facebook and YouTube video?

24              MS. LESTER:  This is the YouTube video.

25              THE COURT:  Both.

D365dor1                         McKenna – direct

 1           (Counsel conferring)

 2           MS. LESTER:  I believe they're admitted without any

 3  objection, your Honor.

 4           THE COURT:  Is that true?

 5           MS. STAFFORD:  Yes, your Honor.

 6           MR. ROTH:  Yes.

 7           THE COURT:  Because relevance is lost on me at this

 8  point.  I mean, this witness can't speak to relevance but if

 9  there is no objection I will allow it.

10           Government's Exhibits 30 and 31 are received.

11           (Government's Exhibits 30 and 31 received in evidence)

12  BY MS. LESTER:

13  Q.  Agent McKenna, can you explain the process of searching the

14  content of a cell phone?

15  A.  Certainly.

16           When I am requested to search a cell phone and it is

17  brought to my office, I begin the process of first off

18  documenting what occurs.  It involves a lot of paperwork, I

19  will inventory the phone, take photographs of it, review the

20  authority that I have to actually search it whether it be a

21  search warrant or consent.  I will examine the make and model

22  of the phone, make a decision on what software solution that

23  I'll utilize to acquire the data from the device, see if it has

24  any what I call peripheral storage devices, whether it be what

25  is called a SIM card which is a small white card that can go in

D365dor1                          McKenna - direct

1    the back of a cell phone or other storage media typically

2    called an SD card where a user could store additional data

3    whether it be documents or videos or photographs or something

4    like that.

5            The biggest thing in digital forensics is to never

6    change the original data that's on the devices, so that's

7    something that my software and my training, that does not

8    occur, that we change the original data, that we just make a

9    copy and acquire it and then we can use that copy to then

10   analyze it.

11           After I have done my initial review of the item that's

12   brought to me I will then make a copy of it using one of my

13   software solutions.

14   Q.  And how do you know that you've been able to copy

15   everything on the phone?

16   A.  What I do is I'll go back and once I have made the copy and

17   start to review the data that's been acquired, I will actually

18   go back to the original device and if a hundred contacts were

19   removed and my software is reporting a hundred contacts, I will

20   actually look on the device and confirm that there are a

21   hundred contacts and I will do that for all the data that's

22   recovered.

23   Q.  Is it ever the case that you aren't able to gather data

24   from a phone?

25   A.  Yes.

D365dor1                         McKenna - direct

1    Q.  Why does that happen?

2    A.  Typically that will occur for a few reasons.  One could be

3    that the phone has some sort of security on it where a user has

4    put up a password or what's called a gesture pattern where you

5    have to scroll your finger across the face of the phone in a

6    particular pattern to unlock the device.  Sometimes the

7    software that I utilize can't defeat those security features

8    and therefore I can't obtain the data.  Other times I don't

9    have a software solution that will acquire the data so I would

10   have to either take photographs of the data or actually

11   transcribe it.

12   Q.  Generally speaking, what types of files are you able to

13   extract from a cell phone?

14   A.  Depending upon how sophisticated the phone is there are

15   numerous types of files.  It will include contact lists, call

16   logs, GPS data, text messaging, multi media messages, videos,

17   pictures, e-mails, audio files.  So, if the phone can -- the

18   phones now are becoming more and more sophisticated, they can

19   hold much more data and the software that I utilize can

20   typically keep up with recovering what's on the device.

21   Q.  When you extract information from a phone are you able to

22   tell what the phone number is associated with that particular

23   phone?

24   A.  Yes.

25   Q.  Is that the case always?

D365dor1                          McKenna - direct

1    A.  No.

2    Q.  Why might you not be able to tell what the phone number is?

3    A.  If the device -- well, it could be -- it depends upon the

4    make and model of the phone.  First of all, there is a

5    technology of cell phones that requires what's called a SIM

6    card and that's what would store a telephone number that goes

7    to a particular device.  If the SIM card is missing, then I

8    wouldn't be able to recover what the telephone number is.

9            A user could also do what is called jail break or root

10   a phone where the user is sophisticated enough to utilize other

11   programs to cause them to be able to use a different carrier.

12   So, if they went and purchased the phone from an AT&T store and

13   then they jail broke or rooted the phone, they're now permitted

14   to be on the Verizon network, say, I might not be able to

15   recover the phone number because they've manipulated the

16   internal workings of the phone.

17   Q.  I have put before you various government's exhibits or

18   what's been marked as various government's exhibits.  Could you

19   take a look at Government Exhibit 604 and 604A and tell me when

20   you have had a chance to review them.

21   A.  Yes.  604A, and this one is marked 60A --

22   Q.  Is the actual CD marked 604A?

23   A.  No.  They're both marked 604A and 60A.

24   Q.  So, do you have before you Government Exhibit 604 and 604A?

25   A.  Yes.

D365dor1                         McKenna - direct

1   Q.  Do you recognize what those are?

2   A.  Yes, I do.  These are DVDs that I created which contain the

3   results of examinations of two cell phones.

4   Q.  I'm sorry.  Government Exhibit 604; what is that?

5   A.  604, I'm sorry, is a piece of evidence.  It is a Motorola

6   model MB501 Cliq cell phone.

7   Q.  And 604A?

8   A.  604A is a DVD which I created which contains the results of

9   the acquisition from that cell phone.

10  Q.  Did you follow the procedures that we were just discussing

11  a moment ago in extracting the information from that phone?

12  A.  Yes, I did.

13  Q.  Do you recall whether you were able to extract a phone

14  number from that phone?

15  A.  I would have to review my notes.

16          (Counsel conferring)

17  Q.  Did you prepare a report in connection with your

18  acquisition of information from this phone?

19  A.  Yes, I did.

20  Q.  And when did you prepare that report?

21  A.  Right after I completed my acquisition.

22  Q.  I am putting before you what has been marked 3534D.  If you

23  would take a look at that?  What is that?

24  A.  These are my notes from the examination of this evidence

25  item number 604, the Motorola Cliq.

1    Q.  And when did you prepare that?

2    A.  At the time that I did the actual analysis and acquisition.

3    Q.  And at that point were you taking care to be accurate in

4    what you were recording on the form?

5    A.  Yes.

6            MS. LESTER:  Your Honor, I would ask that we be

7    allowed to or that the witness be allowed to read a portion of

8    the report as a recorded recollection, just the phone number

9    that he recovered.

10           THE COURT:  I don't think this witness can establish

11   the relevance of any of this.  That's your problem.

12           MS. LESTER:  The defense has agreed that it can be

13   admitted subject to connection through another witness.

14           THE COURT:  Is that correct?

15           MS. STAFFORD:  That is correct, your Honor.

16           THE COURT:  Mr. Roth?

17           MR. ROTH:  Yes, your Honor.

18           THE COURT:  All right.

19           So, you can ask him to read from a portion of this

20   exhibit.

21           MS. LESTER:  Yes.

22   BY MS. LESTER:

23   Q.  Directing your attention to the fourth page of that

24   document, sir?

25   A.  Yes.

1  Q.  Do you see the telephone number that you acquired from the

2  phone?

3  A.  Yes, I do.

4  Q.  Could you read these?

5  A.  It is area code 347-589-3565.

6  Q.  Now, did you also search the contents of other phones in

7  connection with this case?

8  A.  Yes, I did.

9  Q.  And did you follow the procedures that we just discussed in

10  searching those phones as well?

11  A.  Yes, I did.

12  Q.  Could you take a look at Government Exhibits 60, 72, 73, 82

13  and 83 and Government's Exhibits 72 and 73 are already in

14  evidence.

15  A.  Yes.

16  Q.  And then could you take a look at Government's Exhibits

17  60A, 72A, 73A, 82A and 83A?

18         So, the exhibits that we just discussed without the A

19  after them, what are those exhibits?

20  A.  These are cell phones that I was asked to analyze and

21  recover data from.

22  Q.  And what about the exhibits with the A after them?

23  A.  The exhibits are DVDs which correspond to each one of the

24  devices that I conducted an examination of and the DVDs

25  contained the results.

D365dor1                        McKenna - direct

1            MS. LESTER:  Your Honor, at this time the government

2       would offer, again subject to connection, Government Exhibit

3       604, 604A, 60, 60A, 82, 82A, 83 and 83A.

4            THE COURT:  Subject -- are you intending to do

5       anything with these exhibits now?

6            MS. LESTER:  At this time?  No.

7            THE COURT:  No.  All right.  I'm not sure why we don't

8       just admit them when they're connected, but is there any

9       objection?

10           MR. ROTH:  No, your Honor; with that caveat.

11           THE COURT:  Okay.

12           MS. LESTER:  And then with respect to Government

13      Exhibit 72A and 73A, the government would ask to offer those

14      not subject to connection because Government Exhibit 72 and 73

15      have already been received in evidence.

16           THE COURT:  Government Exhibit 604 and 604A, 60 and

17      60A, 82 and 82A and 83 and 83A are received subject to

18      connection.

19           (Government's Exhibits 604, 604A, 60, 60A, 82, 82A, 83

20      and 83A received in evidence)

21           THE COURT:  And then 72 and 72A -- 72 is already in.

22           MS. LESTER:  Yes.  72A and 73A.

23           THE COURT:  72A and 73A are received.

24           Any objection?

25           MR. ROTH:  No, your Honor.

D365dor1                          McKenna – direct

1              THE COURT:  All right.

2              (Government's Exhibits 72A and 73A received in

3     evidence)

4     BY MS. LESTER:

5     Q.  Directing your attention to Government Exhibit 72, do you

6     know off the top of your head whether you were able to extract

7     a phone number from that phone?

8     A.  No, I can't.  I would have to review my notes.

9     Q.  Did you prepare a report similar to the report that you

10    prepared for the other phone?

11    A.  Yes, I did.

12    Q.  And if you could take a look at what's been marked as

13    3534C?  Is that the report that you prepared?

14    A.  Yes.

15    Q.  And, directing your attention to the fifth page of that

16    report, is that the page on which you listed the items that you

17    recovered or the type of evidence you recovered from Exhibit

18    72?

19    A.  Item 72, which is the HTC phone, yes.

20             MS. LESTER:  Your Honor, again, the government would

21    ask that the witness be permitted to read the telephone number

22    as recorded recollection.

23             THE COURT:  All right.  Any objection?

24             MR. ROTH:  No, your Honor.

25             THE COURT:  So, is there one particular telephone

D365dor1                          McKenna - direct

1    number on that document?  Or is there a particular page you are

2    directing him to?

3    BY MS. LESTER:

4    Q.  On the fifth page again, sir, do you see the telephone

5    number there?

6    A.  There was none listed.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. LESTER:

2   Q.  On the page for Exhibit No. 10.

3   A.  Exhibit 10.  I'm sorry.  I was looking at the wrong page.

4   Yes.  There is a phone number.

5   Q.  And Exhibit No. 10 refers to Government Exhibit 72,

6   correct?

7   A.  Correct, yes.

8   Q.  And what is that phone number?

9   A.  It's area code 704, 345-3805.

10  Q.  Now, if you could, take a look at Government Exhibits 73

11  and 73A.

12         THE COURT:  Just so we're clear, what you just read,

13  the phone number, 704-345-3805, that is a phone number you

14  lifted off of Government Exhibit 72?

15         THE WITNESS:  Correct.

16         THE COURT:  And what does that mean you "lifted off"?

17  Does that mean that's the call number for that phone, or that's

18  the number that that phone called?

19         THE WITNESS:  No.  That's the phone number that the

20  carrier assigned to that -- that's the telephone number that's

21  assigned to that device by the carrier.

22         THE COURT:  All right.

23  BY MS. LESTER:

24  Q.  If you could actually take a look at Government Exhibit 73,

25  it's in an envelope, but if you could take it out for a

D36Wdor2                    McKenna - direct

1    moment --

2    A.  73?

3    Q.  Yes.  73.  I'm sorry.  Not 73A.

4    A.  Oh.  It's just a charging cord in here.

5    Q.  Okay.  We'll locate it.

6        73A is the contents of that call, correct?

7    A.  Correct.

8    Q.  Do you recall off the top of your head what types of

9    information you were able to retrieve from Government Exhibit

10   73?

11   A.  This was an Apple iPhone, and, typically, I can, I get a

12   very full acquisition from these types of devices, so it would

13   include contact lists, call logs, e-mails, SMS messages, MMS

14   messages, audio, video, pictures, GPS data.

15           MS. LESTER:  Ms. Brady, if you could pull up an

16   excerpt from the first page of 73A.

17   Q.  Agent McKenna, what are we looking at here?

18   A.  This is the extraction report.  These are the results as it

19   comes out in a report after I've used a Cellebrite program to

20   do an acquisition.

21   Q.  What's on the left-hand side there?

22   A.  The left-hand side is a menu pane that a user can utilize

23   to navigate through the report.

24   Q.  So, for example, towards the bottom of the pane, it says

25   "contacts," those would be the contacts for that phone?

1   A.  Correct.

2          MS. LESTER:  And if you could just scroll down a

3   little bit, Ms. Brady.  A little bit further.  I'm sorry.  A

4   little bit further.

5   Q.  At the very bottom there, there's a section, SMS messages.

6   A.  Correct.

7   Q.  What is that?

8   A.  SMS are typically called text messages, so they're short

9   messages of 160 characters that can be sent electronically from

10  one device to another.

11  Q.  Do you also have in front of you, sir, Government Exhibit

12  73B?

13  A.  Yes, I do.

14  Q.  What is that?  Do you recognize it?

15  A.  Yes, I do.  This is a DVD that I created in regard to

16  specific text messages that were recovered from one of the cell

17  phones I examined.

18  Q.  Was that from the cell phone that's marked as Government

19  Exhibit 73?

20  A.  Yes.

21          MR. ROTH:  I'm going to object.  I guess there's no

22  phone number that he's talking about.

23          THE COURT:  I'm not sure what you're objecting to.  It

24  hasn't been offered yet.  So you're objecting to the offer, or

25  are you objecting to the testimony?

1          MS. LESTER:  It's already in evidence.

2          THE COURT:  The phone is 73.  That was received

3     yesterday, so I'm not sure what the objection is.

4          MR. ROTH:  I'm sorry.  He didn't specify what phone.

5     It's clear now.

6          THE COURT:  All right.  So 73B corresponds to

7     Government Exhibit 73?

8          THE WITNESS:  Correct.

9          THE COURT:  All right.  Which is a cell phone?

10         THE WITNESS:  It's -- correct.

11         THE COURT:  Okay.

12    BY MS. LESTER:

13    Q.  What is on Government Exhibit 73B?

14    A.  This contains isolated text messages.  After I did my

15    analysis utilizing a program called Cellebrite, I was asked to

16    isolate specific text messages, and utilizing the program

17    called Cellebrite, it has a function called conversation view,

18    where I can, I can isolate specific conversations between two

19    phone numbers and then just export that portion of it into a

20    spread sheet for further review.

21    Q.  Were you asked to isolate certain cell phone numbers,

22    sorry, telephone numbers, in this case?

23    A.  Yes.

24    Q.  Does one of those numbers end in 3805?

25    A.  Yes.

1   Q.  And does the other number end in 5031?

2   A.  Yes.

3           MS. LESTER:  Your Honor, the government offers at this

4   time Government Exhibit 73B.

5           THE COURT:  Any objection?

6           MR. ROTH:  No, your Honor.

7           THE COURT:  I'm still not clear exactly what 73B is.

8   Maybe the witness can tell me that.

9           What is it?  It's a DVD.

10          THE WITNESS:  It's a DVD which contains text messages

11   which were recovered.  And when I did the original acquisition

12   of the cell phone, for example, there might have been a

13   thousand text messages, some unrelated to these specific phone

14   numbers, ending in 3805 and 5031.  I was asked to specifically

15   isolate the text message conversations that went back and forth

16   between the specific phone that I examined and these two phone

17   numbers.  So it isolates those messages that were recovered.

18          THE COURT:  And how many are there?

19          THE WITNESS:  I would have to look at the DVD to give

20   you an exact number.

21          THE COURT:  All right.

22   BY MS. LESTER:

23   Q.  Is it fair to say 73B is a subset of what's contained in

24   73A, the contents of the entire phone?

25   A.  Yes.

 1              THE COURT:  All right.  Is there any objection to 73B,

 2    since 73A is already in?

 3              MS. STAFFORD:  We would object, your Honor.  As you

 4    said, 73A is already in.  Your Honor, just to be clear, for the

 5    record, we're not objecting to the foundation.  We're just

 6    objecting to the contents and, subject to connection, those

 7    contents through another witness.

 8              THE COURT:  The problem is 73 and 73A are in evidence,

 9    not subject to connection.  So if 73B is just a subset of 73A,

10    I don't see any basis to keep it out.  There might have been

11    some objection to be had against 73A, but nobody offered that

12    objection.  So overruled.  I'll allow 73B.

13              (Government's Exhibit 73B received in evidence)

14              MS. LESTER:  Ms. Brady, could you pull up an excerpt

15    of 73B.

16    Q.  Agent McKenna, could you look at the screen next to you?

17    A.  Yes.

18    Q.  Are these the text message excerpts, a portion of them,

19    that you're referring to?

20    A.  Yes.

21    Q.  And if I could just ask you, directing your attention to

22    the party column, what's in that column?

23    A.  Those are the phone numbers.

24    Q.  What do you mean by the phone numbers?

25    A.  The phone numbers that were involved in the conversations.

1  Q.  So when it says "to" and a certain number, what does that

2  mean?

3  A.  That's the phone number that received the message.

4  Q.  And when it says "from" and that number, that's the number

5  that sent the message?

6  A.  Correct.

7  Q.  And in the date column, I assume that's the date that the

8  message was sent?

9  A.  Correct.

10  Q.  What about the time?  Do you know what time zone that time

11  relates to?

12  A.  The time zone, it has, if you look at the end of that

13  entry, it's UTC0, which is basically Greenwich Mean Time.  That

14  time, it could be eastern time.  I would have to research the

15  particular carrier, because sometimes these messages are time

16  stamped on the server when it leaves the phone and it goes to

17  AT&T's server and it's rerouted to wherever is its ultimate

18  destination, and sometimes it's time stamped by the actual

19  device at the time that the message is sent.

20  Q.  Are you saying that that UTC indication means that it's

21  Greenwich Mean Time?

22  A.  Yeah, because it has the zero offset.  So it's not, it's

23  not offsetting it to a specific time zone.  If it were eastern

24  time, you would typically see either minus four or minus five

25  to offset Greenwich time to eastern time, and the reason it

1   would be four or five would be to take an account of Daylight

2   Savings Time.

3   Q.   And in the message column on the far right, is that the

4   contents of the text message there?

5   A.   Correct.

6           MS. LESTER:  No further questions, your Honor.

7           THE COURT:  Any cross-examination?

8           MS. STAFFORD:  Could I have one minute, your Honor.

9           THE COURT:  Okay.

10          MS. STAFFORD:  Thank you, your Honor.

11          THE COURT:  Okay.

12  CROSS-EXAMINATION

13  BY MS. STAFFORD:

14  Q.   Good morning, Special Agent McKenna.  You seem to have

15  extensive knowledge concerning SIM cards?

16  A.   Yes.

17  Q.   Can you explain how the SIM cards work, what exactly is

18  contained in SIM cards, what kind of information is contained

19  in the SIM card as opposed to what's contained in the phone?

20  A.   Sure.  SIM card, it stands for subscriber identity module,

21  and it's basically a storage device, similar to your hard

22  drive, similar to a thumb drive.  It just contains data.  So it

23  contains basically two parts of data.  One is utilized in

24  regard to your account, so let's say it's an AT&T SIM card.  It

25  has certain numbers that are encoded within it that enables

```
 1   your device to talk -- when I say talk, communicate -- on the

 2   AT&T network, and it does what is called authenticating the

 3   user.  So if you have an account set up with AT&T, the numbers

 4   that are encoded in your SIM card along with the serial number

 5   on your actual handset will authenticate you to the AT&T

 6   network and say, Okay, John McKenna's a carrier, he's a

 7   customer, he can start making phone calls and we'll start

 8   charging his minutes.  So that's one of the items that is

 9   stored on a SIM card.

10        The other items are user, would be data that comes

11   from a user.  So as far as those items are concerned,

12   typically, I would see contacts, which are, you know, telephone

13   numbers and names that a user would input into their phone and

14   then could copy over to the SIM card.  You could recover

15   certain call logs, text messages, both active messages and

16   deleted messages, and also the telephone number that would be

17   issued to the device through the carrier when it's first

18   initialized.

19   Q.  So it's fair to say the SIM card contains, is essentially

20   like the brain of the phone, like you said, the hard drive of a

21   computer?

22   A.  I wouldn't say that.  It's a storage device to contain

23   data.  The brain of the phone is going to be the actual phone.

24   That's where your processer is.  That's where your main memory

25   is.  That's where a majority of the -- that's where the
```

1    operating system of the phone is contained.  So the SIM card

2    contains certain data that permits you to make phone calls, but

3    it doesn't -- it's static data.  It's data that's encoded into

4    the phone, unless it's user data, which could potentially

5    change, depending upon the contacts, but it doesn't direct the

6    action of the phone.

7    Q.  But it's fair to say that you could essentially take that

8    SIM card, put it into another phone, and use that phone

9    immediately?

10   A.  That is possible, yes.

11   Q.  Do you have any experience with prepaid phones?

12   A.  I do.

13   Q.  Can you explain the difference between a prepaid phone and

14   what is not a prepaid phone?

15   A.  Sure.  A prepaid phone basically is, they're also called

16   pay-as-you-go.  So you would go to a store, a cell phone store,

17   that specializes or sells prepaid phones and you can open up an

18   account.  It would be the same as purchasing a phone.

19   Potentially if the type of phone that you're getting requires a

20   SIM card, the account would be set up.  It would be given a

21   phone number.  The SIM card would be placed into the phone, but

22   the difference between a prepay, or pay-as-you-go, and a not

23   prepay phone is the user would give the carrier a certain

24   amount of money, a hundred dollars, and that would buy them a

25   certain amount of minutes, either talk minutes or data minutes,

D36Wdor2                          McKenna - cross

1    to utilize the device.  And when those minutes run out, then

2    their phone will no longer register on the network and they

3    would have to go back and replenish funds into their account to

4    then continue to utilize the phone.

5    Q.  Thank you.  And you were told by the government to

6    essentially just download the material from the phone; you

7    don't know anything else about the usage of that phone, isn't

8    that true?  I'll rephrase that.

9         You don't have any way of knowing who used the phone?

10   A.  No.

11   Q.  You were only able to download the information from the

12   phone?

13   A.  Correct.

14        MS. STAFFORD:  I'm sorry, your Honor.  Could I just

15   have a moment.

16        THE COURT:  Yes.

17   BY MS. STAFFORD:

18   Q.  Can I ask you one more question about prepaid telephones?

19   You had mentioned purchasing prepaid telephones.  There's two

20   different types of purchase of prepaid telephones; one's with a

21   credit card, where you can buy the phone, and then the other is

22   you can just purchase a number.  Isn't that true?

23   A.  I'm not familiar with that.

24        MS. STAFFORD:  Thank you.

25        THE COURT:  Mr. Roth.

1              MR. ROTH:  Thank you.

2    CROSS-EXAMINATION

3    BY MR. ROTH:

4    Q.  Good morning, sir.

5    A.  Good morning.

6    Q.  In respect to Government Exhibit No. 30, the YouTube video,

7    The Joy --

8    A.  Yes.

9    Q.  -- can you tell us when that video was posted?

10             THE COURT:  That's a yes or no.  Can you or can you

11   not?

12             THE WITNESS:  I can if I'm permitted to look at the

13   DVD because I do recall when I did the preservation, not only

14   did I copy the video itself, but I also copied the YouTube page

15   in the same fashion that I explained, how I saved the Facebook

16   pages, and the upload date is typically written on the page.

17   So it is contained --

18   BY MR. ROTH:

19   Q.  Was it contained in this instance?  I'm directing your

20   attention to the YouTube video, The Joy.

21   A.  It should be, from my recollection.

22   Q.  Do you want to take the opportunity to look?  Do you have

23   something that would refresh your recollection?

24   A.  The DVD that I copied.  It should have the page, and if I

25   were permitted to put it into a computer and open it, it should

D36Wdor2                         McKenna - cross

1   show the date of upload.  Not the date that it was created, but

2   the date of upload.

3   Q.  You don't have any particular notes on that?

4   A.  I do not, no.  Not notes.

5   Q.  Can you tell, sir, who uploaded that video?

6   A.  No.

7   Q.  And the same question in respect to Facebook, Government

8   Exhibit 31, the Facebook page.  Can you tell when that was

9   made?

10  A.  Well, it does indicate, typically, in Facebook, now there's

11  a time line and it will show when the account, when the user

12  account was initially created, and then Facebook -- obviously,

13  everybody seems to know a lot about it and it's social media,

14  and they're very fluid pages, so, as things -- a user can post

15  things, take them down, new things go up.  So the dates are

16  constantly changing, but there typically is a date and time

17  stamp to a particular posting.

18  Q.  Was there in this case?

19  A.  Yes.

20  Q.  In respect to Government Exhibit 31?

21  A.  Throughout the post, throughout the, throughout the page,

22  as people posted things, there's typically a date next to the

23  individual postings.

24  Q.  And you can't tell who did the actual posting, can you?

25  A.  The only way to identify them is through their Facebook

D36Wdor2                    McKenna - cross

1   user name.  Actually, who was sitting in front of a computer

2   when it occurred, no, I cannot tell that.

3   Q.  Can you tell, through sourcing the IP, the address of the

4   computer that posts it?

5   A.  That potentially could be done.  But that would require

6   contacting Facebook directly and getting their logs, which

7   would include something -- counselor mentioned IP addresses,

8   which is basically a phone number for the Internet, in a sense,

9   where each user is given an IP address.  So that's a means to

10  identify a computer that was contacting Facebook and

11  manipulating that page at a given time.  But that would be

12  something that would have to come from Facebook.

13       In this case, I didn't contact Facebook.  The page I was

14  directed to was open to the public.  It wasn't, there weren't

15  any security features where a user would only permit certain

16  people to look at it.  So I was able to just access the page

17  from a computer and then save the individual pages.

18  Q.  And similarly, sir, you didn't contact YouTube?

19  A.  No.  This was just a preservation of the data as it was

20  able to be seen at that date and time to anybody that happened

21  upon it.

22  Q.  Did you record how many hits the video, the YouTube video,

23  The Joy, got?

24  A.  That would have been recorded when I preserved the page.

25  It typically counts how many viewers there have been, so,

D36Wdor2                              McKenna – cross

1   again, if the DVD were viewed, it would show that data.

2   Q.  Thank you.

3            MR. ROTH:  No further questions.

4            THE COURT:  Any redirect?

5            MS. LESTER:  No, your Honor.

6            THE COURT:  You can step down.  Just leave all that

7   stuff there.

8            (Witness excused)

9            THE COURT:  Next witness.

10            MS. LESTER:  Yes, your Honor.  The government calls

11   Youssef Abdulkader.

12    YOUSSEF ABDULLA ABDULKADER,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MS. LESTER:

17   Q.  Hello, sir.

18   A.  Hello.

19   Q.  How are you employed?

20   A.  I'm self-employed.  I have a business.

21   Q.  What type of business do you have?

22   A.  Convenience store.

23   Q.  Where is the store located?

24   A.  It's located at 1905 Guerlain Street in the Bronx.

25   Q.  Could you spell the name of the street?

D36Wdor2                        Abdulkader – direct

1   A.  G-U-E-R-L-A-I-N.

2   Q.  Is that in a particular neighborhood in the Bronx?

3   A.  It's in the Parkchester area.

4   Q.  What type of store is it?

5   A.  It's a convenience store.  We sell sodas, candy, beer,

6   Lotto, cigarettes.  And sandwiches.

7   Q.  Are you friendly with other local business owners like

8   yourself?

9   A.  Yes.

10  Q.  Do you know an individual named Fahd Hussain?

11  A.  Yes, I do.

12  Q.  How do you know him?

13  A.  I know him from, I knew him for over 20 years.  My family

14  and their family knows each other.

15  Q.  Are you from the same country?

16  A.  Yes.

17  Q.  What country is that?

18  A.  Yemen.

19  Q.  Do you know where his store is located?

20  A.  His store is located at White Plains Road at 233rd Street

21  in the Bronx.

22  Q.  Do you know the name of the store?

23  A.  No.  I can't remember.

24  Q.  Do you know what types of items that store sells?

25  A.  Well, he sell stationeries, Lotto, greeting cards, and

D36Wdor2                         Abdulkader - direct

1   gifts.

2   Q.  Are you friendly with Mr. Hussain?

3   A.  Yes.

4   Q.  Did you socialize with him?

5   A.  Yes, I did.

6   Q.  Had he ever been to your home?

7   A.  I'm sorry?

8   Q.  Had he ever been to your home?

9   A.  No, he had not been inside my home, but he knows where my

10  home is.

11  Q.  Have you ever been the victim of a robbery, sir?

12  A.  Yes.

13  Q.  When was that?

14  A.  It was on October 10, 2011.

15  Q.  How do you remember the exact date?

16  A.  Because it was two days away from our birthday.

17  Q.  Where did the robbery take place?

18  A.  It took place in Wallace Avenue between Allerton and Arnow.

19  Q.  What type of neighborhood is that?  Is it a commercial

20  neighborhood or residential?

21  A.  Wallace is commercial.  Allerton -- Wallace is residential.

22  Allerton is commercial.

23  Q.  What time of day did the robbery take place?

24  A.  It took around midnight.

25  Q.  What happened, sir?

1  A.  I parked my car at Allerton Avenue and I walked into

2  Wallace.  While I was walking, I seen two guys were sitting at

3  the steps of 2723 Wallace Avenue.  They were wearing hoodies,

4  dark-skinned, and they got up and I seen a knife in one of

5  their hand.  And I get so nervous, and they asked me if I have

6  a minute.  So I dropped my bag and run for my life.  So,

7  because I see that my life was in danger.

8  Q.  Why were you on the street at that hour, sir?

9  A.  Going home from work.

10  Q.  Is that your usual practice, to go home at that time?

11  A.  Yes.

12  Q.  And your home is near there?

13  A.  Yes.

14  Q.  That part of Wallace Avenue?

15  A.  Yes, it's in the same block.

16  Q.  And you mentioned that the men who approached you were

17  wearing hoodies, is that correct?

18  A.  Yes.

19  Q.  Could you see their faces?

20  A.  No.  I was so nervous, I couldn't even see.

21  Q.  Could you see what race they were?

22  A.  Dark-skinned.  Black.

23  Q.  What was in the bag that you were carrying, sir?

24  A.  I had my laptop and a cell phone.

25  Q.  Was that your personal cell phone?

1   A.   Yes.

2   Q.   What about the laptop; was that for business or personal

3   use?

4   A.   Personal.

5   Q.   And you said you dropped that on the street?

6   A.   Yes.  I dropped that on the street and ran.

7   Q.   Did you ever get those items back?

8   A.   No.

9   Q.   Take a look at what's in front of you there, Government

10  Exhibit 72, in the envelope.  What type of cell phone was it

11  that you dropped on that night, sir?

12  A.   It was exactly like this cell phone, a T-Mobile HTC.

13          MS. LESTER:  Ms. Brady, if you could pull up

14  Government Exhibit 72A.

15  Q.   Mr. Abdulkader, looking at the screen either in front of

16  you or up on the wall there, who is that person in the

17  photograph?

18  A.   That's me.

19  Q.   Do you remember taking that photograph?

20  A.   Yes.

21  Q.   How did you take it?

22  A.   I took it, I think I took it with this same exact phone

23  that I had, that I --

24  Q.   You took it with the phone that you lost --

25  A.   Yes.

1    Q.  -- on October 10?

2    A.  Yes.

3           MS. LESTER:  Can we go to the next photo, Ms. Brady.

4    Q.  Who is that, sir?

5    A.  That's me.

6    Q.  Do you know where that photograph was taken?

7    A.  Yes.  In my shop.

8           MS. LESTER:  The next photograph, Ms. Brady.

9    Q.  Do you know who that is?

10   A.  No.

11   Q.  Did you take that photograph?

12   A.  No.

13          MS. LESTER:  The next photograph, Ms. Brady.

14   Q.  Do you know who that is?

15   A.  No.

16   Q.  Did you take that photograph?

17   A.  No.

18          MS. LESTER:  Just a moment, your Honor.

19          No further questions.

20          THE COURT:  Cross-examination.

21          MS. FONTIER:  Briefly, your Honor.

22          THE COURT:  Yes.

23   CROSS-EXAMINATION

24   BY MS. FONTIER:

25   Q.  Good morning, Mr. Abdulkader.

D36Wdor2                          Abdulkader - cross

1    A.  Good morning.

2    Q.  I just have a few basic questions.

3    A.  Sure.

4    Q.  You said this occurred around midnight on October 10, is

5    that correct?

6    A.  Yes.

7    Q.  And you were walking towards your home?

8    A.  Yes.

9    Q.  And you said you saw two men sitting on steps near you?

10   A.  Yes.

11   Q.  And then when those men started to approach you, you

12   dropped your bag, correct?

13   A.  Yes.  They got up and asked me if I have a minute and

14   seeing a knife in one of their hands and I got nervous, dropped

15   my bag, and ran.

16   Q.  Now, when they approached you, that was in the street?

17   A.  No.  They were -- it was on the sidewalk.

18   Q.  So on the sidewalk, and there are streetlights there?

19   A.  Yes.

20   Q.  This is a regular neighborhood in the Bronx, right?

21   A.  Yes.

22   Q.  So you could see?

23   A.  Well, I could see because I wasn't looking at my left.  I

24   was looking straight.

25   Q.  But it wasn't dark?

D36Wdor2                          Abdulkader - cross

1    A.  Of course it was dark.

2    Q.  There were streetlights though?

3    A.  There were streetlights.

4    Q.  And so from the light of the street, from the light coming

5    out of the streetlamp, you were able to see?

6    A.  Well, like I was saying, I was looking direct, and I don't

7    know if there was lights above where the incidents happen.

8    Q.  But the streetlamp was on?

9    A.  I couldn't remember if the streetlamps were on, but I'm

10   sure there are lights on the block.

11   Q.  You said you were able to see two men?

12   A.  Yes.  I know there were two men sitting.

13   Q.  And you were able to see a knife?

14   A.  Yes.  When I looked, I really didn't look up to their face,

15   I just moved my head to the left and seen the knife.  I got

16   nervous, dropped my bag, and ran.

17   Q.  Okay.

18   A.  Because it was obvious that, common sense that I was going

19   to get rob.

20           MR. ROTH:  Objection to what's obvious, your Honor.

21           THE COURT:  Sustained.

22   BY MS. FONTIER:

23   Q.  Yes, you were able to see the knife, is that what you're

24   saying?

25   A.  Yes.

D36Wdor2                        Abdulkader - cross

1   Q.  And, yes, you were able to see that there were two men, is

2   that correct?

3   A.  Yes.

4   Q.  And, yes, you were able to see what they were wearing,

5   correct?

6   A.  Yes.  I know that they were wearing hoodies on their head.

7   Q.  So fair to say that you were able to see?

8   A.  Yes, I seen some.

9   Q.  You could see?

10  A.  Yes, I could see.  I wasn't blind.

11  Q.  And it wasn't completely dark?

12  A.  It was dark.

13  Q.  But the light was on?

14  A.  I believe so.  The lights were on.

15  Q.  Sufficient for you to be able to see what you described

16  here in court, correct?

17  A.  Yes.

18  Q.  So now when you looked at these men, when they approached

19  you, how close did they get before you dropped the bag?

20  A.  It was like, I'd say, four feet, from --

21  Q.  So maybe the distance from me to the prosecutor there?

22  A.  Yes.

23  Q.  And when they were coming at you in the street, you dropped

24  your bag and you left, right?

25  A.  I dropped my bag.  I was nervous and ran.

D36Wdor2                         Abdulkader - cross

1   Q.  Now, you said they were wearing hoodies, correct?

2   A.  Yes.

3   Q.  They were not wearing masks?

4   A.  I couldn't see their faces.

5   Q.  After this incident, you called the police?

6   A.  Yes.  I went home and I called the police.

7   Q.  And the police responded?

8           THE COURT:  You have to say yes or no.

9   A.  Yes.

10  Q.  And you spoke to police, correct?

11  A.  Yes.

12  Q.  And you described what had just happened, right?

13  A.  Yes.

14  Q.  And you tried to describe this as accurately as possible?

15  A.  Yes.

16  Q.  You tried to be truthful?

17  A.  Yes, of course.

18  Q.  And you wanted to describe the people that, to the best of

19  your knowledge, had just robbed you, right?

20  A.  Right.

21  Q.  And you described one individual as six feet four inches

22  tall, correct?

23  A.  I don't remember how, how I described him.

24  Q.  You remember talking to the officer, though?

25  A.  Yes, I remember talking to the officer.

D36Wdor2                    Abdulkader - cross

1   Q.  And did he ever show you a report that he wrote?

2   A.  No.

3   Q.  Might it refresh your recollection to see his report?

4   A.  I'm sorry?

5   Q.  Would it refresh your recollection to see a report about

6   this incident that you made?

7   A.  Okay.

8          MS. FONTIER:  Withdrawn.  I'll come back to this.

9   Q.  So you made a police report that day, correct?

10  A.  Yes.

11  Q.  And you described the two men?

12  A.  Yes.

13  Q.  And then you also were contacted at a later point by

14  officers, correct?

15  A.  Right.

16  Q.  And -- one moment, sorry -- that was in March?

17  A.  I don't remember the exact month or date.

18  Q.  When you were contacted, you were asked about this October

19  10 incident, correct?

20  A.  Right.

21  Q.  And you again spoke to those officers about what happened,

22  correct?

23          THE COURT:  You have to say yes or no.

24  A.  Yes.

25  Q.  And again you tried to be truthful, correct?

D36Wdor2                         Abdulkader - cross

1    A.  Yes.

2    Q.  You tried to be accurate?

3    A.  Yes.

4    Q.  And you gave that information to the best of your

5    knowledge, correct?

6    A.  Yes.

7    Q.  At that point -- that is, when you described the two men,

8    one of whom was six foot four, you said, correct?

9    A.  I -- yes, I believe so.

10   Q.  And the other was six foot two?

11   A.  I believe so.

12   Q.  And so when you saw the two men, when you looked at them,

13   you felt that they were both above six feet tall, correct?

14   A.  I can't, I'm not sure.  I'm not sure.

15   Q.  But the information that you gave, that they were six foot

16   two and six foot four, to your knowledge, and from seeing them

17   four feet away from you, they appeared to have only about two

18   inches in height difference, correct?

