D37Wdor1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        12 CR 45 (RJS)

5    JERMAINE DORE and DWAYNE
     BARRETT,
6
                   Defendants.
7
     ------------------------------x
8

9                                       March 7, 2013
                                        9:30 a.m.
10

11   Before:

12                   HON. RICHARD J. SULLIVAN,

13                                       District Judge

14
                        APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY
25

D37Wdor1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  All right.  Mr. Murphy, you had an issue?

4          MR. MURPHY:  Yes, your Honor.  One discrete issue I

5     discussed with the government.  I was intending on using

6     Ms. Brown's nonprosecution agreement.

7          THE COURT:  Right.

8          MR. MURPHY:  But we would request that the paragraph

9     that talks about, at page two, "It is understood that Brown's

10    truthful cooperation with this office is likely to reveal

11    activities of individuals who might use violence, force, and

12    intimidation against Brown's family and loved ones.  Should

13    Brown's cooperation present significant risk of physical harm,

14    this office, upon the written request of Brown, accepts" --

15    sorry, "that it determines to be reasonable and necessary to

16    attempt to ensure her safety and that of her family and loved

17    ones," and it's defense's position that that paragraph is

18    prejudicial because it implies that there would be some threats

19    of force or violence or reprisal against Ms. Brown, and we

20    would ask that that paragraph, because it's prejudicial in

21    nature, be redacted from the copy of the exhibit that will be

22    given to the jury.

23         THE COURT:  All right.  Does the government have a

24    response?

25         MS. LESTER:  Yes, your Honor.

D37Wdor1

1          We oppose the redaction.  First of all, we're not

2     going to be highlighting this paragraph in any discussion of

3     the agreement with the jury at all, but we think it's very

4     important that the agreement be admitted in its entirety.  I

5     mean, this is an agreement between a key witness and the

6     government.

7          THE COURT:  I know what it is.  I mean, the issue is

8     isn't it prejudicial to say basically we all agree that these

9     guys are violent and likely to do something to retaliate

10     against the witness.

11          MS. LESTER:  Your Honor, it may be prejudicial, but

12     it's prejudicial --

13          THE COURT:  What's it probative of?

14          MS. LESTER:  I think it is probative.

15          THE COURT:  Of what?

16          MS. LESTER:  Of perhaps her, she's already testified

17     that she was somewhat fearful of Mr. Dore and that that was a

18     reason why she participated in the robberies and decided to

19     help him thereafter.  So I think it does go --

20          THE COURT:  I don't really think that was her

21     testimony.  Let's do this.  You're not offering it.  You're

22     going to cross her on it, but the government will offer it, I

23     presume, in their redirect, and then I think we're not going to

24     publish it to the jury until, the jury's not getting it until

25     the deliberations, so we can decide how the cross goes and what

D37Wdor1

1   comes out at that point.

2           MS. LESTER:  All right.

3           THE COURT:  I'm going to defer, but I think I'm likely

4   to redact it if and when it goes in.

5           Ms. Fontier.

6           MS. FONTIER:  Mr. Roth had asked me earlier, and I

7   didn't know the answer, whether your Honor considers objections

8   made by one of the parties as applying to all for the purpose

9   of record.

10          THE COURT:  Sure.  I think it's more efficient to do

11  it that way rather than everybody jumping up and joining.

12          MS. FONTIER:  That is what we wanted.

13          THE COURT:  Let's get the witness out here.  I hate to

14  have a jury on time and not reward them with prompt action.

15          MR. MURPHY:  Your Honor, would it be okay if I set up

16  over there?

17          THE COURT:  Yes.  When they're coming in, of course,

18  stop and stand at attention.  But you could be over there.  I

19  don't mind.

20   JANIEL BROWN, resumed.

21          THE COURT:  Ms. Brown, just stand when the jury comes

22  in.  Thank you.

23          (Continued on next page)

24

25

D37Wdor1

```
 1              (In open court; jury present)

 2              THE COURT:  All right.  Have a seat.

 3              Good morning, ladies and gentlemen.  Thanks for being

 4    on time.  I wanted to reward you by getting you out here at

 5    9:30 on the nose.  We had one issue we just needed to resolve,

 6    which sometimes those issues make things go faster because we

 7    resolve the need for side bars.

 8              Thanks for being here.  So much for that weather.

 9              We're now going to resume the cross-examination of

10    Ms. Brown by Mr. Murphy.

11    CROSS-EXAMINATION (cont'd)

12    BY MR. MURPHY:

13    Q.  Good morning, Ms. Brown.

14    A.  Good morning.

15    Q.  Ms. Brown, how are you paying for school, ma'am?

16    A.  I get financial aid.

17    Q.  Federal loans?

18    A.  I'm sorry?

19    Q.  Federal loans?

20    A.  When I used to attend St. John's, I would take out loans.

21    However, now that I transferred, I get complete financial aid.

22    Q.  Complete financial aid, so monies that you do not have to

23    pay back, in other words?

24    A.  Correct.

25    Q.  Do you know if those monies are provided by the federal
```

1    government?

2    A.   No.  I'm not sure.

3    Q.   Do you know what kind of loans they are, whether they're

4    Pell grants, Stafford loans, anything of that nature?

5    A.   At the current moment, Pell grants and another one.  I'm

6    not sure what it is.

7    Q.   And a Pell grant is a federal grant process that gives free

8    money to students in need to go to school, correct?

9    A.   Yes.  That's correct.

10   Q.   And when you were going to St. John's, you were getting

11   federal loans as well during the time period 2011 to 2012,

12   correct?

13   A.   Yes.

14   Q.   I shouldn't say as well because what you're getting now is

15   not loans; it's just straight-out money that you don't have to

16   pay back, right?

17   A.   That's correct.

18   Q.   Was any of the money -- withdrawn.

19        When you went to St. John's, did you get loans for

20   everything, or did you pay some portion of that tuition

21   yourself?

22   A.   No.  I didn't pay anything out of pocket.

23   Q.   Everything, in other words, correct?

24   A.   It was financial aid and loans, yes.

25   Q.   Let's talk about money for a second.  You indicated that in

D37Wdor1                          Brown - cross

1   August 2011, when your boyfriend, Mr. Dore, came back from

2   Pennsylvania, he had, what was it, how many thousands of

3   dollars with him?

4   A.  Anywhere between 15 and 20,000.

5   Q.  15 and 20.  And you know that how?

6   A.  By the sums.  He kind of summed up what it was.

7   Q.  He stood there and said I counted?  Did you watch him count

8   it?

9   A.  No.

10  Q.  Did he tell you this is $15,555, or anything of that

11  nature?

12  A.  No.

13  Q.  You just estimated 15 to $20,000?

14  A.  Yes.

15  Q.  Did he give you any of that money, ma'am?

16  A.  Not for my personal use.

17  Q.  What did he give it to you for?

18  A.  When we went out together, he paid.  Or when we went to get

19  an apartment, he would give me money to pay for it.

20  Q.  He gave you monies to pay for your apartment?

21  A.  Yes.

22  Q.  Did he ever buy you clothes with that money?

23  A.  Yes.

24  Q.  How often did he buy you clothes with that money?

25  A.  Maybe once or twice.

D37Wdor1                        Brown - cross

1  Q.  And that was just the money from that first robbery in

2  August of 2011, correct?

3  A.  Correct.

4  Q.  Did he buy you clothes in the future, after that?

5  A.  Once.

6  Q.  And did he ever buy you any jewelry with any of the money?

7  A.  I had a jewelry, a set that I was paying for initially, and

8  Jermaine said that he would pay the balance that remained on

9  it, and he did.

10  Q.  And by paying for I it, you mean you went to a local

11  jewelry store, you saw a nice piece of jewelry, and you

12  purchased it on layaway, correct?

13  A.  No.  Initially, I did that.  I was paying for it every

14  week.  I would go and put an amount on it.  However, the

15  balance, when he found out that's what I was doing he opted to

16  pay the balance.

17  Q.  When was that, that he offered to pay the balance?

18  A.  Sometime in August.

19  Q.  After the August robbery?

20  A.  Correct.

21  Q.  Do you know whether that was with the proceeds of this

22  robbery that you allege your boyfriend committed?

23  A.  No.

24  Q.  Did you say to him, No, Jermaine, I don't want you to use

25  that money that you tell me you robbed to pay for my jewelry?

D37Wdor1                          Brown - cross

1    A.  I was hesitant at first.

2    Q.  But you took the money?

3    A.  He went and paid it.

4    Q.  At what jewelry store was this?

5    A.  A jewelry store in Fordham Road.

6    Q.  How much did you owe on that jewelry at that point in time?

7    A.  Like 250, $300.

8    Q.  How much had you been paying over time?

9    A.  That was, I think, five, 550, in total.

10   Q.  What was the set, what was it?

11   A.  It was earrings, a necklace, a bracelet, and ring.

12   Q.  Is that the necklace you're wearing today?

13   A.  No.

14   Q.  Where are those jewelry pieces now?

15   A.  They're in my house.

16   Q.  Has the government asked you to return that jewelry to

17   them?

18   A.  No.

19   Q.  After the August incident, were there ever any other times

20   that he paid for any jewelry for you?

21   A.  No.

22   Q.  Did he ever make any car payments for you?

23   A.  Car payments?

24   Q.  Car payments.

25   A.  No.

D37Wdor1                    Brown - cross

1   Q.  Did you own your car outright?

2   A.  Yes, I did.

3   Q.  Who purchased that car?

4   A.  I did.

5   Q.  With your own money?

6   A.  Yes, I did.

7   Q.  Did he ever make any payments of utilities or other bills

8   for you?

9   A.  No.

10  Q.  Did he ever, he took you out to dinner from time to time,

11  I'm sure?

12  A.  Yes, he did.

13  Q.  Now, at some point in time, after this August incident,

14  when you learned that your boyfriend is committing robberies,

15  you agreed to join in with him; that's your testimony, correct?

16  A.  That's correct.

17  Q.  And you say that you went on surveillances with him,

18  correct?

19  A.  That's correct.

20  Q.  In fact, it's your testimony that, yesterday you said that

21  you went on something like ten surveillances with him, is that

22  correct?

23  A.  That's correct.

24  Q.  On ten separate occasions, you're sitting in cars with you

25  and your boyfriend and you're going to look to commit

```
 1   robberies, correct?

 2   A.  Not to commit.  To look at areas, yes.

 3   Q.  To look at areas in an effort to commit robberies, correct?

 4   A.  Correct.

 5   Q.  In furtherance of a pattern of robberies with you and your

 6   boyfriend, correct?

 7   A.  That's correct.

 8   Q.  And you participated in it all the time, correct?

 9   A.  That's correct.

10   Q.  Now, at some point in time, you remember just two weeks

11   ago -- withdrawn.

12       I want to be clear about this.  Ten surveillances is your

13   testimony today with this jury, right?

14   A.  That I can recall.

15   Q.  Could have been more, is that your testimony?

16   A.  Possibly.

17   Q.  So do you remember about two weeks ago, you went downtown

18   and met with Ms. Lester and Ms. Masella and the agent in this

19   case, around February 22, 2012 -- 2013?

20   A.  Yes.

21   Q.  And that was the first time you met with them, correct?

22   A.  That's correct.

23   Q.  And you went to meet with them with a lawyer present,

24   right?

25   A.  No.
```

D37Wdor1                         Brown - cross

1   Q.  You were alone?

2   A.  Yes.

3   Q.  And when you met with them, you started telling them

4   things, correct?

5   A.  No.  That's not correct.

6   Q.  You didn't speak to them?

7   A.  No.

8   Q.  When was the first time you met with them, ma'am?

9   A.  The date that I received a subpoena.

10  Q.  And what day was that, ma'am?

11  A.  It was a holiday.  I was off from school, a Monday.  I

12  think it was President's Day.

13  Q.  President's Day in January?

14  A.  No.

15  Q.  Sorry.  That would be Martin Luther King Day?

16  A.  No.

17  Q.  President's Day in February?

18  A.  Yes.  I'm not sure.  If that's the 22nd, then, yes.

19  Q.  The first time you met with the government, did you have a

20  lawyer present or not?

21  A.  No, I did not.

22  Q.  And when you first met with the government, were they

23  taking notes, as Ms. Lester is doing right now, on a notepad?

24  A.  No.

25  Q.  Nobody wrote anything down?

D37Wdor1                    Brown - cross

1   A.  No.

2   Q.  Where did you meet with them?

3   A.  In their office.

4   Q.  And that's here, right in this building?

5   A.  No.

6   Q.  Where is that?

7   A.  The U.S. Attorney's office.

8   Q.  And when you met with them, how long did you meet with them

9   that day?

10  A.  Maybe 30, 45 minutes.  An hour.

11  Q.  Who brought you to that meeting?

12  A.  I'm sorry?

13  Q.  Who brought you to that meeting?

14  A.  I went with my older brother, and the agents took me.

15  Q.  They picked you up at your house?

16  A.  No.  I met them at the precinct.

17  Q.  What precinct?

18  A.  The 47th.

19  Q.  Had you gotten a subpoena before then?

20  A.  No.

21  Q.  You just voluntarily went to the precinct?

22  A.  Well, they produced me with the subpoena that day, and --

23  Q.  You --

24  A.  I'm sorry.

25  Q.  I want you to finish.  Go ahead.

1   A.  They produced me with a subpoena on that day.  That was the

2   grand jury subpoena.  And then they told me that I could come

3   down with them to get a lawyer.  And I said, Okay, no problem.

4   Q.  So they handed you a subpoena, correct?

5   A.  That's correct.

6   Q.  Where were you when they handed you that subpoena?

7   A.  In front of the 47th Precinct.

8   Q.  Did they call you and say, Come meet us at 47th Precinct?

9   A.  They went looking for me and got in contact with me, yes,

10  and I opted that I was not going to meet -- initially, I did

11  not know who these people were.  They just came looking for me

12  and said it was about my car.  It was so bizarre, I called my

13  mom.  I called everyone to find out, I even called 411 to find

14  out what was going on with my car because I had no overdue

15  tickets at that point.  And when I spoke with them, initially,

16  I was going to meet them at a check cashing, and my mom said,

17  No, don't do that, you don't know who these people are.  And

18  she said, You can meet them at the precinct.  I said sure.

19  Q.  Did they seize your car, is that your testimony?  Your car

20  was taken?

21  A.  No, they did not.

22  Q.  So the agents came looking for you several weeks ago,

23  correct?

24  A.  Yes.

25  Q.  And was a physical subpoena handed to you?

1    A.  Yes.

2    Q.  And you knew what was going on with this federal case here

3    in the Southern District of New York with respect to Jermaine

4    Dore at that time, did you not?

5    A.  Yes.  That's right.

6    Q.  You were well aware of this federal criminal indictment,

7    correct?

8    A.  That's correct.

9    Q.  You testified, indeed yesterday, that time and again you

10   were actively involved in communicating with Alice Fontier here

11   with respect to this matter, correct?

12   A.  That's correct.

13   Q.  So you knew, when agents came around your house looking for

14   you, you knew exactly what they were coming for, didn't you,

15   Ms. Brown?

16   A.  No.  I didn't.

17   Q.  You had no idea?

18   A.  No.

19   Q.  You were very surprised?

20   A.  Yes, I was.

21   Q.  Did you feel threatened at any point since January 2012,

22   when Jermaine Dore was arrested in your presence, with respect

23   to this case?

24   A.  Initially, yes.

25   Q.  Initially, you felt very threatened, in fact, right?

1   A.  That's correct.

2   Q.  You felt threatened when the officers came to the home and

3   arrested Mr. Dore, correct?

4   A.  That's correct.

5   Q.  Indeed, the agents who made the arrest of Mr. Dore

6   threatened you directly on the day of the arrest, didn't they?

7   A.  That's correct.

8   Q.  They said, If you don't do what we say, we're bringing you

9   in, correct?

10  A.  That's correct.

11  Q.  And so from the first day of this case, you knew that the

12  agents that were investigating this federal criminal case had

13  an eye on you with respect to this matter, correct?

14  A.  Not really, no.

15  Q.  Oh, you didn't know that they were threatening that if you

16  did not cooperate with them they were going to bring you

17  downtown?

18  A.  I mean, they came back a year later, over a year later, so,

19  no.  Initially, when that happened, I thought it was a scare

20  tactic, and then I just forgot about it.  And then I kept being

21  reassured by Jermaine and Ms. Fontier that, Look, there's

22  nothing for you to worry about, so don't worry about it.

23  Q.  Do you remember them telling you, If you don't call us over

24  the next couple of weeks, we're going to, we'll be coming back?

25  Do you recall them telling that to you on the day of the arrest

D37Wdor1                    Brown - cross

1     of Mr. Dore?

2     A.  Yes, I recall that.

3     Q.  At some point you became aware of these text messages

4     between you and your boyfriend that you testified about

5     yesterday, didn't you?

6     A.  That's correct.

7     Q.  Excuse me?

8     A.  That's correct.

9     Q.  And you became aware of those quite sometime ago, not

10    within the past two weeks, Ms. Brown, isn't that correct?

11    A.  That's correct.

12    Q.  And that's because Ms. Fontier here was showing you the

13    information that the government had with respect to your

14    involvement in these robberies, correct?

15    A.  No.  She didn't point out to me that, Look, this

16    information could possibly be used against you.  All she did

17    was mail me the discovery CD, and I went through it myself.  Of

18    course, at that point, I saw an iPhone in discovery, and, yes,

19    that iPhone belonged to me.  When I went through and saw what

20    they were producing off the iPhone, I mean, I became a little

21    bit worried, but I didn't think anything of it because at this

22    point it was several months after his arrest.

23    Q.  But you became worried because you knew you had been

24    involved in robberies with your boyfriend, is that your

25    testimony today?

1   A.  I became worried because of the text messages that were

2   there and what they said.

3   Q.  And you became concerned for your own safety, correct?

4   A.  Yes.

5   Q.  You used the word "discovery," like that's a word that's in

6   common parlance.  What does discovery mean to you?

7   A.  Information that's presented about a case.  Prior to trial.

8   Q.  Information that the government has about a case about a

9   defendant or defendants on trial, correct?

10  A.  That's correct.

11  Q.  And it's information that the government intends to use

12  against individuals in a trial, a criminal proceeding, correct?

13  A.  That's correct.

14  Q.  And it includes police reports, correct?

15  A.  That's correct.

16  Q.  It would include crime scene reports, correct?

17  A.  Correct.

18  Q.  It would include photos, correct?

19  A.  That's correct.

20  Q.  It would include business records, correct?

21  A.  Not to my knowledge, no.

22  Q.  Okay.  Well, maybe you didn't see any.

23      It would include cell phone records, correct?

24  A.  That's correct.

25  Q.  And these are all things that were provided to you that you

D37Wdor1                    Brown - cross

1   reviewed from Ms. Fontier, correct?

2   A.  That's correct.

3   Q.  With respect to this matter?

4   A.  In relation to Mr. Dore, yes.

5   Q.  In relation to Mr. Dore, which was also in relationship to

6   you, correct?

7   A.  That's correct.

8   Q.  And for quite some time you were trying to help Mr. Dore in

9   his defense, your boyfriend, correct?

10  A.  At the time, yes.

11  Q.  Because it was in your interest to help your boyfriend,

12  correct?

13  A.  He asked me to, yes.

14  Q.  It was in your interest because he was your boyfriend and

15  you wanted to help him, correct?

16  A.  That's correct.

17  Q.  Now, the first time you met with the government -- well, I

18  don't know the first time, but we certainly can agree --

19  withdrawn.

20      You're telling me the first time you met with these

21  individuals here, there was no lawyer present for you, is that

22  right?

23  A.  That's correct.

24  Q.  Did they interview you about things that occurred, or, did

25  they just tell you what was going to happen with this case?

D37Wdor1                        Brown - cross

1   A.  They told me what was going to happen.

2   Q.  And when they told you what was going to happen, what did

3   they tell you?

4   A.  They gave the piece that I could choose to speak with them

5   at that moment or I could choose to get a lawyer.  Of course,

6   going into this situation, my older brother had already advised

7   me not to say anything unless a lawyer was present.  So I

8   already went in with the mind set that I would not be saying

9   anything unless I was presented with a lawyer.

10  Q.  And then you got a lawyer thereafter, correct?

11  A.  The following day, yes.

12  Q.  The following day.  So the first time you didn't tell them

13  anything, you didn't speak to them about anything?

14  A.  No.

15  Q.  They just said to you, This is what's going to happen,

16  correct?

17  A.  Yes.  That's correct.

18  Q.  And when they said, This is what's going to happen, they

19  said, We're going do indict you along with your boyfriend,

20  didn't they?

21  A.  No, they didn't say that.

22  Q.  They said, If you don't cooperate you're going to be

23  charged in this matter, didn't they?

24  A.  Possibly in the future, yes.

25  Q.  Possibly in the future, with federal crimes, correct?

1   A.  Correct.

2   Q.  Including robbery, correct?

3   A.  Correct.

4   Q.  Conspiracy to commit robbery, correct?

5   A.  Correct.

6   Q.  Perhaps conspiracy to commit homicide or murder, correct?

7   A.  No, that was not mentioned.

8   Q.  Just the robbery and the conspiracy to commit robbery,

9   correct?

10   A.  Yes.

11   Q.  The next day you come back with your lawyer, right?

12   A.  No.  The next day I was appointed a lawyer.

13   Q.  Okay.  And he's your lawyer, right?

14   A.  That's correct.

15   Q.  His name is Alan Nelson, is that right?

16   A.  That's correct.

17   Q.  You met with him -- I don't want to know what you discussed

18   with him, but you met with him and then you met with the

19   government?

20   A.  I had several meetings with him, and then we came to the

21   conclusion that I was going to meet with the government.  Yes.

22   Q.  The first time you met with the government, it was

23   Ms. Lester, Ms. Masella, Mr. Nelson, and Mr. Melchiorri, the

24   gentleman at the table, correct?

25   A.  Yes.  That's correct.

1   Q.  And you sat with the government, and then you started

2   telling them what you claim had occurred with respect to this

3   federal case, correct?

4   A.  Based on questions they asked me, yes.

5   Q.  And at that time, you told them, didn't you, that you had

6   only been on two surveillances with your boyfriend, Jermaine

7   Dore, isn't that right, ma'am?

8   A.  To my knowledge, at that point, yes.

9   Q.  To your knowledge at that point, you had only been on two

10  surveillances?

11  A.  Yes.

12  Q.  And, but, by the way, to your knowledge at that point was

13  just two weeks ago, February the 22nd, 2013, correct?

14  A.  That's correct.

15  Q.  But now yesterday, it's now ten surveillances, correct?

16  A.  Yes, that's correct.

17  Q.  So you've expanded the story in the last 14 days, we can

18  agree with that, correct?  You've now filled in further gaps

19  with these extra surveillances, haven't you?

20  A.  By saying that I went with him when I had holiday breaks

21  and on the weekends, yes.

22  Q.  Going from two to ten is five times as many, correct?

23  A.  I had several holiday breaks.  It would not include two

24  surveillances.

25  Q.  So every time you were on a holiday break, it's your

1    testimony you were on a surveillance with your boyfriend?

2    A.  If he asked me to, yes.

3    Q.  Who is Biggs?

4    A.  Jermaine's friend.

5    Q.  Taijay Todd is his name?

6    A.  Yes.

7    Q.  And Biggs is actually a pretty big guy, isn't he,

8    Ms. Brown?

9    A.  Yes, he is.

10   Q.  He's about six foot five, you would agree with that,

11   wouldn't you?

12   A.  I don't know the accurate height, but he's over six feet.

13   Q.  He's a very tall man, correct?

14   A.  Yes, he is.

15   Q.  Wouldn't you agree that Biggs and your boyfriend, Mr. Dore,

16   are pretty good friends, correct?

17   A.  Yes.

18   Q.  Certainly much better friends than your boyfriend is with

19   Dwayne Barrett, correct?

20   A.  No, not correct.

21   Q.  Not so?

22   A.  No.

23   Q.  Do you recall telling the government that he was much

24   closer -- he being Mr. Dore -- with Mr. Taijay Todd than he

25   ever was with Mr. Dwayne Barrett?

D37Wdor1                        Brown - cross

1    A.   That Jermaine and Biggs were closer than Biggs and Tall

2    Man?

3    Q.   Correct.

4    A.   Yes.

5    Q.   You recall telling them that?

6    A.   Yes.

7    Q.   You don't recall telling them that Jermaine and Biggs were

8    closer than Jermaine and Tall Man ever were?

9    A.   I wasn't speaking in relation to Jermaine's closeness.  I

10   was speaking in relation to Biggs' closeness.

11   Q.   Biggs' closeness to Jermaine?

12   A.   To both defendants.  Not Jermaine's closeness where Biggs

13   and Tall Man were concerned.

14   Q.   Jermaine and Mr. Todd, also known as, you refer to him as

15   Biggs, they were pretty tight; you would agree with that?

16   A.   Yes.

17   Q.   And Taijay Todd is actually an aspiring rap artist of some

18   nature, correct?

19   A.   Yes.  That's correct.

20   Q.   And he has a bunch of videos on the Internet, correct?

21   A.   Correct.

22   Q.   And you've seen them, correct?

23   A.   One.

24   Q.   One?  Only one?  And Mr. Barrett is also an aspiring

25   rapper, performer; you're aware of that as well, right?

1   A.  Yes.

2   Q.  And you've heard him go by his rap nickname which is Big

3   Baby; have you heard of that before?

4   A.  Yes.

5   Q.  And you've also heard him go by the nickname Giant,

6   correct?

7   A.  That's correct.

8   Q.  In fact, a lot of people refer to him as Giant, wouldn't

9   you agree?

10  A.  Yes.

11  Q.  Many people on the street even call him Giant, isn't that

12  right?

13  A.  Yes.

14  Q.  And you know that from your dealings with him, correct?

15  A.  Based on what Jermaine told me, yes.

16  Q.  And Mr. Todd and Mr. Barrett have done rap performances

17  together, to your knowledge, correct?

18  A.  I've heard of one.  Yes.

19  Q.  And you're aware of that?

20  A.  Yes.  That's correct.

21  Q.  And did you see that video?

22  A.  Yes.  I saw it.

23  Q.  And in that video was both Taijay Todd and Mr. Barrett,

24  right?

25  A.  That's correct.

D37Wdor1                          Brown - cross

1    Q.  And you saw it on the Internet?

2    A.  Yes.

3    Q.  Do you recall telling the government when you met with them

     on March 1 that Tall Man had videos, meaning multiple, more

5    than one, on YouTube?

6    A.  Yes.

7    Q.  And do you recall telling them that Taijay Todd seemed to

8    be further along in his career than Mr. Barrett was at that

9    time?

10   A.  Yes.  That's correct.

11   Q.  You also recall telling the government that Jermaine Dore

12   had used a lot of cell phones during the time that you knew

13   him, correct?

14   A.  Yes.  That's correct.

15   Q.  And he had used several cell phones from several different

16   sources, isn't that right?

17           THE COURT:  You're using prior statements not to

18   impeach, which is hearsay, so I'm not sure why we're doing

19   that.

20           MR. MURPHY:  Okay.  I was just trying to refresh her

21   recollection.

22           THE COURT:  You can't do that.

23   BY MR. MURPHY:

24   Q.  Let me ask you about, are you aware of Mr. Barrett, how he

25   met Jermaine Dore?

D37Wdor1                    Brown - cross

1   A.  Based on what Jermaine told me, they had a disagreement,

2   and they would, they had a common interest together.

3   Q.  Isn't it, in fact, true that Mr. Barrett used to sell

4   marijuana?

5   A.  That's correct.

6   Q.  To Jermaine Dore, and that's how they met, right?

7   A.  Yes.  That's what he told me.

8   Q.  And you know, it's common knowledge, that Mr. Barrett sold

9   marijuana in small quantities around the Bronx, correct?

10  A.  I don't know of the quantity, but I heard he used to sell

11  it, yes.

12  Q.  And you know that he had sold previously to Mr. Dore,

13  correct?

14  A.  Yes.  That's correct.

15  Q.  And that's how they knew each other, correct?

16  A.  That's correct.

17  Q.  Let me show you a picture.  I'm showing you now what's been

18  marked as Government Exhibit 8.

19      You don't know who that individual is, do you?

20  A.  No.

21  Q.  You've never seen him before, correct?

22  A.  No.

23  Q.  Now, it's your testimony, yesterday, that Mr. Barrett came

24  to your home in or around December or January, 2012 -- December

25  2011, January 2012, to get some gun.  Is that what your

D37Wdor1                          Brown - cross

1  testimony was yesterday?

2  A.  That's correct.

3  Q.  And your testimony was that you gave him this gun and he

4  was with someone else, correct?

5  A.  I gave it to the other person.  But he was there, yes.

6  Q.  And then the two of them, him and the other person, got

7  into a car, correct?

8  A.  They were already in the car, yes.

9  Q.  You came out of the building and gave him the gun?

10  A.  Yes.

11  Q.  And then you got into your car, right?

12  A.  Yes.

13  Q.  And then those two individuals, Mr. Barrett and the other

14  guy, they drove all the way down from your house up in the

15  Bronx, on Carpenter Avenue --

16  A.  That's correct.

17  Q.  -- to the West Side Highway, here in Manhattan, correct?

18  A.  That's correct.

19  Q.  And I think you had said somewhere near the Trump Plaza on

20  the West Side Highway?

21  A.  I remember seeing that after the stop, yes.

22  Q.  Was the Trump Plaza north of where you stopped or south of

23  where you stopped?

24  A.  South.

25  Q.  It was south, so you could see it from where you got off

1    the road?

2    A.  No, I couldn't.

3    Q.  So how did you see it?

4    A.  After we made the stop, we kept traveling, and as soon,

5    like after that he made a U-turn, but then I remembered seeing

6    the Trump Towers after our stop.

7    Q.  And they went all the way down to Manhattan to throw a gun

8    into the river; that's your testimony, correct?

9    A.  That's correct.

10   Q.  And do you recall when you first discussed this issue with

11   the government, the first time you met with them on February

12   22?  Do you recall?  I mean, that's a big issue.  Wouldn't you

13   agree, Ms. Brown?

14   A.  I didn't discuss anything on February 22.

15   Q.  February 22 is the first time that you met with the

16   government in the presence of a lawyer.  We could agree with

17   that, can't we?

18   A.  No, it wasn't.

19   Q.  Do you recall if it was February 22, the first time?

20   A.  The first time I met with the government without a lawyer.

21   Q.  In the presence of a lawyer.

22   A.  No.

23   Q.  No, you don't recall?

24       Let me show you something and see if it refreshes your

25   recollection.  Okay?

D37Wdor1                          Brown - cross

1    A.  Sure.

2    Q.  I'm going to show you these notes and see, if you read

3    this, if this refreshes your recollection with respect to the

4    first time you met with the government, in the presence of

5    Mr. Nelson.

6    A.  Okay.  If that's what it says.

7    Q.  That's not the question.

8            THE COURT:  That's not the question.  Does it refresh

9    your recollection?  Does looking at that make you say, Oh, now

10   I remember?

11           THE WITNESS:  Yeah.

12   BY MR. MURPHY:

13   Q.  Now you remember it was February 22?

14   A.  Yes.

15   Q.  Now, when you met that day with the government, you

16   certainly discussed with them the fact of this gun that was

17   supposedly destroyed, correct?

18   A.  Yes.

19   Q.  And you knew when you met with the government this first

20   time that the government was bringing this case against Dwayne

21   Barrett, isn't that right?

22   A.  That's correct.

23   Q.  You were certainly aware of the fact that the government

24   was trying to build a matter and build a case that was going to

25   trial here in this very courtroom in two weeks, correct?

1    A.  Yes.  That's correct.

2    Q.  And you knew that there were certain weaknesses in the

3    government's case, correct?

4    A.  I'm sorry?

5    Q.  You knew that there were certain weaknesses in the

6    government's case, didn't you?

7    A.  No, not to my knowledge.

8    Q.  Well, you didn't discuss with Ms. Fontier on several

9    occasions weaknesses in the government's evidence, or

10   discovery, as you called it?

11   A.  Weak cell site evidence.

12   Q.  Weaknesses, meaning things that the government needed to

13   make their case better against your boyfriend and Mr. Barrett.

14   A.  No, not in detail.

15   Q.  Never discussed that?  And the first meeting when you met

16   with the government, isn't it -- do you recall that you told

17   the government that on the day that you gave Mr. Barrett the

18   gun, he came to your house, he took the gun, and you never saw

19   it again?

20          MS. LESTER:  Objection, your Honor.

21          THE COURT:  What's the basis?

22          MS. LESTER:  It's not actually to the form.  It's to

23   the content of the question.  I don't believe it's supported by

24   the 3500 material.  But maybe Mr. Murphy can --

25          THE COURT:  All right.  I don't have the material.  So

1   do you want me to look at it?

2            MR. MURPHY:  Oh, I'm sorry.  Sure.

3   Q.  So now, Ms. Brown, let me ask that question again.  Do you

4   recall the first time you met with the government in the

5   presence of a lawyer, you actually told the government simply

6   Mr. Barrett came, I gave him the gun, I never saw it again?

7   You said nothing about this long drive down from the Bronx to

8   Manhattan to destroy that gun, isn't that correct?

9   A.  Well, I was advised by my lawyer if I wasn't sure of

10  certain details I could withhold and speak about it further.

11  Q.  Oh.  So you weren't sure about getting in a car behind

12  Dwayne Barrett, driving about 14 miles from the Bronx to

13  Manhattan to destroy a weapon on February 22, 2013, but you're

14  sure about it today, on March the seventh --

15  A.  Yes.

16  Q.  -- 2013?

17       Yeah.  And so, as a matter of fact, you then, after that

18  meeting, you go, you meet with your lawyer, and then you go

19  back a few days later, and now you tell this long story about

20  how you drove in another car to destroy the gun, correct?

21  A.  That's correct.

22  Q.  And, by the way, how far is Carpenter Avenue from water in

23  the Bronx?  I mean, you could get to the Hudson River.  How far

24  do you think it is to get to the Hudson River from Carpenter

25  Avenue in the Bronx?

D37Wdor1                         Brown - cross

1    A.  I have no idea.

2    Q.  Did you ever go to Van Cortlandt Park?

3    A.  Once.

4    Q.  Are you aware of a big lake in Van Cortlandt Park?

5    A.  No.

6    Q.  And Van Cortlandt Park is real close to your house, right?

7    A.  Yeah.

8    Q.  Walking distance from your house, maybe?

9    A.  No.

10   Q.  Is it your testimony, ma'am, that these robberies that you

11   claim you were committing with your boyfriend upset you?

12   A.  That's correct.

13          MR. MURPHY:  Can we pull up 397, the text, on here?

14          THE COURT:  What exhibit?

15          MR. MURPHY:  72A?  73B.  Hold on.  I have it.  I'm

16   sorry, your Honor.  Just give me one second.

17          I'll just put it on the overhead.

18          THE COURT:  That's fine.

19          MR. MURPHY:  It has some yellow markings, but these

20   have yellow markings also.

21   Q.  I want to reference, if I may, Ms. Brown, you testified

22   that this whole situation upset you, the robberies you claim

23   you were committing with your boyfriend.  Correct?

24   A.  Yes.  That's correct.

25   Q.  You were not happy about it, you said, correct?

1    A.  For myself, that's correct.

2    Q.  In other words, you were not a happy participant, is that

3    your testimony?

4    A.  That's correct.

5    Q.  But he never forced you to do any of these things, did he?

6    A.  No.

7    Q.  He never physically dragged you into a car and made you go

8    do these alleged surveillances with your boyfriend, correct?

9    A.  That's correct.

10   Q.  Now, take a look at this.  So here we are --

11            MR. MURPHY:  There's no zoom.  Oh, here's zoom.  All

12   right.  I'm sorry.  I wanted the jury to see it.  I do

13   apologize for this, your Honor.

14   Q.  In any event, this is exactly what you had discussed

15   yesterday, and I'm going to read it into the record because you

16   went over it yesterday.

17   A.  All right.

18   Q.  At approximately 10:00, and we know that's Greenwich time,

19   based upon prior testimony, on December the 12th, 2011, your

20   boyfriend says to you, "Yeah, I did a job and got money, yeah.

21   Less 10G.  1040."  And your response on December 12 was, "Oh,

22   wow, nice, babe.  I'm happy for you."  Is that correct,

23   Ms. Brown?

24   A.  That's correct.

25   Q.  So you were happy for him when he was telling you about

1   these alleged robberies he was committing?

