D3B5dor1                         trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 CR. 45 (RJS)

5    JERMAINE DORE and DWAYNE
     BARRETT,
6
                 Defendants.
7
     ------------------------------x
8

9                                         March 11, 2013
                                          9:30 a.m.
10

11   Before:

12                   HON. RICHARD J. SULLIVAN,

13                                         District Judge

14
                          APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY
25

D3B5dor1                         trial

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  My law clerk is, I guess,

3   with the jury just letting us know if everybody is here or

4   taking care of whatever is going on with them, but in the

5   meantime I understand that, Ms. Fontier, you have a motion you

6   want to make?

7           MS. FONTIER:  Yes, your Honor.

8           Unfortunately I believe I need -- at this point I need

9   to move to withdraw as counsel and also move for a mistrial for

10  that reason.

11          The basis of that is that during Janiel Brown's

12  testimony she was questioned about what she -- basically the

13  testimony related to whether or not she had provided an alibi

14  for Mr. Dore for the December 12 homicide.

15          THE COURT:  Right.

16          MS. FONTIER:  And her testimony about what occurred in

17  the conversations with me was false and I, after reviewing her

18  transcript of the testimony and my notes and e-mails, I believe

19  there is several material inconsistencies particularly about

20  conversations she had with me, the followup, the timing of what

21  she stated and whether or not she knew what time the homicide

22  was before she came to me with the alibi and how all of that

23  occurred.

24          I think that particularly on the homicide issue her

25  credibility is very central to this case as she's really the

D3B5dor1                    trial

1    only person who ties Mr. Dore directly to the homicide.  It is

2    her statement about what he said that identify him as

3    potentially the person that committed this homicide or at least

4    was present and I think that Mr. Dore, at this point, has a

5    right to call me as a witness and, as the Second Circuit has

6    said, it is being a witness and an attorney in the same trial

7    is untenable.

8            So, while it is not my desire to end as his counsel or

9    have his trial at this point I am moving for both.

10            THE COURT:  You should make a proper motion, put it in

11   writing and cite to the record and cite some authority which

12   might be useful, and then we will see whether it has any legs

13   but, in the meantime, I have a jury here so we are going to

14   resume today so I'm going to deny the motion without prejudice

15   to renewal with a proper motion that includes importantly some

16   authority as to whether or not you are entitled.

17            MS. FONTIER:  Yes, your Honor.

18            THE COURT:  And the government should respond with

19   authority.  This is a situation where Ms. Brown was had been

20   subpoenaed and not just might be named during the trial but

21   3500 for her was not provided until the eve of trial so I don't

22   know whether there is some sort of waiver argument that is

23   available but the timing was very tight with respect to

24   Ms. Brown.

25            Okay.  How are we doing on the jury?

D3B5dor1                         trial

 1           LAW CLERK:  Waiting for one.

 2           THE COURT:  Which one?

 3           LAW CLERK:  Ms. Schuster.

 4           THE COURT:  We have an inquiry over the weekend,

 5    sometime late Friday one of the jurors, Mr. Soto-Valdez.

 6           LAW CLERK:  Yes, No. 3.

 7           THE COURT:  Indicating that his employer only pays for

 8    three days of jury service and so he is concerned that he can't

 9    afford to stay on.

10           Is that the gist?

11           LAW CLERK:  Yes.

12           THE COURT:  So, I think we should talk to him what

13    that means.  I'm not inclined to excuse him at this point.  We

14    have only had a week of trial so if a would-be juror for a

15    two-week trial told me he wasn't getting paid by his employer,

16    that wouldn't cause me any concern at all and I would say you

17    have to serve for two weeks.  I don't know how much longer than

18    two weeks this trial will go so I'm inclined to just hear what

19    he has to say and we can talk about it further, but I'm not

20    inclined to excuse him today or this week.  It is pathetic what

21    we pay jurors but there is no law that employers have to pay

22    employees their salaries during the time they're on jury

23    service.  Maybe there should be but there isn't.  So, while we

24    are waiting for the one juror why don't I bring him out.

25           Anyone have any thoughts before I bring him out?

D3B5dor1                         trial

1          All right, let's hear what he has to say.  While he is

2   here you can raise your hand, otherwise we will chat about what

3   he says afterwards.

4          (Juror present)

5          THE COURT:  Good morning.

6          A JUROR:  Good morning, sir.

7          THE COURT:  You called my chambers --

8          A JUROR:  Friday.

9          THE COURT:  -- and indicated that your employer only

10  pays for three days jury service.

11         A JUROR:  Correct, and I didn't know until I got into

12  work on Friday.

13         THE COURT:  Remind me again what it is that you do.

14         A JUROR:  I'm a computer technician for a medical

15  company, tech support.

16         THE COURT:  How long have you been working there?

17         A JUROR:  Five years.

18         THE COURT:  Had you served on a jury before?

19         A JUROR:  Never.

20         THE COURT:  Never.

21         And so they told you -- tell me exactly what they told

22  you.

23         A JUROR:  Well, as soon as I walked in, somebody that

24  had no business telling me how many days we get covered for,

25  she like told me with an attitude like she was jealous like I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3B5dor1                         trial

1    out on something and she told me, you know, you only get paid

2    for three days.  So, I kept going about my day until my boss

3    came around and he said the state only requires us to pay you

4    for three days and he gave me a piece of paper that I took home

5    with me.

6              THE COURT:  Well, this is a federal court, not a state

7    court, but the federal government doesn't require -- I don't

8    think requires employers to pay any days though a lot of

9    employers do because they recognize the importance of jury

10   service.  We pay jurors something, it is not much but it is

11   something.  So, I mean as a practical matter, there are some

12   jurors whose employees don't pay anything and they only get

13   what the government pays for these things, by statute Congress

14   has said that a juror should be paid.  So, but it is so

15   important that we have people like that on a jury.

16             So, I don't know how long this trial will go.  My

17   sense is that it is moving faster than originally anticipated

18   so we might be done sooner than the time that I had said.  So,

19   I'm going to talk to the lawyers to just see what they think on

20   the subject because I haven't talked to them about it.

21             Anything else, though, you wanted to say on the

22   subject?

23             A JUROR:  I mean, this is an issue for me because I

24   have a 3-year-old son.  You know how the day you asked if there

25   was any problems?  I wasn't -- I didn't have the knowledge of

D3B5dor1                         trial

knowing what the -- like what my job requires or whatever the

case may be, and then once I found out I have a 3-year-old son

I'm a single parent and I have my own place and I work -- I

basically live paycheck to paycheck and with the payments that

I get here I'm not going to be able to pay my stuff.

          THE COURT:  Now, we won't sit Fridays and so have you

been working on Fridays?

          A JUROR:  I went to work at 8:00 a.m. on Friday.

          THE COURT:  Are there ways that you can work --

          A JUROR:  We only work 8:00 to 5:00 Monday through

Friday.

          THE COURT:  There is no weekend hours.

          A JUROR:  No.  We don't work weekends or evenings.

          THE COURT:  All right.

          What is the name of your employer?

          A JUROR:  UMG Medical Imaging, that's in Harrison, New

York.  It is a private business.

          THE COURT:  Who is the person who told you about this

policy?

          A JUROR:  Well, by the end of the day my boss.

          THE COURT:  Who is that?

          A JUROR:  Toufic, T-O-U-F-I-C, Lorenzo.

          THE COURT:  And do you have a number?

          A JUROR:  Yes.  914-835-4600.

          THE COURT:  Would you mind if I gave him a call?

D3B5dor1                    trial

1              A JUROR:  Not at all.

2              THE COURT:  And you said he gave you a piece of paper.

3              A JUROR:  Yeah.  I think I left it at home.  Wait.

4    This is it right here.

5              THE COURT:  Would you mind if I took a look at that?

6              (Pause)

7              Okay.  Thanks.  So, I will make a call.  I don't want

8    you to worry about anything else now.  I want you, today, to be

9    focused on the trial and I will get back to you the end of the

10   day today or tomorrow.  But, for now, I want you to continue

11   being a juror and pay careful attention as you have been for

12   the first week.

13             Thank you.

14             A JUROR:  Go to the back?

15             THE COURT:  Yes.  Hang out back there.

16             (Juror not present)

17             THE COURT:  Just so it is clear, he has New York State

18   Judiciary Law, 16, Section 519 with the highlighting on the

19   second full sentence which is the right of a juror to be absent

20   from employment.

21             Does anyone have any thoughts.

22             MS. FONTIER:  Your Honor, I believe it is at your

23   discretion.  I don't have a position.

24             THE COURT:  Anybody else?

25             MS. MASELLA:  Same for us, your Honor.

D3B5dor1                    trial

1          THE COURT:  I think I'm going to call the employer

2    just to see what the deal is.  I mean, I think it is even -- it

3    may be worse than what he thinks.  An employer may withhold

4    wages if any such employee serving as a juror during the period

5    of such service provided that an employer who employs more than

6    10 employees, shall not withhold the first $40 of such juror's

7    daily wages during first three days of jury service.  So.  It

8    is $40 a day from his employer for the first three days which

9    is like a matching of what the state pays, all of which is less

10   than the minimum wage, basically.  Right?

11          All right.  I will follow up with that.

12          Anything else we can do productively while we're

13   waiting for the juror to arrive?

14          MR. MURPHY:  Perhaps one issue we could address, your

15   Honor.  I had -- good morning, by the way.

16          THE COURT:  Good morning.

17          MR. MURPHY:  Over the weekend I just sent a quick

18   e-mail to the government objecting to certain of the crime

19   scene photos that we expect to be admitted today as being

20   unduly prejudicial, somewhat gory and unnecessary for proving

21   the government's case.  I had noted those specifically.  The

22   government indicated they don't intend to publish those to the

23   jury upon admission so I don't know that this has to be ruled

24   on immediately, your Honor, but at some point --

25          THE COURT:  They will be going back to the jury room?

1              MR. MURPHY:  Correct.

2              THE COURT:  They will be admitted.

3              MR. MURPHY:  Correct.  So, if you would like I can

4       show you the photos now, otherwise we can do it in another

5       moment.  But, otherwise I wanted to put it on the radar screen.

6              THE WITNESS:  Any word from the juror?

7              LAW CLERK:  I got her home.  They said she left early.

8              THE COURT:  They know to knock when everybody is here?

9              LAW CLERK:  I told them.

10             THE COURT:  It was a crazy line downstairs.  Maybe she

11      didn't go to the head of it.

12             MR. ROTH:  I would note, Judge, they let the jurors go

13      ahead.  When you say you're a lawyer on trial they don't want

14      you to go ahead.  I was 25 minutes.  The jurors can't do much

15      better than lawyers so they did trickle in late and --

16             THE COURT:  All right.  I will follow up with them on

17      that.  You get conflicting information.

18             MR. ROTH:  I think it depends who is on detail.

19             THE COURT:  I know, but this is a recurring

20      conversation I have with the marshal about lawyers being held

21      hostage in long lines, particularly on Mondays and Fridays.

22      Fridays we have new citizens and I'm assured that lawyers are

23      told that they can move to the head of the line, particularly

24      if they have an appointment at a particular time.

25             MR. ROTH:  I would say I was pretty aggressive to no

D3B5dor1                          trial

1    avail, Judge.

2            THE COURT:  Okay.  Food for thought.  I have a

3    security committee meeting tomorrow at which we discuss these

4    kinds of things so I will raise it.

5            So let's see the gory photos.  Are any available?

6    What numbers?

7            MR. MURPHY:  201 through 265.  That's the grouping in

8    your book and I can go through item by item the specifics.

9            THE COURT:  201?

10           MR. MURPHY:  201 onward, your Honor.

11           THE COURT:  Tell me what specific numbers.

12           MR. MURPHY:  216, 217 and 218.

13           THE COURT:  You think these shouldn't come in?

14           MR. MURPHY:  I will withdraw 216 and 217, 218 which is

15   a picture of the deceased laying on the sidewalk after he was

16   removed from the vehicle.  I think there is no, if any

17   probative value it is minimal but you're looking at a deceased

18   person in an unnatural position who has been played out on the

19   sidewalk.  I see no purpose why the jury has to see that and

20   especially in light of the other exhibits, pictures that will

21   be useful to the government to prove their points.

22           If your Honor turns to 223, 224, 225 and 226, those

23   are more the heart of our objections, each of which are

24   pictures, once again, out on the sidewalk of the decedent when

25   he is displayed outside of the vehicle.

D3B5dor1                         trial

1          THE COURT:  Where was he found?  In the back of the

2    car.

3          MR. MURPHY:  In the back of the car.

4          If you flip through you will see pictures of him in

5    the car, we don't object to those.  If you look at 229, 230 and

6    231 has him in the car as well.

7          THE COURT:  There is a number that have him in the

8    car.  Are you objecting to 231?

9          MR. MURPHY:  231 I would object to in light of the

10   look on his face and the delivery there.  I think that it is

11   unnecessary to prove the government's point in terms of where

12   he is in the vehicle.

13         THE COURT:  That's a picture of his face you think is

14   irrelevant?  About who he was and what he looked like.

15         MR. MURPHY:  I think it can be made out from many of

16   the other photos.  We are not disputing who he was -- who the

17   victim of this homicide was.

18         THE COURT:  Right, but what the body looked like is

19   not irrelevant.  Do you think that is irrelevant?

20         MR. MURPHY:  I think that particular photo is not

21   irrelevant insofar as -- every photo is relevant one could

22   argue.  The issue is is it more unduly prejudicial or probative

23   than it is to the relevance to the government proving its case.

24         Because of the nature of the disturbing photo, the man

25   staring up with his eyes looking blank and looking up I think

1    that is unduly prejudicial and unnecessary.  Essentially the

2    government can make all of their points with the photos I have

3    not objected to.

4              THE COURT:  Let me hear the government's point with

5    all of this.  There are a lot of photos.  These seem to be

6    close-ups of the face of the victim.

7              MS. MASELLA:  Your Honor, we were planning to offer

8    all of the photographs because the crime scene detective will

9    testify that this is how he conducted his investigation of the

10   crime scene, that first he photographed the victim in the car

11   in the position that he was found and then he and the medical

12   examiner's investigator removed the victim and investigated the

13   wounds.  However, we were planning to be judicial in the sort

14   of number and type of photos that we were going to publish or

15   display to the jury.

16             I was only planning to show one photo of the deceased

17   victim and that was going to be a photo of him inside the car

18   and the position that he was found in.

19             THE COURT:  So are you seeking to admit all of them

20   but only show some of them?  Because if you're not planning to

21   show them then what is the point of admitting them?

22             MS. MASELLA:  Because it documents what the crime

23   scene detective actually did in investigating the scene.  It

24   shows that they did an investigation with respect to the victim

25   inside the car and they removed him and did an investigation

D3B5dor1                         trial

1    outside the car, sort of his complete packet of materials

2    including the crime scene sketch and the photographs.

3            THE COURT:  But, if you are not planning to show it to

4    the jury while the witness is on the stand, why would we want

5    the jury to see it for the first time in the jury room

6    documents you think were necessary to show them while the

7    witness was on the stand?

8            MS. MASELLA:  In the event they want to follow up and

9    see what else was done.  I didn't plan to go through every

10   single photograph, but if they want to see what the other

11   photographs are then they can do that.  They've heard the

12   testimony about them.

13           THE COURT:  Okay.  So let's go through the individual

14   photos and tell me what they're probative of.

15           216, probative of the fact they took him out of the

16   car?

17           MS. MASELLA:  Correct.

18           THE COURT:  Is that a disputed issue, that he was

19   taken out of the car?

20           MS. FONTIER:  No, your Honor.

21           THE COURT:  I'm being facetious.  Of course it is not.

22   I assume they wouldn't leave the body in the car and hope that

23   the new owner, when they resell the thing, just takes care of

24   itself.  I don't think that's terribly prejudicial, frankly.

25           216 shows the back of a human body.  I don't think

D3B5dor1                          trial

1    that that's jarring.

2              What are the other exhibits you're objecting to?

3              MR. MURPHY:  223 through 226, your Honor.

4              THE COURT:  Let's go there.  223 is probative of what?

5              MS. MASELLA:  This is just the investigation they

6    conducted with respect to a victim outside of the car, that

7    they laid him out here and further examined him, 223 through

8    226.

9              THE COURT:  This is probative of that?

10             MS. MASELLA:  Your Honor, we can remove those four.

11             THE COURT:  I'm not saying that you have to, I'm just

12   asking what they're probative of.  So, 223 is a closeup of the

13   face of a deceased man.  Frankly, anybody who watches TV sees

14   much more graphic things than this but I'm not sure what it

15   proves.  At some point his face who he was may be relevant.

16   Maybe the fact that he is Middle Eastern is relevant.  I don't

17   know.

18             224 is him on the sidewalk, this time now face up and

19   shows his clothes and shoes primarily.  I'm not sure what

20   that's probative of but I just don't think it's mind-blowingly

21   prejudicial either.  It is a deceased person.

22             225, the same, pretty repetitive.

23             226 is the same.  Seems to me you can get one of those

24   in.

25             Then there is photos of him in the car so presumably

D3B5dor1                     trial

 1    the numerical and temporal order are inverted but you're not

 2    objecting to the ones in the car right, Mr. Murphy?

 3            MR. MURPHY:  Only 229, 230 and 231.

 4            THE COURT:  Wait.

 5            MR. MURPHY:  I would point out this is cumulative in

 6    terms of the redundancy of some of these photos, your Honor.  I

 7    think it further undercuts --

 8            THE COURT:  229, 230 and 231, not 232?

 9            MR. MURPHY:  No, because I think 232 is a perfect

10    example that would give the jury relevant, probative

11    information showing where the body is positioned.  So, I think

12    by admitting 232 you reasonably cover everything on the other

13    three which are redundant and unnecessary, in particular is 231

14    which, as I noted previously, I think is in fact a more

15    disturbing photograph.  And I certainly understand, your Honor,

16    that we all watch television but there is clearly a distinct

17    difference between what we see on TV and knowing that this is

18    reality and this is unfortunately a person who is no longer

19    with us and truly was killed on that day.

20            THE COURT:  Right.  There is no dispute that he was

21    killed on that day, right?

22            What is probative of 231?

23            MS. MASELLA:  Close-up of the position in the car,

24    your Honor.

25            THE COURT:  It is.  What is probative about it?  Is

1    there something in the photo that is in question or is going to

2    be the subject of testimony?

3          MS. MASELLA:  From 232 and 233 it is more dark and

4    covers more area, it is difficult see what you are looking at.

5          THE COURT:  Well, it would seem to me that there may

6    be other things in the photos that are relevant including the

7    blood spatter, or if there is ballistics material elsewhere in

8    the photo I can't tell.  So, it is hard for me to say what is

9    relevant and what is not relevant.  I think it possibly makes

10   sense to figure out which one the government intends to show to

11   the jury with the witness on the stand and if there is dispute

12   about those I need to rule on those right away.  The remainder

13   I can reserve on once I have heard the testimony and I will

14   probably be in a better position at that point.

15         So, do you know which ones you intend to use?

16         MS. MASELLA:  Yes.  Of the ones in the car I intended

17   to use 230 and 232.

18         THE COURT:  230 and 232; and you are not objecting to

19   those Mr. Murphy?

20         MR. MURPHY:  One moment, your Honor?

21         (pause)

22         MR. MURPHY:  I did not object to 232 and will not

23   object to 232.  I did object to 230.

24         THE COURT:  Overruled.  I think 230 -- they're from

25   different angles, different doors, one is the driver's side

D3B5dor1                          trial

1    door, the front driver's door, and 232 is what appears to be

2    from the passenger side rear door and I think that they're

3    relevant.  I think it just shows where the body was so,

4    overruled.  I will allow 232.

5              What else are you planning to use?

6              MS. MASELLA:  Also 230, your Honor.

7              THE COURT:  Yes, 230.

8              MS. MASELLA:  Of the wound --

9              THE COURT:  I'm sorry, 230 -- I'm allowing 230 and

10   232.

11             MS. MASELLA:  In terms of the wounds to the victim I

12   was planning to use 218 through 222 which all show --

13             THE COURT:  You are objecting to 218 through 222,

14   Mr. Murphy?

15             MR. MURPHY:  No.

16             THE COURT:  I didn't think so.  Okay.

17             MS. MASELLA:  I think that covers it, your Honor.  The

18   rest are just photos that do not involve the victim.

19             THE COURT:  Look if the victim's features, facial

20   features matter or there is going to be somebody who will

21   testify about identification or something, then I would be open

22   to it.  He is Middle Eastern from Yemen or someplace like that?

23             MS. MASELLA:  Sudanese, your Honor.

24             THE COURT:  Sudanese.

25             It seems like we're ready so let's bring in the jury.

D3B5dor1                          trial

1    Find out quietly, Aaron, what the deal was with Ms. Schuster.

2              LAW CLERK:  She said she was stuck on the subway.

3              THE COURT:  14 other people weren't, so.

4              We have a witness?

5              MS. LESTER:  Yes, your Honor.  The government calls

6    Dr. Monica Smiddy from the office of the medical examiner.

7              THE COURT:  Let's get her in here.

8              MS. LESTER:  We are, your Honor.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3B5dor1                         trial

1            (Jury present)

2            THE COURT:  Good morning.  Did you have a nice

3    weekend?

4            We are getting a bit of a late start so, please, do

5    what you can to make sure you give yourself plenty of time to

6    get here just because a half an hour lost is a half an hour

7    multiplied by 14 jurors and however many of the rest of us.

8            So, the government is now going to call their next

9    witness and who is that?

10           MS. LESTER:  Your Honor, we call Dr. Monica Smiddy

11   from the office of the chief medical scam near.

12           THE COURT:  Doctor, would you please stand?

13    MONICA SMIDDY,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16           THE COURT:  Good morning, Doctor.  I think your volume

17   is just about right so you may proceed, Ms. Lester.

18           MS. LESTER:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MS. MASELLA:

21   Q.  Good morning, sir.

22   A.  Good morning.

23   Q.  What is your occupation?

24   A.  I'm employed as a forensic pathologist and a medical

25   examiner.

D3B5dor1                              Smiddy - direct

1   Q.  Where are you so employed?

2   A.  I'm employed by the Office of Chief Medical Examiner here

3   in New York City, and I work in the borough of the Bronx.

4   Q.  What is forensic pathologist?

5   A.  The pathologist is a doctor who is specialized in examining

6   tissues.  The general pathologist works in a hospital.  The

7   forensic pathologist has specialized training in the

8   performance of autopsies, the classification of injuries and

9   the final death certification that includes the cause and

10  manner of death.

11  Q.  What are your duties as a forensic pathologist and member

12  of the staff of the Office of the Chief Medical Examiner?

13  A.  My primary duties involve the performance of autopsies in

14  order to certify their death.  As a senior member of staff I do

15  quite a bit of supervision.  I also do quite a bit of teaching

16  and I'm a member of several public health committees around the

17  City.  And, on special occasions I'm asked to appear as an

18  expert witness as I'm doing today.

19  Q.  What is your educational background and training?

20  A.  I have a medical degree from Boston University School of

21  Medicine.  Following medical school I went to Washington, D.C.

22  where I did a residency training program in pathology, and then

23  I came to New York City in 1993 to do very specialized training

24  in forensic pathology and that's referred to as a fellowship.

25  And I have been at the Office of Chief Medical Examiner for

D3B5dor1                           Smiddy - direct

1   close to 20 years.

2   Q.  Are you licensed to practice medicine in New York City?

3   A.  I'm licensed --

4   Q.  In New York State?

5   A.  I'm licensed to practice medicine in New York State.

6   Q.  Are you board certified in any areas?

7   A.  I am board certified in anatomic and forensic pathology.

8   Q.  What's the difference between those two areas?

9   A.  Anatomic is general pathology and that's generally the

10  pathologist in a hospital setting.  The forensic pathologist

11  generally works for the government and in this case in New York

12  City the Office of Chief Medical Examiner is part of the

13  Department of Health and the forensic pathologist performs

14  autopsies and certifies death.

15  Q.  You mentioned that sometimes you are called upon to testify

16  in court, correct?

17  A.  Yes.

18  Q.  During those times when you testified have you ever been

19  qualified before as an expert in the field of forensic

20  pathology?

21  A.  Yes.

22  Q.  How many times would you estimate that you've been so

23  qualified?

24  A.  Well over a hundred.

25  Q.  And, in which courts have you been so qualified?

D3B5dor1                          Smiddy - direct

1   A.   In the State Courts of all of the boroughs of New York

2   City, Family Court and civil court.

3   Q.   And each time that you testify as an expert and in cases

4   concerning a fatality, were you asked for and did you give your

5   opinion to a reasonable degree of scientific and medical

6   certainty about the cause of death of a particular person?

7   A.   Yes.

8            MS. LESTER:  Your Honor, the government offers

9   Dr. Smiddy as an expert in the field of forensic pathology.

10           THE COURT:  Any objection?

11           MS. FONTIER:  No, your Honor.

12           MR. MURPHY:  No objection.

13           THE COURT:  So, Dr. Smiddy is qualified as an expert

14  in the field of forensic medicine or forensic pathology, so you

15  may proceed.

16  BY MS. LESTER:

17  Q.   Dr. Smiddy, could you explain to the jury what an autopsy

18  is?

19  A.   An autopsy begins with an external examination and the

20  doctor will examine the decedent as he or she is lying on the

21  autopsy table.  During the examination the doctor will make

22  note of any distinguishing characteristics like scars or

23  tattoos, any evidence of disease and, more important, the

24  forensic pathologist will make note of any injuries.

25           On internal examination the doctor will examine all of

D3B5dor1                          Smiddy - direct

1    the major organs in a systematic fashion and the purpose of the

2    internal examination is to document disease and/or injury that

3    may cause or contribute to the death and, during of the course

4    of the autopsy, specimens for laboratory tests may also be

5    collected.

6    Q.  Have you performed autopsies during your work at the Chief

7    Medical Examiner's office?

8    A.  Yes, I have.

9    Q.  Approximately how many would you say you've performed?

10   A.  Well over a thousand.

11   Q.  Have you also supervised other medical examiners when they

12   performed autopsies?

13   A.  Yes, I have.

14   Q.  Are you here today to testify concerning an autopsy

15   conducted of an individual named Gamar Dafala?

16   A.  Yes.

17   Q.  Did you personally conduct that autopsy?

18   A.  I did not.

19   Q.  Who did?

20   A.  Dr. Tara Mahar.  T-A-R-A, M-A-H-A-R.

21   Q.  Does Dr. Mahar still work for the Office of the Chief

22   Medical Examiner?

23   A.  No.  She's currently working in a different jurisdiction.

24   Q.  Did you have any role in this particular autopsy of

25   Mr. Dafala?

D3B5dor1                          Smiddy - direct

1   A.   Yes.  I was the senior doctor who was supervising that day.

2   Q.   Was an autopsy report prepared for Mr. Dafala?

3   A.   Yes.

4   Q.   Who prepared it?

5   A.   Dr. Mahar.

6   Q.   And, are such reports required to be prepared at the time

7   of the autopsy?

8   A.   Yes, they are.

9   Q.   Are they made in the regular course of business of the

10  Office of the Chief Medical Examiner of the City of New York?

11  A.   Yes.

12  Q.   And, is it the regular course of business for the Office of

13  the Chief Medical Examiner to make and keep these records?

14  A.   Yes.

15  Q.   What about death certificates, are those regularly prepared

16  in the course of business of the Chief Medical Examiner's

17  office?

18  A.   Yes, they are.

19  Q.   And who prepares those?

20  A.   The doctor who performs the autopsy.

21  Q.   Is that done again around the same time as the autopsy is

22  performed?

23  A.   Yes, it is.

24  Q.   And, is it the regular course of business for the Office of

25  the Chief Medical Examiner for the City of New York to make and

D3B5dor1                              Smiddy - direct

1    keep these records?

2    A.  Yes.

3    Q.  Putting before you what has been marked Government Exhibit

4    500 for identification, do you recognize that?

5    A.  Yes.

6    Q.  What is it?

7    A.  This is a copy of the autopsy protocol that was prepared by

8    Dr. Mahar as well as supporting documents.

9    Q.  What other supporting documents are included in Government

10   Exhibit 500?

11   A.  The identification of the decedent, Mr. Dafala.  There are

12   laboratory tests, a microscopic examination, toxicology, and a

13   medical/legal investigative report.

14   Q.  Is the death certificate also part of that package?

15   A.  Yes, it is.

16          MS. LESTER:  Your Honor, the government offers

17   Government Exhibit 500.

18          THE COURT:  Any objection?

19          MR. MURPHY:  One moment, your Honor?  (pause)

20          May I voir dire for a moment, your Honor?

21          THE COURT:  The entire report?

22          MR. MURPHY:  A few quick questions, your Honor.

23          THE COURT:  All right.  A couple of questions.

24   VOIR DIRE EXAMINATION

25   BY MR. MURPHY

D3B5dor1                          Smiddy - direct

1    Q.  Dr. Smiddy, good morning.

2    A.  Good morning.

3    Q.  You did not prepare this report, did you?

4    A.  I did not.

5    Q.  Did you sign off on it at some point?

6    A.  I did not.

7    Q.  And when is the first time that you saw this report?

8    A.  Shortly after the autopsy.

9    Q.  And that would have already been finalized by Dr. Mahar on

10   her own independent of you?

11   A.  No.  I reviewed the report before it was finalized.

12   Q.  But you don't actually -- when I said sign off, you don't

13   actually physically sign on it, Dr. Mahar has the authority to

14   do that on her own?

15   A.  No.  Another senior medical examiner signed off on the

16   report.

17   Q.  And who was that?

18   A.  J. H. on the last page of the report, and that stands for

19   Dr. Jonathan Hayes, H-A-Y-E-S.

20   Q.  Why is it that you didn't sign off on this report and

21   Dr. Hayes did instead?

22   A.  Because at the time Dr. Mahar was rotating through the

23   Bronx and that -- the fellows rotate for a month and then they

24   go back to the Manhattan office, and just for logistics

25   Dr. Hayes was there in the Manhattan office, he's a senior

D3B5dor1                    Smiddy - direct

1    medical examiner, so he initialed the report.

2    Q.  Is this a standard form report that is done for all medical

3    autopsies here in the State of New York?

4    A.  Yes, it is.

5              MR. MURPHY:  I have no objection.

6              THE COURT:  Any objection?

7              MS. FONTIER:  No, your Honor.

8              THE COURT:  All right.  Government Exhibit 500 is

9    received.

10             (Government's Exhibit 500 received in evidence)

11   BY MS. LESTER:

12   Q.  Dr. Smiddy, if I can direct your attention to the first

13   page of Government Exhibit 500 in the upper right-hand corner

14   there is an ME number.  Do you see that indicated?

15   A.  Yes.

16   Q.  What does that stand for?

17   A.  The medical examiner unique case number is B-11-05227.  It

18   is a unique medical examiner case number.  Each decedent is

19   given a number and it's for filing purposes.

20   Q.  When did the autopsy of Gamar Dafala take place?

21   A.  On December 13th, 2011.

22   Q.  And when did Mr. Dafala actually die?

23   A.  The date of pronouncement was December 12th, 2011.

24   Q.  Now, turning to the autopsy itself which you attended,

25   could you describe the findings on external examination of

D3B5dor1                          Smiddy - direct

1    Mr. Dafala?

2    A.   On external examination the decedent was well nourished and

3    well groomed.  He was normally developed and he measured

4    approximately 5'9" inches in length and weighed approximately

5    186 pounds.  He was fully clad when he was first examined, and

6    the most important finding on external examination was a

7    gunshot wound to the upper extremity which re-entered the

8    chest.

9    Q.   Could you describe in more detail for the jury exactly

10   where on Mr. Dafala's body the gunshot wound was present?

11   A.   It was a perforating gunshot wound and that means a bullet

12   enters and exits the left wrist region and then the bullet

13   re-entered the left arm and perforating through the muscles of

14   the left arm and then re-entered the left chest just below the

15   left armpit.

16   Q.   Now, when you say there was injury first to the wrist and

17   then to the arm, what part of the arm is that, the second

18   entrance wound?

19   A.   Just below the shoulder.

20   Q.   So, the upper arm?

21   A.   Yes.

22   Q.   Are you familiar with the term -- let me ask you first, do

23   you know where the bullet -- whether the bullet exited again

24   after it entered the victim's chest area?

25   A.   No.  The bullet was retrieved from the spinal cord during

D3B5dor1                              Smiddy - direct

1   the course of the autopsy.

2   Q.  Do you know whether the bullet injured -- well, I guess we

3   will get to that on internal examination.  Never mind.

4          Can I ask you first, are you familiar with the term

5   range of fire?

6   A.  Yes, I am.

7   Q.  What does that term mean?

8   A.  Range of fire refers to the distance between the shooter

9   and the victim and the more accurate definition is the distance

10   between muzzle and target.  In other words, how close is the

11   muzzle of the firearm to the skin surface of the victim.

12   Q.  And, are there any terms that you use in your work to

13   describe effects that you might see from the muzzle of the

14   firearm?

15   A.  Yes.

16          During the course of the autopsy and the external

17   examination, the doctor will examine the skin's surface

18   surrounding the gunshot entrance wound and inside of the

19   gunshot entrance wound as well, and what the doctor is looking

20   for is the presence of gunpowder residue, and if there is

21   gunpowder residue around the wound or within the wound, that's

22   an indication that the muzzle of the gun was significantly

23   close enough to the skin's surface to deposit gunpowder

24   residue.  So, that would be a close or intermediate range

25   gunshot wound.

D3B5dor1                        Smiddy – direct

1  Q.  Is there a technical term to describe what you just

2  mentioned?

3  A.  Yes.  Some doctors describe it as soot, others describe it

4  as fouling.  The detectives like to use the term powder

5  tattooing.

6  Q.  During the course of the external examination of

7  Mr. Dafala, were there any examples of fouling or powder tattoo

8  or soot, as you just mentioned?

9  A.  Yes.  There was gunpowder residue fouling surrounding the

10  gunshot entrance wound to the left wrist.

11  Q.  Based on that fouling or gunpowder residue that was

12  present, do you have an opinion as to the range of fire as to

13  that particular wound?

14  A.  It would be a close-range gunshot wound.

15  Q.  Can you approximate how many feet that might mean the gun

16  was from the victim?

17  A.  There is no way to know with certainty, but certainly

18  within a foot.

19  Q.  Now let's turn to the internal examination.  What were the

20  findings during the internal examination of Mr. Dafala?

21  A.  The significant injuries include fractures and those are

22  cracks or breakage of bones in the left forearm.  The most

23  significant finding was on internal examination when the bullet

24  entered the left chest cavity, it perforating the left lung

25  which caused significant bleeding or hemorrhage in the left

1   thoracic cavity -- that's part of the rib cage -- and then the

2   bullet traveled to the thoracic vertebra and became lodged

3   within the spinal cord.

4   Q.  During the internal examination was the bullet recovered?

5   A.  Yes.

6   Q.  If you can take a look at what is before you and been

7   marked for identification as Government Exhibit 527?  Do you

8   recognize it?

9   A.  Yes I do.

10  Q.  What is it?

11  A.  The white envelope is the NYPD -- the New York City Police

12  Department firearms and ballistics envelope.  The inner manila

13  envelope is from the medical examiner's office and this is

14  Dr. Mahar's handwriting.  When she retrieved the bullet she

15  labeled the bullet which is here in my hand with an asterisk at

16  the base of the bullet and then she placed it in the manila

17  envelope and sealed that and she labeled it, and then it goes

18  into our ballistics safe within the doctor's office, and then

19  the NYPD firearms and ballistics detectives come out --

20          MR. MURPHY:  Objection, your Honor.

21          THE COURT:  What is the objection?

22          MR. MURPHY:  Two-fold, your Honor.  Do you want me to

23  state?  Narrative --

24          THE COURT:  One word each.

25          MR. MURPHY:  Narrative and beyond her knowledge,

D3B5dor1                          Smiddy - direct

```
 1   essentially.  Would do this, would do that, procedure.
 2              THE COURT:  Overruled with respect to the second but
 3   the first one what is it?  It is two envelopes, is that right?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Okay.  Next question.
 6   BY MS. LESTER:
 7   Q.  And, how can you tell that that is the same bullet that was
 8   recovered from the body of Mr. Dafala?
 9   A.  Dr. Mahar describes her inscription on the base of the
10   bullet in her autopsy report, she describes an asterisk which
11   is here on the base of the bullet.
12              MS. LESTER:  Your Honor, the government offers
13   Government Exhibit 527.
14              THE COURT:  Any objection to 527?
15              MS. FONTIER:  No, your Honor.
16              MR. MURPHY:  I object.  There is no chain of custody
17   here, your Honor.
18              THE COURT:  I think that's a fair objection so let's
19   establish the chain of custody.
20              Can you identify?
21              THE WITNESS:  Yes, I can, your Honor.
22              THE COURT:  Okay.  How are you able to identify this
23   as the bullet that was removed from the victim?
24              THE WITNESS:  On page 4 of the autopsy report
25   Dr. Mahar describes the bullet as medium caliber, very slightly
```

D3B5dor1                          Smiddy - direct

1   deformed, nearly in tact copper jacket with rifling around the

2   edges near the base.  It is inscribed in the base with an

3   asterisk and submitted to ballistics.

4          So, this is a perfect description of this bullet.

5   There is an asterisk on the base.  These are the --

6          THE COURT:  You say asterisk on the base; what does

7   that mean?

8          THE WITNESS:  It means that Dr. Mahar takes a sharp

9   object and inscribes the base of the bullet -- there is the

10  base and then the nose of the bullet.

11         THE COURT:  And this inscription and asterisk on the

12  bullet is a common practice in your office?

13         THE WITNESS:  Yes.  Absolutely, your Honor.  In every

14  bullet is inscribed by the medical examiner who retrieves a

15  bullet and each medical examiner has their own way of

16  inscribing the bullet and it may be an asterisk, it may be a

17  number, it may be a letter, it may be initials.

18         THE COURT:  Who decides what it is?

19         THE WITNESS:  The medical examiner.

20         THE COURT:  Okay.

21         THE WITNESS:  It is a unique way to identify the

22  bullet.

23         THE COURT:  With that, I'm going to allow 527, so

24  Government Exhibit 527 is received.

25         (Government's Exhibit 527 received in evidence)

D3B5dor1                          Smiddy - direct

1    BY MS. LESTER:

2    Q.  Dr. Smiddy, you mentioned that it is a medium caliber

3    bullet.  What caliber does that classification generally refer

4    to?

5    A.  Usually a 9 millimeter, however it's not a specific

6    description.  The medical examiners are not firearms and

7    ballistics experts so we say small, medium and large caliber.

8    Q.  Now, during the autopsy of Mr. Dafala, were any specimens

9    for toxicology collected?

10   A.  Yes.

11   Q.  Would you explain to the jury why those are collected and

12   what exactly is collected?

13   A.  Yes.

14          During the course of the autopsy the doctor will

15   collect body fluids like blood, urine if it is present, and

16   bile, as well as some solid organs, brain and liver, and those

17   specimens are labeled, secured, and sent to our toxicology lab.

18   The toxicology laboratory will then test the specimens for the

19   presence of alcohol, drugs of abuse, over-the-counter

20   medications and other common medications.

21   Q.  Now, in this case for Mr. Dafala was there any alcohol

22   found in his system?

