D3cWdor1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              12 CR 45 (RJS)

5    JERMAINE DORE and DWAYNE
     BARRETT,
6
                   Defendants.
7
     ------------------------------x
8

9                                        March 12, 2013
                                         9:30 a.m.
10

11   Before:

12                     HON. RICHARD J. SULLIVAN,

13                                        District Judge

14
                          APPEARANCES
15

     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY

25

D3cWdor1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  I issued a ruling last night on the

4   Daubert issue and also ruled on the evidentiary issues.  So I

5   think we should be squared away.  Anything else we need to

6   discuss before the witness takes the stand?

7          MS. MASELLA:  Not from the government, your Honor.

8          THE COURT:  Nothing from the defense?  All right.

9   Then I asked the government to respond to Ms. Fontier's motion

10  by tomorrow morning.  That's doable, I assume.

11         MS. MASELLA:  Yes, your Honor.

12         MR. ROTH:  Judge, the only other thing is sometime

13  last night -- I don't know, 10:00 last night -- the government

14  actually gave me, provided to the defense, I would say, a

15  paragraph in respect to their witness who is going to testify,

16  Abdulla, in terms of they disclosed to the defense just about a

17  summary, not even a summary of his activities as an ATF

18  informant, indicating that he's been paid, I don't have it in

19  front of me, but some 80 something thousand dollars over the

20  course of five years, or so, and that his services were

21  terminated approximately in 2011 because he was accused of

22  having an inappropriate sexual relationship with a target of an

23  investigation, and he denied that allegation and refused to

24  talk to the ATF about it.

25         He was 13 years with the ATF.  Other than that,

D3cWdor1

1    there's no disclosure in terms of his activities in respect to

2    his role as an informant for the CIA, the FBI, the NYPD.

3    There's no further disclosure.  We were provided with a rap

4    sheet, which, as I indicated before, shows numerous --

5             THE COURT:  Can I interrupt you?  Is he ready?  I

6    wanted the jury to be on time.  We can take this up over lunch.

7             MR. ROTH:  No problem.

8     PATRICK TAYLOR, resumed.

9             THE COURT:  Let's bring in the jury.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3cWdor1

1              (In open court; jury present)

2              THE COURT:  Have a seat.  Thank you very much for

3    being on time.  I really do appreciate it, especially on a wet

4    day today.  Thanks.  I know it means getting up early and it

5    means an inconvenience to you, being here.  So we're ready to

6    go.  We're going to resume the direct examination of Mr. Taylor

7    by Ms. Masella.

8    DIRECT EXAMINATION (cont'd)

9    D3cWdor1                    Taylor - direct

10   BY MS. MASELLA:

11   Q.  Mr. Taylor, do you recall that yesterday you told us about

12   a period of time in which Blaqs and Tall Man were having a beef

13   or an argument?

14   A.  Yes.

15   Q.  Approximately when was that period of time?

16   A.  Like around November of 2011.

17   Q.  And how long did that period of time while they were

18   arguing last?

19   A.  Like two or three weeks.

20   Q.  And what happened during that period of time with respect

21   to the operation of the robbery crew?

22   A.  Me and Blaqs and me and Tall Man and my cousin was always,

23   was not always together.  Now Blaqs and Biggs was with each

24   other more.

25   Q.  And during that two-, or three-week period, did you and

D3cWdor1

1    Tall Man and your cousin conduct any surveillance or any

2    robberies?

3    A.  Yes.

4    Q.  Which one?

5    A.  Like around White Plains Road.  Queens.

6    Q.  I'm sorry?

7    A.  There was no robbery, but it was a driving around to see if

8    we could find a robbery.

9    Q.  Can you tell us what area you were driving in?

10   A.  In the Bronx.  And Queens.

11   Q.  What kind of person or people were you following?

12   A.  People who got business, like cigarettes, phone cards, and

13   stuff like that.

14   Q.  Why didn't any robberies occur during that time period?

15   A.  Because at that time, like there was too much going on, so

16   much going on, so we didn't get to rob anybody at the time.

17   Q.  What do you mean by so much going on?

18   A.  Cops be, was just everywhere driving around.  It was too

19   busy or, so we didn't get to rob anybody at the time.  Too much

20   cops or something was there or, so we didn't get to rob anybody

21   at the time.

22   Q.  Mr. Taylor, did there ever come a time when you heard about

23   a murder in connection with any of these individuals, Tall Man

24   or Blaqs or Biggs?

25   A.  Yes.

D3cWdor1

1   Q.  And where were you when you heard that information?

2   A.  In Bridgeport.

3   Q.  Who were you with?

4   A.  Connecticut.

5   Q.  Who were you with in Bridgeport, Connecticut?

6   A.  I was by myself at the time.

7   Q.  And how did you learn the information?

8   A.  I was watching the news and I seen a robbery in Mount

9   Vernon, and then I heard that the, on the news, there was --

10              MS. FONTIER:  Objection.

11              MR. ROTH:  Objection to the hearsay.

12              THE COURT:  It's not hearsay.  Overruled.

13              You can speak about what you saw and what it prompted

14  you to do.  You saw a news report?

15              THE WITNESS:  Yes.

16              THE COURT:  About what?

17              THE WITNESS:  Murder that took place in Mount Vernon

18  and someone died.

19              THE COURT:  What did you do after you saw that report?

20              THE WITNESS:  Then like a week after, I went to the

21  Bronx, New York, and I asked, and I asked Tall Man if it was

22  them who did that robbery.  But it --

23  BY MS. MASELLA:

24  Q.  I want to slow you down for one second, Mr. Taylor.  When

25  you said you went to the Bronx and talked to Tall Man, where

D3cWdor1

1    specifically did you go?

2    A.   On 229 and White Plains Road.

3    Q.   What is at 229th and White Plains Road?

4    A.   That's where Biggs stay at, live at.

5    Q.   Were you inside Biggs' house --

6    A.   No.

7    Q.   -- when you had this conversation, or somewhere else in

8    that area?

9    A.   Somewhere in the area.

10   Q.   Where were you?

11   A.   White Plains Road, next to 229.

12   Q.   So you were out on the street?

13   A.   Yes.

14   Q.   Who was present for the conversation?

15   A.   It was me, Biggs, and Blaqs.

16   Q.   Was Tall Man there?

17   A.   Yes.   Tall Man.

18   Q.   And now when approximately did this conversation occur?

19   A.   Like a week after the robbery happened.

20   Q.   A week after the news report?

21   A.   Yes.

22   Q.   Do you recall what month or year that was?

23   A.   I think it was in December 2011.

24   Q.   And as best, as specifically as you can, tell us who said

25   what during that conversation on 229th and Carpenter -- or

D3cWdor1

1   White Plains Road.

2   A.  I asked Tall Man if it was, if it was them who did that

3   robbery.  Then he was like, he didn't answer me at the time.

4   Q.  Who didn't?  Try not to say he.  Try to use the name.  Who

5   is he?

6   A.  Tall Man didn't answer me at the time.  Then while Biggs

7   and Blaqs was talking, everybody was talking, and Tall Man and

8   Biggs was like, Blaqs is crazy, Blaqs is crazy, and stuff.

9   They not going to mess with Blaqs no more.

10  Q.  Wait.  Stop for one second.  Who said Blaqs is crazy,

11  they're not going to mess with Blaqs anymore?

12  A.  Biggs and Tall Man.

13  Q.  By they're not going to mess with Blaqs anymore, what did

14  you understand that to mean?

15  A.  That, that Blaqs did something wrong, Blaqs did something

16  messed up, that Tall Man and Biggs didn't like.

17  Q.  What else was said during that conversation?

18  A.  And Tall Man say he ain't to use his car no more, in no

19  more robberies.

20  Q.  Did Tall Man say anything else about his car or explain

21  what he meant by he's not going to use his car anymore?

22  A.  No.  He just be like, he ain't going to use his car no more

23  to do no more robberies.  His car hot now, he ain't going to

24  use his car no more.

25  Q.  His car didn't have -- I didn't hear what you said.

D3cWdor1

A.  No.  His car getting hot, mean the cops know that his car

is doing the robberies and thought that was, he ain't going to

use his car no more.

Q.  Did Tall Man or anyone else in that conversation explain

why the car was hot or noticed by the police?

A.  No.

Q.  Was anything else said during the conversation?

A.  No.  That was it.

Q.  At that time or shortly thereafter, also in December 2011,

did you hear about any of these individuals, Tall Man or Blaqs,

getting arrested, around that time?

A.  Yes.

Q.  Who did you hear about that from?

A.  My cousin called me and told me Blaqs locked up.

Q.  Which cousin are you talking to?

A.  Shea Douglas.

Q.  Duff?

A.  Duff, yeah.

Q.  And when Duff told you that Blaqs had been arrested, did he

tell you anything else about that arrest?

A.  No.  He was like, he was like, him and Blaqs and Tall Man,

in front of Ali's store and the cops came and arrested Blaqs on

233rd in front of Ali's store.

Q.  Did your cousin say anything about what Blaqs or Tall Man

had been doing at that time?

D3cWdor1

1    A.  Not really.  He just told me that Blaqs got locked up.

2    Q.  Did he say anything else about the arrest?

3            MS. FONTIER:  Objection.  Asked and answered.

4            THE COURT:  Overruled.

5            Did he say anything else?

6            THE WITNESS:  No.

7            THE COURT:  No.  Okay.

8    BY MS. MASELLA:

9    Q.  Mr. Taylor, during the time that you knew Blaqs, which is

10   September 2011 through January 2012, did you ever know him to

11   have a legitimate job?

12   A.  Yes.

13   Q.  What was that?

14   A.  Like KFC.

15   Q.  And when did he have a job at KFC?

16   A.  I heard it was from like, from like January 2011 until

17   sometime in the summertime, around 2011.

18   Q.  Was that before you knew him in September?

19   A.  Yes.

20   Q.  During the time after you knew him, did you ever know him

21   to have a legitimate job?

22   A.  No.

23   Q.  And what about Tall Man?

24   A.  No.

25   Q.  Mr. Taylor, did you ever see any music videos made in which

D3cWdor1

1    Tall Man or Biggs, or both, appeared?

2    A.  Yes.

3    Q.  When did you see that video?

4    A.  On like around in November 2011.

5    Q.  Where did you see it?

6    A.  Saw it on the computer.

7    Q.  Where on the computer?

8    A.  On YouTube.

9    Q.  And could you tell from the YouTube page who had posted the

10   video?

11   A.  No.

12   Q.  Couldn't tell?

13   A.  No.

14          MS. MASELLA:  Ms. Brady, may we play Government

15   Exhibit 30 in evidence.

16          We just need one moment, your Honor.

17          (Video recording played)

18          MS. MASELLA:  Pause it for one second.

19   Q.  Mr. Taylor, have you seen this video before?

20   A.  Yes.

21          MS. MASELLA:  Ms. Brady, I just want to go back a

22   little bit, after I ask Mr. Taylor a few questions.

23   Q.  Did you see the people sitting in the front seat of this

24   car?

25   A.  Yes.

D3cWdor1

1   Q.  And do you know who those people are?

2   A.  Yes.

3   Q.  Who was sitting in the driver's seat?

4   A.  Tall Man.

5   Q.  And who was sitting in the passenger's seat?

6   A.  Biggs.

7   Q.  And do you recognize this individual in the back seat?

8   A.  That's Biggs' friend.

9   Q.  Was that friend involved in any robberies as far as you

10  know?

11  A.  Yes.

12  Q.  Which one?

13  A.  It was one on Castle Hill.

14  Q.  That's the same friend you told us about yesterday?

15  A.  Yes.

16  Q.  Do you remember his name at this point, or you still don't

17  remember his name?

18  A.  It's not in my head right now.  Not right now.  No.  Not

19  right now.

20  Q.  Do you recognize the car in this video?

21  A.  Yes.

22  Q.  Which car is it?

23  A.  That's Tall Man's Mercedes-Benz, 500.

24          MS. MASELLA:  Ms. Brady, could you just go back to the

25  beginning.  Thank you.

D3cWdor1

 1            (Video recording played)

 2            MS. MASELLA:  Pause, Ms. Brady.  Thank you.

 3  Q.  Mr. Taylor, did you see any guns in that video?

 4  A.  Yes.

 5  Q.  How many did you see?

 6  A.  Two.

 7  Q.  And who had them in the video?

 8  A.  Biggs and Biggs' friend.

 9  Q.  Do you recognize those guns as items you'd seen before?

10  A.  No.

11  Q.  Do you know the location of where this was filmed?

12  A.  Yes.

13  Q.  What is that location?

14  A.  At Bronx and White Plains, 239 and White Plains Road.

15  Q.  Who lives in that neighborhood?

16  A.  Biggs.

17            MS. MASELLA:  One moment, your Honor.

18            No further questions at this time for Mr. Taylor.

19            THE COURT:  Okay.  Cross-examination.

20            MR. ROTH:  Thank you.

21            THE COURT:  Mr. Roth.

22            MR. ROTH:  Thank you.

23  CROSS-EXAMINATION

24  BY MR. ROTH:

25  Q.  Good morning, Mr. Taylor.

D3cWdor1                        Taylor - cross

1    A.  Good morning.

2    Q.  My name is James Roth, and I represent Mr. Barrett.  We've

3    never met before, is that correct?

4    A.  Yes.

5    Q.  And in the course of my questioning to you, sir, if you

6    don't understand a question that I ask, before you answer it,

7    please indicate that you don't understand it and I'll rephrase

8    it.  Okay?

9    A.  Yes.

10   Q.  Could you please just move up a little bit so I can hear

11   you better, speak into the microphone.  Thank you.

12          Although we've never met before, you've met the

13   prosecutors before, is that fair to say?

14   A.  Yes.

15   Q.  And you've met them many times, is that fair to say?

16   A.  Yes.

17   Q.  Do you know off the top of your head how many times you've

18   met them?

19   A.  No.

20   Q.  Is it more than a dozen?

21   A.  I don't know how much, but I met them a lot of times.

22   Q.  You met with the case agent being present on all those

23   times?

24   A.  Case agent?

25   Q.  The agent who is seated at the table.

D3cWdor1                          Taylor - cross

1    A.  Yes.

2    Q.  What's his name?

3    A.  It's Mr. Anthony.

4    Q.  Mr. Anthony?

5    A.  Yes.

6    Q.  Is that his last name, Anthony?

7    A.  I don't know.  I think that's the first name.

8    Q.  You call him Anthony?

9    A.  Yes.

10   Q.  And the prosecutors, what do you know their names to be?

11   A.  Jessica.

12   Q.  Jessica?

13   A.  Yes.

14   Q.  Jessica is which prosecutor?

15   A.  Right here.

16   Q.  Okay.  And the other prosecutor, do you know her name?

17   A.  No.

18   Q.  During the course of those meetings, you met for many

19   hours, is that fair to say?

20   A.  Yes.

21   Q.  Approximately how many hours was each meeting?

22   A.  Like around two and a half hours.

23   Q.  Some ran over that, is that fair to say?

24   A.  Some were, yes, over that.

25   Q.  And would it be fair to say, sir, that you were busy in the

D3cWdor1                              Taylor - cross

1    last few days and over the weekend preparing for your testimony

2    today?

3    A.   Not over the -- yeah, but not over the weekend.  I was just

4    resting.  That was it.  The weekend.

5    Q.   The last weekend, you weren't preparing?

6    A.   No.

7    Q.   Did you meet with them last night?

8    A.   No.

9    Q.   But you met with them the day before you testified, is that

10   right?

11   A.   I met with them, last time was on Friday.

12   Q.   Friday, okay.

13   A.   That was it.

14   Q.   And that was sort of a dry rehearsal for your testimony

15   today, is that fair to say?

16   A.   Something like that, yeah.

17   Q.   Well, they told you what questions they were going to ask

18   you, is that right?

19   A.   Yeah.

20   Q.   And you gave them answers, is that correct?

21   A.   Yeah.

22   Q.   And they went over that with you more than one time, is

23   that right?

24   A.   Yeah.

25   Q.   And they told you how they would like you to testify, is

D3cWdor1                    Taylor - cross

1   that right?

2   A.  No.

3   Q.  Well, they told you the manner in which to testify, is that

4   fair to say?

5   A.  Yeah.

6   Q.  They told you to look the questioner in the eye, is that

7   fair to say?

8   A.  Yeah.

9   Q.  And you kept on going over that, rehearsing it, and did you

10  actually come into the courtroom?

11  A.  Yes.

12  Q.  This courtroom you came into?

13  A.  Oh, no, no, no.

14  Q.  But you came into a courtroom like this?

15  A.  That's when I was pleading guilty.

16  Q.  Right.  But have you ever come in before to a courtroom

17  like this and practiced your testimony?

18  A.  No.

19  Q.  You know that there's a lot riding on your testimony today,

20  is that fair to say?

21  A.  No.

22  Q.  Well, what I mean by that is the outcome of your case

23  depends on your testimony today.  Is that fair to say?

24  A.  Yeah.

25  Q.  Well, there's no question in your mind about that, is

1     there?

2     A.   No.

3     Q.   And is it fair to say that you've made many deals in the

4     course of your life?

5     A.   What do you mean by many deals?

6     Q.   I'm sorry?

7     A.   What do you mean by that, by many deals?

8     Q.   You know what a drug deal is, don't you?

9     A.   Oh, yeah.

10    Q.   You made a lot of drug deals in your life, is that right?

11    A.   Yeah.

12    Q.   Well, you're shaking your head.  When I say a lot, I'm

13    talking about hundreds of drug deals?

14    A.   Yeah.

15    Q.   Thousands of drug deals?

16    A.   I don't know about thousand, but I know I used to sell

17    drugs.

18    Q.   Well, you sold drugs for five years, right?

19    A.   Four years.

20    Q.   2008 to 2012, is that right?

21    A.   Yeah.  Four years.

22    Q.   So my question to you, sir, is of all the deals that you

23    made in your life, this deal that you made with the government

24    to get a 5K is the most important deal that you've made in your

25    life to date.  Is that fair to say?

D3cWdor1                          Taylor - cross

1    A.  Yes.

2    Q.  Well, you have no question about that, do you?

3    A.  No.

4    Q.  Is it fair to say, sir, that you're a hustler?

5    A.  No.

6    Q.  You're not a hustler?

7    A.  No, I ain't no hustler.

8           THE COURT:  I didn't hear that.  No what?

9           THE WITNESS:  No.

10          THE COURT:  Just no?

11          THE WITNESS:  Yeah.

12   BY MR. ROTH:

13   Q.  You said no, you ain't a hustler, is that right?

14   A.  Ain't a hustler.

15   Q.  When I use the term "hustler," Mr. Taylor, I'm using the

16   term as somebody who does what they have to do to get over.

17   Can you agree with that definition of a hustler?

18   A.  Yeah.  But I don't get over on people.  So I'm not a

19   hustler.

20   Q.  You don't get over on people?

21   A.  No.

22   Q.  And is it your testimony, sir, that you don't do what you

23   can do to survive for yourself, to put yourself No. 1?

24   A.  Right now, yes.

25   Q.  Is this the first time that you've put your self-interests

D3cWdor1                         Taylor - cross

1   above other people's self-interests?

2   A.  Not really, but sometimes when, hard sometimes.  I'm not a

3   terrible person, you know.

4   Q.  Are you telling the jury that you're somebody who always

5   owns up and takes responsibility and never points the finger at

6   other people?

7   A.  I'm not saying that.  Nobody never, that's impossible for a

8   person to own up to everything that he ever did.  He got to

9   point the finger at somebody.

10  Q.  I'm sorry.  I'm not --

11  A.  So I'm not the only person who is going to point finger at

12  someone.

13  Q.  No.  But my question to you, sir, is you've put your

14  self-interests in other situations other than this situation

15  above that of other people.  Is that fair to say?

16  A.  No.

17  Q.  Okay.  Would you consider yourself a risk taker?

18  A.  No.

19  Q.  So when you make a decision, you don't calculate, Well, I

20  could have this good outcome or the outcome of my actions could

21  be really bad, but I'll decide to go for it, take a risk, and

22  try to get the better outcome?  You don't consider yourself a

23  risk taker like that?

24  A.  No.

25  Q.  Let's take as an example your immigration status.  You

1   don't have any legal status in this country, is that fair to

2   say?

3   A.  Yes.

4   Q.  You're what they call out of status, since 2003, is that

5   correct?

6   A.  Yes.

7   Q.  So you've made a conscious decision, have you not, Mr.

8   Taylor, to live in the United States under the threat of

9   arrest, detention, and deportation?  Is that correct?

10  A.  Yes.

11  Q.  So that's a calculated risk that you made for the last ten

12  years, is that correct?

13  A.  Yes.  But, at the time I was a minor, so it wasn't really

14  my fault at the time.  My parents just wanted a better

15  education for me and a better life at the time.  So I don't

16  really blame me.  I would blame my parents for wanting me to

17  have a better life.  Here.

18  Q.  You dropped out of school in high school, is that right?

19  A.  Yeah.  12th grade.

20  Q.  12th grade?

21  A.  Yeah.

22  Q.  And I'm not talking about blame.  I'm talking about the

23  risk you took every day of your life from 2003 until 2012 when

24  you were on the streets living here illegally.  Would you

25  consider that a risk?

D3cWdor1                    Taylor - cross

1    A.  At the time, no.

2    Q.  At no time were you concerned about being arrested by

3    immigration?

4    A.  Yes.

5    Q.  So what steps did you take, sir, to prevent being arrested

6    or to conceal your identity from immigration?

7    A.  I was staying in my house, stay out of trouble, and just

8    keep to myself.

9    Q.  I thought I heard you say on direct testimony, in response

10   to the government's question, that you left your house for five

11   years back and forth dealing marijuana from 2008 to 2012.

12   A.  Yes.

13   Q.  Is that correct?

14   A.  Yes.

15   Q.  Would you consider that laying low and keeping under the

16   radar of immigration?

17   A.  No.  But after, after, after 2008, I was, I wasn't making

18   no money, and the reason that --

19   Q.  Can you answer the question directly?

20   A.  Yes.

21   Q.  The question is, sir, you weren't staying in your house

22   hiding from immigration in a basement; you were going out and

23   engaging in criminal activity on a daily basis, day after day,

24   week after week, month after month, year after year.  Is that

25   correct?

D3cWdor1                          Taylor – cross

1    A.  Yes.

2    Q.  So that increased your possibility of being arrested on the

3    marijuana charges and then on immigration as well, is that

4    correct?

5    A.  Yes.

6    Q.  So you engaged in risky behavior, is that right?

7    A.  Yes.

8    Q.  And you did that to advance your own self-interest, is that

9    fair to say?

10   A.  Yes.

11   Q.  Now, you admitted, on direct examination, to pleading

12   guilty in this courthouse to a conspiracy to possess and

13   possess with the intent to distribute a thousand kilos or more

14   of marijuana.  Is that correct?

15   A.  Yes.

16   Q.  And for those of the jurors who may not know, how many

17   pounds is a thousand kilos?

18   A.  Like a thousand pounds.

19   Q.  What's the conversion of kilos to pounds or pounds to

20   kilos?

21   A.  16 ounces.

22   Q.  I'm sorry?

23   A.  Like 16 ounces a pound, in a pound.

24   Q.  16 ounces in a pound?

25   A.  Yes.

D3cWdor1                          Taylor - cross

1    Q.  And then how many in a kilo?

2    A.  A couple thousand.  I don't exactly know how much.

3    Q.  Could you describe for the members of the jury, because you

4    handled a lot of kilos -- what did you call them, keys?

5    A.  No.  Pounds.

6    Q.  You just sold, when you sold stuff, by pound?

7    A.  Yes.

8    Q.  Were they bricks?  How were they packaged, the drugs you

9    sold?

10   A.  Bricks.

11   Q.  And describe to the members of the jury what a brick is.

12   A.  A brick is like this big, from like right here to right

13   here.  It's a brick.  Weigh like 20 pounds, 40 pounds, 50

14   pounds.  Big bricks.

15   Q.  Okay.  And let's go through this.  When was the first time

16   that you started selling marijuana?

17   A.  In '08.

18   Q.  And who were you selling with at that time?

19   A.  My cousin.

20   Q.  Which cousin?

21   A.  Shea Douglas.

22   Q.  He was the first person that you sold marijuana with?

23   A.  Yes.

24   Q.  Was he already in the marijuana business?

25   A.  No.

1   Q.  Did you start up the marijuana business?

2   A.  No.

3   Q.  Who started the marijuana, who got you into the marijuana

4   business?

5   A.  My uncle.

6   Q.  Which uncle?

7   A.  Mike Douglas.

8   Q.  I'm sorry?

9   A.  Mike Douglas.

10  Q.  How long had Mike Douglas been in the marijuana business?

11  A.  I don't know.  Back in the '90s or so.  I don't really know

12  how long.

13  Q.  So could have been for ten years earlier, or so?

14  A.  Could have been.  I don't exactly know when.

15  Q.  Tell the members of the jury the first time you did a

16  marijuana deal in '08.

17  A.  First time I did it was, was somebody called my uncle for

18  two pounds of marijuana and my uncle tell me to bring it to

19  him.  So I take two pounds of marijuana and bring it to the guy

20  and the guy gave me the money for the marijuana.  I take out my

21  share and I bring the rest to my uncle.

22  Q.  What was your share on that first deal?

23  A.  $200.

24  Q.  And how much did you sell, two pounds?

25  A.  Yes, two pounds.

D3cWdor1                    Taylor - cross

1  Q.  And how much were you selling it for with your uncle per

2  pound at that time?

3  A.  My uncle, around, gave it to me for $800, and then I give

4  it to the person who is going to buy it for a thousand dollars.

5  Q.  Okay.  So he fronted you the merchandise, is that right?

6  A.  Yes.

7  Q.  Is that what you call it, merchandise, or product?

8  A.  Product.

9  Q.  So the first time that you made a deal, was it $800 a pound

10 or $800 per pound or 800 for the two pounds?

11 A.  No.  $800 per pound.

12 Q.  Per pound?

13 A.  Yes.

14 Q.  So the first deal you made was $1,600?

15 A.  Yes.

16 Q.  And your cut on that was $200?

17 A.  Yes.  200 a piece.  200 a piece off of each pound.

18 Q.  So you made $400 on that?

19 A.  Yes.

20 Q.  What kind of marijuana was that?

21 A.  It's Arizona.

22 Q.  Is that where it comes from, or is that what it's called?

23 A.  It's called Arizona, but it came from like Texas or Arizona

24 or California.

25 Q.  And when you say your uncle gave it to you, were you

D3cWdor1                        Taylor – cross

1    staying with your uncle at this time?

2    A.  At the time, yes, I was.

3    Q.  You were staying in the same house?

4    A.  Yes.

5    Q.  And when he gave you those two pounds, where did he get

6    those two pounds from?

7    A.  Where?  California or Texas or Arizona.  I don't know

8    exactly where at.

9    Q.  But physically, where was he keeping it, the marijuana?

10   A.  In the house.

11   Q.  In the house you were staying at?

12   A.  Yes.

13   Q.  And that first time that he gave you two pounds, how much

14   marijuana did he have in the house?

15   A.  My, like 20, 30, 40 pounds.  I don't know exactly how much.

16   Q.  And did you get involved in like weighing it out and

17   packaging it?

18   A.  Yeah, sometime I do.  Yeah.

19   Q.  Okay.  Well, describe to the jury what's involved in

20   weighing it out and packaging.

21   A.  Just get, get a scale, get some bags.  I would get the

22   brick of marijuana.  I would pull it out.  I would put it on

23   the scale, weigh it up.  When it reach a pound, we put it in a

24   bag and put each pound in each bag.

25   Q.  So when you say a scale, are we talking about, we're not

1    talking about a triple beam, electronic scale, or a big scale?

2    What kind of scale?

3    A.  It's a big scale.  Pound scale.

4    Q.  Because you had to weigh large quantities at times, is that

5    correct?

6    A.  Yes.

7    Q.  So who did you sell that marijuana to?

8    A.  Guys who want it on the street.

9    Q.  What was his name?

10   A.  I don't know what his name is.

11   Q.  Is it fair to say you've sold so many times you can't

12   remember?

13   A.  Yes.

14   Q.  And when was the next sale that you made, sir?

15   A.  Like after that, I was selling marijuana almost every day

16   now, after that.

17   Q.  Every day for four years?

18   A.  Not really every day because sometimes we run out of, out

19   of the marijuana, so we got to wait like couple weeks for

20   marijuana to come in again.  So it was not every day, but, you

21   know, when, when we have it there, it's every day.  But

22   sometime we go months without having no marijuana.  Sometime

23   business bad.

24   Q.  Where did you get your customers from?

25   A.  Which customers?

D3cWdor1                          Taylor - cross

1   Q.  People who were buying the marijuana.

2   A.  From clubs.  Go to clubs, find customers.

3   Q.  You personally would go out to clubs?

4   A.  Yeah.

5   Q.  And you'd basically advertise your wares?

6   A.  No.  Not really, but, like, like my cousin driving nice

7   car, wearing nice clothes, people just ask us if we sell weed.

8   If we like them, we tell them yeah.  Sometime we tell them no.

9   Q.  Were you wearing nice clothes and driving nice cars then,

10  too?

11  A.  Yeah.

12  Q.  And what kind of cars were you driving then, sir?

13  A.  Lexus and an Escalade.

14  Q.  Those are your personal cars?

15  A.  Yes.

16  Q.  And when did you buy the Lexus, sir?

17  A.  My uncle bought it probably in '08.

18  Q.  Right from, right out of the box, immediately when you

19  started driving, working for him, or working with him?

20  A.  Yes.

21  Q.  You were sort of partners, is that fair to say?

22  A.  No.  It was no partner.  It was my uncle, so --

23  Q.  Well, he let you share in the profit, is that right?

24  A.  It's not sharing the profit.  I'm working for mine.  He

25  just giving me at a good price, but he wasn't sharing no

D3cWdor1                              Taylor - cross

1   profit.

2   Q.  Well, he's giving you at a low price so you can resell it

3   at a high price, is that right?

4   A.  Yes.

5   Q.  And you're getting over on the customer, so to speak, is

6   that right?

7   A.  I'm not get getting over on the customer because my uncle

8   sell it to the customer for a thousand dollars and I sell it to

9   the customer for a thousand dollars too.  So I wasn't getting

10  over on them.

11  Q.  When I say getting over, you're profiting on every sale

12  that you make, is that right?

13  A.  Oh, yes.

14  Q.  Okay.

15  A.  I was.

16  Q.  Getting back to the Lexus, sir, were you there when your

17  cousin bought that for you?

18              THE COURT:  Cousin or uncle?

19              MR. ROTH:  I'm sorry.

20  Q.  Uncle.

21  A.  At dealership?

22  Q.  Yes.

23  A.  No.

24  Q.  Did you say I want a Lexus?

25  A.  No.

D3cWdor1                         Taylor - cross

1    Q.  He just bought you a Lexus?

2    A.  Yeah.

3    Q.  How much did he pay for that?

4    A.  I didn't, I don't know.

5    Q.  What kind of Lexus was it, sir?

6    A.  It was a GS.

7    Q.  A GS?

8    A.  Yeah.

9    Q.  And was it a 2008?

10   A.  No, like '06.

11   Q.  Was it tripped out in any way?

12   A.  No, just a regular car.

13   Q.  No special rims or anything?

14   A.  Nah.  No rims.

15   Q.  So when you went into the club, sir, and people came up to

16   you and your uncle, I suppose, is that fair to say?

17   A.  No.  Me and my cousin.

18   Q.  You and your cousin.  I keep on saying -- you and your

19   cousin.  And you told them what kind of product you had, is

20   that fair to say?

21   A.  Only -- yeah, yeah, but, only I know if this guy's a

22   Jamaican, I ain't selling weed to her, so that's the only time

23   I tell them yeah.

24   Q.  So you were selective about what information you gave out

25   to potential customers, is that correct?

D3cWdor1                          Taylor - cross

1    A.  Yes.

2    Q.  But you went into these clubs not just for clubbing but to

3    promote your business, is that right?

4    A.  Yeah.  Sometimes.

5    Q.  You said that was your main source of business, is that

6    right?

7    A.  Yeah.

8    Q.  And when people came up to you, what did you tell them

9    about your product?

10   A.  I just told them I got some good Arizona.

11   Q.  So you promoted it; you promoted your product, is that

12   right?

13   A.  Sometimes, yeah.

14   Q.  Well, you wanted them to buy your product and not buy from

15   somebody else, is that fair to say?

16   A.  Yeah.

17   Q.  And you said there came a time when you bought -- somebody

18   else --

19       How did you get the Escalade?  I'm sorry.

20   A.  My uncle bought it for my cousin.

21   Q.  But you drove that as well?

22   A.  Yeah.

23   Q.  And when you say for your cousin, is that for Shea?

24   A.  Yes.

25   Q.  Duffel?

D3cWdor1                            Taylor - cross

1   A.   Yes.

2   Q.   Is that the only nickname that Shea went by?

3   A.   Yes.

4   Q.   And, by the way, do you go by any other street names?

5   A.   Yes.

6   Q.   You go by Spooky?

7   A.   Squeaky.

8   Q.   Only Squeaky?

9   A.   Yes.

10  Q.   Not Spooky?

11  A.   Squeaky.

12  Q.   What about Duffel?  Is that the only name he goes by, Shea

13  Douglas, Duffel or Duff?

14  A.   Duffel or Duff.

15  Q.   And how much, do you know how much the Escalade cost?

16  A.   No.

17  Q.   So tell the members of the jury, you said that you were

18  selling pounds.  Is that basically the quantities that you were

19  selling from 2008, from that first sale on?

20  A.   Yes.

21  Q.   You only dealt in -- you call that weight, is that fair to

22  say?

23  A.   Huh?

24  Q.   Is that fair to say, that you only dealt in weight?

25  A.   Yes.

D3cWdor1                          Taylor - cross

1   Q.  Did you keep a ledger?

2   A.  Huh?

3   Q.  Did you keep a ledger, a book of entries of how much was

4   sold, how much was bought?

5   A.  No.  That's my uncle business.

6   Q.  Well --

7   A.  That wasn't my business.

8   Q.  I'm sorry?

9   A.  That wasn't my business.  That was my uncle.  I just sell

10  his, make my money.  I put my money in my pocket or put it

11  somewhere else.  So...

12  Q.  You say it was your uncle's business, not your business?

13  A.  Yes.

14  Q.  But you and your uncle were like tight, right?

15  A.  Yeah, my uncle.  I love her, so, yeah.

16  Q.  I'm sorry.  Could you speak up?

17  A.  Yes.

18  Q.  So the next sale that you made, your average sales were how

19  many pounds during the first week or month in 2008?

20  A.  Like six, seven pounds.

21  Q.  Six or seven pounds.  And each pound was how much?  Did the

22  price fluctuate?  I'm sorry.

23      Did the price fluctuate during that period of time?

24  A.  Sometime, like around, like in, in summertime the price go

25  up from, from, from ten, from a thousand dollars to $11 dollar,

D3cWdor1                          Taylor - cross

1    to $1,100.

2    Q.  I'm sorry.  I can't hear.  If you could come up closer --

3    A.  Around the summertime, the price went up from a thousand

4    dollars a pound to 1,100 a pound.

5    Q.  And so when you sold 20 pounds, that would be a $20,000

6    deal, right?

7    A.  Yes.

8    Q.  Sometimes you did deals with 40 pounds, is that right?

9    A.  Yeah.

10   Q.  And when you made a 40-pound deal, how did you transport

11   that marijuana?

12   A.  Put it in my car and bring it to the person house, or

13   wherever they want to meet me at.

14   Q.  So you said before, you demonstrated, this is about what 40

15   pounds would be like?  I'm demonstrating with my arms, trying

16   to do what you did.

17   A.  About like that big.  Not really that big right here, but

18   like this big right here.

19   Q.  Okay.  So when you transported that in your car, is that in

20   the Escalade or the other car you had?

21   A.  Whichever car I got at the time.

22   Q.  Did you go by yourself when you transported it to the

23   buyer?

