D3D5dor1                          trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                                12 CR. 45 (RJS)

5    JERMAINE DORE and DWAYNE
     BARRETT,
6
                  Defendants.
7
     ------------------------------x
8

9                                               March 13, 2013
                                                9:40 a.m.
10

11   Before:

12                    HON. RICHARD J. SULLIVAN,

13                                              District Judge

14
                            APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY
25

D3D5dor1                          trial

1              (Trial resumed; jury not present)

2              THE COURT:  We are waiting on at least two jurors

3     because of transportation problems, there is a problem with the

4     4 and 5 trains above 14th Street so two of the jurors called

5     and indicated they were stranded.  They were told to try to get

6     in some other way and they said they would, but I expect it

7     could be 10:00 or so before they're here.  In the interim, why

8     don't we try to do what we can on some other issues.

9              Last night I received the government's letter with

10    respect to the 3500 material or other material relating to

11    Jamal Abdulla.

12             Defendants saw this?

13             MS. FONTIER:  Yes, your Honor.

14             THE COURT:  I don't know if it broke new ground.  The

15    government is conceding that the ATF and the FBI files are fair

16    game but it indicated that it produced what is relevant from

17    those files.  I do think the CIA and NYPD files could not be

18    considered to be in possession of the government and that the

19    case law suggests that the government doesn't have to go

20    rummaging around for that stuff.  If they have access or

21    possession, rather, of such materials now and there is

22    impeachment in there, I think they have to produce it but they

23    don't have to go rummaging around for it.

24             I wanted to hear from the defendants whether they

25    agree with the characterization that relevant materials have

D3D5dor1                         trial

1     been turned over.

2             Mr. Roth, you seemed to disagree with that yesterday.

3             MR. ROTH:  Judge, I would agree based on the

4     representations of the government that they have turned over

5     what they have at this point.

6             THE COURT:  Okay.  So then the issue is resolved, as

7     far as you're concerned.

8             MR. ROTH:  Yes.

9             THE COURT:  Well, then that's easy.  Okay, so one

10    down.

11            I received then this morning the government's response

12    to Ms. Fontier's motion to withdraw and for a mistrial.  I

13    don't know whether defense counsel had a chance to look at this

14    yet.

15            MS. FONTIER:  I have not, your Honor.  I received it

16    last night but I just was not in a position to really digest it

17    and deal with it.

18            THE COURT:  I was here until about 11:30 and I didn't

19    notice this when I left.  What time did you send it?

20            MS. MASELLA:  Sometime between 11:00 and midnight.

21            THE COURT:  Must have been just after I left.

22            So, anyway, I read it this morning but I think,

23    obviously, Ms. Fontier should have a chance to look tat before

24    we have some argument.  So, we may have some time now for you

25    to look at it, but before you do that why don't we talk about

D3D5dor1                         trial

1    what other issues there are that we can resolve today.   I

2    notice I have a bunch of new exhibits and a pile of documents

3    here on my desk, so is there any dispute or any looming

4    objections to any of these materials?

5             MS. STAFFORD:  No objection to the exhibits, your

6    Honor.

7             THE COURT:  Okay.

8             MS. STAFFORD:  I did have one thing we might be able

9    to take care of.

10            Our cell site summary witness needs to have his laptop

11   brought into the court house and I have an order, if you might

12   sign that for me.

13            THE COURT:  You can hand that up.

14            Any other issues that anybody is contemplating since

15   we now have time?

16            MR. ROTH:  Judge, is it still outstanding your ruling

17   on the portion of the witness --

18            THE COURT:  We can talk about that now.  I think

19   that's fair game.  We might as well discuss it.

20            Ms. Stafford, you can grab this.

21            What is the number of the documents, the cooperation

22   agreement?  This is for both Brown and?

23            MR. ROTH:  And Taylor.

24            THE COURT:  Taylor.

25            MS. MASELLA:  Mr. Taylor's agreement is 3537-D, as in

D3D5dor1                        trial

1    David.

2              THE COURT:  3537-D.

3              MS. MASELLA:  And Ms. Brown's is 3539-B, as in boy.

4              THE COURT:  3537-D you said?

5              MS. MASELLA:  Yes.

6              THE COURT:  For 3537-D, who is the offending language?

7    What page?  Page 3 bottom of?

8              MS. MASELLA:  I believe it is the paragraph on the

9    bottom of page 3 and continuing -- oh, no, just the bottom of

10   page 3, the last paragraph.

11             THE COURT:  So, the defense wants to keep this out

12   because it basically says that the defendants are violent and

13   are likely to retaliate, or at least there is a chance they'll

14   retaliate against the witness.

15             What is the government's argument as to why this is

16   relevant?

17             MS. MASELLA:  Your Honor, in our view it is relevant

18   because it is one of the terms in the agreement between the

19   government and the witness.  It is one of the things --

20             THE COURT:  But there has been no testimony about

21   this, this part of the agreement.

22             MS. MASELLA:  There has been no testimony about it

23   actually coming into play in this case but it is part of the

24   witness' understanding as to what the agreement is between the

25   government and the witness.  And if the witness expresses this

D3D5dor1                          trial

1    concern or makes some request, then this basically sets forth

2    what the government will actually do in response or what the

3    government is obligated to do.

4           THE COURT:  I get that, but why is that relevant to

5    any issue at the trial?  It would seem to me if the defense

6    wanted to make something of this, which is that there are other

7    individuals that the witnesses are afraid of and therefore they

8    have even more reason now to curry favor with the government so

9    they can get wit sec or some other favorable treatment, then I

10   think it would be relative to motive or bias.  But, here this

11   would be the government using this to argue a point.  What is

12   the point you would be arguing with this?

13          MS. MASELLA:  Your Honor, this provision has not

14   specifically come up at the trial but I think both witnesses

15   did express some fear as a result of their testimony.

16          Mr. Taylor --

17          THE COURT:  During their testimony?

18          MS. MASELLA:  Not from the defendants in particular

19   but Ms. Brown, on the witness stand, explained that at times

20   during the course of her relationship with Mr. Dore she was

21   afraid of him.  It was clear that she, at times, during her

22   testimony she was nervous and a little bit nervous to be

23   testifying and giving this compiling testimony against

24   Mr. Barrett.  Mr. Taylor talked about initially having withheld

25   some information from the government about Jabba, one of the

D3D5dor1                              trial

1    other co-conspirators, because his family is from the same area

2    in Jamaica as Jabba's family and he had some fear as a result

3    of cooperating.

4            THE COURT:  I don't remember him talking about fear.

5    I thought it was more loyalty.

6            MS. MASELLA:  I think he said he was also afraid as a

7    result of having family members in the same place.  Again, it

8    wasn't directed specifically towards these defendants but this

9    provision does go to the witness' understanding of how that --

10   what the government is obligated to do in the case of any sort

11   of threat or --

12           THE COURT:  Yes, it does that, but it is understood

13   that the defendant's truthful cooperation with this office is

14   likely to reveal activities of individuals who might use

15   violence, force or intimidation.  So, that's a representation

16   by the parties to this agreement about the likely future

17   activity of the defendants in this case.  I don't think there

18   has been any evidence of that.  I think that that's not -- if

19   you were arguing that, I wouldn't let you.  So, I don't know

20   why I would let a document in that, in essence, is going to

21   argue something that I wouldn't let go into the jury over what

22   is -- what am I missing?

23           MS. MASELLA:  The paragraph here is not directed

24   towards these defendants.  It says that --

25           THE COURT:  Who are the individuals who might use

D3D5dor1                         trial

1    violence, force or intimidation?

2              MS. MASELLA:  It could be any of co-conspirators or

3    any of the people that the witness is testifying about or

4    providing information about.

5              THE COURT:  This invites speculation from the jury as

6    to who are the people, who are the individuals who might be

7    using this force, and also basically invites them to imagine

8    whether or not these individuals might use force against the

9    jurors and, if the government is so concerned about this, that

10   it is in this agreement, that they ought to be concerned about

11   it too.  I don't really want them thinking about that.  So, I

12   think that we're effectively making Mr. Roth's case for him.

13             Mr. Roth, any thoughts beyond what we have already

14   talked about?  Mr. Murphy, I'm sorry.

15             MR. MURPHY:  That's fine.

16             I don't believe that Janiel Brown -- and I did review

17   the testimony just yesterday -- ever said anything about

18   fear -- there was a point she testified about having a fight

19   where Mr. Dore supposedly hit her but there was no fear

20   testimony in that regard.  The only threats or testimony about

21   threats that she testified about, frankly, was testimony about

22   she felt threatened by the government.

23             THE COURT:  I thought you guys opened the door wide

24   open and if the government, on redirect, could have said you

25   felt threatened by the police I would let them do it, but they

1    haven't done it, they didn't do it, and I'm not sure at this

2    point that it is appropriate to let the document do it; that's

3    for Brown, but right now we are looking at Taylor and Taylor,

4    there was no discussion about threats.  So, I think for Taylor

5    it is an easy call and I'm going to keep it out.  It is an even

6    closer call for Brown since you guys made threat the issue so

7    that was a dangerous move on your part.  You haven't paid for

8    it yet, but.

9            So, is there a distinction to be made between Taylor

10   and Brown?

11           MS. LESTER:  I think there is, your Honor.

12           THE COURT:  Are you going to argue about threats?  You

13   didn't elicit it in the redirect so I'm not sure how you would

14   be able to do this in summation.

15           MS. LESTER:  I think, your Honor, she did testify on

16   direct examination that her relationship with Mr. Dore was one

17   of love but also fear.

18           THE COURT:  That's in.  That's in.

19           MS. LESTER:  She did use the word fear, and I think

20   the government is entitled to argue that her fear of Mr. Dore

21   was one of the motivating factors of why she got involved in

22   this criminal conduct in the first place.  So, we do think it

23   is relevant.  It is also relevant to her continued cooperation

24   and assistance to Mr. Dore after he was arrested.

25           THE COURT:  Why is it relevant to that?

D3D5dor1                         trial

1            MS. LESTER:  Because she was still fearful of him.  He

2    knew where she lived.

3            THE COURT:  Where did she say that in the transcript?

4            MS. LESTER:  She doesn't say that directly, your

5    Honor, and the government wouldn't argue that directly, but I'm

6    arguing for relevance purposes I think that it is still

7    relevant to her conduct after he is arrested as well.

8            THE COURT:  I think if you made some of these points

9    in the redirect we would have a different calculus here but

10   since you haven't I just think that -- it doesn't seem like you

11   are going to argue with this document in summation.  It seems

12   to me it is calling for speculation and it is ultimately going

13   to be either extraction or worse for the jury, so I'm going

14   to -- let's take it out.  We are going to redact the bottom of

15   page 3 in Taylor, of the cooperation letter, and I don't know

16   where it is on Brown's because I haven't looked at that one yet

17   but I'm assuming it is in roughly the same place.

18           MS. LESTER:  Your Honor, could we ask that the Court

19   give a general instruction, then, at the time of the jury

20   charge that if -- when the jurors receive the exhibits that are

21   in evidence, if there are redactions, they should not speculate

22   as to the reasons that documents are redacted?

23           THE COURT:  I think that's fine.  We will have a

24   charge conference and we can talk about the charge more

25   generally that -- we may need to have this charge conference

1   sooner rather than later given that the case is coming quicker

2   than I anticipated, certainly.

3          So, I have ruled now on the cooperation letters.  What

4   else can we do now?

5          MS. FONTIER:  Your Honor, this is more of just a

6   question than it is an issue.

7          If the government does indeed complete their case

8   today or early tomorrow morning and the defense case is short

9   as expected, would your Honor be expecting us to do summations

10  tomorrow afternoon?

11         THE COURT:  Well, I will have a charge conference

12  first, but if we finish today then I think we can have a charge

13  conference in the morning and I will have the jurors come in

14  maybe midday and we do summations in the afternoon and then

15  they can deliberate on Friday.  Some of them may have already

16  made plans for Friday since I have told them we are not going

17  to be sitting Friday.  What I would generally say is when we

18  get towards the end of the trial once you are deliberating, you

19  should deliberate on Friday.

20         So, let's cross that bridge when we get there.  We may

21  not start for another hour for all I know.  Juror no. 8 called

22  and indicated that he is still running late so I haven't gotten

23  the details on that, but it sounds like he's not within spiting

24  distance of the court house, let's put it that way.  I think

25  maybe it would make sense to just send the jury home and then

D3D5dor1                         trial

1    do summations Monday and we can go straight into the charge and

2    straight into deliberations.

3               It is your vote?

4               MS. FONTIER:  If it is not obvious, that would be my

5    request.

6               THE COURT:  You might be out of this thing by then.

7               MS. FONTIER:  Perhaps.

8               MR. ROTH:  Judge, I understand the scheduling

9    difficulties.  As soon as we know whether we are sitting

10   Friday, because I did -- some Judges were trying to grab me for

11   this morning before trial and I put it over until Friday.  I

12   would suggest that I'm not available Friday.

13              THE COURT:  I don't think it is a problem for you.

14   This court house?

15              MR. ROTH:  This court house.

16              THE COURT:  I don't think that would be a problem if

17   they're deliberating.  You can go to your court appearance.

18   But, does the government think you are going to rest today?

19              MS. MASELLA:  It is a little hard to predict because

20   of the cross-examination, but I think either by the end of

21   today or in the morning tomorrow.

22              THE COURT:  And then the defense case, you are calling

23   at least one witness, right, Ms. Stafford?

24              MS. STAFFORD:  As of now just one, your Honor.

25              THE COURT:  How long, ballpark, do you think that

D3D5dor1                         trial

1   witness will be?

2              MS. STAFFORD:  Half hour, potentially.

3              THE COURT:  So there is a good chance we will finish

4   today.  Let's see where we are this afternoon.  Okay?

5              Aaron, how many are we missing?

6              LAW CLERK:  I checked, there were three missing.

7              THE COURT:  I know the two, who is the third?

8   Ms. Joachim and Mr. Cooper and --

9              LAW CLERK:  Let me go double check.

10             THE COURT:  Go check and see who is there.

11             In the meantime, Ms. Fontier, why don't you read the

12  government's response to your motion and then we can perhaps

13  talk about that sometime later this morning or at a break.

14             MS. FONTIER:  Yes, your Honor.

15             THE COURT:  At a break.

16             I am going to step off and do some stuff.

17             LAW CLERK:  Just one.

18             THE COURT:  Missing only one.

19             (Recess)

20             MS. FONTIER:  Your Honor, after the witness coming up,

21  Detective Reeves --

22             MS. MASELLA:  Officer Reeves.

23             MS. FONTIER:  -- Officer Reeves, I would ask for --

24  Ms. Stafford will be cross-examining Officer Reeves to the

25  extent it is necessary, but I would ask permission for

D3D5dor1                          trial

1    Ms. Stafford to leave the courtroom during the next witness.

2    She is just trying to make sure we have all of the electronics

3    working properly for our case.

4              THE COURT:  That's fine.  Each defendant and the

5    government, each has got two lawyers so if one lawyer needs to

6    step out, that's fine.  You don't need my permission for that.

7              MS. FONTIER:  Okay.  Thank you, your Honor.

8              MS. STAFFORD:  Thank you, your Honor.

9              THE COURT:  So the next witness is?

10             MS. MASELLA:  Joseph Reeves, your Honor.

11             THE COURT:  Then I have a bunch of stuff here.  These

12   are exhibits that are going to be coming in through the

13   witnesses this morning?

14             MS. LESTER:  Your Honor, I think the bulk of what you

15   have is cell site exhibits, that's probably for this afternoon.

16             THE COURT:  I have some stuff from Zeppieri, 3500

17   material.

18             MS. LESTER:  That was from yesterday.

19             THE COURT:  I know he testified yesterday but this

20   looks like it just appeared today.

21             MS. LESTER:  Your Honor, we did hand it up to your

22   Honor's law clerk yesterday.

23             THE COURT:  Okay.

24             Is the jury ready?  Let's get the witness in here.

25             MS. LESTER:  He is right here in the back, your Honor.

D3D5dor1                          trial

1    Do you want him to come up?

2              THE COURT:   Come on up.

3              (Continued on next page)

D3D5dor1                          trial

1              (Jury present)

2              THE COURT:  Good morning.

3              THE JURY:  Good morning.

4              THE COURT:  We're getting a bit of a late start.

5     Sometimes there are things you can't plan for, but each of the

6     jurors who were affected called, told us they were running

7     late, and that was helpful because it allowed us to do some

8     things while you folks were waiting or traveling.  So, we at

9     least moved along all while you were waiting.

10             Thanks for your patience.  We are now going to resume

11    the government's case.  The government is going to call its

12    next witness.

13             And who is that?

14             MS. MASELLA:  Joseph Reeves.

15     JOSEPH REEVES,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18             THE COURT:  You may proceed, Ms. Masella.

19             MS. MASELLA:  Thank you, your Honor.

20    DIRECT EXAMINATION

21    BY MS. MASELLA:

22    Q.  Good morning, sir.

23    A.  Good morning.

24    Q.  For whom do you work?

25    A.  I work for the NYPD, the 45th Precinct.

D3D5dor1                          Reeves - direct

1  Q.  And how long have you worked for the NYPD?

2  A.  Three -- almost three years now.

3  Q.  And what is your title with the NYPD?

4  A.  Police officer.

5  Q.  And you said that you're assigned to the 45th Precinct?

6  A.  As of now, yes, the 45th Precinct.

7  Q.  Where were you assigned before the 45th Precinct?

8  A.  The 47 Precinct.

9  Q.  And when were you assigned to the 47 Precinct?

10 A.  July -- January of 2011.  No, January 2011; yes.

11 Q.  Until what time?

12 A.  Until May of 2012.

13 Q.  And, is the 47 Precinct in the Bronx?

14 A.  Yes, it is.

15 Q.  I want to turn your attention now to December 5th of 2011;

16 were you working that day?

17 A.  Yes, I was.

18 Q.  And was that in the 47 Precinct at that time?

19 A.  In the 47 Precinct.

20 Q.  What hours were you working that day?

21 A.  I was doing a double for that day.  I did my regular tour

22 from 2:00 p.m. until 10:30 p.m., then I did another scheduled

23 tour from 10:30 p.m. to 7:00 a.m.

24 Q.  So, you essentially worked from 2:00 p.m. on the 5th until

25 7:00 a.m. on the 6th of December?

D3D5dor1                          Reeves - direct

1    A.  Yes.

2    Q.  And what was your assignment that night?

3    A.  I was doing patrol.

4    Q.  Did there come a time on December 5th when you responded to

5    a call regarding a robbery?

6    A.  Yes.  I was.

7    Q.  Approximately what time did the call come in?

8    A.  Approximately 2:06 a.m.

9    Q.  And what was the victim's name?

10   A.  Fitzroy Cornwall.

11   Q.  What location did you go to?

12   A.  We responded to the victim's house.

13   Q.  Do you recall what street that was on?

14   A.  It was on Monticello Avenue.

15   Q.  And when you got to the victim's house, did you then

16   proceed to the robbery location?

17   A.  Yes, we did.

18   Q.  What was the location of the robbery?

19   A.  The robbery occurred in front of 4126 Monticello avenue.

20   Q.  And how far was that from the victim's house?

21   A.  It was about two or three blocks away from his house.

22   Q.  How was it that you got from the victim's house to the

23   robbery location?

24   A.  We got into the RMP and we drove down to the victim's --

25   the location of the robbery.

D3D5dor1                          Reeves - direct

1    Q.   What is an RMP?

2    A.   RMP is a marked car -- NYPD marked car.

3    Q.   When you say "we" just to be clear, who was with you at

4    that time?

5    A.   It was me and my partner.

6    Q.   Did the victim accompany you as well?

7    A.   Yes, I did.

8             THE COURT:   What does the RMP stand for?  What is the

9    R, M and P stand for?

10            THE WITNESS:   Radio motor patrol.

11            THE COURT:   RMP, thank you.

12   BY MS. MASELLA:

13   Q.   When you got to the area of 4126 Monticello Avenue, what

14   did you observe at that time?

15   A.   We got to the area, there was a small patch of grass with a

16   tree up, and on the floor was some loose change and a magazine.

17   Q.   Why was the loose change and the magazine of significance?

18   A.   Because the victim was stating that that was his

19   belongings, this is where it all happened.

20   Q.   And, did you do any further investigation at that location

21   in front of 4126 Monticello Avenue?

22   A.   Yes, we did.

23   Q.   What was that investigation?

24   A.   In front of this tree was a parked car, and in the rear of

25   the car on the floor by the tire there was a shell casing.

D3D5dor1                         Reeves – direct

1   Q.  And when you say on the floor, do you mean inside the car

2   or on the ground outside the car?

3   A.  On the ground outside the car under the car.

4   Q.  Did you collect that shell casing?

5   A.  Yes, we did.

6   Q.  Did you look further around the area?

7   A.  Yes, we did.

8         On a patch of grass where the victim's belongings was,

9   there was some more shell casings along within the street too.

10  Q.  Do you recall how many shell casings in total you collected

11  that day?

12  A.  It was seven.

13  Q.  And, do you know what caliber shell casings they were?

14  A.  They was 9 millimeter shell casings.

15  Q.  And, can you explain to the jury what a caliber designation

16  means on a shell casing?

17  A.  Caliber is the size of the round which is for the weapon

18  that is used.

19  Q.  Officer Reeves, after you collected the shell casings, what

20  did you do with that evidence?

21  A.  I went back to the 47th Precinct and I vouchered the

22  evidence.

23  Q.  Can you explain to the jury what a voucher is and what you

24  did with the evidence at that time?

25  A.  A voucher is basically a safe way to put away evidence that

1   needs to be stored or evidence that needs to be checked on for

2   safe keeping, as arrest evidence, or as general property.

3   Q.  What kind of information, generally, is contained on a

4   voucher?

5   A.  It contains how many shell casings was, the description --

6   well, description of the item in the voucher, what the item is,

7   where the item was found, what the item was used for.

8   Q.  Does it have information about the date or the location of

9   the evidence?

10  A.  It also has the date and location that the item was

11  vouchered on and the date and location that the item was found,

12  along with the complaint number.

13  Q.  You just mentioned a complaint number; what is a complaint?

14  A.  A complaint is when somebody wants to file a report, we

15  take -- we do a form which is called a complaint form.  We put

16  down the victim's information, we put down the location of

17  where it occurred, we put a brief narrative of what occurred at

18  this location.

19  Q.  And did you fill out, in addition to the voucher, did you

20  fill out a complaint report in connection with this case?

21  A.  Yes, we did.

22              MR. ROTH:  Judge, again, if he can testify in the

23  first person?

24              THE COURT:  Yes.

25              You say "we" did.

D3D5dor1                        Reeves - direct

1              THE WITNESS:  Yes.  I did.

2              THE COURT:  Did you personally do that?

3              THE WITNESS:  I personally did that.

4     BY MS. MASELLA:

5     Q.  Going back to the voucher for a second, does a voucher

6     contain a unique identifying number?

7     A.  Yes, it does.

8     Q.  I'm going to approach now and show you Government Exhibit

9     268 which has been marked for identification.  Officer Reeves,

10    on that exhibit do you see your voucher number from the robbery

11    that you were just talking about?

12    A.  Yes, I do.

13    Q.  And, do you see your complaint number?

14    A.  Yes, I do.

15    Q.  And also a description of the items?

16    A.  Yes, I do.

17    Q.  And the date on which they were recovered by you?

18    A.  Yes.

19    Q.  Now, did you fill out this envelope?

20    A.  No, I didn't fill out this envelope.

21    Q.  After you filled out your voucher and collected the

22    evidence, do you know where the evidence went after that?

23    A.  We -- well, I sent in a request for lab.

24    Q.  And what kind of lab in particular?

25    A.  It is the NYPD lab.  Basically what this lab does, it

1    checks for ballistics, it checks for evidence or anything else

2    that pertains to the shell casings; if it was used anywhere

3    else or if there is any prints on the shell casings.

4    Q.  And when the shell casings go to the lab, do they go with a

5    copy of your voucher and also the complaint number with it?

6    A.  Yes, it does.

7                MS. MASELLA:  Your Honor, the government offers

8    Government Exhibit 268.

9                THE COURT:  Any objection?

10               MR. ROTH:  No objection.

11               MS. STAFFORD:  Can I just see it, your Honor?

12               THE COURT:  Yes.  Do you want to see it?

13               MS. STAFFORD:  No objection.

14               THE COURT:  No objection.

15               Government Exhibit 268 is received.

16               (Government's Exhibit 268 received in evidence)

17               MS. MASELLA:  No further questions at this time, your

18   Honor.  Thank you.

19               THE COURT:  Cross-examination.

20               MS. STAFFORD:  Yes, thank you.

21   CROSS EXAMINATION

22   BY MS. STAFFORD:

23   Q.  Good morning, Officer Reeves.

24   A.  Good morning.

25   Q.  You did a thorough canvass of the area that day, didn't

D3D5dor1                              Reeves - cross

1    you?

2    A.  Yes, we did -- yes, I did.

3    Q.  Yes, you did.

4           And, can you tell us the area including the car, how

5    far -- how big a canvass you did?

6    A.  We did from -- well, I did from the victim's house down to

7    the area where it occurred.  It was a residential area, it was

8    on both sides of the street there is housing, private housing,

9    there is a sidewalk, it is a two-way street, and on each side

10   there is a lane designated for parking for the residents of the

11   area.

12   Q.  So, the house was about how far from the crime scene?

13   A.  The house is approximately 12, 15 feet away, approximately.

14   Q.  And you searched both sides of the street?

15   A.  Yes, we did -- yes, I did.

16   Q.  Yes.  Yes.

17          And you searched under the cars?

18   A.  I searched under that particular car, yes.

19   Q.  You searched under that particular car?  Was there a reason

20   why you searched under that particular car?

21   A.  It was the only car around at the time.

22   Q.  And did you search the lawn area on either side of the

23   street?

24   A.  Just on that side.

25   Q.  Just on the side?

1   A.   Just on the side where the victim's -- where the victim

2   said that that was his belongings.

3   Q.   Okay.

4        And, did you notice -- you said that you recovered

5   seven shell casings; do you recall the distance between each of

6   the shell casings that you found?

7   A.   To say the distance exactly, I can't recall, but it wasn't

8   that far from each other.  It was all -- it was pretty much

9   close together.

10  Q.   So you found one shell casing under the car?

11  A.   Yes.

12  Q.   You found another shell casing about how far away?

13  A.   About two feet away from it.

14  Q.   And they were all within inches of each other?  Feet of

15  each other?

16  A.   There was a couple -- maybe a couple within inches and

17  there was a couple within feet.

18  Q.   Okay.  So then which -- how many were within inches of each

19  other and how many were a further distance away?

20  A.   I really couldn't say off the top of my -- off the top hand

21  right now.

22       MS. STAFFORD:  Just a moment, your Honor?

23       THE COURT:  Yes.

24       (Pause)

25  BY MS. STAFFORD:

D3D5dor1                          Reeves - cross

1   Q.  You filled out a report that day, didn't you?

2   A.  Yes, I did.

3   Q.  And in that report you were as complete as possible,

4   correct?

5   A.  Yes, I was.

6   Q.  And you took information from the victim; that's true,

7   right?

8   A.  Yes, I did.

9   Q.  And, do you recall the victim told you that he heard three

10  shots were fired?

11  A.  Yes, I do.

12          MS. MASELLA:  Objection.

13          THE COURT:  I'm not sure why -- why is that not

14  hearsay?

15          MS. STAFFORD:  I will withdraw that, your Honor.

16          THE COURT:  Okay.  Sustained.

17          MS. STAFFORD:  I will rephrase it.

18  BY MS. STAFFORD:

19  Q.  Now, when you recovered the shell casings you sent them to

20  the general lab?

21  A.  I sent them for a request for lab which is the NYPD lab

22  which is the only one that I know about.

23  Q.  And you sent them to have them tested for fingerprints?

24  A.  Tested; tested regardless of anything, any evidence that

25  they could have.

D3D5dor1                              Reeves - cross

1    Q.  So, any evidence that you could recover on those shell

2    casings is what you requested?

3    A.  Yes.

4    Q.  And you're aware that fingerprints can be recovered from

5    shell casings, correct?

6    A.  Yes.

7            MS. STAFFORD:  Thank you, Officer.

8            THE COURT:  Okay, Mr. Roth or Mr. Murphy?

9    CROSS EXAMINATION

10   BY MR. ROTH:

11   Q.  Just to clarify, Inspector, the shell casing is the part

12   that is left after a bullet is discharged from the round; is

13   that correct?

14   A.  Yes, it is.

15   Q.  And it is a little, I don't know if the jury had an

16   opportunity to see, but it is a little piece of metal; is that

17   right?

18   A.  Yes, it is.

19   Q.  And the reason you submit that to the police lab for both

20   fingerprints or DNA is because, presumably, somebody, perhaps

21   the person who was shooting the gun, loaded those rounds into a

22   magazine or the gun; is that correct?

23   A.  That is correct.

24   Q.  And so that they presumably left fingerprints or DNA on

25   that, is that correct?

D3D5dor1                          Reeves - cross

1   A.   That is correct.

2            MR. ROTH:   Thank you.

3            THE COURT:   Nothing further.

4            MR. ROTH:   No.

5            THE COURT:   Any redirect?

6            MS. MASELLA:   No, your Honor.

7            THE COURT:   Okay, Officer, you may step down.

8            Government's next witness?

9            MS. MASELLA:   The government calls Jonathan Fox.

10   JONATHAN FOX,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13            THE WITNESS:   Detective Jonathan Fox.   Shield 579 of

14   the New York City Police Department.

15            THE COURT:   Just keep your voice up, don't talk too

16   fast, and with that, I think we can go.

17            You may proceed, Ms. Masella.

18            (Continued on next page)

19

20

21

22

23

24

25

D3dWdor2                          J. Fox - direct

1   BY MS. MASELLA:

2   Q.  Good morning, Detective Fox.

3   A.  Good morning.

4   Q.  I know you said you work for the NYPD.

5   A.  Yes.

6   Q.  How long have you worked for the NYPD?

7   A.  Approximately 15 years.

8   Q.  And you're a detective, correct?

9   A.  Yes.

10  Q.  How long have you been a detective with the NYPD?

11  A.  Approximately eight, nine years now.

12  Q.  And where are you currently assigned within the NYPD?

13  A.  I'm assigned to the firearms analysis section, which falls

14  under the police laboratory.

15  Q.  And how long have you worked in the firearms analysis

16  section of the police laboratory?

17  A.  Since July 2004.

18  Q.  What are your duties and responsibilities as a member of

19  the firearms analysis section of the lab?

20  A.  We test-fire firearms and ammunition for operability as

21  well as microscopically examine ballistic evidence such as

22  cartridge casings, bullets and bullet fragments.

23  Q.  You just mentioned several types of ballistics evidence,

24  including bullets, bullet fragments, and cartridge casings.

25  Can you explain to the jury what each of those items are?

D3dWdor2                          J. Fox - direct

1    A.   Sure.  Bullets commonly come in four components.  Main

2    component is the cartridge casing.  Inside the cartridge casing

3    would be propellant or gun powder.  The bullet would then sit

4    in the mouth of the cartridge casing, and at the base of the

5    cartridge casing would be the primer.  The bullet works when

6    the primer is struck by a firing pin from a firearm.  When that

7    firing pin strikes the primer, it causes the primer to explode.

8    That explosion causes the propellant or gun powder to light, to

9    basically light and turn into a gas.  When that gas builds up,

10   it forces the bullet out of the barrel of the gun.

11   Q.   Detective Fox, you also mentioned operability as one of

12   your duties in the lab.  Can you explain what you mean by that?

13   A.   Sure.  When any type of firearm or ammunition comes into

14   the police lab, we have to test that firearm for operability.

15   We also have to test-fire the ammunition that comes with the

16   gun for operability as well to make sure that the gun operates

17   in the manner which it's designed to.

18   Q.   Detective Fox, have you received any specialized training

19   in order to perform your current duties?

20   A.   Yes.

21   Q.   Can you explain to the jury what kind of training you have

22   received?

23   A.   During my time at the firearms analysis section, I received

24   an 18-month New York City Police Department AFTE, A-F-T-E.

25   AFTE stands for the Association of Firearms and Toolmark

D3dWdor2                         J. Fox - direct

1   Examiners.  It's a training program that consisted of formal,

2   informal lectures, written examinations, practical

3   examinations, presentations.  I was trained by AFTE in

4   identifying different types of firearms ammunition.  Some of

5   these firearms included revolvers, semiautomatic handguns,

6   shotguns, automatic rifles, semiautomatic rifles, and even some

7   homemade devices.

8       Also during that AFTE training program, I received hundreds

9   of hours of microscopic training, meaning you look under a

10  microscope at the ballistics-type evidence I described earlier,

11  and, after that portion was over, I was then given four

12  competency tests to be a microscopic examiner.  One of these

13  competency tests was given from an outside agency.  Three of

14  them were given by the New York City Police Department.

15      After completing those competency tests, I was then able to

16  perform microscopic examinations.  Every year, as being a

17  microscopic examiner, I'm given proficiency tests.

18      I also have a four-year college degree from Marist College

19  as well.

20  Q.  Have you also received any training by various firearms or

21  ammunitions manufacturers?

22  A.  Yes.

23  Q.  Can you explain what that is and how that helps you perform

24  your duties?

25  A.  The courses I receive from the manufacturers they call

D3dWdor2                          J. Fox – direct

1    armorer's courses.  Basically, these courses are given by the

2    gun manufacturer.  We would either go to that manufacturer or

3    they would come to the police laboratory, and they would train

4    us on how their guns work, how their guns are manufactured.  We

5    would take apart their different types of guns, and we would be

6    trained how to put them back together.

7         Some of these manufacturers that I've been trained by are

8    Glock, Sig Sauer, Kahr Arms, and Beretta firearms.

9    Q.  I believe, Detective Fox, you mentioned the phrase toolmark

10   identification.  Can you explain to the jury what that is?

11   A.  Yes.  To be a microscopic -- when I use the term

12   "microscopic examination," I described how, I use a compound

13   microscope.  It's essentially two microscopes combined through

14   an optical bridge, and we use this microscope to look at two

15   different pieces of evidence at the same exact time.  What I'm

16   looking for under this microscope are what's called toolmarks.

17        When the gun's being manufactured by the gun manufacturers,

18   they use different tools to manufacture the different parts of

19   the firearm.  So, for example, when they're manufacturing a

20   barrel, they put lands and grooves on the inside of the barrel.

21   They would use a drilling tool or a broaching tool.  When the

22   drilling tool goes in and out of the barrel, that tool will

23   leave a mark on the inside of that barrel.  When a bullet

24   travels through those lands and grooves, the bullet is usually

25   a softer metal than the inside of the barrel, so when the

D3dWdor2                     J. Fox - direct

1   bullet travels through the lands and grooves, the toolmarks

2   that are on the inside of that barrel are then left on the

3   bullet when it leaves the firearm.  Those are called striations

4   and toolmarks.

5       You cannot see these, these marks with the naked eye.  They

6   can be seen microscopically.  So essentially now we can put one

7   bullet on one side of the microscope, one bullet on the other

8   side of the microscope.  We look through the oculars and we

9   combine both bullets to determine if these toolmarks match each

10  other.  If these toolmarks match each other, we could say

11  they're fired from the same firearm.  If they don't, we could

12  say they're fired from different firearms.

13  Q.  Detective Fox, you just mentioned different toolmarks that

14  are left on a bullet.  Are there also typically toolmarks left

15  on a shell casing when it is fired from a particular firearm?

16  A.  Yes, there is.

17  Q.  Can you explain what types of marks you look for when you

18  look at shell casings?

19  A.  Sure.  The part of a shell casing that comes in contact

20  with the firearm, I described it earlier, would be the firing

21  pin, and the area around the firing pin is what's called the

22  headstamp on the cartridge.  Before the gun's fired, that

23  cartridge would rest inside the firearm.  That, the base part

24  of that cartridge would sit against the firearm, and that part

25  of the firearm is called a breech face.

D3dWdor2                          J. Fox - direct

1      So basically how, when the firing pin strikes the primer,

2    there is such force and such an explosion that that base of the

3    cartridge slams up against the breech face of that firearm.

4    Thus, the marks left from the breech face are now impressed on

5    to the base of the cartridge casings.  Those are called breech

6    face impressions.

7           Also, when a firing pin strikes the primer, it would

8    leave a firing pin impression on to that cartridge as well.

9    These are all areas that we microscopically examine to

10   determine if the individual characteristics are similar to say

11   that they're fired from the same firearm.

12   Q.  Detective Fox, after you and your lab perform a microscopic

13   examination of ballistics evidence and come to some conclusion,

14   is there any further review of your work?

15   A.  Yes.

16   Q.  Can you tell the jury what that is?

17   A.  Every time we perform an examination, we have a hundred

18   percent review process, being every report I do is also looked

19   at by another detective.  He would get the case and look at it

20   on his own to see if he came to the same conclusions I did.

21          MS. MASELLA:  Your Honor, at this time, the government

22   offers Detective Fox as an expert in the field of firearms

23   operability and identification.

24          THE COURT:  Any objection?

25          MS. FONTIER:  No, your Honor.

1         MR. ROTH:  No, Judge.

2         THE COURT:  Detective Fox is recognized as an expert

3   in firearms operability and identification.

4   BY MS. MASELLA:

5   Q.  Detective Fox, I want to turn your attention to two

6   exhibits in front of you, the small white envelopes on the

7   bench there.  Government Exhibit 268 is already in evidence,

8   but, if you could, look at Government Exhibit 267 for a moment.

9   A.  Yes.

10  Q.  And what is that container there, that white envelope?

11  A.  This white envelope is a firearms analysis section white

12  evidence envelope.  I created this envelope at the police

13  laboratory.  Basically, it contains evidence that was listed

14  under voucher 200050613, under complaint No. 2012, 47 Precinct,

15  10757, and was vouchered by PO Camilo of the 47 Precinct.

16  Q.  When you receive evidence in the firearms analysis section,

17  such as shell casings, is it accompanied by a voucher at that

18  time?