19   A.  I don't exactly remember what I tell them how tall are

20   they, that information.  I don't really exactly remember that,

21   but --

22   Q.  The two men that approached you in the street though, they

23   were about the same height, about two inches in difference,

24   correct?

25   A.  I believe so.

1   Q.  And how tall are you?

2   A.  Five 11.

3   Q.  So these two men were just a couple inches taller than you?

4   A.  I believe they were like about the same height.

5   Q.  So they were a couple inches taller than you and about the

6   same height, is that correct, or about the same height as you?

7   A.  I believe they were about the same height.

8   Q.  As you or to each other?

9   A.  As me, or maybe a little more.  I'm not exactly -- been a

10  while, so I'm not really like a hundred percent sure.

11  Q.  And they were both about the same height then as well?

12  A.  I cannot say.

13  Q.  You also, in March of 2012, March 2 of 2012, spoke to a

14  Detective Fleming.  Do you recall that?

15  A.  Yes, I remember spoken to him.

16  Q.  And that was at the precinct, correct?

17  A.  I think so.

18  Q.  When you spoke to him, when you talked about this incident

19  with Detective Fleming, you also tried to be truthful, right?

20  A.  Yes.

21  Q.  Tried to be accurate?

22  A.  Yes.

23  Q.  And you wanted to describe this incident as it occurred,

24  right?

25  A.  Yes.

1  Q.  And when you talked to Detective Fleming, you did not say

2  that the two men were sitting on a step, correct?

3  A.  Well, I don't remember what I told him, but the two men

4  were sitting on the step.  That I know for sure.

5  Q.  So is it not accurate that you told Detective Fleming that

6  they came out of a car?

7  A.  No.  I didn't see them coming out of the car because when I

8  see them, they were sitting on the steps.

9  Q.  So Detective Fleming would be incorrect if he reported that

10 the two men emerged from a car?

11 A.  I guess.

12 Q.  After you dropped the bag, you ran, correct?

13 A.  Yes.

14 Q.  So after that, you did not see what happened to the bag?

15 A.  No.  Actually, I did.  I looked back from a distance.  He

16 picked up the bag and he went towards Allerton Avenue.

17         MS. FONTIER:  I have no further questions at this

18 time, your Honor.

19         THE COURT:  Mr. Roth.

20 CROSS-EXAMINATION

21 BY MR. ROTH:

22 Q.  Good morning, Mr. Abdulkader.

23 A.  Good morning.

24 Q.  How long did you say you've been operating your store in

25 the Bronx?

D36Wdor2                        Abdulkader – cross

1   A.  I'd say for seven, eight years.

2   Q.  Are you physically there during the day, the course of the

3   day?

4   A.  Yes.

5   Q.  During the day and night?

6   A.  Well, during -- part of the day and night.

7   Q.  And you have a fair amount of traffic coming in and out of

8   that store, is that fair to say?

9   A.  Yes.

10  Q.  People just walk in off the street to buy things, is that

11  right?

12  A.  Yes.

13  Q.  Do people also walk in off the street to try to sell things

14  to you?

15  A.  Well, there were time when they would try to sell things.

16  Q.  Like what kind of things?

17  A.  Could be anything, like, you know, their personal stuff.

18  Q.  Their personal stuff, things like chains?

19  A.  Yeah, you could say that.

20  Q.  Gold?

21  A.  Yeah, you --

22  Q.  And fair to say fair number of people come in there trying

23  to sell phones, too?

24  A.  Yes.

25  Q.  That happens with some frequency, that people just come

1    in --

2    A.  It hardly happens.

3    Q.  But have you ever bought any of those phones?

4    A.  No.

5    Q.  You don't buy them, and why is that?

6    A.  Why I don't buy them because I don't know where they came

7    from.  It could be stolen or anything like that, so I don't do

8    that in my business.

9    Q.  It could just be a stolen phone from somebody who just

10   stole a phone or was offering you a stolen phone, correct?

11   A.  Well, I don't know, I don't know where they get the phone

12   from so, you know, I return them.

13   Q.  What other types of personal items do people come in and

14   try to sell you off the street?

15   A.  I don't really remember.  Could be anything.

16   Q.  They come in with laptops, they come in with --

17   A.  Well, yeah.  There was one time they came in with a laptop.

18            MR. ROTH:  No further questions.

19            THE COURT:  Any redirect?

20            MS. LESTER:  No, your Honor.

21            THE COURT:  Why don't we take our morning break and

22   use the restroom, get a drink, and we'll be back in about ten

23   minutes.  Okay?  Don't discuss the case, of course.  Keep an

24   open mind.

25            All rise for the jury.

1          (Jury excused)

2          THE COURT:  Since the bathroom is not working, I'm

3    going to let the jury use these restrooms.  So if everyone here

4    can just avoid using the restrooms for now.  For those in the

5    gallery, if you could wait until the jury comes back in; for

6    the lawyers, you can go to another floor or use the one in the

7    robing room.

8          Have a seat.  Okay.  You're free to step down,

9    Mr. Abdulkader.  Just go back to the witness room and wait a

10   few minutes so you don't bump into the jurors.

11         THE WITNESS:  Thank you.

12         THE COURT:  Thank you.

13         (Witness excused)

14         THE COURT:  Is there anything we need to discuss

15   before the lawyers leave?  All right.  Use the restroom and

16   then we'll get them back.

17         MS. LESTER:  Your Honor, there are some issues.  The

18   next witness is Janiel Brown, so we do need to discuss those

19   issues, but I can discuss them with counsel.

20         THE COURT:  Do that.  I thought we resolved the main

21   one, which is whether you were going to get into the domestic

22   abuse.

23         MS. LESTER:  I'll talk with Ms. Fontier.

24         THE COURT:  Okay.

25         (Recess)

D365dor3

1              THE COURT:  Don't bring them in yet, we're going to do

2      some stuff.

3              So, we have some issues we need to discuss before the

4      witness takes the stand?

5              MS. LESTER:  Your Honor, there is still an issue with

6      respect to the suppression hearing that took place in this

7      case.

8              THE COURT:  Right.

9              MS. LESTER:  Specifically Ms. Brown's -- whether

10     Ms. Brown's credibility was questioned by the government and

11     whether that is relevant and can come in, whether the defense

12     can question her about that.

13             So, we discussed it with Ms. Fontier.  I think she --

14     we're happy to discuss it again between her direct and cross.

15     Ms. Fontier said that at the end of the direct she would give

16     us a better sense of how she plans to elicit it and then we

17     would -- she believes it is not going to be objectionable.  So,

18     at that time we may have --

19             THE COURT:  Let's deal with it then.  I think we have

20     to be very careful how far we get into this.  I found her

21     credible, as I recall.  Does anybody think they get to

22     introduce that?  You argue that she was credible so, do you

23     think the government should be able to introduce that?

24             MS. FONTIER:  Your Honor, it is a two-way street.

25             THE COURT:  I'm not sure -- I think the issue -- the

D365dor3

1    rules of the road on that street are relevance and so what is

2    the relevance to what you argued, what she argued and what I

3    found?

4              MS. FONTIER:  Your Honor, again, as Ms. Lester is

5    correct that I don't want to, prior to her direct, I don't want

6    to go through how -- Ms. Stafford is actually going to do the

7    cross and I don't want to go into how the cross will be

8    structured and how and what we will be questioning her about.

9              THE COURT:  Let's table it.  This witness is going to

10   go through lunch, do you think?

11             MS. LESTER:  I anticipate so.  Yes, your Honor.

12             Marshals, are you all ready with this?  Can we bring

13   her in?  Do you want to move people first?  Let's bring the

14   witness in and have her up in the box.  There is stuff up here,

15   still.

16             Okay, let's bring in the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

D365dor3

1          (Jury present)

2          THE COURT:  Have a seat.

3          I gather that the jurors in the second row have all

4     shifted over one.  I think the wall was just not giving enough

5     reclining room.

6          A JUROR:  And leg room.

7          THE COURT:  That's fine.  That's fine.  So, as long as

8     you stay in the same order I think that is generally my

9     preference.  But, even if we had to move people, we would do

10    that.

11         Everybody else is having no difficulty seeing and

12    hearing?  Let us know if you are.  Okay?

13         All right, we are going to move on to the next

14    witness.

15         Government?

16         MS. LESTER:  Your Honor, the government calls Janiel

17    Brown.

18         THE COURT:  Ms. Brown, if you would stand, please, and

19    raise your right hand.

20     JANIEL BROWN,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23         THE COURT:  Ms. Lester, you are doing the examination?

24         MS. LESTER:  Yes, Your Honor.

25         THE COURT:  Okay.

D365dor3

1   DIRECT EXAMINATION

2   BY MS. LESTER:

3   Q.   Hello, Ms. Brown.

4   A.   Hi.

5   Q.   How old are you?

6   A.   22 years old.

7   Q.   Where were you born?

8   A.   In Jamaica.

9   Q.   When did you move to the United States?

10   A.   2009.

11   Q.   What do you do, currently?

12   A.   I'm a student.

13   Q.   Do you use any nicknames?

14   A.   Yes.

15   Q.   What nicknames are those?

16   A.   Cheeks.   Cheeky.

17   Q.   Who gave you those nicknames?

18   A.   My family.

19   Q.   Do your friends sometimes refer to you by those names?

20   A.   Yes.

21   Q.   Looking around the courtroom, do you recognize anyone here

22   today?

23   A.   Yes.

24   Q.   Who do you recognize?

25   A.   Jermaine.

1    Q.  Do you know his full name?

2    A.  Yes.

3    Q.  What is it?

4    A.  Jermaine Dore.

5    Q.  And can you identify him by where he is sitting and a piece

6    of clothing that he is wearing?

7    A.  From where you're standing he's the second person from your

8    left.

9              MS. LESTER:  Your Honor, could the record reflect that

10   she identified the defendant Jermaine Dore?

11             THE COURT:  Yes; the record shall so reflect.

12   Q.  How do you know Jermaine Dore?

13   A.  He was my boyfriend.

14   Q.  And do you know whether he used any nicknames?

15   A.  Yes, he did.

16   Q.  What were those names?

17   A.  Blacks, Blacka, St. Kitts.

18             THE COURT:  Can you say those a little more clearly?

19             THE WITNESS:  Sorry.

20             THE COURT:  That's all right.

21             THE WITNESS:  Blacks, Blacka, St. Kitts, Kittician.

22   Q.  Do you recognize anyone else in the courtroom here today?

23   A.  Yes.

24   Q.  Who else do you recognize?

25   A.  Tallman.

D365dor3                          Brown - direct

1    Q.  Do you know his real name?

2    A.  Not prior to this case.

3    Q.  Could you identify him by where he is sitting and something

4    he is wearing?

5    A.  He's in a light purple-ish shirt, light blue.

6    Q.  Which table is he sitting at?

7    A.  That's the second table from the front.

8    Q.  And where is he positioned at the table?

9    A.  He's the last person.

10           MS. LESTER:  Your Honor, could the record reflect that

11   the witness has identified the defendant Dwayne Barrett?

12           THE COURT:  Yes; the record shall so reflect.

13   Q.  Again, you didn't know his proper name prior to this case,

14   is that correct?

15   A.  That's correct.

16   Q.  And what name did you call him by?

17   A.  Tallman.

18   Q.  Do you know whether he had any other names?

19   A.  Giant.  Tallest.

20   Q.  Did you engage in criminal conduct with these defendants,

21   Ms. Brown?

22   A.  Yes, I did.

23   Q.  What types of crimes?

24   A.  Robberies.

25   Q.  When did you participate in robberies with these

D365dor3                          Brown - direct

1    defendants?

2    A.   August 2011 to January 2012.

3    Q.   Are you testifying today pursuant to a subpoena?

4    A.   Yes.

5    Q.   Was a lawyer appointed for you in connection with that

6    subpoena?

7    A.   Yes.

8    Q.   Did he explain that you could be charged with contempt if

9    you failed to testify?

10   A.   Yes, he did.

11   Q.   After discussing this with your lawyer, did you agree to

12   meet with the government?

13   A.   Yes, I did.

14   Q.   Who was present at these meetings?

15   A.   The government, an officer, myself, and my lawyer.

16   Q.   Generally speaking, what types of things did you talk about

17   at these meetings?

18   A.   My participation in the robberies and how I knew Jermaine

19   and Tallman and others.

20   Q.   At some point did you enter into an agreement with the

21   government?

22   A.   Yes, I did.

23   Q.   What is your understanding of your duties under that

24   agreement?

25   A.   That once I came here today and told the truth that I will

1   not be prosecuted.

2   Q.  Do you have any other obligations under the agreement?

3   A.  Yes; that I will not commit any further crimes.

4   Q.  And, do you have an understanding of what the government

5   has agreed to do if you fulfill those obligations?

6   A.  Yes.

7   Q.  What is that?

8   A.  That they will not prosecute me.

9   Q.  What happens if you lie during this proceeding today?

10   A.  That agreement will be terminated and I will be prosecuted.

11   Q.  Have you testified in a prior court proceeding in

12   connection with this case?

13   A.  Yes, I have.

14   Q.  Approximately when was that?

15   A.  May of last year.

16   Q.  That's 2012?

17   A.  Yes.

18   Q.  At that time were you asked questions about your

19   relationship with Jermaine Dore?

20   A.  Yes, I was.

21   Q.  Were you completely truthful in answering those questions?

22   A.  No.

23   Q.  In what respects were you not completely truthful?

24   A.  I was asked how long I knew Jermaine and at the time I said

25   I knew him for a year, almost two years --

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Overruled.

3          You may answer.  Go ahead.

4          THE WITNESS:   -- which in fact I only knew him for a

5     year at that time.

6          I was also asked how often he was at the apartment

7     that we were living at.  I stated that he was there at minimum

8     three to four times per week when in fact he lived there, so he

9     was there every single day.

10          I was also asked if I knew the other co-defendants

11     that he was being charged with and I said they were familiar

12     faces which in truth I knew them all.

13          I was also asked if I had rented cars for Mr. Dore.  I

14     stated that I rented cars for myself, yes, not stating that I

15     did in fact rent cars for him.

16     BY MS. LESTER:

17     Q.  You knew it was wrong to lie under oath, didn't you,

18     Ms. Brown?

19     A.  Yes, I did.

20     Q.  At the time that you testified in that prior court

21     proceeding had a lawyer been appointed for you?

22     A.  No.

23     Q.  Had you discussed with a lawyer your potential criminal

24     exposure?

25     A.  No.

D365dor3                          Brown – direct

1   Q.   Why did you lie?

2   A.   Basically, I was just trying to help Jermaine.

3   Q.   When did you first meet Jermaine Dore?

4   A.   June of 2011.

5   Q.   Where did you meet?

6   A.   In the 7-11 on Boston Road.

7   Q.   Did you begin dating at some point?

8   A.   Yes, we did.

9   Q.   Did you become serious?

10  A.   Yes, we did.

11  Q.   Did you consider moving in together?

12  A.   Yes.

13  Q.   Did you actually move in together?

14  A.   Yes, we did.

15  Q.   Approximately when did that happen?

16  A.   September of 2011.

17  Q.   Where did you move to?

18  A.   3983 Carpenter Avenue in the Bronx.

19  Q.   Ms. Brady, at this time I would like to show the witness

20  only Government Exhibit 70.

21       If you could take a look, Ms. Brown, at what has been

22  marked Government Exhibit 70?  Do you recognize that?

23  A.   Yes.  It is the front of the house we lived in.

24       MS. LESTER:  Your Honor, the government would offer

25  Government Exhibit 70.

D365dor3                          Brown - direct

```
 1                 THE COURT:  Well, it is a photograph, right?

 2                 THE WITNESS:  Yes.

 3                 THE COURT:  All right.  Does it fairly and accurately

 4      depict the place where you lived?

 5                 THE WITNESS:  Yes.

 6                 THE COURT:  At the time that you lived there?

 7                 THE WITNESS:  Yes.

 8                 THE COURT:  That's what it looked like?

 9                 THE WITNESS:  Yes.

10                 THE COURT:  Any objection?

11                 MS. STAFFORD:  No objection.

12                 MR. MURPHY:  No, your Honor.

13                 THE COURT:  Government Exhibit 70 is received.

14                 (Government's Exhibit 70 received in evidence)

15                 MS. LESTER:  May we publish it to the jury, your

16      Honor?

17                 THE COURT:  You may.

18      BY MS. LESTER:

19      Q.  Which house is it, Ms. Brown, that you lived in?

20      A.  The middle house.

21      Q.  The white house?

22      A.  Yes.

23      Q.  And where was your apartment within the house?

24      A.  On the second floor we had a room towards the back of the

25      house.
```

1    Q.  And who lived there?

2    A.  Myself and Mr. Dore.

3    Q.  Were there other people who also lived within that house?

4    A.  Yes.  We had initially three other roommates, and then as

5    we were living there it went down to two.

6    Q.  Did there come a time when Jermaine Dore was arrested in

7    connection with this case?

8    A.  Yes.

9    Q.  Do you remember when that was?

10   A.  January of 2012.

11   Q.  Where were you living at the time of the arrest?

12   A.  At 3983 Carpenter Avenue.

13   Q.  And that's the house that we were just looking at the

14   photograph of?

15   A.  Yes.

16   Q.  Were you present when he was arrested?

17   A.  Yes, I was.

18   Q.  Was anything seized from the apartment at the time of the

19   arrest?

20   A.  Yes.

21   Q.  What was taken?

22   A.  They took my cell phone, Jermaine's cell phone, and

23   charging devices.

24   Q.  Can you take a look at what is in evidence as Government

25   Exhibit 72?

D365dor3                         Brown - direct

1    A.  It is Jermaine's cell phone.

2    Q.  You recognize it as his phone?

3    A.  Yes.

4    Q.  During the course of your relationship with him did he have

5    more than one phone?

6    A.  Yes.

7    Q.  How many phones would you estimate he had during the time

8    that you knew him?

9    A.  Anywhere between three and five.

10   Q.  Did he also have different phone numbers during the time

11   that you knew him?

12   A.  Yes.

13   Q.  How many different phone numbers would you say he had?

14   A.  About four.

15   Q.  Ms. Brady, can we display the excerpt, the photographs from

16   Government Exhibit 72A?

17            Ms. Brown, directing your attention to the screen, do

18   you recognize that person?

19   A.  No.

20   Q.  Can we go to the next photo?  It is a different shot of the

21   same person; do you recognize him in that photo?

22   A.  No.

23   Q.  The next photo, Ms. Brady?

24            Do you recognize the people in that photo?

25   A.  Yes.

D365dor3                    Brown - direct

1   Q.   Who is that?

2   A.   Myself and Jermaine.

3   Q.   Thank you, Ms. Brady.

4            I have placed before you Government Exhibit 74; could

5   you take a look at that?  It is that plastic bag.  Could you

6   take out the items in the bag, Ms. Brown?  What do those items

7   appear to be, to you?

8   A.   Mask and gloves.

9   Q.   Have you seen those masks before?

10  A.   Yes.

11  Q.   Where have you seen them?

12  A.   On Jermaine in the house.

13  Q.   What did he use them for?

14  A.   To cover his face when he went to do a job or if he went on

15  a move.

16  Q.   And what do you mean by "a job" or "on a move"?

17  A.   Meaning a robbery or in pursuit of a robbery.

18  Q.   So, looking for someone to rob?

19  A.   Yes.

20  Q.   What about the gloves.  Do you recognize those gloves?

21  A.   They're the type of gloves he would normally take with him

22  as well.

23  Q.   Now, if you can take a look at Government Exhibit 73 which

24  is in front of you in one of those pink envelopes?

25  A.   It's my cell phone and the charger that I used for it.

D365dor3                          Brown – direct

1   Q.  You recognize that as your phone?

2   A.  Yes.

3   Q.  Ms. Brady, if we can pull up Government Exhibit 73A, the

4   contacts?  What type of cell phone is that, Ms. Brown?

5   A.  Mine?

6   Q.  Yes.

7   A.  It is an iPhone.

8   Q.  Was it your practice to keep the contacts of people who

9   called you or who you called in that phone?

10  A.  Yes.

11  Q.  How did you save them?  Did you save them with that

12  person's name?

13  A.  Yes.

14  Q.  Directing your attention to the screen, if you could look

15  at no. 6 it says "Ali"?

16  A.  Yes.

17  Q.  Do you know who that is?

18  A.  Yes.

19  Q.  Who is it?

20  A.  The person Jermaine worked for, his friend.

21  Q.  Do you know Ali's real name?

22  A.  Not prior to this case, no.

23  Q.  Do you know whether Jermaine -- sorry, Mr. Dore referred to

24  him by any other names besides Ali?

25  A.  Moe.

1            THE COURT:  What is his name?

2            THE WITNESS:  Moe.

3            THE COURT:  Moe?

4            THE WITNESS:  Yes.

5   BY MS. LESTER:

6   Q.  Why is his phone number in your phone?

7   A.  Because I think Jermaine had given it to me, and when he

8   had gotten arrested and he wanted me to call him for a calling

9   card when he was in lockup so that he could make calls on the

10  outside, as well as I would keep it just in case I couldn't get

11  to him or I couldn't find him, I could call him and ask him

12  where he was.

13  Q.  So, if you couldn't find Mr. Dore you could call Ali and

14  ask if he knew where he was?

15  A.  Yes.

16  Q.  If you could go down to the next entry, Ms. Brady, for

17  Biggs?

18            We may not be able to zoom in on it but, Ms. Brown, if

19  you can see it on the screen in front of you at the bottom

20  there is an entry for Biggs?

21  A.  Yes.

22  Q.  B-I-G-G-S, correct?

23  A.  Yes.

24  Q.  Do you know who that is?

25  A.  Jermaine's friend.

D365dor3                              Brown - direct

1   Q.   Do you know his real name?

2   A.   Not prior to this case, no.

3   Q.   And why did you have his phone number in your phone?

4   A.   Because he would call me sometimes when he couldn't get to

5   Jermaine and tell me to have Jermaine call him or link him, as

6   he would say.

7   Q.   What does "link him" mean?

8   A.   Call him, get in contact with him.

9   Q.   Can we look at the contact for Duff, Ms. Brady?

10           Well, I can't see it from here, but somewhere on there

11   there is one entry for Duff and one for Duffel.  Do you see

12   those, Ms. Brown?

13   A.   Yes.

14   Q.   Who do those entries refer to?

15   A.   Jermaine's friend Duffel.

16   Q.   Is that the same person, Duff and Duffel?

17   A.   Yes, it is.

18   Q.   Why did you have Duffel's phone number in your phone?

19   A.   For the same reason; if I couldn't get to Jermaine I could

20   call him or if he needed to get in contact with Jermaine he

21   would call and ask me where he is or to tell him to call him.

22   Q.   Do you remember how you -- whether you had Jermaine Dore's

23   phone number stored in your phone?

24   A.   Yes.

25   Q.   And do you know how you designated it in your contacts?

D365dor3                          Brown - direct

1    A.  As Hun.

2    Q.  Can you spell that?

3    A.  H-U-N.

4    Q.  Ms. Brady, can you bring that up, please?

5              It is about two thirds of the way down I think, do you

6    see the entry for Hun?

7              THE COURT:  From the top.

8    Q.  It is at the top.  I really can't see from here.  Are there

9    two numbers, is that correct?

10   A.  Yes.

11   Q.  And both of those numbers would have been for who?

12   A.  Jermaine.

13   Q.  Do you see a contact for Tallman?

14   A.  Yes.

15   Q.  And Tallman is the defendant you identified, Dwayne

16   Barrett, correct?

17   A.  Yes.

18   Q.  And why did you have his phone number in your phone?

19   A.  Again, for the same reason.  He would call me to get into

20   contact with Jermaine.

21             MR. MURPHY:  Objection.

22             THE COURT:  Object to?

23             MR. MURPHY:  To would.

24             THE COURT:  When you say would, you mean that he did

25   on occasion?

D365dor3                          Brown – direct

1           THE WITNESS:  Yes, he did.

2           THE COURT:  So, let's use those terms when we talk

3    about things that actually happened.

4           THE WITNESS:  Sure.

5           He called for Jermaine or he texted for Jermaine.

6    BY MS. LESTER:

7    Q.  And you saved his number on your phone?

8    A.  Yes.

9    Q.  I have put before you a number of items marked as

10   Government's Exhibits 1, 2, 3, 4, and 6.  Could you take a look

11   at Government Exhibit 1?  Do you recognize that?

12   A.  Yes.

13   Q.  What do you recognize it to be?

14   A.  It's Ali.

15   Q.  Is it a photograph of the man you knew as Ali?

16   A.  Yes, it is.

17   Q.  And did you say you knew another name for him as well?

18   A.  Moe.

19   Q.  What about Government Exhibit 2?

20   A.  It is Jermaine.

21   Q.  So, you recognize that to be a photograph of Jermaine Dore?

22   A.  Yes, it is.

23   Q.  An what about Government Exhibit 3?

24   A.  It's Tallman.

25   Q.  What about Government Exhibit 4?

1   A.  It's Biggs.

2   Q.  And Government Exhibit 6?

3   A.  Duffel.

4              MS. LESTER:  Your Honor, at this time the government

5   would offer Government's Exhibits 1, 2, 3, 4 and 6 in evidence.

6              THE COURT:  Any objection?

7              MS. STAFFORD:  No objection.

8              MR. MURPHY:  No.  No objection.

9              THE COURT:  Government's Exhibits 1, 2, 3, 4 and 6 are

10  received.

11             (Government's Exhibits 1, 2, 3, 4 and 6 received in

12  evidence)

13             MS. LESTER:  And, your Honor, we would also offer the

14  corresponding names that Ms. Brown knows those individuals by,

15  they're marked as separate items, the names themselves.

16             THE COURT:  Well, I mean they have specific exhibit

17  numbers you are talking about?

18             MS. LESTER:  They do; Government Exhibit 1B,

19  Government Exhibit 1C, Government Exhibit 2A, Government

20  Exhibit 2B, 2C, 2D, Government Exhibit 3A, 3B, Government

21  Exhibit 4B, Government Exhibit 6B and 6C.

22             THE COURT:  Okay, any objection?

23             MS. STAFFORD:  No objection.

24             MR. MURPHY:  No.

25             THE COURT:  So Government's Exhibits 1B and 1C, 2A,

D365dor3                          Brown - direct

1   2B, 2C, 2D, 3A, 3B, 4B and 6B and 6C are received.

2              (Government's Exhibits 1B, 1C, 2A, 2B, 2C, 2D, 3A, 3B,

3   4B, 6B and 6C received in evidence)

4              MS. LESTER:  Your Honor, may I display those photos

5   and name plates on the board?

6              THE COURT:  Yes.

7   BY MS. LESTER:

8   Q.  So, Ms. Brown, I'm starting with Government Exhibit 1 and

9   who did you say that this was?

10  A.  Ali.

11  Q.  And you also knew him by the name Moe?

12  A.  Yes.

13  Q.  And Government Exhibit 2?

14  A.  Jermaine.

15  Q.  Government Exhibit 3?

16  A.  Tallman.

17  Q.  Government Exhibit 4?

18  A.  Biggs.

19  Q.  And Government Exhibit 6?

20  A.  Duffel.

21  Q.  When you met Mr. Dore back in the summer of 2011, did you

22  know whether he had a job?

23  A.  No, I didn't.

24  Q.  What did he tell you, if anything, about his work at that

25  point?

D365dor3                         Brown - direct

1    A.  At some point he told me that he worked for Ali.

2    Q.  Did he describe what he did for Ali?

3    A.  Basically that he would go to the store and almost be like

4    security.  He would run errands for him.

5    Q.  Do you know where Ali's store is located?

6    A.  Yes.

7    Q.  Where is that?

8    A.  233rd and White Plains Road.  Closer to the corner of

9    233rd.

10   Q.  That's in the Bronx?

11   A.  Yes, it is.

12   Q.  Have you been to that store?

13   A.  Yes, I have.

14   Q.  What type of merchandise does it sell?

15   A.  Novelties like phone cards, toys, household items, DVDs.

16   Along that line.

17   Q.  Did anyone else work in the store?

18   A.  Yes.

19   Q.  Who else?

20   A.  Jerry.

21   Q.  Did you know what Jerry did?

22   A.  He bought and sold gold.

23   Q.  Ms. Brown, I think in front of you you should have

24   Government's Exhibits 40, 41, 42, 42A and B, 44 and 44A.  Could

25   you take a look at those and let me know when you have had a

1   chance to review them?

2   A.  I'm sorry, did you say 43 as well?

3   Q.  Not 43.

4   A.  Okay.  So, 40 is the front of the store.

5   Q.  When you say the store, what do you mean?

6   A.  Ali's store, the store that Ali and Jerry worked in.

7   Q.  So, it is a photograph?

8   A.  Yes.

9   Q.  And is that how this -- does it fairly and accurately

10  depict how the store appeared?

11  A.  Yes.

12  Q.  What about Exhibit 41?

13  A.  It is the photograph of the area that Jerry would work in.

14  Q.  So, it is an interior shot of the store, is that correct?

15  A.  Yes.

16  Q.  And does that --

17          MR. MURPHY:  Object, Judge.  Can we have scope in

18  terms of time?

19          THE COURT:  When the witness observed this you mean?

20          MR. MURPHY:  Yes, when it looked -- appeared like

21  that.

22          THE COURT:  When did you see the store that it

23  appeared like that?

24          THE WITNESS:  September -- from September all the way

25  through to January.

1                  THE COURT:  Okay.

2                  THE WITNESS:  Of 2012.

3                  THE COURT:  All right.

4     BY MS. LESTER:

5     Q.  So, September of 2011?

6     A.  Yes.

7     Q.  And does that fairly and accurately depict what that area

8     of the store looked like?

9     A.  Yes.

10    Q.  I think we're on 42.  And you can look at 42A and B at the

11    same time.

12    A.  So, 42 is another photograph.  This shot is from the back

13    of the store.  Basically it looks like on the side that Jerry

14    would work on and 42A is, again, taken from the back of the

15    store and you could see the front, the side that Ali would work

16    on which, from my direction, is on the right side and where

17    Jerry would work as well.

18               And 42B is from the front looking towards the back

19    and, again, you could see the area that Jerry worked in.

20    Q.  And those photographs, do they fairly and accurately depict

21    the interior of the store as you remember it?

22    A.  Yes, they do.

23    Q.  What about Government Exhibit 44 and 44A?

24    A.  44 is basically the corner store that's between Ali's store

25    and H&R Block, and 44A is the store next to the corner store.

1   Q.  And where is Ali's store in relation to this corner store

2   that you're describing?

3   A.  From my angle it's the left of the corner store.

4   Q.  Are they right next-door to each other, in other words on

5   the street?

6   A.  Yes, they are.

7   Q.  And you are familiar with the exterior of both those

8   stores?

9   A.  Yes, I am.

10  Q.  And do those foes fairly and accurately depict the exterior

11  of those stores as you knew them?

12  A.  Yes, they do.

13          MS. LESTER:  Your Honor, the government offers

14  Government's Exhibits 40, 41, 42, 42A, 42B, 44 and 44A.

15          THE COURT:  Any objection?

16          MR. MURPHY:  No, your Honor.

17          MS. STAFFORD:  No objection.

18          THE COURT:  So, Government's Exhibits 40, 41, 42, 42A

19  and B, 44 and 44A are received.

20          (Government's Exhibits 40, 41, 42, 42A, 42B, 44 and

21  44A received in evidence)

22  BY MS. LESTER:

23  Q.  Ms. Brady, can we please put up Government Exhibit 40?

24          So, Ms. Brown, you said that this is the exterior of

25  Ali's store, is that correct?

1   A.  Yes, it is.

2   Q.  Ms. Brady, can we put up Government Exhibit 41?

3           And you said this is a photograph of the interior of

4   the store?

5   A.  Yes, the area where Jerry worked.

6   Q.  And where was the area that Jerry worked in this

7   photograph?

8   A.  Exactly where you could see, like, the basket with the

9   teddy bear and there is like a door in the front and all of the

10  colognes and where that bag is with the Jamaican flag, that

11  area.

12  Q.  Are we looking -- do you know whether we are looking

13  towards the front of the store?  I mean, we are looking at the

14  side but is it angled toward the front or the rear of the

15  store, the camera?

16  A.  The front.

17  Q.  Ms. Brady, can we put up Government Exhibit 42B?  Sorry,

18  that's not the one, can we put up 42A?

19          Now, which direction is the camera facing in this

20  photo?

21  A.  The person standing at the back, the rear of the store and

22  you're seeing the front.

23  Q.  And where would Ali work in the store?

24  A.  He would be on the right side of the photograph, so

25  basically where, I think -- where the woman is standing, that

D365dor3                         Brown - direct

1    area.

2    Q.  So, up towards the front of the store?

3    A.  Yes.

4    Q.  And on the right-hand side you're saying, in relation to

5    this photograph?

6    A.  Yes.

7    Q.  Ms. Brady, can we pull up Government Exhibit 44?

8            Now, I believe you called this the corner store?

9    A.  Yes.

10   Q.  Is this the store that's next-door to Ali's store?

11   A.  Yes, it is.

12   Q.  What road, if you know, are these stores located on?

13   A.  White Plains Road.

14   Q.  Ms. Brady, can we look at Government Exhibit 44A?

15           Is that just another angle of the two stores next to

16   each other?

17   A.  Yes, they are.

18   Q.  You can take those down.  Thank you.

19           Did there come a time when you learned more about what

20   exactly Mr. Dore did for Ali?

21   A.  Yes.

22   Q.  What did you learn?

23           THE COURT:  When was that?

24           THE WITNESS:  August 2011.

25   Q.  What did you learn?

1   A.  Basically I had to drive Jermaine to a destination in

2   Pennsylvania and we pulled up near to a gas station and we kind

3   of circled around and around, and on the way to Pennsylvania he

4   kept saying to Ali on the phone:  We're almost there, we're

5   almost there.

6           MR. MURPHY:  Objection.

7   Q.  Let me stop you.

8   A.  Okay.

9           THE COURT:  Objection to what?  Narrative, or what?

10          MR. MURPHY:  Two-fold:  One, narrative; second, I

11  don't know how she's established how she knew who he was

12  talking on the phone with at the time.  Assumes a fact not in

13  evidence.

14          THE COURT:  Sustained.

15          You are going to ask questions, Ms. Lester?

16          MS. LESTER:  Yes, your Honor.

17          THE COURT:  Okay.

18  BY MS. LESTER:

19  Q.  Ms. Brown, backing up generally, let's start first with

20  what did you learn when you learned more specifics about

21  Mr. Dore's work which you said you did in August 2011, correct?

22  A.  Right.

23  Q.  What types of things did you learn he was doing for Ali?

24  A.  Committing robberies.

25  Q.  And what types of robberies was he committing?

1    A.  Basically for --

2              MR. MURPHY:  Objection, your Honor.  Did the defendant

3    make statements to her.

4              THE COURT:  I think you have to lay a foundation as to

5    how the witness learned these things.

6    BY MS. LESTER:

7    Q.  How did you learn this, Ms. Brown?

8    A.  Jermaine told me.

9    Q.  And what did he tell you about what he did for Ali?

10   A.  That basically Ali would give him information for a target

11   and he would go view the target, view the target's location,

12   and then set up to rob the person.

13   Q.  What types of information did Mr. Dore tell you he received

14   from Ali?

15   A.  Location, what the person would be carrying, how the person

16   looked, what kind of business they ran, like the route that the

17   person would take each day, hours of operation for the person's

18   business.

19   Q.  Do you know how Mr. Dore received this information from

20   Ali?

21   A.  It would be initiated by a phone call and then he would go

22   to the store to speak with him further about it.

23             MR. MURPHY:  Objection.  Once again.

24             THE COURT:  Yes.  What is the foundation?

25             What is the basis for that?  He told you this?

```
 1                THE WITNESS:  Yes.

 2                THE COURT:  Or you saw this happen?

 3                THE WITNESS:  Yes.

 4                THE COURT:  Well, which one?

 5                THE WITNESS:  Basically he told me, and at times I

 6     would have to take him to the store.

 7                THE COURT:  All right.  Well, let's ask questions that

 8     establish the foundation.

 9                MS. LESTER:  Yes, your Honor.

10     BY MS. LESTER:

11     Q.  Did Mr. Dore use any specific terms to describe his work

12     for Ali when he told you about it?

13     A.  He called it a job, a move, a food.

14                THE COURT:  A job, a move, a what?

15                THE WITNESS:  A food.

16                THE COURT:  A food?

17                THE WITNESS:  Yes.

18     BY MS. LESTER:

19     Q.  And what was your understanding of what those terms meant?

20     A.  In pursuit of a robbery.  Basically that he had done a

21     robbery.  Anything along the lines of actually doing the

22     robbery.

23                MR. MURPHY:  Objection.  Your Honor, can we establish

24     dates, times, locations when these alleged statements are being

25     made?  It is very vague and amorphic at this point.
```

1    THE COURT:  I think it is a fair objection.

2    So, you are going to explore that?

3    MS. LESTER:  I can, your Honor.

4    THE COURT:  Let's do that.

5  BY MS. LESTER:

6  Q.  Ms. Brown, during what period of time did Mr. Dore use

7  these terms in talking with you?

8  A.  They were ongoing.

9  Q.  But during what period of time?

10  A.  Starting August all the way to January 2012.

11  Q.  Ms. Brady, can we pull up an excerpt from Government

12  Exhibit 73B?

13    Now, Ms. Brown, did you communicate with Mr. Dore by

14  phone?

15  A.  Yes, I did.

16  Q.  Did you communicate with him by text message?

17  A.  Yes, we did.

18  Q.  And would he discuss his work for Ali in those text

19  messages sometimes?

20  A.  Yes, he did.

21  Q.  Directing your attention to text no. 674 which is

22  highlighted there on the screen in the column to the left it

23  says -- oh, 764, I'm sorry -- in the column on the left it says

24  "from" and then there is a phone number.  Do you see that?

25  A.  Yes, I do.

1    Q.  Do you recognize that phone number?

2    A.  It was the number Jermaine used at the time.

3    Q.  And there is a name or a term next to it, Hun, H-U-N.  Do

4    you know what that means?

5    A.  That's the name I called Jermaine as.

6    Q.  And then read over a view columns, it says inbox and read,

7    and then the next column it says:  We going to do a job.

8            Do you see that?

9    A.  Yes.

10   Q.  What does that -- what is your understanding of what that

11   means?

12   A.  That he was in pursuit of a robbery.

13   Q.  What do you mean --

14           MR. MURPHY:  Objection.

15           THE COURT:  Objection?

16           MR. MURPHY:  At this point we still don't have any

17   explanation about what location, time, Mr. Dore --

18           THE COURT:  You can do all of that on cross.  You can

19   do all of that on cross.