2   A.  I was happy for him that he was going to get money.

3   Q.  You were happy for him he was going to get money that he

4   was going to share with you, I guess, correct?

5   A.  I didn't know that.

6   Q.  You didn't know that, but he did?

7   A.  Whenever he took me out or paid his share of the rent.

8   Q.  And, indeed, whenever he had money, he gave you a few

9   hundred dollars, you said, right?

10  A.  Yes.

11  Q.  And that was money, from your understanding, that you

12  believed he was getting from violent robberies, is that right?

13  A.  And from Ali, yes.

14  Q.  And from Ali.  And robberies that from time to time that

15  you assisted him in perpetuating, correct?

16  A.  That's correct.

17  Q.  So essentially, you were Bonnie and Clyde, you and your

18  boyfriend, driving around the Bronx and splitting the proceeds

19  of these robberies, correct?

20  A.  Sure.

21  Q.  By the way, you've never seen Dwayne Barrett walk up to

22  anyone and physically take property from them, ever, isn't that

23  correct, Ms. Brown?

24  A.  That's correct.

25  Q.  You've never seen Dwayne Barrett ever use a weapon or any

1    other piece of equipment in taking property from another human

2    being, correct?

3    A.   That's correct.

4    Q.   You never saw him put a knife up to someone and take money

5    or a wallet or a chain or anything, correct?

6    A.   That's correct.

7    Q.   You never saw him put a gun to anyone and take a wallet, a

8    chain, or any other property from anyone, correct?

9    A.   That's correct.

10   Q.   You never saw him ever commit an act of violence, isn't

11   that correct?

12   A.   That's correct.

13   Q.   Let's talk for a second about your agreement with the

14   government.  So after more than a year of working with Ms.

15   Fontier and evaluating the case against your boyfriend, you go

16   and you sit down with the federal authorities and tell them

17   what you claim you did, correct?

18   A.   That's correct.

19   Q.   And, in fact, they told you, when you sat down with them,

20   that you were looking at a lot of jail time, isn't that right?

21   A.   No.  That's not correct.

22   Q.   Okay.  Well, if they didn't tell you that, Mr. Nelson must

23   have told you that, correct?

24   A.   That is, if they chose to prosecute me, which is a gamble,

25   that I could be looking at jail time, yes.

1   Q.  Not just jail time, though, Ms. Brown.  We're talking about

2   substantial jail time, aren't we, ma'am?

3   A.  Well, he didn't tell me that.  No.

4   Q.  Mr. Nelson never told you that --

5          THE COURT:  I'm not sure you should be getting into

6   what Mr. Nelson told her, so get into what her understanding

7   was.

8          MR. MURPHY:  Fair enough.  I apologize for that.

9   Q.  You were not aware that conspiracy to commit robbery has a

10  maximum of 20 years in federal prison?

11  A.  Based on what I saw in the indictment, yes.

12  Q.  So you knew about it from what you had seen from Jermaine

13  Dore, correct?

14  A.  Yes.

15  Q.  And were you aware of what's called a 924(c), ma'am?

16  A.  No.

17  Q.  Were you aware of the fact that using a gun in furtherance

18  of a felony is a mandatory additional seven years consecutive

19  to the underlying time in jail?

20  A.  No.

21  Q.  You never --

22  A.  I didn't realize that.

23  Q.  You had no knowledge of that?

24  A.  No.

25  Q.  And that's in addition to the regular underlying robberies,

1    forgetting the conspiracy issue, you're aware of the fact that

2    there's a maximum 20 years in jail as well?

3    A.  Correct.

4    Q.  And none of that is a threat to you now because you've

5    signed an agreement with the government, correct?

6    A.  No.  Not really.

7             MR. MURPHY:  May I approach.  I forgot, your Honor.

8    You said we don't have to ask that question.

9    Q.  Take a look at this document, if you would.  It's 3539B.

10   Okay?  Take a look at that, and then I'm going to ask you some

11   questions about it.  Okay, Ms. Brown?

12   A.  Okay.  I'm finished.

13   Q.  Okay.  And you signed that document, correct, Ms. Brown?

14   A.  That's correct.

15   Q.  And you signed it along with your lawyer, Alan Nelson,

16   correct?

17   A.  That's correct.

18   Q.  And not even a week ago, March the first, 2013, correct?

19   A.  That's correct.

20   Q.  And signing that document, it's an agreement between you

21   and the federal government, right?

22   A.  That's correct.

23   Q.  And Ms. Lester sitting at the table here, she signed it

24   along with you, correct?

25   A.  That's correct.

D37Wdor1                    Brown - cross

1   Q.  In this agreement, the government has agreed that if you

2   come in here and you testify, that they will not prosecute you

3   with respect to your participation in a conspiracy to commit

4   Hobbs Act robberies between 2011 and 2012, correct?

5   A.  That's correct.

6   Q.  They've also agreed they won't prosecute you at all for

7   your possession or aiding and abetting the possession of a

8   firearm and ammunition between July 2011 and January 2012,

9   isn't that correct?

10  A.  That's correct.

11  Q.  Nothing, no prosecution whatsoever, correct?

12  A.  That's correct.

13  Q.  And, indeed, they won't prosecute you, pursuant to this

14  agreement, based upon anything, for your alleged discarding of

15  a firearm in 2011, excuse me, two thousand -- whatever year it

16  was, you're not sure what year it was, correct?

17  A.  It was either December 2011 or January 2012.

18  Q.  Okay.  But regardless of what it was, based on that

19  agreement, you're not going to be prosecuted for any

20  participation in that, or alleged participation in it, correct?

21  A.  Not in any of these regards, no.  That's correct.

22  Q.  And, in fact, the government has agreed that if you testify

23  here and give the information they want you to give that

24  they'll write a letter on your behalf, at your request, to the

25  Bureau of Immigration and Customs Enforcement, correct?

D37Wdor1                    Brown - cross

1    A.  That if I came here and told what I knew, that -- I'm

2    sorry.  Repeat that?

3    Q.  The government has promised, pursuant to this agreement,

4    that this office, the Southern District of New York, at your

5    request, will bring your cooperation to the attention of I.C.E.

6    Do you know what I.C.E. is?

7    A.  Yes, I know what it is.

8    Q.  Immigration and Customs Enforcement, correct?

9    A.  That's correct.

10   Q.  And you are not a citizen, correct?

11   A.  No, I'm not.

12   Q.  And you are certainly aware that if you were charged with

13   this case and convicted, you would have lost your green card

14   and been deported, correct?

15   A.  That's correct.

16   Q.  You knew that from day one with respect to this case,

17   correct?

18   A.  Based on what Mr. Nelson told me, yes.

19   Q.  Let me ask you for a second.  Do you know what the federal

20   Sentencing Guidelines are, Ms. Brown?

21   A.  I'm aware of them.

22   Q.  What are they, ma'am?

23   A.  Basically, levels of what your criminal act is and how much

24   your, how much time you could get based on what level you have

25   committed.

1    Q.  Did you ever take a look at what your possible guideline

2    calculation would be and what you could be looking at if you

3    were convicted in this case?

4    A.  No, I haven't.

5    Q.  But you looked, in fact, at what Mr. Dore's guideline would

6    be for this case, didn't you?

7    A.  Based on what Ms. Fontier told me, yes.

8    Q.  In fact, she e-mailed you his guideline calculation and

9    told you the amount of years in jail he could be looking at if

10   he's convicted in this case of conspiracy to commit robbery,

11   isn't that right?

12   A.  That's correct.

13   Q.  And you looked at it carefully and discussed it with her,

14   isn't that right?

15   A.  I looked at it.  There was no future discussion where it

16   was concerned.

17   Q.  But you e-mailed her about it, didn't you?

18   A.  Saying that I looked at it?

19   Q.  You e-mailed her about the guideline calculation,

20   specifically requesting to see it from Ms. Fontier?

21   A.  Yes, I did.

22   Q.  Now, you said yesterday that if you lie to the government,

23   you can be prosecuted for perjury, isn't that right?

24   A.  That's correct.

25   Q.  But you did lie to the government previously, didn't you,

1   Ms. Brown?

2   A.   In, in relation to?

3   Q.   Well, let's go back for a second.  You've been in that

4   stand on another occasion besides yesterday, correct?

5   A.   That's correct.

6   Q.   You sat in this courtroom in May of 2012, a mere eight

7   months ago, and testified in this courtroom, correct?

8   A.   That's correct.

9   Q.   And you raised your hand, just like you did today, and you

10  swore to tell the truth, correct?

11  A.   That's correct.

12  Q.   And then you knowingly -- by the way, the Honorable Richard

13  Sullivan was in this room when you did that, right?

14  A.   That's correct.

15  Q.   And you knew at that time you testifying in relation to a

16  hearing where the judge was going to make decisions on evidence

17  in this matter, correct?

18  A.   That's correct.

19  Q.   And you knew he was relying upon your testimony in making

20  these important decisions in this matter in this court,

21  correct?

22  A.   That's correct.

23  Q.   And you looked forward to this judge and to this courtroom

24  and you told several outright lies, isn't that correct?

25  A.   Four, to be exact, yes.

1   Q.  Four lies, under oath, to be exact; that's your testimony,

2   correct?

3   A.  Correct.

4   Q.  You're not being prosecuted for that, are you?

5   A.  No, I'm not.

6   Q.  And that is perjury, or you are understand that, lying

7   under oath, to be illegal, correct?

8   A.  That is correct.

9   Q.  You said if you lie you could be punished, but when you

10  talk about you lying, it's only lying if the government finds

11  out about your lying, correct?

12  A.  That's correct.

13  Q.  If the government doesn't find out that you lied you won't

14  be punished and you won't have a problem, isn't that correct,

15  Ms. Brown?

16  A.  That's correct.

17  Q.  By the way, had you been convicted of a crime, would you

18  have lost your federal Pell grants that are assisting you in

19  studying your forensic psychology at the John Jay College of

20  Criminal Justice?

21  A.  I'm sure.  Yes.

22  Q.  You knew that from day one, correct?

23  A.  That's correct.

24  Q.  By the way, in this agreement that you have with the

25  government, did they ever tell you that you had to forfeit any

530

1   of the proceeds of the crimes you had committed with your

2   boyfriend?

3   A.  No, they didn't.

4   Q.  You didn't have to give back the jewelry that was bought

5   with the proceeds of that crime, correct?

6   A.  No.

7   Q.  You didn't have to give back any cash that you got from any

8   of these alleged robberies, correct?

9   A.  That's correct.

10  Q.  And in evaluating the evidence in this matter over the

11  year-plus that you were involved in it, you were aware that the

12  government had no murder weapon, correct?

13  A.  That's correct.

14  Q.  You knew there was no witness to this murder, correct?

15  A.  No.  That I did not know.

16  Q.  You weren't aware that there was nobody present that would

17  testify in this matter with respect to who shot whom on the day

18  in question, correct?

19  A.  That's correct.

20  Q.  And you were aware there's no DNA evidence tying either of

21  the defendants, including Mr. Barrett, to any of these crimes,

22  aren't you?

23  A.  That's what I was told.  That's correct.

24  Q.  In fact, you did a detailed review of the DNA evidence in

25  this case, didn't you, ma'am?

1   A.  I didn't understand what it meant.

2   Q.  But you had specific conversations with Ms. Fontier about

3   the DNA evidence; you were very interested in that, weren't

4   you, ma'am?

5   A.  In relation to Mr. Dore, that's correct.

6           MR. MURPHY:  May I have one moment, your Honor.

7           THE COURT:  Yes.

8           MR. MURPHY:  I have just a few more questions and I'm

9   going to wrap up, your Honor.

10  Q.  You didn't go to the 1M Stationary very often, did you,

11  Ms. Brown?

12  A.  No, I didn't.

13  Q.  In fact, on the few occasions that you went, oftentimes,

14  you actually waited outside in the car, correct?

15  A.  In relation to meeting Mr. Dore, yes.  That's correct.

16  Q.  So you weren't one of the crew that hung out there often,

17  correct?

18  A.  I didn't hang out there at all.

19  Q.  You didn't hang out there at all.  Okay.

20      And you'd agree with me that Mr. Dore was out a lot doing

21  his thing also on his own, correct?  Out of the apartment, I

22  mean.

23  A.  That's correct.

24  Q.  And you were not involved in a lot of whatever he did, you

25  said that, right?

1   A.  That's correct.

2   Q.  And he didn't involved you in some of this hanging out with

3   these guys who were trying to do this rap thing and produce

4   these videos, or anything of that nature, right?

5   A.  I'm sorry?

6   Q.  He didn't involve you in any interactions with Taijay Todd,

7   Dwayne Barrett, or production of the videos, or anything of

8   that nature, correct?

9   A.  No.  That's correct.

10  Q.  That's kind of a man's thing, it's a man's world, some of

11  that rap stuff, they would say, wouldn't you agree?

12  A.  Not necessarily.

13  Q.  Are you a fan of rap music, ma'am?

14  A.  I listen to it.

15  Q.  You listen to it regularly?

16  A.  Not on a regular --

17  Q.  Did you listen to any of Mr. Todd's music?

18  A.  Yes.

19  Q.  On a regular basis?

20  A.  No.

21          MR. MURPHY:  I am going to wrap up.  I just had one

22  other question.

23  Q.  When your boyfriend came home with this injury to his hand,

24  you continued to live with him, is that correct?

25  A.  That's correct.

1   Q.  You didn't move out on him at that point in time, correct?

2   A.  I went back and forth from --

3   Q.  You went back and forth.  In fact, did you do additional

4   surveillances with your boyfriend thereafter?

5   A.  Yes.  That's correct.

6   Q.  And you claim that the hole was in his hand and he was

7   bleeding profusely?

8   A.  That's correct.

9   Q.  And that was a cause of concern for you, right?

10  A.  Yes, it was.

11  Q.  But you continued on with this relationship and with

12  assisting him in whatever it was he was doing, correct?

13  A.  That's correct.

14          MR. MURPHY:  I have nothing further.

15          THE COURT:  Nothing further?  Okay.

16          Any redirect examination?

17          MS. LESTER:  Yes, I do have some, your Honor.  But may

18  I just speak to the defense for a moment.

19          THE COURT:  Sure.  You had a question?

20          JUROR:  I have a question.  We're all kind of cold.

21  Is there any way --

22          THE COURT:  Yeah, it's always cold in here.  We can

23  call down.  This is a very hard room to regulate the

24  temperature on.  I should have mentioned that earlier.  It's

25  always best to bring layers because you can take them on and

1    off, as needed.

2                JUROR:  We've been doing that.  It's chilly.

3                THE COURT:  Yeah.  My advice is bring a robe.

4                JUROR:  Got some spares?

5                THE COURT:  So we'll call down and see if they can

6    raise the temperature a bit.  The tricky thing is then it gets

7    very hot, and there's only so much you can take off.

8                Are we ready?

9                MS. LESTER:  Yes, your Honor.

10   REDIRECT EXAMINATION

11   BY MS. LESTER:

12   Q.  Ms. Brown, on cross-examination, you were asked several

13   questions about your meetings with the government.  Do you

14   recall those questions?

15   A.  For the most part, yes.

16   Q.  Could you explain to the jurors what generally happened at

17   those meetings?

18   A.  I was basically asked questions about my involvement or how

19   I knew the other defendant, the other defendants, and just gave

20   that information.

21   Q.  And when you first were assigned a lawyer in connection

22   with this case, how many times did you meet with him before you

23   met with the government?

24   A.  Several times.

25   Q.  Did you continue to talk with him while you were meeting

1   with the government as well?

2   A.  Yes.  I did.

3   Q.  And during the meetings with the government, were there

4   times when the meeting had to end before an entire discussion

5   had been finished?

6   A.  Yes.  That's correct.

7   Q.  But by the time you discussed -- I'm sorry.  By the time

8   you actually signed the nonprosecution agreement in this case,

9   had you told the government about all your conduct with regard

10  to the robberies, the guns, all the conduct that we talked

11  about during your direct examination?

12  A.  For the most part.

13  Q.  Well, is there anything you hadn't told the government?

14  A.  No, not to my knowledge.

15  Q.  And, again, at the time that you were conferring with Ms.

16  Fontier about Mr. Dore's defense in this case, had you met with

17  a lawyer?

18  A.  No, I did not.

19  Q.  Had you talked with a lawyer about your own potential

20  criminal exposure in this case?

21  A.  No, I didn't.

22  Q.  Did you have anyone who was advising you about what was

23  best for you?

24  A.  No, I didn't.

25  Q.  Did you have anyone who was advising you that what you

D37Wdor1                         Brown - redirect

1    should do is tell the truth?

2    A.  No.

3    Q.  Again, the agreement that you entered into with the

4    government, that's in front of you, correct, marked as 3539B?

5    A.  That's correct.

6    Q.  And that's an agreement dated March 1, 2013, and you signed

7    the last page, correct?

8    A.  That's correct.

9    Q.  And your lawyer signed it, too?

10   A.  Yes, he did.

11   Q.  And this agreement is the entirety of your agreement with

12   the government, right?

13   A.  That's correct.

14   Q.  And what's your understanding of your obligations under

15   this agreement?

16   A.  That if I came here today and told the truth of what I knew

17   and not commit any future crimes that I will not be prosecuted.

18   Q.  And what's your understanding of the government's

19   agreement?

20   A.  That once -- if I was found to not be telling the truth,

21   that if I was lying, the agreement would be terminated.

22   Q.  And what could happen if that happens?

23   A.  That I will be prosecuted for all the crimes that I have

24   committed and for perjury as well.

25           MS. LESTER:  Your Honor, the government would offer

1    3539B.

2              THE COURT:  3539B?

3              MS. LESTER:  Yes.

4              THE COURT:  3539B is received.

5              (Government's Exhibit 3539B received in evidence)

6              MS. FONTIER:  Subject to the previous request.

7              THE COURT:  Yes.  We'll come back to that.  I think

8    the door may have been opened.  We'll come back.

9              Are you planning to do anything with it now, or it's

10   just in evidence?

11             MS. LESTER:  No, your Honor.

12             THE COURT:  Let's proceed.

13   BY MS. LESTER:

14   Q.  Ms. Brown, during your direct testimony, you mentioned

15   someone named Squeaky.  Do you recall that?

16   A.  Yes, I did.

17   Q.  Who is that person?

18   A.  My knowledge was that he was Duffel's cousin, Jermaine's

19   friend.

20   Q.  Did you ever meet him in person?

21   A.  Yes.

22   Q.  On how many occasions do you think you met him?

23   A.  A couple of times.

24             (Continued on next page)

25

D375dor2                        Brown - redirect

1              MS. LESTER:  May I have a moment, your Honor?

2              THE COURT:  Yes.

3              (Pause)

4              MS. LESTER:  No further questions.

5              THE COURT:  Any redirect?

6              MS. STAFFORD:  Yes, your Honor.

7    RECROSS EXAMINATION

8    BY MS. STAFFORD:

9    Q.  Ms. Brown, you don't want to be arrested, do you?

10   A.  No, I don't.

11   Q.  And you don't want to be charged with a crime, right?

12   A.  No, I don't.

13   Q.  And you don't want to be deported, do you?

14   A.  No, I don't.

15             MS. LESTER:  Objection.

16             THE COURT:  Beyond the scope of the --

17             MS. LESTER:  Yes.

18             THE COURT:  It does seem to be beyond the scope.  I

19   will allow it.  What is your next question?

20             MS. STAFFORD:  One moment, your Honor.

21             (Counsel conferring)

22             THE COURT:  I mean, I suppose it is pertinent to the

23   cooperation agreement, so.

24             MS. STAFFORD:  Yes.  Thank you.

25             THE COURT:  Overruled.  On second thought, overruled.

1   BY MS. STAFFORD:

2   Q.  And you're testifying today so that none of those things

3   happen; isn't that correct?

4   A.  Well, in relation to deportation that is not -- I'm not

5   saved from that in relation to this agreement.  I'm not being

6   prosecuted, therefore if I'm not being charged there is no

7   deportation charges or any act being brought against me.

8   However, if this were to come up, that would only be if I told

9   the government, yes, you can produce this information to ICE.

10  Q.  So it is your understanding that if you're charged with a

11  crime you will in fact be deported; isn't that correct?

12  A.  Yes.  That's correct.

13  Q.  So, the fact that you're not charged with a crime means

14  that you will not be in jeopardy of being deported; isn't that

15  true?

16  A.  That's correct.

17  Q.  So you're testifying here today to avoid any possibility of

18  being deported; isn't that true?

19  A.  I'm testifying today to tell the truth.

20  Q.  Now, you are well aware that Mr. Dore is facing a long jail

21  sentence, aren't you?

22          MS. LESTER:  Objection.

23          THE COURT:  I think that's beyond the scope.

24  Sustained.

25          MS. STAFFORD:  Just a few more questions, your Honor?

D375dor2                        Brown - recross

1    One second.

2              THE COURT:  Yes.

3              (Counsel conferring)

4    BY MS. STAFFORD:

5    Q.  And it is your testimony you are telling the truth today?

6    A.  Yes, it is.

7    Q.  And it is your testimony that when you look an oath today

8    that you are telling the truth?

9    A.  That's correct.

10   Q.  And it is different from the oath that you took back in May

11   of 2012?

12   A.  That's correct.

13   Q.  Because you didn't tell the truth?

14   A.  I wasn't the focus at that point.

15   Q.  The focus at that point was for you to testify on

16   Mr. Dore's behalf, correct?

17   A.  That's correct.

18   Q.  And therefore you took an oath to tell the truth, right?

19   A.  That's correct.

20   Q.  And now you're saying that the oath that you took in May of

21   2012, you still did not tell the truth?

22   A.  I did not tell the truth at that moment, yes.

23   Q.  And you did not tell the truth why?

24   A.  Because I was trying to help him.

25   Q.  So you lied.  That's your testimony?

1    A.   That's correct.

2    Q.   You lied under oath?

3    A.   That's correct.

4    Q.   And you lied for Mr. Dore?

5    A.   Yes.  That's correct.

6    Q.   And you're saying that today you're telling the truth?

7    A.   That's correct.

8    Q.   But you lied for Mr. Dore to keep him out of jail, isn't

9    that true?

10   A.   No, not to keep him out of jail.  That was going to happen

11   regardless.

12   Q.   He was going to get out of jail regardless?

13   A.   No.  He was going to be in jail regardless.  There was a

14   bail hearing, he was denied.  His lawyer told me there was no

15   chance of him getting bail -- there was no chance -- the focus

16   was not about him getting out of jail, the focus was they came

17   into my house, searched it with no warrant, and they had no

18   reason to do that.

19   Q.   But you didn't have to lie, did you?  You could have told

20   the truth when you were asked the questions by Ms. Masella?

21   A.   Yes.  I could have said exactly at that point how long I

22   knew him or I could have said, yes, I rented cars for him.  I

23   could have said, yes, I knew the other co-defendants.  I could

24   have said, yes, he lives there and he was there every single

25   day instead of saying he was there at minimum three to four

1   days.  I could have said all of that at that point.

2   Q.  But you didn't?

3   A.  No.

4   Q.  And it wasn't very hard for you not to do that, correct?

5          MS. LESTER:  Objection.

6          THE COURT:  Overruled.

7          Was it hard for you?

8          THE WITNESS:  At that point I really wasn't thinking

9   about myself.

10  Q.  You weren't thinking about yourself?

11  A.  I was just doing what I was told to do, pretty much.

12  Q.  So it was easy for you to get on the stand and lie?

13  A.  I didn't go on the stand with the intention of lying.

14  Q.  But you did.

15  A.  Yes.

16  Q.  And you didn't have to lie?

17  A.  No one has to lie, no.

18  Q.  But you chose to lie?

19         MS. LESTER:  Objection, your Honor.

20         THE COURT:  I think it has been asked and answered so

21  I will sustain it.

22         MS. LESTER:  I will move on.  I'm sorry, your Honor.

23         THE COURT:  That's all right.

24         MS. STAFFORD:  No further questions, your Honor.

25         THE COURT:  Mr. Murphy?

1           MR. MURPHY:  Thank you, your Honor.

2    RECROSS EXAMINATION

3    BY MR. MURPHY:

4    Q.  Ms. Brown, I'm going to ask you questions about Squeaky.

5    Do you know who I'm talking about?

6    A.  Yes.

7    Q.  You met him too?

8    A.  Just a couple of times.

9    Q.  Do you know his real name?

10   A.  No.

11   Q.  As you sit here today you don't know his real name?

12   A.  No.

13   Q.  You don't where he lives, correct?

14   A.  I know where he lives.

15   Q.  You know where he lives.

16          Had you ever been to his home?

17   A.  Once.

18   Q.  And do you know what he does for a living?

19   A.  Jermaine told me he had a job.

20   Q.  So, would it be fair to say that most of what you know

21   about Squeaky is from what Jermaine told you, correct?

22   A.  Major details, yes.

23   Q.  Major details.

24          So, sort of a he-said-she-said type of thing, this is

25   what I know about squeaky, this is where he comes from, this is

D375dor2                        Brown - recross

1   who he is, correct?

2   A.  Apart from what I saw, yes.

3   Q.  And you only saw him on a few discrete occasions?

4   A.  Yes.

5   Q.  And you never called him Squeaky, right?

6   A.  Yes, I did.

7   Q.  You called him by that name?

8   A.  If I had to call him.

9   Q.  Any other names you would call him by?

10  A.  No.

11  Q.  Never got in a car with him or anything, correct?

12  A.  No.

13  Q.  Never went out to dinner with him, never socialized with

14  him or anything of that nature?

15  A.  No.

16          MR. MURPHY:  I have no further questions, actually.

17  Thank you.

18          THE COURT:  Any redirect?

19          MS. LESTER:  No, your Honor.

20          THE COURT:  Okay, you may step down, Ms. Brown.

21          THE WITNESS:  Thank you.

22          THE COURT:  Just leave everything else there.

23          THE WITNESS:  Okay.

24          THE COURT:  Government, your next witness?

25          MS. MASELLA:  Your Honor, the government calls Abdul

 1    Rauf.

 2     ABDUL RAUF,

 3          called as a witness by the Government,

 4          having been duly sworn, testified as follows:

 5              THE COURT:  Mr. Rauf, good morning.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  Let me ask you to do this, speak slowly

 8    and a little louder?

 9              THE WITNESS:  Okay.

10              THE COURT:  Be as clear as you can so the court

11    reporter can get it all down.  Okay?

12              THE WITNESS:  Okay.

13              THE COURT:  You may proceed, Ms. Masella.

14    DIRECT EXAMINATION

15    BY MS. MASELLA:

16    Q.  Good morning, sir.

17    A.  Good morning.

18    Q.  Can you tell us where you work, please?

19    A.  I work in 10 Stella Street, Matamoras, Pennsylvania.

20    Q.  Mr. Rauf, what is at that location in Matamoras,

21    Pennsylvania?

22    A.  This is bottom of New York and Pennsylvania.

23    Q.  What is the physical location?

24    A.  It is the gas station.

25    Q.  Does the gas station have a name?

D375dor2                        Rauf - direct

1    A.  Go 24.

2    Q.  How long have you worked at the Go 24 Gas Station?

3    A.  More than five years.

4    Q.  What is your role with respect to the Go 24 Gas Station?

5    A.  I'm the partner there.

6    Q.  Do you have other partners as well?

7    A.  Yes, we do have other partners.

8    Q.  How many partners are there total?

9    A.  We have three partners.

10   Q.  Who are the other two partners?

11   A.  One works in the Bronx, we have the wholesale in the Bronx,

12   he deals with that one, and I'm there in the Go 24.  I have

13   another one, partner, we have another location in Matamoras,

14   he's there.

15   Q.  You mentioned a partner who works in the Bronx; what is

16   that partner's name?

17   A.  The Bronx Trading Company, Inc.

18   Q.  Bronx Trading Company?

19   A.  Uh-huh.

20   Q.  What is the name of the actual partner who works at the

21   Bronx Trading Company?

22   A.  Afgun Warriach.

23          THE COURT:  Can you spell that for the court reporter?

24          THE WITNESS:  A-F-G-U-N, last name Warriach,

25   W-A-R-R-I-A-C-H.

1              THE COURT:  Pronounce it again.

2              THE WITNESS:  Warriach.

3              THE COURT:  Warriach?

4              THE WITNESS:  Yes.

5              THE COURT:  And the first name?

6              THE WITNESS:  Afgun.

7              THE COURT:  All right.  Thank you.

8    BY MS. MASELLA:

9    Q.  Mr. Rauf, are you familiar with the Bronx Trading Company

10   business?

11   A.  Yes.  I'm the one who opened it up too, yes.

12   Q.  Do you also work there sometimes?

13   A.  I did work, yes.

14   Q.  What kind of business is the Bronx Trading Company?

15   A.  We are the wholesaler; mostly cigarettes, candy, cigar and

16   paper goods, counter medicines, and some beverage.

17   Q.  When you say wholesaler, what kind of customers does the

18   Bronx Trading Company sell to?

19   A.  Only the business owner come there.  No walk-in customer

20   there.

21   Q.  For example, what type of business owners?

22   A.  Mostly the bodega.

23   Q.  Bodega owners?

24   A.  Mostly the bodega, yes.

25   Q.  I want to turn back to the Go 24 Gas Station in Matamoras

D375dor2                     Rauf - direct

1    for a moment.  Can you describe what that business is like?

2    A.  It is 90 percent cigarette.  We have gas, cigar, candy,

3    coffee.  That's it.

4    Q.  I'm going to approach now, sir, and show you what is in

5    evidence as Government Exhibit 700 to 705.  Can you take a look

6    at those?

7    A.  That's exactly what we have, yes.

8            THE COURT:  Take a look at them all.  Just flip

9    through them.

10   A.  Yes.  That's what we have, yes.

11   Q.  When you say:  "That's what we have," what do you mean by

12   that?

13   A.  I mean this is the place.

14           I'm sorry.  What your question is?

15   Q.  Which place is that?

16   A.  This is Go 24 hour.

17   Q.  Ms. Brady, can we put up Government Exhibit 700, please?

18       Mr. Rauf, can you tell the jury what we are looking at in

19   this photograph, Government Exhibit 700?

20   A.  I mean this is the place.

21   Q.  Which place?

22   A.  Go 24 hour.  I'm sorry.

23   Q.  What is the building on the right-hand side of the

24   photograph?

25   A.  The right-hand side, this is the store.

D375dor2                          Rauf - direct

1    Q.  What types of products are sold in the store?

2    A.  The cigarettes, cigars and candies.  And in the summer we

3    sell fireworks, too.

4    Q.  And where is it that you work?

5    A.  In this building, yes.

6    Q.  How often do you work in the building at the Go 24?

7    A.  Oh almost -- not even -- I would say at least six days,

8    must, I'm there.

9    Q.  I'm sorry?

10   A.  Six days a week.

11   Q.  What are, generally, your hours there six days a week?

12   A.  I live in New Rochelle, like to 9:30, sometimes up there to

13   11:00, or sometimes I leave at 8:00, 7:00.

14   Q.  So, 9:30 in the morning?

15   A.  Yes.

16   Q.  Until sometime in the evening?

17   A.  Like I would say 7:00, 8:00; yes.

18   Q.  Six days a week?

19   A.  Six days, sometimes seven days.

20   Q.  What portion of the business for the Go 24 is in cash

21   proceeds as opposed to credit cards or debit cards or other

22   things?

23   A.  What portion you mean?

24   Q.  Yes.

25   A.  I would say, like, 40 percent would be credit card, the

D375dor2                          Rauf - direct

1    rest, 50 percent would be cash.

2    Q.  50 percent cash?

3    A.  More than 50 percent cash, yes.

4    Q.  What do you do with the cash proceeds of the business for

5    Go 24?

6    A.  What we do?  Once a week now -- you are talking about now?

7    We give to the armored truck.  They come and pick up the money

8    once a week and the rest left we pay to the vendors, we give

9    them cash.

10   Q.  You have armored guards once a week?

11   A.  We have armored car once a week.

12   Q.  Is there a particular day of the week that the armored cars

13   come?

14   A.  Tuesday.

15   Q.  And pick up the cash?

16   A.  Tuesday.

17   Q.  I want to turn your attention now to August of 2011.

18   A.  Okay.

19   Q.  What was your practice at that time with respect to the

20   cash proceeds of the Go 24?

21   A.  We don't have armored truck at that time.  We just -- every

22   Monday I go to the bank to drop the money, yes.

23   Q.  On Mondays?

24   A.  Every Monday, yes.

25   Q.  Who went to the bank on Mondays particularly?

D375dor2                          Rauf - direct

1    A.   Who go to the bank?  Mostly 99 percent I go there.

2    Q.   And which bank did you go to with the cash proceeds on

3    Mondays?

4    A.   We got to bank, we deal with the Wells Fargo and Pennstar

5    Bank.

6    Q.   And where -- can you describe in relation to the Go 24

7    where is the Wells Fargo Bank?

8    A.   Wells Fargo Bank is like five blocks from there.

9    Q.   How would you get to the bank from the Go 24 with the cash?

10   A.   Drive.

11   Q.   You would drive?

12   A.   Yes.

13   Q.   And what was a typical amount of cash proceeds that you

14   would be carrying on a Monday when you went to the Wells Fargo

15   Bank or the Pennstar Bank?

16   A.   Between $80,000 and $120,000 cash, yes.

17   Q.   $80,000 and $120,000?

18   A.   Yes.

19   Q.   How would you carry that money to the bank, back in August

20   of 2011?

21   A.   In the bag.  Just a regular bag.  This is a small town so

22   everybody knows.  It is no problem there.

23   Q.   Generally what time did you go to the bank on Monday

24   mornings?

25   A.   It depends how busy I am in the morning because it takes

D375dor2                         Rauf - direct

```
 1   time to count the money for the weekend because weekends we are
 2   very busy so Saturday, Sunday, I stay up on Monday; so, usually
 3   I would say around 1:00, between 11:00 to 1:00.
 4   Q.  When you say 11:00 are you you're referring to 11:00 a.m.?
 5   A.  Yes.
 6   Q.  11:00 to 1:00 p.m.?
 7   A.  Yes.
 8   Q.  Ms. Brady, we can take that down, please.  Thank you.
 9       I'm going to ask you about a different topic for a moment.
10   Are you familiar with an individual named Fahd Hussain?
11   A.  Yes, I know.  Yes.
12   Q.  How do you know Mr. Hussain?
13   A.  When we opened the Bronx Trading in the Bronx I was working
14   as a salesman, he was working in the store.  I were working,
15   you know, go to the store to try to get the order from him.
16   That's the way we know him from there.
17   Q.  So, when you were at the Bronx Trading Company you said
18   that he was working at the store.  What store are you referring
19   to?
20   A.  I believe he was working there, 233rd -- no 234 and White
21   Plains Road in the Bronx.
22   Q.  What type of store was it that he was working at?
23   A.  He was at a bodega at that time.
24   Q.  He was one of your customers at Bronx Trading Company?
25   A.  Yes he was my customer, yeah.
```

D375dor2                        Rauf - direct

1   Q.  How long have you known him?

2   A.  Since we opened -- I would say it is from '96.

3   Q.  1996?

4   A.  Yeah, 1996 or 1997.  Somewhere in this area.

5   Q.  And other than him being a customer of the Bronx Trading

6   Company, have you had other business dealings with Mr. Hussain?

7   A.  We are -- in 2006 or 2007 we did have some kind of

8   partnership.  We bought some building in Long Island.

9           Yes, we had a partnership with him, yes.

10  Q.  When you say "we" you mean you and Mr. Hussain and someone

11  else?

12  A.  And two more guys.  Four all together, four guys.

13  Q.  How long did that last, that commercial real estate?

14  A.  Not even one year.

15  Q.  Less than a year?

16  A.  Yes.

17  Q.  Have you ever engaged in any cash transactions with

18  Mr. Hussain?

19  A.  He came a couple times recently.  He gave me a check, he

20  said that his lotto will be shut down if he doesn't deposit

21  money in his account so he gave me a check for -- like Monday

22  he gave me a check for, post-dated on Friday so I could cash on

23  Friday.  So, he took the cash from me, he gave me this check.

24  Q.  Let me break that down a little bit.

25  A.  Sure.

D375dor2                         Rauf - direct

1  Q.  You said he came recently a few times.  What do you mean by

2  recently?

3  A.  I mean recently before these things happened, before that I

4  mean.  It is not like always but it happened like four our five

5  times, yes.