23   A.  There was no alcohol in his system.

24   Q.  What about any drug of abuse?

25   A.  There were no drugs of abuse in his system.

D3B5dor1                          Smiddy - direct

1   Q.  Any other traces of substances that the medical examiner's

2   toxicology report returned?

3   A.  Yes.  There was a byproduct or metabolite of nicotine which

4   is from cigarette smoking.

5   Q.  Now, was there a microscopic examination of the gunshot

6   entrance wound in this case?

7   A.  Yes.  There was a microscopic examination of the gun shot

8   entrance wound to the wrist.

9   Q.  And what is the significance, if any, of that examination?

10  A.  The doctor will look at a piece of the skin's surface in

11  the underlying tissues under the microscope to see if there is

12  gunpowder residue on the skin's surface or within the soft

13  tissues.  It is an indication, once again, of range of fire.

14  Q.  And in this case what were the results of the microscopic

15  examination?

16  A.  Dr. Mahar was able to identify gunpowder residue under the

17  microscope within the gunshot entrance wound to the wrist.

18  Q.  Doctor, are you familiar with the term cause of death?

19  A.  Yes.

20  Q.  And is that a technical term of art in your field?

21  A.  Yes, it is.

22  Q.  What does it mean?

23  A.  The cause of death is the disease or injury that's

24  responsible for the death.

25  Q.  And, in the autopsy report for Mr. Dafala, is there a

D3B5dor1                         Smiddy - direct

1   conclusion to a reasonable degree of medical certainty as to

2   the cause of his death?

3   A.  Yes.

4   Q.  Do you agree with that conclusion?

5   A.  I do.

6   Q.  What is it?

7   A.  The gunshot wound of the chest with injuries of the left

8   lung and spinal cord.

9           MS. LESTER:  A moment, your Honor?

10          THE COURT:  That's fine.

11          MS. LESTER:  No further questions.

12          THE COURT:  Cross-examination.

13          MS. FONTIER:  Yes, your Honor.

14          THE COURT:  Okay, Ms. Fontier.

15          MS. FONTIER:  Sorry, your Honor.  Mr. Murphy would

16  like to proceed.

17          THE COURT:  That's fine.

18  CROSS EXAMINATION

19  BY MR. MURPHY:

20  Q.  Good morning, Doctor.

21  A.  Good morning, Mr. Murphy.

22  Q.  If I ask you anything you don't understand, please ask me

23  to rephrase it and I certainly will.

24          How many times have you testified in a court of law,

25  approximately?

D3B5dor1                    Smiddy - cross

1    A.  Well over a hundred.

2    Q.  And that is in both state and federal cases?

3    A.  Yes, it is; and family court as well.

4    Q.  So, a significant part of your job is testifying

5    professionally and presenting information to a jury such as you

6    are today, correct?

7    A.  Probably not a significant part but it is an important

8    part.

9    Q.  Fair enough.

10           And so, if you have testified a hundred times how many

11   times have you prepared to testify in court by lawyers?

12   A.  Can you rephrase the question?

13   Q.  Absolutely.

14           If you testified a hundred times how many times do you

15   think you sat down with a lawyer who was asking you questions

16   as Ms. Lester did and gone over what the questions and answers

17   would be in anticipation of taking the stand and giving sworn

18   testimony?

19   A.  Pretrial conference is a common way to sit down with the

20   individual in order to anticipate the questions that I'm going

21   to be asked.

22   Q.  And so you met with Ms. Lester, I presume, before today,

23   correct?

24   A.  Yes, I have.

25   Q.  And you understood what questions she was going to ask you

D3B5dor1                        Smiddy - cross

1    today, of course?

2    A.   Yes.

3    Q.   How many times did you meet with her, ma'am?

4    A.   I met with her about a week ago and I melt with her this

5    morning prior to my testimony.

6    Q.   Now, you indicated earlier that you did not actually take

7    the autopsy yourself, correct?

8    A.   I did not perform the autopsy but I did supervise.

9    Q.   Take the autopsy is probably a poor use of the English

10   language, right?  You perform an autopsy, correct?

11   A.   Yes.

12   Q.   Which means the doctor or medical examiner responsible to

13   do it physically gets in there, hands-on, and looks at the

14   body; correct?

15   A.   Yes.  That is correct.

16   Q.   And as the individual doctor in the room at the time, are

17   you manipulating the body at all or doing any of the physical

18   examination of the body?

19   A.   In this case I was.

20   Q.   So, it was both you at the same time essentially, or no?

21   A.   I was supervising and present, so I guess we're there at

22   the same time.

23   Q.   And, does Dr. Mahar write anything down while she's doing

24   the autopsy?

25   A.   She does.  During the course of the autopsy as well as

D3B5dor1                         Smiddy - cross

1   immediately after the autopsy.

2   Q.  And were you writing anything down at the time?

3   A.  I don't remember but probably not.

4               (Continued next page)

1    BY MR. MURPHY:

2    Q.   Were you in the room the whole time the autopsy was

3    undertaken?

4    A.   I was in the room for a good part of it.  I may have walked

5    out to use the ladies' room or to answer a phone call.

6    Q.   Are you doing other administrative duties at the same time

7    while she's performing her autopsy on that day?

8    A.   I'm also doing my own autopsy in the same room, in the

9    table next to hers.

10   Q.   So you were both doing an autopsy at the same time?  You

11   have that specific recollection as you sit here today?

12   A.   Yes.

13   Q.   Do you know what you reviewed -- withdrawn.  I'm sorry.

14        Do you know what a serology report is, ma'am?

15   A.   I do.

16   Q.   What is a serology report?

17   A.   During the course of the autopsy, the doctor will collect

18   body fluids, blood, hair samples, and sometimes other samples,

19   and send it to our forensic biology lab, and they do serology,

20   which is blood and some DNA tests on the specimens.

21   Q.   Do you know if the serology report was done as a result of

22   this autopsy?

23   A.   It was.

24   Q.   Do you know if that was reviewed at all by Dr. Mahar in

25   drawing any of her conclusions?

D3bWdor2                          Smiddy - cross

1   A.  No.  The doctors do not review the forensic biology

2   laboratory tests in order to draw conclusions about the cause

3   and manner of death.

4   Q.  And so from the serology report would be where one would

5   get DNA evidence, or things of that nature, is that what you're

6   saying?

7   A.  Yes.

8   Q.  How about the toxicology report then, would Dr. Mahar have

9   reviewed that or relied upon that in any way in drawing any of

10  her conclusions?

11  A.  The toxicology report is part of the record, but it is not

12  causative or contributory to the death.

13  Q.  What's the histology report, ma'am?

14  A.  Histology refers to tissue, and that's a microscopic

15  examination that I described in my testimony when the doctor

16  looks under the microscope at the skin or tissues, to determine

17  range of fire, gun powder residue.

18  Q.  Would a histology report have been generated as a result of

19  this autopsy, or no?

20  A.  It was.  That's the microscopic report that Ms. Lester had

21  asked me about.

22  Q.  What is a criminalist, do you know?

23  A.  A criminalist is a broad term.  It refers to a research

24  scientist or a scientist in forensic science.

25  Q.  And criminalists essentially are professional individuals

1  who evaluate crime scenes to reconstruct things that had

2  occurred, is that fair to say?

3  A.  I don't know, counselor.  I don't know how you're

4  describing criminalist.  I think of it as a broad term.

5  Q.  Was any criminalist conferred with in preparing this

6  report, to your knowledge?

7  A.  No.

8  Q.  You referenced earlier blood in the wound and the injuries

9  that occurred to the several wounds in the body.  Let me direct

10  your attention to that for a moment, if I may.  Do you know

11  what bloodstain pattern analysis is, Doctor?

12  A.  No.

13  Q.  Have you ever conferred with or are you aware of blood

14  spatter experts?

15  A.  Yes.

16  Q.  Can you tell the ladies and gentlemen of the jury what a

17  blood spatter expert is?

18  A.  These are individuals who have specialized training in

19  evaluating a crime scene, to look at a blood spatter pattern.

20  Q.  By blood spatter, could you describe that to the jury so

21  they understand what that is?

22  A.  A blood spatter is part of an injury.

23  Q.  Would it be fair to say that as a result of the injuries

24  that were incurred by Mr. Dafala, that he had profuse bleeding

25  as a result of the gunshot wounds?

D3bWdor2                      Smiddy - cross

1   A.  I don't understand the question.

2   Q.  Would one who incurred these sort of gunshot wounds -- one

3   to the forearm, one to the upper arm, and then one to the

4   chest -- generally bleed a great deal?

5   A.  Counselor, it depends upon whether you mean internal

6   hemorrhage or external.

7   Q.  Thank you.  I appreciate that.  My question is external.

8   Would there be substantial external bleeding as a result of

9   those three gunshot wounds to somebody's body?

10  A.  There may or may not.

11  Q.  What determines whether there will or will not be?

12  A.  Whether the bullet passes through any major blood vessel,

13  particularly arteries, in the extremity.  Also, whether the

14  decedent has garments on, the garments will soak up any blood

15  that does come from the body.  So there are several factors.

16  Q.  What is a serologist?

17  A.  A serologist is an individual with specialized training who

18  works in a serology laboratory.

19  Q.  In this case, you did not consult with any serologists --

20  withdrawn.

21      Dr. Mahar didn't confer with any serologists, is that

22  correct?

23  A.  No.  There is no reason to.

24  Q.  Okay.  Let's talk about the time.  Do you know what's

25  called the agonal theory, Doctor?  Do you know what I mean by

1   that term, Doctor?

2   A.  Agonal is a term that we use meaning around the time of

3   death.

4   Q.  Is it fair to say the agonal period is a period in which

5   the person who incurs an injury that leads to their death, from

6   the time they get that injury until the time that they

7   ultimately expire, is that a fair definition of agonal period?

8   A.  Probably not.

9   Q.  What is inaccurate about what I said?

10  A.  Well, could you rephrase the question?

11  Q.  There is some time period, when someone like Mr. Dafala

12  gets shot, he doesn't die immediately, correct?

13  A.  Correct.

14  Q.  So there is some period of time after which he continues to

15  live before he ultimately expires, correct?

16  A.  Yes.

17  Q.  And there's no way for you as a medical examiner or

18  forensic pathologist to determine how long he lived after he

19  was shot, correct?

20  A.  That is correct.

21  Q.  And that time period could be a fairly extended time

22  period, or it could be a very short time period; that depends

23  on a lot of factors, correct?

24  A.  Oh.  Are you talking about this case, counselor, or in

25  general?

1    Q.  I think I should talk about this case because that's what's

2    important here.  With respect to this case, there are a lot of

3    factors that have to be taken into account to even speculate or

4    guesstimate about how long Mr. Dafala was alive after he was

5    shot, correct?

6    A.  That's incorrect.

7    Q.  What would you look at to determine that?

8    A.  The nature of the injuries.

9    Q.  But there is no way to tell for certain what that time

10   period was, correct?

11   A.  No, but it could be narrowed down.

12   Q.  There are examples of people living for fairly substantial

13   portions of time even after incurring a wound such as

14   Mr. Dafala incurred, correct?  It depends --

15   A.  No.  Counselor.

16   Q.  Let me backtrack and see if I can clarify this.  What are

17   the factors that would come into play in determining how long

18   an individual such as Mr. Dafala could have survived after

19   incurring a wound such as this?

20   A.  In this particular case, with the bullet perforating the

21   lung and the significant amount of hemorrhage within his left

22   thoracic cavity, and then perforating the spinal cord, the

23   death would probably occur within seconds to minutes.

24   Q.  But my question to you, Doctor, was what factors would

25   determine whether it happened in seconds or it happened in

D3bWdor2                          Smiddy - cross

1    minutes?

2    A.  Counselor, I believe I just explained that.  The bullet

3    passed through a major organ that is responsible for sustaining

4    life, and that's the lung.  And then it perforated and became

5    embedded within the spinal cord, another major organ that's

6    responsible for sustaining life.

7    Q.  Let me restate the question because I think you

8    misunderstood what I'm saying.  Different people would react to

9    this in different ways, correct?  Different individuals with

10   physical characteristics would react to injuries such as this

11   in different ways, correct?

12   A.  That's incorrect, counselor.

13   Q.  A larger person who incurred the same injuries wouldn't

14   perhaps live for a longer period of time than a smaller

15   individual who was shot in the same manner?

16   A.  The lung and the spinal cord are very important organs, and

17   when they're damaged significantly, it leads to death.

18   Q.  Okay.  Well, we can move on.  Let's get to the next

19   subject.

20          You, as a medical professional and forensic

21   pathologist, or anyone similarly situated, such as Dr. Mahar,

22   cannot tell specifically what occurred in the immediate moments

23   leading up to a shooting such as this, correct?

24   A.  That is correct.

25   Q.  So, for example, it appears from our review of this report

D3bWdor2                          Smiddy - cross

1   that the victim had a hand up and the bullet went through the

2   arm, the forearm, I mean, then through somewhere what I would

3   call the bicep and then lodged itself in the side of the chest

4   cavity, is that correct, Doctor?

5   A.  That's incorrect.

6   Q.  What portion did it go through?  What am I wrong about

7   that?

8   A.  It did not become lodged within the side.  The bullet

9   became lodged within the spinal cord.

10  Q.  Thank you.  Okay.  But in terms of the path of the bullet,

11  okay, it went through this one arm, forearm, through the bicep

12  then into chest cavity ultimately stopping in the spinal cord,

13  correct?

14  A.  Yes.

15  Q.  So as a medical professional, forensic pathologist, you

16  can't offer an opinion about whether the moment this man was

17  shot he was moving forward or backward, correct, or standing

18  still?

19  A.  That is correct.

20  Q.  He could have been moving forward, correct, when he was

21  shot?

22  A.  It's one possibility.

23  Q.  He could have been standing still when he was shot,

24  correct?

25  A.  Another possibility.

1   Q.  Or he could have been moving backwards when he was shot,

2   correct?

3   A.  Another possibility.

4   Q.  And you talked about gun powder in a wound.  How far is the

5   outer limit of how far a gun could be from a wound to put gun

6   powder into that wound?

7        That was a poorly crafted question.  Can I restate it?

8   A.  Would you rephrase the question, please.

9   Q.  Yes.  I'm sorry.

10       You talked about proximity between the muzzle of a gun and

11  a wound.  I'm bringing you back to that.  Okay?  What was it

12  you called the powder in the wound?  There's a term of art you

13  mentioned.

14  A.  Fouling, or soot.

15  Q.  With a handgun, and if you can't offer an opinion about

16  this, then please tell me you can't, what is the outer distance

17  that gun could be from the victim and still cause gun powder,

18  or soot, on the skin?

19  A.  It depends upon the type of firearm, the length of the

20  barrel, and the type of gun powder residue.  But generally,

21  it's within six inches.

22  Q.  And it could be -- so, all right.  Let's go through this

23  piece by piece.  It depends on the type of gun you have,

24  correct?

25  A.  It depends upon the type of firearm, the handgun.

D3bWdor2                         Smiddy - cross

1   Q.  It depends upon what kind of bullet that might have been

2   used?

3   A.  The type of gun powder.

4   Q.  And it would depend on the length of the muzzle?

5   A.  No, counselor.  The length of the barrel.

6   Q.  Length of the barrel, okay.  Any other factors that might

7   determine that?

8   A.  Those are the three big ones.

9   Q.  Could it ever go as far as five or six feet; you'd still

10  have, in fact, stippling or gun powder residue on the wound?

11  A.  Not with a handgun.

12  Q.  Only with a shotgun?

13  A.  I don't know, counselor.  Not with a handgun.

14  Q.  Do you know what I mean by the term "overkill"?

15  A.  I don't.

16  Q.  So in terms of the amount of bleeding, you were not

17  familiar with what went on at the crime scene, correct?

18  A.  Correct.

19  Q.  You didn't review photos of the crime scene, or things of

20  that nature, correct?

21  A.  Correct.

22  Q.  And you can't, as you sit here today, opine on the extent

23  of the bleeding that may or may not have occurred to the victim

24  when he was in that vehicle, correct?

25  A.  Could you rephrase that question?

D3bWdor2                         Smiddy - cross

1   Q.  You're just not sure how much bleeding occurred in that car

2   on the day in question, correct?

3   A.  That's correct.

4   Q.  It could have been a great deal, it could have been a

5   little; it depends on a lot of different factors.  That's your

6   position, correct?

7   A.  It's irrelevant to the cause and manner of death.

8   Q.  Fair enough.  And that's what you're here for, the cause

9   and manner of death, correct?

10  A.  Yes.

11  Q.  What is biological matter, Doctor?  Do you know what I mean

12  by that term?

13  A.  It has --

14  Q.  It's not a term you use?

15  A.  It's not a term that I use.

16  Q.  So --

17  A.  I could probably give a lecture on biologic matter, but --

18  could you rephrase the question.

19  Q.  Sure.

20  A.  Or ask me a question I can answer.

21  Q.  Sure.  We would call, blood would be biological matter,

22  correct?

23  A.  Yes.

24  Q.  Hair would be biological matter, right?

25  A.  Yes.

D3bWdor2                          Smiddy - cross

1   Q.  Saliva, same thing?

2   A.  Yes.

3   Q.  And even something as small as skin cells would be

4   biological matter, correct?

5   A.  Yes.  Anything that pertains to the human body we generally

6   think of as biologic matter.

7   Q.  As a forensic pathologist, can you explain to the jury how

8   biological matter might be left at the scene of a crime such as

9   this?

10  A.  If a person bleeds, if they're scraping up against a

11  surface, if they're salivating.

12  Q.  So it could be anything?  The victim's blood would be

13  there, it would be biological matter, correct?

14  A.  Many possibilities.

15  Q.  If the victim's hair was left there, that would be

16  biological matter as well?

17  A.  Yes.

18  Q.  Even something as simple as the skin cells, if they were

19  rubbed on something, would be biological matter that could

20  potentially be left at the scene, correct?

21  A.  It's possible.

22  Q.  By the same token, the assailant could leave biological

23  matter at a crime scene such as this, correct?

24  A.  Yes.

25  Q.  And that would be hair, right?

D3bWdor2                          Smiddy - cross

1   A.  Yes.

2   Q.  Or blood if they got cut as well, right?

3   A.  Possible.

4   Q.  Or even something as simple as the skin cells if that

5   assailant had rubbed against something, correct?

6   A.  It's possible.

7   Q.  Or saliva, of course, right?

8   A.  Yes.

9   Q.  Can I direct you to your report, if you would, ma'am.  It's

10  not your report, of course, Dr. Mahar's report, which has now

11  been marked in evidence as GX500.  If you turn through, there's

12  something called a scene investigation form.  Do you see that

13  there, ma'am?

14  A.  May I see what you're referring to, counselor.

15  Q.  Sure.

16          MR. MURPHY:  Your Honor, may I.

17          THE COURT:  Yes.

18  BY MR. MURPHY:

19  Q.  Directing your attention, Dr. Smiddy, to what's been, and

20  the pages are not numbered, but it's in the GX500 and it's page

21  one of four, and the title across the top is Office of Medical

22  Examiner, City of New York, scene investigation form.  Do you

23  see it, ma'am?

24  A.  I do.

25  Q.  What is that form?

D3bWdor2                          Smiddy - cross

1    A.  This is a document that our medical legal investigator will

2    prepare as he or she goes to the scene to do an examination,

3    and they will write notes about the scene and, more

4    specifically, their findings on external examination of the

5    decedent.

6    Q.  So, a representative of the office of the medical examiner

7    went to the location on December the 12th, 2011, correct?

8    A.  Yes.

9    Q.  And who was that?

10   A.  That was Mr. Robert Yee, Y-E-E.

11   Q.  Robert Yee is not a medical doctor, or he would be a

12   medical doctor?

13   A.  Robert Yee is not a physician.  He is a licensed physician

14   assistant with specialized training in forensics.

15   Q.  And Mr. Yee himself, how long has he been with the office,

16   do you know?

17   A.  I don't know.  Around ten years or so.

18   Q.  And he goes and prepares this report after evaluating the

19   crime scene, correct?

20   A.  Yes.

21   Q.  And he's been trained to do this, correct?

22   A.  Yes, he has.

23   Q.  And certainly he knows the importance of what he observes

24   and how he notes them in a report such as this, of course,

25   correct?

D3bWdor2                        Smiddy - cross

1   A.  I can't speak for Mr. Yee, but --

2   Q.  That's what you're trained, or you train your folks up at

3   the Office of the Chief Medical Examiner, when you train them

4   how to prepare these reports, correct?

5   A.  Yes.

6   Q.  Be very deliberate about what you write, correct?

7   A.  Yes.

8   Q.  And if you turn to page two of four, I note that he says

9   there, "Supine wedged between" -- withdrawn.  Where it says

10  "body location and position," about three-quarters of the way

11  down, do you see that, ma'am?

12  A.  I do.

13  Q.  Can you read for the record what it says there?

14  A.  "Supine, wedged between front driver's seat and driver's

15  side rear seat."

16  Q.  And it's part of his obligation, and by his, I mean

17  Dr. Yee's obligation, when he gets to the crime scene, to

18  record what the body location and position is when he gets

19  there, correct?

20  A.  Mr. Yee, he is not a physician.  Mr. Yee will go and record

21  the body location when he arrives at the scene.  In some

22  instances, the body has been moved prior to his arrival.  If

23  emergency medical technicians have been called or detectives

24  have to move the body because of a public view, there are many

25  reasons why the body may be moved prior to his arrival at a

D3bWdor2                          Smiddy - cross

1    scene.

2    Q.  Right.  He seems to have indicated when he got there the

3    body was still in the vehicle, correct?

4    A.  I don't know.

5    Q.  That's what is indicated in the report, however, is that

6    correct?

7    A.  The body -- in this, it says the body is wedged between the

8    front driver's seat and the driver's side rear seat.  So that

9    is an indication that the body is in a vehicle.

10   Q.  Or wedged and pushed down in the vehicle, correct?

11   A.  The body is in a vehicle.

12   Q.  Well, he used the word "wedged" though, correct?

13   A.  Counselor, that's what he has in his report.

14   Q.  Okay.  Let's talk for one moment about the bullet.  Did you

15   see that bullet removed from the victim's body, or no?

16   A.  I don't recall.

17   Q.  And do you know what happened to the bullet?  You didn't

18   personally do anything with that bullet once it was taken from

19   the body, correct?

20   A.  The medical examiner assigned to the case is responsible --

21   Q.  That wasn't my question.  It was a question directed to

22   you, Dr. Smiddy.  You did not personally do anything with the

23   bullet once it was removed from the body, correct?

24   A.  I may have.

25   Q.  You have no independent recollection of having done so?

1    A.  I -- may I explain to the jurors?

2    Q.  Sure.

3            THE COURT:  Just answer the question, yes or no.

4            THE WITNESS:  I can't answer it yes or no, your Honor.

5            THE COURT:  You either have an independent

6    recollection or you don't, so I think you can.  Do you have an

7    independent recollection of handling the bullet?

8            THE WITNESS:  I don't.

9            THE COURT:  Okay.  Next question.

10   BY MR. MURPHY:

11   Q.  And you don't have any specific training in ballistics, or

12   anything of that nature, correct?

13   A.  I have training in ballistics.  During the course of our

14   fellowship training, we do rotate through the NYPD firearms and

15   ballistics division, and I also do lectures on gunshot wounds

16   where I incorporate some aspects of firearms and ballistics.

17   Q.  But you're not --

18   A.  But I am not an expert.

19   Q.  So you can't identify what bullet is from what make or

20   model or any type of bullet specifically?  As you said

21   previously; there are small, medium, and large, I think you

22   said?

23   A.  Yes.  We keep it rather brought broad.

24   Q.  And that bullet that was vouchered or that is before you,

25   is it deformed?

1   A.  Yes, it is.

2   Q.  And though you don't know what type of gun that bullet came

3   from, correct?

4   A.  No.  There's no way to know the type of firearm.

5           MR. MURPHY:  I have no further questions.  Thank you.

6           THE COURT:  Okay.  Ms. Fontier.

7           MS. FONTIER:  Thank you, your Honor.

8   CROSS-EXAMINATION

9   BY MS. FONTIER:

10  Q.  Good morning, Dr. Smiddy.

11  A.  Good morning.

12  Q.  I'll be very brief.  I have a couple of questions about the

13  notations in the report.  First, I believe you testified on

14  direct that samples of different portions of the body were

15  collected and sent to the serologist for toxicology, correct?

16  A.  Samples were collected for toxicology and samples were sent

17  to forensic biology.  Or serology.

18  Q.  And those are to do further testing and collection of

19  evidence, correct?

20  A.  Those are to do laboratory tests on evidence.

21  Q.  And so those laboratory tests are, again, the toxicology,

22  whether there were drugs or alcohol in the person's system,

23  correct?

24  A.  Yes.

25  Q.  And then there is also, the serologist, is that to do DNA

1   testing, or what does the serologist test for?

2   A.  The serologist tests is it blood or not, is it saliva or

3   not, semen or not.  They may do further testing for DNA.

4   Q.  And that's to say whether the material that was

5   collected -- whether it's saliva, sweat, blood -- is from the

6   person, the decedent, or from someone else?

7   A.  Both.

8   Q.  And in this case, samples of biological matter were sent

9   for further testing, correct?

10  A.  Yes, they were.

11  Q.  And again, you said the toxicology report was done, and

12  then you also collected the -- not you, but the bullet that is

13  now in evidence was collected from inside of this person's

14  spine, correct?

15  A.  Yes.

16  Q.  And then that was sent to ballistics, correct?

17  A.  Yes.

18  Q.  And that was sent for further testing?

19  A.  Yes.

20  Q.  Now, if you want to, just so you have it, you still have

21  the report in front of you, correct?

22  A.  Yes.

23  Q.  Looking at Government Exhibit 500, the second page of that

24  report, under the heading of "clothing --"

25  A.  Yes.

1    Q.  -- it states the hands are bagged.  Did you observe that?

2    A.  Yes.

3    Q.  And how did that appear?

4    A.  These are brown paper bags that are put on at the scene,

5    secured at the wrists, with evidence tape.

6    Q.  And these were bags that were placed on, it appeared to

7    you, by the police, correct?

8    A.  I don't know who placed them.  Generally, it's the police,

9    but they're placed at the crime scene.  They're not placed in

10   the mortuary.  They're removed in the mortuary, to examine the

11   hands.

12   Q.  And those bags are placed over the hands to protect any

13   evidence that may be on the decedent's hands, correct?

14   A.  Yes.

15   Q.  And so that you can examine those hands and, if need be,

16   send anything collected from the hands for further testing?

17   A.  Yes.

18   Q.  And that's to examine under the nails?

19   A.  Well, we examine the nails.

20   Q.  And in this case, that examination was done, correct?

21   A.  Yes.

22   Q.  I just want to be clear.  In this report, there are

23   multiple gunshot entries and exits that are listed, I believe.

24   An entry on one side of the wrist, an exit on the other, an

25   entry on the bicep, an exit on the other, and an entry into the

D3bWdor2                          Smiddy - cross

1    chest area, correct?

2    A.  Yes.

3    Q.  But that is all from a single shot, right?

4    A.  Yes.

5    Q.  Now, let me find the correct page.  If you go to what is

6    listed as the case worksheet, which has the handwriting sample

7    on it, if you can tell me when you find that page --

8    A.  Yes.

9    Q.  -- the date and time of the injury is listed as December

10   12, 2011, at 11:50 a.m., is that correct?

11   A.  Yes.

12   Q.  Where does that information come from?

13   A.  This comes from the police report that the doctor is given

14   during or shortly after the autopsy.

15   Q.  So that injury time is only as accurate as the information

16   that is relayed by the police, correct?

17   A.  Yes.

18   Q.  That's not based on a scientific examination of the body?

19   A.  Not at all.

20   Q.  So you don't know if that is an actually correct time?

21   A.  No.  There's no way to know what time the shooting

22   occurred, at the autopsy table.

23            MS. FONTIER:  I have nothing further, your Honor.

24            THE COURT:  Redirect?

25            MS. LESTER:  No, your Honor.  Thank you.

D3bWdor2                        Smiddy - cross

1            THE COURT:  Doctor, thank you very much.  You may step

2   down.

3            (Witness excused)

4            THE COURT:  Government, next witness.

5            MS. MASELLA:  Your Honor, we call Detective Matthew

6   Janisch.

7    MATTHEW JANISCH,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MS. MASELLA:

12  Q.  Good morning, sir.

13  A.  Good morning.

14  Q.  Can you tell us where you work, sir?

15  A.  The crime scene unit in the NYPD.

16  Q.  How long have you worked in the crime scene unit?

17  A.  For three years.

18  Q.  What is your title within the crime scene unit of the NYPD?

19  A.  Detective or crime scene investigator.

20  Q.  How long have you been a detective?

21  A.  A year and a half.

22  Q.  Can you tell us as a detective with the crime scene unit

23  what your duties and responsibilities are?

24  A.  Sure.  We respond to various crimes, homicides, arson,

25  rapes, police-involved shootings, or felony assaults where the

1    victim sustains life-threatening injuries.  Once we're at the

2    scene, we assist the precinct detectives with their case by

3    searching for and collecting forensic or physical evidence,

4    taking photographs of the scene and the evidence, and then

5    doing a sketch of the scene.

6    Q.  In which geographic areas of New York City do you perform

7    these investigations?

8    A.  All five boroughs.

9    Q.  And during the course of your duties at the crime scene

10   unit, approximately how many different crime scenes have you

11   analyzed?

12   A.  Approximately about 70.

13   Q.  What type of training, if any, have you received in the

14   processing and analysis of crime scenes?

15   A.  Sure.  When we first get transferred to the crime scene

16   unit, you partake in a ten-week training program, which teaches

17   you general crime-scene processing, time and date, how to use

18   the camera, what to take pictures of, how to dust for

19   fingerprints, how to collect different kinds of evidence, how

20   to use different chemicals to enhance blood and patent

21   fingerprints, a whole assortment of training.

22   Q.  Over the course of your career with the crime scene unit,

23   have you collected evidence and processed crime scenes related

24   to gunshots and shootings?

25   A.  Yes.

D3bWdor2                         Janisch - direct

1    Q.  Approximately how many of those?

2    A.  Oh, several.  Say 30, or so.

3    Q.  Detective Janisch, I want to now direct your attention to

4    the afternoon of December 12, 2011.  Were you working that day?

5    A.  Yes, I was.

6    Q.  Did you respond to a crime scene that day?

7    A.  I did.

8    Q.  Approximately what time did you respond to that crime

9    scene?

10   A.  I left my office at 1315, or 1:15 p.m., and I arrived at

11   the scene at 1415, or 2:15 p.m.

12   Q.  Where was the crime scene?

13   A.  It was at the corner of Duryea.  I'm not sure if I'm saying

14   that street name right, Duryea and Strang.

15   Q.  Can you spell that?

16   A.  D-U-R-Y-E-A.

17          THE COURT:  It's Duryea.  Go ahead.

18   BY MS. MASELLA:

19   Q.  In what borough is that?

20   A.  That's in the Bronx.

21   Q.  Do you know what precinct that is within?

22   A.  The four seven.

23   Q.  And when you arrived in that area, what did the crime scene

24   look like?

25   A.  Standard intersection.  It's blocked off with yellow police

D3bWdor2                          Janisch - direct

```
 1    tape, protecting or stopping any vehicular or pedestrian

 2    traffic from flowing through, and also uniformed members of the

 3    service and marked police vehicles.

 4             THE COURT:  Detective, can I ask you to just slow down

 5    a touch?

 6             THE WITNESS:  Sorry.  Yeah.

 7             Just raise your hand if you need me to slow down, too.

 8             THE COURT:  It's the court reporter I worry about.

 9    The theorists can usually keep up faster than the fingers.

10    Although the court reporters are very, very good, it's just

11    better.  This way we have no mistakes or reasonable prospects

12    of mistakes.

13             Go ahead.

14    BY MS. MASELLA:

15    Q.  When you arrived at the scene, were there any victims

16    present?

17    A.  Yes, there was one.

18    Q.  Where was the victim present at the scene?

19    A.  Inside of the minivan.

20    Q.  What was the condition of the victim?

21    A.  He was deceased from a gunshot wound.

22    Q.  Approximately how much time did you spend at the crime

23    scene analyzing?

24    A.  I believe it was five hours.  I just have to double-check

25    my notes on that, if that's okay.
```

1   Q.  Detective, at this point, we can just go based on your

2   recollection.

3   A.  Okay.  About five hours.

4   Q.  And what generally did you do to analyze the crime scene

5   while you were there during those hours?

6   A.  Well, you first meet with the catching detective and we'll

7   do a brief walk through of the scene, a conferral as to what

8   might have happened as of thus far.  From there, I will take

9   overall photographs of the scene, as is, when I arrived.  Then

10  I wait for an MLI, medical legal examiner, to arrive at the

11  scene to document the body and go over the decedent for any

12  injuries.  Once that's done, I will then process the inside of

13  the car, photograph the inside of the car, and collect any

14  evidence.

15  Q.  Detective, I'm going to approach and hand you a folder with

16  several documents.

17  A.  Sure.

18  Q.  The first one has been marked as Government Exhibit 3553F

19  for identification.  It should be right on top of the pile.

20  A.  Mm-hmm.

21  Q.  Could you take a look at that and tell us if you know what

22  that is?

23  A.  I do.  That is a computer-generated sketch that I create

24  from my hand-drawn sketch of the scene.

25  Q.  How is it that you're able to recognize it as a sketch of

1    this case?

2    A.  It has a title at the top with my name on it.

3    Q.  When did you create that sketch?

4    A.  A day or two after the incident.

5    Q.  As far as you know, is it a fair and accurate depiction of

6    the crime scene as you sketched it that day?

7    A.  Yes.

8            MS. MASELLA:  Your Honor, the government offers

9    Exhibit 3553F.

10           THE COURT:  Any objection?

11           MS. FONTIER:  Sorry, your Honor.  I'm just trying to

12   locate it.

13           MR. ROTH:  3533F.

14           THE COURT:  3553F.

15           THE WITNESS:  3533F.

16           MS. MASELLA:  Ms. Brady, may we --

17           MS. FONTIER:  Your Honor, I have no objection, now

18   that I've seen it.

19           MR. ROTH:  No objection.

20           THE COURT:  So 3533F.  I think somebody may have said

21   3553, at least that's what's in the transcript, and that's what

22   I heard.  3533F is received.

23           (Government's Exhibit 3533F received in evidence)

24           THE COURT:  Are you going to show it?

25           MS. MASELLA:  Yes.

1          THE COURT:  Okay.  Let's do that.

2          MS. MASELLA:  Thank you.  One moment, your Honor.

3          Your Honor, I apologize.  The government has also

4   marked the same document as Government Exhibit 200A.  We would

5   also offer Government Exhibit 200A, which is more accessible in

6   our computer system.

7          THE COURT:  200A, you said?

8          MS. MASELLA:  Yes.

9          THE COURT:  No objection to 200A, the representation

10  is accurate, so 200A is received.

11          (Government's Exhibit 200A received in evidence)

12          MS. MASELLA:  Ms. Brady, could you blow it up a little

13  bit.  Thank you.

14  Q.  Detective Janisch, we're looking at Government Exhibit

15  200A.  Can you tell us what it is that you have depicted in

16  this sketch?

17  A.  Sure.  That's the scene that I sketch at the actual crime

18  scene.  Duryea is going northbound where the vehicles are

19  located.  Where you can see MJ1, that's the vehicle in

20  question.  And MJ1 is the actual piece of evidence that's

21  inside the car, just so you know which vehicle I'm talking

22  about.

23  Q.  When you talk about MJ1 as being a piece of evidence inside

24  the car, what is that evidence that you're referring to?

25  A.  It's a discharged shell casing.

D3bWdor2                          Janisch - direct

```
 1   Q.  What else do we see in the crime scene sketch, 200A?
 2   A.  Just a general of the area of Duryea and Strang and where
 3   the vehicle's located.
 4   Q.  Detective, can you take a look at the folder in front of
 5   you, which contains what's been marked as Government Exhibits
 6   201 through 265, and tell us if you recognize those items?
 7   A.  Yes.  These are the photos that I took at the crime scene.
 8   Q.  Did you take them during your course of investigation on
 9   December 12, 2011?
10   A.  Yes.
11   Q.  Do those photographs fairly and accurately depict the items
12   at the crime scene as you photographed them that day?
13   A.  Yes.
14          MS. MASELLA:  Your Honor, the government offers
15   Government Exhibits 201 to 265.
16          THE COURT:  All right.  But there are a number of
17   exhibits in that range that I think we had talked about before,
18   so I will, if you're going to show certain ones.  Right?
19          MS. MASELLA:  Correct.  I thought we had reserved.
20          THE COURT:  Yes, but I want to be clear about which
21   ones you're reserving on.  That's why I asked.
22          Previously, before you came out, we talked about
23   certain exhibits that I've reserved on, so I'm going to admit
24   these with the proviso that certain ones I may revisit, but
25   none of those are the ones that are going to be shown so we can
```

1    show the exhibits that we previously discussed.

2              (Government's Exhibits  201-265 received in evidence)

3              MS. MASELLA:  Ms. Brady, can we put up Government

4    Exhibit 254, please.

5    Q.  Detective Janisch, can you tell us what it is that we're

6    looking at in this photo?

7    A.  Sure.  That's -- I'm standing on Duryea looking southbound

8    towards Strang Avenue, and the minivan is the minivan in

9    question on the east side of the building.

10   Q.  What color is the minivan?

11   A.  Silver.

12   Q.  Just for the jury's reference, where is it parked in this

13   photograph?

14   A.  It right behind that green conversion van.  Kind of see it,

15   but --

16   Q.  You're indicating toward the middle of the photograph, near

17   the --

18   A.  Yeah, by, in front of the brick building behind the van.

19             MS. MASELLA:  Ms. Brady, could we look at Government

20   Exhibit 250, please.

21   Q.  Detective Janisch, what is that?

22   A.  That is the minivan, the rear of it.

23   Q.  Are you able to read the license plate in this photo?

24   A.  I am.

25   Q.  Could you just read that for us?

1    A.  I believe it's D, as in David; L, as in Larry; X, as in

2    x-ray, 9048.

3    Q.  And that's a New York State plate, correct?

4    A.  Yes.  Sorry.

5           MS. MASELLA:  Ms. Brady, could we look at Government

6    Exhibit 230, please.

7    Q.  Detective, can you tell us what it is that we're looking at

8    in this photo?

9    A.  That's a photo looking inside of the driver's door, with

10   the victim laying face up behind the driver's seat.

11   Q.  So the seat depicted here is the driver's seat?

12   A.  Yes.

13   Q.  And where is it that the victim is positioned?

14   A.  Face up, and behind the driver's seat towards the, in

15   between the driver's seat and the rear passenger bucket seats.

16          MS. MASELLA:  Ms. Brady, can we look at Government

17   Exhibit 240, please.

18   Q.  What is it that we're looking at in that photo, Detective

19   Janisch?

20   A.  That is going to be showing the victim from the passenger's

21   side, passenger's sliding door.

22   Q.  So the victim's feet are in which direction?

23   A.  By the passenger's side.  The head is going to be by the

24   driver's side, feet by the passenger's side.

25   Q.  Detective, is there any blood depicted in this photograph?

D3bWdor2                          Janisch - direct

1   A.  Yes.  There is.

2   Q.  Can you describe where that is in the photograph?

3   A.  Sure.  It's on the driver's seat, the rear of the driver's

4   seat and the headrest, and also the driver's side passenger's

5   seat, as well as on the floor.