24   A.  Yes.

25   Q.  Did you conceal those drugs in the car when you went to the

D3cWdor1                         Taylor - cross

1    buyer?

2    A.  I just put it in the trunk and then I bring it to the

3    person who want it.

4    Q.  How was it packaged, sir?

5    A.  I wrapped it.  I wrapped it up and just put it in the car.

6    Q.  Was it plastic wrap?

7    A.  Yes, plastic wrap.

8    Q.  Tell the jury how that goes.

9    A.  There's a plastic wrap that you got, that two persons got

10   to hold and wrap the package, like wrapping, like, like

11   wrapping, you know, TV or something in a box, you just wrap it

12   up, you wrap it up around, around the pounds of weed.

13   Q.  Is there any type of special plastic you use, or a machine?

14   A.  Nah.  Just regular plastic from the dollar store.

15   Q.  And you wrap it up, I assume, to avoid --

16   A.  Scent.

17   Q.  The smell?

18   A.  Marijuana.

19   Q.  The smell, right?

20   A.  Yeah.

21   Q.  Trying to conceal the identity of that drug that you're

22   transporting so that you don't get busted, right?

23   A.  Yes.

24   Q.  And when you're traveling with those drugs, $40,000 worth,

25   $50,000 worth of drugs, what did you use for protection?

D3cWdor1                        Taylor - cross

1   A.  I don't got no protection.  Just went there, get it, the

2   person got it, bring it to somebody I know who ain't going to

3   rob me or anyone.  I'm going to their house, so I know that

4   they ain't going to rob me.

5   Q.  You knew every customer that you sold to for four years?

6   A.  I knew every customer who I'm going to sell, like, five or

7   ten pounds to.  I knew their family, everybody.

8   Q.  You knew their family from Jamaica?

9   A.  Nah, not really from Jamaica, but from over here.

10  Q.  How many customers did you have in 2008 when you first

11  started out?

12  A.  I got like a couple customers.  Like five, six, at the

13  time.

14  Q.  What are the names of those customers?

15  A.  I don't remember their name.

16  Q.  Well, you knew their families, is that right?

17  A.  Yeah.

18  Q.  What's the family names of those four or five customers?

19  A.  I didn't know their family like that, but I knew where the

20  family live at and everything at.

21  Q.  You got to meet these people right away when you moved up

22  there in 2008 to Massachusetts?

23  A.  No.

24  Q.  And over the course of time, did you ever carry a weapon

25  when you were transporting the marijuana?

D3cWdor1                         Taylor - cross

1   A.  No.

2   Q.  Did you ever see anyone on the other end, your buyers, have

3   a weapon?

4   A.  No.

5   Q.  These were all Jamaicans, right?

6   A.  Most of them, yeah.

7   Q.  Anyone ever have a knife?

8   A.  Never see a type of weapon.  All I did, I bring them their

9   drugs and they gave me my money.  That was it.

10  Q.  Just to be clear, this is a cash-only business, is that

11  fair to say?

12  A.  Sometime it's cash or sometime if I knew you, that you are

13  a good person, I would bring you some marijuana.  I would say,

14  All right, pay me, and he going to tell me he going to pay me

15  over the, tomorrow, or two days after.

16  Q.  Okay.

17  A.  It's not every time I went there they give me cash same

18  time.

19  Q.  But you didn't take checks?

20  A.  No.

21  Q.  You didn't take credit cards?

22  A.  No.

23  Q.  And you spent the money that you made for yourself, is that

24  right?

25  A.  Yes.

D3cWdor1                        Taylor - cross

1   Q.  By the way, you were talking before about legitimate jobs.

2   When was the last time you had a legitimate job?

3   A.  In '05.  '05.

4   Q.  That's eight years ago?

5   A.  Yes.

6   Q.  And since then, you've just been supporting yourself as a

7   marijuana dealer, is that right?

8   A.  Yes.

9   Q.  And would you say that that was your career goal, to

10  continue to be a marijuana dealer?

11  A.  No.

12  Q.  It was not your career goal?

13  A.  No.

14  Q.  Your uncle, you said, or you got the marijuana from

15  Arizona, is that correct?

16  A.  I said I don't know if it's Arizona or Texas or Cali.  It's

17  over one of those places.  I don't know exactly where at.

18  Q.  Well, did he send you to pick up the marijuana that you

19  were getting?

20  A.  From where?  From California?  No.  Not from California.

21  Q.  What about Arizona?

22  A.  Nah.  Only from the Bronx, New York.

23  Q.  So is that where all your marijuana came in from, from the

24  West Coast to the Bronx?

25  A.  Sometimes.

D3cWdor1                          Taylor - cross

1    Q.  Where else did it come in from?

2    A.  Sometime it came from over there to street in Springfield.

3    Q.  Into Massachusetts?  Where else?

4    A.  In Connecticut.

5    Q.  Springfield, Connecticut?

6    A.  No.

7    Q.  Springfield, Massachusetts?  And where in Connecticut?

8    A.  In Bridgeport.

9    Q.  And my question to you, sir, is:  Did he send you to pick

10   up the big shipments of marijuana that were coming in from the

11   West Coast?

12   A.  No.

13   Q.  How did he get them?

14   A.  I don't know.  I got no idea how.

15   Q.  You never spoke to him about it?

16   A.  Yeah, but I never asked him, like, where, where is the

17   product coming.

18   Q.  Well, you said you had to pick it up in the Bronx, is that

19   right?

20   A.  Yeah, but not a large quantity.  Just like 40 pounds, 50

21   pounds of stuff.

22   Q.  And when you went down to the Bronx to pick it up, did you

23   know who you were picking it up from?

24   A.  Yes.

25   Q.  Who were you picking it up from in the Bronx?

D3cWdor1                          Taylor - cross

1   A.  One of his friends.

2   Q.  I'm sorry?

3   A.  One of his friends.

4   Q.  What was the friend's name?

5   A.  I don't know.

6   Q.  You had to make the contact, didn't you?

7   A.  Yeah.

8   Q.  How did you make the contact to pick up weight in the

9   Bronx?

10  A.  My, my uncle call his friends and tell me to meet him

11  somewhere and then I went there, park up.  The guys come to

12  pull up.  I open my trunk, and they put the marijuana in my

13  trunk of the car, and I just drive off.

14  Q.  Well, did you leave something out in that recounting of the

15  story?  You had to pay him some money, didn't you?

16  A.  No.

17  Q.  So you got it all fronted from him?

18  A.  I just went to pick it up.

19  Q.  Okay.  Who paid him?  Who paid your supplier?

20  A.  I got no idea who paid him.  I just went and picked it up.

21  Q.  And what's the largest quantity of marijuana that you saw

22  in the house that you were living at during that period of

23  time?

24  A.  I don't know exactly how much I saw, but I know I saw a lot

25  of marijuana.  But I didn't measure it, so I didn't know how

D3cWdor1                         Taylor - cross

1    much I saw at the time.

2    Q.  Well, did you ever tell the government you saw hundreds of

3    pounds in the house at one point?

4    A.  No.

5    Q.  What's the most that you told the government that your

6    uncle had, or you had in that house that you lived in at the

7    time?

8    A.  Told them like hundred pounds.

9    Q.  A hundred pounds?

10   A.  Yes.

11   Q.  Now getting back, so we can do the math a little, if you

12   were selling up to a hundred pounds a month from 2008 to 2012,

13   a hundred pounds a month is 1,200 pounds a year, or so, is that

14   right?

15   A.  Yeah, but I wasn't selling a hundred pounds every month.

16   The problem is my uncle have weed every month and sometimes

17   your business bad.  It's not every month.  Me and my uncle

18   going to sell a hundred pounds, sometimes we only sell 20, ten

19   pounds, for the month.  That's business.  Sometime business

20   bad.  Sometime business boom.

21   Q.  It fluctuates?

22   A.  Yeah.

23   Q.  But, on an average, you were selling 20 to 30 pounds a

24   week?

25   A.  Yeah.  Sometimes.

D3cWdor1                         Taylor - cross

1    Q.  And so over the course of those four years, can you

2    approximate how many kilos you sold --

3    A.  No.

4    Q.  Or pounds?  You have no idea?

5             THE COURT:  You have to say yes or no.

6             THE WITNESS:  No.

7    BY MR. ROTH:

8    Q.  Can you agree that a kilo is 2.2 pounds?

9    A.  Pound, 16 ounces in a pound.

10   Q.  Right.  16 ounces in a pound?

11   A.  Yeah.

12   Q.  And a kilo is 2.2 pounds?

13   A.  Mm-hmm.  Yes.

14   Q.  Do you know that, what we call conversion, the way of

15   getting from pounds to kilos?

16   A.  No.

17   Q.  Well, you pled guilty.  You told us on direct examination,

18   in response to a question from the government, that you pled

19   guilty to selling, over the period of time during your

20   conspiracy, 1,000 or more kilos of marijuana during that period

21   of time.

22   A.  Yes.

23   Q.  How did you determine that number to be able to, under

24   oath, before a judge in this courthouse, admit to selling over

25   a thousand kilos of marijuana?  How did you come to that

D3cWdor1                         Taylor - cross

1    number?

2    A.   Because I know in my time of years selling marijuana, I

3    sell more than a thousand pounds.

4    Q.   Well, a thousand pounds, we just decided, determined, is

5    not a thousand kilos.  A kilo is more than a pound, right?

6    A.   Yeah.

7    Q.   A kilo is 2.2 pounds, right?

8    A.   Mm-hmm, yes.

9    Q.   So my question to you, sir, is before you pled guilty, I

10   assume you had extensive or a lot of conversations with your

11   lawyer who was representing you at the time.  Is that correct?

12   A.   Yes.

13   Q.   And he went over what you were going to plead guilty to in

14   respect to the marijuana case, charge, is that right?

15   A.   Yes.

16   Q.   And, correct me if I am wrong, you understood that you were

17   pleading guilty to selling and possessing with the intent to

18   sell over that period of the conspiracy to over a thousand

19   kilos, is that right?

20   A.   Yes.

21   Q.   Now my question to you, sir, is:  How did you get to that

22   number so that you were confident that, when you took the oath

23   and admitted guilt to that charge, that you sold over a

24   thousand kilos during that period of time?

25   A.   Because I know I sold more than a thousand pounds, so I

D3cWdor1                         Taylor - cross

1    thought like everything add up to a thousand kilos.

2    Q.  How did you add that up, sir?

3    A.  I just did.  That was it.  I didn't add it up.  I just

4    think it was that amount.

5    Q.  Before you took your plea of guilty in this courthouse to

6    that charge, the conspiracy to distribute over a thousand kilos

7    of marijuana, did you have an understanding what the United

8    States Sentencing Guidelines was?

9    A.  Yes.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3C5dor2                            Taylor - cross

1    BY MR. ROTH:

2    Q.  And what is your understanding, if you could share it with

3    the jury, of what the United States Sentencing Guidelines are?

4    A.  10 years to life.

5    Q.  Well, that's your understanding what the United States

6    Sentencing Guidelines is?

7    A.  Yes.

8    Q.  When you took the plea before the Court, the Court asked

9    you whether you understood what your penalties for this charge

10   were, is that correct?

11   A.  Yes.

12   Q.  And the Judge asked you what the statutory penalties were,

13   right?

14   A.  Yes.

15   Q.  And that's what the laws are; and then the Judge also asked

16   you had your lawyer explained to you and did you understand --

17   the Judge may have used the fancy words -- the application or

18   how the guidelines -- United States Sentencing Guidelines

19   affected your case and your sentence.

20            Do you remember being asked those questions?

21   A.  Yes.

22   Q.  And you said at the time that you understood the United

23   States Sentencing Guidelines; is that right?

24   A.  Yes.

25   Q.  And have you ever seen, sir, either been shown by your

D3C5dor2                    Taylor – cross

1    lawyer or sitting in jail looking at the guidelines chart?  The

2    Sentencing Guidelines chart?

3    A.  Yes.

4    Q.  And the Sentencing Guidelines chart is a, what we call a

5    matrix; it has a lot of numbers going down one side and a lot

6    of numbers going out the other side, is that right?

7    A.  Yes.

8    Q.  That's the guidelines, that's not the law; is that right?

9    A.  Yes.

10   Q.  And what is your understanding about how that chart works?

11   A.  What do you mean by how does the chart work?

12   Q.  In simple terms how it affects the potential sentence that

13   you can get based on your plea of guilty to the -- we are just

14   talking now about the conspiracy to possess and distribute

15   marijuana.

16   A.  That mean I would get life in prison.

17   Q.  Does the guideline say that?

18   A.  Yeah.  That's the law.  Yeah.

19   Q.  Is it not a fact, sir, that the guidelines and the sentence

20   is determined by the quantity of marijuana?

21   A.  Yes.

22   Q.  So there had to be a number, a guideline number assigned to

23   that charge that you pled guilty, is that correct?

24   A.  Yes.

25   Q.  And what was your understanding, based on your conversation

D3C5dor2                          Taylor - cross

1   with your attorney, before you pled guilty as to what the

2   guideline number was -- United States Sentencing Guideline

3   number was for that count of conspiracy to sell marijuana?

4   A.  10 years to life.

5   Q.  I'm going to go back to the chart that you were talking

6   about, the guidelines chart.  That doesn't say anything about

7   10 years to life, does it?

8   A.  I don't remember.  I don't remember what the chart say.

9   Q.  But you've seen -- how many times have you looked at a

10  guidelines chart?

11  A.  Maybe once.  Twice.

12  Q.  But you thoroughly went over it with your lawyer before you

13  pled guilty and answered the Judge's questions; is that right?

14  A.  Yes.

15  Q.  And you told the Judge you understood the guidelines, is

16  that right?

17  A.  Yes.

18  Q.  Do you understand whether the guidelines are what we call

19  mandatory, the Judge has to follow it?  Or whether they're what

20  we call discretionary and he doesn't have to follow up on it?

21  A.  It is mandatory.

22  Q.  The guidelines are mandatory?

23  A.  Yes.

24  Q.  And who told you that?

25  A.  My lawyer.

D3C5dor2                          Taylor - cross

1    Q.  Did the Judge tell you that what you pled guilty to before?

2    A.  I think she did.  I don't remember.

3    Q.  You're not sure?

4    A.  Yeah, I'm not sure.

5    Q.  By the way, do you smoke pot?

6    A.  No.

7    Q.  You never smoked pot?

8    A.  Try it one time.

9    Q.  Is it fair to say that Mr. Barrett smokes a lot of pot?

10   A.  Yes.

11   Q.  So, I would call somebody who smokes a lot of pot a

12   pothound.  What would you call somebody who smokes a lot of

13   pot; a Jamaican.

14   A.  That's just him.  He likes to smoke.

15   Q.  He likes to smoke.

16          And when you say likes to smoke, Mr. Barrett likes to

17   smoke every day, is that fair to say?

18   A.  Yes.

19   Q.  And you were his connect, you were during that period of

20   time?

21   A.  No.

22   Q.  Well, you were selling him pot, is that right?

23   A.  Sometimes.

24   Q.  Sometimes.

25   A.  Yes.

D3C5dor2                      Taylor - cross

1   Q.  And Mr. Barrett would call you to get pot if he didn't have

2   pot or he needed pot, is that right?

3   A.  Yes.

4   Q.  Is it fair to say he would call you many times and hound

5   you to get pot until he got an answer from you whether you had

6   pot or not?

7   A.  No.

8   Q.  Well, if -- he wouldn't call you on a regular basis to get

9   pot?

10  A.  If he knew that I got it, yes, he would.

11  Q.  And, did you know him to resell pot to other people that

12  you gave him?

13  A.  No.

14  Q.  He never resold small quantities?

15  A.  No.

16  Q.  And what kind of weight did you sell Mr. Barrett at that

17  time?

18  A.  Like ounces, quarters, and stuff.

19  Q.  Small amounts?

20  A.  Yes.

21  Q.  How many times did you sell him pot?

22  A.  Numbers of times.  I don't remember how many times -- like

23  the times.

24  Q.  Let's turn to the first time that the feds came knocking on

25  your door in Connecticut; that was in July of 2012, is that

D3C5dor2                        Taylor - cross

1   correct?

2   A.  Yes.

3   Q.  By the way, when the feds came knocking on your door there

4   was a Mercedes Benz sedan in the driveway, is that right?

5   A.  Yes.

6   Q.  And whose Benz was that?

7   A.  Mine.

8   Q.  That was your Benz?

9   A.  Yes.

10  Q.  And how did you get that Benz?

11  A.  My uncle bought it for me.

12  Q.  So this is another car besides the Escalade and the Lexus?

13  A.  Yes.

14  Q.  When did he buy that car for you?

15  A.  In '09.

16  Q.  And he bought it straight out; you weren't making any

17  payments on that, is that right?

18  A.  No.

19  Q.  Who was that car registered to?

20  A.  My cousin's name.

21  Q.  Is it fair to say, sir, that on July 11, 2012, when the

22  feds came knocking at your door for the first time that at that

23  time you went into survival mode?

24  A.  No.

25  Q.  You didn't start thinking:  *I've got a real problem.  I*

D3C5dor2                          Taylor - cross

1    have to do what I can to get out of this?

2    A.  No.

3    Q.  Is it fair to say, sir, at the first time -- when I say the

4    feds, isn't it a fact that Anthony came to your house?

5    A.  Yes.

6    Q.  So that's one of the feds we're talking about, is that

7    correct?

8    A.  Yes.

9    Q.  And they asked you a lot of questions right then and there,

10   is that right?

11   A.  Yes.

12   Q.  And you told them, in that very first encounter with the

13   feds that you wouldn't lie to them, is that correct?

14   A.  Yes.

15   Q.  And then you proceeded to lie, is that correct?

16   A.  Yes.

17   Q.  You proceeded to lie that day not just about one thing or

18   two things but about a lot of things, is that right?

19   A.  Yes.

20   Q.  And you were lying to try to keep yourself out of jail, is

21   that fair to say?

22   A.  Yes.

23   Q.  And in those lies you started pointing fingers at other

24   people, is that right?

25   A.  At the time, no, I wasn't pointing no fingers at the time.

D3C5dor2                         Taylor - cross

1   Q.  You told them -- who did you tell them owned that Benz that

2   was in your driveway?

3   A.  I told them it was mine.

4   Q.  You didn't tell them it was Randy's?

5   A.  I told them my cousin just got the Benz.

6   Q.  I'm sorry, can you speak up?  I can't hear you.

7   A.  I told them my cousin put it in his name for me and my wife

8   because my wife didn't have a license.  So, that's why.

9   Q.  I apologize.  I can't hear the last part of that answer.

10  A.  I told the feds that my cousin put it in his name because

11  me and my wife didn't have a license, so that's why my cousin

12  put it in his name for us.

13  Q.  You didn't have a license.  You couldn't drive that car?

14  A.  Yeah; but I was driving it.

15  Q.  Well, you were driving without a license?

16  A.  Yes.

17  Q.  That's what we're talking about, risky behavior, is that

18  fair to say?

19  A.  Yes.

20  Q.  And you didn't have any identification with you that day,

21  is that correct?

22  A.  No.

23  Q.  And why didn't you have any identification, sir?

24  A.  Because I didn't got no papers so I didn't got no I.D.

25  Q.  You started -- when I say you started to point at other

D3C5dor2                          Taylor - cross

1    people they were asking you at that time where Shea Douglas

2    was, is that correct?

3    A.   Yes.

4    Q.   You didn't tell them he was your cousin, is that right?

5    A.   At first, no.

6    Q.   Well, I'm talking about the very first time when you

7    started to -- when Anthony came knocking on your door and you

8    said you were going to tell the truth but you started to lie

9    and that's one of the lies that you told them, is that right?

10   A.   No.

11            At first they came in my house asking me for my cousin

12   and if I know anybody by the name of Squeaky.  I told them no.

13   So, at the time I never told them I was going to lie or I never

14   told them I was going to tell the truth because the problem is

15   I never knew why they was at my house.

16   Q.   You didn't know why they were at your house on July 11,

17   2012, the feds were knocking on your door?

18   A.   No, because my cousin was always having cops come to my

19   house so I never know if it was one of his court problems or

20   what because the cops never told me they was here for a robbery

21   or not.

22   Q.   The feds -- the feds are different than the cops, is that

23   right?

24   A.   The feds never told me if they was here at my house for a

25   robbery.  They just came with a picture of my cousin and asked

D3C5dor2                          Taylor - cross

1   me if I knew him.

2   Q.   The feds had never come to your cousin's house, the house

3   you were staying at before, is that right?

4   A.   In Springfield?

5   Q.   Yes.

6   A.   Yes, they came there too.

7   Q.   Now, I'm talking about when they came to your house this

8   time on July 11.

9   A.   Yes.

10  Q.   No.   The feds had never been there before, is that right?

11  A.   No, the regular police.

12  Q.   The regular police.   This is why I say this is the first

13  time the feds came knocking, is that right?

14  A.   Yes.

15  Q.   And you say you don't know anyone named Squeaky and you are

16  Squeaky, is that right?

17  A.   Yes.

18  Q.   And they said specifically to you that they were looking

19  for Shea Douglas, is that right?

20  A.   Yes.

21  Q.   And they asked you specifically what street names does he

22  go by, is that right?

23  A.   Yes.

24  Q.   And you lied, is that correct, about what street names he

25  goes by?

D3C5dor2                          Taylor - cross

1   A.  I told them his name is Shea Douglas.  That was it.

2   Q.  Didn't you tell them, sir, that his name was David?

3   A.  No.  I told them that's my name, David.

4   Q.  Oh.  You told them your name was David?

5   A.  Yes.

6   Q.  Not Squeaky?

7   A.  Yes.

8   Q.  And not Patrick Taylor?

9   A.  Yes.

10  Q.  So you lied about your identity?

11  A.  Yes.

12  Q.  By the way, this is not the first time that you lied to law

13  enforcement, is that correct, to get out of trouble?

14  A.  No.

15  Q.  In fact, you testified on direct examination that in 2008

16  you were arrested in Springfield for marijuana, is that right?

17  A.  Yes.

18  Q.  And at that time, sir, correct me if I'm wrong, but you

19  used somebody else's identity that time when you were arrested,

20  is that correct?

21  A.  Yes.

22  Q.  That's sort of like sort of laying the blame off on

23  somebody else, is that fair to say?

24  A.  Yeah.

25  Q.  There is no question about that, right?

1   A.   Uh-huh.

2   Q.   You are trying to get the other person in trouble and you

3   out of trouble, is that right?

4   A.   Not really, but at the time because I didn't have no papers

5   and I didn't want to go back to Jamaica, so that was my first

6   ever I ever get in any type of trouble so I was scared so I

7   just told them my cousin's name.

8   Q.   Which cousin was that?

9   A.   My cousin Humroy Bennett.

10  Q.   What's the name?

11  A.   Humroy Bennett.

12  Q.   Where does he live?

13  A.   Live in Philadelphia.

14  Q.   When you say that was the first time you got in trouble

15  that time when you were arrested --

16  A.   Yes.

17  Q.   -- it is not the first time that you had been committing

18  criminal actions, is that correct?

19  A.   By the time, no.  I was selling marijuana.

20  Q.   You already were already dealing big-time weed, is that

21  right?

22  A.   Yes.

23  Q.   And, you went in to court and the court is something like

24  this and you appeared in front of a Judge and said you were

25  somebody who you weren't.  You assumed a different personality,

D3C5dor2                          Taylor - cross

1    different name; is that right?

2    A.  Yes.

3    Q.  And can you tell the jurors what the exact charges were?

4    Do you recall?

5    A.  Marijuana.

6    Q.  And what was the penalties you were facing then?

7    A.  Probation or a fine.

8    Q.  What is the status of that case?  What happened in that

9    case?

10   A.  I know that my cousin pay a fine but I never went back to

11   court.

12   Q.  So as far as you know there is a bench warrant on the case?

13   A.  Yes.

14   Q.  And so, you have been a fugitive on that case this entire

15   time?

16   A.  Yes.

17   Q.  The first time that the feds were knocking on your door

18   July 11th, 2012, you immediately started to concoct a story to

19   stay out of trouble, is that right?

20   A.  Yes.

21   Q.  And you made up some story about New Year's Eve, is that

22   correct?

23   A.  Yes.

24   Q.  And you said how you were down in the City for some party

25   or something?

1   A.  No.  I told them that me and my cousin went there to

2   meet -- no, me and my cousin went there to the barber shop to

3   get a hair cut, went to Jabba's barber shop to get a hair cut

4   to go back to a party in Connecticut.

5   Q.  And that was a lie, right?

6   A.  No.  That was true.

7   Q.  But that was only partially true?

8   A.  Partial, yes.

9   Q.  And, by the way, when you spoke to the U.S. Attorney, and

10  we'll get to those many times that you spoke to the U.S.

11  Attorney, at the sessions they were called -- before you signed

12  your plea agreement before you were able to strike a deal with

13  them, those were called what we call proffer sessions, is that

14  right?

15  A.  Yes.

16  Q.  And at every one of those proffer sessions at the very

17  beginning of the proffer session when the U.S. Attorney was

18  there and the special agent was there and you had an attorney

19  there you signed a document each time, is that correct?

20  A.  Yes.

21  Q.  And every time at the beginning, the very beginning of that

22  proffer session they went over the ground rules for you as to

23  how you had to conduct yourself in those proffer sessions, is

24  that right?

25  A.  Yes.

D3C5dor2                          Taylor - cross

1   Q.  And one of the things that they told you each and every

2   time during the half a dozen or more proffer sessions was that

3   it was a separate, independent crime to lie to a federal

4   officer, is that right?

5   A.  Yes.

6   Q.  And you understood that, is that correct?

7   A.  At the time I never really understand what's really going

8   on.  I never really know what's going on, I just thought the

9   feds just want to -- want to be just caught up in everything

10  and tell them everything.

11  Q.  If you can come close closer to the mic?  I can't hear you,

12  sir.

13  A.  Because at the time -- I never really trust the feds.  I

14  didn't know if they was telling me the truth, they just want me

15  to tell them everything that happened.

16          THE COURT:  Are we talking about the proffer sessions

17  or are we talking about the first time you were approached?

18          THE WITNESS:  The first time.

19          THE COURT:  First time?

20          THE WITNESS:  At the home.

21          THE COURT:  Are you talking about the proffer

22  sessions?

23  BY MR. ROTH:

24  Q.  I'm talking about when you were sitting in the room for

25  over six different times with these prosecutors and Anthony and

D3C5dor2                              Taylor - cross

1   they told you you can't lie to a federal officer or that's a

2   separate crime.  Do you remember that?

3   A.  Yes.

4   Q.  And you're saying -- and correct me if I'm wrong, you're

5   saying to me that during these sessions at first you didn't

6   feel that you understood what was happening?

7   A.  Yes.

8   Q.  Did you -- did the prosecutors each and every time tell you

9   at the beginning of the session that if at any time you didn't

10  understand or you had a concern about what you were saying,

11  that you had the opportunity to call a time out, leave the

12  session with your lawyer, and then come back in or stop the

13  session?

14  A.  Yes.

15  Q.  They gave you that option, is that correct?

16  A.  Yes.

17  Q.  So that at any time that you were confused you could just

18  say time out, I need to speak to my lawyer, or you can stop

19  speaking.  Is that right?

20  A.  Yes.

21  Q.  And, sir, did they also tell you when they told you that

22  you can't lie or it would be a crime to lie to them, did they

23  tell you that there is two types of lies?

24  A.  I don't remember.

25  Q.  Well, did they tell you that there is an outright lie and

D3C5dor2                          Taylor - cross

1   there is a lie by what we call omission or by leaving something

2   out?

3   A.  I think so.  Yeah.

4   Q.  Well, for example, they told you that if they ask you a

5   question of did you have a gun on December 31st and you said no

6   but you had a gun on the next day, that they'd consider this a

7   lie?

8           THE COURT:  Did they say that?

9           THE WITNESS:  Can you repeat that, please?

10  Q.  Well, they said that if you failed to say something in

11  response to a question --

12  A.  Yeah.

13  Q.  -- that can be the same as a lie if you're holding back

14  information?

15  A.  Yes.

16  Q.  And you understood that.  Is that correct?

17  A.  Yes.

18  Q.  And you told the feds early on, the first time that they

19  stopped you in July, that --

20          THE COURT:  Now, before the proffer sessions?

21          MR. ROTH:  I will pinpoint, Judge.

22          THE COURT:  I don't want the jury confused as to what

23  took place in proffer sessions and what took place at the

24  house.

25          MR. ROTH:  I appreciate that, your Honor, and I will

D3C5dor2                         Taylor - cross

1    do so.

2    BY MR. ROTH:

3    Q.  After the July 11 meeting, 2012, with the agents, you came

4    downtown and spoke to the prosecutors on July 19th about a week

5    later.  Do you recall that?

6    A.  Yes.  Yes.

7    Q.  And, at that time you said you were with somebody named

8    Rahim, is that right, on New Year's Day?

9    A.  Rahim?  I never say Rahim.  I don't think so.  I don't

10   remember saying Rahim.

11   Q.  Well, is it possible you don't remember the name Rahim

12   because you just made up the name?

13   A.  Might.

14   Q.  I'm sorry?

15   A.  Yes.

16   Q.  And, you told them you basically were trying to create an

17   alibi at that time for New Year's Day, is that right?

18   A.  I wasn't creating no alibi because I knew me and my cousin

19   came here and after that me and my cousin went back to

20   Bridgeport and went to the club.

21   Q.  Well, you told them you were coming down to buy weed for

22   yourself for personal use?

23   A.  No.  I told them it was Blaqs' birthday and I was going to

24   give Black some weed for him to smoke.

25   Q.  You never told them that you bought weed from Jerome on

D3C5dor2                    Taylor - cross

1   Mickel Avenue?

2   A.  No.  I told them I used to buy weed from somebody on Mickel

3   Avenue but I never told them I buy weed that day.

4   Q.  It is clear, sir, that you didn't tell them that on New

5   Year's Day you were participating in robberies, is that right?

6   A.  No.

7   Q.  "No" meaning, yes, you didn't tell them that?

8   A.  Yes, I did.

9   Q.  Okay.

10          Sir, you told them that you knew Tall Man was involved

11  in rap music, is that right?

12  A.  Yes.

13  Q.  And you told them that Biggs was involved in rap music, is

14  that right?

15  A.  Yes.

16  Q.  And you just saw one of their rap videos, is that right?

17  A.  Yes.

18  Q.  And have you seen other rap videos of theirs?

19  A.  Yes.

20  Q.  Is it fair to say, sir, that you were basically successful

21  in holding off the feds from July 2012 until just this year

22  when you came down and started meeting with them?

23          THE COURT:  I don't understand holding off the feds.

24  Can you be more specific?

25  Q.  You were still in the streets, right?

D3C5dor2                          Taylor - cross

1   A.  Yes.

2   Q.  So you were not charged with any of the crimes that you had

3   committed, is that right?

4   A.  Yes.

5   Q.  So you were successful in staying out of jail, is that

6   right?

7   A.  At the time, yes.

8   Q.  And the government, on direct, asked you about a time when

9   you got an attorney, is that right?

10  A.  Yes.

11  Q.  That was an attorney that was given to you by the

12  government, is that right?

13  A.  Yes.

14  Q.  You didn't pay for that lawyer, right?

15  A.  No.

16  Q.  And how did you get that lawyer?

17  A.  By the government.

18  Q.  This government here?

19  A.  Yes.

20  Q.  They arranged for you to have a lawyer, is that right?

21  A.  Yes.

22  Q.  It wasn't just that you decided you wanted to come and

23  speak to the government and confess to your crimes, is that

24  fair to say?

25  A.  No.

D3C5dor2                              Taylor - cross

1   Q.  You knew that you had a situation that had to be dealt with

2   and you were trying to do whatever you could to stay out of

3   jail, is that correct?

4   A.  For the time being, yeah.

5   Q.  Well, that's your goal, is to stay out of jail; is that

6   right?

7   A.  Yes.

8   Q.  Now, on January 13th -- I'm sorry -- on January 10th, when

9   you first proffered with the government at that time, sir, you

10  have testified on direct that you knew that several people were

11  charged and indicted for this case, is that right?

12  A.  Yes.

13  Q.  For the robberies, right?

14  A.  Yes.

15  Q.  By the feds, right?

16  A.  Yes.

17  Q.  And you knew that because Shea Douglas -- Duff, your

18  cousin -- told you that, right?

19  A.  Yes.

20  Q.  And you knew when the feds came to you the first time in

21  July why they were looking for Shea Douglas, is that right?

22  A.  No.

23  Q.  You said that yesterday on direct examination.  You said

24  specifically did you know why the feds were looking -- you

25  answered the question:  Did you know why the feds were looking

D3C5dor2                         Taylor - cross

1    for Shea Douglas?  And you told this jury:  No, you did not

2    know.

3                Is that correct?

4    A.  At the time I never know why the feds was looking for my

5    cousin because I didn't know my cousin was in any type of

6    trouble because I never know if it was because of the robbery

7    or what until the feds told me why and then I knew why.

8    Q.  Isn't it a fact, sir, that in January of 2012, after

9    Mr. Barrett was arrested --

10   A.  In January of 2011?

11   Q.  In January.

12   A.  Of 2011, yes.

13   Q.  In January?

14               THE COURT:  Of what year?

15   A.  Of '11.

16   Q.  Of '11?

17   A.  Yes.

18   Q.  January 2012 was last year that he was arrested, right?

19   A.  Yes.

20   Q.  Are we clear on the years now?

21   A.  Yes.

22   Q.  The feds came to you in 2012, right?

23   A.  Yes.

24   Q.  In the summer?

25   A.  Yes.

1   Q.  And your testimony to this jury yesterday was that you

2   didn't know why they were looking for your cousin Shea Douglas.

3   A.  At the time I told them at the time I never knew why until

4   the feds told me why.

5   Q.  But you testified -- correct me if I'm wrong.  After

6   Mr. Barrett and the others you testified -- you said Jerry got

7   arrested, right?

8   A.  Yes.

9   Q.  You said Ali got arrested, right?

10  A.  Yes.

11  Q.  And you said Blaqs got arrested, right?

12  A.  Yes.

13  Q.  And you said Biggs got arrested, right?

14  A.  Yes.

15  Q.  And you knew that in January of 2012 right after they got

16  arrested, is that right?

17  A.  Yes.

18  Q.  And you knew that because Shea Douglas -- Duff, your

19  cousin, co-conspirator robber -- came to your house right after

20  that arrest and told you that, right?

21  A.  And told me that Blaqs and them get locked up but I never

22  knew that the cops is going to come to my house looking for my

23  cousin.

24  Q.  Or you?

25  A.  Or me.

D3C5dor2                              Taylor - cross

1   Q.  Well, when you say he told you that they had gotten locked

2   up by the feds --

3   A.  Yes.

4   Q.  -- you guys did a little of your own investigation about

5   the case as well, is that correct?

6   A.  Yes.

7   Q.  Which is to say you Googled the case, is that right?

8   A.  Yes.

9   Q.  Because you didn't Google Tall Man, is that fair to say?

10  A.  No.

11  Q.  So, you knew Mr. Barrett's real name, is that right?

12  A.  No.  I went and the Yonkers newspaper and I seen everything

13  right there.

14  Q.  And then so you and Mr. Douglas -- Duff -- were Googling

15  and researching what the charges were that the feds had against

16  them concerning the robberies and the victims and the

17  incidences and the times and the locations.  You knew all that

18  in January before -- six months before the feds came knocking

19  at your door?

20  A.  Yes, I did.

21  Q.  So Shea was up there -- Duff was up there with you, the two

22  of you were up there --

23  A.  Yeah.

24  Q.  -- and is it fair to say you were discussing whether you

25  guys were going to get grabbed?

D3C5dor2                    Taylor - cross

1    A.  Not really, because we know that Tall Man and Blaqs

2    wouldn't told that we was in the robbery so that's why I, my

3    cousin was feeling safe, and me.