19  A.  Yes, it is.

20  Q.  When you created this envelope, you're the one that wrote

21  the voucher number corresponding to the evidence on the

22  envelope there in front of you?

23  A.  Yes, I did.

24  Q.  As well as the complaint number?

25  A.  That's correct.

D3dWdor2                          J. Fox - direct

1   Q.  And if you take a look at the back of the envelope, can you

2   explain to us what those writings are on the back of the

3   envelope?

4   A.  On the back of the envelope, there's three lines.  It says

5   reason, examiner, date.  On those lines, we would write the

6   reason why we examined this, the examiner's initials, also, the

7   date we examined it, and accompanying with that date would be

8   an evidence seal.  Every time that this envelope is opened,

9   that serves as a chain of custody as well as the seals show

10  that, that it wasn't broken and that you examined it and opened

11  it yourself.

12  Q.  Is that envelope sealed right now?

13  A.  Yes, it is.

14  Q.  And some of the initials on the back, are they your

15  initials, taking it in and out of evidence?

16  A.  Yes, they are.

17  Q.  When I say in and out, where is it stored when it's not

18  being used?

19  A.  They're stored in evidence bins at the firearms, police

20  laboratory.

21  Q.  Are those stored in a secure area?

22  A.  Yes, they are.

23          MS. MASELLA:  Your Honor, the government offers

24  Government Exhibit 267.

25          THE COURT:  Any objection?

D3dWdor2                              J. Fox - direct

 1                MS. FONTIER:  No, your Honor.

 2                MR. ROTH:  No, your Honor.

 3                THE COURT:  Government Exhibit 267 is received.

 4                (Government's Exhibit 267 received in evidence)

 5     BY MS. MASELLA:

 6     Q.  Detective Fox, I want to turn to your investigation in this

 7     case.  Can you tell us what you were first asked to do in

 8     connection with this investigation?

 9     A.  Originally, with this examination -- investigation, I was

10     assigned to technically review Detective LaCova's original case

11     which consisted of seven cartridge casings, seven nine

12     millimeter cartridge casings.  Detective LaCova did the case

13     originally.  As I stated earlier, I reviewed the case for him.

14     Q.  And when you say seven cartridge casings, is a cartridge

15     casing the same thing as a shell casing?

16     A.  Yes.

17     Q.  And were those shell casings, based on your examination,

18     fired from a revolver or an automatic?

19     A.  In my opinion, they were fired from a semiautomatic

20     handgun.

21     Q.  And tell us what types of markings you saw on the seven

22     shell casings that told you that it was from a semiautomatic

23     handgun.

24     A.  They were markings on the breech face as well as the firing

25     pin.  Typically, with the semiautomatic handguns, semiautomatic

1    handguns discharge cartridge casings after the gun is fired.

2    When you fire a revolver, the cartridges actually remain in the

3    cylinder until they're manually unloaded.

4         Also, in this particular case there was seven cartridge

5    casings.  Revolvers usually have five to six cylinders within

6    their revolvers.

7    Q.  Can you tell us what caliber the shell casings were in that

8    case, which is Government Exhibit 268?

9    A.  They were nine millimeter Luger, which is also a

10   semiautomatic cartridge, meaning that the nine millimeter Luger

11   is designed to go in a nine millimeter semiautomatic handgun.

12   Q.  Turning now to Government Exhibit 267, what is contained in

13   that exhibit?

14   A.  267 is one nine millimeter Luger cartridge casing that was

15   vouchered on 12, December 12, 2011, in regards to a homicide.

16   Q.  At some point, did you compare the cartridge casings in

17   Government Exhibits 267 and 268?

18   A.  Yes, I did.

19   Q.  Can you explain the method that you used to compare those

20   items?

21   A.  The method I would use, after technically reviewing

22   Detective LaCova's case and determining the seven cartridge

23   casings from the one scene were fired from the same firearm, I

24   then compared the seven cartridge casings from the one crime

25   scene to the one cartridge casing we received from the homicide

D3dWdor2                        J. Fox – direct

1   microscopically.

2   Q.  How did you compare them microscopically?

3   A.  I would put one cartridge casing on one side of my

4   microscope and the other cartridge casing on the left side of

5   my microscope, and we look through the oculars.  You actually

6   see both cartridge casings next to each other, and there would

7   be a line going between those, and that's called a demarcation

8   line.  I would then examine the individual characteristics.  I

9   would actually join the two cartridge casings together so that

10  would actually form one cartridge casing so it would appear to

11  be the same exact cartridge casing if all the individual

12  characteristics lined up properly.

13  Q.  You just used the term, Detective, "individual

14  characteristics."  Can you explain what those are for the jury

15  and distinguish them from class and subclass characteristics?

16  A.  When I discuss characteristics, there's three types.

17  There's class characteristics, individual characteristics, and

18  subclass characteristics.  I'll try not to confuse you as best

19  as I can.  But, basically, a nine millimeter cartridge casing

20  would be a class characteristic.  On that cartridge casing,

21  when it hits the breech face, if there's parallel lines going

22  across the breech face and they're left on to that cartridge

23  casing, those parallel lines would be a class characteristic as

24  well.

25       Now, the difference between class and individual is when

D3dWdor2                              J. Fox - direct

1    you have two different cartridge casings on the microscope and

2    the parallel lines, we're looking at the individuality of those

3    parallel lines, and then we'd match to see if those were

4    individual to that particular cartridge casing, meaning if the

5    toolmarks lined up in such a way or the striations lined up in

6    such a way that they matched each other, those would be

7    individual characteristics.

8         Subclass characteristics are what happens, which we did

9    have in this one particular case, when the cartridge was

10   manufactured at the cartridge manufacturing plant, they left

11   parallel lines all the way across the breech face.  Those were

12   called, those were left by the manufacturer and then left on

13   the cartridge casings.  Those are called subclass

14   characteristics.

15   Q.  So, in other words, when you say that in this case the

16   subclass characteristics were left by the manufacturer in the

17   process of making the ammunition, is that something that would

18   help you or not help you in determining whether they were fired

19   from the same gun?

20   A.  In some cases, those subclass characteristics could hurt me

21   in making the examination.  In this particular case, it didn't.

22   All the individual characteristics on -- well, when I did my

23   examination, I had two different types of cartridge casings.

24   One cartridge casing that had the subclass was manufactured by

25   a manufacturer called Wolf.  The other cartridges were

D3dWdor2                      J. Fox - direct

1    manufactured by Federal cartridge.  So being that one cartridge

2    didn't have this, these marks going across, I was able to

3    determine that the lines going across were made during the

4    manufacturing process of that specific cartridge casing.

5    Q.  I am going to approach now and show you what has been

6    marked for identification as Government Exhibits 269, 270, 271,

7    and 272.  Just take a look at those.

8        Are you familiar with those items, Detective Fox?

9    A.  Yes, I am.

10   Q.  And what are they?

11   A.  These are images I took of the comparison I did of the two

12   cartridge casings.

13   Q.  Are they photographs?

14   A.  Yes, they are.

15   Q.  And were they taken by you?

16   A.  Yes, they were.

17   Q.  And using the microscope in the course of your examination?

18   A.  That's correct.

19   Q.  And based on your review of them, are they a fair and

20   accurate depiction of a microscopic examination that you did in

21   this case?

22   A.  Yes.

23        MS. MASELLA:  Your Honor, the government offers

24   Government Exhibits 269, 270, 271, and 272.

25        THE COURT:  Any objection?

D3dWdor2                              J. Fox – direct

1          MS. FONTIER:  No, your Honor.

2          THE COURT:  Just what's depicted in them.

3          So what are they of?  What's on the right and what's

4    on the left?

5          THE WITNESS:  The cartridge on the right is from the

6    one crime scene and the cartridge on the left is from the other

7    crime scene.

8          THE COURT:  And one of the crime scenes had seven

9    shell casings, right?

10          THE WITNESS:  Correct.

11          THE COURT:  Is it a different shell casing in each of

12    these exhibits, or the same shell casing from the grouping that

13    had seven?

14          THE WITNESS:  It's all the same.

15          THE COURT:  They're all the same?

16          THE WITNESS:  Yes.

17          THE COURT:  These are four photos of two shell

18    casings, one on the right and one on the left?

19          THE WITNESS:  Correct.

20          THE COURT:  Government Exhibits 269 through 272 are

21    received.

22          (Government's Exhibits 269-272 received in evidence)

23          MS. MASELLA:  Thank you, your Honor.

24          Ms. Brady, may we put Government Exhibit 270 on the

25    screen, please.

D3dWdor2                         J. Fox – direct

1    Q.  Detective Fox, using Government Exhibit 270, can you

2    explain to the jury what we're looking at in this photograph?

3    A.  That's a breech face impression.  The exhibit on the left

4    is a Federal cartridge from the crime scene of a robbery.  The

5    exhibit on the right, of the cartridge casing on the right is

6    the Wolf cartridge casing from the scene, crime scene of a

7    homicide.  The line going through the middle of the photo is

8    the demarcation line.  So those are two separate cartridge

9    casings that we're looking at right now.  When you bring them

10   together, those individual characteristics form up and match

11   what I called the striations left from the breech face

12   impression.

13   Q.  I'm just going to hand you the laser pointer, and, if you

14   could, just indicate for the jury what you mean when you talk

15   about individual characteristics and striations.

16   A.  Right here, these are striations.  That's left behind from

17   a tool.  Those are individual characteristics to that

18   particular firearm that fired these cartridge casings.

19           MS. MASELLA:  Ms. Brady, can we look at 272.

20   Q.  Detective, can you tell us what it is that we're looking at

21   in this photo?

22   A.  Those are individual characteristics, just on another part

23   of the cartridge casing breech face.

24   Q.  Also on the breech face, but a different area?

25   A.  Yes.

D3dWdor2                              J. Fox - direct

1          MS. MASELLA:  May we look at 269, Ms. Brady.

2     Q.  Detective Fox, can you tell us what it is we're looking at

3     in this photograph?

4     A.  These are the same two, two cartridge casings -- this is

5     the Federal cartridge; this is the Wolf cartridge -- less

6     magnified.  The first area, that first picture we looked at,

7     was this part of the cartridge casing on the breech face, and

8     these individual characteristics match these individual

9     characteristics.

10    Q.  Go ahead.

11    A.  I'm sorry.

12         The second photo we looked at was this area of the breech

13    face, and the -- it was obviously more magnified, closer, so

14    this area matched this area.  And I know earlier we talked

15    about subclass characteristics.  These lines going right here,

16    those were subclass characteristics left behind when that Wolf

17    cartridge was manufactured.  I don't have it on this cartridge,

18    so I could tell it was something not left behind from the

19    firearm.

20    Q.  Detective Fox, after you completed your microscopic

21    examination of the seven cartridge casings from the robbery

22    scene and the one cartridge casing from the homicide scene,

23    were you able to form any opinion about whether or not those

24    shell casings were fired from the same firearm?

25    A.  Yes.

D3dWdor2                          J. Fox – direct

1   Q.  What is that opinion?

2   A.  It was my opinion that all the cartridge casings were fired

3   from the same firearm.

4   Q.  And when you say all, do you mean all seven to each other

5   and to the one?

6   A.  Yes.

7   Q.  What was that opinion based on?

8   A.  My training and experience.

9           MS. MASELLA:  One moment, your Honor.

10          No further questions, your Honor.

11          THE COURT:  Cross-examination.

12          MS. FONTIER:  Yes, please.

13          THE COURT:  Ms. Fontier.

14  CROSS-EXAMINATION

15  BY MS. FONTIER:

16  Q.  Good morning, Detective Fox.

17  A.  Good morning.

18  Q.  I want to just begin with maybe what are some firearms

19  basics, if you will.  The firearms that are generally around

20  today are manufactured in a factory, right?

21  A.  Yes.

22  Q.  And the different parts are machine manufactured?

23  A.  Yes.

24  Q.  And the entire gun essentially is then machine manufactured

25  and assembled, correct?

D3dWdor2                           J. Fox - cross

1    A.   Correct.

2    Q.   And so these machines, when you have a firearm, if you take

3    it apart, you can interchange the parts, correct, from one --

4    if it's the same type of, say, a nine millimeter Luger.  If you

5    have two nine millimeter Lugers that were made in 2012, you can

6    take them apart and interchange the different parts, correct?

7    A.   That would depend on the manufacturer of -- if you had the

8    same manufacturer, some firearms come with a barrel already

9    built into the frame of the gun so you wouldn't be able to take

10   that off.  You'd be able to use a slide, a different slide,

11   maybe.

12            THE COURT:  So Luger is not a manufacturer; that's a

13   class of a gun?

14            THE WITNESS:  A Luger is a gun manufacturer, it's an

15   old gun manufacturer.  Those look like the old German handguns

16   from World War II.

17            THE COURT:  Right.

18            THE WITNESS:  That's called a Luger.  They make

19   variations off of that nowadays.

20            THE COURT:  Different manufacturers make different

21   variations?

22            THE WITNESS:  Yes, but they wouldn't be

23   interchangeable.  They would have to be -- if I could use a

24   Glock for example?

25   BY MS. FONTIER:

D3dWdor2                          J. Fox - cross

1   Q.  Let's use Glock.  I'll withdraw the Luger and interchange

2   Glock there.  If you had a nine millimeter Glock semiautomatic

3   handgun manufactured in 2012, the same question.

4   A.  You might be able to interchange the barrels between those

5   particular firearms if they were the same model firearm.

6   Q.  When you are examining a bullet, it is the barrel that

7   leaves the marks on the firearm, correct?

8   A.  That's correct.

9   Q.  And when you are interchanging the parts, it's because the

10  manufacturer, say, each barrel is manufactured to be the same

11  size and shape and to be able to fit into the gun, correct?

12  A.  Correct.

13  Q.  And so when these are machine fabricated, the machines turn

14  out what are essentially the same parts for each gun, correct?

15  A.  Correct.

16  Q.  And so, what you are saying is that what you examined is

17  any sort of microscopic differences, correct?

18  A.  I'm looking at the differences in the toolmarks that were

19  left behind during the manufacturing process of that particular

20  gun.

21  Q.  When a machine makes, say, five guns in a row and it's a

22  modern, new machine, there are going to be very few

23  differences, correct?

24  A.  They'll be different, yes.  But they'll, if they're

25  different, they're different.  I don't necessarily matter if

D3dWdor2                         J. Fox - cross

1   it's a few.  But they're still different.

2   Q.  And so now I'm going to focus only on shell casings because

3   that's what you examined in this case.  Right?

4   A.  Yes.

5   Q.  So the shell casing doesn't travel through the barrel of a

6   gun, correct?

7   A.  That's correct.

8   Q.  So it doesn't have those like lands and grooves that I

9   think you described?

10   A.  That's correct.

11   Q.  It just has markings on the outside of the shell casing,

12   correct?

13   A.  The markings would be from a cartridge casing, typically

14   left from the breech face, the firing pin.  Also, on the slide

15   of a semiautomatic handgun, there's what's called an extractor.

16   That's a piece of metal that's located on the slide that hooks

17   into the rim of the cartridge and pulls the cartridge out of

18   the barrel of the gun after the gun is fired.  Also, another

19   area of the cartridge that might have marks on it would be

20   around the cartridge itself, where that cartridge comes into

21   contact with the magazine of a particular firearm.

22          MS. FONTIER:  Ms. Brady, could you put up 269, if you

23   don't mind.

24   Q.  What we're looking at here is the breech face, right?

25   A.  That's correct.

D3dWdor2                          J. Fox - cross

 1   Q.  I'm going to use a cup for an example so that we can see.

 2   If this is a bullet, obviously it's not.  But if it were, the

 3   breech face is essentially this flat bottom of the cup, right,

 4   the back of the bullet, if it was?

 5   A.  That's the base of the cartridge.  The breech face is

 6   located on the firearm itself.

 7   Q.  So is this on a shell or in a firearm?

 8   A.  Those are breech face impressions.

 9   Q.  Okay.

10   A.  Meaning they're impressions from the breech face.  The

11   breech face, if I describe to the jury, this area right here is

12   called a firing pin.  The area around the firing pin is called

13   the base or the headstamp of the bullet.  This part right here

14   is what's called the firing pin impression.  This area of the

15   cartridge rests against the firearm called the breech face.

16   The breech face, in the middle of that breech face is what's

17   called an aperture.  An aperture is a hole.  Out of that

18   aperture comes the firing pin.

19        So this area is, is the base of the cartridge, rests

20   against the breech face of a firearm.

21   Q.  Maybe this would be easier with the actual shell.

22            MS. FONTIER:  Do you mind if I open these?

23            MS. MASELLA:  No.  Go ahead.

24            MS. FONTIER:  Sorry.  One moment.

25            With the government's kind assistance, I now have a

D3dWdor2                        J. Fox – cross

1    shell in my hand.  Maybe I should do this under here.  This

2    would make it a little easier.  All right.

3    Q.  All right.  So I've put the bullet on the overhead, the

4    shell casing, right?  This back portion right here that I'm

5    pointing at, the flat side of the shell casing, what is that

6    called?

7    A.  The base of the bullet or the headstamp of the cartridge.

8    Q.  Government Exhibit 269 that was just up, that's what we're

9    looking at, right?

10   A.  The cartridge on the right, yes.

11              THE COURT:  It's not the base of the bullet, right?

12              THE WITNESS:  It's the base of the cartridge.

13              THE COURT:  The bullet's the little piece of soft lead

14   that rests in that cartridge, right?

15              THE WITNESS:  Exactly.

16   BY MS. FONTIER:

17   Q.  So this is the base of the cartridge?

18   A.  Correct.

19   Q.  And that's what you were comparing in the two pictures that

20   were Government Exhibit 269, right?

21   A.  Yes.

22   Q.  Did you compare the outside, the round outsides of these

23   casings?

24   A.  I don't understand what you mean by the round outsides.

25              THE COURT:  I don't either.

D3dWdor2                              J. Fox - cross

 1   BY MS. FONTIER:

 2   Q.  So we're looking at a cylinder, right?

 3   A.  Okay.

 4   Q.  This casing is a cylinder, right?

 5          THE COURT:  Use the cup.  I think the cup makes it

 6   easier.

 7   BY MS. FONTIER:

 8   Q.  What are we calling this again, the flat back?  What is

 9   this?

10   A.  The base of the cartridge.

11   Q.  The base.  The base of this shell cartridge will be

12   equivalent to the bottom of this cup.  Okay?

13   A.  Okay.

14          MS. FONTIER:  Can we bring up Government Exhibit 269

15   again.

16   Q.  In Government Exhibit 269, we're looking at two pictures of

17   what is essentially the bottom of the cup, right?

18   A.  Yes.

19   Q.  And you said you looked at the markings that are on the

20   bottom of the cup under the microscope, right?

21   A.  The breech face impressions, yes.

22   Q.  So the base of the shell casing.  Did you examine what

23   would be the outsides of the cup, the rest of the shell casing?

24   A.  I -- in this particular case, I examined the breech face

25   impressions and the firing pin impressions.  The only way we'd

1    actually look to the rim of a cartridge casing is if, say, we

2    had an unfired cartridge casing left at the scene, meaning a

3    live cartridge.  We would, we would examine those individual

4    characteristics around the --

5    Q.  I'm sorry.  I'm not asking what you would do.  I'm asking

6    what you did do.

7    A.  I --

8    Q.  Did you examine the outside of these shell casings in this

9    case?  Yes or no.

10   A.  I, I did not.  I examined the breech face impressions.

11   Q.  All we're talking about then is the bottom of the cup, for

12   the rest of this, right?

13   A.  Yes.

14   Q.  Even though marks can be left on the sides of the cup, the

15   around part, right?

16   A.  There is marks that can be left there.  I was trying to

17   explain the only reason why we would examine those marks.

18   Q.  You didn't examine them?

19   A.  I didn't, no.

20   Q.  So what we're talking about then is the bottom of the cup,

21   the base of the cartridge, right?

22   A.  That's correct.

23   Q.  And now, in this picture, in Government Exhibit 269, the

24   base of the single shell recovered from December 12, is in the

25   right, correct?

D3dWdor2                          J. Fox - cross

1   A.  Yes.

2   Q.  And so, now, did you compare this shell casing from the

3   December 12, the single shell casing, to each of the other

4   seven shell casings recovered?

5   A.  Yes, I did.

6   Q.  And do we have any pictures of those here?

7   A.  No, we don't.

8   Q.  So what's on the left in Government Exhibit 269, 270, 271,

9   and 272, are those all from the same single shell?

10  A.  Yes, they are.

11  Q.  Again, what you basically do is put these shells under a

12  microscope and you look at them, right?

13  A.  I examine them, yes.

14  Q.  Now, you said you looked for three different types of

15  classifications, class, subclass, and individual, right?

16  A.  Yes.

17  Q.  Define again for this jury what is class characteristic is.

18  A.  The class would describe a group of evidence.  For example,

19  nine millimeter bullets would be a class characteristic.

20      Individual characteristics would be what we're examining

21  when we're examining striations.  Those are individual to that

22  particular firearm.

23      Subclass characteristics are similar to individual

24  characteristics.

25  Q.  Sorry.  Just one at a time.

D3dWdor2                          J. Fox - cross

1      So class is something that is for a whole group, correct;

2   that's why it's called class?

3   A.  Yes.

4   Q.  And it's something such as caliber?

5   A.  Yes.

6   Q.  You, I believe, also said that parallel lines may also be

7   class?

8   A.  We would classify two cartridge casings before our

9   examination that had parallel lines being a class

10  characteristic.

11  Q.  I want to talk about one shell at a time.  Okay?  Not a

12  comparison, but one shell.

13  A.  You're --

14  Q.  What is a class characteristic?

15  A.  You're asking me how I do my examination and I'm describing

16  to the jury how I'm -- that's how you define class

17  characteristics.

18  Q.  I'm not asking you yet how you did your examination.  I'm

19  asking you what is the actual definition of a class

20  characteristic.

21  A.  There's no other way for me to describe what class

22  characteristics are.

23  Q.  So if you look at a single shell, can you determine

24  anything about the class other than the caliber?

25  A.  I can determine the breech face impressions, whether it be

D3dWdor2                          J. Fox - cross

1   parallel, elliptical, if they have arcs, circles.  And I can

2   determine the caliber.  I can determine within a class

3   characteristic, could be a firing pin impression.  Some firing

4   pin impressions are elliptical-shaped.  Some are

5   rectangular-shaped.  That would be a class characteristic.  So

6   any, any firing pin, any cartridge casing that had a

7   rectangular firing pin, that would share the same class

8   characteristics as other cartridge casings with rectangular

9   firing pins.

10  Q.  If I could use the overhead again, I think it will be

11  easier, and I realize this doesn't zoom, so it might be a

12  little difficult, but I'm putting up what is the right side of

13  Government Exhibit 269.  There we go.  All right?

14  A.  Okay.

15  Q.  So if you're looking at this single shell, which --

16      This shell was examined by itself at one point, correct?

17  A.  That's correct.

18  Q.  And now one of the class characteristics is nine

19  millimeter, correct?

20  A.  Yes.

21  Q.  And you said a Luger is an old type of gun?

22  A.  A Luger is just a, a model of an older type of firearm.

23  They still make them today but just by different manufacturers.

24  Q.  So when the paperwork was filled out in this case --

25      You did the paperwork in this case, right?

D3dWdor2                          J. Fox - cross

1    A.  I did, yes.

2    Q.  And you did a microscopic worksheet on this particular

3    shell?

4    A.  Yes, I did.

5    Q.  You again filled that out as accurately as possible,

6    correct?

7    A.  I -- yes, I did.

8    Q.  And so when you filled this out, you described this shell

9    as nine millimeter Luger.  What does that mean?

10   A.  That's the type of nine millimeter bullet it is, meaning

11   when you describe a Luger, there is a Luger firearm.  When you

12   describe this cartridge casing, it's what's called a nine

13   millimeter Luger.  There's other nine millimeter, there's

14   what's called a nine millimeter Corto round, which would mean a

15   nine millimeter short.  There is nine millimeter Largo rounds,

16   which are longer than nine millimeter Luger rounds.  So it's

17   just a type of cartridge casing.

18   Q.  And those different types of cartridge casings, can they go

19   in any nine millimeter handgun?

20   A.  No.

21   Q.  Can a nine millimeter Luger go in more than one type of

22   handgun?

23   A.  Nine millimeter Luger can fit into a .40 caliber handgun.

24   However, it would only fire once.

25   Q.  If I have a nine millimeter Glock and a nine millimeter

D3dWdor2                          J. Fox - cross

1   Colt handgun, could a nine millimeter Luger bullet, shell

2   casing, go in either one of those two guns?

3   A.  Yes.

4   Q.  So the fact that this is a nine millimeter Luger does not

5   tell you with any particularity what gun it was shot from?

6   A.  It does not.

7   Q.  And that's an example of a class characteristic, right?

8   A.  What's an example of class?

9   Q.  The nine millimeter Luger, the fact of the size and shape

10  of the bullet, correct?

11  A.  Yes.

12  Q.  Now, also, the firing pin, which is basically the circle,

13  correct?

14  A.  Yes.

15  Q.  Is the firing pin the small circle in the middle of what

16  we're looking at or the larger, closer circle?

17  A.  It's this area right here, the smaller circle.

18  Q.  And that is what is struck in order to actually make the

19  bullet fire, correct?

20  A.  This big circle is a primer.  Before that, before this

21  cartridge is fired, this dimple mark would not be there.  After

22  the gun is fired, the firing pin strikes this area of the

23  primer, causing that dimple.

24  Q.  If you can see around the outside of the dimple, the darker

25  portion in the middle of 269 there, there seems to be another

D3dWdor2                         J. Fox - cross

1    circle coming out, sort of.  Do you see what I'm pointing at,

2    the arc over the top of the darker circle here?  I mean, I can

3    go point to it.

4        So you're saying this portion, this dark portion, is the

5    dimple from the firing pin, right?

6    A.  That's correct.

7    Q.  What is this, this circle here, that goes above it on this

8    picture?

9    A.  That would be an impression left behind from the firearm,

10   the breech face impression, or the outside of the aperture of

11   the firing pin.

12   Q.  And is that one of the characteristics that you examine to

13   determine if a gun is shot from the same, or a bullet is shot

14   from the same gun?

15   A.  That could be one of the characteristics, yes.

16   Q.  Would that be a class, subclass, individual?

17   A.  That would be individual.

18   Q.  So if you're looking at that circle, it goes, for the

19   record, basically even with this side, I guess that would be

20   the left side of the dark circle, to partially over to the

21   right side, correct?

22   A.  Correct.

23   Q.  So now if we're looking at that same circle on the other

24   picture, the left side of Government Exhibit 269, it seems to

25   go all the way around the impression, correct?  All the way

1  around the dark circle?

2  A.  It would help me if we put them together.

3  Q.  I'm asking you if by looking at this one single bullet,

4  shell casing.  Sorry.  Look, this circle here, you see the same

5  dark circle, right, which is the dimple from the firing pin?

6  A.  Yes.

7  Q.  Then there seems to be that same circle, but that goes all

8  the way around.  Do you see what I'm tracing with the pen?

9  A.  You're essentially doing a microscopic examination based on

10  a picture.  I need to see both pictures at the same time to

11  accurately describe what you're saying.

12  Q.  But I'm just asking you to look at this picture.  Do you

13  see what I'm pointing at, this circle that goes all the way

14  around the dark circle?

15  A.  I see --

16  Q.  Do you see that?

17  A.  I see what you're looking at.  I'm telling you to answer

18  your question I need to see both at the same exact time.

19          THE COURT:  The question is:  Do you see it?

20          THE WITNESS:  Yes.

21          THE COURT:  Next question.

22  BY MS. FONTIER:

23  Q.  This circle on the left picture goes all the way around the

24  dark impression, right?  And it does not go all the way around

25  the dark dimple on the right side, right?

D3dWdor2                         J. Fox - cross

1    A.  Okay.

2    Q.  That is true, correct?

3    A.  That is true, yes.

4    Q.  And that is one of the individual characteristics that you

5    examine to decide if these shells were shot from the same gun,

6    correct?

7    A.  Correct.

8    Q.  And they were different in this case, correct?

9    A.  They are not different, no.

10   Q.  Then your opinion is that those look the same?

11   A.  My opinion is that this cartridge on the left was made with

12   a different fire, a different manufacturer, meaning whoever

13   made this cartridge, Federal cartridge, used a white primer.

14   They used a different metal than this primer.  The Wolf primer

15   is made of a harder metal than that of the Federal cartridge

16   primer.

17        Also, this nine millimeter Luger says "plus P" right here.

18   Plus P stands for more propellant, meaning there was more force

19   used to fire this cartridge than this cartridge.  When there's

20   more force being used, this cartridge slammed up against the

21   breech face harder than this cartridge, meaning there's more

22   individual characteristics left on this cartridge than this

23   one.  When I did my examination, I examined all the individual

24   characteristics on these two particular firearms and determined

25   they are fired from the same firearm by sufficient individual

D3dWdor2                    J. Fox – cross

1    characteristics of the firing pin and breech face impression.

2    Q.  So is a summary of that the fact that these two circles

3    around the darker dimple in the middle don't matter?  Is that

4    what you're saying?  The fact that they're different doesn't

5    matter?

6    A.  It doesn't matter in this case --

7    Q.  All right.

8    A.  -- because they're different manufacturers.

9    Q.  It doesn't matter; that's your opinion?

10   A.  One cartridge has more individual characteristics than the

11   other.  Both cartridges share sufficient individual

12   characteristics to say they were fired from the same firearm.

13   Q.  Define sufficient.

14   A.  Sufficient is described as the quality and quantity of each

15   individual characteristics, based on the length of the

16   individual characteristic, based on the depth of the individual

17   characteristic.  They call them ridges and furrows.

18       Basically, what I'm looking at when I conduct a microscopic

19   examination, which is not representative to this picture, is

20   I'm looking at the depth of an individual line.  I'm looking at

21   the length of these lines.  I'm looking where these lines break

22   and break off.

23       What we're looking at here is just a representation of what

24   we're seeing under a microscope.  They don't show the depth of

25   these individual characteristics, of exactly what I'm looking

D3dWdor2                              J. Fox - cross

1    at under the microscope.  And what we're looking for, when we

2    have so much of these individual characteristics that there's

3    such quality, meaning the depth and the length and where they

4    break off, and the quality and the quantity of those match, we

5    can determine that as sufficient.  And I could base that on my

6    opinion of looking at thousands of pieces of evidence and my

7    training as well.

8    Q.  So sufficient is what you decide it is by looking at it,

9    correct?

10   A.  It is in my opinion that these two cartridge casings were

11   fired from the same firearm.

12   Q.  The definition of sufficient though is what you decide by

13   looking at these casings, correct; it is subjective?

14   A.  It is subjective, yes.

15   Q.  So one of the other things you said you looked at was the

16   lines.  This has parallel lines.  Is that what I'm pointing to

17   here, these lines running here?

18   A.  These lines right here are striations or parallel lines

19   left from the breech face.

20   Q.  And that was one of the things that you examined here,

21   right?

22   A.  Correct.

23   Q.  And now I have to go back to my trusty cup.  Let's say

24   parallel lines I'm drawing on the cup, across the middle, like

25   that.  Okay?

D3dWdor2                         J. Fox - cross

1   A.  Okay.

2   Q.  This is something that you would examine if those lines

3   exist, right?

4   A.  I would examine them, yes.

5   Q.  And is one of the things that you examine the direction

6   that they go?

7   A.  Yes.

8   Q.  And now, I'm doing a lot of walking here, I guess it's good

9   for me.

10      In this picture, you've lined them up so that they go in

11   the same direction, right?

12   A.  Correct.

13   Q.  Again, I'm looking at Government Exhibit 269.

14           Now, correct me if I am wrong, but when you have a

15   shell casing -- again, it's a cylinder, right?  And when it

16   goes in the gun, it doesn't have to go in any particular, I

17   mean, obviously the bullet needs to face one direction, but as

18   the circular goes, it doesn't have to go in any particular

19   direction.  Right?

20   A.  That's correct.

21   Q.  So on my trusty cup, if this is in the chamber, the lines

22   right now are going parallel left to right, but they could go

23   up and down, they could go diagonal?  When it's sitting in the

24   chamber, you don't know, right?

25   A.  I don't know --

D3dWdor2                          J. Fox - cross

1   Q.  I'm not referring to that right now.  I'm just asking a

2   single question.  Can it go, if this is my bullet, it can go in

3   the gun in this direction, it can go in this direction, it can

4   go in this direction.  It's a circle.  Right?

5   A.  They can go in any particular direction in a firearm, yes.

6   Q.  So, by looking at one casing at a time, this one, you don't

7   know if these lines were sitting this direction in the gun or

8   this direction or this direction, right?

9   A.  I would be able to tell what direction those lines were

10  formed based on the -- when a gun fires a cartridge casing, as

11  I described earlier, there's an extractor and an ejector

12  located in the slide.  The ejector, in most firearms, is

13  usually located in the upper left corner of that particular

14  firearm.  The extractor is usually located on the right-hand

15  portion of the slide.  Both of those leave marks in particular

16  firearms.  So if I have the extractor in the left-hand corner

17  of the cartridge casing -- I'm sorry, the ejector in the

18  left-hand corner of the cartridge casing and I have the

19  extractor on the lower right-hand corner, I could describe the

20  orientation of the particular lines on a firearm.

21  Q.  I'm rather confused.  Where are the corners you're

22  describing on this circle?

23  A.  I'm going to explain to you.

24          In this particular instance I didn't note where the

25  extractor and ejector marks were because it wasn't necessary in

D3dWdor2                              J. Fox - cross

1   this case.  These parallel lines, however which way they face

2   on the firearm, they do match each other, and they match in

3   such a sufficient way that it doesn't matter which way they

4   face.  These parallel lines come from the breech face of a

5   firearm.  These parallel lines or striations were impressed on

6   to this particular cartridge casing.

7        When I did my examination, I just happened to left to right

8   and that's how I did my examination, to show the individuality

9   of each particular line to each other.

10  Q.  Tell me again where the corners on this circle are because

11  I'm a little lost.

12  A.  On this particular circle, I would need the cartridge

13  casing to be less magnified to show you that.

14  Q.  I'll give you the actual casing and I would love for you to

15  point to a corner on a circle.

16  A.  Usually look at microscopes for this, but --

17            THE COURT:  What are you looking for?

18            THE WITNESS:  I'm looking for -- it looks like a

19  dimple, and it would be left on one portion of this particular

20  headstamp.

21            As I described earlier, the, that would be an

22  extractor mark.  So if there was a dimple on the upper

23  left-hand corner of this circle, that would be an ejector mark.

24            THE COURT:  You keep saying corner.  But, of course,

25  circles don't have corners.  So what do you mean?

1           THE WITNESS:  I would mean on the headstamp.  At the

2    corner of one of the circles, the upper left-hand portion of

3    the circle of this base, there are what we would call a dimple

4    mark.  And those ejectors sometimes don't make individual

5    characteristics; they just give you an area of where to start

6    your examination, meaning if you have two different cartridge

7    casings and the left-hand portion of that circle, there is two

8    dimple marks, we could say that's where the ejector was on this

9    particular firearm.  And we could start our examination process

10   there.  We don't use them for anything else, really.

11   BY MS. FONTIER:

12   Q.  Did you compare the ejector marks on this particular shell

13   from the December 12 incident to the other seven shells?

14   A.  We wouldn't do that in this particular case.

15   Q.  So you did not?

16   A.  I did not.

17   Q.  So you essentially compared the parallel lines, right?

18   A.  Yes.

19   Q.  I'm going to put up one half of Government Exhibit 272.

20   We're talking about these parallel lines here, correct, that

21   I'm pointing out?

22   A.  For what?

23   Q.  You examined these lines and these lines, right?

24   A.  Yes, I did.

25   Q.  From that you're saying the right side of Government

D3dWdor2                         J. Fox - cross

1    Exhibit 272 corresponds to those and is a blowup, correct?

2    A.  That's one portion of those individual characteristics,

3    yes.

4    Q.  Okay.  That portion, I don't know how to describe this

5    other than that the lines are messy at the top, they curve up

6    towards what is the top of this picture and curve down and are

7    not very clear.  Correct?

8    A.  To me, they're very clear.

9    Q.  All right.  But see how these are continuous dark lines

10   like the rings on a tree?  These are sort of not in that same

11   character, right?

12   A.  They're characteristics left behind on a tool.  They're not

13   going to be perfect.

14   Q.  Okay.

15   A.  The reason why is that's how we compare them to each other

16   because they're not perfect.  That is unique to this particular

17   tool.

18   Q.  Right.  So this is something that is an individual

19   characteristic that, under the microscope, obviously, you look

20   at because that's something that you say is left by the

21   firearm, right?

22   A.  That's a unique mark left from a particular firearm, yes.

23   Q.  Now, I don't have a blowup of the left side of Government

24   Exhibit 269, but where is that on this portion?

25   A.  Once again, I can't perform a microscopic examination with

D3dWdor2                        J. Fox - cross

1    two pictures, and I can't accurately describe for the jury

2    where it would be on this particular picture.

3    Q.  Okay.

4    A.  I could do my best, but it would be in this area.  Like,

5    I'm looking at these cartridges magnified 40 times, 28 times.

6    When you put both of those together with the demarcation on the

7    line, I could probably describe it better.

8    Q.  Could I see the pointer?

9    A.  Yes.

10            MS. FONTIER:  Ms. Brady, do you mind bringing up 269?

11   I think it's a little bit clearer this way.

12            THE COURT:  That was 269.

13            MS. FONTIER:  Yes, but that was on the -- it's a

14   little bit clearer if we use this.

15   Q.  What we were looking at in Government Exhibit 270 is this

16   portion here, right, on the right side?

17   A.  Yes.

18   Q.  And what I described as the messy lines was up here, right?

19   A.  Yes.

20   Q.  Does that look the same to you in this picture as it does

21   over here?

22   A.  Yes.

23   Q.  Those messy lines that are here, that go up, you see over

24   here?  Because this appears to be a dark line that goes down,

25   to me.