20           Your understanding at the time you received this text

21   was that "we going to do a job" meant what?

22           THE WITNESS:  That he was in pursuit of a robbery.

23           THE COURT:  All right.

24   BY MS. LESTER:

25   Q.  We can take that down.  Thank you, Ms. Brady.  We can go to

1    text no. 1883.

2            Do you see that, Ms. Brown?

3    A.  Yes.

4    Q.  And, again, in the from column it is the same number that

5    we saw before and it says Hun.  So, who is your understanding

6    that this text is from?

7    A.  It is from Jermaine.

8    Q.  And if you look at the actual text message it says:  On the

9    move now.  Correct?

10   A.  Yes.

11   Q.  What is your understanding of what this meant when this

12   text message was sent on January 12th, 2012?

13   A.  That he was in pursuit of a robbery.

14   Q.  You can take that down.  Thank you.

15           To your knowledge, how often did Mr. Dore do jobs like

16   this for Ali?

17   A.  Every week.  Every other week.  Just depended on when he

18   got the information.

19   Q.  Do you know anyone else who worked for Ali besides

20   Mr. Dore?

21   A.  Tallman, Duffel.

22   Q.  And, do you know anybody else who committed robberies

23   besides -- I'm sorry, I should say do you know whether their

24   work for Ali was the same as Mr. Dore's work?

25   A.  Yes.

1    Q.  That is, they committed robberies?

2              THE COURT:  Well.

3              MR. MURPHY:  Objection.

4              THE COURT:  Sustained.  How do you know this?

5              THE WITNESS:  Because if he would tell me that he's on

6    a move I would ask him who he's with and then he would say I'm

7    with Tallman or I'm with Duffel.  Or if he says he's going to

8    do a job whether it is leaving the house or calling me, he

9    would say who he is with at that time.

10             THE COURT:  Okay.

11             MR. MURPHY:  My objection remains, your Honor.  What

12   would have happened during a, whatever it is, one-plus year

13   period he would do this, he would do that, I think is

14   objectionable.

15             THE COURT:  Okay.  Overruled.

16   BY MS. LESTER:

17   Q.  Were you ever present at a robbery when Tallman was there

18   as well?

19   A.  Yes.

20   Q.  Were you ever present at a robbery when Duff was there?

21   A.  Yes.

22   Q.  Did Mr. Dore ever ask you to assist him with a robbery?

23   A.  Yes.

24             MS. STAFFORD:  Your Honor, time frame?

25             MS. LESTER:  I'm getting to it, your Honor.

D365dor3                              Brown - direct

1            THE COURT:  All right.

2     BY MS. LESTER:

3     Q.  When was that, Ms. Brown?

4            THE COURT:  When was what?

5     Q.  That he first asked you to assist him with a robbery.

6     A.  The first time was August 2011.

7     Q.  And what did he ask you to do?

8     A.  He basically asked me to drive with him to Pennsylvania.

9     Q.  Did you know why he asked you to drive him to Pennsylvania?

10    A.  He just told me Ali sent him to check something out.

11    Q.  Do you know why he just didn't drive himself?

12           MR. MURPHY:  Objection.

13           THE COURT:  Sustained.

14    A.  For one he didn't --

15           THE COURT:  No, no.  Don't answer that.

16           THE WITNESS:  Oh.  I'm sorry.

17    BY MS. LESTER:

18    Q.  What vehicle did you drive, Ms. Brown?

19    A.  My truck.  My Isuzu Trooper.

20    Q.  Ms. Brown, can you look at what has been marked Government

21    Exhibit 54 in front of you?

22    A.  It is a photograph of my Isuzu Trooper.

23    Q.  Did you take that photograph?

24    A.  Yes, I did.

25           MS. LESTER:  Your Honor, the government offers

D365dor3                            Brown – direct

```
 1    Government Exhibit 54.

 2                THE COURT:  Any objection?

 3                MS. STAFFORD:  No.

 4                MR. MURPHY:  No, your Honor.

 5                THE COURT:  Government Exhibit 54 is received.

 6                (Government's Exhibit 54 received in evidence)

 7    BY MS. LESTER:

 8    Q.  Ms. Brady, can we put that up for a moment?

 9                Is that your Isuzu Trooper, Ms. Brown?

10    A.  Yes.

11    Q.  What color is it?

12    A.  Tan.

13    Q.  Tan?

14    A.  Yeah.

15    Q.  Does it have four doors?

16    A.  Yes, it does.

17    Q.  You can take that down.  Thank you.

18                Did you ever let other people drive that Trooper?

19    A.  Yes.

20    Q.  Who else?

21    A.  Jermaine, Tallman, Biggs.

22    Q.  Did you know whether Mr. Dore had a license?

23    A.  He did not.

24    Q.  Did you ever use other cars besides that Trooper?

25                MR. MURPHY:  Objection.  Time?
```

1          THE COURT:  Ever use other cars?  I think that's a

2     fair objection.  Let's narrow the time.

3     BY MS. LESTER:

4     Q.  During the period between August 2011 and January 2012, did

5     you ever use other cars besides the Isuzu Trooper that we just

6     saw?

7     A.  Yes.

8     Q.  What types of cars did you use?

9     A.  Rental cars.

10    Q.  Why did you rent cars?

11    A.  Because Jermaine asked me to.

12    Q.  How many times did you rent cars at his request during that

13    tame same period?

14    A.  Anywhere between three and five times.

15    Q.  Did Mr. Dore ever tell you what he did with those cars

16    during that period?

17    A.  No, he didn't.

18    Q.  Do you have an understanding of what he did with those

19    cars?

20          MS. STAFFORD:  Objection.

21          MR. MURPHY:  Objection.

22          THE COURT:  Sustained, unless you can explain what the

23    basis for the understanding is.

24    BY MS. LESTER:

25    Q.  Do you know who drove those cars?

1    A.  Yes.

2    Q.  Did you ever see other people driving them besides

3    yourself?

4    A.  Yes.

5    Q.  Who did you see driving them?

6    A.  Jermaine, Biggs.

7    Q.  Now, going back to the request Mr. Dore made for you to

8    drive him to Pennsylvania, when did you say that that happened?

9    A.  August 2011.

10   Q.  You didn't know where you were going in Pennsylvania?

11   A.  No.

12   Q.  You didn't know the name of the town?

13   A.  No.

14   Q.  Do you remember how you got there?

15   A.  Followed behind Tallman's car.

16   Q.  Do you remember the name of the road that you took?

17   A.  No.

18   Q.  Was it a highway, was it local roads?

19   A.  It was a highway.

20   Q.  So you said you followed another car?

21   A.  Yes.

22   Q.  How do you know that it was being driven by Tallman, as you

23   said?

24   A.  Jermaine told me.

25   Q.  Did Mr. Dore tell you why he wanted to go to Pennsylvania?

D365dor3                              Brown - direct

1    A.  Just that Ali sent him to check something out.

2    Q.  Do you know whether anyone else was in Tallman's car at the

3    time?

4    A.  No.  Not at the time.

5    Q.  I would like you to take a look at Government Exhibit 700,

6    701, 702, 703, 704 and 705.

7    A.  700 is the gas station that we passed.  Basically, once we

8    got off the highway it was the first landmark that we stopped

9    at.

10   Q.  That's in Pennsylvania?

11   A.  Yes.

12   Q.  Could you take a look at the rest of the photographs?  And

13   you don't need to tell me what they show right now, just take a

14   look at them.

15         Are all those photographs photographs of the gas

16   station that you mentioned in Pennsylvania?

17   A.  Yes; and surrounding areas.

18   Q.  And, do they fairly and accurately depict how that gas

19   station appeared when you were there in August 2011 other than

20   perhaps the fact that the trees don't have any leaves on them?

21   A.  Yes.  It is a fair representation.

22         MS. LESTER:  Your Honor, the government would offer

23   Government's Exhibits 700, 701, 702, 703, 704 and 705 in

24   evidence.

25         THE COURT:  Any objection?

1              MS. STAFFORD:  No objection.

2              MR. MURPHY:  No.

3              THE COURT:  Government's Exhibits 700 through 705 are

4    received.

5              (Government's Exhibits 700, 701, 702, 703, 704 and 705

6    received in evidence)

7    BY MS. LESTER:

8    Q.  Ms. Brady, can we put up Government Exhibit 700, please?

9              So, Ms. Brown, did you say you arrived at this gas

10   station?

11   A.  Yes.

12   Q.  And what did you do when you arrived there?

13   A.  Basically circled around maybe two or three times, and then

14   parked.

15   Q.  Who directed you where to park?

16   A.  Jermaine.

17   Q.  Where were you -- what direction were you facing when you

18   parked, towards the gas station or away from the gas station?

19   A.  The gas station would be behind me.

20   Q.  And you mentioned that Tallman was in a separate car,

21   correct?

22   A.  Yes.

23   Q.  Do you know where he parked?

24   A.  So, basically it is a dead end street and his car was

25   parked at the dead end facing the gas station.

1   Q.  Ms. Brown, you said there is a dead end street; can you see

2   the street in this photograph?

3   A.  Basically behind where I think it is a -- the SUV is, that

4   road exactly behind it.  So, there is another gas station and

5   then there is a road in between both gas stations.

6   Q.  And that's the road that had the dead end?

7   A.  Yes.

8   Q.  And is that where Tallman's car was parked?

9   A.  Yes, it was.

10          MS. STAFFORD:  Object to the leading.

11          THE COURT:  Yes, let's watch the leading.

12  Q.  Could you see which direction Tallman's car was facing?

13  A.  Yes, I could.

14  Q.  Which direction?

15  A.  He was parked facing the gas station.

16  Q.  What time of day was it that you arrived in Pennsylvania?

17  A.  Early morning, so around 8:00, 9:00.

18  Q.  What did you do after you had parked?

19  A.  Basically I was there for a while and Jermaine kept going

20  back and forth between my car and Tallman's car.  And there

21  came a time where I was just out of it because I had to get up

22  early to go with him and I hadn't eaten, and I was just tired

23  and I told him that I was hungry, which at that point he told

24  me, like, not to worry, there is a super market across the

25  street, we could go to that.

1    Q.  Ms. Brady, can we put up Government Exhibit 704?  I'm

2    sorry, 705.  Sorry, 701.

3              Ms. Brown, can you tell what we are looking at from

4    here?

5    A.  Basically it is the parking lot next to the gas station.

6    Q.  And what direction was this super market that you just

7    referred to in relation to the gas station?

8    A.  So, if you go past the blue car and there are some fences,

9    the super market parking lot is basically behind those fences.

10   Q.  To the left?

11   A.  Yes.

12   Q.  So, going back to Government Exhibit 700, if you are

13   looking at the front of the gas station which direction is the

14   super market, to the right or to the left?

15   A.  To the right.

16   Q.  What happened after you complained to Mr. Dore about the

17   fact that you were hungry?

18   A.  He basically said that we could go to the super market and

19   Tallman pulled off heading towards the super market and I

20   followed him.

21   Q.  What did you do when you got there?

22   A.  Parked; and Tallman said what he wanted to eat and I went

23   into the super market at which point, like, I wasn't clear of

24   what else he needed, and I called and I heard another voice and

25   I asked him who it was and he said it is Duffel, and Duffel

D365dor3                          Brown – direct

1    also said what he wanted to eat.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. LESTER:

2   Q.  Who did you call?

3   A.  Jermaine.

4   Q.  And where was he at that point?

5   A.  In Tall Man's car.

6   Q.  And so, what did he tell you when you called him?

7          THE COURT:  What did who?

8   BY MS. LESTER:

9   Q.  What did Mr. Dore tell you when you called him?

10  A.  What he wanted to eat.  What Tall Man wanted to eat.  And

11  what Duffel wanted to eat.

12  Q.  What did you do next?

13  A.  I bought everything that they asked for.  I bought some

14  stuff for myself, brought it back to the car, and gave it to

15  him, him meaning Jermaine.

16  Q.  Whose car did you bring it to?

17  A.  Mine, truck.

18  Q.  And how did the food get from you to Mr. Dore; you gave it

19  to him?

20  A.  I gave it to him, yes.

21  Q.  What did he do with it?

22  A.  He took what was his and then he took the bag to Tall Man's

23  car.

24  Q.  Did he sit in the car with Tall Man at that point?

25  A.  Yes, he did, for a while.

1    Q.  What happened next?

2    A.  He kind of stayed there, kept waiting.  Then he came back

3    to my car.  We still waited.  At one point, Jermaine fell

4    asleep, and then he woke up and said it was time to move.

5    Q.  What happened next?

6    A.  Tall Man's car pulled off, out towards the street, so out

7    of the supermarket parking lot, and he made a left turn and I

8    made a left turn behind him.

9    Q.  What happened next?

10   A.  Jermaine told me to stop, and he jumped out of the car

11   heading towards Tall Man's car.

12   Q.  What did you see at that point, if anything?

13   A.  Just him going towards Tall Man's car, but I was blocking

14   traffic, so I had to drive off.  Afterwards, maybe a couple

15   minutes afterward, Jermaine called and says, Meet me in New

16   York.

17   Q.  Were you still in your car when you received that call?

18   A.  Yes, I was.

19   Q.  What did you do?

20   A.  I kept driving, trying to find some angle to make the

21   U-turn.  It was rather difficult because the road was so small,

22   and eventually I got a chance to do it and I made a U-turn to

23   try to find the highway.

24   Q.  Did you see anything else at that point?

25   A.  Just some man running out in the street, like waving his

1  hand, like the whole world had went wrong.  Like he just kept

2  yelling --

3              MR. MURPHY:  Objection.

4              THE COURT:  Yes.  Sustained.

5              Describe what you saw.  Don't interpret it.

6              THE WITNESS:  Okay.

7  A.  So he was just running towards the street with his hand in

8  the air.

9              THE COURT:  Hand or hands in the air?

10             THE WITNESS:  Hands.

11             THE COURT:  Doing what?  What were his hands doing?

12             THE WITNESS:  Just waving.

13             THE COURT:  Like this?  Like this?

14             THE WITNESS:  Like that.

15             THE COURT:  Let the record reflect that you have both

16  hands above your head and sort of shaking them back and forth.

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19  BY MS. LESTER:

20  Q.  Could you see his facial expression from your car?

21  A.  No.

22  Q.  What did you do after you saw that man?

23  A.  My focus switched back to finding the highway, which I

24  eventually did, and head to New York.

25  Q.  And did there come a time when you actually arrived in New

1    York?

2    A.  Yes.

3    Q.  Where did you go?

4    A.  To my house.

5    Q.  Did you hear from Mr. Dore again?

6    A.  Yes, I did.

7    Q.  Describe what happened.

8    A.  It was maybe 45 minutes to an hour later, and he basically

9    called and said that he was on his way to me.

10   Q.  And did he come meet you?

11   A.  Yes, he did.

12   Q.  What happened when he got there?

13   A.  We started arguing because, of course, I was really upset

14   that he had taken me all the way to Pennsylvania and I had no

15   idea where I was or how to get back to New York, and at that

16   time, he was my partner.  I didn't expect for him to leave me

17   by myself, to navigate my way around a town that I did not

18   know.  So we kept arguing and arguing, and he was kind of like

19   he's sorry.  He was extremely apologetic.

20           MR. MURPHY:  Objection.  Narrative.

21           THE COURT:  Describe the conversation you had.  I'll

22   allow it.

23           THE WITNESS:  Okay.

24   A.  So, basically, he -- I just kept saying, like, How could

25   you leave me; like, You knew I didn't know where I was going;

1    like, If we went there together, we should have left there

2    together.  And he was like, Don't worry about it, like he's

3    sorry; like, It will never happen again.  And then afterwards

4    he asked me where do I want to go, what do I want to eat.

5    Q.  Did you go eat something?

6    A.  Yes, we did.

7    Q.  Who paid for the meal?

8    A.  Jermaine did.

9    Q.  Did you see what he used to pay for it?

10   A.  Initially, when we were arguing, he told, he kind of showed

11   me that he had money, like he, he was like, I made money,

12   and --

13              MS. STAFFORD:  Objection.  Nonresponsive.

14              THE COURT:  Yes.  Just answer the question.

15              Restate the question.

16   BY MS. LESTER:

17   Q.  Did he say anything to you about what had happened in

18   Pennsylvania?

19   A.  Yes.

20   Q.  What did he say?

21   A.  Basically, he did a job, it was successful, and now he has

22   money.

23   Q.  What did you understand at that time that he meant by a

24   job?

25   A.  That the thing that Ali sent him to check out was a robbery

1   and that he had did it and got proceeds from that.

2   Q.  Did you see any money --

3   A.  Yes, I did.

4   Q.  -- that day?

5       What did you see?

6   A.  Basically, it was a black grocery bag, and it had bills,

7   like small bills, 20s, fives, and tens, wrapped up in rubber

8   band.

9   Q.  Can you approximate, based on what you saw, how much money

10  it was?

11              MR. MURPHY:  Objection.

12              THE COURT:  If you can, by saying how much money you

13  think you saw.

14  A.  Anywhere between 15 and 20,000.

15  Q.  Did you get any money for yourself that day, Ms. Brown?

16  A.  No, I didn't.

17  Q.  Do you know, were you told by Mr. Dore whether anyone else

18  got money?

19  A.  Yes.

20  Q.  What did he tell you?

21  A.  Basically told me that was his cut, and Tall Man and Duffel

22  got their cut.

23  Q.  Do you know what Mr. Dore did with that money?

24  A.  Basically, we used it to get the apartment.  We shopped,

25  went to different restaurants to eat.  Stuff like that.

1   Q.  When you say you used it to get the apartment, which

2   apartment is that?

3   A.  The one that we lived at, Carpenter Avenue, in the Bronx.

4   Q.  Did Mr. Dore say anything to you about what the other

5   people who got money did with it?

6         MS. STAFFORD:  Your Honor, leading.

7         THE COURT:  What, if anything, did Mr. Dore say about

8   what the others did with their cut?

9         THE WITNESS:  Basically, that Tall Man and Duffel both

10  bought cars.  He said Tall Man bought a Benz and Duffel bought

11  a Range Rover.

12  BY MS. LESTER:

13  Q.  Did you participate in any other robberies with Mr. Dore?

14  A.  Yes, I did.

15  Q.  What was the next robbery that you remember participating

16  in?

17  A.  Like maybe a couple weeks after, he asked me to drive him

18  to the South Bronx.  Basically, I had to follow behind Tall Man

19  to get to the destination, and I pulled over.  Tall Man pulled

20  over.  Jermaine got out, went to his car, came back to my car.

21  He kind of like walked around the area for a little while, and

22  that's how the routine kept going for that morning.  It was

23  early morning again, and we were just there for a while, doing

24  the same thing, just waiting, waiting, waiting.  And at some

25  point, Jermaine came running to the car with a paper bag filled

D36Wdor4                          Brown - direct

1    with money.

2    Q.  What happened next?

3    A.  He basically told me to drive, and the area was so

4    confusing, it was almost like a maze.  So we kept going around

5    in circles and circles and didn't know where we were.  And then

6    Tall Man came and kind of guided us towards the highway.

7              THE COURT:  How did he get you to the highway?

8              THE WITNESS:  Tall Man guided us.

9              THE COURT:  Guided you?

10             THE WITNESS:  Yes.

11             THE COURT:  How did he guide you?

12             THE WITNESS:  Like he drove, and every turn he made I

13   made until we got to the highway.

14             THE COURT:  So you followed him?

15             THE WITNESS:  Yes.

16             THE COURT:  In your car?

17             THE WITNESS:  Yes.

18             THE COURT:  What car was he driving?

19             THE WITNESS:  At that time, I'm not sure.

20   BY MS. LESTER:

21   Q.  You said Mr. Dore had something when he got back in the

22   car?

23   A.  Yes.

24   Q.  What was that?

25   A.  A paper bag filled with money.

1   Q.   Did you actually see the money?

2   A.   Yes.

3   Q.   Can you describe it?

4   A.   It was wrapped up with rubber bands, just bills wrapped up

5   together with rubber bands in the paper bag.

6           THE COURT:  How big was the bag?

7           THE WITNESS:  I want to say like if you go to a

8   Chinese store and they put like two meals in the bag and they

9   use that big paper bag, it was that size.

10          THE COURT:  So just in terms of feet, how many square

11  feet?

12          THE WITNESS:  I don't know.  Like, if I had to use

13  this, it's like this height.  So from the bottom to about here,

14  maybe about this wide.

15          THE COURT:  You're using a legal size folder.

16          THE WITNESS:  Yes.

17          THE COURT:  You're saying about three-quarters of the

18  way up the folder is the height?

19          THE WITNESS:  Yes, yes.

20          THE COURT:  And the width.

21          THE WITNESS:  Maybe an extra quarter attached to this,

22  so about here.

23          THE COURT:  So an extra quarter of the width of the

24  folder.

25          THE WITNESS:  Yes.

```
 1              THE COURT:  And that's an 8-1/2-by-14 folder.  Do you
 2   agree with that?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Anyone disagree with that?
 5              MR. MURPHY:  No.
 6              THE COURT:  Okay.
 7   BY MS. LESTER:
 8   Q.  Ms. Brown, based on what you observed about the money and
 9   the bag, could you estimate how much money it was?
10   A.  Anywhere between ten and 15,000.
11   Q.  What did you do after following Tall Man's car?
12   A.  We went back to some road in Mount Vernon.
13              THE COURT:  To what road?
14              THE WITNESS:  To a road, like a street in Mount
15   Vernon.
16   BY MS. LESTER:
17   Q.  What happened when you got there?
18   A.  Jermaine got out of the car, went to Tall Man's car.  He
19   was there for a while and he came back and asked me what I
20   wanted to eat.
21   Q.  And did you go eat?
22   A.  Yes, we did.
23   Q.  And who paid?
24   A.  He did.
25              THE COURT:  He?
```

1              THE WITNESS:  He, meaning Jermaine.

2    BY MS. LESTER:

3    Q.  Do you know whether he used the money that he had in the

4    paper bag?

5    A.  Yes.

6              THE COURT:  How do you know that?

7              THE WITNESS:  Because he didn't have any money on him

8    before.

9              THE COURT:  How do you know he didn't have any money

10   on him before?

11             THE WITNESS:  Because he said it.

12             THE COURT:  Okay.

13             THE WITNESS:  He said he didn't have any money on him

14   at that time.

15             THE COURT:  All right.

16   BY MS. LESTER:

17   Q.  Did you participate in any other robberies with Mr. Dore?

18   A.  Yes.

19   Q.  What was the next specific one you remember?

20   A.  This one involved a woman.  It started in like around

21   Nereid Avenue and Bronx Boulevard, and basically Jermaine told

22   me we had a job to do.  Ali sent him to check something out.

23   Initially, it was just myself and Jermaine and we pulled over

24   and he kept going back and forth between his --

25   Q.  Let me stop you for a moment, Ms. Brown.

1   A.  Sure.

2   Q.  First of all, do you remember approximately when this

3   robbery took place?

4   A.  I had a break from school, so it was around my winter

5   break.

6   Q.  You don't remember the exact date?

7   A.  No.

8   Q.  Do you remember what time of day you were there?

9   A.  Early morning to like midday.  So --

10  Q.  I think you mentioned Nereid Avenue?

11  A.  Yes.

12  Q.  Are you familiar with that area?

13  A.  Yes, I am.

14  Q.  Did you know sort of why you were in that location?

15  A.  Basically --

16          MR. MURPHY:  Objection.

17          THE COURT:  Yes.  Ask a different question.  Just

18  sustained.

19  BY MS. LESTER:

20  Q.  Why did you go to Nereid Avenue?

21  A.  We were on Bronx Boulevard.  The cross-street would be

22  Nereid Avenue.  Basically, Jermaine asked me to take him there.

23  Q.  And what did you do when you arrived?

24  A.  We pulled over.  We got out of the car, walked around for a

25  little bit, came back.  And then we were just sitting there

1   waiting, and then Tall Man came.

2   Q.   When you were sitting there waiting, were you looking at

3   anything in particular?

4   A.   He initially pointed out to me that he was watching a woman

5   that was in the, like she had a cigarette-selling business.

6   Q.   He told you that?

7   A.   Yes.

8   Q.   Did he tell you anything else about the woman?

9   A.   That it was a business for her and her husband.

10  Q.   Could you see the woman at some point?

11  A.   Yes, I could.

12  Q.   What was she doing?

13  A.   She just kept going back and forth from her place of

14  business to her car and just putting stuff in the car.

15  Q.   What happened next?

16  A.   So we sat there.  Again, he went to Tall Man's car, came

17  back to my car, and then at some point, the lady was ready to

18  go.  So basically, she drove off.  Tall Man drove off behind

19  her, and I drove off behind Tall Man.

20             MR. MURPHY:  Objection.  Judge, I would ask the

21  witness to testify about what she saw people do and not do.

22  "The lady was ready to go" is drawing conclusions.  Her

23  movements and what was in her hand ––

24             THE COURT:  No more speaking objections.  I don't want

25  that either.

1          Overruled.  I'm going to allow this answer.  But it is

2   objectionable.

3          Are you done with your answer?

4          THE WITNESS:  Basically, she just pulled off.  Tall

5   Man pulled off behind her, and as did I.

6          THE COURT:  Okay.

7   BY MS. LESTER:

8   Q.  What type of car was it?  Do you remember what type of car

9   the woman was driving?

10  A.  It was like a silver RAV-4 or silver CRV, but it was an

11  SUV, silver.

12  Q.  Just a moment ago you said that you thought this was

13  sometime during your winter break, is that right?

14  A.  Right.  That's correct.

15  Q.  What time of year is that?

16  A.  December.

17  Q.  What types of items, if any, did you observe the woman

18  carrying back and forth?

19  A.  Her handbag, boxes, bags.  Regular grocery bags.

20  Q.  And what happened once she pulled away, as you said?

21  A.  Again, Tall Man pulled off behind her and I pulled off

22  behind Tall Man, and we just kept following her.

23  Q.  Where did you follow her to?

24  A.  To the Pelham Park area because she made a stop and then

25  she got out and went into like a supermarket, and then Jermaine

1   got out of my car at that point, and went to Tall Man's car,

2   and then afterwards, the lady came back out, pulled off again.

3   Again, Tall Man pulled off.  I pulled off behind him and then

4   she made another stop in the Pelham Park area again.  And

5   afterwards, when she was done with that, she went towards going

6   like the Grand Concourse area.  So she just kept driving and we

7   were following her at that point.

8   Q.  Did you see what she was doing when she made these stops?

9   A.  Just buying groceries.

10  Q.  So you followed her to the Grand Concourse area, is that

11  right?

12  A.  Yes.

13  Q.  What happened next?

14  A.  Basically, we kind of pulled up, my car, pulled up sudden

15  behind her.  She was looking for parking.  I passed her and

16  went around the block, came back around, and she had parked.  I

17  went back.  You would say it's a straight road, it's a one way,

18  and then I had to pull over on the next block over.

19  Q.  What happened next?

20  A.  Jermaine got out of the car, as did Duffel, and went back

21  on to the one-way block that we had just came off.

22  Q.  Could you see the woman's car from where you were?

23  A.  No, I couldn't.

24  Q.  Could you see where Tall Man's car was?

25  A.  Yes, I could.

1   Q.  Where was it in relation to your car?

2   A.  It was in front of me.

3   Q.  And which direction?  When you say which direction Mr. Dore

4   and Duffel were walking in, which way did they go; towards the

5   woman's car or away from it?

6   A.  Towards.

7   Q.  What happened next?

8   A.  I was there for a couple of minutes, then Jermaine came

9   running back towards the car, and he got in and he had a black

10  purse in his hand.  At that point, he just said, Drive, and I

11  was driving.  Tall Man pulled off as well, and he led us to the

12  direction of Mount Vernon.

13  Q.  Now, before Mr. Dore got out of the car, did he do

14  anything?

15  A.  Basically, put gloves on and he already had a mask on.  And

16  he just kind of pulled it up over, to cover his nose and mouth

17  area.

18  Q.  And is that a mask like the masks we looked at earlier?

19  A.  Yes.

20  Q.  Did you see what was in the handbag?

21  A.  No, I didn't.

22  Q.  What happened once you pulled away from that area, as he

23  instructed you?

24  A.  We went to the same area we initially did in Mount Vernon.

25  Q.  What's at that location in Mount Vernon?

D36Wdor4                          Brown - direct

```
 1   A.  Basically, it's a house that Jermaine would go to, to chill
 2   with Tall Man or just to hang out.
 3   Q.  Have you ever been to that house?
 4   A.  Yes.
 5   Q.  You've been inside it?
 6   A.  Yes.
 7   Q.  Do you know whether anyone lives there?
 8   A.  Yeah.  People that Tall Man knew.
 9          MR. MURPHY:  Objection.
10          THE COURT:  I'm sorry.  What did you say?  What did
11   you just say?
12          THE WITNESS:  That there were people, the person that
13   lived there was someone Tall Man knew.
14          THE COURT:  How do you know Tall Man knew this person?
15          THE WITNESS:  Because on several occasions, I've had
16   to take Jermaine there, and when I went inside, Jermaine kind
17   of pointed out, Oh, that's Tall Man's friend and that's Tall
18   Man's friend.  And so he was the one that told me these are
19   people that Tall Man had associated himself with.
20          THE COURT:  All right.  Next question.
21   BY MS. LESTER:
22   Q.  What happened when you arrived at or near the house in
23   Mount Vernon on this occasion?
24   A.  Jermaine got out, went to Tall Man's car.  Basically, he
25   was there for a little while.  And then he came back to the
```

1   car, said, Let's go, what do you want to eat.

2   Q.  Was anyone ever injured during these robberies or other

3   robberies that you know of?

4   A.  Yes.

5   Q.  What can you tell us about that?

6   A.  One night, Jermaine came home with his hand bleeding, like

7   excessively.  He basically was -- he had it wrapped up in a

8   shirt or a cloth, or something, but he had it wrapped up and it

9   was bleeding through that material.  And it just kept bleeding

10  and bleeding.  Initially, he didn't tell me like what went

11  wrong.  But he had come in the house with Biggs, and Biggs kind

12  of said, You know, like, you could throw hydrogen peroxide on

13  it to --

14          MR. MURPHY:  Objection.

15          THE COURT:  Overruled.  You can answer.

16          THE WITNESS:  Okay.

17  A.  So Biggs said you can throw hydrogen peroxide on it to stop

18  the bleeding.  I did that.  It didn't work.  It just kept

19  bleeding and bleeding.  He didn't want to go to the hospital.

20          THE COURT:  Allow her to ask some questions.  Too

21  narrative.

22          Next question.

23  BY MS. LESTER:

24  Q.  What time of night was this?

25  A.  Around one, two.

D36Wdor4                              Brown - direct

1   Q.  Do you remember what time of year it was that this

2   happened?

3   A.  In October.

4   Q.  And you said that Mr. Dore was there and also Biggs was

5   there?

6   A.  Yes.

7   Q.  What happened once you realized the bleeding wouldn't stop?

8   A.  I told him that I was going to take him to the emergency

9   room.

10  Q.  What did you do next?

11  A.  I took him to the emergency room.

12  Q.  Where did you go?

13  A.  The emergency room on 233rd, Montefiore Hospital.

14  Q.  Could you tell what type of injury it was to his hand?

15          MR. MURPHY:  Objection.

16          MS. STAFFORD:  Objection.

17          THE COURT:  Just describe what you saw.  Did you see

18  the injury?

19          THE WITNESS:  Yes.

20          THE COURT:  Could you describe what it looked like?

21          THE WITNESS:  It was basically a hole in the middle of

22  his hand towards like his middle finger that came through the

23  top part of his hand.

24          THE COURT:  A hole?

25          THE WITNESS:  Yes.

1              THE COURT:  How big?

2              THE WITNESS:  Maybe like, I don't know, like the face

3    of my watch, about that size.

4              THE COURT:  About an inch across?

5              THE WITNESS:  Yeah.

6              THE COURT:  All right.  Next question.

7    BY MS. LESTER:

8    Q.  What happened when you got to the hospital?

9    A.  He registered and they had to take him to do x-ray.

10   Q.  Were you there when he registered?

11   A.  Yes, I was.

12   Q.  What name did he give?

13   A.  A name not known to me.  It wasn't his real name is what

14   I'm saying.

15   Q.  Did he tell you why he did that?

16   A.  He said because he didn't have insurance and he didn't want

17   to receive a bill.

18   Q.  Did he receive treatment at the hospital?

19   A.  Yes, he did.

20   Q.  What treatment did he receive?

21   A.  So, after the x-ray, they found out that his finger was

22   actually broken, and they had to call for a specialist in that

23   area who had to basically realign his finger.

24             MR. MURPHY:  Objection.

25             THE COURT:  Sustained.  Next question.

1    BY MS. LESTER:

2    Q.  Without getting into too much detail, Ms. Brown, did he

3    receive some sort of bandage or other treatment for his hand?

4    A.  Yes, he did.

5    Q.  Did he or anyone else tell you what had actually happened

6    that led to this injury?

7    A.  He basically told me, meaning Jermaine, told me that Biggs

8    had stabbed him accidentally.

9            THE COURT:  I didn't hear what you said.  That what?

10           THE WITNESS:  Jermaine told me that Biggs had stabbed

11   him accidentally.

12   BY MS. LESTER:

13   Q.  Did he tell you anything about when this had happened?

14   A.  He basically said he went on a move and there was like a

15   rustle and he got stabbed accidentally by Biggs.

16   Q.  What did you understand him to mean by a move?

17   A.  A robbery.

18   Q.  Do you know whether there were ever any injuries to victims

19   of robberies committed by Mr. Dore?

20   A.  Yes.

21   Q.  How do you know that?

22   A.  One day, another friend of his brought him a newspaper

23   article that had --

24           MR. MURPHY:  Objection.

25           THE COURT:  Overruled.

1   A.   Brought him a newspaper article that had a man on the

2   cover, like in the section of that part of the newspaper, that

3   had gotten like cut in his like abdomen area.

4              THE COURT:  When was this?

5              THE WITNESS:  Not long after -- sometime between

6   October, November.

7              THE COURT:  And who brought the newspaper?

8              THE WITNESS:  A friend of his.

9              THE COURT:  Do you know who that person was?

10             THE WITNESS:  They call him Squeaky.

11             THE COURT:  Squeaky?

12             THE WITNESS:  Yeah.

13             THE COURT:  All right.  So this person brought a

14  newspaper.  And then what happened.

15             THE WITNESS:  Basically, he showed it to him and said,

16  Look, it's in the paper.  And Jermaine was like, All right,

17  like I see it.  He kind of just looked at it and smiled, didn't

18  really pay much attention to it after that.

19             MR. MURPHY:  Objection.

20             THE COURT:  To the last part.

21  He smiled?

22             THE WITNESS:  Yes.

23             THE COURT:  And didn't say anything more after that?

24             THE WITNESS:  No.

25             THE COURT:  Okay.  Next question.

1    BY MS. LESTER:

2    Q.  Now, besides the robberies, the specific robberies we've

3    already discussed --

4              MR. MURPHY:  Excuse me.  Objection.  Could we have a

5    brief side bar?

6              THE COURT:  No.  We're going to break for lunch.  So

7    why don't we stop here.  We'll pick up again at two, ladies and

8    gentlemen, so leave your notebooks in the jury room.  Give

9    yourself enough time to get through security and don't discuss

10   the case, of course.  All right?  Have a good lunch.  All rise

11   for the jury.

12             (Jury excused)

13             THE COURT:  Have a seat.  You can have a seat too.  Do

14   you want to remove the witness?

15             MR. MURPHY:  If I may, your Honor, I can do it now

16   that the jury's not here.

17             THE COURT:  Is it okay for the witness to be here?

18             MR. MURPHY:  I'd like the witness to step out.

19             THE COURT:  Ms. Brown, be back here a little before

20   two.  Go to the witness room now just to allow the jurors to

21   clear out and use the elevators just so you don't bump into

22   them.

23             THE WITNESS:  Okay.

24             (Witness excused)

25             THE COURT:  Okay.  The witness is gone.

1          MR. MURPHY:  Your Honor, my objection is to this whole

2     line of inquiry about this injury and the newspaper article.

3     I'll take them one piece at a time.  The injury itself, the

4     scope of it has not been nailed down in terms of when it

5     happened.  We're working off a list of many robberies and

6     trying to match up what allegations happened at what time with

7     respect to what robbery.  There's no way to figure out which

8     one it's alleged this particular injury happened in, but in

9     addition to that, the scope with respect to the newspaper

10    article, the newspaper article is rank hearsay, there's nothing

11    more than that.

12         THE COURT:  No.  The fact of the newspaper article is

13    not rank hearsay.

14         MR. MURPHY:  Understood.  But we don't know what it

15    said in that newspaper article.  I understand there's a

16    newspaper article; it said something about a stabbing.  Based

17    on what she just said, there was no even reference to a

18    robbery.  He looked at a newspaper article and he laughed.  We

19    don't know what was alleged in that article, if there was a

20    robbery on this avenue or that avenue.  We've never seen that

21    Daily News article.  There's been a lot of talk about it, but I

22    think it is so vague and so limitless in its scope that I think

23    it's objectionable and inadmissible.

24         THE COURT:  Overruled.  I think you can make all these

25    points to the jury, but I think she referenced it in the

D36Wdor4                          Brown - direct

context of the robbery scheme that she participated sometimes

in and that she certainly was familiar with.  Overruled.

        You can make some of these same arguments on summation

or even on cross, but I don't think it's improper to elicit

that.

        Anything else we should discuss before I let you get a

chance to eat something?  Okay.  Why don't you eat.  Be back

here a little before two so if we have to cover some things we

can.  I guess the government and Ms. Fontier and Ms. Stafford

were discussing what, if anything, we're doing concerning the

prior testimony of Ms. Brown, and I think the parties sort of

flip-flopped with respect to her credibility with one side

saying now she's credible and the other saying she's no longer

credible when, in May, you were each taking different views.

So let's think about what, if anything, that means for the

cross and for argument down the road.  Okay?

        Have a nice lunch.  If you could clear out, I have

another matter we'll take up in just a few minutes.

        (Luncheon recess)

D36Wdor4

                              AFTERNOON SESSION

                                   2:00 p.m.

          (In open court; jury not present)

          THE COURT:  Bring out the defendants.

          MS. LESTER:  Your Honor, would you like the witness on

the stand?

          THE COURT:  Not until we know whether we have

something to talk about.  If we're going to have colloquy, I

don't want the witness.

          MS. LESTER:  I don't think we know.  I don't think we

know until after her direct is over.