6  Q.  Four or five times in what year?

7  A.  I would say in '12.  '12 or '11.  I cannot remember.

8  Q.  2011 or 2012?

9  A.  Yeah.

10  Q.  And you said he gave you a check?

11  A.  Yeah.

12  Q.  And explain what he did with the check.

13  A.  Like he gave me a $4,000 check but he did it for Friday.

14  Friday or Saturday.  And Friday or Saturday I could cash it

15  meaning I could deposit it in my account or give it to my

16  vendor where I buy the stuff.

17  Q.  I'm sorry.  Just explain that a little bit more.  He would

18  give you a check, for example, on what day?

19  A.  Suppose he gave me a check on Monday.

20  Q.  On Monday.

21  A.  Okay, but he post-dated the date for Friday or Saturday but

22  that he gets four or five days to put the money in his account.

23  Q.  And how much would the amount of the check be for?

24  A.  It could be $4,000, $6,000.

25  Q.  $4,000 or $6,000?

D375dor2                          Rauf - direct

1   A.  Yes.

2   Q.  And you would give him cash?

3   A.  I would give him cash on Monday, yes.

4   Q.  Where would these transactions take place?

5   A.  What do you mean?  How he got the money?  He got the

6   cash -- he pick up from there, from the store, yes.

7   Q.  He would pick up the cash from which store?

8   A.  Yeah.

9   Q.  Your store?

10  A.  Yeah; the Go 24.

11  Q.  The Go 24?

12  A.  Uh-huh.

13  Q.  And that happened approximately four or five times?

14  A.  Yeah.

15  Q.  Now, Mr. Rauf, I want to ask you about a different topic.

16  A.  Sure.

17  Q.  Were you the victim of a robbery?

18  A.  Yes, I was.  Yes.

19  Q.  And when did that robbery occur?

20  A.  I don't have exact date.  It happened in Pennsylvania.

21  Q.  What month did it occur, and year?

22  A.  I don't know often the top of my head.

23  Q.  Do you know what year it occurred in?

24  A.  Yeah, it was 2011.

25  Q.  2011.  Do you know what month of the year?

D375dor2                          Rauf - direct

1   A.  No.  No.

2   Q.  I'm going to turn your attention to the day of the robbery.

3   A.  Yes.

4   Q.  Approximately what time did it happen?

5   A.  I would say around 12:00 or 1:00.  Something like that.

6   Yeah.

7   Q.  In the afternoon?

8   A.  Yeah.

9   Q.  And where were you at that time?

10  A.  Where -- when did it happen?

11  Q.  Yes.

12  A.  I parked the car in the parking lot of the bank.

13  Q.  Which bank?

14  A.  Wells Fargo.  Start walking to the bank and when I

15  almost -- I would say 20 feet from the door then I see the guy

16  come running from across the street and he hit me on the, you

17  know, with a fist and the other guy came from the behind, he

18  grabbed the bag.

19  Q.  So you're walking from your car into the bank?

20  A.  To the back door, yes.

21  Q.  Were you carrying money with you that day?

22  A.  Do I carry money with me, yes.  I had the bag, yes.

23  Q.  Approximately how much money?

24  A.  $46,000.

25  Q.  $46,000?

1    A.   Yeah.

2    Q.   Was that the typical amount that you carried to the bank or

3    was it more or less?

4    A.   It was less.  I think -- yeah, because the day before we

5    got robbed in New Rochelle for the Bronx stores and we lost

6    $56,000 over here so I had -- he issued the check already so

7    I -- he need the money so I didn't bring all the money with me

8    so I had to deposit money in this -- in the Bronx Trading

9    account to cover up the check.

10            MR. ROTH:  Judge, I'm going to object.  I believe that

11   is nonresponsive.

12            MS. MASELLA:  I can ask --

13            THE COURT:  I think it was responsive.  It is a little

14   narrative, but overruled.

15            Next question?

16   BY MS. MASELLA:

17   Q.   So you had -- you just described that -- you described two

18   individuals.  What did the first individual do?

19   A.   Guy came running from across the street and hit me.  I

20   thought maybe, you know, they're jogging or something like that

21   because I stopped to let them pass from there but he came

22   straight to me, he hit me with a fist, and the other guy came

23   and grabbed the bag.

24   Q.   And when you say the guy hit you with a fist you are making

25   a gesture but can you tell us in words what part of your body

1    he hit you on?

2    A.  In the face.

3    Q.  And what happened to you when that happened?

4    A.  Just, I mean -- I didn't fell down, understand.  I tried

5    to, you know, block it but he did hit me.

6    Q.  You said he came from across the street; what direction was

7    that?  What location is there?

8    A.  He was standing, he was waiting for me there under the shed

9    from the ice cream place across the street and he came from

10   there.

11   Q.  Can you describe that individual for us?

12   A.  He is a black guy, I would say -- I'm 5'5", he was taller

13   than me and he was, you know, good muscles, like a sportsman.

14   Q.  When you say taller than you, can you estimate how much

15   taller than you?

16   A.  I'm 5'5", he's -- I would say he was 5'7", 5'8".  Something

17   like that.

18   Q.  Tell us again what the second guy did.

19   A.  I didn't see him when he was coming but I saw him when he

20   was going there, back.  I just -- I didn't see his face.  When

21   he grabbed the bag just -- I just saw him running across the

22   street.

23   Q.  Did he grab the bag while you were holding it or was the

24   bag somewhere else at that time?

25   A.  He had holding the bag in his hands.

1   Q.  And then where did that individual go?

2   A.  Across the street.

3   Q.  What did the second person look like?

4   A.  Both ran across the street.

5   Q.  Can you describe the second person for us?

6   A.  Second person who hit me or who grabbed the bag?

7   Q.  The guy who grabbed the bag.

8   A.  Again, I didn't see his face, I just saw him when he was

9   running.  He was shorter, he wasn't taller like the other guy.

10  I would say he was 5'4", 5'3" I would say.  A little chubby

11  guy.

12  Q.  Did you notice anything else about these two individuals

13  that you are able to describe?

14  A.  No.  I didn't see anything else.

15  Q.  Did you see what direction they ran in after they left?

16  A.  Yeah.  I know that they -- next to the Turkey Hill behind

17  the building they had some parking.  They parked a car or

18  something like that.

19          MS. MASELLA:  One moment, your Honor.

20          THE WITNESS:  Sure.

21          (Counsel conferring)

22  BY MS. MASELLA:

23  Q.  Mr. Rauf?

24  A.  Yes.

25  Q.  After the two individuals left, what did you do?

D375dor2                          Rauf - direct

1   A.  Well, there was the lady standing in the bank just start

2   screaming.  They start, you know, screaming, making noise.  The

3   bank manager came in from the bank, they called the police.  I

4   didn't call the police, they called the police.  The police

5   were there very quickly.  They tried to look for this guy.

6           MR. ROTH:  Objection to what the police did.

7           THE COURT:  Sustained.  Never mind what they tried to

8   do.

9   BY MS. MASELLA:

10  Q.  How long did you remain in the parking lot area after the

11  robbery, would you say?

12  A.  How long before the police comes?

13  Q.  How long did you stay in the parking lot area?

14  A.  When the police came they did the investigation and then we

15  spent almost a good 30 minutes.

16          MS. MASELLA:  No further questions, your Honor.

17          THE COURT:  All right.  Cross-examination.

18          MR. ROTH:  Thank you.

19  CROSS EXAMINATION

20  BY MR. ROTH:

21  Q.  Good morning, sir.

22  A.  Good morning.

23  Q.  My name is James Roth and I represent Mr. Barrett in this

24  matter.  If there is any question that I ask you or if I speak

25  too quickly, just let me know before you answer it and I will

1    try to rephrase it or speak slower, okay?

2    A.   Okay.

3    Q.   Is it Mr. Rauf?

4    A.   Rauf.

5    Q.   I'm sorry, Rauf.

6         You mentioned that there was $46,000 in that bag that you

7    were carrying to the bank that day; is that correct?

8    A.   That's correct.

9    Q.   And I'm just curious, not running a cash business myself,

10   how did you know that it was exactly $46,000?

11   A.   Because I'm the one who counted it.  I'm the man who made

12   the deposit slip so that's the way I know.

13   Q.   So you are sort of very precise in your accounting, is that

14   what you're saying?

15   A.   Yeah.  Absolutely.

16   Q.   When this fellow Mr. Hussain, your former business partner

17   gave you checks on four or five occasions previously to this,

18   who were the checks made out to?

19   A.   He just put the cash or gave me -- don't put no name on it,

20   I'm the one who put my name or the company name.

21   Q.   He gave you blank checks?

22   A.   Blank checks.  He would just sign it and put the amount on

23   it, yes.

24   Q.   And when he gave you that check, how did you enter that

25   into your books?  You say you account for everything very

1   carefully.

2   A.   What do you mean there?  I don't understand what you're

3   saying.

4   Q.   Well, if I gave you a check today, you're a business man?

5   A.   Okay.

6   Q.   A blank check?

7   A.   Okay.

8   Q.   The amount is filled out, is that correct?

9   A.   Yeah.

10  Q.   So I give you a check today, you say, for some $4,000,

11  $6,000?

12  A.   Okay.

13  Q.   I give it to you?

14  A.   Okay.

15  Q.   You receive that?

16  A.   Okay.

17  Q.   How do you account for that?

18  A.   As -- we just give him the cash.  And so, cash, you put the

19  check over there and then the next day or the same day the

20  cigarette company comes, we give them the deposited check.

21  Q.   I'm sorry.  I didn't hear the answer to the last part of

22  it.

23  A.   Okay.  If he want to deposit it I will keep it in the

24  drawer in the safe to wait for the Friday or Saturday; or if I

25  want to give it to the cigarette company we just put their

1  name, I just give it to them.

2  Q.  But I'm asking how do you enter that check.  When I give

3  you a check for $4,000 to $5,000, how do you enter it into your

4  accounting books?

5        You keep a set of books, is that right?

6  A.  No, we don't go through that.  We don't have the H&R Block,

7  just a cash business over there.

8  Q.  You don't bother with that?

9  A.  No.  We don't bother with that.  No.

10  Q.  So there is no record that if I came and looked at your

11  books --

12  A.  Yeah.

13  Q.  -- as an IRS Person --

14  A.  Yeah.

15  Q.  -- that would record that transaction that Mr. Hussain

16  gave you a blank check on one of these days or four or five

17  days and that you gave him cash?

18  A.  No.  There is no record.

19  Q.  And the accountant couldn't tell what happened?

20  A.  No.  He can't tell.

21  Q.  Did you do any other transactions with Mr. Hussain in terms

22  of sending money anywhere?

23  A.  No.

24  Q.  This whole incident in terms of the robbery itself when you

25  were attacked that day, it was over in seconds, is that fair to

1    say?

2    A.   Say -- one more thing -- I'm sorry.  Say one more time?

3    Q.   Fair enough.

4         When you were walking to the bank with the bag and then you

5    were hit and then the bag was grabbed, that was just literally

6    a matter of seconds?

7    A.   Matter of seconds, yeah.  Yeah.

8    Q.   The assailants, the robbers --

9    A.   Yeah.

10   Q.   -- were they wearing any type of masks?

11   A.   There were no masks, no.

12   Q.   Were they wearing any hoodies?  You know what a hoodie is?

13   A.   There was no hoodie, no.

14            MR. ROTH:  I have no further questions, Judge.

15            THE COURT:  Okay.

16   CROSS EXAMINATION

17   BY MS. STAFFORD:

18   Q.   Good afternoon, Mr. Rauf.

19   A.   Good afternoon.

20   Q.   I just have a few questions for you.

21   A.   Sure.

22   Q.   Right after the incident you spoke to a police officer,

23   didn't you?

24   A.   I did talk to a police officer, yes.

25   Q.   And you described what had just happened to you, right?

D375dor2                        Rauf - cross

1   A.  I told them what happened, yes.

2   Q.  And you described that the persons who robbed you were

3   wearing a baseball cap?

4   A.  I told it was like a red cap, baseball; something like

5   that.  Yes.

6   Q.  And you tried to be as accurate as possible, correct?

7   A.  I would try, yes.

8   Q.  Because you wanted to assist the police in apprehending the

9   person who attacked you, right?

10  A.  Uh-huh.

11          THE COURT:  You have to say yes or no.

12          THE WITNESS:  I'm sorry.  Yes.

13  Q.  And you said you didn't observe anybody wearing a ski mask,

14  right?

15  A.  I didn't observe what?  I'm sorry.

16  Q.  You didn't observe anybody wearing a ski mask, right?

17  A.  No.  There was no mask on him, no.

18  Q.  And you did not observe any weapons?

19  A.  There was no weapon drawn, no.

20  Q.  You did not see a knife?

21  A.  Nothing.

22  Q.  You did not see a gun?

23  A.  Nothing.

24  Q.  And you also wanted to assist the police officer in

25  identifying the person that you saw who hit you, correct?

D375dor2                        Rauf - cross

1    A.  If I see him I could see this guy who hit me, yes.  Not the

2    other guy.  The guy, yes.

3    Q.  And shortly after you spoke to the police you were shown

4    photographs by the police, correct?

5    A.  They come up with something, yes.

6    Q.  And you looked at those photographs carefully, right?

7    A.  I did, but the photograph wasn't clear so we wasn't sure,

8    yes.

9    Q.  You weren't sure?

10   A.  Yeah.

11   Q.  You don't remember identifying somebody that day?

12   A.  No.  Not in this picture, no.

13   Q.  Not in the picture?

14   A.  No.

15   Q.  You don't remember identifying a person -- prior to your

16   testimony today you met with the prosecutors at the table,

17   isn't that true?

18   A.  I did.  I'm sorry.

19   Q.  Prior to your testimony you met with the prosecutors?

20   A.  I never met anybody.

21   Q.  You never met them?

22   A.  Except the lady.

23   Q.  I apologize.  Did you speak with them over the phone?

24   A.  To?

25   Q.  To the prosecutors in this case?

D375dor2                          Rauf - cross

1    A.  No.  I didn't talk to anybody.  No.

2    Q.  You didn't talk to anybody on the phone?

3    A.  No.  No.

4    Q.  You don't remember speaking on the phone in January?

5    A.  What do you mean when you call the prosecutor?  You mean

6    the --

7    Q.  Ms. Masella, Ms. Lester, possibly an agent?

8    A.  I just talked to the detective.

9    Q.  I'm sorry.  Can you say that again?

10   A.  We just talked to the detective.

11   Q.  The detective.

12   A.  Yeah.

13   Q.  You've only spoken with the detective for the NYPD?

14   A.  Yeah.

15   Q.  You haven't spoken with anybody in relation to this case?

16   A.  And the lady sitting over here, that's it.  I met her in

17   the office.

18   Q.  Oh, you did meet her in the office?

19   A.  I did meet her, yeah.  We had a meeting, yes.

20   Q.  So you do recall talking with her?

21   A.  Yeah.

22   Q.  And do you recall Ms. Lester taking notes while you were at

23   that meeting?

24   A.  Yes.  They were writing everything, yeah.

25   Q.  And do you recall explaining to Ms. Lester and the other

D375dor2                        Rauf - cross

1    individuals that you observed the face of the person that had

2    attacked you?

3    A.  Yeah.  Yeah.

4    Q.  And, do you also remember explaining to them that you were

5    able to -- you thought or you believed that you could I.D. that

6    person with a photo?

7    A.  I thought I could, yes.  Yes.

8    Q.  And were you ever shown any other photographs?

9    A.  No.  Nobody showed me any photograph.

10   Q.  The government showed you no photographs?

11   A.  Nobody show me a photograph, no.

12              MS. STAFFORD:  One moment, your Honor.

13              (Pause)

14              MS. STAFFORD:  Thank you for your time.  No further

15   questions.

16              THE WITNESS:  Thank you.

17              THE COURT:  Any redirect?

18              MS. MASELLA:  No, your Honor.

19              THE COURT:  Mr. Rauf, you may step down.  Thank you.

20              (witness steps down)

21              THE COURT:  Next witness.

22              MS. MASELLA:  Yes, your Honor.  The government calls

23   Ahmed Salahi.

24              THE COURT:  Are we okay?  I was going to take a break

25   in 20 minutes unless somebody needs it now.

D375dor2                          Rauf - cross

1              We will take a 10 minute break now and resume with the

2      witness after that.

3              All rise for the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D375dor2                          Rauf - cross

1              (Jury not present)

2              THE COURT:  Anything we need to discuss before this

3      witness takes the stand?

4              MS. FONTIER:  Nothing from the defense.

5              THE COURT:  So, who is after this?  Just tell me the

6      lineup of witnesses.

7              MS. MASELLA:  Ahmed Salahi and then Kassim Salahi.

8      After that it depends sort of who arrives but Mohammad

9      Althomory I believe will be next.  So, those three.

10             THE COURT:  Are they long or short witnesses?

11             MS. LESTER:  Relatively short.

12             MS. MASELLA:  They're relatively short but that should

13     take us through lunch.

14             THE COURT:  Then in the afternoon who do we have?

15             MS. MASELLA:  Mubarak Tawfiq, Agent Winston, and if we

16     have additional time we will be calling Patrick Taylor who is

17     the cooperating witness in custody.

18             THE COURT:  So we might get to the other cooperator

19     today?

20             MS. MASELLA:  Possibly.

21             THE COURT:  All right.  So, take a break.  I just

22     wanted to know.

23             (Recess)

24             MR. ROTH:  Judge, by the way, is the bathroom still

25     down?

D375dor2                    Rauf - cross

1              THE COURT:  They're supposed to be fixed.

2              LAW CLERK:  One of them is working.

3              MR. ROTH:  The only reason I raise that is I saw

4    jurors in the common bathroom.

5              LAW CLERK:  Oh.

6              THE COURT:  At the next break find out what the deal

7    is with the rest rooms because I would really rather have them

8    not using the public bathroom.

9              LAW CLERK:  I think because there is only two of them

10   and they all want to go at the same time.

11             THE COURT:  I don't want them bumping into people.

12             LAW CLERK:  So, should I tell them to keep using these

13   two?

14             THE COURT:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Okay, have a seat.  The government is

3      going to call its next witness.

4           MS. MASELLA:  Your Honor, the government calls Ahmed

5      Salahi.

6           THE COURT:  If you can stand and raise your right

7      hand.

8       AHMED SALAHI,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11          THE COURT:  Have a seat, maybe move the chair a little

12     closer to the microphone.  If you could state your name and

13     spell your names, first and last, for the record?

14          THE WITNESS:  Ahmed Salahi.  A-H-M-E-D, S-A-L-A-H-I.

15          THE COURT:  Mr. Salahi?

16          THE WITNESS:  Right.

17          THE COURT:  Good morning, to you, Mr. Salahi.  Keep

18     your voice up nice and loud.

19          THE WITNESS:  Okay.

20          THE COURT:  You may proceed, Ms. Masella.

21          MS. MASELLA:  Thank you, your Honor.

22     DIRECT EXAMINATION

23     BY MS. MASELLA:

24     Q.  Good morning, Mr. Salahi.

25     A.  Good morning.

D375dor2                          A. Salahi - direct

1   Q.  Can you tell us what you do for a living?

2   A.  Well, I have poultry -- poultry place, own business.

3   Q.  When you say a poultry place, describe what that business

4   is like for us.

5   A.  It is where you have live poultry, live chicken poultry.

6   Q.  And where is the location of that business?

7   A.  On 1307 Bronx River Avenue.

8   Q.  What is your role with respect to that business?

9   A.  Owner.

10  Q.  And do you own that business yourself or with other people?

11  A.  It is family owned business.

12  Q.  Who else in your family is responsible for running the

13  business with you?

14  A.  My brother.

15  Q.  And, in addition to the poultry market in the Bronx River

16  location that you mentioned, do you and your other family run

17  other business?

18  A.  My brother works in another place.  He owns a business on

19  his own.

20  Q.  Where is that business?

21  A.  3313 Ely, it is in the Bronx too.  Ely Avenue.

22  Q.  Can you spell avenue for the court reporter?

23  A.  E-L-Y.

24  Q.  What kind of products to do you sell at your poultry

25  market?

D375dor2                        A. Salahi - direct

1   A.  It is live chicken.

2   Q.  Like anything else?

3   A.  Ducks, rabbits, live poultry.  Chicken, ducks and rabbits.

4   Q.  And how long have you worked at that poultry market in the

5   Bronx?

6   A.  About three years.

7   Q.  Where are the suppliers for your business located?

8   A.  It's a company comes from the farmers in New Jersey and

9   Pennsylvania.

10  Q.  That's where you obtain the live poultry that you sell?

11  A.  Yeah.  They deliver it to my place.  It always comes to the

12  establishment.

13  Q.  What portion of your business is cash proceeds as opposed

14  to credit or other methods of payment?

15  A.  It's credit and EBT.

16  Q.  Do you also have cash proceeds?

17  A.  Yes, we do have cash.

18  Q.  Approximately what percentage or what amount of your

19  business --

20  A.  About a half  --

21  Q.  -- is cash?

22  A.  Yes, half is cash.

23  Q.  And how do you handle the cash proceeds of your business?

24  A.  What do you mean?

25  Q.  Where do you store them?

D375dor2                          A. Salahi - direct

1   A.  Well, take some of it to the house to go to the bank, like,

2   once a week.

3   Q.  And what amounts of cash do you take from your business to

4   your home while you're waiting to go to the bank?

5   A.  About five to six thousand a week.  Weekly.

6   Q.  Are you familiar with an individual named Fahd Hussain?

7   A.  Named who?

8   Q.  Fahd Hussain?

9   A.  No.  No, never see him.

10  Q.  You are not familiar with that individual?

11  A.  No.

12  Q.  Mr. Salahi, were you the victim of a robbery?

13  A.  Yes.

14  Q.  What date did that occur?

15  A.  October 29th.

16  Q.  Of what year?

17  A.  2010?  '10.  I can't remember the year.

18          THE COURT:  Did you say I can't remember the year?  Is

19  that what you said?

20          THE WITNESS:  Yes.  I was away for a year in another

21  country.

22  BY MS. MASELLA:

23  Q.  Well, we're in early 2013, does that help you remember how

24  many years ago it was?

25  A.  2011.  October 29th.

1    Q.  That's the day of the robbery?

2    A.  Yeah.

3    Q.  Do you remember what the weather was like that day?

4    A.  It was snowing a little bit, raining.  Kind of raining,

5    snowing a little bit.

6    Q.  And were you at work that day, October 29th?

7    A.  I was home and I went to the mosque and it happens when I

8    come out from the mosque.

9    Q.  Well, let's start with earlier that day.  At any point that

10   day did you go to work?

11   A.  Yes.  I was working.  I worked to 3:00, then I went home.

12   Q.  Mr. Salahi, I'm just going to ask you to keep your voice

13   up; you are trailing off a little bit.

14   A.  Okay.

15   Q.  And, use the microphone.  Thank you.

16       What day of the week was that?

17   A.  It was Saturday.

18   Q.  And you said you were at work earlier that day?

19   A.  Yeah, to 3:00.

20   Q.  Was that at the Bronx River Market location?

21   A.  Bronx River, yeah.

22   Q.  What time did you go home that day?

23   A.  3:00.  Around 3:00.

24   Q.  And in what area is your home located?

25   A.  It is 2532 Radcliffe Avenue, Allerton, in the Bronx.

D375dor2                          A. Salahi - direct

1    Q.  Can you say the address again for the court reporter?

2    A.  2532 Radcliffe.

3              THE COURT:  2532?

4              THE WITNESS:  Radcliffe Avenue.

5              THE COURT:  Radcliffe Avenue?

6              THE WITNESS:  That's where I live.

7    BY MS. MASELLA:

8    Q.  And after you went home around 3:00, did there come a point

9    when you left your home later that day?

10   A.  Did I come what?

11   Q.  After you went home around 3:00 to Radcliffe Avenue, did

12   there come a point when you later left your home?

13   A.  No.  I left somewhere around close to 6:00.

14   Q.  You left about 6:00?

15   A.  Yeah.  I left the house about 6:00.  Around 6:00.

16   Q.  And where did you go at that time around 6:00?

17   A.  To the mosque.

18   Q.  The mosque?

19   A.  Yes.

20   Q.  Where is the mosque located?

21   A.  It's on Rhinelander and White Plains Road.

22   Q.  Do you know how to spell that?

23   A.  I think it is like R-H-I-N-L-E-D-E-R.  I don't know how to

24   spell it.

25   Q.  How far is that location, the mosque at Rhinelander?

D375dor2                          A. Salahi - direct

1   Approximately how far is it from your house?

2   A.   About 10 minutes' drive.

3   Q.   Did you walk or drive?

4   A.   No.  Drive there.

5   Q.   Mr. Salahi, I'm going to approach and show you what's been

6   marked for identification as Government's Exhibits 900, 901,

7   902 and 903.

8        Can you take a look first at what's been marked as

9   Government Exhibit 900?

10  A.   Okay.

11  Q.   Do you recognize what that is?

12  A.   Yeah.  I know Boston Road.

13  Q.   But what is it that you're looking at?  What is it?

14  A.   What is the piece of paper?

15  Q.   Yeah.

16  A.   It is government 900.

17  Q.   Government Exhibit 900.

18  A.   Okay.  What do you want me to --

19  Q.   Do you recognize what it is that you're looking at?

20  A.   Yeah.  I know it is Boston Road and Allerton Avenue.  I do.

21  Yeah.

22              THE COURT:  It is a map, right?

23              THE WITNESS:  It is a map.

24              (Continued on next page)

25

D37Wdor3                          A. Salahi - direct

1   BY MS. MASELLA:

2   Q.  Are you familiar with that area?

3   A.  Yeah, I know Boston Road and Allerton Avenue.

4   Q.  Is your home located in that area?

5   A.  I think it's close, but I don't see Radcliff Avenue there.

6   It's not showing.

7   Q.  That's fine, sir.  Let's turn instead to Government Exhibit

8   902, what's been marked for identification as 902.

9   A.  Yeah, that's my house.

10  Q.  Is that a photograph?

11  A.  Yeah.

12  Q.  And does Government Exhibit 902 fairly and accurately

13  depict or represent your house?

14  A.  I'm sorry.  I don't understand.

15  Q.  Is that a fair picture of your house?

16  A.  Yeah.  That's my house.

17          MS. MASELLA:  Your Honor, the government offers

18  Government Exhibit 902.

19          THE COURT:  Any objection?

20          MS. STAFFORD:  No objection.

21          THE COURT:  No?  All right.  Government Exhibit 902 is

22  received.

23          (Government's Exhibit 902 received in evidence)

24          THE COURT:  That's what the house looked like in or

25  around October of 2011?

D37Wdor3                        A. Salahi – direct

1              THE WITNESS:  Yes.

2              THE COURT:  All right.

3    BY MS. MASELLA:

4    Q.  Sir, can you take a look at Government Exhibit 901 in front

5    of you?

6    A.  Okay.

7    Q.  Are you familiar with that?

8    A.  No.

9    Q.  You're not familiar with that?

10   A.  White Plains Road.  Yeah, White Plains and Rhinelander.

11   Q.  You see Rhinelander on the map?

12   A.  Yeah.

13   Q.  And this is also a map, correct?

14   A.  That's where it happened, Hunt Avenue.

15   Q.  Does this map, to your knowledge, accurately represent the

16   streets in that area and how they're laid out in relation to

17   each other?  Does it look correct, this map?

18   A.  Does it look correct?  White Plains.  Yeah.  I know White

19   Plains, Rhinelander, that's the street I know of on that map.

20   That's where the mosque appeared.

21   Q.  Near White Plains and Rhinelander?

22   A.  Yeah.

23              MS. MASELLA:  Your Honor, the government offers

24   Government Exhibit 901.

25              MR. ROTH:  Objection.

1           THE COURT:  Come on.  Overruled.  I mean, sustained.

2    He recognizes two roads.  He has no idea what this is.  I don't

3    know if he's seen it before, but this is not the way to get in

4    this exhibit.

5           MS. MASELLA:  I'll move on, your Honor.

6    Q.  Sir, can you take a look at Government Exhibit 903 in front

7    of you?  Are you familiar with that?

8    A.  That's the mosque.

9    Q.  Is it a photograph?

10   A.  Yeah.

11   Q.  And does that photograph fairly represent or depict the

12   mosque that you were talking about?

13   A.  It's the white building next to this first building.

14          THE COURT:  I couldn't hear what you said.

15          THE WITNESS:  It's the building next to the corner

16   building.

17   BY MS. MASELLA:

18   Q.  Is it in the photograph?

19   A.  Yes.

20          THE COURT:  That's not the question.  The question was

21   does the photo fairly and accurately depict the mosque that you

22   were talking about.  Does it?

23          THE WITNESS:  I don't understand.

24   BY MS. MASELLA:

25   Q.  Is that how the mosque looked around October of 2011?

D37Wdor3                         A. Salahi - direct

1    A.  Yes, exactly.  That's the mosque.

2              MS. MASELLA:  Your Honor, the government offers 903.

3              THE COURT:  Any objection?

4              MR. ROTH:  No, your Honor.

5              THE COURT:  All right.  Government Exhibit 903 is

6    received.

7              (Government's Exhibit 903 received in evidence)

8              MS. MASELLA:  Ms. Brady, can we put up Government

9    Exhibit 902, please, in evidence.

10   Q.  Sir, can you tell the jury what it is that we're looking at

11   in Government Exhibit 902?

12   A.  My house, where I live.

13   Q.  And what street is that on?

14   A.  Radcliff Avenue.

15             MS. MASELLA:  Ms. Brady, can we put up Government

16   Exhibit 903.

17   Q.  What are we looking at here, Mr. Salahi?

18   A.  We're looking at the mosque building.  It's not the one on

19   the corner.  It's the white building next to it.

20   Q.  Indicating the white building on the left-hand side of the

21   photograph?

22   A.  On the left-hand side.  Right.

23   Q.  And that's the mosque that you said you went to around 5:30

24   or six p.m.?

25   A.  Yes.

D37Wdor3                          A. Salahi - direct

1   Q.  What time did you leave the mosque that day?

2   A.  Around 6:30, p.m.

3   Q.  And what did you do when you left the mosque?

4   A.  Just went straight to the car.

5   Q.  Whose car?

6   A.  My car.

7   Q.  What kind of car were you driving that day?

8   A.  A Toyota Sienna.

9   Q.  And what kind of car is a Toyota Sienna?

10  A.  It's a minivan.

11  Q.  Did you get into your car?

12  A.  I did.

13  Q.  And what happened at that time?

14  A.  Before I went to close the door, two people stopped me

15  closing the door, and, and hold on to my jacket and told me,

16  don't move.

17  Q.  You're describing two people?

18  A.  Two people, yeah.

19  Q.  And what happened after they stopped you from closing your

20  car door?

21  A.  One guy said, Hold on to him.  Another guy went back, to

22  the back chairs, and they were like helping each other to put

23  me back, like make me, you know, like lay down between the

24  chairs.

25  Q.  In what area did you lie down between the seats in the

D37Wdor3                         A. Salahi - direct

1   minivan?

2   A.   In which area?

3   Q.   Where in the minivan did you lay down?

4   A.   In between the chair.

5   Q.   The front chairs or back chairs?

6   A.   All the chairs.  They made me like lay down between the

7   chairs, you know, like lay down completely between the chairs.

8   Q.   Did they say anything else at that time?

9   A.   When they, when this guy, one on top, the driving chair,

10  drive the car, he told me, We want to go to your house.

11  Q.   Did one of the individuals get into the driver's seat?

12  A.   Yeah, he did.

13  Q.   What did the other person do?

14  A.   He was sitting in the left chair, holding me down, Stay

15  down, that's not to get up.

16  Q.   When you say holding you down, can you describe what he was

17  physically doing?

18  A.   Well, the Sienna has three -- it has a driver chair and

19  middle chair and the last chair.  He was sitting in the last

20  chair, the last, the last chair in the minivan.  And I was just

21  laying down, like my head was right in between his feet.  His

22  legs and my feet was all the way to the, where the car radio,

23  and he was just, you know, sitting down in the last chair.  My

24  head was all the way down and this guy was driving the van.

25  Q.   When these two individuals initially got into your car, did

1    you see any weapons at that time?

2    A.  I did, yeah.  They had like a knife and a gun.

3    Q.  Which individual had a gun?

4    A.  At that time, the driver had the gun and the guy behind me

5    had the knife.

6    Q.  Did you get a look at the gun?

7    A.  Not -- it was dark.  It was a small gun.  It's like, you

8    know, the revolver gun, small, handgun.

9    Q.  Do you remember what color it was?

10   A.  I can't, I can't tell the color.  It was dark.

11   Q.  What about the knife.  Can you describe the knife?

12   A.  The knife is that kind of knife that folds.  It has like

13   the wooden -- it folds, because you -- I could --

14   Q.  It folds, and you said wooden, and you made a gesture.

15   Which part of the knife was wooden?

16   A.  The handle, the one you hold.

17   Q.  After those two people got into your car, did there come a

18   time when you left that area of the car?

19   A.  Left what?

20   Q.  After the two individuals got into your car, what happened

21   next?

22   A.  They drove the car.

23   Q.  And do you know where you went?

24   A.  Not exactly.  It was not too far from my house.

25   Q.  Were you able to see where you were going?

1    A.  No.

2    Q.  How long did the car drive for until it stopped?

3    A.  About ten minutes.  Around ten minutes.

4    Q.  What happened once the car stopped?

5    A.  What happened, this guy asked me for the house key.  He

6    told me that, you know, he makes me show him which key for the

7    house, the exact key.  I did show him the key.

8    Q.  Which guy, the driver, or --

9    A.  The driver.

10   Q.  -- the other guy?

11   A.  The driver.

12   Q.  Did you have keys with you?

13   A.  Yeah.  The whole keys was on the car key, all the keys.

14   Q.  After he asked you to show him which key was for your

15   house --

16   A.  Yes.

17   Q.  -- did you do that?

18   A.  Yeah, I showed him which key, exactly.

19   Q.  What happened next?

20   A.  He left.

21   Q.  What happened with the other guy?

22   A.  He was there all the time.

23   Q.  Did he stay in the car?

24   A.  He did stay in the car, yeah.

25   Q.  Approximately how long were you in the car after that?

1   A.  How long?

2   Q.  Yes.

3   A.  Since they left?

4   Q.  Since the driver left.

5   A.  Not too long.  But minutes.  Two, three minutes.  Then he

6   came back.

7   Q.  Who came back?

8   A.  The driver.

9   Q.  And what happened when the driver came back?

10  A.  When he came back, they were all trying to talk to me.

11  They were like putting pressure on me to tell them how much

12  money I have, where is the money, where is that.

13  Q.  Who was asking you that, the driver --

14  A.  The driver.

15  Q.  -- or the second guy?

16  A.  The driver.

17  Q.  And did you provide any information about money?

18  A.  I did.

19  Q.  What did you say?

20  A.  I tell them first I didn't have any money.  They started

21  like talking to me in a bad way.  Then they told me, then in

22  the end, they asked me, because they were on the phone with the

23  people in the house.  They told me that, Who is the kid in the

24  house, and I realized that it had to be my nephew.  I didn't

25  know they came to visit me that night.

1    Q.  Okay.  Let's back up for a moment.  Who was on the phone?

2    A.  The driver.

3    Q.  And could you hear what he was saying?

4    A.  He was, at the same time he was on the phone and talking to

5    me and he was giving somebody else the information that I was

6    telling him.

7    Q.  About where the money was?

8    A.  About where the money, yeah.

9    Q.  Did you provide information about where the money was?

10   A.  I told him where is the money, yes.

11   Q.  You just referred to being asked about a kid in a house.

12   Can you explain what you mean by that?

13   A.  Because my nephew was crying when they were in the house,

14   some people was in the house.

15   Q.  How do you know that?

16   A.  Because he asked me.  He said, Who is this kid yelling in

17   the house, who is the kid in the house.

18   Q.  Who asked you that?

19   A.  The driver, when he was on the phone.

20   Q.  Okay.  And did you know who the kid was at that time?

21   A.  Well, I don't know who was it, whether it's my nephew or we

22   had a tenant living upstairs.  He always, when I get home, he

23   always comes downstairs.  I didn't know which one was it, my

24   tenants or my nephews, because my brother used to come with his

25   kids every Saturday, like for dinner, in the house.

1    Q.   So your brother would come with his kids, but did you know

2    whether they were home or not?

3    A.   No, I didn't know.

4    Q.   You weren't sure?

5    A.   Yeah.  So when this guy asked me about the kid, then I know

6    there's someone in the house, whether it's my nephew or the guy

7    who lived upstairs.

8    Q.   After you provided information about -- what information

9    did you provide about where the money was?