6            MS. MASELLA:  Ms. Brady, you can take that down.

7   Thank you.

8   Q.  Detective, was there any further investigation with respect

9   to the victim that took place at the scene?

10  A.  Yes.

11  Q.  Did you do that by yourself or were you assisted by

12  someone?

13  A.  Assisted by someone, what I called the MLI, they're

14  investigators from the medical examiner's office.

15  Q.  And did you help that person from the medical examiner

16  conduct a further investigation with respect to the victim?

17  A.  Yes.

18  Q.  Can you tell us what that investigation was conducted by

19  you and the medical examiner's investigator?

20  A.  Sure.  We looked for what kind of injuries the victim

21  sustained, which ended up being three gunshot wounds.

22  Q.  And did that occur inside the minivan or outside the

23  minivan, or both?

24  A.  Not too sure.  Could be --

25  Q.  I'm sorry.  Did the investigation occur?

D3bWdor2                           Janisch - direct

1    A.  Oh.  The investigation was outside of the minivan.  We

2    removed the body and then we conducted the investigation

3    outside.  We have more room to work.

4              MS. MASELLA:  Ms. Brady, may we have Government

5    Exhibit 218, please.

6    Q.  Detective, can you tell us what it is we're looking at in

7    this photograph?

8    A.  That's going to be one of the gunshot wounds to the

9    victim's left side, underneath his armpit, kind of the flank

10   area.

11             MS. MASELLA:  Ms. Brady, may we have 220.

12   Q.  Can you tell us what that is, Detective?

13   A.  That's one of the gunshot wounds to the left wrist.

14             MS. MASELLA:  Thank you, Ms. Brady.

15   Q.  Do you recall anything else about the condition of the

16   interior of the minivan?

17   A.  The glove box was ripped out and on the floor in the

18   passenger's, passenger's side of the floor, in the front seat.

19   And there was a couple suitcases in the back and no rows of

20   seating in the back.  And actually, the engine was also running

21   with the keys in the ignition by the time I arrived.

22   Q.  The engine was still running when you were present on the

23   scene?

24   A.  Correct.

25             MS. MASELLA:  Ms. Brady, may we have Government

1  Exhibit 239, please.

2  Q.  Detective Janisch, can you tell us what it is we're looking

3  at in this photo?

4  A.  Yes.  That is the glove box that was ripped down and on the

5  floor.

6  Q.  On the floor inside of the compartment of the car?

7  A.  Oh, yes.  You could also see the keys in the ignition as

8  well.

9        MS. MASELLA:  Can we look at 236, please.

10 Q.  What is that, Detective Janisch?

11 A.  Just a close-up of the glove box on the floor.

12 Q.  Is that where the glove box was when you first arrived on

13 the scene?

14 A.  Yes.

15       MS. MASELLA:  Ms. Brady, may we have Government

16 Exhibit 228, please.

17 Q.  Detective Janisch, what are we looking at in this

18 photograph?

19 A.  That was a stack of cash that was underneath the seat, I

20 believe, on the rear passenger's side seat.

21       MS. MASELLA:  227, please.

22 A.  Close-up of the money.

23 Q.  Did you do anything with respect to the stack of cash that

24 we're looking at in Government Exhibit 227?

25 A.  Yeah.  What I do is I put it in a brown bag and then I seal

1    it with evidence tape.  I hand it to the safeguarding officer,

2    who was ultimately the invoicing officer, and he'll bring it

3    back to the precinct to count in front of the desk sergeant.

4    Q.  Did you actually count the money that day?

5    A.  I did not.

6    Q.  When you refer to invoicing officer, can you explain what

7    the invoicing officer is and what an invoice is?

8    A.  Sure.  An invoice is any piece of evidence that gets

9    collected from the scene, what we call invoiced.  There is a

10   number specifically assigned to that piece of evidence so that

11   stays with it so it can later be recalled.

12          MS. MASELLA:  Ms. Brady, may we look at Government

13   Exhibit 214, please.

14   Q.  Detective Janisch, what is it that is depicted in this

15   photograph?

16   A.  That, that is the discharged shell casing that was

17   recovered inside of the vehicle.

18   Q.  What area of the vehicle is in this photograph?

19   A.  It's on the floor in between the front seats and the rear

20   seats.  By the floor mat by the center console.

21   Q.  Where is this shell casing in relation to where the

22   victim's body was when you arrived at the scene?

23   A.  It was underneath him.

24   Q.  This photo was taken after he was removed from the car?

25   A.  Correct.

1          MS. MASELLA:  Ms. Brady, may we look at 203, please.

2     Q.  Could you tell us what we're looking at in this photo,

3     Detective?

4     A.  Sure.  It's just a close-up of the shell casing that was

5     inside the vehicle.  Once I collect it, I just put a blue scale

6     next to it and I will put the date, the precinct and the, our

7     run number that we give it, and also the initials MJ1.  MJ is

8     my name, for my initials, and then the number one.  Every piece

9     of evidence gets the number.

10    Q.  When you refer to the run number, what does that refer to?

11    A.  That's our job number.  Every job that comes into our

12    office gets assigned a unit number.

13    Q.  Do you recall what caliber shell casing is depicted in this

14    photo?

15    A.  I believe it's a nine millimeter.

16         MS. MASELLA:  Ms. Brady, may we have 208, please.

17    Q.  Detective, what is depicted in Government Exhibit 208?

18    A.  That is from the rear of the vehicle, looking in, just

19    so -- there's two suitcases, or I guess three suitcases in

20    there, and then the passenger seats ahead of them.

21    Q.  Did you look inside of the suitcases?

22    A.  I don't recall, to be -- I'm assuming I did, but I don't

23    recall.

24    Q.  But as far as you're aware, was there any evidence

25    collected from the suitcases?

D3bWdor2                          Janisch - direct

1    A.  Not inside, no.

2              MS. MASELLA:  Ms. Brady, may we have Government

3    Exhibit 205.

4    Q.  What are these items, Detective?

5    A.  When the MLI that I spoke of earlier was there, they go

6    through pockets to see if there's any wallet with any ID, and

7    that's what was found on the individual at the time.

8              MS. MASELLA:  One moment.

9              Your Honor, no further questions for this witness at

10   this time.

11             THE COURT:  Okay.  Cross-examination.

12             MS. FONTIER:  Briefly, your Honor.

13   CROSS-EXAMINATION

14   BY MS. FONTIER:

15   Q.  Good morning, Detective.

16   A.  Good morning.

17   Q.  You responded to this location, Strang Avenue and Duryea

18   Avenue, on December 12, 2011, correct?

19   A.  Correct.

20   Q.  What time did you arrive?

21   A.  1415 hours, I believe.  2:15 p.m.

22   Q.  So 2:15 p.m., and you said there were other officers

23   already on the scene, correct?

24   A.  Correct.

25   Q.  And that the vehicle, at least the evidence tape stopping

D3bWdor2                         Janisch - cross

1    the traffic was already in place, correct?

2    A.  Yes.

3    Q.  So your role in this investigation was to document the

4    scene, correct?

5    A.  Correct.

6    Q.  And that is to do a thorough examination and take

7    photographs?

8    A.  Correct.

9    Q.  And evidence collection, correct?

10   A.  Yes.

11   Q.  And what you did on December 12 took approximately five

12   hours?

13   A.  Correct.

14   Q.  So that's a very thorough examination then, correct?

15   A.  I think so.

16   Q.  You look inside the vehicle?

17   A.  Yes.

18   Q.  Looked outside the vehicle?

19   A.  Yes.

20   Q.  You looked in all of the different parts of the car,

21   correct?

22   A.  An initial search, yes.

23   Q.  And also you took 66 photos at the time that you were

24   there, right?

25   A.  Yes.

D3bWdor2                          Janisch - cross

1   Q.  So from all the different angles, correct?

2   A.  Yes.

3   Q.  Now, the pictures that we've seen, the body, the person who

4   was killed, did not have bags over his hands.  Did you place

5   bags on his hands when he was removed?

6   A.  Yes.

7   Q.  You're the person who actually did that?

8   A.  Yes.

9   Q.  And you did that in order to preserve any evidence that

10   might be on the hands, correct?

11   A.  Correct.

12   Q.  And you're aware that testing can be done for DNA and

13   different testing can be done on a person's hands?

14   A.  Correct.

15   Q.  And that's the purpose of putting the bags over the hands,

16   correct?

17   A.  Yes.

18   Q.  You said you looked through this vehicle and the only

19   evidence that you noted on Government Exhibit 200A is the one

20   with the shell casings, correct?

21   A.  Correct.

22   Q.  So after you recovered that, you just vouchered it for

23   safekeeping?

24   A.  No.  We sent it to the police lab for ballistics analysis.

25   Q.  You didn't actually perform that though, right?

D3bWdor2                    Janisch - cross

1    A.  No.

2    Q.  And now looking -- again, sorry, you said your role was in

3    evidence collection, correct?

4    A.  Correct.

5    Q.  Not, you're not there to determine -- sorry.  Withdrawn.

6            From looking at the photographs that are in evidence,

7    you can't tell whether the person, the shooter, was actually

8    inside the car when that shot was fired, can you?

9    A.  I do not know.

10   Q.  And this van, which is, again --

11           MS. FONTIER:  Let me just put up a picture, if I may.

12   Bring up 246.

13   Q.  This van is just a minivan, so it has a front door on the

14   driver's side, correct?

15   A.  Correct.

16   Q.  And it has a second door on the backside, correct?

17   A.  Correct.

18   Q.  And that's the same on the passenger's side of the vehicle?

19   A.  Same thing, yes.

20   Q.  So is it possible then, or you don't know from your

21   examination, at least, if the shooter was standing outside of

22   the vehicle, right?

23   A.  No, I can't tell that.

24   Q.  So it's possible that somebody could have been standing on

25   the passenger's side outside, correct?

1    A.  Possible.

2    Q.  And your examination, you don't know, from your

3    examination, you don't know what time the shooting occurred,

4    correct?

5    A.  I don't know.

6    Q.  Now, the actual vehicle was seized, correct?

7    A.  Yes.

8    Q.  And that was seized by the NYPD?

9    A.  Correct.

10   Q.  And it was seized to preserve any further evidence that

11   might be in it, correct?

12   A.  Yes.

13   Q.  And after your examination on the scene on December 12, do

14   you know what, if anything, occurred with that vehicle?

15   A.  Yes.  After, whenever a car is generally involved in a

16   crime scene, we have a car team that will process the car.

17   Basically, the car will get towed to our forensic garage where

18   it's contained in an isolated location.

19   Q.  Do you know if that occurred in this case?

20   A.  Yes, it did.

21           MS. FONTIER:  I have nothing further, your Honor.

22           THE COURT:  Mr. Roth.

23   CROSS-EXAMINATION

24   BY MR. ROTH:

25   Q.  Good morning, Detective.

1   A.   Good morning.

2   Q.   In response to my colleague's question in regard to you

3   didn't know where the shooter was standing when the incident

4   happened, is that correct?

5   A.   Correct.

6   Q.   In fact, sir, is it fair to say from your examination that

7   day, in the entire five hours that you were there, you cannot

8   tell whether there was one perpetrator or two perpetrators or

9   three perpetrators?  Is that correct?

10  A.   That's correct.

11  Q.   You have no clue whatsoever of how that shooting occurred,

12  is that correct?

13  A.   Correct.

14            MR. ROTH:  No further questions.

15            THE COURT:  Okay.  Any redirect?

16            MS. MASELLA:  No, your Honor.

17            THE COURT:  You can step down, Detective.  Leave the

18  exhibits there, but take your own file.

19            Next witness.

20            MS. MASELLA:  Your Honor, we can call the next

21  witness, but it's probably 20 to 30 minutes of direct

22  testimony.  I don't know if you wanted to take a morning break.

23            THE COURT:  No.  I wanted to make up for lost time.

24            Is everybody comfortable?  Can we just keep going?

25  You need a break?  Let's take a very short break so we can try

845

D3bWdor2                          Janisch – cross

1    to get back here and get as much done as we can this morning.

2              (Witness excused)

3              MS. MASELLA:  Thank you.

4              (Jury excused)

5              THE COURT:  Let's stand quiet and at attention while

6    the jury's going out.

7              MS. FONTIER:  I apologize, your Honor.

8              Have a seat.  If you need to use the restrooms

9    yourselves -- have we told the jury not to be using the

10   restrooms in the hall?

11             (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Call your next witness, please?

3              MS. MASELLA:  Your Honor, the government calls Daniel

4      Mulvanerty.

5              THE COURT:  Okay.  Come on up.

6       DANIEL MULVANERTY,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9              THE COURT:  You may proceed, Ms. Masella.

10              MS. MASELLA:  Thank you, your Honor.

11      DIRECT EXAMINATION

12      BY MS. MASELLA:

13      Q.  Good morning.

14      A.  Good morning.

15      Q.  Who do you work for?

16      A.  I work for the New York City Police Department.

17      Q.  Do you have a particular assignment for the NYPD?

18      A.  Yes.  I work for the crime scene unit.

19      Q.  And what is your title with the crime scene unit?

20      A.  I'm a detective.

21      Q.  How long have you been a detective?

22      A.  10 years.

23      Q.  How long have you been with the crime scene unit?

24      A.  Twelve years.

25      Q.  What are your duties and responsibilities include as a

1   detective with the crime scene unit?

2   A.  We respond to major crimes such as homicides, police

3   involved shootings, sexual assaults.  We go to the scene where

4   we will photograph, sketch and collect any evidence in regard

5   to that scene.

6   Q.  In what areas of New York City do you work?

7   A.  The whole five boroughs.

8   Q.  During the course of your work with the crime scene unit,

9   approximately how many different crime scenes have you

10  analyzed?

11  A.  Over a thousand.

12  Q.  What type of training, if any, have you received in the

13  processing and analysis of crime scenes?

14  A.  I received the New York City Police Department homicide

15  course, New York City Police Department evidence collection

16  course, Nikon photography course, latent print course, and

17  continuous on-the-job training.

18  Q.  And, Detective, do you have experience in processing cars

19  as a member of the crime scene unit?

20  A.  I do.

21  Q.  What is that experience?

22  A.  I process vehicles for the New York City Police Department

23  at the 105 precinct garage in Queens Village.  It is an area

24  specifically set aside and it is the same criteria; it is for

25  homicides, police-involved shootings, sexual assaults, or any

1    high-profile crimes.

2    Q.  Can you describe again the location where this processing

3    is usually done?

4    A.  It is a two-bay garage, it is enclosed with a fence

5    outside.  It is alarmed and it is an area where we have tools

6    and any type of equipment to process these vehicles in regards

7    to the crimes.

8    Q.  And, during your time with the crime scene unit, can you

9    estimate approximately how many cars you have processed?

10   A.  Approximately 500.

11   Q.  Detective, I want to direct your attention to early 2012

12   now.  In that part of the year were you asked to process a dark

13   blue Mercedes Benz?

14   A.  Yes, I was.

15   Q.  What was the date on which you processed that car?

16   A.  That was February 14th.

17   Q.  Of 2012?

18   A.  Of 2012, yes.

19   Q.  And where was it that you processed that car?

20   A.  That was in the 47 Precinct.

21   Q.  And, can you describe what that location was like where the

22   car was stored?

23   A.  It is a garage that is attached to the precinct, it has a

24   rolldown gate to secure the vehicle.

25   Q.  Do you know how long the car had been there before you

1    processed it?

2    A.   No.

3    Q.   Approximately how much time did you spend in processing

4    that Mercedes?

5    A.   Approximately four hours.

6    Q.   And what, generally, did do you to process the Mercedes?

7    A.   We photographed the vehicle, did a rough sketch of the

8    vehicle, we swabbed some of the door handles for --

9              MR. ROTH:  Judge, object.  He isn't testifying in

10   first person.

11             THE COURT:  You are saying we.  You were working with.

12             THE WITNESS:  No.  Sorry.  I have a partner but I --

13             THE COURT:  You can describe what you did and he did,

14   but make sure you distinguish between what you did and you saw

15   him or her do.

16             THE WITNESS:  Okay.

17             THE COURT:  Okay.

18             THE WITNESS:  I swabbed door handles for possible

19   touch DNA.  I collected some evidence from inside the vehicle.

20   I processed the vehicle for latent fingerprints.

21   BY MS. MASELLA:

22   Q.   I'm going to approach and hand you a stack of documents

23   that have been marked for identification as Government's

24   Exhibits 401 through 448.

25             THE COURT:  401 and 448 you said?

1          MS. MASELLA:  I'm sorry, 447.

2          THE COURT:  447.

3     BY MS. MASELLA:

4     Q.  Detective, can you take a look at those items?

5     A.  Okay.

6     Q.  Do you recognize those items?

7     A.  I do.

8     Q.  What are they?

9     A.  The first one, Exhibit 401, is a rough sketch of the

10    vehicle and Exhibit 402 to 447 are pictures of the vehicle in

11    question.

12    Q.  And, who made the sketch that you're referring to with 401?

13    A.  I did.

14    Q.  And, did you do that at or around the time that you

15    conducted your processing of the vehicle?

16    A.  I did.

17    Q.  And what about the photographs in 402 to 447; who took

18    those?

19    A.  I took the photos.

20    Q.  And did you do that at the same time as you were conducting

21    your analysis of the car?

22    A.  Yes.

23    Q.  And is Government Exhibit 401 an accurate sketch of your

24    processing of the Mercedes that day?

25    A.  Yes.

1  Q.  And are the photographs 402 through 447 accurate depictions

2  of how the vehicle appeared to you that day?

3  A.  Yes.

4          MS. MASELLA:  Your Honor, the government offers

5  Government Exhibits 401 through 447.

6          THE COURT:  Any objection?

7          MR. ROTH:  No, Judge.

8          MS. FONTIER:  No, your Honor.

9          THE COURT:  Government's Exhibits 401 through 447 are

10 received.

11         (Government's Exhibits 401-447 received in evidence)

12 BY MS. MASELLA:

13 Q.  Ms. Brady, may we look at 401 on the screen, please?

14         Detective, can you tell us what it is that is depicted

15 in Government Exhibit 401?

16 A.  401 is a rough sketch.  It shows the area that the evidence

17 was collected from.

18 Q.  Can you give us some examples of evidence that was

19 collected from different areas?

20 A.  Yes.

21 Q.  DM which is my initials, Daniel Mulvanerty 1 through 8 were

22 the touch DNA swabs from the door handles.

23         Do you want me to use a pointer or something?

24         So, the door handles are here, that's the driver's

25 side front door -- I'm sorry, that's the front passenger door,

D3B5dor3                    Mulvanerty - direct

1   that's the rear passenger door, and that's the driver's side

2   rear door.  That's where the touch DNA swabs were recovered

3   from.

4   Q.  And who is the person that recovered the touch DNA swab?

5   A.  I did.

6   Q.  And can you explain to the jury what a touch D.N.A. swab

7   is?

8   A.  Touch DNA is any areas where someone would possibly

9   touch -- in this case it is a car -- so it is door handles

10  coming in and out of that vehicle.  So, what we do is I take a

11  cotton swab and I hydrate it and I rub the area to see if I

12  possibly would get skin cell DNA from those areas of the door

13  handles.  It is packaged, put into an envelope, and sent to the

14  lab for possible analysis.

15  Q.  Other than touch DNA swabs, was there other physical

16  evidence recovered by you from this Mercedes?

17  A.  Yes.

18  Q.  Can you describe, generally, what that was?

19  A.  There was a pair of gloves, a pair of boots, a water bottle

20  and some road atlases, maps in the rear of the vehicle.

21  Q.  And after you recovered the touch DNA swabs as well as

22  these physical items that you described, what did you do with

23  that evidence?

24  A.  The evidence was documented, it was packaged, and it was

25  given to a detective to voucher and to send to the lab for

1    possible analysis.

2    Q.  Can you actually fill out any vouchers in this case?

3    A.  No.

4    Q.  Ms. Brady, can we look at 420, please?

5          Detective, what are we looking at in this photograph?

6    A.  That's the front of the Mercedes Benz inside the garage of

7    the 47 Precinct as I saw it that day.

8    Q.  And, can you read the New York license plate that is

9    depicted in the photo?

10   A.  Yes.  It is F, as in Frank, M as in Mary, B as in boy,

11   7467.

12   Q.  Ms. Brady, may we look at 414, please?

13         What is depicted here, Detective?

14   A.  That is the vehicle registration sticker.

15   Q.  Ms. Brady, can we look at 402?

16         What is depicted in this photograph, Detective?

17   A.  That's the inside of the front of the vehicle from the

18   front passenger door looking towards the driver's area.

19   Q.  Now can we look at 406?

20         What is depicted here, Detective?

21   A.  That's the rear seat of the vehicle from the passenger side

22   looking towards the driver's side of the vehicle.

23   Q.  May we look at 435, please?

24         Detective, what is depicted in this photograph?

25   A.  That's the rear floor area on the driver's side.  There is

D3B5dor3                          Mulvanerty - direct

 1 | gloves on the floor, a pair of boots, and then on the passenger

 2 | side this is a white sweatshirt.

 3 | Q.  And, can you just tell us in the photograph where the

 4 | gloves are located?

 5 | A.  This area here.

 6 | Q.  So, for the record, indicating a black item in the lower

 7 | center part of the photograph.

 8 |          Is that where the gloves were when you first saw them

 9 | that day?

10 | A.  Yes.

11 | Q.  Can we have 431, Ms. Brady?

12 |          What is in this photograph, Detective?

13 | A.  That's a picture of the black gloves that are laid out on

14 | craft paper with blue scales indicating the evidence number.

15 | Q.  And who laid out the gloves in this manner with the blue

16 | scales?

17 | A.  I did.

18 | Q.  On the left blue scale it says DM-13 and on the right scale

19 | it says DM-12.  What does that refer to?

20 | A.  Just the order that the evidence was recovered.  DM for

21 | Daniel Mulvanerty, so 12 was the twelfth piece of evidence I

22 | took from that vehicle, and 13 was the thirteenth piece of

23 | evidence.

24 | Q.  Ms. Brady, may we look at 434?

25 |          What are we looking at here, Detective?

1   A.  That's the rear passenger floor area.  There was a white

2   sweatshirt and a clear plastic seltzer bottle on the floor area

3   of that car.

4   Q.  May we have 432, Ms. Brady?

5        What is that item, Detective?

6   A.  That's the white sweatshirt that was recovered on the rear

7   passenger floor that's laid out with the blue scale.

8   Q.  And, again, you are the one who laid it out in this manner?

9   A.  Yes.

10  Q.  May we have 433, Ms. Brady?

11       What is that, Detective?

12  A.  That's the seltzer bottle that was recovered on the rear

13  passenger floor area.

14  Q.  Was any further investigation or testing done with respect

15  to the seltzer bottle?

16  A.  Yes.

17  Q.  What was that?

18  A.  That was sent to the lab for DNA analysis and fingerprint

19  analysis.

20  Q.  Ms. Brady, may we have 436, please?

21       Detective, what is depicted in Government Exhibit 436?

22  A.  That's an area -- that's an area that was swapped for

23  possible touch DNA, skin cell DNA.

24  Q.  That's the process you were describing before?

25  A.  Yes.

D3B5dor3                        Mulvanerty - direct

1  Q.  Ms. Brady, may we have Government Exhibit 421?

2          Detective, what is depicted in this photograph?

3  A.  That was a road map that was recovered from the rear of the

4  vehicle in the trunk.

5  Q.  Does it appear to have handwriting on it?

6  A.  Yes.

7  Q.  Can you describe those --

8          THE COURT:  Handwriting?

9  Q.  -- handwritten markings?

10 A.  The areas there is one here, there is another one here and

11 here that are circled on the map.

12 Q.  So, for the record, indicating three circular marks in what

13 appear to be a red pen or marker.

14         May we have Government Exhibit 423, Ms. Brady?

15         What is that, Detective?

16 A.  That was another map that was recovered from the rear of

17 the vehicle.

18 Q.  Did there appear to be handwritten marks on this map?

19 A.  Yes, there are.

20 Q.  And can you describe where those are?

21 A.  There is one here, another one here, and next to it there

22 is another one and then just below that there is another circle

23 right there.

24 Q.  Indicating three circular marks in the middle and upper

25 right portion of the document.

1          Government Exhibit 424, please?  Ms. Brady, can you

2     enlarge the middle part of the photograph, please?

3          What is this, Detective?

4     A.  That's another picture of that, the atlas that was

5     recovered from the trunk area.

6     Q.  Did there appear to be handwritten marks on this atlas as

7     well?

8     A.  Yes.

9     Q.  Can you tell us where those are?

10    A.  There is one here in this area, there is one here and there

11    is another one that is tough to see right around this area

12    there is another one.

13    Q.  So, indicating the center portion of the right-hand page of

14    the atlas.

15         Detective, what did you do with the physical evidence

16    after you collected it from the Mercedes that day?

17    A.  I documented and I packaged it and I gave it to a detective

18    from the 47 Precinct to voucher and send to the lab for

19    analysis.

20    Q.  Do you remember which Detective that was?

21    A.  Yes.  Detective Kruse.

22         MS. MASELLA:  Your Honor, no further questions at this

23    time.

24         THE COURT:  Okay.

25         Any cross-examination?

D3B5dor3                          Mulvanerty - direct

1           MR. ROTH:  Yes, your Honor.

2           THE COURT:  Mr. Roth.

3    CROSS EXAMINATION

4    BY MR. ROTH:

5    Q.  We're almost to the noon hour, so good afternoon.

6    A.  Good afternoon.

7    Q.  Do you know when the Mercedes that you just testified you

8    processed came into the possession of the police lab or the

9    police custody?

10   A.  No.

11   Q.  No idea whatsoever?

12   A.  No, I don't.

13   Q.  There is nothing in your reports that would indicate that?

14   A.  No.

15   Q.  Is it fair to say, sir, that when it came into custody may

16   have some bearing in respect to any potential trace evidence

17   that's left in the car?

18   A.  That's possible.

19   Q.  Which is to say that over the course of time some evidence

20   degrades, is that correct?

21   A.  It's possible.

22   Q.  And what type of evidence degrades, sir, from your

23   experience?

24   A.  DNA evidence could degrade from weather.

25   Q.  Is that the only type of evidence?

D3B5dor3                          Mulvanerty - cross

1    A.   Fingerprint evidence due to weather.

2    Q.   What other types of evidence do you collect, sir?

3    A.   Physical evidence I collected, a sweatshirt; I collected a

4    bottle.

5    Q.   No, no.  I'm talking about what other types besides blood

6    evidence or DNA evidence?  What are you looking for?

7    A.   Looking for fingerprints, any type of trace evidence, some

8    hair and fiber.  I collect hair and fiber.  I collect DNA --

9    skin cell DNA, blood DNA, saliva DNA.

10   Q.   And all that can degrade over the course of time, is that

11   correct?

12   A.   Yes.

13   Q.   And, Detective, you were at the scene, were you not, when

14   members of your department processed a Sienna involved in this

15   case?  Sienna minivan?

16   A.   Yes.

17   Q.   Do you recall that, sir?

18   A.   I do.

19   Q.   Were you on the scene for the entire time when one of your

20   fellow officers you may have seen here today processed that?

21   A.   Yes.

22   Q.   And who was it?

23   A.   Detective Janisch.

24   Q.   And you saw him here today, right?

25   A.   Yes.

1   Q.  And you oversaw or at least assisted him in some way with

2   that collection of evidence that day?

3   A.  Yes.

4   Q.  On that day did Detective Janisch process the Sienna

5   minivan in the manner that you processed this Mercedes?

6   A.  No.

7   Q.  No?

8   A.  I said no.

9   Q.  Okay.

10          So, there was no collection of DNA that day?

11  A.  No.

12  Q.  There was no dusting for fingerprints that day?

13  A.  No.

14  Q.  There was no collection of the blood for serology?

15  A.  No.

16  Q.  Was there any effort to see whether or not there were any

17  foot impressions left in any of the blood in the van that day?

18  A.  No.

19  Q.  Who made that determination, Detective, not to process the

20  minivan in an effort to ascertain who the perpetrators of the

21  homicide was?

22          MS. MASELLA:  Objection.

23          THE COURT:  I'm not sure -- beyond the scope?

24          MS. MASELLA:  And argument, your Honor.

25          THE COURT:  All of this seems to be beyond the scope,

D3B5dor3                          Mulvanerty – cross

1    Mr. Roth.  Am I missing something?  The direct didn't talk

2    about the Sienna at all.

3              Sustained.

4    BY MR. ROTH:

5    Q.  Directing your attention to the Mercedes, you thoroughly

6    processed that car in an effort to gather evidence, is that

7    correct?

8    A.  Yes.

9    Q.  And you thoroughly, based on your training, documented

10   everything you did, is that correct, on that day --

11   A.  Yes.

12   Q.  -- in the collection process?

13             And part of the reason that you do it in such a

14   meticulous fashion is in the event that you have to testify

15   like you are today in a matter concerning the evidence

16   collection, you're able to recall what you did that day.  Is

17   that fair to say?

18   A.  Yes.

19   Q.  Can we have, Ms. Brady, 405 displayed?

20             What is that a picture of, sir?

21   A.  That is the items that were inside the trunk on the day the

22   car was processed.

23   Q.  Specifically, what items did you inventory from the trunk

24   that day in the Mercedes?

25   A.  In the trunk was some atlases and maps.

D3B5dor3                          Mulvanerty - cross

1    Q.   Well, is 405 -- correct me if I'm wrong, 405 is a picture

2    purportedly depicting the contents of the trunk of the Mercedes

3    that day, is that correct?

4    A.   Yes.

5    Q.   And I don't see any maps -- or I see perhaps one map there,

6    the corner of one map, but there is some other items depicted

7    in 405, is that correct?

8    A.   Yes.

9    Q.   And what are those items, sir?

10   A.   There is a laundry box with some items in it, there is a

11   basketball, there is a children's piano, and underneath the

12   piano I recovered the atlas and the maps.

13   Q.   What is that, as you described it, the children's piano

14   appear to be resting on?

15   A.   Atlas.

16   Q.   That white thing is the atlas there that's right under the

17   piano?

18   A.   Yes.

19   Q.   Does it look to you, sir, that it has a frame around it?

20   A.   It is tough to see in that photograph, actually.

21   Q.   I will show you, sir, perhaps a better picture of 405, the

22   same picture but better resolution.

23   A.   Okay.  Okay.

24   Q.   And is that the atlas you're describing there?

25   A.   No.  It is underneath, underneath the items there.

D3B5dor3                          Mulvanerty - cross

1    Q.  So, I was asking you about what is the piano toy resting

2    on.

3    A.  I'm not sure what that item is.

4    Q.  Did you examine that item?

5    A.  Well, we took everything out of that trunk and searched it

6    to see if there is any evidence.

7    Q.  Right.

8          So my question is, sir, what was that item that you

9    examined?

10   A.  I don't recall what that item was.

11   Q.  And, in respect to what appears to be a laundry bag in the

12   trunk, what were the contents of that laundry bag?

13   A.  I don't recall.

14   Q.  Well, it is not just laundry, is that fair to say?

15   A.  Yes.

16   Q.  Well, what else is there, if you recall?

17   A.  Only what I could see in that photograph.

18   Q.  And what do you see in that photograph, sir?

19   A.  I see a couple of plastic bags and what appears to be a

20   bottle or some type of, maybe, cleaning bottle.

21   Q.  Is that the blue bottle you're referring to?

22   A.  The blue bottle, yes.

23   Q.  What about the white object on the top of the bag?

24   A.  I can't make that out.  I'm not sure what that is.

25   Q.  But, did you actually handle that item or you or your

1    fellow officers handle that item?

2    A.  I did.

3    Q.  And you don't recall what it is?

4    A.  No.  I don't recall.

5    Q.  Were there other items of laundry in there or items of

6    laundry?

7    A.  I don't recall what was in that item.

8    Q.  You don't recall -- I'm sorry?

9    A.  I don't recall what was in that box.

10   Q.  Well, can you see in the picture that's up on the screen or

11   I will give you an opportunity to look at 405 close up, does it

12   appear to be a shirt of some sort?  T-shirt of some sort?

13   A.  It is possible.

14   Q.  Well, I will show you 405 and see if that is a better

15   picture and helps you recall what was in the laundry bag that

16   day.

17   A.  Yeah.  I'm not sure what that is.

18   Q.  But there was other laundry in the laundry bag, clothes?

19   A.  I'm not sure what was in that bag.

20   Q.  You made no notation whatsoever what was in that bag?

21   A.  No.  I photographed it but I didn't make a notation; no,

22   sir.

23   Q.  Is it fair to say, sir, that from a piece of laundry or

24   article of clothing that would be a potentially fertile ground

25   to recover DNA from?

1    A.  I'm not sure what was in that laundry bag.

2    Q.  That wasn't my question, sir.

3             Is it fair to say, Detective, that if a piece of

4    laundry or one piece of clothing was recovered, that would be a

5    potential fertile ground to recover DNA from?

6    A.  It is possible.

7    Q.  It is more than possible, is it not, Detective, if somebody

8    sweats or wears an article of clothing that they're

9    transmitting --

10   A.  You are making an assumption.

11   Q.  I'm sorry?

12   A.  You're making an assumption.

13   Q.  I'm making an assumption that if somebody wears an article

14   of clothing --

15   A.  That might be clean laundry that you're referring to.

16   Q.  But you can't tell us that, is that right?

17   A.  You can't either.

18   Q.  You're the one that did the search, is that correct?

19   A.  I did.

20   Q.  And you inventoried the contents of that, is that correct?

21   A.  Correct.

22   Q.  So you have no recollection whatsoever?

23   A.  I don't know what was in that bag.

24   Q.  My question, sir, is in your experience, as vast as it is

25   for over 12 years with the crime scene unit, is it fair to say

1    in your training, sir, that if somebody has a used article of

2    clothing that it is natural to have perspiration transmitted to

3    that clothing?

4    A.  Yes.

5    Q.  And that transmission of perspiration would lead to

6    potential DNA, is that correct?

7    A.  Yes.

8    Q.  Directing your attention to Government Exhibit 409,

9    Ms. Brady?  Thank you for your assistance.

10             What is depicted in the pocket section of that door

11   there?

12   A.  I'm not sure.

13   Q.  Because you can't see the photo?  Do you need a better copy

14   of the photo?

15   A.  I will take a look at the photo, sure.

16   Q.  I'm going to show you 409 which is a same photo that is

17   perhaps a better resolution.

18   A.  I'm not sure what that is.

19   Q.  Do you recall seeing it that day?

20   A.  No, I don't.

21   Q.  Did you examine the contents of the, looks like the rear

22   door compartment, side door compartment?

23   A.  Yes.

24   Q.  Did you record, in any fashion, what was contained in

25   there?

D3B5dor3                          Mulvanerty - cross

1    A.  No.

2    Q.  Can we put up 411, please, Ms. Brady?  Thank you.

3            Does that appear to be the driver's side door?

4    A.  Yes.

5    Q.  Is it fair to say, Detective, that there appears to be

6    several items in the door compartment there, the driver's side

7    door compartment?

8    A.  Yes.

9    Q.  What are those items, sir?

10   A.  All I could tell, one looks like it is a black plastic bag

11   and some papers.

12   Q.  And some papers.

13   A.  Yes.

14   Q.  And what are those papers, sir?

15   A.  I'm not sure.

16   Q.  Did you examine those papers that day?

17   A.  I did.

18   Q.  And did you record those papers in your reports?

19   A.  Just took a photograph of it.

20   Q.  So, do you have any independent recollection of what those

21   papers contain?

22   A.  No.

23   Q.  Any writings, notations?

24   A.  No.

25   Q.  What does it appear to be right on top of the papers, if

D3B5dor3                          Mulvanerty - cross

1   you will?

2   A.  I can't see it in this photograph.

3   Q.  I will show you 411.

4   A.  I can't tell what that is.

5   Q.  Do you recall examining that black looking object that

6   appears in 411 that's over the white papers that you indicated?

7   A.  No.

8   Q.  You made no recollection -- you made no recordings of that,

9   is that fair to say?

10  A.  Correct.

11  Q.  Sir, you recovered and vouchered, sent off for vouchering

12  some sneakers, is that correct?

13  A.  Yes.

14  Q.  And is that because sneakers, again the inside of the

15  sneakers may be a fertile ground for DNA recovery?

16  A.  Yes.

17  Q.  And you recovered a seltzer bottle that day, is that

18  correct?

19  A.  Yes.

20  Q.  Now, that's something that could degrade over the course of

21  time, is that fair to say?

22  A.  It is possible, yes.

23  Q.  Loses its fizzes?

24  A.  Yes.

25  Q.  That seltzer bottle, there appears to be some substance

1   other than seltzer, is that fair to say?

2   A.   Yes.

3   Q.   Colored fluid, is that correct?

4   A.   Yes.

5   Q.   Was that fluid processed?

6   A.   It was sent to the lab.

7   Q.   And you don't know in what manner or shape it was

8   processed?

9   A.   We request several tests.

10  Q.   And there is a category or designation, is there not?  When

11  you say you request a certain type of test there is numerical

12  designation that you use, is that correct?

13  A.   Yes.

14  Q.   And how many tests are there actually that you can request

15  on evidence samples that you recover, Detective?

16  A.   Oh, it depends.

17  Q.   What's the maximum number?

18  A.   I don't know the answer for that.

19  Q.   Well, you know DNA is, for example, request no. 7, is that

20  right?

21  A.   Yes, it is.

22  Q.   And what is fingerprints?

23  A.   8 or 9.

24  Q.   And so, just tell the members of the jury what 1 through 8

25  or 9 is.

D3B5dor3                         Mulvanerty - cross

1    A.   Well, it is on a dropdown so I don't remember what the

2    numbers are for each test.

3    Q.   But there is 8 -- do you have that dropdown with you?

4    A.   No.

5    Q.   And where do you get that dropdown from, sir?

6    A.   It is in the computer when you do a lab request --

7    laboratory request.

8    Q.   From your own, 10, 12 years' experience in the crime scene

9    unit, can you tell us the full array of tests, that is the full

10   options of tests that are available for you to check the

11   dropdown form to process that?

12   A.   Off the top of my head there is all different types of

13   tests.

14   Q.   Well, what's your best recollection of the names of those

15   types of tests?

16   A.   There is fingerprint development, DNA comparison and

17   analysis.

18   Q.   Those were both down in this case?

19   A.   Yes.  There is ballistic analysis.

20   Q.   Okay.

21   A.   There is hair and fiber testing.  There is tread marks.

22   There is a whole array of different tests.

23   Q.   Did you do any hair analysis -- request any hair analysis

24   in any of the evidence that you processed from the Mercedes

25   Benz that day?

1  A.  No.

2  Q.  You recovered gloves, is that correct?

3  A.  Yes.

4  Q.  And those were a wool type of gloves?

5  A.  Yes.

6  Q.  And those could contain hair, trace hair; is that correct?

7  A.  Yes.

8  Q.  But you didn't make any request for trace hair?

9  A.  No; just DNA for that.

10  Q.  And, sir, did you use any other methodology to determine,

11  for instance, whether or not there was any trace evidence of

12  blood in the Mercedes that day?

13  A.  No.

14  Q.  Did you use a strong light?

15  A.  I don't know what that is.

16  Q.  Did you use Luminol?

17  A.  No.

18  Q.  Could you describe to the members of the jury what Luminol

19  is?