4    Q.  You were feeling safe then in January, but then when the

5    feds came knocking on your door --

6    A.  Yes.

7    Q.  -- you were still feeling safe?

8    A.  Yes, because I never knew it was the feds.  I only knew

9    they was cops outside asking me if my cousin -- plain clothes

10   cops, and they was always coming to my house asking me for my

11   cousin in the past so I thought it was just regular police.

12   Q.  Are you telling me, sir, that the special agent who has

13   been sitting there for the whole trial but not right now --

14   A.  Yeah.

15   Q.  -- didn't identify himself and say I'm a special agent

16   with ATF?

17   A.  No.

18   Q.  None of the agents who were there?

19   A.  They just came to my house like around 6:00, knocked on my

20   door, asked me if my -- asked my wife who was inside of the

21   house and my wife told him it was me and she and the kids; and

22   then show my wife a photo of my cousin and asked her if my

23   cousin was inside.  My wife told them no.  So, they asked her

24   if they could come take a look in the house.  My wife told them

25   yes.

D3C5dor2                              Taylor - cross

1              So, they were just talking to us like regular talking

2      to us.

3      Q.  Well, they were asking you specific questions, is that

4      right?

5      A.  Yes.

6      Q.  Your wife was cooperative but you weren't cooperative, is

7      that right?

8      A.  Yeah.

9      Q.  You said you were going to not tell a lie but you started

10     to lie.  You knew where Shea Douglas was at that time?

11     A.  Yeah.

12     Q.  You knew where he was and you told them you didn't, in

13     July, know where Duff was?

14     A.  I know he was in Springfield but I never know exactly where

15     at in Springfield he was.

16     Q.  Wait.

17             Shea Douglas -- Duff -- he is your partner since '08,

18     is that right?

19     A.  Yes.

20     Q.  You say he was selling weed with you and he was committing

21     robberies with you.  Not only is he your boy, he's your blood,

22     he is your cousin; is that right?

23     A.  Yes.

24     Q.  And you have been talking and discussing the fact that

25     other people that you knew who you say you were doing robberies

D3C5dor2                        Taylor - cross

1    were busted by the feds, right?

2    A.  Yes.

3    Q.  So you guys were always -- you never lost contact with him?

4    A.  No.  Never.

5    Q.  So you knew where he was.

6            Now --

7            THE COURT:  Wait.  Is that a question or is that --

8            MR. ROTH:  Is that a question?  Yes, it is a question.

9    Q.  You knew where he was at the time?

10   A.  I knew he was in Springfield, Mass, but that was it.

11   Q.  You knew how to contact him, is that fair to say?

12   A.  Yeah.  By phone.  Yeah.

13   Q.  Right; and you didn't tell the feds this is how you can get

14   him or I can call him up for you, did you?

15   A.  I did.  I told them I got his number, my cousin's number.

16   Q.  Well, you didn't, even when they asked you in July of 2012

17   when they asked you what your own telephone number was for the

18   period of time in question, you didn't even acknowledge what

19   your telephone number was at first, is that right?

20   A.  Yes.

21   Q.  You lied about that, right?

22   A.  I didn't remember it.  Nah.  I didn't lie.  I didn't just

23   remember my number.  I know they got a 518 number.  That was

24   it.

25   Q.  Well, how long did you have that 518 number, sir?

D3C5dor2                        Taylor - cross

1   A.  Couple of months.

2   Q.  Just a couple of months?

3   A.  Yes.

4   Q.  But you're pretty good with dates and times and numbers?

5   A.  No.

6   Q.  You testified on direct you had no trouble going through

7   the dates of these alleged robberies, right?

8   A.  No.  I said here from '03 to '08 I was good until now.

9   Q.  Now, I'm talking about when you testified on direct

10  testimony yesterday about the dates and times of alleged

11  robberies that you participated in; you were able to get those

12  dates and times out like that, is that right?

13  A.  Yeah, because just two of them.

14  Q.  Just two of them?

15  A.  Yes, just two robberies because it was on New Year's --

16  Q.  Which two robberies?

17          THE COURT:  Well, let him finish.  Let him finish.

18  A.  It was December 31st, New Year's night, and October the

19  29th, the snowy day.  So, I knew those ones.

20  Q.  Well, you also rehearsed those answers to those questions

21  with the government before, is that right?

22  A.  Yes.  I always knew those two.

23  Q.  By the way, on that snowy night that you said?

24  A.  Snowy day.

25  Q.  Snowy day.  I'm sorry, the snowy day.  You said the snow

1    was five feet high, is that right?

2    A.  No.  I said it was like around five feet.  It was high.

3    Q.  Five feet high?

4    A.  I said yeah, like that.  I never know exactly how much it

5    was but it was bad outside.

6    Q.  You knew when they first started talking to the feds in

7    January of this year, January 10, that they wanted information

8    about the robberies, is that right?

9    A.  Yes.

10   Q.  They needed your help to help them try to fill in the

11   blanks to make their case, is that right?

12   A.  Yes.

13   Q.  And you knew at that time, sir, that they didn't have

14   anybody who identified any victims who said Mr. Barrett robbed

15   them, did you?

16   A.  I don't got no idea.  I don't know.

17   Q.  Do you recall, sir, that you told them at first from bits

18   and pieces of what you had heard from others about the

19   Radcliffe robbery, that is the snowy day robbery?

20   A.  Yes.

21   Q.  And by the way, the party house that you referred to

22   before, describe for us, if you will, what went on in that

23   party house.

24   A.  It is a house that everybody come to buy weed, play

25   dominos, have parties, got girls over there.  Like it's an open

D3C5dor2                          Taylor - cross

1   house where anybody could come to.

2   Q.  That's where you sold weed there, is that right?

3   A.  Couple times.  Yeah.

4   Q.  When you had the weed you sold it there, is that right?

5   A.  Yes.

6   Q.  And you crashed there, is that right?

7   A.  Yes.

8   Q.  And is that a place where people would sort of kick back

9   and shoot the breeze or chill?

10  A.  Yes.

11  Q.  And you yourself, do you drink?

12  A.  Like not -- only time I would drink is if I'm going out or

13  something.  My birthday or something.

14  Q.  In the party house --

15  A.  Yeah.

16  Q.   -- you didn't have to go out to party, you would party

17  there, I take it?

18  A.  Yeah, but I'm not a drinker.  I don't like to drink or

19  smoke.

20  Q.  And in that party house when people are chilling is it fair

21  to say people are, we'll say, shooting just, you know, having

22  casual conversation and boasting and talking about bragging

23  about various things?

24  A.  Yeah.  Talk about everything in there from robbery to

25  drugs.  Whatever.

D3C5dor2                         Taylor - cross

1   Q.  Well, they also talking trying to show off who has a better

2   car, like you may say I have an Escalade today or I've got a

3   Lexus, things like that, who is doing better.  Is that right?

4   A.  Not really talks that got -- everybody got their car parked

5   outside so people just talk and say he got money, he don't got

6   no money, he's broke.  That was it.  But people don't really

7   talk about that kind of stuff like that.

8   Q.  Is it fair to say, sir, that this group of people that you

9   were hanging out with, you weren't a close friend of Tall

10  Man's, were you?

11  A.  No.

12  Q.  You didn't really socialize with him, right?

13  A.  No.

14  Q.  He is a different age than you, right?

15  A.  Yes.

16  Q.  He is considerably older than you, is that right?

17  A.  Yes.

18  Q.  And this group of people you were talking about who you

19  mentioned before and whose pictures are on the board, you say

20  they used to talk a lot about a lot of different things, is

21  that right?

22  A.  Only robberies.  That's it.

23  Q.  When they were talking about robberies you told us, did you

24  not, sir, that a lot of people in that group would accuse

25  others in that group of, frankly, bullshitting each other.  Is

D3C5dor2                              Taylor - cross

1   that fair to say?

2   A.  Yes.

3   Q.  That was a constant what we call, theme or constant thing

4   happening.  Is that right?

5   A.  There was no trust.

6   Q.  No trust whatsoever?

7   A.  Yes.

8   Q.  It is what we call no honor amongst thieves, is that right?

9   A.  Yes.

10  Q.  Everybody had to watch their back, is that fair to say?

11  A.  Sometimes.  Yeah.

12  Q.  So, if you told me you weren't a party to a -- you didn't

13  participate in a certain robbery I might challenge you, is that

14  right?

15  A.  Yes.

16  Q.  And the reason I would challenge you would be because if I

17  thought I might be entitled to a share of the proceeds, is that

18  right?

19  A.  Yes.

20  Q.  And, in turn, you might challenge me or -- it goes on and

21  on, is that fair to say?

22  A.  Yes.

23  Q.  So, nobody, in some situations, really knew who was telling

24  the truth about certain robberies, is that right?

25  A.  Yes.

D3C5dor2                          Taylor - cross

1   Q.  Now, getting back to the Radcliffe robbery, the snowy day

2   robbery; do you recall telling in one of the proffers that

3   Biggs was on that robbery?

4   A.  At first I did, but then I realize I was lying because

5   Biggs wasn't there.  I was mixing up Biggs and Jabba so I

6   recalled it.

7   Q.  I'm sorry.  Can you sit a little closer in?  I can't hear

8   you.

9   A.  At first I told Biggs was there but then I didn't want to

10  put Biggs somewhere where he wasn't at, so then I told them,

11  no, he wasn't there.

12  Q.  You said you were lying?

13  A.  Yes.

14  Q.  And Biggs, by the way, how does he get the name Biggs?

15  A.  I don't know.  I don't got no idea.  I just met Biggs in

16  around September of '11.  That was his name then so I don't got

17  no --

18  Q.  Well, is he a big guy?

19  A.  He is big, yeah.

20  Q.  Big as in bigger than you, is that right?

21  A.  Yeah.

22  Q.  And he is built, is that fair to say?

23  A.  Not really built but not fat.  I don't know how he is

24  built.

25  Q.  Could you come a little closer?  I can't hear you.

D3C5dor2                          Taylor - cross

1   A.  Yeah.  He's built.

2   Q.  And would you say -- is it fair to say he is around 6'3",

3   6'4"?

4   A.  Yes.

5   Q.  How big is Jabba your friend?

6   A.  I think he is like 6'1".

7   Q.  Jabba is a friend of yours, right?

8   A.  Yes.

9   Q.  And you said to the feds when you lied to them at first

10  that Jabba went into the house at Radcliffe, is that right?

11  That you heard -- that you heard that Biggs -- I'm sorry --

12  that Biggs went into the house at Radcliffe?

13  A.  I heard that Biggs went in the house?

14  Q.  On the snowy day, the Radcliffe house.

15  A.  I never remember telling anybody that, that Biggs went in

16  the house.

17  Q.  Well, you told them Biggs was there, right?

18  A.  At first I told them that Biggs was there and then I

19  remember Biggs wasn't there so I sold told them Biggs wasn't

20  there after that.

21  Q.  Well, you were there, is that correct --

22  A.  Yes.

23  Q.  -- for part of the time, is that right?

24  A.  Yes.

25  Q.  So, you would have seen whether or not Biggs was there, is

D3C5dor2                           Taylor - cross

1    that right?

2    A.  Yes.

3    Q.  But you were lying or mistaken about Biggs being there that

4    day, is that right?

5    A.  Yes.

6           THE COURT:  Wait.  Were you lying or were you just

7    mistaken?

8           THE WITNESS:  Mistaken, yeah, because he wasn't there

9    so I didn't want to get Biggs caught up in something where he

10   wasn't there.  I just want to tell them the truth who was there

11   from who wasn't there.

12          THE COURT:  So you corrected yourself?

13          THE WITNESS:  Yes.  I corrected myself.

14          THE COURT:  Was that because you lied or you made a

15   mistake?

16          THE WITNESS:  Made a mistake and said Biggs was there.

17          THE COURT:  Next question.

18   BY MR. ROTH:

19   Q.  Well, you used the term before yourself you lied, is that

20   correct?  Just minutes ago, about that.

21   A.  It was a -- it was a mistake, because if I wanted to lie I

22   would have told them, yes, Big was there, I wouldn't change it.

23   I would keep on telling them, yes, Biggs was there but he

24   wasn't there so I want to make it clear to everybody he wasn't

25   there.

D3C5dor2                        Taylor - cross

1   Q.  And part of this is just from what you heard from the guys

2   talking, right?

3   A.  It is not really what I heard because I was there.  I was

4   there so that's the people who I'm seeing was there.  In my own

5   eyes they was there.

6   Q.  Right, but if you're seeing with your own eyes, as you

7   say --

8   A.  Yeah.

9   Q.  -- and you have a vivid memory of who was there, you can't

10  be confused that Biggs was there or not, is that fair to say?

11  A.  At the time I didn't remember.

12  Q.  And is it fair to say, sir, that there is no way of

13  proving, really, that Biggs was there for this jury other than

14  you saying whether he was there or not that day?

15  A.  Yeah.

16  Q.  That's the only proof?

17  A.  Yes.

18          THE COURT:  Is this a good break point?

19          MR. ROTH:  Sure, Judge.

20          THE COURT:  Why don't we take our morning break.  We

21  will come back in 10 minutes.

22          Use the restroom, get a drink.  There should be

23  coffee -- it may be cold by now -- but there should be stuff

24  for you to get refreshed.  Okay?

25          (Continued on next page)

D3C5dor2                          Taylor - cross

1                (Jury not present)

2                THE COURT:  Have a seat.

3                Mr. Soto-Valdez, I told you I had that call and that I

4     was going to let him know and that I made the call and I asked

5     his employer if they would reconsider or take another look at

6     their policy.  So, I was inclined to let him know that, just so

7     he's not wondering.

8                Is that okay with you?

9                MR. ROTH:  That's fine.

10               MS. MASELLA:  Yes, your Honor.

11               THE COURT:  We can do it now or right before we

12    resume.  Let's do that right before we resume.

13               So you folks can use the restroom, I will see you in

14    10 minutes.

15               (Recess)

16               (Continued next page)

17

18

19

20

21

22

23

24

25

D3cWdor3

```
 1                (In open court; jury not present)

 2                THE COURT:  Can we get Mr. Soto-Valdez?

 3                (In open court; juror No. 3 present)

 4                Mr. Soto-Valdez, come on in.  Have a seat.  I just

 5      wanted to give you an update.  Have a seat.

 6                I reached out to your employer and played phone tag

 7      yesterday with Mr. Lorenzo, called him back today, he was

 8      traveling, called him again today, didn't get through to him,

 9      but spoke to another individual who advised me of the company's

10      policy with respect to jury service only paying for three days.

11      What you had given me was just the state law, so it doesn't

12      really apply here.

13                JUROR:  That's all they gave me.

14                THE COURT:  I did explain to them the importance of

15      this trial.  I did explain the fact of jury service and the

16      fact that corporations benefit from a system in which jurors

17      are available to serve and resolve cases and resolving disputes

18      in which corporations are parties.  I asked them to consider

19      whether they would change their policy with respect to you.  I

20      don't know whether they will or not, but that's how I left it

21      with them but did reach out to them.  I'll try to call back

22      again at the end of the day if they don't call me back.

23                In the meantime, I want you to just focus on the

24      trial.  If they haven't changed their policy by Thursday, we

25      have to revisit this because I think two weeks is fair.  I
```

D3cWdor3

1    think beyond that might be a hardship on you.  But let's just

2    see how we are over the next couple of days.  So, for now, I

3    just want you to remain doing what you've been doing, which is

4    paying attention, being careful, following my instructions.

5            Let me ask you to not discuss with anyone in the jury

6    room, your fellow jurors, what we talked about out here.  I

7    don't want them speculating.  I also don't want them grilling

8    you about why your situation might be different or the same as

9    other jurors'.  Okay?

10           Any questions you have?  No.  Okay.  I wanted to let

11   you know.  I didn't want you to be wondering.  Head on back

12   there.  We'll bring you back out in a minute.  All right?

13           (In open court; jury not present)

14           THE COURT:  Let's bring in the witness.

15           All right.  Let's bring in the jury.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1       (In open court; jury present)

2               THE COURT:  Okay.  Have a seat.  We now are going to

3       resume the cross-examination of Mr. Taylor by Mr. Roth.

4               MR. ROTH:  Thank you, your Honor.

5       Q.  Mr. Taylor, we were discussing before how you had left out,

6       or omitted, the fact that Jaba, your friend, had participated

7       in that Radcliff robbery, is that correct?

8       A.  Yes.

9       Q.  And is it fair to say, sir, that you didn't indicate that

10      Jaba was involved in that robbery until sometime in February of

11      this year, during a meeting with the government and your

12      lawyer?  Is that right?

13      A.  Yes.

14      Q.  And one of the reasons you didn't do that is because he's

15      your friend, is that right?

16      A.  Yes.

17      Q.  Do you know where Jaba is today?

18      A.  I don't know.

19      Q.  You have no idea?

20      A.  No.

21      Q.  Have you tried to locate him while he was out on the street

22      and you were out on the street?

23      A.  No.

24      Q.  Did you call home to Jamaica?

25      A.  No.

D3cWdor3                        Taylor - cross

1   Q.  You're from the same hometown in Jamaica?

2   A.  Yeah.

3   Q.  Your family knows his family?

4   A.  Yes, sir.  Some of them.

5   Q.  You didn't try to locate him at all?

6   A.  No.

7   Q.  You didn't give him a heads-up that the feds might be

8   looking for him?

9   A.  No.

10  Q.  As far as you know, he's not in custody, is that right?

11  A.  I got no idea, no.

12  Q.  And, sir, when you were having these meetings with the feds

13  in February of this year, you had said at some point that you

14  turned yourself in, is that correct?

15  A.  Yes.

16  Q.  You know, do you not, sir, that at any point the feds could

17  have arrested you in February, is that right?

18  A.  Yes.

19  Q.  They could have arrested you, had you arrested in July for

20  just the immigration violation alone, is that right?

21  A.  Yes.

22  Q.  So you were out in the streets only because the feds let

23  you to be out in the streets until you came into prison, is

24  that right?

25  A.  Yes.

D3cWdor3                         Taylor - cross

1    Q.  So you didn't turn yourself in, just turn yourself in out

2    of goodwill, is that fair to say?

3    A.  I did.

4    Q.  I'm sorry?

5    A.  Yes, I did.

6    Q.  But it was the feds who said how long you could be out, is

7    that right?

8    A.  No.

9    Q.  They had the power to arrest you at any point, is that

10   right?

11   A.  Yes.

12   Q.  When you were having these proffer sessions, do you recall

13   meeting in the beginning of February for one or two meetings

14   with the government, specifically on February 1, February 11,

15   and February 13 of this year, having meetings with the

16   government and your lawyer?

17   A.  I don't know exactly when was it, but I knew I meet with

18   the government several time in February.

19   Q.  And your lawyer was there, right?

20   A.  My lawyer was there.

21   Q.  And your lawyer's the gentleman who is seated in the back

22   row, is that right?

23   A.  Yes.

24   Q.  And at that time, you were discussing with your lawyer,

25   were you not, trying to make a deal to get you out of trouble,

D3cWdor3                          Taylor - cross

1   is that right?

2   A.   What deal you talking about?

3   Q.   I'm sorry?  I can't hear you, sir.

4   A.   What type of deal are you talking about?

5   Q.   I'm talking about a deal to not go to jail for the rest of

6   your life.

7   A.   Yes.

8   Q.   That's the kind of deal your lawyer was trying to work out

9   with the feds, is that right?

10  A.   Yes.

11  Q.   And this is the middle of February, when this trial was

12  beginning in a couple of weeks, is that right?

13  A.   Yes.

14  Q.   Couple weeks before, and you knew that the feds wanted your

15  cooperation; they needed the information that you were going to

16  give them, is that right?

17  A.   Yes.

18  Q.   You were going to help them try to fill in pieces of their

19  case, is that right?

20  A.   Yes.

21  Q.   And you knew that, right?

22  A.   Yes.

23  Q.   Do you recall that the deal itself wasn't struck until

24  February 15?  Is that correct?

25  A.   No.

D3cWdor3                         Taylor - cross

1    Q.  What is correct, sir?

2    A.  I thought I make a deal on, a plea, a plea not, I think it

3    was on February the 25th.

4    Q.  February 25, you actually pled guilty in the case?

5    A.  Yes.

6    Q.  So you made that deal shortly before that, is that right?

7    A.  Yes.

8    Q.  And, by the way, you've lied on other occasions to people

9    who were close to you who you said you wouldn't lie to, is that

10   fair to say?

11   A.  What do you mean by people I'm close with?  I don't

12   understand.

13   Q.  For instance, your wife.

14   A.  Lie to my wife?

15   Q.  Yeah, lie to your wife.

16   A.  About what?  I don't understand.  For what, lie to my wife?

17   Q.  She busted you in having an affair with somebody, is that

18   right?

19   A.  Well, yes.

20   Q.  Well, you lied about having an affair with her until she

21   found out about it, right?

22   A.  Because she kick me out.

23   Q.  Is that correct, that you lied to her about having an

24   affair?  Is that right?

25   A.  At the time, you mean?

D3cWdor3                          Taylor - cross

1    Q.  Can you answer that with a yes or no?

2               MS. MASELLA:  Objection, your Honor.  He is answering.

3               THE COURT:  No.  That's a yes-or-no question.

4               Yes or no?

5               THE WITNESS:  It's no, but at the time --

6               THE COURT:  So no but.  Next question.

7    BY MR. ROTH:

8    Q.  Would you consider, sir, your pledge to tell the truth more

9    important to your wife or to the government?

10   A.  Both.

11   Q.  They're equal?

12   A.  Yeah.

13   Q.  And you lied to your wife?

14   A.  Yes.

15   Q.  Now, sir, there came a time when you actually pled guilty,

16   as you say, on February 25 of this year, a week or so before

17   this trial started.  And at that time, sir, is it fair to say

18   that your attorney, who is seated here in the courtroom, went

19   over with you very carefully the agreement, the cooperation

20   agreement that you had and the penalties that you face with

21   respect to the penalties that you faced on the counts you were

22   pleading guilty to?

23   A.  Yes.

24   Q.  And you understood those before you pled guilty, is that

25   correct?

D3cWdor3                           Taylor - cross

1   A.  Yes.

2   Q.  And, by the way, before I get to that, in the house you

3   were living in when you were dealing marijuana for these four

4   years, were there guns in that house?

5   A.  There was a gun in one of the house.

6   Q.  Which house?

7   A.  In my uncle's house.

8   Q.  Your uncle's house that you were living in?

9   A.  Yeah.

10  Q.  And what kind of gun was that?

11  A.  It was a nine millimeter.

12  Q.  How did you know it was a nine millimeter?

13  A.  Because it was in there, in the stash.  I seen it.

14  Q.  That house was what you call a stash house?

15  A.  Yeah.

16  Q.  And the gun was there to protect the stash?

17  A.  Yes.

18  Q.  From robbers, is that right?

19  A.  Yes.

20  Q.  And it's a dangerous business, the drug business, is that

21  correct?

22  A.  Yes.

23  Q.  You yourself said you got ripped off, is that right?

24  A.  Yes.

25  Q.  And how much did you get ripped off for, sir?

D3cWdor3                          Taylor - cross

```
 1    A.   40 grand.

 2    Q.   40 grand?

 3    A.   Yes.

 4    Q.   And how did you say you knew it was a nine?

 5    A.   It was a, marked on the gun, said nine millimeter.

 6    Q.   Did you carry that gun at all?

 7    A.   No.

 8    Q.   You handled that gun though, right?

 9    A.   No.

10    Q.   You never handled the gun?

11    A.   I touched it, but never bring it nowhere.  I was, I was --

12    Q.   I'm sorry.  Could you move up?  I can't hear you.  Speak

13    into the microphone.

14    A.   I said it was always in the house, the stash.

15    Q.   Right.  So when I meant handled, I meant you touched the

16    gun, is that right?

17    A.   Yeah, touched it.

18    Q.   Where did that gun come from?

19    A.   Like who made it?

20    Q.   No.  How did it get into the house?

21    A.   I don't know.  I went there, move over into, move from the

22    Bronx to there, and it was there.  So it always get there.

23    Q.   Did it stay in the same place all the time for four years?

24    A.   Yes.

25    Q.   Never moved?
```

D3cWdor3                          Taylor - cross

1    A.  Never moved.

2    Q.  And that was for you to use or him to use to protect the

3    stash, is that right?

4    A.  Whoever, right.

5    Q.  Now, you pled guilty, sir, to four counts, is that right?

6    A.  Yes.

7    Q.  And you said that the first count that you pled guilty to

8    was conspiracy to commit robberies, is that correct?

9    A.  Yes.

10   Q.  And your testimony, sir, what is your recollection of what

11   the penalties that you face under that count were?

12   A.  20 years.

13   Q.  I'm sorry?

14   A.  20 years to life.

15   Q.  20 years to life?

16   A.  Yes.

17   Q.  And what about the second count, the count of the actual --

18   do you recall what the second count was?

19   A.  Gun charge.

20   Q.  And that was a gun charge in connection with the robbery,

21   not the drug dealings, right?

22   A.  Yes.

23   Q.  And not the gun we were just talking about, right?

24   A.  Yes.

25   Q.  And what's your understanding, sir, of the penalties for

D3cWdor3                         Taylor - cross

1    that, count two, for carrying a firearm in connection with

2    those robberies?

3    A.  Five years.

4    Q.  Five years?

5    A.  Yes.

6    Q.  I thought you said seven years on direct examination.

7    A.  Yeah.  I think it's seven.  Seven or five.  I don't

8    remember which one.

9    Q.  The number doesn't stick in your head?

10   A.  Not really.

11   Q.  Is that because it's not really a concern of yours?

12   A.  It is a concern of mine.

13   Q.  I mean, even a two-year difference is a lot of time, is it

14   not?

15   A.  Two days is a lot of time for me, so, same.

16   Q.  Wait.  I'm sorry.  If you could just move up.  You keep on

17   sliding back.  I can't hear.

18   A.  I said even two days is a lot for me.

19   Q.  But you don't recall whether it was a mandatory five years

20   or seven years on the gun charge?

21   A.  I know it was five or seven, but I don't remember which

22   one.

23   Q.  And the third count, the count of the actual robbery

24   itself, do you recall what penalties you were facing for that,

25   a conviction on that count?

D3cWdor3                          Taylor - cross

1    A.  I think that's 20 years to life, too.

2    Q.  20 years to life?

3    A.  Yeah.

4    Q.  And the fourth count, the marijuana conspiracy, you've

5    already testified, have you not, that that's --

6    A.  Ten years to life.

7    Q.  Ten years to life?

8    A.  Yes.

9    Q.  And I think you said, but let's go back over it, to the

10   prosecutor's questions that it's your understanding that the

11   penalties for the gun charge and for the marijuana conspiracy

12   charge must be consecutive to each other, is that right?

13   A.  Yes.

14   Q.  And when we say consecutive, is that a term you use like

15   running wild, or running back to back?

16   A.  Running together, like consecutive years.

17   Q.  I'm sorry?

18   A.  Running together, together.

19   Q.  Oh, together, you think that you're facing only seven years

20   and ten years running together, not consecutive?

21   A.  Consecutive, yeah.

22   Q.  You have to do 17?

23   A.  Yes.  17 years.

24   Q.  17 years?

25   A.  To life, yeah.

D3cWdor3                          Taylor - cross

1   Q.  And when you testified on direct examination, you indicated
2   that it was 17 to life minimum, but isn't it a fact, sir, that
3   that 17 to life is consecutive to any time that you get on the
4   first count, the conspiracy to robbery, which you face 20 years
5   on, and the other count of the actual robbery that you face up
6   to 20 years on?  Is that right?
7   A.  Yes.
8   Q.  And when you were making this deal to plead guilty to those
9   four counts, did you have an understanding or a discussion with
10  your lawyer, and based on that discussion, did you understand
11  that you could additionally be charged for possession of the
12  gun that you used in connection with the marijuana dealing?
13  A.  Yes.
14  Q.  And is it fair to say, sir, from your understanding if you
15  had been charged with that gun, in addition to the four counts,
16  of using that gun in connection with your marijuana dealing
17  that you did, that that would be an additional 25 years for
18  that additional charge consecutive to the seven and the ten,
19  which would bring you up to 42 years in jail?
20  A.  Yes.
21  Q.  And you negotiated a deal with the government on the eve of
22  the trial not to have to plead guilty to that gun charge, is
23  that right?  The second gun that you had in connection with the
24  marijuana dealing.
25  A.  Yes.

D3cWdor3                          Taylor - cross

1   Q.  Now, you signed a so-called cooperation agreement with the

2   government, right?

3   A.  Yes.

4   Q.  And you read that carefully, is that right?

5   A.  Yes.

6   Q.  And you said that was to get a 5K, is that right?

7   A.  Yes.

8   Q.  And tell the members of the jury what your understanding of

9   a 5K is.

10  A.  That I got to tell the government about everything that I

11  ever did and I got to tell them the truth, and if they ask me

12  to testify, I got to testify.  If they ask.  And I would never,

13  ever did no more crimes again in my life.

14  Q.  By the way, Mr. Taylor, you started speaking to the federal

15  authorities in July of 2012 and talked to them into February of

16  this year.  When was the first time that you revealed that you

17  had been dealing marijuana for five years, four years?  The

18  first time in all those meetings.

19  A.  It was in February 2013.

20  Q.  Right at the very end, after you had already told them

21  about all this other stuff, and then you said, Oh, by the way,

22  I happen to have been dealing marijuana and possessed a gun for

23  four years?

24  A.  No.  That's when they tell me that everything I did in the

25  past, got to tell them whatever I did in the past.  If I steal

1     from the candy store, I got to tell them.  I never knew that I

2     got to tell them everything that I did in the past.

3     Q.  I'm sorry.  Move up.

4          Well, you didn't tell them about -- maybe you did tell

5     them about stealing candy in a candy store, but that's not why

6     you're here today, is that right?

7     A.  No.

8     Q.  So you had already, by the end of February, struck

9     basically a deal, and then you told them at the very end, you

10    said, And, oh, by the way, I happen to have been dealing

11    marijuana for four years, please wrap that up, cover me, give

12    me protection for that in the plea deal, is that right?

13    A.  No.  That's when they asked me if, if I ever did any more

14    crime in the past, and I told them yes.  And they asked me

15    what.  I told them I was selling marijuana.  I never knew I got

16    to tell them everything that I did in the past, so that's why I

17    never mention anything about it, marijuana.

18    Q.  Well, that goes back to the question of direct lie and

19    lying by omission, by not telling them something.  You knew you

20    were talking to the feds whose job -- this was the alcohol,

21    tobacco, and firearms agency, right?

22    A.  Yeah, but I never knew that the feds could charge me for my

23    past.  My past is my past.  I never get caught or nothing, so I

24    thought my past was my past.  I never knew I got to tell them

25    that I used to sell drugs, I used to steal from the candy

1    store.  No.

2    Q.  Well, they're not concerned about that.  We've already

3    established they're not concerned about the candy store, is

4    that right?

5    A.  Yeah, but -- yeah, but I'm just telling you what I thought.

6    Q.  Okay.

7    A.  I never lied to them.

8    Q.  You had the benefit of your lawyer?

9    A.  Yes.

10   Q.  Right?

11   A.  Yes.

12   Q.  You could ask him any question you want about what you were

13   thinking about the case, is that right?

14   A.  Yes.

15   Q.  It's your testimony that you thought you could wrap up this

16   whole deal and not tell them that you'd been dealing thousands

17   and thousands of pounds of marijuana for four years?

18   A.  Yeah, but I couldn't just keep it to myself, I don't tell

19   them nothing.  They asked me.  I tell them, yes, I used to sell

20   marijuana.

21   Q.  Okay.  That's fair enough.  So you only told them, as you

22   say, answers to questions that they asked?

23   A.  Yeah, because I never knew that I got to tell them

24   everything about my past.  That's why I didn't tell them.  They

25   asked me in the last part of February.  In February, I told

D3cWdor3                              Taylor - cross

1    them yes.

2    Q.  Didn't you have an understanding from the conversations

3    with your lawyer and conversations with the government that

4    when you were in these meetings with the government --

5    A.  Yes.

6    Q.  -- it wasn't supposed to be a question of them trying to

7    pull teeth from you; you were supposed to volunteer?  If you

8    were really cooperating, you were supposed to volunteer the

9    information, is that right?

10   A.  Yes.

11   Q.  Okay.  You weren't supposed to just answer a specific

12   question; you were supposed to volunteer information?

13   A.  But that's the thing.  If nobody told me that, tell them

14   about my past, no one asked me about the case, my case, that,

15   the robbery case, I tell them what I knew about the robbery

16   case.  That was it.  Nobody never asked me if they ever sell

17   drugs in the past, if you ever do this in the past.  No.

18   Q.  You thought you could keep the past separate, that's fair

19   to say?

20   A.  I never thought that.  If they asked me, I was going to

21   tell them yes.

22   Q.  And if they didn't ask you a question, you didn't give them

23   an answer, right?

24   A.  Yes.

25   Q.  Okay.  Fine.

```
 1              Now, the deal that you made to get this 5K letter, is
 2     it fair to say, sir, that it's your understanding that as you
 3     have pled guilty to the four counts, you didn't plead guilty to
 4     the other count that wasn't brought, that you face a mandatory
 5     minimum of at least 17 years consecutive to whatever else you
 6     got on the others?  Is that right?
 7     A.  Yes.
 8     Q.  And without the benefit of this 5K letter from the
 9     government, that you could be the judge's son and you'd have to
10     do at least 17 years in jail, is that right?
11     A.  Yes.
12     Q.  So it was a question, was it not, sir, of not just you had
13     to tell them everything about the case; you had to tell them
14     more than that.  Is that correct?
15     A.  Yes.
16     Q.  If you just told the government, Hey, I know this guy Tall
17     Man, he likes rap music, I sell him some marijuana, that
18     doesn't get you the 5K1 letter, does it?
19     A.  No.
20     Q.  You have to provide information concerning this case that
21     helps them make a case against Tall Man, is that right?
22     A.  Yes.
23     Q.  You have to fill in the blanks, the missing blanks, is that
24     right?
25     A.  Yes.
```

D3cWdor3                          Taylor - cross

1  Q.  And if you do so, then you have, as you say, a potential

2  get-out-of-jail card, is that correct?

3  A.  I don't know what the plans are to getting a card, but I

4  know the judge could give you any, anything from time served to

5  life.  That's what I know.

6  Q.  But you told us on direct examination --

7  A.  Yeah.

8  Q.  -- that your hope and desire is to get time served, is that

9  correct?

10  A.  Yeah.  That's what I, I hope for.

11  Q.  Okay.

12  A.  For the best, not the worst.

13  Q.  Explain to the jury what time served is, sir.

14  A.  Time served is the time that you already did in prison.

15  Q.  And how many days, as we sit here today, have you done, or

16  months have you done in prison?

17  A.  I think like about a month and -- couple months, couple

18  weeks, couple days.

19  Q.  So a month and a half, or so, or not even?

20  A.  Not even that.

21  Q.  Not even a month and a half?

22  A.  Yeah.

23  Q.  And it's your hope that instead of getting at least 17

24  years in jail, you might get no more than a couple months in

25  jail, is that correct?

D3cWdor3                         Taylor - cross

1    A.  Yes.

2              MR. ROTH:  I have no further questions, Judge.

3              THE COURT:  Okay.  Ms. Fontier or Ms. Stafford?

4              MS. FONTIER:  Yes, your Honor.  Thank you.

5    CROSS-EXAMINATION

6    BY MS. FONTIER:

7    Q.  Good afternoon, Mr. Taylor.

8    A.  Good afternoon.

9    Q.  I just want to go over a few things that you said in your

10   direct examination yesterday and ask you a few more questions

11   about some of those things.  Okay?

12   A.  All right.

13   Q.  Yesterday, you said that you met Mr. Dore in September of

14   2011, is that right?

15   A.  Yes.

16   Q.  And you met him at this house that you described as a party

17   house?