D3dWdor2                        J. Fox - cross

1    A.   Based on my training and experience and the thousands of

2    pieces of evidence I looked at under a comparison microscope, I

3    determined the individual characteristics from the cartridge on

4    the left to the cartridge on the right to be sufficient enough

5    to say they were fired from the same firearm.

6    Q.   Okay.  But I'm asking you specifically.  Do you see this

7    dark line that I'm pointing at with the laser pointer?

8    A.   I think --

9    Q.   Top of this --

10             THE COURT:  Do you see it?  That's the question.

11             THE WITNESS:  Yes, I do.

12   BY MS. FONTIER:

13   Q.   Am I fairly and accurately describing this, going from left

14   to right, it goes down, correct?  Am I accurately describing

15   that line?

16   A.   You're describing the cartridge, yes.

17   Q.   Now, on the right side of Government Exhibit 269, that dark

18   line at the top of those parallel lines appears to go from left

19   to right, to go up and then back down, right?

20   A.   Once again, the different metals on different

21   manufacturers.  Throughout my year and a half of training, we

22   go through all these individual characteristics, as I

23   described, again with sufficient enough to each particular

24   firearm.  If a firearm or a cartridge has a different metal, a

25   harder metal or a softer metal than the one on the right,

D3dWdor2                         J. Fox - cross

1  they're going to mark, one's going to have more individual

2  characteristics, one's going to have less individual

3  characteristics.  But we look for the whole picture as well as

4  if it's sufficient individual characteristics.  And I thought I

5  described that earlier, when I'm looking at the depth of the

6  lines, the length of the lines, where they break off, you know,

7  the ridges and the furrows.

8      You're looking at a picture that I just use as a

9  representation of my examination.  Just one picture.  I look at

10 the depth of these lines, which you cannot see in these two

11 particular pictures.  We don't do microscopic examinations with

12 a picture.

13 Q.  I'm describing what I'm seeing, yes?

14 A.  And I'm describing what I'm telling you, in my opinion,

15 based upon a microscopic examination that I conducted, not in a

16 courtroom, at work, in a controlled environment, with the

17 technology, with the highest level of technology available.

18 Q.  Okay.  So now looking at this picture, you're telling me

19 then that the fact that this line goes down and this one goes

20 up doesn't matter?  That's essentially what you're saying?

21 A.  They don't matter.

22 Q.  And the fact that this circle here is a little half arched

23 and this one is a full circle around the impression, that also

24 doesn't matter?

25 A.  It also depends on the softness and hardness of metal of

D3dWdor2                          J. Fox - cross

1    how many individual characteristics are going to be left

2    behind.

3    Q.  So they don't matter, right?

4    A.  I'm not saying they don't matter.  I'm saying one has more

5    individual characteristics than the other because of the plus P

6    ammunition that was used to fire, meaning there was more force

7    used to fire the cartridge on the left.  Since there was more

8    force used, there is more of an explosion and more of a bang

9    from the cartridge on the left to the breech face, meaning,

10   more of the breech face impressions on the cartridge on the

11   left would be impressed on that particular bullet.

12   Q.  Okay.

13   A.  Also, Wolf makes a hard metal.

14            THE COURT:  Let's just stop there.  Next question.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D3D5dor3                              J. Fox – cross

1   BY MS. FONTIER:

2   Q.  Okay.  So, and the on the left we see the plus P here in

3   the bottom of Government Exhibit 269, right?

4   A.  Yes.

5   Q.  So this is the one fired with more force you're saying,

6   right?

7   A.  Yes.

8   Q.  So, more of the individual marks on the breechface of the

9   gun should be left on this shell, correct?

10  A.  That's correct.

11  Q.  On this shell, looking at these lines and pointing on the

12  bottom parallel lines on the bottom of Government Exhibit 269,

13  those appear quite clear on this picture, yes?

14  A.  It could be the lighting of the particular camera.  They do

15  appear clear on that picture, yes.

16  Q.  And these up here and less clear, correct?

17  A.  Slightly less clear.

18  Q.  But yet this is the gun that is fired and should have more

19  clear impressions, right?  This is the shell that was fired

20  with more force?

21  A.  You're looking at a picture with different lighting.

22  Q.  This is the evidence that we have before us so, yes, I'm

23  looking at it.

24          THE COURT:  Is that a question?  Or are you guys

25  having a conversation.  Let's keep it to questions, okay?

D3D5dor3                          J. Fox - cross

1              MS. FONTIER:  Yes, your Honor.

2     BY MS. FONTIER:

3     Q.  Government Exhibit 270, I'm putting the right side and

4     putting in evidence which -- I can do this with that one.  It

5     is much easier to see, I think.

6              I am making you really earn it today, Ms. Brady.

7              This is in evidence as Government Exhibit 270; what is

8     that?

9     A.  The red mark?

10    Q.  Yes.

11    A.  That's seal left behind.  That's a primer seal.

12    Q.  Why -- how does that get there?

13    A.  The manufacturer puts primer seal there so that there is no

14    air between the primer and the cartridge.  That's left by the

15    manufacturer.

16    Q.  And now, going back to 269, you said these diagonal lines

17    are sub-class lines, right?  On the right side?

18              THE COURT:  Sub-class characteristics.

19    Q.  Sub-class characteristics.

20    A.  Yes.

21    Q.  And you said they're sub-class because they don't appear on

22    this shell; is that correct?

23    A.  No.  That's not what I said.

24    Q.  How did you determine that these are sub-class lines then?

25    A.  Because they're made by the manufacturer of that particular

D3D5dor3                        J. Fox - cross

1  cartridge.  I know that because I have seen hundreds of Wolf

2  cartridges that leave that same, exact parallel line.

3  Q.  And to check that did you compare this particular shell to

4  other 9 millimeter Wolf shell casings?

5  A.  Why -- I really don't understand that question.  Why would

6  I compare a fired cartridge casing to other unfired Wolf

7  cartridge casings from my laboratory?

8          THE COURT:  Don't answer a question with a question,

9  so you ask the next question or repeat that question.

10  Q.  In order to confirm your opinion that these are sub-class,

11  did you compare these to other Wolf casings?

12  A.  During my experience at looking at hundreds of Wolf

13  cartridges I know that Wolf, when they manufacture their

14  cartridges, they leave parallel lines going across their, the

15  primer and head stamp.  I don't see that the use in me

16  comparing the cartridge on the right to unfired Wolf cartridges

17  from my laboratory.

18  Q.  So, you did not compare this to other Wolf casings to be,

19  confirm your belief that this is a sub-class line?

20  A.  It is sub-class and I did not compare it to other Wolf

21  cartridges on file at my laboratory, no.

22  Q.  Now, when you did the reports in this case, when you

23  examined, again, this single casing you described these lines

24  as, on the breechface as parallel, right?

25  A.  Yes.

D3D5dor3                          J. Fox - cross

1   Q.  And when you examined the seven shell casings -- just for

2   today I guess we will assume that they all look like this, you

3   describe these parallel lines as granular/parallel, correct?

4   A.  I didn't describe them that way, no.

5   Q.  You did not.

6   A.  No.

7   Q.  So, when you filled out a -- ah, you did not -- sorry.

8        You reviewed the paperwork that was filled out in this

9   case, correct?

10  A.  Correct.

11  Q.  And you reviewed the paper work that was done by the first

12  person who had examined these seven shell casings, correct?

13  A.  Correct.

14  Q.  And you're testifying here based on, in part, on your

15  review of that paperwork and the examination that was done,

16  correct?

17  A.  I reviewed this paperwork, yes.

18  Q.  And so, in reviewing that paperwork you would have an

19  opportunity to correct any mistakes that you saw.  That's part

20  of what a reviewer does, correct?

21  A.  If I saw mistakes I would correct them, yes.

22  Q.  So, is it fair to say then that when the initial reviewer

23  described these lines on the left side -- and again I will

24  point to be sure -- the parallel lines on the breechface as

25  granular/parallel, when you reviewed the paperwork you didn't

D3D5dor3                    J. Fox - cross

 1  have any issue with that, correct?

 2  A.  I did not.  No.

 3  Q.  So, the fact that these are parallel and this is

 4  granular/parallel, does that also not matter, in your

 5  comparison?

 6  A.  He's describing different areas of the cartridge.  If you

 7  look where the plus P is, see in between the plus and the P,

 8  those marks there?  Those are granular marks.  My particular

 9  casing, because of the hardness of the metal, would not need

10  those marks.

11  Q.  So, when you describe -- and looking at the reports -- I

12  mean, if you don't recall what they say I will be happy to

13  provide them for you, there is a line that says breechface and

14  there is a box to provide a description in these forms, right?

15  A.  Yes.

16  Q.  And when you described the breechface, if you write

17  parallel, that would mean lines that are left on the

18  breechface, correct, what we have been talking about here?

19  A.  The base and the -- the breechface can come in contact with

20  the base of the cartridge.  That's what I described earlier

21  why.

22  Q.  And what is the granular -- it actually says granulin.

23  What is a granulin type of line or a breechface that is

24  granulin?  What does that mean?

25  A.  It says granular and it means that -- it describes exactly

D3D5dor3                        J. Fox - cross

1   between the plus and the P, that those marks there would be

2   considered granular, almost like pock marks on the head stamp

3   or the breechface.

4   Q.   This portion out here, so that we have a set of basically

5   three circles, right; a dark circle, another smaller circle

6   around it, this larger circle here and then this outside

7   portion where the plus P is.

8   A.   Okay.

9   Q.   That also comes in contact with the breechface?

10  A.   Yes, it would.

11  Q.   And are marks left on here as well then?  Could they be?

12  A.   Those are granular marks between the plus and the P.  They

13  could be left behind from the breechface, yes.

14  Q.   So those were impressions left behind by the breechface?

15  A.   Correct.

16  Q.   And those do not appear over here?

17  A.   It is a different metal.  Hard metal individual

18  characteristics don't show up on harder metal than softer

19  metal.

20  Q.   So these little pock marks as what is described as granular

21  on this shell, the question is they do not appear on this shell

22  on the right?

23  A.   They do not.

24  Q.   So that doesn't matter?

25  A.   As I -- it doesn't matter because the one on the right I

D3D5dor3                        J. Fox - cross

1  know to be a harder metal.

2  Q.  So, just to be clear then, what matters to you in this

3  particular case is the parallel lines?

4  A.  Yes.

5  Q.  The circle doesn't matter, the granular marks don't matter;

6  it is just a comparison of the parallel lines?

7  A.  The sufficient agreement of the parallel lines on each

8  cartridge casing matters to me.

9  Q.  Okay.  And it also doesn't matter to you that at least in

10 this picture those parallel lines appear to be different,

11 right?

12 A.  They don't appear to be different to me.

13        MS. FONTIER:  Your Honor, I have no further questions

14 at this time.

15        THE COURT:  Okay.

16        Mr. Roth?

17        MR. ROTH:  Thank you, Judge.

18 CROSS EXAMINATION

19 BY MR. ROTH:

20 Q.  Good morning, Detective.

21 A.  Good morning.

22 Q.  When you were listing your credentials I didn't hear, are

23 you a member of the Association of Firearms and Tool Mark

24 Identification?

25 A.  I am not.

D3D5dor3                          J. Fox - cross

1   Q.  Would you consider that, sir, the premiere professional

2   organization in your field?

3   A.  Yes.

4   Q.  And have you applied for that, to be a member of that?

5   A.  I have not yet.  No.

6   Q.  Do you anticipate making an application?

7   A.  I do.  Yes.

8   Q.  And you have been in the firearms division and ballistics

9   division of the police department for nine or 10 years, is that

10  correct?

11  A.  Since 2004; yes.

12  Q.  And, sir, you indicated you're a detective, is that right?

13  A.  Yes, I am.

14  Q.  Can you explain for the members of the jury what grade

15  detectives there are in the NYPD?

16  A.  There is first grade, second grade and third grade

17  detectives.

18  Q.  And you are?

19  A.  A second grade detective.

20  Q.  And first grade is the top rank, is that correct?

21  A.  That's correct.

22  Q.  To be clear, the photographs that there was, you were

23  testifying about today, those -- were those taken during the

24  course of your examination, your original examination?

25  A.  No.  They were not.

D3D5dor3                          J. Fox - cross

1   Q.  They were taken after you had already made your conclusion,

2   is that correct?

3   A.  Yes.

4   Q.  And, in respect to the test that you performed in respect

5   to the cartridges, the seven and the one, you didn't have the

6   benefit of the weapon, obviously, that fired those cartridges;

7   is that correct?

8   A.  There was no firearm recovered in this case.

9   Q.  Had you had that weapon it would have facilitated your job,

10  it would have made it easier; is that fair to say?

11  A.  I wouldn't necessarily say it would make it easier.  It

12  would be helpful to know what type of firearm made that mark,

13  yes.

14  Q.  No, no.  I'm not talking about knowing what type of firearm

15  made the mark, I'm talking about having the actual firearm and

16  firing cartridges if you found bullets, not just cartridges,

17  bullets in the firearm to fire them through the actual gun,

18  right?

19  A.  It really wouldn't matter in our examination.  If we

20  received a firearm we would just produce test fires from that

21  particular firearm and then we would compare it to this case to

22  say these cartridge casings came from that firearm.

23          It is the same examination.

24  Q.  You couldn't do a slide test with these cartridges, is that

25  correct?

D3D5dor3                          J. Fox - cross

1   A.  I'm not aware what a slide test is.

2   Q.  A slide test?  I thought the 10-slide test --

3   A.  Oh, the 10-barrel slide test?

4   Q.  Yes.

5   A.  I'm aware of when a slide -- meaning in that respect what a

6   slide test is, yes.

7   Q.  And you couldn't do that in this case, correct?

8   A.  The way a slide test is done is they take the tool -- they

9   take the same exact tool and they manufacture 10 consecutively

10  made slides.

11  Q.  I'm sorry, but perhaps you can explain what a slide is?

12  A.  The slide is the top of the semi-automatic handgun that

13  moves back and forth when the gun is fired.  Located on the

14  slide is what is called the breechface and the aperture.

15  During our training program we do what is called a 10-slide

16  test and a 10-barrel test.  The reason why we call it a

17  10-slide test is because the manufacturer will use the same

18  tool that they use to manufacture 10 consecutively made slides.

19  So, when they make that breechface, they use the same tool on

20  10 consecutively made slides, then they fire two cartridge

21  casings from each -- from each slide or from each gun that has

22  that slide on it.  Then I'm giving those 10 -- you know, those

23  10 -- there is actually 20 of them from each slide, and I have

24  to compare unknown cartridge casings to each particular

25  cartridge and match them up to each particular slide that those

1   cartridge casings came out of.

2   Q.  Thank you.

3        So, but my question to you, sir, is you didn't have

4   the slide, this was an automatic weapon that you test fired

5   this gun; is that right?

6   A.  I didn't have the slide because we didn't have the firearm.

7   Q.  You didn't have the slide.

8        And you testified, sir, in response to both the

9   government and my colleague, that you found sufficient

10  agreement of class and individual characteristics in respect to

11  the firing pin impression.  Is that right?

12  A.  That's correct.

13  Q.  And could you tell the members of the jury, so we're just

14  all clear how many, in respect to the firing pin impressions,

15  how many agreement of class characteristics did you fire?

16  A.  Class characteristics would mean the firing pin was

17  circular or, in this case, hemispherical.

18  Q.  How many individual characteristics?

19  A.  I don't have to describe the number of individual

20  characteristics.

21  Q.  I'm sorry?

22  A.  I didn't describe the number of individual characteristics,

23  they were sufficient.

24  Q.  No, no; but how many were there?

25  A.  I can't come to a particular number on how many individual

D3D5dor3                      J. Fox - cross

1   characteristics there were.  That number is based on my

2   training and experience and looking at the firing pin

3   impressions under the microscope.

4   Q.  Well, I'm saying when you looked at it under the microscope

5   because you've told us today that the microscope is even better

6   than the pictures here, right?

7   A.  Right.

8   Q.  Did you write down, so the jury could look at your report,

9   your bench report that you filled out -- the bench report is

10  what you do while you're doing that exam, right?

11  A.  Yes.

12  Q.  Did you write down I found one, two, three four sufficient?

13  A.  We are not required to do that.

14  Q.  I'm not asking you what you're required to do.

15         From your memory now, when you examined the two

16  exhibits, how many characteristics did you find individually?

17  Do you recall?

18  A.  I don't recall, put a number on how many I saw.

19  Q.  Do you recall -- you don't recall putting a number, do you

20  recall whether it was more than five or six?

21  A.  I do not recall.

22  Q.  Could it be as few as one?

23  A.  It's possible.

24  Q.  And in respect to, sir, you indicated that there were

25  sufficient agreement of class and individual characteristics of

D3D5dor3                          J. Fox - cross

1   the breechface impression, is that correct?

2   A.   That's correct.

3   Q.   And when you did your examination you, your microscopic

4   examination, did you record in your bench records how many

5   individual characteristics there were of the breechface

6   impression?

7   A.   I did not.

8   Q.   You didn't record that but then from your memory can you

9   tell the jury now how many there were?

10  A.   You want a number?

11  Q.   I would like a number, yes.

12  A.   I can't recall that.

13  Q.   Do you recall was it more than 20?

14  A.   There was sufficient amount.  I don't recall the number.  I

15  don't have a number to say how many sufficient individual

16  characteristics there were.

17  Q.   Well, you told us before that there is no, from your

18  testimony this is all subjective and, but so there is no magic

19  number in your mind of how many there have to be.  That's what

20  you have said, right?

21  A.   There is no magic number, no.

22  Q.   Okay.  But so we now know there is no magic number for you

23  to find sufficient but I'm asking you, despite that fact or

24  assuming that fact, how many individual characteristics did you

25  find on the breechface impression on the two exhibits that you

1  examined?

2  A.  A sufficient amount.  I don't understand.

3  Q.  Sufficient is not a number, you would agree with me on

4  that?

5  A.  I thought I already answered that question no.

6  Q.  No.  So, the answer is you have no way of telling this jury

7  and there is nowhere in your report how many characteristics

8  you found on the two exhibits that you examined?

9  A.  There is no number of individual characteristics that I

10  have listed in my report.

11  Q.  And, is it fair to say that different examiners could find

12  different amounts?

13  A.  Different examiners, more experienced could find more

14  individual characteristics; less experienced could find less

15  individual characteristics.

16  Q.  By the way, were you trained by a fellow detective named

17  James Canoli?

18  A.  I was trained on firearms identification by Detective

19  Ganell, yes.

20  Q.  You have testified you examined thousands and thousands of

21  exhibits, is that fair to say?

22  A.  That's correct.  Yes.

23  Q.  How many do you do a year, sir?

24  A.  I'm unaware of that number.  I just use the thousands -- I

25  do a lot of examinations a year.

D3D5dor3                          J. Fox - cross

1    Q.  Well, we will break it down.  How many in a month, usually?

2    A.  Honestly, I have never kept track.  I do all the Bronx

3    ballistic cases, I can't -- I never kept track of how many I

4    did in a particular month.  It could be --

5    Q.  Just an average?

6    A.  It could be -- you know, when I don't have court it could

7    be two a day.  It could be one a day.  There is no time frame

8    for them.

9    Q.  Have you ever been referred to as The Rain Man, sir?

10   A.  I have.  Yes.

11   Q.  And, The Rain Man, that's from a Dustin Hoffman movie,

12   right?

13   A.  It is.  Yes.

14   Q.  And is that because you have professed to be able to make

15   comparisons over the course of thousands of examinations of one

16   examination to an impression that was left on an exhibit months

17   ago or hundreds of times ago?

18   A.  I never professed that.

19   Q.  Well you are on videos, is that right?  You are on

20   newscasts?

21   A.  There was a New York Times article written saying they

22   thought I had a good memory.

23   Q.  Okay.

24        And, would you tell the members of the jury what a

25   self-initiated examination is?

D3D5dor3                          J. Fox - cross

1   A.  Sure.

2          A self-initiated examination is in this case in

3   particular, which was a self-initiated examination, I

4   technically reviewed Detective LaCova's work meaning I

5   performed the examination just as he would.  A week later more

6   evidence came in from a different crime scene.  When I examined

7   that particular casing I thought to myself that it looked

8   similar to the casing I looked at a week ago.  I would then

9   pull that case and put the cases together, and I determined

10  they were fired from the same firearm, meaning I remembered the

11  individual characteristics from one casing to another.  I

12  didn't put it into each other based on my memory alone; I then

13  pulled the evidence, compared the individual characteristics to

14  each other, and then did the examination.

15  Q.  So, my question to you, sir, is when you did that

16  self-initiated comparison examination, how many of those

17  individual characteristics that you just testified to the jury

18  did you have in your mind that you thought matched the other

19  exhibit?

20  A.  A sufficient amount.

21          If I can explain to them without --

22  Q.  No, no, no.  I'm asking you was it five?  Was it six?

23  A.  In this particular photo, 270, there appears to be, based

24  on counting lines, there appears to be well over 10.

25  Q.  And that's what you were basing it on?  So, now you have

D3D5dor3                    J. Fox - cross

1   come up with a number?

2   A.  You asked me a question.

3   Q.  Yes.

4   A.  I told you earlier that I didn't put a number in my

5   examination report.  You keep on insisting that I give you a

6   number.  I told you based on this that it appears that there

7   are at least 10 lines that match each other.  I'm telling you I

8   didn't put that in my report.

9   Q.  So there is no way of verifying that?

10  A.  There is no way of verifying that, no.

11  Q.  And some other examiner could find five or they could find

12  15, perhaps?

13  A.  It is possible.

14  Q.  Okay.  Is it fair to say, sir, that the number of so-called

15  self-initiated examinations that you perform and that come out

16  in your way positive, is a factor that's considered in your

17  reviews for promotion to first grade detective?

18  A.  All of my work is reviewed for that as well.

19  Q.  Well, that's specifically something that was considered

20  when you went from third grade to second grade; is that fair to

21  say?

22  A.  I would imagine they considered it.  I wasn't there when

23  they were reviewing my application.

24          MR. ROTH:  Thank you.  No further questions.

25          THE COURT:  Any redirect?

D3D5dor3                          J. Fox - cross

1            MS. MASELLA:  No, your Honor.

2            THE COURT:  Okay, Detective.  You may step down.

3    Thank you.  Leave all the exhibits here.

4            THE WITNESS:  Thanks, your Honor.

5            THE COURT:  Take whatever you brought with you but

6    everything that was given to you leave there.

7            Next witness?

8            MS. LESTER:  Your Honor, the government calls Prashant

9    Goel.

10    PRASHANT GOEL,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13            THE COURT:  Pull your chair up to the microphone.

14    Could you state your name and spell your name for the record?

15            THE WITNESS:  Prashant Goel.

16            THE COURT:  It is pronounced Goel?

17            THE WITNESS:  Goel.

18            THE COURT:  Mr. Goel, could you speak a little louder

19    and not too quick so that the jury can hear you and the court

20    reporter can hear you?

21            Proceed, Ms. Lester.

22            MS. LESTER:  Thank you, your Honor.

23    DIRECT EXAMINATION

24    BY MS. LESTER:

25    Q.  Good morning, sir.

D3D5dor3                              GOEL - DIRECT

1    A.  Good morning.

2    Q.  How are you employed, sir?

3    A.  I work for PG Phone Cards Inc.

4              THE COURT:  Incorporated or what is in my pen?

5              THE WITNESS:  No, no, incorporated.

6              THE COURT:  PG Inc.

7    Q.  What type of company is that?

8    A.  A prepaid calling cards.

9    Q.  And you said you were a driver?

10   A.  Yes.

11   Q.  So, what is a typical day of work for you?

12   A.  Drive around with a helper with me, I take him around, he

13   goes to deliver phone cards to stores.

14   Q.  So you go with another co-worker?

15   A.  Yes.

16   Q.  And what's your job during the day?

17   A.  Just drive him around and keep the car safe.

18   Q.  What do you mean by keep the car safe?

19   A.  You know, just make sure like I don't get no tickets, make

20   sure I don't get robbed.

21   Q.  And is there a physical location for your company?  A

22   storefront or some other building?

23   A.  Yes.

24   Q.  Where is that located?

25   A.  379-A Bedford Park, Boulevard, Bronx, New York, 10458.

1   Q.  How long have you been working for this company?

2   A.  Almost about 10 years.

3   Q.  Do you sell any other items besides phone cards?

4   A.  No, ma'am.

5   Q.  What types of customers do you sell the cards to?

6   A.  Grocery store owners, stationeries.  Customers like that

7   just sell, you know, phone cards.

8   Q.  And, do you have regular customers that you've dealt with

9   over the period of time that you have worked for the company?

10  A.  Yes.

11  Q.  And, do you have regular delivery routes that you follow

12  every day?

13  A.  Yes.

14  Q.  And is that constant from one week to the next?

15  A.  Once in a blue it will change depending on the weather but

16  most likely it is always constant.

17  Q.  Ms. Brady, can we put up Government Exhibit 40, please?

18          Mr. Goel, do you recognize that store?

19  A.  Yes.

20  Q.  What is it?

21  A.  It is one of my customer; 4194 White Plains Road close to

22  233rd street.

23  Q.  You made deliveries to that store?

24  A.  Yes, ma'am.

25  Q.  Do you know who works in that store?

1   A.  Yes.  The customer that I was dealing with in that store

2   was Fahd Hussain.

3   Q.  For how long have you dealt with him for?

4   A.  About two years.

5   Q.  During what years were you dealing with Mr. Hussain?

6   A.  I don't recall, because the customer was originally the

7   boss' customer and I was transferred to him.

8   Q.  What about in 2011; were you dealing with Fahd Hussain in

9   that year?

10  A.  Yes.

11  Q.  How often would you make deliveries to that store?

12  A.  Twice a week, three times a week.

13  Q.  How would you know when you needed to make a delivery

14  there?

15  A.  Usually I would pass by the store every day just to check

16  up on him because he has a high balance so I would go try to

17  collect money from him and get the order for the next day.  So,

18  once he gives me the money, I would process the order.

19  Q.  And you said sometimes you needed to pick up money from

20  him?

21  A.  Yes, ma'am.

22  Q.  He had a high balance; what does that mean?

23  A.  Usually customers are on a bill-to-bill basis or they want

24  credit lines because they don't want to pay cash COD, so he had

25  a balance of close to 5,000.

D3D5dor3                        GOEL - DIRECT

1   Q.  And how many phone cards would he order at a time?

2   A.  I think it would be approximately numbers, like you have

3   almost three different types of calling cards and based on that

4   it is very hard to calculate.

5           MS. LESTER:  Your Honor, I would like to approach for

6   a moment and just show the witness --

7           THE COURT:  Yes.

8   Q.  Mr. Goel, can you look up here directing your attention to

9   what is marked Government Exhibit 1?  Can you see that?

10  A.  Yes.

11  Q.  Do you recognize that person?

12  A.  That's Fahd Hussain, the first one.

13          MS. LESTER:  Your Honor, the government would offer

14  Government Exhibit 1A which is the name plate for Fahd Hussain.

15          THE COURT:  Any objection?

16          MR. ROTH:  No, Judge.

17          THE COURT:  Government Exhibit 1A is received.

18          (Government's Exhibit 1A received in evidence)

19  BY MS. LESTER:

20  Q.  Now, Mr. Goel, during the time you were dealing with Fahd

21  Hussain, did he know where your physical business was located?

22  A.  Yes.

23  Q.  And did he know that you were a driver for that business?

24  A.  Yes.

25  Q.  Did he know what other customers you dealt with on a

D3D5dor3                              GOEL - DIRECT

1  regular basis?

2  A.  Some of them, yes.

3  Q.  Did you ever discuss with him your delivery routes?

4  A.  Once in a while.

5  Q.  Have you ever been the victim of a robbery, sir?

6  A.  Yes.

7  Q.  When was that?

8  A.  In 2011.

9  Q.  And, can you tell us what happened that day of the robbery,

10  starting from the beginning of the day?

11  A.  I start my day off usually -- I start with White Plains

12  Road so I --

13          THE COURT:  Slow, slow, slow.

14          MR. ROTH:  Judge?  I'm sorry.  We didn't have a day,

15  did we?

16          THE COURT:  Well, I don't think that -- I don't think

17  that's the question so we maybe get to that next.

18          Tell us what happened the day of the robbery, 2011.

19  Can you be more specific when in 2011?

20          THE WITNESS:  I don't recall the month.

21          THE COURT:  Month?  Season?

22          THE WITNESS:  Summer.

23          THE COURT:  Summer you think?

24          THE WITNESS:  Yes.

25          THE COURT:  So you were asked to describe what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3D5dor3                              GOEL - DIRECT

1    happened the day of the robbery starting from the beginning of

2    the day which seems to cry out for a narrative answer so let's

3    narrow it down.  Okay?

4    BY MS. LESTER:

5    Q.  Okay.

6         Were you making deliveries on that day?

7    A.  Yes.

8    Q.  Where did you go first?

9    A.  White Plains Road -- I'm sorry, Grand Concourse.  Grand

10   Concourse.

11   Q.  In the Bronx?

12   A.  Yes.

13   Q.  How many deliveries did you make on the Grand Concourse?

14   A.  About 15 to 20.

15   Q.  Did you collect money from those customers?

16   A.  Yes.

17   Q.  Was your co-worker with you, as you mentioned he often is?

18   A.  Yes.

19   Q.  What did you do with the money that you collected from

20   those customers?

21   A.  Dropped it off to the office at 381 Bedford Park.

22   Q.  Did you do that after you finished the Grand Concourse

23   deliveries?

24   A.  Yes, ma'am.

25   Q.  What did you do next?

D3D5dor3                          GOEL - DIRECT

1    A.  Picked up my second route.

2    Q.  Where was that?

3    A.  White Plains Road and Boston Road and New Rochelle.

4    Q.  So, where did you go first, White Plains Road?

5    A.  I went to Boston Road, then I came down to White Plains

6    Road, and then I stopped by Fahd Hussain to see if he had any

7    money for me.  He told me he don't have no money, I have to

8    come back within an hour.  So, I told him I was going to go to

9    New Rochelle and come back around and pick up the money within

10   the hour.

11   Q.  Okay.

12       At the time that you went to White Plains Road -- and

13   you were gesturing towards the monitor -- is that the store

14   that you went to?

15   A.  Yes, ma'am.

16   Q.  And you spoke to Mr. Hussain there?

17   A.  Yes, ma'am.

18   Q.  Do you know approximately what time of day it was that you

19   were there?

20   A.  It was afternoon.  I don't recall the time.

21   Q.  Okay.

22       And, you said you told him you were going to New

23   Rochelle later?

24   A.  Yes, ma'am.

25   Q.  Where did you go after you left White Plains Road?

D3D5dor3                          GOEL - DIRECT

1    A.  I went to my first customer in New Rochelle, 622 Main

2    Street, and the lady sometimes gives a hard time so my

3    co-worker went in and she wanted to give him 2,000 cash, she

4    want him to count up front which he didn't know how to count

5    that good.  So, I had to go in.  I parked my car, I went in,

6    but when I'm going in I see this one guy right next to the

7    pizzeria of my customer and he looks -- he looked familiar,

8    like I seen him before and he had that look but I didn't pay

9    attention to him because he was on the phone.  And I went

10   inside the store and I'm counting the money.

11          So, I'm counting the money.  I see like two people

12   like walking by and I'm telling this lady look, can I not

13   county the money in the front?  It is dangerous if somebody is

14   watching me.  I can get robbed but she is hard-headed but --

15          MR. ROTH:  Judge, object to the narrative.

16          THE COURT:  The question was where did you go.  So,

17   just where did you go?

18          THE WITNESS:  622 Main Street.

19          THE COURT:  Next question.

20   BY MS. STAFFORD:

21   Q.  While you were there did you receive money from the

22   customer?

23   A.  Yes.

24   Q.  Did you count that money?

25   A.  Yes.

D3D5dor3                              GOEL - DIRECT

1    Q.  What did you do with the money after you received it?

2    A.  Wrapped it in the invoice and put it in my pocket and came

3    out the store.

4    Q.  And was your co-worker still with you at this time?

5    A.  No.  He was in the car.

6    Q.  What did you do when you got back in the car?

7    A.  I sat down, put my seat belt on, and I drove away to the

8    next customer.

9    Q.  Where was the next customer?

10   A.  RC Variety.  I don't remember the exact address.  It is

11   like almost -- I think it's Post Road.

12   Q.  Is that also in New Rochelle?

13   A.  Yes.

14   Q.  Now, how much money had you collected at this point from

15   the other delivery that you made?

16   A.  It was very hard to calculate because I don't add up the

17   money but I do have records on file.

18   Q.  Well, can you give an approximation?  Do you know how much

19   money you received from the woman you just described?

20   A.  2,000.

21   Q.  Approximately how much did you receive from the stores on

22   White Plains Road?

23   A.  About six -- six to eight.

24            THE COURT:  Six to eight thousand?

25            THE WITNESS:  Yes.

D3D5dor3                          GOEL - DIRECT

1  Q.  Did you have that money with you in the car at the time or

2  had you dropped it off back to your office?

3  A.  That was with me.

4  Q.  It was with you in the car?

5  A.  Yes, ma'am.

6  Q.  Where do you keep it in the car?

7  A.  Glove compartment.

8  Q.  Do you lock it?

9  A.  No.

10  Q.  Do you keep it inside anything?

11  A.  No, just wrapped in invoices.

12  Q.  Now, when you got to the next location in New Rochelle,

13  what happened?

14  A.  I stopped the car, he ran in and made the delivery.

15  Q.  When you say "he," who are you talking about?

16  A.  My co-worker.

17  Q.  Where did he go?

18  A.  To the customer, RC Variety.

19  Q.  And what happened next?

20  A.  Then I drove to my third customer, Cashmere and Pelham

21  Manor.

22  Q.  And do you know the address of that store?

23  A.  No, because that's down my route -- I know my route by

24  roads, I don't remember the addresses.

25  Q.  Do you know what road it is on?

D3D5dor3                          GOEL - DIRECT

1   A.   It is close to Pelham Manor.

2   Q.   What happened at that location?

3   A.   I pulled in, parked my car.  My co-worker got out and he

4   went to make the delivery.

5   Q.   And what happened next?

6   A.   I'm waiting for him to come out and then I see the same

7   person -- the same people that I seen at the first customer,

8   622 Main Street, walking towards the direction of my car.

9   Q.   Were they approaching from behind or towards you?

10  A.   Behind.  From the behind.

11  Q.   So, how were you able to see them?

12  A.   From my rearview mirror.

13  Q.   What happened next?

14  A.   This time he has a baseball bat in his hand, the one that

15  was walking, and the other one -- there was supposed to be

16  three; a short one, very tall one and a medium height.  The

17  tall one and the medium one were walking towards my car while

18  he had a baseball bat in his hand so I'm thinking he is going

19  to pass by my car.  But suddenly the medium one stops and ran

20  into my passenger tire and starts doing something.  I feel the

21  car shaking.  I'm thinking, What is he doing?  In the meantime

22  the tall one grabs the bat, gets a grip, and breaks the

23  passenger side window.

24  Q.   Let's take these individuals one at a time.

25            Could you describe the tall -- you have mentioned that

1    he is tall and with a baseball bat.  Do you know what race he

2    was and what skin color he had?

3    A.  They were all black.

4    Q.  Do you know whether his face was covered in any way?

5    A.  No.

6    Q.  It was not covered or you don't know?

7    A.  I mean -- you mean like with a mask?

8    Q.  Yes.

9    A.  He didn't have no mask.

10   Q.  Do you know what he was wearing?

11   A.  He had a -- I don't recall.

12   Q.  You say he was tall.  How tall are you, sir?

13   A.  I'm 5'5".

14   Q.  Can you approximate how tall you think he was?

15   A.  About 5'8", 5'9".

16   Q.  Now, the second person you said was medium, is that fair to

17   say?

18               THE COURT:  Wait.  The tall guy was 5'8" or 5'9".

19               THE WITNESS:  Yes, around 5'8" or 5'9".

20               THE COURT:  You're 5'3", sir?

21               THE WITNESS:  5'5".

22   Q.  The medium type person, what did he look like?

23   A.  He had a bandage on his right arm.

24   Q.  What type of bandage?

25   A.  It was like a pale, light pinkish; one of those bandages if

D3D5dor3                         GOEL - DIRECT

 1   you have like I guess -- like swollen arm and just collect some

 2   medicine and wrap around it.  One of those arm bandages.

 3   Q.  So, it is a bandage on his arm?

 4   A.  It was on his wrist going to his forearm.

 5   Q.  Was it wrapped around his hand, his palm?

 6   A.  Yes.

 7   Q.  And then you described a third person who was shorter, you

 8   said?

 9   A.  Yes.

10   Q.  Where did that person come from?

11   A.  At that point the person came from in front of me.

12   Q.  He was walking towards you?

13   A.  Yeah.  He ran up after this incident began.

14   Q.  And the other two approached from behind your car, is that

15   right?

16   A.  Yes.

17   Q.  Did you remain in your car?

18   A.  Yes.

19   Q.  Which seat were you sitting in?

20   A.  Driver.

21   Q.  What happened after -- and I'm sorry, you said that the

22   tall individual had a bat, correct?

23   A.  Right.

24   Q.  And the medium person bent down near the front passenger

25   sire?

D3D5dor3                          GOEL - DIRECT

1   A.  Yes.

2   Q.  Could you see what he was doing?

3   A.  No.

4   Q.  Did you feel any effect of what he was doing?

5   A.  I felt the car shaking a little bit.

6   Q.  Now, what happened next?

7   A.  As soon as he broke the window the person -- the medium

8   person reached in with a knife and said where is the money, you

9   know, MF, and then I say -- I just point at the glove

10  compartment, he has a knife to me so I pointed at the glove

11  compartment, he took out the money and then he unlocked the

12  door because the other person with the bat was going to get in

13  the back because I had some deliveries we make that I was

14  supposed to go to and those bag of deliveries were behind the

15  passenger seat.  So, he was trying to get to the bag but the

16  doors were locked.  So, after he grabbed the money, he unlocked

17  the door and the person in the back took out the bag of phone

18  card deliveries.  In the meantime, the other person ran up to

19  me from the front and opened the driver's side door, he hit me

20  once or twice, and then he went in my pocket and took out my

21  house keys.