          THE COURT:  Nothing to do now, then.  Yes, let's do

that.

          MS. LESTER:  In that case, should we put her on the

stand?

          THE COURT:  Yes.  Put her on.  How much more do you

have on direct?

          MS. LESTER:  Maybe 30, 45 minutes.

          MS. FONTIER:  Your Honor, with this witness and the

next portion of her direct, there is going to be testimony

about her being present when Mr. Dore was arrested at one

point, not the January arrest, but additional arrests.

          THE COURT:  Okay.

          MR. ROTH:  My understanding is she doesn't know what

the arrest was for, what ultimately occurred, but because it

D36Wdor4

1   was a minor marijuana arrest, I would like to have that in, and

2   the government has agreed to enter that by stipulation.  If we

3   could, at the end of her testimony, just break, enter that

4   stipulation, and then we can also address the other issue.

5              THE COURT:  That's fine.  The stipulation we can do

6   during the direct, if you want.  However you want to do it with

7   the stip is fine with me.

8              MS. FONTIER:  Thank you, your Honor.

9              THE COURT:  Let's bring in the jury.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury present)
 2                THE COURT:  All right.  Have a seat.  I hope you had a
 3      nice lunch.  Pretty windy out there?  Don't be alarmed.  It
 4      sounds like we're on a ship the way this building creaks, but
 5      we won't fall off.
 6                We're going to resume the direct examination of
 7      Ms. Brown by Ms. Lester.
 8                Ms. Lester.
 9                MS. LESTER:  Thank you, your Honor.
10      Q.  Ms. Brown, before the break, you answered a few questions
11      about an injury that Mr. Dore sustained?
12      A.  Yes.
13      Q.  I believe you stated that he had a bandage on his hand?
14      A.  Yes, he did.
15      Q.  Could you describe the bandage?
16      A.  White.
17      Q.  It was a white bandage?
18      A.  Yes.
19      Q.  How much of his hand did it cover?
20      A.  It only left out his four fingers and his, everything else
21      up to the middle of his arm was covered.
22      Q.  So did it cover his wrist area as well?
23      A.  Yes, it did.
24      Q.  And the lower part of his forearm?
25      A.  Yes.
```

D36Wdor4                              Brown - direct

1    Q.  Besides the specific robberies that we've already discussed

2    during your testimony, were you present on other occasions when

3    robberies or attempted robberies were committed?

4    A.  Yes.

5    Q.  And who else was present besides you?

6            THE COURT:  The same people every time?  How many

7    other occasions?

8            THE WITNESS:  Most of it was surveillance, not that a

9    robbery had actually taken place, so --

10           THE COURT:  How many times?

11           THE WITNESS:  Any time I had a break from school and

12   on the weekends.

13           THE COURT:  More than five times?

14           THE WITNESS:  Yes.

15           THE COURT:  More than ten times?

16           THE WITNESS:  About.

17           THE COURT:  All right.  So if there are some things

18   that are common to all of those, then let's ask that.  But

19   otherwise, I think we need to pinpoint what we're talking

20   about.

21           MS. LESTER:  Yes, your Honor.

22   Q.  Can you tell me, Ms. Brown, besides yourself, if there was

23   anyone who was also always present on each of those occasions?

24   A.  Tall Man, Duffel, Jermaine.

25   Q.  Were you on foot?  How were you present at the locations?

D36Wdor4                          Brown - direct

1   A.  I was in my car.

2   Q.  And is that the Isuzu Trooper?

3   A.  Yes.

4   Q.  What about the other people?

5   A.  They would be in Tall Man's car, meaning Jermaine would

6   initially be in my car, and then he would get to Tall Man's

7   car, and Duffel would always be in Tall Man's car.

8              MR. MURPHY:  Objection.

9              THE COURT:  To the "would be"?

10             When you say would be --

11             THE WITNESS:  Duffel was always in Tall Man's car.

12             THE COURT:  Be careful with "would be" because there

13  can be some ambiguity as to what you're actually saying.  If

14  you're talking about something that actually happened, then use

15  the past tense to show that you're talking about what did or

16  didn't happen, or what you saw or didn't see.

17             THE WITNESS:  Okay.

18             THE COURT:  Thank you.

19  BY MR. ROTH:

20  Q.  During the period between September 2011 and January 2012,

21  what car did Tall Man use?

22  A.  For the most part, a Benz.

23  Q.  Can you describe the Benz?

24  A.  Dark blue, has the Benz symbol on the front, tinted

25  windows.

1    Q.  How many doors did it have?

2    A.  Four.

3    Q.  Was it a sedan or an SUV?

4    A.  A sedan.

5    Q.  Going back to the testimony about August 2011 and the trip

6    to Pennsylvania, do you recall that?

7    A.  Yes.

8    Q.  When Mr. Dore first asked you to drive him there, did you

9    know what was happening?

10   A.  No, not initially.

11   Q.  Did you understand what the purpose of the trip was?

12   A.  Just to check out something that Ali told him to do.

13   Q.  When did you understand that a robbery had occurred?

14   A.  When we had an argument, after I went back to New York, and

15   he came to see me.

16   Q.  From that point forward to January 2012, did Mr. Dore ask

17   you to assist him in similar ways on other occasions by driving

18   him?

19   A.  Yes.

20   Q.  And what was your knowledge about why he wanted you to

21   drive him to the locations on those occasions?

22            MR. MURPHY:  Objection.

23            THE COURT:  No.  I'm going to allow that.  You can

24   answer that.  May need to follow up, but you can answer.

25   A.  My knowledge was for him to check out a location, basically

1    to see what the area looked like, or if the target was there,

2    to see what routes they would take or how they would move or

3    operate.

4              THE COURT:  What was your basis for understanding the

5    purpose of these activities?

6              THE WITNESS:  He would tell me.

7              THE COURT:  He would tell you?

8              THE WITNESS:  Yes.

9              THE COURT:  All right.

10             MS. LESTER:  Ms. Brady, could we pull up an excerpt

11   from Government Exhibit 73B.  This is a text message on

12   December 20, 2011, text No. 432.

13   Q.  Ms. Brown, can you see that there in front of you?

14   A.  Yes.

15   Q.  In the "from" column, you have a phone number ending in

16   5031 and then beginning "Hon."  Do you see that?

17   A.  Yes.

18   Q.  Who would that text message be from?

19   A.  Jermaine.

20   Q.  And in text 433, which follows, it says "to" the same

21   number and "Hon."  Does that mean that you sent a text message

22   to him in response?

23   A.  Yes.

24   Q.  So now directing your attention to the right-hand column

25   where the text message content is, the first line in message

1   432 is, "You always do that shit, B."  And then in 433, "What

2   did I do, Jermaine?  I'm following er lead what you say."  Do

3   you have any recollection of what this text message

4   conversation is about?

5   A.  Yes.

6   Q.  What is your recollection?

7   A.  Jermaine was in pursuit of a robbery, meaning he had seen

8   the target, and I was supposed to just basically follow his

9   direction, to keep the target in sight.

10  Q.  Were you in your car at that time?

11  A.  Yes, I was.

12  Q.  Where was Mr. Dore?

13  A.  In Tall Man's car.

14  Q.  Do you know who was driving Tall Man's car?

15  A.  No.

16  Q.  Do you know whether Mr. Dore was driving?

17  A.  No.

18  Q.  The text message conversation continues.  The next one, No.

19  434, is from Mr. Dore to you.  It says, "You take too long to

20  move, B."  And then the next one, "I tell you to go to the next

21  gas ST."  Do you know or did you have an understanding of what

22  that meant, "next gas ST"?

23  A.  Yes.

24  Q.  What did that mean?

25  A.  He was saying that he told me to go to the next gas

1    station, basically, so that where he was and where my car was,

2    we would have, whether it's a left or right angle, to whenever

3    the target would move.

4            THE COURT:  What's the B?  What did you understand the

5    B to mean?

6            THE WITNESS:  B means me, as in it could -- he would

7    just always call me B.

8            THE COURT:  All right.

9            MS. LESTER:  Let's scroll down a bit to text message

10   444.

11           THE COURT:  444, you said?

12           MS. LESTER:  Yes.  This is another message in the same

13   conversation.

14   Q.  So directing your attention to the "to" column, this is

15   from you to Mr. Dore, is that correct?

16   A.  Yes.

17   Q.  That was 444?

18   A.  Yes.

19   Q.  And you say, "If they didn't see, why did they take the

20   lead, huh?"

21   A.  Yes.

22   Q.  What are you communicating there?

23   A.  That basically, he was blaming me for losing the target and

24   I was saying that if Tall Man, which was my understanding of

25   who was driving the vehicle, if Tall Man didn't see the person

1   pull out --

2          MR. MURPHY:  Objection.

3          THE COURT:  Overruled.

4   A.  If Tall Man didn't see the person pull out, then why did he

5   go in front of me.

6   Q.  And the next message is No. 228.  That's another message

7   that you sent to Mr. Dore, correct, to the 5031 number?

8   A.  Yes.

9   Q.  And that message is, "Like, I honestly don't know what you

10  want from me.  Like, I tried to BR supportive and assist the

11  best way I can, but I am not cut out for this.  I'm not."  And

12  then it continues into the next message:  "Like, I'm not you or

13  Tallest or Duf.  I'm me, and all I tried to do is assist you in

14  the best way possible."

15      What were you saying in this message?

16  A.  Basically, he was upset at me for losing the person, and I

17  was just saying to him like, you know, I'm not cut out for

18  these kind of things, like I'm not cut out for following

19  targets and making sure that I'm seeing where they're turning

20  and going like, this is not something that I'm used to.  I'm

21  not like you, like you can't be so harsh on me for something

22  that I'm not used to doing.

23  Q.  Let's take a look at message No. 233, a little further

24  down.  Can you see the contents of that message, Ms. Brown?  It

25  begins "have really ever thought."

1    A.  Yes.

2    Q.  So this is another message from you to Mr. Dore.  It says,

3    "Have really ever thought about the risk that I'm taking.

4    Like, I had to clean up your mess twice already.  Like, I love

5    you so much, but do you ever really think what would happen to

6    me if I got caught up in this?  Like, I didn't want to even say

7    this, but everybody else's wife and females are at home and

8    they are out there.  That's really not my place.  It's not for

9    me.  Like, I love you and I would want to be around to make you

10   feel more at ease, but if you love me like you say you do, you

11   would never want me to get caught up and you would keep me away

12   from it as much as you can."

13       Do you remember this part of the conversation?

14   A.  Yes.

15   Q.  What were you expressing to Mr. Dore in this conversation?

16   A.  That basically if he said he loved me as much as he did,

17   that he wouldn't want me to be in the streets doing the same

18   thing he did, to mess my life up.

19   Q.  Let's look at message No. 234, a little bit further down.

20   It begins, "Like it's crazy."  Do you see that, Ms. Brown?

21   A.  Mm-hmm, yes.  Sorry.

22   Q.  And this is another message from you to Mr. Dore.  It says,

23   "Like it's crazy.  I love you so much that I would put my life

24   at risk and possibly get arrested, lose everything, and instead

25   of seeing it that way, all you see is this chick don't want to

1    stay home so I'll have her come and drive so I can feel safe."

2         Do you recall this part of the conversation?

3    A.  Yes.

4    Q.  What did you mean when you said "So I can feel safe"?

5    A.  Meaning that he would feel safe if I drove him.

6    Q.  In your mind, why would he feel safer if you drove him?

7    A.  One, because he didn't have a license, and I was a female,

8    and it's not the norm for officers to pull over a guy and a

9    girl just in their car driving.

10   Q.  Is it fair to say that in this series of text messages that

11   we just looked at you and Mr. Dore were arguing?

12   A.  Yes.

13   Q.  During the course of your relationship, did you argue

14   often?

15   A.  Yes, we did.

16   Q.  What sort of things did you argue about?

17   A.  About me not working or me staying home too much.  Me not

18   having money.  Me constantly questioning him.  If I ever went

19   somewhere with him and messed up, that would also cause an

20   argument.  Just the simplest things at times.

21   Q.  Were you working at all during the period of time between

22   September 2011 and January 2012?

23   A.  Yes, I was.

24   Q.  Where were you working?

25   A.  On my school campus.

1    Q.  And what hours were you working during that time?

2    A.  Three to 11.

3    Q.  And do you recall approximately how much money you were

4    making?

5    A.  Every week, between 250 to 300.

6    Q.  A week, is that right?

7    A.  Yes.

8    Q.  What about on school break; did you work during that time?

9    A.  No.

10   Q.  Did you contribute money to household expenses?

11   A.  Yes, I did.

12   Q.  How did you and Mr. Dore pay for the rent on your

13   apartment?

14   A.  We would go half and half.

15   Q.  And so how much was that per month that you had to

16   contribute?

17   A.  The rent, in total, was 175.  Then we got an increase

18   because the landlord found out Jermaine was living there

19   permanently, to 210, so anywhere between 180 to a hundred,

20   depending on what the rent was at that time.

21   Q.  And you said some of the arguments were about the fact that

22   you weren't working at certain periods?

23   A.  Yes.

24   Q.  What was the source of that argument?

25   A.  Just basically that I was on break and I was not bringing

1   in any form of income, and I would just stay home and lay in

2   bed every single day when I was on my break.

3   Q.  What income did Mr. Dore have during the same period,

4   September 2011 to January 2012?

5   A.  Proceeds that he would get from robberies.  Or money that,

6   and money that he would get from Ali.

7   Q.  What about the money he would get from Ali; do you know

8   what that was for?

9   A.  Just basically asking for it.

10  Q.  Who asking for it?

11  A.  Jermaine would just ask him for money if he needed it.

12  Q.  Do you know whether it was a loan?

13  A.  He didn't tell me that.

14  Q.  Do you know during this period whether Mr. Dore ever had

15  any other sort of job, other than committing the robberies that

16  you've described?

17  A.  No.

18  Q.  Did he ever have any legitimate job during the time that

19  you were with him?

20  A.  No.

21  Q.  Any other source of income besides the robberies and

22  getting money from Ali, that you knew of?

23  A.  No.

24  Q.  Now, in part of the text messages that we've looked at,

25  there seemed to be a concern on your part about possibly

1   getting caught.  Is that fair to say?

2   A.  Yes.

3   Q.  You mentioned getting arrested.  Do you recall that?

4   A.  Yes.

5   Q.  Did you ever talk about that with Mr. Dore?

6   A.  Yes, I did.

7   Q.  What did you say to him and what did he say to you?

8   A.  Basically, I would just say to him, like, I don't want to

9   do this with you.  I don't want to have to come on these kind

10  of moves with you, but it's like I felt obligated because I

11  didn't have an income and he would just basically, he'd play it

12  off and say, If you don't want to come, you don't have to.  But

13  at the same time, he would make me feel guilty for not having

14  an income and not supporting him.

15  Q.  Were you fearful of being arrested?

16  A.  Yes, I was.

17  Q.  What about Mr. Dore; did he ever express any concern to you

18  about getting caught?

19  A.  In the later stages, yes.

20  Q.  What do you mean the later stages?  What are you referring

21  to?

22  A.  Around December, he kind of kept saying, you know, he

23  doesn't want to do this for the rest of his life, while he has

24  a daughter, and he doesn't want to have to keep living his life

25  in this way, and he wants to make a change and just do

1    something else.

2    Q.  Do you know whether he took any steps at various times

3    during this same period -- again, September 2011 to January

4    2012 -- to avoid getting caught by the police?

5    A.  Yes.

6    Q.  What steps?

7    A.  He would wear masks and gloves.  He would have an app on

8    his phone, which is like a police scanner, so he would be in

9    the house, listening to it before he goes outside.  And when he

10   comes in, he would be listening to it.  He also went back to

11   retrace his steps a couple of times.

12   Q.  Did you ever threaten to call the police on him?

13   A.  Yes.

14           MS. LESTER:  Ms. Brady, if we could take a look at

15   text message No. 524.

16   Q.  Now, Ms. Brown, directing your attention to this second

17   message -- actually, it's No. 525.  It begins, "Then you want

18   talk about a call cops and not having in that be it a no-no."

19           Do you see that message?

20   A.  Yes.

21   Q.  And that's from Mr. Dore to you, correct?

22   A.  Yes.

23   Q.  Do you recall this conversation?

24   A.  Yes, I do.

25   Q.  What were you discussing with Mr. Dore?

1    A.  Basically, he had hit me and I told him that I was going to

2    call the cops and tell them.

3    Q.  And looking down a little bit further in the conversation,

4    the line that begins, "Just so you know, if you call them, I

5    will tell them you was my driver.  Word."  And the next one:

6    "And go tell everyone now."  And the next text:  "Tell them

7    everything."  And the next text:  "Good.  And tell them just

8    know if they come to my, I will tell them about PA and the

9    other, B."

10        Do you see those messages?

11   A.  Yes.

12   Q.  What was your understanding of what Mr. Dore was telling

13   you in these messages?

14   A.  That if I went to the cops and told them that he had hit me

15   and they came to him that he was going to tell them that I

16   drove him to Pennsylvania to commit a robbery.

17   Q.  During this same period of time, Ms. Brown, between

18   September 2011 and January 2012, did you ever learn about a

19   robbery that involved Mr. Dore and Biggs?

20   A.  Yes.

21   Q.  Tell us about that.

22        THE COURT:  How did you know about this?

23   BY MS. LESTER:

24   Q.  How did you know about this?

25   A.  Basically, he came home one night and he was there for a

1   little bit, and he kept complaining that Biggs had messed up

2   and dropped his cell phone when they went to do a robbery.

3            THE COURT:  When was this?

4            THE WITNESS:  Between October, November.

5            THE COURT:  Okay.  Next question.

6   BY MS. LESTER:

7   Q.  Did Mr. Dore seem concerned about the fact that the phone

8   had been dropped?

9   A.  Yes, he was.

10  Q.  Did he take any steps as a consequence?

11  A.  Yes.

12  Q.  What did he do?

13  A.  He told me he was going back to the area to see if they

14  could recover the phone.

15  Q.  Do you know whether they recovered the phone?

16  A.  He told me that they didn't.

17  Q.  During this same period of time, between September 2011 and

18  January 2012, did Mr. Dore ever tell you about a time when he

19  was stopped by the police?

20  A.  Yes, he did.

21           MS. STAFFORD:  Leading, your Honor.

22           THE COURT:  I'll allow it as a transitional question.

23  Overruled.

24  A.  Yes, he did.

25  Q.  And did he tell you whether anyone else --

D36Wdor4                          Brown - direct

1              THE COURT:  What did he tell you?

2              THE WITNESS:  Basically, I was at school, and he

3    called me when he was in the house.  And, of course, it was

4    strange that he was inside because he's never inside throughout

5    the day, and I'm like, What's going on.  And he said he was

6    inside now because he was with Tall Man and the cops pulled him

7    over.

8              THE COURT:  When was this?

9              THE WITNESS:  Between October and November.

10             THE COURT:  All right.  Next question.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. LESTER:

2    Q.  Did he tell you anything else about the incident?

3    A.  Not at that time.  No.

4    Q.  Did he tell you anything at any time?

5    A.  Basically when I went home I kind of asked him what

6    happened and he kind of said he didn't like understand, but he

7    figured the person that he was following called the cops.

8    Q.  Now, I would like to direct your attention to December

9    2011.  Are you aware of a robbery that took place in that

10   month?

11   A.  Yes.

12          MR. MURPHY:  Objection.

13          THE COURT:  Well, that's a yes or no.  It is not an

14   impermissible question.  Overruled.

15          How did you know?  How did you learn about this?

16   A.  Well, basically I was at school, again it was throughout my

17   finals, and he called and he sounded -- well, he was upset and

18   he kept complaining like people don't know how to do their job,

19   they're always messing up.  And I'm like, what are you talking

20   about?  And he said, Don't worry about it.  I'll talk to you

21   when you get home.

22   Q.  After that conversation did you communicate with him by

23   text message?

24   A.  Yes.  I did.

25   Q.  Ms. Brady, if we could please pull up text message no. 65?

1          Ms. Brown, this text message is to the number ending

2     in 5031 and it is on December 12, 2011.  Is that around the

3     time of the conversation that you just related, the phone

4     conversation?

5     A.  Yes.

6     Q.  And this is a message to Mr. Dore from you, correct?

7     A.  Yes.

8     Q.  Now, let's look at the body of the text message.  It says:

9     I was only asking about it now so that way when you went to

10    sleep you don't have to bring it up or talk about it again when

11    you sleep it off.

12         And the next message says:  Like I always say, be

13    careful, because I don't want to lose you to this mess and as

14    much ad you act tough, you really are troubled when things like

15    this happen.

16         Do you remember that text message conversation?

17    A.  Yes.

18    Q.  What were you trying to communicate to Mr. Dore with these

19    messages?

20    A.  Basically, based on how he sounded i was, for one, trying

21    to get him to talk about it now because I didn't want to

22    prolong the conversation because he doesn't like to do that, it

23    is kind of like once it is talked about and done it is done,

24    and of course I didn't like wake him up to talk about it

25    either.  And then the next part is just based on how he

1   sounded.  Again, I was telling him it was obvious that

2   something went wrong and I was telling him, like, I don't want

3   to lose you to this stuff that you keep doing like which, in

4   truth, he does act tough but he is troubled when things don't

5   go the way he has them planned.

6   Q.  And we were saying:  I don't want to lose you to this mess.

7   What were you referring to?

8   A.  His jobs, his moves, the robberies that he would commit.

9   Q.  Now, the next message is from Mr. Dore to you, it is a few

10  minutes later right below that one, it says:  Am cool.  On it

11  now again.

12          Do you see that message?

13  A.  Yes.

14  Q.  And then the following message says:  We move now an a food

15  for 60 G now.

16          Do you see that message?

17  A.  Yes.

18  Q.  What is your understanding of what those -- what Mr. Dore

19  was saying to you in those messages?

20  A.  Basically he just blew off what was bothering him at that

21  point and he was on it again meaning a job and that this job

22  was going to -- the amount of this job was $60,000.

23  Q.  Now, later on in this same text conversation on the 12th he

24  says to you at message no. 130:  I have the blue too now.  Do

25  you see that message?  Do you recall that?

1    A.   Yes.

2    Q.   What was he talking about?

3    A.   He was talking about a blue tooth that he had and when I

4    was talking to him in the initial conversation he was stressed

5    out about it, he couldn't find it, he didn't know where it was.

6    Q.   And do you recall whether he found it?

7    A.   Yes.

8    Q.   Do you recall where he found it?

9    A.   He told me he found it in Tallman's car.

10   Q.   Now, if we can scroll down to No. 144, Ms. Brady?

11            This is a continuation, again, of the conversation on

12   12/12, this is a message from Mr. Dore to you, it says:  Yeah,

13   I did a job and get money, yeah, at less ten G.

14            And you respond:  Oh wow.  Nice babe.  I'm happy for

15   ya.

16            Do you see that?

17   A.   Yes.

18   Q.   What was your understanding of what he was telling you in

19   that text message?

20   A.   That he committed the robbery and the result was at least

21   $10,000.

22   Q.   Now, when you were discussing the phone conversation that

23   you had earlier this day, December 12th, you said that you

24   agreed to talk later?

25   A.   Yes.

D365dor5                        Brown - direct

1   Q.  Did you actually speak later on that day?

2   A.  Yes.

3   Q.  What was the conversation that you had?

4   A.  I got off work and went home, basically tried to ask him,

5   again, why he sounded the way he did.  He kept going between

6   like watching the news and talking on his phone.  And then,

7   when he finally paid me some attention I kind of asked him,

8   like, again, like what happened?  What happened?  And I asked

9   him if what you did had resulted in a duppy.

10  Q.  Let's back up for a moment.  You said when you went home he

11  was watching the news?

12  A.  Yes.

13  Q.  Did you also see the news?

14  A.  Yes.

15  Q.  Do you remember what was on the news?

16  A.  It just said a robbery had been done and someone had been

17  shot and killed.

18  Q.  What was Mr. Dore doing, if anything, while he was watching

19  the news program?

20  A.  Just talking on his phone.

21  Q.  Could you hear anything he was saying on the phone?

22  A.  Just that he said it's on the news.

23  Q.  Do you know who he was talking to?

24  A.  No.

25  Q.  Now, you said you talked to him about it and you asked him

1   whether it had resulted in a duppy?  Is that what you said?

2   A.  Yes.

3   Q.  What does the term "duppy" mean?

4   A.  Based on a conversation that we had before, it meant either

5   someone was shot or someone was shot and killed.

6   Q.  And when you say based on a conversation you had before, do

7   you mean a conversation with Mr. Dore?

8   A.  Yes.

9   Q.  Did he say anything more about the duppy?

10  A.  Just that when I asked him if it had resulted in one he

11  said yes.

12  Q.  Did Mr. Dore tell you any more details about what had

13  happened that had caused the duppy?

14  A.  Yes.  He just said that they messed up and he didn't do

15  what he was supposed to do and it caused him to do that.

16  Q.  Now, in your mind did you draw any connection between the

17  news incident and what Mr. Dore was telling you?

18  A.  Yes.

19  Q.  What conclusion did you draw?

20          THE COURT:  Sustained.

21  Q.  Now, Ms. Brown, we talked a moment ago about whether

22  Mr. Dore was concerned about getting caught.  Do you remember

23  that?

24  A.  Yes.

25  Q.  And you said that later on he was concerned?

1    A.   Yes.

2    Q.   What period of time do you recall him expressing concern?

3    A.   Maybe a day or two later.

4    Q.   Let's take a look at text message 478.  This is on December

5    24th and it is a series of four messages that you are sending

6    to Mr. Dore and then one message back from him.  The first

7    message, no. 478 is you saying:  Listen, how often it is that

8    PPL --

9             Can you tell me what PPL stands for?

10   A.   People.

11   Q.   -- people know that I go with you when you do what you do,

12   I need to stop this.  Is just one more thing for my mother to

13   find out about.

14            Do you see that message?

15   A.   Yes.

16   Q.   And then two messages later you say:  Like word is out

17   there that you rob people and you use my car to do it and I go

18   with you.  I don't need that being said out there about me.  I

19   really can't.

20            What were you expressing to Mr. Dore in this text

21   conversation?

22   A.   I had gone to a hair store to buy products and the person

23   that worked in there that helps you find everything in the

24   store, I knew her previously before I had met Jermaine and she

25   explained to me that she heard that I was going to commit

1    robberies with Jermaine and that he was using my car to do it.

2    Q.  And so why did you ask Mr. Dore about it?

3    A.  Because I just felt like for her to say that to me it means

4    he's stating it to someone and I just did not want that

5    information out there about me.

6    Q.  Why?

7    A.  For one, my mother would possibly kill me; and two, I could

8    just get caught.

9    Q.  Do you know whether Mr. Dore had a gun during the period

10   from September 2011 through January 2012?

11   A.  Yes.

12   Q.  How do you know that?

13   A.  I seen him with it.

14   Q.  How many times have you seen him with a gun?

15   A.  Maybe two or three times.

16   Q.  Was it always the same gun?

17   A.  Yes.

18   Q.  Can you describe it?

19   A.  It has two types of material so it's brownish, which would

20   be like wooden, and then it's like grayish, silverish.

21   Q.  Do you know whether it had a barrel?

22   A.  It didn't.

23   Q.  Do you know whether it had a clip?

24   A.  It did.

25   Q.  Did you ever handle the gun?

1    A.   Yes.

2    Q.   When?

3    A.   When he would ask me to bring it to him.

4    Q.   How many times did you handle it during this same period?

5    A.   Maybe three or four times.

6    Q.   Where was the gun kept, if you know?

7    A.   In a drawer for Jermaine.

8    Q.   Sorry.  Where was the drawer?

9    A.   In the house.  In our apartment.

10   Q.   Did you ever see whether the gun was loaded?

11   A.   Yes.

12   Q.   When was that?

13   A.   When I would see him pull it apart, basically, to clean it.

14   Q.   To your knowledge, did Mr. Dore have any other ammunition

15   besides that ammunition that you saw when you saw him taking

16   apart the gun?

17   A.   Yes.

18   Q.   What other ammunition did you see?

19   A.   Once over the summer he brought a box, like a package

20   almost, filled with bullets, and he put it in a carry-on

21   suitcase and asked me to store it in my house.

22   Q.   And did you?

23   A.   Yes, I did.

24   Q.   For how long did you store it?

25   A.   Maybe a month, month and a half, two months.

1  Q.  Did you ever see the ammunition that was inside the

2  suitcase?

3  A.  Yes.

4  Q.  What did it look like?

5  A.  There were just huge bullets.

6  Q.  Was it different or the same as the ammunition that you had

7  seen with the gun?

8  A.  No.  They were different.  They were bigger.

9  Q.  Do you know whether Mr. Dore had any other weapons besides

10  the gun?

11  A.  Knives.  A baseball bat.

12  Q.  What kind of knives?

13  A.  Like, a graffiti knife.

14  Q.  Can you describe how the knife operated?

15  A.  It has a wooden section and basically you have to -- you

16  can flick it out.

17  Q.  Did he have more than one of those knives?

18  A.  Yes.

19  Q.  And you said a baseball bat as well?

20  A.  Yes.

21  Q.  What kind of baseball bat?

22  A.  A regular baseball bat.

23  Q.  Where would he store these items?

24  A.  Sometimes the knife would be in the house.  When I had the

25  truck it would be in the back of the truck.  At one point he

1   took it out.  And when we had the rental he would have it
2   stored in the rental as well.
3   Q.  Is that the knife or the bat that you're referring to?
4   A.  The bat.
5           THE COURT:  Can you describe the bat?  You said a
6   regular bat.  I don't know what that means.  What was it made
7   of?
8           THE WITNESS:  It was metallic, black.  I didn't like
9   take much detail of it.  I know it was like a regular baseball
10  bat that if you're a fan or that's a hobby for you then that is
11  what you would use.  It is not like a kid's size baseball bat.
12  I don't know how else you want me to describe it.
13          THE COURT:  Metal, not wood?
14          THE WITNESS:  No.  Right.
15          THE COURT:  All right.  Next question.
16  BY MS. LESTER:
17  Q.  Were you ever present when Mr. Dore had one of these items,
18  either the gun, a knife, or a bat with him?
19  A.  In relation to?
20  Q.  For example, when you -- you were in the car with --
21          MR. MURPHY:  Objection.
22          THE COURT:  Yes.  Just, I think -- she didn't finish
23  the question so it is hard to know whether it was objectionable
24  because it didn't come out, but I think there is a better way
25  to phrase it.  So, rephrase.

D365dor5                          Brown - direct

1    BY MS. LESTER:

2    Q.  Ms. Brown, when you were in the car with Mr. Dore

3    conducting surveillance as you have described --

4    A.  Yes.

5    Q.  -- was there ever an occasion when he had a baseball bat

6    with him?

7    A.  Yes.

8    Q.  What about a knife?

9    A.  Yes.

10   Q.  What about a gun?

11   A.  Maybe once.

12   Q.  And the other two items on more than one occasion when you

13   were with him?

14   A.  Yes.

15   Q.  And that's during that same period we have been talking

16   about, September 2011 through January 2012?

17   A.  Yes.

18   Q.  Now, at the beginning of your testimony we discussed a

19   search that took place of your apartment when Mr. Dore was

20   arrested.  Do you remember that?

21   A.  Yes.

22   Q.  Were there any weapons recovered during that search?

23   A.  No.

24   Q.  Do you know where the gun was at that time?

25   A.  It was disposed of previously.

1    Q.  How do you know that?

2    A.  Because at one point Jermaine had gotten arrested and it

3    was of concern for myself, Tallman and Duffel that this gun was

4    in the apartment and they just didn't want to -- they just --

5    we didn't want to have it lingering around.

6    Q.  Let's stop a moment --

7              MR. MURPHY:  Objection.

8    A.  Sure.

9              THE COURT:  We didn't want it lingering around?  Is

10   that what you said?

11             THE WITNESS:  Yes.

12             THE COURT:  You can only speak for yourself or what

13   someone else told you.

14             THE WITNESS:  Okay.

15             THE COURT:  So you can rephrase the question if you

16   want.  Sustained.

17   BY MS. LESTER:

18   Q.  Ms. Brown, you mentioned that Mr. Dore had gotten arrested?

19   A.  Yes.

20   Q.  Do you recall approximately when this was?

21   A.  Sometime between December/January.

22   Q.  And were you present when he was arrested?

23   A.  Yes, I was.

24   Q.  What can you tell us about this circle -- what did you

25   observe about the circumstances of the arrest?

D365dor5                          Brown - direct

1    A.  Basically we were in a motel parking lot and we were

2    bringing food to Tallman, and as soon as we pulled in, a couple

3    minutes after the police pulled in behind us.

4    Q.  What happened next?

5    A.  They basically came up to the car, told us to get out; they

6    placed us both in handcuffs and had us sit in their car after

7    which they went back to my vehicle and searched it which

8    resulted in them telling me that I should go home, that

9    Jermaine was not going to be going home with me, and they took

10   him to the precinct.

11   Q.  Was anything found in your car that you know of?

12   A.  No.

13   Q.  Were you charged with anything in connection with that?

14   A.  No.

15   Q.  Were you allowed to drive your own car home?

16   A.  Yes, I was.

17   Q.  Now, you said you thought this happened sometime in

18   December or January time period, is that right?

19   A.  Yes.  That's correct.

20   Q.  Was this before or after December 12th when you had that

21   conversation with Mr. Dore about the duppy?

22   A.  After.

23   Q.  You said that you were near a hotel parking lot when the

24   arrest took place?

25   A.  We were in a motel parking lot, yes.

D365dor5                      Brown - direct

 1   Q.   What were you doing there?

 2   A.   Initially we went there because Tallman called Jermaine and

 3   said he wanted to clean the beds down and Jermaine was like,

 4   okay.  No problem.  I'm going to come to you.  And I drove

 5   Jermaine to the motel.

 6            MR. MURPHY:  Objection.  Move to strike, your Honor.

 7            THE COURT:  What were you doing there?  Overruled.

 8   Overruled.

 9   Q.   What did you do once you drove Mr. Dore to the hotel?

10   A.   Basically I parked.  Jermaine got out, met up with Tallman

11   and they just started to wipe the beds down.

12   Q.   Could you see them doing that?

13   A.   Yes.

14   Q.   What were they doing?

15   A.   They just had gloves on with rags and cloth and a spray

16   bottle just wiping handles inside and outside.

17   Q.   When you say they had gloves on, could you see what type of

18   gloves they had?

19   A.   Disposable latex gloves.

20   Q.   Like cleaning gloves exceptionally?

21   A.   Yes.

22   Q.   And I believe you said they had a separate bottle?

23   A.   Yes.

24   Q.   Do you know what was in the spray bottle?

25   A.   No.

1  Q.  What were they doing with it?

2  A.  They were just spraying everywhere on the car, the outside,

3  the inside, the door handles, the dashboard, from what I could

4  see sitting in my car.

5          THE COURT:  Wait, wait.  What were they wiping down?

6          THE WITNESS:  The car handle.

7          THE COURT:  Okay.  I think before it says wiping the

8  "beds" down.

9          THE WITNESS:  The Benz down.

10          THE COURT:  The car.  So not beds in a motel room, the

11  Benz.

12          THE WITNESS:  No.

13          THE COURT:  Well, that may not have been clear to all

14  the jurors so it wasn't clear to me.

15          THE WITNESS:  Okay.

16          THE COURT:  So are you talking about a car, not a

17  motel room?

18          THE WITNESS:  Right.  That's correct.

19  BY MS. LESTER:

20  Q.  And when you say the Benz, what Benz are you referring to?

21  A.  The Benz that Tallman owned.

22  Q.  And that's the dark blue car that we have already talked

23  about?

24  A.  Yes.

25  Q.  After Mr. Dore was arrested, what did you do?

1   A.  I basically left, I called Tallman, told him what had

2   happened, and he said that he was going to come and see me.

3   Q.  What happened next?

4   A.  He came later that evening with Duffel and they basically

5   got out of the car and started to talk to me about the arrest

6   and how bizarre it seemed that they weren't -- he wasn't doing

7   anything and that he had gotten arrested.

8   Q.  And was anyone else present during this conversation?

9   A.  Myself, Tallman and Duffel.

10  Q.  How did they come to your house?

11  A.  Tallman drove.

12  Q.  In what vehicle?

13  A.  Another vehicle.

14  Q.  Was anyone else present in the car?

15  A.  He -- Tallman had with him his girlfriend Felicia and his

16  son.

17  Q.  Could they hear the conversation?

18  A.  No.

19  Q.  And when you say another vehicle, do you mean just another

20  vehicle, not the Mercedes Benz?

21  A.  Yes.

22  Q.  So they came to your apartment and you had this

23  conversation.  What happened next?

24  A.  They told me that they were going to come back after

25  Tallman took his family home --

 1          THE COURT:  Who told you that?

 2          THE WITNESS:  Tallman.  Sorry.

 3          Tallman told me that he would come back after he took

 4   Felicia and his son home and we would do away with the gun at

 5   that point.

 6   Q.  What happened next?

 7   A.  He came back a couple of hours later.  At that point I

 8   brought the gun downstairs to him and Duffel.  Me, Tallman and

 9   Duffel -- and then Tallman told me that I could just follow

10   them.

11   Q.  When he brought the gun down from the apartment, was it

12   packaged in any way?

13   A.  It was just wrapped in, like, a shirt and then it was in

14   like a regular -- a regular black grocery bag.

15   Q.  Did you wrap it up?

16   A.  It was already wrapped.

17   Q.  Was it already in the bag?

18   A.  Yes.

19   Q.  And what did you do with it when you brought it downstairs?

20   A.  I went on the passenger side which is where Duffel was and

21   I gave it to him, him meaning Duffel.

22   Q.  What did you do next?

23   A.  Tallman told me that I could follow them or -- in my car

24   and then I got in my vehicle and followed them.

25   Q.  Why did you decide to follow them?

```
 1   A.  For one I wanted to make sure that they did what they said

 2   they would and I just didn't want, when Jermaine got back and

 3   he asked me what happened, I kind of just gave him an overview,

 4   oh, they took it and I didn't know what happened to it.  So, I

 5   kind of went for security purposes of making sure that whatever

 6   they said they did and not that they were going to hide it

 7   somewhere and then it was going to show up weeks or months

 8   later.

 9   Q.  Now, you said "when Mr. Dore got back," so he was still in

10   the custody of the police at this time?

11   A.  Yes.

12   Q.  Now, what happened after you got in your car?

13   A.  Tallman drove off, I drove off behind him, and we headed to

14   the West Side Highway.