10   A.   I told him where was the money.

11   Q.   Where was it?

12   A.   It was in a room, in the closet.

13   Q.   Inside your house?

14   A.   Yeah.  It was underneath the closet.  Always leave it

15   there.

16   Q.   Approximately how much money did you have there that day?

17   A.   15,000.

18   Q.   What happened after that?

19   A.   Well, nothing happened, after.  Actually, they -- he was

20   talking on the phone saying, We got it, we got it.  Then the

21   driver, after he came back, then he left again that time.  Then

22   I just waited with this guy that was sitting with the knife on

23   top of my head, like that.  And they came back, and this guy

24   behind me told me, Don't move, just stay where you are.  And he

25   jumped from top of the chairs to the front, and they all got

D37Wdor3                        A. Salahi - direct

1    out and left.

2    Q.  After the driver came back and you told him where the money

3    was, he left again?

4    A.  He left again, yeah.

5    Q.  How long was he gone that time, approximately?

6    A.  About ten minutes.

7    Q.  And who stayed with you during that time?

8    A.  The guy in the back.  He was always there, all the time.

9    Q.  What was he doing during that time?

10   A.  He was just holding me down and he had a knife on his head,

11   in his hand.

12   Q.  Was he saying anything to you?

13   A.  No.  I can't remember if he was saying anything.  I think

14   he's the one who told me, he say, How much money you have,

15   asking me, How much money you have, and -- when he was there

16   alone.  And then I told him I don't have any money, he said,

17   You're driving Infiniti, and you don't have any money, things

18   like that.

19   Q.  You drive an Infiniti?

20   A.  Yeah.

21   Q.  Do you drive an Infiniti?

22   A.  Not at that time.  I had it like three months before this

23   happened.  It was my brother's car.

24   Q.  Your brother had an Infiniti?

25   A.  Yeah.

1    Q.  So after approximately ten minutes, what happened at that

2    time?

3    A.  The driver came back and they all left.

4    Q.  Did they say anything to you then?

5    A.  They didn't say anything when they left.

6    Q.  What did you do when they left?

7    A.  Well, I was just looking around to see if anybody's still

8    around.  Then I just kind of pull myself out from in between

9    the chairs because I was squeezed there.  When I look around,

10   there was nobody.  Then outside, nobody was there anymore.

11   Everybody left.

12   Q.  When you got outside, were you able to see what location

13   you were in?

14   A.  I never pay attention to see what location.  I just get out

15   of the car, was looking for the keys, and I saw the key was on

16   the car.  I turn on the car.  And I just kept driving, until I

17   just saw Boston Road and I just know where I was, and I just

18   kept on driving.

19   Q.  When you initially got out of the car, did you know whether

20   you were close to your house or far from your house?

21   A.  It looks familiar, but I never get to look what street was

22   it.

23   Q.  What did you do after that, after getting into your car and

24   driving away?

25   A.  I drive to Boston Road.

1   Q.   And where did you go after that?

2   A.   I went to a store on Allerton Avenue.

3   Q.   And what did you do at that time?

4   A.   I called my brother, and they were asking me, What happened

5   to you, where are you.  I was asking him, How is Kassim, how

6   are you.  He said, Everybody's fine.  He said, Where are you.

7   I said, I'm coming right now.  I asked him, Kassim said he

8   already called the police.  I went to the house and everybody

9   was there with the police, and everybody.

10  Q.   Who is Kassim?

11  A.   My brother.

12  Q.   Where was he?

13  A.   He was the one who was in the house with his two sons.

14  Q.   Can you describe the person that you've been talking about

15  as the driver, who got into the driver's seat?

16  A.   The driver, I couldn't see anybody.  They had mask.  But

17  the driver, he looks like he's a -- they both, they both look

18  like they're skinny.  The driver is taller than the guy who was

19  sitting behind me.

20  Q.   Is there anything else you're able to say about their

21  description?

22  A.   No.  I didn't see anything.  They were all mask, they were

23  all covered up.

24  Q.   They were both wearing masks?

25  A.   Yeah.

1    Q.  Do you remember what the masks looked like?

2    A.  It's cloth, some type of cloth, mask.

3    Q.  Do you remember what color the masks were?

4    A.  Black.

5    Q.  Were they wearing anything else to cover their hands or

6    their faces?

7    A.  They had gloves.

8    Q.  What kind of gloves?

9    A.  I don't know what kinds of gloves.

10   Q.  Do you know what color they were?

11   A.  I think black.  It was dark.  Looks like it's black.

12          MS. MASELLA:  One moment, your Honor.

13   Q.  Mr. Salahi, the approximately $15,000 that was in your home

14   that day, was that business proceeds or other money?

15   A.  It's my, my, my salary, my own money and business money

16   also.

17   Q.  Both?

18   A.  Both.

19   Q.  When you eventually returned to your house that day, was

20   that money still there, or was it gone at that time?

21   A.  After it happened?

22   Q.  Yes.

23   A.  No.  It was gone already.  Even, even the closet wasn't

24   there.  Everything was moved.

25          MS. MASELLA:  No further questions.

1          THE COURT:  Okay.  Cross-examination.

2          MR. ROTH:  Thank you, your Honor.

3          THE COURT:  Mr. Roth.

4     CROSS-EXAMINATION

5     BY MR. ROTH:

6     Q.  Good morning, Mr. Salahi.

7     A.  Good morning.

8     Q.  My name is Mr. Roth and I represent Mr. Barrett in this

9     matter.  If there's any question that I ask you that you don't

10    understand or I speak too quickly, just ask me to rephrase it

11    or speak slower, and I will do that.  Okay?

12    A.  Okay.

13    Q.  Do you recall right after this incident, on October 29,

14    2011, making a report to the police department?

15    A.  Yes, sir.

16    Q.  And when was that, sir?

17    A.  When was that?  October 29.

18    Q.  How shortly after the incident did you make that report?

19    A.  I went to the precinct the same night.

20    Q.  The same night?

21    A.  Yeah.

22    Q.  And so is it fair to say, sir, that at that point you had

23    the best recollection of what happened?  I mean, your memory

24    was the freshest, is that fair to say?

25    A.  Yeah.  Yeah, I guess so.

D37Wdor3                        A. Salahi - cross

1   Q.  And the police officers, I take it, interviewed you in an

2   effort to get as many details from you as possible in respect

3   to this robbery, is that right?

4   A.  Right.

5   Q.  And you tried to cooperate fully with them, I assume, is

6   that right?

7   A.  Right.

8   Q.  And you told them everything that you knew about the

9   robbery at that time that had just happened, what, hours

10  before?

11  A.  Yeah, about an hour before.  Yes.

12  Q.  Do you recall telling them that there were three people who

13  got into your car that night and accosted you?

14  A.  Yeah, I did.  I did.  I thought it was three because I

15  don't know how many people were sitting in the back, and the

16  driver --

17  Q.  If you could, just answer the question.  Do you recall

18  that?

19  A.  Do I recall --

20  Q.  Do you recall, as you said --

21  A.  I don't recall anything.  I said two or three.  I didn't

22  give them like a number, how many there were exactly,

23  because --

24  Q.  You didn't tell the police officer who you spoke to the

25  first time, that evening, on October 29, 2011, that three

D37Wdor3                           A. Salahi - cross

1  people got into your car?

2  A.  I don't say three.  I say two or three.

3  Q.  You said two or three?

4  A.  Yeah.

5  Q.  Okay.

6  A.  Because I wasn't sure.

7  Q.  Okay.  Fair enough.  And then the police officer asked you,

8  to the best of your ability, to give descriptions, provide

9  descriptions of those two or three people, is that correct?

10  A.  Yeah.  I think they asked me that.

11  Q.  There's no doubt in your mind, is there?

12  A.  They asked me, yeah.

13  Q.  And what description did you provide of the driver at that

14  time?

15          MS. MASELLA:  Objection.

16  BY MR. ROTH:

17  Q.  If you recall.

18          THE COURT:  Overruled.

19          Do you recall what you said about the driver or what

20  he looked like?

21          THE WITNESS:  I didn't give him any description.  He

22  asked me, he said, What they sound like.  I told him they sound

23  like they have Jamaican accent.  He tell me, Do you know what

24  they look like.  I didn't tell them anything because I didn't

25  see anything.

D37Wdor3                         A. Salahi - cross

1    BY MR. ROTH:

2    Q.  You told them, did you not, sir, that they wore masks?

3    A.  No, I didn't tell them that.  I told him they had masks.

4    Q.  You told him that they had masks?

5    A.  Yeah.

6    Q.  That was part of the description that you gave, is that

7    right?  They asked you person by person for you to describe

8    robber No. 1, robber No. 2, and robber No. 3, is that fair to

9    say?

10   A.  No, no.  They didn't ask me that.

11   Q.  Did you tell them what robber No. 1 looks like that day,

12   robber No. 2?

13   A.  I didn't tell them.  I didn't tell them what anybody looked

14   like because I didn't see anybody.  They all had masks on.

15   Q.  Did you tell them, sir, anything at all regarding their

16   height or weight?

17   A.  I can't remember if I told them.  He told them they were,

18   the only thing I remember I told them the accent.  I remember

19   they had a Jamaican accent.

20   Q.  I take it, sir, you're not from Jamaica, is that fair to

21   say?

22   A.  No.

23   Q.  Do you speak patois?

24   A.  No.

25   Q.  Do you know what patois is?

D37Wdor3                          A. Salahi - cross

1   A.  No.  What is that?

2   Q.  Jamaican dialect.

3   A.  I have Jamaican customer.  I know what they sound like.

4   Q.  Can you tell a Jamaican accent versus a Haitian accent?

5   A.  I don't know.  If I know the people, I can tell.

6   Q.  Sir, if you knew somebody was from Haiti, then you could

7   tell they had a Haitian accent, is that fair to say?

8   A.  If I have a Haitian customer, I know what they sound like.

9   Q.  Right.  And if you have a Jamaican customer, and you know

10  they're Jamaican, then you're saying they're speaking with a

11  Jamaican accent, is that right?

12  A.  Yeah.  If I know he's Jamaican, I know he's Jamaican.

13  Q.  Do you know any Jamaican words or slang?

14  A.  No, but I know how they sound like.

15  Q.  How do they sound?  Could you give the Court and the jury a

16  demonstration of how they sound?

17  A.  No.  If you can speak Jamaican, I will tell you exactly.

18  But I don't know.

19  Q.  You're the witness.  You can't at all approximate what, to

20  you, as you describe it, a Jamaican accent is?

21  A.  It's a question they ask me.  They said, What they sound

22  like.  They asked me if they were black Americans or, you know,

23  someone else.  And I told him they sound like they were

24  Jamaicans.  This was my answer to the, to the, who asked me the

25  question.

1   Q.   So getting back to my earlier question, they asked you to
2   provide the best possible description of the two or three
3   robbers who you say were in your car that day, is that right?
4   A.   Yeah, they asked me that.  They asked me, Can you describe.
5   I said I don't see anybody.  They all had masks.  They were
6   covered up with hoody sweatshirt.  No way I could tell.
7   Q.   They had hoody sweatshirts as well?
8   A.   Yeah, they had hoody sweatshirts.
9   Q.   But you said earlier that they were blacks, is that right?
10  A.   No.  I didn't say they were blacks.
11  Q.   You didn't say that any of the robbers were black?
12  A.   No, I didn't say they were black.  But I said they sound
13  like Jamaican.
14  Q.   Oh, so you don't know whether they were African-Americans
15  or whites?
16  A.   I don't know.  I don't know.
17  Q.   No way you could tell whatsoever?
18  A.   No way I could tell what the skin color.
19  Q.   Okay.
20  A.   They were all covered up.
21  Q.   And you testified on direct examination about the weight
22  that you thought some of them were, is that fair to say?
23  A.   Yeah.
24  Q.   And when you're facedown on the ground --
25  A.   I wasn't facedown.  I was just on the side, right on the

D37Wdor3                          A. Salahi - cross

```
 1   side.
 2   Q.  The person who was holding -- what did you say, they were
 3   holding a gun to your head?
 4   A.  No.  Not all the time.  Person was behind me had a knife in
 5   his hand.
 6   Q.  Did you tell the police officer on the first day, right
 7   after the robbery, that the person who was holding you down had
 8   a knife?
 9   A.  I can't remember if he asked me that question.  I only
10   answer what he asked me.
11   Q.  Well, the officer was trying to solve this crime, is that
12   fair to say, to your knowledge?
13           MS. MASELLA:  Objection.
14           THE COURT:  You can answer.
15   BY MR. ROTH:
16   Q.  He's asking you who robbed you and what happened, is that
17   right?
18   A.  Yeah, he asked me questions.  I can't remember exactly.
19   Q.  And is it possible you didn't tell him that the person had
20   a knife?
21   A.  I did tell them, yeah.
22           MS. MASELLA:  Objection.
23           THE COURT:  What is the basis for the objection?
24           MS. MASELLA:  It's not inconsistent with the statement
25   he's being asked about.
```

1           THE COURT:  The question is just simply is it possible

2     you didn't tell him that the person had a knife.  Overruled.

3           Is it possible you didn't tell him about the knife?

4           THE WITNESS:  Yeah, because I don't know if the

5     question was asked.  I can't remember exactly.  I saw the

6     knife.  If they ask me, I would tell them.

7     BY MR. ROTH:

8     Q.  I'm going to hand you what's been marked, what I'll mark

9     for identification 3516G, and ask you if the police report of

10    that night in question, if you review this, whether this

11    refreshes your recollection as to whether you were asked the

12    question concerning what, if any, weapons the individuals had

13    and what, if any, answer you gave in respect to those questions

14    that night.

15    A.  Okay.

16    Q.  You can read English?

17    A.  Yeah, a little bit.  What is that about?

18    Q.  This is the police report that was filled out the night in

19    question, when you made the report.

20    A.  Okay.

21    Q.  Can you take your time and read this, where it talks about

22    descriptions and any weapons involved?

23           THE COURT:  The question is whether this document

24    refreshes your recollection as to whether they asked about

25    weapons.

D37Wdor3                         A. Salahi - cross

 1              MR. ROTH:  Yes.

 2              THE COURT:  Is that the question?

 3              MR. ROTH:  And after he's read it, whether that

 4    refreshes his recollection.

 5    A.  I don't see anything.

 6    Q.  Did you have an opportunity to read this?

 7    A.  No.  Why -- you want me to read that, or --

 8    Q.  Yes, please.  And I direct your attention to where it

 9    says --

10              THE COURT:  It is a five-page document.  We're going

11    to have him read five pages?

12              MR. ROTH:  I'll direct his attention specifically.

13              THE COURT:  Okay.

14    BY MR. ROTH:

15    Q.  "Wanted, No. 2 of 3."  Do you see that, "weapon used,

16    possessed, or displayed"?

17              THE COURT:  Just point.

18              MR. ROTH:  I'm sorry.

19    Q.  Do you see that question.

20    A.  Okay.

21    Q.  There's no indication about a knife in respect to "wanted

22    No. 2 of 3," is that correct?

23              MS. MASELLA:  Objection, your Honor.

24              THE COURT:  Sustained.  Let's go.

25    BY MR. ROTH:

1   Q.  You indicated, sir, that there was a small revolver that an

2   individual had in the car that night?

3   A.  Yes.

4   Q.  Do you have a knowledge of guns?

5   A.  No.  Not a lot.

6   Q.  I'm sorry?

7   A.  No.

8   Q.  Can you distinguish between a revolver and an automatic,

9   sir?

10  A.  What I know is a revolver is the one that has like a

11  circle, that every time you -- it's a circle.

12  Q.  And how do you know that, sir?

13  A.  Well, I seen guns, magazines, and some like that.

14  Q.  And what's your understanding of what an automatic looks

15  like?

16  A.  I don't know about an automatic.

17  Q.  So you don't really know the difference between an

18  automatic and a revolver?

19  A.  No.

20  Q.  You indicated that the driver was skinnier, was skinny, is

21  that correct?

22  A.  They both were skinny.  The driver was taller guy.

23  Q.  How tall are you, sir?

24  A.  I'm five seven.

25  Q.  Okay.  So he was taller than you?

604

1   A.  He was a little bit taller, yeah.

2   Q.  So five eight, nine?

3   A.  I don't know.

4   Q.  Ten?

5   A.  I don't know.  I don't know about numbers.

6   Q.  You can't really tell?

7   A.  No, I can't.  He was a tall guy.

8   Q.  But, when you say taller than you, you're not quite average

9   height, but he was somewhat taller than you?  Two, three, four

10  inches taller than you?

11  A.  I don't know.

12  Q.  You can't tell?

13  A.  I can't tell.  But he was tall.

14  Q.  And the gloves that the individuals were wearing that day

15  who were in your car, could you tell anything about those

16  gloves?

17  A.  They were black.

18  Q.  What about the material?

19  A.  I can't tell.

20  Q.  You couldn't tell whether they were cloth, or --

21  A.  I never pay attention.

22  Q.  In fairness, you were just trying to protect yourself?

23  A.  Yes.  They were all covered up.  Can't see nothing then.

24  Q.  And it was dark in the car that day as well?

25  A.  It was dark.  It was dark, yes.  It was the nighttime.

D37Wdor3                              A. Salahi - cross

1    Q.  And, sir, you indicated that there was $15,000.  Did you

2    know that was the exact sum that you had in your house?

3    A.  Yes.

4    Q.  What was that for, sir?

5    A.  It was my home money and the business money, too.

6    Q.  Was that for the holidays?

7    A.  It was for the holidays, yes.

8    Q.  Which holidays?

9    A.  Thanksgiving was coming up soon, and the Muslim holiday.

10   Q.  Ramadan?

11   A.  Not Ramadan.  It's called Eid, Muslim holiday.

12   Q.  When is that, sir, that year?

13   A.  It was weeks, it was like a week from when it happened.  A

14   week prior.

15   Q.  And you testified, sir, that you don't know Fahd Hussain,

16   is that correct?

17   A.  I don't know him.

18   Q.  Never heard of him before?

19   A.  No, I never.  Never.

20   Q.  Do you know anyone named Fahd, named Moe, nickname Moe?

21   A.  No.

22           MR. ROTH:  I have no further questions at this time.

23           THE COURT:  Okay.  Any cross by you, Ms. Stafford?

24           MS. STAFFORD:  Very briefly, your Honor.

25   CROSS-EXAMINATION

D37Wdor3                          A. Salahi - cross

1    BY MS. STAFFORD:

2    Q.  Good afternoon, Mr. Salahi.

3    A.  Good afternoon.

4    Q.  I just have one or two questions.  You said that you

5    described the gun used in the attack or the robbery as a

6    revolver, and that's because you noticed that it had round --

7    how would you describe the round part of the gun?

8    A.  What do you mean?  I mean, it's --

9    Q.  How would you describe why you thought it was a revolver?

10   A.  How would I describe?  That's what I saw, looks like.

11   Q.  You saw a revolver?

12   A.  Yeah.

13   Q.  You definitely saw a revolver, that's your testimony?

14   A.  Yeah.

15           MS. STAFFORD:  Thank you.  No further questions.

16           THE COURT:  Okay.  Any redirect?

17           MS. MASELLA:  No, your Honor.

18           THE COURT:  You can step down, Mr. Salahi.  Thank you.

19   Just leave everything there.  You're free to go.

20           (Witness excused)

21           THE COURT:  Government, your next witness.

22           MS. LESTER:  Your Honor, the government calls Kassim

23   Salahi.

24    KASSIM SALAHI,

25        called as a witness by the Government,

1          having been duly sworn, testified as follows:

2                   THE COURT:  Ms. Lester.

3                   MS. LESTER:  Yes, your Honor.  May I proceed.

4                   THE COURT:  Yes.

5     DIRECT EXAMINATION

6     BY MS. LESTER:

7     Q.  Good afternoon.

8     A.  Good afternoon.

9     Q.  How are you employed?  Where do you work?

10    A.  I work in my live poultry, 3313 Ely Avenue, in the Bronx.

11    Q.  What type of establishment is it, a store?

12    A.  Yes.  It's live poultry.

13    Q.  Do you sell anything besides live poultry?

14    A.  No.  Only live, livestock, live chickens and lamb and goat.

15    Q.  So besides chicken, you also sell lamb and goats you said?

16    A.  Yes.

17    Q.  Is there a particular time of year when you sell those

18    animals?

19    A.  Yes.  Like holiday, Muslim holiday.  We sell a lot of lamb

20    and goat.

21    Q.  What holiday is that?

22    A.  The Muslim holiday.

23    Q.  Is there a name for it?

24    A.  I don't know what they call it, you know, but it's like a

25    big holiday, like new year, and, I don't know what they call it

1  in English.

2  Q.  Do you have any other locations of your business?

3  A.  Yes, we do.  My brother, he have another one.  Bronx River

4  Avenue.  And we have share in, by Yankee Stadium, partnership.

5  Q.  And what is the partnership with Yankee Stadium?

6  A.  It's Yankee souvenirs.

7  Q.  And what do you sell there?

8  A.  T-shirts and jackets.

9  Q.  Where do you get the live animals that you sell in your

10 establishments?

11 A.  It's a company that bring it to us from the stores.

12 Usually from New Jersey, Pennsylvania.

13 Q.  Is it a family business?

14 A.  Yes.

15 Q.  How many members of your family work in the business?

16 A.  We are four brothers.

17 Q.  Four brothers?

18 A.  Yes.

19 Q.  Could you tell me their names?

20 A.  Ahmed, Nasser and Qathan.

21        THE COURT:  How do you spell that?

22        THE WITNESS:  Q-A-T-H-A-N.

23        THE COURT:  Try that again.

24        THE WITNESS:  Q-A-T-H-A-N.

25 BY MS. LESTER:

D37Wdor3                          K. Salahi - direct

1   Q.  And you all work in the business?

2   A.  Yes, we do.

3   Q.  Which location do you usually work at?

4   A.  Like Ely Avenue.

5   Q.  And what about your other brothers?

6   A.  My brother Ahmed, in the Bronx River Poultry.  And Nasser,

7   by Yankee Stadium, that's where he work, in fried chicken.

8   161, there's a fried chicken there.  We have a share there,

9   too.  Qathan, he work in souvenirs.

10  Q.  I'm sorry.  What was that?

11  A.  The last brother, Qathan, he work on Yankee souvenirs, the

12  last year.

13  Q.  And those are the souvenirs you mentioned earlier?

14  A.  Yes, those are partnership.

15          THE COURT:  Those are what?

16          THE WITNESS:  Partnership.

17          THE COURT:  Partnership?  All Yankees?

18          THE WITNESS:  Yeah, all Yankees.

19          THE COURT:  No Mets?

20          THE WITNESS:  Get in trouble, maybe.

21          THE COURT:  Go ahead.

22  BY MS. LESTER:

23  Q.  What hours do you typically work in a week?

24  A.  Usually like eight to six.

25  Q.  Every day?

D37Wdor3                          K. Salahi - direct

1    A.  Every day, yes.

2    Q.  Even Sunday?

3    A.  Sometimes Sunday we close a little earlier.

4    Q.  What about Saturdays?

5    A.  Saturdays, eight to six.

6            MS. LESTER:  May I approach, your Honor.

7            THE COURT:  You may.

8    Q.  Would you take a look at what's in front of you as --

9    A.  I'm sorry.

10   Q.  Could you take a look at what's in front of you and is in

11   evidence as Government Exhibit 1.  Do you see that?

12   A.  Yes.

13   Q.  Do you know who that person is?

14   A.  This one is Fahd.  He has beard.  Fahd.

15   Q.  Do you know his last name?

16   A.  Fahd El Ghiradi.  That's what he -- like we call him

17   El-Ghiradi.

18   Q.  Does he go by any other names?

19   A.  His father's name is Masin.

20   Q.  But does he have any other name, Fahd?

21   A.  I don't know.  I know him as Fahd Masin El Ghiradi.  That's

22   the real name.

23   Q.  How long have you known him?

24   A.  I know him long time, when I come to this country.  I used

25   to know him like when he was a young kid.  I used to work with

1    my father, and he used to come to the store when he was in the

2    school.

3                MS. LESTER:  Your Honor, could I just ask the witness

4    to show the photograph to the jurors so they know who he's

5    talking about.

6                THE COURT:  Sure.  You mean put it on the board?

7                MS. LESTER:  Display it, yes.

8                THE COURT:  It's in evidence.  All right.

9    BY MS. LESTER:

10   Q.  Are you and Fahd from the same country?

11   A.  Yes, we are.

12   Q.  What country is that?

13   A.  Yemen.  And we are from the same town Yafa, Y-A-F-A.

14   Q.  Did you know him in Yemen?

15   A.  No.  Only here.

16   Q.  Do you know any members of his family?

17   A.  I know his father and his brother.

18   Q.  Do you know what he does for work?

19   A.  Yes.  He have store in 233rd Street.

20   Q.  Have you been to that store?

21   A.  Yes.

22   Q.  Could you take a look at what is in evidence as Government

23   Exhibit 40, before you.  Do you recognize that?

24   A.  The store, yes.

25   Q.  And is that the store --

1    A.  That's the store, yes, like I always go to see him.

2    Q.  Who do you mean by him, just to be clear?

3    A.  For Fahd.  I used to go see Fahd.

4         MS. LESTER:  Ms. Brady, could you put up Government

5    Exhibit 40 for a moment.

6    Q.  Where is this store located, sir?

7    A.  233rd Street, White Plains Road.

8    Q.  Is it on 233rd or is it on White Plains Road?

9    A.  On White Plains.

10   Q.  This entrance that we're looking at opens up on to White

11   Plains Road?

12   A.  Yes.

13   Q.  What types of items are sold in the store?

14   A.  He sell like -- it's a stationery, like a gift shop.

15   Q.  Is there any other business that's done within the store?

16   A.  He have like some merchandise, cell phone, and some stuff,

17   gift shop.

18   Q.  Does he have, for example, a lottery machine?

19   A.  Yeah.  He have Lotto machine, yes.

20   Q.  Any other items like that?

21   A.  Lotto machine.  And he's, he's transfer money, like, you

22   know, I think MoneyGram.  That's what he do.

23   Q.  So you can transfer money at the store?

24   A.  Yes.

25   Q.  Have you ever done that?

1    A.  Yes, I did.

2    Q.  Where were you transferring that money to?

3    A.  To Yemen, to my father.  I send it there.

4    Q.  How many times would you say you did that?

5    A.  Maybe -- I don't know how many exactly -- six, seven times

6    to ten times.

7    Q.  Over what period of time?

8    A.  Like how often I go?

9    Q.  Yes.  Or during what years did you do that?

10   A.  It's the last year.  Like maybe from 2012.  Not before

11   that.

12   Q.  Before that, you think?

13   A.  No.  Not before.

14   Q.  Not before?

15   A.  2012.  Not before.

16   Q.  Are you social with Fahd?  Do you socialize with him?

17   A.  Like, I don't understand.

18   Q.  Do you have dinner with him?

19   A.  No, no, no.  Only like when I see, go see him only in that

20   store.  That's it.

21   Q.  Does he know where you live?

22   A.  Yes, he did.

23   Q.  Could you take a look at the other exhibit before you?

24   What number is that one?  Do you see the yellow sticker?

25   A.  902.

1              MS. LESTER:  Ms. Brady, would you put that up for a

2      moment.

3      Q.  What's that, sir?

4      A.  Okay.  That's my father house.

5      Q.  Your father's house?

6      A.  Yes.

7      Q.  Who lives there?

8      A.  My brother.  He live in the basement.

9      Q.  Which brother?

10     A.  Ahmed.

11     Q.  Have you been to that house?

12     A.  Yes.  I used to live in that house until my family come

13     from Yemen, and I rent another house because it was like, the

14     house was renting and no rooms.

15     Q.  And back in 2011, October of 2011, was your brother living

16     in this house?

17     A.  Yes.

18     Q.  Where were you living at that time?

19     A.  We used to live in the basement, me and my brothers.

20     Q.  Were you living there in October 2011?

21     A.  Before my family come, I don't know now, almost, they have

22     been here almost two years.  I don't know like the date

23     exactly.

24     Q.  Okay.  We'll get to that.

25     A.  Almost two years here.  Before that, I used to live in the

D37Wdor3                     K. Salahi - direct

1   basement.  I still have keys to go inside.

2   Q.  Do you recall a robbery that took place in 2011?

3   A.  I'm sorry?

4   Q.  Were you the victim of a robbery in 2011?

5   A.  Yes.

6   Q.  Do you remember approximately when that took place, the

7   date?

8   A.  The date, no.  I can't remember.  Even now, when I said

9   that I transfer money, it's before that.  Before that, that was

10  happening a year before the robbery.

11  Q.  Okay.

12  A.  Yes.

13  Q.  Do you remember anything about the date on which the

14  robbery took place, what time of year it was?

15  A.  No, I can't.  No, I can't remember.  It was like November.

16  I don't know what the date.

17  Q.  Was it in the fall?

18  A.  Yes.  I think it's in the fall, yeah.

19  Q.  Do you remember anything unusual about the day on which the

20  robbery took place?

21  A.  Like the day, Saturday?  It was happening like Saturday.

22  Q.  It was a Saturday?

23  A.  On Saturday, yes.

24  Q.  What was the weather like that day?

25  A.  That was like, you know, the first snow, the first, like,

1    the weather, it was like snow day.  It was a snow, that day it

2    rained a little bit.

3    Q.  Do you know whether you were working that day?

4    A.  Me, I was working on Ely Avenue.

5    Q.  What time did you finish work that day?

6    A.  We usually close like 6:00.  Every day, six.  When I

7    finish, 6:00, I go home straight to my house.

8    Q.  Where were you living at that time?

9    A.  I used to live 2442 Pearsall Avenue in the Bronx.  Like

10   three block or four block from my house.

11   Q.  Pearsall Avenue?

12   A.  Yes.

13   Q.  What's three or four blocks from your house?

14   A.  Like from my father house, from this one.

15   Q.  From the house in Government Exhibit 902?

16   A.  Yes, from that house.

17   Q.  How did you get from your store to your home?

18   A.  I, driving.  I have a car.

19   Q.  What car did you drive that day?

20   A.  That day I have the Infiniti.

21   Q.  What type of Infiniti?

22   A.  M35.

23   Q.  Has that always been your car?

24   A.  Yes.

25   Q.  Has anyone else driven that car on occasion?

1   A.  Yes.  My brother Ahmed, sometime he drive that car.

2   Q.  Do you know what kind of car your brother was driving in

3   October or November of 2011?

4   A.  Sienna.  White Sienna, Toyota.

5   Q.  What type of vehicle is that, the Sienna?  Is it a sedan?

6   A.  Minivan.

7   Q.  So after you got to your house and you drove home from

8   work, what did you do next?

9   A.  Okay.  We like go to the house, usually like meeting me and

10  my brothers.  We have some food.  I have my wife, she cook for

11  us some food.  I go there.  I change.  We take the food.  We go

12  to my brother, to the house in 902.

13  Q.  And what avenue is that house on?

14  A.  That's on Radcliff Avenue in the Bronx.

15  Q.  So you went to the Radcliff Avenue house next?

16  A.  Yes.

17  Q.  Did you go by yourself or with someone else?

18  A.  I got two of my kids.

19  Q.  How old are your kids?

20  A.  Ten years and eight years.

21  Q.  Boys or girls?

22  A.  Boys.

23  Q.  And did you say you brought food with you?

24  A.  Yes.

25  Q.  So what was your intention in going to the house at that

D37Wdor3                          K. Salahi - direct

1   time?

2   A.   Like usually we close, I close the store and I go, and I

3   find my brother over there, in the store -- in the house.  I

4   have keys to go inside the house.  I open and we go inside.  We

5   was waiting for my brother to come.

6   Q.   Where was your brother at that point, do you know?

7   A.   He was in the store.  He's usually like work in the store

8   and like we waiting for him.  You know, he's coming, to come.

9   Q.   Did he eventually come home?

10  A.   That day?  When we stay, like me and my two kids, you know,

11  like ten minutes after, it was like people come and open the

12  door and they get in.

13  Q.   Two people opened the door, is that what you said?

14  A.   Yes, two people, they grabbed my kids.  And I was down on

15  the couch, and behind the door is behind me, and the kids, when

16  my kids, they heard something, they think it's like my brother

17  that come.

18          MR. ROTH:  Objection, your Honor.

19  A.   And when I look over --

20          THE COURT:  Sustained as to what the kids thought.

21          Just tell me what you saw and what you heard.  Go

22  ahead.

23          THE WITNESS:  Okay.

24  A.   When they come, they heard like some door, my kids.  They

25  go back to the doors in the kitchen, the door's entrance.  And

1   when I look over, they, the two people, they grab my kids.

2   When they grab them, you know, one grab one and one grab the

3   other.  They grab the other one and they come to me.  They

4   said, Be quiet.  Don't say anything.

5   Q.  When you said they were able to come in the house, how --

6   A.  They open, they open the door.  They have the keys and my

7   kids, they think it's like, you know, from when my brother, my

8   brother come, and they have the mask --

9              MR. ROTH:  Objection again, your Honor.

10             THE COURT:  How do you know they thought it was your

11   brother?

12             THE WITNESS:  My kids because even me and my kids, we

13   waiting for my brother to come.  They know my brother, he going

14   to come, because we have like the food for them, waiting for

15   them.

16   BY MS. LESTER:

17   Q.  So you were expecting your brother to come?

18   A.  We were expecting, yes.

19             MR. ROTH:  Objection, your Honor.

20             THE COURT:  Just tell us what you were expecting.

21             THE WITNESS:  We were expecting my brother to come

22   because we were like waiting for them.  We have the food, we

23   going to have --

24             MR. ROTH:  If he could testify in the first person.

25   BY MS. LESTER:

D37Wdor3                          K. Salahi - direct

1    Q.  Mr. Salahi, when you answer, it's helpful if you could say

2    I, what I thought.  Were you personally expecting your brother

3    to come home?

4    A.  Yes.

5    Q.  And you saw someone open the door?

6    A.  Yes.

7    Q.  How many people came in?

8    A.  Two people.  They were inside.

9    Q.  Can you describe them?

10   A.  I'm sorry?

11   Q.  Can you describe the two people who came inside?

12   A.  Yes.  Two black people.  One is like dark skin and one

13   light skin.

14   Q.  Approximately how tall were they?

15   A.  Maybe like six feet.

16   Q.  Were they the same height?

17   A.  Maybe like, the light skin a little bit higher, a little

18   bit taller.

19   Q.  I believe you said that they grabbed your sons?

20   A.  Yes, they did.

21   Q.  Could you see if they had anything in their hands?

22   A.  They have guns, both them.  Both mens, they have guns in

23   the hand.

24   Q.  Did you get to look at the guns?

25   A.  I did look, yes.  One of them has like revolver gun and one

D37Wdor3                          K. Salahi - direct

```
 1   have like regular gun.

 2              THE COURT:  One of has a revolver, is that what you

 3   said?

 4              THE WITNESS:  Revolver, yes.

 5              THE COURT:  And the other has regular gun?

 6              THE WITNESS:  Regular, yes.

 7              THE COURT:  What do you mean by regular?

 8              THE WITNESS:  Like not revolver, the other one.

 9              THE COURT:  Not a revolver?

10              THE WITNESS:  Yeah.

11   BY MS. LESTER:

12   Q.  Focusing first on the revolver, do you recall what it

13   looked like, the color of it, anything about it?

14   A.  I'm sorry?

15   Q.  Do you recall the color of it or anything else about it?

16   A.  The gun?

17   Q.  Yes.  The revolver.

18   A.  Like a little bit brown, yeah.  Like dark, dark brown.

19   Q.  Was that the revolver or the other gun?

20   A.  The other, the revolver, yes.

21   Q.  What about the other gun?

22   A.  The other gun was, I think, black.

23   Q.  Could you see the people's faces who came in?

24   A.  They were wearing mask.

25   Q.  What type of masks?
```

1    A.  Like the hat, and only show the eye and the lips.

2    Q.  Do you remember what color the masks were?

3    A.  Black.  The dark skin has like black.  The other one, only

4    I see his face.  I didn't see his mouth.  I can't see like this

5    area.  His forehead is like a little bit bigger than the other

6    one.

7    Q.  Do you remember anything about the clothing that they were

8    wearing?

9    A.  The dark skin, he has like black, only black.  The other

10   one, I'm not sure.  But I think he's like maybe brown jacket,

11   the light skin.

12   Q.  What happened after they entered the house?

13   A.  They entered the house and they, they grab my kids.  And

14   they put us and they lay us down between the floor, and the

15   couch, and they cover us with blankets.