20  A.  Luminol is a chemical when they're looking for blood you

21  have to dim the lights, you will spray the chemical on certain

22  areas that you think possibly blood might appear, and if there

23  is blood there it will illuminate and at that point you can

24  swab it and send it to the lab for analysis.

25  Q.  And when I say strong light, do you not, sir, have the

1    capacity and the tools to have a light that you can scan an

2    area such as the interior of the car with to determine whether

3    there is any blood residue there?

4    A.  Yes.

5    Q.  And what do you call that light if not a strong light?

6    A.  Crime scope.

7    Q.  A crime scope.

8    A.  Alternate light source.

9    Q.  Okay.

10        And is it fair to say, Detective, that that's employed

11   sometimes to try to ascertain or if you believe, perhaps, that

12   the crime scene that you're processing was wiped down?

13   A.  It's possible.

14   Q.  And what will you see under that light?

15   A.  If it was wiped down?  That's the question?

16   Q.  No.  What is the purpose of that light that you just

17   described, the scope.

18   A.  The light is to look for any type of bodily fluids.

19   Q.  And that's to detect bodily fluids or blood, correct --

20   A.  Correct.

21   Q.  -- that is not readily apparent to the naked eye, is that

22   fair to say?

23   A.  Yes.

24   Q.  And then you can follow that up if you find stuff with, for

25   instance, the Luminol test; is that correct?

D3B5dor3                          Mulvanerty - cross

1   A.  Yes.

2   Q.  And, are you familiar with the Castle Myers color test?

3   A.  No.

4   Q.  You processed a sweatshirt in this case, is that correct?

5   A.  I photographed and sent it to the lab.  I didn't process

6   it.

7   Q.  To be processed?

8   A.  To be processed; yes.

9   Q.  Was there anything unique about that sweatshirt?

10  A.  For me?

11  Q.  Yes.

12  A.  No.

13  Q.  And why did you process that sweatshirt?

14  A.  It was requested by the detective to take it.

15  Q.  And what detective made that request?

16  A.  Detective Kruse.

17          MR. ROTH:  I have no further questions, your Honor.

18          THE COURT:  Okay.

19          Ms. Fontier?

20  CROSS EXAMINATION

21  BY MS. FONTIER:

22  Q.  Good afternoon, Detective.

23  A.  Good afternoon.

24  Q.  Detective, you said you have been with the crime scene unit

25  for about 12 years, right?

D3B5dor3                    Mulvanerty - cross

1   A.  Yes.

2   Q.  And over those 12 years you've processed more than one

3   vehicle, correct?

4   A.  Yes.

5   Q.  Would you be able to estimate about how many?

6   A.  Yes.

7   Q.  And how many was that?

8   A.  Over 500.

9   Q.  So, in the processing of over 500 vehicles is there a

10  standard procedure that you use?

11  A.  Pretty much, yes.

12  Q.  And the first step, is it to photograph the vehicle in the

13  shape that it is in?

14  A.  Yes.

15  Q.  And that is to document how it was when you first looked at

16  it, correct?

17  A.  Yes.

18  Q.  And then you go through the interior of the car and look

19  for any potential evidence?

20  A.  Yes.

21  Q.  And you also, as here, swab areas, as you said, where there

22  is possible touch DNA, correct?

23  A.  Yes.

24  Q.  And in this case you swabbed nine different areas, right?

25  A.  Yes.

1    Q.   And that's from the interior of the door handles?

2    A.   Interior and exterior door handles; yes.

3    Q.   And that's because when people are getting in and out of

4    cars they tend to touch the door handles, right?

5    A.   Yes.

6    Q.   And that's a procedure that you use in, when you examine

7    any vehicle?

8    A.   If it's requested.

9    Q.   It is a standard procedure though?

10   A.   It is a standard procedure, yes.

11   Q.   And you also, in this case, found a seltzer bottle,

12   correct?

13   A.   Yes.

14   Q.   And that was sent in for both DNA and fingerprint testing?

15   A.   Yes.

16   Q.   And then you also vouchered the sweatshirt, two gloves and

17   two boots, correct?

18   A.   Yes.

19   Q.   And both of those -- all of those items were sent in for

20   DNA testing?

21   A.   Yes.

22   Q.   And then from the trunk I only saw various items in there

23   but you collected three different items which were all

24   different atlases and maps, correct?

25   A.   Yes.

1    Q.  And those were sent in for fingerprint and DNA testing?

2    A.  Yes.

3    Q.  Ms. Brady, if I could get some assistance?  If I could see

4    Exhibit 427?

5         Government Exhibit 427 was located in the trunk of the

6    car, correct?

7    A.  Yes.

8    Q.  And that is a Connecticut road map?

9    A.  Yes.

10   Q.  And 428, please, Ms. Brady?

11        428 was also located in the trunk of the car?

12   A.  Yes.

13   Q.  And that's, again, a New York City five-borough pocket

14   atlas, correct?

15   A.  Yes.

16   Q.  Moving on to 429, please?

17        This is the third atlas that you found, the 2004 road

18   atlas of the United States, Canada and Mexico, correct?

19   A.  Yes.

20   Q.  And that map included all 50 states, right?

21   A.  Yes.

22   Q.  If we can go to 421, please?

23        Government Exhibit 421, which includes a closeup of

24   West Hartford, Hartford, East Hartford; is it fair to say that

25   is a close up on the page of the Connecticut map?

1   A.  Yes.

2   Q.  And which atlas did this come out of?  Do you know?

3   Actually, withdrawn.  Withdrawn.

4           And that is there -- you indicated, I believe, that

5   the red circles are handwriting on this map of Connecticut,

6   correct?

7   A.  Yes.

8   Q.  And Government's Exhibits -- I'm sorry, the other

9   Government's Exhibits that you indicated included writing I

10  believe were 422 and 423; is that correct?

11  A.  Yes.

12  Q.  If we can pull up 422, please?

13          This is 422 is the Connecticut road map as well,

14  right?

15  A.  Yes.

16  Q.  And that one included some handwriting?

17  A.  Yes.

18  Q.  423, please?

19          423 is Providence, there is circles on Providence,

20  East Providence, Bristol; those are locations in Rhode Island,

21  correct?

22  A.  Yes.

23  Q.  And 424, please?

24          Is 424 just a zoom out of 423, a Rhode Island map?

25  A.  Yes.

1   Q.   Is it fair to say that you took photographs of each page of

2   all of these maps that included any handwriting?

3   A.   Yes.

4   Q.   And you looked at all three of the maps that are in --

5   photos of which are in evidence, correct?

6   A.   Yes.

7   Q.   So, is it also then fair to say that there was no

8   handwriting on any locations in the five borrows of New York?

9   A.   Yes.

10  Q.   Also fair to say that there was no handwriting on the map

11  of Pennsylvania, correct?

12  A.   Correct.

13          MS. FONTIER:  I have no further questions, your Honor.

14          THE COURT:  Okay.

15          Any redirect?

16          MS. MASELLA:  Briefly, your Honor.

17  REDIRECT EXAMINATION

18  BY MS. MASELLA:

19  Q.   Detective, do you recall that you were asked a series of

20  questions about various items within the Mercedes that you did

21  not take into custody and collect and voucher?

22  A.   Yes.

23  Q.   Did you, during your analysis of the car, look at all of

24  the items in the car?

25  A.   Yes.

1    Q.  And how is it that you determined which items to take into

2    evidence and which items to leave in the car?

3    A.  I work with the catching detective, there was an FBI agent

4    also that gave us some information, and we coordinate together

5    on what items that we're going to take and what items that

6    we're going to leave behind.

7    Q.  When you refer to the catching detective, do you recall who

8    that was in it this case?

9    A.  Yes.  That was Detective Kruse from the 47 precinct.

10             MS. MASELLA:  No further questions, your Honor.

11             THE COURT:  Recross?

12             MR. ROTH:  Yes, your Honor.

13   RECROSS EXAMINATION

14   BY MR. ROTH:

15   Q.  Detective, that's a determination that you, as part of the

16   law enforcement team prosecuting this case make, is that

17   correct?

18   A.  In conjunction with the two other officers, yes.

19   Q.  But not in conjunction with the defense team, is that fair

20   to say?

21   A.  No.

22   Q.  You mean it is fair to say?

23   A.  It is fair to say.

24             MR. ROTH:  Okay.  Thank you.

25             THE WITNESS:  Thank you.

 1              THE COURT:  Ms. Fontier, anything?

 2              MS. FONTIER:  No.  Thank you, your Honor.

 3              THE COURT:  Any re-redirect?

 4              MS. MASELLA:  No, your Honor.

 5              THE COURT:  Detective, you may step down.  Thank you

 6    very much.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Next witness.

 9              MS. MASELLA:  Your Honor, the government calls Ayoub

10    Mohammed.

11     AYOUB MOHAMMED,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14              THE COURT:  Mr. Mohammed, good afternoon.  If you

15    could move a little closer to the microphone, perhaps, and keep

16    your voice up and don't talk too fast.  Keep your voice nice

17    and clear so the court reporter can hear and correctly

18    transcribe it.

19              You may proceed, Ms. Masella.

20              MS. MASELLA:  Thank you, your Honor.

21    DIRECT EXAMINATION

22    BY MS. MASELLA:

23    Q.  Good afternoon, Mr. Mohammed.

24    A.  Good afternoon.

25    Q.  How are you employed, sir?

D3B5dor3                        A. Mohammed - direct

1    A.  Sorry?

2    Q.  What kind of work do you do?

3    A.  I'm self-employed.  I have my own business.

4    Q.  What is the name of the business that you own?

5    A.  A1 Discounts.

6    Q.  And how long have you owned A1 Discounts?

7    A.  Since November 2008?

8    Q.  Are you the sole owner of the business A1 Discounts?

9    A.  Yes.

10   Q.  What kind of merchandise does A1 Discounts sell?

11   A.  Prepaid phone cards.

12   Q.  In addition to prepaid phone cards, does A1 discount sell

13   any other items?

14   A.  General merchandise.

15            THE COURT:  General merchandise?

16            THE WITNESS:  Yes.

17   Q.  What do you mean by general merchandise?  Can you give us

18   some examples of that?

19   A.  Over-the-counter stuff like mints and batteries, like other

20   stuff.

21   Q.  What kind of customers does A1 Discounts sell?

22   A.  The groceries, delis, gas stations.

23            THE COURT:  Groceries, delis, gas stations?

24   A.  Yes.

25   Q.  What areas, geographic areas do you have customers?

D3B5dor3                          A. Mohammed - direct

1   A.  Westchester County and New York City.  In the Bronx most of

2   my customers and Westchester County, Yonkers, New Rochelle,

3   Mount Vernon.

4   Q.  Mr. Mohammad, do you actually make deliveries of your

5   products yourself or do you have employees that do that?

6   A.  No.  I do it myself.

7   Q.  You do everything yourself?

8   A.  Yes.

9   Q.  And what kind of car do you drive in order to make your

10  deliveries?

11  A.  Honda Odyssey.

12  Q.  What type of car is a Honda Odyssey?

13  A.  It is a minivan.

14  Q.  What color is your Honda Odyssey?

15  A.  Tan.

16  Q.  What?

17  A.  Tan.

18  Q.  How long have you been using your tan Honda Odyssey to make

19  deliveries?

20  A.  Ever since I started my business.

21  Q.  Back until 2008?

22  A.  Yes.

23  Q.  Now, as you're driving around to various locations making

24  deliveries, where is it that you keep the proceeds during the

25  course of your delivery route?

D3B5dor3                        A. Mohammed – direct

1   A.  In my van.

2   Q.  Is there a particular location in your van?

3   A.  Yeah.

4   Q.  Where is that?

5   A.  It is in the back.

6   Q.  I'm sorry?

7        THE COURT:  In the back?

8   A.  In the back.

9   Q.  In the bag?

10       THE COURT:  I'm confused.  Back or bag?

11  A.  In the bags in the back.

12  Q.  Mr. Mohammed, are you familiar with a store located at 4194

13  White Plains Road?

14  A.  Yes.

15  Q.  What is at that location?

16  A.  1M Stationery.

17  Q.  Is 1M Stationery at that location one of your customers?

18  A.  Yes.

19  Q.  Is there a particular person there who works at 1M

20  Stationery that is your customer?

21  A.  Yeah.

22  Q.  Who is that person?

23  A.  His name is Fahd Hussain.

24  Q.  How long have you known Fahd Hussain?

25  A.  Since 2005.

D3B5dor3                          A. Mohammed - direct

1   Q.  And how did you first get to know him?

2   A.  I was working for a company so I used to go there for

3   deliveries so I know him from there.

4   Q.  When you were working for a different company?

5   A.  Yeah.

6   Q.  And how long has he been a customer of your business, A1

7   Discounts?

8   A.  Ever since I started in 2008.

9   Q.  And approximately how many times per week or per month did

10  you make deliveries to 1M Stationery?

11  A.  Every week.  Almost every week.

12  Q.  What types of products did you deliver to 1M Stationery?

13  A.  Only phone cards.

14  Q.  Only phone cards.

15  A.  Calling cards.

16  Q.  Has Fahd Hussain ever been with you in your minivan when

17  you're making business deliveries?

18  A.  Yes.

19  Q.  Has he ever been in your minivan when you stored money

20  relating to your business?

21  A.  Sorry?

22  Q.  Has he ever been present inside your minivan when you put

23  away money --

24  A.  Yeah.

25  Q.  -- relating to your business?

D3B5dor3                          A. Mohammed - direct

1          Mr. Mohammed, has your minivan ever been broken into

2    and business proceeds stolen?

3    A.  Yes.

4    Q.  When was that?

5    A.  2011, September 29.

6    Q.  And on that day, September 29th, 2011, where had you been

7    earlier that day before your van was broken into?

8    A.  I went to the 1M Stationery, 4194 White Plains Road.  That

9    was my last stop.

10   Q.  I didn't hear that.  Say that again.  Speak very clearly.

11   A.  I was at 1M Stationery, that was my last stop before they

12   broke into my van.

13   Q.  When you say you were at 1M Stationery on that day, what

14   were you doing there?

15   A.  I went to pick up my payment.

16   Q.  How was it that you were picking up a payment that day from

17   1M Stationery?

18   A.  Sorry?

19   Q.  Did the customer at 1M Stationery, Mr. Hussain, owe you

20   money?

21   A.  Yes.

22   Q.  How much money did he owe you?

23   A.  About $500.

24   Q.  And how is it that you were contacted to go to 1M

25   Stationery that day?

886

D3B5dor3                          A. Mohammed – direct

1   A.   I went there like 4:00, he wasn't there, so I call him,

2   then he say come back like 7:00 something.  After 7:00.

3   Q.   Did you in fact go there after 7:00 that day?

4   A.   That's right.

5   Q.   And when you got there, did you receive any payment from

6   Fahd Hussain?

7   A.   Yes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3bWdor4                    Mohammed - direct

1    BY MS. MASELLA:

2    Q.  Approximately how much money did he pay you that day?

3    A.  500.

4    Q.  Did you have other business proceeds with you that day?

5    A.  Yeah, from the day, yes.

6    Q.  Approximately how much money did you have in total with you

7    that day, after you left 1M Stationary?

8    A.  I had in the car like 1,900 and some in my pocket.

9    Q.  Where within your car did you have the $1,900?

10   A.  In the glove box.

11   Q.  Was the glove box locked in some way?

12   A.  Yes.

13   Q.  After you left 1M Stationary, where did you go then?

14   A.  I went to, like Gun Hill Road, East Gun Hill Road.

15   Q.  What did you do when you got there?

16   A.  I parked my car on the street and I walked to the store.  I

17   got parking like a block up from the store, so I had to park

18   the van.  I went to the store.

19   Q.  How long were you gone from your minivan before you

20   returned?

21   A.  Approximately 30 minutes.

22   Q.  And when you returned to your minivan, what did you

23   observe?

24   A.  When I came to my van, I see the window on the passenger's

25   side is broken.  And the glove compartment was broken, too, and

1    the money's gone.

2    Q.  Was there a lock on the glove compartment?

3    A.  Yes.

4    Q.  How did it appear that the lock had been opened?

5    A.  They take with something, it was broken.  There was all

6    glass all over it.

7    Q.  Did it seem to be broken, the lock?

8    A.  Yes.

9    Q.  Mr. Mohammed, did there come a later time when you were the

10   victim of a robbery?

11   A.  Repeat, please.

12   Q.  Did there come a time after September 29 when you were the

13   victim of a robbery?

14   A.  Yes.

15   Q.  What was that date?

16   A.  December 31, 2011.

17   Q.  Approximately what time on December 31, 2011, did the

18   robbery occur?

19   A.  Around eight p.m.

20   Q.  Where had you been just before the robbery at eight p.m.?

21   A.  I was at, in the last stop was 1M Stationary, 4194 White

22   Plains Road.

23   Q.  Why had you been at 4194 White Plains Road, 1M Stationary,

24   that day?

25   A.  Next to 4192 White Plains Road is a deli owned by the, his

 1   family, Fahd Hussain's family.  So I had the deli right there,

 2   so I went and I dropped my stuff, and the owner of that deli

 3   wasn't there.  He was working overnight.  So I was leaving, and

 4   this gentleman, Fahd, he came.  He said the guy to pay my

 5   money.

 6   Q.  Let me just slow you down for one second, Mr. Mohammed.

 7   You stated that you had a delivery at 4192 White Plains Road

 8   that day?

 9   A.  Yes.

10   Q.  What is the relationship, as far as you know, between 4192,

11   the deli, and 4194, 1M Stationary?

12   A.  They're brothers, brothers, brothers, brother-in-law.  The

13   same family.  Brother and brother-in-law, yeah.

14   Q.  So after you made the delivery at 4192, did you meet with

15   Fahd Hussain that day?

16   A.  Yes.

17   Q.  And what was the purpose of that?

18   A.  Well, he was there.  He saw me, and he came to me and he

19   said, Oh, you came here.  So I said yes.  And then he asked the

20   guy to pay, but the guy said they paid to some other vendor so

21   they don't have money.  So Fahd said, Come to my store, I'll

22   pay.

23   Q.  Which guy was it that said he could not pay?

24   A.  I don't know.  The employee of 4192.

25   Q.  Employee of 4192?

D3bWdor4                          Mohammed - direct

 1    A.  Yes.

 2    Q.  After that, did you, in fact, receive some payment from

 3    Fahd Hussain at 4194?

 4    A.  Yes.

 5    Q.  What was that?

 6    A.  Like $300.

 7    Q.  Approximately how long were you in the 1M Stationary store

 8    that evening?

 9    A.  Around 25 minutes.

10    Q.  Was 25 minutes an unusual length of time for you to be

11    waiting there?

12    A.  Yeah.

13    Q.  What do you mean by that?

14    A.  Well, first I went to other store.  Then he came to the

15    4192 to tell me to come here.  I went there.  He was on the

16    phone talking.  Then he hand me a lot of single, a lot of

17    bills, so I have to count.  So that took up approximately 25

18    minutes, which is unusual.

19    Q.  Okay.  He paid you in what kind of bills?

20    A.  Most like single or dollar bills, $1 bills.

21    Q.  For a total of how much money?

22    A.  Total of 300.

23    Q.  And after you received approximately $300 from the 1M

24    Stationary, where did you go after that?

25    A.  I drove to my parking lot where I park my van.  That was my

D3bWdor4                          Mohammed - direct

1   last stop, before I went to my parking garage.

2   Q.  And where is your parking lot located?

3   A.  On Gun Hill and Jerome intersection.

4   Q.  And what happened when you got to the parking lot?

5   A.  I got there.  I parked my van.  I take all my payments and

6   I have some phone cards, but they were next to my parking card.

7   Q.  How much money did you have on you approximately in cash

8   and approximately how much money in phone cards?

9   A.  It was like 3,000 plus in dollar, cash, plus like $200

10  worth of phone cards.

11  Q.  How were you carrying those items that day?

12  A.  In a bag.

13  Q.  Did you take the bag with you when you left your van?

14  A.  Yes.

15  Q.  What happened then?

16  A.  I just came out of the parking lot, and I see -- like I

17  walk out, right away I see a guy.  He came to me and asked me

18  to hand over the bag.

19  Q.  Which direction did you walk out of the parking garage, on

20  what street?

21  A.  On Jerome Avenue.

22  Q.  And where did you see the guy that asked you to hand over

23  the bag?

24  A.  He's on my right.  He was on my right.

25  Q.  Was he on Jerome or in some other location?

1   A.  On Jerome.

2   Q.  What happened after that?

3   A.  He asked me for the bag and I said, and I was like no.

4   Then he said, then other guy came from the other side, one more

5   person, and they started pulling the bag from my hand, that I

6   was not giving.  They beat me, punch me, throw on the ground,

7   punch me on the face, and I was still not giving, I was holding

8   the bag, like asking for help.  Like nobody came.  One guy

9   started beating like on the head, on the face.  Still I was not

10  giving.  So they tried to pull me up and then they beat me a

11  lot on the face, and they took the bag and ran.

12  Q.  I want to focus on the first individual that you saw for a

13  moment.  The first individual that you saw approaching you and

14  asked for the bag, what did that person look like?

15  A.  I mean, say it again, please.

16  Q.  The first individual that you saw who approached you --

17  A.  Yes.

18  Q.  -- what did he look like?

19  A.  African-American.  Tall guy.

20  Q.  African-American, did you say?

21  A.  Yes.

22  Q.  Was it a male or female?

23  A.  Male.

24  Q.  How tall was he?

25  A.  He was taller than me.  Like six plus, I would say.

1    Q.  How tall are you, sir?

2    A.  Five ten.

3    Q.  Was that person wearing anything to disguise their

4    appearance?

5    A.  Yeah.  He has a mask on.

6    Q.  What kind of mask was he wearing?

7    A.  A black color mask.

8              THE COURT:  Black what mask?

9              THE WITNESS:  Black color.

10   BY MS. MASELLA:

11   Q.  Black color?

12   A.  Yes.

13             THE COURT:  What material?

14             THE WITNESS:  It was dark.  I couldn't tell.

15   BY MS. MASELLA:

16   Q.  What about the second individual; could you describe that

17   person for us?

18   A.  Yeah.  He's shorter than him and me, shorter than me.  And

19   he was chubby, like big guy.  And he came from the back, on the

20   other side.

21   Q.  How much shorter than you, do you think?

22   A.  I would, I think four inch shorter than me.

23   Q.  And was that person wearing a mask?

24   A.  Yes.

25   Q.  Were you able to see the color of that person's skin?

1   A.  Same.  Same color.  Black color.

2   Q.  Mr. Mohammed, did you see any weapons that day?

3   A.  No.

4   Q.  Did both of the individuals hit you or only one of the

5   individuals?

6   A.  Both.

7   Q.  Can you describe what parts of your body they hit you on

8   and what they did?

9   A.  The left eye here and the head.  And they pushed me on the

10  ground, I was hit on my arms too, laying on the ground.

11  Q.  Did you sustain any injuries as a result of this?

12  A.  Yes.

13  Q.  Can you describe your injuries?

14  A.  Like I had a black eye.  And headaches, I have, for the --

15  Q.  Did you receive any medical attention?

16  A.  Yes.

17  Q.  What was that?

18  A.  Just when I went to the police precinct, ambulance came.

19  Q.  Did you go to the hospital?

20  A.  No.

21  Q.  Mr. Mohammed, after that incident, the December 31, was

22  there another time when you were the victim of a robbery?

23  A.  Yes.

24  Q.  What was that day?

25  A.  The day was Tuesday, January 11, I think.

D3bWdor4                          Mohammed - direct

1    Q.  Of what year?

2    A.  2012.  January.

3    Q.  What was the location of that robbery?

4    A.  They came to my house, to my apartment.

5    Q.  What street is your apartment located on?

6    A.  On DeKalb Avenue, 3551 DeKalb Avenue.

7    Q.  Is that in the Bronx?

8    A.  Yes.

9    Q.  What were you doing that day?

10   A.  Well, I came down to my, to get my delivery from the

11   vendor.  So I came out of my building, like came down to the

12   street because I have delivery.  The guy couldn't find the

13   parking, so I just came down to pick up my merchandise.

14   Q.  When you say you came down to pick up a delivery from your

15   vendor, what kind of delivery was it?

16   A.  Phone cards.

17   Q.  Approximately how much value in phone cards were you

18   picking up that day?

19   A.  Around like 2,000.

20   Q.  $2,000?

21   A.  Yes.

22          THE COURT:  You came to get a delivery from your

23   vendor, is that what you said?

24          THE WITNESS:  Mm-hmm.

25   BY MS. MASELLA:

D3bWdor4                          Mohammed - direct

1    Q.  Did you, in fact, pick up the merchandise from your vendor?

2    A.  Yes.

3    Q.  What happened when you picked up the merchandise from your

4    vendor?

5    A.  I went into the building and took the elevator to my floor.

6    Once I came out of elevator, I see a person running towards me

7    with the mask on the face and started asking me like, Give me

8    the money.  So I said I have no money.  So he took my bag.  He

9    search all the bag, and he, there was no cash at that time.

10   Q.  When you say you took the elevator up to your floor, what

11   floor was that?

12   A.  I went to fourth floor.

13   Q.  When you got there, you saw this one person wearing a mask?

14   A.  Yeah.

15   Q.  Did you see anyone else at that time?

16   A.  No.

17   Q.  Had that person been there when you went out of your

18   building to receive the delivery?

19   A.  No, no.

20   Q.  Can you describe that person?

21   A.  That person was skinny, like he's my height.  Same height

22   as my height.  He was wearing blue jeans, boots, and the same

23   kind of mask.

24   Q.  What do you mean by the same kind of mask?  Describe the

25   mask.

D3bWdor4                          Mohammed - direct

1    A.   Black color face mask.  I could see his hairs and his, like

2    the head.

3    Q.   I'm sorry?

4    A.   I could see the hairs and like the color of the skin.

5    Q.   What did his hair look like?

6    A.   Like, like African-American.

7             MR. ROTH:  I'm sorry, Judge.  I couldn't hear.

8             THE COURT:  I couldn't hear either.

9             THE WITNESS:  Like a small hair.  Like -- I don't know

10   how to describe.

11   BY MS. MASELLA:

12   Q.   Short hair?

13   A.   Yeah.  Short hair.

14   Q.   What did that person do when he approached you?

15   A.   He asked me to give the bag.

16   Q.   What did he do when he asked for the bag?

17   A.   I just gave him and he was looking through the bag.  There

18   was no cash, and he put it -- he check my, my pockets.

19   Q.   Did you have any cash in your pockets?

20   A.   No.  I just paid to the vendor everything.

21   Q.   Did that person take anything from you, the bag or any

22   other items that were in your pockets?

23   A.   That day, no.

24   Q.   Mr. Mohammed, has your business changed since these

25   robberies?

D3bWdor4                         Mohammed - direct

```
 1   A.   Yes.

 2   Q.   Can you explain how your business has changed?

 3   A.   Like I stop selling the phone cards now.  I don't do that.

 4             THE COURT:  Is there an objection?

 5             MS. FONTIER:  Relevance.

 6             THE COURT:  I'll allow it.  One question.

 7   BY MS. MASELLA:

 8   Q.   Mr. Mohammed, I don't think we heard your answer.  How has

 9   your business changed since these robberies?

10   A.   I stopped selling phone cards now, after that.

11   Q.   And what effect has that had on your business?

12             MS. FONTIER:  Objection.

13             THE COURT:  Overruled.

14   A.   We carry our cash money.  I have to collect a lot of cash,

15   and it's kind of risky, so I stopped doing it.

16             MS. MASELLA:  One moment, your Honor.

17             No further questions at this time, your Honor.

18             THE COURT:  Okay.  Cross-examination.

19             MS. FONTIER:  Please, your Honor.

20   CROSS-EXAMINATION

21   BY MS. FONTIER:

22   Q.   Good afternoon, Mr. Mohammed.

23   A.   Good afternoon.

24   Q.   I just have a few questions for you.

25   A.   Yeah.
```

D3bWdor4                        Mohammed - cross

1    Q.  I'm going to do these incidents in reverse order, so

2    starting with the third one that you just described, that was

3    in January of last year.  Right?

4    A.  Yes.

5    Q.  2012.

6        Again, you described the person as skinny and about your

7    height, and your height again is five ten?

8    A.  Yes.

9    Q.  And when you saw that person, was it in the hallway?

10   A.  Yeah.

11   Q.  You said he was wearing a mask, correct?

12   A.  Mm-hmm, mm-hmm.

13   Q.  That mask covered his face?

14   A.  Yeah.

15   Q.  But you could see the hair?

16   A.  Yeah, and the portion here.

17   Q.  So the mask didn't go all the way over his hair?

18   A.  Yeah.  No.

19   Q.  I want to move to the December incident when you were

20   describing that you were robbed by two people in the parking

21   lot.

22   A.  Yeah.

23   Q.  That was December 31, is that right?

24   A.  Yes.

25   Q.  That one you said the first person who approached you was a

D3bWdor4                          Mohammed - cross

1     tall black guy, right?

2     A.   Mm-hmm.

3     Q.   He was more than six feet tall, you're saying?

4     A.   Mm-hmm.

5     Q.   And the second person was chubby and shorter than you,

6     right?

7     A.   Yes.

8     Q.   So you said three to four inches shorter than you?

9     A.   Yeah.

10    Q.   So that was a person then that was maybe five seven and

11    heavyset, correct?

12    A.   Yes.

13    Q.   Is that correct?

14    A.   Yes.

15    Q.   Now you, again, said you had been at the 1M Stationary

16    store many times, correct?

17    A.   Yes.

18    Q.   And in going there, you had seen people at the store other

19    than Fahd, correct?

20    A.   Yeah.

21    Q.   On some occasions, you saw some black guys hanging out at

22    the store, is that right?

23    A.   Yes.

24    Q.   Before testifying here, you've met with the prosecutors in

25    this case, correct?

D3bWdor4                          Mohammed – cross

1    A.   Yes.

2    Q.   Met with Ms. Lester and Ms. Masella?

3    A.   Yeah.

4    Q.   And now they asked you about this incident, right?

5    A.   Yes.

6    Q.   And also you told to them that you thought that the person,

7    the taller man in the December robbery, was someone you had

8    seen at the store before, right?

9    A.   Yes.

10   Q.   And you thought also that you would be able to recognize

11   him, correct?

12   A.   Yes.

13   Q.   And were you shown photos by them?

14   A.   No.

15   Q.   Were you shown photos by the police?

16   A.   No.

17   Q.   But you believed that you would be able to recognize the

18   taller man, correct?

19   A.   Yes.

20           MS. FONTIER:  Your Honor, I have no further questions.

21           THE COURT:  All right.

22           Mr. Roth.

23           MR. ROTH:  No questions, Judge.

24           THE COURT:  No questions.

25           Any redirect?

1              MS. MASELLA:  No, your Honor.

2              THE COURT:  You can step down.  Thank you very much.

3              THE WITNESS:  Thank you.

4              (Witness excused)

5              THE COURT:  Government, who is your next witness?

6              MS. LESTER:  Your Honor, it's Detective Aniello

7    Mazzella.

8              THE COURT:  How long a witness?

9              MS. LESTER:  He's not that long, but we could break

10   now if it's more convenient.

11             THE COURT:  More than ten minutes?

12             MS. LESTER:  The direct, no.

13             THE COURT:  Let's do that.  Let's go ahead.

14    ANIELLO MAZZELLA,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. LESTER:

19   Q.  Good afternoon, Detective Mazzella.

20   A.  How are you?

21   Q.  How are you employed?

22   A.  I'm with the New York City Police Department.

23   Q.  Are you assigned to a particular precinct or division?

24   A.  Precinct.

25   Q.  What is that?

1   A.  The five two precinct.

2   Q.  Where is that located?

3   A.  That's at 3016 Webster Avenue.

4   Q.  Is that in the Bronx?

5   A.  Yes, ma'am.

6   Q.  What area of the Bronx does the 52nd precinct cover?

7   A.  Basically, it would be like the Fordham, Fordham area,

8   basically.  That's what they call it.  Basically, it's the

9   northern part of the Bronx.

10  Q.  How long have you been a detective with NYPD?

11  A.  Since 2007.

12  Q.  And how long have you been working as a police officer with

13  the NYPD?

14  A.  Since 1997.

15  Q.  What are your duties and responsibilities as a detective?

16  A.  Reports would come in, and we would investigate the reports

17  that come in that are taken by patrol units.

18  Q.  I'd like to direct your attention to December 31 of 2011.

19  Do you recall whether you were working that day?

20  A.  Yes, I was.

21  Q.  Do you know what shift you were working?

22  A.  That, I do not remember at this time.  I'd have to look

23  at --

24          THE COURT:  What do you have to look at?

25          THE WITNESS:  One of my reports.

1                THE COURT:  That would refresh your recollection as to

2     your shift?

3                THE WITNESS:  Yes, sir.

4                THE COURT:  Are you showing that to him?

5                MS. LESTER:  Yes, your Honor.

6     Q.  I'm going to approach and show you what's been marked for

7     identification as 3542A.  Could you take a look at that and

8     then tell me when you've finished looking at it?

9     A.  Okay.

10    Q.  Does that refresh your recollection as to approximately

11    what hours you were working on December 31?

12    A.  Yes, ma'am.

13    Q.  And what hours were you working that evening?

14    A.  That would be the four-to-one shift, from 1600 hours to

15    0100 hours.

16    Q.  So that's 4:00 in the afternoon to 1:00 in the morning the

17    next day?

18    A.  Yes, ma'am.

19    Q.  Did you have occasion to speak to the victim of a robbery

20    on that day?

21    A.  Yes, ma'am.

22    Q.  And approximately what time of day did you speak to him, if

23    you know?

24    A.  At night.

25    Q.  Did you take any other steps to follow up on what the

1    victim told you after you spoke with him?

2    A.  Yes, ma'am.

3    Q.  Do you recall what steps you took?

4    A.  We went and canvassed for video in regards to that

5    incident.

6    Q.  Did you know where the robbery had taken place?

7    A.  Yes, ma'am.

8    Q.  Where was that?

9    A.  On the corner of Gun Hill Road and Jerome Avenue.

10   Q.  And did you know whether it had taken place near any

11   landmarks of any sort?

12   A.  There was a parking garage right over there and some

13   stores.

14   Q.  Could you take a look at what's in front of you and marked

15   for identification as Government Exhibit 1602.

16       Do you recognize that?

17   A.  Yes, ma'am.

18   Q.  What is it?

19   A.  That's the parking garage that --

20   Q.  Is that a photograph of the parking garage?

21   A.  Yes, ma'am.

22   Q.  Did you take that photograph?

23   A.  No, ma'am.

24   Q.  Does that photograph fairly and accurately depict the

25   parking garage on --

1        Is it on Jerome?

2    A.  Yes, ma'am.

3    Q.  -- on Jerome, as it appeared in December of 2011?

4    A.  Yes, ma'am.

5        MS. LESTER:  Your Honor, the government offers

6    Government Exhibit 1602.

7        MS. FONTIER:  No objection.

8        MR. ROTH:  No objection.

9        THE COURT:  Government Exhibit 1602 is received.

10        (Government's Exhibit 1602 received in evidence)

11        MS. LESTER:  Ms. Brady, can you pull that up.

12   Q.  Detective Mazzella, in the foreground of the photograph

13   right up above, the upper right-hand corner, there's a dark

14   area with some buttresses leading up to it.  Do you know what

15   that is?

16   A.  That's the el train.

17   Q.  Where is the parking lot in this photograph?

18   A.  It's the building on the left.  It's got, it's two story.

19   It's got an open part up top and enclosure at the bottom.

20   Q.  There is a car in the photograph on the left-hand side,

21   correct?

22   A.  Yes, ma'am.

23   Q.  Where is the entrance of the parking light in relation to

24   that car?

25   A.  Right by the rear of that car.

D3bWdor4                        Mazzella - direct

1    Q.   Did you actually visit the parking lot?

2    A.   Yes, ma'am.

3    Q.   What did you do when you got there?

4    A.   I talked to the worker at the time and asked if I could see

5    his surveillance system.

6    Q.   And were you able to look at the surveillance system?

7    A.   Yes, ma'am.

8    Q.   What did you see?

9    A.   The cameras, I saw our victim walk out and then two

10   males --

11            MR. ROTH:  Objection, your Honor.

12            THE COURT:  I'm not sure that that is exactly the

13   question, but --

14            MS. LESTER:  I can rephrase, your Honor.

15            THE COURT:  Let's do that.

16   BY MS. LESTER:

17   Q.   You said you spoke to the manager at the location?

18   A.   Yes, ma'am.

19   Q.   Was he able to retrieve some video from the time of the

20   robbery?

21   A.   Yes, ma'am.

22   Q.   Did you actually watch that video with him?

23   A.   Yes.

24   Q.   Were you able to retrieve it for yourself for evidence in

25   some way?

 1    A.  Yes, ma'am.

 2    Q.  How did you do that?

 3    A.  I downloaded it on to a zip drive.

 4    Q.  And prior to your testimony today, did you review a CD

 5    containing some videotape surveillance footage?

 6    A.  Yes, ma'am.

 7    Q.  If you could take a look at what's been marked as

 8    Government Exhibit 1608 in front of you, do you recognize that?

 9    A.  Yes, ma'am.

10    Q.  What is that?

11    A.  That's the DVD I watched earlier today.

12    Q.  And what is on that DVD?

13    A.  Basically, the video footage from that location.

14    Q.  Do you recognize it to be the same?

15    A.  Yes, ma'am.

16    Q.  How do you know that that's the same CD that you viewed

17    earlier today?

18    A.  I put my initials and my tax number on it.

19             MS. LESTER:  Your Honor, at this time, the government

20    would offer Government Exhibit 1608.

21             THE COURT:  Any objection?

22             MS. FONTIER:  No, your Honor.

23             MR. ROTH:  No, your Honor.

24             THE COURT:  Government Exhibit 1608 is received.

25             (Government's Exhibit 1608 received in evidence)

1           MS. LESTER:  No further questions, your Honor.

2           THE COURT:  All right.  Any cross-examination?

3           MS. FONTIER:  I have no questions, your Honor.

4           MR. ROTH:  I have no questions, your Honor.

5           THE COURT:  You can step down, Detective.  Thank you.

6      You can leave all that there.  In fact, why don't you wait for

7      a second, while I excuse the jury.

8           Ladies and gentlemen, we'll break for lunch.  We'll

9      pick up again at 2:00.  Don't discuss the case.  Keep an open

10     mind.  Enjoy your lunch.  See you at two.

11          (Jury excused)

12          THE COURT:  Have a seat.  You can step down,

13     Detective.  Thank you.  You can leave all that stuff there.

14          (Witness excused)

15          THE COURT:  I've got a sentencing that I've got to do,

16     so if you could just make some room for me.

17          Is there anything else we need to do before we break?

18          MS. LESTER:  Not from the government, your Honor.

19          MR. MURPHY:  Your Honor, there is one issue.  I don't

20     know if you want to address it now or when we come back from

21     lunch.  I did realize, although Government Exhibit 500 we did

22     not object to the admission of, the medical examiner's

23     report --

24          THE COURT:  Right.

25          MR. MURPHY:  There is one paragraph in there that,

1    basically, is just rank hearsay from the witnesses who were on

2    the scene, from whatever they gathered together about what

3    occurred inside the van.  And, frankly, I think that it's

4    hearsay.  It's not something that the medical examiner would

5    have used to draw her conclusions or --

6            THE COURT:  Why don't you talk to the government about

7    it.  The time to make these objections is when the exhibit is

8    being offered.