18   A.  Yes.

19   Q.  That's in Mount Vernon?

20   A.  Yes.

21   Q.  And before September of 2011, you had never met him before?

22   A.  I saw him like one, one time, like around June, but never

23   talk.  But I met him now in September.  Talk after that to

24   friends.

25   Q.  You saw him once in June?

D3cWdor3                    Taylor - cross

1   A.  Yeah.

2   Q.  But you didn't have a conversation with him at that point?

3   A.  No.

4   Q.  So the first time you actually spoke to him was in

5   September?

6   A.  Was in September.

7   Q.  Okay.  And when you spoke to him, you didn't really know

8   anything about him, right?

9   A.  No.

10  Q.  You didn't know who he was?

11  A.  Not really.

12  Q.  You didn't know what he did for a living?

13  A.  I heard they did robbery.  That was it.

14  Q.  But you didn't know?

15  A.  No.

16  Q.  You hadn't been with him, you didn't see him do anything?

17  A.  No.

18  Q.  So you didn't know if he was a police officer?

19  A.  Nope.

20  Q.  He could have been an undercover, for all you knew?

21  A.  Yes.

22  Q.  And he didn't know you, right?

23  A.  No.

24  Q.  You had to introduce yourself to him?

25  A.  Yes.

D3cWdor3                           Taylor - cross

1   Q.  He didn't know if you were a police officer, right?

2   A.  Yes.

3   Q.  He didn't know if you were an informant working for the

4   government, right?

5   A.  Yeah.

6   Q.  He didn't know anything about you?

7   A.  Yes.

8   Q.  But it's your testimony that at that first meeting, you

9   told him you were a drug dealer, right?

10  A.  Not really that first meeting but couple days after that.

11  Q.  All right.

12  A.  Couple.

13  Q.  So you saw him in September at this house and then one, two

14  days later you saw him again?

15  A.  Yeah.

16  Q.  Where did you see him?

17  A.  Same place.

18  Q.  All right.  So back at that house, the second time you meet

19  him, you say, Hey, by the way, I'm a drug dealer?

20  A.  Yeah.

21  Q.  You did that without knowing who he was?

22  A.  Yes.

23  Q.  Without knowing if he was an undercover?

24  A.  Yes.

25  Q.  You just felt like sharing that you were a drug dealer?

D3cWdor3                        Taylor - cross

1    A.  Not really sharing, but at the time, I was desperate, yeah.

2    Q.  And you said, because you said, Oh, I'm a drug dealer, you

3    asked him what he did, right?

4    A.  Yes.

5    Q.  And that's when he started confessing his crimes to you?

6    A.  Yes.

7    Q.  And telling you all about these violent robberies he had

8    committed?

9    A.  No.  He didn't told me that he committed no violent

10   robberies.  He just tell me that he did robberies.

11   Q.  So:  Oh, thanks, nice to meet you, you're a drug dealer,

12   I'm a robber."  That was basically the conversation?

13   A.  Like that, yeah.

14   Q.  And you said that he had this confessional conversation

15   with you without knowing you?

16   A.  Yes.

17   Q.  The second time he met you?

18   A.  Yes.

19   Q.  And this all took place in this house that you just

20   described on cross-examination where people went, but there was

21   no trust in the group, right?

22   A.  No.  When I met them after, after everything, like trust

23   was there.

24   Q.  Okay.  So two days after meeting him at this party house,

25   everybody trusted enough to tell everybody what was happening

D3cWdor3                          Taylor - cross

1   in their lives, right?

2   A.  Yeah.

3   Q.  And you told Mr. Dore that you were broke, right?

4   A.  Yes.

5   Q.  You had been robbed?

6   A.  Yes, at the time.  Yes.

7   Q.  And the robbers took all your money?

8   A.  Yes.

9   Q.  And that was all money you had earned by selling marijuana?

10  A.  Yes.

11  Q.  So your drug dealing proceeds were gone?

12  A.  Yes.

13  Q.  Where was this robbery?

14  A.  In the Bronx.

15  Q.  Where in the Bronx?

16  A.  Next to Boston Road.

17  Q.  Boston Road and what?

18  A.  I think Gun Hill or some road, near Gun Hill.  Gun Hill and

19  Boston Road.

20  Q.  Do you think or you're sure?

21  A.  I'm not really sure.

22  Q.  This is a major event in your life though, right?

23  A.  Yeah, but I'm not sure, I already knew that person from

24  back in the day so I could trust him.  So I'm just bringing my

25  money to that person to buy some weed back from California, but

D3cWdor3                          Taylor - cross

1    he never bring us back no weed.

2    Q.  So you took $40,000 to the Bronx in Gun Hill Road --

3    A.  Boston Road.

4    Q.  To Boston Road?

5    A.  Yeah.

6    Q.  To buy marijuana?

7    A.  Yes.

8    Q.  And you didn't get any marijuana?

9    A.  Yes.

10   Q.  He took your money instead?

11   A.  Yes.

12   Q.  Did he take it at gunpoint?

13   A.  No.

14   Q.  How did he take it?

15   A.  I handed it to him.

16   Q.  You handed it to him and then what, he ran away?

17   A.  No.

18   Q.  What happened?

19   A.  Thing is, right, me, I'm like, like always business with

20   him where I bring.  All right?  Say like me going to Arizona,

21   so my cousin bring with me his money to buy this product over

22   there and bring it back to me here.  So I was going to come

23   into Bronx, give him the money, and he was going to take the

24   money from me and go over to California or Arizona and get the

25   product and then bring back to me in couple days or a week.

D3cWdor3                           Taylor - cross

 1   But he never came back.

 2   Q.  So just like in some occasions your uncle would give you

 3   marijuana without you first giving money --

 4   A.  Yes.

 5   Q.  -- this was the opposite?  You gave him money?  Who was

 6   this person?

 7   A.  It was a family friend.

 8   Q.  What's his name?

 9   A.  I think it was D.

10   Q.  D?

11   A.  D, yeah.

12   Q.  How long have you known D?

13   A.  From I was young.

14   Q.  So you've known D for most of your life, right?  And do you

15   know his phone number?

16   A.  No, I don't know his phone number.

17   Q.  How did you contact him and tell him you were bringing him

18   $40,000?

19   A.  Oh, I knew his phone number then.  It was in my phone, but

20   I don't know it now.

21   Q.  Okay.  So you had D's phone number?  You knew where to meet

22   D?  You had known him most of your life?  You trusted D?

23          THE COURT:  Wait.  You have to say yes.  Are these

24   individual questions, or a series?

25          MS. FONTIER:  Yes.  He's nodding.

1    THE COURT:  Nodding's not going to do it.  You have to

2    say yes or no.

3            Let's start over.

4    BY MS. FONTIER:

5    Q.  You knew D most of your life?

6    A.  Yes.

7    Q.  You had his phone number?

8    A.  Yes.

9    Q.  You knew where to meet him?

10   A.  Yes.

11   Q.  You trusted him enough to give him $40,000?

12   A.  Yes.

13   Q.  You had done prior deals with this D?

14   A.  My uncle.

15   Q.  So your family had done prior deals with D?

16   A.  Yes.

17   Q.  So you knew you could trust him?

18   A.  Yes.

19   Q.  You took $40,000 to D?

20   A.  Yes.

21   Q.  And then D disappeared?

22   A.  Yes.

23   Q.  Never to be seen again?

24   A.  Never to be seen again.

25   Q.  That was, and when was this?

1   A.  That was around the summertime, like 2011, like May.

2   Around May 2011.

3   Q.  So May of 2011, you lose your drug profits at that point,

4   right?

5   A.  Yes.

6   Q.  But you were still selling it then, right?

7   A.  By the time, that was only like money or only product that

8   would sell.  Everything was done at the time.  So bring the

9   money to New York, get more product in.

10  Q.  Now, D wasn't your only supplier, right?

11  A.  Because my uncle went back to Jamaica, so, no.  Me and my

12  cousin have no -- start do our own stuff now.  So we just

13  trying to build up fast.

14  Q.  Let me back up a little and see if I can get a better sense

15  of this time frame.  You started dealing with your uncle in

16  2008, right?

17  A.  Yes.

18  Q.  When did your uncle go to Jamaica?

19  A.  Like in '011, in January '011.

20  Q.  So, from 2008 until January 2011, you're working basically

21  with your uncle?

22  A.  Yes.

23  Q.  And he's your primary supplier?

24  A.  Yes.

25  Q.  He would give you upwards of 40 pounds of marijuana at a

D3cWdor3                          Taylor - cross

1   time, right?

2   A.  Yes.

3   Q.  And then you would sell that?

4   A.  Yes.

5   Q.  And whenever you sold one pound of marijuana for your

6   uncle, you got to keep $200, right?

7   A.  Yes.

8   Q.  And you would sell each pound for a thousand, right?

9   A.  Yes.

10  Q.  And you were doing that all the time for three years?

11  A.  Yes.

12  Q.  And you did that in the Bronx?

13  A.  No.  I bought it from the Bronx to Springfield or

14  Connecticut, but I sell like sometime in the Bronx.  Bronx go

15  crazy, I don't really like selling drugs in the Bronx.  Bronx

16  too risky.

17  Q.  So you picked up weight in the Bronx?

18  A.  Yes.

19  Q.  And sold it in Connecticut?

20  A.  Yes.  And Springfield, Mass.

21  Q.  And Springfield, Massachusetts?

22  A.  Yes.

23  Q.  So you sold marijuana in two states?

24  A.  Yes.

25  Q.  Primarily?

D3cWdor3                          Taylor - cross

```
 1   A.  Yes.

 2   Q.  And sometimes in the Bronx?

 3   A.  Yes.

 4   Q.  But most of the marijuana that you would get you would pick

 5   up in the Bronx?

 6   A.  Some, yeah.

 7   Q.  And that was on behalf of your uncle though?

 8   A.  Yes.

 9   Q.  So he leaves, he goes to Jamaica in January 2011?

10   A.  Yes.

11   Q.  So you and your cousin --

12       Is that Shea Douglas?

13   A.  Yes.

14   Q.  -- are on your own?

15   A.  Yes.

16   Q.  And you realize you want to continue in this profitable

17   business you're in, right?

18   A.  Business, yes.

19   Q.  So in order to continue in that business, did you work with

20   the same suppliers, the people who had supplied your uncle?

21   A.  I -- at that time, no, because my uncle peoples told us

22   that me and my cousin too young.  So they don't give us some

23   marijuana, me and my cousin just try to do, doing stuff.

24   Q.  All right.  But it was your testimony on direct that from

25   2008 all the way until July of 2012, when that agent sitting
```

D3cWdor3                         Taylor - cross

1    there showed up at your door, you sold marijuana?

2    A.  I did.

3    Q.  Right?

4    A.  I was, yes.

5    Q.  All the way until July of 2012?

6    A.  Yes.

7    Q.  And it was also your testimony that from that entire period

8    you were selling anywhere from 60 to a hundred pounds of

9    marijuana a month, right?

10   A.  Yes.

11   Q.  You would sell sometimes 20, 30 pounds in a week, right?

12   A.  Yes.

13   Q.  And you continued that after your uncle was gone, correct?

14   A.  Yes.

15   Q.  Now, I want to go back to this.  You told, when you said

16   you met Mr. Dore in September of 2011, that was -- June, July,

17   August, September -- four months, basically, after this

18   robbery, right?

19   A.  Which robbery?

20   Q.  When you say you lost $40,000.

21   A.  Yes.

22   Q.  So four months after this, you're telling him this sad

23   story, and he agrees to help you out; that's your testimony,

24   right?

25   A.  Yes.

D3cWdor3                              Taylor - cross

1    Q.  He says, Oh, don't worry about it, I can bring you in on

2    what I do, right?

3    A.  Yes.

4    Q.  And so then it's your testimony that a few days after that

5    second meeting with him, you got a call from him and agreed to

6    do a robbery, right?

7    A.  Yes.

8    Q.  So in September, you said you helped out, you punched a

9    guy, right?

10   A.  No.  I never punched the guy.

11   Q.  You never punched him?

12   A.  No.

13   Q.  Who did the punching?

14   A.  Blaqs.

15   Q.  All right.  So you just went there?

16   A.  Yeah, pick up the bag and I run back to Tall Man car.

17   Q.  All right.  So you got the bag and you ran back?

18   A.  Yes.

19   Q.  That was your role?

20   A.  Yes.

21   Q.  And for that you got $250, right?

22   A.  Yes.

23   Q.  And you said the next time you did a robbery was the snow

24   day, right?

25   A.  Yes.

D3cWdor3                          Taylor - cross

1    Q.  The five feet of snow?

2    A.  Yes.

3    Q.  That was October 29, you would agree, right?

4    A.  Yes.

5    Q.  I'm going to come back to this later, but let's talk about

6    this very briefly at the moment.  It's your testimony that on

7    that day, on the snowy day, you acted as a lookout, right?

8    A.  Yes.

9    Q.  And then after everything was over, you met back at Jaba's

10   house?

11   A.  Yes.

12   Q.  And once you were there, you guys talked about the robbery?

13   A.  Yes.

14   Q.  And for your role as a lookout, you got a thousand dollars?

15   A.  Yes.

16   Q.  So from September to October, you've made $1,250, right?

17   A.  Yes.

18   Q.  And now it's your testimony again that your next offense,

19   your next robbery, was in November, right?

20   A.  Yes.

21   Q.  And in that one, you stole some cigarettes?

22   A.  Mm-hmm.

23   Q.  You took them out of the back of a van?

24   A.  Yes.

25   Q.  Then you say you sold them to Ali?

D3cWdor3                          Taylor – cross

1   A.  Yes.

2   Q.  For this you got $150, right?

3   A.  Yes.

4   Q.  Then your testimony, I believe, is that your final robbery,

5   which we'll also come back to, is the New Year's Eve robbery,

6   December 31, right?

7   A.  Yes.

8   Q.  And in that one, you waited for someone in a parking

9   garage, right?

10  A.  Yes.

11  Q.  You chased him down?

12  A.  Yes.

13  Q.  And now you didn't hit him, you say, right?

14  A.  No.

15  Q.  But you took his bag of money?

16  A.  Blaqs did that.

17  Q.  So you just ran back and forth?

18  A.  Yes.

19  Q.  And for that you got $300?

20  A.  Yes.

21  Q.  So, for this, all your work here, you got a total of

22  $1,700, right?

23  A.  Yes.

24  Q.  That's four robberies, September, October, November, and

25  December of 2011?

D3cWdor3                        Taylor - cross

1   A.  Yes.

2   Q.  So over the course of four months, you got $1,700 total?

3   A.  Yes.

4   Q.  And you needed that money because you had been robbed?

5   A.  Yes.

6   Q.  Right?

7   A.  Yes.

8   Q.  So you committed these robberies to earn this money?

9   A.  Yes.

10  Q.  Now, again, you said you were selling marijuana, that was

11  your testimony, from 2008 to 2012?

12  A.  Mm-hmm.

13  Q.  And you were selling it regularly?

14  A.  Yes.

15  Q.  And all the way through 2012, you were making sales,

16  sometimes as little as one pound, sometimes as much as 40, you

17  said, right?

18  A.  No.  After my uncle went back, like things bad, so we was

19  really coming in, so that's why I went to New York to see if I

20  could get some money to start back selling weed again.  But I

21  was still selling weed until 2012, the cops came to my house.

22  By then I wasn't selling like that, those 50 to 20 pounds no

23  more because my uncle went back to Jamaica, and things was bad

24  for us.

25  Q.  Okay.  Do you remember yesterday when you testified?

D3cWdor3                         Taylor - cross

1   A.   Yes.

2   Q.   Do you remember sitting in this seat?

3   A.   Yes.

4   Q.   Do you remember Ms. Masella asking you questions?

5   A.   Yes.

6   Q.   Do you remember when you were asked this question?

7        MS. FONTIER:   This is, government, at 971:

8   "Q. What kinds of quantities of marijuana did you deliver to

9   individual customers?"

10       And you gave this answer:   "Like from one pound to

11  like ten, 20, 30, 40 pounds."   And then Ms. Masella asked you:

12  "Q. From one pound to 40 pounds in a particular delivery?

13  "A. Like sometimes, like five pounds, ten pounds, 20 pounds,

14  for person, one person."

15       And then the question:   How many pounds of marijuana

16  would you estimate that you sold per month during this time

17  period.

18  "A. For a month?   Sometimes like 60 to 70 pounds for a month.

19  Sometimes hundred pounds."

20       And then the question:   "During what years were you

21  operating this marijuana business from Springfield,

22  Massachusetts?

23  "A. From '08 to '12."

24  Q.   Do you remember being asked those questions and giving

25  those answers?

D3cWdor3                         Taylor - cross

1    A.  Yes.

2    Q.  So yesterday, it was your testimony that from the period

3    starting in 2008 all the way until July 2012, you were selling

4    between 60 and a hundred pounds of marijuana every month,

5    right?

6    A.  Yes.  But I never say I was selling exactly that in 2012.

7    I told the guys my business was messed up, and that's the

8    reason why I started robbery, just to go back to California and

9    get my business started up back.  So that's why I went to Mount

10   Vernon and I met Blaqs there, just to get my own business start

11   up again.  If I was selling 15, 20 pounds in '012, I would

12   never meet Blaqs then.  But I was just still selling marijuana

13   in '012.  I was.  But I wasn't selling ten and 20 and 40

14   pounds, no.  I was broke.  But from, from '08 until '012, I was

15   selling marijuana.  That's what I said.

16   Q.  Okay.  I'm going to ask you to answer this next question

17   with either a yes or no, not a yes but or a no but.

18   A.  All right.

19   Q.  Okay?

20   A.  Yes.

21   Q.  Was it your testimony yesterday, just yesterday, when you

22   came in here that from '08 to '012, to 2012, you were selling

23   between 60 and 100 pounds of marijuana every month?

24   A.  I never say that exactly still '012.  I told the guys I was

25   selling marijuana from '08 until '012, but my business got

1  trashed so I went to New York to see if I could get some money

2  to go to California to buy some weed.  That's when I had start

3  doing robberies.

4  Q.  So are you saying that it is not true that you were asked

5  this question:  "During what years were you operating this

6  marijuana business from Springfield, Massachusetts?

7  "A. From '08 to '012."

8           MS. FONTIER:  Sorry.  Let me back you up.  Withdrawn.

9  Q.  Were you asked these questions?

10  A.  Yes.

11          MS. MASELLA:  Objection, your Honor.

12          THE COURT:  Sustained.

13  A.  Yes.

14          THE COURT:  The record speaks for itself.

15  BY MS. FONTIER:

16  Q.  That was your testimony just yesterday?

17  A.  Yes.  I was selling marijuana from '08 to '012.  Yes, I

18  was.

19  Q.  And it was your testimony during that entire period you

20  were selling between 60 and one hundred pounds of marijuana,

21  correct?

22  A.  Yes.

23          MS. MASELLA:  Objection.

24  A.  But I never say, in like '012, I was selling those amount a

25  week, when my uncle was here.

D3cWdor3                         Taylor - cross

1    Q.  Okay.  So yesterday, when you answered questions, you

2    forgot to say yes, but, and give all these explanations, is

3    that correct?

4                MS. MASELLA:  Objection.

5                THE COURT:  Sustained.  That's argument.

6    BY MS. FONTIER:

7    Q.  Now you do agree, I think it was your testimony on

8    cross-examination just today, that on average marijuana costs

9    about a thousand dollars a pound, right?

10   A.  Yes, yes.

11   Q.  And sometimes it would be more?

12   A.  Yes.

13   Q.  And that might depend on the quality?

14   A.  Yes.

15   Q.  It would depend on the amount that you sell sometimes?

16   A.  Yes.

17   Q.  Right?

18   A.  Yes.

19   Q.  But using a thousand pounds or a thousand dollars, when you

20   made these five-pound sales to people, it was a $5,000 job,

21   right?

22   A.  Yes.

23   Q.  If you moved ten pounds from the Bronx and sold it on a job

24   in Connecticut, that would be a $10,000 job, right?

25   A.  Yes.

D3cWdor3                         Taylor - cross

1   Q.  So in the course of a month, when you were selling 60

2   pounds, that was about a $60,000 job, $60,000 worth of

3   marijuana that you were selling, right?

4   A.  Yes.

5   Q.  And if you sold a hundred pounds, that was a hundred

6   thousand dollars in a month, right?

7   A.  Yes.

8   Q.  Now, by September of 2011, you'd been selling marijuana for

9   over three years, right?

10  A.  Yes.

11  Q.  And if you're making on a bad month, you said, 60 pounds,

12  if you're selling 60 pounds and making $60,000 a month, on a

13  bad month that would be, you're making about $720,000 a year,

14  correct?

15  A.  Yes.

16  Q.  That's the amount that you were moving?

17  A.  Yes.

18  Q.  So before September of 2011, you had sold over $2 million

19  worth of marijuana, right?

20  A.  I think so.  I don't know.

21  Q.  You agree that it was about $720,000 a year, right?

22  A.  Yeah.

23  Q.  You multiply that by two, it's over two million, correct?

24  By three.  Sorry.

25  A.  Yeah.  I don't know exactly a month I was selling.  It

D3cWdor3                          Taylor - cross

1   wasn't really my money.  I was just making, I was just making a

2   hundred or $200 a pound, so...

3   Q.  All right.  If you're selling, when you were selling,

4   working with your uncle, you were profiting --

5   A.  Yes.

6   Q.  -- $200 a pound, right?

7   A.  Yes.

8   Q.  So if you sell 100 pounds, you're going to make $20,000

9   profit, right?

10  A.  Yes, that's correct.

11  Q.  So on a bad month, if you're selling 60, you're going to

12  make $12,000 profit, right?

13  A.  Yes.

14  Q.  So every single month for at least three years, until your

15  uncle leaves, you're making between 12 and $20,000 in pure

16  profit?  Every single month, right?

17  A.  Not every single month, but some months.  Not every month.

18  Q.  Well --

19  A.  Not every month.

20  Q.  So over the course of three years, making upwards of

21  $20,000 a month -- and you're not paying taxes on this, are

22  you?

23  A.  No.

24  Q.  You're not reporting it to the government?

25  A.  No.

D3cWdor3                          Taylor - cross

1   Q.  You're not giving Uncle Sam one-third of your profits,

2   right?

3   A.  No.

4   Q.  This is cash that goes in your pocket?

5   A.  Yes.

6   Q.  All right.  So when you lost $40,000 in an investment, it

7   was two months out of the last two years that you had earned,

8   right?

9   A.  My -- I'm not sure.

10  Q.  Fairly small portion of what you had earned over the prior

11  three years?

12  A.  Yes.

13  Q.  But it's your testimony that you needed 150 bucks in

14  September, $300 on another occasion, from Mr. Dore?

15  A.  Yes.

16  Q.  All right.  Now, you also said that after, when you met Mr.

17  Dore in 2011, September 2011, two days later, he invited you,

18  or a few days later he had invited you to take part in a

19  robbery, right?

20  A.  Yes.

21  Q.  And then I believe it was your testimony that after that

22  period, you were with Mr. Dore and others from six a.m. to six

23  p.m. every single day?

24  A.  Not every single day, but almost every day.

25  Q.  It was your testimony yesterday that you were with them

1    every single day, isn't that correct?

2    A.  Not every single day, but almost every day.  Not every

3    single day, but almost every day after that.

4    Q.  So almost every day from six a.m. to six p.m., you're

5    driving around in the Bronx?

6    A.  Yes.

7    Q.  This is your new full-time job?

8    A.  Yes.

9    Q.  And you did this from September all the way through to New

10   Year's Eve, right?

11   A.  Yes.

12   Q.  Hanging out every day?

13   A.  Yes.

14   Q.  And it's your testimony that in that period of time,

15   September 2011, when you were with Mr. Dore every single day,

16   there were only three robberies that you saw, right?

17   A.  Four.

18   Q.  Four, including the first one that you say you went on,

19   right?

20   A.  Yes.

21   Q.  I want to talk about a couple of these robberies.  We'll go

22   in reverse order, so starting with the December 31, the New

23   Year's Eve robbery.  That's the one we watched the video,

24   right?

25   A.  Yes.

D3cWdor3                        Taylor - cross

1  Q.  And you picked yourself out on the video?

2  A.  Yes.

3  Q.  When is the first time you saw that video?

4  A.  I think like sometime in February '013.

5  Q.  And it's March 2013 now, right?

6  A.  Yes.

7  Q.  So less than a month ago?

8  A.  Yes.

9  Q.  In one of the meetings with these prosecutors?

10  A.  Yes.

11  Q.  You were shown that video?

12  A.  Yes.

13  Q.  And you saw yourself?

14  A.  Yes.

15  Q.  You saw yourself run?

16  A.  Yes.

17  Q.  But this wasn't the first time that you talked about the

18  December 31 incident with agents or prosecutors or anyone else,

19  right?

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

D3C5dor4                          Taylor – cross

1   BY MS. FONTIER:

2   Q.  In fact, this is the incident that you say you've been

3   talking about since the first time you met with the agents,

4   right?

5   A.  Yes.

6   Q.  Now, this agent here came to your house, right?

7   A.  Yes.

8   Q.  He came there on September 11 of 2012?

9   A.  No, on June.

10   Q.  I'm sorry.  July?

11   A.  July.

12   Q.  On July 11 of 2012 he came to your house?

13   A.  No -- yes.  Yes.  Yes.  Yes.

14   Q.  And you agreed to speak with him, right?

15   A.  Yes.

16   Q.  You in fact went to the precinct?

17   A.  Yes.

18   Q.  And you told him you were going to tell him the truth,

19   right?

20   A.  Yes, but at the time I never told him I was going to the

21   precinct, that they handcuffed me and brought me to the

22   precinct to fingerprint me.

23   Q.  But you went there and you talked to them, right?

24   A.  Yes.

25   Q.  And he specifically told you you were not under arrest,

1   right?

2   A.  Yes.

3   Q.  You just agreed to talk to him?

4   A.  Yes.

5   Q.  And now, when you agreed to talk to him you told him a

6   version of events that is not true, didn't you?

7   A.  Yes.

8   Q.  You lied about your name?  Didn't you testify on

9   cross-examination you told him your name was David?

10  A.  Yes.  Yes.  Yes.  But --

11  Q.  He also asked you if you knew somebody named Squeak and you

12  said no?

13  A.  Yes.

14  Q.  You didn't volunteer for him:  Hey, people call me Squeak.

15  A.  Yes.

16  Q.  When he knocked on your door and said I'm looking for

17  Squeaky you didn't say, hey, that's me?

18  A.  No.  He was look -- he wasn't looking for Squeaky, he asked

19  me if I knew anybody by the name of Squeaky.  I told him no.

20  Squeak or some type of name like that, I told him no.

21  Q.  So, they showed you a picture of your cousin Shea Douglas,

22  right?

23  A.  Yes.

24  Q.  And you said yeah, that's Shea, but you didn't know where

25  he was?

D3C5dor4                        Taylor - cross

1   A.  Yes.

2   Q.  And then they asked you do you know someone named Squeaky,

3   right?

4   A.  Yes.

5   Q.  And you said no.

6   A.  Spook, Spooky; if I know him, anybody by the name of

7   Spooky.  I told him no.

8   Q.  So, which is it?  Did he ask you about Squeaky or Spooky?

9   A.  Spooky, but my name is Squeaky.  But he asked me if I knew

10  anybody by the name of Spooky.  I told him no.

11  Q.  When Mr. Roth was cross-examining you just a few minutes

12  ago did you or did you not say he asked for somebody named

13  Squeaky?

14  A.  Yes, but true he said Spooky.  And I knew he was talking

15  about me but he just didn't pronounce it right or something so

16  I figured he was talking about me because I'm the only one like

17  name of that type of name in the group.

18  Q.  So you knew that he was asking about you?

19  A.  Yes.

20  Q.  And then he later asked you if you go by any nicknames,

21  right?

22  A.  Yes.

23  Q.  And you said David?

24  A.  Yes.

25  Q.  Who calls you David?

D3C5dor4                        Taylor - cross

1   A.  Some friends in Bridgeport.

2   Q.  Is that a fake name that you give when you get arrested?

3   A.  No.  That's just a nickname.

4   Q.  David?

5   A.  Yes.

6   Q.  All right.

7        Even though you knew he was asking about you, you lied

8   and gave him the name David?

9   A.  Yes.

10  Q.  So then after lying about your name you were asked about

11  December 31st specifically, right?

12  A.  Yes.

13  Q.  You were asked where you were?

14  A.  Yes.

15  Q.  And you said Bridgeport, Connecticut?

16  A.  Yes.

17  Q.  That you did not leave Bridgeport, Connecticut?

18  A.  No.

19  Q.  You didn't tell the agent that you were in Bridgeport,

20  Connecticut for New Year's Eve and you stayed there?

21  A.  No.  I told him I was in Bridgeport, Connecticut from in

22  the morning and I went to Bronx, New York, like around 4:00 in

23  the evening, me and my cousin.  That's the exact order I told

24  the agent.

25  Q.  Are you forgetting that he confronted you with your cell

D3C5dor4                          Taylor - cross

1   phone records before you volunteered that you went to the

2   Bronx?

3   A.  Yes, but I was in Bridgeport.  My cell phone record show

4   that I was in Bridgeport that day.

5   Q.  Okay.

6   A.  Until in the evening I went to New York, me and my cousin.

7   Q.  Isn't it true that this is the timing:  You were asked

8   about December 31st, you said you were in Bridgeport.  The

9   agent showed you your cell phone records and said we know you

10  were in the Bronx and you said, oh yes, I guess I went there at

11  4:00.

12          Isn't that how it happened?

13  A.  Might, but I don't remember what I told him I was -- I was

14  in Bridgeport and I came to New York, me and my cousin.

15  Q.  You were lying because you thought you would get away with

16  it and then you changed the story when he showed you cell phone

17  records, right?

18  A.  I don't remember what I told him what I did.

19  Q.  So then he asked you what happened when you were in the

20  Bronx, right?

21  A.  Yes.

22  Q.  And you immediately said, oh, I saw Mr. Dore commit a

23  robbery; right?

24  A.  Yes.

25  Q.  You just tried to blame him?

D3C5dor4                          Taylor - cross

1   A.  Yes.

2   Q.  You didn't say to him I got out of a car, I ran up to this

3   victim, I was there.  Right?

4   A.  Yes.

5   Q.  You just blamed Mr. Dore?

6   A.  Yes.

7   Q.  And that worked, right?

8   A.  No.

9   Q.  At that time the agent accepted your story, yes?

10  A.  Yes.

11  Q.  He in fact said wonderful.  I would like to speak to you

12  again.

13          Right?

14  A.  Yes.

15  Q.  And because you, yourself, said you didn't do anything

16  wrong, you were allowed to go home again that day, right?

17  A.  Yes.

18  Q.  And now, you said you're here illegally, right?

19  A.  Yes.

20  Q.  You have no papers?

21  A.  Yes.

22  Q.  You have no right to even be sitting here right now, right?

23  A.  Yes.

24  Q.  And you do things to avoid --

25  A.  It is a free country.

D3C5dor4                          Taylor - cross

1   Q.  You do things to avoid deportation like fake names, right?

2   A.  It is not fake names, it is just my nicknames.  No fake

3   names.

4   Q.  You have never given a fake name?

5   A.  Yes, I did.

6   Q.  When was that?

7   A.  When I was locked up.

8   Q.  When you were in Springfield, Massachusetts, right?

9   A.  Yes, once.

10  Q.  You were arrested for marijuana?

11  A.  Yes.

12  Q.  You gave a fake name?

13  A.  Yes.

14  Q.  You gave a fake name because you were trying to avoid being

15  in trouble for that arrest, right?

16  A.  Yes.

17  Q.  And you were trying to avoid being deported, right?

18  A.  Yes, but I knew I wasn't going to get deported.

19  Q.  Why did you know that?

20  A.  Because it was only like a pound or so of marijuana.  I was

21  only going to get a ticket or a fine.

22  Q.  You are well aware that if you have no papers whatsoever to

23  be in this country any contact with law enforcement can get you

24  deported, right?

25  A.  Could get you, yeah, but they don't -- they don't like just

1    catch you and just send you back to your country.  They don't

2    do that.  Only if you have a felony or something like that.

3    Q.  All right.  So, you had no motivation, then, for failing to

4    return to court?

5    A.  Yes, I was.

6    Q.  What was your motivation?

7    A.  I was going to -- I was going to go back and tell them that

8    that was me and I went and told a lawyer about my case and the

9    lawyer told me that if I go back there and tell the judge that,

10   that's a felony so they going to send me back to Jamaica.  So I

11   was, like, I can't then.

12   Q.  So, you were planning to go to court, confess your sins and

13   say that you had given a false name but then you realized that

14   might get you deported so you didn't go back to court at all?

15   A.  No.  Then the lawyer, I talked to him, I talked to him and

16   tell him my case and he tell me, said if I went back there and

17   tell them what happened, they might give me bail but that's a

18   felony so they're going to send me back to Jamaica, they might

19   send me back to my country.

20   Q.  So, you went to court and you were told to come back,

21   right?

22   A.  Yes.

23   Q.  The judge told you to come back?

24   A.  Yes.

25   Q.  And it was a court order to go back to court?

1   A.  Yes.

2   Q.  And you were told to talk to a lawyer about that?

3   A.  About my case.

4   Q.  And when you learned the consequences of your actions you

5   decided to live as a fugitive?

6   A.  Yes.

7   Q.  And when was that arrest?

8   A.  In '08.

9   Q.  So, from 2008 until sometime in 2013 when you're meeting

10  with these prosecutors this arrest never came up, right?

11  A.  No.

12  Q.  It came up?

13  A.  No.

14  Q.  It did not?

15  A.  I don't know.  I have no idea if it came up or not but I

16  was fingerprinted, but I don't know if it came up or what.

17  Q.  But you never had to go back to court in Springfield?

18  A.  No.

19  Q.  You never had to face the judge?

20  A.  No.

21  Q.  You never got charged with a felony for providing a false

22  name as you thought you would, right?

23  A.  Yes.

24  Q.  And obviously you didn't get deported, right?

25  A.  Yep.

D3C5dor4                          Taylor - cross

```
 1   Q.  So you got away with that?

 2   A.  No.

 3   Q.  You did not get away with it?

 4   A.  No.

 5   Q.  You were getting away with it and --

 6   A.  I was getting away with it, yes.

 7   Q.  You were in the process of getting away with it still,

 8   right?

 9   A.  Yes.  Yes.

10   Q.  And you met with these agents or these prosecutors, right?

11   A.  Yes.

12   Q.  And the first time you met with them you didn't tell them

13   about that arrest?

14   A.  No.

15   Q.  The second time you met with them you didn't tell them

16   about that arrest?

17   A.  No.

18   Q.  Sometime in February a couple weeks ago you finally fessed

19   up about that arrest, right?

20   A.  Yes.

21   Q.  So, you fessed up about it; they're not prosecuting for

22   that either, right?

23   A.  I don't know.  I got no idea if they are or they not.

24   Q.  Sir, I got a little off track here.  I was originally going

25   to be asking you about the New Year's Eve robbery which I'm
```

1    going to go back to again.

2            Again, you first said you were in Bridgeport which --

3    and then you agreed that maybe you had been to the Bronx, and

4    in July when you are talking to the agent how all you had done

5    was see this occur, right?

6    A.  Yes.  Correct.

7    Q.  You were in your car you said?

8    A.  Yes.

9    Q.  And now we've seen the video and you are on it so we know

10   that that was a lie, correct?

11   A.  Yes.

12   Q.  And when, in July, July 11th specifically, the first

13   meeting with this agent, you didn't tell him about the

14   September robbery, right?

15   A.  No.

16   Q.  You didn't tell him about the October robbery?

17   A.  No.

18   Q.  You didn't tell him about the November robbery?

19   A.  No.

20   Q.  You also didn't tell him that you were selling 60 to 100

21   pounds of weed every month, right?

22   A.  No.

23   Q.  And you didn't tell him that all the way up until January

24   of 2012 -- from September to January of 2012 you spent 6:00

25   a.m. to 6:00 p.m., a 12-hour shift doing surveillance, right?