22  Q.  Now, going back to the person who had a knife, you said

23  that was the medium person?

24  A.  Yes, ma'am.

25  Q.  The medium height person?

D3D5dor3                        GOEL - DIRECT

1    A.  Yes, ma'am.

2    Q.  Is that the person with a bandage on his hand?

3    A.  Yes, ma'am.

4    Q.  Can you describe the knife?

5    A.  I mean, it would be hard.  It was a big knife.

6    Q.  Approximately how long do you think it was?

7    A.  I don't recall.  The only thing I see was the front of the

8    knife.

9    Q.  And what color was the part of the knife that you saw?

10   A.  It was a blade.  It was silver.

11   Q.  Did you see the handle?

12   A.  No.

13   Q.  Did you -- when it was shown to you was it open?

14   A.  Yes.

15   Q.  You said that the third person who approached you opened

16   your door, is that correct?

17   A.  Yes, ma'am.

18   Q.  And then he hit you?

19   A.  Yes, ma'am.

20   Q.  Did he say anything to you?

21   A.  He said don't look at me.  Because as soon as he opened the

22   door I turned around and that's when he punched me and he said

23   don't look at me.

24   Q.  Now, approximately how many phone cards do you think you

25   had in the vehicle at that time?

1  A.  I had about at least six to 8,000.

2  Q.  And how much would those have been worth?  How much would

3  those have been worth?

4  A.  Estimated value would have been at least five thousand

5  something.

6  Q.  Did you sustain any injuries from being hit?

7  A.  No.

8  Q.  And any bleeding?

9  A.  I had minor cuts from the glass that the tall person broke

10  with the bat but it was minor cuts, minor bleeding.

11  Q.  What happened after the money and the phone cards had been

12  taken from the car?

13  A.  They all ran off in the same direction.

14  Q.  Did you see where they ran to?

15  A.  They ran behind my car.  They went -- because right behind

16  my car there is a block that goes up like facing east, I think

17  it was west, and they went in that direction.  I mean, I didn't

18  follow them, they ran off and I just stayed there.

19  Q.  What did you do next?

20  A.  Came out of my car and I'm in shock.  I mean, I don't know

21  what to do because they took my cell phone with them but then

22  there was a witness there or a person that came up to me and

23  let me use the cell phone to call 911.

24  Q.  And, did the police arrive?

25  A.  Yes, ma'am.

D3D5dor3                          GOEL - DIRECT

1    Q.  Did you notice anything on the ground at the scene at the
2    time of the robbery or immediately after the robbery?
3    A.  Yes.  There was a knife and a cell phone.
4    Q.  Where were those located?
5    A.  By the passenger driver's side.
6    Q.  Did you see --
7    A.  Passenger tire side.
8    Q.  I'm sorry, passenger tire side?
9    A.  Yeah.
10   Q.  That's where the broken window was?
11   A.  Yeah.
12          THE COURT:  Front tire?
13          THE WITNESS:  The front tire, yes.
14   BY MS. LESTER:
15   Q.  Did you see what happened with those items?
16   A.  The knife was recovered by the cops on scene but the cell
17   phone, somebody came up from one of the people that were
18   watching the robbery and picked it up and started walking away
19   with it.
20   Q.  And was this your cell phone or was it another phone?  Do
21   you know?
22   A.  It was the -- one of those perps' phone.
23   Q.  What do you mean by that?
24   A.  I mean the person that robbed me, it was one of their
25   phones.

1  Q.  You have said earlier that you thought you left White

2  Plains Road sometime in the afternoon, correct?

3  A.  Yes.

4  Q.  Do you know approximately what time the robbery took place?

5  A.  Between 4:00 and 5:00.

6          MS. LESTER:  No further questions, your Honor.

7          THE COURT:  Cross-examination.

8          MS. FONTIER:  Very briefly.  Thank you, your Honor.

9  CROSS EXAMINATION

10  BY MS. FONTIER:

11  Q.  Good afternoon.

12          Sir, you said three people that approached the car and

13  robbed you, you had seen them earlier in the day, right?

14  A.  Yes, ma'am.

15  Q.  And you recognized them as those same people, right?

16  A.  Yes, ma'am.

17  Q.  And you also said that they were not wearing masks,

18  correct?

19  A.  Yes, ma'am.

20          MS. FONTIER:  No further questions, your Honor.

21          MR. ROTH:  No questions, your Honor.

22          THE COURT:  Thank you.

23          Redirect?

24          MS. LESTER:  No, your Honor.

25          THE COURT:  Thank you very much, Mr. Goel.  You may

D3D5dor3                        Goel - cross

1    step down.  Don't forget your coat.

2              (Witness steps down)

3              THE COURT:  Next witness.

4              MS. LESTER:  Your Honor, the government calls Tramelle

5    Woods.

6              THE WITNESS:  How is it goin'?

7              THE COURT:  It is going good.  Why don't you stay

8    standing.

9         This is a courtroom so why don't we treat it as a

10   serious place.

11    TRAMELLE MARQUIS WOODS,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE COURT:  Have a seat.

15        Please state your name and spell your name, for the

16   record.

17             THE WITNESS:  Tramelle Marquis Woods.

18   T-R-A-M-E-L-L-E, last name Woods, W-O-O-D-S.

19             THE COURT:  Ms. Lester, you may proceed.

20             MS. LESTER:  Thank you, your Honor.

21   DIRECT EXAMINATION

22   BY MS. LESTER:

23   Q.  Good afternoon, Mr. Woods.

24   A.  Good afternoon.

25   Q.  Where do you live, sir?

 1    A.  I live in New Rochelle. 41 Clinton Place.

 2              THE WITNESS:  Do I have to give my address?

 3              MS. LESTER:  No, you don't have to give your exact

 4    address.

 5              THE WITNESS:  New Rochelle.

 6              THE COURT:  New Rochelle.

 7    BY MS. LESTER:

 8    Q.  Are you familiar with a mini mart that's located on Pelham

 9    Road?

10    A.  Yes.  I grew up there.

11    Q.  Were you present at that mini mart on October -- or in

12    October 2011 when a robbery took place?

13    A.  No.

14    Q.  Did you see a vehicle with a smashed window on a date in

15    October 2011?

16    A.  Yes.

17    Q.  What did you see?

18    A.  All I seen, I came up to the store, there was a lot of

19    commotion, people are standing around staring at each other;

20    seen a phone on the floor, I asked some Indian guy, Is this

21    your phone?  He said no.  I said, Anyone, is this your phone?

22    No one said anything about a robbery or nothing; took the

23    phone, walked away, and got arrested for the crime.

24    Q.  Do you remember the name of the police officer who

25    approached you and arrested you?

D3D5dor3                              Woods - direct

1   A.  There was several officers.  No, I'm not aware.

2   Q.  Did they take the phone back from you?

3   A.  Yes.

4           MS. LESTER:  Your Honor, I have no further questions.

5           THE COURT:  Okay.

6           Cross-examination, Ms. Fontier?

7           MS. FONTIER:  Sorry, your Honor.

8           THE COURT:  Yes or no?  I didn't hear what you said.

9           MS. FONTIER:  I said sorry, your Honor.  I was just

10  reviewing.  One moment, please.

11  CROSS EXAMINATION

12  BY MS. FONTIER:

13  Q.  Essentially you walked into a parking lot where there were

14  police and other people around?

15  A.  No.

16  Q.  There were no police?

17  A.  No police.

18  Q.  There were just multiple other people around?

19  A.  Multiple other people.

20  Q.  You didn't see anything that had occurred prior to walking

21  up?

22  A.  No.

23  Q.  You just saw a cell phone?

24  A.  Saw a cell phone, asked them if this was anybody's phone

25  and I ended up getting arrested.

1    Q.  You asked everybody at that scene whether it belonged to

2    them?

3    A.  Yes.

4    Q.  And you were, I assume, taken to jail for that?

5    A.  Yes.

6              MS. FONTIER:  I have no further questions, your Honor.

7              THE COURT:  Mr. Roth or Mr. Murphy?

8              MR. ROTH:  Nothing, your Honor.

9              THE COURT:  No.

10             Any redirect?

11             MS. LESTER:  Just briefly, your Honor.

12   REDIRECT EXAMINATION

13   BY MS. LESTER:

14   Q.  Mr. Woods, when you say you were arrested, what was the

15   charge?

16   A.  They tried to charge me with grand larceny and I guess a

17   robbery.  I'm not sure of the charges.  By the time I went to

18   court there was no charges.

19   Q.  The charges were dismissed?

20   A.  I have no idea.  They just said we have good news, bad

21   news; no charges.

22   Q.  Did you ever appear in court again on those charges?

23   A.  No, I appeared, but I had to post bail and everything for

24   this.

25   Q.  Have you appeared in court since that time?

D3D5dor3                          Woods - redirect

1   A.  No.

2              MS. LESTER:  No further questions.

3              THE COURT:  Okay.

4              Ms. Fontier?

5              MS. FONTIER:  Nothing further.  Thank you, your Honor.

6              THE COURT:  Thank you, Mr. Woods.  You may step down.

7              THE WITNESS:  All right.

8              (Witness steps down)

9              THE COURT:  Government, your next witness.

10             MS. LESTER:  Your Honor, the next witness is police

11  officer Matthew McKay.

12   MATTHEW MCKAY,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15             THE COURT:  State your name and spell your name for

16  the record.

17             THE WITNESS:  Officer Matthew McKay.  M-C-K-A-Y.

18             THE COURT:  That's right about the right volume so go

19  ahead, Ms. Lester.  You may proceed.

20             MS. LESTER:  Thank you, your Honor.

21  DIRECT EXAMINATION

22  BY MS. LESTER:

23  Q.  Good afternoon, Officer.

24  A.  Good afternoon.

25  Q.  Where do you work?

1    A.   New Rochelle Police Department.

2    Q.   And what are your duties and responsibilities as a New

3    Rochelle police officer?

4    A.   I work in the patrol division, third tour, which is 4:00 to

5    12:00.

6    Q.   That's 4:00 p.m. to midnight?

7    A.   Correct.

8    Q.   And how long have you been doing that for?

9    A.   Approximately nine years.

10   Q.   Did there come a time in 2011 when you responded to a

11   robbery call?

12   A.   Yes.

13   Q.   And where did that robbery take place?

14   A.   Pelham Road in New Rochelle.

15   Q.   What is located at that area?

16   A.   We responded to a call at a convenience store in a small

17   strip mall.

18   Q.   And do you recall the date?

19   A.   I believe it was the -- I don't recall that.

20   Q.   Do you recall the month?

21   A.   October.

22   Q.   What was going on at the scene when you arrived?

23   A.   I was probably the second or third officer to respond.  At

24   that point we had just received the call of a robbery -- strong

25   arm robbery where the suspects had fled the scene.

D3D5dor3                              McKay – direct

1    Q.  I'm sorry.  What term did you use to describe the robbery?

2    A.  Strong arm robbery.

3    Q.  What does that mean?

4    A.  It is a robbery with physical assault involved.

5    Q.  When you arrived at the scene what did you personally see?

6    A.  We observed a gentleman, unknown party who we believe may

7    have been involved in the crime, walking away from the area.

8    Q.  And what did you do next?

9    A.  We stopped the individual and we questioned him.

10   Q.  Do you know that person's name?

11   A.  I believe his name is Tramelle Williams.

12   Q.  Williams, did you say?

13   A.  Correct.

14   Q.  Is this someone that you know?

15   A.  No.

16   Q.  Is that the first time you met him?

17   A.  Yes.

18   Q.  Did you speak to him?

19   A.  Yes, I did.

20   Q.  Did you ask him whether he was present at the time of the

21   robbery?

22   A.  We basically stopped him and detained him for questioning.

23   We weren't really sure if he was involved or not but we wanted

24   to question him further.

25   Q.  What did you do next?

1    A.   Basically we had questioned him as to his whereabouts,

2    where he was going, where he was coming from, and we frisked

3    him for weapons.

4    Q.   Did he have anything on him?

5    A.   He didn't have any weapons.  We did observe two cell

6    phones.

7    Q.   And, did you do anything with those cell phones?

8    A.   I was instructed by my supervisor to basically hold the

9    phones off to the side which were later put into evidence.

10   Q.   Did you put the phones into evidence?

11   A.   No, I did not.

12   Q.   Did you give them to someone else?

13   A.   Sergeant Rodriguez took possession of the phones.

14            MS. LESTER:  No further questions, your Honor.

15            THE COURT:  Cross-examination.

16            MS. FONTIER:  Please, your Honor.

17   CROSS EXAMINATION

18   BY MS. FONTIER:

19   Q.   Good afternoon, Officer?

20   A.   Officer McKay.

21   Q.   Officer McKay.

22            So, Officer McKay, when you arrived on the scene that

23   you described, there were multiple civilian people -- civilian

24   witnesses around, right?

25   A.   Correct.

D3D5dor3                          McKay - cross

1   Q.  And then there were also police officers there already?

2   A.  Correct.

3   Q.  And are you the person -- you said you saw is it

4   Mr. Williams?

5   A.  I know his first name is Tramelle.  I'm not a hundred

6   percent sure of his last name.

7   Q.  Okay.  Well, I will refer to him as Tramelle so we make

8   sure we are talking about the same person.

9           You said you saw Tramelle walking away?

10  A.  Correct.

11  Q.  Where was he?

12  A.  He was walking away from the store, probably about a house

13  or two house lengths away from the incident.

14  Q.  And you had been informed, as you said, that this was a

15  strong arm robbery and the perpetrators or suspects had fled,

16  right?

17  A.  Correct.

18  Q.  So you saw him a little bit away and you thought he might

19  be a suspect?

20  A.  Correct.

21  Q.  So you stopped him and brought him back to your car?

22  A.  Correct.

23  Q.  And you searched him?

24  A.  Correct.

25  Q.  He had two cell phones on him?

1    A.  Correct.

2    Q.  And then at that point you placed him under arrest?

3    A.  No.  I didn't place him under arrest.  I held him in

4    custody until detectives responded.

5    Q.  And so he was -- but he was held in your custody at that

6    point, correct?

7    A.  Correct.

8    Q.  During that time there was another person at the scene that

9    was asking for his cell phone back, correct?

10   A.  Correct.

11   Q.  Was that person placed under arrest?

12   A.  No, he wasn't.

13             MS. FONTIER:  I have no further questions, your Honor.

14             MR. ROTH:  No questions.

15             THE COURT:  Redirect?

16             MS. LESTER:  No, your Honor.

17             THE COURT:  Okay.  Thank you Officer McKay.  You may

18   step down.

19             THE WITNESS:  Thank you.

20             (Witness steps down)

21             THE COURT:  Next witness.

22             MS. STAFFORD:  Your Honor, the government calls

23   Vincent Marion.

24             THE COURT:  If you haven't guessed, since we got a

25   late start we will go straight through lunch, we won't take a

D3D5dor3

1    break.  Is anyone uncomfortable?

2            The witness is here so let's do this.  Come on.  This

3    is short.

4            MS. LESTER:  Short.

5            THE COURT:  Raise your right hand.

6     VINCENT MARION,

7        called as a witness by the Government,

8        having been duly sworn, testified as follows:

9            THE COURT:  Mr. Marion, thank you.  That is great

10   volume.

11           Ms. Lester, you may proceed.

12           MS. LESTER:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MS. LESTER:

15   Q.  Good afternoon.

16   A.  Good afternoon.

17   Q.  Where do you work?

18   A.  New Rochelle Police Department.

19   Q.  What's your title there?

20   A.  Police officer.

21   Q.  How long have you been a police officer with New Rochelle

22   Police Department?

23   A.  For eight years.

24   Q.  Are you familiar with the area of Pelham Road?

25   A.  I am.

D3D5dor3                     Marion - direct

1    Q.  Did you respond to a robbery call in October of 2011?

2    A.  Yes.

3    Q.  And where was that robbery?

4    A.  It was in the area of 123 Pelham Road.

5    Q.  Do you recall approximately what time of day you responded?

6    A.  It was right around 4:00 p.m. when I started.

7    Q.  What's at that location at 123 Pelham Road?

8    A.  It's a strip mall; four stores, convenience store is one of

9    them.

10   Q.  What did you see, yourself, when you arrived?

11   A.  When I pulled up I saw a black car -- a dark car parked and

12   I saw someone standing right outside of it.

13   Q.  Do you know who that person was?

14   A.  I don't know his name.

15   Q.  Did you speak to him?

16   A.  No.

17   Q.  What else did you see?

18   A.  I saw some other officers down the street in front of the

19   area of 131 Pelham Road talking to another group of people.

20   Q.  At some point did you learn whether there was any evidence

21   left behind at the scene by the robbers?

22   A.  I did.

23   Q.  What did you learn about that?

24   A.  That there was a cell phone left.

25   Q.  Did you take any steps with regard to that cell phone?

D3D5dor3                    Marion - direct

1   A.  I did.

2   Q.  What did you do?

3   A.  It was given to me.

4   Q.  Who was it given to you by?

5   A.  Sergeant Rodriguez.

6   Q.  And what did you do with it?

7   A.  I immediately turned it over to a detective on my job.

8   Q.  Who is that detective?

9   A.  Detective Massena.

10          MS. LESTER:  No further questions, your Honor.

11          THE COURT:  Okay.

12          Cross?

13          MS. FONTIER:  Very briefly.

14  CROSS EXAMINATION

15  BY MS. FONTIER:

16  Q.  Ms. Lester just described, I believe the question was did

17  you learn that there was any evidence at the scene left by the

18  robbers.  What led you to believe that this was evidence left

19  by a robber?

20  A.  Through the investigation they asked the victim if it

21  belonged to him and he said no.

22  Q.  So it didn't belong to the person who was in the car,

23  correct?

24  A.  That's my -- that's correct.

25  Q.  But you don't know who it belonged to?

D3D5dor3                      Marion – cross

1    A.  I don't.

2              MS. FONTIER:  No further questions.

3              MR. ROTH:  No questions.

4              THE COURT:  Redirect?

5              MS. LESTER:  No, your Honor.

6              THE COURT:  Okay.  All right, you may step down,

7    Officer.  Thank you very much.

8              (Witness steps down)

9              THE COURT:  We will take a very short break.  This is

10   just a bathroom break, not a schmooze break, because we will be

11   breaking for lunch shortly.  Okay?

12             All rise for the jury.

13             (Jury not present).

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D3dWdor4

```
 1              THE COURT:  Have a seat.

 2              Mr. Dore, I don't want another staged yawn like I

 3    heard before with a big "yahahar."  Don't do that again.  It's

 4    not funny.  It's distracting.  I didn't comment on it because I

 5    don't generally call the jurors' attention to stuff like that,

 6    but if it happens again, I will.  This is a courtroom, treat it

 7    with respect.  I've treated you with respect throughout this

 8    entire proceeding.  I expect the same.  All right?

 9              (Recess)

10              THE COURT:  What's the witness order now?

11              MS. LESTER:  Your Honor, we have three law enforcement

12    witnesses from New Rochelle, who are going to be similarly very

13    brief:  Raul Rodriguez, Michael O'Rourke, and Michael Messina.

14    And then we have also a very brief custodial witness from DMV.

15    Hopefully, we can do all that before lunch.

16              THE COURT:  Let's get Mr. Rodriguez in here so as soon

17    as they're ready we can get them out here.

18              Let's bring in the jury.

19              (Continued on next page)

20

21

22

23

24

25
```

D3dWdor4

| | |
|---|---|
| 1 | (In open court; jury present) |
| 2 | THE COURT:  Have a seat.  The government's going to |
| 3 | call its next witness, and that is -- |
| 4 | MS. LESTER:  Your Honor, the government calls Raul |
| 5 | Rodriguez. |
| 6 | RAUL RODRIGUEZ, |
| 7 | called as a witness by the Government, |
| 8 | having been duly sworn, testified as follows: |
| 9 | DIRECT EXAMINATION |
| 10 | BY MS. LESTER: |
| 11 | Q.  Good afternoon. |
| 12 | A.  Good afternoon. |
| 13 | Q.  Where do you work? |
| 14 | A.  City of New Rochelle Police Department. |
| 15 | Q.  What's your title there? |
| 16 | A.  I'm a sergeant. |
| 17 | Q.  How long have you been employed by the New Rochelle Police |
| 18 | Department? |
| 19 | A.  Almost 13-1/2 years. |
| 20 | Q.  Are you familiar with Pelham Road in New Rochelle? |
| 21 | A.  Yes. |
| 22 | Q.  Did there come a time in 2011 when you responded to a |
| 23 | report of robbery at that location? |
| 24 | A.  Yes. |
| 25 | Q.  Do you recall the date? |

D3dWdor4                        Rodriguez - direct

1   A.  I believe it was October 11.

2   Q.  Where did you respond to?

3   A.  To 123 Pelham Road.  It's a strip, strip mall, about four

4   or five stores.

5   Q.  What did you personally observe when you arrived at that

6   location?

7   A.  I observed a dark-colored vehicle in the parking lot as we

8   rolled up.  The passenger's side window was smashed, and there

9   was glass on the ground next to it.  And there is, I believe

10  there was a knife in the middle of the glass, pocket knife.

11  Q.  What did you do after you made these observations?

12  A.  Officer Gargan and I located the victim and we were trying

13  to ascertain information from him.

14  Q.  Did you speak to the victim?

15  A.  No.  Officer Gargan did.

16  Q.  What did you do?

17  A.  Well, as Officer Gargan was speaking to him, a citizen or

18  witness approached me and advised me that he observed --

19          MR. ROTH:  Objection.

20          MS. FONTIER:  Objection.

21          MS. LESTER:  It's not for the truth.

22          THE COURT:  It's not being offered for the truth.

23  It's being offered to explain the subsequent steps taken by the

24  officer.  Overruled.

25          You can answer.

1    A.   The witness told me he observed a black guy with a black

2    T-shirt pick up the cell phone from where the shattered glass

3    was next to the car and walk away toward North Avenue from the

4    strip mall.

5              THE COURT:  All right.  What did you do after you got

6    that information?

7              THE WITNESS:  I immediately went, exited the parking

8    lot and see if I could find the man.

9              THE COURT:  All right.

10   BY MS. LESTER:

11   Q.   What happened after you walked away?

12   A.   I, I observed a male, a black guy and two white guys

13   walking up the street toward North Avenue, and I yelled at that

14   them to come back, back to my location.

15   Q.   Did you speak to them?

16   A.   Yes.  I walked toward them and they walked toward me, met

17   them about halfway in the middle of the block.

18   Q.   Did you speak to them when you met up with them?

19   A.   Yes.

20   Q.   What happened next?

21   A.   I asked them if they had seen what happened at the location

22   of the robbery, and two of the white guys said, Yeah, we were

23   there.

24             MR. ROTH:  Objection.

25             THE COURT:  I don't want to get into what they told

D3dWdor4                          Rodriguez - direct

1   you, unless it explains something you did next?  You had a

2   conversation --

3           THE WITNESS:  Conversation.  I asked them if anyone

4   picked up something from the ground over there, the crime

5   scene.

6           THE COURT:  What happened next?

7           THE WITNESS:  The black guy said, Yeah, I think I

8   picked up a cell phone.

9   BY MS. LESTER:

10  Q.  At some point, did you come into possession of the cell

11  phone?

12  A.  Later on, yes.

13  Q.  Where did you get that cell phone from?

14  A.  Officer McKay handed it to me.

15  Q.  What did you do with that cell phone?

16  A.  I went back and showed it to the victim and asked if this

17  was his cell phone.

18  Q.  What did he say?

19  A.  No.

20  Q.  What happened next?

21  A.  I gave the cell phone to Officer Marion.

22          MS. LESTER:  No further questions, your Honor.

23          THE COURT:  Cross-examination.

24  CROSS-EXAMINATION

25  Q.  Good afternoon, Officer.

D3dWdor4                          Rodriguez - cross

1    A.   Good afternoon.

2    Q.   The first time you saw this cell phone you're talking about

3    was when another officer gave it to you, right?

4    A.   Correct.

5    Q.   You don't know where it came from?

6    A.   Officer McKay said he took it from the suspect.

7    Q.   You didn't see it on the ground at any point?

8    A.   No, no.

9    Q.   You didn't see where it was in location to the car, right?

10   A.   No.

11   Q.   You don't know how long it had been on the ground, if it

12   was actually on the ground?

13   A.   No.

14   Q.   All you know is that you got it from another officer?

15   A.   Correct.

16          MS. FONTIER:  I have no further questions, your Honor.

17          THE COURT:  All right.

18          MR. ROTH:  No questions.

19          THE COURT:  No questions?

20          Any redirect?

21          MS. LESTER:  No, your Honor.

22          THE COURT:  Thank you, Sergeant.  You may step down.

23          (Witness excused)

24          THE COURT:  Next witness.

25          MS. LESTER:  Your Honor, the government calls

D3dWdor4                         Rodriguez - cross

1    Detective Michael O'Rourke.

2     MICHAEL O'ROURKE,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. LESTER:

7    Q.  Good afternoon.

8    A.  Good afternoon.

9    Q.  How are you employed, sir?

10   A.  New Rochelle Police Department.

11   Q.  What's your title there?

12   A.  Detective.

13   Q.  How long have you been a detective at the New Rochelle

14   Police Department?

15   A.  Detective for seven years.

16   Q.  What are your duties and responsibilities as a detective

17   with the New Rochelle Police Department?

18   A.  Investigate crimes against persons.

19   Q.  Are you familiar with Pelham Road in New Rochelle?

20   A.  Yes.

21   Q.  Did there come a time in 2011 when you responded to a

22   report of a robbery there?

23   A.  Yes.

24   Q.  Do you recall the date?

25   A.  October 11.

D3dWdor4                          O'Rourke - direct

1    Q.   And what location did you respond to?

2    A.   123 Pelham Road.

3    Q.   What did you observe when you arrived at the location?

4    A.   There were several police officers on the scene already

5    speaking with a victim of a robbery.

6    Q.   Did you speak to the victim?

7    A.   Yes, I did.

8    Q.   What did you observe about the scene itself?

9    A.   The victim's vehicle, with a flat tire and a broken window.

10   Q.   Where was the broken window?

11   A.   I believe it was the passenger front window.

12   Q.   Was there any evidence at the scene besides the car and the

13   window glass that you could see?

14   A.   Yes.  There was a cellular phone and a knife.

15   Q.   Did you actually see those items?

16   A.   Yes.

17   Q.   When did you see them?

18   A.   I saw the cellular phone when it was handed to my partner.

19   And the knife was on the ground while, while we were

20   investigating.

21   Q.   Who handed the cellular phone to your partner, if you know?

22   A.   I, I don't recall.

23   Q.   Do you know whether it was another law enforcement officer?

24   A.   Yes.  It was one of the -- it was either Sergeant Rodriguez

25   or Officer Marion.

D3dWdor4                         O'Rourke - direct

1    Q.  And you were present when that took place?

2    A.  Yes.

3    Q.  Did you come into custody of the phone?

4    A.  Yes, I did.

5    Q.  What did you do with it?

6    A.  It was logged into evidence after it was handed to me.

7    Q.  Did you personally do that?

8    A.  Yes.

9    Q.  I'm showing you what's been marked -- actually, it's in

10   evidence but subject to connection -- as Government Exhibit

11   604.  Could you take a look at that and tell me whether you

12   recognize it?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  It's a cellular phone, which we recovered, with an evidence

16   tag with my name on it.

17   Q.  How do you know that that's the phone?

18       First of all, do you know the date that that phone was

19   recovered?

20   A.  October 11.

21   Q.  Do you know where it was recovered from?

22   A.  At 123 Pelham Road.

23   Q.  Is that the cell phone that you just testified you came

24   into custody of on that day?

25   A.  Yes.

D3dWdor4                        O'Rourke - direct

1    Q.  How do you know it's the same cell phone?

2    A.  My signature is on it, on the evidence tag.

3    Q.  Now, besides the cell phone or the recovery and the

4    vouchering of the cell phone, did you take any other

5    investigative steps with regard to this robbery?

6    A.  Yes.

7    Q.  What did you do?

8    A.  We subpoenaed the records for the cell phone.

9    Q.  And besides subpoenaing the records, did you undertake any

10   other investigation regarding the robbery?

11   A.  We interviewed the victim.  Took a statement from the

12   victim.

13   Q.  Did you canvass in the area at all?

14   A.  Yes, we did.  The stores located at 123 Pelham Road, we

15   spoke to the owners of the stores and observed video

16   surveillance footage from those stores.

17   Q.  I'm showing you what's been marked for identification as

18   Government Exhibit 602.  Could you take a look at that?

19   A.  Yes.

20   Q.  Do you recognize that?

21   A.  Yes.

22   Q.  What do you recognize it to be?

23   A.  A DVD with the video surveillance recovered from several

24   locations.

25   Q.  How do you know that that's the video surveillance that was

1    recovered?

2    A.  It has the New Rochelle event number of this case.

3    Q.  Were you present when that surveillance was collected?

4    A.  Yes.

5    Q.  Who actually did the collection of the video?

6    A.  Tom Burpee.

7    Q.  Who is that?

8    A.  He is the police department's video tech, among other -- he

9    does computers and video surveillance recovery, I guess you

10   would call it.

11   Q.  And those videos were then transferred on to that disk?

12   A.  Yes.

13            MS. LESTER:  Your Honor, the government offers

14   Government Exhibit 602.

15            THE COURT:  Any objection?

16            MS. FONTIER:  No, your Honor.

17            MR. ROTH:  No, your Honor.

18            THE COURT:  Government Exhibit 602 is received.

19            (Government's Exhibit 602 received in evidence)

20            MS. LESTER:  Your Honor, we'd also like to just put on

21   the record that we believe now we've established the connection

22   for Government Exhibit 604, the cell phone.

23            THE COURT:  Yes.  Government Exhibit 604 is also

24   received.

25            MS. FONTIER:  That's over objection, your Honor.

D3dWdor4                          O'Rourke - direct

1          THE COURT:  What's that?

2          MS. FONTIER:  Over objection as to the connection.

3          THE COURT:  Overruled.  604 is received.

4          (Government's Exhibit 604 received in evidence)

5          MS. LESTER:  Your Honor, we'd like to play a portion

6   of one of the videos on Government Exhibit 602.

7          THE COURT:  All right.

8          (Video recording played)

9          THE COURT:  Before playing it, what are we looking at

10  here?  Stop.

11  BY MS. LESTER:

12  Q.  Detective O'Rourke, could you just explain, what this view

13  is?

14  A.  This is a view from 120 -- the exterior of 123 Pelham Road,

15  looking into the parking area of 123 Pelham Road.

16  Q.  Where is Pelham Road in this video shot?

17  A.  At the top right hand of the corner, you see a black line,

18  which is kind of on a diagonal.

19  Q.  I'm giving you the laser pointer.

20  A.  This black line here is the railing, the parking railing,

21  that separates Pelham Road to the parking lot.  So Pelham Road

22  is on the right side of that black line there, running east and

23  west.

24  Q.  So you're pointing to the very upper right-hand corner of

25  the video screen, correct?

 1   A.  Correct.

 2          MS. LESTER:  Ms. Brady, could we fast forward to

 3   15:51, approximately.

 4          (Video recording played)

 5          THE COURT:  Are we seeing anything that's relevant?

 6          MS. LESTER:  Yes, your Honor.  I'm sorry.  The video

 7   is a little imprecise, but we're approaching right now.

 8   Q.  Detective O'Rourke, there's a car that just pulled up in

 9   the upper right-hand corner near the divider that you were

10   pointing out a moment ago.

11   A.  Yes.

12   Q.  Do you know whose car that is?

13   A.  That is the victim's vehicle.

14          MS. LESTER:  Could we fast forward, please, Ms. Brady,

15   to 15:53.  Pause it for a second.

16          (Video recording played)

17   BY MS. LESTER:

18   Q.  Detective O'Rourke, what's happening now?  What are we

19   seeing in the video?

20   A.  Looks like two suspects approached the vehicle.  One, the

21   first suspect closer to the front of the vehicle, looks like he

22   cut the front tire of the car, while the second suspect, with

23   some sort of object, broke the window of the vehicle.

24          MS. LESTER:  Okay, Ms. Brady.

25          (Video recording played)

1          MS. LESTER:  Ms. Brady, could you pause it for a

2     moment.

3     Q.  Detective O'Rourke, you've watched this video more than one

4     time, correct?

5     A.  Yes.

6     Q.  Do you know whether you can see whether any items from the

7     robbers are left behind at the scene, based on this video?

8     A.  Yes.

9          MR. MURPHY:  Objection, your Honor.  The video speaks

10    for itself.

11         THE COURT:  Can you point to the object that you

12    believe was left by the robbers, using your laser?

13         THE WITNESS:  Underneath the passenger's side door

14    there is where the, a cell phone was recovered.  On the ground.

15    BY MS. LESTER:

16    Q.  And you believe you could actually see that in the video?

17         MR. MURPHY:  Objection.

18         THE COURT:  Whether or not he can see it is

19    irrelevant.  Whether the jury can see it is the issue.  If you

20    can see it, you can see it.  If you can't, you can't.  You can

21    ask for this in your deliberations, we will give it to you.

22         MS. LESTER:  Thank you, your Honor.

23         Ms. Brady, if we could fast forward.  Let's let it

24    play for a few more seconds.

25              (Video recording played)

1          MS. LESTER:  Could we now fast forward to

2     approximately 15:59.  If we could just go back a little bit.

3          (Video recording played)

4          MS. LESTER:  Thank you, Ms. Brady.

5          No further questions, your Honor.

6          THE COURT:  Cross-examination?

7          MS. FONTIER:  Yes.

8          THE COURT:  Okay.

9          MS. FONTIER:  You want me to start now?

10         THE COURT:  If we can wrap this up before lunch, then

11    the witness can be excused.  How long do you think you're going

12    to be?

13         MS. FONTIER:  I'll be brief.

14    CROSS-EXAMINATION

15    BY MS. FONTIER:

16    Q.  Detective, you said that when you arrived, there was, I

17    believe, again described as evidence, a knife and a cell phone,

18    correct?

19    A.  Yes.

20    Q.  And the knife was also located on the passenger's side, by

21    the front door?

22    A.  Yes, I believe so.

23    Q.  And that was by the broken glass as well, right?

24    A.  Yes.

25    Q.  Did you voucher that knife?

D3dWdor4                          O'Rourke – cross

1    A.   Personally, no.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3D8DOR5                         O'Rourke - cross

1    CROSS-EXAMINATION

2    BY MS. FONTIER:

3    Q.  But you did voucher the cell phone?

4    A.  Yes.

5    Q.  Were you there when the knife and the cell phone were

6    picked up?

7    A.  I was there when the -- well, the cell phone I believe was

8    picked up prior to my arrival.  The knife was picked up by our

9    crime scene unit.

10   Q.  The crime scene unit documented where that knife was?

11   A.  I believe so.

12   Q.  It was, again, what we just saw in the video, the people by

13   the front passenger side of the car, right?

14   A.  Yes.

15   Q.  And the knife was in the area where they were standing,

16   right?

17   A.  I believe so, yes.

18              MS. FONTIER:  I have no further questions.

19              MR. ROTH:  No questions.

20              THE COURT:  Redirect?

21              MS. LESTER:  No, your Honor.

22              THE COURT:  Thank you, Detective.  You can stand down.

23              Ladies and gentlemen, we will break for lunch now.  We

24   will pick up again at 2.  Don't discuss the case, keep an open

25   mind, and be back in time so we can start sharp at 2.  Thank

D3D8DOR5                          O'Rourke – cross

1    you.

2              (Jury exits courtroom)

3              THE COURT:  I have another matter so if you can just

4    give us some room that will be great, and see you a little

5    before 2.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3D5dor6

```
 1                    A F T E R N O O N   S E S S I O N

 2                              2:06 p.m.

 3              THE COURT:  Let's proceed.  Let's bring in the jury.

 4              (Jury present)

 5              THE COURT:  Have a seat.  I hope you had a good lunch.

 6     It is a nice day out there.  Spring is really here.  I hope so.

 7              We are going to resume the government's case.

 8              Your next witness, Ms. Lester.

 9              MS. LESTER:  Your Honor, the government calls Yan

10     Wong.

11      YAN WONG,

12          called as a witness by the Government,

13          having been duly sworn, testified as follows:

14              THE COURT:  State your name and spell your name for

15     the record.

16     A.  Yan Wong.  Y-A-N, W-O-N-G.

17              THE COURT:  Mr. Wong, good afternoon.

18              THE WITNESS:  Good afternoon.

19              THE COURT:  Move your chair up a little closer.  Keep

20     your voice nice and loud and don't talk too fast so the court

21     reporter can get it all down.

22              THE WITNESS:  Thank you.

23              THE COURT:  You may proceed, Ms. Lester.

24              MS. LESTER:  Thank you, your Honor.

25     DIRECT EXAMINATION
```

 1    BY MS. LESTER:

 2    Q.  Good afternoon.

 3    A.  Good afternoon.

 4    Q.  How are you employed?

 5    A.  I'm employed by the Department of Motor Vehicles.

 6    Q.  Is that for the State of New York?

 7    A.  Yes.

 8    Q.  What do you do at the Department of Motor Vehicles?

 9    A.  I administer the written test for the learner's permit.  I

10    verify person's identify for New York State I.D. cards.  I

11    register vehicles like cars, motorcycles and boats and try to

12    resolve enforcement issues like suspensions and revocations.

13    Q.  Do you also sometimes testify as a representative of the

14    Department of Motor Vehicles?

15    A.  Every week.

16    Q.  And is that known as commonly as the DMV?

17    A.  Yes.

18    Q.  That's easier to say.

19         Besides, when you testify, are you usually called upon

20    to testify about records created by DMV?

21    A.  Yes.

22    Q.  What types of records does DMV create about drivers?

23    A.  There will be something called a driver's abstract which is

24    a person's driving history.  There is also something called a

25    registration abstract which is a person's registration history,

1    as well as a title abstract which is a person's title history.