15   Q.  Where did you go?

16   A.  We got on the highway and kept going, and maybe after 20,

17   30 minutes he pulled over into an emergency stop where Duffel

18   got out and threw the gun into the river.

19   Q.  How do you know he threw the gun in the river?

20   A.  Because it was this same package that I had given to him.

21   It was the same bag that I gave to him.  It was exactly what I

22   saw him throwing in the river.

23            MS. LESTER:  May I have a moment, your Honor?

24            THE COURT:  Yes.

25            (Pause)
```

1                  MS. LESTER:  No further questions.

2                  THE COURT:  Cross-examination?

3                  MS. FONTIER:  Yes, your Honor.  One moment?

4                  THE COURT:  Yes.

5                  (Pause)

6                  MS. STAFFORD:  I'm sorry, your Honor.  Just one

7      moment.

8                  THE COURT:  That's fine.

9                  (Pause)

10     CROSS EXAMINATION

11     BY MS. STAFFORD:

12     Q.  Good afternoon, Ms. Brown.

13     A.  Good afternoon.

14     Q.  As you know, I represent Jermaine Dore, along with Alice

15     Fontier?

16     A.  Yes.

17     Q.  And this is not the first time we have spoken, is it?

18     A.  No.

19     Q.  In fact, you called me not too long ago, about a week ago?

20     A.  Two weeks, yes.

21     Q.  Two weeks.

22                  And you were very upset, weren't you?

23     A.  Yes, I was.

24     Q.  And you were very upset because the FBI and the ATF had

25     come to you with subpoenas.  Isn't that true?

D365dor5                          Brown - cross

1   A.  Yes.

2   Q.  And you said that you felt threatened?

3   A.  I was nervous, anxious.  Not --

4   Q.  You could barely speak on the phone.  Isn't that true?

5   A.  I was extremely upset, yes.

6   Q.  Didn't you tell me you didn't know why this was happening

7   to you?

8   A.  Yes.

9   Q.  Do you remember telling me that you never did anything

10  wrong?

11  A.  No.

12  Q.  Do you remember telling me that you didn't know what to do?

13  A.  Yes.

14  Q.  And that you were never involved in any criminal

15  activities?

16  A.  No.

17  Q.  And did you remember telling me that you didn't want to go

18  in the car with the FBI?

19  A.  Yes.

20  Q.  But that's not the first time you felt threatened by them,

21  was it?

22  A.  I'm sorry?

23  Q.  That's not the first time you felt threatened by them, was

24  it?

25          MS. LESTER:  Objection, your Honor.

D365dor5                          Brown - cross

1         THE COURT:  I'm not sure who the "them" is.

2         MS. STAFFORD:  I'm sorry, what?

3         THE COURT:  I don't understand who the "them" is.

4   BY MS. STAFFORD:

5   Q.  That's not the first time you felt threatened by the ATF or

6   the FBI, is it?

7         MS. LESTER:  Objection.

8         THE COURT:  Overruled.

9   A.  No.

10  Q.  No, it wasn't?

11  A.  No.

12  Q.  It was not the first time?

13  A.  No.

14  Q.  In fact, it is not the first time you are testifying in

15  this court today, is it?

16  A.  That's correct.

17        THE COURT:  Well, it is the first time she's

18  testifying today.  Today is not the first time she's

19  testifying.

20        MS. STAFFORD:  I'm sorry.  That was phrased badly.

21  Q.  You have testified before previously regarding this case,

22  have you?

23  A.  Yes, I have.

24  Q.  And you testified at a previous hearing on May 29, 2012,

25  isn't that true?

D365dor5                          Brown - cross

1   A.  That is correct.

2   Q.  And, like today, you raised your hand and you took an oath,

3   right?

4   A.  Yes, I did.

5   Q.  And you swore to tell the truth?

6   A.  Yes, I did.

7   Q.  And did you tell the truth?

8   A.  Not in its entirety at that hearing, no.

9   Q.  You didn't.

10        What didn't you tell the truth about?

11  A.  As I said, initially how long I knew Jermaine, how often he

12  was at the apartment, if I knew the other co-defendants, and if

13  I had rented cars for him.

14  Q.  And you lied about all of that?

15  A.  I shaded what was the truth, yes.

16  Q.  You shaded the truth.

17  A.  Yes.

18  Q.  You didn't perjure yourself, you shaded the truth?  You

19  call that shading the truth?

20        You realize you are under an oath to tell the truth,

21  right?

22  A.  Yes, I do.

23  Q.  And, in addition to speaking to me on the phone you also

24  spoke numerous times with my co-counsel Ms. Fontier?

25  A.  Prior, yes.

D365dor5                         Brown - cross

1   Q.  And during those many conversations you asked her for the

2   entirety of the discovery in this case, isn't that true?

3   A.  That is correct.

4   Q.  And did you receive all the discovery in this case?

5   A.  I don't know if I received everything.  I received what

6   Ms. Fontier gave me.

7   Q.  You looked at police reports?

8   A.  Yes.

9   Q.  You looked at cell phone records?

10  A.  Yes.

11  Q.  You looked at DNA reports?

12  A.  Yes.

13  Q.  You looked at incident reports?

14  A.  In terms of a few incidents, yes.

15  Q.  And you also looked at the motions in this case, didn't

16  you?

17  A.  Yes, I did.

18  Q.  And you monitored the case very closely, isn't that true?

19  A.  Yes, I did.

20  Q.  And that's because you wanted to know what was going on?

21  A.  Yes.

22  Q.  And you wanted to know what was going on because you wanted

23  to help Jermaine?

24  A.  That's correct.

25  Q.  And after reviewing the discovery which included, like I

D365dor5                        Brown – cross

1    said the call records, the police reports -- did you look at

2    police reports?

3    A.  Yes, I did.

4    Q.  Did you look at call records?

5    A.  Yes, I did.

6    Q.  Did you look at cell site location records?

7    A.  Not to my knowledge, no.

8    Q.  Did you receive all the discovery in this case?

9    A.  You just testified you received all the discovery in this

10   case.

11          THE COURT:  She said she received what Ms. Fontier

12   gave her.

13   Q.  Did you receive a DVD of the entire discovery in this case?

14          MS. LESTER:  Objection.

15          THE COURT:  Sustained.

16   Q.  Do you recall receiving a DVD from Ms. Fontier?

17   A.  I'm sorry?

18   Q.  Do you recall receiving a DVD of discovery from

19   Ms. Fontier?

20   A.  Yes.

21   Q.  And that contained, in the discovery, phone records?

22   A.  Yes.

23   Q.  Police reports?

24   A.  Yes.

25   Q.  And along with those phone records were cell site records.

1            THE COURT:  Is that a question?

2    Q.  Is that what you recall?

3    A.  I don't recall the cell site records.

4    Q.  Okay.

5            After reviewing the discovery that you did receive

6    from Ms. Fontier, you had several discussions with her

7    concerning the case, correct?

8    A.  Yes.

9    Q.  And you went to her office?

10   A.  Yes.

11   Q.  On several occasions and you spoke to her about December

12   12th, 2011; isn't that correct?

13   A.  Yes.

14   Q.  And you told her that on December 12, 2011 that you were

15   shopping in Co-op City in the Bronx.  Isn't that true?

16   A.  That's correct.

17   Q.  And you provided her with bank records, isn't that correct?

18   A.  That's correct.

19   Q.  And you provided her with bank records that showed that you

20   had made several withdrawals and deposits in Co-op City at

21   11:59 on December 12, 2011.  Isn't that true?

22   A.  That's correct.

23   Q.  And the reason why you told Ms. Fontier about this is

24   because you told her that Jermaine Dore was with you at the

25   time, right?

D365dor5                      Brown - cross

1   A.  Yes.

2   Q.  So, it is your testimony that Mr. Dore was with you on

3   December 12, 2011 at 11:59?

4            MS. LESTER:  Your Honor, could we have a clarification

5   as to whether that's a.m. or p.m.?

6            MS. STAFFORD:  Sure.

7            THE COURT:  Okay.

8   BY MS. STAFFORD:

9   Q.  You said you provided records to Ms. Fontier?

10  A.  Yes, I did.

11           MS. STAFFORD:  Your Honor, may I have just one moment,

12  please?

13           THE COURT:  Yes.

14           (Pause)

15           MS. STAFFORD:  May I approach the witness, your Honor?

16           THE COURT:  Yes.

17           MS. STAFFORD:  Your Honor, I'm approaching the witness

18  with Defendant's Exhibit A for identification.

19           THE COURT:  A for identification.  All right.

20  BY MS. STAFFORD:

21  Q.  Ms. Fontier, can you take a close look at that and when you

22  are done looking at it can you please let me know -- Ms. Brown.

23           I'm sorry, are you done?

24  A.  Yes, I am.

25  Q.  And do you recognize that as a record that you gave

D365dor5                          Brown - cross

1    Ms. Fontier?

2    A.  Yes.  I provided her with this information.

3    Q.  And is that fair and accurate as to what you provided her

4    when you saw her?

5    A.  This is what I gave to her.  Yes.

6           MS. STAFFORD:  Your Honor, I ask to move into evidence

7    Defendant's Exhibit A.

8           THE COURT:  Objection?

9           MS. LESTER:  No, your Honor.

10          THE COURT:  Can I just see it?

11          Just for the record, Exhibit A is a three-page

12   document, two of which are page 1 of 1, so I'm not sure that

13   they all belong together but this is the exhibit Defendant's

14   Exhibit A.  It is received.

15          (Defendant's Exhibit A received in evidence)

16          MS. STAFFORD:  Your Honor, may I publish Defendant's

17   Exhibit A to the jury?

18          THE COURT:  Yes.

19          MS. STAFFORD:  I apologize.

20   Q.  Ms. Brown, can you read the bottom portion of that piece of

21   paper that I just put in front of you and can you tell me the

22   date and time of that transaction, December 12th, 2011?  And

23   can you tell me if that's 11:59 a.m. or p.m.?

24   A.  It says p.m. on the paper.

25          (Pause)

D365dor5                              Brown - cross

1   Q.  So, Ms. Brown, you brought these documents to Ms. Fontier

2   to prove that Mr. Dore was with you the day of December 12,

3   2011; isn't that true?

4   A.  Yes.

5   Q.  Now --

6           THE COURT:  Can I just be clear, the day or the

7   evening?

8           You can answer.

9           THE WITNESS:  I think she's talking about the date

10  because the time is off.

11          THE COURT:  All right.  The question was you brought

12  these documents to Ms. Fontier to prove that Mr. Dore was with

13  you the day of December 12th, 2011; and you said yes; and I'm

14  asking the day or the evening or what you meant.

15          THE WITNESS:  Brought it for that day.

16          THE COURT:  For that day.

17          THE WITNESS:  Yes.

18          THE COURT:  All right.

19  BY MS. STAFFORD:

20  Q.  And that day was important because December 12, 2011, was

21  the day of the alleged homicide?

22  A.  That's correct.

23  Q.  And you wanted to convince Ms. Fontier that Mr. Dore was

24  with you because you wanted to testify on his behalf.  Isn't

25  that true?

1   A.  I wanted to tell her that he was with me, not to testify on

2   his behalf at that moment.

3   Q.  At that moment?

4   A.  I was not asked to testify in relation to the December 12th

5   event.  I was asked to testify about what took place on the

6   search that morning when he got arrested.  I was never asked to

7   testify in relation to the December 12th event.

8   Q.  Okay.

9        But you went there because you had read the discovery

10  and you knew that the government was alleging that Mr. Dore had

11  been involved in a homicide and you wanted to convince

12  Ms. Fontier that Mr. Dore was with you and could not have been

13  at the scene of the crime, isn't that true?

14  A.  Yes.

15  Q.  So, when you went to Ms. Fontier to convince her that

16  Mr. Dore was with you and was not involved in the murder, you

17  were telling her the truth?

18        MS. LESTER:  Objection.

19  A.  I was asked --

20        THE COURT:  Overruled.

21        Were you telling her the truth?  Yes or no.

22        THE WITNESS:  No.

23  Q.  You were not telling her the truth?

24  A.  No.

25  Q.  And you knew that you weren't telling her the truth at that

1   time?

2   A.  I provided her documents about December 12 not knowing what

3   time the murder had taken place because if you asked

4   Ms. Fontier, it was pointed out that this could not be used as

5   a defense for Mr. Dore because the timing is off and that's why

6   that conversation went no further.  There was no talks about

7   the receipts, the documents after which she told me that it

8   could not be used because the timing that they said the murder

9   had taken place is completely different from what I showed her

10  on the document.

11  Q.  Okay.  But, you asked for the indictment, correct?

12  A.  Yes, I did.

13  Q.  You asked for the discovery, the police reports; right?

14  A.  I asked for the discovery, yes.

15  Q.  And the police report.

16          And so, when you went to Ms. Fontier's office to show

17  her that Mr. Dore was with you at the times that you made those

18  transactions and for the day, you knew when the alleged

19  homicide had happened?

20  A.  Not the time.  The date.

21  Q.  You knew -- you didn't know the time?

22  A.  Exactly.

23  Q.  That's what your testimony is?

24  A.  Yes.

25  Q.  Is your e-mail Janiel.Brown09@mySt.John's.edu?

D365dor5                              Brown - cross

1    A.  Yes, it is.

2    Q.  Did you e-mail Ms. Fontier on several occasions requesting

3    various documents in discovery?

4    A.  Yes, I did.

5    Q.  And did you also request that you be provided with the

6    times of the incidents and the dates of those incidents?

7    A.  Yes.

8    Q.  So, again, I'm going to ask you when you went to speak with

9    Ms. Fontier, you knew the time and the date of the murder,

10   isn't that true?

11           MS. LESTER:  Objection, your Honor.  We don't know

12   when these e-mails took place.

13           THE COURT:  Well, I don't think that's a basis for an

14   objection.  If the witness can answer.  At the time you

15   provided documents to Ms. Fontier were you aware of when the

16   murder took place?

17           THE WITNESS:  Not the time.  The day, yes.

18   BY MS. STAFFORD:

19   Q.  You also signed a declaration in this case?

20   A.  I'm sorry?

21   Q.  You also signed a declaration in this case, isn't that

22   true?

23   A.  I don't recall.

24   Q.  Did you sign an affidavit -- you don't recall signing an

25   affidavit?

1    A.  No.

2    Q.  You recall testifying at a prior hearing, right?

3    A.  Yes.

4    Q.  You recall that prior to your testimony you were provided

5    an affidavit?

6    A.  Oh, yes.  Correct.

7    Q.  And you reviewed that affidavit, correct?

8    A.  Yes, I did.

9            THE COURT:  Just fix a time.  Reviewed it when.  Prior

10   to signing or prior to testifying today?  Just be clear.

11   BY MS. STAFFORD:

12   Q.  Thank you, your Honor.

13           Prior to signing the affidavit you reviewed it, isn't

14   that correct?

15   A.  Yes.

16   Q.  You reviewed it carefully, right?

17   A.  To my knowledge, yes.

18   Q.  And you were aware that by signing that affidavit that you

19   were declaring under the penalty of perjury that everything

20   contained in the affidavit was true and correct?

21   A.  Yes.

22   Q.  So, when you signed the affidavit and stated that

23   Mr. Dore -- I will withdraw that for now.

24           Ms. Fontier --

25           THE COURT:  Ms. Brown.

1    Q.  Ms. Brown, you are in school at the moment, aren't you?

2    A.  Yes, I am.

3    Q.  And what degree are you pursuing at the moment?

4    A.  Psychology.  Forensic psychology.

5    Q.  And what courses do you take in pursuit of your degree as a

6    forensic psychologist?

7    A.  Psychology courses, math courses, English courses, science.

8    Q.  Nothing related to forensics?

9    A.  I have taken a forensic psychology class before.  Failed

10   it.

11   Q.  And so you probably know a little bit more about the law

12   than the average person, wouldn't you say?

13   A.  No.  Not necessarily.

14   Q.  You don't think so?

15   A.  No.

16   Q.  Do you recall reviewing the motions in this case?

17   A.  Yes.

18   Q.  And do you recall giving an extensive list of arguments and

19   opposition to the government's motions?

20   A.  Yes.

21   Q.  And do you recall providing that to Ms. Fontier?

22   A.  Yes, I did.

23           MS. STAFFORD:  Your Honor, may I approach?

24           THE COURT:  You may.

25   Q.  I'm showing the witness Defendant's Exhibit B; is that the

D365dor5                          Brown - cross

1    document that you created and provided to Ms. Fontier after you

2    reviewed the government's motion and your suppression hearing

3    transcript?

4    A.  Yes, I did.

5    Q.  That is?

6    A.  Yes, it is.

7            MS. STAFFORD:  Your Honor, I would ask that that be

8    moved into evidence.

9            MS. LESTER:  Objection.

10           THE COURT:  Sustained.  I'm not sure why is this

11   relevant.

12           MS. STAFFORD:  I'll ask questions instead.

13   BY MS. STAFFORD:

14   Q.  So you recall reviewing the government's opposition motion

15   after you testified at the suppression hearing?

16   A.  Yes, I did.

17   Q.  And you remember going through it and reviewing it

18   extensively and as a result you created this document?

19   A.  I went through it in detail and, yes, I did create the

20   document.

21   Q.  So you were provided with the government's motion and you

22   reviewed it?

23   A.  Yes, I did.

24           MS. STAFFORD:  Your Honor, may I approach the witness?

25           THE COURT:  Yes.

1   Q.  Ms. Fontier, you said --

2   A.  Ms. Brown --

3            THE COURT:  Ms. Brown.

4   Q.  Ms. Brown, you said you looked at the DNA reports in this

5   case, correct?

6   A.  Not in detail.

7   Q.  Not in detail.

8   A.  No.

9   Q.  But you did look at them?

10  A.  From what was in the discovery, yes.

11  Q.  And so you reviewed them?

12  A.  Yes.

13           MS. STAFFORD:  Your Honor, may I approach?

14           THE COURT:  Yes.

15           MS. STAFFORD:  Purely for identification, your Honor,

16  Defendant's Exhibit D.

17  Q.  Do you recognize that report?

18  A.  Yes.

19  Q.  You do?

20  A.  Yes.

21  Q.  So, do you recall reviewing it?

22  A.  I looked at the pictures.  That's about it.

23  Q.  You just looked at the pictures, you didn't look at the

24  date or time at the top of that report?

25  A.  I knew it was in relation to December 12.  I didn't pay

1   attention to the time at that point, no.

2   Q.  Do you see the time on the report now?

3   A.  Yes.

4   Q.  And do you remember you had known -- you don't recall

5   looking at the time, you just recall that you just looked at

6   the date, that you weren't concerned about the time?

7   A.  That's correct.

8   Q.  So, even though you had gone to Ms. Fontier's office after

9   you had looked at that report, you're telling us that you

10  didn't care about the time?

11  A.  This information was provided to me after I gave

12  Ms. Fontier the transaction dates and time, and that is when

13  she pointed out to me that the dates are not correct and the

14  timing that this incident took place would not suffice at that

15  point, where Jermaine was at that point.

16          So, this information was given to me after I had dug

17  up all my Chase transactions, all my Chase receipts.  This

18  information came later down.  This was not given to me prior to

19  giving her the information about the Chase receipts and

20  transactions.

21  Q.  And you recall that how?

22  A.  Because that's when she pointed out the time of the event

23  would not suffice for the dates that are on the receipt.

24  Q.  So you're saying that Ms. Fontier told you that the time

25  was not right?

1   A.  Yes.  When I presented her with the receipts, that's why it

2   went no further.  That's why --

3   Q.  So you both had the police reports in front of you?

4   A.  No.

5   Q.  You looked at the police reports, she had looked at the

6   police reports and you still hadn't noticed the time?

7   A.  No.  We never sat and discussed any police reports.  I

8   still have not discussed with her the discovery on the CD that

9   she had sent to me up until this day.

10  Q.  So, when you provided her with the ATM transactions and

11  Ms. Fontier said to you -- it is your testimony that she said

12  to you that it was not the right time?

13  A.  Yes.

14  Q.  She didn't tell you --

15          THE COURT:  Let her finish the answer.

16  Q.  I'm sorry.  Are you done?

17  A.  Yes.  Go ahead.

18  Q.  So, it is your testimony that it went no further than that?

19  A.  To my knowledge, yes.

20  Q.  To your knowledge.

21  A.  Yes.

22  Q.  So, you're saying that you did not know that the

23  investigator subsequently went out, based on the information

24  that you provided with Ms. Fontier, to pursue to find the

25  surveillance camera footage from that day and time at that ATM?

1   A.  She told me he did.

2   Q.  She told you he did?

3   A.  Yes.

4   Q.  So I'm confused.

5       She told you he did but you had just shown her the

6   time and she told you it wasn't the right time?

7   A.  I provided Ms. Fontier with the transaction information.

8   She said, okay, I'm going to have an investigator look into it.

9   When she came back she said it me that the times were not

10  correct which is why it went no further.  There was no

11  substance for it to say, okay, then Jermaine was with you at

12  the time when this robbery took place.  There was no substance

13  which is why it went no further and I had to keep trying to

14  find other information and other alibis, supposedly, for him,

15  which came to nothing.

16  Q.  Other information?

17  A.  Yes.

18  Q.  What other information did you have?

19  A.  Nothing else came up.  That was the issue.

20  Q.  But you were convinced that he was with you at the time of

21  the homicide?

22  A.  At the time, yes.

23  Q.  So you were convinced he had nothing to do with the murder?

24  A.  At the time, yes.

25  Q.  But you just provided testimony not too long ago that

1    Mr. Dore told you that he was involved in a murder.

2    A.  I was convinced to tell Ms. Fontier that he wasn't.  After

3    all, he is -- she is his attorney.

4    Q.  After all she is his attorney.

5    A.  Yes.

6    Q.  Can you please explain what that means?

7    A.  Meaning I'm following Jermaine's direction of what I am and

8    am not supposed to tell her.

9    Q.  Let's see.  You just said that you were convinced,

10   yourself, that Jermaine was with you at the time of the murder?

11   A.  Not knowing when it took place, yes.

12   Q.  So, your testimony is Jermaine was with you at the time of

13   the murder?

14   A.  My testimony is he was with me on December 12.

15   Q.  But you just testified that he was with you -- it was your

16   understanding that he was with you at the time of the homicide.

17   You were convinced that he was with you at the time of the

18   murder and that is why you went to collect further information?

19            MS. LESTER:  Objection, your Honor.

20            THE COURT:  Argumentative.  Sustained.  Rephrase.

21   That's multiple questions.

22   BY MS. STAFFORD:

23   Q.  You just stated previously that you were looking for

24   further information to convince Ms. Fontier that Jermaine was

25   with you at the time of the murder.

1   A.  On December 12th, not at the time of the murder.

2   Q.  I understand that.  But, you also just previously testified

3   that prior to seeing -- prior to Mr. Dore's arrest, prior to

4   meeting with Ms. Fontier you -- it was your understanding that

5   Mr. Dore told you that he had committed a duppy.

6   A.  That's correct.

7   Q.  So, how could you be convinced that he was with you at the

8   time of the murder?

9   A.  I'm not quite sure -- I'm not quite sure what exactly

10  you're asking me at this point.

11  Q.  I'm asking you the truth.

12  A.  And that's what I'm giving you.  Initially my focus was not

13  the information I knew.  My focus was Ms. Fontier saying, well,

14  you know if you can find alibis or anything that would make him

15  not seem like he would commit any of this, okay, go for it.

16  Jermaine said the same thing.  I said, okay.  No issues.  At

17  that point I was still with him.  When I testified and all of

18  that I was still with him.  And of course I went out and tried

19  to help him as best as I possibly could.  No issues.  Did I

20  tell Ms. Fontier that I'm going to try to provide you

21  information to say that he was with me on December 12th?  Yes,

22  I did.  In relation to the exact time?  No, because that was

23  not known to me and that's why when I provided her with the

24  information of December 12th and the time it did not go any

25  further because the two times did not coincide.

D365dor5                         Brown - cross

1    Q.  You knew at the time that you spoke to Ms. Fontier that

2    Jermaine Dore was at -- I withdraw that.  I'm sorry.

3            Before you went and spoke to Ms. Fontier you knew from

4    what you testified today --

5    A.  Right.

6    Q.  -- that he allegedly told you the next day or a few days

7    later that he committed a duppy?

8    A.  That's correct.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. STAFFORD:

2   Q.  And that it was your understanding that that was a murder?

3   A.  Yes.

4   Q.  Now, in all the times that you contacted Ms. Fontier to

5   assist in the case, you were adamant that Jermaine was with you

6   and not involved in the murder, and that is what you told Ms.

7   Fontier?

8   A.  Yes.

9   Q.  And that is why the investigator went out to follow up on

10  all the information that you provided Ms. Fontier, to prove or

11  to substantiate the fact that Mr. Dore was with you at the time

12  of the murder?

13              MS. LESTER:  Objection.

14              THE COURT:  Sustained.

15  BY MS. STAFFORD:

16  Q.  Going back to meeting with Ms. Fontier, after that meeting

17  that you say Ms. Fontier told you that the timing wasn't right,

18  you continued to contact her to find out what the investigator

19  had accomplished, correct?

20  A.  Yes.

21  Q.  Regarding finding further information to substantiate that

22  Mr. Dore was with you?

23  A.  Yes.

24  Q.  And you kept, and you continued to do that, yes?

25  A.  Until she provided me with information, yes.

D36Wdor6                        Brown - cross

1    Q.  And you continued to do that knowing that now the time

2    was -- now that in your mind the time was not the right, was

3    incorrect?

4    A.  That's correct.

5    Q.  You were still convinced that he was with you at the time

6    of the murder?

7    A.  After I saw that the timing was not correct, I pushed the

8    issue no further.  There was no substance for me to keep saying

9    to Ms. Fontier, Look, like he was with me on December 12.  The

10   timings were incorrect.  So there was no reason for me to keep

11   pushing the issue of saying, Here, here's an alibi, here's an

12   alibi, keep doing it.  It was pointless.

13   Q.  You just testified that you kept following up with her

14   regarding that issue?

15   A.  I followed up with her in relation to everything.

16   Q.  In relation to everything regarding the case?

17   A.  Yes.

18   Q.  Now, I'm going to change subjects.  You testified about one

19   of the robberies that you say you committed with Mr. Dore.  Is

20   that correct?

21   A.  That's correct.

22   Q.  And one of those robberies, you say, involved a woman?

23   A.  Yes.

24   Q.  Right?  And you said that you saw her shopping?

25   A.  Yes.

D36Wdor6                          Brown - cross

1   Q.  And you saw her carrying a bag?

2   A.  Yes.

3   Q.  And you could actually see her pocketbook, right?

4   A.  When she initially put it in the car from her place of

5   business, yes.

6   Q.  So you could see her?

7   A.  Yes.

8   Q.  And do you recall what she looked like?

9   A.  No.

10  Q.  You don't recall anything about what she looked like?

11  A.  No.

12  Q.  Do you recall speaking to the prosecutors prior to your

13  testimony today?

14  A.  Yes.

15  Q.  And do you recall telling them what you thought she looked

16  like, what her description of what she looked like?

17  A.  Middle Eastern.

18  Q.  I'm sorry?  I didn't hear you.

19  A.  I think I said middle, like she was from the Middle East.

20  Q.  She was Middle Eastern?

21  A.  Yes.

22  Q.  So you could see her pocketbook, but you could not, and you

23  said she was Middle Eastern?

24  A.  Yes.

25  Q.  Do you recall how old she was?

1    A.  No.

2    Q.  But you recall telling them that she was dark-skinned?

3    A.  Yes.

4    Q.  You also testified today that one of the alleged robberies

5    that you committed with Mr. Dore, that you were in a position

6    to see Duff get in the car?

7    A.  I was in a position to see Duff get in what car at what

8    time?

9    Q.  Well, you tell me.

10            THE COURT:  No, I think you have to be more

11   pinpointed.  You also testified --

12   BY MS. STAFFORD:

13   Q.  You also testified that you were involved in a robbery

14   which also included Mr. Duff or -- I don't even know, who you

15   know by the name Duff?

16   A.  Yes.

17   Q.  And you said you saw him?

18   A.  Yes.

19   Q.  And how did you see him?

20            MS. LESTER:  Your Honor, could we be more specific

21   about what we're talking about?

22            THE COURT:  I didn't hear the last part.  Be more

23   specific about what?

24            MS. LESTER:  I don't know which incident we're talking

25   about.

D36Wdor6                           Brown - cross

| | |
|---|---|
| 1 | THE COURT:  I'm not sure if there's more than one.  So |
| 2 | I don't know. |
| 3 | THE WITNESS:  There is. |
| 4 | THE COURT:  There is more than one? |
| 5 | THE WITNESS:  Yes. |
| 6 | BY MS. STAFFORD: |
| 7 | Q.  There is more than one that you know about? |
| 8 | A.  I mentioned three separate incidents where I saw Duff, yes. |
| 9 | Q.  There's three separate, do you know the dates of those |
| 10 | incidents? |
| 11 | A.  I don't know the dates, but I know the circumstances |
| 12 | surrounding them. |
| 13 | Q.  Of each one? |
| 14 | A.  Yes. |
| 15 | Q.  Okay.  Let's take the first one.  When did that happen? |
| 16 | A.  In Pennsylvania. |
| 17 | Q.  Okay.  And when did that happen? |
| 18 | A.  In August. |
| 19 | Q.  And you saw Duff? |
| 20 | A.  Duffel. |
| 21 | Q.  Duffel? |
| 22 | A.  He was on the phone.  He told Jermaine what he wanted when |
| 23 | I went into the supermarket. |
| 24 | Q.  And how about the second incident? |
| 25 | A.  By some area in the South Bronx when I saw them both |

D36Wdor6                          Brown - cross

1    running towards the direction of my car, yes.

2              THE COURT:  Who is "them both"?

3              THE WITNESS:  Jermaine and Duffel.

4              THE COURT:  All right.

5    A.  And the third which is the one, the woman where I said I

6    saw them both get out.  Jermaine got out of my car.  Duffel got

7    out of Tall Man's car and went in the direction that the woman

8    was.  Yes, those three incidents I saw him.

9    Q.  You saw him in all three incidents?

10   A.  Yes, or knew of him being there.

11   Q.  Now, you testified that Mr. Dore had at certain times

12   stored a knife in your apartment?

13   A.  Not stored.  He lived there, so he would have a, his

14   personal knife that he would bring in the apartment.

15   Q.  And you said he had a gun?

16   A.  Yes.

17   Q.  And you said he had a bat?

18   A.  Yes.

19   Q.  And you were there the day that Mr. Dore was arrested,

20   weren't you?

21   A.  In January?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And when the FBI agents came, do you recall telling them

25   that there was nothing in the apartment?

1    A.   Yes.

2    Q.   So throughout the time that he was living with you, Mr.

3    Dore had a knife, he had a bat, and he had a gun?

4    A.   Yes.

5    Q.   At various times?

6    A.   Yes.

7    Q.   But on the day that he happened to get arrested, there was

8    no bat, there was no gloves, and there was no knives?

9    A.   There was no --

10          THE COURT:  No gloves?

11          MS. STAFFORD:  I'm sorry.  No -- I withdraw that.

12   Q.   On the day Mr. Dore was arrested, there was no gun, right?

13   A.   That's correct.

14   Q.   There was no bat, right?

15   A.   That's correct.

16   Q.   And there was no --

17          THE COURT:  Knife.

18   Q.   -- knife?

19   A.   That's correct.

20   Q.   And you knew there weren't anything, there were none of

21   those items there?

22   A.   Yes.

23   Q.   Because you told the police as soon as they showed up?

24   A.   When they asked me, yes.

25   Q.   Ms. Fontier, you've been --

1          THE COURT:  Brown.