16   Q.  I'm sorry.  I didn't catch that last part.

17   A.  They cover us with blankets, me and my two kids.  They say,

18   Don't say anything, be quiet, don't move, no yelling, don't say

19   anything, be quiet.  And they lay us down and they cover us

20   with the blanket, and the couch, the pillow, they put all like

21   over us.

22   Q.  So at that point, you were covered up?

23   A.  Yes.  Me, I was covered and my two kids, all same ways.

24   Q.  Could you see anything that was happening?

25   A.  No, I can't see anything.

1   Q.  Could you hear anything that was happening?

2   A.  Yes, I heard them, like, in the rooms.  We have one room on

3   the right and one on the left.  They, I think one of them go

4   this side, the other one, I hear like both ways.  And they tell

5   me, Where is the money, where is the money, your brother, he

6   said he have the money here.  And I tell them I don't know

7   where is the money, what are you talking about.

8   Q.  Did you know whether your brother kept any money in the

9   apartment?

10  A.  I know he have some money, but I don't know where he put

11  it, where he put the money, where his --

12  Q.  Besides talking to you the way you just described, were the

13  two people talking to each other at all?

14  A.  I, they have like phone speakers and they talk to the other

15  people, too, that was like on the other end of the speakers.

16  Q.  You could hear them talking on the phone?

17  A.  Yes, yes.

18  Q.  Could you hear both sides of the conversation?

19  A.  Both sides, yes, I heard.

20  Q.  What did you hear?

21  A.  I heard, like, they talking, Where is the guy, where is the

22  money.  They just keep like talking.  I can't understand what

23  they're talking about.  The accent, you know, they speak, you

24  know, like street language.  I don't know which, sometimes, you

25  know.

D37Wdor3                              K. Salahi – direct

1   Q.  Did you recognize any accent?

2   A.  Accent is like street language, like maybe Jamaican accent,

3   something like that.

4   Q.  Could you hear what they were doing as they were going back

5   and forth?

6   A.  They was looking for the money.  They said like they keep

7   looking, looking.  They can't, they said, We can't find it, we

8   look.  They was talking to the other people.

9              (Continued on next page)

1    BY MS. LESTER:

2    Q.  Did they take anything from you?

3    A.  They took my cell phone.

4    Q.  When did they take that?

5    A.  They tell me you have money like I think I don't know.

6    When they got out and I was going to look my phone, I don't

7    know when they take it out because when I go to the house I

8    change.  My cell phone is in my pants and my wallet, you know?

9    Q.  So you had taken off your pants when you --

10   A.  When I go to the house, yes.  Yes.

11   Q.  And your cell phone was in those pants?

12   A.  Yes, and then like on the belt, in the pouch.

13   Q.  After the two people left was it still there?

14   A.  No.  When I go check, no, it was not there.  I go to the

15   room, can't find my phone.

16   Q.  How long do you think you were under the blanket with your

17   children?

18   A.  Like maybe 10, 15 minutes.

19   Q.  How did you know when it was safe to come out?

20   A.  It was like quiet and one of my kids, you know, he said

21   maybe like they go out, they got out already because my kids,

22   he said he can see, like see from under the blankets.

23   Q.  Did you talk to your children at all while you were under

24   the blanket?

25   A.  I just tell them just calm down, don't be scared; like

1   that.  Because I don't want to tell them something, you know

2   they hear something and --

3            MR. MURPHY:  Objection, your Honor.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  Overruled.

6            Next question.

7   Q.  Were your children crying?

8   A.  They were scared.  Like I feel them, you know, when they

9   are under the blanket they shake, especially the youngest one.

10  Q.  They were shaking?

11  A.  Yes.  He was like, you know, scared.  Scared.

12  Q.  What about you, sir.

13  A.  Me too, yeah.  I was worried what was going to happen to

14  my -- us, my two kids and me.

15  Q.  What happened when you heard that it was all quiet?  What

16  happened next?

17  A.  Just I want to make sure we just stay a little bit more

18  until everybody leave, they go out already and we like, you

19  know, my son, he said there is nobody there, nobody.  He can

20  see.  And I -- you know, we got out.  I go to the, my pants to

21  get my phone when I go there, there is no phone.  I try to get

22  out the door and I look, the street, there is nobody there.  It

23  was quiet.  We try -- I tell my kids to go upstairs to see if

24  somebody can help us, bring phone.  They go upstairs and knock

25  the door, nobody answer.  They said, okay, his one guy, his

 1  wife answer, he said he is somewhere, he said bathroom.  I stay

 2  like more than a couple of minutes, maybe two, three minutes,

 3  nobody, and I go to my house to bring like my other cell phone,

 4  my wife's cell phone.

 5  Q.  And what did you do when you got to your house?

 6  A.  And me and my two kids, we got out, we go by car -- it is

 7  only three blocks, you know, bring my -- the telephone and come

 8  back to the house, me and my two kids.  We call the police.  I

 9  called the police.

10  Q.  You went to your house.  Did you call the police at your

11  house?

12  A.  No, from when I come back to Radcliffe.  I looked and my

13  brother's come or nobody come.  I call the police.

14  Q.  Did there come a time when your brother did come home?

15  A.  I'm sorry?

16  Q.  Did your brother come home that night?

17  A.  Yes.  After work -- when he come he tell me did you call

18  the police?  I tell him yes.

19          MS. LESTER:  Just a moment, your Honor.

20          (Pause)

21  Q.  When you were describing the two individuals that came into

22  the house, the two men, you mentioned something about their

23  height.

24  A.  Yes.

25  Q.  How tall would you estimate they were?  And let's take them

1    one at a time.

2    A.   Okay.  Dark-skinned.

3    Q.   How about the first one who opened the door?

4    A.   The dark-skinned.  He is like a little bit like -- maybe

5    he's 170 pound maybe, 160, 170, maybe 6 feet, maybe.

6    Q.   What about the other one?

7    A.   The other one, maybe he is like 2 -- maybe 200 pounds and

8    little bit heavier.  I don't know how much exactly and he is

9    maybe like 6'11" maybe because we don't have high ceiling in

10   the basement, he didn't want to hit his head.  You know, he

11   went down a little bit.

12   Q.   So you're indicating that his head was almost touching the

13   ceiling of the basement?

14   A.   Yes.

15   Q.   Sir, you mentioned the skin color of the two individuals on

16   a few occasions and referring to their descriptions.  What part

17   of their skin were you able to see if they were wearing masks?

18   A.   I see like the part here on the eye.  Like the light skin I

19   can see like his eye socket was a little bit higher.  The light

20   skin, I can see his lips around here, his dark skin.  That's

21   the only places.

22   Q.   Could you see their hands?

23   A.   These they have gloves and like only open the finger.  Only

24   open finger where they have gloves.

25            MS. LESTER:  No further questions, your Honor.

1           THE COURT:  Okay.

2           Cross-examination.  Mr. Roth?

3           MR. ROTH:  Thank you, your Honor.

4    CROSS EXAMINATION

5    BY MR. ROTH:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  Mr. Salahi, my name is James Roth and I represent

9    Mr. Barrett.  If I ask you a question that you don't understand

10   or if I speak too quickly, just indicate that --

11   A.  Okay.

12   Q.  -- and I will rephrase my question or I will speak slowly,

13   okay?

14        You indicated, sir, that day that one of the robbers who

15   came into your apartment had a dark brown revolver; is that

16   correct?

17   A.  Yes.

18   Q.  And how big was that weapon?

19   A.  Like I don't know how big maybe what do you call it, 32 or

20   34?

21   Q.  32 or 34 what?

22   A.  What they call like the police officer usually have, like

23   that size.

24   Q.  A police officer, to your knowledge, carries a -- are you

25   referring to -- what does the 32 or the 34 refer to, sir?

1    A.   The gun.  Like the gun would be this size.  If you show me

2    some guns and I show you exactly what is like size or what he

3    was carrying, I don't know if it was 32 or 34.  That's what

4    they're called.  Do you want to show me some guns and I will

5    show you exactly which ones it looked like?

6    Q.   I don't have any guns.  I'm sorry.

7    A.   I don't know the size, I don't carry guns.  I don't know

8    size of the guns but --

9    Q.   My question, sir, is, in all seriousness, are you referring

10   to 32 inches?  34 inches?

11   A.   No.  No.  No.  What they call the size like 32 or 34 they

12   call the names, the guns of all the guns.  That's what I like,

13   you know, my idea.  That's what I know.

14   Q.   That's just your idea.  You don't know whether that refers

15   to inches, meters?

16   A.   No.  Meter, not inches.

17   Q.   I'm sorry?

18   A.   Maybe like if you say this size, maybe it would be like

19   this size.  I don't know what they call that.  Maybe you want

20   to show me some guns, then I show you.

21   Q.   Again, I don't have any guns.

22   A.   I don't know what size the guns but they carry like regular

23   guns.  You see the guns when they -- when I see them only the

24   police officers I see the guns.

25   Q.   Sir, is it fair to say different police officers carry

1   different guns in New York City?  We'll just confine ourselves

2   to New York City.

3   A.  New York City.  They usually carry, like, sometimes I know

4   it is like regular guns, like these size guns, handguns.

5   Q.  Handguns.

6   A.  Okay.

7   Q.  We both agree a handgun is something you can carry, it is

8   not a rifle?

9   A.  Yes.  That's what I know.

10  Q.  But is it fair to say, sir, in your experience, that New

11  York City police officers, that you've seen carry different

12  types of weapons?

13  A.  I see them like they have the rollover and the handguns,

14  the regular.

15  Q.  So, to your knowledge it was a revolver or a handgun, a

16  regular gun?

17  A.  It is like a regular gun.  Handguns is like the regular one

18  and the rollover, that's two guns.  I see them.

19  Q.  Getting back to the first weapon that you described that

20  you saw that day in the basement, what was dark brown about

21  that gun?

22  A.  What part of that gun was dark brown, it is the rollover

23  gun.

24  Q.  Do you know what a barrel of the gun is?

25  A.  What is the barrel?  I don't know that.

1   Q.   The barrel is the part that the -- the round part that

2   comes out of a gun or a square part that comes out of a gun?

3   A.   Yes.

4   Q.   When you describe a regular gun --

5   A.   Yes.

6   Q.   Do the regular guns that you're describing, do they have a

7   round barrel?

8   A.   Yes.

9   Q.   So do they have a square barrel?

10  A.   Okay.   One of them has like the rollover gun, it is the

11  brown one.   The rollover gun, that's the brown one.

12  Q.   The brown one.

13  A.   Yes.

14  Q.   But my question to you, sir, is it the barrel that was

15  brown, dark brown?

16  A.   No, no.   It was only like the whole gun is the same color.

17  It is like you see the wood you have there?   Like that wood.

18  Q.   You are indicating to the lectern?

19  A.   Something like that wood.

20  Q.   So the barrel was that color as well?

21  A.   Maybe like the barrel may be a little bit darker, you know,

22  but I see it and it was a little bit brown.

23  Q.   What was the handle made out of?

24  A.   The handle?   I can't see the handle, it is in his hand.   I

25  can see only the rollover and the stick.   That's it.

1    Q.  You're calling it a stick?

2    A.  I don't know what they call that.  I don't know what they

3    call you're talking about.

4    Q.  You couldn't see the handle because the individual robber

5    was holding --

6    A.  Right, he hold it like that.

7    Q.  And that was a glove, is that right?

8    A.  Yes.

9    Q.  And what type of glove was that, sir?

10   A.  Like I said, like you know they have cutoff gloves, black

11   gloves.  They carry the gun.

12   Q.  Both of them had -- did you say cut gloves?

13   A.  Yes.

14   Q.  So you're saying gloves that didn't have full fingers, is

15   that correct?

16   A.  Yes.

17   Q.  And they weren't handling -- could you see them handling

18   other things at your house that day; handling, picking up

19   things and going through your house when they first came?

20   A.  When they came in they hold my kids, they grabbed my kids

21   they was like by the door.  When they hear the door they go to

22   the door to meet my brothers and these two people, they grab my

23   kids and they come to me to inside like the basement, the

24   living room.

25   Q.  What type of material were the gloves that these robbers

D375dor4                          K. Salahi - cross

1   were wearing?

2   A.   The gloves?  What type?

3   Q.   What type.  Yes.

4   A.   Gloves.  I don't know what type gloves.

5   Q.   I'm asking you, sir, what type of material were the gloves;

6   were they leather?  Were they plastic?  Were they cloth?

7   A.   I don't know if they were plastic.  I don't know which one.

8   It is like glove, they cut gloves like I didn't look exactly

9   what kind of gloves leather or -- I don't know.

10   Q.   It is fair to say, sir, you couldn't see the type of

11   material of the handle -- now, we're just confining ourselves

12   to the gun that you described as a dark brown glove, that is

13   the color of this lectern, is that right?

14   A.   Yes.

15   Q.   You couldn't see whether the material was plastic or

16   wooden, is that fair to say?

17   A.   What's that?

18   Q.   The handle of the gun, the first gun that you were

19   describing?

20   A.   The handle?

21   Q.   The handle.

22   A.   The rollover gun.  The rollover gun.

23   Q.   I apologize.

24       Could you describe the type of material that the handle of

25   the gun that you said that the robber had that was dark brown

D375dor4                        K. Salahi - cross

 1  was?

 2  A.  The handle, I can't see the handle because they hold the

 3  gun.

 4  Q.  Okay.

 5  A.  I can see only the rollover and that's it.

 6  Q.  And you indicated, sir, that they were speaking in a

 7  somewhat of a Jamaican accent, is that correct?

 8  A.  Yes.

 9  Q.  You have told us yourself you're obviously not from

10  Jamaica, is that correct?

11  A.  Me?  No.

12  Q.  Do you know any Rastafarians?

13  A.  Jamaican.

14  Q.  No, Rastafarian.

15  A.  I'm sorry?

16  Q.  Do you know what a Rastafarian is?

17  A.  No.

18  Q.  Can you, for the jury, give just in a few words, speak in a

19  Jamaican accent?

20  A.  Speak like all my -- all my customer where I work, they are

21  Jamaican.

22  Q.  All your customers --

23  A.  Yes.

24          THE COURT:  You have to let him finish the question.

25          THE WITNESS:  Okay.

1    THE COURT:  So let him finish the question.

2    THE WITNESS:  Okay.

3   Q.  All your customers -- that's the majority of your customers

4   are Jamaican?

5   A.  The customer, the neighborhood almost.  Not all of them,

6   almost all Jamaican people.

7   Q.  Are there Haitians there?

8   A.  Haitians?  Not too many.

9   Q.  Are there other people from the Caribbean there?

10  A.  Yes, there are.

11  Q.  And do you speak patois, sir?

12  A.  What is that?  I don't know what's that.

13  Q.  Do you speak Jamaican slang?

14  A.  Me?  No.  I don't speak, no.

15  Q.  You said they were speaking in street slang, is that right?

16  A.  Yes.

17  Q.  What would you describe that as, sir?  To the best of your

18  ability.

19  A.  They I can tell like when they speak:  *Yo, yo, what's up,*

20  *B*?  Like that.  That's how they speak like accent in Jamaican

21  street language.

22  Q.  Is it only Jamaicans who speak like that?

23  A.  The Jamaicans, they have special words.

24    THE COURT:  You have to let him finish.

25    MR. ROTH:  I apologize, Judge.

D375dor4                          K. Salahi - cross

1   Q.  Is it only the Jamaicans who say: *yo, what's up B*?

2   A.  No.

3   Q.  What other groups of people, in your experience in your

4   store in the Bronx speak like that?

5   A.  They -- I know like when they speak how these people -- if

6   you showed me now, you know, on the language I will tell you

7   which one is Jamaican and which one is not Jamaican.

8   Q.  You can tell that?

9   A.  Yeah.

10  Q.  You know who Bob Marley is?

11  A.  I'm sorry?  What's that?

12  Q.  Do you know who Bob Marley?

13  A.  No.

14  Q.  Do you know who Haile Selassie is?

15  A.  No.

16  Q.  You don't know who the creator is?

17  A.  No.

18  Q.  And you're telling me, sir, as you sit here now, you can

19  distinguish between a Haitian accent and a Jamaican accent?

20  A.  I'm sorry?

21  Q.  Can you tell -- I apologize.

22      Can you tell the difference between a Jamaican accent and a

23  Haitian accept?

24  A.  Yes.

25  Q.  Could you tell us what the difference is?

D375dor4                          K. Salahi - cross

1    A.  I can't tell but like, my experience, you know, like

2    Jamaicans, when they come to talk in my store I know they are

3    Jamaican, you know, because of the way they talk.  That's only

4    my experience, you know.

5    Q.  Do they come in and say I'm Jamaican?

6    A.  No.  But the accent when they talk, I know they talk like

7    they are Jamaican.

8    Q.  They what?

9    A.  I know they are Jamaican.  They speak like they are, the

10   accent is Jamaican.

11   Q.  You know it when you hear it?

12   A.  Yes, when I hear.

13   Q.  When you hear it?

14   A.  Yeah.

15   Q.  Now, you indicated -- describe the other weapon that the

16   other robber had that day.

17   A.  It is like a handgun.

18   Q.  Okay.

19   A.  Okay.

20   Q.  32 or 34 you said?

21   A.  I don't know what size, like a handgun, like a small

22   handgun, black handgun the other one.

23   Q.  And the police told -- asked you when you first made the

24   report what if any weapons the two robbers who came into your

25   house had that day, is that correct?

1    A.  Yeah.

2    Q.  And you told them what weapons that they had?

3    A.  Yeah.  I think I tell him, yes.

4    Q.  You think?

5    A.  Yeah, I tell them.  I tell them what I have and that day

6    exactly maybe I tell them exactly what when they have, which

7    one they wear because now maybe I forgot something but that day

8    when they come, I tell them everything that is happening to me

9    that day.

10   Q.  Was your memory better, sir, on, in October of 2011 than it

11   is today when you testifying today in --

12   A.  Yes.

13   Q.  I didn't finish the question.

14   A.  Okay.  Sorry.

15   Q.  In March of 2013?  When was your memory better, sir?  When

16   you spoke to the police --

17   A.  Yes, when I spoke to the police.  That's my main memory.

18   Q.  Is it possible, sir, that you described the weapons at that

19   time as two black handguns?

20   A.  I'm sorry?

21   Q.  And not a brown handgun?

22   A.  I don't understand.

23   Q.  Is it possible, sir, that when you described the weapons

24   that they were, the two robbers were carrying that day because

25   you went to the police that day, right?

D375dor4                         K. Salahi - cross

1    A.  Yes.  The police come to the house.

2    Q.  Right after the incident?  Right after the robbery happened

3    you made a complaint and you spoke to the police?

4    A.  Yes.

5    Q.  And they interviewed you, correct?

6    A.  Yes.  Yes.

7    Q.  And is it possible, sir, that you indicated that they were

8    both carrying black revolvers?

9    A.  I don't know what I tell them exactly.  The day I went and

10   talked to the police is that that's what happened to us

11   exactly.  That's what I tell them.

12   Q.  You told them exactly what happened?

13   A.  Yes.  Yes.

14   Q.  I'm going to show you what's been previously marked 3517-D

15   and ask you to read to yourself the highlighted portions here,

16   it is a police report filled out in connection with this and

17   indicate -- can you read English, sir?

18   A.  Not really.  Not --

19          MR. ROTH:  May I have permission to read it to him if

20   he can't read English?  I'm not sure I -- I didn't know the

21   witness had a --

22          THE COURT:  Well, are you trying to refresh him?

23          MR. ROTH:  Yes, if that refreshes his recollection as

24   to the description that he gave which is in respect to the

25   weapons.

D375dor4                              K. Salahi - cross

1            THE COURT:  Do you think seeing a document is going to

2       refresh your recollection as to what you said to the police?

3            THE WITNESS:  Maybe.

4            THE COURT:  All right.  Let's do this:  We're going to

5       take an early lunch today, folks, and then we can do

6       something -- we're going to do some things while you're not

7       here, we will pick up again at -- we will say 2:00 still.  You

8       will have a longer lunch today.  So, 2:00, be ready to go.

9       Don't discuss the case, keep an open mind and have a nice

10      afternoon.  Hopefully it is not snowing.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  So, clear out, folks, because I have

3   another matter.  So, we will deal with -- Mr. Salahi, if you

4   can come back here around 1:45, all right?  And then we can

5   follow up on some of the things we've talked about here.  Don't

6   discuss with anyone your testimony.

7          THE WITNESS:  Okay.

8          THE COURT:  You can talk to the government folks about

9   where you can have lunch and where you can go but don't discuss

10  your testimony.  All right?

11         THE WITNESS:  Okay.

12         THE COURT:  Okay.  Thank you.

13         (witness steps down)

14         MR. ROTH:  Judge I was just confirming with the

15  marshal, is it okay on the next multi-defendant that they put

16  them in the box?

17         THE COURT:  Are you in this one?

18         MR. ROTH:  No.  I just happen to -- I don't want to be

19  on that.

20         (Luncheon recess).

21         (Continued on next page)

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                             1:45 p.m.

 3            (In open court; jury not present)

 4            THE COURT:  All right.  Do you want to start?  So

 5   Mr. Roth wanted to be able to refresh the witness' recollection

 6   with a document that's in English, and the witness indicated he

 7   has difficulty reading English, so the thought was have the

 8   document read aloud outside the presence of the jury so that

 9   then the question can be put to him, does that refresh your

10   recollection.  Right, Mr. Roth?  That's the plan?

11            MR. ROTH:  Yes.

12            THE COURT:  And no objection to that from the

13   government?

14            MS. LESTER:  No, your Honor.

15            THE COURT:  How long is the document, Mr. Roth?

16            MR. ROTH:  I'm sorry?

17            THE COURT:  How long a document is it?

18            MR. ROTH:  I was just going to do a portion of the

19   document, Judge.  It's 3517D, that's been marked for

20   identification.