9            MR. MURPHY:  I do understand that.

10           THE COURT:  It's in.

11           MR. MURPHY:  Your Honor, but it hasn't been shown to

12   the jury yet.  I regret the fact that I didn't do it earlier

13   this morning.  I don't think it's consensual.  I discussed it

14   with the government.  They will not consent to it, so I just

15   need your Honor to rule.

16           THE COURT:  Just tell me the page and I'll look at it

17   later.

18           MR. MURPHY:  Fair enough.  It will say four of four.

19   It's about two-thirds of the way -- there's no Bates number, so

20   it's difficult for me to give you the exact.  Four of four.

21           THE COURT:  Who is the statement by?

22           MR. MURPHY:  It doesn't attribute it to anyone.  It's

23   just basically a summary of where the investigation was in the

24   moments right after the medical investigator, Mr. Yee, got

25   there, at least that's what I gleaned from it.

D3bWdor4

1           THE COURT:  I'll take a look at it.  Okay.  Thanks.

2    Have a good lunch.

3           (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3B5dor5

<pre>
 1                    A F T E R N O O N   S E S S I O N

 2                            2:18 p.m.

 3              (Trial resumed; jury present)

 4              THE COURT:  Have a seat.  I'm sorry to make you wait.

 5         I generally try to schedule some things during lunch

 6    so I can keep my docket going and sometimes -- here -- I

 7    misjudged how long it would take.  So, I apologize for that.  I

 8    know your time is valuable and the last thing I want you to do

 9    is sit around waiting for me.  So, I will try to keep it to a

10    minimum.  Once in a while things you can't quite predict.  So,

11    thank you for your patience.

12              We are now moving on to the government's next witness.

13    Who is that?

14              MS. LESTER:  Your Honor, the government calls Norman

15    Clark.

16              THE COURT:  Mr. Clark, if you can stand and raise your

17    right hand.

18     NORMAN R. CLARK, III,

19         called as a witness by the Government,

20         having been duly sworn, testified as follows:

21              THE COURT:  You may proceed, Ms. Lester.

22              MS. LESTER:  Thank you, your Honor.

23    DIRECT EXAMINATION

24    BY MS. MASELLA:

25    Q.  Good afternoon.
</pre>

1     A.   Good afternoon.

2     Q.   Where do you work?

3     A.   I work for Sprint.

4     Q.   What is your title at Sprint?

5     A.   I'm custodian of records.

6     Q.   Sprint is what type of company?

7     A.   We're a telecommunications company primarily dealing with

8     cell phone service.

9     Q.   What are your duties and responsibilities as a custodian of

10    records at Sprint?

11    A.   Primarily I'm responsible for maintaining as well as

12    retrieving different documents that Sprint produces such as

13    information about subscribers, calls, as well as periodically

14    coming to trial and testifying about those same records.

15    Q.   How long have you been a custodian of records for Sprint?

16    A.   For the last two years.

17    Q.   Were you working for Sprint prior to that?

18    A.   Yes, I was.

19    Q.   What were you doing at that point?

20    A.   For the four and a half years prior I was an electronics

21    surveillance technician with Sprint.

22    Q.   What did that entail?

23    A.   I worked with law enforcement for implementing wiretaps,

24    pen registers, GPS tracking as well as aiding in locating

25    people in emergency circumstances.

1    Q.  Now, you mentioned that in your role as a custodian of

2    records you sometimes have to testify in court as you are

3    today, correct?

4    A.  Yes.

5    Q.  Do you testify about any other topics besides the

6    maintenance and creation of records?

7    A.  Yes.  I have testified -- besides that I have testified

8    about cell site information, the operation of our networks, the

9    relationship of handsets and relationship to cell towers and

10   how the two interact as well.

11   Q.  What is cell site information?

12   A.  Cell site information is essentially the information about

13   what cell site was used, and by cell site they're often

14   referred to as a cell tower.  It is the information of which

15   cell tower was used at the beginning as well as at the end of a

16   phone conversation.

17   Q.  And is information about cell sites collected and

18   maintained by Sprint?

19   A.  Yes.

20   Q.  Are you familiar with those types of records?

21   A.  Yes, I am.

22   Q.  Are you familiar with other records that Sprint keeps

23   relating to its cellular telephone customers?

24   A.  Yes, I am.

25   Q.  What other types of records does Sprint create and

D3B5DOR5                          CLARK - DIRECT

1    maintain?

2    A.   In addition to the cell site information we also maintain

3    subscriber records which are records showing subscriber name,

4    address, types of services received, information about the

5    handset they have, as well as what is called call detail

6    records which are simply the transactions of incoming and

7    outgoing phone calls during a specific period of time, as well

8    as the other processes making those phone calls happen.

9    Q.   Do you receive any special training through your work at

10   Sprint with regard to cell site records in particular?

11   A.   Yes.  We receive extensive training.

12   Q.   And what type of training is that?  Could you describe it

13   for the jury?

14   A.   Sure.

15         We essentially have training that takes place with

16   actual RF, which is radio frequency engineers, who are the type

17   of engineers that maintain our network.  We are trained with

18   them to understand the nuances of a cellular network, at least

19   in the basics as well as training that pertains to the record

20   keepers who specifically record the cell site information from

21   the different calls and put those together with specific

22   training on how to understand how they relate to one another.

23   Q.   Prior to your testimony today were you asked to examine

24   certain records?

25   A.   Yes, I was.

1   Q.  Did you recognize those records?

2   A.  Yes, I did.

3   Q.  What were they?

4   A.  They were Sprint records, specifically subscriber records,

5   call detail records with cell site information.  There were

6   cell site master keys which are master lists of cell sites for

7   a particular area, as well as a couple of documents explaining

8   how to read and interpret some of those records.

9   Q.  And, did those records relate to one particular phone

10  number?

11  A.  Yes, they did.

12  Q.  I have just handed you what's been marked for

13  identification Government Exhibit 2020.  Do you see that?

14  A.  I do.

15  Q.  What is it?

16  A.  This is a CD that contains the information I was

17  discussing, the subscriber information, call detail records

18  with cell site, cell site master lists, as well as some

19  documents explaining how to read them, and in fact there is

20  essentially three sets of the same records repeated on here.

21  Q.  And were you able to recognize those records as being

22  created by Sprint?

23  A.  Yes, I was.

24  Q.  And would they have been created at or near the time of the

25  events to which those records relate?

1   A.  Yes.

2   Q.  Is it Sprint's regular practice to create and maintain

3   these records for its customers?

4   A.  Yes, it is.

5   Q.  And, are they kept in the ordinary course of Sprint's

6   business?

7   A.  Yes.

8           MS. LESTER:  Your Honor, the government offers

9   Government Exhibit 2020.

10          THE COURT:  Any objection?

11          MR. ROTH:  May I have a brief voir dire?

12          THE COURT:  I'm not sure why.  This is a document that

13  has all been provided to you folks in advance, right?

14  Overruled.  Overruled.  I'm going to allow it.

15          Government Exhibit 2020 is received.

16          (Government's Exhibit 2020 received in evidence)

17  BY MS. LESTER:

18  Q.  Now, Mr. Clark, I would like to take a look at some of the

19  records that are maintained on that disk and maintained by

20  Sprint.

21          Ms. Brady, if we could please pull up the subscriber

22  excerpt?

23          Is this the subscriber information that you were

24  talking about, Mr. Clark?

25  A.  Yes, it is.

D3B5DOR5                         CLARK - DIRECT

1   Q.  And, in general, who provides the name or address of the

2   subscriber?

3   A.  It, generally speaking, is provided by the customer who is

4   opening an account with us.

5   Q.  Now, can we look at the call detail record, Ms. Brady?

6           Mr. Clark, is this an example of call detail records

7   from Sprint?

8   A.  Yes, it is.

9   Q.  These are the call detail records relating to what phone

10  number?

11  A.  These are relating to phone number 347-883-8414 which is

12  found in the lower left-hand corner of the spreadsheet

13  preceding -- following the letters "PTN" which stands for

14  "personal telephone number."

15  Q.  Now, could you describe for the jury what the columns in

16  this spreadsheet mean?  So, the first column is calling NBR,

17  what does that stand for?

18  A.  First of all, "NBR" stands for number and that's repeated

19  throughout.  The calling number indicates the call for the

20  person who is initiating the phone call.  So, if we see the

21  347-883-8414 in that first column, it means that person is

22  initiating the call.  If we don't see that number there it

23  means someone else is initiating the call and ultimately the

24  number ending in 8414 is the person who is receiving it.

25  Q.  So, in other words, if in the calling number column the

1   phone number for which these are the records, in other words

2   the number ending in 8414 appears, then that means it is a call

3   being placed by that telephone, correct?

4   A.  That is correct.

5   Q.  Now, in the next column, called number, what does that

6   mean?

7   A.  Called number is ultimately who is receiving the call.

8   Once again, same rule applies as far as the number ending in

9   8414; if it is found in that column it means ultimately that

10  phone is what is receiving the call.  If it is another number

11  it is someone else receiving.  There are some specific cases as

12  well, and if we look at the very first line we have a very

13  unusual phone number, it is a 624-5000 number, that is

14  indicated voice mail and that would be the voice mail ending

15  for the number ending in 8414.  It is ultimately what served

16  the call.

17  Q.  Now, sometimes there is a number in the calling number

18  column but not in the called number column, for example in the

19  fifth line there.  Do you know why that is?

20  A.  Well, there are instances, knowing the fact that cellular

21  networks are not always perfect, naturally, but when we see a

22  blank it may indicate that a call was attempted but did not

23  transfer all the way through and we can further verify that in

24  that column we can see "undetermined" which will be explained

25  as well as looking at the duration.  It tells us that a number

1   was dialed but before it processed through the network and

2   connected with the other party it was terminated for some

3   reason.

4   Q.  Now, the next column where it is dialed digits, what is the

5   significance of that column?

6   A.  Dialed digits is what is captured by our system.  It is

7   what has been transmitted on the hand set and that means did

8   the person dial an area code or not?  Did they dial a 1 before

9   the area code?  Did they dial a star key which would be

10  indicated by the letter B?  Different things.  So, it

11  essentially tells us what was done to be able to initiate the

12  phone call.

13  Q.  The next column is MR number.  What does that mean?

14  A.  MR stands for mobile roll number and it is -- unfortunately

15  it is a title that goes back to the previous way of doing

16  business where we used numbers as opposed to words but

17  hopefully this is less confusing.  It simply indicates it is an

18  inbound call meaning it is received by the number ending in

19  8414, an outgoing call meaning it is made by the number ending

20  in 8414, though there are a couple other possibilities as well.

21       We might see routed.  Routed means being sent to voice

22  mail which is indicated in the first two lines, routed calls

23  indicate part of the process for inbound call, perhaps a

24  searching, looking for where the found is located at to be able

25  to make the phone call be successful.

1          You may also see null mobile roll which would indicate

2     that the network is communicating with the phone but not in the

3     way that it is making a phone call, perhaps sending or

4     receiving information or it is moving from one part of the

5     network to the other.

6          Then, sometimes we can see undetermined.  And

7     undetermined really means it is part of an incomplete call

8     where it is really not saying it is inbound or outbound because

9     no actual connection was made with two parties.

10    Q.  Now, the next two columns are start date and end date and

11    there are also times indicated in those columns.  What do those

12    indicate?

13    A.  Well, start date is when the phone conversation for the

14    phone call begins.  It is listed with the month, date, then

15    year, then using the 24-hour or military format it is showing

16    then the hour, minute and second for when it begins.  Then, in

17    the end date, the same is true then for when the phone

18    conversation ends.

19    Q.  Now, do you know what time zone those time indications are

20    in?

21    A.  Sure.

22         For phone conversations, those are going to be listed

23    in the time local to where the person is at so, as an example,

24    if it is here in New York City, they would be listed in Eastern

25    time.

D3B5DOR5                          CLARK - DIRECT

1   Q.  Now, the next column is duration and there is an

2   abbreviation sec.  What does that indicate?

3   A.  That shows the number of seconds that there were of network

4   usage for the particular phone call.

5   Q.  And the next column is repoll number, what is that?

6   A.  Repoll is kind of a funny word that we use to mean a

7   switch, and a switch simply is a computer that is in charge of

8   one of two things:  Either text messaging or controlling phone

9   calls in a particular area.  It is particularly helpful in

10  determining the specifics of a cell site so we have it there to

11  help us identify which lists we need to look at to receive more

12  information about the cell sites.

13  Q.  And those lists you just mentioned that have further

14  information about the particular cell sites, is that also

15  something that is maintained by Sprint?

16  A.  Yes.  And in fact they're part of the same disk.  They were

17  included on it.

18  Q.  The last two columns are first cell and last cell.

19          We were looking at the last two columns there, first

20  cell and last cell.  What did those mean, Mr. Clark?

21  A.  They both pertain to cell site information.  The first cell

22  would be the cell site that was used when the call initiated

23  and the last cell is the last one they were connected to at the

24  time the phone call terminated.  The information in the column,

25  you will notice that it is a five-digit number if there is any

D3B5DOR5                          CLARK - DIRECT

 1    number besides zero, that is.  The first digit indicates the

 2    piece of equipment which are sometimes referred to as the

 3    sector.  The last four digits are actually the cell site number

 4    itself.

 5              So, looking at the third line down from the top we

 6    will see there is a 3055 and what we're looking at is looking

 7    at cell tower 55, part of repoll 262, and specifically it is

 8    the third sector or the third piece of equipment that is part

 9    of that cell site.

10    Q.  Maybe you could talk a little bit for the jury so they

11    understand what you just meant by a sector.

12              How is a cell tower or a cell site location typically

13    configured?

14    A.  First we need to understand that there is three sides.

15              If you can imagine an upside down triangle and in this

16    particular part of the world being New York the sides of the

17    towers are numbered 2, 3 and 4.  I'm not sure why it is not 1,

18    2 and 3 but engineers designed it so they like to complicate

19    things.

20              So, side 2 generally would be the top of that upside

21    down triangle or generally the northern face.  Side 3 then

22    would be the southeast facing, and side four would be generally

23    the southwest facing.  But, having said that, all those rules

24    can be thrown out, we would have to actually look at a master

25    list and it would tell us the specific direction they're being

D3B5DOR5                      CLARK - DIRECT

1    faced because even though that's the general configuration, we

2    sometimes set them up and face all three in one way, or we

3    tweak it just a little bit to make sure we can meet the needs

4    for our customers in a particular area.

5    Q.  Now, you mentioned that sometimes the sectors can be angled

6    slightly differently, but are there always three sectors for

7    every cell tower or cell site?

8    A.  There are two-sided towers.  There is one-sided towers.

9    They all are going to have different configurations

10   potentially, but that's why it is important that we look at

11   that particular number there.  It will tell us if we see 2, 3

12   or 4 tells us the sector and we can look at the master list and

13   we can look at the other sect ors that are in the same list

14   with it and it would tell us then how many sides there are for

15   sure.

16   Q.  Ms. Brady, if you could pull up the cell site?

17        What are we looking at here, Mr. Clark?

18   A.  This is one of the examples of the cell site master list,

19   and in this particular case in the lower left-hand corner you

20   will notice there is a number that says 232, then it says NY-LI

21   City-2 and then 10312011.

22        The first number 232 indicates the repoll number, the

23   switch, so that would match up with that number in the repoll

24   column on the cell site -- on the call detail log with cell

25   site information.  The next tells us the name of the switches

1    New York Long Island City 2, and the last is simply a date

2    October of -- October 31, 2011, which was one of the iterations

3    of when this information was generated.

4    Q.  How does this information get generated?

5    A.  It actually is created by our engineers who constantly,

6    when they're working on the network, provide the information

7    back to a database which is then accessed by people in Sprint

8    to determine what network elements or pieces of equipment are

9    currently working where they're located at including sometimes

10   information about how they're facing or which direction they're

11   facing to understand better their coverage.

12           The information in the first column on the left is the

13   cell number so that would be the actual number we would have

14   seen for the last four digits, for instance that 55 we would

15   look at no. 55 in that list.  The other information is a lot to

16   do with the property addresses and information like the cascade

17   I.D., a fancy name just to mean how did the engineers name it.

18   But, if we move across the page further to the right we see a

19   couple bits of information, we see latitude and longitude and

20   that's the specific location of where that piece of equipment

21   is at and that would tell us where specifically that equipment

22   would be found if we used a map such as Google maps, we could

23   pinpoint that.  And that last column that says azimuth, that

24   means it is the way that piece of equipment is facing and that

25   would help us to know how it is tweaked from that upside down

1    triangle to know is it facing due north at the top or is it

2    facing more northeast or northwest, just depending on how

3    they've set it up.

4    Q.  So, in other words, using the latitude and longitude

5    indications here, would it be possible to create a map that

6    shows the exact location of the cell tower at issue?

7    A.  It is.  If you took the information from the previous

8    spread sheet that we were looking at which would tell us then

9    the specific column question, we could then look it up on one

10   of these lists, find the latitude longitude and plug it into a

11   map and create a map showing what piece of equipment was used

12   and therefore showing generally where the person had to have

13   been at in relationship to that particular tower.

14   Q.  And the azimuth column that you mentioned, is it fair to

15   say that that relates to the particular cell tower sector?

16   A.  Yes.  That is very specific to the sector.

17          If you notice once again on the screen here, some of

18   these numbers are repetitive and we see it here it says 1, 2

19   and 3.  Well, in this particular case 1, 2 and 3 equates to 2,

20   3 and 4, but looking at those numbers it would tell us in what

21   specific sector, what general direction it is facing and

22   therefore give you a better understanding of not only the

23   location of the cell tower or the cell site, but also the

24   direction the person was in relationship to that cell site.

25   Q.  Now, Mr. Clark, how is it that a phone makes a connection

1    to -- chooses to make a connection to a particular cell tower

2    at a particular time?

3    A.  Well, to understand that we have to understand there are a

4    couple basic things taking place.  Number one, the network has

5    multiple options just about everywhere you go so there is never

6    just one cell site and that's partly by design.  We want to

7    make sure there is overlapping coverage so that way you can

8    always get a signal and successfully make a call.

9            So, understanding that, there is multiple choices that

10   are available for you and your handset has to make a choice,

11   and then at the beginning of a call it is really what is making

12   that choice.  It is going to look like a greedy kid and choose

13   what gives it the biggest and best signal possible because it

14   wants to be successful.  And generally that's the one that is

15   closest to it.  Now, obviously if there is a building between

16   the two locations that is blocking the signal, maybe the

17   closest one isn't the one providing the best signal so maybe it

18   goes for the second closest.  But it is really about that

19   signal strength.  The more signal strength which is like more

20   bars you see on your handset, that means the more successful

21   the call will be.  And that is what the tower is going to

22   connect to.

23           Now, the end one, that's the one that the networks

24   then use to determine at the end of a phone call that they were

25   connected to and that may be the same as the first one, or it

1    may be something different.  And if it is different, it may be

2    because the network had to move them over to a different

3    location because of network traffic, more calls coming in off

4    the original, or maybe because a person has moved and now there

5    is another one that provides a more stronger signal, therefore

6    it would be better able to serve the customer by connecting to

7    it.

8    Q.  You mentioned overlapping coverage areas just now.

9    A.  Yes.

10   Q.  Does Sprint -- how does Sprint specifically lay out its

11   towers to ensure overlapping coverage?

12   A.  We purposefully design our network to only broadcast out a

13   certain distance.  In general terms, we can say in an urban

14   environment we don't want to broadcast more than two miles and

15   in a rural environment, such as, say, rural Kansas out in the

16   middle of nowhere, that may go up to 10 miles.  It is really

17   based upon how many customers.  The more customers we are

18   trying to serve the more narrow the area we can cover so that

19   two miles may not even be feasible and somewhere like midtown

20   Manhattan as an example, we may have towers every couple blocks

21   to make sure that all of our customers, if they came out

22   simultaneously and started making phone calls, that the vast

23   majority of them would be successful.

24          So, the way we set up our network is to have

25   overlapping between two different points so any one tower you

1    can say it is maximum effective range is to the next tower that

2    is closest to it.  And the distance between those towers is

3    really depending on how many customers there are in that area,

4    the environment it is in meaning how many big buildings, how

5    many mountains if you're in the mountainous part of the

6    country; those kinds of things that are all taking place.

7    Q.  Now, when a physical phone, a handset makes a call and

8    utilizes a particular tower, what does that mean in terms of

9    where the phone has to be physically located in relation to the

10   tower?

11   A.  It means it has to be in proximity to that tower.  What I

12   mean by that, I mean it has to be nearby it.

13           If you can imagine you put three different places

14   around the room, different corners of the room.  The phone has

15   to be within the confines of this room to be able to hit any of

16   the cell towers that are at its edges.  If it is beyond that,

17   then another box would be drawn with cell towers around it and

18   it would be in the confines of it.  So, you couldn't, let's

19   say, be in Manhattan and expect to hit a cell tower that would

20   be somewhere in Riverhead, New York, as an example.  You would

21   expect to be hitting off the towers in nearby Manhattan, the

22   ones that are all around it.

23   Q.  Now, in terms of this cell site information that's

24   maintained and recorded by Sprint how far back, historically,

25   does Sprint keep records from a particular phone number?

D3B5DOR5                         CLARK - DIRECT

1   A.  We can go back for about two years to be able to pull up

2   that information, and after we have received a request then we

3   store that information that we retrieve for an additional three

4   years.

5            MS. LESTER:  May I have a moment your Honor?

6            THE COURT:  Yes.

7            (Pause)

8            MS. LESTER:  No further questions.

9            THE COURT:  Cross-examination, Mr. Roth.

10           MR. ROTH:  Thank you.

11  CROSS EXAMINATION

12  BY MR. ROTH:

13  Q.  Good afternoon, sir.

14  A.  Good afternoon.

15  Q.  If you do not understand a question that I pose to you,

16  just ask me to rephrase it and I will.  Okay?

17  A.  All right.

18  Q.  The records that you just testified about, did you

19  personally download those records?

20  A.  No, I did not personally download those records.

21  Q.  Do you know who downloaded those records?

22  A.  I know they were sent to law enforcement but I'm not sure

23  who in law enforcement downloaded them.

24  Q.  Do you know when they were downloaded?

25  A.  That I do not know either.  I do know that it is sometime

1   in 2012, but I don't know the specific day that they downloaded

2   them.

3   Q.  And, do you know in what manner they were downloaded?

4   A.  They were provided electronically.  I do not know how they

5   accessed them, though, if it was to be e-mail or through

6   another system.  But, they were sent electronically.

7   Q.  You said -- I guess it was somewhat of an admission, Sprint

8   is not perfect, is that correct, on your direct testimony?

9   A.  Well, our network is not perfect is what I said.

10  Q.  Is your record-keeping perfect?

11  A.  As best as we can.  We're in the process of trying to make

12  money so we don't want to make too many errors, otherwise we

13  would have customers we would be losing.

14  Q.  Do you know, sir, what your error rate is in terms of

15  retention of records and retrieval of records regarding

16  subscriber calls?

17  A.  If there is any errors that are taking place they're taking

18  place at the location where they're being recorded which is at

19  the cell sites but, generally, if we make a decision, if there

20  is an error that is happening, we favor on the side of the

21  customer so if we can't determine if there is a call we see on

22  the record where it says undetermined or null and mobile roll

23  which indicates it doesn't look like it is a call so we won't

24  bill for it.  But, as far as a specific number, I don't think

25  there is anywhere in our system that we have that kind of

1    information that says what is the specific error rate.

2    Q.  And you have never had any outside independent agency

3    examine Sprint's record-keeping to determine the error rate

4    that you made in terms of the billing or the record keeping in

5    respect to the cell site information?

6    A.  I don't think that we do that primarily because these are

7    the records that we use to create our bill, and because of that

8    we have control over them completely and, once again, if anyone

9    is doing any auditing it is our customers and they're doing

10   that by whether or not they maintain their relationship with

11   us.

12   Q.  So, is it fair to say if the customer says there may be an

13   error and a call didn't connect or I didn't get service your

14   error, Sprint is as a money-making company in saying, okay, we

15   don't challenge that.  We will give you a refund.  We won't

16   charge you for that call?

17   A.  Generally.  But, once again, the process of how that

18   happens is done by our customer care group and I'm not privy to

19   all of their decisions, but generally speaking we try to

20   prevent those calls from coming up by handling them in advance.

21   Q.  You said handling them in advance.  There are times, many

22   times you have acknowledged yourself, that there are errors

23   made in the Sprint network, is that correct?

24   A.  I wouldn't qualify my answer saying there is many times.  I

25   would simply say that if there are times where there

1    potentially is an error, as indicated by a null mobile roll or

2    undetermined, that those are taken out in advance of the

3    billing process.  But, the records we are looking at are kind

4    of raw data.  It is showing everything that is happening.

5    Q.  I don't want to quarrel with you in terms of semantics; you

6    say many times.  You don't have a number to provide to this

7    jury as to the error rate though, is that fair to say?

8    A.  That's correct.

9    Q.  And you indicated, sir -- who did you say this phone was

10   subscribed to?

11   A.  I don't believe I was asked for a specific name but I

12   could -- if someone could bring it up I could tell you what the

13   name shows on our record.

14   Q.  Ms. Brady, if I can have your assistance?  Thank you.

15             THE COURT:  Which document?

16   Q.  I think the first page of the document; you can tell us.

17   A.  The first page of the subscriber record.

18   Q.  The first page.

19   A.  I believe it says Ellis Thomas was the name of the

20   subscriber.

21   Q.  And you have no way of knowing whether that person, that

22   was his phone, is that correct?

23   A.  As far as if they're using the phone or if they're the

24   person subscribed to it?

25   Q.  The person who is subscribed to it.

1   A.  I would assume that the person subscribed to it would be

2   Ellis Thomas but that's all it is, is an assumption.

3   Q.  It is an assumption.

4         And when you -- the records that you testified about

5   today in respect to the call detail records, you can't tell

6   whether this gentleman was using the phone or any other

7   particular person was using the phone on a given time, is that

8   fair to say?

9   A.  That is fair to say.

10  Q.  You couldn't tell whether it was me using that phone?

11  A.  That's correct.

12  Q.  And you indicated, sir, that there was a designation on the

13  call detail records in respect to the first cell tower that

14  that call made contact with, is that correct?

15  A.  Yes; on all the phone calls there is a first cell site that

16  they're connected to, as well as a last cell site.

17  Q.  Is it not fair to say, sir, that that phone, that connected

18  to the first tower, may have connected to several other towers

19  before it got to that last tower?

20  A.  There is always that possibility.  Obviously the longer the

21  phone conversation is there is a higher probability that can

22  happen.  A shorter conversation, the less likely just depending

23  on the distance between those points but there is always a

24  possibility.

25  Q.  Well, it is a possibility if somebody -- it is not just a

1   question of how long the conversation is, is that fair to say?

2   A.  I think that takes a big roll in it.  If we are looking at

3   a 10-second conversation and we are looking at a start point

4   and end point that are the same within 10 seconds, it is fair

5   to say that how far can you really go in 10 seconds?  Now, if

6   it is a 3,000 second conversation, that would provide some

7   latitude, I would imagine, to be able to move from place to

8   place during the course of a call.  But unless you're superman

9   and have supersonic speeds, 10 seconds to me would make a big

10  difference as far as what kind of movement would happen between

11  first and last cell but that would be just my opinion.

12  Q.  Well, there is other factors, are there not, in respect to

13  that 10-second telephone conversation that could affect which

14  tower or which towers could have been implicated in that call

15  between the first and the last call such as call volume traffic

16  at the particular cell site?

17  A.  Yes.  At the time that a call begins, as I stated, the

18  handset itself is going to make that determination.  But, once

19  the calls began, the network is going to determine what it can

20  use as far as the ending cell site that is still within what

21  the phone finds acceptable.  So, it is possible that you see a

22  first cell site and last cell site be different and the person

23  could stay in the same place as an example because the network

24  is taking into account the amount of traffic coming in on the

25  original cell site and making a decision to move it to another

1    one.

2    Q.  So, that that person would be standing there and then it

3    would be -- you used the term picking, it would be picking off

4    of two different cell towers?

5    A.  I wouldn't necessarily use the word picking.  It is an

6    often used term but it is really a misnomer.  Picking really is

7    the process of this cell phone and the cell network

8    communicating in any fashion, but once you're actually in a

9    phone call, it is really a constant, not a picking process.  It

10   is a steady bit of communication between the two.

11   Q.  And, you indicated, sir, that the document, the government

12   exhibit that was shown that was entered through your testimony,

13   was an iteration of October 13th, 2011, is that correct?

14   A.  The cell site record that we looked at, the master key,

15   that one in particular was an iteration from that date.  We

16   produced them periodically throughout the year.

17   Q.  And you produced them periodically, I take it, because

18   things change within the network?  Is that fair to say?

19   A.  Yes.  That's part of the reason we do that.  Sometimes new

20   cell sites come into place, sometimes old ones disappear.

21   Sometimes information about the cell site itself type of

22   equipment there might change and for that reason our

23   engineering group publishes different versions throughout the

24   year and the frequency of publication really is based upon the

25   number of changes that are happening in that particular area.

1   Q.  So, you can't tell from that document, per se, whether or

2   not when a particular cell tower is reflected there as the

3   tower that was utilized at the beginning or the end of the

4   call, whether there was perhaps a closer cell tower to the

5   caller that may not have been in operation at the time?

6   A.  What we can tell from our records is the piece of equipment

7   that was used, and based upon that the worst case scenario we

8   have to look at what the generic values are which is in an

9   urban environment, as an example, a two-mile radius.

10          So, we can always go back to that and say whatever our

11  records indicate was the cell site that was used, the person

12  had to have been within at least that proximity to it.  If as

13  far as there is other equipment that was available or not

14  available, we're not able to make that kind of determination

15  because we don't keep records of when specific cell sites go

16  down in relation to when our -- all we know is if a piece of

17  equipment was used, the phone had to be in transmission range

18  of that tower to be able to successfully make a phone call off

19  of it.

20  Q.  So, to be clear, when you say -- I forget what term you

21  used about cell tower going offline or being destroyed, a storm

22  could destroy a cell tower, is that right?

23  A.  It is potential, yes.

24  Q.  And to be clear, sir, from your testimony, is it fair to

25  say, sir, from your testimony, that the caller who is making

1    the call, that that phone, while it may seek the tower that's

2    closest to it, there is a number of variables that would cause

3    it not to seek that tower or not connect to that tower?

4    A.  Once again, it really isn't looking necessarily for the

5    closest tower.  The general rule of thumb is the strongest

6    signal is the closest tower but that's really what it is

7    looking for, is the strongest signal.  If you're standing two

8    feet away from that we would assume that nothing else is

9    providing a stronger signal because of your proximity.  But, if

10   that tower, I guess, was offline, then whatever the strongest

11   signal the phone sees would be the one it connects to.  It is a

12   machine, it can't determine it is standing next to one or not.

13   It just knows where the signals are coming from.

14   Q.  So, one factor that would play into which tower a phone

15   would connect to would be as if the nearest tower was offline,

16   that is one factor, right?

17   A.  I guess that would be one of the factors as far as why it

18   wouldn't connect to the one that is closest, but yes.

19   Q.  And another one, even if it is two feet, if the tower is

20   over here but I'm on the other side, I'm in a bank vault and

21   that is separating me from that tower and on the other side it

22   is open, I might connect to a tower that's two miles away, is

23   that fair to say?

24   A.  There is that possibility.  If there is something

25   obstructing the signal that it would not go for the nearest but

D3B5dor5                          Clark - cross

1   I believe that is something I obviously said at the beginning

2   as well.

3   Q.  And weather is a contributing factor as to what tower a

4   cell phone would connect to?

5   A.  Extreme weather.

6           We build into account that we are going to have rain,

7   we are going to have sunshine, we are going to have clouds.

8   That is part of what our network engineers do.  However, we

9   can't account for hurricanes, blizzards, those kind of things

10  that bring in too many factors for us to account for.  So,

11  extreme weather definitely can be a factor.

12  Q.  Something like Hurricane Sandy?

13  A.  Definitely something like Hurricane Sandy.

14  Q.  Is it fair to say, sir, that if there were overhead trains

15  operating in an area that that would affect the radio

16  frequency?

17  A.  Once again, those kinds of things are taken into account

18  and they're engineers, they're bright people, they look at what

19  is around them and they're not going to design the network with

20  something --

21  Q.  Well, I'm asking, is that something that can affect the

22  network?

23  A.  What I'm saying is that -- those kinds of things.

24  Q.  Can you answer that with with a yes or no, sir?

25  A.  I cannot answer that with a yes or no because those kinds

of things are taken into account when we design our network.

            So, cell sites are built around what is currently

there so if there is somewhere that has overhead trains, the

network engineers have taken that into account so we can't say

that that's a factor that would be an extreme factor that might

influence negatively from over one area or another; if the

network has been built around the idea that that exists there

or that could happen.

Q.  Does the headset strength, the phone of a -- the strength

of a phone that is making the call influence what tower it may

connect to?

A.  It is not necessarily the strength of the handset, it is

the strength of the antenna which the battery life --

Q.  The battery and the handset?

A.  -- which the battery life has somewhat of a role in that.

If the battery is low it will have to connect to towers that

have a much stronger signal.  That's sometimes why you get

calls that say cannot be completed because your phone is not

able to connect to any tower.

Q.  So, on any of those given towers that are designated in the

call detail records where the sector within the towers are

designated 1, 2 and 3, can you tell whether or not those

antennas on those towers have been maintained properly?

A.  I would assume so but, once again, it is not part of our

records.

1    Q.  So it is just an assumption, is that right?

2    A.  That's correct.  We do not make it a standard business to

3    record our maintenance logs and that's proprietary information.

4    But, what we can say is if the person can connect to it, if it

5    is used as part of our call detail record we know it was

6    operable and able to make a call.

7    Q.  But you don't know, for instance, if -- correct me if I'm

8    wrong here -- the funnel shape that you talked about, the 360

9    degree radius or circle that's divided into three sectors, 120

10   degree sectors, you don't know if the antenna tipped one way or

11   the other which would then shift all your 1, 2 and 3 sectors.

12   Is that fair so say?

13   A.  I think we would have to look at master lists which would

14   show the azimuths which would then tell us the specific way

15   they've been shifted, but that's why I said you would have to

16   use the two together because that provides the specific

17   information of which way that sector is facing and with that

18   master list we would have that information provided.

19   Q.  But, your testimony was before that master list, like this

20   particular one, that this call detail record was generated from

21   was from October 31st, 2011, so you don't go out there every

22   day and check those antennas, is that correct?

23   A.  Nor do we change them every day.  It is possible that an

24   antenna created in 2009 has the exact same azimuth in 2011 as

25   has it today.  There are some things that just don't need to be

1  changed, it is just a matter of that shows the list showing the

2  exact location and showing which way it was facing.  If

3  anything major is changing in it then it would generate a new

4  list.

5          THE COURT:  Did you get it?

6          (Record read)

7          THE COURT:  Next question.

8  Q.  It is possible that the azimuth has changed, though, since

9  that list was generated, is that correct?

10  A.  It is probable that since that time there have been

11  changes.  But, once again, when we talk about changes we're not

12  talking about moving from due north to due south, we are

13  talking about moving from due north to maybe one or two degrees

14  one way or the other to adjust to the changes that are

15  happening in an area, a new building, those kind of things.

16  So, the changes generally are very minor.  If a major change

17  happens it gets identified as a new cell site.  That is just

18  part of our policy.

19  Q.  And you mentioned before that some of your records are

20  proprietary, is that correct?

21  A.  There is quite a few of them that are proprietary, yes.

22  Q.  So, if I asked you today for a predictive coverage map,

23  could you give that to me?

24  A.  That is not something that we just create.  We have the

25  information through drive tests that are stored but just the

1    map itself is -- and, provided, it is not part of our business

2    records.

3    Q.  But do you have -- do you maintain predictive coverage

4    maps?

5    A.  No, we don't maintain just predictive coverage maps.  We

6    use drive testing which is a process our engineers use using

7    various pieces of equipment to go to specific areas and

8    determine strength of signal from different cell sites and see

9    if it matches what they predict it will be but they don't

10   create a map necessarily that is there and available at any

11   given moment.  It is not something that they do.  We only

12   create those maps when we have specific requests or demands

13   that say we have to have them.

14   Q.  So is it fair to say, sir, that on any of those particular

15   towers, cell towers that are reflected in the exhibit, the call

16   detail records, the best you can do is give an approximation,

17   the coverage may be two miles or so, in a urban area?

18   A.  The best I could do is look at all the cell sites in a

19   particular area and say the best coverage I can provide is the

20   distance between the cell site we're looking at and the next

21   closest one.  That's really the best I can do because our

22   network is not designed to leap frog or jump over the next

23   closest cell site.  There is a limited number of frequencies we

24   have to work with and we repeat those frequencies throughout.

25   If we had a leap frogging ability to jump over the top it would

1    muddle the signal, the handsets wouldn't know where to connect

2    to and we wouldn't be able to successfully make calls.

3              So, the best I can determine is if I looked at all

4    cell sites to say this is generally the area that would cover

5    is to the next closest cell site and knowing that it is not a

6    perfect circle.  Maybe one cite has a cell site next closest to

7    it four blocks away, maybe another site has six.  So, we would

8    have to take those into account.

9    Q.  And one may, as you said on direct, up to two miles, is

10   that correct?

11   A.  That's the maximum potential for an urban environment, yes.

12   Q.  And, sir, you testified earlier that you have done GPS

13   tracking, is that correct?

14   A.  Yes.  In my prior job that was part of what I did.

15   Q.  And that was with law enforcement you were working for?

16   A.  No.  That was with Sprint, as part of our electronic

17   surveillance group, which is essentially a group that is

18   federally mandated to work with law enforcement to respond to

19   Court Orders or search warrants that authorize GPS tracking.

20   Q.  And what law enforcement agencies did you work with, sir,

21   in your capacity in that position?

22   A.  I worked with federal, state and local law enforcement

23   agencies all across the United States.

24   Q.  You worked with ATF?

25   A.  I believe I have, yes.

D3B5dor5                           Clark - cross

1   Q.  You have worked with the FBI?

2   A.  Yes.

3   Q.  And, to be clear, sir, none of those call record -- those

4   call detail records that we saw in that exhibit have anything

5   to do with GPS tracking, is that correct?

6   A.  That's correct.  These are all historic records simply of

7   phone calls and the equipment used at the time of those calls.

8   Q.  And to explain to the jury, GPS tracking requires

9   triangulation, does it not?

10  A.  That's one way.  It is actually called trilateration if we

11  are using it between cell towers, but essentially it is using

12  multiple GPS satellite signals to determine location or a

13  combination of satellite signals and cell site locations.  It

14  just depends on the area and the particular circumstances as

15  far as how a location is determined.

16  Q.  And using those techniques you can actually tell pretty

17  much exactly where a caller is calling from, is that correct?