D3C5dor4                         Taylor - cross

1    A.  Can you repeat that, please?

2    Q.  It is your testimony that basically every day --

3    A.  Yes.

4    Q.  -- from 6:00 a.m. to 6:00 p.m., you drove around in a car

5    looking for people to rob, right?

6    A.  Yes.

7    Q.  Is it fair to describe that as surveillance?

8    A.  Yes.

9    Q.  So now, you did not tell this agent when you met with him

10   in September that you spent every day, for four months, doing a

11   12-hour surveillance shift, right?

12   A.  No.

13            MS. MASELLA:  Objection.  Can we clarify the time of

14   when he told the agent?

15            MS. FONTIER:  September 11th, 2012.

16            THE COURT:  No, no.  The objection is when the

17   meetings with the agent took place?  Is that what you're

18   saying?

19            MS. MASELLA:  She's saying September and that's

20   incorrect as to the meeting.

21            MS. FONTIER:  Oh, sorry.  It is just my mistake.  In

22   July of 2012.

23   Q.  So, when you met with him in July 2012 you didn't tell him

24   that you spent the last four months of 2011 doing surveillance

25   12 hours a day?

D3C5dor4                              Taylor - cross

1   A.  No.

2   Q.  You told him about one single incident and you lied about

3   it, right?

4   A.  Yes.

5   Q.  But then the agents wanted to meet with you again anyway?

6   A.  Yes.

7   Q.  They did not send you to immigration, right?

8   A.  No.

9   Q.  They sent you home?

10  A.  Yes.

11  Q.  So, just over a week later you met with this agent again,

12  right?

13  A.  Yes.

14  Q.  And you did that again voluntarily?

15  A.  Yes.

16  Q.  You weren't arrested?

17  A.  No.

18  Q.  You just thought this is working, I'm going to continue

19  what I'm doing, right?

20  A.  Yes.

21  Q.  So then you were asked about the December 31st robbery

22  again, right?

23  A.  Yes.

24  Q.  And then you said you claim you saw Blaqs assault the

25  victim and take his bag, right?

D3C5dor4                       Taylor - cross

```
 1    A.  Yes.
 2    Q.  But you didn't -- when you met with him on the second time
 3    you didn't tell him the truth about what you did, did you?
 4    A.  No.
 5    Q.  You didn't tell him that you got out of the car, that you
 6    ran back and forth, that you chased him down, right?
 7    A.  No.
 8    Q.  And on this second meeting you again did not tell him about
 9    the September, November, October robberies, right?
10    A.  No.
11    Q.  You did not tell him about your booming marijuana business,
12    did you?
13    A.  No.
14    Q.  You didn't tell him about your full-time job as a
15    surveillance man, right?
16    A.  No.
17    Q.  You just told him some little portion of the truth, or what
18    you claim is the truth, right?
19    A.  Yes.
20    Q.  And now you went in there to tell him whatever it was you
21    wanted to tell him to avoid getting arrested, right?
22    A.  At the time, yes.
23    Q.  And now, when you testified yesterday about that December
24    31st robbery, you say you chased after the victim, right?
25    A.  Yes.
```

D3C5dor4                          Taylor - cross

1   Q.  You still say you didn't hit him though?

2   A.  No.  I didn't hit him.

3   Q.  He fell down, right?  You said he fell down?

4   A.  Yeah.

5   Q.  And that you claim Mr. Dore hit him again, right?

6   A.  And picked the bag up, yes.

7   Q.  And this time at least you are very close to him when this

8   happens, right?

9   A.  Yes.

10  Q.  So you started in Bridgeport and now you are right next to

11  him.  You keep getting closer, yeah?

12  A.  Yeah.

13  Q.  But you still say you didn't hit him and you didn't grab

14  the bag, right?

15  A.  I didn't touch him.  I didn't grab the bag.

16  Q.  Now, the October 29th incident, that snowy day.

17  A.  Yes.

18  Q.  You said in this incident you went to the house, right?

19  A.  Yes.

20  Q.  And you were acting as the lookout?

21  A.  At first all of us was in the same car at the guy's house

22  and then, after that, everybody was hungry so I call my friend

23  to come get me to go get some food for everybody.  And then

24  when I came back I gave everybody their food I went to look

25  out, if the guy was coming back to his house or what I would

D3C5dor4                              Taylor - cross

1    call them and say, yeah, he's coming or the cops is coming down

2    the block or something.

3    Q.  So, after doing a food run you were hanging out being a

4    lookout?

5    A.  Yes.  Correct.

6    Q.  You were looking with your eyes and using your phone app

7    you said, right?

8    A.  Yes.

9    Q.  And that phone app is like a police scanner?

10   A.  Police scanner, yes.

11   Q.  And now at some point you were told to leave, to go back to

12   Jabba's house, right?

13   A.  Yeah.

14   Q.  So you did not actually see anything that occurred during

15   that -- this incident, right?

16   A.  No.

17   Q.  You just went back and you say talked to people about it,

18   right?

19   A.  Yes.

20   Q.  And it is your understanding that this victim was grabbed

21   as he was walking up to his house, right?

22   A.  Yes, as he was getting out of his car.

23   Q.  And that was in front of the house that you guys were

24   watching for the better part of that day, right?

25   A.  Yes.

D3C5dor4                          Taylor - cross

1    Q.  And, again, you didn't see this happen though, right?

2    A.  No.

3    Q.  I want to go to this, what you describe as a beef between

4    Mr. Dore and Tall Man, as you call him.

5    A.  Yes.

6    Q.  You said that happened in November?

7    A.  Yes.

8    Q.  Now, this robbery that you have claimed they took part in

9    on October 29th, that was -- were they beefing then or was it

10   afterwards?

11   A.  Which one was that?

12   Q.  The snowy day.

13   A.  No.  It was after that they was beefing.

14   Q.  They were okay on that snowy day?

15   A.  Yes.  They was fine.

16   Q.  And you spent almost every day with both of them.  That's

17   your testimony?

18   A.  Yes.

19   Q.  So when did -- was it that same week, like the first week

20   in November that this beef started?

21   A.  I don't know exactly when, but I knew it was sometime in

22   November.

23   Q.  If you can think back about your memory and spending every

24   day with these two men as you say you did?

25   A.  I never said every day --

D3C5dor4                        Taylor - cross

1                THE COURT:  Let her finish the question.

2   Q.  Was it one day after this snowy day?

3   A.  I don't remember when.  I knew sometime in November they

4   was beefing.

5   Q.  Do you know, could it have been a week after this snowy

6   day?

7   A.  I don't remember when.  All I knew it was in November.

8   Q.  So, a few days or sometime after October 29th they get in a

9   beef, right?

10  A.  Yes.

11  Q.  And then they're not together for at least two to three

12  weeks was your testimony, right?

13  A.  Yes.

14  Q.  Because they were fighting?

15  A.  Not really physical fighting but they was, yes.  Yeah.

16  Q.  They weren't getting along?

17  A.  They wasn't getting along, yeah.

18  Q.  So, for that two to three weeks of November, so for the

19  majority of November, you say you just were with Tall Man?

20  A.  Yes.

21  Q.  You were not with Mr. Dore?

22  A.  No.

23  Q.  And so, is it possible that that period, when they don't

24  talk to each other, would include the middle of the month, like

25  November 14th?

D3C5dor4                         Taylor - cross

1    A.  I can't say November 14th.  I knew it was in November, I

2    don't know which day.

3    Q.  But, there is two to three weeks in the month of November

4    when they are not together, correct?

5    A.  Yes.  Correct.

6              MS. FONTIER:  One moment, please?

7              (Pause)

8    Q.  Now, when you were just testifying a few minutes ago on

9    cross-examination you, in a "yes-but" answer, explained that

10   the reason that you didn't tell anyone about your marijuana

11   dealing until a couple of weeks ago, February of 2013, is

12   because you weren't asked.  Is that right?

13   A.  Yes.

14   Q.  So, what you did was answer questions and only the

15   questions that you were asked?

16   A.  Yes.

17   Q.  And you were asked questions about Mr. Dore, right?

18   A.  Yes.

19   Q.  And you told the prosecutors what they wanted to hear,

20   right?

21   A.  Not what they wanted to hear but what I know about Tall

22   Man.

23   Q.  So, you answered those questions and you talked about those

24   people because that's who you were being asked about, right?

25   A.  Yes.

D3C5dor4                         Taylor - cross

1  Q.  But you didn't tell them about the crimes that you were

2  committing?

3  A.  No.

4  Q.  The crimes that you were committing every single day?

5  A.  Not every single day but almost every day.

6  Q.  And you didn't tell them about the arrest in Springfield?

7  A.  At the time, no.

8  Q.  You didn't tell them that there was a warrant for your

9  arrest?

10 A.  At the time, no.

11 Q.  You didn't tell them that you used false names?

12 A.  No.

13 Q.  You didn't tell them about robberies that you were involved

14 in, right?

15 A.  Yes.  I did tell them about robberies that I did.

16 Q.  You didn't tell them about the robbery on Boston Road.

17 A.  Robbery on Boston Road?

18 Q.  There was a robbery on Boston Road where an individual got

19 shot that you were involved in but you didn't tell them about

20 that, did you?

21 A.  I never involved in no robbery on Boston Road.

22 Q.  You still hadn't been asked about that one, right?

23 A.  I did ask about that one.

24 Q.  Now, you testified that you read about this case in the

25 news, right?

D3C5dor4                        Taylor - cross

1   A.  Yes.  And my cousin too.  My cousin came to my house and

2   tell me.

3   Q.  So you're testifying about things that you've heard?

4   A.  That I heard, that I see.  Not what I heard.  I was there,

5   so.

6   Q.  Some of your testimony is based on what you read in the

7   paper, right?

8   A.  Like one of them, one.  Just one.  That is my testimony.

9   Q.  And some of your other testimony is about what you saw on

10  TV?

11  A.  Yes.

12          MS. FONTIER:  I have no further questions at this

13  time, your Honor.

14          THE COURT:  Any redirect?

15          MS. MASELLA:  Yes, your Honor.

16  REDIRECT EXAMINATION

17  BY MS. MASELLA:

18  Q.  Mr. Taylor, do you recall that during cross-examination you

19  were asked by both lawyers a whole series of questions about

20  what you told federal agents when they first came to your house

21  in July of 2012?

22  A.  Yes.

23  Q.  Now, at the time that federal agents first came to your

24  house in July, had you obtained a lawyer at that time?

25  A.  No.

1   Q.  Were you surprised when the federal agents knocked on your

2   door on that day?

3   A.  Yes.

4   Q.  Had you thought about whether you would lie or tell the

5   truth when first approached by law enforcement officers?

6   A.  First I thought I was going to just tell them lies just to

7   see if they know anything about me.

8   Q.  At some point after July, Mr. Taylor, did you obtain a

9   lawyer?

10  A.  Yes.

11  Q.  When was that?

12  A.  It was on November 2011.  Sometime in November.

13  Q.  And after you obtained a lawyer, without telling us what

14  the discussions were, did you have discussions with the lawyer

15  about your case?

16  A.  Yes.

17  Q.  Did you discuss what kind of criminal exposure you might be

18  facing?

19  A.  Yes.

20  Q.  And did you discuss what the best way to handle your case

21  might be?

22  A.  Yes.

23  Q.  And after you had those discussions with the lawyer, what

24  did you decide to do with respect to your case?

25  A.  I decide to go in and talk to the government, me and my

1    lawyer.

2    Q.  And after you made that decision did you in fact have

3    meetings with the government?

4    A.  Yes.

5    Q.  Are these the meetings we have been referring to as proffer

6    sessions?

7    A.  Yes.

8    Q.  Do you recall, Mr. Taylor, that you were also asked a

9    number of questions about what happened during these proffer

10   sessions and whether you answered questions that were asked or

11   volunteered information?

12   A.  Yes.

13   Q.  Mr. Taylor, how long did each of these proffer sessions

14   last, approximately?

15   A.  Like two hours or so.  Two and a half hours, three hours.

16   Q.  Two, two and a half or three hours?

17   A.  Yeah.

18   Q.  Now, during the first proffer session did you cover every

19   single topic about your own criminal conduct and other conduct?

20   A.  No.

21   Q.  Did the government's questions focus on particular topics

22   during particular proffer sessions?

23   A.  Yes.

24   Q.  But when the government asked you about robberies that

25   occurred, did you tell them that you participated in those

1  robberies?

2  A.  Yes.

3  Q.  And did you tell them what you knew about other people

4  participating in those robberies?

5  A.  Yes.

6  Q.  Now, did the government ask you about your own criminal

7  conduct other than robberies during the first or second proffer

8  session?

9  A.  Yes.

10 Q.  When did the government first ask you about other conduct

11 like your marijuana dealing, for example?

12 A.  I think it was sometime in February.

13 Q.  And when the government asked you to explain other conduct

14 besides the robberies, did you tell them about your conduct?

15 A.  No.

16 Q.  Did you tell them about your marijuana dealing?

17 A.  Oh, yes.  Yes, I did.

18 Q.  And, did you offer that information including the length of

19 time, who was involved and the quantities involved?

20 A.  Yes.

21 Q.  Now, at the time you told the government about your

22 marijuana dealing, was it your understanding that the

23 government had or did not have any other evidence of your

24 marijuana dealing?

25 A.  They didn't have any idea of me selling marijuana.

1   Q.  Did you have any idea or understanding that the government

2   was investigating you for marijuana dealing at that time?

3   A.  No.

4   Q.  Did you think that there was some basis for you to be

5   charged with marijuana dealing other than your own statements?

6   A.  No.

7   Q.  But you eventually did get charged with that marijuana

8   dealing, correct?

9   A.  Yes.

10  Q.  And did you plead guilty to that marijuana dealing charge?

11  A.  Yes.

12  Q.  And that was part of the four charges that you told us

13  about that were part of your guilty plea?

14  A.  Yes.

15  Q.  Mr. Taylor, do you recall that you were asked a series of

16  questions on cross-examination by these lawyers about what they

17  called a deal or a deal that you struck with the government?

18  A.  Yes.

19  Q.  I'm going to approach now and hand Mr. Taylor what's been

20  marked as 3537-D.

21         Mr. Taylor, can you take a minute to look at that and

22  tell me when you're through?  Mr. Taylor, does your signature

23  appear on that document?

24  A.  Yes.

25  Q.  Does your lawyer's signature appear on document?

D3C5dor4                          Taylor - redirect

1    A.  Yes.

2    Q.  What do you recognize this document to be?

3    A.  This is my charge sheet.

4    Q.  What is your understanding of what's contained in this

5    document?

6    A.  These are the crimes that I committed.

7    Q.  Is this document an agreement between you and the

8    government?

9    A.  Yes.

10   Q.  Is this the agreement that we were speaking about before

11   earlier in your testimony?

12   A.  Yes.

13   Q.  And, as far as you know, does this agreement contain all of

14   the agreements between you and the government?

15   A.  Yes.

16           MS. MASELLA:  Your Honor, the government offers

17   3537-D.

18           MR. ROTH:  I have an objection to a portion of this,

19   your Honor, to redact.

20           THE COURT:  We can take that up later, but certainly

21   the bulk of it would be coming in.  So, Government Exhibit

22   3537-D is received.

23           (Government's Exhibit 3537-D received in evidence)

24   BY MS. MASELLA:

25   Q.  Mr. Taylor, do you recall that on cross-examination you

1    were also asked a series of questions by Mr. Roth about the

2    potential penalties that you were facing on each of the

3    separate charges that you pled guilty to?

4    A.  Yes.

5    Q.  Now, taking all the charges together, what is your

6    understanding of the sentence that you're facing, all together,

7    if you don't get a 5K letter in this case?

8    A.  Like, forty-something years.

9    Q.  What is your understanding?

10           MR. ROTH:  Judge, I'm sorry.  I couldn't hear that.

11           THE COURT:  Forty-something years.

12           Is that what you said?

13           THE WITNESS:  Yes, forty-something years.

14           THE COURT:  Forty-something years.

15   BY MS. MASELLA:

16   Q.  What is your understanding of a minimum sentence that you

17   can get without receiving a 5K letter?

18   A.  70 years.

19   Q.  And the maximum sentence?

20   A.  Life.

21   Q.  What happens under the terms of your agreement when you

22   don't tell the truth when you testify in this case?

23   A.  The government would not give me the, will tear the

24   agreements up.

25   Q.  And, what happens to your 5K letter in that case?

D3C5dor4                         Taylor - redirect

1   A.  I won't get one.

2   Q.  And what happens on the other hand, if you tell the truth

3   when you testify?

4   A.  The government will give the judge the 5K letter.

5   Q.  And in that case what is the lowest sentence that you could

6   get?

7   A.  Time-served.

8   Q.  And what is the highest sentence that you can get, even if

9   you get a 5K letter?

10  A.  Life.

11  Q.  Mr. Taylor, do you recall that you were asked a number of

12  questions by both lawyers about whether you were somehow

13  filling in gaps or evidence that the government needed in this

14  case?  Do you recall those questions?

15  A.  Yes.

16  Q.  Mr. Taylor, did the government ever tell you any

17  information about what other witnesses would be testifying at

18  this trial?

19  A.  No.

20  Q.  Did they ever show you a witness list?

21  A.  No.

22  Q.  Did the government ever discuss the evidence in the case

23  with you, aside from your own testimony?

24  A.  No.

25          MS. MASELLA:  No further questions, your Honor.

D3C5dor4                        Taylor - redirect

1              THE COURT:  All right.  Why don't we break for lunch.

2    We will resume with this witness, unless you have just a minute

3    or two.

4              MR. ROTH:  No, Judge.

5              THE COURT:  So, let's break for lunch.  We will pick

6    up again at 2:00.  Don't discuss the case, keep an open mind

7    and I will see you at 2:00.  Thanks.

8              All rise for the jury.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3C5dor4                          Taylor – redirect

1                  (Jury not present)

2                  THE COURT:  Anything else we need to discuss now?

3                  MS. MASELLA:  No, your Honor.

4                  MS. FONTIER:  No, your Honor.

5                  THE COURT:  Let's pick up after lunch.

6                  Who is the next witness after this?

7                  MS. LESTER:  I think it depends a little bit on the

8    timing, your Honor.  We have some lay witnesses who we may try

9    to put on before law enforcement witnesses, but we also have a

10   custodial witness from AT&T who may be the next witness.

11                 THE COURT:  Just make sure that they know who is next

12   because I don't think we will be that much longer with

13   Mr. Taylor.  Okay?

14                 MS. MASELLA:  Thank you, your Honor.

15                 THE COURT:  I will see you at 2:00.

16                 (luncheon recess)

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                            2:05 p.m.

3           (Trial resumed)

4           THE COURT:  Let's bring in the jury.

5           (Jury present)

6           THE COURT:  Okay, have a seat.  I hope you had a nice

7    lunch.  Is it raining out still?  Bad.

8           How are we fixed for snacks and drinks?  Do we have

9    enough back there?  If there is any stuff that you would like

10   that we don't seem to have, talk to Mr. Halegua and we will see

11   what we can do.

12          We are going to start the recross of Mr. Taylor by

13   Mr. Roth, correct?

14          MR. ROTH:  Thank you, your Honor.

15          THE COURT:  Yes.

16   RECROSS EXAMINATION

17   BY MR. ROTH:

18   Q.  Mr. Taylor, before lunch you indicated in response to some

19   questions by the government that you didn't have a concern that

20   the government would find out about your drug dealing.

21          Is that correct?

22   A.  Yes.

23   Q.  And isn't a fact, sir, that it would have been easy for

24   them to find out?

25   A.  Yes.  Yes.

D3C5dor4                        Taylor - recross

1   Q.  Well, easy in the sense that your cousin, Duff, was your

2   partner in that drug dealing, is that right?

3   A.  Yes.

4   Q.  Do you recall the first time that the feds came to visit

5   you on July 11th, 2012 when you told the special agent who is

6   seated there now, Anthony, that he had called you the night

7   before and said that he was going to talk and tell everything?

8   That Duff had called you.

9   A.  Yes.

10  Q.  And isn't it a fact, sir, that you're aware that right

11  before or during the February of last month that Shea Douglas

12  was arrested in this case?

13  A.  Yes.

14  Q.  You know he is in custody right now, right?

15  A.  Yes.

16  Q.  And that was -- he was in custody right around the time

17  when you were making this deal, right?

18  A.  Yes.

19  Q.  So, he could have told the government if you hadn't told

20  him everything about your drug dealing, is that correct?

21  A.  Yes.

22  Q.  And had you decided to withhold it it could have blown up

23  your deal, is that right?

24  A.  Yes.

25          MR. ROTH:  Thank you.

D3C5dor4                           Taylor - recross

1          THE COURT:  Nothing further?

2          MR. ROTH:  No.

3          THE COURT:  Okay.  Ms. Fontier.

4          MS. FONTIER:  No.  Thank you, your Honor.

5          THE COURT:  Okay.  Re-redirect.

6          MS. MASELLA:  No, your Honor.  Thank you.

7          THE COURT:  I thought we would be longer, so do we

8     need --

9          MR. ROTH:  Well --

10         THE COURT:  You don't have to.  That's all right.

11         Mr. Taylor, your testimony is concluded.  Do you need

12    a minute so you can step down?

13         (Witness steps down)

14         Who is the next witness from the government?

15         MS. LESTER:  Your Honor, the government calls Henry

16    Enright, he is an AT&T custodian.

17         THE COURT:  How is the temperature?  Okay?  Some of

18    you are wearing coats, some of you are not and are in shirt

19    sleeves.  Mr. Lara is smarter than the rest of them.

20         A JUROR:  He is French.

21         THE COURT:  It is hard to make the room comfortable

22    for everyone.  If you are uncomfortable, let us know.  It is

23    generally easier to make it cool so you can wear layers which,

24    if you are warm, we can't do much about it.  But, we will do

25    what we can, so let us know.

D3C5dor4

 1    HENRY ENRIGHT,

 2         called as a witness by the Government,

 3         having been duly sworn, testified as follows:

 4              THE COURT:  Ms. Lester, are you going to do the

 5    honors?

 6              MS. LESTER:  Yes, your Honor.

 7              THE COURT:  You may proceed.

 8              MS. LESTER:  Thank you.

 9    DIRECT EXAMINATION

10    BY MS. LESTER:

11    Q.  Good afternoon.

12    A.  Good afternoon.

13    Q.  Where do you work, Mr. Enright?

14    A.  I'm a contractor for AT&T Mobility.

15    Q.  What's your title there with AT&T?

16    A.  I'm a custodian of records.

17    Q.  What are your duties and responsibilities as a custodian of

18    records for AT&T?

19    A.  To verify and authenticate the legitimacy of call detail

20    records and subscriber information.

21    Q.  And, are you called upon in that work to testify, as you

22    are doing today?

23    A.  I am.

24    Q.  Do you receive any training from AT&T as part of your

25    preparation for that testimony?

D3C5dor4                        Enright - direct

1   A.   I worked for AT&T for 20 years as an employee and I was

2   trained in RF engineering and record-keeping and billing.

3   Q.   What does RF engineering mean?

4   A.   Radio frequency engineering.

5   Q.   And, can you give a layperson's definition of what that is?

6   A.   Sure.

7        Cellular is based upon transmit and receive.  If I had

8   my cell phone I could bring out my cell phone but they took it.

9        So, when your cell phone is communicating with the

10   wireless cell towers it's basically transmitting and receiving

11   signals to and from the network.

12   Q.   And you mentioned you worked for AT&T for 20 years prior to

13   doing what you're doing now?

14   A.   Correct.

15   Q.   What titles did you have during your time at AT&T?

16   A.   I was corporate security manager as well as investigations

17   and physical security manager.  I was their systems engineering

18   manager for telephone interconnect.

19        I've had lots of titles, so I mean I was promoted a

20   lot of times.  Project manager for construction of cell sites

21   and real estate acquisition, and of course I was an assistant

22   RF engineer, I think, in the very beginning.

23   Q.   And, again, RF stands for radio frequency?

24   A.   Radio frequency, yes.

25   Q.   That basically means the radio signals that are coming from

D3C5dor4                          Enright - direct

1   a cell tower, is that fair to say?

2   A.  Communicating to the mobile device from the best-serving

3   cell site.

4   Q.  And when you say cell site, is cell tower the same thing as

5   a cell site?

6   A.  Correct.

7   Q.  Could you describe, physically, what a cell tower generally

8   looks like?  How it is laid out?  How it functions?

9   A.  Certainly.

10          In an urban environment such as Manhattan, you are not

11  going to see a classic tower like you would on a mono pole in a

12  rural area.  In an urban environment, such as Manhattan or the

13  boroughs or other urban environments most likely you will see

14  antennas on top of the roof parapets or on the walls on the top

15  of the building.  So, for height you have to be above whatever

16  horizon you are trying to transmit to but not too high so you

17  don't interfere with other cell sites.

18          So, a typical cell site could be a building next-door

19  to us where you'll see the antennas and they're panel antennas

20  about the size of a mail box and they'll be in a different

21  array and by that I mean they're sectorized.  So, if you can

22  imagine a pizza pie cut into three pieces, you will have a zero

23  sector pointing north, you will have a 120-degree sector

24  pointing Southeast, and a 240-degree sector pointing Southwest.

25  And that's not a hard and fast rule but that's just generally

1  how cellular towers are corrected.  And then they run -- from

2  the antennas they run co-axial lines down to the equipment

3  which houses the RF engineering transmit and receive equipment.

4  Q.  And what is the relationship -- let me ask you this:  When

5  a handset device, in other words a cellular phone places a

6  call, what happens?

7  A.  Basically as long as your phone is powered on, at all times

8  your phone is registering with the closest available cell

9  tower, so the switch which controls everything, all the cell

10  sites are tied into a main switch hub, they need to know

11  exactly the cell site area that you are in so if you want to

12  make a call or send a call or other communication like a text

13  message or what have you, that they're able to provision you

14  with what I call a voice channel.

15          So, if you are going to make a telephone call and your

16  phone is powered on I already know where you are.  I know the

17  best serving cell site even if you're moving because these

18  things work in microseconds and I'll be able to provide you

19  with a suitable voice channel within a very, very short period

20  of time -- seconds -- once you hit "send" on your phone to make

21  a call and, conversely, if someone receives a call, the network

22  knows where you are so an inbound call can go from the land

23  line network to the cellular switch to the serving cell site to

24  the mobile device.

25          MR. ROTH:  Judge, I'm going to object to knowing where

1    the person is, the caller is.

2                THE COURT:  Overruled.  You will get a chance to cross

3    on it.

4                Go ahead.

5    BY MS. MASELLA:

6    Q.  Mr. Enright, does AT&T make and maintain records regarding

7    what cellular tower is used by a cell phone when it is making a

8    particular call?

9    A.  It does.

10   Q.  And does it do that for every time a cell phone makes a

11   call?

12   A.  Generally, yes.

13               If there is a call that for whatever reason there is

14   different conditions, if there is poor RF -- we have all had

15   experiences where the signal on our cell phones was poor and it

16   dropped; if you hit "send" and the call doesn't go through a

17   variety of conditions where nothing even registered, it didn't

18   even make it to the cell tower and there is nothing happening

19   at that point, there are several conditions that can cause that

20   field where we populate the cell site -- which is at latitude

21   and longitude in the sector -- to be blank.

22   Q.  Let me ask you this:  Besides the cell site information

23   that you just recounted for the jury, what other types of data

24   does AT&T record about its customers?

25   A.  Well, if you look for, as an example -- are you talking

D3C5dor4                        Enright - direct

1    about call detail records or subscriber information?

2    Q.  Either one.

3    A.  Okay.

4    Q.  I guess are both records that AT&T maintains?

5    A.  Sure.  Let's go over call detail records first.

6         If you have call detail records for voice calls and

7    text messages and for data sessions you will have the date, the

8    time, the duration of the call, the to and from numbers -- the

9    originating number and number dialed.  For text messages it

10   will say in or out -- inbound or outbound -- and for data

11   sessions it will say kilobytes, I believe.  For subscriber

12   information, at the point of sale you will collect the name and

13   address of the subscriber, the telephone number that's

14   provisioned for that subscriber and other miscellaneous

15   information such as that e-mail address is often collected.

16   Q.  Now, are you familiar with the records that you just

17   describe, subscriber records, call detail records and cell site

18   records as they're created and maintained by AT&T?

19   A.  I am.

20   Q.  And, prior to testifying here today were you asked -- or

21   earlier today, were you asked to examine a CD that contained

22   certain records?

23   A.  I did.

24   Q.  Did you recognize those records?

25   A.  I did.

1    Q.  What did you recognize them to be?

2    A.  They were subscriber information records as well as call

3    detail records for a certain wireless number.

4    Q.  And were there also cell site location records on that

5    disk?

6    A.  Yes.

7    Q.  How were you able to recognize those as AT&T records?

8    A.  Well, they're in a format that I've testified to hundreds

9    of times and they have other designations on the record itself

10   that signifies it to be AT&T -- have a file code number,

11   they'll usually have the logo of AT&T on it.

12   Q.  And are those records that are created at or about the time

13   of the events to which they relate, that is the phone calls

14   that are actually made?

15   A.  They are.

16   Q.  And, is it AT&T's regular practice to create and maintain

17   these records during its ordinary course of business?

18   A.  It is.

19        MS. LESTER:  Your Honor, I would like to approach now

20   and show this to the witness.

21        THE COURT:  Yes.

22   Q.  Showing you what's been marked Government Exhibit 2051 for

23   identification.

24   A.  I have it.

25   Q.  Do you recognize that?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  This is the disk that I signed earlier this morning.

4    Q.  And is that the disk that you review that we were just

5    discussing containing AT&T records?

6    A.  It is.

7              MS. LESTER:  Your Honor, the government offers

8    Government Exhibit 2051.

9              THE COURT:  Any objection?

10             MS. STAFFORD:  No objection.

11             MR. ROTH:  No objection.

12             THE COURT:  Government Exhibit 2051 is received.

13             (Government's Exhibit 2051 received in evidence)

14   BY MS. LESTER:

15   Q.  Now, Mr. Enright, I would like to take a look at some

16   excerpts from the data that is on Government Exhibit 2051.

17             Ms. Brady, can we pull up a call detail excerpt?

18             Are you able to see that there in front of you,

19   Mr. Enright?

20   A.  Yes, I can.

21   Q.  What are we looking at?

22   A.  This is page 1 of a call detail record for AT&T customer

23   917-455-0969.

24   Q.  And, what information is displayed on this record?

25   A.  These are the call details as far as date and time, to and

 1   from, originating and dialed numbers, the duration of the call,

 2   the equipment referenced, and the type of call and the cell

 3   site information, latitude and longitude and sector.

 4   Q.  Now, you mentioned that there is a date and time.  Do you

 5   know what time zone that time is for?

 6   A.  It doesn't reflect -- if I had the cell site data in front

 7   of me -- I mean if I had the cell sites, if I Googled the

 8   latitude and longitude I could tell you if these were in the

 9   east or central or west but I can't tell from --

10   Q.  Is it fair to say that the time zone is tied to the

11   location of the cell tower?

12   A.  Yes.

13   Q.  So if the time zone is located in the Eastern Time Zone it

14   would be on the Eastern United States?

15   A.  Yes.

16   Q.  The series of numbers, the column that are very small?

17           THE COURT:  Are you having trouble seeing?  You can

18   sit in the next row if that happens, if you want to six to next

19   to Ms. Schuster.

20           Can you blow up some part of this Ms. Brady?  I have

21   seen you do if before.  Highlight a column?

22   Q.  Now, the column labeled cell location --

23   A.  Correct.

24   Q.  -- what is that information?

25   A.  That's the latitude and longitude of the cell site or cell

 1    sites, if there was a handoff involved, utilized for that phone

 2    call.

 3    Q.  So, that is the latitude and longitude, meaning point that

 4    you could use to tell you exactly, geographically, where this

 5    cell tower is?

 6    A.  Well, yeah; where the cell tower is exactly, yes, based on

 7    the latitude and longitude because you have to file these sites

 8    with the FCC.  So, when that call is made it is populated in

 9    the database and it was, okay, that tower is utilized in New

10    York City at this date and time for that phone call.

11    Q.  And you said that there is reference on these records for

12    the equipment used.  What does that mean?

13    A.  Well, the IMEI field stands for International Mobile

14    Equipment Identifier, that's the handset, and there is a term

15    called a dummy handset.  Cell phones are, in the new versions

16    anyway, are called dummy handsets because you put a SIM card

17    inside the handset and the SIM card is the next column which is

18    IMSI, International Mobile Subscriber Identity, and that is the

19    information that identifies you to the network.  That's where

20    all the intelligence on the phone is stored.

21              (Continued on next page)

22

23

24

25

D3cWdor5                         Enright - direct

 1   BY MS. LESTER:

 2   Q.  And that's the SIM card, you said?

 3   A.  That's the SIM card, noted here on this call detail record

 4   as, under the field IMSI, I-M-S-I.

 5   Q.  Is it possible to take a SIM card out of one phone and put

 6   it into another phone?

 7   A.  Oh, yes.

 8   Q.  What about the IMEI number; is it possible to change that

 9   number on a given phone?

10   A.  Certainly.  That's the whole premise of that.  Yeah.

11   Q.  How did that happen?

12   A.  Well, you just, if you want to, if you want to -- if you

13   have another phone that you want to use, you take the SIM card

14   out of the one phone and put it into the other.  So you're

15   going to have the original IMEI, let's stay you made it on that

16   one call, and then you want to change equipment, so you take

17   the SIM card out of that phone and put it into the new device

18   that you want to utilize for your next phone call.  But the

19   network's looking at the information transmitted based on the

20   information on the IMSI, the SIM card.

21   Q.  How long back, historically, does AT&T keep cell site

22   records such as these?

23   A.  I'd say as a guideline seven years.  But, you know, it

24   depends on the circumstances and on the carrier.  There's been

25   a lot of mergers and acquisitions.  So I would say as a general

D3cWdor5                          Enright - direct

1    rule, it could be up to seven years.  I don't believe it goes

2    beyond that.  But it could be less.

3              MS. LESTER:  May I have a moment, your Honor.

4              THE COURT:  Yes.

5              MS. LESTER:  No further questions.

6              THE COURT:  Cross-examination, Ms. Stafford.

7              MS. STAFFORD:  Thank you.

8    CROSS-EXAMINATION

9    BY MS. STAFFORD:

10   Q.  Good afternoon, Mr. Enright.

11   A.  Good afternoon.

12   Q.  Now, you testified just previously that when the cell

13   phone's turned on, it registers to the closest tower?

14   A.  To the best serving tower is what I stated in my testimony,

15   meaning the signal strength is what is going to decide what

16   voice channel that customer's provisioned with.

17   Q.  And that particular signal strength is affected by several

18   conditions, isn't that correct?

19   A.  I would say that's correct.

20   Q.  And those conditions would include the terrain, right?

21   A.  It could.

22   Q.  The weather, correct?

23   A.  It could.

24   Q.  The foilage, perhaps?

25   A.  Foilage?

D3cWdor5                          Enright - cross

1   Q.  Yes.

2   A.  You mean foliage?

3   Q.  Foliage.  Thank you.

4   A.  Yeah.

5           THE COURT:  Trees.

6           THE WITNESS:  Yeah, trees.

7           MS. STAFFORD:  Trees.  Thank you, your Honor.

8   Q.  And buildings as well, right?

9   A.  Absolutely.

10  Q.  If there's construction in the area?

11  A.  Doesn't have to be construction.  Signals refract and they

12  bounce.  This is, this is radio, so they're going to bounce

13  around.  But, generally, the way cellular's constructed is you

14  have like a honeycomb.  You have one cell site provisioned to

15  serve a specific area.

16  Q.  And the signal strength can also be affected by the cell

17  tower itself; for instance, if it's being repaired that day?