2    Q.  Are there also records relating to license plates at DMV?

3    A.  Yes.

4    Q.  What types of records?

5    A.  When the plates are issued or who it is issued for.

6    Q.  And are you familiar with how those types of records are

7    maintained by the Department of Motor Vehicles?

8    A.  We maintain them in the database up in Albany.

9    Q.  I'm showing you what's been marked for identification as

10   Government Exhibit 53.  Do you recognize the form of that

11   document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It is a registration abstract.

15   Q.  And, is that the type of registration abstract or is that a

16   registration abstract kept by the Department of Motor Vehicles

17   for the State of New York?

18   A.  Yes.

19   Q.  How can you tell that?

20   A.  By the seal on the bottom, along with a signature of the

21   Commissioner of Motor Vehicles, Barbara J. Fiala.

22   Q.  And you recognize the way the document appears as well to

23   be a record of the DMV?

24   A.  Yes.

25   Q.  Is it the regular practice of the DMV to create and

D3D5dor6                         Wong - direct

1   maintain these records?

2   A.  Yes.

3   Q.  And are those records created at or about the time of the

4   events to which they relate, that is, the actual registration

5   itself?

6   A.  Yes.

7   Q.  And are they kept in the ordinary course of the DMV's

8   business?

9   A.  Yes.

10          MS. LESTER:  Your Honor, the government offers

11  Government Exhibit 53.

12          THE COURT:  Any objection?

13          MR. ROTH:  No objection, Judge.

14          MS. FONTIER:  No, your Honor.

15          THE COURT:  No objection?

16          MS. FONTIER:  No, your Honor.

17          THE COURT:  All right.  Government Exhibit 53 is

18  received.

19          (Government's Exhibit 53 received in evidence)

20  BY MS. LESTER:

21  Q.  Mr. Wong, directing your attention to the top portion of

22  the registration record which you have there in front of you,

23  are you able to tell what type of car this registration record

24  relates to?

25  A.  Yes.

D3D5dor6                          Wong - direct

1    Q.  What is that?

2    A.  Mercedes Benz.

3    Q.  And are you able to tell anything else about the car from

4    this record?

5    A.  Just the color is blue, it is four doors, the weight is

6    4,255.

7    Q.  And what about the license plate information for that car?

8    A.  Yes.

9    Q.  What is the license plate number?

10   A.  F, as in Frank, M as in mary, B as in boy, 7467.

11   Q.  Are you able to tell date on which this car was registered?

12   A.  The date was 8/26/2011.

13   Q.  And what's the name under which the car is registered?

14   A.  Felicia M. Lake.

15          MS. LESTER:  No further questions, your Honor.

16          THE COURT:  Any cross-examination, Mr. Roth?

17          MR. ROTH:  Just briefly, your Honor.

18   CROSS EXAMINATION

19   BY MR. ROTH:

20   Q.  Can you tell, sir, from the document that has just been

21   admitted, what the purchase price of the car was?

22   A.  No, sir.

23   Q.  Can you tell when the car was purchased?

24   A.  No, sir.

25   Q.  You can only tell when it was registered, is that right?

1   A.   Correct, sir.

2              MR. ROTH:  I have no further questions.

3              THE COURT:  Ms. Fontier, anything?

4              MS. FONTIER:  Nothing.  Thank you, your Honor.

5              THE COURT:  Any redirect?

6              MS. LESTER:  No, your Honor.

7              THE COURT:  Okay.  Thank you very much, Mr. Wong.  You

8   may step down.

9              THE WITNESS:  Thank you.

10             (Witness steps down)

11             THE COURT:  Government, your next witness?

12             MS. LESTER:  Your Honor, the government calls Jamal

13  Abdulla.

14   JAMAL ABDULLA,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17             THE COURT:  Please have a seat and if you can state

18  your name and spell your name?

19             THE WITNESS:  J-A-M-A-L, A-B-D-U-L-L-A.

20             THE COURT:  Is it Abdulla or Abdulla?

21             THE WITNESS:  Abdulla.

22             THE COURT:  Let me ask you to move up a little closer

23  to the microphone and speak slowly enough so the court reporter

24  can get it all down and try to speak clearly.  It is a very big

25  room so you have to speak in a loud voice to be heard.

1       THE WITNESS:  All right.

2       THE COURT:  Ms. Lester, you may proceed.

3       MS. LESTER:  Thank you, your Honor.

4   DIRECT EXAMINATION

5   BY MS. LESTER:

6   Q.  Hello, Mr. Abdulla.

7   A.  How are you doin'.

8   Q.  How old are you, sir?

9   A.  I'm 45.

10  Q.  Where are you from?

11  A.  I'm from Sudan.  Africa.

12  Q.  Africa?

13  A.  Yes.

14  Q.  How long have you been in the United States?

15  A.  Like 20 years -- 28?  28.  28.

16  Q.  28?

17  A.  Yes.

18  Q.  Is English your native language?

19  A.  No.  Arabic.

20  Q.  When did you first -- when you first came to the United

21  States, where did you come to?

22  A.  To -- what?

23  Q.  What city did you arrive in?

24  A.  New York.

25  Q.  And have you been in New York basically since that time?

1    A.  Yes.

2    Q.  Are you currently employed?

3    A.  Right now?

4    Q.  Yes.

5    A.  Yes.

6    Q.  What are you doing for work?

7    A.  I helping my friend.  He have a company, ATM company, ATM

8    machine.

9    Q.  Have you been employed in the past for any government

10   agencies?

11   A.  Yes.

12   Q.  Can you tell the jurors about that?  What agencies have you

13   worked for?

14   A.  I worked for ATF, I worked for DEA, I work for FBI.  I work

15   for the CIA.

16   Q.  And when you say ATF, is that the Bureau of Alcohol,

17   Tobacco and Firearms?

18   A.  Yes.

19   Q.  How long, approximately, did you work for the ATF?

20   A.  Maybe 16 years.

21   Q.  What type of work were you doing for the ATF?

22   A.  I do undercover, like buying drugs, buying guns for the

23   government for ATF.

24   Q.  Is that commonly known as a confidential informant or C.I.?

25   A.  Yes.

D3D5dor6                          Abdulla - direct

1   Q.  And I'm sorry, did you say you were paid for that work?

2   A.  Yes.

3   Q.  And you also mentioned the FBI, correct?

4   A.  Yes.

5   Q.  How long, approximately, did you work for the FBI?

6   A.  Same time.  Same time.  I work for all of them at the same

7   time.

8   Q.  Were you working for more than one agency at a time?

9   A.  Yes.

10  Q.  And, were you paid for your work with the FBI as well?

11  A.  Yes.

12  Q.  For the other agencies that you worked for, were you also

13  paid?

14  A.  Yes.

15  Q.  Are you working for any of those agencies now?

16  A.  No.

17  Q.  Were you actually terminated as a confidential informant by

18  at least two of these agencies?

19  A.  Yes.

20  Q.  And was that -- when did that happen?

21  A.  It happened last year sometime.  I don't know the exact

22  time.

23  Q.  2012?

24  A.  Yes.

25  Q.  Do you know the reason why you were terminated?

D3D5dor6                          Abdulla - direct

1   A.  No.

2   Q.  Prior to or rather besides your work as a confidential

3   informant, how else have you earned money, previously?

4   A.  Say that again, please?

5   Q.  What else have you done for money besides working as a

6   confidential informant?

7   A.  I did the last -- before that I did like a cigarette thing.

8   Q.  Cigarettes?

9   A.  Cigarette, yes.

10  Q.  What do you mean by that?

11  A.  Like I go to Virginia, bring cigarettes and sell over here.

12  Q.  So, you would pick up cigarettes in Virginia and bring them

13  to New York?

14  A.  Yes.

15  Q.  And, what was the purpose of buying them down in Virginia?

16  A.  It is cheaper there.

17  Q.  And do you know why that is?

18  A.  Yeah.

19  Q.  Why are they cheaper?

20  A.  There is no tax there.

21  Q.  And, what would you do with the cigarettes once you brought

22  them up to New York?

23  A.  Sell them.

24  Q.  Who would you sell them to?

25  A.  To the stores.

D3D5dor6                         Abdulla - direct

1    Q.  Over what period of time did you do this?

2    A.  I did this like maybe five months, six months.

3    Q.  In what year?

4    A.  2012.

5    Q.  2012 or 2011?

6    A.  2011.  I'm sorry.

7    Q.  Did you also engage in transactions with other people where

8    you were the broker for a cigarette deal?

9    A.  Yes.

10   Q.  So, in other words, you introduced --

11           MR. ROTH:  Judge, objection.

12           THE COURT:  Let's --

13   BY MS. LESTER:

14   Q.  How would those transactions work, sir?

15   A.  Like I helped them sell cigarettes and they give me cut for

16   the money.  They give me some commission.

17   Q.  So, you would get a portion of the money?

18   A.  Yeah.

19   Q.  And, how much did you engage in those types of

20   transactions?

21   A.  Like maybe 10 of them.

22           THE COURT:  10?  Is that what you said?

23   A.  I believe.  Maybe 10 of them.  I'm not sure of the exact --

24   Q.  What year was that that you did that?

25   A.  2011.

1    Q.  Prior to your testimony here today, did you enter into an

2    agreement with the government?

3    A.  Yes.

4    Q.  And what's your understanding of what that agreement --

5    what the understanding is for that agreement?

6    A.  They will not charge me by what I did, the cigarette action

7    that I did.

8    Q.  Who will not charge you?

9    A.  Government.

10   Q.  And that's for the untaxed cigarette transactions that we

11   were just talking about?

12   A.  Yes.

13   Q.  And what is your understanding of what you have to do in

14   return for that agreement?

15   A.  For I cooperate, not lie, say the truth, nothing untruth.

16   Q.  And you are testifying here today pursuant to that

17   agreement, correct?

18   A.  Yes.

19   Q.  What's your immigration status, sir?

20   A.  I don't know right now.  They're still working on

21   immigration.

22   Q.  Do you have any legal status right now, as far as you know?

23   A.  No.

24   Q.  Have you ever been the victim of a robbery, Mr. Abdulla?

25   A.  Yes.

D3D5dor6                        Abdulla - direct

 1   Q.  When was that?

 2   A.  Last year, in December.

 3   Q.  Was it last year, 2012?

 4   A.  Yes.

 5   Q.  Just this past December, 2012 or in?  We're in 2013 now?

 6   A.  Yes, last year.  Last year, 2012.

 7   Q.  2012?

 8           THE COURT:  So, two and a half months ago?

 9   A.  No.  I'm confused.  2011.  I'm sorry.

10   Q.  The previous year?

11   A.  2011.

12   Q.  And where did that robbery take place?

13   A.  This happened Fourth and Fourth in front of me sir, 267.

14   Q.  267, what's the street?

15   A.  South Fourth.

16   Q.  South Fourth?

17   A.  Yes.

18   Q.  And what town is that?

19   A.  Mount Vernon, New York.

20   Q.  You said in front of my store?

21   A.  Yes.

22   Q.  What type of business did you have at that time?

23   A.  Grocery store.

24   Q.  And what types of items did you sell?

25   A.  Like regular things.  Like regular store, potatoes.

D3D5dor6                        Abdulla - direct

1   Q.  Did you also sell cigarettes?

2   A.  Yes.

3   Q.  Did you use that business location at all in connection

4   with your untaxed cigarettes?

5   A.  Yes.

6   Q.  What did you do in connection with that?

7   A.  Like I bring the cigarette there and stuff and make a sale,

8   you know.  I move it out of there like a storage place.

9           MR. ROTH:  Judge, object.  If he can speak slower?

10          THE COURT:  Yes.  We're having a little difficulty

11  understanding you, Mr. Abdulla so, slow down a bit.

12          So, the question was:  What did you do in connection

13  with the untaxed cigarettes at your store.  What did you do?

14          THE WITNESS:  Like I bring the cigarette there and I

15  sell it for, you know -- you use it like a storage place.

16          THE COURT:  Okay.

17  BY MS. LESTER:

18  Q.  I'm showing you what's been marked as Government Exhibit

19  524 for identification.  Do you recognize that?

20  A.  Yes.

21  Q.  What is it?

22  A.  This is my store, 267 South Fourth.

23  Q.  Is it a photograph of the store?

24  A.  Yes.

25  Q.  And did you take that photograph?

D3D5dor6                          Abdulla - direct

1   A.  No.

2   Q.  Is that a fair and accurate representation of what the

3   store looked like in 2011?

4   A.  Yes.

5           MS. LESTER:  Your Honor, the government offers

6   Government Exhibit 524.

7           THE COURT:  Any objection?

8           MS. FONTIER:  No, your Honor.

9           MR. ROTH:  No, Judge.

10           THE COURT:  Government Exhibit 524 is received.

11           (Government's Exhibit 524 received in evidence).

12   BY MS. LESTER:

13   Q.  Mr. Abdulla, looking at this photograph, there is a blue

14   car in the center of it and a store behind that; is that your

15   store?

16   A.  Yes.

17   Q.  And which street is that that we're looking at in the

18   photograph?

19   A.  South Fourth.

20   Q.  South fourth?

21   A.  Yes.

22   Q.  Let's go back to the robbery that took place in December

23   2011.

24           THE COURT:  Can I ask you a question?  Is this how the

25   store looked when it was open for business?

D3D5dor6                          Abdulla - direct

1              THE WITNESS:  No.

2              THE COURT:  Okay.  What is different?

3              THE WITNESS:  It is not there, the stuff.  Now it is

4    changed.  Different, changed.  At that time I do construction

5    in it.

6              THE COURT:  I mean there is something over the

7    windows.

8              THE WITNESS:  Yes.  I block the window.  I put some

9    paper.

10             THE COURT:  Okay.  That wasn't true back in 2011?

11             THE WITNESS:  Huh?

12             THE COURT:  Was that on the windows in 2011?

13             THE WITNESS:  Yes.

14             THE COURT:  It was?

15             THE WITNESS:  Yes, but after that time changed but now

16   it is changed.

17             THE COURT:  So now it doesn't look like that.

18             THE WITNESS:  No.

19             THE COURT:  But in 2011 it looked like that?

20             THE WITNESS:  Yes.

21   BY MS. LESTER:

22   Q.  Mr. Abdulla, you no longer operate that store, is that

23   correct?

24   A.  No.  No.

25   Q.  Is the store closed now or is there another store in that

1   location?

2   A.  Some other owner.

3   Q.  And you mentioned that it's South Fourth.  Do you know if

4   it is an avenue or a street?

5   A.  Avenue.

6   Q.  Avenue.

7   A.  Avenue.

8   Q.  And I think you mentioned a cross street as well that's

9   nearby?

10  A.  Yes.

11  Q.  What is that street?

12  A.  I call it two names -- my store is Fourth Avenue and South

13  Fourth and now they call it Malcolm X.

14  Q.  Malcolm X?

15  A.  It is Fourth Avenue and Malcolm X.

16  Q.  Malcolm X is the cross street?

17  A.  Yes.

18  Q.  We can take that down, Ms. Brady.  Thank you.

19          On the day of the robbery, Mr. Abdulla, starting in

20  the morning, what were you doing that day?

21  A.  That day I'm waiting for cigarettes to come in.  On the

22  corner store -- my friend, he own the corner store and I'm

23  waiting there on the corner store drinking coffee waiting for

24  my friend that he pass away, I'm waiting for him.

25  Q.  You mentioned your friend who passed away; who is that

D3D5dor6                         Abdulla - direct

1   individual?

2   A.   Gamar.  It is a guy, my friend I do business with him for

3   cigarettes.

4   Q.   Gamar?

5   A.   Yes.

6   Q.   Do you know where he's from?

7   A.   Yes; from same country, Sudan.

8            THE COURT:  That's where you're from, Sudan?

9            THE WITNESS:  Yes.

10  Q.   How long had you known Gamar?

11  A.   Not long; maybe three or four months.

12  Q.   When did you first meet?

13  A.   I met him in Richmond, Virginia.

14  Q.   You met him where?

15  A.   Richmond, Virginia.

16  Q.   When did you meet him, approximately?

17  A.   How long?

18  Q.   Do you recall the month?  You said it was three or four

19  months?

20  A.   Yes, three months.

21  Q.   So, three or four months before the robbery in December

22  2011?

23  A.   Yes.

24  Q.   What were the circumstances of your first meeting?

25  A.   I meet him by other friend, what do you help me there.  At

D3D5dor6                    Abdulla - direct

1   that time he want to go to Richmond, Virginia, he meet me the

2   same.  I'm helping him because I buy and sell cigarettes in New

3   York.  This is what the reason.

4   Q.  So, did you meet him in relation to your cigarette business

5   you were operating at the time?

6   A.  Yes.

7   Q.  And what was your understanding of why he was introduced to

8   you?

9   A.  It is him, he want to sell cigarettes but don't know people

10  in New York and I know people in New York.

11  Q.  So, after that first meeting did you engage in any

12  cigarette transactions with him?

13  A.  Like maybe like three weeks later.

14  Q.  Tell us about that.  What happened?

15  A.  Three weeks later him and me meet him in Richmond, Virginia

16  and he comes with me to New York and bring cigarette and sell

17  it.  And after that it just started the coming together selling

18  together cigarettes.

19  Q.  How many times before the day of the robbery did he come up

20  to New York to sell cigarettes with you?

21  A.  Maybe 10 times.

22  Q.  And on the day of the robbery you were expecting him?

23  A.  Yes.

24  Q.  Did you know where he was coming from?

25  A.  Yes.  Richmond, Virginia.

D3D5dor6                    Abdulla - direct

1   Q.  Do you know when he had arrived?

2   A.  Yes.  He called me at the time he got in the motel.

3   Q.  What day did he arrive?

4   A.  I'm not remember.  December.  December, but I'm not exact.

5   Q.  Sorry.  I will be more precise.  What day in relation to

6   the robbery?  Was it the day before?  A few days before?

7   A.  Say that again?

8   Q.  The day that he arrived in New York he called you, correct?

9   A.  Yes.

10  Q.  What was the day in relation to the day that the robbery

11  took place?  Was it a few days before?  A week before?

12  A.  Yes, a couple of --

13  Q.  Approximate time.

14  A.  He called me, I believe on like Friday, told me he will

15  come in a weekend but he not make it in the weekend, he make it

16  like two days later on Sunday, Sunday night.

17  Q.  And, did you make arrangements to meet?

18  A.  Yeah.  Next day in the morning, Monday.

19  Q.  Where did you meet him?

20  A.  I meet him on the Fourth Avenue.  Fourth Avenue and my

21  friend's store, I have been waiting for him there in the

22  morning.

23  Q.  So, you met him at your friend's store you said?

24  A.  Yes.

25  Q.  Why is that located in relation to your store?

1    A.  Like close door.

2    Q.  Next-door?

3    A.  Yeah, next-door.

4    Q.  What time, approximately, did you meet Gamar that day?

5    A.  I believe around 10:00.  Between 10:00 and 11:00 at that

6    time, morning.

7    Q.  In the morning?

8    A.  Yes.

9    Q.  How did he arrive at the location?

10   A.  Came by taxi that I used.  Chinese guy that I use all the

11   time, him bring him there.

12   Q.  What type of vehicle did that taxi driver use that day?

13   A.  It is a Toyota van -- Toyota van.

14   Q.  And, what happened when Gamar arrived in the taxi?

15   A.  What happened?  I jump in the car the same and I went there

16   to sell the cigarettes.

17   Q.  Did you know, did you see the actual cigarettes that Gamar

18   had with him?

19   A.  I know to have a cigarette.  I'm not saying -- it is in the

20   boxes.  All I ask him how many cartons of cigarettes and that's

21   it.  That's all I ask him.

22   Q.  But you had an understanding --

23           MR. ROTH:  Object.

24           THE COURT:  Is there an objection?

25           MR. ROTH:  I just thought it was nonresponsive.  She

D3D5dor6                          Abdulla - direct

1   asked him whether he saw the cigarettes.

2              THE COURT:  He has already answered, right?  So, next

3   question.

4   BY MS. LESTER:

5   Q.  Where did you go once you both got in the car?

6   A.  I went like to 1, 2 -- like three or four blocks from my

7   store.

8   Q.  To what street?

9   A.  First Avenue and Third Avenue.

10  Q.  And did you go -- you went in the taxi?

11  A.  Yes.

12  Q.  Did all three of you go?

13  A.  Yes.  Yes.

14  Q.  What did you do once you got to that location?

15  A.  The guy where I sell him the cigarette, I get out of the

16  car, him he meet us there, him in his car, move the boxes to

17  his car and after I jump in in the front passenger seat, he

18  pass me the money and I not count it, get out of the car, get

19  in the other car -- the taxi -- and I give Gamar the money for

20  counting.

21  Q.  So you arrive at the location -- were you expecting someone

22  to meet you there at that second location?

23  A.  Yes.

24  Q.  Who was that person?

25  A.  A customer, Dominican guy.  A guy I sell to him all the

D3D5dor6                          Abdulla - direct

1    time cigarette.

2    Q.   This is someone you dealt with before?

3    A.   Yes.

4    Q.   And how many cigarettes -- what was the understanding about

5    the transaction?  How many cigarettes were involved?

6    A.   I believe at that time he sell them like a hundred cartons

7    of cigarettes.

8    Q.   How much money were you supposed to get for those

9    cigarettes?

10   A.   Like $10,000, I believe.

11   Q.   And, how many cartons of cigarettes were actually

12   exchanged?  Do you know?

13   A.   Like a hundred and change.

14   Q.   How were the cigarettes packaged?

15   A.   In the boxes.

16   Q.   What types of boxes?

17   A.   Like regular boxes what they buy for a storage place.

18   Q.   Like cardboard boxes?

19   A.   Yes.

20   Q.   Who unloaded the boxes?

21   A.   Gamar.

22   Q.   Gamar?

23   A.   Yes.

24   Q.   Who conducted the transaction?  Who was doing the talking?

25   A.   Me.

D3D5dor6                        Abdulla - direct

1   Q.  And was there money exchanged?

2   A.  Yes.

3   Q.  How much money?

4   A.  I give the cigarette to the Dominican guy, he just advise

5   he never no count the money.  All the time I -- he tell me, I

6   ask him how much money in the bag.  He tell me oh, $10,000.  I

7   take the bag and give it to Gamar and Gamar now count the

8   money.

9            THE COURT:  Gamar counts the money?

10           THE WITNESS:  Yes.

11  Q.  You didn't count the money yourself?

12  A.  No.

13  Q.  What did you do after you gave the bag of money to Gamar?

14  A.  I told the driver let's go, move, drive me to my store,

15  back.

16  Q.  And so you did -- did that happen?

17  A.  Yes.

18  Q.  What happened when you guys arrived back at your store?

19  A.  Then what happened, I park in the front of the store and I

20  talk to Gamar about next order and, like, maybe 10 minutes, 15

21  minutes the door for the driver, open, gun on the head, some

22  people have some stuff on their face and the guy over in to my

23  door to other guy and put the other gun on my head.

24  Q.  Let's stop right there for a moment.

25           You said that Gamar arrived at your store in the

D3D5dor6                          Abdulla - direct

1   morning, like 10:00 or 11:00, correct?

2   A.  Yes.

3   Q.  Approximately how long did this cigarette transaction take?

4   A.  Not even 15 minutes.

5   Q.  Including driving back and forth?

6   A.  Maybe, like, 20 minutes.

7   Q.  And then when you arrived back at your store, were you

8   sitting in the van still or did you get out?

9   A.  No.  I sitting in the front in the front seat.

10  Q.  Where was Gamar sitting?

11  A.  Sitting behind me.

12  Q.  And how was the interior of the van set up?  Were there

13  bucket seats in the back?  A bench seat?  What do you remember?

14  A.  I seat.  He have like two sets.

15  Q.  Two separate seats?

16  A.  Yes.

17  Q.  Do you know which seat he was sitting in?

18  A.  Behind me.

19  Q.  So the passenger side?

20  A.  Yes.

21  Q.  Was the driver still in the van as well?

22  A.  Yes.

23  Q.  How did you communicate with the driver?  Does he speak

24  English?

25  A.  Not really, really speak English.  It is it we have like,

D3D5dor6                        Abdulla - direct

 1   you know, sometime have to understand what I said to him.

 2              THE COURT:  It is hard to understand?

 3              THE WITNESS:  Yes, him have to stand, like easy I

 4   speak to him, he I have to repeat two times, three times.

 5              THE COURT:  With the Dominican?

 6              THE WITNESS:  No; with the driver.

 7              THE COURT:  The driver.  Okay.

 8   BY MS. LESTER:

 9   Q.  What about Gamar?  How did you communicate with him?  What

10   language did you use?

11   A.  Arabic.

12   Q.  Did he also speak English?

13   A.  Yes.

14   Q.  Now, once you arrived back at your store and you're sitting

15   in the van, what was Gamar doing, if you could see?

16   A.  Him counting the money.

17   Q.  Do you know how much money there was?

18   A.  Yes.  I ask him after he finish counting, I said how much

19   money, is it correct $10,000.  He said correct, $10,000.

20   Q.  Did you get any of that money?

21   A.  I told me give me $200 and he gave me $200.

22   Q.  What did he do with the rest of the money?

23   A.  In the back I don't know what he do with it.  I told him --

24   I don't know.  Money is his -- I don't know what he did.

25   Q.  What about the driver?  Did the driver get any money?

D3D5dor6                           Abdulla - direct

1    A.  Yes.  Gamar take care of that.

2    Q.  How many minutes passed before the robbery began?

3    A.  Maybe like 15 minutes.

4    Q.  Tell us again what happened, starting with the first thing

5    you noticed and just, you know, give a little bit of a

6    description and then stop, I will ask you some more questions.

7    A.  I was parking -- the car is still running and talking, me

8    and Gamar for the next order what I need exact, I need for next

9    time, and just for all of a sudden the other door open, the

10   driver's side, and on the gun on his head and people have --

11   somebody have the stuff on his face.

12   Q.  Okay.  So, the first thing you noticed was that the

13   driver's side door opened?

14   A.  Yes.

15   Q.  And you saw an individual there?

16   A.  Yes; and the guy have a gun on the driver's head.

17   Q.  Can you describe the person at all?

18   A.  It is a black person, he got a thing, I see -- I can't see

19   his face.

20   Q.  Are you indicating a mask?

21   A.  Yes.

22   Q.  Do you know what the mask was made out of?  Some kind of

23   cloth?

24   A.  Yes.

25   Q.  What color was the mask?

D3D5dor6                          Abdulla - direct

1   A.   Black.

2   Q.   Do you remember anything about what the person was wearing?

3   A.   Not really.

4   Q.   What about height or weight?

5   A.   Him like 5 -- I can't.

6   Q.   You can't.  Okay.

7        You mentioned that he had a gun.  Can you describe the

8   gun?

9   A.   Yes.  The gun is, I believe is 35 -- 38 automatic.

10  Q.   An automatic gun?

11  A.   Yes; and it has color of this is the handle.

12  Q.   Was the whole gun that color or just the handle?

13  A.   Just the handle, the rest is black.

14  Q.   And what happened after that person opened the door?

15  A.   I put the gun to a driver and he passed the thing to the

16  other guy, yes, open the door for -- my door is locked, he

17  opened the door for his partner and now a gun on my head too.

18  Q.   So you're indicating pressing so --

19  A.   Yes.

20  Q.   -- that person pressed a button in the car?

21  A.   Yes.

22  Q.   And the person who was on your side of the vehicle, can you

23  describe him?

24  A.   He is tall, tall guy.

25  Q.   What race or color was his skin?

D3D5dor6                      Abdulla - direct

```
 1    A.  I don't remember but him, all I remember him tall.

 2    Q.  Was he also wearing a mask?

 3    A.  Yes.

 4    Q.  Do you remember anything about his clothing?

 5    A.  I believe like Army clothes.

 6              THE COURT:  Army?

 7              THE WITNESS:  Like green jacket.

 8    Q.  And you said he also had a gun?

 9    A.  Yes.

10    Q.  What did that gun look like?

11    A.  I'm not taking a chance so you look back, but I know I feel

12    a gun on my head.

13    Q.  Did they say anything to you?

14    A.  Yes.  Want the money.

15    Q.  Which one of them spoke?

16    A.  Both -- the other the one close to me ask me where the

17    money at and right away I got the $200 in my pocket and I threw

18    it to him in the chair in the car.  I'm not give to him in the

19    hand.

20    Q.  Now, you're indicating with your hands the direction; did

21    you throw the money at the person on the driver's side?

22    A.  Yes.  I'm not give to him in the hand.

23    Q.  And just again, for the record, when you were describing

24    the gun that that person was holding, you were pointing to the

25    wood in front of you indicating the bench that you're sitting
```

1   at, is that correct?

2   A.  Yes, like that color.

3   Q.  So the color of the handle was like the color of the wood

4   bench in front of you?

5   A.  Yes.

6   Q.  After you threw the $200 at the person, what happened?

7   A.  He searched me.

8   Q.  Searched you?

9   A.  Yes; and he find my phone and he said where your wallet?  I

10  said I don't have no wallet.  He find my phone and take my

11  phone.

12  Q.  What else happened?

13  A.  After that I saw the other one searched the Chinese, and

14  after that using the other language say get out of the car, me

15  and the Chinese, get the fuck out of the car; and I get out.

16  Q.  And what happened at that point, after you got out of the

17  car?

18  A.  I'm try open the door to get my partner Gamar out of the

19  car.

20  Q.  So, you and the taxi driver got out of the car, correct?

21  A.  Yes.

22  Q.  What happened to Gamar?

23  A.  Gamar in the back, them not see him.

24  Q.  How did they not see him?

25  A.  Because the car is dark.  Tinted.  Them never know.

1          MS. FONTIER:  Objection about what they saw or didn't

2    see.

3          THE COURT:  I'm just not sure I am following what is

4    being said.

5          How do you know that they didn't see Gamar?

6          THE WITNESS:  Because all attention to me and the

7    driver, never no like, you know --

8          THE COURT:  You do you know what they saw or didn't

9    see, do you?

10          THE WITNESS:  Them not saw him the time where they --

11          THE COURT:  Okay.  Next question.

12   BY MS. LESTER:

13   Q.  Does the van have tinted windows?

14   A.  Yes.

15   Q.  So, once you and the driver got out of the car, what did

16   the robbers do?

17   A.  Jump in in the car and take over.

18   Q.  Was Gamar still in the car?

19   A.  Yes, and I'm trying -- soon as I get out of the car I'm

20   trying open the door and the door can't open, and the car start

21   going fast and threw me out until the last minute after -- at

22   last minute I can't hold no more, I told Gamar throw the money

23   and him throw the money, throw the money to me.

24   Q.  So you instructed Gamar to throw the money out?

25   A.  Yeah, after -- you know, I can't get control, I can't get

D3D5dor6                    Abdulla - direct

1   him out.  And I said, listen, they go one block go, you know,

2   let him go, there is no money.  And I told him to throw it.

3   Q.  He threw the money out?

4   A.  Yes.

5   Q.  Were you able to recover it?

6   A.  Yes.

7   Q.  What did you do with the money?

8   A.  I put it in the store.

9   Q.  What happened after the car -- well, first of all, which

10  direction did the car drive off in?

11  A.  Went straight up ahead to Fourth Avenue.

12  Q.  And what happened after the car drove off?

13  A.  I grab the money and after that I see like one block if me

14  have a police car and you went to the police.  I went to the

15  police and told them what's going on.

16          MS. LESTER:  Your Honor, at this time we would like to

17  play a portion of two of the videos that were admitted

18  yesterday.

19          THE COURT:  What videos?

20          MS. LESTER:  Government Exhibit 505 and 501.

21          THE COURT:  All right.

22  Q.  Can we start with 505, Ms. Brady?

23          (video played)

24  Q.  Ms. Brady, if we can fast forward to about 10 minutes, 30

25  seconds in the video?

D3D5dor6                        Abdulla - direct

1          (Video played)

2     Q.  Pause it for a moment?

3          Mr. Abdulla, do you recognize that street?

4     A.  Yes.  It is Fourth Avenue.

5     Q.  Can you see your store in this video?

6     A.  Yes.

7     Q.  Where is it?

8     A.  Over there.  That is the store over there.

9     Q.  That's your store?

10    A.  Yes.  Yes.

11    Q.  Indicating the building in the upper right-hand corner of

12    the video, correct?

13    A.  Yes.

14    Q.  Can you see the taxi in this video?

15    A.  Yes.  There.

16    Q.  And there is an individual standing on the sidewalk; do you

17    know who that is by the driver's side -- driver's side of the

18    taxi?

19    A.  These are the people who rob us.

20    Q.  Ms. Brady, can we just play a little?

21         (Video played)

22    Q.  Pause it again.

23         Mr. Abdulla, there is now a person standing on the

24    driver's side of the van?

25    A.  This is my driver, Chinese guy.

D3D5dor6                          Abdulla - direct

1    Q.  And who is the person on the passenger side?

2    A.  It is me over here outside.  They told me to get out of the

3    car and I'm trying to open the door for Gamar.

4              MR. ROTH:  Judge, I'm sorry.  I can't hear.

5              THE COURT:  I didn't hear the last sentence.  You

6    tried opening the door?  What did you say?

7    A.  Yes, I tried opening the door for Gamar.

8    Q.  You tried opening the door for Gamar?

9    A.  Yes.

10   Q.  And at this point, during the robbery, where are the people

11   who were robbing you?

12   A.  Inside the car.

13   Q.  Can we continue to play, Ms. Brady?

14              (Video played)

15   Q.  Pause it for a second.

16              Mr. Abdulla, did you see that person who is crossing

17   from the left-hand side to the right-hand side of the screen on

18   the sidewalk?

19   A.  This one over here?

20   Q.  Yes.

21   A.  Yes, this is my driver.  Yeah, Chinese guy.

22   Q.  Which direction is he going?

23   A.  He's going, both of us running behind the car.

24   Q.  So, when you say the car, do you mean the taxi?

25   A.  Yes.

D3D5dor6                         Abdulla - direct

1   Q.  So it has driven up the street at this point?

2   A.  Yes.

3   Q.  Now, we're at a corner intersection here in this view from

4   the video, correct?

5   A.  Yes.

6   Q.  Now, the street that's horizon here in this view, is that

7   Fourth Avenue?

8   A.  They call it like two name of South Fourth or Malcolm X.

9   You have two names assigned.

10  Q.  So what are the two streets here?

11  A.  Fourth Avenue.

12  Q.  Fourth Avenue?

13  A.  Yes.

14  Q.  And what's the other street?

15  A.  Straight.  If you go to -- ahead -- it is a Fourth Avenue,

16  still continue Fourth Avenue.

17  Q.  Okay, but there is an intersection here, correct?

18  A.  Yes.

19  Q.  One street is Fourth Avenue, right?

20  A.  Yes.

21  Q.  What is the other street?

22  A.  South Fourth.

23  Q.  South Fourth Street?

24  A.  Yes.

25  Q.  And South Fourth Avenue?

D3D5dor6                    Abdulla - direct

1    A.  Yes.

2    Q.  Okay.  That's this intersection that we are looking at

3    here, correct?

4    A.  Yes.

5    Q.  And again, that's at where the time stamp is 10:56:21 a.m.

6           Okay, Ms. Brady, can we now switch to Government

7    Exhibit 501?

8           (Video played)

9    Q.  Mr. Abdulla, do you recognize the street that we're looking

10   at in this view?

11   A.  Yes; Fourth Avenue.

12   Q.  Is that the same intersection that we were just looking at

13   a moment ago?

14   A.  Yes.

15   Q.  Are we closer to your store location than we were in the

16   other picture?

17   A.  Yes.  Yes.

18           (Video played)

19   Q.  Again, this is the same view we were just looking at,

20   right, Mr. Abdulla?

21   A.  Yes.

22   Q.  Can you fast forward, Ms. Brady?  Pause, please?

23   A.  There it is there.

24   Q.  Mr. Abdulla, do you recognize a van just passed from the

25   left side of the screen towards the center?

D3D5dor6                          Abdulla - direct

1   A.  Yes.  This is the van.

2   Q.  Is that the taxi?

3   A.  Yes.

4   Q.  Did you see yourself?

5   A.  Yes.

6   Q.  Where are you?

7   A.  Over there I play and I go see him here, the car moving

8   here, so this car is blocking me but if he move a little bit he

9   goes.

10  Q.  Okay, Ms. Brady, if you can continue to play?

11              (Video played)

12  A.  Yes.  See, there is me over here.

13  Q.  Is that you running after the van?

14  A.  Yes.

15  Q.  Thank you, Ms. Brady.

16              (Video stopped being played)

17              MS. LESTER:  May I have a moment, your Honor?

18              THE COURT:  Yes.

19              MS. LESTER:  No further questions.

20              THE COURT:  Cross-examination, Mr. Roth?

21  CROSS EXAMINATION

22  BY MR. ROTH:

23  Q.  Good afternoon, Mr. Abdulla.

24  A.  How are you doing?

25  Q.  You indicated on direct examination that you served in the

1   capacity of a confidential informant for various law

2   enforcement agencies, is that correct?

3   A.  Yes.

4   Q.  And you said that you served in that capacity for

5   approximately 16 years, is that correct?

6   A.  Yes.

7   Q.  And you indicated that you served in that capacity

8   beginning at the same time for all those agencies, is that

9   correct?

10  A.  Say your question again?

11  Q.  Did you start working for those agencies all at the same

12  time?

13  A.  Yes.

14  Q.  And what was your arrangement with the district attorney's

15  office?

16  A.  I'm not -- I make -- I did ATF.  ATF, you know I'm not

17  meeting -- I did the ATF or FBI.  I'm not dealing with the U.S.

18  Attorney direct.

19          THE COURT:  You did not deal with the U.S. Attorney

20  direct?

21          THE WITNESS:  No.

22  Q.  We will start slowly.

23          Did you work for any New York law enforcement

24  agencies?

25  A.  Yes.

D3D5dor6                          Abdulla - cross

1   Q.  And which New York law enforcement agencies did you work

2   for, sir?

3   A.  Any one to name.  Anyone to name in this country, I work

4   for them.