2     A.  Ms. Brown.

3     Q.  Brown.  Up until two weeks ago, you were still in a

4     relationship with Mr. Dore?

5     A.  Yes.

6     Q.  And you were very close to him, isn't that correct?

7     A.  Yes.

8     Q.  And you stayed in constant contact with him while he's been

9     trying to fight this case, correct?

10    A.  I had no choice.  Yes.

11    Q.  You had no choice?

12    A.  I mean, he had no one there for him.  I was in a

13    relationship with him.  No one -- he didn't have family members

14    that would go and visit him on a regular or send him money or

15    keep on top of his lawyer to do anything that she was supposed

16    to do.  I was basically his eyes, his ears, on the outside, to

17    get what he needed to get done.

18    Q.  And you did that because --

19    A.  He asked me to.

20    Q.  Because you loved him?

21    A.  I have loved, I had love for him.

22    Q.  You had love for him?

23    A.  Yes.

24    Q.  And you were aware that -- well, you had love for him?

25    When did that, when did that end?

D36Wdor6                         Brown - cross

1   A.   Beginning of this situation, Mr. Dore told me at no point

2   would you ever have to get caught up in this situation, have to

3   testify, have to do anything in relation to this case, where it

4   would hurt you.  And I believed him for that, because, of

5   course, my understanding was that he cared for me.  When I

6   realized that that was not the case and he was going to say,

7   Oh, go and talk to whoever you need to talk to and do whatever

8   you need to do for you, I realized how could somebody that say

9   they love you want to go through an entire process of

10  testifying and, and sitting in court, like that person could

11  not love you.

12  Q.   Ms. Brown, you're an intelligent woman?

13  A.   Yes.

14  Q.   You're getting an advanced degree, and -- right?

15  A.   Yes.

16  Q.   And when you're not working; you're going to school?

17  A.   Yes.

18  Q.   And when you weren't going to school or working, you were

19  committing robberies?

20  A.   At the request of Mr. Dore, yes.

21  Q.   At his request?

22  A.   Yes.

23  Q.   And that's all it took, just his request, and --

24  A.   When Jermaine met me, I was in a vulnerable place.

25            THE COURT:  Just --

D36Wdor6                          Brown - cross

1  A.  So for him to be the person that was going to show that he

2  loved and cared about me more than my own family --

3          MS. STAFFORD:  Your Honor --

4  A.  -- it's like why would I not?  And every time I objected to

5  doing something, there would be an argument.  It would be a

6  fuss.  It would be me getting told to go back home to my mom.

7  So in light of wanting to be with him and having that comfort

8  and that person to go to, yes, I did whatever he asked me to,

9  out of fear and because I did not want to be alone.  Yes.

10  Q.  You didn't want to be alone?

11  A.  Yes.

12  Q.  And you didn't want to be with your mother?

13  A.  My mom was not there.

14  Q.  You didn't want to be alone, so you decided that you

15  allegedly would get in a car and drive people to commit

16  robberies?

17  A.  Drive Jermaine to where he wanted me to, yes.

18  Q.  And you would conduct surveillance for hours?

19  A.  Yes.

20  Q.  And what did you think after the first time you did that?

21  A.  I'm sorry?

22  Q.  What did you think after the first time that you did that?

23  Did you think it was wrong?

24  A.  After he kept threatening me to go to the cops, after I did

25  it the first time?

D36Wdor6                        Brown - cross

1   Q.  After you, after you drove Mr. Dore -- well, actually,

2   let's just get to the driving part.  You testified earlier that

3   you allowed Mr. Dore to drive your car?

4   A.  Yes.

5   Q.  Okay.  And you also testified that Mr. Dore insisted that

6   you come with him on these alleged robberies?

7   A.  Yes.

8   Q.  And that was because you said it would be less suspicious,

9   right?

10  A.  Yes, and more at ease for him, yes.

11  Q.  Then if Mr. Dore could drive him, if Mr. Dore could drive

12  him, could have access to your car whenever he wanted, why

13  would he need you to drive him around?

14  A.  Because he didn't want to do it himself.  As I said, he did

15  not have a license.  And at the point of when he's

16  surveillancing, his mind set is not about driving.  It's about

17  looking at exactly what a location has or exactly what a target

18  is.

19  Q.  How did you fit this in between school and work?

20  A.  As I said, I did it when it was the weekend or I had a

21  break from school.

22  Q.  So if we look at your school records, you couldn't, and

23  they didn't coincide with any of these incidents, then it

24  couldn't have, you wouldn't, you couldn't have been there,

25  right?

1          THE COURT:  Sustained.  Rephrase the question.

2    BY MS. STAFFORD:

3    Q.  Ms. Brown, the government has agreed not to prosecute you.

4    A.  That's correct.

5    Q.  And you're aware that that's a pretty incredible deal for

6    what you, for the crimes that you've allegedly committed?

7    A.  Yes.

8    Q.  They've agreed -- well, you're aware that you have put

9    yourself in the middle of an alleged conspiracy that involved a

10   murder and several robberies, right?

11   A.  That's not how I saw it at the time, no.

12   Q.  You didn't see that you, as the driver, were part and

13   parcel to these violent crimes that you allegedly said

14   happened?

15   A.  No.

16   Q.  How did you see yourself?

17   A.  As a girlfriend that was assisting the person that she was

18   in love with.

19   Q.  So you did it out of love?

20   A.  Yes.

21   Q.  And have you committed other crimes out of love?

22   A.  No.

23   Q.  You had a prior relationship, didn't you?

24   A.  Yes, I did.

25   Q.  And did you commit crimes with your previous boyfriend?

1    A.  No.

2    Q.  Are you sure about that?

3    A.  I'm sure.

4    Q.  Are you sure that he wasn't committing crimes?

5    A.  Not to my knowledge.

6    Q.  That you're aware of?

7    A.  Not to my knowledge, no.

8    Q.  Are you sure that when the police came to you that you

9    didn't tell them that your boyfriend was involved in a robbery?

10            MS. LESTER:  Objection.

11            THE COURT:  Overruled.

12            MS. LESTER:  Can we have a date or a time?

13            THE COURT:  If there's a good faith basis to ask the

14   question, I don't think it turns on whether there's a time or a

15   date.

16   BY MS. STAFFORD:

17   Q.  Do you remember a police officer, an Asian police officer,

18   coming to you and asking you about a robbery?  Did that occur?

19   A.  Yes.

20   Q.  And do you recall telling him that it was your

21   ex-boyfriend, but, in fact, it wasn't?

22   A.  He asked me if anyone had access to my car, which, in fact,

23   I told him yes, and that was the truth at that time.

24   Q.  So this was another boyfriend that had access to your car,

25   that had committed a robbery, allegedly?

D36Wdor6                                    Brown - cross

1   A.  Allegedly.

2   Q.  And you told the police officer that you gave your

3   ex-boyfriend access to your car?

4   A.  No, I did not.

5   Q.  You told the police officer that he was involved in the

6   robbery?

7   A.  No, I did not.

8   Q.  You just told him that he had access to your car?

9   A.  They asked me if he, if anyone had access to my car.

10  Q.  Because your car --

11  A.  And I said possibly.

12          THE COURT:  Wait.  Let her finish.  Go ahead.

13  A.  And I said possibly.  Yes.

14  Q.  So your car was involved in an alleged robbery?

15  A.  That's what they said to me, yes.

16  Q.  And that's all that you know about it?

17  A.  They didn't tell me what happened.  They basically came to

18  my house, showed me a photograph of my ex-boyfriend, and asked

19  if this was my ex-boyfriend.  I said yes.  They told me that a

20  robbery had taken place, or, they just needed to question me

21  surrounding my car, and I said okay.  And they basically said

22  does anyone have access to your car.  I said possibly he does,

23  and they took it and then never came back to me, questioned me

24  about it.  There was no follow-up for that situation.

25  Q.  So your car, and your ex-boyfriend, happened to be involved

1   in another robbery, that you know of?

2              MS. LESTER:  Objection.

3              THE COURT:  Sustained.

4   A.  Not that I knew of.

5              THE COURT:  No.  I sustained the objection.  So don't

6   answer.

7              THE WITNESS:  Okay.

8   BY MS. STAFFORD:

9   Q.  Did you recently have an accident?

10  A.  Yes, I did.

11  Q.  And did you make an insurance claim?

12  A.  Yes, I did.

13  Q.  And did you concoct that accident so that you could make a

14  false insurance claim?

15  A.  No, I did not.

16  Q.  Are you sure about that?

17  A.  Yes.  I'm positive about that.

18  Q.  Have you told the government, as per your agreement, of any

19  and all the crimes that you've been involved in?

20  A.  Yes, to my knowledge and remembrance.  Yes.

21  Q.  And you know that you're not going to be prosecuted for any

22  criminal tax fraud, for any tax problems?

23  A.  That's correct.

24  Q.  Tax problems?

25  A.  That's correct.

D36Wdor6                        Brown - cross

1    Q.  What are you concerned about with that?

2    A.  I'm not concerned about it.

3    Q.  So you just happened to get, as part of your agreement,

4    that you would not be prosecuted for any criminal tax --

5    A.  If I remember correctly, my lawyer explained to me when we

6    read that agreement that that was something that the government

7    could not protect me from.  Therefore, if I had committed any

8    form of tax fraud prior to this situation, they could not

9    supposedly give me a get-out-of-jail-free card because it's not

10   their jurisdiction.

11   Q.  And you're not going to be prosecuted for your alleged

12   robbery involvement, right?

13   A.  That's correct.

14   Q.  And you're not going to be prosecuted for the possession of

15   a gun?

16   A.  That's correct.

17   Q.  And you're not going to be prosecuted for the possession of

18   a gun that potentially, you say, may have been involved in a

19   murder?

20   A.  That's correct.

21   Q.  And you're not going to be prosecuted for the fact that you

22   perjured yourself, are you?

23   A.  No.  That's not a part of the agreement.

24   Q.  That's not a part of the agreement?

25   A.  No, it's not.

1   Q.  So you may be prosecuted for perjury?

2   A.  In a prior proceeding, you mean in the hearing that took

3   place before?

4   Q.  Right.

5   A.  Well, when I discussed it with my lawyer, no, I wasn't

6   going to be, because the fact is I was the one that brought

7   that information out, so I did not wait for the government to

8   come to me and be like, Ms. Brown, we realize that you did not

9   tell the truth here.  I brought that out to them.  I told them,

10  Look, initially when I was in that situation, this is what I

11  said, but this is what the truth is, and I was the one that

12  brought that out to them.  They did not bring that to me, so,

13  no, there was no talk of me being prosecuted for perjury.

14  Q.  But you took an oath?

15  A.  Yes.

16  Q.  The same exact oath you took today?

17  A.  That's correct.

18  Q.  And you swore to tell the truth?

19  A.  Yes.

20  Q.  And you swore to tell the whole truth?

21  A.  Yes.

22  Q.  But you didn't.  You lied, right?

23  A.  At that time.

24  Q.  At that time, you lied?

25  A.  Yes.

D36Wdor6                          Brown - cross

1   Q.  So it's your understanding that even though you did not

2   tell the truth at the time that you took the oath that that's

3   not perjury?

4   A.  It's not that it's not perjury, but that I would not be

5   prosecuted for it.

6   Q.  So you understand that if you don't tell the truth today,

7   that you're committing perjury, right?

8   A.  Yes.  I understand that.

9   Q.  Okay.  And you obviously understand that because you're not

10  being prosecuted for what are very serious crimes, that you're

11  going to get to walk out the door and not have to ever worry

12  about this case again, isn't that true?

13  A.  No, that's not true.

14  Q.  That's not true?

15  A.  No, it's not.

16  Q.  How is that not true?

17  A.  Because even if I walk out of here with a supposed not

18  being prosecuted, I still have to live with the fear of what

19  will happen in the future.  So, no, it's not over.

20  Q.  It's not over?

21  A.  No.

22  Q.  So you --

23  A.  As well as I have an obligation to that agreement.

24  Q.  You have an obligation to the agreement?

25  A.  Yes, which is that I would commit no future crimes.

D36Wdor6                          Brown - cross

1    Q.  You're not going to be, you're not ever going to have to

2    appear before another judge, are you?

3    A.  My intention is not to.  No.

4    Q.  You're never going to have to potentially go to jail?

5    A.  No.

6    Q.  You're never going to have to be on probation, right?

7    A.  I'm not going to put myself in that situation, no.

8    Q.  So you're aware that because of the testimony that you're

9    providing today, that you will never have to spend a day in

10   jail, right?

11   A.  Possibly.

12   Q.  Possibly?

13   A.  Yes.

14   Q.  So, but you do know that if you were charged and

15   prosecuted, that you could be facing up to life in prison,

16   right?

17   A.  Yes.

18   Q.  And you know that because you've researched that on your

19   own, right?

20   A.  That's what I read in the indictment.

21   Q.  You've looked at that indictment carefully, haven't you?

22   A.  I have.

23   Q.  Just like you've looked at all the discovery in this case

24   very carefully?

25   A.  For the most part.

D36Wdor6                              Brown - cross

1   Q.   And you knew exactly what the government needed to make

2   their case successful, right?

3   A.   No.

4   Q.   You knew that the government had no DNA, right?

5   A.   That's correct.

6   Q.   You knew the government did not have any identification by

7   any of the police officers or the victims?

8   A.   That's correct.

9   Q.   You knew that the government did not have the alleged

10  murder weapon, right?

11  A.   That's correct.

12  Q.   And you were aware of the cell site evidence, correct?

13  A.   No.

14  Q.   You don't know anything about the cell site evidence?

15  A.   There was supposed to be a meeting set up with Ms. Fontier.

16  That meeting never took place.

17  Q.   But you researched the cell site?

18  A.   I did.

19  Q.   So you know about cell site evidence?

20  A.   An overview.

21  Q.   Right.  So, again, you are fully aware of the entirety of

22  the government's case?

23  A.   No.

24  Q.   Up until January 31, you were still getting discovery in

25  this case, isn't that true?

D36Wdor6                          Brown - cross

1    A.  The last piece of information I received was the witness

2    list.  So if that was January 31, then, yes.

3    Q.  So as of January 31, you had received all of the alleged

4    evidence in this case, I mean, all of the evidence in this

5    case?

6    A.  Whatever Ms. Fontier gives to me, yes.

7    Q.  And so when you sat down with the U.S. Attorneys and the

8    FBI agents, you knew all the evidence that was going to be

9    presented in this case as of January 31?

10   A.  For the most part.

11   Q.  So you knew what evidence they had and what evidence they

12   didn't have?

13            MS. LESTER:  Objection, your Honor.

14            THE COURT:  Sustained.

15   BY MS. STAFFORD:

16   Q.  You were aware of what was, you were aware of the evidence

17   that was provided to the defendants, correct?

18   A.  Not in its entirety, no.

19   Q.  Well, you were provided with the witness list?

20   A.  Yes.

21   Q.  You were provided with the exhibit list?

22   A.  Yes.

23   Q.  And you were provided with the discovery that was provided

24   to the defendants as of January 31, 2012?

25   A.  '13.

D36Wdor6                          Brown - cross

1    Q.  2013?

2    A.  Yes.

3    Q.  Okay.  So at that, so you knew everything that was provided

4    to the defendants as of January 31?

5    A.  Provided to the defendants based on what Ms. Fontier gave

6    me, yes, because I still received knowledge that there were

7    certain things I had not received.

8    Q.  So, again, as of, you knew what the government's case was

9    as of January 31, 2013?

10   A.  Not in its entirety.  For the most part, yes.

11   Q.  You knew what the defendants knew?  You knew what the

12   discovery, what was in the discovery?

13   A.  Yes.

14             MS. STAFFORD:  One moment, your Honor.

15             THE COURT:  Yes.

16             MS. STAFFORD:  No further questions, your Honor.

17             THE COURT:  All right.  Ladies and gentlemen, we're

18   going to finish a little early today.  Not now, we're going to

19   finish at 4:30.  I'd like to push through.  If anybody really

20   needs to use the restroom -- all right.  You think you need to

21   use the restroom.  We'll take a real quick break.  I think

22   there are snacks and stuff in there for you.  You can wolf them

23   down, but I do want to get as much as we can done, so we'll

24   take about five minutes.

25             (Jury excused)

D36Wdor6                          Brown - cross

1                THE COURT:  Have a seat.  All right.  Mr. Roth, how
2      long do you think you'll be?
3                MR. ROTH:  Mr. Murphy is going to do it.
4                THE COURT:  Mr. Murphy, how long do you think you'll
5      be?
6                MR. MURPHY:  Hard to tell, Judge.  45 minutes.
7                THE COURT:  We're not going to finish today.
8                MR. MURPHY:  We're not going to finish today, no.
9                THE COURT:  If we're close, I might be inclined to go
10     a little bit --
11               MR. MURPHY:  I think I would probably be an hour, but
12     I would say ballpark 45.
13               THE COURT:  Then we're bound to have some redirect,
14     you think?
15               MS. LESTER:  Just briefly, your Honor.
16               THE COURT:  We've got a witness lined up for the
17     Daubert hearing at 4:30?
18               MS. LESTER:  Correct, your Honor, and it's my
19     understanding that he's already here.
20               THE COURT:  If we get to a logical breaking point
21     around 4:30 or a little after 4:30, then we'll break there.
22     All right.  If anybody needs -- well, the jurors --
23               Is the bathroom fixed.
24               MR. ROTH:  We can go down a floor.
25               THE COURT:  If you don't mind, that would be good.

D36Wdor6                      Brown - cross

1   They have been fixed?  So they're not using the restrooms here.

2   I'm told that the restrooms in the jury room have been fixed.

3           MR. ROTH:  I don't know.

4           THE COURT:  Go downstairs, just to be safe.

5           (Recess)

1              (In open court; jury present)

2              THE COURT:  Okay.  Have a seat.  We'll at least get

3    started on the cross by Mr. Murphy of Ms. Brown.

4              Mr. Murphy, you may proceed.

5              MR. MURPHY:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. MURPHY:

8    Q.  Ms. Brown, my name is Ken Murphy.  If anything I ask you

9    doesn't make sense, please just let me know.  Okay?

10   A.  Okay.

11   Q.  Ms. Brown, when did you get to this country?

12   A.  2009.

13   Q.  When you came to the United States, how did you get here?

14   Did you come for a visit?  Did you come on a visa?  That's what

15   I mean by that question.

16   A.  In 2009, I came to live.

17   Q.  Are you a current citizen?

18   A.  No.

19   Q.  What is your current status?

20   A.  Permanent resident.

21   Q.  A what?

22   A.  Permanent resident.

23   Q.  Permanent resident, with a green card?

24   A.  Yes.

25   Q.  Who sponsored you?

1    A.  My mom.

2    Q.  Is your mother a citizen?

3    A.  No.

4    Q.  And where do you currently go to school?

5            MS. LESTER:  Objection.

6            THE COURT:  Overruled.  You can answer that question.

7    A.  John Jay College of Criminal Justice.

8    Q.  How long have you been going to John Jay College of

9    Criminal Justice?

10   A.  Started this semester.

11   Q.  This semester meaning in January?

12   A.  Yes.

13   Q.  Just recently?

14       And what are you studying there at the John Jay College of

15   Criminal Justice?

16   A.  Forensic psychology.

17   Q.  Forensic psychology.  Can you tell the ladies and gentlemen

18   of the jury what forensic psychology is all about?

19   A.  From my understanding, it's basically someone that assists

20   in trials or assists with defendants to see if they're fit to

21   stand trial.  There are several aspects of it.  It doesn't

22   necessarily have to be with the court system.  For me in

23   particular, I'm still trying to learn how broad the field is to

24   decide what area I want to go in.

25   Q.  How long have you been studying forensic psychology?

1   A.   I started this semester.

2   Q.   What had you been studying prior to this?

3   A.   Psychology in general.

4   Q.   So since the arrest of Mr. Dore, you've gone into the field

5   of forensic psychology, is that correct?

6   A.   No.

7   Q.   So you were studying it before his arrest?

8   A.   No.

9   Q.   When did you start studying it, ma'am?

10   A.   In January of this year.

11   Q.   2013?

12   A.   Yes.

13   Q.   Okay.  And we can agree that he was arrested in January of

14   2012, correct?

15   A.   Yes.

16   Q.   So you started studying it since his arrest, correct?

17   A.   Yes.

18   Q.   And you can agree with me then, from your understanding of

19   it, that this forensic psychology is the study of the

20   interaction between law and psychology, correct?

21   A.   Yes.

22   Q.   And one of the things that forensic psychologists do is

23   they apply facts and evidence to simple psychological

24   principles, correct?

25   A.   Yes.

D36Wdor6                          Brown - cross

1    Q.  And what they do is they evaluate whether -- one of the

2    things -- withdrawn.

3            In your studies, have you learned that one of the

4    things that forensic psychologists do is evaluate whether or

5    not someone is or is not telling the truth?

6    A.  Not in great detail.

7    Q.  You haven't learned that yet?

8    A.  No.

9    Q.  Have you learned how forensic psychologists can be used in

10   both civil and criminal matters to help fill in gaps and build

11   cases for lawyers litigating matters?

12   A.  In an overview, yes.

13   Q.  In an overview, and that's an integral part of what

14   forensic psychologies do from your point of view, is that

15   correct?

16   A.  Yes.

17   Q.  And that's what you're studying now, correct?

18   A.  Yes.

19   Q.  Tell me about the August 2011 robbery that happened in

20   Pennsylvania.  I have a few questions about that.  Okay?

21   A.  Sure.

22   Q.  What time did you leave in the morning to go to

23   Pennsylvania that day?

24   A.  Maybe around seven, eight.

25   Q.  Seven or eight, you're not sure which?

1    A.   No.

2    Q.   And who was driving?

3    A.   I was.

4    Q.   And how did you get there, and by that I mean what route

5    did you take?

6    A.   A highway.

7    Q.   What highway?

8    A.   I'm not quite sure.

9    Q.   Okay.  When you got up at seven or eight in the morning and

10   you started driving, what bridge did you take out of the Bronx?

11   A.   I don't know.

12   Q.   You don't recall?

13   A.   No.

14   Q.   Was it the Throgs Neck, maybe?

15   A.   I'm not sure.

16   Q.   Excuse me.  That would be the George Washington.

17        In any event, do you remember when you were in the car,

18   perhaps, let's say, 45 minutes from the Bronx, at any point

19   asking Mr. Dore what you were going to Pennsylvania for?

20   A.   Initially, he just told me that Ali had sent him to check

21   something out.

22   Q.   Check something out?  Did you follow up and say, What do

23   you mean by check something out?

24   A.   No.

25   Q.   Did you know whether he was going there to purchase goods

1    for Ali's store?

2    A.   No.

3    Q.   Did you know whether he was going there to deliver goods

4    from Ali's store to that place in Pennsylvania?

5    A.   He didn't have any goods with him, so no.

6    Q.   And you had no reason to ask him, Why are we driving to

7    Pennsylvania, I'm just going to check something out, that was

8    sufficient for you?

9    A.   Yes.

10   Q.   Did he have any weapon on him that you saw at that time?

11   A.   No.

12   Q.   And when you drove to Pennsylvania and you arrived there,

13   where did you say you parked at first?

14   A.   On the one-way street.

15   Q.   And is it your testimony that when you went to

16   Pennsylvania, you drove there with my client, Mr. Barrett, or

17   no?

18   A.   No.

19   Q.   He was not with you?

20   A.   He was in a separate car.

21   Q.   But he was not in your car?

22   A.   No.

23   Q.   And when you got to Pennsylvania and you parked on the

24   street, at that point in time, did you get out of the car?

25   A.   No.

1  Q.  At that point in time, did Mr. Dore get out of the car?

2  A.  Yes.

3  Q.  And where did he go?

4  A.  Towards Mr. Barrett's car.

5  Q.  And did he ever get in Mr. Barrett's car?

6  A.  Yes.

7  Q.  Did he ever go to that store that you had driven to in

8  Pennsylvania?

9  A.  I don't recall.

10 Q.  Did you come back to your car after he allegedly went to

11 Mr. Barrett's car?

12 A.  Yes.

13 Q.  And at that point in time, did you say to him, Mr. Dore,

14 what are we here to check out?

15 A.  No.

16 Q.  And how long were you sitting in that car with Mr. Dore

17 before he got out of the car the next time?

18 A.  Maybe 20 minutes.  Not long.

19 Q.  And when he got out of the car the next time, where did he

20 go?

21 A.  Back towards Tall Man's car.

22 Q.  And how long was he in that car then?

23 A.  Long enough for me to get upset, to say that I'm hungry and

24 I'm tired.

25 Q.  And when he came back, you said to him, I'm hungry and I'm

D36Wdor6                      Brown - cross

1    tired, Jermaine, what are we doing here, didn't you?

2    A.  I don't recall if I asked what are we doing here.  I just

3    know what my focus was, being hungry and tired.

4              (Continued on next page)

D365dor7                          Brown - cross

1    BY MR. MURPHY:

2    Q.  Okay, so you said I'm hungry, I'm tired?

3    A.  Yes.

4    Q.  But you don't recall whether you said to him what am I

5    doing in Pennsylvania?

6    A.  No.

7    Q.  And so, then at that point after you told him you were

8    hungry and tired, what did Mr. Dore do?

9    A.  He said there was a super market that we could go to.

10   Q.  And you went to the super market?

11   A.  Yes.

12   Q.  With Mr. Dore?

13   A.  He was in my car, yes.

14   Q.  And you went into the super market?

15   A.  Yes.

16   Q.  And you purchased goods in the super market?

17   A.  Yes.

18   Q.  And whose money did you use to purchase those goods?

19   A.  Mine.

20   Q.  Who did you purchase the goods for?

21   A.  Myself, Mr. Dore, Tallman and Duffel.

22   Q.  You used your money to purchase goods for everybody?

23   A.  Jermaine gave me some money.

24   Q.  So Jermaine gave you some money.

25         You didn't go in the store with Mr. Barrett, though,

1   you just went in the store with Mr. Dore?

2   A.  Correct.

3   Q.  And you then purchased goods for the whole group and then

4   you went back to your car?

5   A.  Yes.

6   Q.  Did you eat in your car?

7   A.  Yes.

8   Q.  Did Mr. Dore eat with you in the car?

9   A.  For the most part, yes.

10  Q.  And at the point whole you were eating did you ask him what

11  are we doing here in Pennsylvania?

12  A.  No.

13  Q.  So you continue to sit in the car on the street eating your

14  lunch with Mr. Dore with no discussion of why you're there?

15  A.  No.

16  Q.  Am I correct?

17  A.  Yes.

18  Q.  So, how long are you sitting in the car after you finished

19  lunch with Mr. Dore?

20  A.  I don't -- I don't know.  At one point Jermaine fell

21  asleep.

22  Q.  Did it upset you when he fell asleep?

23  A.  No.

24  Q.  Were you bored?

25  A.  I had my phone, so no.

D365dor7                          Brown - cross

1   Q.  So you were texting people?

2   A.  Yeah.  Pretty much.

3   Q.  You didn't have any game to play or anything like that, no

4   DS?

5   A.  No.

6   Q.  So you were sitting in the car.  Listening to music or

7   anything?

8   A.  The radio was on.

9   Q.  He was sleeping?

10  A.  Yes.

11  Q.  How long did he sleep for?

12  A.  Not long.  A short period of time.

13  Q.  And when he woke up did you ask him what are we doing?

14  A.  No.  He just woke up and told me it was time to move.

15  Q.  Time to move.

16          And did you move at that point after Tallman's car

17  pulled off?

18  A.  Yes.

19  Q.  How long did you think you had been in Pennsylvania before

20  you made that, as you call it, move?  Several hours?

21  A.  Maybe three hours.

22  Q.  And when he said it is time to move, did you say:  Move

23  where, Jermaine?

24  A.  No.

25  Q.  You just followed him?

 1   A.  Yes.

 2   Q.  And was he in your car at this point in time?

 3   A.  Yes.

 4   Q.  And at some point he got out of your car?

 5   A.  Yes.

 6   Q.  And he did not get back into your car again?

 7   A.  No.

 8   Q.  And then how did you know to go home?

 9   A.  Jermaine called me.

10   Q.  On the phone?  You had an oral conversation?

11   A.  Yes.

12   Q.  And he said to you go back to the Bronx?

13   A.  Meet him in New York.

14   Q.  Meet him in New York.

15   A.  Yes.

16   Q.  Did you say, Jermaine, I have to drive back home alone now?

17   I'm all by myself?

18   A.  Yes.

19   Q.  You were upset about that?

20   A.  Yes, I was.

21   Q.  Did you at that point say to him why the heck am I in

22   Pennsylvania?

23   A.  No.

24   Q.  You just drove back by yourself?

25   A.  Yes.

1   Q.  So you did not drive back with Mr. Barrett, you drove back

2   alone?

3   A.  Yes.

4   Q.  And you did not see Mr. Barrett again that day, did you?

5   A.  No.

6            MR. MURPHY:  Do you want me to continue, your Honor?

7   I see it is 4:30.  This would be a good place for me to stop.

8            THE COURT:  Is this a good breaking point?

9            MR. MURPHY:  It is for a number of reasons.

10           THE COURT:  Ladies and gentlemen, we are going to

11  break here.  We will pick up tomorrow at 9:30.  Weather is

12  unpredictable, my hunch is it will be a lot of rain but, what

13  do I know.

14           So, a couple things.  There is a number you can call

15  for the court house have if you have questions as to whether

16  we're open for business.  That number is 212-805-0515.  You can

17  also go to the website, Southern District of New York -- United

18  States District Court, Southern District of New York.  The

19  website is www.NYSD.U.S.Courts.gov or just a Google search and

20  put NYSD, I think you would possibly get the site.  In any

21  event, that will be posted if the court house is closed but I

22  think it is very unlikely the court house will be closed.  I

23  think it is some of you in Westchester might get snow that down

24  here is just rain and it might affect your ability to travel.

25  If that is the case, then let us know.  Call the chambers

D365dor7                          Brown - cross

number which I think you have, 212-805-0264.  Depending what

time it is leave a voice mail.  Let us know if you are running

into trouble or if you are basically stuck.

          Yes?

          A JUROR:  The last number was 212-805-0426?

          THE COURT:  805-0515 is the court house hotline for

weather.  So, that will be a recording that just says the court

house is closed but I wouldn't put money on that.  We closed

because of Sandy but not because of the weather, that was

because of the electricity, we lost power.  But, I don't think

this is likely to keep us closed but you never know.  So, I

don't want anyone to do anything that will get them hurt.  So,

gauge the weather.  When in doubt, give a call, but I'm

presuming we will be able to go forward tomorrow as scheduled.

That means 9:30 ready to go so we can right away resume the

testimony of Ms. Brown and keep going with the trial.

          Don't discuss the case with anyone, don't do any

research or anything like that.  Keep an open mind.  Leave your

books here which Mr. Halegua will collect from you and you can

take a cookie for the road or whatever is in there you can take

something with you.

          Have a good day.  Have a good evening.  Thanks very

much.

          All rise for the jury.

          (Continued on next page)