21            THE COURT:  So let's do that.  Okay?

22   BY MR. ROTH:

23   Q.  Mr. Salahi, do you remember I asked you whether you were

24   interviewed the night of the crime by police officers about the

25   occurrence itself, about what happened?
```

D37Wdor5

1    A.  Yes.

2    Q.  And they asked you to provide a description of the weapon,

3    is that correct, that the robbers had?

4    A.  Yes.

5    Q.  Do you recall saying, sir, that perpetrator No. 1 was

6    carrying a black revolver?

7    A.  I don't know what I tell them.  Whatever the police report,

8    whatever I tell them is right.  That's the police report,

9    that's what I tell them?

10   Q.  Yes.  That's what I'm referring to.

11   A.  Yes.

12   Q.  Do you recall telling them that?

13   A.  Yes.

14   Q.  And do you recall telling them in respect to the second

15   perpetrator that he was carrying a black revolver as well?

16   A.  Yes.

17   Q.  So that refreshes your recollection now that that was the

18   description of the weapons that you told the police officers

19   that day, is that correct?

20   A.  Yeah.  Whatever I tell them that day is the like, is the

21   right answer.

22          MR. ROTH:  Okay.

23          THE COURT:  The jury's not here, so I think you're

24   going to have to replicate some of that.

25          MR. ROTH:  I will.

D37Wdor5

|  |  |
|---|---|
| 1 | THE COURT:  Okay.  So there's nothing else we can do |
| 2 | outside of the presence of the jury, right? |
| 3 | MR. ROTH:  I don't think we have to. |
| 4 | THE COURT:  Right?  We're not going to refresh him on |
| 5 | anything else you're going to read, are you? |
| 6 | MR. ROTH:  It depends on his answers, Judge, in |
| 7 | respect to something else, in terms of other notes, interview |
| 8 | notes. |
| 9 | THE COURT:  Do you want to explore that now, or no? |
| 10 | MR. ROTH:  I'd rather not.  I'd rather do it in front |
| 11 | of the jury.  I don't think it will take too long. |
| 12 | THE COURT:  Let's think about what we're supposed to |
| 13 | do then in front of the jury.  We're going to send them out so |
| 14 | you can do this again? |
| 15 | MR. MURPHY:  If I may, your Honor, is there any reason |
| 16 | it couldn't be done at side bar, out of the presence of the |
| 17 | jury, so it could be read to him at that time?  It's short, |
| 18 | what we did right here, if we could just approach. |
| 19 | THE COURT:  We could.  It's a little cumbersome.  It's |
| 20 | less cumbersome than sending the jury out. |
| 21 | MR. ROTH:  It's not a big, I'm almost done with my |
| 22 | cross. |
| 23 | THE COURT:  Oh, all right.  Okay.  I told the jury |
| 24 | 2:00.  So we have five minutes, so I guess if you want to just |
| 25 | stretch or use the restroom, you can.  I'm going to stay here |

646

D37Wdor5

1    just because my computer's here.

2              MS. LESTER:   Thank you.

3              (Recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D37Wdor5

1          (In open court; jury present)

2          THE COURT:  All right.  Have a seat.

3          I hope you had a nice lunch.  I worked all the way

4     through, so I'm going to be hungry and grouchy, just so you

5     know.  I'm taking it out on lawyers; you can feel sorry for

6     them.

7          We're going to resume now with the cross-examination

8     of Mr. Salahi by Mr. Roth.  Just so it's clear, during the

9     break, before you came out here, Mr. Salahi was shown a

10    document.  It was in English, so he couldn't really read it, so

11    it was read out loud to him.  The document is not in evidence,

12    and the question is simply whether the document refreshes his

13    recollection about something that happened in the past.  It's a

14    perfectly appropriate question.  But the document's not in

15    evidence so we didn't want it read out loud so you could hear

16    it.  That's what we've done and Mr. Roth is going to follow up

17    with some questions based on what we just did here.

18          Right, Mr. Roth?

19          MR. ROTH:  That is correct, your Honor.  Thank you,

20    you Honor.

21    CROSS-EXAMINATION (cont'd)

22    BY MR. ROTH:

23    Q.  Good afternoon again, Mr. Salahi.

24    A.  Good afternoon.

25    Q.  Now that your recollection is refreshed as to what you told

D37Wdor5                         K. Salahi - cross

1    the police officers the night that you were robbed about what

2    type of weapons the robbers had, is it fair to say, sir, that

3    you told them on that night, right after the incident, that

4    both robbers had black revolvers?

5    A.   Whatever is there in the report, that's what I tell them.

6    Q.   Well, the report --

7    A.   What --

8    Q.   The report was read to you before?

9    A.   Yes.

10   Q.   And you said that that refreshed your recollection?

11   A.   Yes.

12   Q.   As to the type of weapons that they had, and it said black

13   revolvers, so that's what they were carrying.  Is that correct?

14   A.   Yes.

15   Q.   So it was black and it wasn't dark brown, is that right?

16   A.   Yes.

17   Q.   And it was two black revolvers, not a black revolver or,

18   and any other regular gun, as you call it, is that correct?

19   A.   Yeah.  When I tell them there --

20   Q.   Is that correct, sir?

21   A.   Yes.

22            THE COURT:  But you have a recollection of that now?

23   You remember that?

24            THE WITNESS:  Like, like the black one, maybe like not

25   black-black.  Dark brown, look like black.  To me like, inside

1   the basement, maybe it's a dark brown.  When I tell them that

2   day, that's what, you know, like what's happening.  I tell them

3   whatever they have the guns.

4   BY MR. ROTH:

5   Q.  Right.  But you said what you told them and --

6   A.  Yeah.

7   Q.  You saw them taking notes and they wanted to be very exact

8   and precise, and they said black revolvers, and that's what

9   they said, and you said that's true, right?

10  A.  I don't know if it's black or dark brown.  Dark brown is

11  like to me, the gun is like black.  I don't know black-black or

12  like dark brown.

13  Q.  Both guns now?

14  A.  Both guns.  One is black.  One is the other one, is, not

15  sure, exactly.

16  Q.  So in your mind there's a difference between black-black

17  and not so black, right?

18  A.  And dark brown, yeah.  Dark brown.

19  Q.  But your memory is now refreshed that on October 29, 2011,

20  right after the incident --

21  A.  Yes.

22  Q.  -- that you told the police officers that they were both

23  revolvers, as you say --

24  A.  Okay.  Yes.

25  Q.  -- the brown revolver?

1   A.  Yes.

2   Q.  That's correct, right?

3   A.  Yes.

4   Q.  So there was never any regular, regular gun?

5   A.  Yes.

6   Q.  You were wrong when you said that?

7   A.  When, now?  Before?  Or when I talk to the police?

8   Q.  When you testified to the jury this morning that there was

9   a regular gun and a revolver.

10  A.  Like now, I'm not like sure, very sure.  But when I tell

11  the police, that's the right one, that's the right thing, the

12  right answer.

13  Q.  Okay.

14  A.  Yeah.

15  Q.  Sir, before you testified today in this courtroom, had you

16  been interviewed by the prosecutors or the United States

17  Attorneys, these two women, seated at this table?

18  A.  When?

19  Q.  Before you testified today.

20  A.  Before, yes.  One time.

21  Q.  One time.  And was that one time about a month and a half

22  ago, in January?

23  A.  I'm not sure exactly, but maybe, maybe that's --

24  Q.  Early this year, sometime this year?

25  A.  Yes, early, yeah.

D37Wdor5                        K. Salahi - cross

1  Q.  And, sir, did you come down to their office?

2  A.  I'm sorry?

3  Q.  Did you, when you were having the interview --

4  A.  Yes, I come.

5  Q.  -- with the two, it's these two prosecutors right here?

6  A.  Yes.

7  Q.  Was there another person there in the room, too?

8  A.  Yes, there was another, another one.  Yeah.

9  Q.  Do you recall whether it was this young woman on your

10 right, of the table?

11 A.  I think, yes.  Before, yeah.

12 Q.  And that meeting was conducted in a building down here by

13 the courthouse?

14 A.  Yeah, next to the courthouse.  Yes.

15 Q.  It's connected?

16 A.  Yes.

17 Q.  Is that the only time you've been there?

18 A.  Yes.

19 Q.  And when you were with them, they were asking you

20 questions, were they not, about the robbery?

21 A.  They asking me what happened.  That's it.  Then I tell them

22 what happened.

23 Q.  Right.

24 A.  Yes.

25 Q.  They asked you questions about the robbery, right?

D37Wdor5                        K. Salahi - cross

1    A.  Yes.

2    Q.  And at the time that they were asking you questions, they

3    were taking notes, is that right?

4    A.  Yes.

5    Q.  Now, sir, prior to you walking into this courtroom and

6    taking the stand here today, did you ever, ever, to anyone, say

7    that one of the robbers was six feet 11?

8    A.  No.

9    Q.  Never said that?  This is the absolute first time you've

10   ever said that, described the height of one of the robbers as

11   six 11?

12   A.  Maybe I, they tell me how high and I tell them like how

13   high.  He's very tall.  One of them, he's very tall.  That's,

14   that's --

15   Q.  Sir, how tall are you, sir?

16   A.  Me, like five ten, maybe.  Five nine, five ten.

17   Q.  Five nine, five ten?

18   A.  Yeah.

19   Q.  Could you stand up?  Are you sure about that?

20   A.  Maybe.  I don't know.  We'll see.  Maybe.

21   Q.  What's your basis of saying you're five nine or five ten,

22   sir?

23   A.  I know my height.  My height, you know, it's like maybe

24   that.

25            MR. ROTH:  Judge, just in terms of a visual example --

1          THE COURT:  You want him to step down?

2          MR. ROTH:  Yes, if he could.

3          THE COURT:  Step down.  Stand nice and tall.

4   BY MR. ROTH:

5   Q.  Stand nice and tall next to me.

6          THE COURT:  Do you want to go back to back?

7          MR. ROTH:  I think the jury can see the height.  Okay.

8   Q.  So we've established that you've never, ever told anybody

9   that the robber was six foot 11 before, is that correct?

10  A.  No.  Yes.  Yes.  That's correct.  I tell them he's very

11  tall.  I did tell them.  Yeah.

12  Q.  During the conversations that you had with these assistants

13  who were taking notes, or somebody was taking notes, do you

14  recall telling them that the one dark-skinned black male was

15  around five ten, thin build, 170 pounds?

16  A.  I'm sorry?

17  Q.  Do you remember saying, when you were speaking to the

18  prosecutors that day, in January of this year, in their office,

19  that the one dark-skinned black male was around five ten, thin

20  build, around 170?

21  A.  Maybe, yes.  Maybe, yes.

22  Q.  And do you recall further saying, sir, that the second,

23  lighter skinned male was slightly taller than the first male?

24  A.  Yes.  Taller.  Yes, I did.

25  Q.  Slightly taller, right?

 1   A.   What do you mean slightly?

 2   Q.   A little bit.

 3   A.   A little bit?

 4   Q.   A little bit.

 5   A.   I tell them he's tall because when he went inside the

 6   basement --

 7   Q.   I'll ask the questions, sir.

 8   A.   No.  I don't know.

 9   Q.   Okay.

10   A.   I don't know.

11   Q.   So somebody who is five ten is your height?

12   A.   Yes.

13   Q.   Or my height?

14   A.   Yes.

15   Q.   More or less, being generous.  And somebody who is slightly

16   taller than even five ten is six feet, six one, six two, is

17   that correct?

18   A.   I'm sorry?

19   Q.   Somebody who is a little bit taller than five ten --

20   A.   Maybe six.  I don't know.  Six -- five, six ten, yeah.

21   Tall.

22   Q.   You're talking about five to ten inches more?  You're

23   describing it as slightly --

24           THE COURT:  Wait.

25   A.   Maybe six 11, like taller than me, like this high or

D37Wdor5                          K. Salahi - cross

1    taller.

2    Q.  Would be, you're just saying this much taller?

3    A.  Yeah.

4    Q.  Okay.

5              MR. ROTH:  Can I have my client stand up for a second.

6              THE COURT:  That's fine.

7    BY MR. ROTH:

8    Q.  So not this distance we're talking about?

9    A.  Maybe more.

10   Q.  Maybe more?

11   A.  Maybe his height.

12   Q.  Maybe?

13   A.  Yes.

14   Q.  But you never said that to the --

15             MR. ROTH:  You can sit down.

16   Q.  You never said that to the U.S. Attorneys, you said a

17   little bit taller than five ten?

18   A.  I tell them tall.  Tall means tall.  Six ten, six 11, maybe

19   that's -- I don't know how much like taller, how much in

20   inches, but tall.

21   Q.  You're the one who said --

22   A.  Okay.

23             THE COURT:  You can't both talk, or she'll explode.

24   So he asks the questions, you let him finish.

25             THE WITNESS:  Okay.

1              THE COURT:  And then you answer.  Okay?

2    BY MR. ROTH:

3    Q.  Just to go over it again, you told the assistants that the

4    first robber was around five foot ten, right?  And you

5    described the weight, correct?

6              THE COURT:  Is that true?

7              THE WITNESS:  Yes.

8              THE COURT:  Do you remember saying that?

9              THE WITNESS:  I tell them I don't know how much is the

10   height, but I tell them one is like maybe my height or a little

11   bit more and the other one is tall.  I don't know what size I

12   tell them.

13             THE COURT::  All right.

14             THE WITNESS:  I tell them about my basement.  My

15   basement --

16             THE COURT:  Let's leave the basement out of this for

17   now.

18             Go ahead.  Next question.

19   BY MR. ROTH:

20   Q.  Then you told them in terms of the description of the

21   second one that the second robber was slightly, or a little

22   bit, taller than the first robber, is that right?

23   A.  I don't know what I tell them.  Whatever you have there, in

24   the report.

25             MR. ROTH:  Judge, this brings us to that point.  I'll

D37Wdor5                          K. Salahi – cross

1    take it a step further.

2    Q.  If you saw that report, you said whatever we have in that

3    report, if you saw that report, it might refresh your

4    recollection?

5    A.  Not refresh.  I don't know the size.

6    Q.  If I could finish my question, sir.

7    A.  Okay.

8    Q.  If you saw the report that you're referring to, the notes

9    of that interview, do you think that would refresh your

10   recollection as to the height description that you provided for

11   the second robber that day?

12   A.  Yes.

13            THE COURT:  All right.  Let's have a side bar.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  He's not really saying that he doesn't

3    remember what he said as the description.  He's saying that the

4    guy was tall.  You're saying did you say slightly.  He's saying

5    he didn't say slightly or he doesn't remember saying slightly.

6    You're really trying to impeach him.  You're not trying to

7    refresh his recollection.  You're hoping that he's going to

8    just adopt what's in the document there and saying that must be

9    true.

10          MR. ROTH:  It's my error that I didn't indicate that

11   on 3517A, which are the interview notes provided by the

12   government, he actually said slightly taller, maybe.  It's my

13   fault.

14          THE COURT:  So we're going to bring him over, you're

15   going to read this to him?

16          MR. ROTH:  Then he's going to say --

17          THE COURT:  You know what he's going to say.  He's

18   going to say that must be right.

19          MR. ROTH:  Right.

20          THE COURT:  That's not going to refresh his

21   recollection, so he's being manipulated into saying something

22   that he's really not saying.  I don't think that's really

23   proper refreshing recollection.

24          MR. ROTH:  How would I impeach him then?

25          THE COURT:  Then you're going to call the agent who

1    took the notes.

2              MR. ROTH:  This isn't the agent.  This is the

3    assistant.

4              THE COURT:  So they're going stipulate.

5              MS. LESTER:  Your Honor, if it's "slightly taller,

6    maybe," I don't know that that's --

7              MR. ROTH:  We're talking about --

8              THE COURT:  Do you want to --

9              MR. ROTH:  If you're willing to stipulate --

10             THE COURT:  Do you want to bring him over?

11             Wait.  Stop.  We're all doing what he's been doing.

12   So do you want him to come over here and you're going to ask

13   him?

14             MR. ROTH:  Yes, I would like to.

15             THE COURT:  Then I'm going to ask some questions at

16   the side bar that I haven't been asking from the bench in front

17   of the jury because I really don't think -- just him blindly

18   adopting whatever is in there is not saying yes, my

19   recollection has been refreshed.  So, I think that has to be

20   explored.

21             Mr. Salahi, could you come over here.

22             Mr. Salahi, Mr. Roth is going to read a part of this

23   to you.

24             THE WITNESS:  Okay.

25             THE COURT:  Then he's going to ask you a question or

D37Wdor5                          K. Salahi - cross

1    two.

2    BY MR. ROTH:

3    Q.  You were asked to provide the description of the robbers

4    that day by the U.S. Attorney in their interview with you in

5    January, is that right?

6    A.  Yes.

7    Q.  And you described the first one as five foot ten, skinny,

8    and 170, is that correct?

9    A.  Yes.

10              THE COURT:  Wait.  Did you use those words?  Do you

11   remember saying five foot ten, skinny, 170?

12              THE WITNESS:  I said that, yes.

13              THE COURT:  Did you say that, or did you say my

14   height?

15              THE WITNESS:  Yes, I say, I say.

16              THE COURT:  What did you say?

17              THE WITNESS:  I tell him like he weigh like 170, maybe

18   five ten.  I'm not sure, but maybe five ten.  Maybe more.

19              THE COURT:  Here's the issue, Mr. Salahi.

20              THE WITNESS:  Yeah.

21              THE COURT:  The question is:  Do you remember saying

22   those words to the people that were interviewing you on this

23   day?

24              THE WITNESS:  Yes.

25              THE COURT:  You do remember --

1            THE WITNESS:  Yes.

2            THE COURT:  -- the question?

3            THE WITNESS:  I told them yes.  I told them they are

4     like this weight and maybe they are this height.

5            THE COURT:  The fact that somebody has written it down

6     doesn't change your memory, and all we're interested in is your

7     memory.

8            THE WITNESS:  Yes.

9            THE COURT:  Mr. Roth can ask you this about this

10    document.  He can show it to you, and if seeing this or hearing

11    this you say now I remember, that's fine.  But if it doesn't do

12    that, if you're assuming this must be right and so you're going

13    to adopt it, that's not really the question.  Do you

14    understand?

15           THE WITNESS:  I'm sorry.  Again?  He showed me this

16    one, like I tell them --

17           THE COURT:  The question is simply:  Does hearing

18    this --

19           THE WITNESS:  Okay.

20           THE COURT:  -- remind you?  Does it make your

21    recollection come back?

22           THE WITNESS:  I tell them, yes.

23           THE COURT:  Okay.  Read the document.

24           THE WITNESS:  Okay.

25           MR. ROTH:  And did you indicate that the second robber

D37Wdor5                              K. Salahi - cross

1   was light-skinned black male, slightly taller, maybe, than the

2   dark-skinned male?

3                  THE WITNESS:  Yes.

4                  THE COURT:  You used those words?

5                  THE WITNESS:  Yes.

6                  THE COURT:  You remember that?

7                  THE WITNESS:  Yes.

8                  THE COURT:  You have a recollection of saying that?

9                  THE WITNESS:  Yes.

10                  THE COURT:  You're not just adopting --

11                  THE WITNESS:  No, no.  Yes, I told them this.

12                  THE COURT:  All right.

13                  (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2     BY MR. ROTH:

3     Q.  Sir, after having the document, 3517A, read to you, the

4     interview notes of the interview that you had with the U.S.

5     Attorney in January of this year concerning this incident, is

6     your recollection, do you now remember saying that the second

7     male was slightly taller, maybe, than the dark-skinned male

8     that you described as five ten?

9     A.  Yes.

10               MR. ROTH:  No further questions, your Honor.

11               THE COURT:  Okay.

12               Ms. Stafford.

13               MS. STAFFORD:  Thank you, your Honor.

14    CROSS-EXAMINATION

15    BY MS. STAFFORD:

16    Q.  Good afternoon, Mr. Salahi.

17    A.  Good afternoon.

18    Q.  You testified just previously that the gloves that the

19    perpetrators were wearing had open fingers?

20    A.  Yes.

21    Q.  Correct?

22    A.  Yes.

23               MS. STAFFORD:  Can I have Government Exhibit 74,

24    please.

25    Q.  It would be fair to say it would not be these gloves that

1    you recall seeing on the day of the robbery?  Should I come

2    closer?

3    A.  I don't know.  Like maybe they have, one is open fingers

4    here.  Open fingers.

5    Q.  Open fingers?

6    A.  Yeah.  Like this glove, like cut from here.  The fingers,

7    you know, I see them.

8    Q.  And you're referring to the fingertips of the gloves?

9    A.  Yes.

10   Q.  So they wouldn't be these gloves, they wouldn't resemble

11   these gloves?

12   A.  Especially the dark-skinned guy, I remember for sure I see

13   his, like the fingers.  The light-skinned, I'm not sure.  You

14   know, I'm not sure.  The light skin, I don't know what I said

15   in the report.  The reports have, like I say, whatever he wear,

16   whatever he have is in the report the first time.

17   Q.  But you do clearly remember that somebody had open --

18   A.  Yes.  Dark-skinned guy, is for sure.

19   Q.  And do you remember testifying previously that the

20   perpetrators searched the house?  Correct?  They came into the

21   front door?

22   A.  I'm sorry?

23   Q.  The perpetrators came into the front door?

24   A.  Where?

25   Q.  Into your house.

D37Wdor5                          K. Salahi - cross

1    A.  When they come?

2    Q.  When they came, yes.

3    A.  When they came, they open, yeah.  They have the keys.

4    Q.  They had the keys in their hands, right?

5    A.  The robbery, when they come?  You're talking about the

6    robbery, or who?

7    Q.  The robbers, yes.

8    A.  The robbers, they come, they open the door.  When they come

9    inside, when they inside, my kids was by the door, they catch

10   my kids.

11   Q.  They touched your kids?

12   A.  Yeah.  The hallway, yes.

13   Q.  They put them on the couch?

14   A.  They walk to me, when they have the kids in the hand.

15   Q.  And they brought you over to the couch?

16   A.  We -- yeah, between the couch.  Then we, they tell me like

17   get down and we have blanket on the couch.  They cover me with

18   my kids and the blanket.

19              (Continued on next page)

20

21

22

23

24

25

D375dor6                        K. Salahi - cross

1   BY MS. STAFFORD:

2   Q.  And they picked up the blanket with their hands and they

3   put it on top of you and your kids?

4   A.  Yes.

5   Q.  And then you heard that searching throughout the house,

6   right?

7   A.  Yes.

8   Q.  And you heard -- what did you hear?

9   A.  I heard like, you know, some noise and room is two rooms,

10  one on this side, one on this side.  I heard somebody in this

11  room and another guy in another room.

12  Q.  So you heard them moving things throughout the house?

13  A.  Yes.

14  Q.  And you also know that they went throughout the closet?

15  A.  Yes, one --

16  Q.  They searched the closet?

17  A.  Yes.  Yes.

18  Q.  They opened the door to the closet?

19  A.  I don't know if they open but I heard some noise.

20  Q.  Things were out of the closet when you went back to look at

21  it?

22  A.  After they left?

23  Q.  After they left, yes.

24  A.  We see some door is open, the closet is moved; yes.

25  Q.  And you also said that your cell phone was taken?

D375dor6                          K. Salahi – cross

1    A.  Yes.

2    Q.  And your cell phone was inside your pants pockets?

3    A.  Was like in the pouch on the belt.

4    Q.  In a pouch?

5    A.  Yes.

6    Q.  The robbers would have had to grab the phone out of the

7    pouch of your pockets?

8    A.  Yes.

9    Q.  And you also said that day that you were driving your

10   Infiniti car?

11   A.  Yes.

12   Q.  And you parked it outside in front of your house?

13   A.  Yes.

14            MS. STAFFORD:  No further questions.  Thank you.

15            THE WITNESS:  Thank you.

16            THE COURT:  Any redirect?

17            MS. LESTER:  Just briefly, your Honor.

18   REDIRECT EXAMINATION

19   BY MS. LESTER:

20   Q.  Mr. Salahi, when you saw the light-skinned robber in your

21   house, how tall was he compared to the ceiling in the

22   apartment?

23   A.  Almost same height.  From the door is little bit low.  When

24   he walk in he down like this to hit head not hit the ceiling.

25   Q.  When you go through the door or when you're in the

D375dor6                         K. Salahi - redirect

1   apartment, do you have to duck your head?

2   A.   No.  I go easily.

3            MS. LESTER:  No further questions, your Honor.

4            THE COURT:  Recross?

5            MR. ROTH:  No, Judge.

6            THE COURT:  Ms. Stafford, anything?

7            MS. STAFFORD:  I'm sorry.  No, your Honor.

8            THE COURT:  Okay.  You can step down.  Thank you,

9   Mr. Salahi.

10           Government, your next witness.

11           MS. LESTER:  Your Honor, the government calls

12   Althomory.

13    MOHAMMAD ALTHOMORY,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16           THE WITNESS:  My name is Althomory.

17           THE COURT:  Could you spell those names?

18           THE WITNESS:  M-O-H-A-M-M-A-D, Althomory,

19   A-L-T-H-O-M-O-R-Y.

20           THE COURT:  Spell your last name again.

21           THE WITNESS:  A-L-T-H-O-M-O-R-Y.

22           THE COURT:  Althomory.

23           All right.  Keep your voice up, don't speak too

24   quickly because it is hard to get it all down and keep your

25   vice voice nice and loud.  All right?  You may proceed,

1     Ms. Lester.

2              MS. LESTER:  Thank you, your Honor.

3     DIRECT EXAMINATION

4     BY MS. LESTER:

5     Q.  Good afternoon.

6     A.  Good afternoon.

7     Q.  Where do you work?

8     A.  I was working at Bronx Distributors.

9     Q.  I'm sorry?

10    A.  I used to work, at that time when they rob, in the Bronx

11    Distributors.

12    Q.  And what is Bronx Distributors?

13    A.  It was -- they were selling tobacco and medicine.

14    Q.  Where did you sell tobacco and medicine?

15    A.  We sell it to grocery store.

16    Q.  What is Bronx Distributor?  Is it wholesale?

17    A.  Wholesale, yes.  It was a wholesale.

18    Q.  Where is it located?

19    A.  It was 2415 East Tremont.

20    Q.  East Tremont did you say?

21    A.  Yes.

22    Q.  Is that in the Bronx?

23    A.  In the Bronx, yes.

24    Q.  And where are the stores that you sell to?

25    A.  In the Bronx.

D375dor6                          Althomory - direct

1    Q.  What is a typical day of work for you?  What do you do?

2    A.  Delivery.

3    Q.  So you're delivering the items that Bronx Distributors

4    sells?

5    A.  Yes.

6    Q.  How do you do that?  By car or on foot?

7    A.  By car.

8    Q.  And what type of car do you drive?

9    A.  Van.

10   Q.  A van?

11   A.  A van, yeah.

12   Q.  What does the van look like?

13   A.  We used to have two or three vans.  We use one white, one

14   gray, one Silver.

15   Q.  Were they all the same type of van?

16   A.  Yes.

17   Q.  Did they have windows on the sides or were they closed in?

18   A.  The Ford van was closed but the other has windows.

19   Q.  And how do your customers, the stores, pay for the items

20   when you're delivering?

21   A.  Some of them cash if it is a little bit, and some of them

22   checks.

23   Q.  And what do you do with the cash if you make a delivery and

24   you get cash from the store?

25   A.  When I finish my job I go back to the company, give them

1   the money and do the math and leave.

2   Q.  Do you make more than one delivery on a day usually?

3   A.  Yes.

4   Q.  How many deliveries would you say you make?

5   A.  One day, 10 delivery; one day five, six, seven.  It is not

6   all the same.

7   Q.  So it varies?

8   A.  Yes.

9   Q.  And when you make a delivery and you get cash but you have

10  another delivery to make, what do you do with the cash in the

11  meantime?

12  A.  I put it in my pocket.

13  Q.  In your pocket?

14  A.  Yes.

15  Q.  So you carry it on your person?

16  A.  I carry it with me.

17  Q.  The vans that belong to Bronx Distributor, do they have any

18  logo or sign on the side that says what they are?

19  A.  On the van?  No.

20  Q.  I have put before you what is in evidence as Government

21  Exhibit 1.  Do you recognize that person?

22  A.  Yeah, I know this person.

23  Q.  Who is that?

24  A.  Fahd.  I Fahd Al Ghadi.

25  Q.  What do you call him?

1   A.  Fahd.  Only Fahd.

2   Q.  What do you know about him?

3   A.  I used to know nothing about him before but, but --

4   Q.  Did you ever work with him in the Bronx?

5   A.  I used to deliver to him.  I'm sorry.

6   Q.  You used to deliver to him?

7   A.  Yes.

8   Q.  When you worked for Bronx Distributors?

9   A.  Yes.

10  Q.  Did he own a store?

11  A.  I'm not sure.  He's there always a long time.  I've been

12  deliver to him since 2005.

13  Q.  Could you look at Government Exhibit 40 which is in front

14  of you there on the ledge?  Do you recognize that?

15  A.  Yeah.

16  Q.  What is that?

17  A.  That's his place, right?  Yeah.  That's his place.  That's

18  his store, the store he worked.  He was there.

19  Q.  Fahd?

20  A.  Yes.

21  Q.  And did you ever visit that store when you were working?

22  A.  Not visit.  I go there --

23  Q.  You went there for work?

24  A.  Only when he order, when he placed an order.

25  Q.  So, he placed orders with Bronx Distributors?

1   A.  Yes.  He placed the order on a Sunday, I give it to him

2   Monday, and the same day they robbed me, then he asked me for

3   another order.

4           MR. ROTH:  Object to the characterization.

5   A.  Then he asked me for another order --

6           THE COURT:  Wait.  Stop for a second.

7           I don't understand.  So, let's rephrase.

8           So, he placed orders with Bronx Distributors.  That's

9   a yes or no.  So, yes?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.

12          Next question.

13  BY MS. LESTER:

14  Q.  How long were you dealing with him?  Over a period of what

15  time?

16  A.  What you mean?  Since I know him or you mean how many times

17  a week deal with him?

18  Q.  Over a period of what years did you make deliveries to him?

19  A.  Oh, I start giving him deliveries from 2005 but in 2007 he

20  stopped ordering from me like for two years until 2010 and he

21  came back for, like, two months and he stopped, then he came

22  back in 2011.

23  Q.  In 2011?

24  A.  Yes.

25  Q.  Okay.

1       And, in 2011 how often did he order things from Bronx

2   Distributors?

3   A.  He ordered, like, two or three times from me like one time

4   in May and one time in August and one time at the same day.

5   Q.  Was it the same day as what?

6   A.  When they robbed me at noon, December 12th, 2011.

7               MR. ROTH:  Object again, Judge.

8               THE COURT:  The question was the same day as what.

9   Two times in one day or the same day as some other event?

10               THE WITNESS:  I'm sorry?

11               MS. LESTER:  I can ask for a clear question, your

12   Honor.

13               THE COURT:  Let's do that.

14   BY MS. LESTER:

15   Q.  Were you robbed at some point in 2011?

16       Were you the victim of a robbery?

17   A.  Yeah.  That day, yes.

18   Q.  When was that?  What day?

19   A.  December 12th, 2011, at 5:30 p.m.

20   Q.  Did you make a delivery to that store --

21   A.  Yes.

22   Q.  -- Fahd's store on that day?

23   A.  Yes.

24   Q.  And just so the jury is clear, can we put up Government

25   Exhibit 40 for a moment, Ms. Brady?  So, this is the store

1    where Fahd worked you said, Mr. Althomory?

2    A.  Always, yes.  Always he's there.

3    Q.  Do you know what road this store is on?

4    A.  White Plains.

5    Q.  White Plains Road?

6    A.  White Plains Road, yes.

7    Q.  And do you know what the nearest cross street is?

8    A.  233rd Street.

9    Q.  So, talking now about December 12th, the day of the

10   robbery; what time did you start work that day?

11   A.  2:00 I start working.  I go to him at 3:00.

12   Q.  Okay.  Did you make -- what happened when you got there?

13   A.  When I got there I give him the stuff he ordered for like

14   $71, and when he give me the money there is three guys in front

15   of him, they was with the newspaper, and when he tried to give

16   me the money he was looking at them like this and he turned to

17   me -- *oh, I'm sorry.  I don't know what I'm doing.*  Like he's

18   showing them that's me.

19            MR. ROTH:  Objection, your Honor.  Object to the

20   conclusion.

21            THE COURT:  All right.

22            So, when he was giving -- he tried to give you the

23   money and what did he do?

24            THE WITNESS:  He was looking at the people in front of

25   them, the people in front of him, the three black guys.

1          THE COURT:  Looking at other people?

2          THE WITNESS:  Yes.  Then he take a look at them and

3    take a look to me and said *oh, I'm sorry.  I don't know what*

4    *I'm doing*, to me.

5          THE COURT:  Next question.

6    BY MS. LESTER:

7    Q.  So you were there to deliver some items?

8    A.  Yeah.

9    Q.  And how much were those items worth?

10   A.  $71.

11   Q.  And did he have the money to pay you for those items?

12   A.  He paid me $71 cash, yes.

13   Q.  Did you see him count out the money?

14   A.  Yes.  He take it from his bucket.

15   Q.  And before he handed you the money, what did he do?

16   A.  He was behind the counter, he was talking to people over

17   there, and somebody was talking to me about they rob him in the

18   night.  He was working with them.

19         MS. FONTIER:  Objection.

20         MR. ROTH:  Objection, your Honor.

21         THE COURT:  I don't understand this.

22         THE WITNESS:  I mean, ones of his work -- I'm sorry.

23         THE COURT:  Someone was talking to you about being

24   robbed?

25         THE WITNESS:  Yes, on the night, Sunday -- Monday

1    night.  He finished work on Sunday with this guy and he give

2    him the salary -- his salary and the guy has new iPhone --

3              MS. FONTIER:  Object, your Honor.

4              MR. ROTH:  Object.

5              THE COURT:  Nonresponsive.

6              So, just listen to the questions that are asked by the

7    prosecutor and only answer that question.

8              THE WITNESS:  Okay.

9    BY MS. LESTER:

10   Q.  Now, you mentioned that you saw some men in the store

11   besides Fahd, right?

12   A.  Yes.  A worker.

13   Q.  I'm sorry?

14   A.  He is a worker with him.

15   Q.  There is a worker there?

16   A.  The guy I was talking to, he is working with him.

17   Q.  Okay.  Do you know the name of that person?

18   A.  What I know is Ali.  Ali Hababi.

19   Q.  I'm sorry?

20   A.  Hababi; I know him from there.  He was working with him.

21   He was explaining to me what happened to him in the night and

22   he tell me to be --

23             MR. ROTH:  Objection.

24             MS. FONTIER:  Objection.

25             MS. LESTER:  Mr. Althomory --

1          THE COURT:  Just listen to the question that is asked

2   by the lawyer.

3   BY MS. LESTER:

4   Q.  I will try to ask very clear questions but just answer my

5   questions.  If I need more information I will ask a question.

6   A.  Sorry.

7   Q.  That's okay.

8          So, did you say that there were some other men including

9   someone reading a newspaper?

10  A.  Yeah.  That guy, that worker.  The worker.

11  Q.  The worker was reading the newspaper?

12  A.  No.  No.  No.  Only the three guys and Fahd behind the

13  counter and that guy, the one he was working with him.

14  Q.  So, there were a total of four other people besides Fahd,

15  correct?

16  A.  Yes.

17  Q.  Where were these three men that you saw?

18  A.  In front of his cashier from our side.

19  Q.  Were they inside or outside the store?

20  A.  Inside the store.

21  Q.  Inside?

22  A.  Yes.

23  Q.  Standing by the cashier?

24  A.  Yes.

25  Q.  And, could you describe them?

D375dor6                          Althomory - direct

1    A.   One of them, he was wearing a gray jacket and he's not too

2    high, he has a big shoulder, a big head, and the other is tall

3    guy, skinny.  And the other one, he's a little bit higher than

4    me.  So.

5    Q.   A little bit taller than you?

6    A.   Yes.

7    Q.   Could you see what color skin they had?

8    A.   Yeah.  They black.

9    Q.   Did you hear whether they were talking?

10   A.   No.  They was reading and -- I didn't pay attention a lot

11   to be honest with you because I'm trying to get my money to

12   leave.

13   Q.   Why did you notice them?

14   A.   After the problems.  After they robbed me I, you know --

15            MR. ROTH:  Objection, your Honor.

16            MS. FONTIER:  Objection.

17            THE COURT:  The question was why did you notice them

18   in the store?

19            THE WITNESS:  Oh.  I just see them there.

20            THE COURT:  Okay.

21   BY MS. LESTER:

22   Q.   Had you seen them before?

23   A.   No.

24   Q.   Did you see whether Fahd talked to them at all?

25   A.   No.  They was reading the paper in front of him and he was

D375dor6                    Althomory – direct

1    talking to me and he gave me the money and he was looking at

2    them.

3    Q.  He looked at them?

4    A.  Yes.

5    Q.  When did he look at them?

6    A.  When he gave me the money.  And I tell you how he -- how

7    he --

8    Q.  You're making a gesture there, sir.

9    A.  Yeah.

10   Q.  What are you doing?  What are you trying to convey through

11   that gesture?

12   A.  I'm sorry.  I don't understand what you mean.

13   Q.  You are moving your hand in a certain way across your body,

14   right?

15   A.  Not me, him.

16   Q.  Exactly.

17        You are trying to describe what Fahd was doing when he

18   handed you money?

19   A.  Yes.

20            MR. ROTH:  Judge, I ask that the assistant doesn't

21   testify.

22            THE COURT:  Look.

23            MR. ROTH:  She's characterizing.

24            THE COURT:  That's fine.  It is fair to say that the

25   witness is moving his arm from right to left in a particular

1     manner, there is nothing wrong with that.

2               So, what is the gesture?  What did you just do?  Show

3     me again, what it is that Fahd did?

4               THE WITNESS:  I was going to the three guys that were

5     in front of him.  They was right here -- like I'm the

6     cashier -- and he's the cashier like that and the three guys

7     are there and I'm in front of him and the other worker right

8     there.

9               THE COURT:  So, what did he do with his hand?

10              THE WITNESS:  Well, he count the money, then he look

11    at them like that and he do this:  *Oh, I'm sorry.  I don't know*

12    *what I'm doing.*

13              THE COURT:  Just let the record reflect that the

14    witness extended his hand, looked in one direction and then

15    moved his hand and his head and eyes to the other direction,

16    the left, moving from right to left.

17              THE WITNESS:  Yes.

18              THE COURT:  All right.

19    BY MS. LESTER:

20    Q.  So, when he first looked, who was he looking toward?

21    A.  They was together, the three guys in front of him.

22    Q.  Was he looking at the three men?

23    A.  They was in front of him but -- yeah, I see his face to

24    them like this.

25    Q.  And then when he turned, who was he looking at then?

1    A.   To me.

2    Q.   And, did you take the money from him?

3    A.   I take the money from him and I tell them bye and I leave.

4    Q.   Where do you go?

5    A.   I go to my car then I go back to the -- no, I go back to

6    the super market.

7    Q.   Where was the super market?

8    A.   It was in Lydig and Kroeger.  Key Food.

9              THE COURT:  Key Food?

10   A.   Yes; I buy the stuff and I go to my house to try to eat but

11   they didn't let me.

12   Q.   So, you go to the grocery store and then you head home?

13   A.   I was going back to home to eat and I take some stuff from

14   the super market and then I have to go back to work but they

15   followed me and they wait for me --

16             MR. ROTH:  Objection to the "they."

17             THE COURT:  Let's ask this one question at a time.

18             Just listen to the questions because they're much

19   smaller than your answers.  Your answers are telling a story so

20   just answer the question.

21             THE WITNESS:  Sorry.

22             THE COURT:  That's okay.

23   BY MS. LESTER:

24   Q.   After you brought the groceries, where did you go?  What

25   location?

1    A.  To Esplanade Avenue and Hone Avenue.

2    Q.  Could you take a look at what's in front of you and marked

3    as Government Exhibit 1400?  It has a yellow sticker on it.

4         Do you see that in front of you, sir?

5    A.  Yeah.  Esplanade, right here.

6    Q.  Sir, what is this in front of you?

7    A.  That's my street.

8    Q.  But what is that document?  Is it a map?

9    A.  Is what?

10   Q.  It is a map?

11   A.  Yeah.  It is a map.  Yeah.

12   Q.  Are you familiar with the area in that map, those streets?

13   A.  Yes.

14   Q.  Is that near where you live?

15   A.  Yeah.

16        MS. LESTER:  Your Honor, the government would offer

17   Government Exhibit 1400.

18        MR. ROTH:  Judge, I'm going to object.  I don't know

19   if this is to scale or what.

20        THE COURT:  I'm not sure if scale is essential.

21        What do you have in front of you there?

22        THE WITNESS:  It is a map.

23        THE COURT:  You are familiar with those streets?

24        THE WITNESS:  Yes.

25        THE COURT:  You drive in those areas?

1                THE WITNESS:  Yes.

2                THE COURT:  Does this map fairly and accurately depict

3      that part of the Bronx?

4                THE WITNESS:  Yeah.

5                THE COURT:  It does.  All right.

6                Is it to scale?

7                THE WITNESS:  What is scale?

8                THE COURT:  To scale meaning it is exactly measured so

9      that everything is the exact distance or is it just

10     approximate.

11               THE WITNESS:  Yes.

12               THE COURT:  The latter, approximate?  Is that what

13     you're saying?

14               THE WITNESS:  Yes.

15               THE COURT:  I'm going to allow it.

16               Government Exhibit 1400 is admitted.

17               (Government's Exhibit 1400 received in evidence)

18     BY MS. LESTER:

19     Q.  Ms. Brady, can we put that up for the jury?

20         Now, Mr. Althomory, what avenue did you say you went to

21     after you finished with your grocery shopping?

22     A.  Hone Avenue.

23     Q.  Hone Avenue?

24     A.  Yes.

25     Q.  Do you see Hone Avenue on the map?

1   A.  Corner of Esplanade.

2   Q.  So, you went to the corner of Hone Avenue and Esplanade?

3   A.  Yes.

4   Q.  Can you see where the laser pointer is pointing on the map

5   up there?

6   A.  Yes.

7   Q.  And you can reference the map in front of you?

8   A.  Right there.

9   Q.  This is Esplanade, correct?

10  A.  Right there.

11  Q.  So, indicating on Government Exhibit 1400 just above the

12  words "New York," right?

13  A.  Yes.

14  Q.  We can take that down, Ms. Brady.  Thank you.

15      So, what happened after you got to the intersection of Hone

16  Avenue and Esplanade?

17  A.  I got out of my car, I take the stuff that I buy from the

18  super market, I close my car.  I just walked two steps from the

19  sidewalk to the street and the other guy come from behind me

20  and he hold my eyes and then he take a knife and he put his

21  left hand in my mouth, he tried to cover my mouth not to yell

22  or not to scream and he told me don't move, I will murder you.

23      THE COURT:  Stop there.  Next question.

24  Q.  Could you see this person?

25  A.  I didn't see him.  He came from behind but I see the guy

1   that came from the in front of me.

2   Q.  So, was there another person besides that man who

3   approached from behind?

4   A.  One came from behind and the other came from the other side

5   to face me and he has a gun in his hand -- in the left hand;

6   the other one behind me with the knife.

7   Q.  Did you actually see the knife?

8   A.  I see the knife, yes.

9   Q.  What did it look like?

10  A.  Silver, and the handle is gray -- how you could say, like

11  beige.

12  Q.  Beige color?

13  A.  Yes.

14  Q.  Could you see what it was made out of, whether it was metal

15  or some other material?

16  A.  No.  It was a little bit dark.  It was not --

17  Q.  Could you see the person's hand who was holding the knife?

18  A.  I don't -- he was high from me.  When I -- I do this.  He

19  was higher than me.

20          THE COURT:  Taller.

21  A.  And skinny.  Yeah, taller.

22      So, the other guy, he was not tall, short, and big

23  shoulder.

24  Q.  So the person who was facing you was shorter?

25  A.  Yeah; shorter than the other guy.

1    Q.  Shorter than you?

2    A.  Not than me.

3    Q.  How tall are you, sir?

4    A.  Taller than me, like 5'6", 5'5".

5    Q.  How tall are you?

6    A.  Me?  5'3".

7    Q.  So he was taller than you?

8    A.  Yes.

9    Q.  Can you describe him at all?

10   A.  He has a big shoulder and he was covering his face with a

11   mask and the other guy too, and he was holding that gun in his

12   left hand and he told me the F'n word, just give me the F'n

13   money.  And I tell him okay, take everything.  Then they

14   stopped talking to me and don't talk to me anymore, just search

15   my pocket.  They take all the money and then they take me back

16   to the sidewalk, they hit me one on the side and one on the

17   other.

18          MR. ROTH:  Object to the narrative.

19   Q.  Just one step at a time, okay?

20   A.  Okay.

21   Q.  Can you describe the gun that you saw?

22   A.  Black.

23   Q.  Do you know, are you familiar with guns at all?

24   A.  Yeah.

25   Q.  Do you know whether it had a barrel?

D375dor6                         Althomory - direct

1   A.  Not with the circle one, no.

2          THE COURT:  Every gun has a barrel, we know that from

3   yesterday.

4   Q.  I'm sorry.

5      Do you know the difference between a revolver and an

6   automatic gun?

7   A.  Yes.

8   Q.  Do you know whether there was a revolver or an automatic?

9   A.  Not the -- with the circle one.  The circle, I don't know

10  how you call it.  It is an automatic one, yeah.

11  Q.  So it didn't have a circular part on it?

12  A.  No.  No.

13  Q.  And what color was the gun?

14  A.  Black.

15  Q.  All black?

16  A.  Yes.

17  Q.  What about the hands of the person who was holding that

18  gun?

19  A.  He used to have gloves on his hand.

20  Q.  Do you know what color the gloves were?

21  A.  Black.

22  Q.  And you said he was wearing a mask?

23  A.  Yes.

24  Q.  What color was the mask?

25  A.  Black.

1    Q.   What about his clothing?  Do you remember anything about

2    that?

3    A.   I don't remember anything about his clothes.  I just see --

4    you can say black jacket or sweater.

5    Q.   What were you carrying at the time that these robbers

6    approached you?

7    A.   I was carrying grocery from the super market.

8    Q.   And did you have any money on you?

9    A.   Yes.

10   Q.   What money?

11   A.   For the company.

12   Q.   The money from your deliveries earlier that day?

13   A.   Yes.

14   Q.   Do you remember approximately how much money you had?

15   A.   Yes.  It was -- not really because it was in cash $9,844,

16   and checks it was $5,300, total $15,000 and some change.

17   Q.   So, after the robbers approached you and one was from

18   behind and one was coming towards you --

19   A.   Yes.

20   Q.   -- what happened next?

21   A.   After they take the money from me they take me to the

22   sidewalk and they hit me, one guy hit me on this side and then

23   one guy hit me on this side, and I fell down to the floor like

24   almost 30 seconds, 40 seconds.  I scratched my face, my nose,

25   my teeth comes out a little bit of it and blood comes out from

1    my mouth.  Then, after 30 seconds, I tried to get up two or

2    three times and when I tried to get up I go back to the floor.

3    Q.  So you were hit by both individuals?

4    A.  Yes.

5    Q.  And you were gesturing to your neck area?

6    A.  Yes; and my side of my face.

7    Q.  Indicating your cheek area, is that correct?

8    A.  Yes.

9    Q.  And what about on the other side, where were you hit?

10   A.  The same.  Both sides got swollen and they take me to the

11   hospital.  I stay there for one night and one day.

12   Q.  And you said you fell to the ground?

13   A.  Yes.

14   Q.  Did you remain conscious?

15   A.  It is like -- yeah.  For like 30 seconds I don't feel

16   myself.

17   Q.  Did you pass out?

18   A.  Not pass out.

19   Q.  Okay.

20   A.  No.

21   Q.  But you were on the ground?

22   A.  Yes.  I fell down and I feel myself but like I can't get

23   up.

24   Q.  So you felt you couldn't get up, is that right?

25   A.  I tried one time, two time, three time.  When I try to get

D375dor6                        Althomory - direct

1    up I go back again.

2    Q.  But then you were able to get up after all?

3    A.  I'm sorry?

4    Q.  After a few moments you were able to get up?

5    A.  Yes.  After that.

6    Q.  What happened next?

7    A.  To be honest with you, I don't know how I got into my

8    house.  I can't believe that.  Sometime when I talk to myself,

9    like, how I got inside the house? I don't know.  I don't know

10   how I walked.

11   Q.  What did you do once you got inside the house?

12   A.  I don't even press the button for my wife to open the door,

13   I just banging my hand.  So, when they open I just remember my

14   kids, they cry when they see the blood coming from my mouth.

15            MR. ROTH:  Objection, your Honor.

16            THE WITNESS:  Yeah.

17            THE COURT:  I don't think that's nonresponsive.  I

18   think it is responsive.  It might be narrative.

19            So, next question.

20   BY MS. LESTER:

21   Q.  Sir, you mentioned you will to go to the hospital?

22   A.  The police come to my house and they tell me to go with

23   them, if we see them outside so maybe I'm going to remember --

24   I tell them I can't.  Then they take me to the precinct for

25   like 20 minutes, they take my name and whatever, then the

D375dor6                        Althomory - direct

1    ambulance comes to there, they take me to the hospital.

2              THE COURT:  Let's stop there.  Next question.

3    Q.  At the hospital, what injuries did you have?

4    A.  I was having too much pain in the right side in my face and

5    my ear and my eyes got red -- the eye, right one got red too

6    much and my face swollen, and the doctor tell me I have ripped

7    something inside so they make me stay the night to one day.

8    Q.  Inside your neck?

9    A.  I don't know, chin, or what they call here.

10   Q.  In your chin?

11   A.  They said they're going to do surgery for me.

12             MR. ROTH:  Objection to what the doctor said.

13             MS. FONTIER:  Objection.

14             THE COURT:  Actually, I think that would be admissible

15   so the problem is we're just listening to the questions,

16   Mr. Althomory.

17             THE WITNESS:  Okay.

18             THE COURT:  Because they're very specific.

19             THE WITNESS:  Sorry.  I'm not good in English because

20   I didn't go to school.

21             THE COURT:  Just listen to the questions and answer

22   only the questions.

23             THE WITNESS:  Okay, I will.

24             THE COURT:  Did somebody need to use the rest room?

25             A JUROR:  Yes.

D375dor6                          Althomory – direct

1              THE COURT:  Let's take a very short break for a

2       bathroom break, okay?  All rise.

3                      (Continued on next page)

1            (Jury not present)

2            THE COURT:  Have a seat.

3            It seemed like the one juror was in some distress.  I

4    wouldn't normally take a break now but he looked like he

5    couldn't wait.  So, this will be quick I think.  Have a seat.

6            (Recess)

7            MS. MASELLA:  Your Honor, just for scheduling

8    purposes, did I hear you say we are going to 4:30 today?

9            THE COURT:  4:30, quarter to 5:00 at the latest.  I

10   have to squeeze in stuff; a plea I can't fit in at lunch.

11           MS. MASELLA:  Understood, your Honor.  Thank you.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (Jury present)

 2            THE COURT:  Have a seat.

 3            Ladies and gentlemen, just in terms of scheduling,

 4   we're not going to be sitting tomorrow.  As I told you, Fridays

 5   we don't sit, it is a day when I do my other conference matters

 6   because I have hundreds of other cases that I also have to keep

 7   an eye on.  But, we will go today until about 4:30 or 4:45

 8   because I have a different case that I have to take then.  I

 9   think we are doing pretty good in terms of timing so don't

10   worry about that.

11            I will give you final instructions at the end of the

12   day, but basically so you know, that's the game plan for today.

13            Let's resume with the direct examination.

14   BY MS. LESTER:

15   Q.  Mr. Althomory, I think when we broke we were talking about

16   that you went to the hospital, right?

17   A.  Yeah.

18   Q.  Did you have to stay overnight in the hospital?

19   A.  That's what the doctor said.

20   Q.  And did you stay overnight?

21   A.  Yes.

22   Q.  Just for one night?

23   A.  For one night and the second day until 3:00 in the

24   afternoon.

25   Q.  And then you went home?
```

1   A.   Then I went home.  Yeah.

2             MS. LESTER:  No further questions, your Honor.

3             THE COURT:  All right, Ms. Fontier; cross-examination?

4             MS. FONTIER:  Can you give me Government Exhibit 74?

5   CROSS EXAMINATION

6   BY MS. FONTIER:

7   Q.   Good afternoon, Mr. Althomory.

8   A.   Good afternoon.

9   Q.   This will be brief.

10       You're talking about an incident that occurred on December

11  12th of 2011, correct?