18  A.  Well, the best case scenario you might be able to tell

19  where someone is at within 30 feet if they get a GPS location

20  from multiple satellites, but more often than not a perfect

21  world doesn't exist so the location is usually within a couple

22  hundred feet to a quarter mile.  It just depends on where the

23  person is at and where the signal is because it is hard to

24  predict because from one moment to the next you can get

25  different kinds of locations where the handset is moving, where

D3B5dor5                          Clark - cross

1   it is located at.  All of these things can take a potential

2   factor for the GPS.  But, again, the GPS signal is much

3   different than the cell phone site signal.  It was designed

4   specifically by the government to be a noninvasive signal so it

5   was designed not to penetrate into buildings whereas cell site

6   signal is designed to penetrate into buildings so you can use

7   your phones there.

8   Q.  But you agree, will you not, sir, that the GPS is a much

9   better tracking device?

10  A.  It is potentially a better tracking device, yes.

11  Q.  In which cases is it not, sir?

12  A.  It is potentially.  I'm not law enforcement.  I simply

13  provide information that's available so I wouldn't know whether

14  it would be better or not because I have never been a law

15  enforcement officer.

16  Q.  You testified, sir, it could get you to within 30 feet, 50

17  feet?

18  A.  Potentially, yes.

19  Q.  And the call detail records we are talking about implicate

20  an area up to two miles away in an urban area, is that right?

21  A.  Potentially, yes.

22          MR. ROTH:  Thank you.  I have no further questions.

23          THE COURT:  Ms. Stafford?

24  CROSS EXAMINATION

25  BY MS. STAFFORD:

D3B5dor5                              Clark - cross

1    Q.   Good afternoon, Mr. Clark.

2    A.   Good afternoon.

3    Q.   I just wanted to ask you just a few things to clarify what

4    you testified to during your direct and your cross-examination.

5              Can you please explain, I think you did a little bit

6    but I'm not sure if you said everything, what you meant by

7    cellular networks are not perfect when you said that?

8    A.   What I mean by that is obviously we have to make

9    adjustments.  We can go in and design everything as best as

10   possible but if we throw a new building out in the middle of

11   midtown we have to adjust to it and that adjustment may take

12   place multiple times.  As the building continues to grow maybe

13   the signal is not as effective and we have to continue to make

14   changes.  So, in that aspect it is not a perfect environment.

15   We continually have to do little modifications.  However, we do

16   our best in advance to try to anticipate as many of those

17   things as possible knowing that if we don't, we lose customers.

18   Q.   So, you're saying the signal strength or the coverage area

19   is not perfect between the networks; is that what you're

20   saying?

21   A.   I'm saying that is there anything that is perfect?  No.  It

22   is simply understanding the fact that we have to constantly be

23   making small, minor adjustments to certain things based upon

24   the back bone that we have done our best to study.  But I

25   couldn't sit here and say our network is perfect.  I have to

1  accept the fact that as best as we do, that is all it is, is a

2  best effort, though we are pretty good at it.

3  Q.  And there is a range of things that come into the signal

4  strength that could interfere with the signal strength and I

5  think you mentioned a few; you mentioned weather, building

6  obstruction.  Are there any other things that interfere with

7  signal strength between the handset and the cell tower?

8  A.  Extreme weather we said, obviously obstruction.

9  Potentially the strength of your handset.  I guess that could

10  play a role.

11      There is probably as many reasons that can interfere

12  with it as we have time today to explain.  There is just so

13  many different factors as far as what legal things to go into

14  play but generally those are minor things.  It is really the

15  extreme factors are the ones that interfere with the network's

16  ability.  So, to say the world series, everyone coming out is

17  trying to use their phone simultaneously, that might be an

18  extreme case of network having an effect.  Hurricane factors.

19      So, extreme factors are the ones that impact the

20  signal.

21  Q.  So, the records that you provided us with today, they're

22  typically called historical call detail records, right?

23  A.  Yes.  Historical or call detail records.  They are one in

24  the same.

25  Q.  And they're historical because they're records that you're

1   obtaining from a time in the past?

2   A.  Yes.  They're from phone calls that have already taken

3   place as opposed to ones that are about to take place.

4   Q.  And, that's different from the information that you would

5   use to actually try angulate a phone, correct?

6   A.  That's correct.  The GPS location is a real-time event so

7   it is something that happens as it is occurring now as opposed

8   to these other records which are phone calls that have already

9   taken place.

10  Q.  And in order -- the real-time information is not something

11  that you, your company would see fit financially to keep in

12  their database, correct?

13  A.  The only time we keep the real-time information is when we

14  are under Court order to provide that information to law

15  enforcement and we therefore have to keep a record of what we

16  provide, even if it is in real-time, but that's the only

17  instance.  But we also have a legal obligation not to track our

18  customers for privacy reasons.  So, we do not do any kind of

19  real-time tracking unless there is a Court order involved.

20  Q.  And, just along those lines, these records are not kept for

21  the purposes of providing them to law enforcement, correct?

22  A.  No.  These are records that we use for billing purposes to

23  a lesser degree or our engineers to be able to look at and see

24  if there is anomalies as part of their process of analyzing the

25  network.

D3B5dor5                           Clark - cross

1   Q.  And you had stated previously that the handset typically

2   is -- the best signal strength is the tower that is closest to

3   the handset?

4   A.  Generally that's the rule of them.  The stronger the signal

5   closer in proximity obviously taking everyone to account the

6   exceptions we have mentioned.

7   Q.  Would it be fair, your testimony, that it would not be

8   possible for the handset to be outside of the proximity of a

9   particular tower?    A register of that tower?

10  A.  Just to make sure I understand the question, are you saying

11  that it is not possible for the phone to be able to connect to

12  a tower that it is not somewhere within a proximity to it?

13  Q.  Exactly.

14  A.  Understanding once again the potential maximum of where it

15  is at, as long as it is within whatever that is or wherever it

16  has been set at by the engineers for a particular area, it

17  could potentially connect to it.  Understanding it can't leap

18  frog.  So, if it's contained within the confines as we said

19  like the corners of this room, it is somewhere in this room, it

20  is fair to say that all the corners, if they were cell sites,

21  would potentially be ones it would connect to.  Which one it

22  would choose would be wasted upon the strongest signal.  But,

23  it wouldn't be fair to say that if it was inside this room it

24  would connect to one, say, in a courtroom somewhere in Queens

25  because that wouldn't be in proximity to where the phone is at.

D3B5dor5                              Clark - cross

1    Q.  But so you're -- but it is possible?

2    A.  No.  It is not possible.

3    Q.  So you're saying it is not possible.  It is not possible

4    for the handset to connect to, like you said, a courtroom

5    outside of this courtroom?

6    A.  It has to be contained within the confines.

7           If you look at the cell network and the concept of

8    cells means it is an enclosed environment which means all the

9    cell sites are rounded are enclosing these telephone itself

10   within it, so you have to connect to one of those things that

11   encloses it.  If one of those appears then maybe it stretches

12   out further but it still encloses it within what is reasonably

13   practical.  You know, the signal cannot go on and on and on and

14   still work.  Obviously the signal doesn't stop at a particular

15   location but its strength is limited by the engineers.  They

16   purposefully do that to make sure it covers adequately a

17   specific area.  So, if you have a point that is in Queens, as

18   an example, and you are here, there is a lot of different cell

19   sites between the two points.  So, you would expect that if

20   these ones didn't happen it would be enclosed by the next set

21   but it wouldn't jump across the entire network.  It just cannot

22   happen.

23   Q.  And was it reflected anywhere in the records that it did

24   connect with a cell tower outside of that range that you have

25   talked about?

1    A.  Once again, our records simply indicate which cell sites

2    they connected to so that would tell us, understanding how the

3    networks work, that they were somewhere within proximity of

4    that cell site to be able to connect to it.

5    Q.  But the records are what dictate what you're talking about,

6    right?  I mean, you are taking the call detail records and you

7    are matching them up with the cell site location records --

8    A.  They're.

9    Q.   -- and you are determining, you know, where that phone

10   registered?

11   A.  That's correct.

12   Q.  For that particular tower?

13   A.  Yes.

14   Q.  And you're saying in an urban area it cannot connect

15   further than a mile to two miles?

16   A.  I'm saying that by design that is the maximum that we can

17   set it out in an urban environment without it just becoming a

18   gibberish signal.  So, in most cases that maximum say,

19   theoretical, the practicality is it is much shorter.  There are

20   many instances where in Manhattan or even in downtown Brooklyn,

21   parts of Queens that signal strength is measured in blocks, two

22   or three.  So, we are not even talking miles, we are talking

23   fractions of miles.  It just depends how we set up the network

24   for that particular area and how it is set up depends on the

25   buildings around, the amount of potential customers and the

D3B5dor5                         Clark - cross

1   amount of total traffic we might think we have in an area.

2           So, our records do indicate what they do which is if

3   they connected to that tower, which is what it shows, they had

4   to have been in proximity to that tower.  That's just the way

5   the network goes.  We can't make an assumption that because I

6   say the wall is green that it is green because I just made that

7   up.  We have to follow the rules which the rules of radio

8   frequency say which for this to work it has to be within

9   proximity.

10  Q.  And you are saying that from the records, correct?

11  A.  I'm saying that based upon what we have in the records that

12  that's the cell site location that they connected to which

13  means they have to be within proximity to that cell site

14  location.

15  Q.  Okay.

16          And, these records -- okay.  Fair enough.

17          MS. STAFFORD:  I think that's it.  Thank you.

18          THE WITNESS:  You're very welcome.

19          THE COURT:  Any redirect?

20          MS. LESTER:  Just briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MS. LESTER:

23  Q.  Mr. Clark, during your direct testimony we were looking at

24  what is essentially a key to the cell site information.  Do you

25  remember that spreadsheet that we looked at?

D3B5dor5                          Clark - redirect

1    A.  Yes, I do.

2    Q.  If we can pull it up, Ms. Brady?  It was the third excerpt.

3          At the bottom you indicated there is a date on it,

4    correct?

5    A.  Yes.

6    Q.  Do you know how often those cell site location keys are

7    updated?

8    A.  It really varies.  We potentially could go in every month

9    and reprint a new one but we generally don't because the

10   information isn't updated that often.  But, it is fair to say

11   that at least probably four times a year would be about the

12   average time frame.

13   Q.  And who is updating that information?

14   A.  It actually comes from our engineering group.  They provide

15   us the updates but the actual compilation, this is done by our

16   legal department, and part of our compliance is to create a

17   format that is understandable for someone to read besides our

18   engineering group.

19   Q.  Now, when records are requested from Sprint such as the

20   call detail records that we were looking at before, and Sprint

21   also provides this key, what is the general practice with

22   regard to whether the most recent key available is used?

23   A.  That is our practice.  We try to look at the date range for

24   the records that were involved and we look at what was the

25   closest information that was provided to us by the engineers

D3B5dor5                              Clark - redirect

1    for cell site information and provide that most up-to-date

2    list.  If there is ones that are directly in between the two,

3    it is left up to the judgment of the person who is pulling the

4    records to say it is the one prior or the one later because

5    there is no right answer to that one if it is right in the

6    middle.  But, generally, there is one that is closer.

7    Q.  So the practice then is to provide the most accurate, the

8    most updated key to the people who are requesting the records?

9    A.  That's correct.

10             MS. LESTER:  No further questions.

11             THE COURT:  Recross?

12             MR. ROTH:  Nothing.

13             THE COURT:  Recross?

14             MS. STAFFORD:  Nothing further.

15             THE COURT:  Thank you, Mr. Clark.  You may step down.

16             THE WITNESS:  Thank you.

17             THE COURT:  Government, your next witness.

18             MS. MASELLA:  Your Honor, the government calls Police

19   Officer Alexis Diaz.

20    ALEXIS DIAZ,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23             THE COURT:  State your name and spell your name, first

24   and last, for the record.

25             THE WITNESS:  Officer Alexis Diaz.

1          THE COURT:  Officer, let me ask you to scoot the chair

2     up closer and then speak loudly and clearly and not too fast,

3     okay?

4          THE WITNESS:  All right.

5          THE COURT:  Thank you.

6          You may proceed, Ms. Masella.

7          MS. MASELLA:  Thank you, your Honor.

8     DIRECT EXAMINATION

9     BY MS. MASELLA:

10    Q.  Good afternoon, Officer.

11    A.  Good afternoon.

12    Q.  Where do you work?

13    A.  The 47 Precinct in the Bronx.

14    Q.  And for whom do you work?

15    A.  New York City Police Department.

16    Q.  How long have you worked for the New York City Police

17    Department?

18    A.  About eight years.

19    Q.  What is your title with the New York City Police

20    Department?

21    A.  Police officer.

22    Q.  And you just mentioned that you work in the 47th Precinct

23    in the Bronx.  Can you tell the jury what area that precinct

24    covers?

25    A.  That covers the northeast section of the Bronx.

D3B5dor5                           Diaz – direct

1    Q.  How long have you worked in the 47th Precinct?

2    A.  About seven years.

3    Q.  And what do your duties and responsibilities as a police

4    officer within the 47th Precinct include?

5    A.  I work routine patrol every day.

6    Q.  And how long have you been working on patrol?

7    A.  Seven years.

8    Q.  And what are some of the things that you do as an officer

9    on patrol?

10   A.  Respond to radio runs of different emergencies, different

11   situations.

12   Q.  Is collecting evidence from different scenes a part of your

13   job?

14   A.  No.

15   Q.  Do you ever take into custody evidence or maintain it after

16   it has been collected by someone else?

17   A.  Yes.

18   Q.  Can you explain, generally, what the process is for

19   maintaining evidence?

20   A.  Once we get the evidence from the crime scene unit we

21   usually take them back to the 47 precinct and we voucher them

22   at the station house.

23              MR. ROTH:  Judge, I will ask that he talk in the first

24   person.

25              THE COURT:  All right.  Speak about either your own

D3B5dor5                          Diaz - direct

1    experience or identify who else is involved in this process.

2              So, when you said "we" just now, that is what you do

3    typically?

4              THE WITNESS:  I'm referring to my partner and I.

5              THE COURT:  So, as a general matter that is what you

6    do.

7              Next question.

8    BY MS. MASELLA:

9    Q.  When you said you voucher evidence, can you explain to the

10   jury what a voucher is and what a voucher number is?

11   A.  We collect -- well, we get evidence from the crime scene

12   unit we go back to the station house and we do a process, it is

13   computerized, we put it in the system and we get the voucher,

14   we get them -- each one has different numbers to identify each

15   item we're vouchering.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

D3bWdor6                         Diaz - direct

1   BY MS. MASELLA:

2   Q.  Does a voucher contain a unique number?

3   A.  Yes.  Each one has different numbers.

4   Q.  Is there any description of the item of evidence that you

5   place on the voucher?

6   A.  Yes.  We put a description on it.

7   Q.  Officer, I want to direct your attention now to December 12

8   of 2011.  Were you working on that day?

9   A.  Yes.

10  Q.  Approximately what time were you working that day?

11  A.  7:05 a.m. to 3:40 p.m.

12  Q.  Did there come a time on December 12, 2011, when you

13  responded to a crime scene?

14  A.  Yes.

15  Q.  What time did you respond to the crime scene?

16  A.  About 11:50 a.m.

17          THE COURT:  A.m.?

18          THE WITNESS:  A.m.

19  BY MS. MASELLA:

20  Q.  And where was the crime scene?

21  A.  It was on Strang Avenue and Duryea Avenue.

22  Q.  Was that within the 47th Precinct?

23  A.  Yes, in the Bronx.

24  Q.  When you arrived in that area of Duryea and Strang Avenue,

25  what did the scene look like?

D3bWdor6                          Diaz - direct

1    A.   When my partner and I arrived there, we observed a parked

2    vehicle in the corner of Strang and Duryea, and we approached

3    the vehicle.  We noticed a middle --

4              MS. LESTER:  Judge, could he just testify what he

5    observed?

6              THE COURT:  All right.  He observed that.

7              You approached with your partner, right?

8              THE WITNESS:  Yes.

9              THE COURT:  Overruled.  He can speak about what he and

10   his partner did.

11             What you observed, you should just talk about what you

12   observed.  Okay?

13             THE WITNESS:  All right.

14             THE COURT:  So what did you observe?

15             THE WITNESS:  I observed a parked vehicle on the

16   corner of Strang and Duryea.  I observed a male laying

17   unconscious inside the vehicle.

18   BY MS. MASELLA:

19   Q.   What kind of vehicle was it?

20   A.   I don't recall exact vehicle.  It was a minivan, but I'm

21   not too sure on the make.

22   Q.   Was the car running or had it been turned off at the time

23   that you saw it?

24   A.   The car was running at that time.

25   Q.   And were you and your partner the first NYPD officers who

D3bWdor6                        Diaz - direct

1   were at the scene, as far as you know?

2   A.  Yes.

3   Q.  What is your partner's name, by the way?

4   A.  Officer Camilo.

5   Q.  Can you just spell that for the court reporter, please?

6   A.  Yes.  C-A-M-I-L-O.

7   Q.  Were you present during the time that detectives with the

8   crime scene unit arrived?

9   A.  Yes.

10  Q.  Did you stay in the area while the detectives from the

11  crime scene unit processed the scene?

12  A.  Yes.

13  Q.  At any point, did they give you any evidence that you later

14  took custody of and vouchered?

15  A.  Yes.

16  Q.  What was that evidence?

17  A.  They gave me a, a -- could I refer to the voucher to

18  refresh my memory?

19  Q.  You would like to see a copy of the voucher?

20  A.  Yes.

21  Q.  You don't recall what the evidence was?

22  A.  Not at all.

23          MS. MASELLA:  One moment.

24  Q.  I'm showing you 3528D, which has been marked for

25  identification.

D3bWdor6                         Diaz – direct

1          THE COURT:  What was that number?

2          MS. MASELLA:  3528D.

3    Q.  Does that refresh your recollection, Officer Diaz?

4    A.  Yes.

5    Q.  What was the item of evidence that you received from the

6    crime scene detective?

7    A.  It was one discharged shell casing from the scene.

8    Q.  I'm now going to approach and show you what's been marked

9    as Government Exhibit 267 for identification.  Do you recognize

10   that item, Officer Diaz?

11   A.  Yes.

12   Q.  Can you tell us what it is?

13   A.  The discharged shell casing I got from the scene.

14   Q.  How do you know it's the same shell casing you received at

15   the scene?

16   A.  Well, crime scene detectives from the crime scene unit,

17   they actually package the items and hand it over to us, for us,

18   to me, actually, to voucher at the precinct.

19   Q.  But after you completed the voucher at the precinct --

20   sorry.  Withdraw that.

21          Looking at that small white envelope that is

22   Government Exhibit 267, does your voucher number appear

23   anywhere on that envelope?

24   A.  Yes.

25   Q.  Did you also fill out a complaint report in connection with

1   this case?

2   A.  Yes, I did.

3   Q.  What's known as a 61?

4   A.  Yes.

5   Q.  If you could, tell the jury what a 61 is.

6   A.  A 61 is a complaint report we prepare for different crimes

7   that we encounter.

8   Q.  Does each 61, or complaint report, also have a unique

9   identifying number?

10  A.  Yes.

11  Q.  Does that number appear on the white envelope, Government

12  Exhibit 267, in front of you?

13  A.  Yes.

14          MS. MASELLA:  One moment, your Honor.

15          No further questions, your Honor.

16          THE COURT:  Any cross-examination?

17          MS. FONTIER:  Just very briefly, your Honor.

18  CROSS-EXAMINATION

19  BY MS. FONTIER:

20  Q.  Good afternoon, Officer Diaz.

21  A.  Good afternoon.

22  Q.  So December 12 of 2011, you said you arrived at Strang and

23  Duryea at 11:50 a.m.?

24  A.  About, yes.

25  Q.  And were there other officers that were already there?

1   A.  There were other officers, not from the NYPD, from Mount

2   Vernon PD.

3   Q.  So when you arrived, the Mount Vernon PD were already at

4   that scene?

5   A.  Yes.

6   Q.  And fair to say that the vehicle with the body in it was

7   also there, correct?

8   A.  Yes.

9   Q.  So it was there prior to 11:50 a.m.?

10  A.  Yes.

11  Q.  You also vouchered eventually that vehicle, correct, the

12  Toyota Sienna?

13  A.  Yes.

14  Q.  And that was taken into police custody, correct?

15  A.  Yes, it was.

16  Q.  It was held for evidence collection?

17  A.  Yes.

18          MS. FONTIER:  No further questions, your Honor.

19          THE COURT:  Mr. Roth?

20          MR. ROTH:  No.

21          THE COURT:  Any redirect?

22          MS. MASELLA:  No, your Honor.

23          THE COURT:  Thank you, Officer.  You can step down.

24          (Witness excused)

25          THE COURT:  Next witness.

D3bWdor6

```
 1              MS. MASELLA:  Your Honor, the government calls Patrick
 2    Taylor.  He is a witness who is in custody.  It's my
 3    understanding it will take just a couple of minutes.
 4              THE COURT:  Why don't we take an afternoon break so we
 5    can switch the witness in.  Hopefully you have water and snacks
 6    and we can pick up again in about ten minutes.
 7              (Jury excused)
 8              THE COURT:  Have a seat.
 9              Do you think this witness will take us the rest of the
10    day?
11              MS. MASELLA:  I believe so, your Honor.
12              THE COURT:  That's what I would expect.  All right.
13    So, any objections to exhibits that are coming in through this
14    witness?  Think about that just so we can deal with it outside
15    the presence of the jury, if we need to.
16              MS. MASELLA:  Thank you, your Honor.
17              MS. LESTER:  Your Honor, also, just for the Court's
18    planning purposes, we were planning to call Detective Fox
19    tomorrow.
20              THE COURT:  The expert on the guns?
21              MS. LESTER:  On the ballistics.
22              THE COURT:  Okay.  I'll rule on that.
23              MS. LESTER:  Thank you.
24              (Recess)
25              THE COURT:  Have a seat.  We're now going to move on
```

1        to the government's next witness.

2                  Ms. Masella.

3                  MS. MASELLA:  The government calls Patrick Taylor.

4         PATRICK TAYLOR,

5             called as a witness by the Government,

6             having been duly sworn, testified as follows:

7        DIRECT EXAMINATION

8        BY MS. MASELLA:

9        Q.  Good afternoon, Mr. Taylor.

10       A.  Good afternoon.

11                 THE COURT:  You have to say it nice and loud.  Okay?

12                 THE WITNESS:  Good afternoon.

13       BY MS. MASELLA:

14       Q.  Do you use any nicknames, sir?

15       A.  Yes.

16       Q.  What are those nicknames?

17       A.  Squeak.

18       Q.  How long have you been called Squeak?

19       A.  My, ten years, all my life.

20       Q.  How old are you now, sir?

21       A.  25.

22       Q.  Are you married?

23       A.  Yes.

24       Q.  When did you get married?

25       A.  In August.  In August 2012.

1    Q.  Do you have any children?

2    A.  Yes.

3    Q.  How many children?

4    A.  One.

5    Q.  How old is your child?

6    A.  He's, he's five months.

7    Q.  Mr. Taylor, have you committed crimes in your life?

8    A.  Yes.

9    Q.  Generally speaking, what types of crimes?

10   A.  Robbery and selling marijuana.

11   Q.  Did you commit robberies alone or with other people?

12   A.  With, with other people.

13   Q.  Looking around the courtroom, do you see anybody with whom

14   you have committed robberies?

15   A.  Yes.

16   Q.  How many people do you see?

17   A.  Two.

18   Q.  Tell us who the first one is.  Can you describe where that

19   person is sitting, what name you knew him by, and what he's

20   wearing?

21   A.  Blaqs.  He's right there.  Short hair, glasses.  He got a

22   pen in his hand with jacket suit on.

23          MS. MASELLA:  Your Honor, may the record reflect that

24   the witness has identified the defendant Jermaine Dore.

25          THE COURT:  The record shall so reflect.

1              What name did you know him by?

2              THE WITNESS:  Blaqs.

3              THE COURT:  Blaqs?

4              THE WITNESS:  Yeah.

5              THE COURT:  Okay.

6  BY MS. MASELLA:

7  Q.  Who was the second individual, Mr. Taylor?

8  A.  Tall Man.

9  Q.  Where do you see that person and what is he wearing?

10  A.  He's over there.  Glasses and a long sleeve shirt on with a

11  tie.

12              MS. MASELLA:  May the record reflect that the witness

13  has identified the defendant Dwayne Barrett.

14              THE COURT:  All right.  The record shall so reflect.

15  BY MS. MASELLA:

16  Q.  Do you know any other names for Tall Man?

17  A.  No.

18  Q.  What about Blaqs, do you know any other name for Blaqs?

19  A.  Yes.

20  Q.  What other name do you know for Blaqs?

21  A.  St. Kitts.

22  Q.  Can you spell that?

23  A.  St. Kitts.  Kitts.

24  Q.  Mr. Taylor, where were you born?

25  A.  Jamaica.

1   Q.   And when did you come to the United States for the first

2   time?

3   A.   In 1992.

4   Q.   How old were you at that time?

5   A.   Five.

6   Q.   With whom did you come to the United States at that time?

7   A.   My step mom.

8   Q.   How long did you stay when you first came to the United

9   States?

10  A.   A couple years.

11  Q.   And --

12  A.   Like six years.

13  Q.   During those six years, in what area of the United States

14  did you live?

15  A.   The Bronx.

16  Q.   Did there come a time after that when you returned to

17  Jamaica?

18  A.   Yes.

19  Q.   And then you came back to the United States?

20  A.   Yes.

21  Q.   What year did you come back to the United States?

22  A.   In 2003.  August 27, 2003.

23  Q.   How old were you at that time?

24  A.   16.  Just turned 16.

25  Q.   With whom did you come when you came to the United States

1    in 2003?

2    A.  By myself.

3    Q.  In what area did you live when you first came to the United

4    States in 2003?

5    A.  Bronx.

6    Q.  In what section of the Bronx?

7    A.  In Mickle Avenue, Mickle and Gun Hill, Gun Hill and Mickle

8    Avenue.

9    Q.  Mickle Avenue and Gun Hill?

10   A.  Yes.

11   Q.  How long did you stay in the Bronx?

12   A.  Like five years.

13   Q.  Until what year?

14   A.  Until '08.

15   Q.  And in 2008, where did you move to?

16   A.  To, to Springfield, Massachusetts.

17   Q.  With whom did you live in Massachusetts?

18   A.  A cousin and my uncles.  My uncle and my cousin.

19   Q.  What is your cousin's name?

20   A.  Shea Douglas.

21   Q.  Did Shea Douglas have a nickname that you knew him by?

22   A.  Yes.

23   Q.  What is that nickname?

24   A.  Duffel.

25   Q.  Duffel?

D3bWdor6                          Taylor – direct

1   A.   Yes.

2   Q.   What did you do to make money when you were living in

3   Massachusetts?

4   A.   I sell weed, marijuana.

5   Q.   Did you do that alone or with other people?

6   A.   With other, with other people.

7   Q.   Which other people did you sell marijuana with?

8   A.   My cousin, my uncle, friends, that stuff.

9   Q.   When you say a cousin, which cousin are you referring to?

10  A.   Shea Douglas.

11  Q.   How did your marijuana organization work?

12  A.   Came in from California to Springfield, to the Bronx.

13  Q.   What was your role with respect to that marijuana

14  organization?

15  A.   To sell it to other people.

16  Q.   What did you physically do in connection with selling

17  marijuana to other people?

18  A.   I bring it to them, give them the drugs, and I, and I, and

19  they give me the money, so, so like that.

20  Q.   In what different geographic areas did you make these

21  deliveries of marijuana?

22  A.   Bronx, Connecticut, and Springfield, Mass.

23  Q.   What kind of quantities of marijuana did you deliver to

24  individual customers?

25  A.   Like from the one pound to like ten, 20, 30, 40 pounds.

D3bWdor6                          Taylor - direct

1   Q.  From one pound to 40 pounds at a particular delivery?

2   A.  Like sometime like five pounds, ten pounds, 20 pounds.  For

3   person, one person.

4   Q.  How many pounds of marijuana would you estimate that you

5   sold per month during this time period?

6   A.  For a month, sometime like, like 60 to 70 pound for a

7   month, sometimes.  Hundred pounds.

8   Q.  During what years were you operating this marijuana

9   business from Springfield, Massachusetts?

10  A.  From '08 to '012.

11  Q.  Did there come a time when you stopped selling marijuana in

12  2012?

13  A.  Yes.

14  Q.  What month during 2012 did you stop selling marijuana?

15  A.  It was in, it was in July of 2012.

16  Q.  Was there something specific that happened in July of 2012

17  that caused you to stop selling marijuana?

18  A.  Yes.

19  Q.  What was that?

20  A.  The feds came to my house.  ATF came to my house, looking

21  for my cousin.  So, I was scared, so I stopped.

22  Q.  When you say the feds came to your house, is there a

23  particular agency that came to your house that you're aware of?

24  A.  The ATF.

25  Q.  When you say your cousin, which cousin were they looking

D3bWdor6                          Taylor - direct

1    for?

2    A.  Shea Douglas.

3    Q.  Do you know why they were looking for your cousin at that

4    time?

5    A.  No.

6    Q.  You said that you were scared.  Why were you scared at that

7    time?

8    A.  Because, because I knew I was doing armed robberies, and

9    stuff, so I was scared.

10   Q.  Once the federal agents came to your house in July 2012,

11   what did you decide to do with respect to your own criminal

12   conduct?

13   A.  Decided to talk to the federal agents.

14   Q.  Why did you decide to do that?

15   A.  Because I know I was doing robberies and stuff.

16   Q.  At that time, were you aware that anybody that you had been

17   doing robberies with had been arrested?

18   A.  Yes.

19   Q.  Who were you aware of that had already been arrested at

20   that point?

21   A.  Blaqs, Tall Man, Ali, Jerry, and Biggs.

22   Q.  At that time, in July 2012 when federal agents came to your

23   house, did you believe that you could be arrested for

24   committing robberies with those individuals?

25   A.  Yes.

D3bWdor6                          Taylor - direct

1    Q.  Had you been charged with any crime by the federal

2    authorities as of that point, July 2012?

3    A.  No.

4    Q.  When you said that you wanted to talk to the authorities,

5    did you, in fact, talk to the authorities?

6    A.  Yes.

7    Q.  What occurred during the first meeting that you had with

8    any federal authority?

9    A.  I tell them like about robberies, and stuff, but I didn't

10   tell them, the federal agent, the truth.

11   Q.  Did you tell any of the truth during that meeting?

12   A.  Yes.

13   Q.  What part of the truth did you tell?

14   A.  It was a robbery that I've been on, on December 31, I told

15   them that I was there but that I didn't do anything.  I was

16   just in my car.

17   Q.  Did you talk about any other robberies that you had

18   participated in during that first meeting?

19   A.  No.

20   Q.  Who was at that first meeting?

21           MR. ROTH:  Judge, could we have a time?

22           MS. MASELLA:  Around July 2012.

23   Q.  Who was at that first meeting, Mr. Taylor?

24   A.  It was me and the government and ATF agents.

25   Q.  You and the agents were the only ones present?

1    A.  Yes, yes.

2    Q.  Did you have a lawyer at that time?

3    A.  No.

4    Q.  Did there come a later time when you obtained a lawyer in

5    connection with this case?

6    A.  Yes.

7    Q.  When did you obtain a lawyer?

8    A.  November 2012.

9    Q.  At the time that you obtained a lawyer, had you been

10   charged by the federal authorities for your conduct?

11   A.  No.

12   Q.  What did you and your lawyer decide to do to handle your

13   case after November of 2012?

14   A.  After that, we're, we decide to talk to the government.

15   Q.  After you made that decision, did you, in fact, attend a

16   series of meetings with the government?

17   A.  Yes.

18   Q.  Approximately how many meetings did you attend?

19   A.  Like four.

20   Q.  Who was present for those meetings?

21   A.  It was me, my lawyer, and the government.

22   Q.  And when you say the government, were the prosecutors

23   present?

24   A.  Yes.

25   Q.  Were there federal agents present?

1   A.  Yes.

2   Q.  What happened during those meetings?

3   A.  I told them everything that, that was happening about the

4   robberies and everything that happened.

5   Q.  Did you talk about your own conduct in connection with the

6   robberies?

7   A.  Yes.

8   Q.  Did you talk about the conduct of other people?

9   A.  Yes.

10  Q.  Did you talk about any other crimes that you had committed?

11  A.  Yes.

12  Q.  During that series of meetings, was there any information

13  that you initially held back or did not tell the government?

14  A.  Yes.

15  Q.  What was that information?

16  A.  About my friend Jaba.  Told them Jaba wasn't in the

17  robbery.

18  Q.  You said you held back information about a friend Jaba?

19  A.  Yes.

20  Q.  Was he, in fact, involved in a robbery?

21  A.  Yes.

22  Q.  Why did you hold that information back?

23  A.  Because me and him came from the same place in Jamaica, so

24  I was a little bit, I'm scared.  So that's why I hold it back,

25  both came from the same place in Jamaica.

1    Q.  What about the December 31 robbery that you already

2    mentioned.  Did you tell the government about everything the

3    first time you talked about that robbery?

4    A.  No.

5    Q.  What did you leave out?

6    A.  I told them I wasn't next to the victim, but I was.  I was

7    next to the victim.

8    Q.  So the truth is that you were near the victim during the

9    robbery?

10   A.  Yes.

11   Q.  And you did not say that the first time you talked about

12   it?

13   A.  Yes.

14   Q.  Did you also hold back or not disclose at first a prior

15   arrest that you had for marijuana?

16   A.  Oh, yes.  Yes, I did.

17   Q.  When was that arrest, in fact?

18   A.  It was in '08, two thousand -- it was in '08, in

19   Springfield, Massachusetts.

20   Q.  What was that arrest for?

21   A.  Marijuana.

22   Q.  And what quantity of marijuana?

23   A.  I think it was like a couple pounds.  I don't know how much

24   was it.

25   Q.  What happened to those charges?

1    A.  I don't really know because problem is I never went back to

2    court.

3    Q.  You failed to go back to court on those charges?

4    A.  Yes.

5    Q.  When you were arrested that time in 2008 in Springfield,

6    did you use your real name, or did you use a different name?

7    A.  My cousin name.

8    Q.  So not your name?

9    A.  No, not my real name.  No.

10   Q.  Before your testimony here today, have you at this point

11   told the government everything that you know about these

12   subjects?

13   A.  Yes.

14   Q.  Mr. Taylor, at some point after you began meeting with the

15   government, were you placed in federal custody?

16   A.  Yes.

17   Q.  When was that?

18   A.  Around, in February 2012, 2013.

19   Q.  How was it that you came to be in federal custody?

20   A.  I turned myself in.  To the government.

21   Q.  And at the time when you turned yourself in, in February,

22   were you charged at that time?

23   A.  Yes.

24   Q.  What were you charged with on that day?

25   A.  I was charged with robbery at gunpoint.

D3bWdor6                          Taylor - direct

1    Q.   How many charges?

2    A.   Four charges.

3    Q.   At the time you turned yourself in.

4    A.   No.  One.  One charge.

5    Q.   And after you came into federal custody and you had that

6    initial charge, did you continue to attend meetings with the

7    government?

8    A.   Yes.

9    Q.   Did there come a time when you pleaded guilty to charges in

10   connection with the robberies that you committed?

11   A.   Yes.

12   Q.   When was your guilty plea?

13   A.   It was in February 25, 2013.

14   Q.   How many charges did you plead guilty to in February of

15   2013?

16   A.   Four.

17   Q.   What's the first charge that you pleaded guilty to?

18   A.   The first one is conspiracy to armed robbery, and second

19   one is --

20   Q.   Stop, Mr. Taylor.  Sorry.  Stop after the first one.  I'm

21   going to ask you what time period did the robbery conspiracy

22   charge cover?

23   A.   What time period?

24   Q.   Did the charge cover, yes.

25   A.   It's from September 2011 until January 2012.

1  Q.  What was the second charge that you pled guilty to?

2  A.  A gun charge.

3  Q.  Did the gun charge have any relationship to the robberies?

4  A.  Yes.

5  Q.  What is that relationship?

6  A.  The armed robbery at gunpoint.

7  Q.  What is the third charge that you pleaded guilty to?

8  A.  Third charge is robbery at gunpoint.

9  Q.  What is the date that related to that third charge for the

10  gunpoint robbery?

11  A.  It was October 29.

12  Q.  What year?

13  A.  2011.

14  Q.  What is the fourth charge that you pleaded guilty to in

15  connection with your guilty plea?

16  A.  Selling marijuana.

17  Q.  During what years?

18  A.  '08 to '012 of July.

19  Q.  Was your guilty plea, Mr. Taylor, pursuant to any kind of a

20  plea agreement?

21  A.  Yes.

22  Q.  What kind of plea agreement?

23  A.  Getting a 5K letter.

24  Q.  What is your understanding of your duties under the terms

25  of your plea agreement?

1  A.  I got to tell the truth and if the government asks me to

2  come to meetings or they ask me to come, to go, to come on

3  trial, I got to do it.  I got to tell them everything that,

4  that I ever did in the past.

5  Q.  When you say come to trial, do you mean testify?

6  A.  Testify, yes.

7  Q.  Are you allowed to commit any further crimes under your

8  agreement, Mr. Taylor?

9  A.  No.

10 Q.  Now, if you do all the things that you're obligated to do

11 under the agreement, what is your understanding of what the

12 government will do?

13 A.  They supposed to write me the 5K letter.

14 Q.  What is your understanding of what is in a 5K letter?

15 A.  Everything that I told to the government and everything

16 that I did.

17 Q.  Can you be more specific when you say everything that you

18 did?

19 A.  My past history of my crimes, robberies, everything that

20 I've told the government I did.

21 Q.  Who does the 5K letter go to?

22 A.  To the judge.

23 Q.  Which judge?

24 A.  Who is going to sentence me.

25 Q.  Without getting a 5K letter, what is your understanding of

1    the maximum amount of time that you're facing in your case?

2    A.  Life.

3    Q.  And without getting a 5K letter, what is your understanding

4    of the minimum amount of time that you're facing?

5    A.  17 years.

6    Q.  If you get a 5K letter, what's the lowest sentence you

7    could get?

8    A.  Time served.

9    Q.  If you get a 5K letter, what's the highest sentence you

10   could get?

11   A.  Life.

12   Q.  What is your understanding of whether the 5K letter will

13   recommend any particular sentence for you?

14   A.  No.

15   Q.  What do you mean by that?

16   A.  Huh?

17   Q.  Will the 5K letter recommend any particular sentence for

18   you?

19   A.  No.

20   Q.  What sentence are you hoping to get?

21   A.  Time served.

22   Q.  What is your understanding of what happens if you lie under

23   your plea agreement?

24   A.  That the government will tear up my agreements, my 5K

25   letter.

1    Q.  What happens if your agreement is torn up and you do not

2    get a 5K letter?

3    A.  I'm going to get 17 years, probably, life.

4    Q.  Has anyone told you what sentence you're going to get?

5    A.  No.  No.

6    Q.  Has anyone promised you any particular sentence?

7    A.  No.

8    Q.  Mr. Taylor, I now want to turn back to two individuals,

9    Blaqs and Tall Man, that you identified.  When did you first

10   meet Blaqs and Tall Man?

11   A.  Like around, on September 2011.

12   Q.  And where were you at that time?

13   A.  I was in Mount Vernon, at a party house.

14   Q.  When you say a party house in Mount Vernon, can you

15   describe the location of that house?