18  A.  Oh, absolutely.

19  Q.  Or if there's any software changes?

20  A.  If it's down.

21  Q.  In the area?

22  A.  If it's down, it's down, yeah.

23  Q.  And so, as you stated previously, just so I understand, you

24  said, When the phone goes on, I know who you are.  What did you

25  mean by that?

1   A.  What I meant by that is I need to know the cell site that

2   is, you are currently pinging off of so I'm regularly

3   registering your phone with the network.  It's not every

4   second, but it's on a regular interval.  So if you want to make

5   a call or if you want to receive a call, I can, as quickly as I

6   can, get you a voice channel so you can make that call or

7   receive that call.  This way, there's as little time as

8   possible for that customer to be set up with a voice channel.

9   That's the reason that, since I've been in this industry, in

10  the early '80, that's the way, the purpose of cellular, is to

11  register your phone, where are you, so I can serve you as a

12  customer.

13  Q.  And what you're really talking about is real time, correct?

14  When you say pinging, you're talking about the phone pinging

15  from the tower?

16  A.  Your cell phone is pinged by the tower, meaning that it

17  sends out a signal and the phone will reply back.  Again, these

18  are transmit-and-receive devices.

19  Q.  And that's in order, that's a benefit for you to give to

20  the customer, correct?

21  A.  Correct.

22  Q.  Okay.  But we're not talking about triangulation, are we?

23  A.  Oh, no.

24  Q.  Because triangulation requires pinging off three cell

25  towers at the same time, correct?

1   A.  That's my understanding, yes.  That's how we got the word

2   "triangular."

3   Q.  And then from that particular, those particular pingings

4   off of three separate towers, that would give you an estimate

5   or approximation of where that phone is, correct?

6   A.  Yeah.  I believe it's within 125 feet whereby, it works on

7   time and distance.  So it will ping the target mobile, and,

8   depending on which signal comes back first, they can narrow

9   down the area.  Doesn't give you like he's on that exact

10  street, spot, at the street corner, but it will get you within

11  like, I think, I believe it's around 125 feet.

12  Q.  And in the case of the record you provided to the

13  government today, that contains the location of one cell tower,

14  correct?

15  A.  Could you be more specific?

16  Q.  What I'm trying to say is the cell tower records themselves

17  reflect when the phone registered, when the phone was turned

18  on, at that particular tower; and when the cell phone call

19  ended, what cell phone tower it registered at, right?

20  A.  No, that's not correct.  Let me just clarify.

21  Q.  Okay.

22  A.  When the voice channel's provisioned, it's at that point

23  that the cell tower information is logged.  It doesn't log when

24  you're registering.

25  Q.  Okay.

D3cWdor5                        Enright - cross

1   A.  It only, that only, registration and cell sites only comes

2   into play when you're on like a Title III intercept and you're

3   looking for a kidnap victim or someone dialed 911 and you're

4   trying to find them.

5       So this is in a situation where you got a call, the serving

6   cell site is this, this is the latitude and longitude examples

7   we looked at before, and, as I said, if you're driving on that

8   same call, the record will reflect the handoffs, as I mentioned

9   earlier.

10  Q.  Okay.

11  A.  So you could use multiple cell sites during one

12  communication.

13  Q.  You just mentioned Title III investigations.  Can you tell

14  us the difference between what goes into a Title III

15  investigation and what's actually contained in the record you

16  provided today?

17          MS. LESTER:  Objection.

18  A.  I didn't say investigation.

19          THE COURT:  You could explain.

20          THE WITNESS:  It's an intercept.

21  BY MS. STAFFORD:

22  Q.  An intercept?

23  A.  So Title III intercepts, and I'm not an expert in Title III

24  intercepts by any means, but you have -- exigent circumstances

25  will require finding that particular mobile.

D3cWdor5                         Enright - cross

1    Q.   Correct.

2    A.   And at that point in time, you can use real time events

3    such as registration data to find what cell tower it's pinging

4    off of.

5    Q.   And in this particular case, you provided what are called

6    historical call detail records, correct?

7    A.   Yes, yes.

8    Q.   Call records?

9    A.   Call detail records, that's correct.

10   Q.   Call detail records that reflect phone calls made in the

11   past?

12   A.   Correct.

13   Q.   And they provide the calling number, the number that's been

14   called, the cell tower that it originated on, and the cell

15   tower that it terminated on, correct?

16   A.   Correct.

17   Q.   So we're left with just one cell tower?

18   A.   Well --

19   Q.   Or two?

20   A.   Oh.  Oh, at the end.  Yeah.  Like I said, you have

21   multiples, so it depends what we're talking about.  So we have

22   the beginning and the end and the cell towers if you have

23   multiple cell towers involved in a conversation.  If you're on

24   the phone driving on Route 80 for 60 minutes, you're going to

25   have multiple towers.

1    Q.  But the spread sheet itself reflects one tower for each

2    phone call, right?

3    A.  No.

4    Q.  Correct?

5    A.  You could have multiple on one phone call.

6    Q.  How would that be reflected on the spread sheet?

7    A.  You would have multiple -- it's not in front of me now, but

8    you would have multiple calls on that call record.

9    Q.  That reflect several different towers --

10   A.  Correct.

11   Q.  -- going down a particular column?

12   A.  Correct.

13   Q.  Okay.

14   A.  All in that same column on the far right.

15   Q.  Thank you very much.  And these records were provided

16   pursuant to a subpoena, correct?

17   A.  Well, cell sites, you'd have to get a --

18           THE COURT:  Are you muttering to yourself, or was that

19   for us?

20           THE WITNESS:  No.  I guess I wasn't close enough.

21   A.  For cell sites, to obtain cell sites, my understanding is

22   that you need a specific and articulable facts court order to

23   get location information.

24   Q.  I guess my question was these are not maintained

25   specifically for law enforcement.  Are they?

D3cWdor5                         Enright - cross

1    A.   No.

2    Q.   They're maintained for billing purpose, correct?

3    A.   Billing purposes.  Well, engineering purposes as well.

4    Q.   And those engineering purposes that you're speaking about

5    is in order to determine better ways to provide coverage for

6    your customers, correct?

7    A.   It could be for a variety of reasons.

8    Q.   Okay.

9    A.   You'd want to look at the record, and this is one database

10   where you can retrieve that information.

11   Q.   And you did not download these records yourself; you just

12   maintain them?

13   A.   I receive them from our subpoena compliance center.

14   Q.   And then --

15   A.   And then I print them out.

16   Q.   And you print them out and verify that those are the

17   records that have been requested?

18   A.   Correct.  Well, I mean I have to log in first.  They're

19   encrypted errors and they're password protected.  So I have to

20   log into the system and pull them up and then print them.

21   Q.   So you're not involved in the compilation of the data

22   that's collected in the record you provided today, correct?

23   A.   That's correct.

24   Q.   So you can't really speak about any inaccuracies or how

25   reliable they are?

D3cWdor5                        Enright - cross

1   A.  I wouldn't say that.  That's a, kind of a broad question.

2   I would say that these records are legitimate records and

3   authentic, and I'm here to authenticate them.  If there's an

4   error in them, then I certainly would want to know the root

5   cause of it, but these are billing --

6   Q.  As maintained, you don't know?

7   A.  As far as I know, these are legitimate records.

8   Q.  Legitimate meaning verified --

9   A.  They're authenticated and they're correct and true.

10          MS. STAFFORD:  Okay.  Thank you.

11          THE COURT:  Okay.  Mr. Roth.

12  CROSS-EXAMINATION

13  BY MR. ROTH:

14  Q.  Sir, I believe I heard you say when you were testifying in

15  respect to Government Exhibit No. 205 that you're not sure what

16  time zone those cell towers were in, is that correct?

17  A.  That's correct.

18  Q.  You don't even know, so you don't know whether they're from

19  California or the mid or central zone or East Coast, is that

20  correct?

21  A.  I only saw the latitude and longitude, which seems like

22  that's the eastern time zone because I've testified lots of

23  times for that longitude and latitude.  But to truly verify it,

24  I would have to log in, enter that, those coordinates to 100

25  percent be certain that it's East Coast time.

1   Q.   By the East Coast --

2   A.   I'm sorry.  Eastern time zone.  I apologize.

3   Q.   By the eastern time zone, you're suggesting it could be

4   anywhere from Maine down to Florida or right here, is that

5   correct?

6   A.   Well, if my college latitude and longitude recollection is

7   of any value here, I don't think it would be Florida.  Like I

8   said, I recognized the coordinates of 73 and 40 when I was

9   going through them.  And, generally, that's like in this area,

10  but I wouldn't be -- I certainly wouldn't say in court that

11  that's definitely New Jersey or New York or Connecticut --

12  Q.   Okay.

13  A.   -- without looking at, well, entering in those coordinates

14  myself, I'd want to make sure where that, where the, where

15  those coordinates corroborated with.

16  Q.   Fair enough.  I appreciate your candor.

17       So I assume it follows that you don't know whether the cell

18  towers that are depicted by the coordinates in the Government

19  Exhibit are what you were calling those monopoles or the other

20  type of cell towers, is that correct?

21  A.   Those are cell towers.  Could you restate your question?

22  Q.   My question -- well, I'll phrase it another way.

23       You don't know whether the towers that are depicted in

24  those call detail records are from a rural area or from an

25  urban area, is that correct?

1233|alphanum"left header center header

```
1    A.  That's correct.

2    Q.  So there's no way that you can tell this jury, fair to say,

3    what the coverage areas of the respective cell towers are that

4    are depicted in those call detail records?

5    A.  Not from just that one sheet of paper, no.

6              MR. ROTH:  Thank you.

7              THE COURT:  Nothing further?

8              MR. ROTH:  Nothing further.

9              THE COURT:  Any redirect?

10             MS. LESTER:  No, your Honor.

11             THE COURT:  Thank you, Mr. Enright.  You can step

12   down.

13             (Witness excused)

14             THE COURT:  Next witness.

15             MS. MASELLA:  Your Honor, the government calls Sterlin

16   Sahadeo.

17    STERLIN SAHADEO,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. MASELLA:

22   Q.  Good afternoon, sir.

23   A.  Good afternoon.

24   Q.  Where do you work?

25   A.  Riverroad Motor Inn.
```

D3cWdor5                        Sahadeo - direct

1    Q.  Where is the Riverroad Motor Inn located?

2    A.  4225 Webster Avenue.  That's in the Bronx.

3    Q.  How long have you worked at the Riverroad Motor Inn?

4    A.  About 13 years.

5             THE COURT:  30?

6             THE WITNESS:  13.

7             THE COURT:  13.

8             THE WITNESS:  13, yes.

9    BY MS. MASELLA:

10   Q.  What is your title or position at the Riverroad Motor Inn?

11   A.  I'm the manager.

12   Q.  What are some of your duties and responsibilities as a

13   manager of the Riverroad Motor Inn?

14   A.  Payroll, ordering of supplies.  Sometime I work at the

15   desk.

16   Q.  Would you have any role with respect to guests checking in

17   and out of that inn?

18   A.  Yes.  That's the desk job.

19   Q.  Can you tell us what kind of an inn the Riverroad Motor Inn

20   is?

21   A.  It's a motel.  We have like hourly rates.  Also overnights.

22   Q.  I'm going to approach and show you what's been marked as

23   Government Exhibit 510 for identification.  Sir, I'm going to

24   ask you if you recognize that item, Government Exhibit 510.

25   A.  Yes.  That's the Riverroad Motor Inn.  That's where I work.

D3cWdor5                          Sahadeo - direct

1    Q.   Is it photograph, sir, of that?

2    A.   Yes.

3    Q.   Is that photograph a fair and accurate depiction of the

4    Riverroad Motor Inn?

5    A.   Yes, it is.

6            MS. MASELLA:   Your Honor, the government offers

7    Government Exhibit 510.

8            MS. FONTIER:   No objection.

9            MR. ROTH:   No objection.

10           THE COURT:   Government Exhibit 510 is received.

11           (Government's Exhibit 510 received in evidence)

12           MS. MASELLA:   Can we publish it, Ms. Brady.

13   Q.   Can you tell us what street we're looking at in the

14   foreground of this picture?

15   A.   The street?

16   Q.   Yes.

17   A.   That's Webster Avenue.

18   Q.   What is to the left-hand side of the inn; is that a parking

19   lot?

20   A.   Yes.

21           MS. MASELLA:   Thank you, Ms. Brady.

22   Q.   In connection with guests who stay at the motel, are there

23   any records created related to that?

24   A.   Yeah.  We do keep three-year backup records of all the

25   guest checks in there.

D3cWdor5                        Sahadeo - direct

1   Q.  How long do you keep the records, sir?

2   A.  Three years.

3   Q.  What kind of records are actually created when a guest

    checks into or out of the motel?

5   A.  Registration card.

6   Q.  And who fills out the registration card?

7   A.  The clerk.

8   Q.  Where are the cards maintained after they're filled out?

9   A.  In a storage room.

10  Q.  Is that at the motel?

11  A.  Yes.

12  Q.  Are you one of the people responsible for maintaining those

    cards?

14  A.  Yes.

15  Q.  Are those cards regularly kept and maintained, created and

    maintained in the course of your business?

17  A.  Yes.

18  Q.  I want to direct your attention now to December 11th and

    12th of 2011.  Were you working on those days?

20  A.  Yes.

21  Q.  Do you recall what hours you were working?

22  A.  I was working the four to 12 on a Sunday night and eight to

    four on a Monday.

24  Q.  So by four to 12, you mean four p.m. to midnight?

25  A.  Yes.

1    Q.  And Sunday is the 11th?

2    A.  Yes.  Eight p.m. to four p.m.

3    Q.  The following day?

4    A.  Yes.

5    Q.  Eight a.m. to four p.m. on the 12th?

6    A.  Right.

7    Q.  And what were you doing during those two shifts at the inn?

8    A.  I was doing the clerk's position, checking in guests.

9    Q.  I'm going to approach now and show you what's been marked

10   for identification as Government Exhibit 526.  Do you recognize

11   that item, sir?

12   A.  Yes, that's one of our registration card.

13   Q.  Is your handwriting on that item?

14   A.  Yes.

15   Q.  Are you the one who filled it out?

16   A.  Yes.

17   Q.  Is it in the same condition as it was when you last saw it?

18   A.  Yes.

19   Q.  Is this one of the records that is regularly kept in the

20   course of your business?

21   A.  Yes.

22   Q.  And you're one of the people responsible for maintaining

23   that record?

24   A.  Yes.

25           MS. MASELLA:  Your Honor, the government offers

D3cWdor5                              Sahadeo - direct

1   Government Exhibit 526.

2            THE COURT:  Any objection?

3            MS. FONTIER:  No, your Honor.

4            MR. ROTH:  No, your Honor.

5            THE COURT:  No?  All right.  Government Exhibit 526 is

6   received.

7            (Government's Exhibit 526 received in evidence)

8            MS. MASELLA:  Thank you.

9            Ms. Brady, may we put it on the screen.

10  Q.  Sir, can you tell us what information is contained on this

11  card?

12  A.  Have the customer name, and the ID he used was a green

13  card, and he was from Sudan.

14  Q.  Where is the customer's name on the card?

15  A.  Top, it says Gamar Dafalla.

16  Q.  Did you write that or did the customer write that?

17  A.  I wrote that.

18  Q.  How did you know what his name was?

19  A.  He gave me his ID, which was the green card.

20  Q.  And did you write that as well, "Sudan" and "green card" at

21  the top?

22  A.  Yes.

23  Q.  Now, there are some items that appear to be crossed out.

24  Can you explain what that is?

25  A.  Yeah.  That was the customer who came before and decided

D3cWdor5                         Sahadeo - direct

1   not to take the room, and we used the same card to, for this

2   new customer.

3   Q.  I'm going to take back the original exhibit from you, sir,

4   so we can see the back.

5         Sir, can you tell us in general what information is

6   contained on the back of the card?

7   A.  The check-in and check-out time, and it says "ON."  That

8   means overnight.  It means he stayed for the full night.

9   Q.  Which one is the check-in time, the one on the right or the

10  left, in this picture?  If you're unable to see it, I can hand

11  you back the original.

12  A.  I believe it's the one on the right.  December 11.

13  Q.  Are you the one who checked this guest into the hotel?

14  A.  Yes.

15  Q.  And did you create this time stamp when you did that?

16  A.  Yes.

17  Q.  And the one on the left is which one then?

18  A.  That's the check-out time.

19  Q.  What is the writing over the check-out time?

20  A.  It says "ON."  That means overnight.

21  Q.  And did you write that?

22  A.  Yes.

23  Q.  Mr. Sahadeo, I'm just going to hand this back to you so you

24  can look closely at it.

25  A.  Okay.

1    Q.  And can you read for us what the time stamp on the right,

2    the check-in time, says?

3    A.  6:42 p.m.

4    Q.  On what date?

5    A.  December 11.

6    Q.  What about the check-out time?

7    A.  10:32 a.m., December the 12th.

8    Q.  Thank you.

9              MS. MASELLA:  No further questions, your Honor.

10             THE COURT:  Any cross-examination?

11             MS. FONTIER:  No, your Honor.

12             MR. ROTH:  Briefly, Judge.

13             THE COURT:  Yes.

14             MR. ROTH:  Ms. Brady, could we have 526 up again,

15   please.

16   CROSS-EXAMINATION

17   BY MR. ROTH:

18   Q.  Just to help me out here, whose address is that that

19   appears there, by street number?

20   A.  That was the customer who checked in before.  He didn't

21   take the room.  That's his information.

22   Q.  So where does the customer's, Mr. Gamar Dafalla, address

23   appear on that registration card?

24   A.  He had no address.  He had a green card ID, and that does

25   not carry an address.

1   Q.  Fair enough.  And there's an indication for a make of a

2   car.  What is that designation?

3   A.  Okay.  All those information is from the previous customer

4   who did not take the room.

5   Q.  So that has nothing to do with Mr. Dafalla?

6   A.  No, nothing to do.  No.

7   Q.  Did Mr. Dafalla sign this card?

8   A.  No.  He -- signed?  No, he didn't.

9   Q.  You didn't ask him what car he had?

10  A.  No.

11  Q.  And you didn't ask him to sign the registration?

12  A.  No.

13          MR. ROTH:  Thank you for the clarification.

14          THE COURT:  Redirect?

15          MS. MASELLA:  No, your Honor.  Thank you.

16          THE COURT:  Mr. Sahadeo, thank you very much.  You may

17  step down.

18          (Witness excused)

19          THE COURT:  Next witness.

20          MS. MASELLA:  Your Honor, the government calls Zhao

21  Liang, and this witness will be testifying through an

22  interpreter who is also present in the courtroom.

23          THE COURT:  Okay.  Let me first swear the interpreter,

24  if the interpreter could state her name and spell her name for

25  the record.

D3cWdor5                           Sahadeo - cross

1           THE INTERPRETER:  Charley Chan.  C-H-A-R-L-E-Y and

2     C-H-A-N.

3           THE COURT:  Ms. Chan.

4           (Cantonese interpreter sworn)

5      ZHAO QIANG LIANG,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8           MS. MASELLA:  Your Honor, I'd just note we're having

9     some trouble hearing the interpreter.  Maybe she could use the

10    microphone.  Thank you.

11    DIRECT EXAMINATION

12    BY MS. MASELLA:

13    Q.  Sir, are you fluent in English?

14    A.  A little bit.  Not much.

15    Q.  What language are you testifying in here today?

16    A.  Cantonese.

17    Q.  How old are you?

18    A.  52.

19    Q.  In what area do you live?

20    A.  Manhattan.

21    Q.  Are you currently employed, sir?

22    A.  I'm working as a part time.

23    Q.  What kind of work are you doing part time?

24    A.  In a sewing factory.

25    Q.  What kind of other work have you done in the past?

D3cWdor5                          Liang - direct

1   A.   In restaurant.  I work in restaurant too.

2   Q.   Have you ever given customers rides, taxi rides, in

3   exchange for money?

4   A.   Yes.

5   Q.   But do you consider yourself a taxi driver?

6   A.   No.  I do not.

7   Q.   I want to turn your attention to December of 2011.  What

8   kind of car were you driving at that time?

9   A.   Toyota Sienna van.

10  Q.   What color was it?

11  A.   Silver.

12  Q.   Were there times when you used that silver Toyota Sienna to

13  give passengers rides in exchange for money?

14  A.   Yes.  I did.

15       MS. MASELLA:  Ms. Brady, could we put up Government

16  Exhibit 250 in evidence, please.

17  Q.   Do you recognize that photograph, sir?

18  A.   This is my car.

19       MS. MASELLA:  You can take that down, Ms. Brady,

20  please.

21  Q.   Mr. Liang, were you ever present inside your van during a

22  robbery?

23  A.   There's only one time.  There was only one time.

24  Q.   When was that, sir?

25  A.   I'm not sure about the time.

1   Q.  Do you remember the month and the year?

2   A.  It should be 2011, December.

3   Q.  What location were you in inside your van when that

4   occurred?

5   A.  It's in the Bronx, and then I think there is called Mount

6   Vernon, but I don't know how to spell that name.

7   Q.  Can you describe where it is in relation to the Bronx?

8   A.  It is around 240th Street.

9   Q.  Who else was with you?  Who, if anyone, else was with you

10  in your minivan when the robbery occurred; how many other

11  people?

12  A.  There are two, two people.

13  Q.  Who were those two other people?

14  A.  I don't know their names.  One of them, I've heard it from

15  the police that he pass away.

16  Q.  Do you know any part of his name?

17  A.  I don't know the name because they, we just call each other

18  my friend.

19  Q.  Did you know where this person who called you my friend was

20  from?

21  A.  One live around that area and one was travel by bus.

22  Q.  The person who after that was deceased, is that the person

23  who traveled by bus or the person who lived nearby?

24  A.  The person that is deceased is by bus.

25  Q.  Who is the second person?

D3cWdor5                         Liang - direct

1   A.  He lives around that area, but I'm not sure exactly where,

2   but is very close to that store, the store that I recognize.

3   Q.  Which store are you referring to?  Where is it?

4   A.  So, it was the store in Mount Vernon.

5   Q.  Are you saying Mount Vernon?

6   A.  Mount Vernon.

7   Q.  Mount Vernon is where the store was and where the robbery

8   occurred?

9   A.  Mount Vernon.

10          THE INTERPRETER:  Sorry.

11  BY MS. MASELLA:

12  Q.  On that day, was one of those persons a passenger of yours?

13  A.  They are both my passengers.

14  Q.  Had you agreed to drive one of them in exchange for money?

15  A.  Yes.

16  Q.  Which one, the guy that travels by bus or the person who

17  lived in Mount Vernon?

18  A.  At first I promise the guy who travel by bus that I can

19  take him in exchange for money.

20  Q.  The person who traveled by bus, had you driven him on prior

21  occasions in exchange for money?

22  A.  One time.

23  Q.  And when was that; about how long before December?

24  A.  One week before the incident.

25  Q.  Now, on this occasion of the robbery, when did the person

D3cWdor5                       Liang - direct

```
 1   who traveled by bus first arrive into town, into New York, as

 2   far as you know?

 3   A.  I do not remember the day, but it is around three to four

 4   p.m. in the afternoon.

 5   Q.  How many days before the robbery was it?

 6   A.  One day before, the day that I actually took him to the

 7   hotel.

 8   Q.  Okay.  So the day before he arrived around three or four

 9   p.m., and where did you pick him up?

10   A.  In Chinatown.

11   Q.  And where did you drive him to that day?

12   A.  In a motel in Mount Vernon.

13   Q.  Was that person carrying anything with him when you picked

14   him up?

15   A.  A few boxes of stuff.

16   Q.  Do you know what he was carrying in those boxes?

17   A.  Before I didn't know, but later on I did.  I know it.

18   Q.  When you later found out, what did you find out?

19   A.  It's cigarettes.

20            THE COURT:  How did you know that?

21            THE WITNESS:  The next day he asked me to pick him up

22   again and then want me to take him to a place and then get

23   cardboard box.  Then we took the cardboard box, go back to the

24   hotel, and I was in the room to see him; that is, putting the

25   stuff into the boxes.
```

1        And then he told me to move the boxes on to the car.

2   BY MS. MASELLA:

3   Q.  Sir, after you dropped this person off at the hotel, when

4   is the next time you saw him?

5        THE INTERPRETER:  You mean after he first pick up from

6   Chinatown?

7        MS. MASELLA:  Correct.

8   A.  Next day, around nine or ten in the morning.

9   Q.  Had he asked you to come back around nine or ten in the

10  morning?

11  A.  Yes.

12  Q.  And where was that that he asked you to come back to?

13  A.  The motel.

14  Q.  And when you got back to the motel at nine or ten, what

15  happened then?

16  A.  So he told me to go to get the cardboard box.

17  Q.  Did you go to get cardboard boxes?

18  A.  So I drove him to go to get the cardboard boxes and then

19  drove him back to the motel and put the stuff in the boxes.

20  Q.  When you say put the stuff in the boxes, who did that?  Did

21  he do that, or did you do that, or both?

22  A.  He did it.

23  Q.  Did you see him doing that?

24  A.  Yes.

25  Q.  Did you see what the items were?

D3cWdor5                          Liang - direct

1    A.  Cigarettes.

2    Q.  And how many cartons of cigarettes did he put into the

3    boxes, if you know?

4    A.  So the boxes, each one of them, is this big, and then he

5    put the cigarette into all his boxes.  He had four of them.

6    Q.  Do you know how many cartons fit into those boxes?

7    A.  I don't know.

8    Q.  Were the boxes mostly full?

9    A.  Almost.

10   Q.  Before the cigarettes were put into the boxes, did you see

11   where they had been before that?

12   A.  No.

13   Q.  Do you know in what containers he had been carrying the

14   cigarettes?

15   A.  In the luggage.

16          MS. MASELLA:  Ms. Brady, can we put up 208, please, in

17   evidence.

18   Q.  Sir, do you recognize this photo?

19   A.  Yes.

20   Q.  What are those?

21   A.  These are the luggage.  The two, the top two are the

22   luggage that he used to carry the cigarettes.  The one on the

23   lower right corner is the one that he put his own personal

24   stuff in.

25   Q.  But the two, the blue one and the green one, on the upper

1   part of the photo are where the cigarettes had been?

2   A.  Yes.  Correct.

3          MS. MASELLA:  Thank you, Ms. Brady.

4   Q.  After the cigarettes were put into the boxes, where did the

5   boxes go?

6   A.  So we put it into the vehicle, and then I drove the vehicle

7   to Mount Vernon, one of the store in Mount Vernon.

8   Q.  So did you help this person put the boxes back into your

9   vehicle?

10  A.  Yes.  He want me to, he asked me to help him.

11  Q.  Did you also put the suitcases back into your minivan?

12  A.  The luggage is still in the car.

13  Q.  That's what I meant, the luggage.  Did that go back into

14  your minivan?

15  A.  So the luggage is in the car.

16  Q.  Approximately what time did you and this other person leave

17  the hotel in your minivan?

18  A.  I'm not sure.  Maybe around half an hour that we left.

19  Q.  What time would that have been?

20  A.  Around, sometime after nine and before ten.

21  Q.  In the morning?

22  A.  Yes.

23  Q.  After you left the hotel in your minivan with this other

24  person, did there come a time when you picked up a third

25  person?

D3cWdor5                              Liang - direct

1   A.  So, when we -- yes.  When we arrived at that store and then

2   there's another person came out from the store and to talk to

3   him.

4   Q.  What happened at that time?

5   A.  So they talk for about an hour, and then the guy that I

6   drove him to the store went inside to the store.  And later on,

7   the guy came out of the store, told me to drive to a few blocks

8   down the road.

9   Q.  And did you, in fact, drive a few blocks down the road

10  after that?

11  A.  Yes, I did.

12  Q.  Was that still in Mount Vernon?

13  A.  Supposedly, yes.

14  Q.  And were there still the three of you inside of your

15  minivan?

16  A.  At that point, there's only two of us, I and the guy who

17  came out from the store.

18  Q.  And what happened when you got to that other location in

19  Mount Vernon?

20  A.  So he told me to stop and then he call up one, he call, and

21  then I remember that I saw somebody actually got out from

22  another car that is a few yards away, a few feet away.  And I

23  remember the car is, it was a Jeep.  Infiniti Jeep.  A black

24  Infiniti Jeep.

25  Q.  Did the person from the black Infiniti Jeep come towards

D3cWdor5                          Liang – direct

1   your minivan?

2   A.  So at that point, my passenger actually got out of the van

3   to walk towards him, to talk to him.  And then later on, he

4   came back to pick up the boxes and transfer the boxes to the

5   Jeep.

6   Q.  Who transferred the boxes, your passenger or the guy from

7   the Infiniti?

8   A.  Both of them.

9   Q.  Once the boxes were transferred out of your car, did you

10  see any money exchange take place?

11  A.  No, I did not.

12  Q.  And after the boxes were transferred out of your car, did

13  you leave that area?

14  A.  So what I saw was the guy hand my passenger a black bag

15  that something is inside.  So then my passenger came back to my

16  car.

17  Q.  Once he came back to your car, did you and he leave that

18  area inside your car?

19  A.  So he told me to drive to the store.

20  Q.  By the store, you're referring to the store also in Mount

21  Vernon?

22  A.  Yes.

23  Q.  That was a short distance away?

24  A.  Yes.

25  Q.  When you and your passenger got back to the store in Mount

1   Vernon, did anybody else get inside your car?

2   A.  So when we arrived to the store, my passenger told the guy

3   who later on deceased, came back and got up to the car, to my

4   car.

5   Q.  So the guy who was later deceased got back in your car?

6   A.  Both of them were in my car.

7   Q.  So there are three people in your car at this point, right?

8   A.  Yes.

9   Q.  Was the black bag that you described still in your car?

10  A.  Yes.

11  Q.  Did you see what was inside the black bag that day?

12  A.  I did not actually see it, but I kind of know that they are

13  at the bag to, counting something.

14  Q.  How do you know they were counting something?

15  A.  Because I heard that, it seems like they are counting

16  money.

17  Q.  Sir, were you paid any money that day?

18          THE INTERPRETER:  Excuse me.  Can you repeat?

19  BY MS. MASELLA:

20  Q.  Were you paid any money that day?

21  A.  I don't understand the question.

22  Q.  Were you paid money that day for driving the passenger?

23          THE INTERPRETER:  You mean he paid to the passenger or

24  passenger paid to him?

25          MS. MASELLA:  Did he receive any money that day?

1    A.  No.  No.

2    Q.  Did you have some agreement with the passenger as to how

3    much you would be paid for driving him?

4    A.  Yes.  I did.

5    Q.  What was that agreement?

6    A.  $60.

7    Q.  Did you receive $60 that day?

8    A.  So I got $60 on that day before.  But on that day that I'm

9    supposed to get another $60, I never got.

10   Q.  How long were you and these two other individuals inside

11   your minivan while they were counting money, approximately?

12   A.  More than ten minutes, because when they are counting, they

13   are also talking.

14   Q.  And what happened after approximately ten minutes?

15   A.  I did not notice what happened until there are two men

16   actually came towards my car and then one of them actually has

17   a gun that is on my driver's side, that came to approach my

18   driver's side.

19   Q.  Were you in the driver's seat when this happened, sir?

20   A.  Yes, I was.

21   Q.  Tell us what happened when the guy approached the driver's

22   side of your van.

23   A.  The only English that I can make out of is he seems like

24   he's asking me for money and cigarettes.

25   Q.  So did the person say other words that you couldn't

1   understand?

2   A.  Yeah.  He said something that I didn't understand, but I

3   think eventually he want me to pull out my wallet.

4   Q.  Did you do that?

5   A.  Yes, I did.

6   Q.  And what did he do with your wallet?

7   A.  He didn't, he did not take my wallet, but he was talking to

8   the guy came out from the store.

9   Q.  All right.  The guy that approached the driver's side of

10  your minivan, was he carrying any weapon?

11  A.  Yes.

12  Q.  What kind of weapon?

13  A.  A pistol.

14  Q.  And what did the pistol look like?

15  A.  In mainland China, they call it Kojak.  It's the Chinese

16  term.  I think probably it's a Glock.

17          MS. MASELLA:  I didn't hear the last word the

18  interpreter said.

19          THE INTERPRETER:  A clock.  A clock.  A Glock.

20  BY MS. MASELLA:

21  Q.  Mr. Liang, do you know the difference between a revolver

22  and semiautomatic gun?

23  A.  I know what is a revolver, but it was not a revolver.

24  Q.  This gun was not a revolver?

25  A.  No.

1    Q.  Can you tell us what color or colors the gun was?

2    A.  So the gun itself is black and the handle is the color of

3    the wood.

4           MS. MASELLA:  And, for the record, indicating the wood

5    on the witness stand in front of the witness.

6    Q.  Can you describe that person for us?  Tell us how tall he

7    was, what size he was, what he was wearing.

8    A.  The guy on my driver's side wear a sweater and has a hat

9    that covered the head.  And also is like a mask covering the

10   face.  Doesn't reach six feet.  Maybe five feet something,

11   maybe half a head taller than me.

12   Q.  How tall are you, sir?

13   A.  Five feet five inches.

14   Q.  What color was the mask?

15   A.  Black.

16   Q.  Did you also see the person who approached the passenger's

17   side of the car?

18   A.  Yes.  They opened the door at the same time.

19   Q.  What did the person on the passenger's side look like?

20   A.  That guy was wearing brown sweater.  Also has the mask.

21   But I did not see any weapon on him.

22   Q.  What color was his mask, the guy on the passenger's side?

23   A.  I don't remember.

24          THE INTERPRETER:  Oh.

25   A.  Because the passenger that came out from the store, he was

D3cWdor5                          Liang – direct

1  actually sitting on the passenger's side.  Only the guy who

2  deceased was sitting at the back.

3  Q.  Were you able to see the skin color of either the person

4  who approached the driver's side or the passenger's side?

5  A.  Supposed to be black.

6  Q.  Both of the individuals?

7  A.  Yes.  I was nervous at that point, so I think that they are

8  black.

9  Q.  And after those individuals opened the doors to your van,

10  what did you do after that?

11  A.  He told me to get down from the car.

12          THE COURT:  Get out of the car or get down in the car?

13          THE WITNESS:  He was actually pulling me to get out.

14          THE INTERPRETER:  Sorry.

15  BY MS. MASELLA:

16  Q.  Did you get out of the car at that time?

17  A.  Yes.

18  Q.  Did anyone else get out of the car?

19  A.  My passenger from the store also was being pulled out from

20  the car.

21  Q.  Did anyone remain inside of the car?

22  A.  The guy who deceased was still remain in the car.

23  Q.  The guy who had traveled with the suitcases full of

24  cigarettes?

25  A.  Yes.

D3cWdor5                          Liang - direct

1   Q.  What happened after you got out of the car?

2   A.  So the two guys that, with the masks got on to the car and

3   then they drove off.

4   Q.  Did you see which direction the car went in?

5   A.  It's a straight road.  Just, they went down the road.

6   Q.  Did you try to follow your car?

7   A.  I did not, but my passenger that is from the store actually

8   chase after them for a hundred yards.

9   Q.  And what happened at that point?

10  A.  So I -- afterward, I saw my passenger that was a hundred

11  yards away, that he picked up something on the ground.

12  Q.  Did he later walk back towards where you were?

13  A.  I saw that the stuff that he pick up from the ground, it

14  was from throwing out from the car, so he eventually -- he

15  walked towards me.

16  Q.  And when you say that the stuff on the ground was thrown

17  from the car, did you later see what that was?

18  A.  It's money.

19  Q.  Was it the same money in the plastic bag you were

20  describing earlier?

21  A.  Yes, because the passenger was still counting the money at

22  that point.

23          MS. MASELLA:  One moment, your Honor.

24          No further questions at this time for Mr. Liang.

25          THE COURT:  All right.  Why don't we take our

D3cWdor5                         Liang - direct

1    afternoon break now.  We're going to go until about five, a

2    little bit after five.  We won't go all the way to 5:30 today.

3    Don't discuss the case.  Hopefully, there are some snacks back

4    there for you, and we'll see you in about ten minutes.