5   Q.  Any law enforcement in the entire country?

6   A.  Yes.

7   Q.  State or local or federal?

8   A.  Yes.

9   Q.  Okay.

10          Well, let's confine ourselves to New York because we

11  are here.  Which particular law enforcement agencies in New

12  York -- and we first start in New York State, New York City --

13  New York City specifically?

14  A.  Intell.

15  Q.  Intell.  Let's go slowly here.

16  A.  That mean intell.

17  Q.  Intelligence.

18  A.  Police department street crime.

19  Q.  Street crime?

20  A.  Street crime.

21          Tax evasion.

22  Q.  Taxation?

23  A.  Yes.

24  Q.  That deals with untaxed cigarettes?

25  A.  Yes.  ATF.  DEA.

D3D5dor6                         Abdulla - cross

1    Q.   Now, you are talking about some federal agencies.  ATF, is

2    that right?

3    A.   Yes; FBI.  DEA.

4    Q.   DEA?

5    A.   Yes, as --

6    Q.   And CIA?

7    A.   CIA, Secret Service.  Anything you can name.

8    Q.   How about ICE, Immigration and Customs?

9    A.   No, never no work for them.

10   Q.   And Department of Defense, the intelligence?  Even

11   Department of Defense?

12   A.   Yes.

13   Q.   You worked for them too?

14   A.   Yes.

15   Q.   I would just like to have you explain the nature of your

16   relationship with these various agencies.  Did you have one

17   what is called handler, person who actually interacted with

18   you?

19   A.   Yes.

20   Q.   You have a different one for each of these agencies?

21   A.   Yes.

22   Q.   How did you keep track of them all?

23   A.   What do you mean?

24   Q.   How did you -- did you have them in your phone book, all

25   these contacts for all these agents?

D3D5dor6                        Abdulla - cross

1   A.  I did -- any agent I did is one person.  One person I did

2   as each agent.

3   Q.  And were you -- as a confidential informant, I take it

4   then, that you were actually signed up and registered as a C.I.

5   for all these agencies?

6   A.  Yes.

7   Q.  And when I say signed up, you actually signed a contract,

8   more or less, with them?

9   A.  Yes.

10  Q.  And what were the terms of the contracts at these various

11  agencies, sir?  The terms.  What was your obligation and what

12  was their obligation?

13  A.  What they need from me I do it.  Whatever they want me to

14  do I do it.

15  Q.  And, when you say you do it, were there any restrictions,

16  prohibitions on your activities?

17  A.  Yes.

18  Q.  What were those prohibitions or restrictions on your

19  activities.

20  A.  No, as long as I commit any crimes.

21  Q.  No crimes whatsoever?

22  A.  Yes.

23  Q.  Unless you told them about that?

24  A.  Yes, if I told them.

25  Q.  And, in return for your assistance as a confidential

D3D5dor6                         Abdulla - cross

1    informant for the various agencies, what did you get in return,

2    sir?

3    A.  Money.

4    Q.  Money?

5    A.  Yes.

6    Q.  Is that the only thing that you got over the course of 16

7    years?

8    A.  Yeah.  Money.

9    Q.  Nothing besides money?

10   A.  Money.

11   Q.  If you got arrested, did they intercede on your behalf?

12   A.  No.  They just handle my problem.  Them handle my problem.

13   I'm facing my problem.

14   Q.  I'm sorry.  I didn't catch the answer to that.

15   A.  They can't help me.  If I commit a crime they can't help

16   you.

17            THE COURT:  If you commit a crime they can't help you.

18   A.  If I commit a crime they can't help me.  That is the

19   agreement I signed with them.  They can't help me with any

20   crime.

21   Q.  And over this period of time you committed crimes?

22   A.  No.

23   Q.  You never committed a crime?

24   A.  No.

25   Q.  Over this 16-year period you never committed a crime?

D3D5dor6                          Abdulla - cross

1    A.  No crime.  Maybe minor thing, fighting with my wife and

2    stuff like that.

3    Q.  Oh, well, fighting with your wife.

4    A.  My wife, yeah.

5    Q.  That led to an arrest?

6    A.  Yes; domestic violence.

7    Q.  Just domestic violence?

8    A.  Yeah.

9    Q.  And in the course of -- when was that, sir?

10   A.  I don't remember.

11   Q.  But you went to court for that?

12   A.  Yes.

13   Q.  And you were -- appeared in front of a judge?

14   A.  Yes.

15   Q.  And when you appeared in front of the judge on that

16   domestic violence case, the judge issued an order for you to

17   stay away from your wife?

18   A.  Yes.  Yes.

19   Q.  Did you ever violate that order?

20   A.  Yes, I did.

21   Q.  You mean you were in a court like this and a judge told you

22   stay away from your wife or you'll get arrested and you

23   violated that order?

24   A.  After I went out, yeah, I break order of protection.

25   Q.  You violated that order of protection?

D3D5dor6                          Abdulla - cross

1    A.  Yes.

2    Q.  And what happened when you violated that order of

3    protection, sir?

4    A.  I did time.  I did a year in jail.

5    Q.  A year in jail?

6    A.  Yes; and I got suspended for all the people I work for,

7    from them I got suspended.

8    Q.  Well, you said you worked for the last 16 years; how long

9    were you suspended for?

10   A.  Any time I get a domestic violence they suspend me.  After

11   the case has been closed after that I get back again.

12   Q.  So, I take it from what I hear you had more than one arrest

13   for domestic violence?

14   A.  Couple of them.

15   Q.  Okay.  And did you have any couple of violations for orders

16   of protection?

17   A.  One.  One what I did a year for.

18   Q.  And, did you go to jail on any of the other domestic

19   violation cases?

20   A.  Yes; for breaking an order of protection.

21   Q.  And, how long did you go to jail on that case for, sir?

22   A.  12 months.

23   Q.  But on just one occasion or more than one occasion?

24   A.  One.  One, one.

25   Q.  And so, what happened?  Correct me if I'm wrong here,

D3D5dor6                      Abdulla - cross

1   during this 16-year period, if you violated your contract and

2   broke the law they would suspend you for the time that you were

3   in jail?

4   A.  Yes, to a time my case period close.

5   Q.  Closed your case?

6   A.  Yes.

7   Q.  And then you come out and say Can we make the deal again?

8   and they -- the ATF -- would say, fine, you can work for us

9   again?

10  A.  Yes.

11  Q.  And that would happen until you caught your next arrest, is

12  that correct?

13  A.  What?

14  Q.  That would happen until you got arrested again?

15  A.  No.  It depends.  If I get arrested for domestic violence I

16  get suspended automatically.  But other minor stuff, nothing.

17  Q.  What about for like --

18  A.  You know I get DWI for -- last time for two days, went to a

19  jail, I get out, I'm continue working.

20  Q.  Oh, I see.

21       So, something like a driving while intoxicated

22  conviction is not --

23  A.  Yes.

24  Q.  -- is not a big deal?

25       MS. LESTER:  Objection, your Honor.

1     THE COURT:  Overruled.  You can answer that question.

2   BY MR. ROTH:

3   Q.  You were convicted for driving while intoxicated?

4   A.  Yes.

5   Q.  You went to jail for a couple days?

6   A.  24 hours.

7   Q.  And so, just for that brief 24 hours you were suspended and

8   back on the job?

9   A.  All domestic violence -- domestic violence, they suspend

10  me.  Other minor stuff, no.

11  Q.  And, all the agencies that you work for, the CIA, the FBI,

12  ATF, they had a category of crimes you could commit and crimes

13  you couldn't commit, is that right?

14  A.  That's any time I get in argument with my wife I get

15  suspended.  I don't know I was going to start with them and

16  they're --

17            MR. ROTH:  I'm sorry, Judge.

18  A.  All I know I get in argument with my wife, I get suspended.

19  Q.  On all the other times that you have gone to jail for just

20  more than the DWI, right, and the domestic violence?

21  A.  Minor thing, like go in and you can go out, the case

22  dismissed.

23  Q.  You mean going in, going out of jail?

24  A.  Yes, like 24 hour arrest -- no, no, no.  At the time I go

25  inside the jail and I come out, it is all day.  I'm not doing

D3D5dor6                              Abdulla – cross

1   no time, all day.

2            THE COURT:  24 hours you mean?

3            THE WITNESS:  Like I go see a Judge and procedure with

4   the rest.

5            THE COURT:  You're in jail for 24 hours and then you

6   get out the next day?

7            THE WITNESS:  Yes.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3D8DOR7                          Abdulla - cross

1    Q.  So you had several of those type of arrests but you weren't

2    suspended for them?

3    A.  No.  Only for domestic violence.

4    Q.  How many of those other times did you get arrested?

5              MS. LESTER:  Objection.

6              THE COURT:  Sustained.  Let's move on.

7              MR. ROTH:  Can I just ask about one other, Judge?

8              THE COURT:  Maybe we need a side bar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3D8DOR7                          Abdulla - cross

1             (At the side bar)

2             THE COURT:  If you're going into other stuff that is

3    10, 20 years old, I do think that's beyond what the rule

4    contemplates.  It better be a good reason for it.

5             MR. ROTH:  There was one other assault arrest.

6             THE COURT:  From when?

7             MS. LESTER:  It has to be prior to 2004.

8             MR. ROTH:  It was a conviction.

9             MS. LESTER:  A misdemeanor.

10            THE COURT:  None of that has anything to do with

11   veracity.

12            MR. ROTH:  I have no problem with that.

13            THE COURT:  Let's move on.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D3D8DOR7                          Abdulla - cross

1                    (In open court)

2     BY MR. ROTH:

3     Q.   Mr. Abdulla, what was your agreement in terms of

4     compensation, payment that you talked about that you got from

5     these various agencies for your actions?

6     A.   How much money?

7     Q.   Well, how did you get to get paid?  What were the terms?

8     A.   I do a job and any time I do the job he pay me.  I have to

9     sign a receipt and two witness.  Some paid me like a Week, FBI

10    every three week give me $5,000.

11    Q.   Every three weeks you got $5,000 from the FBI?

12    A.   Every three months, actually, $5,000.

13    Q.   In total, how much did you get from the FBI, do you

14    remember?

15    A.   I don't remember.  A lot of money.  I know a lot of money.

16    I'm not counting.

17    Q.   A lot of money to you and to the jurors may be a different

18    number.  How much a day did you get from the Department of

19    Taxation?

20    A.   Excuse me?

21    Q.   You said sometimes you got a daily --

22    A.   Daily money.

23    Q.   It sounded like a lot.  How much was it?

24    A.   Like $4,000 a day, maybe more, a day.

25    Q.   How much more than $4,000?

D3D8DOR7                        Abdulla - cross

1   A.  Huh?

2   Q.  How much more than $4,000?

3   A.  Maybe 6, 7.  Since I work with these people, if I count it,

4   at least I got a million dollars for the deal.

5   Q.  A million dollars?

6   A.  A million dollars.

7   Q.  Just from?

8   A.  All of them.  If I collected, since I started with them,

9   like a million dollars.

10  Q.  Is that something you pay taxes on?

11  A.  Yes, I pay tax.  I file tax.

12  Q.  What did you have to do for the ATF to get some of that

13  money?

14  A.  They take me to a bad area, people selling gun, a lot of

15  killing.  This guy kill like whole family, and I got the gun, I

16  got the machine gun that they use in the murder, I got it, find

17  out who killed this family.

18  Q.  So you basically go sort of undercover?

19  A.  Yes.

20  Q.  Do you know exactly how much you got from the ATF, for

21  instance?

22  A.  I don't remember, but it's a lot of money.

23  Q.  We have established that.

24          THE COURT:  I think I am in the wrong business.

25  Q.  Unfortunately, there came a time when you're out of the

D3D8DOR7                          Abdulla - cross

1   business, right, now?

2   A.  Excuse me?

3   Q.  You no longer are in this profitable business?

4   A.  No.

5   Q.  You testified on direct that you didn't know why you got

6   fired from this job?

7   A.  I don't know.  I don't remember.  I have argument with the

8   supervisor for the FBI.

9   Q.  Didn't your supervisor in the ATF have a problem with you

10  as well?

11  A.  Yes.

12  Q.  Would you describe to the members of the jury what that

13  problem was, sir?

14  A.  Accuse me of sleeping with some girl at the time I do some

15  case, and I not sleep with her.

16  Q.  They accused you of sleeping with?

17  A.  A girl, yeah.

18  Q.  Some girl was a target of the ATF investigation?

19  A.  Yes.

20  Q.  She was your target?

21  A.  Yes.

22  Q.  Am I correct, sir, that you also testified today that in

23  the course of your -- when you were still a CI, you were

24  selling untaxed cigarettes?

25  A.  No, that's not correct.  After I have a problem, and I am

D3D8DOR7                          Abdulla - cross

1   no longer working with them, after that I start do cigarette

2   business.  At the time I work with these people, never commit

3   no crime, never did anything.

4   Q.  We have already gone over that.  You didn't commit any big

5   crimes in your mind?

6   A.  The stuff I did with them, no cigarettes.

7   Q.  No cigarettes, but you did commit other crimes that you

8   characterize as little crimes?

9   A.  Argument with my wife is what I did.  It's a normal thing

10  in a home, domestic violence.

11  Q.  I am not permitted to answer a question of the witness.

12          Sir, this fellow, you call him a Dominican fellow who

13  you were brokering the cigarette deal with in December 2011,

14  what is his name?

15  A.  I call him Big Man.

16  Q.  Big Man?

17  A.  Yes.

18  Q.  How big is he?

19  A.  He is tall, big.

20  Q.  When you say tall.  How tall are you?

21  A.  Who me?  5'6".

22  Q.  So when you say tall, he is taller than you but how tall?

23  A.  Maybe tall like the gentleman there.

24  Q.  Have you seen that gentleman standing?

25  A.  Yes.  I not see his face, but I see him sitting down.

D3D8DOR7                    Abdulla – cross

1  Q.  When you say taller than you, you're 5 what?

2  A.  Taller than me, like I tell you, gentleman there.

3  Q.  How tall did you say you are?

4  A.  5'6" I believe.

5  Q.  That Dominican fellow could be as tall as the gentleman who

6  is seated over there?

7  A.  Yes.

8  Q.  What is his name?

9  A.  I call him Big Man.  Any time I don't know people name I

10  call them whatever name come into my head.

11  Q.  How do you get in contact with him?

12  A.  I go there to his store.

13  Q.  Where is his store?

14  A.  Third Avenue and Second Avenue on the corner.  His father's

15  store.

16  Q.  Do you know what kind of car he drives?

17  A.  All the time he drive different car.

18  Q.  He switches cars all the time?

19  A.  Yes.

20  Q.  You saw him in an Infinity that day?

21  A.  Yes.

22  Q.  An SUV?

23  A.  Yes.

24  Q.  What other types of cars did you see him drive?

25  A.  Got that Mercedes Jeep.

D3D8DOR7                          Abdulla - cross

1   Q.   A Mercedes Jeep?

2   A.   Yes.

3   Q.   What other types of cars?

4   A.   Other Ford cars.

5   Q.   Did you provide all that information to the police that

6   day?

7   A.   Yes.

8   Q.   Do you live in your store, by the way, or behind the store?

9   A.   Yes, at that time.

10   Q.   You said that the police recovered the money that you had

11   taken from the scene that day in your store, is that correct?

12   A.   Yes.

13   Q.   Was it actually in your store or under your bed?

14   A.   Under my bed.  I signed a release form.  I said go to the

15   store, go ahead.

16   Q.   Getting back to the robbery, you said there were two people

17   who robbed you that day?

18   A.   Yes.

19   Q.   How old were those people?

20   A.   I can't tell, but I know how they look.  One like the

21   gentleman there, tall.

22   Q.   Stand up, if you would, for a second.  When you say tall,

23   you're 5 what?

24   A.   Him taller than me.

25   Q.   How much taller than you?

1   A.  Him taller than me.

2   Q.  If you could demonstrate for the jury how many inches over

3   your head you're saying that the robber was?

4   A.  I can't.  If you're able to have him sit close to me, I

5   show you the difference.  I can't tell you.

6   Q.  Did you ever tell the prosecutors when they were preparing

7   this case, and they were asking questions about the case, that

8   the tall guy looked like he was in his early 20s?

9   A.  If I say that, I'm not sure about.  Maybe I say it, but I'm

10  wrong.

11  Q.  You're wrong?

12  A.  I'm not good in age.  I'm not good in age.

13          THE COURT:  You're not good in age?

14  A.  I am not good in age.  At the time they ask me, I say maybe

15  20, maybe older than that.  I am not sure exact his age.  But I

16  know for sure him taller gentleman, like the gentleman there.

17  Another one like the gentleman there, short guy.

18  Q.  What do you consider a short guy, somebody shorter than

19  yourself?

20  A.  Like I tell you, at the time I not see the faces, but my

21  experience, at that time I look to them, how they move, how

22  them tall, and they look like the two gentlemen over here.

23  Q.  You're not saying either one of these gentlemen was the one

24  that robbed you?

25  A.  It looked like them.

1    Q.  When you say you make observations of people in the course

2    of your job as a CI, the police must come and say, is the guy 6

3    foot tall, for instance.  They ask you questions like that,

4    right?  You give descriptions of the people who are your

5    targets?

6    A.  Yeah.  But this time is different.  I am attacked.  At the

7    time this happened, my mind is shock.

8    Q.  You were in total shock so you couldn't really recall?

9    A.  I can't think right, only because I look to how they look.

10   I can't see a face and I look on the body and how they move,

11   what they were doing, and how tall and short.

12   Q.  My question to you, sir, is on those times when you weren't

13   in shock and couldn't really recall what happened, when you

14   were out on the job as a CI, you came back and you were asked

15   to provide descriptions of height and weight for suspects,

16   right?

17   A.  Yeah, but it's different.  It's not like somebody put a gun

18   on my head.  I think I am going to die.  It's different.  At

19   the time I do that business, nobody put gun in my head.  I do

20   just like how I talk to you, I buy drugs for you.

21   Q.  I am talking about the different time when you're able to

22   observe casually like we are talking now.  OK?  How tall would

23   you say I am, sir?

24   A.  5'6".

25   Q.  OK.  So what is the tallest person you ever described as a

1    suspect?

2    A.  I don't remember.

3    Q.  If I am 5'6" and you saw somebody who is up to here, you

4    would describe him as how tall?

5    A.  7, 8.

6    Q.  5'7", 5'8"?

7    A.  Yes.

8    Q.  And the first person that you saw that day, the one who

9    wasn't tall, you described him as how tall?

10   A.  Him tall.

11   Q.  Both of them were tall?

12   A.  No.  One tall, one short.

13   Q.  The short one, how short was the short one?

14   A.  I don't remember.  All I know one short, one tall.

15   Q.  What was the difference in height?  We will try that.

16   A.  One tall, one short.

17   Q.  Keep your hands up.  We are in the courtroom now.  No rush.

18   A.  One tall, one short.

19   Q.  Showing a difference of, maybe the Court can estimate

20   better.

21        THE COURT:  Is that the difference in height?

22   A.  One tall and one short.

23        THE COURT:  What was the difference in height between

24   them, a foot, a half a foot, two inches, what do you think?

25        THE WITNESS:  I can't recall it.  I am not good at

1   size.

2   Q.  We are not talking about numbers.  We are talking relative

3   size.  Something like this?  Between the short guy -- you're

4   looking at your hand.  I can't see that.  He is spreading his

5   hands.  What is that, five inches difference?

6   A.  All I know one tall, one short.

7   Q.  But one was short and one was tall so it was about this

8   difference?

9   A.  I don't know.

10  Q.  What then?

11  A.  One tall, one short.  That's all I can tell you.

12  Q.  How tall and how short we don't know, is that right?  OK.

13          MR. ROTH:  I have no further questions of this

14  witness, Judge.

15          THE COURT:  All right.

16  CROSS-EXAMINATION

17  BY MS. FONTIER:

18  Q.  Good afternoon, Mr. Abdulla.

19          You met with these prosecutors a few times before you

20  testified here, right?

21  A.  Yes.

22  Q.  You met with them four times?

23  A.  I don't remember how many times.

24  Q.  More than once?

25  A.  Yes.

D3D8DOR7                          Abdulla - cross

1  Q.  They asked you these types of questions, right, what

2  happened that day?

3  A.  Yes.

4  Q.  They asked you about descriptions of these people?

5  A.  Yes.

6  Q.  Right?

7  A.  Yes.

8  Q.  Isn't it true that you told them that the shorter one was

9  5'6"?

10  A.  I believe at that time.  That's what you're saying, that's

11  what I told them.

12  Q.  You told them he was 5'6", correct?

13        Now, you said you made a lot of money working with the

14  ATF?

15  A.  Yes.

16  Q.  Part of that, you gave one description of a job you did was

17  buying a specific gun, correct?

18  A.  Excuse me?

19  Q.  The description that you gave of some of the work you did

20  was meeting with somebody and buying a specific gun, right?

21  A.  I bought a lot of gun.

22  Q.  You bought a lot of guns?

23  A.  Yes.

24  Q.  Over the course of 16 years of working with the ATF, you

25  saw multiple different guns?

D3D8DOR7                         Abdulla - cross

1    A.  Yes.

2    Q.  You saw different types of guns?

3    A.  Yes.

4    Q.  If the ATF told you they were looking for a specific type

5    of gun, you knew what they were talking about in order to try

6    and purchase it for them, right?

7    A.  Yes.

8    Q.  So when you described the gun that you saw that day as a

9    .38 automatic, you recognized it as that, right?

10   A.  Yes.

11   Q.  And a .38 automatic, .38 refers to the caliber size, right?

12   A.  Automatic.

13   Q.  .38, though, is the size of the gun, right?

14           THE COURT:  You have to say yes or no.

15   A.  Say it again.

16   Q.  The .38 that you said, it looked like a .38?

17   A.  Yes.

18   Q.  That's the size of the gun, right?

19   A.  Bullet, call it .38.

20   Q.  That's different than a 9 millimeter, right?

21   A.  Yes.

22           MS. FONTIER:  No further questions.

23           THE COURT:  Redirect?

24           MS. LESTER:  Yes.  Just briefly, your Honor.

25           THE COURT:  Go ahead.

D3D8DOR7                          Abdulla - cross

1    REDIRECT EXAMINATION

2    BY MS. LESTER:

3    Q.  Mr. Abdulla, on the day of the robbery in December 2011,

4    were you working as a CI on that day?

5    A.  No.

6    Q.  When you engaged in the other cigarette transactions that

7    you described during your direct testimony, were you working as

8    a CI in operating of those transactions?

9    A.  No.

10           MS. LESTER:  No further questions.

11           MR. ROTH:  Just briefly.

12   RECROSS-EXAMINATION

13   BY MR. ROTH:

14   Q.  Because you were working in the capacity of a CI on that

15   day, Mr. Abdulla, is that why you had to get the agreement from

16   the government, made the deal to get the non-prosecution

17   agreement from the government?

18   A.  Say it again.

19   Q.  You didn't have a license to sell the cigarettes that day,

20   right?  They were untaxed, it was illegal, it was a crime,

21   right?

22   A.  Yes.

23   Q.  Because it was a crime, you had to get an agreement or you

24   made an agreement with the government in exchange for your

25   testimony to not be prosecuted for that crime, is that right?

1   A.  Yes.

2              MR. ROTH:  Thank you.

3              THE COURT:  Ms. Fontier, anything else?

4              MS. FONTIER:  No.  Thank you, your Honor.

5              THE COURT:  Any redirect?

6              MS. LESTER:  No.

7              THE COURT:  You can step down, Mr. Abdulla.  Thank

8   you.

9              Government, your next witness.

10             MS. MASELLA:  The government calls David Magnuson.

11   DAVID MAGNUSON,

12        called as a witness by the government,

13        having been duly sworn, testified as follows:

14             THE COURT:  State your name and spell your name for

15   the record.

16             THE WITNESS:  My name is David Magnuson,

17   M-A-G-N-U-S-O-N.

18             THE COURT:  Mr. Magnuson, good afternoon.

19             THE WITNESS:  Good afternoon, Judge.

20             THE COURT:  Ms. Lester, you may proceed.

21   DIRECT EXAMINATION

22   BY MS. LESTER:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  Where do you work?

D3D8DOR7                          Magnuson - direct

1    A.  I am A special agent with the Federal Bureau of

2    Investigation.

3    Q.  How long have you been a special agent with the FBI -- is

4    that known as the FBI?

5    A.  Yes, it is.

6    Q.  How long have you been a special agent with the FBI?

7    A.  Just over 21 years.

8    Q.  Are you currently assigned to any unit or section within

9    the FBI?

10   A.  I am.  I report to a unit called the Cellular Analysis

11   Survey Team out of Washington, D.C., our FBI headquarters, but

12   I am physically stationed in Miami.

13   Q.  Is the Cellular Analysis Survey Team also known as CAST?

14   A.  Yes.  That's the acronym.

15   Q.  How long have you been within that particular group?

16   A.  I have been with that group since it became formalized, and

17   that's about three years now.

18   Q.  Prior to your work in the CAST group, what types of cases

19   or investigations did you work on?

20   A.  Well, I worked different programs of the FBI.  I worked La

21   Cosa Nostra investigations.  I worked international organized

22   crime, including civilian mafia and Chinese Triads, Russian

23   organized crime.  I worked on the FBI drug squad for about five

24   years conducting international money laundering and drug

25   trafficking investigations of South and Central American

1   cartel.  For the past five or six years, I have been embedded

2   in the violent crimes task force in Miami where we apprehend

3   violent felons.

4          MS. LESTER:  May I just have a moment?

5          THE COURT:  Yes.

6   Q.  Agent Magnuson, do you have any special training that you

7   undergo as part of the CAST team?

8   A.  Yes, ma'am, I do.

9   Q.  Can you describe that for the jury?

10  A.  Yes.  I have been involved in several hundred hours of

11  training by the FBI, by private industry, as well as with the

12  cell phone companies themselves, their legal compliance people

13  and their telecommunications engineers, we interact with them.

14  We have training periods and conferences.  I have been trained

15  and certified to operate certain network optimization software,

16  which is something that the networks use to check the status of

17  their cellular network and optimize it, and this is how they

18  tune it.  And I have been certified on FBI Project Pinpoint,

19  which is the analysis of historical cell site records, the

20  records that the phone companies maintain in the course of

21  business.

22  Q.  What are historical cell site records?

23  A.  They are records maintained by cell phone companies, and

24  they are called historical because they already happened, the

25  events that they contain and document already happened.  They

1    are not realtime.  For example, if you put in a request, a

2    legal request to a cell phone company for records, you could

3    request typically historical in nature for a time period.

4    Q.  What type of data is included in cell site records?

5    A.  Well, the one that we deal with and analyze is called a

6    call detail record and it's a product generated by the network

7    computer.  Every time you pick up your cell phone and you do

8    something with it, either turn it on and register with the

9    network, or you hit send and send a call or you hit send and

10   receive a call, the network computer documents all the phone

11   activity and it populates this in a database.  That's called a

12   call detail record.

13   Q.  What do you do as part of the CAST team, what are your

14   general duties and responsibilities?

15   A.  Well, one of the things is we take these records and with

16   our training and experience, we can analyze these records, and

17   we can provide a product, a mapping solution of the geo

18   location, where the handset was in the network when it accessed

19   the network for resources.

20   Q.  Now, you mentioned mapping solution.

21   A.  Yes, I did.  Yes, ma'am.

22   Q.  What does that mean?

23   A.  Well, we can simply take a written record and display it on

24   a map graphically and it provides like the same information

25   visually.

1    Q.   How do you do that?  What type of technology do you use to

2    create the map?

3    A.   We use off-the-shelf commercially available mapping

4    software.  We use Excel spreadsheets.  We take the records from

5    the companies, which are in also commercially established

6    formats, like Excel and PDF files.  We utilize information

7    provided by the cell phone companies and analyze their own

8    business records, and then we can provide a product, a third

9    product, in a map solution format that shows us visually where

10   the phone -- which antenna on a cell tower that the cell phone

11   connected to to make a call or receive a call.

12   Q.   Did you perform this type of analysis or mapping in this

13   case?

14   A.   Yes, ma'am, I did.

15   Q.   Did you prepare slides and maps in connection with that

16   task?

17   A.   Yes, I did.

18   Q.   Have you worked on this case or investigation in any other

19   capacity other than doing this analysis?

20   A.   No, ma'am.

21   Q.   Could you give a general description of a cell tower and

22   how a cell tower operates?

23   A.   Well, a cell tower is a physical steel structure with

24   antennas at the top and cabling coming down the structure, and

25   at the bottom of the structure you will have a support facility

1    there with computers, power supplies, switching equipment.  And

2    these support the antennas and they route the RF signals from

3    the antennas into the larger hardwire network.

4    Q.  I am placing before you what is already in evidence as

5    Government Exhibits 2010, 2020, and 2051.  Could you please

6    take a look at those?

7    A.  Yes, ma'am.

8    Q.  What are those?

9    A.  These are CDs and they contain records, phone records.

10   Q.  So prior to your testimony this afternoon, did you review

11   the contents of those CDs?

12   A.  I did, yes, ma'am.

13   Q.  Did those CDs contain a subset of the records that you

14   looked at in regard to this case?

15   A.  Yes, they did, because there was a lot of records and these

16   are part of those larger.  Yes, ma'am.

17   Q.  Are the records that are on those disks the records that

18   you used to create certain maps and slides that we just

19   discussed a moment ago?

20   A.  Yes, they are.

21        MS. LESTER:  Ms. Brady, if we could put up an excerpt

22   from Government Exhibit 2020.

23   Q.  Agent Magnuson, are you able to see that on the screen

24   either right in front of you or up on the wall?

25   A.  Yes, I am.

1   Q.  Do you recognize what company these records come from?

2   A.  Yes.  This is a one page, it looks like, or about from a

3   Sprint call detail record.

4   Q.  How can you tell?

5   A.  I can tell by the particular format.  All the cell phone

6   companies, they maintain these types of records, but they all

7   maintain them in their own formats, and after working with them

8   over and over, you get to recognize them.

9        And this is, you can tell, by Sprint because they use

10  the term in column H "the repoll," and that's a term unique to

11  the Sprint company.  It refers to a large population of cell

12  towers in a certain region of the company.

13  Q.  What information on these records did you use to create the

14  maps that you made in this case?

15  A.  I used, actually, most of it, but more importantly, I used

16  the last three columns, H, I and J, which is the cell site

17  information.  But I was also analyzing the records in regards

18  to date and time, which is in these other columns here.

19  Q.  Can you describe to the jury what each of those last three

20  columns means, repoll, first cell and last cell?

21  A.  Yes, ma'am.

22       The last three columns titled "repoll number," "first

23  cell" and "last cell" is Sprint's engineering code for the

24  group of towers, like an area code.  And then, more

25  specifically, the first cell tower and the first antenna that

D3D8DOR7                        Magnuson - direct

1    the phone connected to when it made a call at these exact times

2    and dates.

3    Q.   What about the last cell?

4    A.   The last cell is the termination of the call.

5    Q.   Now, in the repoll number column, you referenced that that

6    refers to a geographical area of cell towers, is that correct?

7    A.   About the repoll, yes, ma'am.

8    Q.   Is there other data provided by Sprint that you used to

9    actually create a map from the data that's in the call detail

10   records?

11   A.   Yes.  Sprint also produces and maintains, obviously, a

12   listing of all their cell towers in their network, the

13   orientation of the antennas, the exact GPS location, the

14   physical address of their towers.  We use that product in

15   conjunction with the information that's provided in the last

16   three columns here, and we kind of just marry it up, and we get

17   a geographic location from that.

18            MS. LESTER:  Ms. Brady, if we can pull up the second

19   excerpt, please?

20   Q.   Do you recognize this type of document, Agent Magnuson?

21   A.   Yes.  This is an excerpt from the Sprint cell site

22   database, the 262 repoll.

23   Q.   So, in other words, this is the additional information that

24   you were talking about that relates to the repoll information?

25   A.   Yes.  This helps us connect it all together, the

D3D8DOR7                      Magnuson - direct

1    information on the call detail record, the codes in those last

2    three columns, you can take that and look them up in this

3    database, and it will give you additional information about the

4    location of the tower and which antenna or which side of the

5    tower that the phone connected to to access the network.

6    Q.   You mentioned the antennas of the tower.  How many antennas

7    does a cell tower typically have?

8    A.   It varies, but the typical cell tower has three sets of

9    antennas for transmitting and receiving radio signals.

10   Q.   How are those typically configured?

11   A.   Well, they are oriented so that they are covering up 360

12   degrees, typically, and then each one-third of that would be

13   about a 120 degree sweep of cell coverage area that that

14   antenna is providing.

15           MS. LESTER:  Ms. Brady, can we scroll over to view the

16   columns on the right?

17   Q.   Agent Magnuson, do you see the columns labeled "latitude"

18   and "longitude," and then to the far right "sector" and

19   "azimuth"?

20   A.   Yes, I do.

21   Q.   Can you explain what those columns mean to the jury?

22   A.   Yes.  The latitude and longitude is the very precise

23   location information of where that tower is on the planet.  The

24   sector information is indicating the side of the tower that

25   the -- it's broken up into three and if you look at the top

1     three, you see one, two and three.  So it's designating the

2     side of the tower.  And that last column, the azimuth, it's

3     what we call the orientation or azimuth.  It's showing the

4     direction that the center of that sector is facing.

5     Q.  So what you said previously was that these are the types of

6     records that you use to compile the maps and slides you created

7     in this case, is that correct?

8     A.  Yes.

9     Q.  Who provided you with the phone records that you used?

10    A.  Special Agent Anthony Melchiorri, the ATF case agent,

11    provided me with all the records.

12    Q.  Did he provide you with any other information?

13    A.  Yes.  He gave me a brief summary of the investigation to

14    date and then requested -- he gave me address locations, dates

15    and times that they were interested in, that I should be

16    looking at certain records, kind of guiding me to what the

17    issues were.

18    Q.  If you could take a look at what I have placed in front of

19    you in a folder, and it's marked as Government Exhibit 3001

20    through 3008.  Have you had a chance to look those over?

21    A.  Yes, ma'am.

22    Q.  Do you recognize those?

23    A.  Yes.

24    Q.  What do you recognize them to be?

25    A.  These are the mapping solutions or the report or the

1    analysis, the product that I produced after looking at the cell

2    phone records and then getting the information derived from the

3    cell site tower database and then putting that on a map.

4    Q.  You did that for the specific dates that were given to you,

5    correct?

6    A.  Yes, the dates and times and any addresses referenced were

7    provided to me, and I just mapped them out as well.

8              MS. LESTER:  Government offers Government Exhibits

9    3001 through 3008.

10             THE COURT:  Any objection?

11             MS. FONTIER:  No.

12             MR. ROTH:  No.

13             THE COURT:  Government Exhibits 3001 through 3008 are

14   received.

15             (Government's Exhibits 3001 through 3008 received in

16   evidence)

17   Q.  I would like to go through these with you, Agent Magnuson.

18             MR. ROTH:  Ms. Brady, can we put up Government Exhibit

19   3002, the second page.

20   Q.  Agent Magnuson, what are we looking at on this page?

21   A.  This is the type of product I was just discussing that can

22   be produced by simply portraying the information in the call

23   detail record and with the knowledge and the cell site database

24   and putting that kind of on a map.  Here we have, in the yellow

25   there is the information that's on the call detail record.

D3D8DOR7                          Magnuson - direct

1     It's a phone call by the 8414 number on 8/15.  And this is

2     saying that that phone utilized, from 10:30 a.m. through 12:31

3     p.m. on 8/15/2011, it utilized that particular Sprint tower

4     that is being pointed to by that arrow, that little red icon.

5     That's the Sprint cell tower location.

6     Q.  That's pretty much in the center of the exhibit, correct?

7     A.  Yes, it is.

8     Q.  There are some other red triangles to the right of that.

9     What are those?

10    A.  Those are also other Sprint towers.

11    Q.  So the full telephone number is 347-883-8414, correct?

12    A.  Yes, ma'am.

13             MS. LESTER:  Can we look at Government Exhibit 3003,

14    Ms. Brady, the second page?

15    Q.  What are we looking at here, Agent Magnuson?

16    A.  This is a very similar map because this time 347-883-8414

17    again utilized that Sprint tower that's indicated on the map at

18    2:15 to 3:09 p.m. on 8/22.

19    Q.  Now, with respect to this particular phone and this

20    particular tower, did you look to see whether this phone used

21    this tower on any other dates in August 2011?

22    A.  I did, yes.

23    Q.  Were these the only dates on which that tower was used by

24    this phone?

25    A.  As I recall, that's true, yes.

1           MS. LESTER:  Ms. Brady, if we could look at Government

2      Exhibit 3004.

3      Q.  What are we looking at here, Agent Magnuson?

4      A.  This is an analysis of a T-Mobile phone number 347-589-3565

5      on October 10, 2011, at 11:39 p.m.  And the result is similar

6      to Sprint.  Here again you have a map of a geographical area

7      plotted out on that map.  The green icons are the location of

8      T-Mobile cell towers in that area.  And where you see those

9      black lines radiating from one green icon is representative of

10     the cell tower that the phone utilized at that time.

11     Q.  This is two separate phones, correct?

12     A.  Yes, ma'am.  It's 347-589-3565.  And another T-Mobile phone

13     347-583-3929.

14          MS. LESTER:  Ms. Brady, can we go to Government

15     Exhibit 3005, the second page?

16     Q.  What are we looking at here, Special Agent Magnuson?

17     A.  This is another mapping solution of the information

18     contained in a T-Mobile call detail record for cell phone

19     347-359-3565.  And on October 11, 2011, at 3:58 p.m., the phone

20     connected to the sector indicated by those two lines or the

21     wings there.

22          MS. LESTER:  If we can go to the next page, Ms. Brady.

23     Q.  What about in this exhibit?

24     A.  That's a very similar mapping solution.  It appears that

25     347-583-3929 utilized that tower and that sector on October 11,

D3D8DOR7                          Magnuson – direct

1   2011, at 3:52 p.m.

2   Q.  That's the same tower that we had seen in the previous

3   page, correct?