```
 1              (Jury not present)

 2              THE COURT:  Have a seat.

 3              Ms. Brown, you can step down.  Be ready tomorrow a

 4    little before 9:30.  Okay?

 5              THE WITNESS:  All right.

 6              THE COURT:  You're on cross-examination, so you

 7    shouldn't talk with the government lawyers about the substance

 8    of your testimony.

 9              THE WITNESS:  All right.

10              THE COURT:  You can talk about logistic perhaps if you

11    have trouble getting here because of weather, that's okay, but

12    don't talk about anything related to your testimony, okay?

13              THE WITNESS:  Okay.

14              THE COURT:  Thank you.

15              (Witness steps down)

16              THE COURT:  If you wouldn't mind, stick in the witness

17    room for five minutes until the jury clears out so you don't

18    run into them.

19              Is there anything we need to talk about before we

20    start the hearing?

21              MS. MASELLA:  Not from the government, your Honor.

22              THE COURT:  No.  So, tell me, what we are going to do

23    here?  We are going to hear from one witness, right?

24              MS. MASELLA:  Correct, your Honor.  Detective Fox is

25    here.
```

1          THE COURT:  And then the government is going to do

2     direct and then we will hear crosses from who is going to do

3     the crosses?

4          MS. FONTIER:  I will, your Honor.  Mr. Roth may as

5     well.  We're just trying to figure out sort of the parameters.

6     We were discussing with the government as well how -- I know

7     your Honor's order said that you were basically looking at a

8     couple of issues and that my cross was limited to 30 minutes

9     and I just want to make sure that I don't go on too long so

10     that Mr. Roth doesn't have time just to make sure we're hitting

11     the right points.

12          THE COURT:  I don't think there is any question about

13     the experience of the officer.  I think the issue is whether

14     the testimony is based on sufficient facts or data and whether

15     there are principles, reliable principles and methods for this

16     field and whether or not the principles and methods have been

17     reliably applied in this case to the facts in this case.

18     That's the inquiry.

19          So, I don't think that's going to take too long.  So,

20     I don't want to prevent anyone from doing cross, but that is

21     the focus.  It is just eyeballing it in which case it seems

22     like it is hard to distinguish what principles and methods

23     would be, or is there some actual methodology that allows one

24     to say this is the application that is applied generally in all

25     cases and there is a process that's followed and applying that

D365dor7

1    process to these facts would lead an expert to actually make a

2    determination.

3            MS. FONTIER:  Given the Court's ruling on what you

4    have just stated just for purposes of the hearing and hopefully

5    sort of moving it along a little quicker, I would agree that

6    the government can skip the preliminaries of going through all

7    of his training and testimony and all of that and just get to

8    what was actually, what he has done and what was done here.

9            THE COURT:  Well, I mean, it is not just what was done

10   but it is what is usually done, what is the standard for

11   somebody who is in this field.

12           MS. FONTIER:  Yes.

13           THE COURT:  That's what I do want to hear about.

14           MS. MASELLA:  We will streamline.

15           THE COURT:  I don't think there is a question about he

16   has testified before and observed a zillion guns and shell

17   casings before.  I want to hear the methodology and the

18   principles.  Okay?

19           MS. FONTIER:  Thank you, your Honor.

20           THE COURT:  So let's bring up witness.

21    JONATHAN FOX,

22       called as a witness by the Government,

23       having been duly sworn, testified as follows:

24           THE COURT:  Let us proceed.

25           MS. MASELLA:  Thank you, your Honor.

D365dor7

1    DIRECT EXAMINATION

2    BY MS. MASELLA:

3    Q.  Good evening, Detective Fox.

4            How long have you been with NYPD?

5    A.  Approximately 15 years.

6    Q.  How long have you been a detective?

7    A.  I have been a detective for eight years.

8    Q.  Where are you currently assigned as a detective?

9    A.  I'm assigned at the firearms analysis section which is

10   located at the police -- the New York City Police Department

11   Crime Laboratory.

12   Q.  And just generally speaking, what are some of the things

13   that you do as a detective in the firearms analysis section?

14   A.  We test and identify firearms and ammunition for

15   operability.  We also microscopically examine firearm ballistic

16   evidence such as cartridge casings, bullets, bullet fragments.

17   We also examine live cartridges as well.

18   Q.  I'm going to focus now on one thing you just referred to

19   which is the microscopic examination of ballistics evidence.

20   First of all, can you just tell us what is ballistics evidence?

21   A.  Ballistics evidence, as I stated earlier, it would be fired

22   cartridge cases, bullets, anything that would come out of a

23   firearm.  When this ballistic evidence comes out of a firearm

24   individual tool marks are left on that evidence when it is

25   discharged out of a firearm.

1           THE COURT:  It is discharged out of a barrel, right?

2           THE WITNESS:  There is -- the bullet would come out of

3  the barrel of the firearm and if it is a semi-automatic handgun

4  the cartridge casing would come out of the semi-automatic

5  handgun.  With a revolver, the casing would stay inside of the

6  resolver when you fired it.

7           THE COURT:  The barrel is the thing the bullet comes

8  out of, right?

9           THE WITNESS:  Yes.

10          THE COURT:  So, the difference between a clip and

11 cylinder, that would be the relevant comparison between a

12 semi-automatic and a revolver, right?

13          THE WITNESS:  The main difference between a

14 semi-automatic and revolver is how the gun is loaded.  The

15 semi-automatic handgun is a gun that is loaded through a

16 magazine which goes in a magazine well of the handle which is

17 located in the grip of the firearm.  The revolver or the

18 cartridges are loaded into a cylinder which is then closed into

19 the revolver, the cylinder moves left or right every time you

20 fire the revolver and remains in the cylinder until you

21 manually unload the revolver.

22          THE COURT:  Thanks.

23 BY MS. MASELLA:

24 Q.  Detective Fox, I'm going to focus on the cartridge casing

25 for a moment here because that is what you looked at in

1  connection with this case, correct?

2  A.  Yes.

3  Q.  Now, when a cartridge casing is fired from a semi-automatic

4  gun, which parts of the casing come in contact with the gun and

5  what types of marks may be left on the cartridge casing?

6  A.  I will describe what a cartridge casing is first.  A

7  cartridge consists of four components; there is the bullet, the

8  cartridge casing itself.  Inside the mouth of the cartridge

9  casing the bullet would sit.  Inside the casing is the

10 gunpowder or propellant and at the base is what is called a

11 primer.

12         In a semi-automatic handgun the cartridge casing would

13 sit inside the chamber with the head stamp or the base of the

14 cartridge casing resting on the breechface of the

15 semi-automatic handgun.  When you pull a trigger on the

16 semi-automatic handgun, it releases the mechanism that causes

17 the firing pin to strike that primer.  When the firing pin

18 strikes the primer it crushes the primer causing a spark.  That

19 spark ignites the propellant or the gunpowder located inside

20 the cartridge and the gases -- it basically when that lights

21 up, it turns it into gases and those gases build-up so much

22 pressure that it forces the bullet outside the barrel of the

23 gun.  All of the gases that force it out of the gun also slide

24 to the rear.  There is what is called an extractor located on

25 the slide -- a hook located on the slide of the semi-automatic

1    handgun, this hooks into the rim of the cartridge casing and

2    pulls the cartridge out of the chamber.  The cartridge hits an

3    ejector and it is ejected out of the handgun.

4          So, the main areas that the cartridge casing would

5    come in contact to is the magazine, the base of the cartridge

6    would come in contact with the breechface, the firing pin which

7    has tool marks would then be impressed onto the firing pin

8    impression, the area of the breech -- the area around the

9    breechface has tool marks on it that would come in contact with

10   the firing pin -- I'm sorry with the primer and the head stamp,

11   and the cartridge casing itself, when it rests inside a

12   chamber, would have marks on it as well.

13   Q.  Detective Fox, you used the phrase "tool marks" several

14   times on tool mark comparison.  Can you explain what it is that

15   you mean by those terms?

16   A.  The term tool mark refers to when a gun manufacturer makes

17   a weapon or a semi-automatic handgun, let's say, they use

18   specific tools too make the inside of the barrel.  They use

19   specific tools to make the area around the breechface.  They

20   can sand that down.  The firing pin is made by a tool.  When

21   these tools come in contact with these -- with this metal, the

22   tool marks are then left behind on that metal.  They're also

23   called striations and unique surface contours.  When the

24   cartridge casing or bullet, which is usually a softer metal

25   than that of the inside of the firearm comes in contact with

1    these tool marks, there is such force used in firing this

2    weapon that these tool marks would then be impressed onto the

3    base of the cartridge casing or the firing pin impression, and

4    when a bullet travels through the barrel, the striations or the

5    tool marks, the imperfections on the inside of the barrel would

6    come in contact and be left behind on the bullet.

7    Q.  And, Detective, have you received training in the field of

8    tool mark comparison?

9    A.  I received training in firearms identification and which

10   essentially is tool mark comparison within firearms

11   identification.

12   Q.  Can you describe for us what that training was, in

13   particular?

14   A.  When I was assigned -- at which time I was assigned to the

15   firearms analysis section I was trained in an 18-month training

16   program.  It was a New York City particular AFTE -- it stands

17   for the Association of Firearm Tool mark Examiners.  This

18   training program consisted of me being trained in firearms

19   operability, firearms identification and ammunition

20   identification.  AFTE stands for the Association of Firearm

21   Tool mark Examiners.  It is an organization that is represented

22   in 42 countries and has a thousand members worldwide.  This

23   organization represents our scientific discipline in the field

24   of the firearms identification.

25           During that training program with this AFTE we

1    performed formal, informal lectures, presentations.  We have

2    written and practical examinations as well as on-the-job

3    training with senior members of the firearms analysis section

4    and we assist them with their casework on firearms operability

5    and microscopic analysis.  During that training program I would

6    receive training under the microscope for hundreds of hours in

7    identifying the different tool marks that would come in contact

8    with the bullet and identifying them.

9           Upon completing my training program I was given

10   competency tests, one which was given by an outside agency

11   called CTS, Comparative Testing; and I was also given three

12   internal competency tests all of which I had to pass with a

13   hundred percent.  And every single year I am given a

14   proficiency test as well.

15   Q.  Detective Fox, you mentioned AFTE, A-F-T-E, the Association

16   of Firearms and Tool marks Examiners?

17   A.  Yes.

18   Q.  How long has that association been around?

19   A.  That association has been around since 1969.

20   Q.  And you mentioned that it was used in 42 countries and had

21   over a thousand members, is that correct?

22   A.  It has a thousand members worldwide within 42 countries,

23   yes.

24          AFTE also puts out periodic journals on firearms

25   identification.  They also have yearly seminars that are

D365dor7                        J. Fox - direct

1    attended and they have training materials as well.

2            THE COURT:  What does it mean to have an association

3    that is used in a country?  I don't understand that.

4            THE WITNESS:  It is recognized in that particular --

5    in 42 countries.

6            THE COURT:  Recognized by whom?

7            THE WITNESS:  The scientific community.

8            THE COURT:  The scientific community in each country

9    recognizes the association?

10           THE WITNESS:  Yes.

11           THE COURT:  And the scientific community manifested as

12   what?

13           THE WITNESS:  It started off as -- you mean where did

14   it originate?

15           THE COURT:  I don't know what you mean by scientific

16   community.

17           THE WITNESS:  Well, we consider firearms

18   identification to be a science and it has been around for a

19   hundred years.

20           THE COURT:  No.  The question was used in 42 countries

21   and had a thousand members.  I don't know what it means to say

22   that an association is used.

23           THE WITNESS:  I meant to say it was recognized.

24           THE COURT:  Recognized.

25           THE WITNESS:  Recognized in 42 countries.

1           THE COURT:  Okay.  Let's go.

2    BY MS. MASELLA:

3    Q.  When you noted that AFTE puts out periodical and training

4    materials and things like that, are you familiar with those

5    materials?

6    A.  Yes, I am.

7    Q.  And during the course of your work, do you regularly review

8    those materials?

9    A.  Yes, I do.

10   Q.  I want to ask you about a few specific things with respect

11   to the tool mark, the theory of tool mark comparison or firearm

12   identification based on tool mark comparison.

13           Have you participated in what is described as a 10

14   barrel test and a 10 slide test?

15   A.  Yes, I have.

16   Q.  Who administered or created those tests?

17   A.  They were created by an outside agency and they were

18   administered by the New York City Police Department during my

19   training.

20   Q.  And, can you explain what each of those tests, the 10

21   barrel test and the 10 slide test consisted of?

22   A.  I can explain.  The 10 barrel test is exceptionally they

23   take 10 consecutively made barrels with the same tool that

24   would make the inside of those barrels.  When they use just one

25   tool to make 10 consecutively made barrels, after they make the

1   barrel they then fire two bullets out of each single barrel so

2   it will be barrels 1 through 10, each would have two bullets

3   that would be fired out of it.  After that they would come up

4   with different -- they would fire different bullets out of

5   these barrels at what point I would get them and then I would

6   have to compare the different bullets to see which barrel they

7   came out of.  After I determined that they came out of a

8   specific barrel, I would then complete the test and I completed

9   that test.  And you have to get a hundred on the test or you

10  get it wrong and you have to start your training process all

11  over again.

12          But, basically what that 10 barrel test is used to

13  tell the difference what you -- you to determine what a

14  sufficient individual characteristic is because they're saying

15  it is a best known non-match between barrel 1 and barrel 2.

16          THE COURT:  I don't know what that means.  Best known

17  non-match.

18          THE WITNESS:  When a tool makes the inside of the

19  barrel the tool marks from the tool is left on the inside of

20  the barrel.  They can use the same tool to make 10 separate

21  barrels.  The tool -- the difference between barrel 1 and

22  barrel 2 I can tell based on the tool marks.  I can tell the

23  difference between those barrels.

24          THE COURT:  All right.  Well, I mean, I guess the

25  issue is you can tell this and are you applying the same test

1    that people in Australia are?

2              THE WITNESS:  Yes, we are.

3              THE COURT:  Okay.  So, what is the test?

4              THE WITNESS:  It is called a 10-barrel test.

5         Like I said, the person who created the test would

6    fire two bullets out of each consecutively made barrel.  I

7    would then get the bullets and they would give me a set of 20

8    bullets and I would have to see which bullet came out of which

9    specific barrel.  Then I send the test and they give me the

10   results back and if I fail the test --

11             THE COURT:  How do you tell -- so, what standard do

12   you apply in determining which bullet came from which barrel?

13             THE WITNESS:  I'm looking at the individual

14   characteristics and the sufficient individual characteristics.

15   The way I tell what is a sufficient individual characteristic

16   is I'm looking for the unique surface contours that are created

17   by the tool marks that is such of quantity and quality that

18   would be a practical impossibility for another tool to make

19   that mark.  Meaning when I'm looking at these tool marks I'm

20   looking at the peaks, I'm looking at ridges, furrows; I'm also

21   looking at the height, the depth, the width, the spatial

22   relationship between these peaks, ridges and furrows.  When I

23   determine that there is sufficient agreement between these

24   individual characteristics, I can say they were fired from the

25   same firearm or I can say they're fired from the different

1    firearm.

2              THE COURT:  Is there some standard as to how many

3    matches there has to be or how many corresponding peaks, ridges

4    or furrows there needs to be?

5              THE WITNESS:  There just has to be a sufficient

6    amount.  As I stated, that sufficient amount is based on the

7    quality and quantity of those individual characteristics.

8              THE COURT:  Define sufficient.  What is to say that

9    what you find sufficient somebody in Australia wouldn't find

10   insufficient?

11             THE WITNESS:  Well, the sufficient nature would come

12   from my training and experience as well as I described earlier,

13   by doing these tests, by doing this 10 barrel test I can tell

14   the difference between individual characteristics on barrel 1

15   and barrel 2.  These tests allow us to determine what is

16   sufficient based on the tool marks that are left behind during

17   these testing processes.  Basically, as I was stating before,

18   the best known non-match.  So when the same tool is used to

19   make barrel 1 and barrel 2, that is the closest these

20   individual characteristics are going to get.  I can determine

21   the difference between those characteristics during this

22   examination process.

23             THE COURT:  I'm not sure it is helping me at all so

24   keep going I hope it gets better.

25   BY MS. MASELLA:

D365dor7                         J. Fox – direct

1    Q.  Let me back up one second, Detective Fox.  You used the

2    term individual characteristics.  Are you also familiar with

3    the term class and subclass as well as individual

4    characteristics?

5    A.  Yes, I am.

6    Q.  Can you explain what all three terms mean and how they

7    might appear on a shell casing or a bullet?

8    A.  With respect to class characteristics, I can describe for

9    you, your Honor, as a 9 millimeter bullet would be a class

10   characteristics.  A bullet --

11            THE COURT:  Caliber is class characteristic.

12            THE WITNESS:  Caliber can be a class characteristic.

13   A parallel lines on the breechface left behind from the gun can

14   be a class characteristic.

15            So, if I have two 9 millimeter bullets that have

16   parallel lines going across it I would determine them to be in

17   the same class characteristic.

18            THE COURT:  You mean that is common to all guns of the

19   same make and manufacture?

20            THE WITNESS:  Possibly.  If I can explain it this way?

21            THE COURT:  The same series.

22            THE WITNESS:  The same series.

23            If I was going to compare two 9 millimeter cartridge

24   cases an one had parallel lines going across and the other one

25   had, let's just say arcs going -- arc type marks on it, I could

1    say just by looking at those characteristics that they were

2    fired from different firearms based on class characteristics.

3              Individual characteristics is --

4    BY MS. MASELLA:

5    Q.  Let me stop you there for one second.

6              You would at that point not be able to say, based on

7    class characteristics, that they were fired from the same gun?

8    A.  I'm sorry?

9    Q.  You could rule out those two pieces as being fired from the

10   same gun?

11   A.  Yes.

12   Q.  But let's say --

13             THE COURT:  Wait.  Again.  I'm glad you guys all seem

14   to know this but since I'm the fact finder you better explain

15   what methodology it is.

16             So, you can look at two casings and determine they

17   were not fired from the same gun because of what?

18             THE WITNESS:  As I described, the class -- it might

19   help.  If I have a bullet, the inside of a barrel --

20             THE COURT:  You are talking about a bullet.  The piece

21   of lead that has gone through the gun and is now in the wall

22   and has been extracted and is the lab?  Is that what you are

23   talking about?  Or a shell casing?

24             THE WITNESS:  I can describe.  The bullet --

25             THE COURT:  Is there testimony about bullets?

1            MS. MASELLA:  No, your Honor.

2            THE COURT:  Then I don't care about bullets, I want to

3      hear about shell casings.

4            THE WITNESS:  With cartridge cases, if I have two

5      cartridge casings and I put them under my microscope and

6      both -- or one cartridge casing has parallel lines going across

7      the cartridge case, the other cartridge casing has, instead of

8      parallel lines there is circles in the breechface impression, I

9      can automatically say that these were fired from two different

10     firearms based on class characteristics.  They're automatically

11     classified as not fired from the same firearm.

12           If I get two cartridge casings, I put them side to

13     side and I look at them, they both have parallel lines going

14     across, those are called -- I would have to determine if those

15     parallel lines were individual characteristics.  I could

16     determine if they were fired through the same firearm or

17     different firearms based on individual characteristics.

18           Sub-class characteristics are sometimes during the

19     manufacturing process of whether it be ammunition or let's say

20     a firing pin a certain tool mark will be left behind on that

21     tool that will be left behind on a certain lot of cartridge

22     casings or breechface impressions.

23           So, even though they weren't fired from the same

24     firearm they leave the same sub-class characteristic on the

25     firearm and we identify that sub-class characteristic.

1              MS. MASELLA:  May I approach, your Honor?

2              THE COURT:  Yes.

3   Q.  Detective, I'm going to show you what's been marked for

4   identification as 269 to 271, Government's Exhibits.  And you

5   also have in front of you Government Exhibit 268 and 267.

6   A.  Yes.

7   Q.  First of all, what are Government's Exhibits 268 and 267?

8   Those are the items in the small envelopes in front of you.

9              THE COURT:  Those are what?

10             MS. MASELLA:  These are the physical ballistics

11  pieces.

12             THE COURT:  All right.

13             THE WITNESS:  These are envelopes that were created at

14  the firearms analysis section containing evidence involved in

15  this particular case.

16  BY MS. MASELLA:

17  Q.  And is that the evidence that you in fact examined in this

18  case?

19  A.  Yes.

20             THE COURT:  These are shell casings or cartridge

21  casings?

22             THE WITNESS:  Yes, your Honor.

23             THE COURT:  Is there any difference between shell

24  casing and cartridge casing?

25             THE WITNESS:  Right.  They're both fired from

D365dor7                          J. Fox - direct

1    semi-automatics.  They're essentially just wording.  Now.

2              THE COURT:  If I call something a cartridge casing and

3    he calls it a shell casing, is one of us right?

4              THE WITNESS:  You're both right.

5              THE COURT:  They're interchangeable.  They're

6    synonyms.

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.

9    BY MS. MASELLA:

10   Q.  Detective, looking at Government's Exhibits 269 through

11   272, what are those items?

12   A.  These are pictures I took of the comparison of these

13   cartridge casings.  Essentially when I'm doing a comparison I

14   use a comparison microscope.  It is essentially two microscopes

15   that are combined through an optical bridge.  This allows me to

16   look at two pieces of evidence at the same exact time.  I don't

17   know if you notice the line going through the middle, that is a

18   demarcation line and that's what I'm looking at.

19             THE COURT:  I get it.

20             THE WITNESS:  Picture 269 is pictures of two different

21   cartridge casings.  Now, I noted earlier about class

22   characteristics, this would be --

23             THE COURT:  Before we get there.  So, this is a photo

24   from your microscope, that is a dual image?

25             THE WITNESS:  Yes, your Honor.

1    BY MS. MASELLA:

2    Q.  These are photos you took in connection with the

3    investigation in this case?

4    A.  Yes.

5            THE COURT:  What is on the right and what is on the

6    left?

7            THE WITNESS:  On the right is the cartridge casing

8    record from one crime scene and on the left it would be a

9    cartridge casing recovered from the scene of a homicide.

10           THE COURT:  One is 267 and one is 268 presumably, is

11   that right?

12           THE WITNESS:  Yes.  Exactly.  I can tell you the one

13   on the left is from 268 and the one on the right is from 267.

14           THE COURT:  Okay.

15           THE WITNESS:  As I described earlier, class

16   characteristics and sub-class characteristics, if you look at

17   269 the image on the right is a Wolff 9 millimeter cartridge

18   casing.  Now, if you look at the picture you see these lines

19   moving that way sort of at an angle.

20           THE COURT:  Top -- going from top right down to bottom

21   left, right?

22           THE WITNESS:  Yes; that's what we would call sub-class

23   characteristics, they were made during the manufacturing --

24           MS. FONTIER:  Your Honor, would it be possible to put

25   one on the ELMO so we can see what we are looking at?

 1              MS. MASELLA:  Plaintiff's Exhibit 269.

 2              MS. FONTIER:  Thank you.

 3              THE COURT:  He will explain.

 4              Does anyone have a laser pointer?

 5              MS. MASELLA:  Sorry, your Honor.

 6              THE COURT:  Just be explicit with your language.

 7         So you are talking about the photo on the right which

 8    is from 267 and you are showing that there is diagonal lines

 9    going from the top right to the bottom left?

10              THE WITNESS:  Exactly.  Those are what we call

11    sub-class characteristics.  Those lines are actually created

12    during the manufacturing process of that particular cartridge

13    and, as you can tell, when both of these images are next to

14    each other you can see the parallel lines actually going

15    through the sub-class so we can eliminate that sub-class

16    characteristic as not being made from that particular firearm.

17    BY MS. MASELLA:

18    Q.  Can I just interrupt you for one second?  How is it that

19    you are able to tell the diagonal lines on the right side of

20    the Exhibit 269 are sub-class characteristics?

21    A.  We are aware of the sub-class characteristics, number one

22    with the Wolff cartridge cases, but when you're comparing these

23    two cases to each other, it's going in the complete opposite of

24    the marks that were put on these cartridge casings from the

25    firearm so we can determine that that is ruled out as sub-class

D365dor7                         J. Fox - direct

1    characteristics and I would not compare these -- also, if you

2    notice, the line actually goes right through the firing pin and

3    that would be impossible for the gun to make that impression.

4              If we move on to Exhibit --

5              MS. MASELLA:  One second.

6    Q.   In other words, the sub-class characteristics you are

7    referring to are a sub-class of a set of ammunition during the

8    manufacturing process of the ammunition?

9    A.   Yes.

10   Q.   In this case?

11   A.   Yes.

12   Q.   And can you just explain what, for those of us less

13   knowledgeable, in the photo what is the firing pin in the

14   photo?  Or the firing pin impression rather?

15   A.   Right in the middle where that looks like the dimple,

16   that's a firing pin impression.  That's where the firing pin

17   struck the primer.  Around that area, I would say it looks like

18   a hole around that area is what is called the breechface

19   impression and those are the areas that came in contact with

20   that particular firearm that left those individual

21   characteristics.

22   Q.   Now looking at Government Exhibit 269, are there individual

23   characteristics present that helped you with your analysis and

24   can you explain what those are?

25   A.   Yes.

1          If we can go to Exhibit 270 I can show the individual

2     characteristics which I used to show that these two firearms --

3     these two cartridge casings were fired from the same firearm.

4          These are what we call individual characteristics.

5     This picture represents what I was looking at underneath my

6     microscope.  When I am looking at, in my microscope I'm looking

7     at the depth of the individual lines, I'm looking at curvature,

8     the ridges, the width from each other.  By using my comparison

9     microscope I'm able to match the cartridge casing and say

10    they're fired from the same firearm based on these individual

11    characteristics and that's an individual characteristic left

12    over from the breechface impression.

13         THE COURT:  So, I guess I'm trying it figure out how

14    many individual characteristics would you need to observe

15    before you could conclude that two shell casings were fired

16    from the same gun.

17         THE WITNESS:  Based on this particular area I would

18    conclude that this was sufficient agreement.  There was such a

19    quality and quantity of these individual characteristics --

20    like I said, I have looked at thousands of pieces of evidence

21    throughout my training program and through these specific tests

22    I was given such as a 10 barrel test, 10 slide test, I can

23    determine that these are individual characteristics that were

24    made during the manufacturing process of that particular

25    firearm and then left onto that particular cartridge casing.

1           What I am looking at under a microscope I am looking

2      at the depth of the lines, the width, the length, the spatial

3      relationship between these individual characteristics that's

4      actually not represented in this photo, but when I'm looking at

5      that I'm looking that they match perfectly and the quality and

6      quantity of these marks are such that it would be a practical

7      impossibility for two different tool marks to make that same

8      mark.

9   Q.  When you say not represented in the photo, is that because

10     there is a three dimensional aspect to your microscope view

11     that is not included in a two-dimensional photograph?

12  A.  Well, yes.

13  Q.  And how do you know -- you just referred to the 10-slide

14     test.  Can you explain, briefly, what that is and how something

15     like that gives you the ability to know what is sufficient when

16     you look at other pieces of evidence?

17  A.  A 10-slide test actually pertains to cartridge casings.  As

18     I described earlier with the 10-barrel test, the 10-slide test

19     was actually made for cartridge casing comparison for

20     breechface -- more for breechface comparison.  So, they took 10

21     consecutively made slides --

22  Q.  Let me stop you there.  What is the slide?

23  A.  The slide is the top of the semi-automatic handgun, that's

24     the area that actually pulls -- it moves back and forth and

25     puts the cartridge into the chamber.  When the cartridge is

1   fired, all of those gases that force the bullet out of the

2   chamber force the slide to the rear.  Located on that slide is

3   a hook that pulls that cartridge casing out of the weapon.

4       Now, the area where this -- the area right here and

5   around the head sit that sits on the breechface of this firearm

6   and within that -- in the middle of that breechface is what is

7   called an aperture, and that aperture is the hole where the

8   firing pin comes out.  When the firing pin comes out of that

9   hole it strikes this area making a firing pin impression.

10  There is so much force used that this area slams up against the

11  breechface and the marks that were made that were left on the

12  breechface during the manufacturing process are now impressed

13  onto this breechface which is a softer metal than the inside of

14  the firearm.  And those individual characteristics are now

15  impressed onto this cartridge casing.  With the 10-slide test

16  they use the same tool to manufacture each breechface from

17  slide 1 through 10 and, as I said before, they fire two

18  cartridge casings out of each barrel and then they give me a

19  lot of cartridge casings that I have to compare to each

20  specific barrel and, in doing so, you have to pick which

21  cartridge casing was fired from barrel 1 and which was fired

22  from barrel 2 and so on, until I come to my conclusions.  And

23  obviously if we get one wrong we get the test wrong.

24       THE COURT:  Who is to say what is right and what is

25  wrong?

D365dor7                           J. Fox - direct

1         THE WITNESS:  I am to say what is right and wrong

2    based on my training and experience.

3         As I stated, hundreds upon hundreds of hours under a

4    comparison microscope, thousands of pieces of evidence I have

5    looked at.  We studied the manufacturing process of these

6    firearms and upon doing so we know how a particular tool would

7    be left upon a breechface and then how that tool mark would

8    then be impressed onto a breechface.  And then we compare those

9    marks and we can tell that one tool does mark differently on

10   consecutively made barrels or slides in this particular

11   instance where the cartridge casing and these tools leave

12   different marks.

13         It is a practical impossibility for two different

14   tools to make that mark.

15   BY MS. MASELLA:

16   Q.  Why do you say that?  How does something like the 10-slide

17   test enable to you have that conclusion, that it is a practical

18   impossibility for two slides to leave marks like the one that

19   we're seeing in Government Exhibit 270?

20   A.  Well, when they're making the slides or the breechface they

21   use the same tool in each slide and each barrel or each slide

22   has different individual characteristics than the one before

23   it, and we can determine that by they fire known -- they fire

24   known cartridge casings out of barrel 1, they fire known

25   cartridge casings out of barrel 2 and we do our comparison

1    based off that and they're all different from each other.

2    Q.  So, when you're looking at pieces of ammunition that were

3    fired from consecutively made slides, is it fair to say that

4    the class and sub-class characteristics would be the same?

5    A.  The class characteristics would be the same from

6    consecutively matched -- consecutively made barrels, yes.

7    Q.  And the sub-class made may be the same?

8    A.  This could be sub-class on the 10 consecutive barrels but

9    that would be identified and eliminated through the individual

10   characteristics.

11   Q.  In other words, when you are looking at consecutively made

12   slides this is the closest that you're ever going to get

13   without actually having a match because it is the same tool

14   mark making the same slide in consecutive order.  Is that fair

15   to say?

16   A.  It is the same tool making each slide consecutively so

17   that's the closest -- that's the closest non-match you would

18   get, is between slide 1 and slide 2.  That would be the closest

19   non-match, yes.

20   Q.  Now, when you examine evidence in your lab through the

21   comparison microscope, when you are completed with your

22   examination is there any sort of peer review that occurs after

23   you have made your examination?

24   A.  Yes.  Every one of our cases, a hundred percent, is

25   peer-reviewed and verified meaning that another examiner also

1    looks at my work, determines his results, and then if he agreed

2    with my results he would sign the bottom of the form and he

3    would verify my results as well.

4    Q.  Did that happen in this case?

5    A.  Yes.

6    Q.  Did the second person reviewing your determinations agree

7    with your determinations in this case?

8    A.  Yes, he did.

9    Q.  And what happens if there is not agreement in a particular

10   case?

11   A.  Then it would go to another examiner or a supervisor at the

12   firearms analysis section and we would take further action upon

13   that to see if there is a conclusion.

14   Q.  I just want to look at Government Exhibit 272 for a moment.

15   Can you tell us what it is that we are looking at in that

16   photograph?

17   A.  That's more individual characteristics left from the

18   breechface of the firearm that were impressed onto this

19   particular cartridge casings.  As I stated earlier, that's of

20   such quality and quantity that for two different tools to make

21   that mark would be a practical impossibility.

22            THE COURT:  What is the quantity?  Explain to me what

23   you mean when you say the quantity.

24            THE WITNESS:  Well, if we can go back to Exhibit 269

25   and I can show you the different areas where we got the

1    individual characteristics?

2              If you look at the cartridge casing on the right, to

3    the right of the firing pin impression there is individual --

4    there is individual characteristics to the right of the firing

5    impression left on the breechface.

6              THE COURT:  There is scratches on both.  I will say

7    that.  Let's just say that.  I see scratches in the same spot

8    on both, to the right, right around 2:00.

9              THE WITNESS:  The size of that breechface is

10   sixteen-thousandths of an inch.

11             THE COURT:  Of what breechface?

12             THE WITNESS:  Of this 9 millimeter breechface.  On

13   each cartridge it is sixteen-thousandths of an inch.  Within

14   that sixteen-thousandths of an inch we had all those individual

15   characteristics going one on top of each other that lined up

16   perfectly --

17             THE COURT:  What are all of those?  What are you

18   referring to?

19             THE WITNESS:  I'm looking at, if you can go to Exhibit

20   270 again, within that sixteen-thousandths of an inch all

21   those -- there is that set of individual characteristics, there

22   is --

23             THE COURT:  What is the set you are talking about?

24   Articulate to me what you are referring to.  Each line which

25   looks like striations in rock?  Stratifications in rock?  Is

D365dor7                        J. Fox - direct

1    that what you mean?

2              THE WITNESS:  That's metal that we are looking at.

3              THE COURT:  I know that.  I'm not an idiot.

4         I'm asking -- you keep saying the quantity of

5    characteristics and are not telling me what are the

6    characteristics you are referring to.  What specifically are

7    you referring to?

8              THE WITNESS:  I'm referring to the striations that are

9    left behind that are those parallel lines going back and forth.

10             THE COURT:  What is one of them -- what is the

11   quantity of them that you see here?

12             THE WITNESS:  I can see probably 10 in a row.  10

13   lines in a row, that would be a quantity of quality.  There can

14   be 10 of those individual striations in a row that are such

15   quality and quantity that I could state that --

16             THE COURT:  I will give you a red pen, you draw a line

17   through the striations that each one of which is one quantity,

18   one measurable characteristic that you think is an individual

19   characteristic.

20             THE WITNESS:  Well, it would --

21             THE COURT:  Just draw it.  Just show me what you are

22   referring to.  You said at least 10 so draw me lines through

23   10.

24             THE WITNESS:  It doesn't work.  This whole area, all

25   these lines going across are called striations.

D365dor7                          J. Fox - direct

1              THE COURT:  All right.

2              THE WITNESS:  To me that's such quality and quantity

3     enough that for any other tool to make those striations, it is

4     practically impossible for two different tools to make that

5     mark.  One tool made that mark.  That particular tool was left

6     on the firearm, those tool marks were left on the firearm.

7     When those separate cartridge casings came into contact with

8     that breach face, those striations were left from the

9     breechface and impressed on to these cartridge casings.  Based

10    on all of this alone, that's the bottom of the cartridge, this

11    is the top area, it is the same thing.  All of these going

12    across are called striations.

13             THE COURT:  Right.

14             THE WITNESS:  When you put these two areas together,

15    then a firing pin impression that looks like that, that, to

16    me -- that to me is what I consider such quality and quantity

17    that it's a practical impossibility that two different tools

18    would make that mark.  One tool made that mark which is one

19    firearm, on both of these cartridges.

20             THE COURT:  I think where we are running into

21    confusion is I want to hear about the methods and principles

22    and that's what I mean by asking quality and quantity and

23    characteristics and you seem to want to get to the conclusion

24    that you have drawn that these are fired from the same weapon

25    and so I think we're talking past each other.

1          So, do you have any questions that are going to go to

2     this?

3          MS. MASELLA:  Yes.

4     BY MS. MASELLA:

5     Q.  Detective Fox, is there a particular number that you're

6     looking for when you talk about quantity?  Is there an explicit

7     number?  Five, six, 10 or 15 such characteristics?

8     A.  There is not a specific number, no.

9     Q.  So, how do you know what is sufficient or what's of a

10    sufficient quality and quantity?

11    A.  As I keep describing, when this unique surface contour is

12    so sufficient and sufficient I mean by the spatial relationship

13    between these surface contours, the depth of these surface

14    contours, the length of these surface contours, when there are

15    so many of these surface contours that are unique to each other

16    that match each other from two different pieces of evidence is

17    so unique, that's what I consider sufficient.

18    Q.  Is the standard that you're applying the same standard

19    applied by other microscopic examiners in the field of tool

20    mark comparisons?

21    A.  Yes.

22    Q.  How do you know that?  Can you explain that to us?

23    A.  We're an accredited laboratory, and within that

24    accreditation we are accredited by the ASCLD Crime Lab.  That

25    stands for the Association of Crime Lab Directors.  We're also

D365dor7                              J. Fox - direct

1   an accredited lab by ISO.  ISO is the International

2   Organization of Standardization.  The ISO is one of the highest

3   accreditations in the world meaning that the lab report I do in

4   my particular, in my lab, would mean a lab technician in Sweden

5   would be able to get the same conclusions I did based on our

6   scientific method.

7   Q.  And are your lab reports and your conclusions reviewed by

8   these accreditation organizations?

9   A.  Yes.

10  Q.  Can you explain what that review process is?

11  A.  They come to the lab, they grab our reports, they look at

12  our procedures and then they review our procedures and our

13  method.  Our specific scientific method is located in the

14  firearms and analysis section standard operating procedure 14.

15  They will review our standard operating procedure.  They would

16  make sure that based on our standard operating procedure that

17  we adhere to the scientific method.  Once they realize that

18  they -- that we adhere to the scientific method that they did,

19  they review all of those policies to make sure our scientific

20  method is the same as their scientific method.

21          THE COURT:  I don't know what that means, that their

22  scientific method is different from your scientific or is the

23  same as your scientific method.

24          THE WITNESS:  We're an accredited lab.  ISO which is

25  an international accreditation, they want to make sure we're

1   following the same scientific method as a firearms

2   identification unit in, let's say, Sweden, and we passed all of

3   our accreditations and have the highest level of accreditation.

4   BY MS. MASELLA:

5   Q.  Did you actually review particular determinations in

6   particular cases to see if they agree with the determination

7   that was made by a certain examiner?

8   A.  Yes.

9   Q.  And how often does that occur?

10  A.  Our most recent accreditation was done this past year by

11  ASCLD lab.  As I stated, that is the Association of Crime Lab

12  Directors and we passed that accreditation process.

13  Q.  Do you know whether your work has been reviewed by these

14  organizations?

15  A.  Yes.  It has been.

16  Q.  And, again, when they're reviewing, are they -- these

17  characteristics that you talk about, the sub-class, the class

18  and the individual and having a sufficient number, are these

19  the same standards that are used by these organizations and by

20  other tool mark examiners?

21  A.  Yes, they are.

22          THE COURT:  But the standard -- it seems to me it is a

23  phrase.  That's why I'm wondering, it is of sufficient quality

24  and quantity.  That's the standard.  I don't know how one can

25  articulate what that standard is because sufficient is, by

D365dor7                         J. Fox - direct

1    definition, something that is enough or qualifies to meet the

2    needs of a proposed situation.  So, I don't understand, really,

3    how that helps.

4           The peer reviews, how often do peer reviews result in

5    different conclusions?

6           THE WITNESS:  I would not be aware of that particular

7    statistic.  If the peer review would result in someone

8    disagreeing with that, like I said, that would go to a

9    supervisor and we handle it that way.  In this particular case

10   there was no disagreement within the peer review process.

11   BY MS. MASELLA:

12   Q.  Do you know how often peer review, with respect to your own

13   work, has resulted in a difference of opinion than that of a

14   supervisor?

15   A.  In my particular example of myself, we get proficiency

16   tests every year.  I have never failed a proficiency test.

17   However, I'm human, I do make mistakes.  So, in a peer review

18   process it is possible I make spelling errors.  These spelling

19   errors would be noticed during the peer review and have to be

20   corrected.

21          THE COURT:  Spelling errors?

22          THE WITNESS:  I'm saying administrative-type errors.

23   But as far as errors with respect to identifying particular

24   individual characteristics of the firearms, I have not made an

25   error in that particular field, no.

D365dor7                        J. Fox - direct

1    BY MS. MASELLA:

2    Q.  So, with respect to the peer review of your examination of

3    ballistics evidence in your career, there has never been a time

4    when a peer reviewer has had a difference of opinion as to the

5    identification of the ballistics evidence, that is, whether it

6    came from the same firearm or different firearms?

7    A.  That's correct.

8    Q.  Then you can't speak for the lab in general, that is your

9    experience with peer review?

10   A.  Yes.

11          THE COURT:  How did the accreditation process.

12          THE WITNESS:  The accreditation process would be

13   examiners, for example, with ASCLD labs, examiners from

14   different parts of different labs throughout country would come

15   to our lab, they're at our lab for -- it could be a week.  They

16   will review our standard operating procedures, they will review

17   how evidence is intaked into the lab.  They review the

18   methodology I used to get to my conclusions.

19          THE COURT:  Where is the methodology you used to get

20   to your conclusions?  Is that written down?

21          THE WITNESS:  That's written down in the Firearms

22   Analysis Section Standard Operating Procedure 14.

23          THE COURT:  All right.  Do I have those?

24          MS. MASELLA:  No, your Honor.  But the Detective can

25   explain what the standard operating procedure is for, let's say

1    the examination of shell casings which is the relevant inquiry

2    in this case.

3           THE WITNESS:  With our scientific matter it wouldn't

4    matter if you are looking at cartridge casing or bullets.  We

5    use the same process every single time to come to our

6    conclusions meaning I would sign out evidence from the control

7    room.  I would make sure none of the evidence is tampered with

8    meaning none of the seals were broken.  I would then make sure

9    all of the evidence listed on the voucher in front of me was

10   actually in front of me and sealed in a security envelope.  I

11   would then take each piece of evidence out of the security

12   envelope.  I would initial each piece of evidence with a unique

13   identifier, it would be item 1, item 2.  Also would go on that

14   would be a case number from whatever case it came from.  After

15   that I would do a preliminary investigation.  I would determine

16   like for a cartridge casing, for example, a 9 millimeter

17   cartridge casing with individual -- with parallel lines as

18   being a class characteristics.  Once I determined that these

19   cartridges exhibit the same class characteristics I would then

20   try to determine if the individual characteristics were

21   sufficient enough to say they were fired from the same firearm.

22   By doing this I use --

23   Q.  Let me stop you there for one second.

24          I think there is still a little bit of confusion as to

25   when you're looking at a particular piece of evidence such as a

1    cartridge casing.  How you can tell what is a class

2    characteristic and what is an individual characteristic?

3    A.  Well, the class characteristic would be they are both 9

4    millimeter cartridge casings.  That would be the class.

5    Q.  What about at between sub-class and individual

6    characteristics?

7    A.  Sub-class we would identify during our examination process.

8    The initial process would -- if I had a .45 caliber cartridge

9    and a 9 millimeter caliber cartridge they would be in different

10   class characteristics and I could say automatically, without

11   looking at them, that they were fired from different firearms

12   because there is no way the 9 millimeter can be fired out of a

13   45 and there is no way a 45 can be fired out of a 9 millimeter.

14   Then, once I determine the class characteristics, I would then

15   start my examination process through the comparison microscope.

16        As I stated earlier, the comparison microscope is two

17   microscopes essentially combined through an optical bridge.  It

18   allows me to look at two different pieces at the exact same

19   time.  When I'm going through this process I'm looking for the

20   individual characteristics created during the manufacturing

21   process of a particular firearm and those individual

22   characteristics would be impressed onto the cartridge casing or

23   bullet.

24        Once I determine the individual characteristics we

25   then have pictures that we take of the individual

1    characteristics which are represented in this photo.  We then

2    do case notes saying these two cartridge casings were fired

3    from the same gun based on the firing pin and breechface

4    impression.  And then we would do a main report stating such:

5    Cartridge casing marked 1 was compared to cartridge casing

6    marked 2 and I determined that they were fired from the same

7    firearm.  After that I would then seal the evidence in each

8    white evidence envelope and then I would put that evidence into

9    its particular place where it's held.  And then the case --

10   before that the case would be peer-reviewed and verified,

11   technically reviewed.

12           MS. MASELLA:  Your Honor, I don't know if the Court

13   has further questions about a particular area.  I know we are

14   talking about sufficient and what is sufficient.  I think that

15   it is clear through the testimony there is quantity, there is

16   no specific number.  I don't know if the Court has further

17   questions about that.

18           THE COURT:  Well, I'm not sure that anybody can give

19   me a definition of what sufficient means but let's hear the

20   cross.

21           Who is doing the cross, Ms. Fontier?

22           MR. ROTH:  I will just reserve five minutes, Judge, at

23   the end.

24           THE COURT:  Okay.

25   CROSS EXAMINATION

D365dor7                          J. Fox - cross

1    BY MS. FONTIER:

2    Q.  Good evening probably at this point, Detective.

3    A.  Good evening.

4    Q.  I am probably going to ask you what are incredibly basic

5    questions because I don't have my NRA card, this is sort of new

6    to me so I just want to see if I am understanding what you're

7    saying to me here.