12  A.   Yeah.

13  Q.   And that was at about 5:30 in the afternoon?

14  A.   Yes.

15  Q.   And you were, you said I believe at about 3:00 you were in

16  the 1M Stationery Store, correct?

17  A.   Yes.

18  Q.   You were making a delivery there?

19  A.   Yes.

20  Q.   And you said you saw -- again, obviously you have described

21  it in great detail, but there were three men standing in the

22  store, correct?

23  A.   Yes.

24  Q.   And that was three black men in addition to Fahd and

25  another man that worked there that you knew, correct?

1   A.  Yes.

2   Q.  And you described the men as short and just a little taller

3   than you, right?

4   A.  Yeah.

5   Q.  You have -- today is not the first time that you're talking

6   about this incident, correct?

7   A.  Uh-huh, yes.

8   Q.  You met with police officers that same day?

9   A.  Not the same day.

10  Q.  When did you first meet with the police officers?

11  A.  You mean the detective or the police?  The police, they

12  came the same day, yes.

13  Q.  The police came the same day?

14  A.  I'm sorry.  I thought you meant the --

15          THE COURT:  Whoa, whoa.

16  A.  Yes, the police come after the robbery in like 10 or 15

17  minutes.

18  Q.  And then about three days later on December 15th you spoke

19  to a detective, correct?

20  A.  Yes.

21  Q.  And then about two weeks after the robbery you spoke to a

22  detective again?

23  A.  Yeah.

24  Q.  And then much closer in time to now in January of this year

25  you spoke to the prosecutors, correct?

1    A.  Yes.  I come to come to St. Andrew's Plaza.

2    Q.  And you met with the --

3           THE COURT:  Mr. Althomory, if she's asking a question

4    you have to let her finish.

5           THE WITNESS:  I'm sorry.

6           THE COURT:  Because if you are both talking at the

7    same time it is very hard on the court reporter.

8    BY MS. FONTIER:

9    Q.  You met with the two attorneys that are here, Ms. Lester

10   and Ms. Masella, correct?

11   A.  Yes.

12   Q.  When you talked to them you talked about this incident that

13   occurred on December 12th, right?

14   A.  Yes.

15   Q.  And were you asked to describe -- you were asked to

16   describe the men that were in the store, the three black men,

17   correct?

18   A.  Uh-huh.  Yes.

19   Q.  And when you described them you describe one as being about

20   5'4" or 5'5", is that right?

21   A.  5'5" or 5'6".

22

23   Q.  And one was three to four inches taller than that?

24   A.  I'm sorry?

25   Q.  The other one was about three to four inches taller than

1   that man, so 5'4" to 5'5", so 5'7", 5'8"?

2   A.  The other guy was taller, yeah, like about 6'.

3   Q.  And the other one was -- and then one guy was the similar

4   size to the first, is that correct?

5   A.  Yes.

6   Q.  So, two people about just slightly taller than you and one

7   a little bit taller than that?

8   A.  Yes.

9   Q.  And that was, again, you saw them in the store, they were

10  standing there reading papers, correct?

11  A.  Yes.

12  Q.  I'm going to assume that at that point they were not

13  wearing masks?

14  A.  At the same time, no.  When I saw them in the store.

15  Q.  When you saw them in the store you could see the people in

16  the store, you could see their faces?

17  A.  I remember a little bit about them.  I didn't pay attention

18  a lot to them because I don't know if they're going to follow

19  me or do something to me, so I just take a look one time but I

20  still have a little bit memory about them.

21  Q.  Just answer me yes or no.

22  A.  Yes.

23  Q.  The lights were on in the store, correct?

24  A.  I'm sorry?

25  Q.  The lights were on in the store?

D375dor6                          Althomory - cross

1   A.  Yes.

2   Q.  It was 3:00 p.m. during the day, correct?

3   A.  Yes.

4   Q.  So you could see the men in the store, right?

5   A.  Yes.

6   Q.  And you were -- we have seen the inside of the store but it

7   is not a very large store, correct?

8   A.  Yes.  It is a big store.  It is not --

9   Q.  But they were by the counter near you?

10  A.  Not behind the counter, in front of the counter, from our

11  side.

12  Q.  You were on the same side of the counter as them?

13  A.  Yes.

14  Q.  And they were in the store with you?

15  A.  They was with this guy from before.  I just come inside the

16  store and they there.

17  Q.  So you could see what they looked like though?

18  A.  Yes.

19  Q.  And at some point -- sorry.

20      On December 24th when you met with the detective about this

21  case they asked you to look at photographs?

22  A.  Yes.

23  Q.  And they asked you to look at photographs to see if you

24  could identify anyone, correct?

25  A.  Yes.

D375dor6                              Althomory - cross

1    Q.  And you did that, right?

2    A.  I did.

3    Q.  And you did not identify anyone, correct?

4    A.  I choose two.

5    Q.  You chose two people from that?

6    A.  Yes.

7    Q.  From the photo array?

8    A.  Yes.

9    Q.  So -- and that was December 24th when you did that?

10   A.  I don't remember the date.

11   Q.  But when you spoke -- was there -- did you look at photos

12   on more than one occasion?

13   A.  One time they give me the photos and I choose two, the

14   Detective Phil E. Man, he gave me the --

15   Q.  Is it possible it is Detective Flemming, Flemming?

16   A.  I don't know how to spell his name.

17   Q.  But does that sound about write, Detective Flemming?

18   A.  He is outside, yeah.

19   Q.  Okay.  So, the detective that is here?

20   A.  Yeah.

21   Q.  He gave you photos?

22   A.  Yeah, and I choose the guy.  I remember I saw them over

23   there in that store.

24   Q.  So you chose two people out of those photos that you saw in

25   the store?

1   A.  Yes.

2   Q.  Okay.

3       Now, sir, I just want to go back to the first time you met

4   with the detectives which was, I believe, December 15th, about

5   three days after the robbery?

6   A.  Three days after, yes.

7   Q.  You were getting asked about this incident, right?

8   A.  I'm sorry?

9   Q.  You were asked about this robbery that occurred, to

10  describe it?

11  A.  Yes.  I told him everything.

12  Q.  And you were asked to describe the people that actually

13  robbed you in the street, correct?

14  A.  Yes.

15  Q.  And obviously one came from behind so you couldn't see much

16  about him but the person in front you you were able to

17  describe, right?

18  A.  Yes.

19  Q.  You were able to see what he was wearing?

20  A.  It was like black jacket or black sweater, so I --

21  Q.  And you said today that he was wearing black gloves, right?

22  A.  Yes.

23  Q.  And those were half gloves, right?

24  A.  Yes.

25  Q.  So you could see his finger?

D375dor6                          Althomory – cross

1    A.  Yes.

2    Q.  I'm showing you what is Government Exhibit 74; can you see

3    from there?

4    A.  Yes.

5    Q.  This is one pair of gloves, right?

6    A.  Uh-huh.

7    Q.  Is it fair to say that you cannot see somebody's fingers

8    through these gloves?

9    A.  No.  I don't see them.

10   Q.  This is not a half glove, right?

11   A.  That is not a half.

12   Q.  Okay.

13       And this other glove here also, this is not a half glove?

14   Do you see my fingers?

15   A.  That one is the same.

16   Q.  Same?

17   A.  I don't see nothing.

18   Q.  Okay.

19       So, the person that was facing you was not wearing these

20   gloves, correct?

21   A.  I mean his finger black and the gloves was black.  I just,

22   you know, see a little bit of his nails.

23   Q.  But you could see his fingers?

24   A.  Yes.

25   Q.  He had half gloves, correct?

1    A.  Yes.

2             MS. FONTIER:  Your Honor, I have no further questions.

3             THE COURT:  All right.  Mr. Roth or Mr. Murphy?

4             MR. ROTH:  Just briefly.

5    CROSS EXAMINATION

6    BY MR. ROTH:

7    Q.  Good afternoon, sir.

8    A.  Good afternoon.

9    Q.  If I talk too fast let me know, and I will rephrase the

10   question if you don't understand.

11   A.  Okay.

12   Q.  I just want to go over with you in respect to the robbers

13   who robbed you out in the street that day, okay?  You said that

14   one gentleman was about to your height, is that fair to say?

15   A.  I'm sorry?

16   Q.  Was one of the robbers about your height?  The ones in the

17   street when the guys grabbed you?

18   A.  Oh yeah.  The actual guy from my behind, yeah.

19   Q.  When you say -- tall is what we call a relative term,

20   right, meaning to some people tall may be this high, some it

21   may be this high, some may be this high tall, right?

22   A.  Yeah.  I say him higher than me a lot.

23   Q.  But you're 5'3", right?

24   A.  Me, 5'3".

25   Q.  So, five inches or six inches is a lot taller than you,

1   right?

2   A.  He is from 5'8" to 6'.

3   Q.  From 5' what?

4   A.  5'8" to 6'.

5   Q.  Five -- I'm sorry?

6   A.  Closer to 6'.

7   Q.  You say around 6' feet?

8   A.  Yes.

9   Q.  Sir, did there come a time after this incident when a

10  detective met you at your store and escorted you on your

11  delivery route, meaning traveling with you, followed you on

12  your delivery route from your store?

13  A.  Yes.

14          After four days, that guy, he placed another order and

15  he never do that, the same way.

16  Q.  Just take it -- try to stay with me on the questions.

17      Did there come a time after the robbery, around four days

18  after the robbery --

19  A.  Yes.

20  Q.  -- in December, that the detectives came to your store and

21  escorted you to, in the course of you making deliveries to this

22  particular store?

23  A.  Yes.

24  Q.  The 1M Stationery Store?

25  A.  Yes.

D375dor6                        Althomory - cross

1   Q.  And they followed you while he made the delivery and then

2   after you left, is that right?

3   A.  Yes.

4   Q.  And all they saw was and all you did that day was they

5   followed you and you made a delivery and then you left, is that

6   right?

7   A.  Yeah, but that day the guy made -- he place another order.

8   He never do that, ask for two orders in one week but that

9   day --

10              MR. ROTH:  I ask it be stricken as nonresponsive.

11              THE COURT:  Just answer the question.

12              Sustained.  I will strike that.

13   BY MR. ROTH:

14   Q.  You weren't robbed that day after you made that delivery,

15   is that right?

16   A.  No.

17              MR. ROTH:  I have no further questions.

18              THE COURT:  Any redirect?

19              MS. LESTER:  No, your Honor.

20              THE COURT:  Okay, Mr. Althomory.  Thank you.  You are

21   free to go.

22              THE WITNESS:  Thank you.

23              THE COURT:  We appreciate your coming.

24              THE WITNESS:  I have to take my cup with me.

25              THE COURT:  You can take it with you.

D375dor6                              Althomory - cross

1          THE WITNESS:  I'm sorry so much.  I'm sorry about the

2   words.

3          THE COURT:  That's okay.

4          Government, your next witness.

5          MS. LESTER:  Your Honor, the government calls Ahmed

6   Muswara.

7    AHMED MUSWARA,

8        called as a witness by the Government,

9        having been duly sworn, testified as follows:

10          THE COURT:  Could you state your name and spell your

11   name?

12          THE WITNESS:  My name is Ahmed Muswara.  A-H-M-E-D is

13   the first name, last name is M-U-S-W-A-R-A.

14          THE COURT:  Mr. Muswara, good afternoon.  Keep your

15   voice up, don't talk too fast, keep your voice nice and loud so

16   everyone can here thank you.

17          Ms. Lester?

18          MS. LESTER:  Your Honor, thank you.

19   DIRECT EXAMINATION

20   BY MS. LESTER:

21   Q.  Good afternoon.

22   A.  Good afternoon.

23   Q.  In 2011 where were you working?

24   A.  Vision Phone Cards.

25   Q.  What kind of company is that?

1    A.   It distributes phone cards, the calling card like

2    international rebate card like phone cards where you call a

3    different country like they had like to and rebate.

4    Q.   Telephone calling cards?

5    A.   Telephone calling cards, yeah.

6    Q.   That you can use to make long distance calls?

7    A.   International calls.

8    Q.   International, okay.

9         Where is the Vision Phone Card office located?

10   A.   It is in the Bronx by Allerton and Wallace.   Allerton

11   Avenue and Wallace.

12   Q.   And what type of customers did Vision Phone Card have?

13   A.   Like mostly grocery stores, deli and stuff.   Like grocery

14   stores.   And also like small wholesalers.

15   Q.   Small wholesalers?

16   A.   Wholesalers, yeah.

17   Q.   And, is calling cards the only thing that Vision Phone

18   Cards sells?

19   A.   Yeah.

20   Q.   What did you do when you were working for Vision Phone

21   Cards?

22   A.   Deliveries.

23   Q.   And where would you go on those deliveries on a typical

24   day?

25   A.   Like, around, in the Bronx.

1    Q.  What types of stores would you go to?

2    A.  Like the 99 cent store, grocery stores, and that's

3    basically it.

4    Q.  What did you do when you got to a particular store?

5    A.  I usually, like, find a parking lot, I park, and then I

6    have to get out, give the order to the customer, collect money,

7    and then leave.

8    Q.  And so would you collect -- what form was the money in that

9    you would collect, cash or check?

10   A.  Mostly for small stores, cash.

11   Q.  What would you do with the cash once you got it from a

12   delivery?

13   A.  Like I put it in a place, like I collect it in a bag and

14   that's it.

15   Q.  And if you were making more than one delivery, what would

16   you do with the cash in between those deliveries?

17   A.  Put it like in a small brown bag.

18   Q.  Would you take the bag with you or would you leave it in

19   the car?

20   A.  I take it, like, if I park next to the store I usually

21   leave it in the car; I lock the car and then run.  If it is

22   far, I take it with me.

23   Q.  What type of car did you use to make the deliveries?

24   A.  It's a Honda.  Honda Civic.  Car you said, right?

25   Q.  Yes, car.

D375dor6                              Muswara - direct

1      Did the car have any markings on it for your company or was

2    it just a regular car?

3    A.  No.  It is a regular car.

4    Q.  Now, did there come a time when you were robbed while you

5    were working for Vision Phone Card?

6    A.  No.  That was the first -- first time.

7    Q.  So, were you a victim of a robbery?

8    A.  Yes.

9    Q.  Do you remember approximately when that took place?

10   A.  It took place around the office, the place where I work.

11   Q.  I'm sorry, what was the date you said it took place you

12   thought?

13   A.  The date or the place?

14   Q.  Oh.  I asked the date first.

15   A.  Oh, the date.

16   Q.  Yes.

17   A.  It was Wednesday, 2011.

18   Q.  Do you remember what month?

19   A.  It was October -- October, I think.  October.

20   Q.  And where did it take place?

21   A.  In -- near to the office which is Wallace -- by Wallace and

22   Allerton.

23   Q.  And what time of day, approximately, was it that you were

24   robbed?

25   A.  I believe, but I'm not sure was Wednesday.

1    Q.  No.  I'm sorry.

2        You think it was Wednesday, that day of the week?

3    A.  Yeah.

4    Q.  But you don't remember the exact date?

5    A.  No.

6    Q.  Okay.  That's fine, sir.

7        What my question is now, do you remember what time of day

8    it was?  Was it morning or afternoon?

9    A.  It was like afternoon, like around like 12:00.

10   Q.  What happened that day when the robbery took place?

11   A.  Okay.  What happened like was like, you know, I take the

12   deliveries and the last store was M stationery was my last stop

13   and then, you know, as I usually do like drop the order and

14   then wait for the money to collect and usually, if the customer

15   does not -- doesn't want to pay, I usually call the office and

16   let them know.  So, if they tell me I have to collect, I have

17   to wait.  If they tell me to leave, I leave.  And they told me

18   I have to wait so I waited for the money and it took like a

19   while, like about like 30 minutes.

20   Q.  Okay.  Let me stop you there for a moment.

21       Could you take a look at what's in front of you there on

22   the ledge, the white document, the white piece of poster board

23   there, the poster board piece that is marked Government Exhibit

24   1.  Do you see that with the yellow sticker?

25   A.  The yellow?  This one?

 1                THE COURT:  No.  The other one, no. 1.

 2                THE WITNESS:  Okay.

 3   Q.  Do you see that picture in front of you?

 4   A.  Yeah.

 5   Q.  Do you recognize that person?

 6   A.  Yep.

 7   Q.  Who is that?

 8   A.  That's the owner for the M Stationery.

 9   Q.  Do you know his name?

10   A.  Fahd.

11   Q.  Fahd?  Is that how you knew him?

12   A.  Yeah, by that name.

13   Q.  And looking at the other photo there in front of you, what

14   is that?

15   A.  That's the store.

16   Q.  Can we put up Government Exhibit 1 for a moment, Ms. Brady?

17       So, this is the American you knew as Fahd?

18   A.  Yeah.

19   Q.  And Government Exhibit 40, please, Ms. Brady?  This is the

20   store?

21   A.  Yeah.

22   Q.  Do you know what road this store is on?

23   A.  White Plains.  White Plains Road.

24   Q.  And is this the store you just mentioned a moment ago that

25   you made a delivery at?

1   A.  Yeah.  That was it.

2   Q.  So I think you were saying, sir, that you were waiting to

3   be paid?

4   A.  Yeah.

5   Q.  Do you remember how much you were going to be paid that

6   day?

7   A.  I don't know what it was for that delivery.  I don't know.

8   I forgot.

9   Q.  Can you estimate?  Do you have any memory?

10  A.  $500.  Around like $500, $600.

11  Q.  And so, did you say you called your office when you were

12  waiting?

13  A.  Yeah.  I tell them like he didn't have money to pay and

14  they said don't leave until you get paid at least half of it

15  or, you know, part of that order.

16  Q.  And, did you wait?

17  A.  Yeah.

18  Q.  Did you eventually get paid?

19  A.  Yes.

20  Q.  What did you do next?

21  A.  He paid me and then he told me to wait, he wants to give me

22  a return -- like phone cards to return, he said they're not

23  selling, so that took a while too.

24  Q.  How long would you estimate you were in the store waiting

25  to be paid first and then for Fahd to give you back some phone

1    cards?

2    A.   The whole -- the whole time?

3    Q.   Yeah.

4    A.   Like 30 minutes.

5    Q.   Was that unusual?

6    A.   Yeah.  I would say so.

7             No, it is usual, but like when he gave me the return

8    is like unusual because usually he should have them ready if it

9    is not selling.  If the phone card is not selling he should

10   have them ready before and, you know?

11   Q.   So, was that out of the ordinary, then, that he wouldn't

12   have phone cards ready for you?

13   A.   Like, I don't know.  It happens with other stores but for

14   him, yeah, it was like that's the first time.

15   Q.   Now, what happened after you got the money and got the

16   phone cards from Fahd?

17   A.   I left.

18   Q.   Where did you go?

19   A.   Directly to the office because it was closed.  I took like

20   Allerton Street and then I parked the car from there and they

21   hit me and I don't know.  Like I wake up after.

22        (Continued on next page)

23

24

25

BY MS. LESTER:

Q.  Okay.  Let's take it one step at a time.  So you parked
your car?

A.  Right.

Q.  What street did you park on?

A.  On Wallace.

Q.  Were you within sight of the Vision Phone Card building at
that point?

A.  No.  It's --

Q.  It's around the corner, you said?

A.  Well, it's like, around.

Q.  What did you do after you parked the car?

A.  I get out with a bag in my hand.

Q.  And what money did that bag contain?

A.  Cash.  Cash and the phone cards.

Q.  How many other deliveries had you made that day besides
Fahd's store?

A.  I'd say like four, altogether, like five, four.

Q.  Do you remember approximately how much money you had in the
bag?

A.  Four -- three to four thousand, around there.

Q.  And you said you also had some phone cards?

A.  Mm-hmm.

Q.  Do you remember approximately how many phone cards you had
in the bag?

1   A.  No.  He gave me, I put them in the bag, and I left.  I

2   didn't count the cards.

3   Q.  And when you say he, who do you mean?

4   A.  The owner.

5   Q.  Fahd?

6   A.  Yeah, Fahd.

7   Q.  Now, after you got out of the car with the bag, what's the

8   next thing you remember happening?

9   A.  I was hit.  That's it.  They came from the back.  I didn't

10  know.

11  Q.  Now, you said they.  Do you know whether it was more than

12  one person?

13  A.  I would say two.  I believe two.

14  Q.  Where were you hit?

15  A.  In the back.

16  Q.  In the back of your head, in the neck?

17  A.  Yeah, like, I had -- they hit me and then, you know, I was

18  like unconscious, yeah.

19  Q.  So you lost consciousness?

20  A.  Yeah.  I did.

21  Q.  Did you fall?

22  A.  Yeah, I fell down.

23  Q.  What's the next thing you remember happening?

24  A.  Somebody took me to the office.  They, they said they saw

25  me walking, and I didn't know.

D37Wdor7                          Muswara - direct

 1          MR. MURPHY:  Objection, your Honor.

 2          THE COURT:  I don't think it's being offered for the

 3   truth.

 4          But someone helped you to the office?

 5          THE WITNESS:  Yeah.

 6          THE COURT:  Next question.

 7   BY MS. LESTER:

 8   Q.  What happened when you got to the office?

 9   A.  They just, they called the ambulance, and that's it.

10   Q.  Were you injured?

11   A.  Yeah.

12   Q.  What had happened to you?

13   A.  I had fracture in my, in my cheek and also in my nose was

14   broken.

15   Q.  Did you go to the hospital?

16   A.  Yes.

17   Q.  How long did you have to stay in the hospital?

18   A.  Like three, like two, two, to like midnight.

19   Q.  Were you discharged that same day; you went home?

20   A.  Yeah.

21   Q.  Or you stayed overnight?

22   A.  No.  I was discharged, but I have to come back for the

23   surgery.

24   Q.  So you had to have surgery?

25   A.  Yeah, like -- yeah.

1    Q.  Do you still work for Vision Phone Card?

2    A.  No.

3    Q.  Why did you leave that company?

4    A.  I felt it was not safe, so, I wasn't --

5            MS. LESTER:  May I have a moment, your Honor.

6            THE COURT:  Yes.

7            MS. LESTER:  No further questions.

8            THE COURT:  All right.  Cross-examination?

9            MS. STAFFORD:  No questions, your Honor.

10           THE COURT:  Mr. Roth?

11           MR. ROTH:  No questions, your Honor.

12           THE COURT:  Thank you very much, Mr. Muswara.  You can

13   step down.

14           (Witness excused)

15           THE COURT:  Next witness.

16           MS. LESTER:  Yes, your Honor.  The government calls

17   Mubarak Tawfiq.

18    MUBARAK I. TAWFIQ,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21           THE COURT:  You may proceed, Ms. Lester.

22           MS. LESTER:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MS. LESTER:

25   Q.  Good afternoon.

```
 1   A.  Good afternoon.

 2   Q.  Where do you currently work?

 3   A.  Vision Phone Card.

 4   Q.  And where is Vision Phone Card located?

 5   A.  In the Bronx, New York.

 6   Q.  What type of company is it?

 7   A.  We sell phone card, calling cards.

 8   Q.  And how long have you worked there?

 9   A.  Almost two years and a half.

10   Q.  What do you do in your employment there?

11   A.  Delivery guy.

12   Q.  Do you use a vehicle to make deliveries?

13   A.  Yes, ma'am.

14   Q.  What type of vehicle?

15   A.  It's a 2010 Honda Civic.

16   Q.  And what do you do once you make the deliveries?  Do you

17   get paid by the people you're delivering to?

18   A.  Yes, ma'am.

19   Q.  How do you usually get paid?

20   A.  Okay.  I give them the merchandise, and they give me cash.

21   Q.  What do you do with the cash in between deliveries?

22   A.  Well, I stash them in the car.  When I finish all my

23   deliveries, I take the money back to the office.

24   Q.  Do you generally make deliveries by yourself or with

25   another person?
```

D37Wdor7                          Tawfiq - direct

1   A.  Sometimes by myself.  Sometimes with another person.

2   Q.  And what types of stores do you make deliveries to,

3   generally?

4   A.  Well, all kind of stores.  Gas stations, grocery stores and

5   some wholesalers, too.

6   Q.  Where are those stores generally located?

7   A.  It's all over the city.  We do some in Manhattan, Bronx,

8   Brooklyn, you know.

9   Q.  During the time that you have been employed by Vision Phone

10  Card, have you ever been the victim of a robbery?

11  A.  No.

12  Q.  You've never had a robbery take place while you've been

13  working for them?

14  A.  No.  It's only with them that I've been robbed before.

15  Q.  So have you been a victim of a robbery?

16  A.  No.

17  Q.  Ever?

18  A.  Never.

19  Q.  But as an employee of Vision Phone Card, have you?

20  A.  Yes, ma'am.

21  Q.  Okay.  And do you remember when that robbery took place?

22  A.  I don't remember the exact date.

23  Q.  Do you remember approximately when it was?

24  A.  No.  Nah.  I'm not sure.

25  Q.  Do you remember what year it was?

D37Wdor7                        Tawfiq - direct

1    A.  Nah.  I don't remember.  It's, sort of -- no, I don't

2    remember.  I just forget.  But it's almost --

3    Q.  Okay.  Well, we're in 2013 now, right?

4    A.  Yes, ma'am.

5    Q.  Was it last year, 2012?

6    A.  Yeah, I think so.  Somewhere between '11 and '12, yeah.

7    I'm not sure.

8    Q.  You're not sure if it was 2011?

9    A.  End of '11 or somewhere '12, yeah.

10   Q.  Can you tell me what happened on the day of the robbery?

11   Where were you?  What were you doing?  Were you working?

12   A.  Yes, ma'am.  I was working.  I came from the office and

13   then I stopped by three customers, so I was in the fourth

14   store.  It's a supermarket, down by Webster and Bedford Park.

15   So they do have a small parking lot inside the supermarket.  So

16   I just drove in, parked my car, and then my guy -- we were two

17   guys in the car.  He went in with a delivery to see the

18   customer.  So when he came out, when he stepped out, I just

19   locked my car.  So when he came back to the car, as soon as he

20   opened his driver's side door, one guy did jump inside the car.

21   Q.  Okay.  Let's stop right there.

22   A.  Okay.

23   Q.  So you were with a coworker, is that right?

24   A.  Yes, ma'am.

25   Q.  And you were in the car you described, the Honda Civic?

D37Wdor7                    Tawfiq - direct

1    A.  Yes, ma'am.

2    Q.  Did you say you went to the supermarket?

3    A.  Yes, ma'am.

4    Q.  Where was the supermarket located?

5    A.  It's Bedford and Webster.

6    Q.  Do you remember what time of day it was, approximately,

7    that you went to the supermarket?

8    A.  Well, it was somewhere between 11 and 12:00, yeah.

9    Q.  Was this a regular customer of yours that you went to?

10   A.  Yes, ma'am.

11   Q.  You'd been there before?

12   A.  Yes, ma'am.

13   Q.  Okay.  What happened when you arrived in the parking lot?

14   A.  Well, nothing happened.  I just parked my car and my guy

15   just left.

16   Q.  So your coworker got out of the car?

17   A.  Mm-hmm.

18   Q.  Did he take anything with him?

19   A.  Just the merchandise, and he went inside the supermarket.

20   Q.  So you remained in the car?

21   A.  Yes, ma'am, with the money, with the other deliveries'

22   money.

23   Q.  How much money did you have with you, do you remember?

24   A.  I don't know.  I don't remember.  But it's like three

25   deliveries, you know.  I just collect the money and put them in

D37Wdor7                          Tawfiq - direct

1   one bag.

2   Q.  Can you give an approximation, an estimation of how much

3   money it was?

4   A.  Nah, nah, nah.  I can't.

5   Q.  Do you think it was more than a hundred dollars?

6   A.  Yeah.  It was more than a hundred dollars.  More than a

7   thousand dollars, anyway.  But I don't know the exact figure.

8   Q.  But more than a thousand dollars?

9   A.  Yes, ma'am.

10  Q.  What type of container did you have the money in?

11  A.  Just a regular plastic bag, the black ones.

12  Q.  And where was that bag in the car?

13  A.  It was right in front of the driver's side seat.

14  Q.  Right in front of your seat?

15  A.  No.  The driver -- no.  The passenger's side.  Sorry.

16  Q.  Down by the floor?

17  A.  Yes, by the floor.

18  Q.  And did your coworker come out of the grocery store?

19  A.  Yes, he came back.

20  Q.  What happened next?

21  A.  As soon as he came back, he opened his door, the guy just

22  pushed him and jumped in the car and grabbed the black bag.

23  Q.  What guy?

24  A.  The thief, a young black guy.

25  Q.  Okay.  So you saw someone who pushed your coworker into the

1  car?

2  A.  Mm-hmm.

3  Q.  What did he do?

4  A.  He grabbed the black bag, the plastic bag.

5  Q.  The bag that had the money in it?

6  A.  Yes, ma'am.

7  Q.  What did that person look like?

8  A.  I'm not good at description.  Yeah, he got a hoody on.

9  What happened is, went in, grabbed the bag, and then I grabbed

10  him by the hoody.  So I was shouting outside, Thief, thief,

11  thief, and, Help, come over.  Nobody said nothing.  But, so I

12  end up hitting him in the eye several times, so he left the bag

13  and then ran away.

14  Q.  Can you give any description for him?  I think you said he

15  was young.

16  A.  Yeah, he was young.  Probably, you know, like me,

17  fair-colored, and a little bit, weigh around 160, 170 pounds,

18  five nine, ten.

19  Q.  And his skin color, compared to yours?

20  A.  Yeah, a little bit lighter than me.

21  Q.  A little bit lighter?

22  A.  Yeah.

23  Q.  You said he was wearing a hoody.  Do you remember anything

24  else?

25  A.  No.  That's all.  Just a red hoody.  That's all.

1    Q.   Did he say anything to you?

2    A.   No.  He was just saying, Leave the bag, leave the bag,

3    telling me to leave the bag.

4    Q.   So you struggled with him?

5    A.   Yeah, I struggled with him.

6    Q.   What happened next?

7    A.   Well, I start, I started hitting him in the eye.  He just

8    left the bag and ran away.  And there was a black Mercedes-Benz

9    outside, so he just jumped in with another guy because there

10   was two guys, him and another Spanish guy.  It's a white guy,

11   very skinny.  He was just standing next to him.  So when I

12   started hitting him, they both ran away.

13   Q.   So the Spanish guy that you're describing, he was outside

14   the car?

15   A.   Yeah, he was outside the car, standing next to the door.

16   Yeah.

17   Q.   Where was your coworker as this was happening?

18   A.   He was just inside.  He was just young guy.  He was like

19   this in the car, even after I hit him.  I went outside the car,

20   but he was just like this.  He was just scared, in the car.

21   Q.   So you're indicating that he was hunched over?

22   A.   Absolutely.  He was hunched over.

23   Q.   Was he hiding his face?

24   A.   Yeah.  He was hiding his face.

25   Q.   So you said that you saw a Spanish-looking guy?

1    A.  Yeah.

2    Q.  Standing outside the car?

3    A.  Mm-hmm.

4    Q.  Was that during the period when you were struggling?

5    A.  Yeah.  During the period.

6    Q.  Okay.

7    A.  Mm-hmm.  I didn't even know they were together until, when,

8    after hitting him, when they went outside, they both ran to the

9    Mercedes-Benz.  Then I knew he was with him.

10   Q.  What direction did they run in?  Did they run toward the

11   street?

12   A.  Yes, main entrance.  There's one entrance.  You just come

13   through it and exit the same way.

14   Q.  What road would that be that they were running towards?

15   A.  Webster.

16   Q.  Where was this Mercedes-Benz that you saw?

17   A.  When?

18   Q.  Where was the Mercedes-Benz that you saw?

19   A.  It was right on Webster Avenue, outside the parking lot.

20   Q.  And did you see it move?

21   A.  Yeah, I saw them getting inside and then bang the door, and

22   they just left.  At that time, I was on the phone with 911.

23   Q.  So you called the police?

24   A.  Yes, I called the police.

25        MS. LESTER:  May I have a moment, your Honor.

 1              THE COURT:  Yes.

 2              MS. LESTER:  No further questions.

 3              THE COURT:  All right.  Any cross?

 4              MR. ROTH:  Thank you.

 5     CROSS-EXAMINATION

 6     BY MR. ROTH:

 7     Q.  Good afternoon, sir.

 8     A.  Good afternoon, sir.

 9     Q.  If there's any question that I ask that you don't

10     understand or I speak too quickly, please ask me to rephrase it

11     and I will rephrase the question before you answer.  Okay?

12     A.  Okay.

13     Q.  Have you ever been robbed before?

14     A.  No.

15     Q.  This was the first time, is that fair to say?

16     A.  Yes.

17     Q.  Was it fairly traumatic, I mean, a significant event for

18     you?

19     A.  Yes.

20     Q.  You were very upset?

21     A.  Yeah.  Yes, I am.

22     Q.  And you were upset then as well, is that correct?

23     A.  Yeah, at the time of the incident.

24     Q.  It was a shock and a surprise, is that fair to say?

25     A.  Yeah, both, a shock and a surprise because it came from

D37Wdor7                          Tawfiq - cross

1  nowhere.  It just happened.

2  Q.  You were just going about your job, and, all of a sudden --

3  A.  Yeah.

4  Q.  -- somebody, two guys jumped, is that right?

5  A.  Absolutely.

6  Q.  When was the first time, sir, that you reported this

7  incident to the police?

8  A.  As soon as the thing happened.

9  Q.  The same day?

10  A.  The same day, right away, from the parking lot.

11  Q.  And they asked you several questions in regard to the

12  incident as to what happened, is that correct?

13  A.  Yes, sir.

14  Q.  And they asked you in great or as much detail, they asked

15  you to provide as much detail as possible about the facts and

16  circumstances of what happened when you were robbed that day,

17  is that correct?

18  A.  Yes, sir.

19  Q.  And did there come a subsequent time or a time after that

20  that you were interviewed by the detectives or police in

21  connection with this robbery?

22  A.  Yes.

23  Q.  When was that, sir?

24  A.  I don't know the exact date.  But they came down to my

25  office.

D37Wdor7                              Tawfiq - cross

1   Q.  Okay.  Was that like a month or two months after, or do you

2   recall?

3   A.  No.  Just couple of days.  From the day of the incident.

4   Q.  And did there come a time, finally, before you came into

5   this courtroom that you were prepared for your testimony today

6   by the U.S. Attorneys, the two prosecutors who are seated at

7   the table in front of you?

8   A.  Well, I would say I wasn't that prepared because I just had

9   a call last night around 8:00.  I wasn't expecting anything,

10  and I was told to just come down here today.

11  Q.  This is not the first time, is it, sir, that you've come

12  down to discuss this case?

13  A.  No.  This is not the first time.

14  Q.  Okay.

15  A.  Yeah.

16  Q.  So I'm referring, sir, to the first time that you came

17  downtown, if you will --

18  A.  Okay.

19  Q.  -- and you spoke to these prosecutors and that special

20  agent.