16   A.  It's off First Street, it's a house that, that people goes

17   and buys drugs or play dominoes, or do whatever they want

18   there.

19   Q.  Did some people stay overnight in that house?

20   A.  Yeah.

21   Q.  Did you stay overnight in that house?

22   A.  Yeah, couple times there.

23   Q.  What were the circumstances of you staying overnight at the

24   party house in Mount Vernon?

25   A.  Because at the time, I didn't have anywhere else to stay

D3bWdor6                        Taylor - direct

1    at, so I just stay over there for a couple of days and stuff.

2    Q.   Where had you been living before September 2011?

3    A.   In Connecticut.

4    Q.   With whom?

5    A.   My wife.

6    Q.   And why was it that in September 2011, you felt as if you

7    did not have a place to live?

8    A.   Had a fight, so leave out, move out.  We had a fight.  We

9    keep on fighting, so I was fed up.  So I move out.

10   Q.   How was it that you first met Blaqs and Tall Man at the

11   party house?

12   A.   Just everybody there talk and talk, so everybody just got,

13   everybody from Jamaica or some type island, everybody talk to

14   each other.  So we just talking, so I start talking, ask them

15   what they do, they ask me what I do.  I tell them I sell drugs,

16   but right now my business started -- slow and tell me what they

17   did, from then.

18   Q.   At the point at which you told them your drug business was

19   slow, was that true?

20   A.   Yes.

21   Q.   Why was your drug business slow at that time?

22   A.   Gosh, somebody robbed me and my cousin our money so

23   everything went down from there.  I was broke.

24   Q.   So you were unable to purchase drugs?

25   A.   Yes.

D3bWdor6                          Taylor - direct

1   Q.  When you say you asked them what they did, let's go one by

2   one.  Who did you ask first, Blaqs or Tall Man?

3   A.  Blaqs.

4   Q.  What did Blaqs say when you asked him what he did?

5   A.  Make money.

6   Q.  Did he specify any further?

7   A.  Not really.

8   Q.  What about Tall Man?

9   A.  Tall Man, just there, just smoking.  I was started talking,

10  started talking, started talking.  Then after that, they was

11  like, you know, just, this guy who, who get the money, and I

12  asked him, and I asked him, Oh, like, what type of money.  They

13  was like money.  A lot of money.  So I asked them doing what.

14  They was like robbery.

15              THE COURT:  Who said that?

16              THE WITNESS:  Blaqs.

17              THE COURT:  Blaqs?

18              THE WITNESS:  Yeah.

19  BY MS. MASELLA:

20  Q.  Was this conversation at a later time?

21  A.  Yes.

22  Q.  How much later after the first time?

23  A.  Like couple days after that, like two days.

24  Q.  And so the conversation you're relaying is from Blaqs or

25  from Tall Man?

1   A.  From Blaqs.

2   Q.  And when he said that he had a guy who could get him money,

3   what did you understand him to mean by that?

4   A.  Get him money, like robbery, or something.  That's what I

5   think.

6   Q.  Did there come a later time when they were more specific?

7   A.  Yes.

8   Q.  Who was that, Blaqs or Tall Man?

9   A.  Blaqs.

10  Q.  And what did Blaqs say that was more specific?

11          THE COURT:  When was this?

12  BY MS. MASELLA:

13  Q.  When was this?

14  A.  It was like a couple days after we first met.  I was

15  talking, and he was like, you know, this dude who got some

16  people who bring money to him and stuff.  And then he, he was

17  like, whenever that dude call him, he's going to call me and

18  come get me, I was going to go and do it.

19          (Continued on next page)

20

21

22

23

24

25

D3B5dor7                          Taylor - direct

BY MS. MASELLA:

Q.  Was it still in September or was it a later month?

A.  Yes.  September.

        THE COURT:  Where were you when you had that

conversation?

A.  The party house.

Q.  When you were having this conversation in the house with

Blaqs, was Tall Man also present?

A.  Yes.

Q.  Did he say anything at that time?

A.  Not really.  Just talking to him like a lot of money and

stuff.

        THE COURT:  I didn't hear what you said.

Q.  And after Blaqs said that he would call you.  Did you agree

to that?

A.  I was ready.  Yeah.

Q.  And did there come a later time when in fact you did get a

call from Blaqs about Tall Man doing the robbery?

A.  Yes, Blaqs.

Q.  From Blaqs?

A.  Yes.

Q.  And how much later was that?

A.  Like a couple of days, like four days after that, three

days.

Q.  Still in September 2011?

D3B5dor7                          Taylor - direct

1   A.   Yes.

2   Q.   Now, when you got a call from Blaqs in September 2011, who

3   were you with at that time?

4   A.   My cousin.

5   Q.   Which cousin?

6   A.   Shea Douglas.

7   Q.   And where were you?

8   A.   Over Mount Vernon at the party house.

9   Q.   And when Blaqs called you, what did he say?

10  A.   He told me that the boys come getting me right now, picking

11  me up from the house.

12  Q.   And after he told you he was about to come pick you up,

13  what happened after that?

14  A.   Then Blaqs and Tall Man came.  Tall Man driving his Benz

15  car and Blaqs driving the Trooper Jeep but Blaqs came with

16  Biggs so me and my cousin went in to Tall Man's car.

17  Q.   And you saw Blaqs and Biggs arrive in, I think you said, a

18  Trooper?

19  A.   Trooper, yeah.  Truck.

20  Q.   Do you know who that Trooper belonged to?

21  A.   I think it is Blaqs' girlfriend's truck.

22  Q.   Do you know Blaqs' girlfriend's name?

23  A.   Yes.  Cheeky.

24          THE COURT:  What's the name?

25          THE WITNESS:  Cheeky.

 1          THE COURT:  Cheeky?

 2          THE WITNESS:  Yeah.

 3   BY MS. MASELLA:

 4   Q.  You also said Tall Man arrived in his car.  What kind of

 5   car was he driving that day?

 6   A.  It is an S500 Mercedes Benz.

 7   Q.  What color is the S500 Mercedes?

 8   A.  Dark blue.

 9   Q.  And which car did you get into?

10   A.  Tall Man's Benz.

11   Q.  And did your cousin Duffel go along as well?

12   A.  Yes.

13   Q.  Which car did he get into?

14   A.  Tall Man's car too.

15   Q.  Mr. Taylor, I'm showing you what's been marked for

16   identification as Government Exhibit 8.  Do you recognize that?

17   A.  Yep.

18   Q.  And what is it?

19   A.  That's a picture of me.

20          MS. MASELLA:  Your Honor, the government offers

21   Government Exhibit 8.

22          THE COURT:  Any objection?

23          MS. FONTIER:  He said it is a picture of himself?

24          THE COURT:  Yes.

25          MS. FONTIER:  No objection.

1        THE COURT:  No objection?

2        MR. MURPHY:  No, your Honor.

3        THE COURT:  Government Exhibit 8 is received.

4        (Government's Exhibit 8 received in evidence)

5        THE COURT:  Are the name plates in evidence too?  Or

6   not.

7        MS. MASELLA:  Apologies, your Honor.  The government

8   offers Government Exhibit 8A and 8B, a nameplate of Squeak and

9   a nameplate Patrick Taylor.

10       THE COURT:  Any objection to the name plates?

11       MR. ROTH:  No, your Honor.

12       MS. FONTIER:  No, your Honor.

13       THE COURT:  So the name plates 8A and B, are also

14   received.

15       (Government's Exhibit 8A and 8 B received in evidence)

16   BY MS. MASELLA:

17   Q.  Mr. Taylor, are you able to see the board to your left with

18   the various pictures on it?  Looking at the photo in the upper

19   left-hand corner which is Government Exhibit 1, are you

20   familiar with that individual?

21   A.  Yes.

22   Q.  And who is that individual?

23   A.  That's Moe.  Ali.

24   Q.  Turning now to the individual next to him, second from the

25   left, are you familiar with that person, Government Exhibit 2?

1   A.  Yes.

2   Q.  Who is that?

3   A.  Blaqs.

4           THE COURT:  Can we start with Moe/Ali?  I don't think

5   we have had any testimony about him from you; how do you know

6   him?

7           THE WITNESS:  By Blaqs and Tall Man.

8           THE COURT:  Had you met him?

9           THE WITNESS:  Yes.

10          THE COURT:  When was the first time you met him?

11          THE WITNESS:  Like around September.  Late September.

12          THE COURT:  Of what year?

13          THE WITNESS:  Of 2011.

14          THE COURT:  Okay.

15          All right.  Go ahead.

16  BY MS. MASELLA:

17  Q.  Mr. Taylor, turning to the next photo, the third from the

18  left, Government Exhibit 3, are you familiar with that

19  individual?

20  A.  Yes.

21  Q.  Who is that?

22  A.  Tall Man.

23  Q.  And the photo next to him all the way on the right of the

24  top row, Government Exhibit 4; do you know that person?

25  A.  Yes.

1   Q.   Who is that?

2   A.   Biggs.

3   Q.   That's the person you just mentioned as being present in

4   the Trooper?

5   A.   Yes.

6   Q.   And now you just identified yourself in the lower left-hand

7   corner.  In the lower right-hand corner, Government Exhibit 6,

8   are you familiar with that individual?

9   A.   Yes.  My cousin.

10  Q.   And which cousin is that?

11  A.   Shea Douglas.

12  Q.   Mr. Taylor, after you got into the Mercedes with Tall Man

13  and Duffel, where did you go?

14  A.   To the Bronx to 233rd and White Plains Road.

15  Q.   And when you went to the area of 233rd and White Plains

16  Road, were you able to see where the other car, the Trooper

17  containing Biggs and Blaqs went?

18  A.   Yes.

19  Q.   Where did that car go?

20  A.   Straight down 233rd and White Plains road.

21  Q.   Was that car in front of you or behind you?

22  A.   In front of us.

23  Q.   And, what happened when you got into the area of 233rd

24  Street and White Plains Road?

25  A.   After that we followed this car, this Green civic, this

D3B5dor7                        Taylor - direct

Honda car to Wallace Avenue.  After that we -- after that the

car stop on Wallace, he came out of his car.  Me and Blaqs

approached the guy, Blaqs punched him, he fell.  And then,

after that, picked the bag up with the money and the phone card

then, after that, went back to Tall Man's car and then --

Q.  Mr. Taylor, I am going to stop you for a second so we can

go step by step.

         What kind of car was it that you said that you were

following to the area of Wallace Avenue?

A.  It is a blue Honda car, Honda Civics.

Q.  And do you know what kind of a person you were following in

the Honda civic?

A.  No.  Not at the time, no.

Q.  At the time you did not know?

A.  No.

Q.  And on the way there was there any discussion in your car

or over the phone with Blaqs about what was going to happen

when you got there?

A.  I know Blaqs got to jump out and after that he is going to

be with me, my cousin is getting out of the car and help Blaqs

out.

Q.  How did you know?  Was there some conversation during which

it was discussed that Blaqs was going to get out of the car and

then either you or your cousin would get out?

A.  Yes.

D3B5dor7                           Taylor - direct

1    Q.  When was that discussion?

2    A.  When I was in the car going down, me and Tall Man and my

3    cousin was talking.

4    Q.  What did Tall Man say during that conversation?

5    A.  Tall Man said Blaqs going to get out of his car so me and

6    my cousin better get out at his car as Blaqs out.

7    Q.  Did there in fact come a time when you got out of the car?

8    A.  Yes.

9    Q.  What occasion was that?

10   A.  That's on Wallace Avenue.

11   Q.  Where was the Mercedes car parked on Wallace Avenue?

12   A.  Mercedes parked on, I think it is Burke.  The car parked on

13   Burke and Wallace.  Burke is the main street and Wallace Avenue

14   going up, so the Mercedes parked like right next to Wallace

15   Avenue on the corner of Wallace Avenue at Burke.  Me and Blaqs

16   went on Wallace Avenue to rob the kid.

17   Q.  And what did Tall Man and Duffel do at that time?

18   A.  They were just in the car waiting on us.

19   Q.  Which car did they stay in?

20   A.  Tall Man's Benz.

21   Q.  And what about Biggs?  What did he do during this incident?

22   A.  Biggs was in Blaqs' car driving.  Biggs was the driver.

23   Q.  Did he remain in the car?

24   A.  Yes.

25   Q.  And after you and Blaqs got out of the two different cars,

1   what did you do then?

2   A.  After that we went over to the guy, to the victim, then

3   Blaqs punched him, he fell on the floor and he dropped the bag

4   with the money and the phone card, then I picked it up, went

5   back to Tall Man's car and Blaqs went back to Biggs' car, his

6   truck.

7   Q.  What did the victim look like?

8   A.  He is like from -- he is from --'s from Ali's country, Arab

9   or something like that.  Is Arab.

10  Q.  He's air big?

11  A.  Arabic, yes.

12  Q.  Do you know what country Ali is from?

13  A.  Yes.  I think um Yemen.  Yemeni or something like that.

14  Yemen.

15  Q.  Have you ever seen this particular victim before?

16  A.  No.

17  Q.  Do you know what kind of business he worked in?

18  A.  At the time, no.  But after I find out.

19  Q.  How did you find out afterwards?

20  A.  I went to a phone card place that sell phone cards and that

21  dude's car was there.

22  Q.  And where was that place, the phone card -- the place that

23  sold phone cards?

24  A.  I think it was next to Fordham Road.  Fordham Road in the

25  Bronx.

D3B5dor7                          Taylor - direct

1    Q.  Were there other times when you followed any individuals

2    who worked from that business?

3    A.  Yes.

4    Q.  How many other times would you say you followed other

5    victims from the same business?

6    A.  Like a couple times, like three times, four times.

7    Q.  Were any of those -- did any of those incidents result in

8    robberies or were you just following them?

9    A.  Following them, yeah.  Yes.

10   Q.  After you took the bag from the victim that day and ran

11   back to Tall Man's car, where did you go next?

12   A.  To Mount Vernon.

13   Q.  Where in Mount Vernon?

14   A.  To a house.  So, a street side next to a house like on 13th

15   or something like that.

16   Q.  13th Street?

17   A.  Yeah.

18   Q.  Was there anyone in particular who lived there?

19   A.  No.  Not at the time, no.

20   Q.  And what happened --

21          Sorry, withdrawn.

22          When you got to that location who was there?

23   A.  It was me, Biggs, Tall Man, Blaqs and my cousin.

24   Q.  And what happened when you got to that location?

25   A.  When there Tall Man was counting the money, Tall Man gave

D3B5dor7                          Taylor - direct

1    me my money, gave my cousin his, gave Blaqs his, he take his

2    and gave Biggs his money, his share.

3    Q.  Did Tall Man say how much money in total was there?

4    A.  Yeah.  Two grand.  $2,000.

5    Q.  And how much was your share of the $2,000?

6    A.  $250.

7    Q.  Was there anything else in the bag besides money?

8    A.  Yes.

9    Q.  What was that?

10   A.  Phone cards.

11   Q.  What happened to the phone cards?

12   A.  Tall Man gave them back to Ali, to Moe.

13   Q.  Did he say that?

14   A.  Yes.

15   Q.  After that robbery that day, did you get an understanding

16   as to who gave the information about the victim that you robbed

17   on Wallace Avenue?

18   A.  Yes.  Like a couple days after that, yes.

19   Q.  And how was it that you got that understanding?

20   A.  Because me and Blaqs and Tall Man went over to Ali's store

21   and 233rd and meet Ali by the store.

22   Q.  What happened -- when you refer to the store on 233rd, what

23   store is that?

24   A.  That was Ali's store.  It is a store like at 233rd owned by

25   Ali.

D3B5dor7                         Taylor - direct

1    Q.  Do you know the name of it?

2    A.  I think it's 1 million or something like that.  1 million.

3    I think something like that.

4    Q.  Ms. Brady, can we have Government Exhibit 40 in evidence on

5    the screen, please?

6            Mr. Taylor, do you recognize that photograph?

7    A.  Yes.

8    Q.  What is that?

9    A.  That's photograph of the store on 233rd, Ali's store.

10   Q.  Ms. Brady, can we have Government Exhibit 42, please?

11           Mr. Taylor, do you recognize that photo?

12   A.  Yes.

13   Q.  What is that?

14   A.  That's the inside of Ali's store.  The inside of the store.

15   Q.  Now, when you went to the Ali's store that day a few days

16   after the robbery, how did you learn about the information

17   related to the victim?

18   A.  Um, because everybody was talking so I learned that it was

19   him giving out the information to Blaqs and Tall Man.

20   Q.  When you say everybody was talking, who was present?

21   A.  It was me, my cousin, Tall Man and Ali.  Me, Blaqs, Tall

22   Man and Ali and my cousin.

23   Q.  And, what was -- can you tell us who said what during the

24   conversation that led you to understand the information about

25   the victim?

D3B5dor7                          Taylor - direct

1   A.   Like they was just talking because Tall Man said Ali told

2   him that it was more money in the bag but Ali said he was -- it

3   was $6,000 but when we get it it was only two grand.  So, they

4   was just talking saying that's crazy because Ali thought it was

5   six grand.  Everybody thought it was six grand so everybody

6   thought it was Ali playing games or somebody was playing games,

7   was lying.  Somebody was just talking.

8   Q.   After the robbery on Wallace Avenue, when is the next time

9   that you talked to Blaqs or Tall Man about a robbery?

10  A.   After that it was like almost every day after that.

11  Q.   Well, how soon was the next time that you talked to them

12  about a robbery?  The next day or several days?

13  A.   Couple days after that.

14  Q.   Do you think it was still in September of 2011?

15  A.   Yeah.

16  Q.   When you said it was everyday, can you describe what

17  happened everyday?

18  A.   First, we wake up like 6:00.  Everybody would wake up

19  early, 6:00, and then after that we would be driving around the

20  Bronx, South Bronx everywhere looking for people to rob from

21  6:00 until 6:00.

22  Q.   From 6:00 in the morning until 6:00 at night?

23  A.   Yeah, just driving.

24  Q.   You said we would be driving around, specifically who was

25  driving around?

D3B5dor7                        Taylor - direct

1    A.  Me, Blaqs, Tall Man, my cousin, sometimes Biggs.

2    Q.  Was Tall Man always present on these robbery surveillances?

3    A.  Yes.

4    Q.  Was Blaqs always present?

5    A.  Yes.

6    Q.  What kind of cars were used?

7    A.  Tall Man's car, Blaqs' truck and Ali's rental car.

8    Q.  When you say Tall Man's car, which car are you referring

9    to?

10   A.  His Benz.  His 500 Benz -- Mercedes Benz.

11   Q.  When you say Blaqs' truck, which truck are you referring

12   to?

13   A.  It is a Jeep Trooper.  Jeep Trooper.  It is it's a brown

14   one, color brown.

15   Q.  And when you say other cars rented by Ali, what kinds of

16   cars were those?

17   A.  It is a Chevy Impala, silver one.

18   Q.  Is that one time or more than one time?

19   A.  More than one time, yeah.

20   Q.  When is the first time that you talked to Ali?

21   A.  The first time was when Tall Man sent me in to Ali's store

22   for wanting to buy gas for the car.

23   Q.  And when was that that Tall Man sent you in to get gas

24   money?

25   A.  I think it was in October.  Early October.

D3B5dor7                           Taylor - direct

1   Q.   And what happened on that occasion?

2   A.   I went to get money.  I went to pick up the money from Ali

3   to buy gas to just drive around and see if there was people to

4   rob driving in the south Bronx, the Bronx, stuff like that.

5   Just driving around.

6   Q.   Any other areas that you were ever in other than the South

7   Bronx and the Bronx?

8   A.   I think it went to Yonkers too.  Yonkers.

9   Q.   Now, on these occasions when you were driving around did

10  you get any more information about the types of people that you

11  were following?

12  A.   Yes.

13  Q.   Where did you get that information?

14  A.   From Ali.

15  Q.   And what information did you get about the types of people

16  that you were following?

17  A.   The type of people is from Ali's country who do business

18  with Ali.

19  Q.   And what kind of businesses were these people in with Ali?

20  A.   Mostly phone cards, cigarettes, and that was it I think.

21  Q.   Was there ever any weapons used, either to conduct these

22  robberies or present in the car when you were driving around

23  looking for victims?

24  A.   Yes.

25  Q.   What different types of weapons?

D3B5dor7                                    Taylor - direct

1     A.   Guns, knives and bats.  Baseball bat.

2              MR. ROTH:  Judge, can we have a time frame?

3              THE COURT:  I think that is a fair question.

4              When was this?  What time period are we talking about

5     now?

6              MS. MASELLA:  Beginning in September of 20 --

7              THE COURT:  No, no.  Not you.

8              MS. MASELLA:  Sorry.

9              THE COURT:  I'm asking the witness.

10             What time period are we talking about here?

11             THE WITNESS:  Like in around October 2011.

12             THE COURT:  Until when?

13             THE WITNESS:  Until December 31st.

14             THE COURT:  All right.

15    BY MS. MASELLA:

16    Q.   What types of guns did you see, Mr. Taylor?

17    A.   9 millimeter, Smith & Wesson, and a 22 revolver.

18    Q.   And what were you saying after that?

19    A.   An AK.  AK.

20    Q.   Starting with the 9 millimeter Smith & Wesson, who did you

21    see with that gun?

22    A.   Blaqs.

23    Q.   When did you see that?

24    A.   Like around October 29th, 2011.

25    Q.   Where did you see him with that gun?

D3B5dor7                        Taylor - direct

1   A.   Inside Tall Man's car.

2   Q.   What did the gun look like?

3   A.   It is a black gun but it, the handle is brown like this

4   brown right here.

5   Q.   When you say brown handles indicating them --

6   A.   Wood.

7   Q.   The bench in front of you, you are describing wood?

8   A.   Wood handle, yeah.

9   Q.   You also mentioned a 22 revolver; who did you see with that

10  gun?

11  A.   Jabba.

12          THE COURT:  How do you spell it?

13          THE WITNESS:  J-A-B-B-A.

14  BY MS. MASELLA:

15  Q.   Who is Jabba, Mr. Taylor?

16  A.   That's -- he's a friend of us, all of us.

17  Q.   Did he participate in any robberies with you?

18  A.   Yeah.  One.

19  Q.   Which one was that?

20  A.   On October 29.  And -- October 29th.

21  Q.   Going to approach and show you what's been marked for

22  identification Government Exhibit 7.  Do you recognize that,

23  Mr. Taylor?

24  A.   Yes.

25  Q.   What is that?

D3B5dor7                        Taylor - direct

1    A.  That's a picture of Jabba.  Photo of Jabba.

2    Q.  Is that a fair photo of Jabba as you knew him in the late

3    part of 2011?

4    A.  Yes.

5    Q.  Your Honor, the government offers Government Exhibit 7?

6              THE COURT:  Any objection.

7              MR. ROTH:  No objection.

8              MS. FONTIER:  No objection.

9              THE COURT:  And 7A also or 7B.

10             MS. MASELLA:  7B which is the nameplate for Jabba.

11             THE COURT:  7 and 7 B are received.

12             (Government's Exhibits 7 and 7 B received in evidence)

13   BY MS. MASELLA:

14   Q.  Other than the 9 millimeter and the 22 revolver you also

15   mentioned an AK-47?

16   A.  Yes.

17   Q.  What that kind of gun?

18   A.  It is a big gun with two handles to it, long handles, one

19   like right here and one right here.  Long.  Gun.  It is like

20   this big right here.

21   Q.  Indicating about two feet?

22   A.  Yeah.  About this size.

23   Q.  Mr. Taylor, where did you see that gun?

24   A.  In Blaqs' house.

25   Q.  Which house is that?

D3B5dor7                          Taylor - direct

1    A.  On Carpenter in the Bronx.

2    Q.  And approximately when did you see that?

3    A.  Around -- I think it was in October or early November.

4    Q.  Who was present when you saw that gun?

5    A.  It was me, Biggs, Blaqs and Tall Man and Blood Money.

6           DEFENDANT DORE:  You're lying, man.  You're lying.

7           THE WITNESS:  You're lying, man.

8           THE COURT:  Mr. Dore, don't do that again, okay?  I'm

9    not going to tolerate that so we are going to have an orderly

10   trial or I'm going to have you removed.

11          Don't do it again.

12          Next question.

13   BY MS. MASELLA:

14   Q.  Mr. Taylor, where within the Carpenter apartment was it?

15   A.  It was under the mattress.

16   Q.  And how is it that you were able to see it?

17   A.  Because Blaqs take it out.

18   Q.  Why did you do that?

19   A.  I don't know.  Show it to us.

20   Q.  Now, other than guns I think you also mentioned baseball

21   bats?

22   A.  Yes.

23   Q.  Where did you see a baseball bat?

24   A.  Blaqs' baseball bat, his truck -- his Trooper.

25   Q.  What did the baseball bat look like?

D3B5dor7                          Taylor - direct

1   A.  It's wood.  All wood like that.

2   Q.  Did you ever see a knife?

3   A.  Yeah.

4   Q.  Where did you see a knife?

5   A.  Like everybody had a knife.  Almost everybody have a knife.

6   Q.  Who did you see with a knife in particular?

7   A.  I see Blaqs, Tall Man, my cousin, me.

8   Q.  What kind of knives?

9   A.  It is a Jamaican knife called a ratchet knife.  Ratchet

10  like close down and pull it up.

11  Q.  What do you mean by ratchet knife?

12  A.  That's what Jamaicans call it.

13  Q.  What did it look like?

14  A.  It is a knife that you can close it down and you can pull

15  it up back.  You can close it and put it up.

16  Q.  How was it that you opened this type of knife?

17  A.  Just put it up.

18  Q.  Pull it out?

19  A.  Yes.  Pull it out like that.

20  Q.  What, if anything, was used by yourself and these other

21  individuals to conceal your identity during robberies?

22  A.  Gloves, masks, and my hoodie.

23  Q.  What kind of gloves did you and others wear?

24  A.  Cloth.  Regular gloves like cloth gloves.

25  Q.  What color cloth were they?

1    A.  Like black.

2    Q.  What about masks?

3    A.  Yeah, black ones too.

4    Q.  What were the masks made out of?

5    A.  Cloth too.

6    Q.  Where did you obtain these gloves and masks?

7    A.  From 233rd, Ali's store.

8              THE COURT:  From 233rd?

9              (Record read)

10             THE COURT:  Ali's store.

11             THE WITNESS:  Yeah.

12   BY MS. MASELLA:

13   Q.  Mr. Taylor, after the Wallace Avenue robbery, when is the

14   next time that a robbery actually occurred that you were

15   present for?

16   A.  It was on October 29th, 2011 on Wall -- no Allerton and

17   Radcliffe -- no Radcliffe.

18             THE COURT:  And what was the other?  Allerton?  Spell

19   it.

20             THE WITNESS:  Allerton Avenue.

21             THE COURT:  Just spell it, just so we're all talking

22   about the same.

23             THE WITNESS:  A-L-L-E-N-T-O-N.

24             THE COURT:  A-L-L-E-N?

25             THE WITNESS:  Yes.

```
 1              THE COURT:  T-O-N?

 2              THE WITNESS:  Yes.  A-L-L-E-N-T-O-N Avenue.

 3              THE COURT:  Next question.

 4    BY MS. MASELLA:

 5    Q.  Mr. Taylor, you mentioned that it occurred on October 29th,

 6    2011; do you remember the weather that day?

 7    A.  Yeah, it's crazy.  It's like a storm coming down like five

 8    foot of snow.

 9    Q.  Five feet of snow?

10    A.  Yes, or more.

11    Q.  Had you and others been there on a prior occasion to

12    attempt a robbery at that house?

13    A.  Yes.

14    Q.  How much before October 29th was the first time you went to

15    the house on Radcliffe?

16    A.  Huh?  Can you repeat that?

17    Q.  How much before or how many days or weeks before October

18    29th was the first time you tried to, a robbery at that

19    location?

20    A.  Like a week for that.

21    Q.  What time of day did you go to the house on that occasion?

22    A.  It was like 12:00 at night.  12:00, 1:00 at night.

23    Q.  And what information did you have about the people who

24    lived in that house?

25    A.  Ali tell Tall Man that there is 250 grand in the house.
```

1  Q.  Ali told Tall Man; how did you learn the information?

2  A.  Tall Man told it to me.  Tell me.

3  Q.  Did you learn anything about where the 250 grand was from

4  or what kind of money it was?

5  A.  No.

6  Q.  What kind of car did the victim drive?

7  A.  It was a Toyota van.  Toyota family van.

8  Q.  And on the time the week before October 29th when you went

9  there, who was with you?

10 A.  It was me, Blaqs, Tall Man and my cousin.

11 Q.  Which cars were you in?

12 A.  Tall Man's car and Ali's car.  Ali's rental car.

13 Q.  When you say Tall Man's car you are referring to the

14 Mercedes?

15 A.  Benz, yeah.  Blue one.

16 Q.  And what happened on that day when you went to the house on

17 Radcliffe?

18 A.  Me and Tall Man -- no, me and Blaqs and my cousin tried to

19 go around the back but the neighbors are or somebody heard us

20 and called the cops so we leave.

21 Q.  How did you -- why did you think the cops had been called?

22 A.  Because when we went back over -- no, because on our phones

23 everybody got this app that we download the police scanner on

24 our phone, so whenever anybody call the cops you could hear it

25 on our phone.

D3B5dor7                          Taylor - direct

1   Q.  When you say everybody, did you have an app with a police

2   scanner on your phone?

3   A.  Yes.

4   Q.  And who else did you see in this group that had an app with

5   a police scanner?

6   A.  My cousin, Tall Man, Blaqs.

7   Q.  Now, turning back now to October 29th, who was with you on

8   that day on Radcliffe Avenue?

9   A.  It was me, Blaqs, Tall Man and Jabba.

10  Q.  Which cars were there that day?

11  A.  Tall Man's car.

12  Q.  What time did you arrive in the area of the house on

13  Radcliffe?

14  A.  Like around 11:00, 12:00 in the morning.

15  Q.  Ms. Brady, may we have Government Exhibit 902 in evidence,

16  please?

17          Mr. Taylor, do you recognize what is depicted in

18  Government Exhibit 902?

19  A.  Yes.

20  Q.  What is that?

21  A.  That's the house that we robbed.

22  Q.  And, when you said you arrived around 11:00 or 12:00 in the

23  morning, where were you in relation to this house?

24  A.  We were parked, like, all the way over to the house but all

25  the way, like, two houses down from the house.

D3B5dor7                          Taylor - direct

1   Q.  Two houses down.  Are you indicating to the right or to the

2   left?

3   A.  On the right-hand side, yeah.  To the right.

4   Q.  To the right of the photograph?

5   A.  Yes.

6   Q.  You can take that down, Ms. Brady.  Thank you.

7           When you were in that location inside of Tall Man's

8   car, did you and others discuss a plan for that robbery?

9   A.  Yes.

10  Q.  Can you tell us what the discussion was about a plan for

11  the robbery?

12  A.  The plan was when the guy come, me and Blaqs and Jabba is

13  going to get out of the car, hold him down and take his key and

14  go inside his house for the money.

15  Q.  Did you see anyone with a gun that day?

16  A.  Yes.

17  Q.  Who did you see with a gun?

18  A.  Blaqs.

19  Q.  Which gun was it?

20  A.  The 9 millimeter Wesson -- Smith & Wesson 9 millimeter.

21  Q.  And where did you see that gun?

22  A.  In his -- in his side and he take it out.

23  Q.  When you say in his side, what do you mean by that?

24  A.  Like right here.

25  Q.  Was it underneath his clothing?

D3B5dor7                        Taylor - direct

1   A.  Yeah.

2   Q.  At what point did you see it?

3   A.  He take it out and take it out in the car and put it on his

4   lap.

5   Q.  When you were in Tall Man's car?

6   A.  Yes.

7   Q.  At some point did he put it back?

8   A.  Yes.

9   Q.  When was that?

10  A.  Like a couple -- like about 20 minutes after that he take

11  it out.

12  Q.  How long did you wait in the area of the house on Radcliffe

13  Avenue that day?

14  A.  We wait from like -- from like 11:00, 12:00 to like 5:00.

15  Everybody was hungry, everybody was starving, so I called my

16  friend to bring me to get some Jamaican food.  So, my friend

17  came and picked me up and I went and got some food for me and

18  Blaqs and everybody else.

19  Q.  So, your friend picked you up in the area of Radcliffe

20  Avenue?

21  A.  Yes; and bring me to get --

22  Q.  And you left Radcliffe for a period of time?

23  A.  Yes, from like 5:00 to 6:00 something.

24  Q.  P.m.?

25  A.  Yes.

D3B5dor7                          Taylor - direct

1   Q.  And did you get food just for yourself or for other people?

2   A.  For everybody.

3   Q.  And when you came back, who was still there in the area of

4   Radcliffe Avenue?

5   A.  When I came back it was Tall Man, Blaqs and Jabba there.

6   Q.  And where were they?

7   A.  The same place next to the house, parked.

8   Q.  Were they still inside of the car?

9   A.  Yes.

10  Q.  And what did you do after you returned with the food?

11  A.  After that I gave everybody their food, and then after that

12  me and my friend went and on Allerton Avenue to watch what was

13  going on.

14  Q.  Well, when you went with your friend on Allerton Avenue,

15  did anyone tell you what to do at that point?

16  A.  Tall Man tell me to watch out for the cops or when the guy

17  coming in I should call and tell him he is here, he is coming

18  now.

19  Q.  He told you to watch out for the cops or the guy.  By the

20  guy, who do you mean?

21  A.  The guy for the house.

22  Q.  What happened after that?

23  A.  And then like around, like 7:00 -- 7:00 they call and tell

24  me he's here.  He's here so I must -- if the cops come by just

25  call him and tell him.  So, I was just watching out.

1    Q.  Can you stop talking, Mr. Taylor, for one second?

2            When you say you got a call, who called you?

3    A.  Tall Man.

4    Q.  What did Tall Man tell you?

5    A.  Tall Man tell me that the guy is here now.  He is here.

6    Q.  And did he give you any instructions about what you should

7    do then?

8    A.  To look for the cops and call when the cops come on the

9    block.

10   Q.  Did you in fact do that?

11   A.  Yes.

12   Q.  Did you use anything to help you watch out for the cops?

13   A.  My -- the phone.

14   Q.  What do you mean by your phone?

15   A.  There is a -- the one with the app on my phone, so I put --

16   I turn on it to the scanner and put it in my ears to listen for

17   the cops coming over there.

18   Q.  And how long did you wait like that listening to the police

19   scanner?

20   A.  Like 15, 20 minutes.

21   Q.  And what happened after 15 or 20 minutes?

22   A.  And then after that they called and told me, called me and

23   said go back to the spot, to the crib.

24   Q.  And when Tall Man said go back to the spot or the crib,

25   what did you understand what he was referring to?

D3B5dor7                          Taylor - direct

1    A.  Yeah.

2    Q.  What was he referring to?

3    A.  Go back to the house because everything already finish

4    already.  The job already done already.

5    Q.  Whose house was he referring to?

6    A.  Jabba and them house.  It is a house -- it is a house like

7    with rooms and stuff, rooming house.

8    Q.  And where was Jabba's house located?

9    A.  In Mount Vernon.

10   Q.  And, did you in fact go back to that house?

11   A.  Yeah.  I went back to Mount Vernon.

12   Q.  And when you got there, who else was there?

13   A.  Just me, Jabba, Tall Man and Blaqs.

14   Q.  Once you were back at Jabba's house was there any

15   discussion about what had happened during the robbery?

16   A.  Yeah.

17        Blaqs was like, yo, that was your first time to Tall

18   Man to get out of his car and go in the house and do anything

19   so everybody was laughing and stuff.

20   Q.  And when Blaqs said that about Tall Man getting out of the

21   car, did Tall Man say anything in return?

22   A.  He was just smiling, laughing.

23   Q.  Did anyone say anything about what else occurred during the

24   robbery?

25   A.  Yeah.  I said that -- I said the kids in the house was

1    going crazy.  They were as bad as hell.

2    Q.  Who said that the kids were going crazy inside the house?

3    A.  Blaqs and Tall Man.

4    Q.  Does anyone say anything about how they gained entrance

5    into the house?

6    A.  Yes.

7    Q.  Who said what about that?

8    A.  Blaqs and them said that the guy came, pulled up next to

9    his house.  By the time he came out of his car they had run

10   toward his door, hold him down and bring him back in his car.

11   Q.  Who did that?

12   A.  Blaqs and Jabba.

13   Q.  And what happened once they brought the guy back to his

14   car?

15   A.  They take away his keys for the house.

16   Q.  And, did someone stay with the guy inside his own car?

17   A.  Yes.

18   Q.  Who was that?

19   A.  Jabba.

20   Q.  And did he do anything to keep the guy in the car?

21   A.  They were just talking like regular like everything was

22   good.  And then --

23   Q.  Did -- go ahead.

24   A.  They were talking and then they asked -- Jabba and them

25   asked the guy where the money at, and the guy tell them that

1    the money was under the sink in the bathroom.  And then Blaqs

2    went in the house and go under the sink and got the money and

3    leave out.

4    Q.  While Jabba was in the car with the guy, did he have any

5    weapons with him?

6    A.  A knife.  Yeah.

7              MS. FONTIER:  Objection.  Speculation.

8              THE COURT:  Well, you weren't in the car, were you?

9              THE WITNESS:  Huh?

10             THE COURT:  Were you in the car with him?

11             THE WITNESS:  No.

12             THE COURT:  So how do you know Jabba had a knife?

13             THE WITNESS:  Because they told me.

14             THE COURT:  Who told you?

15             THE WITNESS:  Jabba.

16             THE COURT:  When?

17             THE WITNESS:  After we went back to Mount Vernon.

18             THE COURT:  To Jabba's house?

19             THE WITNESS:  Yeah.

20             THE COURT:  He told you he had a knife?

21             THE WITNESS:  Yeah.

22             THE COURT:  Overruled.  Next question.

23   BY MS. MASELLA:

24   Q.  During that conversation in Jabba's house at Mount Vernon,

25   did you learn anything about the amount of money that was taken

D3B5dor7                          Taylor - direct

1    from the house?

2    A.   Yes.

3    Q.   Who said something about the amount of money that was

4    taken?

5    A.   Tall Man say it was 15 grand.

6    Q.   And were you given a portion of that money?

7    A.   Yes.

8    Q.   How much money did you receive?

9    A.   $1,000.

10   Q.   Did you see other people receive a portion of money while

11   you were in the house at Mount Vernon?

12   A.   Yes.

13   Q.   Who else did you see receive money?

14   A.   Blaqs and Tall Man -- no, Blaqs and Tall Man got theirs and

15   Jabba.

16   Q.   Do you know whether Ali got any money from the Radcliffe

17   robbery?

18   A.   Yes, but he didn't got no money.  He didn't get no money.

19   Q.   Well, did somebody tell you anything about whether he got

20   money or not?

21   A.   Ali went over -- Ali's store, he was pissed.  He was mad

22   that Tall Man didn't give him no money.

23   Q.   When was that?

24   A.   Like next day after the robbery happened.

25   Q.   After the robbery on October 29th, did you participate in

D3B5dor7                          Taylor - direct

1   any other robberies with Blaqs and Tall Man?

2   A.  Yes.

3   Q.  What is the next robbery that you recall participating in?

4   A.  My next robbery was the cigarette guy that we robbed.

5   Q.  Approximately when was that?

6   A.  I think it was around November 2011.  I don't know exactly

7   when was it.