5              (Jury excused)

6              THE COURT:  Have a seat.

7              Anything we need to discuss before we take a short

8    break?

9              MS. MASELLA:  No, your Honor.

10             MS. FONTIER:  No, your Honor.

11             THE COURT:  Let's take a quick break.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D3C5dor6                         Liang – direct

1          MR. MURPHY:  Just the one issue, the photos; are those

2     still shots going in?

3          MS. MASELLA:  No.

4          MR. MURPHY:  Nothing then.

5          THE COURT:  All right.  So, we're good?  All right,

6     great.  Thanks.

7          (Recess)

8          THE COURT:  Are we ready?  So we are done with direct?

9          MS. MASELLA:  Yes, your Honor.

10          THE COURT:  Cross.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3C5dor6                          Liang - direct

 1          (Jury present)

 2          THE COURT:  Okay.  Have seats.

 3          We will now have cross-examination of Mr. Liang by

 4     Ms. Fontier, is that correct?

 5          MS. FONTIER:  Yes, your Honor.  Thank you.

 6     CROSS EXAMINATION

 7     BY MS. FONTIER:

 8     Q.  Mr. Lang, I just have a couple of questions for you.

 9          You said you were 5'5", correct?

10     A.  Yes.

11     Q.  And now, on December 12th, and you're describing this

12     incident that took place, the robbery, you said you were seated

13     in the driver's seat of your van, right?

14     A.  Yes.

15     Q.  And people approached from either side of the van, correct,

16     so one person approached the driver's side and one approached

17     the passenger?

18     A.  Yes.  Correct.

19     Q.  And the person on the passenger side you said you can't

20     really describe at all, correct?

21     A.  Correct.

22     Q.  The person then that came to your window was just a few

23     inches from you on your left there, right?

24     A.  When he pulled open my door then I realize that there was

25     somebody there.

D3C5dor6                         Liang - cross

1    Q.  So, you were in the van and the person physically opened

2    your driver's side door?

3    A.  Correct.

4    Q.  And then that person continued to stand right at the door

5    while he was speaking to you, correct?

6    A.  So he was holding a gun and standing next to me.

7    Q.  So, just a few inches away from you?

8    A.  Just like I and the interpreter, distance.

9    Q.  For the record, the interpreter is standing about, to my

10   estimation about a foot, foot and a half from the witness.

11          And so now, and then you said he made you get out of

12   the vehicle, right?

13   A.  Correct.

14   Q.  And so, when you got out you were standing right in front

15   of him, is that right?

16   A.  When he opened my door he asked for wallet and cigarettes

17   first and then he asked me for money.  So, I pull out my wallet

18   and hold it in my hand.  He told me to get out of the car.  So,

19   I didn't have time to react and he pulled me out.  So, I came

20   down from the car, came out from the car, and then I walk past

21   him because he has a gun in his hand.  So, I just want to stay

22   a little bit further away.

23   Q.  But when you -- the moment when you came out of the car he

24   was still standing right by your door, correct?

25   A.  Since he pulled me out of the car he was standing right

D3C5dor6                      Liang - cross

1    next to the door.

2    Q.  So, when you came out you had to walk very close to this

3    person, right?

4    A.  I do not understand the question.

5    Q.  Just trying to get a mental picture of what happened.

6            The man opened the door and took you out and he didn't

7    back away or leave, right?  He stayed in that area?

8    A.  So, he pulled me down, I step aside, and then he jump into

9    my car.

10   Q.  So, as you were switching places, he's getting into the

11   car, you're getting out, you were right next to each other,

12   right?

13   A.  Yes.

14   Q.  And so, as you're standing on the ground next to him,

15   that's when you are able to observe that this person was less

16   than six feet tall, correct?

17   A.  So, I realize that when I got down from the car and

18   actually he was this much taller than me.

19   Q.  Okay.  Thank you.  I have no further questions.

20   A.  I was nervous so I'm not really clear of the whole thing.

21           MS. FONTIER:  Okay.  I have no further questions,

22   thank you.

23           THE COURT:  Mr. Roth?

24           MR. ROTH:  Briefly, your Honor.

25   CROSS EXAMINATION

D3C5dor6                          Liang – cross

1   BY MR. ROTH:

2   Q.  Good afternoon, Mr. Liang.

3   A.  Good afternoon.

4   Q.  How many times, prior to the incident that you're talking

5   about, had you picked up the deceased?

6   A.  The best I can remember, maybe three to four times.

7   Q.  And those three or four times, does that include the day

8   before when you picked him up from Chinatown and brought him to

9   the Bronx?

10  A.  Yes.

11  Q.  And each of those three or four times, was the purpose for

12  you picking him up was for him to engage in illegal cigarette

13  transactions?

14  A.  At the beginning I did not know that it was illegal.

15  Q.  No, no.  I appreciate that, but at some point you've told

16  the government that you realized that he was dealing with

17  illegal cigarettes, is that fair to say?  Or untaxed

18  cigarettes?

19  A.  Supposedly; because I really don't know where the

20  cigarettes come from.

21  Q.  Fair enough.

22          On those two or three other times or three or four

23  other times he was doing transactions with cigarettes.  We will

24  leave it at that.

25  A.  Yes.

D3C5dor6                          Liang - cross

1    Q.  And on those other prior occasions was he doing

2    transactions with the second person that you came into contact

3    that day with that you picked up at the store?

4    A.  Yes.

5    Q.  How do you refer to that second fellow, if at all?  Do you

6    call him a name or refer to him in some way?

7    A.  No.  I address him as my friend.

8    Q.  You refer to the person that you picked -- the deceased

9    that you picked up as "my friend," right?

10   A.  Before that I wanted to make a comment on something.

11            THE COURT:  No, no.  Just answer the question.

12            THE WITNESS:  (In English)  Okay.  Yeah.

13            THE WITNESS:  Yes.

14   Q.  Did you refer to both the people as your friend?

15   A.  So, because he used me, he used my car for more than one

16   time and I don't know his name, so that's why I just call him

17   my friend.

18   Q.  No.  I appreciate that.  That's the deceased, right?  I'm

19   talking about the other person that you were talking about that

20   you had -- who was involved in the three or four other

21   transactions with your friend.

22   A.  The person from the store, the second person actually

23   called me my friend -- I mean his friend, and that's why I call

24   him my friend.

25   Q.  Okay.

1        And there was an additional person in the Infiniti, is

2   that correct; a third person?

3   A.  Yes, because the guy is -- that was in the Infiniti

4   actually contact -- has contact with the guy that did not pass

5   away.

6   Q.  Right.

7        And the guy in the Infiniti, had you seen the guy in

8   the Infiniti or his car before?

9   A.  Yes.  I did not see the car before but the previous two

10  times it was the same transaction.

11  Q.  So, you had seen the man who was in the Infiniti on the

12  date that you testified about today on prior occasions involved

13  in cigarette transactions as well?

14  A.  Correct.

15  Q.  And on the prior times when you saw the man in the Infiniti

16  doing cigarette transactions were the two other people that you

17  described today present during those transactions?

18  A.  No.  Only the guy from the store was present when --

19  Q.  So there was -- on one or more of these prior occasions you

20  saw the guy in the Infiniti involved in cigarette transactions

21  where neither of those two other fellows were present?  Is that

22  correct?

23          MS. MASELLA:  Objection.

24          THE COURT:  I think that's fine.

25  A.  That's not correct.  It is only the guy that is still alive

D3C5dor6                       Liang - cross

1    that has contact with the Infiniti guy.

2    Q.  Okay.  So those two were involved in transactions that you

3    drove one or both of them to, is that correct?

4    A.  Yes.  I drove the guy from the store to do the transaction.

5              THE COURT:  Wait, wait.

6              Ms. Chan, can you speak up a little bit?  It is a big

7    room and I think the jury is having some trouble hearing you,

8    okay?

9              INTERPRETER:  I drove the guy from the store to do the

10   transaction with the guy from the Infiniti.

11   BY MR. ROTH:

12   Q.  Do you know what country the fellow from the store is from?

13   A.  I'm not sure.  I believe he mentioned he may be from Sudan,

14   from Africa.

15   Q.  So, this fellow who may have been from the Sudan, was he

16   the one who was selling cigarettes to the guy in the Infiniti

17   on the other occasions?

18   A.  Correct.

19   Q.  And had you made contact or had contact with the gentleman

20   from the Sudan prior to you having ever have contact with the

21   deceased?

22   A.  Yes, because the first time when the transaction happened,

23   it was the guy from the store who called me to do the job.

24   Q.  And, to do that transaction the first time did it involve

25   this hotel as well?

D3C5dor6                         Liang - cross

1    A.  No.  The first time I did not go to the hotel -- the motel.

2    Q.  Where was that transaction?

3    A.  So, the first time is the guy from the store call me to go

4    to pick up some stuff and then go to the store.

5    Q.  So, you picked up some stuff that may have been cigarettes

6    from someplace and you brought it to the store?  Is that

7    correct?

8    A.  No.  So, the first time is the guy from the store told me

9    to transport some stuff from Chinatown to the store.

10   Q.  And how did he get your telephone number, sir?

11   A.  He asked my phone number and saying that the next time I

12   need you I will call you.

13   Q.  How did he get your number the first time is my question.

14   A.  It was out on the street that he asked me whether I want to

15   transport something for him and I can pay you.

16   Q.  Briefly describe, if you could for the jury, the other

17   transactions you did with this fellow from the store.

18   A.  So, the second time the guy from the store told me to pick

19   up the guy who died in Chinatown, the guy who passed away

20   bought all the cigarettes and transport it to his store.  So,

21   the store person connected with the guy with the Infiniti to do

22   the transaction.

23   Q.  Okay.

24          So, was there any time where the guy from the store

25   was with the guy from the Infiniti and the deceased were all

D3C5dor6                         Liang – cross

1    together?

2    A.  Never.

3    Q.  So he kept -- the guy from the store kept the deceased

4    separate from the guy in the Infiniti, is that right?

5    A.  Correct.

6              MR. ROTH:  Thank you.  I have no further questions.

7              THE COURT:  Any redirect?

8              MS. MASELLA:  No, your Honor.

9              THE COURT:  Thank you, Mr. Liang.  You may step down.

10             Thank you, Ms. Chan.

11             INTERPRETER:  You're welcome.

12             THE COURT:  Government, your next witness.

13             MS. LESTER:  Your Honor, the government calls George

14   Drape.

15    GEORGE DRAPE,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18             THE COURT:  Mr. Drape, maybe move that microphone

19   closer?

20             Keep your voice up, don't talk too fast, and you may

21   proceed, Ms. Lester.

22             MS. LESTER:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MS. LESTER:

25   Q.  Good afternoon, sir.

D3C5dor6                          Drape - direct

1    A.  How are you.

2    Q.  What type of work do you do?

3    A.  Repossession and towing.

4    Q.  And, do you own your own business?

5    A.  I'm sorry?

6    Q.  Do you own your own business?

7    A.  Yes.

8    Q.  What's the name of the business?

9    A.  Masters Auto Recovery Incorporated.

10   Q.  How does your business work?

11   A.  We get assignments from clients, mainly banks, and they'll

12   send us out to go collect the car.

13   Q.  So, when you say repo, do you mean repossession?

14   A.  Yes.

15   Q.  And you get information from banks about cars; what's your

16   understanding of what is the situation with those cars?  Why

17   are the banks asking for the cars?

18   A.  The people are in debt, mainly two to three months behind.

19   Q.  How do you locate the cars that the banks ask you to find?

20   A.  We have several different ways, mostly license plate

21   recognition technology, where we collect a lot of data using

22   cameras with laptops and signal processors and there is also

23   the banks give us primarily their whereabouts, last known

24   location.  Stuff like that.

25   Q.  When you say their whereabouts, who are you referring to?

D3C5dor6                          Drape - direct

1    A.  The home of the debtor.

2    Q.  So, the individual who owns the car or has possession of

3    the car?

4    A.  Correct.

5    Q.  And you mentioned license plate recognition technology?  Is

6    that what you called it?

7    A.  Yes.

8    Q.  Can you explain to the jurors what that is?

9    A.  Basically it is a camera system that's connected to a

10   signal processor and a laptop.  The information is captured as

11   you're driving by the car it will take a picture -- it takes

12   two pictures in a split second.  It will collect the data, then

13   send it to a main storage and it will be there for use for

14   years to come.

15   Q.  Now, can you explain how does your company go out and

16   locate the cars that you're looking to repossess -- or the

17   banks are looking to repossess?

18   A.  We have cars that scan 24 hours a day, seven days a week,

19   so they're capturing pictures all day long seven day a week.

20   Q.  So, your company has vehicles that capture the license

21   plate technology?

22   A.  Yes.

23   Q.  How many vehicles do you have?

24   A.  Five.

25   Q.  How do you know where to deploy them, what area they should

D3C5dor6                          Drape - direct

1   be?

2   A.  I have them assigned to boroughs.

3   Q.  And once the vehicle is out on the street, what sort of

4   information is it collecting?

5   A.  It just takes a picture of the license plate.  Like I said,

6   it takes two pictures of the license plate and then it stores

7   it.

8   Q.  And, besides the picture, is there any other information

9   collected?

10  A.  Yes; it dates and time stamps and geographic coordinates

11  stamps them.

12  Q.  And, what did you say happens with that information once it

13  is captured by the camera?

14  A.  It is uploaded immediately directly to a mainframe.

15  Q.  And what happens to it after that?

16  A.  It will be stored.

17  Q.  How is it stored?

18  A.  In a computer.

19  Q.  What do you then do with the information?

20  A.  Well, it will just sit there until we need it again.  If a

21  bank has a specific car that they're looking for, they'll send

22  over a license plate and they'll ask us to check it against our

23  system.

24  Q.  Is there any other way to search for a vehicle besides by

25  license plate number?

D3C5dor6                          Drape - direct

1   A.  Yes.  We would obviously look at it by the year, make,

2   model, color and VIN number, most importantly.

3   Q.  What's the VIN number?

4   A.  Excuse me?

5   Q.  What is a VIN number?

6   A.  Vehicle identification number.

7   Q.  Is there any other information -- so, this information that

8   you're describing:  The make, the model, the year of the car as

9   well as the date and time and the geographical coordinates?

10  A.  Yes.

11  Q.  How is it stored?  Is it in a database of some sort?

12  A.  Yes.  It is a database.

13  Q.  Is there a name for the database?

14  A.  Yes.  It is recovery -- sorry.  It is Recovery Database

15  Network.

16  Q.  And is that a database that's available to people in the

17  business like yours of repossession?

18  A.  Yes; and law enforcement.

19  Q.  And how do you access that database?

20  A.  We have a password that we go onto the internet and access

21  a website.  We then enter your user name and password.  It will

22  then allow to you query the system by way of setting the

23  parameters to date, time and using the license plate that

24  you're looking for.

25  Q.  And, do you pay for access to this database system?

1  A.  We pay for the system, the initial system, and we also pay

2  a monthly fee for the database.

3  Q.  Directing your attention to late 2011 or early 2012, did

4  there come a time when you were asked to assist the New York

5  City Police Department with an investigation?

6  A.  Yes, I was.

7          I was called --

8  Q.  If I could just stop you there, sir?

9  A.  Okay.

10 Q.  What assistance, if any, did you provide -- without saying

11 what you were -- what someone told you.

12 A.  They had asked me to run a license plate for them through

13 my database.

14 Q.  And, did they give you a license plate number?

15 A.  Yes, they did.

16 Q.  Off the top of your head, do you remember what that license

17 plate number is?

18 A.  I do not.

19 Q.  Were you able to look up that license plate number?

20 A.  Yes.

21 Q.  And, did you look it up using that database that we just

22 discussed a moment ago?

23 A.  Yes, I did.

24 Q.  Were you able to get any hits back from that license plate

25 number?

D3C5dor6                          Drape - direct

1    A.  I did.  There was one single hit.

2    Q.  And, do you remember what that information was?

3    A.  It was a black, late model Mercedes Benz, big body style,

4    either S430 or S500 Class in Mount Vernon.

5    Q.  Do you recall the date on or which the Mercedes got that

6    hit, according to the database?

7    A.  I just remember that it was in 2011.

8            MS. LESTER:  Your Honor, I'm showing the witness

9    what's been marked for identification as Government Exhibit

10   528.

11   Q.  Mr. Drape, do you see that in front of you?

12   A.  Yes.

13   Q.  What is that?

14   A.  This is a typical printout of information with feedback of

15   a license plate hit.

16   Q.  Is this a printout from the database that you mentioned a

17   moment ago?

18   A.  It is.

19   Q.  And, did you actually print out this page?

20   A.  Yes.

21   Q.  When did you do that?

22   A.  Today.

23   Q.  And, what information did you put into the database in

24   order to get this printout?

25   A.  I was able to set the date back as far as 2010 and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3C5dor6                          Drape - direct

1    entered the license plate number that -- into the area of

2    question, and then a hit search and it came back with this

3    response.

4    Q.  And who provided the license plate number to you?

5    A.  You guys did.

6              THE COURT:  Who do you mean by you guys?

7              THE WITNESS:  Jessica and Amy and Anthony.

8              THE COURT:  All right.

9              MS. LESTER:  Your Honor, the government offers

10   Government Exhibit 528.

11             THE COURT:  Any objection?

12             MR. ROTH:  I will just object since it is not his

13   database, Judge.

14             THE COURT:  Since it is not?

15             MR. ROTH:  His database.  The original database.  He

16   didn't maintain it.  He generated it off of a --

17             THE COURT:  Yes.  This is a commercial database,

18   commercially available?

19             THE WITNESS:  Yes, it is.

20             THE COURT:  So, do you know how -- you have given some

21   description of it but do you know how the information is

22   collected and maintained?

23             THE WITNESS:  There are 600 agents -- affiliates

24   nationwide that have these cameras and it all goes to one

25   database.

D3C5dor6                        Drape - direct

1            THE COURT:  You say affiliates; who are the

2    affiliates?

3            THE WITNESS:  We're the affiliates, the collection

4    companies.

5            THE COURT:  So you are one of the affiliates?

6            THE WITNESS:  Yes.

7            THE COURT:  And you have how many cameras?

8            THE WITNESS:  Five sets.

9            THE COURT:  Five sets.

10           THE WITNESS:  Yes.

11           THE COURT:  Where are the cameras?

12           THE WITNESS:  They're mounted on cars and tow trucks.

13           THE COURT:  And your arrangement with this company is

14   that you provide them information?

15           THE WITNESS:  We provide the cars and the trucks to do

16   the field work.

17           THE COURT:  And the information is then sent by you to

18   them?

19           THE WITNESS:  It is sent by us back to them.

20           THE COURT:  Through the equipment directly or on your

21   own?

22           THE WITNESS:  Through the internet.

23           THE COURT:  So you don't have to do anything, it is

24   part of the --

25           THE WITNESS:  It sends it directly to them.  The

D3C5dor6                          Drape - direct

1  programming and so forth is set up that way.

2              THE COURT:  Then you have access to this information?

3              THE WITNESS:  Correct.  We pay for it.

4              THE COURT:  So the information that you have there on

5  this exhibit, Government Exhibit 528, that's from your cameras

6  or some other cameras or you don't know?

7              THE WITNESS:  This is from my set.

8              THE COURT:  How can you tell that?

9              THE WITNESS:  It is set up specifically on here -- you

10 can see --

11             THE COURT:  Don't describe what it says.  Just tell me

12 how.

13             THE WITNESS:  Each vehicle has an I.D. number and each

14 set has an I.D. number, so the set is specific to a vehicle and

15 therefore it has our company name on it.

16             THE COURT:  All right.  Okay.

17             Are you still objecting, Mr. Roth?

18             MR. ROTH:  Yes, your Honor.

19             THE COURT:  Overruled.  I'm going to allow it as a

20 business record.

21             Government Exhibit 528 is received.

22             (Government's Exhibit 528 received in evidence)

23             MS. LESTER:  Your Honor, may we publish it to the

24 jury?

25             THE COURT:  Yes.

D3C5dor6                    Drape - direct

 1  BY MS. LESTER:

 2  Q.  Ms. Brady, if you can zoom in?  Thank you.

 3           Mr. Drape, just a moment ago you were referencing that

 4  the name of your company appears on this record?

 5  A.  Yes.

 6  Q.  Could you direct the jury to where that is?

 7  A.  If you look to --

 8  Q.  What field?

 9  A.  If you look where it says, five lines down it says:

10  Vehicle I.D.

11  Q.  Yes.

12  A.  And it says all underneath that Masters or Recovery, user,

13  and then the numbers; that's each vehicle that's in the system.

14           THE COURT:  That's your vehicles that have the

15  equipment?

16           THE WITNESS:  Correct.

17  Q.  So, what is this record showing?

18  A.  If you look further down where it says:  Info, edit, plate

19  1, plate 2, local time next to where it says case visit report

20  it will give you the date and the time of when we captured the

21  picture stamped with the longitude and latitude coordinates and

22  the vehicle I.D. -- my vehicle I.D.

23  Q.  So, that relates to your car that picked up this image,

24  correct?

25  A.  Correct.

D3C5dor6                      Drape - direct

1   Q.  And over on the right-hand side there is a photograph -- a

2   small photograph labeled plate image and then a photograph

3   labeled car image.  What are those?

4   A.  I'm sorry?

5   Q.  What are those images?

6   A.  The first one is an actual image of the license plate close

7   up and then the second one is the back of the car zoomed out a

8   little bit more.

9   Q.  And those were photographs that were taken again by your

10  license plate reader vehicle?

11  A.  Correct.

12  Q.  I think you mentioned that you were able to tell what type

13  of make and model the car was?

14  A.  Yes.  That's correct.

15  Q.  How were you able to tell that?

16  A.  I have been in business for close to 15 years and I know my

17  vehicles very well and I can see that there is a Mercedes

18  symbol on the back, and by the design of the taillights I know

19  that it's a big body style Mercedes S class.

20  Q.  Are you able, when you yourself are using this database,

21  are you able to manipulate or enlarge the car image photograph?

22  A.  If you save -- if you save this picture to the computer you

23  can then blow it up and make it larger.

24  Q.  Did you examine the image in a larger format yourself?

25  A.  I did.

D3C5dor6                          Drape - direct

 1            MS. LESTER:  May I have a moment, your Honor?

 2            THE COURT:  Yes.

 3            (Pause)

 4   Q.  Mr. Drape, what is the license plate number for this

 5   vehicle that we see in the image?

 6   A.  FMB 7467.

 7   Q.  And, did you say earlier that you were able to verify what

 8   location -- I realize that here in front of us we only have the

 9   latitude and longitude, but at the time that you were assisting

10   the police did you actually look up what that location was?

11   A.  Yes, I did.

12   Q.  Do you recall what it was?

13   A.  I believe it was on South Fourth Street in Mount Vernon.  I

14   don't know the exact numbers.

15            MS. LESTER:  Thank you, your Honor.  No further

16   questions.

17            THE COURT:  Okay.

18            Cross-examination?

19            MS. FONTIER:  No questions, your Honor.

20            MR. ROTH:  No questions.

21            THE COURT:  Thank you, Mr. Drape.  Step down and thank

22   you very much.

23            (Witness steps down)

24            Government's next witness?

25            MS. MASELLA:  Your Honor, the government calls Fitzroy

D3C5dor6

1    Cornwall.

2     FITZROY CORNWALL,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5             THE COURT:  You may proceed, Ms. Masella.

6             MS. MASELLA:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MS. MASELLA:

9    Q.  Good afternoon, Mr. Cornwall.

10   A.  Good afternoon.

11   Q.  Sir, were you ever the victim of a robbery?

12   A.  Yes, I was.

13   Q.  When did that occur?

14   A.  On the 8th of December, 2011.

15   Q.  And approximately what time of day did the robbery occur?

16   A.  Between 10:00 and 10:30 and 11:00.

17   Q.  In the morning or in the evening?

18   A.  Night.

19   Q.  And what location did the robbery occur at?

20   A.  On Monticello Avenue.

21   Q.  In what area of Monticello Avenue?  Do you remember the

22   address or the cross streets?

23   A.  Between Bussing and Edenwald.

24   Q.  Did you say Busing and Edenwald?

25   A.  Yes.

1   Q.  And, where is that location in relation to where you live,

2   sir?

3   A.  I live on Monticello, like a block from my house.

4   Q.  Were you working earlier that day on the day of the

5   robbery?

6   A.  Yes, I was.

7   Q.  Where do you work?

8   A.  I work at Westchester Medical Center.

9   Q.  Where is that in relation to Monticello and where you live?

10  A.  Monticello is in Bronx.  Westchester Medical Center is in

11  White Plains.

12  Q.  How did you get home from work that day?

13  A.  I took the bus.

14  Q.  And did you go straight home?

15  A.  No, I didn't.

16  Q.  Where did you go on the way home?

17  A.  I stopped by a bar for a few beverage.

18  Q.  And where did you go after you had a few beverages?

19  A.  I went home.  I was heading home.

20  Q.  And what happened to you when you were on the way home that

21  night?

22  A.  While I was walking home I was attacked by two guys from

23  behind who were wearing hoodies.

24  Q.  And, what happened then?

25  A.  They pushed me to the ground and say that I should not

D3C5dor6                          Cornwall - direct

1   move, and one of them draw a gun and the other one went through

2   my pockets and took my chain and my wallet and money.

3   Q.  Were you able to see the gun, Mr. Cornwall?

4   A.  No.  I was face down on the ground.  They attacked me from

5   behind.

6   Q.  How do you know, then, that there was a gun at the robbery?

7   A.  Because one of the guys say that *Should he shoot me?*  And

8   the other one said *No.*  So, the guy who had the gun fired it in

9   the air so when the cops came, they found the spent shell was

10  there.

11  Q.  When you said that one of the guys fired the gun in the

12  air, do you recall how many shots were fired?

13  A.  To be honest, I was so scared I heard one or two but they

14  found seven.

15              MR. MURPHY:  Objection.

16              THE COURT:  Never mind what they found but just talk

17  about what you heard or what you saw.

18              THE WITNESS:  Okay.

19  BY MS. MASELLA:

20  Q.  So, how many shots did you hear, Mr. Cornwall?

21  A.  About two shots.

22  Q.  And, did these two people say anything else to you?

23  A.  No.

24  Q.  Did they take any items from you?

25  A.  My cell phone, my necklace, my wallet.

D3C5dor6                         Cornwall - direct

1    Q.  What were you carrying in your wallet that day?

2    A.  Well, I had my credit card, my bank card, and some money.

3    Q.  Do you remember approximately how much money you had?

4    A.  About $50, $60 or something like that.

5    Q.  Mr. Cornwall, did you get a look at the two robbers?

6    A.  No.  I did not see them.

7    Q.  Are you able to provide any description at all?

8    A.  Well, when they started running, they were, like, about

9    5'8", 5'9" in height.  That's the only thing I can say.

10   Q.  Were they wearing anything to cover their faces or --

11   A.  I didn't have to look at their face.  I didn't get to look

12   at their face I only saw hoodies.

13   Q.  So you saw hoodies?

14   A.  Yes.

15   Q.  You didn't see their face?

16   A.  No.

17   Q.  Where did you go after the robbers went off?

18   A.  I went home and called 911.

19   Q.  And, did there come a time when police arrived at your

20   home?

21   A.  Yeah.

22   Q.  Approximately how much later after the robbery was that?

23   A.  Like five, ten minutes, your Honor.

24   Q.  When the police arrived at your home did you go back to the

25   scene of the robbery with them?

D3C5dor6                         Cornwall - direct

1    A.  Yeah.

2    Q.  How far was that from your home, approximately?

3    A.  Approximately a block or less.

4    Q.  Was there -- were you able to tell, when you went with the

5    police, exactly where the robbery occurred?

6    A.  Yeah.

7    Q.  Why is that?

8    A.  Because I left items right there.  My hat was left there

9    and some coins that I had in my pocket.

10   Q.  So, when you got to the area you saw your hat on the

11   ground?

12   A.  Yeah.

13   Q.  Had you been wearing your hat during the robbery?

14   A.  No.  When they pushed me to the ground my hat fell off.

15   Q.  It fell off and you did not pick it up?

16   A.  I did not pick it up.  I was so scared I ran home.

17   Q.  Did you see the police collect any other items in that area

18   while you were with them?

19   A.  No.  They were just canvassing the area with lights and

20   stuff like that.

21           MS. MASELLA:  Thank you, Mr. Cornwall.

22           No further questions.

23           THE COURT:  Cross-examination.

24   CROSS EXAMINATION

25   BY MR. MURPHY:

D3C5dor6                        Cornwall - cross

1   Q.  Good afternoon, sir.

2   A.  Good afternoon.

3   Q.  My name is Ken Murphy.  If anything I ask you doesn't make

4   any sense to you, please tell me and I'll restate it.  Okay?

5           Mr. Cornwall, what hours were you working that night?

6   A.  I was working until 8:00.

7   Q.  Until 8:00 p.m.?

8   A.  Yeah.

9   Q.  So, when this occurred what was the date that this incident

10  occurred?  Do you know?

11  A.  It was the 8th of December.

12  Q.  The 8th of December.

13          What time did it occur?

14  A.  Between 10:30 and 11:00.

15  Q.  You were working at Westchester Medical Center, did you

16  say?

17  A.  Yeah.

18  Q.  I think you said you went straight to a bar, is that

19  correct?

20  A.  Yes.

21  Q.  What bar did you go to?

22  A.  Classique.

23  Q.  Classique?

24  A.  Yes.

25  Q.  Where is that located, sir?

D3C5dor6                         Cornwall - cross

1   A.  Boston Road.

2   Q.  Boston Road.

3           How far is it from the scene of the robbery?

4   A.  About a half mile.

5   Q.  Half a mile?

6   A.  Yeah.

7   Q.  Had you walked from Classique to the scene of the robbery

8   when it occurred?

9   A.  Yeah.

10  Q.  So, what time did you get to Classique that night after

11  work?

12  A.  9:15, 9:20.

13  Q.  And then you left Classique around what time, about 11:20

14  two hours later?

15  A.  No.  Less than two hours.

16  Q.  How long was it, sir?

17  A.  I don't know exactly.  Less than two hours.

18  Q.  What were you drinking that evening, sir?

19  A.  Beer.

20  Q.  How many beers did you have?

21  A.  Two.

22  Q.  Two beers.

23          And, do you go to Classique every night?

24  A.  No.

25  Q.  Or was this an unusual occasion?

D3C5dor6                          Cornwall - cross

1   A.  No.

2   Q.  When you went and you were walking on your way home from

3   Classique when you were robbed?

4   A.  Yeah.

5   Q.  And the men came up from behind you you said, right?

6   A.  Yeah.

7   Q.  Is that correct, sir?

8   A.  Yes.

9   Q.  So, you did have -- certainly you didn't have a chance to

10  see their face when they approached you, correct?

11  A.  No.

12  Q.  And, in fact, when they approached you you couldn't even

13  see whether they were wearing hoodies at that time, correct?

14  A.  No.

15  Q.  You only saw the hoodies after the fact?

16  A.  After the fact.

17  Q.  When they approached you and pushed you to the ground, did

18  you hear them speaking to you at some point?

19  A.  Yeah.

20  Q.  Where are you from originally, Mr. Cornwall?

21  A.  Jamaica.

22  Q.  And, the men that you heard talking to you at that time,

23  they were speaking in American accents, correct?

24  A.  Yeah.

25  Q.  Not Jamaican accents, correct?

D3C5dor6                              Cornwall - cross

1   A.  No.

2              MR. MURPHY:  I have no further questions.  Thank you.

3              THE COURT:  Ms. Stafford?

4              MS. STAFFORD:  No questions, your Honor.

5              THE COURT:  Any redirect?

6              MS. MASELLA:  No, your Honor.  Thank you.

7              THE COURT:  Okay, Mr. Cornwall.  Thank you very much.

8   You may step down.

9              THE WITNESS:  Thank you.

10             (Witness steps down)

11             THE COURT:  Government, your next witness?

12             MS. LESTER:  Your Honor, the government calls Susan

13  Johnson.  This is a T-Mobile custodian of records.

14             THE COURT:  Okay.

15   SUSAN JOHNSON,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18             THE COURT:  Ms. Johnson, good afternoon.

19             THE WITNESS:  Good afternoon.

20             THE COURT:  Your volume is just right.  Be careful not

21  to talk too fast but, otherwise, I think we will be fine.

22             THE WITNESS:  Thank you.

23             THE COURT:  You may proceed, Ms. Lester.

24             MS. LESTER:  Thank you, your Honor.

25  DIRECT EXAMINATION

D3C5dor6                           S. Johnson – direct

 1  BY MS. LESTER:

 2  Q.  Good afternoon.

 3  A.  Good afternoon.

 4  Q.  Where do you work, Ms. Johnson?

 5  A.  T-Mobile.

 6  Q.  What's your title there?

 7  A.  I'm the custodian of records.

 8  Q.  How long have you been a custodian of records for T-Mobile?

 9  A.  Sixteen years.

10  Q.  What are your duties and responsibilities as custodian of

11  records?

12  A.  We respond to subpoenas from various law enforcement

13  agencies across the United States which basically means that we

14  fulfill the subpoenas with subscriber information, call detail

15  records and cell site information, if requested.

16  Q.  Are you familiar with the way in which T-Mobile creates

17  records relating to the phones used by customers?

18  A.  Yes.  I am.

19  Q.  What types of records does T-Mobile create and maintain?

20  A.  The call detail records, as well as the subscriber

21  information and the cell site information.

22  Q.  And, are you familiar with how those records are maintained

23  by T-Mobile and for how long?

24  A.  Yes.

25  Q.  Approximately how long does T-Mobile keep this type of

D3C5dor6                          S. Johnson – direct

1     information?

2     A.   We keep cell site information for approximately six months,

3     call detail records, depending on what type of account it is;

4     if it is a monthly account we'll keep it for the life of the

5     account, and if it is a prepay we keep those records for two

6     years.

7     Q.   Are you familiar with a company called Simple Mobile or

8     Tracfone?

9     A.   Yes, I am.

10    Q.   What's the relationship, if any, between Simple Mobile and

11    T-Mobile?

12    A.   They are a reseller of T-Mobile.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D3cWdor7                          Johnson - direct

 1  BY MS. LESTER:

 2  Q.  What does that mean?

 3  A.  What that means is that they sell the service under their

 4  name.  However, they use our network.

 5  Q.  And records for users of Simple Mobile phones, who keeps

 6  those?

 7  A.  We do.

 8  Q.  Does T-Mobile keep all records relating to Simple Mobile

 9  users?

10  A.  No, we do not.

11  Q.  What records does Simple Mobile keep?

12  A.  We keep the call detail records, the cell site information,

13  up to six months.  And then the subscriber information would

14  come from Simple Mobile.

15  Q.  Prior to your testimony this afternoon, were you asked to

16  examine a CD containing certain records?

17  A.  Yes, I was.

18  Q.  Did you recognize those records as belonging to T-Mobile?

19  A.  Yes, I did.

20  Q.  How were you able to recognize them as such?

21  A.  There are several documents in there that do say T-Mobile,

22  and I also work with them on a daily basis.

23  Q.  Are these records ones that were created by T-Mobile at or

24  near the time of the events to which they relate; that is, the

25  calls that were actually made by the users?

D3cWdor7                          Johnson – direct

1   A.  Yes.

2   Q.  And is it T–Mobile's regular practice to create and

3   maintain these types of records for its customers?

4   A.  Yes.

5   Q.  Are they kept in the ordinary course of T–Mobile's

6   business?

7   A.  Yes, they are.

8   Q.  I'm approaching to show you what's been marked for

9   identification as Government Exhibit 2010.  Could you take a

10  look at that, please.  What is that?

11  A.  That's the CD that I looked at earlier today.

12  Q.  How do you know it's the same CD?

13  A.  Because my initials are on the sticker.

14          MS. LESTER:  Your Honor, the government offers

15  Government Exhibit 2010.

16          THE COURT:  Any objection?

17          MR. ROTH:  No objection.

18          MS. FONTIER:  No objection.

19          THE COURT:  All right.  Government Exhibit 2010 is

20  received.