4   A.  In a previous slide, yes, ma'am, that's correct.

5   Q.  But two separate numbers, correct?

6   A.  Yes, ma'am.

7         MS. LESTER:  Ms. Brady, can we please go to Government

8   Exhibit 3006.

9   Q.  What are we looking at in this exhibit, Agent Magnuson?

10  A.  Well, we are looking at another map and on it we populated

11  with Sprint cell towers in the area.  And it's representative

12  of the cell tower and the sector which Sprint phone

13  347-883-8414 used on October 29, 2011, from 1:24 p.m. through

14  5:36 p.m.  And then we have some addresses referenced there.

15        MS. LESTER:  If we can go to the next page, Ms. Brady.

16  Q.  This is the second map in the exhibit.  What does this

17  show, Agent Magnuson?

18  A.  This is a similar result showing that 347-883-8414 on

19  10/29/2011 from that range of 5:52 p.m. through 6:32 p.m. was

20  in the geographic area represented by those two wings.

21  Q.  So the previous slide was the same phone number, correct?

22  A.  Yes.

23  Q.  And it was a slightly earlier time frame, is that right?

24  A.  Yes, it was.

25  Q.  So in the previous slide --

1          MS. LESTER:  If we can just go back to it for a minute
2     Ms. Brady.
3     Q.  -- the cell tower that was being utilized was the one by
4     the top address in the exhibit that is Radcliff Avenue, is that
5     correct, Agent Magnuson?
6     A.  That's correct.  Yes, ma'am.
7          MS. LESTER:  And then if we go to the next page, Ms.
8     Brady.
9     Q.  A few minutes later then the same phone number is using a
10    tower in a different area, correct?
11    A.  That's correct.
12    Q.  By the second address, correct?
13    A.  It appears so, yes, ma'am.
14         MS. LESTER:  Can we go to the third slide, Ms. Brady?
15    Q.  Agent Magnuson, is this the same phone number that we were
16    looking at before just a moment ago?
17    A.  I believe it is.  347-883-8414.
18    Q.  And this is a little bit later in time, correct?
19    A.  It's a little bit later in time and it's 6:44 p.m. through
20    7:21 p.m.
21    Q.  Is this the same tower that was in the first slide that we
22    looked at?
23    A.  If you could go back to the first slide --
24    Q.  Yes.
25    A.  -- we could take a look.  Yes.

D3D8DOR7                    Magnuson - direct

1           MS. LESTER:  Can we go back to the third page, Ms.

2    Brady?

3           That's the second page I think.  Can we go to the

4    fourth page?

5    Q.  Agent Magnuson, what is this?

6    A.  This, as indicated in the yellow text box, it's a zoom in

7    of the previous slide showing a little closer view in an area

8    of service that that sector was providing.

9           MS. LESTER:  The final page of the exhibit, Ms. Brady.

10   Q.  Is this just a zoom in of the previous page we looked at,

11   Agent Magnuson?

12   A.  Yes.  The sequence was zoomed out on two locations, and

13   then I think at the end of this report I zoomed in for clarity.

14   Q.  Agent Magnuson, on this map that we are looking at, there

15   are other red triangles on the map other than the one with the

16   wings coming off it, correct?

17   A.  Yes.  Correct.

18   Q.  What do those represent again?

19          THE COURT:  The red triangles or the wings?

20          MS. LESTER:  The red triangles.

21   A.  The red triangles represent the locations of other Sprint

22   cell towers in the community or in this view.

23   Q.  How did you know how to place those on the map, where to

24   place them on the map?

25   A.  The cell site database has columns with GPS latitude and

1    longitude, and it's just an option of importing the data into

2    mapping software and it automatically plots it.

3    Q.   So those are automatically populated in the map when you

4    create it?

5    A.   Yes, ma'am.

6    Q.   Can we turn to Government Exhibit 3007?

7         What are we looking at here, Agent Magnuson?

8    A.   This is a mapping solution or a view of the T-Mobile cell

9    sector utilized by 704-756-5031, on December 5, 2011, at 1:14

10   a.m.  It's showing the sector -- showing the tower.  It's

11   showing the sector or the antenna on the tower which the phone

12   utilized to either place or receive a call at 1:14 a.m.  And

13   then there is also a reference to location there.

14   Q.   That's Monticello Avenue, correct?

15   A.   Yes, ma'am.  Monticello Avenue.

16        MS. LESTER:  Can we look at Government Exhibit 3008,

17   Ms. Brady.

18        Actually, if we can go to the first page of this.

19   Q.   Agent Magnuson, on the first page of your exhibit, there

20   are three cellular telephone numbers listed, correct?

21   A.   Yes.

22   Q.   And those three phones are the ones you were asked to look

23   at for this particular date, is that right?

24   A.   That's correct.  Yes, ma'am.

25        MS. LESTER:  Can we look at the second page, Ms.

D3D8DOR7                          Magnuson - direct

1    Brady?

2    Q.  What are we looking at here?

3    A.  This is one of the three phones that was analyzed for

4    December 12, 2011.  And this resulting mapping solution is

5    telling us that the 347-883-8414, on December 12, 2011, from

6    10:09 a.m. through 10:32 a.m. was making calls -- well, kind of

7    camped in that sector.

8          MS. LESTER:  Can we look at the next page, Ms. Brady?

9    Q.  What about on this map, what is depicted here?

10   A.  This is referring to an analysis of T-Mobile phone

11   347-261-5867, and it indicates on December 12, 2011, this phone

12   made a phone call beginning at 10:37 a.m., and the phone call

13   lasted several minutes and terminated at 10:45 a.m.

14         As we saw before in the call detail record, in the

15   last two columns, it's got the first cell and the last cell.

16   At the beginning of the call, the computer populates the

17   location of the cell tower and sector which was utilized.  At

18   the termination of the call, the network computer populates the

19   column with the final tower and cell sector which was utilized

20   when the call was broken down, terminated.  So this is showing

21   the location beginning and then the end.

22         MS. LESTER:  If we can go to the next page, Ms. Brady?

23   Q.  This is the third phone number, right, this is now the

24   third phone number that we looked at?

25   A.  Yes.

1  Q.  What is this map showing?

2  A.  This is an analysis of a T-Mobile number 704-756-5031.

3  From the call detail record, we know that on December 12, 2011,

4  from 10:30 a.m. through 10:34 a.m., that that handset accessed

5  a network in the confines of that sector facing southeast,

6  which is demonstrated by those two wings there.  And then there

7  is a reference to Webster Avenue there.

8           MS. LESTER:  Can we go to the next page?

9  Q.  This is a little bit of a later period from 10:38 to 10:57,

10  but we are back to the cell phone number ending in 8414.  What

11  does this map show?

12  A.  This shows a date and time range, again, for the Sprint

13  347-883-8414.  It's indicating that on December 12, 2011, from

14  10:38 a.m. through 10:57 a.m., that that handset connected to

15  and accessed the network in the area represented by the wings

16  there.  And then there is a reference to South Fourth Avenue

17  there in Mount Vernon.

18  Q.  On the next page, we are now looking at the 704-756-5031

19  number, what is this map showing with respect to that number?

20  A.  This is T-Mobile and it's showing the T-Mobile tower and

21  sector or site of tower which that phone utilized when it

22  placed or received a call on the T-Mobile network.

23  Q.  At 10:57 a.m.?

24  A.  Yes, ma'am, 10:57 a.m.

25           MS. LESTER:  Ms. Brady, can we go to the next page,

1    please?

2    Q.  Now, this is again for the cell phone number ending in 5031

3    a little bit later.  What does this map show?

4    A.  This is again the T-Mobile phone 704-756-5031, and it's

5    demonstrating the information from the call detail record,

6    which gives us the tower number.  And when you decipher that,

7    you come up with this location and this orientation for the

8    sector that the phone used.  And there is a geographical

9    reference to Strang and Duryea Ave. in the Bronx.

10             MS. LESTER:  Can you go to the next page, Ms. Brady?

11   Q.  Now we moved on to a time period later that same day around

12   4:38 p.m., and we are back to the 347-883-8414 number.  What is

13   depicted on this map?

14   A.  This is again a depiction of the information from the call

15   detail record, which is the tower and the specific site of the

16   tower that the handset connected to when placing a call on

17   12/12/2011, at 4:38 p.m.  Again, here is referenced an address

18   in a section of Esplanade in the Bronx.

19             MS. LESTER:  The final page, Ms. Brady.

20   Q.  We are now looking at a range from 4:30 to 4:51 that same

21   day.  What is this map showing?

22   A.  I believe that's actually depicting two calls, one at 4:30

23   and one at 4:51 p.m., on 12/12.  And those are the two towers

24   or the two sectors which the phone used at those two times.

25   Q.  Do you know which one was used at 4:30 and which one was

D3D8DOR7                           Magnuson - direct

1    used at 4:51?

2    A.  To the best of my recollection, I believe the one on the

3    left was the earlier and then the one on the right was the

4    later at 4:51 p.m.

5    Q.  I think it's indicated on the slide actually.  I don't know

6    if you can see it in front of you.  Do you see an indication?

7    A.  Yes, that's true.  4:30 p.m., you can see that just above

8    the wings there.  And then just inside the wings on the right

9    side, 4:51 p.m.

10          MS. LESTER:  Can we take a look at what is in evidence

11   as Government Exhibit 3001 now, Ms. Brady, please.

12   Q.  What are we looking at in this first page, Agent Magnuson?

13   A.  A similar product, different date and time.  This is a

14   T-Mobile phone 704-756-5031.  And it's January 7, 2012, and the

15   time is 2:32 p.m.  We have got a reference to Lydig Avenue, and

16   again, the wings there are depicting the tower and the specific

17   antenna or the sector on that tower which the phone utilized at

18   2:32 p.m.

19          MS. LESTER:  Can we go to the next slide, Ms. Brady?

20   Q.  This is again showing the cell phone number ending in 5031.

21   What are we looking at in this map?

22   A.  We are looking at the plotting of the tower sectors in

23   which the phone utilized when it made two calls on that date,

24   1/7/2012, first one at 3:37 p.m. and another one at 3:45 p.m.

25   Q.  You have indicated on the slide which call was for which

1   tower, correct?

2   A.  I did.  The one towards the bottom of the map or south was

3   at 3:37, and the one north of that geographical reference of

4   256th Street was made at 3:45 p.m.

5           MS. LESTER:  If we can go to the final page.

6   Q.  What are we looking on this, Agent Magnuson?

7   A.  This is a whole new phone, AT&T.  I haven't seen that today

8   yet, but I recall doing this.  It's a similar solution.  AT&T

9   cell sector is utilized by 917-455-0969, on January 7, 2012,

10  and apparently there were three calls that were analyzed or

11  mapped, one at 2:33 p.m., one at 2:50 p.m., and one at 4:27

12  p.m.  And then I have got those mapped out.  What my own

13  analysis is telling me is that it utilized the same tower, but

14  different sectors on that same tower, as representative by the

15  three different sectors or areas there divided up by those

16  wings.

17  Q.  In other words, the 0969 number used two sectors of the

18  same tower to make the 2:33 p.m. call and then the 2:50 p.m.

19  call?

20  A.  Yes.  And then later on, at 4:27 p.m., we find that the

21  handset is apparently moved north, is now connecting to a

22  different tower in the network, as indicated by the wings and

23  the time up top.  Then there is a reference again to East 256th

24  Street.

25          MS. LESTER:  No further questions, your Honor.

D3D8DOR7

| | |
|---|---|
| 1 | THE COURT:  Why don't we take an afternoon break and |
| 2 | then we will start the cross.  About ten minutes. |
| 3 | (Jury exits courtroom) |
| 4 | THE COURT:  Government, how many more witnesses? |
| 5 | MS. LESTER:  I think we will be prepared to rest. |
| 6 | THE COURT:  This is the last witness you think? |
| 7 | MS. LESTER:  Yes. |
| 8 | THE COURT:  Let's think about what we are going to do. |
| 9 | I presume there is going to be Rule 29 motions.  Why |
| 10 | don't we just reserve those?  I will deem the motions made.  We |
| 11 | will reserve argument until after the jury has left for the |
| 12 | day.  Then we are going to start with the defense case right |
| 13 | away, is that the plan? |
| 14 | MS. STAFFORD:  That's the plan. |
| 15 | THE COURT:  Who are you calling? |
| 16 | MS. STAFFORD:  A summary cell site witness. |
| 17 | THE COURT:  Mr. Roth, are you calling anybody? |
| 18 | MR. ROTH:  No, your Honor. |
| 19 | THE COURT:  Ms. Fontier, you have got now this motion |
| 20 | to withdraw that is premised on you being a witness I think. |
| 21 | Is there a contemplation that you would be a witness in this |
| 22 | case? |
| 23 | MS. FONTIER:  That would be the reason that I think a |
| 24 | mistrial would be warranted because I would have to be a |
| 25 | witness and it would be very difficult in this case. |

D3D8DOR7

1              THE COURT:  I don't know if it would or not.  The

2      rules actually do contemplate certain circumstances where that

3      can happen.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3d5DOR8

1          MS. FONTIER:  Yes.  I would testify on behalf of

2     Mr. Dore if the Court ruled that my testimony was admissible

3     and that was allowed.

4          THE COURT:  So, my point is I think we need to resolve

5     that, obviously.  So, I'm not sure if we should try to do that

6     now before the jury comes back or if we should do it after -- I

7     mean, I don't want to give the jury instructions what we are

8     doing tomorrow.  I want to give them -- I have to resolve that

9     before I give them instructions on tomorrow.

10          MS. FONTIER:  Yes, your Honor.

11          THE COURT:  Are you prepared to argue the motion?

12          MS. FONTIER:  I can argue it.  It won't be an in depth

13     argument.  There are a couple of points made in the

14     government's response, cases that I didn't have the opportunity

15     to look up since they've been here, but I think I can argue

16     that extent, I just won't be able to do any sort of direct

17     response to the cases that they've cited.

18          THE COURT:  Well, let's take a break and then we will

19     come back and chat a little bit about that motion.  I think

20     that's the most efficient way to do this.  Okay?

21          And then your witness is here, Ms. Stafford?

22          MS. STAFFORD:  Yes, he is.

23          MR. ROTH:  It is a joint witness.

24          THE COURT:  All right.

25          MS. STAFFORD:  I'm sorry.

1           THE COURT:  But Ms. Stafford is doing the direct?

2           MR. ROTH:  Yes.

3           THE COURT:  Okay.  So let's come back in five minutes.

4           MS. LESTER:  I'm sorry, your Honor.  So, you wanted to

5     address the motion before we resume the cross of the witness?

6           THE COURT:  Well, because my contemplation was that

7     we're going to finish with this witness and then we'll go into

8     the next witness and then I can send the jury home with

9     instructions to either come back tomorrow afternoon or to come

10    back Monday morning.  I mean, we still have to do a charge

11    conference but I don't think there is a lot.  There weren't a

12    lot of disputes with respect to the charge.

13          How long do you think the summations are going to be?

14          MS. MASELLA:  Your Honor, I'm not sure yet.  We do

15    have a lot of material to cover, so it may be -- the main

16    summation may be an hour and a half to two hours.

17          THE COURT:  Okay.  And the defense summations?

18          MS. FONTIER:  Judging by the number of flags so far in

19    my transcript, I'm guessing 45 minutes to an hour.

20          THE COURT:  All right.

21          MR. ROTH:  That would be similar, your Honor.

22          THE COURT:  Okay.  I think we might be able to get to

23    the charge conference today since there is so few

24    disagreements.  I think there is only a handful of

25    disagreements that you folks flagged in the joint proposed

D3d5DOR8

1   charge.

2          Do you agree with that?  It relates to Pinkerton,

3   relates to witness identification, relates to circumstantial

4   evidence.  I think those are the three disagreements so I think

5   we can almost do that today and we could sum up tomorrow.

6          MS. FONTIER:  Your Honor, there is one additional

7   charge I think we had vaguely talked about and I think we may

8   want to submit, given how the evidence has come in, but this is

9   not a request at this point because I need to actually look at

10  the law and the issue but regarding the multiple conspiracies.

11         THE COURT:  And then in terms of summation -- look.  I

12  think we could sum up tomorrow and I guess I would be inclined

13  to do that.  Others feel differently.

14         MS. FONTIER:  I feel tired.  Does that count for

15  anything?

16         THE COURT:  That is something.

17         MS. FONTIER:  It is possible, certainly.

18         THE COURT:  The reason, I guess not to do it, is

19  that --

20         MR. ROTH:  The only question is if the jury had made

21  alternative plans for Friday.

22         THE COURT:  If Friday is not a day for deliberating

23  then they probably wouldn't get the case until late tomorrow, I

24  think.  Two hours, an hour, that's four hours, probably, of

25  summations plus 90 minutes of charge.  It is going to take the

1    whole day, I would guess.

2              MS. FONTIER:  My hesitation with that is always that,

3    if the jury is not, doesn't come in to deliberate on a Friday,

4    three days after the summations and then bringing them in on

5    Monday to begin deliberations, things always go a little

6    haywire.

7              THE COURT:  But the thing to be concerned about, of

8    course, is we have jurors who have travel plans and other

9    commitments so we have to address that, we have to deal with

10   Mr. Soto-Valdez who is not getting paid for all of this and has

11   made it clear that this is a hardship and I am frankly inclined

12   to grant his request, I think, at this point.  If we were going

13   to sum up tomorrow and deliberate then maybe I would feel

14   differently, but then I think he is indicating he is living

15   paycheck to paycheck, he is not getting paid for any of this

16   and won't be getting paid going forward.

17             And Juror 2, Ms. Joachim who has travel plans the

18   evening of the 21st and other jurors with issues including

19   Ms. Schuster whose mother was ill and so she was kind of on

20   standby as to whether she would have do fly out to Las Vegas.

21             So, those are the arguments for going quickly.

22             MS. FONTIER:  Your Honor, as to Mr. Soto-Valdez,

23   before we would excuse him I would ask if, at least at the end

24   of today if we know either that we will be doing summations

25   tomorrow or on Monday, whichever one it is, we ask him if he is

D3d5DOR8

1    willing to stay for deliberations.  I don't want to -- he has

2    been here and active.  He has been obviously paying attention.

3    I don't know that I want to excuse him for a day or whoever

4    knows how long deliberations, but if it is the end of the case

5    and it's his turn to finally do something, I would hesitate to

6    excuse him without asking.

7            THE COURT:  If he wants to stay I'm not going to get

8    rid of him either.  He is the one who made the request to be

9    excused ford hardship and I think he is looking for guidance on

10   that.  His employer made it clear they're not paying.

11           MS. FONTIER:  I understand, and I understand what your

12   Honor is saying.  I would like to ask him whether he would

13   still like to leave if it is the end of the case.

14           THE COURT:  I'm going to have my law clerk inquire of

15   the jurors in the jury room as to whether they're available to

16   work on Friday or whether they've made other plans and just

17   can't do it.  Okay?

18           Anybody have any objection to that?

19           MS. FONTIER:  No, your Honor.

20           MS. MASELLA:  No objection.

21           THE COURT:  He is not going to drum them, just to find

22   that information.  Okay?

23           Is take a quick break and we will come back and do the

24   motion.

25           (Recess)

D3d5DOR8

1          THE COURT:  Let's have argument then on the motion.

2          I received Ms. Fontier's motion's and the government's

3     response.  Everybody has had a chance to receive the

4     submissions?

5          So, I guess, Ms. Fontier, what I'm trying to figure

6     out from you is what exactly is it that you would be testifying

7     about?

8          MS. FONTIER:  Your Honor, essentially I think what I

9     would be able to testify to, she testified about statements

10    that I made to her that she made to me, the conversations that

11    were had.

12         THE COURT:  All on cross.  I mean this was elicited by

13    Ms. Stafford on cross, right, not on direct?

14         MS. FONTIER:  That's correct, your Honor.

15         THE COURT:  Okay.  So I just want to make it clear

16    this wasn't something that was the subject of the direct, I

17    don't think.

18         MS. FONTIER:  No, your Honor.

19         And the issue came up when Ms. Brown failed to tell

20    the truth about what occurred.  I mean, I think it was fertile

21    ground for cross-examination, just as any meeting --

22         THE COURT:  So, what is it that -- you want to testify

23    about what?

24         MS. FONTIER:  I want to testify that when she said she

25    hadn't -- didn't know the date or the time of the homicide,

D3d5DOR8

1   that that was not true, that I had told her the time of the

2   homicide.

3            THE COURT:  When had you told her the time of the

4   homicide?

5            MS. FONTIER:  I told her that as soon as I had the

6   initial discovery which was on -- the initial police reports

7   were provided in February.  I sent those to her.  When she got

8   those she came to my office -- and this is essentially what I

9   would testify to, that I sent her that initial discovery of

10  February, she received it, she called me and told me she needed

11  to have a meeting with me and she came to me to tell me that

12  Mr. Dore had an alibi because if she knew -- the homicide was

13  the only incident for which we knew the date and the time from

14  the indictment, we only knew the dates but when we got the

15  initial discovery which included some of the reports about the

16  homicide we knew the time of the homicide.  As soon as she got

17  that she initiated a meeting with me, came to my office and

18  told me that Mr. Dore had an alibi for that, that they were

19  shopping in Co-op City and that they had gone to the bank.

20           Because of that information I got an investigator

21  assigned, by your Honor, to who then went and tried to get

22  video from the bank.

23           THE COURT:  When did you get the documents that are

24  Defendant's Exhibit 1?

25           MS. FONTIER:  My motion is right in here.

D3d5DOR8

    1              THE COURT:  That's the statements from the bank that

    2      were --

    3              MS. FONTIER:  I got those -- I don't know the actual

    4      date which is why it is not in the motion but it was subsequent

    5      to the meeting that I had with her.

    6              THE COURT:  So, I guess I'm just trying to figure out

    7      what is proven by that.

    8              So, she knew when the date was and knew what the time

    9      was and then told you that there was an alibi.  You hired an

   10      investigator, she then gave you documents that showed it was

   11      11:59 p.m. and so she must be lying now?  About what?

   12              MS. FONTIER:  Essentially, your Honor, the argument is

   13      either -- had she came to me in February or March of last year,

   14      whenever this meeting was and told me that he had an alibi, she

   15      was either lying to me on that day or she's lying on the stand

   16      here about the fact that Mr. Dore and her had this conversation

   17      about a duppy and she understood that to mean that he had

   18      committed a murder on that very day.

   19              So, she either -- she is either lying on the stand or

   20      she was lying to me and I think that I'm entitled -- or

   21      Mr. Dore's counsel, whoever that might end up being at the end

   22      of this case -- to argue her credibility on this very

   23      particular issue since she is the only person in this case that

   24      says she heard some sort of admission from Mr. Dore about this

   25      homicide.

D3d5DOR8

1    THE COURT:  I guess, but this seems to be a dispute.

2    I mean, you're not a witness to what was said between Mr. Dore

3    and Ms. Brown.

4    MS. FONTIER:  No.

5    THE COURT:  This is about the conversation you had

6    with Ms. Brown about the time of the homicide.

7    MS. FONTIER:  But her testimony over the course of the

8    cross, she came back around and when she said essentially what

9    she testified to at the end is that she knew she was with him

10   on that day but she didn't know the time of the homicide so she

11   wasn't lying to me, she thought that maybe she was with him at

12   some particular time so maybe it was an alibi.  But, she --

13   which is different than her coming to me and specifically

14   saying at noon I was with him, which is what she said.

15   THE COURT:  All right.  But I guess I'm trying to

16   understand.  What flows from that then?  That she was lying to

17   you because her plan, all along, was to set up Mr. Dore?

18   MS. FONTIER:  No.  The bottom line is this is a

19   person, a witness who cannot be trusted.  It goes directly to

20   her credibility.

21   THE COURT:  Well, no.

22   MS. FONTIER:  She is someone who was either willing to

23   manufacture an alibi to protect her boyfriend or she's someone

24   who is willing to -- either way she is willing to lie.  That's

25   the bottom line.  She either had an alibi and is lying and

D3d5DOR8

1    changing her story now because she might be in trouble, or she

2    lied to me to try to protect her boyfriend.  But, either way,

3    it goes directly to whether or not she is a credible witness.

4    Both things cannot be true.

5              THE COURT:  Well, there are other possibilities as

6    well of course which is just a mistake, but why is this not a

7    collateral lie?

8              In other words, if it is a mistake or a lie it is an

9    inconsistency in any event.  Why does that get proved up by

10   extrinsic evidence?

11             MS. FONTIER:  I see it as when she -- Ms. Stafford

12   tried to question her further about it she was able, because we

13   cannot complete the impeachment with my testimony --

14             THE COURT:  I'm not sure you would anyway, even if you

15   were a witness and not a lawyer, the question is why you would

16   get to do that.

17             MS. FONTIER:  This goes to her -- this is the only

18   witness that really, in any significant way, ties Mr. Dore to

19   this homicide to this supposed admission.  So, her credibility

20   about what actually occurred on December 12th, 2011, is the

21   central issue to the homicide charge.

22             THE COURT:  You have no testimony about what happened

23   on that day, you have testimony about what you said to her at

24   some point after Mr. Dore was arrested.

25             MS. FONTIER:  It is testimony about what she says

D3d5DOR8

1    occurred.  It is a prior inconsistent statement of this witness

2    that was made to me.

3         THE COURT:  Well, and your testimony is that you told

4    her the time of the murder?

5         MS. FONTIER:  Absolutely.  I sent her the discovery,

6    she looked at it.

7         THE COURT:  When did you send her the discovery?

8         MS. FONTIER:  In February or March.  Right after I got

9    it, I sent it to her.  She looked at it, we had a phone

10   conversation about what time and what date.

11        THE COURT:  Because there is a letter that hasn't been

12   marked, although it is not in evidence, with a defendant's

13   sticker on it addressed to Ms. Brown from Ryan Duffy saying

14   enclosed please find the DVD with discovery and that's dated

15   August 13th, 2012.

16        MS. FONTIER:  That's correct, your Honor.  I sent her

17   further discovery.

18        THE COURT:  So I don't know -- this wasn't introduced

19   but is there some other evidence to indicate that she had the

20   discovery before that?

21        MS. FONTIER:  Attached to my motion there were --

22   there is an e-mail, there was an e-mail attached to the motion.

23   I am totally disorganized at this point, but.

24        February 8, 2012 the government provided discovery

25   which included the NYPD reports related to the December 12th

D3d5DOR8

1    attempted robbery and homicide.  I forwarded that discovery to

2    Janiel Brown a day or two later and that's when she contacted

3    me.

4              THE COURT:  What are you referring to?  Are you

5    referring to an exhibit?

6              MS. FONTIER:  I'm referring to my motion but it is

7    attached -- the e-mail from the government's discovery letter

8    dated February 8 is attached as Exhibit 1.

9              THE COURT:  Okay.

10             MS. FONTIER:  So that shows the discovery that was

11   sent to me.

12             THE COURT:  Right.

13             MS. FONTIER:  In February.  I forwarded that discovery

14   to her.

15             THE COURT:  The letter or you forwarded --

16             MS. FONTIER:  No, the actual discovery which was

17   provided.

18             THE COURT:  You said there is an e-mail to that

19   effect?

20             MS. FONTIER:  I don't know that I e-mailed her and

21   told her but this was sent to her.  I don't have a letter

22   showing that I sent that discovery to her but, as you can see

23   from my Exhibit 2, by March 11th I had contacted Nelson

24   LaSalle, the investigator in this case, and asked him in an

25   e-mail if he was available to work because there was a

D3d5DOR8

1    potential alibi.  So, sometime between February 8th and March

2    11th I sent her that discovery and then I met with her in

3    person and had multiple phone conversations with her.

4            THE COURT:  Again, it is unclear to me sort of -- the

5    discovery indicates when the murder was?

6            MS. FONTIER:  Yes.  The NYPD reports, which were

7    produced in the initial February 8th discovery, included crime

8    scene runs, Mr. Janisch's -- I believe it was Detective

9    Janisch, his documents that were turned over in the initial

10   discovery on February 8 and they indicated the time on them

11   which is why she contacted me and we had the in-person meeting.

12           THE COURT:  Let me hear from the government at this

13   point.

14           MS. LESTER:  Your Honor, I think -- the government

15   does concede that the time of the homicide is in that initial

16   discovery production but --

17           THE COURT:  Okay.

18           MS. LESTER:  But we don't necessarily know whether

19   Ms. Brown reviewed it, even if she received it.  Although she

20   did say -- I don't think it is narrowed down necessarily to a

21   time period, but she did say on cross-examination that she did

22   see the discovery and she did review it at some point in

23   relation to Mr. Dore's case.  She said, though, that she didn't

24   remember learning the time at the time that she went to

25   Ms. Fontier and talked about the alibi, but Ms. Fontier's point

D3d5DOR8

that her testimony is necessary to draw out the lie, in other
words that Ms. Brown was lying when she provided the supposed
alibi documents and knew, in fact, that Mr. Dore had committed
the murder.  They attempted to draw that out already on
cross-examination.  At the transcript at page --

THE COURT:  I don't see how that lie helps the defense
but that is beside the point.

MS. LESTER:  I don't either, your Honor.

But, to the extent that they're trying to show that
she's a liar and that she lied to Ms. Fontier, Ms. Brown
already admitted this on cross-examination.  At page 355 of the
transcript Ms. Stafford asked her, line 9:
"Q  You went there because you had read the discovery and you
knew that the government was alleging that Mr. Dore had been
involved in a homicide and you wanted to convince Ms. Fontier
that Mr. Dore was with you and could not have been at the scene
of the crime.  Isn't that true?
"A  Yes.
"Q  So, when you went to Ms. Fontier to convince her that
Mr. Dore was with you and was not involved with a murder, you
were telling the truth?"

And then there is objection but she answered -- you
overruled the objection the answer is:
"A  No.
"Q  You were not telling her the truth?

1    "A  No."

2              She admitted that she already lied so I don't see what

3    Ms. Fontier's testimony would add to this, plus the government

4    agrees that it is a wholly collateral matter since, really, the

5    only dispute is whether she knew about the time of the

6    homicide.  But, according to Ms. Brown's testimony on cross,

7    she would have provided the documents regardless of whether she

8    knew about the time because she was lying to Ms. Fontier when

9    she presented the alibi documents to begin with.

10             THE COURT:  I don't recall her admitting that she

11   lied.  What you just read from is her saying that it wasn't the

12   truth.  But, I thought she also said at various points that she

13   didn't realize it at the time, that she later learned.

14             Am I mischaracterizing the evidence or the testimony?

15             MS. LESTER:  That's fair; she did say that she didn't

16   know the time but she also said.  At 355 of the transcript

17   question, from Ms. Stafford:

18   "Q  But you just provided testimony not too long ago that

19   Mr. Dore told you that he was involved in a murder?

20   "A  I was convinced to tell Ms. Fontier that he wasn't.  After

21   all, he is -- she is his attorney.

22   "Q  After all she is his attorney?

23   "A  Yes.

24   "Q  Can you please explain what that means?

25   "A  Meaning I'm following Jermaine's direction of what I am and

1    am not supposed to tell her."

2              THE COURT:  All right.  So, Ms. Fontier, basically you

3    want -- you would be testifying that you sent her the

4    discovery, the discovery included the time of the murder, and

5    from that would argue that she was lying to you when she gave

6    you the alibi?

7              See, I guess -- the problem is that what she provided

8    to you are documents that don't establish an alibi, they're 12

9    hours after the murder, right?

10             MS. FONTIER:  Yes, your Honor.

11             THE COURT:  And so, it seems to me that if the

12   argument is she was lying to you, the inference then is that

13   Mr. Dore did commit the murder which is not an argument I think

14   you want to make.  The argument is that she is lying from the

15   stand and that in fact he was with her, there is -- is that

16   what you're arguing?  You are arguing he really was with her at

17   the time of the murder?

18             MS. FONTIER:  I would love --

19             THE COURT:  You are not really arguing that, right?

20             MS. FONTIER:  I would love to argue that, your Honor.

21             THE COURT:  Are you planning to argue that to the

22   jury?

23             MS. FONTIER:  No, but I am going to argue that she

24   cannot be trusted, that nothing that comes out of her mouth is

25   credible, she lies on the stand, she lies to me, she lies to

 1   the jury.  That is absolutely --

 2              THE COURT:  I think you're able to do that now so what

 3   does the added testimony give you that you don't already have

 4   on that front?

 5              MS. FONTIER:  I think that the problem is that one of

 6   the arguments that I would like to say in the transcript -- I

 7   don't have the exact cite right now, she also says: *Ask*

 8   *Ms. Fontier, she'll tell you like the time*, and blah, blah,

 9   blah.  That came out of her mouth and I would like to be able

10   to stand up on closing and say, you know what?  Ask me.  That's

11   not what happened.

12              THE COURT:  Well, you would like to be able to say ask

13   me, that's not what happened.

14              MS. FONTIER:  She knew the time.  We had a

15   conversation about the time.  She knew exactly what she was

16   doing when she came into my office and she was either willing

17   to make up this elaborate story then or she's telling a lie

18   now.

19              THE COURT:  About what?

20              MS. FONTIER:  She's either lying on the stand about

21   that she wasn't with him and that she -- he told her about a

22   duppy, or she was lying to me.  Either way, she's willing to

23   tell some elaborate, large lie about what happened on December

24   12th and that her testimony can't be trusted.  I mean, I think

25   that's ultimately what it is.

D3d5DOR8

1          THE COURT:  Well, it seems to me you can make an

2     argument with what you have now.

3          I mean, it seems to me the only evidence that you are

4     looking to introduce is that she was aware of the time of the

5     robbery and so I'm not sure if a stipulation would do that, but

6     it does seem to me to be largely duplicative of what is already

7     in the record based on your testimony.

8          MS. FONTIER:  I would settle for a stipulation to that

9     fact.

10          THE COURT:  To what fact, that she received the

11     discovery on X date or on or around X date and that the

12     discovery included the time of the murder?

13          MS. FONTIER:  And that she met with me and was -- and

14     was aware of the time.

15          THE COURT:  Well, that's a fact -- I mean, I don't

16     think you would be able to testify that she was aware of the

17     time.

18          MS. FONTIER:  We had a long conversation about it.

19          THE COURT:  That's different than she was aware of.  I

20     mean, you would testify that you had a conversation with her

21     about it?

22          MS. FONTIER:  We sat in my office, talked about the

23     fact that this happened about noon.

24          THE COURT:  What day did you do that?

25          MS. FONTIER:  I don't have the -- my notes are

D3d5DOR8

1  unfortunately not dated.  I'm learning from this mistake here

2  to keep much better notes, apparently.

3          THE COURT:  How do you know that it was before -- that

4  that was before she reviewed discovery or before she provided

5  the documents that are marked as Defendant's Exhibit 1?

6          MS. FONTIER:  She told me -- I sent the discovery to

7  her, she told me she reviewed it and needed to talk to me.  She

8  came in and said the murder happened -- that what time did it

9  happen?  I said at about noon.  We talked about it and she said

10 that can't be true, he was with me.  I know he was with me, we

11 went to the bank.  And then she told me which ATM she used,

12 when they were there and that I said, all right, I'm going to

13 need to get more information.  And then she later sent me that

14 document and then -- but between that, on March 11th, I

15 contacted the investigator to see if there was video to

16 corroborate this but the bank doesn't keep video for that long.

17         THE COURT:  When did you get the document that is now

18 marked as Defendant's Exhibit 1?

19         MS. FONTIER:  I don't recall, honestly.

20         THE COURT:  Because you would be crossed on that.

21         MS. FONTIER:  Yes.  Of course.

22         THE COURT:  Of course.

23         MS. FONTIER:  And I would have to admit also that I

24 did not notice that it said 11:59 p.m. and not 11:59 a.m.

25         THE COURT:  I do want to finish this witness so I

D3d5DOR8

1    guess I'm going to reserve on this.  We can chat maybe a little

2    more after this but let's get the witness back on the stand.

3    Generally the case is you sort of elicit testimony about

4    statements that make you a witness and then move for a

5    mistrial.  It is not usually the way it is supposed to work.

6            Anyway, we will talk more about this.  Let's bring in

7    the jury.

8            (Continued on next page)

1          (Jury present)

2     DAVID MAGNUSON, resumed.

3          THE COURT:  Sorry that it took a little longer.  We

4     were working through some things that were designed to make

5     things move more efficiently.

6          So we are now going to have cross-examination of Agent

7     Magnuson by Ms. Stafford.

8     CROSS-EXAMINATION

9     BY MS. STAFFORD:

10    Q.  Good afternoon, Agent Magnuson.

11    A.  Good afternoon, ma'am.

12    Q.  I just wanted to talk a little bit about how you put

13    together those maps.

14         MS. STAFFORD:  Ms. Brady, would you put up Government

15    Exhibit 210, the cell site location and cell detail records for

16    704?

17    Q.  Isn't it true, sir, that it's very basic the information

18    that goes into putting these maps together?

19    A.  Basic for me.  I mean, I don't think the average person

20    would find it basic.

21    Q.  Well, isn't it true that -- let's take, for instance, the

22    top row.  I can't quite see it, but I am assuming that's the

23    telephone number that's in the first column, right?

24    A.  Yes.

25    Q.  If you go over to the column that says "first cell ID"?

D3D8DOR9                         Magnuson - cross

1   A.  Yes, ma'am.

2   Q.  There is a number there.  And that number is -- can you

3   read that number, please?

4   A.  37791.

5           MS. STAFFORD:  Ms. Brady, can we scroll over to the

6   end of the spreadsheet, please?

7           Thank you very much.

8   Q.  The first LAC column reads?  Can you read that number,

9   please?

10  A.  The first LAC?

11  Q.  Yes.

12  A.  52183.  Yes, ma'am.

13  Q.  And the last LAC?

14  A.  52183.

15  Q.  Now, isn't it a fact that you take that first LAC number,

16  the 52183, and if we go back again to the cell ID and

17  input -- after the first LAC, you would put a semicolon.  And

18  then you would input 37791, correct?  And you would put that

19  into, I guess it's a notepad or an Excel spreadsheet that the

20  phone company provides you?