8           When -- and limit yourself, if you can, to talking

9    about cartridge casings or shells, okay?

10   A.  Yes.

11   Q.  Because that's what we're talking about here, right?

12          Now, the marks that are on a cartridge casing, you

13   study those; right?

14   A.  Yes.

15   Q.  And because you testify regularly you stay apprised of

16   developments in this field, right?

17   A.  That is correct.

18   Q.  And now so you're aware that just looking at the marks on

19   these, that basic premise that each firearm would leave a

20   unique set of marks has never actually been proven, right?

21   A.  I don't follow -- it is proven to me based on my

22   examination that that one particular tool left a mark on a

23   particular firearm that were impressed onto these two cartridge

24   casings that was from the same firearm.

25   Q.  But the basic premise that any one gun would leave the same

1   marks on every bullet, shell that came out of it, has never

2   been proved?

3   A.  The theory of uniqueness?

4   Q.  Yes.

5   A.  I'm not aware if it's been proven.  But the theory of

6   uniqueness is that no two objects are the same.

7   Q.  And then that theory is what this entire study is based on,

8   correct?

9   A.  Well we, through the theory of uniqueness, we say that no

10  two tools will make the same mark.  Based on that we go off

11  what we determine as sufficient surface contours to say that it

12  was fired from one particular tool to another.

13  Q.  But your starting point is a theory that these are unique?

14  A.  Yes.  We follow that scientific principle, yes.

15  Q.  Now, you're also aware of the National Science Academy,

16  correct?

17  A.  Yes, I am.

18  Q.  And the National Research Center?

19  A.  Yes, I am.

20  Q.  And let's call them the NRC for short.  You are aware that

21  the NRC issued a report calling into question that very basic

22  premise that you are saying is scientific?

23  A.  I think that from what they were saying that more was to be

24  used in the study but the study -- this particular science has

25  been used for a hundred years, let's just say, you know, and

D365dor7                          J. Fox – cross

1    that more study would go into looking into that particular

2    field.

3    Q.  And the field of gun manufacturing from 100 years ago when

4    this science, this theory was developed has drastically

5    changed, correct?

6    A.  The basic premise on how firearms are manufactured using

7    tools is the same premise then as it is now.

8    Q.  But a hundred years ago the majority of firearms were

9    manufactured by hand, right?

10   A.  I'm not aware of how firearms are exactly made a hundred

11   years ago but I would say they were used by tools.  To make a

12   firearm you would need a tool to make that particular firearm.

13   Whether someone used a hand tool to do that, that might have

14   been the case, but tools were used to make particular firearms.

15   And when a tool, a particular tool comes in contact with other

16   metal, those marks are going to be impressed on those tools and

17   be left behind as tool marks.  Every time that tool touches a

18   different piece of metal those tool marks are being changed and

19   will be left differently on the next firearm that it makes.

20   Q.  But you're aware that it is commonly accepted in the field

21   that machine manufacturing has made it more difficult to

22   compare firearm markings, that there are less unique markings

23   on each shell, correct?

24   A.  That is not correct.  No.

25   Q.  So it is your opinion, then, that a machine-manufactured

D365dor7                              J. Fox - cross

1  gun may have the exact same amount of markings as a

2  hand-manufactured gun?

3  A.   It is my opinion, which I based on different tests that we

4  have taken, that tool marks left on particular areas of a

5  firearm are different each time that tool comes in contact with

6  a particular area of the firearm, yes.

7  Q.   I am not talking about the tests that you have taken

8  recently.  I'm saying that a gun that was manufactured by

9  somebody literally making it by hand using their hand tools

10  versus a gun that was machine manufactured in, like, the Luger

11  factory, they're going to have different manufacturing

12  processes, correct?

13  A.   Well, being that they're making it by hand would be a

14  manufacturing process, so yes.

15  Q.   And you would agree that the one made by hand would have

16  more variations than the machine manufactured gun, between tool

17  marks -- or between firearms?

18  A.   I would not agree to that, no.

19                    (Continued on next page)

20

21

22

23

24

25

D36Wdor8                          J. Fox - cross

1   BY MS. FONTIER:

2   Q.  All right.  Let me see.  Maybe I'm saying this wrong.  If I

3   make two guns by hand, the variations from one gun to the next

4   will be greater than two guns manufactured by the same machine,

5   correct?

6   A.  I wouldn't say that's correct.  I would have to see the

7   toolmarks to determine if that's correct.

8   Q.  So you don't accept that basic premise, that machine

9   manufacturing has narrowed the field?

10  A.  I wouldn't say that, no, because, like I said, I examine

11  toolmarks on each individual piece of evidence.  I don't look

12  to determine if machine toolmarks are less or more.

13  Q.  Okay.  I'll move on.

14          You've talked about the methodology that you use, your

15  standard methodology.  Tell me if I'm understanding this

16  incorrectly.  Your methodology is to look at two shells,

17  correct?  You place them on your microscope and you look at

18  them?

19  A.  That wouldn't be our method, no.

20  Q.  Tell me what IT means to do microscopic examination then.

21  A.  Well, based on our scientific method, you follow a standard

22  operating procedure.  As I stated earlier, you look for, the

23  question we would have is if we have two different pieces or

24  two cartridge casings, two different cartridge casings, we

25  would try to determine if they were fired from the same guns or

1   multiple guns, and that would be our question.

2   Q.  All right.  Let me stop you for a minute?  I'm asking you

3   about what you specifically physically do.  You take shell No.

4   1 and you take shell No. 2 and you put them each under a

5   microscope, correct?

6   A.  Yes.

7   Q.  And those are connected by a bridge, correct?

8   A.  The microscope's connected to an optical bridge, yes.

9   Q.  And you look through that optical bridge so you can see two

10  shells at the same time?

11  A.  That's correct.

12  Q.  And you look at them?

13  A.  I look at them.  I study them to study their individual

14  characteristics and to see if those, based on the individual

15  characteristics, from the toolmarks left behind from the

16  firearm, if they're fired from the same gun or different guns.

17  Q.  But am I incorrect that what you are doing is physically

18  looking with your eyes through a microscope at two shells at

19  the same time?

20  A.  Yes.

21  Q.  And those microscopes don't do anything other than make it

22  bigger so that you can see it easier, correct?

23  A.  They magnify the individual characteristics, yes.

24  Q.  So you are looking at the shells, and then you are looking

25  for certain marks, correct?

D36Wdor8                          J. Fox - cross

1    A.  I'm looking for toolmarks, yes.

2    Q.  Now, I want to get into the class, subclass, and individual

3    characteristics.  A class characteristic, that is somebody that

4    defines, if you have a particular shell, it would fit into

5    anything within that class, correct?

6    A.  That's correct.

7    Q.  All right.  And that is something such as the caliber?

8    A.  That's correct.

9    Q.  And also, are revolver versus semiautomatic shells

10   different?

11   A.  It would be -- a .38 Special would be a .38 Special class.

12   Q.  Okay.  Are there any marks on the shell that count as class

13   characteristics?

14   A.  Yeah.  It could be the direction in which those

15   characteristics are going, whether they're in parallel lines,

16   whether they're rectangular, whether the impression on a

17   rimfire was rectangular as opposed to circular, that would be a

18   class characteristic, yes.

19   Q.  So, let's talk about parallel lines.  Those could be a

20   class characteristic?

21   A.  Yes.

22   Q.  And if they all go one direction, it could be common to the

23   class?

24   A.  It would be, that class characteristic would be parallel

25   breech face impressions, yes.

D36Wdor8                         J. Fox - cross

1   Q.  So if there was a set of shells with a bunch of parallel

2   lines going the same direction, that could all be just a class

3   characteristic?

4   A.  We would determine that to be a class characteristic in

5   that if I had, if the shell I was comparing, the cartridge

6   casing I was comparing it to didn't have those parallel lines

7   but had circles, I could say they were fired from different

8   guns based on class characteristics.

9   Q.  But I'm talking about two shells under your microscope that

10  you're looking at and they both have parallel lines going in

11  the same direction.

12  A.  They would be in the same class characteristic, yes.

13  Q.  When would those parallel lines be anything other than a

14  class characteristic?

15  A.  Those parallel lines are actually -- that's what I'm trying

16  to explain to you, are individual characteristics.  Through our

17  scientific method, we go through a scientific method, we

18  determine the class characteristics of our cartridge case

19  notes, so I can eliminate two cartridge casings to each other

20  if one has parallel lines and one doesn't.  The parallel lines

21  itself are individual toolmarks, individual characteristics of

22  that particular firearm.

23  Q.  Can you see this?

24  A.  I can, yes.

25  Q.  And you have a screen up there.

D36Wdor8                          J. Fox - cross

1       These two parallel lines here that I'm pointing at, this

2   one goes this way, this one goes this way.  That's a parallel

3   line, correct?

4   A.  Yes.

5   Q.  What makes that not a class characteristic?

6   A.  It is a class characteristic.

7   Q.  So these two parallel lines could have been made by any gun

8   that fits within this class?

9   A.  No.  Not in this -- these are, this is what I'm trying to

10  explain to you.  Those are class characteristics.

11  Q.  Okay.

12  A.  If the one, if the cartridge casing on the right didn't

13  have parallel lines but, in fact, had arcs or circles in that

14  area, they would be fired from different firearms based on

15  class characteristics.  I could eliminate them right off the

16  bat without even looking at them.  When I see two cartridge

17  casings that have the same class characteristics, I would

18  examine them and examine their individual characteristics.

19  Those parallel lines, those sets of parallel lines are

20  individual characteristics.  The direction in which they go is

21  what's the class.  If Glock manufactures their firing pin,

22  their firing pin shape is elliptical, meaning it's in this

23  shape.  If the, if I was comparing two cartridge, if I was

24  comparing two cartridge casings and one had an elliptical

25  firing pin and one had a circular firing pin, I could say

1    they're fired from different firearms based on class

2    characteristics, so -- but if I had two Glock cartridges on my

3    microscope and they both had elliptical firing pins, I would

4    say their elliptical firing pin is a class characteristic of

5    the specific firearm.  I would then compare the individual

6    characteristics within that class to see if they're actually

7    fired from the same gun or fired from different firearms.

8    Q.  Let me slow you down for a minute.  Let's say we have a

9    nine millimeter Luger handgun semiautomatic and we have ten

10   more of those that were all made within the same time period.

11   So we have ten nine millimeter Luger handguns that were made at

12   similar times.  All right?

13   A.  Yes.

14   Q.  Might those all have parallel lines?

15   A.  Well, as I stated earlier in my testimony, I did a

16   particular test and examination where ten consecutively made

17   slides were made from High Point.  Every one of those slides,

18   the breech case had parallel lines going across it, thus being

19   the same class characteristic.  Once I determined that all

20   those parallel lines were the same class characteristic, I then

21   studied each cartridge casing to determine if one cartridge

22   casing was individual, was fired from the same firearm based on

23   the individual characteristics located within those parallel

24   lines.

25   Q.  Who defines what is a class characteristic?

D36Wdor8                         J. Fox - cross

1   A.   Who -- the, the lines being parallel is defined as a class

2   characteristic.  A nine millimeter cartridge would be a class

3   characteristic.  Two cartridge casings fired out of a nine

4   millimeter firearm with parallel lines would be a class

5   characteristic.  The class characteristics would be determined

6   by the firearm manufacturer.

7   Q.   And class characteristics do not tell you that bullets were

8   shot from the same gun, correct?

9   A.   They do not tell me.  I look for the individual

10  characteristics.

11  Q.   And parallel lines are a class characteristic?

12  A.   Parallel lines are a class characteristic of a particular

13  firearm, yes.

14  Q.   So looking at parallel lines does not tell you that these

15  two bullets were shot from the same gun, right?

16  A.   I don't just look at the parallel lines.  I look at the --

17  Q.   That's the only question.

18  A.   I don't get the question.

19  Q.   If parallel lines count as a class characteristic, then

20  that does not tell you --

21  A.   I --

22  Q.   You cannot draw a conclusion from that?

23  A.   Exactly.

24  Q.   Right?

25  A.   I would not be able to determine, I would not be able to

1   come to a conclusion based on just class characteristics alone.

2   I would have to study the individual characteristics of that

3   particular cartridge casing.

4   Q.  And in all of your training and in all of your experience,

5   have you ever seen a written set of definitions about what

6   constitutes a class characteristic?

7   A.  I don't understand what you mean.

8   Q.  You said there's three types of things you're looking for,

9   right?  Class, subclass, and individual, right?

10  A.  I wasn't saying I was looking for them.  I was describing

11  what a class characteristic is.  I was describing what

12  individual characteristics were.  Then I was describing what

13  subclass characteristics were.  When I'm making identifications

14  between two different cartridge casings, I'm looking for the

15  individual characteristics created during the manufacturing

16  process.  Those individual characteristics that are created by

17  a tool, a specific tool for that firearm, was left on the, on

18  to the weapon and then impressed on to a particular cartridge

19  casings.  Those are called individual characteristics.  I'm

20  looking at the individual characteristics.  I'm looking at the

21  depth of those individual characteristics, the lengths, the

22  widths, the spatial relationships between those individual

23  characteristics, and I'm looking to determine, based on all

24  that knowledge and my training, determine if they're fired from

25  the same firearm.  We use class characteristics for a totally

1    different field.

2    Q.   Very, very basic question.  Do you decide what is a class

3    characteristic, or is there a definition that is accepted in

4    your field?

5    A.   I gave a definition of what a class characteristic is.

6    Q.   Who decided that?  You?  Or is there an accepted

7    definition?

8    A.   There's an accepted definition that was given by AFTE,

9    which is the Association of Firearm and Toolmark Examiners, an

10   organization that is recognized in 42 countries and has been

11   around since 1969.  They would come up with the term class

12   characteristics.

13   Q.   And is parallel lines a class characteristic?

14   A.   As I stated earlier, parallel lines are the class

15   characteristic.

16   Q.   Okay.  So parallel lines on two shells cannot tell you that

17   they came from the same gun?

18   A.   I would look for the individual characteristics within

19   those parallel lines.  Just regular parallel lines going across

20   the breech face would not tell me if they were fired from this

21   particular firearm.

22          THE COURT:  But if you compared two shell casings and

23   one had parallel lines and one had elliptical lines, then you

24   could conclude that they're not, they have different class

25   characteristics, so they couldn't have been fired from the same

1    gun?

2              THE WITNESS:  Exactly.

3              THE COURT:  Let's move on to individual

4    characteristics.

5    BY MS. FONTIER:

6    Q.  I just want to make it clear that just having parallel

7    lines is not sufficient to say they came from the same gun, is

8    that right?

9    A.  I would never say two cartridge casings were fired from the

10   same firearm based on the class characteristics.

11   Q.  Looking at these pictures again, the one on the right, as

12   you pointed out, has a bunch of diagonal lines in addition,

13   correct?

14   A.  Yes.

15   Q.  And you're saying that those are not class characteristics,

16   the diagonal lines?

17   A.  Those are subclass characteristics.

18   Q.  Who decides what is a subclass versus a class?

19   A.  We determine subclass characteristics through our training,

20   experience.  I actually wrote an article on subclass

21   characteristics.  Some particular cartridges made during their

22   machine process, during their manufacturing process, some of

23   the marks from that process would be then left upon the

24   cartridge casings.  So, theoretically, two unfired cartridge

25   casings that have never been in a gun, you could match up to

D36Wdor8                         J. Fox - cross

 1   each other based on the individual characteristics.  Those

 2   characteristics were made during the manufacturing process of

 3   that particular bullet or cartridge, and they would be present

 4   on this particular -- as in this case, on the cartridge on the

 5   right, those parallel lines going across from top right down to

 6   the bottom left, those were made during the manufacturing

 7   process of that particular cartridge.

 8   Q.  How do you know that they were not made by pressing against

 9   the breech face of the gun?

10   A.  They're not made because all Wolf cartridges have that,

11   those lines going across the breech.  That's from a tool used

12   to make the press, that primer into the cartridge.

13   Q.  And did you compare this bullet to other Wolf casings to

14   make sure that that was true?

15   A.  Well, in this particular case, I didn't have any other Wolf

16   casings to compare it to.

17   Q.  If you said that all Wolf casings had these lines, clearly

18   you could have gotten a Wolf casing and compared it, yes?

19   A.  I don't understand why I would do that.

20          THE COURT:  What's your basis for saying that all Wolf

21   shell casings have that line?

22          THE WITNESS:  We're aware of how Wolf manufactures

23   their casings.  We've researched how they manufacture those

24   casings.  When they manufacture those casings, those lines you

25   could actually see go right through the firing pin impression.

D36Wdor8                        J. Fox - cross

1   They don't stop.  They're not broken up.  So the other, the

2   breech face impressions actually are perpendicular to those

3   lines going across.

4                THE COURT:  I get that.  It's a simple question.  Your

5   basis for knowing that all Wolf shell casings have that

6   characteristic is because it's a manifestation of the way the

7   shell casing was manufactured?

8                THE WITNESS:  Yes.

9                THE COURT:  That's based on your experience, based on

10  writings that you've seen from other places?

11               THE WITNESS:  It's based on research and writings that

12  we've read.  Also me seeing thousands of Wolf cartridges and

13  how they're made.

14               THE COURT:  That's an example of a subclass

15  characteristic.

16               THE WITNESS:  Yes.

17               THE COURT:  There are other subclass characteristics

18  that are not based on the manufacture of the shell casing?

19               THE WITNESS:  Correct.

20               THE COURT:  So what are some of those other subclass

21  characteristics?

22               THE WITNESS:  There could be a particular, for

23  example, there could be a particular burr located on the firing

24  pin when that firing pin is made, and that burr leaves a mark

25  on 15 different firing pins and 15 different guns, so that same

1   mark would be left upon 15 guns.

2            THE COURT:  So not every member of the class would

3   have that marking?

4            THE WITNESS:  Exactly.

5            THE COURT:  Okay.  Let's get to individual.

6            MS. FONTIER:  All right.

7   Q.  Moving on to, again, the individual characteristics, that's

8   what you actually need to examine, correct?

9   A.  Yes.

10  Q.  And I believe the judge asked you this, but I am not sure

11  if you actually answered it.  Is there any accepted number of

12  individual characteristics that need to match before you can

13  declare that these are from the same gun?

14  A.  There's no specific number.  I determine what's sufficient

15  based on my examination process.  As I stated earlier, based on

16  my training and experience, based on the thousands of cartridge

17  casings that I've looked at, based on the ten barrel tests I've

18  taken, based on the ten slide tests I've taken, based on the

19  competency tests that I've been given and passed from outside

20  agencies and proficiency tests I've taken every year from our

21  quality assurance division, I can determine what an individual

22  characteristic is to a particular firearm.

23  Q.  But it's subjective, right?

24  A.  Our science is subjective in nature.  Yes, it is.

25  Q.  The entire science is subjective in nature?

D36Wdor8                           J. Fox - cross

1    A.  Yes, it is.

2              THE COURT:  What makes it a science?  I guess that's

3    what I keep coming back to.  This sounds like more art than

4    science.  You're obviously very expert.  You're very, very

5    experienced.  You have a good eye.  You've been doing this for

6    a long time.  But how is this a science and not just your

7    ability to determine what things are alike and what things are

8    not alike?

9              THE WITNESS:  I would say it would be a science based

10   on that we used a scientific method to get to our conclusions.

11             THE COURT:  What's the scientific method?  It seems to

12   me the standard is sufficient agreement and you decide whether

13   there is sufficient quantity and quality to reach that

14   standard.

15             THE WITNESS:  Well, throughout our years of practicing

16   this type of firearms identification, we've come to realize

17   that when tools come in contact with other metals, that those

18   tools leave marks.  And these marks have been studied and

19   proven that they would be, that one particular tool leaves a

20   mark on a particular firearm, which would make that tool unique

21   to that firearm.  So when a tool comes in contact with a

22   particular area of a firearm, the firearm is made in such a

23   fact that it's made of a hard metal, and the reason they make a

24   firearm in a hard metal is so it withstands being fired.

25             THE COURT:  I get that.  I get what makes an

1    individual characteristic.  It's just not clear to me what

2    enables an individual examiner to decide what's sufficient and

3    what's not sufficient.

4             THE WITNESS:  This is something that's been studied

5    and practiced over the years.

6             THE COURT:  That's not really an answer.  Somebody

7    that studies Stradivarius violins would be expert and might be

8    able to make conclusions based on his examination of

9    Stradivarius violins, but I'm not sure it would necessarily be

10   a science.

11            THE WITNESS:  Well, I'm saying we use a scientific

12   method to get to our conclusions, and our scientific method is

13   based on that we have two different cartridge casings, and

14   we're trying to determine, based on the individual

15   characteristics, if they are fired from the same firearm.  So

16   the question is were these fired from the same firearm.  Then

17   we come to a hypothesis and a conclusion, and then we test

18   those hypotheses and conclusions to see if, in fact, they did

19   come from a particular firearm.

20            THE COURT:  But the test is, again, based on whether

21   somebody else agrees with you.

22            THE WITNESS:  It -- yes, it's subjective, and it's

23   based on if someone reviews my work, and, if they agree with

24   me, we put out a report saying if they're fired from the same

25   firearm or different firearms.

1              THE COURT:  All right.  Anything else?

2              MS. FONTIER:  Just very briefly.

3   Q.  I believe you said one of the individual characteristics

4   that you look at is the direction of the marks, correct?

5   A.  Yes.

6   Q.  Now, let me put this back up.  So you had it like this,

7   right?  And so looking at this, there's, I guess, a wider

8   portion of the parallel line here, which seems similar to this

9   one here.  Right?

10  A.  It's the same.

11  Q.  Now, you put them under the microscope in this direction,

12  right?

13  A.  I took a picture of the cartridge this way to show an

14  overview of the class characteristic and individual

15  characteristics of these two particular cartridge casings, yes.

16

17  Q.  And so part of what you measure is the direction of these,

18  right?

19  A.  Yes.

20  Q.  A bullet is round, right?

21  A.  A bullet is round?

22  Q.  A bullet.  It's round, the shell?

23  A.  The base of a cartridge casing is round, yes.

24  Q.  Doesn't have to go into the gun in any particular

25  direction?

D36Wdor8                         J. Fox - cross

1   A.  Well, it would go into the gun with the bullet facing, the

2   bullet facing out of the weapon.

3   Q.  But if it was in like that, and when it hit the breech

4   face, who says that's the same direction?

5   A.  The -- I don't think you understand me.  The lines on the

6   breech face go in the same direction no matter how the bullet

7   rests on that breech face.  When the, such force is used to

8   fire this bullet, the cartridge slams up against the breech

9   face.  No matter what direction the bullet's in or no matter

10  what area the cartridge is in that particular chamber, the

11  breech face impressions don't change.  If the breech face

12  impressions on a particular firearm are parallel, they're going

13  to slam on to that cartridge casing and be parallel.  If

14  they're going up and down, they're going to be up and down.

15  And both cartridges would have -- if I saw this, if you put

16  these two next to each other where the parallel lines are going

17  north and south and I had to compare it to the ones going east

18  and west, I would say they were fired from different firearms

19  based on class characteristics.

20  Q.  Okay.  This is what I'm asking you.  A shell casing, the

21  back of it, is round, right?

22  A.  Yes.

23  Q.  And it goes into the bullet with the round part that we're

24  looking at --

25          THE COURT:  Goes into the bullet?

1          MS. FONTIER:  Into the barrel.  I'm sorry.

2     Q.  Into the gun, when you load it, it comes in before it's

3     fired and it sits in there with the round part facing the

4     breech face, right?  This back part?

5     A.  Right.

6     Q.  And this round part here, it's flat on this side and it can

7     get -- would the markings come from pressing against the back

8     of the chamber?  Right?  The breech face?

9     A.  Yes.

10    Q.  Now, who is to say which direction this round bullet was in

11    while it was in the chamber?

12    A.  I thought I explained that.  A round -- the breech face,

13    when it's made at the gun manufacturer, if, during the

14    manufacturing process of that breech face, parallel lines are

15    going across that breech face, no matter what direction the

16    bullet is sitting, there's going to be parallel lines going

17    across the breech face.  The breech face doesn't move.  The

18    breech face is located in the slide and slams up against this

19    headstamp.

20    Q.  Right.  I understand that.

21    A.  I don't --

22    Q.  I understand what you're saying, and I understand why

23    you're saying that marks from that breech face would leave the

24    same marks on a casing.  But is there any way to tell which

25    direction a casing was sitting inside the chamber?

D36Wdor8                           J. Fox - cross

1    A.  Well, if you put the individual characteristics next to

2    each other and line it up, then you could tell that way.

3    Q.  If you assume these were shot from the same gun.

4    A.  When you turn it this way, you turn it towards where the

5    parallel lines, I can put them together, you could say that the

6    cartridge was resting in the firearm in this particular

7    direction based on the individual characteristics matching each

8    other.

9    Q.  If you line these up, then you say they're in the same

10   direction.  But if you put them like this, one goes vertical

11   and one goes horizontal, correct?

12   A.  That's the way you lined up the photos, yes.

13   Q.  And if you do not assume that these were shot from the same

14   gun, how do you know which direction the lines were in the

15   particular gun that shot it?

16   A.  No. 1, I would never assume two cartridges were fired from

17   the same firearm.  I would look at the individual

18   characteristics, and once I lined up the individual

19   characteristics, I would then determine if they were fired from

20   different guns or the same firearm.

21   Q.  Looking at this one alone, 269 of the government, all

22   right, the way it is in your exhibit, there are parallel lines

23   horizontal, correct?

24   A.  Yes.

25   Q.  Is it possible that it was in the gun this way and there

1    are parallel lines going vertical?

2    A.  I don't, I really don't -- it doesn't matter which way

3    they're going, as long as they line up individually together

4    and match each other, then that would say they're fired in a

5    particular firearm together.  If that was, if the top of the

6    breech face was, where the parallel lines were going north and

7    south, those are still impressions and toolmarks from that

8    breech face.  I can't line up lines going left and right and

9    north and south.  I can't do that.  I took the pictures of the

10   parallel lines going east and west, perpendicular to each

11   other, and I would match them up together.  I would like for

12   the individual characteristics from that particular firearm

13   that was left on that particular base of that cartridge casing.

14   Q.  Now, in this case, you did not have a firearm to compare

15   these to, right?

16   A.  I did not, no.

17   Q.  All right.  So you didn't have the ability to shoot a test

18   round, correct?

19   A.  I didn't produce test-fires because we didn't have any

20   firearm in this particular case.

21   Q.  Okay.  So you don't know whatever gun shot whatever of

22   these shells, particularly did, you were not able to control

23   anything, correct?

24   A.  I'm not able to control anything.

25   Q.  So you don't have a neutral point that you know to be from

1   a particular gun?

2            THE COURT:  This is turning into his cross at trial.

3   I'm interested in whether or not he can be qualified as an

4   expert and, if so, with what degree of certainty he will be

5   allowed to testify about his opinion.

6            MS. FONTIER:  Okay.

7   Q.  How do you know that these bullets, these directions were

8   the same?  Do you know that, or did you line them up in order

9   to compare them?

10  A.  I lined them up going left and right so I could compare

11  them to each other because that was the easiest way for me to

12  compare these individual characteristics to each other.  That's

13  how I performed this examination.

14  Q.  Now, the individual characteristics -- can I see the one

15  that you wrote on with red pen?

16           THE COURT:  Do you have it?  Just state the number of

17  the exhibit.

18           MS. FONTIER:  I'll put up Government Exhibit 272.

19  Q.  So, you drew lines through one, two, three, four, five, six

20  different portions of the parallel lines, right?

21  A.  The red lines were me just representing where the

22  individual characteristics were in the particular image we were

23  looking at.  It doesn't represent -- I'm not an artist.  I

24  can't draw individual characteristics.  I was just representing

25  the area they were in.

D36Wdor8                      J. Fox - cross

1   Q.  All right.  These are not in the same area on the two

2   different shells, are they?  Like what you've blown up in

3   Government Exhibit 272, correct me if I am wrong, appears to me

4   to be this outside right portion of the shell on the right and

5   the interior portion on the shell on the left.

6   A.  Those are the individual characteristics actually meeting

7   together to form, to show that it's fired from the same

8   firearm.  These are two different cartridge casings left and

9   right.  It's clear that based on these individual

10  characteristics, that based on the depth of these lines, the

11  length of these lines, and how these lines meet up that they're

12  fired from the same firearm.

13  Q.  If they were pulled farther apart, would the lines look

14  exactly the same?

15  A.  I'm putting them together so they do look exactly the same,

16  the fact that they meet to form a puzzle to each other, meaning

17  that the individual characteristics on the cartridge casing on

18  the right and the one on the left were fired from the same

19  firearm.  The pictures that we use are just a mere reference

20  guide for us to look at these.  When I'm looking at my

21  microscope, I see something totally different than this.  I see

22  the depth of these lines.  You can't see the depth of these

23  lines in this particular photo.  It's just a representation of

24  the entire picture we're looking at.  You can't see the length

25  of these lines.  You can't see where these lines are broken up.

D36Wdor8                        J. Fox - cross

1   I'm looking at this in real time.  I'm looking at the depth of

2   these lines.  I'm looking at the width, the spatial

3   relationship of these lines.  All that I'm looking for I get in

4   my training and my experience, and when we do our scientific

5   method of how we come to this conclusion.  This is just an

6   image, a representation of what I looked at.  It's to add more

7   to our paperwork.

8   Q.  And just to be clear, these parallel lines could be class

9   characteristics, they could be subclass, and they could be

10  individual, and you subjectively decide?

11  A.  I subjectively decided that, yes, these are class

12  characteristics.  They're individual parallel lines, meaning

13  they're in the same class.  I've also subjectively concluded

14  that these are individual characteristics, that were from one

15  firearm, and pressed on to two different toolmarks, two

16  different cartridge casings.

17          THE COURT:  But what made this mark, what part of the

18  gun?

19          THE WITNESS:  The breech face.

20          THE COURT:  What's your basis for saying that the

21  breech faces on the weapons that fired these are the same as

22  opposed to just very similar?

23          THE WITNESS:  Well, as I stated earlier, I mean, we're

24  just looking at a picture.  When I'm looking under my

25  microscope, I'm looking at the depth of these lines, the length

1   of these lines, the spatial relationship of these lines.

2   There's such a quantity of these lines and quality of these

3   lines that it's a practical impossibility for two of the same

4   tools to make that mark.  That comes with the theory of

5   uniqueness, that everything, that there's not one two objects

6   that's the same.  So this is a sufficient agreement from the

7   same tool to say that these were fired from the same firearm.

8           THE COURT:  I think I've heard enough.  Do you need

9   any more?

10          MS. FONTIER:  If Mr. Roth wants any more time --

11          THE COURT:  Do you think you do?

12          MR. ROTH:  Just a couple questions.

13          THE COURT:  Okay.

14  CROSS-EXAMINATION

15  BY MR. ROTH:

16  Q.  Detective Fox, following up on your last point, isn't it

17  absolutely clear that you would not render an opinion as to

18  whether or not those two shell casings matched based on the

19  photographs that are depicted in Government Exhibits 269 to

20  272?

21  A.  If I never saw these particular, I would never use a

22  photograph to say two pieces of evidence were fired from the

23  same firearm.

24  Q.  Because it's impossible without telling the depth of the

25  furrows, as you said, and everything else?

1   A.   Exactly.  This is just a representation of what I used

2   during my scientific method to reach my conclusions.

3   Q.   In terms of using your scientific method, in this case,

4   these photographs were generated not part of your initial exam,

5   is that correct?

6   A.   They were not generated during my initial exam, no.

7   Q.   They were generated after a Daubert hearing was ordered, is

8   that right?

9   A.   Yeah.  I thought they would help aid in explaining the

10  individual characteristics.

11  Q.   And you indicated, sir, that there was a peer review of

12  your work in your laboratory, is that correct?

13  A.   This case was technically reviewed and verified by another

14  firearms examiner, yes.

15  Q.   But that's not an independent review, is it?

16  A.   It is an independent review.

17  Q.   It's your peer; it's somebody in your unit.

18  A.   Then you would question our integrity.

19  Q.   Well --

20  A.   This, this -- I'm sorry.  This evidence can be looked at by

21  an independent consultant, a defense expert.  A peer is not

22  going to agree with me based on me giving him, Hey, this is

23  from the same gun.  That's never going to happen.  We have to

24  sign our names to this.

25  Q.   I understand your method.  I'll just ask specific

1   questions, Detective Fox.

2       The peer who reviewed it is in your unit, is that correct?

3   A.  The, the --

4   Q.  The peer that did the peer review of your work --

5   A.  He's a firearms examiner, a microscopist in the

6   department's metal section, yes.

7   Q.  Has there ever been of your work, your personal work, an

8   independent review of your error rate?

9   A.  Well, as I said, every single year, I get a proficiency

10  test.

11  Q.  I'm not talking about proficiency.

12  A.  You just said if I have an error rate.  We have a quality

13  assurance unit located within the police laboratory that

14  governs how we do our work.  Every year, they give me a

15  proficiency test.  I don't know the outcome of this test.  I

16  don't know the results of this test.  They'll give me five

17  bullets, they'll give me five cartridge casings.  Only they

18  know the answer.  I do a report, put the answer down, and then

19  they get it.  And based on the proficiency tests, I don't have

20  an error as far as making microscopic comparisons and

21  identification.

22  Q.  You didn't have the benefit of a barrel test here or a

23  slide test, is that correct?

24  A.  The barrel test and the slide test are only used as

25  training aids for us to determine what's sufficient enough to

D36Wdor8                          J. Fox - cross

1   determine --

2            THE COURT:  That's what I want.  What does it mean,

3   the peer review in your examination of two particular samples,

4   results, that somebody else just looks at it after you did?

5            THE WITNESS:  Yes, and they sign their name to the

6   report as well stating they agree with my findings as well.

7            THE COURT:  But they know your findings before they

8   make their own findings, or they blindly take the two samples,

9   do an analysis, and then see whether it matches yours?

10            THE WITNESS:  Exactly.

11            THE COURT:  That's what they do, the latter?

12            THE WITNESS:  Yes.

13            THE COURT:  Is there a percentage?  Does anybody keep

14   track of how often the peer disagrees with your initial

15   analysis?

16            THE WITNESS:  I'm not aware of that.

17   BY MR. ROTH:

18   Q.  What about in respect to the laboratory itself, your unit?

19   The error rate of your unit.  Not you, but your unit.

20   A.  I'm aware of the error rate nationwide based on the CTS

21   test, and that's no less than, no more than two percent and

22   no -- and then greater than zero percent.  It's actually 1.5

23   percent based on the CTS tests, which is an outside agency

24   giving these tests out to different firearms examiners.  The

25   firearms examiners take these tests and then they return them

D36Wdor8                         J. Fox – cross

1   back to the CTS services, and then they come up with the error

2   rate.  And they came up, there's a 1.5 percent error rate of

3   fired cartridge casings and bullets.

4   Q.  When they give that CTS test, is that every year that

5   you're given that test?

6   A.  I'm given a proficiency test every single year, yes.

7   Q.  Are you given the CTS test?

8   A.  I'm given -- to even become competent and to even perform a

9   microscopic examination, I have to be given a CTS test.

10  Q.  My question is, sir, is it given every year to you.  Do you

11  take the CTS test every year?

12  A.  I'm given a proficiency test.  Sometimes it's from CTS.

13  Sometimes it's from the quality assurance division in our unit,

14  which is located -- they're not a part of our unit.  They're in

15  a separate unit located in the police lab, and they will give

16  me the proficiency test.

17  Q.  They're part of the NYPD, correct?

18  A.  They're part of the New York City Police Department, yes.

19  Q.  That you work for?

20  A.  I work for the New York City Police Department, yes.

21          MR. ROTH:  Nothing further.

22          THE COURT:  Anything else?

23          MS. LESTER:  No, your Honor.

24          THE COURT:  Detective, thank you very much.  I

25  appreciate it.  It was definitely educational.  I don't think

D36Wdor8

there's any question about your expertise.  The issue is really

whether or not this science, as you call it, or whether it can

be called an art form, whether it meets the qualifications for

expert testimony under Rule 702 of the Federal Rules of

Evidence.  That's what we're focused on, and that's a lawyer's

question more than a practitioner's question.  And so I think

we'll probably have a little bit of argument now, but you can

certainly step down.

          THE WITNESS:  Thank you, your Honor.

          THE COURT:  Thank you.  I appreciate it.

          THE WITNESS:  You're welcome.

          (Witness excused)

          THE COURT:  At this point, I want to ask the

government what exactly it is you're contemplating doing with

this witness.

          MS. MASELLA:  Your Honor, Detective Fox examined one

shell casing from the scene of the murder in this case.  He

examined seven shell casings from a scene of a robbery that

occurred --

          THE COURT:  Right.  I get that.  He's going to testify

about his examinations of those samples, and he's going to say

what he did to compare them.  And I assume he's probably going

to use something like this, right, if not these very photos?

          MS. MASELLA:  We may, your Honor, if there is no

objection from the defense.

1          THE COURT:  Then from that you're going to elicit from

2     him an opinion, correct?

3          MS. MASELLA:  Correct.

4          THE COURT:  Tell me what the question is going to be

5     and what you anticipate the answer to be.

6          MS. MASELLA:  I would ask him what his determination

7     was as to whether these shell casings were fired from the same

8     or different guns, based on his examination, and he would say

9     that, in his opinion, all seven shell casings plus the one

10    shell casing were all fired from the same gun, in his opinion.

11    We're not planning to elicit any degree of certainty or any

12    qualification on that opinion, just simply his conclusion that

13    they were fired from the same gun, in his opinion.

14         THE COURT:  All right.  And then, defense, let's

15    assume I allow that, what then are you planning to do on cross,

16    or with your own expert?

17         MS. FONTIER:  Your Honor, part of why I asked for this

18    hearing is because I think that him saying it's my opinion that

19    these came from the same gun is the same as saying to the

20    exclusion of all else.

21         THE COURT:  There is virtually no case where this has

22    been ruled out as admissible, right?  Virtually none.  Even if

23    the best case is for the defense, I think Judge Rakoff's

24    opinion does a marvelous job of explaining this.  The testimony

25    would have to be qualified in such a way as to not allow a

1    statement about certainty or to a ballistics certainty, which I

2    don't even know what that means, or to a reasonable degree of

3    scientific certainty, and so what Judge Rakoff allowed and what

4    other judges have allowed is more likely than not, which is

5    about as low, I guess, as you can go.  And so at the very

6    least, it would seem to me that's going to be allowed.

7           Are you suggesting that I should even go beyond what

8    Rakoff and Judge Sarris and Judge Gertner and others have done?

9           MR. ROTH:  No, but I would like a ruling that he can't

10   say more, that it's more likely than not.  Obviously we'll

11   cross-examine him in greater detail than I did today, but his

12   fall-back position is that it's virtually impossible that they

13   would come from two different guns.

14          THE COURT:  I don't know that he's not going to be

15   able to elicit that on direct, I don't think.  He's going to

16   say that it's his opinion that they're fired from the same gun.

17   If that is the statement, are you contemplating your own

18   expert?

19          MS. FONTIER:  Not at this point.

20          THE COURT:  No?  Okay.  Mr. Roth?

21          MR. ROTH:  No.

22          THE COURT:  No.  Okay.

23          MR. ROTH:  Not at this point.

24          THE COURT:  Right now we're quibbling over whether or

25   not the witness will be allowed to say it's my opinion that

D36Wdor8

1    they were fired from the same gun or it's my opinion that more

2    likely than not they were fired from the same gun.  That's what

3    you're seeking, and the government wants the former.

4          MS. FONTIER:  Right, which is, I think, a very large

5    difference, in my opinion.

6          THE COURT:  It is a difference, that's for sure.  So I

7    think that then is the only argument.  I think that there's

8    very little that I heard today that altered, I think, Judge

9    Rakoff's analysis on this issue.  I think, in large degree,

10   this is somebody's significantly subjective exercise.  It's not

11   a question of expertise and knowledge and experience of the

12   witness and others who do this in the same department, but it

13   is to say that it is different than other types of expert

14   testimony that are deemed to be scientific based on science.

15   This is different than that, and I think there is clearly a

16   high degree of subjectivity that's brought into this.  That

17   doesn't mean it's not admissible as expert testimony.  It just

18   means that it's not entitled to the same treatment as purely

19   scientific testimony.  So I think then the issue for me just

20   boils down to how much I allow him to say and about what his

21   opinion is.

22          What's the government's response to what Judge Rakoff

23   did in the Guinn case?

24          MS. MASELLA:  Your Honor, there's no question that

25   there's a subjective component to this analysis.  However, as

D36Wdor8

1    Detective Fox testified, there are standards.  There are

2    standards that are universally recognized.

3          THE COURT:  There really aren't.  I just don't know

4    what it means to say that there is sufficient agreement.

5    That's the standard?  There's sufficient agreement of the

6    quality and quantity?  So I disagree with that.  I think it is

7    as Judge Rakoff found.  I think that is an inherently vague

8    standard.  What you're really saying is that the practitioners

9    tend to come out the same way with a great degree of

10   uniformity.  They really do.  And I think that sounds right.

11   But we don't actually even have the error rate.  What we have

12   is this detective's proficiency rate in a different examination

13   that is designed to see how well he does against known

14   quantities.  Right?  Bullets and shell casings that are taken

15   from a particular gun where the person administering the test

16   knows whether or not they're the same or fired from the same

17   weapon.

18         MS. MASELLA:  Correct.

19         THE COURT:  So it's clear, whether he got it right or

20   got it wrong, and he apparently performs very well on those,

21   but we don't have the tests that I think would be more relevant

22   here, which is how often a peer review for examples that don't

23   have that control end up in different conclusions from people

24   of comparable experience.

25         MS. MASELLA:  Detective Fox can testify that with

1    respect to his own examinations, he is aware that there has

2    never been a peer review that resulted in a different result.

3         THE COURT:  But they're not blind peer reviews.

4    That's the problem, right?

5         MS. MASELLA:  He did testify --

6         THE COURT:  Go ahead.

7         MS. MASELLA:  I think the idea that different

8    ballistics examiners looking at the same evidence and applying

9    the same standards, even though it's subjective in nature, will

10   reach the same result.  That's how it's different from

11   something that's purely subjective with no standards.

12        THE COURT:  If you can define for me by tomorrow

13   morning at nine what the standard is, then I'd certainly

14   listen.  But if you're just going to repeat to me that there is

15   sufficient agreement or sufficient quantity and quality of

16   agreement, that strikes me as not being a standard that's very

17   easily applied.  Again, that's an artisan's or a craftsman's

18   application.  And that's certainly going to be admissible, but

19   I don't think it's going to be admissible as though it is a

20   precise science.

21        Fingerprinting has standards that are articulable, and

22   there might be different problems with fingerprinting or DNA,

23   but there are standards that can be articulated and applied.

24   Here, and it's really subjective the way he has described it, I

25   don't doubt his conviction for a moment.  He's a very sincere

1    and very thoughtful witness, but I think that what he's talking

2    about is a very different process than would apply to

3    fingerprinting or DNA.

4              MS. MASELLA:  The only other point I would raise, your

5    Honor, is the other reason that we ask that he be allowed to

6    state his opinion on direct examination is so that he can

7    adequately answer questions on cross and be cross-examined

8    about these very issues.  If he has to say on direct something

9    to the effect of "more likely than not these shell casings were

10   fired from the same gun," it sort of hamstrings him because

11   that's not actually his opinion and then he's not able to

12   really field questions on cross-examination about how he came

13   to that result.

14             THE COURT:  If they open the door on

15   cross-examination, that might be a different story.  I'm going

16   to think about this a little more, but I'll rule by tomorrow.

17             When are we planning to call this witness?

18             MS. MASELLA:  Probably next week, your Honor.

19             THE COURT:  So it's not imperative that we do this

20   tonight.

21             Anything else the defense lawyers want to say?  It's a

22   little late at night.  The marshals are dying to get out of

23   here.  Okay.  Thanks, everybody.  I'm not sure who everybody is

24   here watching.  I hope it was educational.  Some of you, I have

25   a feeling, knew this stuff before you came.  But don't be

484

D36Wdor8

1     alarmed by what you might think were ignorant questions by

2     judges and lawyers because this is a legal standard that we're

3     talking about and trying to get our head around.  It's Rule

4     702, so that is, I think, the real issue.

5              Thanks, all.  Let me thank the court reporter for

6     working late and the marshals.  See you all tomorrow.

7              MS. MASELLA:  Thank you, your Honor.

8              (Adjourned to March 7, 2013, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     JOSE RUIZ

4     Cross By Ms. Fontier . . . . . . . . . . . . 173

5     Cross By Mr. Roth  . . . . . . . . . . . . . 186

6     JOHN MCKENNA

7     Direct By Ms. Lester . . . . . . . . . . . . 193

8     Cross By Ms. Stafford  . . . . . . . . . . . 215

9     Cross By Mr. Roth  . . . . . . . . . . . . . 219

10    YOUSSEF ABDULLA ABDULKADER

11    Direct By Ms. Lester . . . . . . . . . . . . 222

12    Cross By Ms. Fontier . . . . . . . . . . . . 227

13    Cross By Mr. Roth  . . . . . . . . . . . . . 235

14    JANIEL BROWN

15    Direct By Ms. Lester . . . . . . . . . . . . 242

16    Cross By Ms. Stafford  . . . . . . . . . . . 345

17    Cross By Mr. Murphy  . . . . . . . . . . . . 392

18    JONATHAN FOX

19    Direct By Ms. Masella  . . . . . . . . . . . 409

20    Cross By Ms. Fontier . . . . . . . . . . . . 445

21    Cross By Mr. Roth  . . . . . . . . . . . . . 472

22

23

24

25

```
                        GOVERNMENT EXHIBITS

Exhibit No.                                          Received

30 and 31   . . . . . . . . . . . . . . . . . 198

30 and 31   . . . . . . . . . . . . . . . . . 198

604, 604A, 60, 60A, 82, 82A, 83 and 83A   . . 205

604, 604A, 60, 60A, 82, 82A, 83 and 83A   . . 205

72A and 73A   . . . . . . . . . . . . . . . . 206

73B   . . . . . . . . . . . . . . . . . . . . 213

70   . . . . . . . . . . . . . . . . . . . . 249

1, 2, 3, 4 and 6   . . . . . . . . . . . . . 258

1B, 1C, 2A, 2B, 2C, 2D, 3A, 3B, 4B, 6B  . . . 259

        and 6C

40, 41, 42, 42A, 42B, 44 and 44A  . . . . . . 263

54   . . . . . . . . . . . . . . . . . . . . 274

700, 701, 702, 703, 704 and 705   . . . . . . 278

                        DEFENDANT EXHIBITS

Exhibit No.                                          Received

A   . . . . . . . . . . . . . . . . . . . . . 353
```