21  A.  Yes.

22  Q.  Do you recall that?

23  A.  Yes, I recall that.

24  Q.  And that was sometime in January of this year?

25  A.  Mm-hmm, yeah.

1    Q.  About a month and a half ago?

2    A.  Yeah.  That's right.

3    Q.  And that was in their office, is that right?

4    A.  Yes, sir.

5    Q.  It wasn't perhaps as nerve-racking as this situation, it

6    wasn't as much pressure as this situation, is that fair to say?

7    A.  No.  Just the two of us, me and her.  She just asked me a

8    couple of questions.

9    Q.  Well, it was the two of them and the agent who is seated

10   there as well, right?

11   A.  No.  It was her only.  I spoke with her.

12   Q.  Just Ms. Lester?

13   A.  Yes, sir.

14   Q.  And Ms. Lester asked you some questions and she was taking

15   notes of everything you were saying, is that right?

16   A.  Yeah.

17   Q.  And she asked you to be truthful and to tell everything

18   that you knew about the incident, is that correct?

19   A.  Yes, sir.

20   Q.  And you were truthful at that time, is that correct?

21   A.  Yes, sir.

22   Q.  She asked and you described to her the robbery, like you

23   just described it here today, is that correct?

24   A.  Yes.

25   Q.  Did you describe it, everything, exactly the same, more or

1    less, or -- did you describe it more or less the same as you

2    did to them that day?

3    A.   Not really, but I just, the color and the other stuff, you

4    know.  I'm not good with description, you know.  So it's just

5    the same thing as I did at that time.

6    Q.   But basically what happened.  You talked to them?

7    A.   Yeah.  Yeah, I spoke to her.

8    Q.   Isn't it a fact, sir, that today is the first time that you

9    told anybody who conducted an investigation of this case, your

10   robbery, that you saw the robbers get into a Mercedes-Benz?

11   A.   I don't get your question.

12   Q.   I'll ask it again.

13   A.   Yeah.

14   Q.   Isn't today the first day, as you sit here now, under oath,

15   isn't this the first time that you have told anybody -- police

16   officers who came to the scene or the U.S. Attorneys or anyone

17   else -- that you saw the people who robbed you get into a

18   Mercedes-Benz?  Get into the car?

19   A.   You mean isn't it the first time?

20   Q.   Yes, that you said that you saw the robbers get away in the

21   Mercedes-Benz.

22   A.   Yeah -- no, it's not the first time.

23   Q.   You've, that you personally saw that?

24   A.   Right.  I saw them.

25   Q.   Do you recall telling the U.S. Attorneys on February 13 of

1    this year, last month, that you didn't see them get in?

2    A.  I didn't see them getting in the car?

3    Q.  Yeah.

4    A.  Well, we spoke.  She did ask a lot of questions, but then

5    it's -- what I'm telling you based on seeing them is my story

6    from day one, up to now.

7    Q.  My question, sir, is --

8    A.  Yeah.

9    Q.  -- did you, do you recall telling the U.S. Attorneys less

10   than a month ago --

11   A.  Yeah.

12   Q.  -- that you did not see the robbers flee into a

13   Mercedes-Benz?

14   A.  I -- do I recall telling --

15   Q.  Do you remember, do you remember, do you remember telling

16   Ms. Lester, this U.S. Attorney here who you've pointed to --

17   A.  Yeah.

18   Q.  You came down and the only time you came down and talked to

19   her before you testified today --

20   A.  Yeah.

21   Q.  Telling her that you didn't see them, the robbers, flee in

22   the Mercedes-Benz?

23   A.  I don't -- I'm not sure, but I don't recall even talk -- we

24   did spoke, but I don't recall that part, if she did ask me.

25   But we did spoke about the incident.  But then my story, as I

1    was saying --

2    Q.  No, no.

3    A.  Yeah.

4    Q.  Is there anything that you think that would refresh your

5    recollection, the notes of that day's interview?

6    A.  Anything like --

7    Q.  That would help you remember whether or not you said that

8    you didn't see them get into, the robbers get into the

9    Mercedes?

10   A.  I saw them.  So I don't know what you're talking about.

11   Q.  My question, sir, is --

12   A.  Yeah.

13   Q.  -- if you saw notes of the interview you had with the U.S.

14   Attorney --

15   A.  Yeah.

16   Q.  -- just last month, is it possible that that would help

17   refresh your recollection of what you said that day to the U.S.

18   Attorneys about where the robbers fled and if they got into the

19   Mercedes?

20   A.  Well --

21   Q.  That's a yes or no.

22            THE COURT:  Yes or no.

23   BY MR. ROTH:

24   Q.  Would it help you if you saw this?

25   A.  Well, I didn't write any notes, so I don't know what notes

1    you're talking about.

2    Q.  I understand you didn't.  My question to you, sir, is --

3                MR. ROTH:  Judge, may I show the witness.

4                THE COURT:  No.

5    BY MR. ROTH:

6    Q.  If you saw the notes of the interview --

7    A.  I didn't saw any notes.  I just spoke to her verbally, so I

8    don't know what you're talking about.

9    Q.  I appreciate it.

10   A.  Yeah.

11   Q.  You said already, sir, that the U.S. Attorney was making

12   some notes as you were talking, is that fair to say?

13   A.  Well, yeah, everybody.  Not her, but the detective, they

14   were just writing something.  But I don't know what they're

15   writing.

16   Q.  I'm not talking about other times.  I'm talking about less

17   than a month ago when you were prepared for the trial,

18   Ms. Lester, the U.S. Attorney, was taking notes as you were

19   talking?

20   A.  Yeah, she was just writing something.  I don't know what

21   that is.

22   Q.  She was asking you questions?

23   A.  Yeah, yeah.

24   Q.  You were giving her answers?

25   A.  Yes.

1    Q.  And she was just writing something, right?

2    A.  Mm-hmm, yeah.

3    Q.  Now here's the question.

4    A.  Okay.

5    Q.  If you saw those notes, Ms. Lester's notes, taken that day,

6    would it help you remember what you told her that day about

7    whether or not you saw the people get into the Mercedes-Benz

8    and flee that day?

9    A.  Well, maybe.

10            MR. ROTH:  May I show the witness.

11            THE COURT:  No, you may not.  This is not refreshing.

12   Come on, Mr. Roth.  No.

13            MR. ROTH:  I have no further questions.

14            THE COURT:  Okay.

15            Ms. Stafford.

16            MS. STAFFORD:  No questions.  Thank you, your Honor.

17            THE COURT:  Any redirect?

18            MS. LESTER:  Yes.  Briefly, your Honor.

19   REDIRECT EXAMINATION

20   BY MS. LESTER:

21   Q.  Mr. Tawfiq, you said that you called 911 on the day of the

22   robbery, right after it happened, right?

23   A.  Yes, ma'am.

24   Q.  Did the police respond?

25   A.  Yeah, as soon as possible.

1   Q.  Did you speak to them, right then?

2   A.  Yeah, I spoke with, like, yeah, one cop was asking me some,

3   few questions.

4   Q.  Did you tell them what happened?

5   A.  Yeah.

6   Q.  Sitting here today, what's your memory of what you told

7   them about the Mercedes-Benz?

8   A.  Well, as I said, as my -- I saw the guys.  They ran away

9   from me, took off in the black Mercedes-Benz on Webster Avenue.

10  That's the thing I told them, and then after that, I went to

11  the police station again.  They did ask me a couple of

12  questions.  The same story.  And then they came to my office.

13  Again, they asked me a couple of questions.  The same story

14  again.  And then they came with a big picture album with a lot

15  of pictures in.  I spent like almost one to two hours, one,

16  two, to see whether the robber is in.  The robber, I couldn't

17  find, I couldn't see his face.

18          THE COURT:  All right.  So let's remember the

19  question.  What is your memory of what you told the officers

20  about the Mercedes-Benz?

21          THE WITNESS:  Well, I saw the armed robbers.

22          THE COURT:  What did you tell the officers?  Do you

23  remember what you told the officers?

24          THE WITNESS:  I told them the armed robbers, the armed

25  robbers, they went into a black Mercedes-Benz and left.

1          THE COURT:  Okay.

2          MS. LESTER:  No further questions.  Thank you.

3          MR. ROTH:  Nothing.

4          THE COURT:  Recross?

5          You may step down, Mr. Tawfiq.  You're free to go.

6          (Witness excused)

7          THE COURT:  Government, your next witness.

8          MS. MASELLA:  Yes, your Honor.  The government calls

9   Ayesha Winston.

10   AYESHA WINSTON,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13          THE COURT:  You may proceed.

14          MS. LESTER:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MS. MASELLA:

17   Q.  Good afternoon.

18   A.  Good afternoon.

19   Q.  How are you employed?

20   A.  By the Bureau of Alcohol, Tobacco, Firearms, and

21   Explosives.

22   Q.  That's sometimes referred to as the ATF?

23   A.  That's correct.

24   Q.  What is your title with the ATF?

25   A.  Special agent.

1    Q.  How long have you been a special agent with the ATF?

2    A.  It will be nine years in August.

3    Q.  What is your current assignment with the ATF?

4    A.  I'm assigned to group two.  We work out of Brooklyn, here

5    in New York.

6    Q.  What kinds of criminal cases or investigations is group two

7    involved with?

8    A.  Mostly violent crime.

9    Q.  I'm going to direct your attention now to January 19 of

10   2012.

11   A.  Yes.

12   Q.  Were you working on that day?

13   A.  Yes, I was.

14   Q.  What was your assignment on that day?

15   A.  That day, I was the, what we call the recorder, so I would

16   be the person to videotape the location after we made entry and

17   again after we left.

18   Q.  I just want to back up for a second.  You referred to

19   making entry and a location.

20   A.  Yes.

21   Q.  What were you going to do that day?

22   A.  The first, what we started out to do was execute a search

23   warrant for Mr. Barrett.

24   Q.  You said --

25   A.  I'm sorry.  An arrest warrant for Mr. Barrett.

D37Wdor7                          Winston - direct

1    Q.  So you had an arrest warrant for Mr. Barrett that day?

2    A.  Yes.

3    Q.  Do you recall what charges the arrest warrant was based on?

4    A.  I believe it's a Hobbs Act robbery.

5    Q.  Are you familiar with Mr. Barrett based on your work on

6    January 19?

7    A.  Yes.

8    Q.  Do you know his first name?

9    A.  Dwayne.

10   Q.  Would you recognize Dwayne Barrett if you saw him again?

11   A.  I would.

12   Q.  Do you see him today?

13          MR. ROTH:  We'll concede identification for this

14   limited purpose.

15          THE COURT:  That's fine.  You can still ask the

16   question.

17   BY MS. MASELLA:

18   Q.  Do you see him today, Special Agent Winston, in the

19   courtroom?

20   A.  I do.

21   Q.  Can you indicate where you see him and something that he's

22   wearing?

23   A.  He's sitting on the right-hand side of the courthouse, the

24   courtroom.  He's wearing a gray shirt and, a striped shirt and

25   a gray tie.

1           MS. MASELLA:  May the record reflect that the witness

2     has identified the defendant Dwayne Barrett.

3           THE COURT:  Yes.

4     BY MS. MASELLA:

5     Q.  You said that you were executing an arrest warrant that

6     day.  Were you working with other people in conducting that

7     arrest?

8     A.  Yes, I was.

9     Q.  Approximately how many other people were you working with?

10    A.  I think it's a total of seven of us.

11    Q.  And who did that include?

12    A.  My supervisor, Agent Mulham.  Would you like me to list

13    them?

14    Q.  If you recall, yes.

15    A.  Okay.  Agent Mulham, Agent Petrano, Agent Edmonds, Steve

16    Danini, who is also an agent, myself, and two marshals.

17    Q.  When you refer to marshals, what agency are you referring

18    to?

19    A.  U.S. Marshals.

20    Q.  Did there come a time on that day when the group that

21    you're referring to gathered together in order to begin work?

22    A.  Yes.

23    Q.  What time was that?

24    A.  Probably about 5:15, 5:30.

25    Q.  And what was the plan with respect to the arrest of

1    Mr. Barrett?

2    A.  We had, I believe, two addresses for Mr. Barrett.  We went

3    to the first address.  He was not there.  And we went to the

4    second address, and he was there.

5    Q.  And what was the second address that you went to?

6    A.  18 Hancock Avenue, in Yonkers.

7    Q.  I'm going to approach and show you what's been marked as

8    Government Exhibit 80 for identification.

9        Special Agent Winston, do you recognize Government Exhibit

10   80?

11   A.  I do.

12   Q.  And what is it?

13   A.  This is 18 Hancock Avenue, in Yonkers.

14   Q.  Is it a photograph of that location?

15   A.  Yes.

16   Q.  And is that a fair and accurate depiction of how that

17   location looked on the morning of January 19 --

18   A.  Yes.

19   Q.  -- 2012?

20   A.  Yes, it is.

21             MS. MASELLA:  The government offers Government Exhibit

22   80.

23             THE COURT:  Any objection?

24             MR. ROTH:  No objection.

25             MS. STAFFORD:  No, your Honor.

1            THE COURT:  Government Exhibit 80 is received.

2            (Government's Exhibit 80 received in evidence)

3            MS. MASELLA:  Thank you, your Honor.  Ms. Brady, can

4    we publish Government Exhibit 80.

5    Q.  When you first arrived at the location 18 Hancock Avenue,

6    which house depicted here are you referring to?

7    A.  It would be the house in the middle.

8            MS. MASELLA:  Thank you, Ms. Brady.

9    Q.  Approximately what time did you get to that address, 18

10   Hancock Avenue?

11   A.  A little after -- just before six or just about six.

12   Q.  Can you describe what your role was in connection with the

13   arrest?

14   A.  My responsibility was to document any evidence that was

15   found in the residence, if there was any.  And to write an ROI,

16   or report of investigation, about what was taken.

17   Q.  And what happened once you and the other ATF and the

18   Marshals Service arrived at that location on January 19?

19   A.  Whoever was in the front of the stack, I don't remember who

20   that was, would knock and announce, you know, Police, open the

21   door.  And we made entry into the apartment.

22   Q.  Did you go into the apartment at some point as well?

23   A.  Yes, I did.

24   Q.  Was Dwayne Barrett in the apartment?

25   A.  Yes, he was.

1    Q.  And was he arrested?

2    A.  Yes, he was.

3    Q.  Was there anyone else present in the apartment when the ATF

4    and the marshals arrived?

5    A.  Yes.  His girlfriend and their small child.

6    Q.  Do you remember his girlfriend's name?

7    A.  Yes.  Felicia Lake.

8    Q.  After Mr. Barrett was arrested, what happened next?

9    A.  The apartment, I believe, actually belonged to -- the

10   leaseholder was Mrs. Lake.  We asked her for permission to

11   search.  She gave us permission, and she signed a consent to

12   search, and we did.

13   Q.  Did you participate in the search of Dwayne Barrett's

14   apartment?

15   A.  Yes, I did.

16   Q.  Were you assisted by other people as well?

17   A.  Yes.

18   Q.  What, if anything, did you find during the search of that

19   residence, 18 Hancock Avenue?

20   A.  There were two phones.  $1,720 United States currency, a

21   notebook with some writing in it.  There was a car that was

22   involved, a rental car.  There were some car chargers that were

23   in there, an EZPass.  I think that's about it.

24   Q.  Agent Winston, I'm going to approach now and show you

25   what's been marked as Government Exhibits 82, 83, and 86.  Can

D37Wdor7                      Winston - direct

1   you just take a look through these items, take a moment, and

2   tell me when you're done.

3   A.   Item 12 is a Sprint Samsung phone.   Item 11 is also a

4   Sprint Samsung phone.

5        THE COURT:   Item 11, you said?

6   BY MS. MASELLA:

7   Q.   I'm sorry.   We're referring to the yellow Government

8   Exhibit stickers on the front.

9   A.   I'm sorry.   I'm going by the ATF labels.

10       So 82 and 83 are both Samsung phones.   And item 86 is the

11   $1,720 and my -- that's my handwriting.

12   Q.   Let's start with the money, and you just indicated that's

13   your handwriting.   Which part is your handwriting on that

14   packaging?

15   A.   The manila envelope that was inside the pink envelope, has

16   a U.S. Department of Justice, Bureau of Alcohol, Tobacco,

17   Firearms, and Explosives label on it, and my handwriting of the

18   amount of money on the back.

19   Q.   And who put the money into that envelope on the day of

20   Mr. Barrett's arrest?

21   A.   I did.

22   Q.   And what did you do with it after that?

23   A.   I held on to it until I got back to the office and it was

24   eventually entered into evidence.

25   Q.   When you say it was entered into evidence, is there

1    anything further that's done to label it with respect to

2    information after that?

3    A.  Yes.  You have to enter it into our, our computer system,

4    which is called Enforce.  You have -- someone has to count it

5    to verify that the amount is correct.  And I see that my

6    supervisor actually did that.  And then it's entered into the

7    vault.

8    Q.  Is the location that the item was found listed on the

9    label?

10   A.  Yes, it is.

11   Q.  What about the date?

12   A.  Yes.

13           MS. MASELLA:  Your Honor, the government offers

14   Government Exhibit 86.

15           THE COURT:  Okay.  No objection?

16           MR. ROTH:  I didn't hear -- I'm sorry -- how it got

17   here today from the vault.

18           THE COURT:  I don't think I did either.  So you're

19   objecting then?

20           MR. ROTH:  Yes.  That is an objection.

21           THE COURT:  All right.  Let's ask a couple of

22   questions?

23   BY MS. MASELLA:

24   Q.  Special Agent Winston, once an item is entered into the ATF

25   vault, what is the procedure with respect to putting it in or

1   taking it out of the vault after that?

2   A.   The agent has to go to their vault custodian and let them

3   know that they want this item to be taken out of the vault.

4   The vault custodian will then take it out of the vault and then

5   the agent has to sign that -- well, the vault custodian will

6   sign that they've released, taken the item out of the vault,

7   and then the agent has to sign also.

8   Q.   And on the envelope for the item you're talking about,

9   Government Exhibit 86, is there any indication as to when this

10   item was put in or taken out of the vault?

11   A.   Yes.   It was taken out --

12            MR. ROTH:   Objection, your Honor.

13            THE COURT:   All right.   Leading?   What are you

14   objecting to?

15            MR. ROTH:   I don't know, other than her reading from

16   the document, where we're going.

17            THE COURT:   Is there any indication?   She can answer.

18            Go ahead.   You can answer the question.

19            THE WITNESS:   Could you repeat the question?

20   BY MS. MASELLA:

21   Q.   On the pink envelope Government Exhibit 86 was contained

22   inside of, is there any indication as to when this item was put

23   in or taken out of the vault?

24   A.   Yes, to both.   There's an indication of when it went in and

25   when it came back out.

1    Q.  When did it come out?

2              THE COURT:  Now it's a hearsay objection?

3              MR. ROTH:  Yes.

4              THE COURT:  Did you put it in or did you take it out

5    yourself?

6              THE WITNESS:  I did not.

7              THE COURT:  How did this get here today, do you know?

8              THE WITNESS:  Normal course of business is the agent

9    whose case it is would sign it out from the vault.

10              MR. ROTH:  Objection, your Honor.

11              THE COURT:  Overruled.  She can answer.

12    BY MS. MASELLA:

13    Q.  Do you recognize the handwriting on the signature for the

14    time when it was taken out of the vault?

15    A.  Yes.

16    Q.  Are you familiar with that handwriting?

17    A.  Looks like it's the case agent's handwriting.

18    Q.  How are you familiar with the handwriting?

19    A.  We've worked together in the past.  I've seen his initials.

20              MS. MASELLA:  Your Honor, we would offer Government

21    Exhibit 86.

22              THE COURT:  Do you recognize this?

23              THE WITNESS:  Yes.  This looks like --

24              THE COURT:  No, no.  Are you able to recognize it, the

25    exhibit, the money?

1          THE WITNESS:  Yes, absolutely.

2          THE COURT:  How are you able to recognize it as far as

3     any other cash?

4          THE WITNESS:  Let me rephrase that.  I recognize it as

5     being the amount that I took into evidence that day.  I

6     recognize the envelope because it has my signature on it.  Now,

7     I can't say that these are, in fact, the exact bills that, you

8     know -- I didn't write down the serial numbers and catalog it

9     that way, but it was $1,720 and I believe this is $1,720.

10          THE COURT:  All right.  Mr. Roth, you'll call some

11     other agents next.

12          MS. MASELLA:  That's fine, your Honor.

13     Q.  Special Agent Winston, I wanted to turn your attention now

14     to Government Exhibits 82 and 83.  Do you recognize those two

15     items?

16     A.  Yes.

17          THE COURT:  82 and 83?

18          MS. MASELLA:  Yes.

19     A.  Yes.

20     Q.  I just want to remind --

21          THE COURT:  She already testified that she recognized

22     those.  They're in.

23          MS. MASELLA:  Okay.  They were subject to connection.

24          THE COURT:  Right.

25          MS. MASELLA:  I was just drawing the connection.

1          THE COURT:  Okay.  Do you recognize them?  Where did

2     you see these?  Did you recover these during the search?

3          THE WITNESS:  Yes, there was one that was in the back

4     room and there was one that was in the bedroom.

5          THE COURT:  I think this is enough.  Go ahead.

6          MS. MASELLA:  That's fine, your Honor.

7     Q.  Special Agent Winston, turning back to the cash for a

8     moment, the $1,720, do you know where that was recovered from,

9     from within the residence that we're talking about?

10    A.  Yes, it was recovered from the bedroom where Mr. Barrett

11    was sleeping with Felicia Lake.

12    Q.  Where was the cash the first time you saw it that day?

13    A.  It was on the floor.

14    Q.  Was it in the open or was it hidden in some way?

15    A.  When I saw it, it was laying on the floor, you know, not in

16    a perfect pile, but spread out a little bit where he had been

17    laying down.

18    Q.  Special Agent Winston, approximately how long did you stay

19    in the apartment that day?

20    A.  Maybe a half hour, 45 minutes.

21    Q.  Other than your role in assisting with the arrest of Dwayne

22    Barrett and the search of that residence, do you have a

23    continuing role with respect to this investigation?

24    A.  I do not.

25         MS. MASELLA:  One moment, your Honor.

1           Nothing further of this witness.

2           THE COURT:  Okay.  Cross-examination.

3           MR. ROTH:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. ROTH:

6    Q.  Good afternoon, Agent.

7    A.  Good afternoon.

8    Q.  I represent Mr. Barrett.

9        This is not the first time you've testified before, is that

10   correct?

11   A.  No.

12   Q.  No, meaning you have testified before?

13   A.  I have testified before, yes.

14   Q.  When you went to Mr. Barrett's, to arrest him, with the

15   arrest warrant, looking for him, what was the first address you

16   went to?

17   A.  I don't remember.

18   Q.  Do you have anything with you that would refresh your

19   recollection?

20   A.  I do not.

21   Q.  And who provided that address?

22   A.  I'm not sure.  I would assume it would be -- I won't

23   assume.  I don't know who provided it.

24   Q.  Okay.  Well, where was it relative to the Hancock address

25   that you just testified to that you arrested Mr. Barrett in?

1  A.  I don't have a full recollection.  I'm not sure where it

2  was.  But it wasn't that far, so it could have been somewhere

3  in lower Westchester, or the Bronx.

4  Q.  But you go out early in the morning, and that was the first

5  place that you attempted to find him?

6  A.  Yes.

7  Q.  And then Hancock was the second place, is that correct?

8  A.  Yes.

9  Q.  And how did you gain entry into the unit?

10  A.  We knocked and -- I'm not sure if someone opened the door

11  if they -- I'm pretty sure someone answered the door.  I don't

12  think they knocked the door down, so I believe -- I don't

13  remember specifically.  I think that someone in the apartment

14  opened the door.

15  Q.  And there came a time, I think, you indicated that

16  Ms. Lake, his girlfriend, or the mother of his child, gave you

17  consent to search the apartment, is that right?

18  A.  That's right.

19  Q.  And Mr. Barrett didn't object in any way, shape, or form,

20  is that fair to say?

21  A.  Not that I'm aware of.  No.

22  Q.  You saw him that day, right?

23  A.  I did see him that day.

24  Q.  He was sleeping when you came, woke him up, if you will?

25  A.  I was not the first person to encounter him, but it's my

1   understanding that he was asleep when entry was made into the

2   room where he was found.

3   Q.   How many agents were in the room that entered Mr. Barrett's

4   bedroom prior to you entering the bedroom?

5   A.   I couldn't say.

6   Q.   How long were they in that bedroom prior to you entering?

7   A.   A few minutes.  Five minutes, maybe.

8   Q.   When you gathered the items that were just entered, that

9   you were just shown and you described, were you wearing any

10  gloves?

11  A.   I was not.

12  Q.   Is that part of the normal protocol of ATF that the agent

13  who gathers evidence does not wear gloves?

14  A.   No.  That's not part of the protocol.

15  Q.   What is the protocol, in respect to gloves and gathering

16  evidence?

17  A.   I don't know --

18  Q.   In a criminal investigation.

19  A.   I don't know that ATF has a protocol.  I think that it is

20  on the agent to decide whether or not they're going to wear

21  gloves, and I think it also has to do with what it is that

22  you're looking for.

23  Q.   Well, you knew, you were familiar with this investigation,

24  isn't that right?

25  A.   I was familiar, yes.

D37Wdor7                    Winston - cross

1   Q.  Pretty much all aspects of it, is that fair to say?

2   A.  Not all, but a lot.

3   Q.  You knew it concerned a lot of robbery, is that fair to

4   say?

5   A.  That's correct.

6   Q.  You knew that there were allegations involving guns and

7   knives and proceeds from robberies and victims?

8   A.  I don't know that I knew about knives, but I knew about

9   guns and robberies, yes.

10  Q.  So if there were any knives or guns in the house, you would

11  have, you would have seized that for evidence, is that fair to

12  say?

13  A.  Yes, I would have.

14  Q.  And you would have used gloves in that instance?

15  A.  It depends, you know, what you're searching.  If you go

16  into a house and you know that this was not a search warrant --

17  this didn't start off as a search warrant.  This was an arrest

18  warrant.  The purpose was to go and arrest him.  If Mrs. Lake

19  had said that we could not search the apartment and there had

20  not been a reason to get the search warrant, I wouldn't have

21  searched.  I do carry gloves with me.  If I come across blood

22  or I come across a gun that I think might lead to DNA, or

23  something like that, I put those gloves on.  It's not that we

24  don't have those things available to us.  It's just a

25  case-by-case situation.

1   Q.  You've been on many so-called raids to execute arrest

2   warrants, is that right?

3   A.  That's correct.

4   Q.  You know the law, do you not, in terms of your ability to

5   search and seize contraband that's in plain view?

6   A.  That's correct.

7   Q.  So you don't need a search warrant, if you see a gun when

8   you come into Hancock, to take it, is that fair to say?

9   A.  That's true.

10  Q.  So you made a determination, I take it, that, for instance,

11  the phones that you seized that day were not going to be

12  processed for fingerprints, is that fair to say?

13  A.  That really wouldn't have been my decision to make, but I

14  did not wear gloves with the intention of thinking that they

15  would send them later for fingerprinting, no.

16  Q.  You've never sent, or in your experience, you've never sent

17  a phone, a cellular phone, for fingerprints in a criminal

18  investigation that you have been involved in?

19  A.  I have never sent a phone for fingerprinting, ever.

20  Q.  And you've never preserved a phone in such a way to

21  preserve it for fingerprints?

22  A.  No.

23  Q.  And what about the other items that you seized there that

24  day?

25  A.  The money?

1    Q.  Did you seize a notebook that day?

2    A.  Yes, I did.

3    Q.  And that was a notebook.  And again, you didn't preserve

4    that in a fashion that that notebook could be submitted for

5    fingerprints, is that correct?

6    A.  No, I did not.

7    Q.  You were with the special agent, Special Agent Zeppieri.

8    Do you know -- I'm butchering his name here, but, do you know

9    the fellow agent that I'm talking about who is part of your

10   task force, your group, Zeppieri?

11   A.  I know Michael Zeppieri, yes.

12   Q.  And you were with him when Mr. Barrett was questioned on

13   January 9, some ten days, or so, earlier in the 47th Precinct,

14   is that correct?

15   A.  Yes, I was.

16           MS. MASELLA:  Objection.  Scope.

17           THE COURT:  I'm trying to remember.  It is beyond the

18   scope, Mr. Roth.  I mean, does it have something to do with

19   what was discovered about the search?

20           MR. ROTH:  I'll move on, Judge.

21   Q.  So it's your testimony that when you walked into the

22   apartment, the bedroom of Mr. Barrett and Ms. Lake, was the

23   child in that bedroom sleeping with them?

24   A.  I don't remember.

25   Q.  You did a full search or your team members did a full

1    search of the entire apartment, is that correct, fair to say?

2    A.  When we make the entry, some go this way -- depending on

3    the layout of the apartment or the house, or whatever it is

4    that we're searching, people go in different directions, based

5    on what they encounter when they make entry.  By the time I saw

6    Mr. Barrett, that room, he had already been secured.  Ms. Lake

7    was secured and the child was awake and standing up.  So I'm

8    not, I couldn't tell you where the child was sleeping.  I know

9    that he was sleeping on the floor; that's what I was told.  I

10   did not see him sleeping on the floor.  By the time I saw him,

11   he was not sleeping.

12   Q.  And you're saying after the apartment was so-called cleared

13   on the entry, then after the consent was given by Ms. Lake,

14   then a further search of the entire premises was made, is that

15   fair to say?

16   A.  That is fair to say.

17   Q.  And these are the only items that you recovered at that

18   time, is that correct?

19   A.  That's correct.

20   Q.  And tell us again where, how that money was that you

21   seized.  Where was it?

22   A.  The first time I saw the money, it was laying on the floor.

23   Not in a perfect pile, but spread out as it would be if someone

24   was -- it was explained to me that the money was under him.  So

25   that's the first time I saw it, and that's where it was.

 1   Q.  Was it explained to you by Ms. Lake that that was her rent

 2   money as well?

 3   A.  I think she did say something like that.

 4              MS. MASELLA:  Objection.

 5              THE COURT:  Sustained.

 6   BY MR. ROTH:

 7   Q.  Did you ask on that day whose money it was to either

 8   Ms. Lake or Mr. Barrett?

 9              MS. MASELLA:  Objection.

10              THE COURT:  Whether she asked is a permissible

11   question.

12              Did you ask?

13              THE WITNESS:  No.

14   BY MR. ROTH:

15   Q.  You indicated before someone explained to you whose money

16   that was, is that correct?

17   A.  Someone said where the money was found.  They pointed to

18   the money and said that was underneath Mr. Barrett.

19   Q.  You're talking about underneath him now?  It was actually

20   underneath him; he was sleeping on the money?

21   A.  That's what they said, the money was underneath him.

22              THE COURT:  You didn't see this, right?

23              THE WITNESS:  No, I did not.

24              MR. ROTH:  I have no further questions.

25              THE COURT:  Ms. Stafford.

 1            MS. STAFFORD:  No questions, your Honor.

 2            THE COURT:  Redirect?

 3            MS. MASELLA:  No, your Honor.

 4            THE COURT:  You can step down.  Thank you, Agent.

 5            (Witness excused)

 6            MS. MASELLA:  Your Honor, the government's next

 7     witness is a lengthy witness who is in custody.  I don't know

 8     whether you want us to begin today or whether it makes sense to

 9     wait.

10            THE COURT:  It might make sense.  Sometimes five or

11     even 20 minutes is probably not worth starting.  We would have

12     to take a break and we would have to do some other things.

13            We'll break early.  We have had a full day and you

14     folks have worked hard.  We'll pick up again on Monday at 9:30.

15     Be here ready to go at 9:30.  I promise we'll have coffee and

16     the other stuff.  So if you get here early, you get first pick.

17     Don't discuss the case, of course.  Keep an open mind.  If the

18     weather is bad, you know the numbers to call, but I think we're

19     in the home stretch now with winter.

20            Have a good weekend.  Thanks.

21            (Jury excused)

22            THE COURT:  Have a seat.  Anything we need to cover

23     before the next witness?  The next witness is who?

24            MS. MASELLA:  We were planning to call cooperating

25     witness Patrick Taylor.

1          THE COURT:  Right.

2          MS. MASELLA:  We also do have some witnesses scheduled

3    for Monday, such as Dr. Smiddy, the medical examiner.  So we'll

4    probably start with her, because of her schedule.  She is

5    scheduled for Monday and has to come that day.

6          THE COURT:  Okay.

7          MS. MASELLA:  We will have both of those on Monday,

8    and as well some of the telephone company custodians are

9    expected on Monday.

10         THE COURT:  How are we doing in terms of time?

11         MS. MASELLA:  I think we're doing pretty well, your

12   Honor.  I think that we still estimate that we can complete the

13   evidence in less than three weeks.  Probably closer to two, or

14   two and a little bit more.

15         THE COURT:  So the other witnesses that we have for

16   next week, we only have one more cooperator, right?

17         MS. MASELLA:  Correct.

18         THE COURT:  One really long witness.  Who are the long

19   witnesses after that?

20         MS. MASELLA:  We also have the cell site summary

21   witness who will be somewhat lengthy.  Two crime scene

22   detectives, which tend to take a little bit more time.  We have

23   two witnesses, two other victims of the homicide incident.

24   Each of those will be more like 30 minutes to an hour, rather

25   than some of these other victims.  But other than that, it's

D37Wdor7

1    mainly short witnesses.

2          THE COURT:  All right.  Anything else from the

3    defense?

4          MS. FONTIER:  I have nothing at this time, your Honor.

5    Thank you.

6          MR. ROTH:  No, Judge.

7          THE COURT:  No?

8          MR. ROTH:  Maybe we can reach a stipulation on the

9    custodian of records.  I wasn't prepared for that.

10         THE COURT:  Just give me some space because I've got

11   another matter, so you can chat, certainly.  You can chat

12   outside.

13         Ms. Fontier, did you want to say something?

14         MS. FONTIER:  We need to clear everything out, right?

15         THE COURT:  Clear out one of those tables so I can put

16   a defendant at one of those tables.

17         (Adjourned to March 11, 2013, at 9:30 a.m.)

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    JANIEL BROWN

4    Cross By Mr. Murphy . . . . . . . . . . . . . 491

5    Redirect By Ms. Lester . . . . . . . . . . . 534

6    Recross By Ms. Stafford . . . . . . . . . . 538

7    Recross By Mr. Murphy . . . . . . . . . . . 543

8    ABDUL RAUF

9    Direct By Ms. Masella . . . . . . . . . . . 545

10   Cross By Mr. Roth . . . . . . . . . . . . . 560

11   Cross By Ms. Stafford . . . . . . . . . . . 564

12   AHMED SALAHI

13   Direct By Ms. Masella . . . . . . . . . . . 572

14   Cross By Mr. Roth . . . . . . . . . . . . . 594

15   Cross By Ms. Stafford . . . . . . . . . . . 606

16   KASSIM SALAHI

17   Direct By Ms. Lester . . . . . . . . . . . . 607

18   Cross By Mr. Roth . . . . . . . . . . . . . 647

19   Cross By Ms. Stafford . . . . . . . . . . . 663

20   Redirect By Ms. Lester . . . . . . . . . . . 667

21   MOHAMMAD ALTHOMORY

22   Direct By Ms. Lester . . . . . . . . . . . . 669

23   Cross By Ms. Fontier . . . . . . . . . . . . 696

24   Cross By Mr. Roth . . . . . . . . . . . . . 704

25   AHMED MUSWARA

1    Direct By Ms. Lester . . . . . . . . . . . . 707

2    MUBARAK I. TAWFIQ

3    Direct By Ms. Lester . . . . . . . . . . . . 718

4    Cross By Mr. Roth  . . . . . . . . . . . . . 727

5    Redirect By Ms. Lester . . . . . . . . . . . 735

6    AYESHA WINSTON

7    Direct By Ms. Masella . . . . . . . . . . . 737

8    Cross By Mr. Roth  . . . . . . . . . . . . . 750

9                      GOVERNMENT EXHIBITS

10   Exhibit No.                          Received

11    3539B  . . . . . . . . . . . . . . . . . 537

12    902  . . . . . . . . . . . . . . . . . . 579

13    903  . . . . . . . . . . . . . . . . . . 582

14    1400  . . . . . . . . . . . . . . . . . . 684

15    80  . . . . . . . . . . . . . . . . . . . 742

16

17

18

19

20

21

22

23

24

25