8   Q.  And who were you with that day?

9   A.  That day I was me, Blaqs, Tall Man and Biggs and Blood

10  Money.

11            THE COURT:  Blood Money?  What was the last name?

12            THE WITNESS:  Blood Money.

13            THE COURT:  Blood Money?

14            THE WITNESS:  Yes.

15            THE COURT:  Okay.

16  BY MS. MASELLA:

17  Q.  And where did that occur?

18  A.  I think it is somewhere around like -- I don't know exactly

19  where at, but we headed down to 233rd, took the highway back.

20  I don't remember exactly where we were at, though.

21  Q.  Were you in a car that day?

22  A.  Yes.

23  Q.  Whose car were you in?

24  A.  Tall Man's Benz and Blaqs' Jeep.

25  Q.  Both cars were present?

D3B5dor7                          Taylor - direct

1    A.  Yes.

2    Q.  Which one were you in?

3    A.  I was in Tall Man's car.

4    Q.  What happened when you got to that area around the highway?

5    A.  We followed the guy, he stopped at some store.  We get out

6    of the car and then we approach the guy.  He run off.  He run,

7    then got in his truck get all the boxes, cartons of cigarettes.

8    Went back to the car and we drive off back to Carpenter.

9    Q.  Well, when you say you followed a guy in a truck, what kind

10   of truck was it?

11   A.  He was driving like those white vans, those white -- those

12   two-door white vans.  Those small, like bus van like they're

13   small but they're vans with only two doors.

14   Q.  And who got out of the cars and approached the victim?

15   A.  That day it was me, Blaqs and Biggs.

16   Q.  And what happened as you, Blaqs and Biggs got close to the

17   guy?

18   A.  The guy ran to the main street.

19   Q.  And did you take anything from his man?

20   A.  Yes.

21   Q.  Who took what from his van?

22   A.  Cigarettes.  We all took boxes of cigarettes from his car,

23   from his van.

24   Q.  And how many cartons of cigarettes did you take that day?

25   A.  It was like four big boxes.  Like four big boxes.

D3B5dor7                           Taylor - direct

1  Q.  Do you know how many cartons were in the four big boxes or

2  you don't know?

3  A.  I don't -- am not sure how much was in there.

4  Q.  I think you said you went back to Carpenter after that?

5  A.  Yes; went back to Carpenter.

6  Q.  What was at that location?

7  A.  Blaqs' house.

8  Q.  What happened inside Blaqs' house?

9  A.  Went back there, Tall Man or Blaqs called Ali.  Ali come

10  over there for the cigarettes and gave us $700 for the

11  cigarettes.

12  Q.  Ali came to Blaqs' house.

13  A.  To the Carpenter.  Not in Blaqs' house but on Carpenter and

14  we bring them downstairs to Ali.

15  Q.  Did you receive any money from that robbery?

16  A.  Yes.

17  Q.  How many money did you receive?

18  A.  I think I received like $150.

19  Q.  Did you see other people get money from that robbery?

20  A.  Uh-huh.

21  Q.  Who else did you see get money?

22  A.  Blaqs, Tall Man and Biggs and Blood Money.

23  Q.  After the cigarette robbery that you're describing, did you

24  participate in other robberies with Blaqs and Tall Man?

25  A.  Yes.

D3B5dor7                              Taylor - direct

1   Q.   What was the next robbery?

2   A.   The next robbery was on December 31st at Jerome Avenue.

3   Q.   When you say December 31st, what year are you referring to?

4   A.   2011.

5   Q.   And what kind of victim did you rob on that occasion?

6   A.   It was a Arabian -- from Yemen from Moe's country, like

7   that person.

8   Q.   Was that person involved in any sort of business?

9   A.   I think involved in the phone card business.

10  Q.   Who was involved in that robbery?

11  A.   That was me and Blaqs and Tall Man and my cousin.

12  Q.   And how was it that you became involved in that robbery?

13  A.   Me and my -- me and my cousin came down from Bridgeport,

14  Connecticut like on New Year's Eve and we came to New York, and

15  then my cousin was over at the barber shop getting a cut from I

16  don't remember, and got a call from -- I don't remember if it

17  was Blaqs or Tall Man.

18  Q.   When either Tall Man or Blaqs said something was going

19  down, what did you understand them to mean?

20  A.   That a robbery was going down.

21  Q.   At that point what did you and your cousin do?

22  A.   Met up with Tall Man and Blaqs.

23  Q.   In what area did you meet up?

24  A.   Jerome and Gun Hill.

25  Q.   What was in that area of Jerome and Gun Hill?

D3B5dor7                           Taylor - direct

1   A.  The guy.

2   Q.  Was there anything in particular at that location?

3   A.  It was next to train tacks.

4   Q.  Ms. Brady, can we have Government Exhibit 1602, please?

5   A.  And a garage.  Car garage.

6   Q.  Mr. Taylor, do you recognize the area depicted in this

7   photo?

8   A.  Yes.

9   Q.  What is that?

10  A.  That's the place where we robbed the victim at.

11  Q.  When you say there is a garage in that area, where in the

12  photo is the garage located?

13  A.  It is on the right-hand side next to the buildings.

14  Q.  Where is the entrance to the garage?

15  A.  It is right here.  Okay?

16  Q.  Can you describe where in the photo?  Left, right, center?

17  A.  It is in the center.

18  Q.  In the center of the photo?

19  A.  Yeah.

20  Q.  Thank you, Ms. Brady.

21          Once you and your cousin arrived in that area, did you

22  see anyone else that you knew?

23  A.  Blaqs and Tall Man.

24  Q.  Where were they?

25  A.  They was parked on the right-hand side next to the parking

1    garage.

2    Q.   On the same side as the parking garage or the other side of

3    the street?

4    A.   On the same side.

5    Q.   And what did you do when you got to that location?

6    A.   Made my cousin park and then I went out the car and went

7    next to Blaqs and Tall Man.

8    Q.   And what did you see Blaqs and Tall Man do?

9    A.   First, Tall Man was in his car but Blaqs was next to Tall

10   Man's car leaning up and I went next to Blaqs.

11   Q.   What happened after that?

12   A.   Then, after that, after that me and Blaqs saw that guy

13   coming out of the garage with a bag in his hand so we ran after

14   him --

15   Q.   Who ran after him?

16   A.   Me and Blaqs.

17   Q.   What happened after that?

18   A.   Ran after him.  He was about to run but we caught him at

19   the same time.  He fell.  And then Blaqs took up the bag and

20   run back to Tall Man's car -- to Blaqs' -- ran -- Blaqs ran

21   back to Tall Man's car and me ran back to my cousin's car.

22   Q.   When you said the victim fell, did anybody hit the victim?

23   A.   I think Blaqs did.  I don't -- everything happened so fast

24   I don't know, but I think Blaqs did hit him still.  He did hit

25   him.

D3B5dor7                         Taylor - direct

1   Q.  And who was it that took the guy's money?

2   A.  Blaqs.

3   Q.  Did you later find out what was in the bag?

4   A.  Yes.

5   Q.  How did you find out?

6   A.  Went to Yonkers next to Tall Man's house and show the money

7   and phone cards.

8   Q.  How much money was in the bag?

9   A.  Tall Man told us it was $1200.

10  Q.  And how many dollars worth of phone cards?

11  A.  I'm not really sure.

12  Q.  Did you get a portion of the $1200?

13  A.  Yes.

14  Q.  How much did you get?

15  A.  I got like $300.

16  Q.  Did you see other people get a portion of the money?

17  A.  Yes.

18  Q.  Who was that?

19  A.  My cousin and Blaqs and Tall Man.

20          MS. MASELLA:  Your Honor, I would like to play a

21  portion of a video, Government Exhibit 1608, that was admitted

22  earlier today.

23          THE COURT:  All right.

24          MS. MASELLA:  Ms. Brady, if we can start with camera 6

25  around --

D3B5dor7                          Taylor - direct

1                  (video played)

2     BY MS. MASELLA:

3     Q.  Mr. Taylor, do you recognize this area?

4     A.  Yes.

5     Q.  What is it?

6     A.  That's Gun Hill and Jerome.  That's the parking lot.

7     Q.  Can you pause it, Ms. Brady?

8                  There is a person that just walked from the left-hand

9     side of the screen and a person who walked from the right-hand

10    side of the screen; who is the person that walked across from

11    the left-hand side?

12    A.  That's me and that's Blaqs.

13                 THE COURT:  Rewind that?  I would like to see it.

14    Q.  Do you recognize that person, Mr. Taylor?

15    A.  Yes.

16    Q.  Who is that?

17    A.  Me.

18    Q.  On the day you were describing, December 31st?

19    A.  Yes.

20                 THE COURT:  Okay.

21                 (video played)

22    Q.  Can you pause it there?

23                 Who is that person that walked from the upper

24    left-hand corner of the screen, Mr. Taylor?

25    A.  Blaqs.

D3B5dor7                          Taylor - direct

1    Q.   And the lower right-hand corner?

2    A.   That's Blaqs.

3    Q.   The second person from the lower right-hand corner.

4    A.   I only see two persons.

5              THE COURT:  So who are the two people?

6              THE WITNESS:  Me and Blaqs.

7              THE COURT:  Which one is you?

8              THE WITNESS:  I'm in the red hoodie and Blaqs is in

9    the black -- all black.

10   BY MS. MASELLA:

11   Q.   Can we play it, Ms. Brady?

12             (video played)

13             Where were you coming from at that time, Mr. Taylor?

14   A.   I was in the garage to see if I saw the victim in there.

15   Q.   And did you see the victim?

16   A.   No.  At that time no I didn't see the victim.

17   Q.   So what are you doing right now after that?

18   A.   Right now we are going back to Tall Man's car and wait

19   until he get there.

20             (video played)

21   Q.   Can you pause it there, Ms. Brady?

22             Mr. Taylor, do you recognize that person?

23   A.   Yes.

24   Q.   Who is that?

25   A.   That's the victim.

1    Q.  Can we play it again, please?

2              (video plays)

3    Q.  Can you pause it there, please?

4              Do you see individuals there, Mr. Taylor?

5    A.  Yes.

6    Q.  Who are they?

7    A.  Blaqs and me.

8    Q.  Which one are you, the first one or second one?

9    A.  The second one.

10   Q.  Can we play it again, Ms. Brady?

11             (Video played)

12             Do you recognize that person, Mr. Taylor?

13   A.  Yes.

14   Q.  We can pause it.

15             Who is that person walking across the street?

16   A.  That's my cousin.

17   Q.  Which cousin?

18   A.  Shea Douglas.

19   Q.  Let's play it, please.

20             (video played)

21             Did you just see those two people run back across the

22   street?

23   A.  Yes.

24   Q.  Who was that?

25   A.  Blaqs and me.

D3B5dor7                          Taylor - direct

1    Q.  And that third person?

2    A.  My cousin.

3    Q.  Thank you, Ms. Brady.

4             Mr. Taylor, other than the robberies that you've

5    described --

6             THE COURT:  Wait.

7             So, when you were running back across the screen

8    there, what had happened?

9             THE WITNESS:  After that we went back to our cars and

10   went back to Yonkers to share the money up.

11            THE COURT:  What happened to the victim from when you

12   left the screen to when you came back?

13            THE WITNESS:  He was on the floor calling for help,

14   for the cops, police.  So, we grabbed the bag with the money

15   and Blaqs went back to Tall Man's car and me and my cousin went

16   back to our car and we went back to Yonkers.

17            THE COURT:  Okay.

18   BY MS. MASELLA:

19   Q.  Mr. Taylor, were there any other robberies that you

20   participated in with these individuals?

21   A.  After that, that was it.

22   Q.  After December 31st?

23   A.  Yes.  That was it.

24   Q.  And, did you hear about any robberies that occurred before

25   you started participating in robberies in September of 2011?

1    A.  Yes.

2    Q.  And who did you hear about the robberies from?

3    A.  Blaqs and Tall Man.

4    Q.  What was the first robbery that you heard about and who did

5    you hear about it from?

6              MR. ROTH:  Can we have a time frame, Judge?

7              THE COURT:  I think it is a fair question.

8              All right.  Can you narrow it down, Ms. Masella?

9    BY MS. MASELLA:

10   Q.  When did you hear about the robbery from Tall Man?

11             MR. ROTH:  Where perhaps, Judge?

12             MS. MASELLA:  Well --

13             THE COURT:  Let's lay a foundation.

14   BY MS. MASELLA:

15   Q.  When did you first hear about the robbery that occurred

16   before you joined this group in September 2011?

17   A.  I heard it, it was sometime around 2 --

18   Q.  Sorry, Mr. Taylor.  I'm asking you when the conversation

19   was that you heard about it, not when the robbery was.

20   A.  It was around in, like, September of 2011.

21   Q.  So the conversation was in September?

22   A.  Yes.

23   Q.  Who was present during the consideration?

24   A.  It was me, Blaqs and Tall Man.

25   Q.  And when did the robbery occur that was discussed during

D3B5dor7                          Taylor - direct

1    that conversation?

2    A.  I think it was sometime during the summer of 2011.

3    Q.  And who told you about it; Blaqs or Tall Man or both?

4    A.  Both of them was talking about the robbery.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3bWdor8                          Taylor - direct

1   BY MS. MASELLA:

2   Q.  And where did that robbery occur, according to what they

3   told you?

4   A.  In Yonkers.

5   Q.  And what did they say happened during that robbery?

6   A.  They told me that this guy own a cigarette factory or

7   company there, so they followed him to his house.  They walk

8   out.  He open his car door, going toward his house, but he got

9   a black bag in his hand, and Blaqs run him down, grabbed the

10  black bag, went back to the car, and then leave out, went back

11  to Mount Vernon.

12  Q.  Did they say how much money was in the bag?

13  A.  He says somewhere like 40 grand.  Around 40 grand.

14          THE COURT:  Who said that?

15          THE WITNESS:  Blaqs.  Around 40 grand.

16  BY MS. MASELLA:

17  Q.  And during the same conversation, did you hear about

18  another robbery that occurred --

19  A.  Yes.

20  Q.  -- before you met them in September?

21  A.  Yes.

22  Q.  And when did that other robbery occur?

23  A.  I think it was sometime around the summertime, too.  That

24  same time.

25  Q.  Who told you about it during that conversation?

D3bWdor8                          Taylor - direct

1    A.  Blaqs.

2    Q.  And where did that robbery occur?

3    A.  In Pennsylvania.

4    Q.  And what did Blaqs say about the robbery in Pennsylvania?

5    A.  That, that the guy in Pennsylvania and one in Yonkers is

6    some type of family, cousin or brother, or something.  But that

7    they, the guy in Pennsylvania, he own a gas station.

8    Q.  And did Blaqs say where the robbery of the guy in

9    Pennsylvania occurred?

10   A.  Yes.  Next to a bank.

11   Q.  Did he say who else was present at the robbery?

12   A.  Not really.  It was, he was talking like it was just him

13   and Tall Man was there.

14   Q.  Did they say what occurred during that robbery?

15   A.  They told me that the guy was walking toward the bank and

16   Blaqs ran and grab the bag out of his hand.

17            THE COURT:  Who told you this?

18            THE WITNESS:  Blaqs.

19   BY MS. MASELLA:

20   Q.  Did Blaqs say what was contained in the bag that they

21   grabbed from the guy, that he grabbed from the guy, rather?

22   A.  Yes.  It was money, like around 60 grand.

23   Q.  Did Tall Man ever tell you when he got the Mercedes that

24   you saw him driving?

25   A.  Not really.

1    Q.  Did he ever say how he bought it?

2    A.  No.

3    Q.  Did Blaqs ever tell you when Tall Man got the Mercedes?

4    A.  I heard it was sometime --

5              MS. FONTIER:  Objection.

6              MR. ROTH:  Objection.

7              THE COURT:  This is a yes or no.  Did Blaqs tell you

8    about how Tall Man got the Mercedes?

9              THE WITNESS:  No.

10   BY MS. MASELLA:

11   Q.  Did somebody else tell you about how Tall Man got the

12   Mercedes?

13             MR. ROTH:  Objection.

14             THE COURT:  Overruled.  I'll allow it.

15             Yes or no.  Did somebody else tell you about how the

16   Mercedes was acquired?

17             THE WITNESS:  Yes.

18             THE COURT:  Who?

19             THE WITNESS:  A friend from Mount Vernon.

20             THE COURT:  Let's move on.

21   BY MS. MASELLA:

22   Q.  Did there come a time, Mr. Taylor, when you learned that

23   Tall Man and Blaqs had been stopped in the Mercedes by the

24   police?

25   A.  Yes.

1    Q.  How did you learn about that?

2    A.  Me and my cousin was home and then Tall Man, Tall Man

3    called my cousin up and told my cousin he's about to come to

4    our house.

5    Q.  Which house?

6    A.  On 13.  13 -- First and 13.

7    Q.  Mount Vernon?

8    A.  Yeah, Mount Vernon.

9    Q.  Did Tall Man, in fact, come to the house?

10   A.  Yeah, Tall Man and Blaqs came over to the house.  They was

11   like laughing and smiling.  So me and my cousin asked them

12   what's going on.  They told us the cops just pull them over.

13   We asked them for what.  They said for following this guy in

14   the truck, so the guy find out that they were following him, so

15   the guy called the cops.

16   Q.  Can you be specific as to who is telling you this, Tall

17   Man, or Blaqs, or both?

18   A.  Both of them was talking, was talking to us.

19   Q.  So they told you that they were following a guy and that

20   the police pulled them over?

21   A.  Yes.

22   Q.  Did they say for what reason they were following that guy?

23   A.  That, that, that guy, they was following him from the gas

24   station, from some gas station in Mount Vernon.

25   Q.  For what purpose?

1    A.   Rob him.

2    Q.   Did they tell you what happened when the police pulled them

3    over?

4    A.   Yes.

5    Q.   What did they say?

6    A.   They said police pulled them over and asked them if they

7    following that guy.  Tall Man told the cops no, that, then the

8    cops asked Tall Man for his license.  Tall Man gave the cops

9    his ID, and then they take Tall Man and Blaqs out of Tall Man's

10   car and ask Blaqs' name.  And Blaqs gave the cops a wrong name,

11   and then after that, the cops asked Blaqs to, to, to spell it,

12   the name, and Blaqs couldn't spell the name.

13   Q.   Did Blaqs say that day which name he gave to the police?

14   A.   He gave them some crazy name, some crazy name.

15   Q.   So you don't recall?

16   A.   Yeah.  I don't recall that name.

17   Q.   Which car were they in when they were stopped by the

18   police?

19   A.   Tall Man's Benz.

20   Q.   Mr. Taylor, were there any other robberies that you learned

21   about that you were not present for?

22   A.   Huh?

23   Q.   Were there any other robberies that you learned about

24   committed by these individuals that you were not present for?

25   A.   Yes.

D3bWdor8                          Taylor - direct

1    Q.  What was that?

2    A.  There was robbery in Castle Hill, that somebody got

3    stabbed.   The victim got stabbed.

4    Q.  Before you continue, let me ask you how you learned about

5    that.

6    A.  First, first, like they was, there was this guy in the

7    Castle Hill that Ali told us about him, that he got money in

8    his house.  So --

9              THE COURT:  You were present when Ali said that?

10             THE WITNESS:  Yes.

11             THE COURT:  Where were you?

12             THE WITNESS:  233rd, Ali's store.

13   BY MS. MASELLA:

14   Q.  Did you participate in any sort of surveillance of that

15   individual?

16   A.  Yes.  I went over there one time before.

17   Q.  Who did you go with on that occasion?

18   A.  It was me, Tall Man, Blaqs, and my cousin.

19   Q.  And where did you go?

20   A.  And Castle Hill.  On Castle Hill, Castle Hill.

21   Q.  Do you remember what streets were around the area of Castle

22   Hill, or you don't remember?

23   A.  No.  No.  I don't remember what street.

24   Q.  Do you remember what month and year this was?

25   A.  Yes.  It was in, it was in November 2011.

1   Q.  And what happened on the occasion when you were present in

2   that area?

3   A.  We was first waiting for the guy to come home, but he never

4   came home.

5   Q.  Do you know what kind of guy it was that you were waiting

6   for?

7   A.  Yes.  He own a, have store, two deli store.  Two store like

8   Ali.  He's from Ali's country, Yemen.

9   Q.  And the guy didn't come home that day?

10  A.  No.  That night.

11  Q.  That night?

12  A.  Yeah.

13  Q.  How did you learn that there was later a robbery of that

14  person, from whom?

15  A.  Me and Tall Man was in his car.  Tall Man was reading a

16  newspaper, and then Tall Man said, Oh, shit.  I was like, What.

17  Then he, he showed me the paper and the guy was in it, stabbed

18  his chest.  And then when I look again, it was in Castle Hill.

19  So Tall Man was like, Oh, shit, this got to be Blaqs, this got

20  to be Blaqs.

21  Q.  What was it that you saw in the newspaper; was it writing

22  or a photo?

23  A.  Saw the guy's picture there and where it happen at.

24  Q.  And where did you and Tall Man go after that?

25  A.  After, after that, Tall Man called Blaqs and problem is at

1    the time Blaqs and Tall Man was like beefing, like they wasn't

2    getting along.

3    Q.  Mr. Taylor, I'm just going to ask you to sit a little bit

4    closer to the microphone again.  You're trailing off.

5        You said at the time Blaqs and Tall Man were beefing?

6    A.  Yes.

7    Q.  What do you mean by that?

8    A.  Like they wasn't getting along with each other.

9    Q.  How long did that last for, this period when they weren't

10   getting along with each other?

11   A.  Like two weeks, three week, two weeks.

12   Q.  And it was during what month?

13   A.  It was between November and -- November.

14   Q.  So where did you and Tall Man go after you saw this

15   newspaper article?

16   A.  Carpenter.

17   Q.  Who did you see when you got there?

18   A.  Blaqs.

19   Q.  Did you have a conversation with Blaqs?

20   A.  Yeah.  Tall Man ask Blaqs if it was him that did that.

21   Blaqs was like:  Nah, man, that wasn't me.

22       So Tall Man said:  Blaqs, like stop fucking around, man.

23   That was you.  Where's my money at?  Tall Man asked Blaqs for

24   his money.

25       Blaqs was like:  Yo, there's no money.

D3bWdor8                          Taylor - direct

1      Tall Man was like:  what do you mean there's no money?  And

2   Blaqs told to Tall Man that Biggs fuck it up.  Biggs let the

3   guy throw the money over the fence so nobody, they didn't get

4   no money from the guy.

5   Q.  Did Blaqs say anything else in that conversation?

6   A.  He said his boy messed it up.

7           THE COURT:  Ali was there too?

8           THE WITNESS:  Huh?

9           THE COURT:  Who was all there at Carpenter?

10          THE WITNESS:  At the time, it was Blaqs and Biggs.

11  Blaqs and Biggs and Biggs' boy.

12          THE COURT:  Who is Biggs' boy?

13          THE WITNESS:  He's Puerto Rican.  I don't remember his

14  name.

15          THE COURT:  And who else?

16          THE WITNESS:  That was it.

17          THE COURT:  Not Ali?

18          THE WITNESS:  No.  Ali wasn't there.  That was it.

19          MS. MASELLA:  Just to be clear, I think the witness is

20  talking about who was at the robbery.

21          THE WITNESS:  Yeah.

22          MS. MASELLA:  The judge was asking who was at

23  Carpenter.

24          THE COURT:  I'm asking who was at carpenter when you

25  had this conversation.

D3bWdor8                          Taylor – direct

1           THE WITNESS:  Me and Tall Man and Blaqs.

2           THE COURT:  And who else?

3           THE WITNESS:  That's it.

4           THE COURT:  So not Ali --

5           THE WITNESS:  No.  Ali wasn't there.

6           THE COURT:  Didn't you say before that Ali said his

7    boy messed up?

8           THE WITNESS:  No, no, no.  Blaqs tell, Blaqs tell us

9    that, that Biggs, Biggs' boy messed it up.

10          THE COURT:  Blaqs said that Biggs' boy messed up?

11          THE WITNESS:  Yeah.

12   BY MS. MASELLA:

13   Q.  By Biggs' boy, who are you referring to?

14   A.  Biggs' friend, Puerto Rican guy.

15   Q.  Do you know his name?

16   A.  Yes.  It's in my head, but I can't remember his name.

17   Q.  You just can't remember?

18   A.  Yeah.  Right now, I can't remember it.

19          MS. MASELLA:  Your Honor, this would be a convenient

20   time to break.

21          THE COURT:  Yes.  It's 5:30, so why don't we break.

22   We'll pick up again tomorrow.  Be ready to go at 9:30.  Give

23   yourselves time to get in and out.  Mondays are always a busier

24   day because that's when most judges pick a jury, but some

25   judges will push it over to Tuesday or some judges won't have

D3bWdor8

 1    finished, so there may be lines again tomorrow.  If you're

 2    confronted with lines, let them know you're already a sitting

 3    juror in a case.  Okay?  But give yourself enough time to

 4    manage public transportation and security and everything else.

 5          Have a good night.  Don't discuss the case and have a

 6    good evening.  Thank you.

 7          (Jury excused)

 8          THE COURT:  Okay.  Have a seat.  Let's excuse the

 9    witness.  All right?  So we'll see you tomorrow, Mr. Taylor,

10    bright and early.

11          (Witness excused)

12          THE COURT:  I noticed Mr. Valdez talking to my law

13    clerk on the way out, I assume, about what's up with his

14    situation.  I've placed a call to his employer and his boss,

15    the name he gave me, Mr. Lorenzo, was away.  He's working in

16    Chicago.  He then called me while I was on the bench here and

17    indicated he's about to get on an airplane, so I will speak

18    with him tomorrow.  He said he'll be in about 8:30 in the

19    morning.  I'll follow up and see what the company's policy is

20    with respect to jury duty.  And once I have that information,

21    we can talk.  Okay?

22          Is there anything else we should discuss tonight?

23    Mr. Roth.

24          MR. ROTH:  Judge, were you going to give the ruling

25    regarding the Daubert?

D3bWdor8

1         THE COURT:  I will do that.  He is clearly going to

2    want to testify.  My law clerk and I are kicking around what

3    the limit will be with respect to ballistics certainty,

4    scientific certainty, more likely than not, or some other

5    variation.

6         MR. ROTH:  Will you just post that on ECF?

7         THE COURT:  I will, or I'll just tell you tomorrow in

8    the morning.

9         How much more do we have on Mr. Taylor?

10        MS. MASELLA:  I would say 15 or 20 minutes on direct,

11   your Honor.

12        THE COURT:  That's all?  Okay.  Then cross, ballpark,

13   how long do you think you're going to take?

14        MS. FONTIER:  Maybe Mr. Roth would like to go first,

15   so whatever he does will obviously --

16        MR. ROTH:  Not hours, Judge.

17        THE COURT:  Not hours?  Do you think you may be done

18   with him by lunchtime?

19        MR. ROTH:  Oh, sure.

20        MS. FONTIER:  I think that that's likely.  I do have

21   fairly substantial cross then.

22        THE COURT:  So who is next?

23        MS. MASELLA:  Your Honor, we have, we're intending to

24   call Fitzroy Cornwall and Police Officer Reeves, which is the

25   other set of ballistics evidence that we'll need before

D3bWdor8

1      Detective Fox.

2                We're also planning to call Jamal Abdulla and Zhao

3      Liang tomorrow, who are the two surviving victims of the

4      homicide incident.  I believe we also have two more phone

5      custodians who are scheduled for tomorrow.

6                THE COURT:  Okay.

7                MR. ROTH:  Judge, the only thing, I haven't spoken

8      today to the government, but we had made a demand last week for

9      the CI, at least some of the records regarding Abdulla, the

10     payment records, any crimes that he's committed.  We've never

11     gotten that from the government.

12               THE COURT:  He's the CI?

13               MR. ROTH:  As was represented before in the 3500,

14     that's what triggered our demand.  He was the CI for the ATF,

15     this agency that's prosecuting, so it's a little bewildering

16     why they can't get his folder, the CIA, the FBI, the NYPD, and

17     another division of the New York State taxing authority and my

18     understanding is he has an extensive criminal record.  I don't

19     know what the result of any of those arrests are, but I know

20     he's had, I know he's had over 30 arrests.

21               THE COURT:  30 arrests?

22               MR. ROTH:  That's from my reading of the 3500 material

23     that's been given to me, but it's not the docket number, so I

24     have not been able to pursue that.

25               THE COURT:  So you asked the government for additional

D3bWdor8

1        3500 material.

2                    Is there additional 3500 material?

3                    MS. LESTER:  Yes, there is, your Honor, and we're

4        going to give it to the defense as soon as we get back down to

5        our trial room.

6                    THE COURT:  Why was it not produced already?

7                    MS. LESTER:  Some of it we've just obtained from the

8        ATF.  We do have a disclosure to make about what's in the ATF

9        file.  We don't intend to actually turn over the CI file, but

10       we have reviewed it and we can disclose the pertinent facts

11       about Mr. Abdulla's time with ATF, what types of cases he

12       worked on, how much he was paid over that period of time, and

13       why he was terminated as a CI with ATF.

14                   We also have a copy of his rap sheet, which we just

15       inadvertently didn't turn over previously.  And then we're

16       happy to talk to Mr. Roth about what other information we may

17       have.  We don't really have any other specific information

18       regarding his services as CI for other agencies.  We have made

19       inquiries, but we haven't been able to get it.  But, again,

20       your Honor, this is a witness who is testifying as a victim,

21       one of the two surviving victims of the robbery that resulted

22       in a homicide.  And, of course, we would not object to the

23       defense crossing him as extensively as they'd like on his

24       services as a CI for other agencies.

25                   MR. ROTH:  To be clear, as I stated previously, yes,

D3bWdor8

1    he's a victim, there's no question, but he was involved in a

2    criminal transaction at the time of the incident.  And to say

3    that they don't know about his involvement with the other

4    agencies, it was in the 3500 material that was provided.

5    That's where I got it from, otherwise I wouldn't have known

6    that he had been a CI for all these various agencies.  So

7    obviously they have the ability to follow up and ask questions,

8    were you being paid by the CIA, were you paid by the FBI.

9            MS. LESTER:  Your Honor, the answers to those

10   questions that were given to us by Mr. Abdulla are in the 3500

11   material.  We've made inquiries with these other agencies, but

12   we have not been able to get a physical copy of any of the

13   other files.  We may be able to provide a bit more information

14   about his service with the FBI.  Again, we're trying to do the

15   best we can, but Mr. Roth is free to ask the witness whatever

16   questions he wants.

17           THE COURT:  But the issue is whether you have an

18   obligation to produce 3500 material and whether things are in

19   your possession if they're in the possession of different law

20   enforcement agencies, most of which were respective agencies.

21   That's the issue.

22           MS. LESTER:  Your Honor, we've made requests, repeated

23   requests.  We've tried to obtain the file, but at this point,

24   the only physical file that we've been able to look at is the

25   ATF file.

D3bWdor8

1           THE COURT:  Again, you don't get to vulcanize the

2    federal government.  Okay?  So this is the government.  If it's

3    in the possession of the FBI, then I think it's in your

4    possession, so you better get it, if it's responsive.

5           MS. LESTER:  I understand what your Honor's saying,

6    but I do think for a witness of this type where he's testifying

7    as a victim of a crime and not as a law enforcement witness or

8    a CI in any capacity, yes, it's true he was involved in an

9    untaxed cigarette transaction at the time that was an illegal

10   transaction.  He was not doing that under the auspices --

11          THE COURT:  All of that is great, but the fact is you

12   have obligations to produce things under 3500, under Giglio,

13   Jencks.  So if what you're saying is you don't have any

14   obligation to do this, then that's fine.  But it seems you're

15   kind of talking a mile a minute in a lot of different

16   directions so the fact that you've made a request doesn't

17   impress me that much.  If you're saying it's not something

18   that's responsive and doesn't have to be turned over, that's a

19   different argument.  And you should make that argument.  But I

20   think you ought to think about what arguments you're making and

21   what arguments you're not making before this witness gets on

22   the stand, before he gets on cross, anyway.

23          Is there something we need to follow up on?

24          THE CLERK:  He's going to come back tomorrow.

25          MR. ROTH:  Judge, obviously I know you don't set any

D3bWdor8

1    time limits with respect to the disclosure --

2              THE COURT:  It's not me.  It's the Second Circuit.

3              MR. ROTH:  No.  I appreciate that.  I appreciate that.

4    But getting the 3500 material today, in terms of his rap sheet

5    tonight, I really can't do anything with that by tomorrow.

6              THE COURT:  If you're asking then for an adjournment

7    or the ability to recall him for purposes of resuming cross,

8    then that's the request you can make.

9              MR. ROTH:  Fine.

10             MS. FONTIER:  Your Honor, just on this issue, if the

11   government is, as they've stated, not intending to turn over

12   the CI file to us and just give us their summary of what we

13   believe we're entitled to, or whatever the record was that was

14   just made, I would ask that that entire file be available for

15   the Court to review, to the extent that there may be additional

16   things in there if we make specific requests that the Court may

17   be able to look at and rule on those.

18             THE COURT:  All right.  Let's try to figure out what

19   documents are available for that kind of review because it

20   sounds like many of them are not.  And then once we have had a

21   chance to chew on this, we can revisit it tomorrow.  But we're

22   not going to have much of a chance beyond tomorrow because the

23   witness is going to get called tomorrow.  Right?

24             How are we doing in terms of ETA on finishing the

25   government's case?

D3bWdor8

1          MS. MASELLA:  We're doing well, your Honor.  I think

2     we're slightly ahead of schedule.  I would estimate that we'll

3     finish the witnesses on Wednesday or Thursday.

4          THE COURT:  All right.  Anything else we need to cover

5     today?

6          MR. MURPHY:  Just the one other issue.  You didn't

7     rule at this point, your Honor, on the photos, just noting

8     that.  It doesn't matter whether you decide that now or

9     tomorrow, or whenever.  And then I had made that request before

10     the lunch break about that one provision.

11          THE COURT:  Right.  I have not left the bench since

12     then.

13          MR. MURPHY:  I'm sorry, your Honor.  I just wanted to

14     note that whenever your Honor makes rulings, so be it.

15          THE COURT:  With respect to the photos, you told me

16     before the ones you were objecting to, so it's just a handful.

17     Right?

18          MR. MURPHY:  Yes, your Honor.

19          THE COURT:  So we can clarify all that tomorrow.

20     Looks like hearsay to me.  Looks like it's a statement about

21     what some police officer told to the physician assistant from

22     the medical examiner's office.  Right?

23          MR. MURPHY:  Correct.

24          THE COURT:  So maybe we want to take a minute now on

25     that.

D3bWdor8

1          What's the government's theory as to why this comes

2     in?

3          MS. LESTER:  Your Honor, the document is already in

4     evidence.

5          THE COURT:  That's an argument, I guess, that it's too

6     late.  Is there some other argument as to why this wouldn't be

7     hearsay?

8          MS. LESTER:  We're not going to draw, we didn't draw

9     the jurors' attention to this portion of the autopsy report

10    during Dr. Smiddy's testimony and we don't intend to either in

11    the remainder of the trial or in closing.  Again, the document

12    is in evidence and the defense didn't make this objection at

13    the time, which they could have because they actually did draw

14    Dr. Smiddy's attention to this particular document, the crime

15    scene investigation report.  But again, we don't intend to draw

16    anyone's attention to it.

17         THE COURT:  The fact that you don't intend to draw

18    anyone's attention to it is neither here nor there.  It's in

19    evidence and the jury can look at it and they can consider it

20    and review it for the truth.  Seems to me I have to rule on the

21    hearsay objection.  Either I can say it's been waived because

22    this was admitted without objection, or I could say, well,

23    yeah, it's not timely, but, still, I have a gatekeeping

24    responsibility which is designed to prevent hearsay from

25    getting to the jury, and since they haven't been shown this

D3bWdor8

yet, sort of no harm no foul in the late objection.  If it's

that situation, if it's the latter, is there an argument as to

why this would be admissible?

          MS. LESTER:  Not through Dr. Smiddy, your Honor.  I

mean, she testified that this entire packet was part of the

business records of the Office of the Chief Medical Examiner,

that it was all compiled and part of the autopsy report.  So

certainly the document itself is a business record.  As for the

actual report within it, I think I would have to agree that it

appears to be hearsay so there's no exception to let that

particular portion in, other than that the defendants may have

waived it by not raising it.

          THE COURT:  I think that's then all I've got is the

waiver.  Okay.  So I'll rule on those things.  I'll either

shoot you something tonight or just before the jury gets here

tomorrow, I'll rule on that document, the photos, the Daubert

limitation, and I think that's it.  Right?  Okay.  All right.

So I'll see you tomorrow.  Thanks.

          (Adjourned to March 12, 2013, at 9:30 a.m.)

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     MONICA SMIDDY

4     Direct By Ms. Masella . . . . . . . . . . . 782

5     Cross By Mr. Murphy . . . . . . . . . . . . 799

6     Cross By Ms. Fontier . . . . . . . . . . . 820

7     MATTHEW JANISCH

8     Direct By Ms. Masella . . . . . . . . . . . 824

9     Cross By Ms. Fontier . . . . . . . . . . . 839

10    Cross By Mr. Roth . . . . . . . . . . . . . 843

11    DANIEL MULVANERTY

12    Direct By Ms. Masella . . . . . . . . . . . 846

13    Cross By Mr. Roth . . . . . . . . . . . . . 858

14    Cross By Ms. Fontier . . . . . . . . . . . 873

15    Redirect By Ms. Masella . . . . . . . . . . 878

16    Recross By Mr. Roth . . . . . . . . . . . . 879

17    AYOUB MOHAMMED

18    Direct By Ms. Masella . . . . . . . . . . . 880

19    Cross By Ms. Fontier . . . . . . . . . . . 898

20    ANIELLO MAZZELLA

21    Direct By Ms. Lester . . . . . . . . . . . 902

22    NORMAN R. CLARK

23    Direct By Ms. Masella . . . . . . . . . . . 912

24    Cross By Mr. Roth . . . . . . . . . . . . . 930

25    Cross By Ms. Stafford . . . . . . . . . . . 946

1    Redirect By Ms. Lester . . . . . . . . . . . 953

2    ALEXIS DIAZ

3    Direct By Ms. Masella  . . . . . . . . . . . 956

4    Cross By Ms. Fontier . . . . . . . . . . . . 963

5    PATRICK TAYLOR

6    Direct By Ms. Masella  . . . . . . . . . . . 966

7                    GOVERNMENT EXHIBITS

8    Exhibit No.                              Received

9     500   . . . . . . . . . . . . . . . . . . . 790

10    527   . . . . . . . . . . . . . . . . . . . 796

11    3533F   . . . . . . . . . . . . . . . . . . 829

12    200A   . . . . . . . . . . . . . . . . . . . 830

13     201-265 . . . . . . . . . . . . . . . . . . 832

14    401-447 . . . . . . . . . . . . . . . . . . 851

15    1602   . . . . . . . . . . . . . . . . . . . 906

16    1608   . . . . . . . . . . . . . . . . . . . 908

17    2020   . . . . . . . . . . . . . . . . . . . 917

18    8   . . . . . . . . . . . . . . . . . . . . 990

19    8A and 8 B   . . . . . . . . . . . . . . . . 990

20    7 and 7 B   . . . . . . . . . . . . . . . . .1004

21

22

23

24

25