21          (Government's Exhibit 2010 received in evidence)

22  BY MS. LESTER:

23  Q.  What types of records does this CD contain, Ms. Johnson?

24  A.  It contains our cell site list, which is where all of our

25  towers are located nationwide.  It contains cell site

1    information as well as subscriber information for various cell

2    phone numbers.

3    Q.  More than one number, is that correct?

4    A.  Correct.

5              MS. LESTER:  No further questions.

6              THE COURT:  Any cross?

7              MS. STAFFORD:  No cross.

8              THE COURT:  Mr. Roth?

9              MR. ROTH:  No, your Honor.

10             THE COURT:  All right.  You may step down.  Thank you,

11   Ms. Johnson.

12             (Witness excused)

13             THE COURT:  Government, your next witness.

14             MS. LESTER:  Your Honor, the government calls Michael

15   Zeppieri.

16    MICHAEL ZEPPIERI,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MS. LESTER:

21   Q.  Good afternoon.

22   A.  Good afternoon.

23   Q.  How are you employed?

24   A.  I'm a supervisory special agent with the Bureau of Alcohol,

25   Tobacco, Firearms, and Explosives.

D3cWdor7                        Zeppieri - direct

1   Q.  Is that also known as the ATF?

2   A.  Yes.

3   Q.  How long have you been working for the ATF?

4   A.  Ten and a half years.

5   Q.  What's your current assignment there?

6   A.  I'm a group supervisor for New York Group One.

7   Q.  And what does New York Group One focus on, if anything?

8   A.  Violent crimes, firearms trafficking, robberies, and

9   homicides.

10  Q.  What are your duties and responsibilities as a group

11  supervisor?

12  A.  I manage the case work.  I also am an investigator.

13  Q.  Directing your attention to early January 2012, did you

14  participate in an interview at the 47th Precinct?

15  A.  Yes.

16  Q.  Do you recall the date of that interview?

17  A.  I believe it was in January, beginning of January.

18  Q.  Is there something that would refresh your recollection as

19  to the exact date?

20  A.  Yes.  I wrote a report on it.

21  Q.  I'm showing you what's been marked for identification as

22  3543C.  Could you take a look at that and then tell me when you

23  have had a chance to review it?

24  A.  I've reviewed it.

25  Q.  Does that refresh your recollection as to the date on which

1    the interview took place?

2    A.   Specifically, I can't remember the exact date.  I, I do

3    remember reporting on it shortly thereafter that exact date.

4    Q.   And did you prepare that?  Is that the report you prepared

5    shortly after the interview?

6    A.   Yes.

7    Q.   And at the time that you prepared that report, were you

8    trying to be accurate?

9    A.   Yes, I was.

10   Q.   At that time, you obviously knew what date the interview

11   had taken place on, correct?

12   A.   Yes, I did.

13             MS. LESTER:  Your Honor, we'd ask that the witness be

14   allowed to read just the date of the interview from the report

15   as a recorded recollection.

16             THE COURT:  Okay.  No objection?

17             MR. ROTH:  No, your Honor.

18             MS. FONTIER:  No, your Honor.

19             THE COURT:  Okay.  You can do that.

20             THE WITNESS:  It was on January 9, 2012.

21   BY MS. LESTER:

22   Q.   Approximately what time of day did this interview take

23   place?

24   A.   It was in the evening.  It was about eight p.m.

25   Q.   Who was the person who was being interviewed?

D3cWdor7                        Zeppieri - direct

1   A.  Dwayne Barrett.

2   Q.  Was Mr. Barrett already present in the 47th Precinct when

3   you arrived?

4   A.  Yes.

5   Q.  Could you describe what you did when you first got to the

6   precinct?

7   A.  When I arrived there, I spoke with Lieutenant Fitzpatrick

8   of the 47th Precinct squad, who informed me some, about a

9   homicide that took place in the four seven approximately one

10  month prior.

11          MR. ROTH:  Objection, your Honor.

12          THE COURT:  The general subject of the conversation is

13  all right.  Overruled.

14          So you had a conversation about --

15          THE WITNESS:  About a homicide.

16          THE COURT:  About a homicide?

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  Next question.

19  BY MS. LESTER:

20  Q.  At some point, did you learn whether Mr. Barrett had a cell

21  phone?

22  A.  Yes, I did.

23  Q.  What did you do, if anything, with respect to that phone?

24  A.  I asked the lieutenant if we had permission to search the

25  phone.

D3cWdor7                        Zeppieri - direct

1    Q.  Did there come a time when the phone was, in fact,

2    searched?

3    A.  Yes.

4    Q.  Who conducted that search?

5    A.  I initiated a search of the phone, and, while I was

6    searching it another detective came to me and asked, asked me

7    if he would like -- if I would like him to do it

8    electronically.

9    Q.  So you actually had custody of the phone at that point

10   then?

11   A.  Yes.

12   Q.  And then did you give it to this other detective?

13   A.  Yes, I did.

14   Q.  While you had custody of the phone, did you have an

15   opportunity to examine it?

16   A.  Yes, I did.

17   Q.  And what, if anything, did you do with it while it was in

18   your custody?

19   A.  I reviewed the home page of the phone.  I reviewed the

20   contacts.  I reviewed some of the text messages, and I recorded

21   some of that information on a notepad.

22   Q.  Can you take a look at what's in front of you and has been

23   marked for identification as Government Exhibit 87?

24   A.  Yes.  I see it.

25   Q.  And could you take it out of the package.  What is that?

D3cWdor7                          Zeppieri - direct

1    A.   It's a Sprint smart phone.

2    Q.   And do you recognize that phone?

3    A.   Yes, I do.

4    Q.   How do you recognize it?

5    A.   It was the phone that was at the 47th Precinct.

6    Q.   How are you able to recognize it as the same phone?

7    A.   I remember the casing, now that I'm holding it.  And I

8    remember the screen.

9    Q.   And does the packaging assist you in remembering whether

10   it's the same phone?

11   A.   The packaging?  The evidence packaging?

12   Q.   Yes.

13   A.   Yes, it does.

14   Q.   How is that?

15   A.   I signed to it on January 10.

16          MS. LESTER:  Your Honor, the government offers

17   Government Exhibit 87.

18          THE COURT:  Any objection?

19          MR. ROTH:  No objection.

20          MS. FONTIER:  No, your Honor.

21          THE COURT:  Government Exhibit is received.

22          (Government's Exhibit 87 received in evidence)

23   BY MS. LESTER:

24   Q.   Agent Zeppieri, can I ask you to take a look at what's been

25   marked for identification as Government Exhibit 87A?

D3cWdor7                         Zeppieri - direct

1   A.  Yes.

2   Q.  What is that?

3   A.  This is a DVD or a CD of the information that was extracted

4   from this phone.

5   Q.  How do you recognize it to be that?

6   A.  By the, by what's written on the case of it.

7   Q.  Could you look at the actual CD itself?  Do you recognize

8   the CD?

9   A.  I don't believe I've ever looked at it, no.

10  Q.  Did you receive a CD that was in that same case?

11  A.  I received this case, yes.

12  Q.  Who did you receive that from?

13  A.  I -- I'm not -- I'm not totally sure who handed me this

14  disk.

15  Q.  Do you know if it was a law enforcement officer?

16  A.  Yes.

17  Q.  Do you know what precinct, if any, that law enforcement

18  officer was affiliated with?

19  A.  The 47th Precinct.

20          MS. LESTER:  May I have a moment, your Honor.

21          THE COURT:  Sure.

22          MS. LESTER:  No further questions.

23          THE COURT:  Any cross?

24          MR. ROTH:  Just one question.

25  CROSS-EXAMINATION

D3cWdor7                          Zeppieri - cross

1    BY MR. ROTH:

2    Q.  Mr. Barrett, on the date in question, sir, consented to let

3    you search that phone, is that correct?

4    A.  Not to me, but, yes.

5    Q.  To one of your fellow officers?

6    A.  To another officer, yes.

7            MR. ROTH:  Thank you.

8            THE COURT:  Ms. Fontier?  Ms. Stafford?

9            MS. FONTIER:  No.  Thank you, your Honor.

10           THE COURT:  Redirect, Ms. Lester?

11           MS. LESTER:  No, your Honor.

12           THE COURT:  Thank you.

13           THE WITNESS:  Thank you.

14           THE COURT:  You may step down.

15           (Witness excused)

16           THE COURT:  Next witness.

17           MS. LESTER:  The government calls Thomas Green.

18    THOMAS GREEN,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21    DIRECT EXAMINATION

22    BY MS. LESTER:

23    Q.  Good afternoon, sir.

24    A.  Good afternoon.

25    Q.  How are you employed?

 1  A.  I'm a detective with the New York City Police Department.

 2  Q.  Which precinct are you affiliated with?

 3  A.  The 47th Precinct, in the Bronx.

 4  Q.  How long have you been a detective with the 47th Precinct?

 5  A.  I've been at the four seven for approximately three years.

 6  Q.  What geographic area does the 47th Precinct cover?

 7  A.  It covers the neighborhoods of Williamsbridge and Woodlawn,

 8  approximately from I95 on the eastern side to I87 on the

 9  western side, from the Mount Vernon/Yonkers border down to

10  approximately Gun Hill Road.

11  Q.  What are your duties and responsibilities as a detective

12  within the 47th Precinct?

13  A.  We investigate all crimes that are worthy of further

14  investigation that are committed within the precinct.

15  Q.  I'd like to direct your attention to December 12, 2011.

16  Were you working that day?

17  A.  Yes, I was.

18  Q.  Did you respond to a crime scene at some point during that

19  day?

20  A.  Yes, I did.

21  Q.  Do you recall where the crime scene was?

22  A.  I believe it was Duryea and Strang.

23  Q.  Is that within the confines of the 47th Precinct?

24  A.  Yes, it is.

25  Q.  Do you know what type of crime scene it was?

D3cWdor7                           Green - direct

1   A.  It was a homicide.

2   Q.  What did you observe at the scene when you arrived?

3   A.  There was a vehicle with a man's body in it.

4   Q.  Do you know what type of vehicle it was?

5   A.  I don't recall.

6   Q.  Do you know if it was a car or a van, an SUV?

7   A.  It was a minivan.  But the specific type I don't recall.

8   Q.  Did you take any -- well, can I ask you?  What time of day

9   did you visit the scene?

10  A.  It was, I believe, approximately -- you know, I'm not sure.

11  I'd have to review my notes for the exact time.

12  Q.  Was it during daylight hours?

13  A.  It was during daylight hours, yes.

14  Q.  Did you take any further investigative steps after visiting

15  the scene?

16  A.  Well, yes.

17  Q.  What were those?

18  A.  We started canvassing for video.

19  Q.  And where did you canvass for video?

20  A.  Well, we just -- we -- obviously we canvassed the scene

21  right around where the body was found.  We received other

22  information, however --

23          MR. ROTH:  Objection.  If he could testify in the

24  first person.

25          THE COURT:  When you say we --

1   A.   I had received other information that led us to canvass

2   other areas as well.

3   Q.   Where else did you canvass for video?

4   A.   We canvassed at a motel where we had been told the --

5              MR. ROTH:  Again, Judge.

6              THE WITNESS:  I'm sorry.  Sorry, your Honor.

7              THE COURT:  You canvassed?

8              THE WITNESS:  I canvassed.

9              THE COURT:  You and someone else canvassed?

10             THE WITNESS:  Right.

11  A.   I and someone else canvassed at a hotel where we had been

12  told the victim had been staying, and that apparently was the

13  beginning of a crime that ended in our precinct in Mount

14  Vernon.

15  Q.   Did you actually go to that hotel?

16  A.   Yes, I did.

17  Q.   Do you recall where it's located?

18  A.   It's located on Bronx River Road just off of 233rd Street.

19  Q.   Do you know the name of that hotel?

20  A.   I believe it's the Bronx River Motor Inn.

21  Q.   Did you also go to other locations besides the hotel?

22  A.   Yes.  We went to Mount Vernon where, at approximately

23  Fourth Street and Fourth Avenue.

24  Q.   Where did you go to retrieve video in that location?

25  A.   There was a laundromat there.  We also noted that there was

1   a camera from the City of Mount Vernon mounted on a pole.  And

2   we also went to a lighting business.

3   Q.  I'm sorry.  Did you say a lighting business?

4   A.  Yeah.  I believe it was a lighting business.  Lighting and

5   electronics.

6   Q.  Were you able to actually retrieve video from those two

7   businesses?

8   A.  Yes.

9   Q.  And those were all located in the same vicinity?

10  A.  Yes.  They were all on South Fourth.

11  Q.  What did you do to actually retrieve the video?

12  A.  Well, when you go into -- first, noticing that there's

13  video cameras at the location, we'll speak with the management

14  of the establishment, ask them for permission to access the

15  video system.  And usually what you have is a digital video

16  recorder that's connected to the cameras that allows you to

17  rewind, review, and download the video.

18  Q.  And did you review the video prior to downloading it?

19  A.  Yes, I did.

20  Q.  Since that time, have you viewed the videos that you

21  downloaded?

22  A.  Yes, I have.

23  Q.  Could you take a look at what's in front of you and marked

24  for identification as Government Exhibits 501, 502, and 505.

25  Do you recognize those?

D3cWdor7                           Green - direct

1   A.  Yes, I do.

2   Q.  What are they?

3   A.  These are the official copies of the video that was

4   downloaded from those locations.

5   Q.  And did you review those prior to your testimony?

6   A.  Yes, I did.

7   Q.  How do you know that -- those are CDs, correct?

8   A.  Correct.

9   Q.  How do you know that those contain the same videos that you

10  just testified about?

11  A.  Because each disk has my initials on them, which I placed

12  on them after reviewing the video.

13          MS. LESTER:  Your Honor, the government offers

14  Government Exhibits 501, 502, and 505.

15          THE COURT:  Any objection?

16          MR. ROTH:  No objection.

17          MS. FONTIER:  No, your Honor.

18          THE COURT:  Had you reviewed them on the day that you

19  were doing the canvassing first?

20          THE WITNESS:  Yes, I did.

21          THE COURT:  Then you downloaded them?

22          THE WITNESS:  That's correct.

23          THE COURT:  And you reviewed them again, or you

24  reviewed what's on these disks then, later.

25          THE WITNESS:  Yes, your Honor.  To determine that it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    the same video that I downloaded on that day.

2              THE COURT:  All right.  Government Exhibits 501, 502,

3    and 505 are received.  Which is which?  Can you tell us which

4    is 501, which is 502, and which is 505?

5              MS. LESTER:  Your Honor, actually, I was going to put

6    them up briefly on the screen and then witness could identify

7    where they are from.

8              THE COURT:  All right.  Normally you do that before.

9    But there's no objection.  501, 502, and 505 are received.

10             (Government's Exhibits 501-502 and 505 received in

11   evidence)

12             MS. LESTER:  Ms. Brady, could we pull up Government

13   Exhibit 501.

14   Q.  First of all, Detective Green, do you see that there are

15   four video files?  Do you recall what location this is, just

16   off the top of your head, looking at the four files?

17   A.  Yeah.  This is the video that was downloaded from the

18   laundromat at the scene, and two of the files are going to be

19   facing to the left and two are facing to the right.  So two are

20   north and two are southbound.

21   Q.  Where is the laundromat located?

22   A.  It's just off the corner of South Fourth Street and Fourth

23   Avenue in Mount Vernon.

24             MS. LESTER:  Ms. Brady, could we just pull up the

25   second clip for a moment.

1   Q.  Detective Green, are you familiar with this area?

2   A.  Yes.

3   Q.  What direction is the camera facing?

4   A.  Southbound.

5           (Video recording played)

6   BY MS. LESTER:

7   Q.  What street is that there, the main street in front of the

8   camera?

9   A.  That would be South Fourth Street.

10  Q.  And there's an intersection just ahead with another street

11  perpendicular to South Fourth Street.  Do you know what street

12  that is?

13  A.  That would be Fourth Avenue.

14          MS. LESTER:  Thank you, Ms. Brady.  You can take that

15  down.

16          I'd like now to look at Government Exhibit 505.  If

17  you could just pause it for a second, Ms. Brady.

18          (Video recording played)

19  BY MS. LESTER:

20  Q.  Detective Green, do you recognize where this video is from?

21  A.  Yes.  This is the pole-mounted camera belonging to the City

22  of Mount Vernon, on the corner of South Fourth Street and

23  Fourth Avenue.  It's actually on the northwest corner.

24  Q.  Is this a stationary camera?

25  A.  It rotates.

D3cWdor7                          Green - direct

1   Q.  Does it rotate 360 degrees?

2   A.  It rotates 360 degrees in an automatic loop.

3            MS. LESTER:  Ms. Brady, you can take that down.  Thank

4   you.

5            If we could take a look at Government Exhibit 502, and

6   look at that first camera.

7            (Video recording played)

8   BY MS. LESTER:

9   Q.  Detective Green, are you familiar with this street that's

10  shown in this camera?

11  A.  Yes.  This is also South Fourth Street.

12  Q.  Which business is this camera angled from?

13  A.  This is from Prince Telecom.

14  Q.  Is that the lighting business?

15  A.  Yeah.  They do lighting, A/V, audiovisual stuff.

16  Q.  You said earlier that the laundromat is also located on

17  South Fourth Street, is that correct?

18  A.  That's correct.

19  Q.  Where is this business in relation to the laundromat?

20  A.  It is north of the laundromat, with this camera facing

21  southbound.

22  Q.  So the intersection that we were looking at before of South

23  Fourth Street and Fourth Avenue --

24  A.  Fourth Avenue.

25  Q.  -- is basically down at the end of the camera's view, is

1    that fair to say, up in the upper left-hand corner?

2    A.   That's correct.  It would be in the upper left-hand corner.

3            MS. LESTER:  Ms. Brady, if it's possible, fast forward

4    to approximately 15:54.

5            (Video recording played)

6            MS. LESTER:  Could I stop you right there, Ms. Brady.

7    Thank you.

8    Q.   Detective Green, when you were reviewing this video, did

9    you know what you were looking for in particular?

10   A.   Yes.  We knew we were looking for a black sedan, possibly

11   Mercedes, and we knew that the victim's vehicle was a

12   light-colored minivan.

13   Q.   And in reviewing that video clip that we were just looking

14   at, did you see either of those two vehicles?

15   A.   Yes, I did.  I see the black Mercedes and as well as the

16   victim's minivan passed by prior to that.

17           MS. LESTER:  Ms. Brady, if we could now go to the

18   second clip.  Actually, let me just pause it for a second,

19   Ms. Brady.

20   Q.   Detective Green, there are several different clips here.

21   What's your understanding of how the clips are related to one

22   another?

23   A.   They're from the same camera, but just chronological order.

24   Q.   So they're sequential?

25   A.   Yes, that's correct.

 1   Q.  Are there any gaps between them?

 2   A.  I'm not sure.

 3          MS. LESTER:  You can play it now, Ms. Brady.  Thank

 4   you.

 5          (Video recording played)

 6          MS. LESTER:  Could you pause it, Ms. Brady.  Okay.

 7   Just rewind just for a moment.  Pause it there.

 8   Q.  Detective Green, do you see that other vehicle passing by?

 9   A.  Yes.

10   Q.  Do you know what that vehicle is?

11   A.  Yes.  It's a Chevy Impala with a plate reader system on it.

12   Q.  How can you tell that it has a plate reader system on it?

13   A.  Well, you can see two black devices that are mounted on the

14   rear corners of the trunk.  The police department has many of

15   these.  I'm very used to seeing them.  It's something that

16   stands out to my eye.

17   Q.  Do you know if any follow-up investigation was done based

18   on the review of the video and seeing this plate reader go by?

19   A.  Yes, I -- I do.

20   Q.  Do you know what further investigation was undertaken?

21   A.  Yes.  It was determined the company that was operating the

22   plate reader and where they were operating out of.

23   Q.  And do you know whether you were able to get in touch with

24   that company?

25   A.  Yes, we did.  I did.

1    Q.  What was the result of that inquiry?

2    A.  Well, from the company, we received a list of the plates

3    that had been scanned in the area that day.

4    Q.  Do you know whether you were able to identify the car that

5    is parked there, that the plate reader vehicle is passing by

6    right now?

7    A.  Yes.  I was able to.

8            MS. LESTER:  Ms. Brady, could you fast forward --

9    start it again, please.

10           (Video recording played)

11   BY MS. LESTER:

12   Q.  Detective Green, right now, we're seeing someone get out of

13   the sedan that's parked by the fire hydrant, correct?

14   A.  Yes.

15   Q.  And that person is walking southbound, is that right?

16   A.  That's correct.

17   Q.  So towards the intersection of South Fourth Avenue and

18   Fourth Street?

19   A.  That's correct.

20           MS. LESTER:  Ms. Brady, could you now go to the fourth

21   clip, please.

22           (Video recording played)

23   BY MS. LESTER:

24   Q.  Detective Green, I don't know if you can see it, but

25   directing your attention again to the sedan that's now parked

1    up towards the top of the picture, can you see an individual

2    walking towards it?

3    A.  Yes.

4          MS. LESTER:  Ms. Brady, if you could fast forward

5    almost to the end of that clip.

6          (Video recording played)

7    BY MS. LESTER:

8    Q.  Again, directing your attention to that same sedan, do you

9    see two individuals walking away from that sedan?

10   A.  Yes, I did.

11         MS. LESTER:  Now could we go to the fifth video,

12   please, fifth clip.

13         (Video recording played)

14   BY MS. LESTER:

15   Q.  Again, now it's picking up from the same time, so we

16   continue to see the two individuals walking across the street,

17   is that correct?

18   A.  That's correct.

19   Q.  Again, they would be walking southbound?

20   A.  That's correct.

21   Q.  Towards the intersection of South Fourth Avenue and Fourth

22   Street?

23   A.  Yes.

24   Q.  And now we see the sedan pull away, is that correct?

25   A.  That is correct.

 1   Q.  Also heading southbound?

 2   A.  Correct.

 3            MS. LESTER:  Thank you, Ms. Brady.  We can stop it

 4   now.

 5   Q.  Turning to a different topic, Detective Green --

 6            THE COURT:  This might be a logical spot to stop.

 7   We're going to finish a little earlier today and pick up

 8   tomorrow at 9:30.

 9            How much more do you think you need?

10            MS. LESTER:  I have some very brief questions, your

11   Honor.  It's really like less than five minutes.

12            THE COURT:  But then we have cross as well.  All

13   right.  Go ahead.  Finish the direct anyway.

14   BY MS. LESTER:

15   Q.  I'd like to direct your attention to early January of 2012.

16   Did there come a time when you were asked to download the

17   contents of a cell phone at the 47th Precinct?

18   A.  Yes.

19   Q.  Were you able to download the contents of that cell phone?

20   A.  Yes, I was.

21   Q.  Do you recall who you received the cell phone from?

22   A.  I believe I received it from Detective Crisfield.

23   Q.  And did you understand anything about the possessor of the

24   cell phone or the owner of the cell phone?

25   A.  I understood that he was a suspect in this crime.

```
 1    Q.  Did you know whether he was present at the 47th Precinct at

 2    the time?

 3    A.  Yes, he was.

 4    Q.  And I'd like you to take a look at what's been marked for

 5    identification as Government Exhibit 87A there in front of you,

 6    in the folder.  Do you recognize that?

 7    A.  Yes, I do.

 8    Q.  What do you recognize it to be?

 9    A.  This is the DVD that I saved the contents that I downloaded

10    from the phone.

11    Q.  Just opening the DVD, can you verify that it is the same

12    one that you actually downloaded?

13    A.  Yes, I can.

14    Q.  And how are you able to recognize it as the same one?

15    A.  Well, I recognize the DVD, and this is my handwriting on

16    it.

17             MS. LESTER:  Your Honor, the government offers

18    Government Exhibit 87A.

19             THE COURT:  Any objection?

20             MR. ROTH:  No, your Honor.

21             THE COURT:  Ms. Fontier?

22             MS. FONTIER:  No, your Honor.

23             THE COURT:  So 87A is received.

24             (Government's Exhibit 87A received in evidence)

25    BY MS. LESTER:
```

D3cWdor7                          Green - direct

1   Q.  Do you recall what types of information you were able to

2   download from the phone, Detective Green?

3   A.  I believe we downloaded text messages, contacts, and some

4   photos.

5               MS. LESTER:  No further questions, your Honor.

6               THE COURT:  Okay.  Cross-examination, Mr. Roth?  Or

7   Ms. Fontier?

8               MR. ROTH:  Not at this time.

9               THE COURT:  No?  Ms. Fontier?

10              MS. FONTIER:  No, your Honor.

11              THE COURT:  That's good.  We didn't have to bring you

12  back tomorrow.  You may step down.

13              (Witness excused)

14              THE COURT:  So this is a logical breaking point.  We

15  will break for the day and pick up tomorrow morning at 9:30, as

16  we have typically.  So give yourself enough time to get here

17  and deal with issues involving public transportation and

18  security.  Don't discuss the case.  Keep an open mind.  I think

19  we're moving at a pretty good pace, and we'll resume tomorrow.

20  Have a good night.  Thanks.

21              (Jury excused)

22              (Continued on next page)

23

24

25

D3cWdor7

1          (In open court; jury not present)

2          THE COURT:  Okay.  Have a seat.  All right.  Anything

3    we need to discuss?  Who have we got tomorrow?

4          MS. LESTER:  Your Honor, we have Police Officer Joseph

5    Receives; Detective Fox, from the ballistics lab; Jamal

6    Abdulla, who is the other victim from the robbery that Mr.

7    Liang testified about, and then some witnesses relating to a

8    robbery that took place in New Rochelle, a number of law

9    enforcement witnesses and a victim witness, Prashant Goel, and

10   then our cell site witness, Special Agent Magnuson.

11         THE COURT:  Then that's it?

12         MS. LESTER:  I think that may be it, your Honor.

13         THE COURT:  So you may rest tomorrow.

14         MS. LESTER:  We may.

15         THE COURT:  That's the lineup.  Defense, do you know

16   right now whether you're putting on a case?

17         MS. STAFFORD:  Your Honor, we have one cell site

18   witness we'll be putting on, and I did speak to your law clerk

19   earlier just in terms of -- I don't know if you have any

20   influence with the IT department.

21         THE COURT:  Here?

22         MS. STAFFORD:  Yes, here, just to make sure

23   everything's in working order, to make sure there's no issues

24   before.

25         THE COURT:  Make arrangements with them or maybe make

D3cWdor7

arrangements with Ms. Brady to see whether the equipment that's

set up at the front table can be utilized or adapted to the

back table.  I don't understand any of that stuff.  But if you

give them enough notice, the IT folks could be useful.

MS. STAFFORD:  I am going to make the phone calls.  I

just wanted you to know we're going to be contacting them

today.

THE COURT:  Ms. Fontier.

MS. FONTIER:  There is just the outstanding issue of

the two cooperation agreements before they're actual admitted.

We had requested that the portion, and it's the same portions

in each, be redacted about the safety of the witness.

THE COURT:  All right.  But the cross with respect to

Ms. Brown made big issues about how threatened she felt by the

police.  It seems to me you guys opened the door to threats

going one way.  I'm not sure it's fair that threats the other

way have to be kept out of this.

Does the government have a view?

MS. MASELLA:  Yes, your Honor.

We are opposed to removing any terms from the

agreement.  In the first case, this is the kind of case that

involves violence and violent crimes, obviously.  We haven't

had any testimony about threats by the defendants, but unlike

some other cases which might involve a white collar case or a

fraud case, it's not so farfetched to include this term in the

D3cWdor7

1    cooperation agreement in the first place.

2                THE COURT:  What is it probative of?  The issue is not

3    whether it's farfetched.  The issue is the jury's going to read

4    it and they are going to infer from that what?

5                MS. MASELLA:  Your Honor, our concern is redacting a

6    term from the agreement because we have gone to great lengths

7    to tell the jury all about the terms of these agreement so they

8    have an understanding about what the witness' motives to

9    testify truthfully are.  We have said that this agreement

10   contains all of the terms between the government and the

11   witness.  We've tried to --

12               THE COURT:  How does that make the threat part

13   probative?

14               MS. MASELLA:  If we take it out or redact it, it could

15   be misleading to the jury.

16               THE COURT:  Why would it be misleading to the jury?

17               MS. MASELLA:  Because they're going to see an

18   agreement that has a big black redaction in the middle.

19               THE COURT:  They're going to get transcripts that have

20   redactions about things that we talked about at side bar and

21   things that we talked about here in court.  I assume that they

22   won't infer anything from the redactions and won't speculate as

23   to what's in it.

24               MS. MASELLA:  It's different in the sense that it's an

25   actual exhibit that the witness has testified to.

D3cWdor7

1          THE COURT:  You've got to do better than that.  If you

2     think it should come in because you'd like the complete one to

3     come in, that's not really an argument.  If you're going to

4     tell me why it is that the steps taken to deal with threats are

5     relevant to some issue of credibility or some other issue,

6     that's legitimately before the jury, I'm happy to hear it.  But

7     just that you want the complete document is not really an

8     argument.

9          I have to run because I teach up at Columbia on

10    Tuesday nights so if anybody wants to make a submission

11    tonight, that's fine.  Otherwise, I guess I'll rule tomorrow.

12         MR. ROTH:  Judge, the only other thing is Abdulla, the

13    CI witness, and the state of the disclosure and the scope that

14    we're going to be given in terms of latitude on

15    cross-examination since we haven't been supplied with all those

16    other files, the CI files or any information.

17         THE COURT:  But you think you'd be entitled to his

18    entire CI file?

19         MR. ROTH:  No, no.  I meant the contents in regard to

20    payments made by the other agencies to him in respect to his

21    work as a CI for those agencies.  I think we're entitled to

22    that.

23         THE COURT:  The fact of payment is certainly something

24    that's relevant.  I think that's right.  But I don't know that

25    you're entitled to the CI file.

D3cWdor7

1          MR. ROTH:  I'm not saying we're entitled to the entire

2     files, Judge.

3          Also, because of the late disclosure, we have almost

4     nothing.  Basically, I'll make a call to my investigator

5     tonight.  I gave him the rap sheet.  But we don't have anything

6     in regard to the arrests, his prior arrests, which were

7     numerous, and convictions.  Now we know there are convictions.

8          THE COURT:  You have a rap sheet, I thought.

9          MR. ROTH:  As long as we do that, I don't have the

10    underlying file.  I can cross-examine off of the rap sheet.

11         THE COURT:  Look, I don't know what exists.  Maybe you

12    don't either, but I don't think the entire CI file for an

13    agency where he was an informant would be produced as 3500

14    material just automatically.  So payment, anything that's

15    impeachment, obviously, has got to be turned over.  But the

16    fact of the details of what he was doing and the investigations

17    he was working on clearly wouldn't be.

18         MR. ROTH:  Just to be clear, again, we only have

19    payments for ATF.  None of the four or five other agencies that

20    he was a CI for.

21         THE COURT:  Has the government got any more?

22         MS. LESTER:  No, your Honor.  Our view is that that is

23    not required to be turned over.

24         THE COURT:  So the fact that he was paid by other

25    federal agencies is not something that needs to be turned over?

1          MS. LESTER:  We've turned over the fact that he was

2     paid and we've questioned the witness about it during our

3     debriefing of him.

4          THE COURT:  But you have a file that presumably has

5     records, receipts, or some record of what he was paid.

6          MS. LESTER:  We do not have that for other agencies

7     other than the ATF.

8          THE COURT:  But you're the executive branch.  Okay?

9     So you don't get to vulcanize yourselves and then say we don't

10    have it.  The CIA might be a different issue, but the brother

11    law enforcement agencies, I don't see why you can't get that.

12         What steps have you taken to get it?

13         MS. LESTER:  We have made inquiries as a courtesy with

14    the FBI, and we may be able to obtain that information before

15    tomorrow.  As soon as I go back to the trial room, I'm going to

16    check on it.  But, your Honor, I don't believe that the theory

17    of it's one big government and, therefore, we're responsible

18    for searching out this information for a witness who is

19    testifying on a matter completely unrelated to his service as a

20    CI --

21         THE COURT:  His service as a CI might be related to

22    his credibility though.

23         MS. LESTER:  That's true, your Honor.  The fact that

24    he was a CI and the fact that he was paid.  But they can freely

25    cross-examine him on that.

D3cWdor7

| | |
|---|---|
| 1 | THE COURT:  But they can't impeach him.  If it turns |
| 2 | out what he's told you is unsupported by what's in the FBI |
| 3 | file -- |
| 4 | MS. LESTER:  Your Honor, his service as a CI has |
| 5 | nothing to do with the substance of his testimony in this case. |
| 6 | THE COURT:  If he was deactivated by the FBI for |
| 7 | making false statements, you don't think that would be relevant |
| 8 | to his credibility? |
| 9 | MS. LESTER:  I think it's relevant that he was |
| 10 | deactivated by the ATF, which is the agency that's cooperating |
| 11 | with the prosecution in this case, and we've turned over that |
| 12 | information to the defense. |
| 13 | THE COURT:  But you think if he was deactivated by the |
| 14 | FBI, that would not be relevant? |
| 15 | MS. LESTER:  Not necessarily. |
| 16 | THE COURT:  You should submit something by 10:00 |
| 17 | tonight.  You're going to have to explore this and show me why |
| 18 | this is not in the government's possession and why it wouldn't |
| 19 | be impeachment.  So I'll expect that.  I'll be back by then. |
| 20 | So, great.  I'll see you folks tomorrow. |
| 21 | (Adjourned to March 13, 2013, at 9:30 a.m.) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1

                        INDEX OF EXAMINATION

2  Examination of:                              Page

3  PATRICK TAYLOR

4  Direct By Ms. Masella . . . . . . . . . . .1057

5  Cross By Mr. Roth . . . . . . . . . . . . .1066

6  Cross By Ms. Fontier . . . . . . . . . . .1156

7  Redirect By Ms. Masella . . . . . . . . . .1201

8  Recross By Mr. Roth . . . . . . . . . . . .1211

9  HENRY ENRIGHT

10 Direct By Ms. Lester . . . . . . . . . . .1214

11 Cross By Ms. Stafford . . . . . . . . . . .1225

12 STERLIN SAHADEO

13 Direct By Ms. Masella . . . . . . . . . . .1235

14 Cross By Mr. Roth . . . . . . . . . . . . .1242

15 ZHAO QIANG LIANG

16 Direct By Ms. Masella . . . . . . . . . . .1244

17 Cross By Ms. Fontier . . . . . . . . . . .1262

18 Cross By Mr. Roth . . . . . . . . . . . . .1265

19 GEORGE DRAPE

20 Direct By Ms. Lester . . . . . . . . . . .1270

21 FITZROY CORNWALL

22 Direct By Ms. Masella . . . . . . . . . . .1283

23 Cross By Mr. Murphy . . . . . . . . . . . .1287

24 SUSAN JOHNSON

25 Direct By Ms. Lester . . . . . . . . . . .1292

```
1    MICHAEL ZEPPIERI

2    Direct By Ms. Lester . . . . . . . . . . . .1296

3    Cross By Mr. Roth  . . . . . . . . . . . . .1303

4    THOMAS GREEN

5    Direct By Ms. Lester . . . . . . . . . . . .1303

6                      GOVERNMENT EXHIBITS

7    Exhibit No.                           Received

8     3537-D  . . . . . . . . . . . . . . . . .1206

9     2051    . . . . . . . . . . . . . . . . .1221

10    510     . . . . . . . . . . . . . . . . .1237

11    526     . . . . . . . . . . . . . . . . .1240

12    528     . . . . . . . . . . . . . . . . .1279

13    2010    . . . . . . . . . . . . . . . . .1295

14    87      . . . . . . . . . . . . . . . . .1301

15   501-502 and 505  . . . . . . . . . . . . .1309

16    87A  . . . . . . . . . . . . . . . . . . .1317

17

18

19

20

21

22

23

24

25
```