21  A.  Well, I see what you're saying, and I agree with your prior

22  statement about this being basic.  You are taking the data from

23  the call detail record and you're matching it up with the cell

24  site tower database and then importing them on MapPoint or

25  Streets & Trips.  Is that what you are --

D3D8DOR9                      Magnuson - cross

1   Q.  That's exactly what I am referring to.  So once you get the

2   longitude and latitude, then you would be able to put that into

3   some sort of mapping program, such as Google Earth or Google

4   Maps and it would give you the location of the cell tower?

5   A.  Yes, it would, yes.

6   Q.  The records that you received from the government were call

7   detail records, correct?

8   A.  Yes.  That's true.

9   Q.  The cell site location record, right?

10  A.  Yes.  The cell site tower database, yes, ma'am.

11  Q.  Those were the only records that you were provided,

12  correct, for each particular phone number?

13  A.  There may have been letters from the cell phone companies

14  indicating their case number and their response.  There is also

15  sometimes a CDR tip sheet or a key on how to understand their

16  call detail records and how to match it up with their towers

17  and some idiosyncrasies with their coding and stuff like that,

18  and so they give you a reference guide, yes.

19  Q.  You didn't receive any engineering data regarding any of

20  the cell towers you plotted today, correct?

21  A.  Nothing, except what is in the cell site listing.

22  Q.  Which is what we are looking at right now?

23  A.  That's correct, yes.  This is actually a call detail

24  record.

25  Q.  Right.  In conjunction with that, you also received a list

D3D8DOR9                          Magnuson - cross

1    that had the location of the cell site towers, correct?

2    A.  Yes.

3    Q.  Within that list, there is no engineering information about

4    those particular towers, correct?

5    A.  It depends on the cell site tower database you're looking

6    at.  Sometimes they are more robust with providing information

7    and sometimes they are not.  But the typical type of

8    information, you could have antenna height, you could have

9    antenna orientation.  You're going to have beam width

10   associated with the radiated radio frequency energy.  It

11   depends on the provider what they provide in the cell tower

12   database.

13   Q.  But you reviewed these records, correct?

14   A.  Yes, I did.

15   Q.  That kind of information was not provided in this case,

16   correct?

17          Would you like to look at all of Government Exhibit

18   210?

19   A.  If you have a specific question about what type of

20   information was not, perhaps if you had another question, I

21   would understand.

22   Q.  There is no other information in those records regarding

23   any engineering data or RF, as you referred to, that you looked

24   in order to plot your map today, correct?

25   A.  Correct.  Whatever I was provided with by the case agent is

D3D8DOR9                        Magnuson - cross

1   what I used to formulate and interpret those historical records

2   and then map them out, yes, ma'am.

3   Q.  Thank you.

4   A.  Yes, ma'am.

5           THE COURT:  No further questions, Ms. Stafford?

6           MS. STAFFORD:  No further questions.

7           MR. ROTH:  No questions.

8           THE COURT:  Any redirect?

9           MS. LESTER:  No, your Honor.

10          THE COURT:  You can step down.  Thank you, Agent.

11          Government, you're next witness.

12          MS. LESTER:  Your Honor, the government rests.

13          THE COURT:  Ladies and gentlemen, the government has

14  rested in the presentation of their evidence.  As you told you

15  before, the defendants have no obligation to put on any case

16  whatsoever.  They are presumed innocent.  The burden is always

17  with the government.  But if they wish to put on a case, they

18  are certainly free to do that.

19          So let me ask the defendants if they wish to put on a

20  case.

21          MS. FONTIER:  Yes, your Honor.

22          THE COURT:  Call your first witness.

23          MS. STAFFORD:  The defense calls James Macedonio.

24          (Continued on next page)

25

D3D8DOR9

1    JAMES MACEDONIO,

2         called as a witness by the defendant,

3         having been duly sworn, testified as follows:

4              THE COURT:  State your name and spell your name for

5    the record.

6              THE WITNESS:  James Macedonio, M-A-C-E-D-O-N-I-O.

7              THE COURT:  Mr. Macedonio, good afternoon.

8              THE WITNESS:  Good afternoon.

9              THE COURT:  You may proceed, Ms. Stafford.

10   DIRECT EXAMINATION

11   BY MS. STAFFORD:

12   Q.  Mr. Macedonio, where do you live?

13   A.  I live in Bayside, Queens.

14   Q.  How old are you?

15   A.  23.

16   Q.  What kind of work do you do?

17   A.  I work as a paralegal.

18   Q.  What kind of cases have you worked on as a paralegal?

19   A.  Federal criminal cases.

20   Q.  What have you done in your capacity as a paralegal for

21   those cases?

22   A.  Mostly I go over discovery material, 3500 material.  I do a

23   lot of transcripts and recently I have been doing a lot of cell

24   site analysis.

25   Q.  Now, you said discovery.  What do you mean by the term

1   discovery?

2   A.  Evidence turned over by the government.

3   Q.  Such as?

4   A.  It could be audio recordings, documents, videos, pictures,

5   cell site data, stuff like that.

6   Q.  Now, did you review any discovery regarding this case?

7   A.  I did.

8   Q.  What kind of discovery was it?

9   A.  Cell site data.

10  Q.  When you say cell site data, what exactly do you mean?

11  A.  Well, the phone companies, I guess, provided spreadsheets

12  of the different phone calls presented to you, phone numbers

13  presented to you, and on those spreadsheets are LAC numbers and

14  cell tower numbers.

15          MS. STAFFORD:  Ms. Brady, can we have Government

16  Exhibit 2010 again.

17  Q.  I would like to show you what is already in evidence as

18  Government Exhibit 2010 and ask you if you recognize it?

19          THE COURT:  This is 2010?

20          MS. STAFFORD:  That is the sum of Government Exhibit

21  2010.

22          If we can look at 704-756.

23          Actually, the file right below it.

24  Q.  Mr. Macedonio, do you recognize this?

25  A.  Yes.  This is a spreadsheet of cell site data for phone

1  number 704-756-5031.

2  Q.  Did you review spreadsheets like this for other phone calls

3  as well, other phone numbers as well?

4  A.  For other phone numbers, yes.

5  Q.  Did you also utilize any programs in reviewing those phone

6  calls?

7  A.  Yes.  I used Google Earth, which is a software, and Google

8  Maps, which is online software.

9  Q.  Did you also review work that had previously been done in

10  the case regarding cell site discovery?

11  A.  I reviewed work that had been done in the Google Earth

12  program.

13  Q.  Did you compare that program with the underlying records

14  that were reflected in that program?

15  A.  Yes.

16  Q.  Did you determine if they were accurate?

17  A.  I did.  I used the -- it has GPS data on here, like

18  latitude and longitude for each phone call made, and I checked

19  that against the work that was put into Google Earth, and it

20  was accurate.

21       MS. STAFFORD:  May I approach, your Honor?

22       THE COURT:  Yes.

23  Q.  Do you recognize that?

24  A.  Yes.

25  Q.  Could you just take a look at it?  What is it?

1   A.  This is the PowerPoint presentation that I put together in

2   relation to this case.

3   Q.  That was at the request of myself?

4   A.  Yes.

5            MS. STAFFORD:  At this time, your Honor, I would like

6   to admit into evidence Defendants' Exhibit B.

7            THE COURT:  Is that what you just showed him?

8            MS. STAFFORD:  Yes, it is.

9            THE COURT:  Any objection?

10           MS. LESTER:  Yes, your Honor.  We would ask for a side

11  bar.

12           THE COURT:  I think we are going to need a side bar.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  This is a PowerPoint?  It seems like it's

3    a wide assortment of different documents.  There has been no

4    testimony about how it was prepared and what he did to create

5    these things.  Some of them are just tables.  Others are photos

6    that have numbers put on them.  I don't think the foundation

7    has been laid.

8              What is the government's objection?

9              MS. LESTER:  We have other objections in addition to

10   the ones mentioned by the Court.

11             The first objection is this phone number -- there's no

12   page numbers on the exhibit, but about three quarters of the

13   way through there is a phone number listed 917-200-1367.  That

14   phone number, there are subscriber records in evidence, but

15   there are no cell site or call detail records for that phone

16   number in evidence.

17             Also, in just a quick review that we had of

18   Defendants' Exhibit B, and Ms. Stafford did try to send this to

19   us last night and we weren't able to open the program, but our

20   agent looked at a page with regard to phone number

21   704-345-3805.  We believe that there has been a map on a

22   following page that shows 1705 Purdy Street in the Bronx.  I

23   think what that map is purporting to show is at the location of

24   the two towers that were utilized by the 3805 cell phone in a

25   particular call, the first tower and then the ending tower.

 1    But our agent was able to quickly run the tower IDs for just

 2    this particular call and has told us that the tower location is

 3    actually not correct on this map.

 4              THE COURT:  You can cross on that or you can call a

 5    witness.  I think the issue is whether or not there is a

 6    foundation laid for this, whether they are what they purport to

 7    be.  It's a grab bag of documents.  I am not sure how we are

 8    going to do this so he can explain what each is and how he

 9    created it.

10              MS. STAFFORD:  I can go through that.  I did not know

11    that they had an objection.  I showed it to them before.

12              THE COURT:  If there is no objection, then I generally

13    haven't been stopping stuff from coming in, because the parties

14    can stipulate, and if they are not objecting, I assume they are

15    effectively doing that.  But I don't think the record as

16    currently constituted provides foundational support for the

17    exhibit.

18              What about the phone number about which there

19    apparently was no underlying record?

20              MS. STAFFORD:  It was my understanding that we would

21    be stipulating to the admission of that phone call.  That's the

22    only phone that we wanted the underlying records to come in as

23    well.  Otherwise I would have moved to have those records come

24    in when the custodian was here.

25              MS. LESTER:  That's fine.  We can stipulate to it, but

 1    the records haven't been presented in evidence.  They are not

 2    in evidence currently.

 3           THE COURT:  You're willing to stipulate to them?

 4           MS. LESTER:  Yes.  But we don't have a copy of them

 5    available for the jury.

 6           Do you have a copy of them?

 7           MS. STAFFORD:  Yes.

 8           MS. LESTER:  As business records of which company?

 9           MS. STAFFORD:  That I am sure is T-Mobile.

10           THE COURT:  Let's identify that document which is the

11    records.  The parties can stipulate that defense exhibit,

12    whatever we are calling it, are phone records from Sprint or

13    whoever, that are business records, and describe what it is.

14    And from there, you're going to lay a foundation for what else

15    is in here?

16           The government doesn't sound like it otherwise has

17    objections, is that right?

18           MS. STAFFORD:  These particular records and the maps

19    that the government had introduced before are simply the same

20    thing, the historical call detail records.

21           THE COURT:  Which are you referring to?  There is no

22    page numbers on the document.

23           MS. STAFFORD:  Google Maps program which was created

24    by a software program that imports all the phone calls and then

25    creates a map.  I will create a foundation for that.  That's

1    the same program reflecting that cell tower where calls

2    throughout the phone records are registering from that cell

3    tower throughout that time period.

4              THE COURT:  What is the relevance of that?

5              MS. STAFFORD:  The relevance is that these cell towers

6    are the same cell towers that the government just put into

7    evidence as calls being within range of those cell towers on

8    those days, and we would like to establish that the same call

9    records, that those cell towers are being used throughout that

10   time period.

11             THE COURT:  So what?  Is there any dispute that the

12   cell towers are being used throughout the time period?

13             MS. FONTIER:  These particular, like what your Honor

14   is looking at here, which correspond to the maps that the

15   government just put into evidence, this is the cell tower that

16   was identified with having a single call at a time.  We would

17   like to introduce these to show that it's not just a single

18   call at or near the time of the robbery.  They are using these

19   phone towers all the time.  So there is nothing special about

20   the fact they were using this tower at or near the time of a

21   robbery.

22             THE COURT:  You think that shows that?

23             MS. FONTIER:  Yes.

24             MR. ROTH:  Every call is dated, Judge.

25             MS. FONTIER:  It will be explained with this witness.

1    Obviously, the maps that the government put in had no meaning

2    until the agent explained them as well.

3              MS. LESTER:  This just visually is quite confusing.

4              THE COURT:  I certainly find it confusing.  I am not

5    sure if that's the goal.

6              MS. STAFFORD:  If I may, your Honor.  Each triangle

7    was assigned a different color as soon as the phone records are

8    imported into the program.  And that telephone number registers

9    with that tower at a particular time.  So the triangles and the

10   time periods refer to each time that that cell tower is

11   utilized by that phone number.  And the phone number, if I may,

12   is reflected in the previous page and the cell tower is

13   reflected in the previous page.  So the second page after that,

14   if you look on that particular cell tower, it will give you the

15   information that was imported from those call records.

16             THE COURT:  If the point is just that that phone was

17   in that neighborhood on other days and other times, so being

18   there on the day of the robbery is no big deal, that's fine.

19             MS. FONTIER:  That's the entire point.

20             THE COURT:  I don't think that's apparent from the

21   exhibit.

22             MS. FONTIER:  I think it will be.

23             THE COURT:  It might be from testimony, but I don't

24   know that it is from the exhibit.

25             MS. FONTIER:  If the jury chooses not to pay attention

1   to our exhibit, it's neither here nor there.

2           THE COURT:  I have a gatekeeping function, which is

3   not to have the jury confused.  It's very hard to look at this

4   and have any idea what this is about at all.  It doesn't list a

5   phone number.

6           MS. STAFFORD:  The phone number is listed.

7           THE COURT:  It's not clear from the exhibit.  It's a

8   hodgepodge exhibit as opposed to multiple exhibits which might

9   have made make that clear.  This doesn't even tell you.

10          MS. STAFFORD:  It's unfortunately the way the program

11  operates, and there are very few programs out there that can do

12  this.  I think it's the only one.

13          THE COURT:  The government's objection was principally

14  that some of what is in this exhibit is based on records that

15  are not in evidence, and then some of it is that there is an

16  error, which I don't think that's a basis for keeping it out.

17  I think that's a basis for cross-examination.  Again, we should

18  have exhibits that are cleaner than this and have page numbers

19  that are discretely laid out.  The goal is to make it easy for

20  the jury to follow, the point of an exhibit of this kind.

21  Summary exhibits are designed to make life for the jury easy,

22  not to make life harder.  It seems to me the testimony will

23  make life a lot easier than the exhibits, which is backward.

24          Let's see how it goes.  I don't think this is

25  generally what summary charts are supposed to do.

 1              (In open court)

 2   BY MS. STAFFORD:

 3   Q.   If we could just go back a second.  You said that you

 4   worked with Google Earth, correct?

 5   A.   Yes.

 6   Q.   What particular programs did you work with?

 7   A.   I worked with two programs on this case, one was Google

 8   Earth, the other was Google Maps.

 9   Q.   With regard to the Google Earth, what exactly did you do?

10   A.   With Google Earth, that program was given to us by the

11   previous -- by the cell expert in this case, and it had every

12   phone call made by the numbers in evidence, plotted by date and

13   time and what cell tower they used.  So I looked at that, and I

14   verified that program against the actual spreadsheet records to

15   make sure the locations of the cell towers were plotted

16   correctly.

17   Q.   Did you do that for all the phone calls that are reflected

18   in the program?

19   A.   Not all, just a few, to make sure the records were

20   accurate.

21   Q.   What did you do after that?

22   A.   After that I opened up the spreadsheets myself in Microsoft

23   Excel, the spreadsheets of the cell site data.  And I looked at

24   the LAC numbers, which is location area code, and location area

25   code is a group of cell towers.  And I looked at the cell tower

1     numbers to determine where certain phone calls -- to determine

2     what cell towers these phone calls came off of.

3     Q.  As a result of verifying the information in the Google

4     Earth program, did you also verify the times that the phone

5     calls are made?

6     A.  Yes.

7     Q.  Did you verify the location of the towers that those phone

8     calls were made from?

9     A.  Yes.

10          THE COURT:  What documents were you referring to when

11    you did all of that?

12          THE WITNESS:  What documents?  The Excel spreadsheets

13    for all the different phone numbers.  I think they are labeled

14    the phone number and then it says cell cite.

15          THE COURT:  Do you know what the exhibit number is?

16          THE WITNESS:  There are a few of them.  I don't know

17    the exact exhibit numbers.

18    Q.  Were you provided certain phone numbers to look at?

19    A.  Yes.

20    Q.  Do you recall what those phone numbers were?

21    A.  Not off the top of my head, but they are on Defendant's

22    Exhibit B.

23    Q.  Would that refresh your recollection as to what numbers you

24    actually reviewed?

25    A.  It would, yes.

```
 1    Q.  Would you like to take a look at it?

 2              THE COURT:  It's not the numbers reviewed.  It's

 3    documents you reviewed related to certain numbers.  Do you know

 4    what documents you reviewed?

 5              THE WITNESS:  The documents I am fairly certain are

 6    labeled just the phone number and then cell site.

 7              THE COURT:  Where did you get them from?

 8              THE WITNESS:  From the discovery.  It was provided to

 9    me.

10    Q.  Are you familiar with call detail records?

11    A.  Yes.

12    Q.  Is that what you reviewed in this case?

13    A.  Yes.

14    Q.  How are you familiar with records related to call detail

15    records?

16    A.  Yes.

17    Q.  What are those?

18    A.  Well, records relating to call detail records would be the

19    Excel spreadsheet that I reviewed.

20    Q.  Do you know what that is commonly referred to as?

21    A.  Cell site data.

22    Q.  Did you look at any other documentation to compare the cell

23    site data and the call detail records?

24    A.  No documentation, no.

25    Q.  Was there any instruction by the phone company?
```

D3D8DOR9                        Macedonio - direct

1   A.  Yes.  The phone company provided a key on how to look up

2   the exact locations of cell towers given the cell site data.

3   That was my mistake.  I'm sorry.

4   Q.  Going back to the Google Earth program that you reviewed

5   and that you utilized, did you also create slides from that

6   Google Earth program?

7   A.  From Google Maps I created slides.  And from Google Earth,

8   actually, too, just recently.

9   Q.  Can you identify any of those slides from the exhibit in

10  front of you?

11  A.  Sure.  The first page here is a Google Earth, I guess you

12  would call it PDF image, and it shows the location of a cell

13  tower.

14  Q.  Did you create that?

15  A.  I did.

16  Q.  Is that accurate?

17  A.  As far as I know, yes.

18  Q.  Did you also create more slides?

19  A.  Yes, many more slides.

20  Q.  Can you take a look at the next page, please?

21  A.  Sure.  This is the same cell tower and it's in the same

22  location, and the little lines coming off with other markers

23  indicate different phone calls that came off of that cell tower

24  from the phone numbers inputted into Google Earth.

25  Q.  How did you verify those different phone numbers?

1   A.  Well, against the cell site records.

2   Q.  Did you create additional slides?

3   A.  I did.

4   Q.  Can you take a look at the other slides that you created

5   from Google Earth?

6   A.  Sure.  The next page after that is a different cell tower,

7   and it shows latitude and longitude here as provided by Google

8   Earth.  I guess that information was put into Google Earth from

9   the spreadsheets.  And the next page after that --

10  Q.  Is that accurate the slide that you created?

11  A.  Yes.

12          THE COURT:  What information was put into Google

13  Earth, just the phone number?

14          THE WITNESS:  Latitude and longitude information.

15          THE COURT:  Anything else?

16          THE WITNESS:  The phone number.

17          The top number on this sheet is the phone number that

18  the information belongs to.  The next line down, call number,

19  is the number it dialed -- the number that called -- the line

20  after that was the number that was dialed, which is the number

21  that was called.  It's an incoming call.

22  Q.  Don't read it.  Do you recall verifying the information

23  that you see on the page?

24  A.  Yes.

25  Q.  How did you verify that information?

1  A.  Well, the cell site records have latitude and longitude

2  that you plug into a separate program, which I did, which is

3  Google Maps, and it shows the same location.

4  Q.  Can you go to the next page, please?

5  A.  Sure.

6  Q.  Do you recognize that page?

7  A.  I do.

8  Q.  Is that also a picture that was created by Google Earth?

9  A.  Yes.

10  Q.  Is that a slide that you created?

11  A.  It is.

12  Q.  How did you verify that information that's contained in

13  that slide?

14  A.  The information in this slide?

15  Q.  Yes.

16  A.  The information on this slide is just the different phone

17  calls that came off that tower.

18  Q.  OK.

19  A.  I didn't verify that these calls actually came off of this

20  tower, but I verified the location of this tower.

21  Q.  Referring back to the slide before that.

22  A.  Sure.

23  Q.  Is that the same cell tower that you verified the

24  information for?

25  A.  It is.  The first page of the presentation is just a

1    picture of the cell tower.  The second one is a picture of the

2    cell tower that shows different phone calls coming off of it at

3    different times.

4    Q.  The phone calls that are coming off at different times, are

5    those the phone calls that you reviewed and verified were

6    entered properly into the program?

7    A.  Yes.

8    Q.  What records did you refer to?

9    A.  The cell site records.

10   Q.  Just be more specific.

11   A.  The cell site records provided to me from the evidence.

12   Q.  The cell site records meaning what documents?

13   A.  The Excel spreadsheets.

14   Q.  When you say Excel spreadsheets, what do you mean

15   specifically?

16   A.  The latitude and longitudes, the cell tower numbers, LAC

17   numbers are on there, the phone numbers are on there, dates and

18   times of phone calls are on there.

19   Q.  What about the phone calls, is that the same Excel

20   spreadsheet or is that a separate Excel spreadsheet?

21   A.  The actual phone calls themselves, that's a separate

22   spreadsheet.

23   Q.  Would you go to the next page, please?  Can you take a look

24   at that slide?

25   A.  Yes.

1   Q.   Is that also a Google Earth slide you created?

2   A.   It is.

3   Q.   The information contained on that slide, was that verified

4   by you?

5   A.   It was.

6   Q.   In the same manner that you verified the other information?

7   A.   Yes.

8   Q.   Is that accurate?

9   A.   Yes.

10  Q.   Can you turn the page again to the next slide?

11          Is that also Google Earth slide?

12  A.   It is.

13  Q.   How does that relate to the previous slide?

14  A.   This is the same cell tower as the previous slide.  The

15  previous slide is just a picture of the location of the tower.

16  This one is a picture of the location of the tower and it has

17  separate lines coming off to that show different phone calls on

18  different dates and times.

19  Q.   That information was verified in the same manner that you

20  had verified the previous slide?

21  A.   Yes.

22  Q.   Can you turn to the next slide, please?

23          The next slide is?

24  A.   This is a chart for a phone number 704-345-3805.  What it

25  shows is the call number as listed on the cell site data

1    spreadsheet in Excel.  It has the first LAC used by the phone

2    call, the second LAC on the phone call, the first cell tower,

3    which is labeled cell ID, and second cell tower, or cell ID,

4    and it also has the duration of the phone call.

5    Q.  Where did that information come from?

6    A.  This information came -- this is basically copied and

7    pasted off of the Excel spreadsheets for cell site data

8    provided to me.

9    Q.  Are you referring to one document or two separate

10   documents?

11   A.  This chart was created with one document.

12   Q.  And that information was just from the cell site data?

13   A.  Right.

14   Q.  Is that information accurate?

15   A.  Yes.

16   Q.  As to what you created?

17   A.  Yes.

18            THE COURT:  Let's do this.  It's 5:15.  Let's break

19   for the day, folks.  We will pick up again tomorrow morning at

20   9:30.  Don't discuss the case.  Keep an open mind.  I will give

21   you more instructions tomorrow as to where we are at, but for

22   the time being, as always, give yourself enough time to get

23   here in the morning, leave your notebooks here, and have a good

24   evening.  Thanks very much.

25            (Jury exits courtroom)

D3D8DOR9

1          THE COURT:  I don't think this is coming in as clean

2     as it needs to.  First of all, I want page numbers on the

3     exhibit so we know what we are talking about.

4          Second of all, I don't think it's sufficient for him

5     to say based on spreadsheets that were provided to me.  That

6     just doesn't provide the foundation.  So what I would like this

7     witness to do is go through the exhibits that are in evidence

8     that are the basis for these charts, which are various

9     exhibits.  And I think they should make clear what phone number

10    we are talking about.  And you should be in a position to say

11    this is based on Government Exhibit X or Y, whatever it was,

12    just because exhibits provided to me doesn't give us anything.

13    I think he has to be able to identify what are the exhibits

14    that are the basis for a chart that he has prepared.  To just

15    say I have got some spreadsheets, and this is accurate based on

16    those spreadsheets I don't think is sufficient.

17         In the interim then the parties should talk.  If they

18    can stipulate about the records that are not yet in evidence,

19    that would be the basis for part of this.  And then my hope is

20    that tomorrow we can start afresh with Mr. Macedonio and then

21    just get it in clean rather than kind of do it piecemeal like

22    this because there are some problems here.

23         MS. FONTIER:  I appreciate that.  I will make sure

24    that they get organized and put together.  We can get this in,

25    I think, in a fairly efficient manner.

D3D8DOR9

1      THE COURT:  I don't think it's going to be that tough

2   to do.  The whole purpose of a summary chart is that it makes

3   it easier for the jury to understand some things.  Everything

4   he is testifying about is in evidence.  The data is all in

5   evidence, or it should be in evidence, or there has to be a

6   stipulation that it's accurate.  So if the parties want to

7   stipulate that the whole thing can come in, I am fine with

8   that.  It doesn't sound like that was the case at the side bar.

9      So that means then we will finish up with Mr.

10  Macedonio, which I don't think it will take more than an hour,

11  right?

12      MS. STAFFORD:  No.

13      THE COURT:  Then I am going to rule on Ms. Fontier's

14  motion.  And then there are no other witnesses anyone is

15  contemplating, right?

16      MS. FONTIER:  We don't have any other witnesses unless

17  we cannot agree on a stipulation as to the DNA and fingerprint.

18  The testing that was done on Mr. Dore and Mr. Barrett were not

19  matches.  I think we have always said that we would be able to

20  agree on it.  We just haven't done it.  I just want to make

21  sure that it's on the record that we need to get that done.

22  Otherwise, we will have to call a witness.

23      THE COURT:  Do that or have a witness, but obviously

24  talk and give yourselves enough time that you are able to call

25  a witness if you have to.  But that's it otherwise, right?

D3D8DOR9

1          Then the government, I don't know if they are planning

2     a rebuttal case, if they are planning to recall Magnuson or

3     anything else given what you said at the side bar, but have

4     that witness ready to go, because if you're going to do

5     rebuttal, we are going to do it right after the close of the

6     testimony tomorrow.

7          MS. LESTER:  Yes, your Honor.

8          THE COURT:  Let me have the lawyers here at 9 just so

9     we can resolve the outstanding issues.  The Rule 29, I think we

10    can do it before or after I send the jury home.  I assume we

11    will finish the evidence.  I will send the jury home with

12    instructions to come back on Monday.  And then we will have a

13    charge conference at some point tomorrow, and then you can

14    prepare your summations, and we will do summations first thing

15    Monday.

16         MS. FONTIER:  I wanted to just note one thing for the

17    record to the extent that it's necessary.  When Detective Fox

18    testified and was qualified as an expert, I said no objection.

19    I did not mean to be waiving the fact that I don't think that

20    he is an expert or should have been allowed to testify.

21         THE COURT:  You folks made a motion before.  I ruled

22    on that motion.  My point in asking that, was there any other

23    deficiencies beyond the ones that you objected on.

24         MS. FONTIER:  That's why I said no objection.

25         THE COURT:  I noticed the hesitation, and I assumed

D3D8DOR9

1    that was what was going through your head.  If either of you

2    wanted to say, well, there wasn't sufficient testimony about

3    his qualifications, then you would have an opportunity to

4    object on those grounds.

5              MS. FONTIER:  That's how I understood it too.  Thank

6    you, your Honor.

7              THE COURT:  OK.  Anything else we think we need to

8    chat about tonight?

9              MS. FONTIER:  I have nothing.

10             THE COURT:  Tomorrow we will deal with

11   Mr. Soto-Valdes.  I think we will finish early enough so he can

12   go to work tomorrow, probably before lunch.  So he will

13   probably be happy about that.  And if he wants to stay to

14   deliberate, I am all for it, but he is not getting paid for it

15   and that seemed to what prompted him to want to get off the

16   jury.

17             I will see you tomorrow.  If you could also start

18   thinking about getting the exhibit lists up to speed so that we

19   have everything in the form that it's going to go to the jury.

20   Basically, the way the government has laid it out in their

21   exhibit list is right.  The first two columns.  I don't need to

22   know when it came in or through what witness.  Just the exhibit

23   number and a brief description.  So what I would like to have

24   is one document that is all the exhibits, government and

25   defense exhibits, with a page break that makes it clear when

D3D8DOR9

1      one ends and the other begins, but I would like one document.

2              MS. MASELLA:  Is it the Court's practice to send the

3      full set of exhibits back to the jury?

4              THE COURT:  No, just the list.  What I intend to send

5      to the jury after I have charged them is a binder, 12 binders

6      that each have a copy of the indictment, redacted if necessary,

7      a copy of the charge, a copy of the exhibit list, a copy of the

8      witness list, and a copy of the verdict form, which we haven't

9      talked about.  I don't think you folks have sent me a verdict

10     form.  I will draw one up, but we will have to talk about that

11     as well.

12              So they will each have that, and then if they want to

13     ask for exhibits, they can ask for exhibits.  We have to talk

14     about whether there are certain exhibits that won't go back to

15     them, for example, video.  If they want to look at video in the

16     jury room, we have to give them equipment to do that, which

17     might be tricky.  It's probably not unheard of, but it might be

18     tricky, and they also need to know how to use the equipment.

19     So I think probably the easier thing to do, if they want to

20     look at video, we will bring them out and look at video.  But

21     if you think otherwise and you have a proposal as to how we

22     should go about it, I am fine with that.

23              I generally send back transcript portions.  If they

24     say, we would like to see testimony of the cross-examination of

25     witness X, then we will pull it, we will make sure we agree on

1   what is responsive to the request, and then send it back,

2   rather than have them come back for a read back.  I think it's

3   more efficient.  The jurors prefer it and the Second Circuit is

4   fine with it.  So that's what we will do for transcript

5   requests.

6           Video is the only thing I think in this case that we

7   might have to have them come back in for.

8           MS. LESTER:  The only other thing is obviously the

9   phone records in this case, the call detail and cell site

10  records are voluminous and so they are on CDs.  We could print

11  out portions or whatever they wanted to look at, but for now

12  they are on CDs.

13          THE COURT:  If we need to print out, we can.  If there

14  is a thought about sending back a blank laptop that just allows

15  them to access CDs, that's fine too.  It's been done before.

16  This is not the first time this has come up.  Give it some

17  thought.  You have a few days to think about that.  So you

18  folks huddle up and make sure we are all on the same page

19  tomorrow on this exhibit so we can move efficiently.

20          Mr. Soto-Valdes is still here.  Do you want to talk to

21  him now or have him come back tomorrow?

22          MS. FONTIER:  We can talk to him now.

23          (Juror enters courtroom)

24          THE COURT:  Come back to your usual seat,

25  Mr. Soto-Valdes.

D3D8DOR9

1          Have a seat.  Thank up for your patience.

2          I wanted to follow up with you.  Your employer is not

3     required by law to pay you while you're on jury service.  The

4     federal law doesn't require it.  The state law requires a

5     certain number of days.  That's not your full salary.  It's

6     just a certain amount of money.  It's a stipend.  Many

7     employers are willing to do this because they recognize the

8     importance of jury service.  They want to encourage their

9     employees to be able to exercise that civic duty, and many of

10    them recognize that they themselves, corporations and

11    individuals, are the beneficiaries of a system that has jurors

12    who can serve.  Companies like yours that get into legal

13    disputes sometimes go to trial, and they ask jurors to do

14    exactly what you have been doing for the last two weeks.  So I

15    find it sort of ironic that they won't let their employees do

16    it, but they are more than happy to have other people's

17    employees serve in cases that involve them.

18         That being said, you have indicated that you're living

19    paycheck to paycheck, that you only get paid now the relatively

20    small amount of money that the federal courts pay jurors for

21    service, which is not, I am sure, close to what you get paid

22    from your business.  We are nearing the end here however.  You

23    have served this long.  It may be that you wish to continue to

24    serve.  I will leave it up to you.  If you think at this point

25    it's a hardship to have you not making your salary.  But if you

D3D8DOR9

1    wanted to continue serving, certainly I will let you do that,

2    and I encourage you to do that.  So what do you think?

3              JUROR:  I would have liked to, but the circumstances

4    won't allow me to.  Because what I got to do right now, I have

5    got to try and see if they will apply five vacation days, which

6    is all I have left for the year, to actually get paid because I

7    am not being paid.

8              THE COURT:  All right.  So you think this would really

9    be a hardship on you to continue.  We might go another week

10   with deliberations.

11             JUROR:  If it wasn't that, I wouldn't mind staying.

12   Unfortunately, with the situation that I am facing, I have got

13   loans and stuff that I am paying so I can't afford not to get

14   paid.  I have got to sacrifice my vacation days to get paid.  I

15   haven't spoken to them about it.  I am going to tell them just

16   take my last five vacation days and pay me -- I will come

17   tomorrow because that includes tomorrow, but if you don't see

18   any point in me coming tomorrow if I am not going to be here --

19             THE COURT:  We won't be starting the deliberations

20   tomorrow.

21             JUROR:  Then it won't be any point.

22             THE COURT:  Do the lawyers have anything else they

23   wanted to say?

24             MS. FONTIER:  No, your Honor.  Thank you.

25             THE COURT:  Then I am going to excuse you,

D3D8DOR9

Mr. Soto-Valdes, but let me say this.  What you did the last

two weeks was really a public service.  And don't let anybody

tell you otherwise.  I am sorry you weren't able to continue

serving.  You did something that cost you, at some sacrifice to

you, because you recognize that this was an important thing to

do.  It was a duty of citizenship that you took seriously.  I

know I speak for all the lawyers, I know I speak for all the

parties when I say I really thank you for that.  We don't ask

much of our citizens and for some people jury service is easier

than others.  For you it was not easy, given your financial

circumstances and given the fact that your employer wasn't

going to pay for you to be here, but you still came here.  You

paid attention and you really were serious and dedicated.  I

really appreciate that.  We all do.  I wish you the best of

luck and maybe we will see you again in the future.

       Now, we will let you know what happened in the case.

In the meantime, I don't want you to talk to anybody about what

went on.  I don't want you to contact any of the other jurors.

When the case is over, if you guys would like to talk and have

a reunion, that's fine.  But don't contact any of the jurors

now.  And just continue to not discuss the case or what you

thought about the case until after you hear from us when the

case is done.  OK?

       JUROR:  Understood.

       THE COURT:  Good luck to you.

D3D8DOR9

1           All rise one last time for Mr. Soto-Valdes who has

2     earned that measure of respect.

3           THE COURT:  Anything else we need to discuss today?

4           MS. FONTIER:  No.

5           MS. LESTER:  No.

6           THE COURT:  We will move up Mr. Mills to seat number

7     3.  Everybody else will stay.

8           Have a good night.

9           (Adjourned to March 14, 2013, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   INDEX OF EXAMINATION

2   Examination of:                              Page

3   JOSEPH REEVES

4   Direct By Ms. Masella . . . . . . . . . . .1343

5   Cross By Ms. Stafford . . . . . . . . . . .1350

6   Cross By Mr. Roth . . . . . . . . . . . . .1354

7   JONATHAN FOX

8   Direct By Ms. Masella . . . . . . . . . . .1356

9   Cross By Ms. Fontier . . . . . . . . . . .1372

10  Cross By Mr. Roth . . . . . . . . . . . . .1405

11  PRASHANT GOEL

12  Direct By Ms. Lester . . . . . . . . . . .1416

13  Cross By Ms. Fontier . . . . . . . . . . .1434

14  TRAMELLE MARQUIS WOODS

15  Direct By Ms. Lester . . . . . . . . . . .1435

16  Cross By Ms. Fontier . . . . . . . . . . .1437

17  Redirect By Ms. Lester . . . . . . . . . .1438

18  MATTHEW MCKAY

19  Direct By Ms. Lester . . . . . . . . . . .1439

20  Cross By Ms. Fontier . . . . . . . . . . .1442

21  VINCENT MARION

22  Direct By Ms. Lester . . . . . . . . . . .1445

23  Cross By Ms. Fontier . . . . . . . . . . .1447

24  RAUL RODRIGUEZ

25  Direct By Ms. Lester . . . . . . . . . . .1450

1   Cross Q. . . . . . . . . . . . . . . . . .1453 a

2   MICHAEL O'ROURKE

3   Direct By Ms. Lester . . . . . . . . . . . .1455

4   Cross By Ms. Fontier . . . . . . . . . . . .1463

5   Cross By Ms. Fontier . . . . . . . . . . . .1465

6   YAN WONG

7   Direct By Ms. Lester . . . . . . . . . . . .1468

8   Cross By Mr. Roth . . . . . . . . . . . . .1471

9   JAMAL ABDULLA

10  Direct By Ms. Lester . . . . . . . . . . . .1473

11  Cross By Mr. Roth . . . . . . . . . . . . .1503

12  Cross By Ms. Fontier . . . . . . . . . . . .1525

13  Redirect By Ms. Lester . . . . . . . . . . .1528

14  Recross By Mr. Roth . . . . . . . . . . . .1528

15  DAVID MAGNUSON

16  Direct By Ms. Lester . . . . . . . . . . . .1529

17  Cross By Ms. Stafford . . . . . . . . . . .1573

18  JAMES MACEDONIO

19  Direct By Ms. Stafford . . . . . . . . . . .1578

20                    GOVERNMENT EXHIBITS

21  Exhibit No.                         Received

22   268    . . . . . . . . . . . . . . . . . .1350

23   267    . . . . . . . . . . . . . . . . . .1364

24   269-272  . . . . . . . . . . . . . . . . .1369

25   1A     . . . . . . . . . . . . . . . . . .1420

1    602       . . . . . . . . . . . . . . . . . . .1459

2    604       . . . . . . . . . . . . . . . . . . .1460

3    53        . . . . . . . . . . . . . . . . . . .1470

4    524       . . . . . . . . . . . . . . . . . . .1481

5   s 3001 through 3008    . . . . . . . . . . . .1539

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25