D3eWdor1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           12 CR 45 (RJS)

5    JERMAINE DORE and DWAYNE
     BARRETT,
6
                    Defendants.
7
     ------------------------------x
8

9                                          March 14, 2013
                                           9:20 a.m.
10

11   Before:

12                      HON. RICHARD J. SULLIVAN,

13                                          District Judge

14
                              APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JESSICA MASELLA
          AMY LESTER
18        Assistant United States Attorneys

19   ALICE L. FONTIER
          Attorney for Defendant Dore
20        -and-
     LAW OFFICES OF YING STAFFORD
21   BY:  YING STAFFORD

22   HURWITZ, STAMPUR & ROTH
          Attorneys for Defendant Barrett
23   BY:  JAMES M. ROTH
          -and-
24   SIMON & PARTNERS, LLP
     BY:  KENNETH C. MURPHY
25

D3eWdor1

```
 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  I want to get back to a couple of issues

 4     we left open from yesterday.  One is Ms. Fontier's motion to

 5     withdraw and/or for mistrial, and then the other is with

 6     respect to the exhibits that we were working with yesterday.

 7     So let's start with the second one first.

 8              We've got a new exhibit, is that right?

 9              MS. STAFFORD:  Yes, your Honor.

10              THE COURT:  I don't know if I have it.

11              MS. STAFFORD:  No, you don't have it.  Mr. Macedonio

12     is actually in line downstairs.

13              THE COURT:  The parties have talked about this?  The

14     government has seen it?

15              MS. LESTER:  Yes, we have, your Honor.

16              THE COURT:  Are there objections to this one?

17              MS. LESTER:  We still have objections sort of based on

18     clarity and whether this exhibit is actually going to aid the

19     jury, but we can wait until we see -- and also I think perhaps

20     foundation.

21              THE COURT:  You have the revised one?

22              MS. LESTER:  Yes.

23              THE COURT:  That's what you're looking at?

24              MS. LESTER:  Yes.

25              MS. STAFFORD:  I have a color copy we can bring up on
```

D3eWdor1

1    the computer, your Honor.

2            THE COURT:  Let's do that.  How many pages is it,

3    first of all?

4            MS. STAFFORD:  It's approximately 40 pages.  It's

5    broken into sections and divided into Defendants' Exhibits.

6            MS. FONTIER:  Your Honor, if I may, basically what we

7    are attempting to do is to ultimately introduce a CD that is a

8    Power Point presentation of all of these slides, but what we've

9    done for ease is divide the slides into categories, and in each

10   category, the printouts are a separate exhibit so that the

11   foundation can be laid.  Say, for like the Google Earth images,

12   the foundation will be laid for those.  Those printouts will be

13   admitted, hopefully.

14           The second category would be like a Google Map.  The

15   foundation will be laid for those.  Those will be admitted as a

16   group, those printouts, and then the foundation will be laid

17   for the CD which contains the Power Point presentation that

18   includes all of Defendants' Exhibits, whatever they are, C, D,

19   E, and then hopefully admit the Power Point presentation and

20   display for the jury the Power Point presentation with

21   questions from the witness that will explain each of the slides

22   as we go through them.

23           THE COURT:  All that's fine.  I guess the devil is in

24   the details.  The issue is whether or not the proper foundation

25   can be laid or whether there's something else objectionable

D3eWdor1

1    about it.  If there are no objections, my general approach,

2    unless there's something truly glaring or something that makes

3    it clearly inadmissible, if the parties agree that it's coming

4    in, then I don't think we should belabor it.

5              Government, your objection is to what, you just don't

6    think it's helpful?

7              MS. LESTER:  We certainly don't think these Google Map

8    images are helpful, your Honor.  We think that they're

9    confusing.  It's not clear exactly what they're showing.

10   There's no time period listed.

11             THE COURT:  Yes.  There is.  At least in this picture

12   there is.

13             MS. LESTER:  It says 10/29/11 and other times.

14             THE COURT:  So what are these other times?

15             MS. STAFFORD:  The other times, your Honor, are the

16   phone calls that are emanating from the tower, and those do

17   have times.

18             THE COURT:  So this is 10/29?  Or is it November 6 or

19   December 15?  I don't understand.

20             MS. STAFFORD:  This is a phone call that was routed to

21   that particular cell tower, and when you click on that cell

22   tower, because the program works sort of as a database, it

23   pulls up all the phone calls which are imported to it, which

24   are the numbers 347-883-8414.

25             THE COURT:  I get that.  Over what period of time?

D3eWdor1

1          MS. STAFFORD:  It's the duration of the phone records.

2          THE COURT:  Which is what?

3          MS. STAFFORD:  Which is approximately July 2011 to

4    approximately February 2012.

5          THE COURT:  All right.  So why not just say that?

6          MS. STAFFORD:  I'd be happy to say that.  I mean, I

7    had planned on eliciting that, within the foundation, the

8    duration of the records, period that they cover.

9          THE COURT:  I think it's a fair point that the fact

10   that this phone happened to be in the vicinity of a robbery on

11   a particular day is not as impressive when you consider that

12   that phone was bouncing off of towers in that area every day

13   for months.  So I think that's a point that's fair.  It can be

14   made.  I think it can be made graphically.  I'm not sure that

15   this chart makes that so apparent.  There will be testimony, so

16   it's not coming in in a vacuum.

17         MS. LESTER:  Your Honor, another problem with this is

18   that it has three phone numbers here, but there's no

19   designation, at least that I can tell, in the visual as to

20   which calls are for which phone number.

21         MS. STAFFORD:  Your Honor, to do that would make it

22   even more, I don't know how visually we could have done that.

23         THE COURT:  You could have done a separate slide for

24   each phone number.

25         MS. STAFFORD:  It literally comes from the phone

D3eWdor1

1    records themselves, Government Exhibit 2020.

2                THE COURT:  You could have separated them out by phone

3    number.  The government exhibits break down data for each phone

4    number.  So I don't think you had to have done it, but you

5    certainly could have done it.

6                MS. STAFFORD:  Yes, you're absolutely right.  We could

7    have done it.

8                THE COURT:  I think these are points that can be made

9    on cross.  I'm inclined to allow it.  It's not the way I,

10   frankly, would have done it, but that's not the standard, lucky

11   for all of you.  I say that with a smile, of course.

12               So this one, it seems to me, I think, could be

13   admissible if there's proper foundation.  It still doesn't

14   indicate what exhibits he relied on, but I assume he will

15   testify about that better than he did yesterday.  He can't just

16   say I got a bunch of documents and inputted it all here and

17   that's accurate.  That's not sufficient.

18               MS. STAFFORD:  No.  I don't plan to do that, your

19   Honor.

20               THE COURT:  Are there other specific slides or

21   categories of slides that the government objects to?

22               MS. LESTER:  No, your Honor.  We'll wait until we hear

23   what the foundation is for the rest of them.

24               THE COURT:  If there are foundation issues, then we'll

25   deal with that.  But if there are more fundamental objections,

D3eWdor1

 1    I'd like to deal with those now rather than at a side bar.

 2              MS. FONTIER:  If we can go to the next set, your

 3    Honor, these are by far the most complex.  The remaining are

 4    Google Maps, essentially.

 5              THE COURT:  I don't know if they're complex.

 6              MS. FONTIER:  And an excerpt of the government's

 7    exhibit.

 8              THE COURT:  The jury's all here?  Is that what the

 9    knocking was?  Are we still waiting?

10              MS. STAFFORD:  He's got to be downstairs.

11              MR. ROTH:  I see that your phone is making calls.  I

12    think they're holding him there.

13              THE COURT:  Did the government put a hold on this guy?

14              MS. STAFFORD:  They're making him wait downstairs,

15    yes.  Should I go downstairs?

16              THE COURT:  No.  Aaron, can you go down and tell

17    them -- what entrance is he at?

18              MS. STAFFORD:  Pearl Street.

19              THE COURT:  Aaron, go down.  Just tell the jury that

20    we're, don't give them a reason.  Just tell them we'll be with

21    them shortly.  Okay?  They should have another cup of coffee.

22              MS. LESTER:  Your Honor, we don't have any other

23    objections other than waiting for the foundation to be laid.

24    But I did speak to defense counsel last night about the fact

25    that we may well call Agent Magnuson back to the stand.

D3eWdor1

1           THE COURT:  Today?

2           MS. LESTER:  In rebuttal, yes.  He's here and

3    available.  We gave them notice.  I just wanted to let the

4    Court know.

5           THE COURT:  I don't know if you need to give them

6    notice, but it's good that you did.  That's fine.

7           Just get Mr. Macedonio up here.  That's who we're

8    waiting for?

9           MS. STAFFORD:  Yes, your Honor.

10          THE COURT:  While we're waiting for him, let's talk

11   about two issues.  We have a jury issue that came up.

12          I am prepared to rule on Ms. Fontier's motion.  I've

13   thought about this a great deal.  I'm going to deny the motion.

14   I guess as an initial matter I would note that I think this is

15   a pretty late motion.  I don't think there's any dispute that

16   defendants knew that Ms. Brown was subpoenaed weeks ago but

17   didn't make this motion then.  The 3500 material on Ms. Brown

18   was handed over on the Monday before jury selection, and the

19   motion wasn't made then.  We then opened.  The government

20   called Ms. Brown.  There was no motion made after her direct.

21   She then was crossed at length.  No motion was made at that

22   point.  It wasn't really until days later, Monday of this week,

23   that the motion was made.

24          Most of what Ms. Fontier wants to impeach are

25   statements that were brought out on cross, and so it's not

D3eWdor1

1   impeaching things that were really said on direct.  So I don't

2   know that that alone is a reason to deny the motion.  I don't

3   think it probably is, but I do think it's important to note

4   that for context.

5          The real reason, I think, is the issues about which

6   Ms. Fontier wishes to testify are really collateral.  I think

7   they're impeaching the credibility of Ms. Brown generally.  I

8   think it would be a different analysis if the defense theory

9   were that Ms. Brown's prior statements about an alibi were the

10  truth and her recent testimony, which is a recantation of that,

11  is false, and you've got two statements of the witness, one of

12  which the government is saying is true, one of which the

13  defense is saying is true, then i Think the fact of

14  conversations between Ms. Fontier and Ms. Brown would not be

15  collateral and I think would be appropriate.  But that's not a

16  defense.  The defense is not arguing that the alibi that was

17  proffered by Ms. Brown to Ms. Fontier was, in fact, or is, in

18  fact, valid, nor can they, I think, because the documents that

19  were provided by Ms. Brown reflect an alibi that's 12 hours

20  after the murder.  And so the argument really is that she was

21  prepared to lie then and so she's lying now.

22         I think that's an argument that can be made.  I just

23  don't think it requires the testimony of Ms. Fontier to make

24  it.  I mean, there's a lot of other material to argue about her

25  lack of credibility.  She testified falsely under oath at a

D3eWdor1

```
 1    prior proceeding, so there's ample material there to challenge
 2    the credibility of Ms. Brown.  But I think really what is being
 3    proffered as the testimony of Ms. Fontier now, what would be
 4    her testimony, is designed really just to impeach her general
 5    credibility, and so that is, I think, precisely the sort of
 6    minitrial that the Federal Rules of Evidence caution against,
 7    and so we're not going to get into that.
 8            I see Mr. Macedonio is here.  I just wanted to let you
 9    know the ruling so you're not wondering and so it's very clear
10    as to where we're going today.
11            We're going to hear from Mr. Macedonio, have some
12    direct, have some cross.  And then no other witnesses from the
13    defense, is that correct?
14            MS. FONTIER:  No.  We have worked out a stipulation,
15    so I would just be reading that into the record.
16            THE COURT:  That's the stipulation that was handed up
17    to me?
18            MS. FONTIER:  Yes.  I have the original, signed.
19            THE COURT:  Okay.
20            MS. FONTIER:  Your Honor, we did work out a
21    stipulation for the admission of the underlying call detail
22    records that the government had not introduced, so I think our
23    intention is, it's fine obviously that Mr. Macedonio be on, but
24    to read that stipulation in now so his testimony about that
25    number is based on --
```

1        THE COURT:  That's perfect.  That's fine.

2        Ms. Schuster, who is juror No. 12, you recall, had

3   indicated that her mother was undergoing cancer treatment, I

4   think.  So her mother has surgery next Thursday.  I don't know

5   if that means she needs to leave earlier or she has to leave

6   Thursday.  But that's certainly cutting into deliberations.  If

7   she needs to leave Wednesday for Thursday surgery -- I think

8   the jury's probably not going to get this case for

9   deliberations until the end of the day Monday -- so that's

10  cutting it close.  That's a risk.  We don't have to decide that

11  now, but I do think we'll have to decide what we want to do

12  before I excuse the jurors for the day.  I guess I could have

13  her come back Monday and we'll decide Monday, but that's an

14  issue.

15       Remember, we also have an issue with respect to juror

16  No. 2, Ms. Joachim, who has a trip planned.  It's all prepaid,

17  it's not refundable, and it's her business also.  And she's

18  leaving Thursday night.  So that's another juror with whom we

19  have an issue.  We have two alternates left, so think about it.

20  We'll talk more once we finish with the evidence.  Okay?

21       MS. FONTIER:  Certainly.  I know we'll talk more, your

22  Honor, but I know my position as to Ms. Schuster.  I know that

23  she also had mentioned that her father does have Alzheimer's

24  and is not really in a position to provide care and I know that

25  presurgery preparations can be very difficult, so I would have

D3eWdor1

1    no objection to excusing her at the end of today if that's what

2    the Court and the government decide.

3              THE COURT:  All right.  We'll talk about that more.

4    Let's see if we're ready on the evidence and then we'll bring

5    in the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Have a seat.  Thank you again for being on

3    time.  You guys have been terrific and it's always gratifying

4    for me to hear a knock on the door even before 9:30, which

5    means you're all here ready to go.  It pains me then to not be

6    able to get you in right away because I worry you will lose

7    faith in me.  I'm only half joking about that.  I want to make

8    sure your time is used efficiently because your time is

9    valuable and you're giving your time to be able to serve.  At

10   the same time, I have the consolation of knowing that we were

11   working to resolve issues in order to make the thing go faster,

12   so it wasn't wasted time.

13          We're going to resume the examination of

14   Mr. Macedonio.  You can have a seat for now, Mr. Macedonio.

15    JAMES MACEDONIO, resumed.

16          THE COURT:  Before we do that, however, we have had a

17   departure.  Juror No. 3, Mr. Soto-Valdez, has been excused.

18          Mr. Mills, you will now be juror No. 3.  So you can

19   leave the back row and ascend to the seat up front.  This again

20   hammers home the point I made to you earlier, which is that

21   alternates are often called to serve, and I know our alternates

22   have been paying as much attention as our jurors.  There has

23   been no distinction, with that understanding in mind.  So,

24   thank you.

25          With that, we'll now proceed.

D3eWdor1

```
 1              MS. STAFFORD:  I just would like to read a
 2    stipulation, and it reads:  "The parties in United States of
 3    America v. Jermaine Dore and Dwayne Barrett hereby stipulate
 4    and agree to the following:
 5              "That Defendants' Exhibit B, the call detail records
 6    and the cell site location records for telephone number
 7    917-200-1367 are admissible as evidence in this case as
 8    business records."  And it is also signed by the parties and
 9    dated March 14, 2013.
10              THE COURT:  All right.  So Defendants' Exhibit B is
11    received by virtue of that stipulation.  Are we marking the
12    stipulation as an exhibit?
13              MS. STAFFORD:  Yes.  The stipulation is marked as B1.
14    The actual records are marked as Defendants' Exhibit B, and I
15    would like to move that into evidence, your Honor.
16              THE COURT:  Yes, Defendants' Exhibits B and B1 are
17    received.
18              (Defendant's Exhibits B and B1 received in evidence)
19              THE COURT:  As I told you, folks, I'll give you a list
20    of all the exhibits when you are deliberating.  And I also told
21    you a stipulation is an agreement between the parties and it's
22    an agreement to facts sometimes, and you should accept those
23    facts as true.
24              You may proceed.
25              MS. STAFFORD:  Thank you.
```

D3eWdor1

1    DIRECT EXAMINATION (cont'd)

2    BY MS. STAFFORD:

3    Q.  Good morning, Mr. Macedonio.

4    A.  Good morning.

5    Q.  I'm going to hand you, if I may approach, your Honor --

6            THE COURT:  You may.

7    BY MS. STAFFORD:

8    Q.  -- Defendants' Exhibit C1.  If you could, just take a look

9    at it, please.

10   A.  Sure.

11   Q.  Do you recognize these documents?

12   A.  Yes, I do.

13   Q.  Did you create these documents?  Yes.

14   A.  I created these slides in the Power Point presentation.

15   Q.  Who created?

16   A.  The pictures in the slides were created by the cell site

17   expert in this case in Google Earth.

18   Q.  Do you know what is represented in those documents?

19   A.  I do.

20   Q.  And are you familiar with Google Earth?

21   A.  Sorry?  Google Earth?

22   Q.  Yes.

23   A.  Yes, I am.

24   Q.  And did you verify the records, the information contained

25   in Google Earth that was created by the cell site expert with

D3eWdor1                         Macedonio - direct

1    any exhibits that were provided to you?

2    A.  I did.

3    Q.  And what were those exhibits?

4    A.  I compared them to Exhibits 2010 and 2020, which are cell

5    site information and call detail records for the numbers listed

6    347-883-8414, 917-200-1367, 704-345-3805, and a few others.

7              THE COURT:  Wait.  And a few others?  What does that

8    mean?

9              THE WITNESS:  Just numbers that I don't remember off

10   the top of my head.

11             THE COURT:  You took the numbers from Government

12   Exhibits 2010 and 2020?

13             THE WITNESS:  Yes.

14             THE COURT:  And with those numbers you did what?

15             THE WITNESS:  Well, with those -- the numbers are just

16   the numbers and the spread sheets that follow those numbers

17   contain call detail records and cell site information.  And

18   with that information, I verified the work put into Google

19   Earth which is basically just you take those spread sheets and

20   you put them into a program and it creates a map of all the

21   latitudes and longitudes in the spread sheets.

22             THE COURT:  You took the data from 2010 and 2020 and

23   you inputted it into a program maintained by Google Earth?

24             THE WITNESS:  I didn't put it.  The previous expert

25   did.  I just verified his work was accurate.

D3eWdor1                          Macedonio - direct

1          THE COURT:  How did you do that?

2          THE WITNESS:  I looked at the latitudes and longitudes

3    provided in the program and i checked them against a separate

4    program, Google Maps, and found the cell towers located in the

5    same places, which is what this map indicates, where cell

6    towers are.

7          THE COURT:  Next question.

8    BY MS. STAFFORD:

9    Q.  Did you also refer to exhibits, the actual records, to

10   verify the Google Earth program?

11   A.  I did.

12   Q.  Did you confirm that that information was accurate?

13   A.  I did.

14   Q.  And how did you create the printout that is in front of

15   you?

16   A.  We took snapshots of the Google Earth program, which is

17   like an interactive program, so you would have to take a screen

18   shot of it because it's, it has pretty much all the data loaded

19   into it for GPS points all over the world for latitude and

20   longitudes.  And we put markers in where cell towers are, so we

21   just took screen shots of where the cell towers in question

22   were and put them in these slides.

23   Q.  How about, where did you get the information from the phone

24   calls that are represented on the map at Google Earth?

25   A.  From Government Exhibits 2020 and 2010.

D3eWdor1                         Macedonio - direct

1   Q.  Are those printouts that are in front of you a fair and

2   accurate depiction of what you captured of the images from

3   Google Earth?

4   A.  Yes.

5   Q.  Can you take a look at the next page?

6          THE COURT:  Page two of C1?

7          MS. STAFFORD:  Page two of C1.

8   A.  Mm-hmm.

9   Q.  Was that created in the same way as page one of C1?

10  A.  Yes.

11  Q.  Is it a fair and accurate depiction?

12  A.  Yes.

13  Q.  And could you please look at the next page, Mr. Macedonio.

14  And that's page three of C1 --

15  A.  Yes.

16  Q.  -- is that correct?

17      And is that also a fair and accurate depiction of the image

18  that you created from Google Earth?

19  A.  Yes.

20  Q.  And then if you could look at page four of C1 --

21  A.  I have --

22          THE COURT:  I don't have a page four.

23  A.  -- three pages.

24          MS. STAFFORD:  I'm sorry.  It just goes to page three.

25  Q.  Do each of those images correspond to a government exhibit

D3eWdor1                         Macedonio - direct

1    that you looked at?

2    A.  Yes, they do.

3    Q.  And those exhibits, you mentioned them before, but if you

4    could just mention them again?

5    A.  2010 and 2020.

6    Q.  And is there a Defendants' Exhibit that you also looked at?

7    A.  Defendants' Exhibit -- this would be C1 right here.

8    Q.  Was there a Defendants' Exhibit that you also looked at

9    that contained call detail records?

10   A.  I believe those are just the government exhibits.  No?

11   Q.  Do you recall the number?  Do you recall the numbers that

12   are inputted in that program?

13   A.  Yes, I remember them from inputting them into my own

14   slides.

15   Q.  Do you recall a 917 number?

16   A.  I recall a 917-200 number.  The last four are usually an

17   issue for me to remember.  And then I remember there were two

18   704 numbers and a few 347s.

19   Q.  Were you provided the call detail records for the 917

20   number?

21   A.  Yes.

22   Q.  And those correspond with the information that's in Google

23   Earth?

24   A.  Yes.

25   Q.  And that information was accurate and correct, according to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3eWdor1                        Macedonio - direct

 1   the call detail records that you looked at?

 2   A.  Yes.

 3           MS. STAFFORD:  Your Honor, at this time, I ask to

 4   admit Defendants' Exhibit C.

 5           THE COURT:  Any objection?

 6           MS. LESTER:  Yes, your Honor.  Could I just voir dire,

 7   a few questions?

 8           THE COURT:  The only ones I will allow are with

 9   respect to time frame.  Is that where you're going?

10           MS. LESTER:  No, your Honor.  With respect to the

11   verification that he did of the fact that this representation

12   is accurate and depicts what's actually in the call detail

13   records.  I believe he said that he verified the tower location

14   but that he didn't verify each individual call.  In other

15   words --

16           THE COURT:  Let's ask that question.

17           There are three photos in this exhibits, correct?

18           THE WITNESS:  Yes, sure.

19           THE COURT:  Each depicts a particular tower, is that

20   right?

21           THE WITNESS:  Yes.  The center of the image is the

22   tower.

23           THE COURT:  And there are sort of lines emanating from

24   that tower, correct?

25           THE WITNESS:  Yeah, and they come to different points

D3eWdor1                        Macedonio - direct

1  which represent not locations but different phone calls that

2  came off that tower at different times.

3           THE COURT:  So what did you do to verify that those

4  calls hit that tower?

5           THE WITNESS:  See, this information, I didn't put this

6  in.  So I didn't really do a lot to verify the actual

7  individual calls because there are a lot of, a lot of different

8  calls on here, especially page three.  So I just verified the

9  location of the towers.

10          THE COURT:  All right.  And that's your objection?

11          MS. LESTER:  Yes, your Honor.

12          MS. STAFFORD:  May I ask another question, your Honor.

13          THE COURT:  Yes.

14 BY MS. STAFFORD:

15 Q.  Mr. Macedonio, when you received the Google Earth program

16 from the prior person who had imported the information on the

17 phone calls, did you also verify from the call detail records

18 that you referred to as Government Exhibits, and I won't say it

19 again.

20          THE COURT:  2010 and 2020.

21          MS. STAFFORD:  2010 and 2020.

22 Q.  Did you verify that that information was inputted

23 accurately into the actual program?

24 A.  I verified the GPS locations that were listed in each of

25 the government exhibits and the Google Earth program and I

D3eWdor1                          Macedonio - direct

1  found them to be the same.  But, I mean, the calls actually

2  came off the same spread sheets as the GPS location, so --

3  Q.  Correct.

4  A.  -- as far as checking each call, I didn't do that.  But

5  checking the source of the information, I did check that.

6  Q.  So you went through the call detail records and you looked

7  at the phone numbers on the Google Earth program --

8  A.  Mm-hmm.

9  Q.  -- to verify the phone records?

10      Did you, in fact, verify the phone records match the phone

11  calls that are listed in the program?

12  A.  The phone numbers, yes.  And the locations of the towers,

13  yes, but not each individual phone call.  What we did is I used

14  just, I selected phone calls here to check against the spread

15  sheets as for GPS locations of those towers.

16          THE COURT:  I'm not sure I understand.  So there's a

17  bunch of phone numbers on here.

18          THE WITNESS:  Right.  Three phone numbers on this.

19          THE COURT:  Listed at the top.  And then there's dates

20  and times listed in the exhibit.

21          THE WITNESS:  Right.

22          THE COURT:  Did you do anything to check whether the

23  dates and times correspond with what's on the government

24  exhibit?

25          THE WITNESS:  Not all of them.  Just the ones that I

D3eWdor1                              Macedonio - direct

 1    used.

 2                    THE COURT:  I'm not sure I understand.

 3                    THE WITNESS:  Each cell --

 4                    MS. STAFFORD:  Let me try and clarify.

 5                    THE WITNESS:  Yeah.

 6    BY MS. STAFFORD:

 7    Q.  Prior to creating any presentation here before your

 8    testimony today, when you received the Google Earth program

 9    that had been previously imported with several telephone

10    numbers, were you provided call detail records from Government

11    Exhibit 2020 and Government Exhibit 2010?

12    A.  Yes.

13    Q.  And did you, in fact, correspond those phone records with

14    the phone calls that were inputted into the Google Earth

15    program to ensure that they were accurate?  Just the phone

16    call, not the towers.

17    A.  These individual phone calls on the paper right here?

18    Q.  No.  The entire, the Google program that you originally

19    received prior to any preparation of the slides.

20    A.  I verified the tower locations but not each individual

21    phone call, like I said before.

22    Q.  Are you referring to each individual phone call that's in

23    the image?

24    A.  In the image.

25    Q.  Okay.  But the underlying database that was looked at by

D3eWdor1                         Macedonio - direct

1   you --

2   A.  Yes.

3   Q.  -- that contains several phone calls?

4   A.  Right.

5   Q.  Were you asked to look at certain phone calls and verify

6   that those phone calls corresponded with the actual records

7   that were provided to you?

8   A.  Yes.

9   Q.  Okay.  So then you did, in fact, verify that the

10  information inputted into the program, although -- inputted

11  into the actual Google Earth programs --

12  A.  Right.

13  Q.  -- was accurate in corresponding with Government Exhibits

14  2020 and 2010?

15  A.  Yes.

16          THE COURT:  All right.  That's my question.

17          THE WITNESS:  Sorry.

18          THE COURT:  Did you take the data from 2020 and 2010,

19  which is a list of phone calls on particular dates and

20  particular times, and confirm that that data was inputted into

21  the software that is the Google Earth program?

22          THE WITNESS:  Yes.

23          THE COURT:  You did that?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  And after you did that, then what

D3eWdor1                          Macedonio - direct

1    did you do next?

2            THE WITNESS:  As far as what, your Honor?

3            THE COURT:  To prepare this document.

4            THE WITNESS:  To prepare this document?  Well, this

5    document was prepared by a previous, the document pictured in

6    this document was prepared by a previous expert who basically

7    just put all --

8            THE COURT:  Is this document the product of what you

9    just described, that the data from 2020 and 2010 was inputted

10   into the Google Earth software program?

11           THE WITNESS:  Yes, but I didn't input it into that

12   program.

13           THE COURT:  But you verified that what was inputted

14   into the program corresponded with what's on 2020 and 2010?

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  And so after that, the Google

17   Earth program spit something out, right?

18           THE WITNESS:  It spits out images that look like this

19   on the paper.

20           THE COURT:  What's the difference between what the

21   Google Earth program spit out and Defendants' Exhibit C1?  What

22   did you do to it?

23           THE WITNESS:  Well, when you open Google Earth it

24   shows a whole map of the whole world, and you can zoom in on

25   different locations that have been plotted, and the center of

D3eWdor1                           Macedonio - direct

1    this picture is the location that's been plotted, and you can

2    just zoom on it.  And when you click on it, you can see which

3    phone calls come off this tower during the range of time that

4    was inputted into the data.

5               THE COURT:  And you confirmed that this is, in fact,

6    the tower that is listed on here, the tower located at 2705

7    Colden Avenue?

8               THE WITNESS:  Yes.

9               THE COURT:  For example, on page one.  All right.

10              Any objection to this exhibit?

11              MS. LESTER:  Your Honor, I think it's still not clear

12   that this witness is the proper witness because he doesn't know

13   how the program, at least I haven't heard whether he knows how

14   the Google Earth program works.

15              THE COURT:  We had testimony about that yesterday.

16   You can ask the question.  Go ahead.

17   VOIR DIRE EXAMINATION

18   BY MS. LESTER:

19   Q.  Have you used Google Earth yourself?

20   A.  Yes.

21   Q.  Do you understand how it works?

22   A.  I have a basic understanding of it, yeah.

23   Q.  How does it work?

24   A.  Well, pretty much every point on the earth has a GPS

25   location as far as latitude and longitude, and Google Earth has

D3eWdor1                           Macedonio - direct

1   the whole world mapped out.  And when you input latitude and

2   longitude, it will bring you to that point.

3   Q.  How do you use Google Earth to create a record such as

4   we're looking at in Defendants' Exhibit C1?

5   A.  Well, as far as this exhibit, you would have to get the

6   latitude and longitude of the tower that's pictured and then

7   you input it into Google Earth and put a place marker there,

8   and that will show you where the tower is.

9   Q.  How do you get the other information that's on the exhibit?

10  A.  The other information also comes from the call detail

11  records and cell site information because each of these phone

12  calls that comes off of the cell tower has information as to

13  the location area code and the cell tower that was used to make

14  the phone call or text message, or whatever it is.  And if the

15  records are accurate, then you can input it and see which cell

16  tower it came off of.

17  Q.  But how do the call detail records get put into Google

18  Earth?  Do you understand that process?

19  A.  Yes.  The dates and times on the call detail records.  And

20  there's also a GPS location which is inputted into the GPS

21  program.

22  Q.  So if I'm understanding you correctly, you put in the GPS

23  location for the particular cell tower?

24  A.  Yes.

25               (Continued on next page)

1    BY MS. LESTER:

2    Q.  And then you put in additional GPS locations based on each

3    call detail record entry?

4    A.  Well, these -- the ones pictured in Defendant's Exhibit C,

5    they're all going to be the same GPS locations because they're

6    coming off of the same cell tower.

7              THE COURT:  And you know that from the government's

8    exhibits that you examined?

9              THE WITNESS:  Yes.  It is all listed on the cell site

10   information and the call detail records.

11             MS. LESTER:  Have you ever used Google Earth to create

12   a document such as this?

13             THE WITNESS:  Not to create one.  This is the first

14   time that I have used it.

15             MS. LESTER:  All right, your Honor.  We don't object.

16             THE COURT:  Yes, I think that's sufficient.

17             Defendant's Exhibit C-1, which is three pages -- three

18   specific maps, is admitted.  I did have one caveat though:

19   There is a header at the top that talks about certain dates and

20   it listed one particular date and then says other times.  Can

21   you be more specific as to what the dates are that are covered

22   by these individual photos?

23             THE WITNESS:  You're asking me, your Honor?

24             THE COURT:  Yes.

25             THE WITNESS:  The dates on the photos correspond with

1    phone calls that were made off of this cell tower and I guess

2    the date range is -- I'm not sure of whatever date range is in

3    the cell tower information and call detail records in

4    government 2010 and 2020.

5           THE COURT:  Do you have a sense as to how long a

6    period that is?  Days?  Weeks?  Months?

7           THE WITNESS:  Years.

8           THE COURT:  Years.

9           THE WITNESS:  Yes.  It starts in 2011 and -- at least

10   a year.  I remember seeing 2012 in there as well.

11          THE COURT:  All right.  So that's received.

12          (Defendant's Exhibit C-1 received in evidence)

13          THE COURT:  Are you going to show it to the jury?

14          MS. STAFFORD:  I will show it to the jury now.  Thank

15   you, your Honor.

16          Sorry, your Honor, I am going to move on and try to

17   build a foundation for the rest of the PowerPoint and do that

18   at the end.

19          THE COURT:  That's fine.

20          MS. STAFFORD:  May I approach?

21          THE COURT:  You don't have to ask.  That's fine.

22   BY MS. STAFFORD:

23   Q.  Showing you Defendant's Exhibit marked D-1 for

24   identification, if you can look at that?  Take your time.

25          THE COURT:  Do you want him to study every page?

1    THE WITNESS:  I'm just making sure everything is here.

2    I recognize the document.

3    THE COURT:  It is a 37-page document, right?  That's

4    what you have?

5    THE WITNESS:  Yes.

6    BY MS. STAFFORD:

7    Q.  Did you create these documents, Mr. Macedonio?

8    A.  I did.

9    Q.  And how did you create these documents?

10   A.  I'm sorry, let me get to the right page.

11         So, to create these documents I had cell site

12   information for numbers 704-345-3805, 704-356-5031,

13   917-200-1367.

14         THE COURT:  Where do you get that?

15         THE WITNESS:  These are from Government Exhibit 2010.

16         THE COURT:  All from 2010?

17         THE WITNESS:  Yes.

18   BY MS. STAFFORD:

19   Q.  Is there another exhibit that you got those numbers from?

20   A.  2020; but I believe these particular numbers are from 2010.

21   Q.  Did you use a particular program to create that document?

22   A.  I used two programs; I used Microsoft PowerPoint to create

23   the actual document I'm looking at, and I used Google Maps,

24   which is similar to Google Earth, to create the maps in the

25   program -- in the presentation.  Sorry.

D3E5dor2                          Macedonio - direct

1   Q.  Is Google Maps a publicly available program?

2   A.  It is.

3   Q.  Can you just explain what Google Maps does?

4   A.  It does something very similar to what Google Earth does;

5   you can plug in GPS data as far as latitude and longitude and

6   put in addresses on Google Maps to find directions from one

7   place to another pretty much is what most people use it for.

8   And I took information that I got from the cell site data for

9   these numbers and there is a key provided with that that tells

10  you how to locate exactly where that cell tower is at, its

11  address and different cell towers on different maps.  I input

12  those addresses into Google Maps -- I mean -- yes, Google Maps.

13  Q.  Where did you get that information?  You may have mentioned

14  it before but you can say it again?

15  A.  Government Exhibit 2010.

16  Q.  Did you compare Government Exhibit 2010 with the maps that

17  you created in this exhibit?

18  A.  Yes, I did.

19  Q.  And are each of the maps in Defendant's Exhibit D a fair

20  and accurate printout of the map that you created on Google

21  Maps?

22  A.  Yes.

23  Q.  I'm sorry.  How did you create the printout that you have

24  in front of you?

25              THE COURT:  The maps?

D3E5dor2                          Macedonio - direct

1   Q.   The maps, yes.

2   A.   The maps?  Well, I inputted the address locations for

3   different cell towers and then I clicked get directions which

4   is just a way that I know how to show this map from A to B and

5   I took a screen shot, printed a PDF of the image that came up

6   and I put it into Microsoft PowerPoint.

7   Q.   The documents that you looked at, are those fair and

8   accurate depictions of the documents that you created?

9   A.   Yes.

10  Q.   Did you also verify -- I apologize.

11             I think at this time, your Honor -- there are certain

12  phone numbers on there, if you could turn to page 2 and if you

13  could take a look at that page, please?

14  A.   Sure.

15  Q.   And how did you create that particular document?

16  A.   For this particular document I looked at the cell site

17  information for phone number 704-345-3805.  I looked at

18  particular phone calls.  I got their LACs and each phone call

19  has first LAC, second LAC -- and an LAC is location area code

20  which is a grouping of cell towers -- and then I also got that

21  phone call's first cell I.D. and second cell I.D. which

22  indicates the cell towers used because each phone call has two

23  cell I.D.s or cell towers it uses in the spreadsheet.

24  Q.   And when you say the spreadsheet you're referring to --

25  A.   Government Exhibit 2010.

D3E5dor2                          Macedonio - direct

 1  Q.  And the information that you have here, is this accurate

 2  information that you verified with Government Exhibit 210.

 3          THE COURT:  You are talking about 2010 or 210?

 4          MS. STAFFORD:  There is Government Exhibit 2010 or

 5  2020.

 6          THE COURT:  When you say 210 you mean 2010.

 7          MS. STAFFORD:  At this time, your Honor, I move to

 8  admit Defendant's Exhibit D.

 9          THE COURT:  Any objection?

10          MS. STAFFORD:  Your Honor, just to the foundation for

11  phone number 917-200-1367; there aren't any call detail records

12  for that number in Government Exhibit 2010.

13          THE COURT:  I think that's a fair objection, so.

14  BY MS. STAFFORD:

15  Q.  Did you review the phone number 917-200-1367 which is on

16  page 36?

17  A.  Yes.

18  Q.  And, what records were you provided for 917-200-1367?

19  A.  Cell site records.

20  Q.  And can you be more specific?

21  A.  As far as what's in the cell site records?

22  Q.  Were they call detail records?

23  A.  I believe they're called call detail records and cell site

24  records for each number.

25          MS. STAFFORD:  Your Honor, is there some objection?

```
 1   Or I can bring them up on the screen to verify that he

 2   recognizes it.

 3            THE COURT:  What are you going to bring up on the

 4   screen?

 5            MS. STAFFORD:  Defendant's Exhibit B which is a 917

 6   call.

 7            THE COURT:  Just search him and see if it refreshes

 8   his recollection if that exhibit includes data from that

 9   exhibit.

10            MS. STAFFORD:  Your Honor, we only have these in CD

11   form because they're several hundred pages long, just as the

12   government only has theirs in CD form.

13            I can put the computer in front of him and see --

14            THE COURT:  It is in evidence so you can show it on

15   the screen.

16   BY MS. STAFFORD:

17   Q.  Oh sure.  Defendant's Exhibit B.

18            Ms. Brady, can we click on the first file, please?

19            Mr. Macedonio, do you recognize that file?

20   A.  Yes.

21   Q.  What is it?

22   A.  These are the call detail records for 917-200-1367, and I

23   think the confusion is it is not labeled that, it is labeled

24   CDR, it is abbreviated up there.

25   Q.  Why do you say that?  What is the confusion?
```

D3E5dor2                              Macedonio - direct

```
 1    A.  I think the government had said there were no call detail
 2    records but it is just --
 3              THE COURT:  No, no.  The issue is this is not 2010 or
 4    2020, is it?
 5              THE WITNESS:  I don't have the actual exhibit number
 6    in front of me.
 7              THE COURT:  So, you utilized certain records like this
 8    one to prepare some of the charts that are in Defendant's
 9    Exhibit D, right?
10              THE WITNESS:  Similar to this, yes.  There is also
11    cell site records which is a different file.
12    BY MS. STAFFORD:
13    Q.  We will get to that one.  Do you actually recognize this
14    file?
15    A.  Yes.
16              THE COURT:  So you used this file in preparing --
17              THE WITNESS:  Not this particular file, but one for
18    this phone number, the cell site there is two different files,
19    call detail records and cell site records.
20              THE COURT:  So you didn't use this document?
21              THE WITNESS:  Not this document.
22              THE COURT:  Okay, so.
23    BY MS. STAFFORD:
24    Q.  If we can go to the next file?
25              Now, can you explain why this file is different from
```

D3E5dor2                              Macedonio - direct

1    the other file I just showed you?

2    A.  Is this the full screen view of this?  I don't think that

3    it is.

4    Q.  It can probably be moved over a lit bit.

5    A.  This is different because there is more information on

6    here.  If you go all the way to the left, first cell I.D. and

7    last cell I.D. are the cell I.D. numbers that I was talking

8    about earlier that indicate cell towers.  So, if you look first

9    cell I.D. for phone call 7 is the first one that has it, the

10   first cell I.D. is 23152, and the second or the last cell I.D.

11   is also 23152.

12              THE COURT:  Okay, but the issue is did you use this

13   document --

14              THE WITNESS:  Yes --

15              THE COURT:   -- to prepare what is currently

16   Defendant's Exhibit D.

17              MS. STAFFORD:  B.

18              THE COURT:  B?  No.  Did you use this document to

19   prepare the exhibit that you are trying to get in which is

20   Defendant's Exhibit D.

21              THE WITNESS:  Yes.

22              THE COURT:  You did.  Okay.  So that covers the

23   government's objection.  Otherwise no objection?

24              MS. LESTER:  That's right, your Honor.

25              THE COURT:  I didn't want to question but there is

D3E5dor2                              Macedonio - direct

1      some maps in here, right?

2                    THE WITNESS:  Yes; in the presentation.  Right.

3                    THE COURT:  The maps have a line that shows point A to

4      point B, right?

5                    THE WITNESS:  It is not a direct line, it is like --

6      because you couldn't obviously travel through these buildings

7      that are depicted.

8                    THE COURT:  But there is lines and they zig-zag; what

9      do the lines depict?

10                   THE WITNESS:  They depict what is supposed to be the

11     fastest travel location from A to B.

12                   THE COURT:  And A and B are what?

13                   THE WITNESS:  Different cell towers.

14                   THE COURT:  And is it your understanding that you have

15     to drive to a cell tower to be able to get a cell phone to hit

16     off of it?

17                   THE WITNESS:  No.  The directions aren't as important

18     as just showing the location.

19                   THE COURT:  Why are the directions important at all?

20                   THE WITNESS:  The directions are important --

21                   THE COURT:  Why are they relevant at all?

22                   THE WITNESS:  They're relevant in that to utilize

23     either cell tower you have to be within a range of each cell

24     tower, right.  So, to get from using cell tower A to using cell

25     tower B you would have to, in theory, move from one place to

D3E5dor2                              Macedonio - direct

1     another.

2              THE COURT:  But you wouldn't have to drive from one

3     cell tower to the other, right?

4              THE WITNESS:  No.  You could walk.  But, in the

5     instance of -- which slide are you looking at?

6              THE COURT:  Looking at page 3 -- well, no, page 5 of

7     Defendant's Exhibit D.

8              THE WITNESS:  Okay.  So, in page 5 the driving

9     distance of 1.9 miles is shown and that is call 267.

10             THE COURT:  I know what it shows.  I'm asking why

11    would it matter?  Whether you get cell coverage doesn't turn on

12    whether you are standing on the cell tower, right?

13             THE WITNESS:  No, you don't have to be standing on it,

14    you have to be standing within a certain range of that cell

15    tower.

16             THE COURT:  Right.  So the fastest route to drive

17    there is -- I guess my question is to relevance.  There is no

18    objection on relevance grounds but I just don't want the jury

19    confused by all of this.

20             So, it is in, I'm going to allow it in.  Defendant's

21    Exhibit D-1 is received but maybe we'll have some questions

22    when we look at some things, okay?

23             (Defendant's Exhibit D-1 received in evidence)

24             THE COURT:  Next.

25             MS. STAFFORD:  Thank you, your Honor.

D3E5dor2                        Macedonio – direct

1  BY MS. STAFFORD:

2  Q.  I approach showing the witness Defendant's Exhibit E and I

3  am providing the Court an additional copy.

4          Can you look at that, Mr. Macedonio?  Do you recognize

5  these documents?

6  A.  I do.

7  Q.  How do you recognize these document?

8  A.  I have created them.

9  Q.  And how did you create this document?

10  A.  This document I was given two locations, one being a

11  residence and one being the location of a cell tower.

12  Q.  And, is that the same program that you used to create

13  Defendant's Exhibit E?

14  A.  Yes, the same program Google Maps -- my apologies again for

15  the driving directions.  I don't know why I thought that was

16  relevant.  Sorry.

17  Q.  Don't apologize.

18          And is there information that is not contained in any

19  government exhibit that's on that particular slide?

20  A.  I'm not sure if the residence location is contained in a

21  government exhibit.

22  Q.  And how did you get that residence location?

23  A.  It was given to me.

24  Q.  And who was that given to you by?

25  A.  By yourself.

D3E5dor2                        Macedonio - direct

1   Q.  And was that also given to you by --

2           How did you locate that address and that map?

3   A.  I just plugged it into the program and it came right up.

4   Q.  Is that -- how did you create that printout?

5   A.  The same way I did the printouts on D, I just clicked print

6   and then you can save to PDF instead of printing to create a

7   picture and I just used the picture.

8   Q.  And, is that fair and accurate depiction of what you

9   printed out?

10  A.  Yes.

11          MS. STAFFORD:  Your Honor, I would ask to admit

12  Defense Exhibit E at this point.

13          THE COURT:  Any objection?

14          MS. LESTER:  No, your Honor.

15          THE COURT:  Hold on.

16          MS. STAFFORD:  Sorry.

17          THE COURT:  Can we have a quick side bar?  I want to

18  make sure I'm not missing something.

19

20

21

22

23

24

25

1       (At side bar)

2       THE COURT:  I don't understand what is the relevance

3  of the driving distance between two cell towers.

4       MS. STAFFORD:  I will explain the difference.

5       THE COURT:  Explain it to me because I think you are

6  having a tough time doing that.

7       MS. STAFFORD:  Well, from the call records there are

8  certain phone calls, your Honor, that show towers where the

9  phone call is starting at one place and ending at another

10  place.

11       THE COURT:  I get that.  I get that, but towers cover

12  areas.

13       MS. STAFFORD:  Correct.

14       THE COURT:  So one doesn't have to be standing on one

15  tower and then standing on the other tower to get switched.  I

16  think it's incredibly misleading to suggest -- let's look at

17  the exhibit that I asked your witness about.

18       So, what is to be inferred from the fact that you have

19  to drive west, then south, then farther west and then do a loop

20  and then drive north along the Bronx River Parkway to get to

21  the second tower?

22       MS. STAFFORD:  What is to be inferred is that it is

23  impossible for a person to make it -- to be within the

24  proximity of that particular cell tower.

25       THE COURT:  But what if you walked two friggin blocks

1    to there or to there?  This is irrelevant.  The government

2    didn't object on relevancy grounds but my job is not to mislead

3    the jury so why is this relevant?  And anybody can jump in.

4            You guys objected to the exhibit that had a closed

5    loop on a "V" because you said there was no basis for saying

6    the distance was limited by that loop and I took it out.  Why

7    on earth does the jury need to know the driving distance

8    between two towers rather than just the point of these towers?

9            MS. FONTIER:  Your Honor, I think that the primary

10   issue is the way to get the two points listed on the same map

11   on Google Earth puts the driving directions in and I think

12   that, obviously, it's open for argument that you could do that,

13   you could walk there.  We're not saying that you would have to

14   drive this way, it is just a --

15           THE COURT:  Why is it relevant that this is one way

16   you could go?  Why is it relevant that that's 1.9 miles and

17   five minutes?

18           MS. FONTIER:  Google Maps produces the fastest driving

19   directions.

20           THE COURT:  I don't care.  Why is it put in?

21           MS. FONTIER:  Because if there was -- the argument --

22           THE COURT:  We're not bound by Google Maps.  The fact

23   that Google Maps does something doesn't mean that's the way

24   this Court has to accept it.  Why does anybody care about the

25   driving distance between point A and point B?

1          MS. FONTIER:  Because all of the testimony in this

2    case is about the car and them driving around in the car and if

3    they're going from cell tower to cell tower.

4          THE COURT:  But you don't have to be on top of a cell

5    tower to hit the cell tower.  This supposes or presupposes that

6    you have to be standing on one and then standing on the other

7    to get a switch.  That is false.  There is no basis for that so

8    this is irrelevant.

9          MS. FONTIER:  We're not going to elicit that

10   testimony.

11         THE COURT:  What is the basis for including this line?

12         MS. STAFFORD:  The basis is --

13         THE COURT:  Are you implying that anybody drove that

14   route?

15         MS. STAFFORD:  No.

16         THE COURT:  Are you implying that anyone would need to

17   describe that route?

18         MS. STAFFORD:  No.

19         THE COURT:  Why is it there?

20         MS. STAFFORD:  It is there to demonstrate that it

21   would be impossible for the phone call to happen the way it

22   happened and therefore the accuracy of the records -- the

23   accuracy of the records are questionable because the phone call

24   is starting here and then it's starting two miles away,

25   therefore it would be impossible for a person to get from point

D3E5dor2                         Macedonio - direct

1    A to point B within the --

2              THE COURT:  You don't have to get to point A to point

3    B to get coverage of a tower.  You know that as well as I know

4    that.  That's how cell towers work.  You could have started

5    here and driven here and you move from one cell tower to

6    another depending on what the coverage is but there is no

7    suggestion that you have to drive this route to get coverage.

8              MS. STAFFORD:  Right.

9              THE COURT:  This is not coming in.  Take it out.  You

10   can get it in, you can revise this but not -- the jury is not

11   seeing driving distance.  It is utterly misleading.  It is

12   designed to mislead the jury and I'm not going to let you do

13   it.

14

15

16

17

18

19

20

21

22

23

24

25

D3E5dor2                            Macedonio - direct

1              (In open court)

2              THE COURT:  I'm going to allow in Defendant's Exhibit

3    D with a modification that the parties will correct before the

4    jury sees it.  Okay.

5              (Defendant's Exhibit D received in evidence)

6              THE COURT:  And with respect to E, the same proviso.

7    Okay?  The lines come out, As and Bs stay.

8              (Defendant's Exhibit E received in evidence)

9              MS. STAFFORD:  May I approach, your Honor?

10             THE COURT:  Yes.

11   BY MS. STAFFORD:

12   Q.  Mr. Macedonio, I'm showing you what's marked as Defendant's

13   Exhibit F and ask you if you recognize it.

14   A.  I do.

15   Q.  And what is it?

16   A.  It is a CD containing the PowerPoint presentation that I

17   just read over.

18             THE COURT:  Which PowerPoint presentation?

19             THE WITNESS:  This one; Defendant's Exhibit C, D and

20   E.

21             THE COURT:  It has got them all?

22             THE WITNESS:  Yes.

23   BY MS. STAFFORD:

24   Q.  Did you create this CD?

25   A.  I did.

D3E5dor2                        Macedonio - direct

1    Q.  And are those your initials on the CD?

2    A.  They are.

3    Q.  And do they incorporate all the documents that have been

4    introduced --

5    A.  Yes.

6    Q.  -- as Defendant's Exhibit D, C, and E?

7    A.  Yes.

8             MS. STAFFORD:  I move to admit Defendant's Exhibit

9    E --

10            THE COURT:  F?

11            MS. STAFFORD:  I mean F, subject to your Honor's

12   modification.

13            THE COURT:  But just so I'm clear, does Defendant's

14   Exhibit F have them broken up as D and E?

15            THE WITNESS:  Yes, it does.

16            THE COURT:  So it is exactly the way they're printed

17   out --

18            THE WITNESS:  Yes.

19            THE COURT:  -- is how they appear on the disk.

20            THE WITNESS:  Yes, your Honor.

21            THE COURT:  So, with that one caveat that Ms. Stafford

22   just indicated, I will accept Defendant's Exhibit F in

23   evidence.  It is received.

24            (Defendant's Exhibit F received in evidence)

25            MS. STAFFORD:  We would like to start with publishing

1   Defendant's Exhibit C and then I will let you know, if we may?

2          THE COURT:  Yes.  That's fine.

3   BY MS. STAFFORD:

4   Q.  Mr. Macedonio, what is depicted in this slide?

5   A.  This is a cell tower located at 2705 Colden Avenue in the

6   Bronx and it is used by phone numbers 347-883-8414,

7   917-200-1367 and 704-345-3805.

8   Q.  There are several triangles and dates and times; what does

9   that refer to?

10  A.  They just refer to different cell phone calls, text

11  messages, and basically any time that that tower is utilized by

12  the phone.

13  Q.  When you say the phones you are referring to the number

14  that you just stated?

15  A.  Yes.

16  Q.  If we can go to the next page, please?

17          And, again, please tell us what this depicts?

18  A.  It is the same kind of image, it just looks like a

19  different cell tower than it is, it is at 275 West 238th Street

20  in the Bronx.

21  Q.  Can you read that again, the address, please?

22  A.  275 West 238th Street in the Bronx.

23  Q.  And what else does it depict?

24  A.  It depicts where that cell tower is and it also depicts,

25  again, different times and dates where that cell tower is

D3E5dor2                        Macedonio - direct

1   utilized by the numbers listed.

2   Q.  Again, if you can explain the triangles and the dates and

3   times next to those triangles?

4   A.  Sure.

5        The triangles are indicative of any location, they're

6   where they're placed, but they're indicative of different dates

7   and times that the cell tower is utilized by these phone

8   numbers.

9   Q.  And at the top of the screen it says cell tower located at

10  the address we just stated and it says on December -- I'm

11  sorry.  It says on, and what date is that?

12  A.  12/05/11.

13  Q.  And it also says other times?

14  A.  Yes.

15  Q.  And the other times are they depicted within the slide?

16  A.  Yes.  I see 12/4, 10/12.  All different dates.

17  Q.  Ms. Brady, if you can go to the next slide, please?

18  Finally, can you please tell us also what this slide depicts?

19  A.  This is a cell tower located at 715-719 233rd Street in the

20  Bronx.

21  Q.  And it is utilized by what phone numbers?

22  A.  734-883-8414, 917-200-1367 and 704-345-3805.

23  Q.  And you indicated a time period that you recall from the

24  records?

25  A.  This looks like just the entirety of the records.

D3E5dor2                         Macedonio - direct

1   Q.  Okay.  You don't recall the time period, the years, the

2   months that the records reflected?

3   A.  2011 to, I think, some of the last days I had seen were in

4   January 2012.

5   Q.  Okay.

6          MS. STAFFORD:  Your Honor, did you want me to make the

7   modifications to the next exhibit?

8          THE COURT:  If you can do it on the fly; otherwise, it

9   will be in evidence and the jury can look at it but I'm not

10   going to let them see it as it is currently configured.

11          MS. STAFFORD:  We are going to do this with the

12   overhead.

13          THE COURT:  So, what are you putting on the overhead?

14          MS. STAFFORD:  I'm going to be publishing, with your

15   permission, Defendant's Exhibit D-1.

16          MS. FONTIER:  Your Honor, this would include the

17   slides with the maps, the slides leading up to the maps without

18   actually showing the maps.

19          THE COURT:  You know my instruction so I assume you

20   are going to follow it.

21          MS. FONTIER:  Yes, your Honor.

22          MS. STAFFORD:  Absolutely.

23          THE COURT:  Go ahead.

24   BY MS. STAFFORD:

25   Q.  Mr. Macedonio, would you look at the screen, please?  D-1,

D3E5dor2                        Macedonio - direct

1    what does that indicate?

2    A.  This is an historical cell detail analysis, cell site

3    analysis for phone numbers 704-345-3805, 704-756-5031,

4    917-200-1367.

5    Q.  And, did you utilize those telephone numbers and create

6    some charts?

7    A.  Yes, I did.

8    Q.  I'm going to show you page 2 of Defendant's Exhibit D and I

9    want you to focus on call number 267.

10   A.  Okay.

11   Q.  And can you please explain to us the information that's

12   depicted there?

13   A.  Sure.  It is the call number as listed in the cell site

14   information spreadsheet that I was provided from Government

15   Exhibit 2010.  The first LAC used, the second LAC used by that

16   phone call, the first cell tower and the second cell tower used

17   by that phone call, and also the duration of the phone call in

18   seconds.

19   Q.  And how long was the phone call?

20   A.  Eight seconds.

21   Q.  And, I'm going to now put on page 3; can you tell me what

22   that slide indicates?

23   A.  This slide just indicates that on call 267 the cell I.D.

24   switches from A to B during the course of that phone call.

25   Q.  And do you know the relative distance -- you can refer to

D3E5dor2                         Macedonio - direct

1   the document in front of you but don't --

2   A.   From A to B?

3   Q.   Are you able to determine the distance -- not the traveling

4   distance but just the distance between those two towers?

5   A.   I would have to estimate it.

6           MS. STAFFORD:  Would that be permissible, your Honor?

7           THE COURT:  You can estimate.  What is your basis for

8   estimating?

9           THE WITNESS:  Well, in front of me I have travel

10  directions and I would just kind of do a visual estimation

11  based on that.

12          THE COURT:  What is your estimate of the distance

13  between the two towers?

14          THE WITNESS:  About a mile and a half.

15          THE COURT:  Mile and a half.  Okay.

16  BY MS. STAFFORD:

17  Q.   And so call 267 registered at tower A and then it

18  registered at tower B?

19  A.   Yes; during the course of the phone call.

20  Q.   And the distance, you said, was approximately what?

21  A.   Looks like about a mile and a half, based on what I have in

22  front of me here.

23  Q.   And the length of the call was how long?

24  A.   Eight seconds.

25  Q.   I'm now going to refer you to page no. 6 of Defendant's

D3E5dor2                          Macedonio - direct

1   Exhibit B. -- I'm sorry, 7, and ask you to focus on call 26.

2   A.  Okay.

3   Q.  How long was that phone call?

4   A.  Six seconds.

5   Q.  And can you approximate -- well, that phone call registered

6   on a tower that labeled as tower A?

7   A.  Yes.

8            THE COURT:  Where do you label it as tower A?

9            THE WITNESS:  It is on the next page.

10           THE COURT:  But tower A is 23356?  Is that what you're

11   saying?  What is the tower?  52198?

12   BY MS. STAFFORD:

13   Q.  How did you determine the location of the towers for this

14   particular exhibit?

15   A.  For this particular exhibit I utilized the cell site

16   records in Government Exhibit 2010 and there is also a key

17   coming with it telling you how to look up where that tower is

18   and it comes from T-Mobile which is the phone company here.

19   Q.  And if you can refer to page 8?

20   A.  Okay.

21   Q.  And does that correspond with the phone call 268?  Is that

22   correct?

23   A.  Yes, it is.

24   Q.  And, tower A, do you know the location of that tower?

25   Approximately?

D3E5dor2                        Macedonio - direct

1    A.  It is in between Martin Luther King Boulevard and Second

2    Street.

3    Q.  And how about tower B?  Do you know the approximate

4    location of that tower?

5    A.  Sure.  It is 20 Secor Place, Yonkers New York.

6    Q.  And, do you know the approximate distance between the

7    towers?

8    A.  Again, it looks like about a mile and a half.

9    Q.  And if you can move down to call No. 320?

10   A.  Okay.

11   Q.  Now, the duration of that phone call was how long?

12   A.  320 is 13 seconds long.

13   Q.  And, do you know the approximate location of the first

14   tower that the phone call registered with, tower A?

15   A.  It is right off Bronx River Parkway around, like 235th

16   Street in the Bronx.

17   Q.  And, do you know the approximate location of tower B?

18   A.  It is 167 Saw Mill River Road in Yonkers.

19   Q.  And, do you know approximately the distance between those

20   two towers?

21   A.  This one looks like it might be around like three miles,

22   three and a half miles.

23   Q.  I'm sorry.  Just a moment, your Honor.

24           I am now placing on the ELMO page 36 of Defendant's

25   Exhibit D.  Can you tell me the telephone number for that

D3E5dor2                        Macedonio - direct

1    exhibit?

2    A.   Sure.  It is 917-200-1367.

3    Q.   And I'm now putting on page no. 35, Defendant's Exhibit D

4    and can you tell me what is stated in that exhibit?

5    A.   This exhibit states that a phone call numbered 222 in the

6    spread sheets that I used from Government Exhibit 2010 switches

7    from cell tower location A to location B during the course of a

8    one-minute phone call on January 3rd, 2013 -- it should be

9    12 -- at 12:59 p.m.

10   Q.   And, tower A, do you know approximately where that is

11   located?

12   A.   It is located almost right on the FDR drive in between the

13   FDR Drive and First Avenue at 105th Street.

14   Q.   And, do you know where tower B is located in relation to

15   tower A?

16   A.   It is located in Queens right over the RFK Bridge on --

17   very close to 21st Street.

18   Q.   And, is it fair to say that that's across the East River?

19   A.   Yes, it is.

20   Q.   Can you give us an approximate distance between the two?

21   A.   Maybe, again, a mile and a half, little more.

22   Q.   And how long was the phone call?

23   A.   This is 222 --

24   Q.   I will put it up.

25   A.   -- is 61 seconds.

D3E5dor2                          Macedonio - direct

1    Q.  Sorry.  Did you see it?

2    A.  Yes; 61 seconds long.

3    Q.  Thank you.

4            Can you take a look at Defendant's Exhibit E,

5    Mr. Macedonio?

6    A.  Okay.

7    Q.  And that's -- what is that?

8    A.  This is just a map of a cell tower used in a phone call at

9    11:17 a.m. on 12/12/11 by phone number 704-756-5031; and B

10   shows the cell tower on the map and A shows a residence given

11   to me.

12   Q.  And, can you give the approximate address of A?

13   A.  It's 3983 Carpenter Avenue in the Bronx.

14   Q.  And how about B?

15   A.  3990 Bronx Boulevard in the Bronx.

16   Q.  And, do you know the time that that phone call was made?

17   A.  11:17 a.m.

18   Q.  Do you happen to know where in relation the cell tower is

19   to 3983 Carpenter Avenue?

20   A.  It is on the same block just on the opposite side of the

21   block.

22           MS. STAFFORD:  Thank you, Mr. Macedonio.  I have no

23   further questions.

24           THE COURT:  Cross-examination.

25           MS. LESTER:  Yes, your Honor.  Thank you.

D3E5dor2                          Macedonio - direct

1    CROSS EXAMINATION

2    BY MS. LESTER:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  What's your title -- first of all, where do you work?

6    A.  I work at a law office in Queens.

7    Q.  What's your title there?

8    A.  Paralegal.

9    Q.  Have you testified in court previously?

10   A.  This is my first time.

11   Q.  Do you have any experience with cellular telephones other

12   than your own personal use of a cellular telephone?

13   A.  Cellular telephones or records?

14   Q.  Cellular telephones.

15   A.  That's pretty much it, my own.

16   Q.  Have you ever spoken to cell phone companies about the

17   coverage range of their cell towers?

18   A.  No, I haven't.

19   Q.  Have you ever researched what the coverage range is for a

20   cell tower?

21   A.  Only in that I have heard people testify about it --

22   experts testify about it.

23   Q.  You personally don't have any knowledge about that?

24   A.  Other than that, no.

25   Q.  In preparation for your testimony here today you reviewed

1   call detail records and cell site records, correct?

2   A.  Yes.

3   Q.  And you testified that you created Defense Exhibit C-1

4   based on your review of those records, correct?

5   A.  Yes.  I created this exhibit.

6   Q.  But you said a portion of the exhibit had been prepared

7   previously, that is the image from Google Earth, is that right?

8   A.  That's right.

9   Q.  And that was prepared by someone else?

10  A.  It was.

11  Q.  And you called that person a cell site expert?

12  A.  That's what he has been referred to, yeah.

13  Q.  Who is that person?

14  A.  He's a guy known only to me as Gus, I think his last name

15  is Dimitrios.

16  Q.  Who does he work for?

17  A.  I believe he was working for the defense before I came into

18  the case.

19  Q.  Did you ever talk with him about what he had prepared?

20  A.  I did.

21  Q.  And, did you discuss with him how he prepared the maps in

22  Google Earth?

23  A.  Yes.

24  Q.  Did he explain the process to you?

25  A.  Yes, he did.

D3E5dor2                    Macedonio - cross

```
 1   Q.  Can we take a look at, Ms. Brady, the second page of

 2   Defendant's Exhibit C-1?  Or you don't have it.

 3          Mr. Macedonio, if you could just look at that

 4   yourself?

 5   A.  Okay.

 6          THE COURT:  It is in evidence, there is a disk.

 7          MS. STAFFORD:  You have Defendant's Exhibit F, right?

 8          THE COURT:  If you don't care, I don't but it is in

 9   evidence is my point.

10   BY MS. LESTER:

11   Q.  Mr. Macedonio, on direct I think you verified that the

12   records through 2705 Colden Avenue is an actual tower location,

13   is that right?

14   A.  Yes.

15   Q.  And you verified that this map accurately depicted where

16   2705 Colden Avenue is in the Bronx, is that right?

17   A.  I believe so.  Yes.

18   Q.  But you didn't verify whether each phone call that's

19   supposedly shown on this map actually appears in the call

20   detail records, is that right?

21   A.  No.  Not each phone call, no.

22   Q.  And, are all three of these phone numbers that are listed

23   here, the number ending in 8414, the number ending in 1367 and

24   the number ending in 3805, are those all under the same service

25   provider?
```

D3E5dor2                          Macedonio - cross

1  A.  I don't know off the top of my head.  I know that a lot of

2  the numbers that I used were on T-Mobile.

3  Q.  So, do you know who the service provider is for 8414?

4  A.  I would have to guess.  Right now I have an idea but I

5  don't know for sure.

6  Q.  What about 1367?

7  A.  I'm pretty sure that's T-Mobile.

8  Q.  And what about 3805?

9  A.  Again, I'm pretty sure that's T-Mobile.

10 Q.  Do you have an understanding of whether phones that are

11 under one service provider can use towers from a different

12 service provider?

13 A.  Not my only personal knowledge.  From what I have heard

14 from testimony, I believe so.

15 Q.  So you actually, yourself, don't have any personal

16 knowledge of that though?

17 A.  No.

18 Q.  You also, up here at the top of the exhibit, have listed

19 10/29/11 as a date and other times.  Do you see that?

20 A.  Yes.

21 Q.  Now, looking at the exhibit itself, it appears that there

22 are quite a few calls on 10/29/2011, in fact I believe there

23 are at least 18 calls on that particular date.

24       Did you do any analysis as to how many calls were on

25 any particular date?

D3E5dor2                         Macedonio - cross

1    A.  No, I did not.

2    Q.  Is it fair to say, looking at this map, just eyeballing it,

3    that the majority of the calls appear to have taken place in

4    October?

5    A.  Let me take a look quickly.  There are a lot in October,

6    yes.

7    Q.  Again, this map doesn't indicate which calls were made by

8    which phone number so we don't know which call was made by 8414

9    versus 1367 for example, right?

10   A.  Not by looking at this, no.

11   Q.  And we don't know which one was made by the 3805 number

12   either?

13   A.  You couldn't tell just looking at this exhibit, no.

14   Q.  And I think you testified that you don't know the exact

15   date ranges off the top of your head of the periods of time

16   covered through the call detail records and cell site records

17   that you reviewed, is that right?

18   A.  That's right.

19   Q.  But you testified that this map was created using whatever

20   records were available to you through the government's exhibits

21   and the defendant's exhibit that you testified about, is that

22   right?

23   A.  Yes.

24   Q.  So, sitting here today you don't know what date range is

25   actually displayed in this map, what period of time?

1   A.  I mean, I could count it and figure it out but.

2   Q.  But you don't know what date range of records were used to

3   create this map off the top of your head sitting there?

4   A.  Not off the top of my head.

5   Q.  If we could go to the third page, the third slide?

6          Mr. Macedonio, this exhibit shows a cell tower located

7   on 233rd Street in the Bronx; is that right?

8   A.  Yes.

9   Q.  Do you know why you were asked to select that location for

10  the cell tower to be displayed in this map?

11  A.  I don't.

12  Q.  Were you directed to pick out particular cell towers to

13  look at?

14  A.  Yes.

15  Q.  And who gave you that information?

16  A.  Ms. Stafford.

17  Q.  And this exhibit actually doesn't have a date range in the

18  header, it just says:  And other times?

19  A.  Right.

20  Q.  And, again, there are the three phone numbers here listed

21  8414, 1367, 3805; correct?

22  A.  Yes.

23  Q.  And there is no designation in the visual portion of the

24  map as to which of those cellular telephones made those phone

25  calls on particular days; we don't know that, correct?

D3E5dor2                        Macedonio - cross

1   A.   No, you don't.

2   Q.   And did you follow the same procedure that you used with

3   respect to the other map that we just looked at that is you

4   verified the tower location, that that was correct on the map

5   but you didn't individually verify each phone call, is that

6   right?

7   A.   That's right.

8   Q.   Mr. Macedonio, you have worked on this case, you made

9   reference to the fact that you have spoken with a cell site

10  person who was retained by the defense, correct?

11  A.   Yes.

12  Q.   Are you familiar with some of the locations about which

13  there has been testimony in this case?

14  A.   The only work I've done in this case is really with these

15  spread sheets and with these slides.

16  Q.   Are you familiar with the location of a store at 233rd and

17  White Plains Road about which there has been testimony in this

18  case?

19  A.   I haven't been in court or reading testimony or anything

20  like that.

21  Q.   Do you know if that's why you were asked to look for a

22  tower located at 233rd Street in the Bronx?

23  A.   I don't know.

24          MS. LESTER:  May I have a moment, your Honor?

25          THE COURT:  Yes.

D3E5dor2                              Macedonio - cross

 1              (Pause)

 2              MS. LESTER:  No further questions.

 3              THE COURT:  Any redirect?

 4              MS. STAFFORD:  No, your Honor.

 5              THE COURT:  Okay.  You may step down, Mr. Macedonio.

 6     Thank you.  Leave that there, let the lawyers do something.

 7              THE WITNESS:  Okay.

 8              (Witness steps down)

 9              THE COURT:  Defense, your next witness?

10              MS. FONTIER:  Your Honor, at this time I will read a

11     stipulation.

12              THE COURT:  Okay.

13              MS. FONTIER:  The parties reached a stipulation in the

14     matter of United States against Jermaine Dore which states:

15     The parties, Jermaine Dore, Dwayne Barrett and the United

16     States, hereby stipulate and agree to the following facts:

17              1.  A forensic examination of the 2009 Toyota Sienna

18     New York plate no. DLX 9048 was conducted on December 19, 2011.

19     During this examination, pertinent and conducive areas and

20     items in the interior and exterior of the vehicle were

21     processed in a conventional way for swab DNA samples and latent

22     fingerprints.

23              2.  A forensic examination of the 2003 Mercedes Benz

24     New York plate no. FMB 7467 was conducted at the time and in

25     the manner as testified to by NYPD Detective Daniel Mulvanerty.

D3E5dor2

1          3.   Oral swabs of DNA were taken from Jermaine Dore

2     and Dwayne Barrett and submitted to the Office of the Chief

3     Medical Examiner.

4          4.   Jermaine Dore is not a match for any of the DNA

5     samples that were tested.

6          5.   Dwayne Barrett is not a match for any of the DNA

7     samples that were tested.

8          6.   Jermaine Dore is not a match for any of the latent

9     fingerprints that were examined.

10          7.   Dwayne Barrett is not a match for any of the

11     latent fingerprints that were examined.

12          And this is executed March 14th, 2013, in New York,

13     New York, signed by Alice L. Fontier, attorney for Jermaine

14     Dore, James Roth, attorney for Dwayne Barrett, Jessica Masella

15     and Amy Lester, Assistant United States Attorneys.

16          That is the stipulation of the parties.

17          THE COURT:  All right.

18          Any further evidence or witnesses whom the defense

19     wish to call?

20          MS. FONTIER:  No, your Honor.  The defense would rest

21     at this time.

22          THE COURT:  Mr. Roth?

23          MR. ROTH:  The defendant rests, your Honor.

24          THE COURT:  Is there a rebuttal case that the

25     government wishes to put on?

D3E5dor2

1              MS. LESTER:  Yes, your Honor.

2              THE COURT:  Who does the government wish to call?

3              MS. LESTER:  Your Honor, the government wishes to

4     recall Special Agent David Magnuson.

5              THE COURT:  Is he here?

6              MS. LESTER:  He is, your Honor.  Before we do that we

7     have one issue with respect to Agent Magnuson's testimony.  We

8     can either --

9              THE COURT:  Why don't we take a short break.  It is

10    11:00 now, it is earlier than I normally would break but we can

11    use the time while you folks are relaxing, using the bathroom

12    and drinking cold coffee.

13             We will make it short.

14             All rise for the jury.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D3E5dor2

 1              (Jury not present)

 2              THE COURT:  What is the issue?

 3              MS. LESTER:  Your Honor, we believe at this point

 4      through Defendant's Exhibit D, the one with the maps indicating

 5      the distance between two cell towers, that the defendants have

 6      now opened the door to the issue of coverage area and we should

 7      be able to have Agent Magnuson testify based on his expertise.

 8      We don't need to qualify him as an expert but he obviously has

 9      knowledge of the coverage area range of cell towers, how cell

10      towers operate, how it is possible for an 8-second call to take

11      place, and for the handset to switch from one cell tower to

12      another.

13              THE COURT:  I think, clearly, that door has been

14      opened, so I assume that's why you were calling him.  So, yes,

15      that's fine.

16              Anybody want to be heard?  Is the defense suggesting

17      otherwise?

18              MS. FONTIER:  As long as it is limited to the

19      testimony that was just proffered I don't think we would have

20      an opposition.

21              THE COURT:  Yes.  I mean, the jury has heard -- I

22      think the clear implication from the questions that were put to

23      Mr. Macedonio about the distance between cell towers and the

24      length of the calls was that somebody would have to travel a

25      mile and a half in six seconds and that, I think, is not

D3E5dor2

1    accurate in terms of you could get a switch from –– on one call

2    from one tower to another by moving a block or, you know, half

3    a block.  And so, I think it is clearly fair rebuttal

4    testimony.  So, let's see what he has to say.

5            Anything else?

6            MS. LESTER:  No, your Honor.

7            (continued on next page)

D3eWdor3

1              MS. LESTER:  No, your Honor.

2              THE COURT:  Anything else from the defense at this

3      point?

4              MR. MURPHY:  No.

5              THE COURT:  So then let's take a short break and we'll

6      pick up again.  We will have to talk about what we want to do

7      with Ms. Schuster.  So why don't we do that now before the

8      break and maybe just start.  Okay?  Ms. Fontier indicated she

9      had no objection to excusing Ms. Schuster.  We didn't hear what

10     Ms. Schuster has to say.

11             Does anybody else have any thoughts?

12             MS. MASELLA:  Your Honor, at this point just because

13     it's unclear what exactly her date conflict is, I think it

14     would make sense to have her come back on Monday to hear the

15     closings, with the other alternates, and then at that point

16     decide what the likelihood is that her timing will be a

17     conflict or not.

18             THE COURT:  So don't even ask her today, you mean?

19             MS. MASELLA:  We could ask her if she has plans.  Who

20     knows what her plans are.  But I would suggest that we not make

21     a decision with respect to her until Monday.  We have some idea

22     as to when the case is going to go to the jury.

23             THE COURT:  It's not a hardship for her to be here

24     Monday, right, unlike Mr. Soto-Valdez who, frankly, was dipping

25     into the vacation time, and I felt bad for the guy.

D3eWdor3

1    Ms. Schuster has never complained about being here.  It doesn't

2    seem like it's a financial hardship for her.  It's just that

3    she has this other concern.  If we address that Monday, that's

4    fine, but I think we should at least find out what plans she's

5    already made and what her schedule is as of today.  That could

6    change between now and Monday, I suppose.

7            My law clerk is saying that he inferred, based on what

8    she said, that she was considering leaving on Wednesday.  Let's

9    ask her.  We'll ask her now, but my inclination is not to

10   excuse her today.  But I think we should be thinking about it,

11   and let's get the information from her before she leaves today.

12   Okay?  Let's take a short break.

13           (Recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D3eWdor3

```
 1                 (In open court; jury present)
 2                 THE COURT:  Have a seat.
 3                 We will now hear from the government's rebuttal
 4       witness.  I'll just remind you, Mr. Magnuson, you're still
 5       under oath.
 6                 THE WITNESS:  Yes, sir.
 7        DAVID MAGNUSON, recalled.
 8                 THE COURT:  Ms. Lester.
 9       DIRECT EXAMINATION
10       BY MS. LESTER:
11       Q.  Good morning, Special Agent Magnuson?
12       A.  Good morning.
13       Q.  Have you had conversations during the course of your duties
14       as a member of FBI's cellular analysis survey team with the
15       service providers whose phone records you analyzed?
16       A.  Yes.  Very often I communicate directly with the legal
17       compliance department or their network engineers.
18       Q.  Speaking with particularly the network engineers, what
19       topics do you discuss with them relative to how a cellular
20       network or their particular cellular network operates?
21       A.  Well, we communicate with them on --
22                 MR. ROTH:  Objection.  If he could testify in the
23       first person.
24                 THE COURT:  Yes, just your conversation.
25                 THE WITNESS:  Thank you.  Yes.
```

1   A.   I communicate on a wide variety of issues, from placement

2   of towers, direction or tuning of antennas, range of RF energy,

3   how cell phones work within their network and on their

4   technology base.  Could be any number of issues.

5   Q.   You just mentioned the term range of RF.  What was the last

6   word?

7   A.   Energy.

8   Q.   Energy.  What do you mean by that?

9   A.   Well, a cellular network is made up of radio frequencies,

10  and that's a form of electromagnetic energy, and they design

11  the network, they kind of carve it up and compartmentalize it

12  so that they can reutilize a very limited number of frequencies

13  that they're assigned to by the Federal communications agency.

14  So each cell within a cellular network is a very specific

15  bordered group of energy so they can manage their network

16  precisely.

17  Q.   Have you had any conversations with network engineers, and

18  let's use Sprint as an example, with Sprint's network

19  engineers, about how their towers are laid out and the coverage

20  areas for those towers?

21  A.   Yes, I have.

22  Q.   And what is your understanding of how Sprint's network or

23  other cellular telephone networks are laid out, in terms of the

24  relative distance between towers?

25  A.   Well, the relative distance is totally dependent on

D3eWdor3                          Magnuson - direct

1    relative environment that the towers are going to be installed.

2    They'd have to analyze the environment, whether it's urban or

3    countryside or riverside, highway-side, and then they determine

4    the needs of their subscribers, kind of capacity they're going

5    to be serving, and then they design and implement the cellular

6    network to meet the needs of the subscribers.  So, for

7    instance, in an urban area like the city here, you can take

8    full advantage of all the buildings here because they're

9    instant infrastructure.  They don't have to put up a tower.

10   They can tap into the electricity, bolt an antenna on the side

11   of a building or bridge.  So they have a lot of opportunity to

12   carve up and provide quality service even in an area which

13   might have impediments to RF signal propagation.

14   Q.  What do you mean by impediments to RF signal propagation?

15   A.  Certain natural objects, and manmade, provide some kind of

16   impediment to the signal being sent out, but most objects do

17   not reflect energy; they kind of absorb it so it still goes

18   through into buildings.  But when you design a cell phone

19   network, most of your antennas are up higher than the users and

20   they're pointing down into a very specific area.

21   Q.  And in setting up the towers in a certain geographic

22   location, what is the goal of the service provider?

23   A.  The goal is to provide seamless quality service in any

24   geographic area so that they, they strive to ensure that

25   there's pockets of energy, cellular energy, that can take your

D3eWdor3                       Magnuson - direct

1   call and that it can be handed off into the next cell and the

2   next cell, as you move throughout the network.

3        If you're stationary and the signal, the antenna that

4   you're communicating with starts to get some kind of noise on

5   it or less desirable, the network can hand you off to a more

6   desirable quality signal so that you don't drop your call.  The

7   handset is constantly looking at the network, and it sees up to

8   six sectors at a time.  And it's constantly prioritizing those

9   on quality and strength and always putting the next available

10  best quality signal is the next one I'm going to go to if the

11  one I'm on now tends to degrade.

12  Q.  Is it possible for a cellular telephone to switch cell

13  towers based on the issues you just discussed, coverage and

14  strength of signal, without the physical handset of the phone

15  actually moving?

16  A.  Yes.  That can occur, depending upon what we're look --

17  what the phone is seeing and what the network is telling the

18  handset.  During a call, the network computer and the handset,

19  which is a computer, really the phone's a computer, they're

20  communicating on control channels all the time, and the network

21  is telling the phone either to decrease or increase your

22  battery output, to keep your call at optimum, because it

23  doesn't want to drain your battery and wants to give you a

24  strong signal, because it knows that you have a very small

25  battery and if it drains your battery every three hours, it

D3eWdor3                        Magnuson - direct

1    would be very undesirable.  So there's a lot of communication

2    protocol going on, control channels telling the phone what the

3    network wants to do and vice versa.

4              MS. LESTER:  Ms. Brady, could we put up Government

5    Exhibit 3008, the fifth page.

6    Q.  Agent Magnuson, this is one of the pages from the exhibit

7    that we went through on your direct testimony.  Do you recall

8    this page?

9    A.  Yes.

10   Q.  Can you just remind the jury what we are looking at here in

11   this depiction?

12   A.  This is a map, portion of, appears to be Mount Vernon, New

13   York.  It's a Sprint, icons on the map, there's two different

14   colors.  In this particular case, the red ones are Sprint

15   towers, locations of Sprint towers.  The green ones, I believe

16   they were leftover T-Mobiles from the previous analysis.  And

17   again, it's got the date and time.  This is Sprint No.

18   347-883-8414, on 12/12/2011, from 10:38 through 10:57.  However

19   many calls were made or received, the phone was on the same,

20   hitting on the same sector there.

21   Q.  Now, the tower that's indicated in this map is located

22   where, approximately?

23   A.  I'm sorry.  Could you repeat the question?

24   Q.  The tower that's the relevant tower in this particular map

25   that the 8414 number is hitting off at this time --

D3eWdor3                          Magnuson - direct

1    A.  Yes.

2    Q.  -- 10:38 through 10:57 --

3    A.  Yes, ma'am.

4    Q.  -- where is that tower located on the map?  Just the street

5    location, the approximate street location.

6    A.  Kind of blurry, I think.  It looks -- is it Fourth Avenue

7    there?

8    Q.  I can give you the paper copy if it's easier.

9    A.  Okay.  It appears from the map that the tower address

10   location is at the intersection of South Fourth Avenue and East

11   Fourth Street on the northwest section of that intersection

12   there.  And you can see underneath where those two wings meet,

13   there's a little icon.  That's the precise location of the

14   Sprint tower.

15   Q.  The wings you just mentioned coming out from the tower,

16   what do those represent?

17   A.  Well, that represents a, an antenna or the direction the

18   antenna is facing on that particular call, and that's from the

19   call detail records in reference to the cell site index that

20   the phone company provides.

21   Q.  So during your direct testimony, we looked at a section of

22   cell site records that included information like azimuth.  Do

23   you remember looking at that column in the cell detail records?

24   A.  Yes, I do.

25   Q.  A-Z-I-M-U-T-H?

D3eWdor3                        Magnuson - direct

1   A.  Yes, ma'am.

2   Q.  And what does azimuth mean?

3   A.  That's a nomenclature for a direction on a compass, and

4   they use that as a reference to maintain and orient their

5   antennas.  So if you're looking at a compass rose that's 360

6   degrees and this particular antenna, the center of it, where

7   the two wings come together, it's not quite due north.  It's

8   probably a little, I'd say 350, 355, the center coming out.  So

9   if you're setting up an antenna, you have to have some point of

10  reference, and they mark it down and they put that in their

11  tower list.

12  Q.  Did you use the data relating to the azimuth to help you

13  designate which way the wings coming off the tower should be

14  pointed?

15  A.  Yes.

16  Q.  Now, if you could, you can use the laser pointer, if you'd

17  like, but can you indicate the coverage area that you would

18  expect from that tower and that particular sector, given what

19  you know about how Sprint's cell towers operate?

20  A.  Well, we're looking at a tower that's located right here,

21  and this tower has three sides to it.  These wings are showing,

22  they're coming off the center.  This would be the azimuth or

23  the orientation for this tower that's documented in the Sprint

24  cell tower listing.  And the reason it's wide open like that is

25  because each sector is approximately 120 degrees.  So that's

D3eWdor3                        Magnuson - direct

1    120, 60 and 60.  And three times 120 would be 360, which would,

2    each tower's got like a circular coverage path service area

3    that it's responsible for, and they break it up into three

4    sides because directional antennas are much more efficient than

5    a polarizing or unilateral pole, monopole, that's transmitting

6    in all directions because they want to be very precise.  They

7    want to target a very precise geographical area because they

8    have to reuse the frequencies that they're allocated, and they

9    can't have interference or noise.

10   Q.  Agent Magnuson, indicating with the laser pointer, can you

11   show the jury what is the coverage area for that particular

12   sector of that cell tower?

13   A.  That would be something going out and then if you drew a

14   line, perhaps a pie shape would be, based upon my experience,

15   an estimated coverage area for that particular sector.

16   Q.  Now, I believe up at the -- I can't read it.  Maybe it's

17   the Bronx River Parkway.  There's some road up at the top

18   portion of the map and there's a cell tower there.  There, yes,

19   the red triangle.

20       Is that another Sprint cell tower?

21   A.  Yes, it is.

22   Q.  Now, when Sprint or any other service provider sets up

23   towers like this in conjunction with one another, what are they

24   trying to do in terms of coverage area?

25   A.  They're trying to provide every geographical area with

1   coverage of RF energy so that you can make a phone and have

2   seamless calls and they overlap a little bit so that it's not

3   cut and dried; you don't walk out of one energy field and into

4   another energy field.  There's calculations going on and it's a

5   very smooth, calculated, predetermined handoff to the next

6   sector so that it's very seamless to the user.  You don't hear.

7   It's transparent.

8   Q.  If somebody was using the phone approximately halfway

9   between both of these towers, how would the network decide or

10  how would the phone decide which cell tower to utilize?

11  A.  Well, when the phone's not, it's in idle mode, it's on,

12  it's monitoring the network, it's in control.  It's got a list

13  of six cells that it can select from, from one to six.  It

14  prioritizes them on quality, signal quality and strength, and

15  the cell phone knows which ones it's going to seek out and talk

16  to and send a signal for resources to the network.  So when you

17  hit the send button, it goes right to that tower, whatever it

18  is.  Whatever's on No. 1 on the phone.

19  Q.  What determines what's No. 1 in terms of the phone

20  priority?

21  A.  Signal strength and signal quality, and it's an algorithm

22  that is calculated for both because sometimes the strongest

23  signal is not always the cleanest.  You could have a strong,

24  noisy signal, but you could have one that's almost as strong

25  but much cleaner, and the phone would either select that, or,

D3eWdor3                        Magnuson - direct

```
 1   if you're in a call, the network will tell you to move to that
 2   handoff.
 3   Q.  So, if there are two towers such as we see on this map, and
 4   you've already described that they would have an overlapping
 5   coverage area, is that fair to say?
 6   A.  Yes.  Most geographical areas have overlap.
 7   Q.  If the phone is in that overlap position, would it be
 8   possible for it to hit either tower?
 9   A.  Yes.
10   Q.  And it would make that determination based on the factors
11   you just mentioned?
12   A.  Yes.  It would constantly speak between the network
13   computer and the handset and it would constantly be determining
14   what is the best frequency, cleanest, strongest traffic channel
15   available for this handset and customer and they're going to be
16   transferring, or handing off, that phone or those frequencies
17   for the phone to use, if necessary.
18   Q.  Now, you examined numerous call detail records and cell
19   site records in connection with your preparation for this case,
20   correct?
21   A.  Yes, ma'am.
22   Q.  And did some of those call detail records contain phone
23   calls or other network communications by the phone that were
24   very short in duration, say, 30 seconds or less?
25   A.  Yes.
```

D3eWdor3                        Magnuson - direct

1   Q.  What, if anything, do you know based on your training and

2   experience about what types of communications a short-duration

3   communication like that might be?

4   A.  Well, there's a number of events which could be signified

5   by seeing a short duration call on a call detail record.  Your

6   phone could be on, it could ring for five or six rings, and

7   then you could send it to voice mail or it will automatically

8   go to voice mail.  And depending upon the service provider and

9   how they populate their call detail records, it may very well

10  populate cell site data even though the call went to voice

11  mail, because the network attempted to locate it to the

12  network.  It rang your phone.  It didn't answer, but the call

13  terminated, so there's still a series of starting, beginning,

14  and terminating events for that particular activity.

15  Q.  Now, in the call detail records and cell site records that

16  we looked at yesterday during your direct examination, there

17  were two columns, one for the starting cell tower, at the

18  beginning of a call, and then one for the ending cell tower at

19  the end of a call.  Do you remember that?

20  A.  Yes, I do.

21  Q.  Now, during a short-duration communication such as the one

22  you just discussed, what are the possible explanations for why

23  there might be one tower at the beginning of the communication

24  and a different tower at the end of that communication?

25  A.  Well, when the phone is in idle, when it's on, and you're

1   not making a call, the phone is monitoring the network and it

2   sees up to six cell sectors.  So the phone knows at that point

3   if it's going, when you hit send, it's going to go to No. 1 on

4   its list.  And it's called the neighbors lists and it's looking

5   at all the neighboring sectors.  Once that happens, the CDR is

6   populated by the network computer.  If and when a traffic

7   channel is assigned for voice, for the voice call, which is

8   considered a network resource, now the network is committing a

9   frequency pair to this handset and it's got to qualify.  So

10  once it assigns it, it may hand off to another adjacent

11  qualifying sector.  And that may be the sector when the phone,

12  when the call terminates, it would populate with that

13  particular sector.

14  Q.  Does it necessarily mean that the phone itself moved at

15  all?

16  A.  No.  No.  It's, it's like a cell in a cellular network is

17  like the infield of a baseball field.  Say the handset is on

18  the pitcher's mound and it sees sectors from home plate, first

19  base, second base, and third base.  It sees four cell sectors.

20  Well, that infield is the cell, and in this case it's made up

21  of four sectors.  So the handset's on home plate and it thinks

22  it sees the sector off, the handset's on the pitcher's mound

23  and it thinks it sees the sector off home plate or a little

24  stronger, so when you hit send, it reaches out to it and the

25  network computer populates that sector off home plate.

1  Immediately thereafter, the network, who is now in control and

2  much smarter, says I think I like the sector on third base for

3  you.  For whatever reason I determine, probably a better

4  signal, I immediately transfer you to those signals on third

5  base.  The call terminates.  It populates the sector from third

6  base.

7      What happened?  The phone was always in the area of the

8  pitcher's mound.  It's being serviced by the four cell sectors.

9  That's a cell network.  That's a cell within a cell network.

10 Q.  Actually, expanding on your analogy a little bit, if there

11 are then a series of cell towers in the outfield, beyond the

12 bases, so there is a cell tower in right field, center field,

13 and left field, the phone is still on the pitcher's mound,

14 would the phone ever hit one of the towers in the outfield

15 instead?

16 A.  Negative.  That's not, it's not designed to jump sectors

17 and number of towers in sectors.  It's --

18 Q.  Why not?

19 A.  Well, if you were doing a tile job in your bathroom and you

20 had -- the number for cell networks and management and

21 architecture is seven.  They have a limited number of

22 frequencies that they're assigned by the government.  So they

23 have to reuse these frequencies, and it's the same thing if you

24 have seven colors and you're going to tile your bathroom with

25 seven tiles.  And you don't want two blue tiles next to each

 1   other, so you come up with this pattern and you start to repeat

 2   this pattern and you never have a blue or a green tile next to

 3   each other, they do the same thing with their frequencies

 4   throughout the network.  They repeat the architecture, the

 5   structure, because the frequencies of outside their cell, to

 6   them, to the phone, is noise.  So it can't, it can't jump to

 7   that far blue tile, so to speak, because it's, there's too many

 8   other tiles in between that are considered noise and it's too

 9   far.  It's compartmentalized.  It's not designed to be that

10   way.  Each sector and tower has a specific geographic coverage

11   responsibility, and they do that so they can precisely manage

12   their subscribers throughout the network and their limited

13   number of frequencies.

14            MS. LESTER:  May I have a moment, your Honor.

15            THE COURT:  Yes.

16            MS. LESTER:  No further questions.

17            THE COURT:  Cross-examination?

18            MS. FONTIER:  Briefly, your Honor.

19            THE COURT:  Yes.

20   CROSS-EXAMINATION

21   BY MS. FONTIER:

22   Q.  Good morning, sir.

23   A.  Good morning, ma'am.

24   Q.  I don't play baseball, so I'm not going to be able to use

25   this analogy.  But when you've described a sector that any

D3eWdor3                          Magnuson - cross

1   particular towers has, that's the range of coverage, right?

2   Yes?

3   A.  Well --

4       When you're talking about a range, could you rephrase?  I'm

5   sorry.

6   Q.  All right.  So when you say the cell tower's sector, what

7   was between the arms on your exhibit --

8   A.  Yes, ma'am.

9   Q.  -- you're talking about the range of coverage, the area

10  that is covered, correct?

11  A.  I'm talking about -- yes.  Correct.  Both the range and the

12  orientation, because the handset has to see that antenna.

13  Q.  It doesn't physically have to see it; it has to be within

14  the radio range, the signal range, right?

15  A.  Exactly, yes.

16  Q.  And that range can extend for different distances, correct?

17  A.  Yes.

18  Q.  And that's dependent upon interference, weather, things of

19  that nature, correct?

20  A.  It is, but it has an end.  It has a border, that range.

21  Otherwise, it would be interfering with the whole network

22  operation.

23  Q.  And that range can extend up to two miles, correct?

24  A.  Depending on the environment, I would say yes.

25  Q.  I'm not sure what you specifically called it, but you were

1   saying the phone has a priority list of six sectors.  Correct?

2   A.  Yes.

3   Q.  What did you call that?

4   A.  It's called a neighbors list.

5   Q.  So in that neighbors list, a phone is picking up six

6   different towers, right?

7   A.  Yes.

8   Q.  And it's --

9   A.  No.  Six sectors.

10  Q.  Okay.  Six different sectors.  And it sorts through those

11  for the strongest signal, correct?

12  A.  Correct.

13  Q.  And so it has to be able to be within the range of six of

14  those different sectors, right?

15  A.  Yes.

16  Q.  But you don't know which one it's in the range of

17  specifically or which one it's closest to?  Sorry.

18  A.  Whatever is No. 1, and that's the one it's going to reach

19  out for instantly when you hit send, and that's what the

20  network computer populates.

21  Q.  But there's a difference between signal strength and

22  physical distance, right?

23  A.  Could you rephrase that?

24  Q.  When you say signal strength, it picks up the signal

25  strength that is strongest, right?

D3eWdor3                              Magnuson - cross

1   A.  Yes.

2   Q.  That is not necessarily going to be the closest distance,

3   correct?

4   A.  Could you rephrase that, because there's also signal

5   quality and signal strength.

6   Q.  All right.  The No. 1 priority in the neighbors list is

7   signal strength.  When the phone picks up that call, so it

8   starts a call on a particular tower, No. 1, that's not

9   necessarily the closest in physical distance to the actual cell

10  phone, correct?

11  A.  That is correct.

12  Q.  And when a phone is stationary, it can go from one tower to

13  the next, correct?  During the course of a single call, without

14  the phone moving, it can use more than one tower, right?

15  A.  You would see populated two sectors:  The beginning of the

16  call which the phone selected the sector; and if the network

17  decided to move it, for whatever reason, then you would see

18  that sector populated in the call detail record.

19  Q.  We might be saying the same thing and using different

20  language.

21  A.  Yes, ma'am.

22  Q.  If I'm standing right here on my phone, my phone will pick

23  up a single tower, and it is possible for it to switch during

24  the course of my call to a different phone, correct, or a

25  different tower?  Yes?

D3eWdor3                          Magnuson - cross

1    A.  Yes.

2    Q.  And that's because both are, it's within the range of both

3    of those?

4    A.  Yes.

5    Q.  And now the reverse is also true, correct?  You can be on a

6    call, on a single tower, and physically move, correct?

7    A.  And?

8    Q.  And stay on that tower, during the course of a call.

9    A.  Yes, you can stay -- you can stay within that sector, that

10   the -- yes.

11   Q.  Within that two-mile range?

12   A.  I don't, I wouldn't caveat that with any kind of range.

13   Q.  But looking at the cell tower does not tell you where

14   within the range the phone is located, correct?

15   A.  No.  Incorrect.

16   Q.  It tells you the exact location?

17   A.  No.

18   Q.  It just tells you that it's within range of that tower,

19   correct?

20   A.  It tells you it's within a general area in an orientation

21   off a specific geographical location of the tower, and by

22   looking at the distance of the surrounding towers, you can get

23   a good estimate of the service coverage of that sector, and

24   it's general in nature, but the handset had to be in that

25   sector in order for it to populate the information in the call

1   detail record.

2   Q.  But if you look at the call detail record, it's not like a

3   GPS, correct, a global positioning system?  It doesn't tell you

4   an exact latitude and longitude of the actual phone, correct?

5   A.  Correct.

6   Q.  So looking at just the cell tower use, all you know is that

7   it's within the range of that cell tower, it's able to pick up

8   the signal, correct?

9   A.  Correct.

10  Q.  And if it moves, within a single call, if the call detail

11  records indicate as starting on one number and ending on a

12  different number, say, in eight seconds, you don't know if the

13  phone actually moved or if it was just because of signal

14  strength, correct?

15  A.  I would have to look at the actual location of the sectors

16  and then that would suggest to me, okay, these are two adjacent

17  sectors on the neighbors list, so, yeah, he's in the overlap

18  area.

19  Q.  But the records themselves, the detail records themselves

20  don't tell you whether the phone is stationary or whether the

21  phone is moving, right?

22  A.  No.  Sometimes they do tell that it's moving.

23  Q.  Let me put up --

24          MS. FONTIER:  Sorry.  One moment, please.

25  Q.  So, I'm going to show you a page from what is marked as

D3eWdor3                           Magnuson - cross

1   Defense Exhibit D, and let's take, for instance, page two of
2   that exhibit.  Can you see that, sir?
3   A.  Yes.
4           THE COURT:  Is it on your screen as well?
5           THE WITNESS:  Yes, it is.  Thank you, your Honor.
6   BY MS. FONTIER:
7   Q.  I think you have a pointer, so I can show you what I'm
8   talking about.  What this is is an excerpt of the call detail
9   record, right?  Is that what it appears to be to you?
10  A.  Appears to be, yes.
11  Q.  So when you're looking at, let's look at No. 267, the call
12  date.  This was an eight-second-duration call, right?
13  A.  Right.
14  Q.  So what's in these records?  Explain to me what this is,
15  LAC, so I don't use the wrong language.
16  A.  Well, this is a, several of the columns of what I recall as
17  having a much, many more columns of information, call detail
18  records for, what's it, T-Mobile, 704-345?
19  Q.  Sorry.  If I may rephrase, what does the first LAC mean?
20  A.  That's the first location area code.
21  Q.  That's the group of cell towers, right?
22  A.  Yes, ma'am.
23  Q.  And then the first cell ID, this is the specific tower
24  within this group, right?
25  A.  Right.

D3eWdor3                          Magnuson - cross

1    Q.   And the second LAC is what?

2    A.   Second location area code or group of towers.

3    Q.   Is that where the call ends?

4    A.   Yes.

5    Q.   And then this second cell ID is the specific tower, right?

6    A.   Yes.

7    Q.   And this is the information contained in the call detail

8    records about the phone's location, correct?

9    A.   Correct.

10   Q.   And then the duration of this eight-second call, it

11   switches from one tower to the next, correct?

12   A.   You're looking at the 267?

13   Q.   267.  Yes.

14   A.   Yes.

15   Q.   Here and here.  And so if I'm looking at these records,

16   this information, you can't tell where in relation to either

17   one of these cell towers the actual physical phone was, right?

18   A.   Yes, I can.

19   Q.   From looking at this record, you can tell where the

20   physical phone was, the actual location, like as if it were a

21   GPS?

22   A.   Not the specific location of the handset.  A general

23   location, yes.

24   Q.   The general area.  You can tell the area that it was in,

25   right?

D3eWdor3                                    Magnuson - cross

1   A.  Yes.

2   Q.  And but you don't know, just the fact that these two, it

3   went from one tower to another doesn't tell you if the phone

4   moved, right?

5   A.  Not without analyzing the location and the orientation of

6   the sectors because they could be adjoining, looking at each

7   other, and you could be right in the middle.  So it's, the

8   movement is --

9   Q.  Is it true you could be in the middle or you could be next

10  to this tower or you could be next to this tower?  All of those

11  things are true, right?

12  A.  Yeah.  I could be in a car traveling 50 miles an hour and

13  have an eight-second call and moved from one sector to the

14  other, so, all of the above.

15  Q.  Yes.  All of the above are possible, right?

16          THE COURT:  Yes?  You said yes?  All of the above are

17  possible?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.

20  BY MS. FONTIER:

21  Q.  From looking at these records, you can't tell whether the

22  phone was in a particular place or whether it's stationary or

23  mobile, correct?

24  A.  Well, I can go, I'd like to go back and suggest that you

25  need to look at where the towers are and where the sectors are

D3eWdor3                          Magnuson - cross

1   and then you could make an educated guess as if there was

2   movement or not movement or whether or not there was or wasn't.

3   Q.  But it would be an educated guess; you can't specifically

4   say that, right?

5   A.  No.  Because we have the data right here.  This tells us

6   where the hand set was in a general geographic area when it

7   started a call and when it ended a call.  Right.

8   Q.  And we have the general geographic area, correct?

9   A.  We have two general geographic areas.  Unless we look at

10  them on maps, we can't really understand what we're trying to

11  say, so I'm reluctant to say it was in a car and it was moving

12  or walking.  Yes, ma'am.

13              MS. FONTIER:  No further questions.

14              THE COURT:  Thanks.  Mr. Roth.

15              MR. ROTH:  Just briefly.

16              THE COURT:  Yes.

17  CROSS-EXAMINATION

18  BY MR. ROTH:

19  Q.  Good morning, Mr. Magnuson.

20  A.  Good morning, sir.  How are you?

21  Q.  Okay.  Thanks.

22              Getting back to the general geographic area you drew,

23  with the pointer you indicated general coverage area on

24  Government Exhibit 3008.  Do you remember doing that?

25  A.  I do.  Yes, sir.

D3eWdor3                    Magnuson - cross

1    Q.  And just so that we're clear about how general that

2    depiction is that you made with the pointer, are you familiar

3    with the area that's depicted in Government Exhibit 3008?

4    A.  Yes.  Only on maps though.

5    Q.  I meant have you physically been to that area?

6    A.  No.

7    Q.  Do you even know the scale on that map?

8    A.  There are various scales on the maps.  Some from a few

9    hundred yards to some, I think, maximum probably two miles.

10   Q.  I'm talking about the actual scale of the map itself.  The

11   map that --

12   A.  That particular map, I can't recall a scale and I did not

13   put a scale on the map.

14   Q.  Is it fair to say, sir, when you were talking and you told

15   my cocounsel that generally the coverage area could be within

16   two miles within one of the sectors, one of the azimuths,

17   120-degree sectors radiating from the cell tower itself.  Is

18   that correct?

19   A.  I said I agree I said it could be up to two miles, but you

20   have to take in the environment that you're in.

21   Q.  Of course.  Of course.  And, but this environment you

22   didn't take into consideration exactly, right?

23   A.  Yes, I did.

24   Q.  Let me ask you this, sir.  Have you actually seen from

25   Sprint, the carrier that you're talking about, the predictive

D3eWdor3                          Magnuson - cross

1    coverage maps for this cell tower?

2    A.  No.  They don't provide their propagation RF maps.  It's

3    very proprietary and they're very secretive about that.

4    Q.  Let's just break that down.  What does that mean?  It

5    means -- you work for the FBI, is that right?

6    A.  Yes, sir.

7    Q.  And you want information from a private profit

8    organization, corporation, right?

9    A.  True.  Yes, sir.

10   Q.  And you're telling me that the FBI can't get the

11   propagation or predictive maps of the coverage area of that

12   particular cell tower from Sprint?

13   A.  I'm sure we can get it.

14   Q.  But you made no effort to get it in this case, is that

15   right?

16   A.  I made no effort to get it in this 2012 case.  So trying to

17   get them would be very difficult to get the status of their

18   network at the time because they don't archive it.  They'll

19   have a current status of it.

20   Q.  Right.  But obviously the agents who were working on this

21   case before, they could have gotten it and they could have

22   subpoenaed it if they wanted to, is that right?

23   A.  I suppose that is accurate.  Is there a question?

24   Q.  Yes.  They had the ability -- you work for the FBI, is that

25   right?

D3eWdor3                          Magnuson - cross

1   A.  Yes, sir.

2   Q.  Okay.  You know Federal law enforcement have agency law

3   departments, and they could have subpoenaed the documents from

4   Sprint, the predictive coverage maps or propagation maps for

5   this cell tower from Sprint, is that correct?

6   A.  Yes.

7   Q.  And, to your knowledge, they didn't do it and you didn't do

8   it, is that right?

9   A.  That's right.  Yes, sir.

10  Q.  And, finally, sir, to generate those maps and to actually

11  determine what the coverage area is on a given cell tower, the

12  way that they, Sprint, the carrier, gets that secret

13  propagation predictive map is by, one way of them doing it, the

14  most accurate way is by their RF engineers going around with

15  antennas and driving through the areas in respect of the cell

16  tower, is that correct?

17  A.  That is one way, yes.

18  Q.  That's the best and the optimal way, is that correct?

19  A.  Yes.

20          MR. ROTH:  I have no further questions.

21          THE COURT:  Thanks.  Any redirect?

22          MS. LESTER:  Just briefly, your Honor.

23          Ms. Brady, pull up Government Exhibit 3006, page four.

24  Is it possible to zoom in a little bit on the map itself?

25  REDIRECT EXAMINATION

D3eWdor3                          Magnuson - redirect

1    BY MS. LESTER:

2    Q.  Now, Special Agent Magnuson, this is another one of the

3    maps that you created, correct?

4    A.  Yes.  It appears to be, yes.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3E5dor4                        Magnuson - direct

1   BY MS. LESTER:

2   Q.   And this has a tower that looks to be at the intersection,

3   approximately, of Allerton Avenue and Radcliffe avenue,

4   correct?

5   A.   Yes.   There is two dark lines there demonstrating a sector

6   off the tower that's located there.

7   Q.   And the other red triangle, as we have already discussed,

8   are other cell towers for that same network?

9   A.   Yes.

10  Q.   Now, how did you determine how far out to draw those two

11  wings, as you referred to them previously?

12  A.   Well, through our training and experience and interacting

13  with the telecommunications vendors and various providers,

14  their estimates and the way they determine it and the way we

15  determine it is we go out from the tower that you're looking

16  at, you go out about 70 percent to the nearest tower which is

17  right there, and then you would draw an arc and close that and

18  that would be your estimated coverage sector because there is

19  going to be some overlap from the sector that is coming off

20  this tower and that would come out, perhaps, 70 percent, and

21  there is a precise footprint for each sector on every side of

22  every tower and there is overlap from each one.   So, the

23  location of the surrounding towers helps us determine how far

24  to estimate the coverage of each sector.

25  Q.   Now, you were asked some questions on cross-examination

D3E5dor4                    Magnuson - direct

1   about a coverage range of up to two miles.  Do you remember

2   those questions?

3   A.  I do.

4   Q.  In an urban area such as that depicted on this map, which

5   is in the Bronx, correct --

6   A.  Correct.

7   Q.  -- do these towers have a range of two miles?

8   A.  No.  These towers have a range somewhat less than two

9   miles.

10  Q.  How do you know that?

11  A.  Well, I have measured distances from tower to tower and I

12  think the estimate, by looking at this map, even though there

13  is no scale there, that there is a population of towers every

14  half mile, every mile or so, and they're carving up this whole

15  environment of buildings or other edifices or railroad tracks

16  or highways, covering the highways and such so that, again,

17  they take advantage of the infrastructure that is there and

18  they can just -- there is no radio electricity and structures

19  to mount antennas on and they don't need to put up a tower,

20  they can carve up and add more cell sectors.

21  Q.  Looking at this map, Agent Magnuson, can you count how many

22  blocks are between the tower at Allerton Avenue and Radcliffe

23  Avenue and the next tower over to the left?

24  A.  It's about eight blocks, by my count.

25  Q.  And those towers would have overlapping coverage areas

 1  within that eight block radius?

 2  A.  Exactly.  So, the coverage area for each sector which you

 3  probably face each other right along that avenue, there is

 4  probably four blocks with an overlap area in the middle and

 5  that's where the calculations would be made whether to hand off

 6  to the next sector or the best sector.

 7            MS. LESTER:  No further questions.

 8            THE COURT:  Any recross?

 9  RECROSS EXAMINATION

10  BY MS. FONTIER:

11  Q.  This range, the wings we're looking at, you said it was

12  your estimation, correct?

13  A.  Yes, ma'am.

14            MS. FONTIER:  No further questions, your Honor.

15            MR. ROTH:  I'm just going to follow up on the wings.

16            THE COURT:  Go ahead.

17  RECROSS EXAMINATION

18  BY MR. ROTH:

19  Q.  As I understood you, sir, you indicated that the wing on

20  the -- or the one that is coming down there would be 70

21  percent, I think you said, from the nearest tower, that's why

22  you drew the first, the top wing that distance; is that

23  correct?

24  A.  Correct.

25  Q.  So, which -- help me out here.

D3E5dor4                          Magnuson - recross

1    A.   Sure.

2    Q.   This seems to be -- which tower are you referring to on the

3    wing that's coming down there, that's 70 percent to which

4    tower?  Which is the tower you used as a mark?

5    A.   I didn't.  I tried to maintain consistency with the nearest

6    tower which was 70 percent and I drew the alternating wing the

7    same.

8    Q.   So that wing, which is, would go all the way down almost

9    past the highway there, is that right?

10   A.   We don't know.

11   Q.   We don't know because it is imprecise, is that correct?

12   A.   No.  We do know that if I drew a line basically creating a

13   pie shape connecting these two wings, that that would be a good

14   estimate of the coverage of that sector.  That's what we know.

15   Q.   And if a representative from Sprint sat in the same chair

16   as you in this trial and said it was two mile coverage area, he

17   would be wrong?  Up to a two mile coverage area?

18   A.   He wouldn't be wrong because he is believing that cell

19   sectors, they can cover up to two miles.

20   Q.   Not just cell sectors, his cell sectors in Sprint in this

21   area.  They can?  You've conceded that, is that right?

22   A.   I didn't concede that.  No, sir.  I did not.

23   Q.   So, there is no way that your testimony is that there is no

24   way that this tower could cover a two mile area?

25   A.   I don't think so.  There is too many towers nearby and the

sectors -- there is a major highway there, there is a lot of

activity going on, so you have to take into account a lot of

factors.

Q.  But you can't even take -- from the map you can't even take

all those factors into consideration, right?

A.  Not now, but we could.

Q.  I understand if it was done properly and you had the

propagation maps and you had the prediction maps and you took

an RF antenna, you could sit up here and give a relatively

precise answer as to the coverage area.  Is that fair to say?

A.  Sir, this is a relatively precise estimate.  I do take

antennas and measure cell networks and actual RF footprints and

this is a very good approximation of the coverage of that

sector.

Q.  You didn't do that in this case for this particular

geographical area taking into consideration the highways and

the trains and the weather and everything else and the

geography, is that correct?

A.  That's correct.

           MR. ROTH:  I have no further questions.

           THE COURT:  Any re-redirect?

           MS. LESTER:  No, your Honor.

           THE COURT:  Okay.  Agent Magnuson, you may step down

again.  Thank you.

           (Witness steps down)

D3E5dor4

```
 1            THE COURT:  Does the government have any other

 2   witnesses that they wish to call in their rebuttal case?

 3            MS. LESTER:  No, your Honor.

 4            THE COURT:  So the government rests.

 5            Well, ladies and gentlemen that concludes the evidence

 6   portion of our trial.  Now you are going to go to work or go

 7   home and play hooky.  We don't sit on Fridays except when the

 8   jury is deliberating, I expect they sit through to Friday.

 9            So, what happens on Monday is at 9:30 you are going to

10   come as always.  We will have the closing arguments of the

11   lawyers, the summations.  After that I will instruct you on the

12   law and then you will begin to deliberate.

13            So, until then I don't want you thinking about the

14   case, I don't want you pre-judging the case.  I want you to

15   keep an open mind.  I don't want you discussing the case, of

16   course.  I want you to have a nice weekend and get some work

17   done or whatever else you want to do between now and Monday,

18   but Monday, be ready to go because the case will then become

19   yours in short order.  All right?

20            So, with that, I will bid you adieu.  We are going to

21   do work on our end so we can be ready to go on Monday.  So, we

22   have plenty to do but you should just be coming back on Monday

23   to do your next piece.  Okay?  Great.

24            MS. FONTIER:  Your Honor?

25            THE COURT:  9:30 Monday.
```

D3E5dor4

1          (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3E5dor4

1           (Jury not present)

2           THE COURT:  Have a seat.  We are going to bring

3    Ms. Schuster in so we can have a chat with her briefly.

4           Then we can have argument on Rule 29 motions and

5    charge conference which I don't think will take too long.

6           (Juror Schuster present)

7           THE COURT:  You can take your usual seat or sit

8    anywhere you want, Ms. Schuster.

9           A JUROR:  I get to pick?  Wow.  I'm going sit in the

10   front row.

11          THE COURT:  I understand from Mr. Halegua you have

12   more information with respect to your mother.

13          A JUROR:  They have scheduled her surgery for next

14   Thursday, the 21st.

15          THE COURT:  It is in Las Vegas?

16          A JUROR:  It is in Las Vegas.

17          THE COURT:  What does that mean for you?

18          A JUROR:  I have to fly out on Wednesday.

19          THE COURT:  Do you have a flight yet?

20          A JUROR:  No.  I don't yet, no.  I wanted to speak

21   with you first.

22          THE COURT:  I expect that we are going to have

23   summations, that that will take us through the morning, I think

24   probably maybe into early afternoon.

25          A JUROR:  On Monday.

D3E5dor4

1          THE COURT:  On Monday.  And then my instructions will

2     take us probably through to the mid or late afternoon so the

3     jury wouldn't start deliberating until probably late in the

4     afternoon, relatively late in the afternoon on Monday.  So,

5     that would mean Tuesday you would be able to deliberate but

6     depending on what your flight was on Wednesday, that would cut

7     into your ability to deliberate.

8          A JUROR:  Yes, sir.  I mean, I'm going to -- again, as

9     I said, I didn't really even take the time.  It was very late

10    before I got the information last night as they're three hours

11    earlier than we are so I felt it was a moot point for me to

12    start looking for flights last night.  I needed to come in and

13    speak with you first.  So, obviously that will be something I

14    will do this afternoon.

15         I'm going to guess just based on experience it could

16    be anywhere from -- you know I depart 3:00 p.m. to 7:00 p.m.,

17    somewhere in there.

18         THE COURT:  Right.  Okay.

19         A JUROR:  Which would mean I have to be at the airport

20    two hours prior to that or an hour and a half prior to that.

21         THE COURT:  Why don't you look into flights, nail down

22    flights for yourself and give a call to chambers and let us

23    know what the range of flights is.

24         A JUROR:  I can do that.

25         THE COURT:  In the meantime I will chat with the

D3E5dor4

1   lawyers about what that means for whether you should continue

2   or whether we should start without.  Once we start

3   deliberations it is difficult to sort of have somebody leave.

4          A JUROR:  Gotcha.

5          THE COURT:  So, we will kick that around but I think

6   why don't you plan on being here Monday anyway.

7          A JUROR:  Will do.

8          THE COURT:  But let us know what your flight is or the

9   options of flights are.

10          A JUROR:  Right.  I will call this afternoon.

11          THE COURT:  Thank you very much.  I appreciate it.

12          A JUROR:  Thank you.

13          THE COURT:  All rise for Ms. Schuster.

14          (Juror not present)

15          THE COURT:  Okay.  Have a seat.

16          Ms. Fontier, you were saying something?

17          MS. FONTIER:  Just a question.  The stipulation that I

18   read into evidence, did you want it marked as a defendant's

19   exhibit?

20          THE COURT:  I generally do that.

21          MS. FONTIER:  Okay.

22          THE COURT:  So.

23          MS. FONTIER:  Then for the record it is marked as

24   Defendant's Exhibit G.

25          THE COURT:  G.  Okay.  So Defendant's Exhibit G is the

D3E5dor4

1    final stipulation of the defense.

2            MS. FONTIER:  And that's the stipulation regarding the

3    DNA and the fingerprints.

4            THE COURT:  Yes.  Okay.  Defendant's Exhibit G.

5    That's fine.

6            (Defendant's Exhibit G received in evidence)

7            THE COURT:  How do you want do this?  We have Rule 29

8    and charge that we need to discuss and we can talk about

9    Ms. Schuster as well.

10           Do you want to jump in on that now?  Take a couple of

11   minutes?

12           MS. FONTIER:  I don't know about Mr. Roth but my Rule

13   29 is quite quick.

14           THE COURT:  Okay.  Let's do Rule 29 now and then we

15   can talk about how quick the charge conference will be.

16           So, Rule 29.  We have multiple counts obviously, so go

17   ahead.

18           MS. FONTIER:  Your Honor, I would move for an order of

19   dismissal as to all counts against Mr. Dore for the general

20   reason that the government has not provided sufficient evidence

21   of any of the elements with particularity, however, to the

22   identification of Mr. Dore as the perpetrator of these

23   offenses.

24           THE COURT:  Mr. Roth?

25           MR. ROTH:  Judge, similarly, I would move for an order

D3E5dor4

1    of dismissal in respect to Mr. Barrett that the government has

2    not met their burden of proof at this juncture in respect to

3    the crimes charged in the indictment.

4           THE COURT:  Government, do you want to respond?

5           MS. MASELLA:  Your Honor, I don't know how much detail

6    you want but, among other things, the testimony of Patrick

7    Taylor, the cooperating witness, placed both of these

8    defendants within the conspiracy that is charged in Count One.

9    He testified at length about the operation of the robbery

10   conspiracy.  He testified about numerous robberies including

11   the substantive robberies in Counts Three and Five.  Janiel

12   Brown also placed both of the defendants squarely in the

13   robbery conspiracy and provided ample proof of each and every

14   element of the conspiracy count as well as the murder count

15   against Mr. Dore.

16          In addition, we presented physical evidence

17   corroborating the testimony of those two witnesses.  For

18   example, one of the victim's cell phones, Government Exhibit

19   73, was taken from the victim in October; it was seized from

20   the defendant Mr. Dore upon his arrest in January and it

21   contained photographs of both the victim Abdul Cader, as well

22   as the defendant Jermaine Dore.

23          Also, the cell site evidence of this case which we

24   will be arguing in summation, I'm not sure how much of it was

25   clear in the demonstrative exhibits, but places both

D3E5dor4

defendants' phones, Dwayne Barrett's phone and Jermaine Dore's

phone in very close proximity to at least seven or eight of the

robbery locations at dates and times closely linked with the

robberies.

THE COURT:  I'm going to deny the motion with respect

to the conspiracy.  I think for the individual counts I will

reserve just because I have to make sure I have got my head

around what the different evidence is for each of the other

substantive counts.  Okay?  So, I will reserve on that.

I sent, last night, my draft of the jury charge.

There were only three areas in which the parties disagreed and

I have resolved those; they related to an instruction on

circumstantial evidence which I stuck with what I normally do

as opposed to what was proposed by the defense to incorporate

an instruction that Judge Batts has previously used; there then

was a dispute with respect to an instruction on identification

but I'm not going to include that because I think that

instruction is really where there are identifications by people

who, if the victims had made identifications I think that

instruction might have been appropriate but we don't have

identifications from the victims, instead we have

identifications from people who clearly knew about the

defendants.  So, I think that instruction was really not well

suited to the testimony of the witnesses that were in this case

and I think the instructions that are already in the charge

D3E5dor4

1    cover witness credibility with respect to the witnesses who did

2    testify about identification.  So, I deny the proposal by the

3    defendants there.

4             The other dispute related to whether it was

5    appropriate to give a Pinkerton instruction, so I thought it

6    would be useful to have a little bit of discussion on that.

7             The case and the explanations cited by the defendants

8    with respect to the Pinkerton instruction, they cited a RICO

9    case and that Pinkerton doesn't apply to state substantives

10   which would be the predicate for RICO, I really think that's

11   apples and oranges so I want to have discussion about the

12   counts that are in this indictment and whether a Pinkerton

13   instruction is appropriate given the evidence that's come in

14   and given the counts of the indictment that are here.

15            So, the government, you're arguing for a Pinkerton

16   charge so -- and that's just for Counts Three, Four, Five, Six

17   and Seven, correct?

18            MS. MASELLA:  Correct, your Honor.

19            THE COURT:  So why?

20            MS. MASELLA:  Your Honor, we believe that Pinkerton

21   instruction is appropriate because while there is very, very

22   strong proof in our view of the conspiracy between these two

23   and other individuals, with respect to the two substantive

24   incidents and the related firearms charge, there are sort of

25   alternative theories or potential alternative theories

D3E5dor4

1    supported by the evidence as to who did what during the actual

2    crimes.

3           So, taking for example the October 29th robbery which

4    is the subject of Counts Three and Four, based on the victim

5    testimony from the two brothers, remember, who were the victims

6    of that incident, the brother who was inside the house

7    testified that the two individuals who came inside the house

8    both possessed firearms on that occasion.

9           Patrick Taylor's testimony -- remember he was in the

10   car as a lookout down the street -- demonstrated that he had

11   seen Jermaine Dore with a gun earlier that day.  So, he can

12   place a gun in the hand of the Defendant Dore on the same day

13   in connection with the incident but then in terms of, you know,

14   who went into the house and actually held the guns at the

15   victim's who were restrained there, there are alternative

16   theories.

17          So, on that incident we think that Pinkerton is

18   appropriate because it is enough to show that the defendants

19   were in a conspiracy and were participating in this incident

20   with knowledge of a purpose and what was going on, that the

21   acts undertaken inside the house during the course of a robbery

22   including with the guns were foreseeable to all of the members

23   of the conspiracy including Dwayne Barrett and Jermaine Dore,

24   and that the jury can convict them on a Pinkerton theory

25   because it is not -- based on the evidence we do believe there

D3E5dor4

1     is evidence that Dwayne Barrett was in the house with a gun.

2     That was the testimony that we heard from the victim who

3     described the taller individual stooping down under the

4     basement ceiling, and also from Patrick Taylor after the

5     incident when the group gets back to the location where they're

6     talking about the robbery, they're all sort of joking about the

7     fact that Dwayne Barrett went into the house on that occasion

8     and participated in the conducting of the robbery because that

9     was somewhat unusual for him.

10          So, the evidence would support a theory of direct

11    liability for both Dore and Barrett on that incident but there

12    also is evidence to support the idea that Barrett was at the

13    scene driving the car, that he knew about the presence of a

14    gun, that he was part of the robbery, that he understood that

15    an armed robbery was going to take place and he played a role

16    but that he didn't necessarily himself possess a gun that day.

17          THE COURT:  But you're talking about doing it for --

18          MS. MASELLA:  That's Counts Three and Four.

19          THE COURT:  Count Three, which is a substantive

20    robbery and a firearm, the firearms that corresponds with it,

21    right?  And then Count Five which is another robbery.

22          MS. MASELLA:  Right.

23          THE COURT:  And the corresponding gun charge as well.

24    Two corresponding gun charges, right?

25          MS. MASELLA:  Yes, your Honor.

D3E5dor4

1              I guess on further reflection we would be satisfied if

2        it were just Counts Four and then Six and Seven that included

3        the Pinkerton charge, in other words not the substantive

4        robbery counts but each of the firearms counts and then the

5        murder count.

6              THE COURT:  So, let me hear from the defendants if you

7        disagree.  If you agree with that then just tell me.

8              MS. FONTIER:  No, we disagree, your Honor.

9              THE COURT:  Okay.

10             MS. FONTIER:  Your Honor, I just don't think that the

11       Pinkerton charge is necessary in this case and there are --

12       there is aiding and abetting, the theories that are available

13       to the government that are listed in the indictment.

14             THE COURT:  Right.

15             MS. FONTIER:  And that charge is already included.

16       And I think with the general instructions on conspiracy and on

17       the aiding and abetting of the substantive charges it covers

18       any of the alleged actions here and the Pinkerton charge is

19       unnecessary.

20             That's it.  It is unnecessary.

21             MR. ROTH:  I concur with that, Judge.

22             THE COURT:  Look.  I think as a general matter the

23       government often overincludes Pinkerton charges but I think

24       this is a case where, frankly, it actually does make some sense

25       so I'm inclined to keep it.  I want to think about it a little

D3E5dor4

1   more and look at the case law to make sure I'm not missing

2   something, but I do think I'm probably going to give a

3   variation on the Pinkerton charge that is here which is I think

4   straight from Sand.

5             And so, the government is just seeking it on the gun

6   charges, correct?

7             MS. MASELLA:  Correct, your Honor.

8             THE COURT:  So let me know if that changes.

9             MS. MASELLA:  Counts Four, Six and Seven.

10            MR. ROTH:  So my understanding is the government is

11   going to argue in the alternative basically, factually.

12            THE COURT:  Yes; for those gun charges, that's right.

13            Now, those were the areas of disagreement with respect

14   to the charges that were submitted prior to the trial.  Just

15   this morning I got a request to include a multiple conspiracies

16   instruction from Ms. Fontier so the government has now seen it.

17            Does the government have a position on this?  I'm

18   inclined to include it frankly.

19            MS. MASELLA:  Your Honor, we are opposing this.

20            We don't see any basis for a multiple conspiracy

21   charge.  In terms of the incidents that were proved up in this

22   case, I think all but one actually included both defendants

23   Dore and Barrett.  Most of them also included Fahd Hussain and

24   the information coming from him and the operating in a common

25   course of dealing in the course of these robbery conspiracies.

1    I don't see any way that there is any basis in the evidence for

2    finding that a separate or different conspiracy existed.

3         THE COURT:  Well, I mean, I think the argument would

4    be that there was a different conspiracy sort of that was each

5    robbery was a separate conspiracy, I suppose.  I mean, there

6    were certain people who were not present for some and were

7    present for others who had no involvement in certain robberies

8    and were very present for others.

9         So, I think all of that -- you can argue all of the

10   things you just argued but I'm not sure the defense would be

11   precluded from arguing that the conspiracy that has been

12   alleged didn't exist.  So, that's my inclination.

13        Mr. Roth?

14        MR. ROTH:  In addition, Judge, there are some

15   robberies where there is -- I haven't seen any connection to

16   Hussain who is supposedly the hub of this conspiracy.

17        MS. MASELLA:  No.  There are several robberies to

18   which we did not prove a connection to Hussain but each of the

19   robberies that we did prove involved both of the charged

20   defendants save one robbery which only had Dore and other

21   members.  So, even if there were other co-conspirators who were

22   present sometimes and not at other times, the multiple

23   conspiracy charge focused on the conspiracy that the defendants

24   were part of and what they did because they were present at

25   every robbery.

D3E5dor4

```
 1          THE COURT:  Well, you're alleging they were present at
 2    every robbery but I don't think that's -- I mean, I don't think
 3    that's a given and I think that there is room to argue multiple
 4    conspiracy.
 5          But, look, the government just got this, I assume,
 6    when I did which was early this morning.  So, if you want to
 7    have an opportunity to consider it and propose either different
 8    language or cite some authority as to why it is not
 9    appropriate, I will give you a chance to do that.
10          MS. MASELLA:  Thank you, your Honor.
11          THE COURT:  This probably should have been included
12    with the draft that was submitted before the trial but there
13    are always things that happen during a trial that prompt
14    changes.  I'm surprised there frankly aren't even more.
15          I have taken out several of the instructions that are
16    I think clearly not applicable so you should have seen what
17    those were.
18          Are there any other objections to what is in the
19    charge?
20          MS. FONTIER:  May I just have one moment to fine line?
21          THE COURT:  Yes.
22          MS. LESTER:  Your Honor, there is in the final section
23    of the charge under deliberations of the jury a section about
24    seeing exhibits and I think the government would ask for an
25    inclusion of maybe just a sentence about redactions in exhibits
```

D3E5dor4

1      and that no inference should be drawn from the redactions.

2                THE COURT:  The only redaction is from the one

3      exhibit, right?

4                MS. LESTER:  No, your Honor.

5                THE COURT:  The two exhibits; the cooperation

6      agreement is --

7                MS. LESTER:  There is also redaction from the autopsy

8      report.

9                THE COURT:  Yes.  That's right.

10               Anybody have a view on that?  Defense?

11               MR. MURPHY:  No.  No objection.

12               MS. FONTIER:  No objection, your Honor.

13               THE COURT:  Okay.  You propose to put in the right to

14     see exhibits?  That one, page 70?

15               MS. LESTER:  Wherever the Court thinks it makes the

16     most sense, but there the Court is talking about their ability

17     to look at exhibits in the case.

18               THE COURT:  Okay.  Anything else from the defense?

19               MS. FONTIER:  I just want to be sure that in the

20     General Instructions, K, the testimony of cooperating

21     witnesses --

22               THE COURT:  K?

23               MS. FONTIER:  -- on page 66 under the general

24     instructions, K, testimony of cooperating witnesses.

25               THE COURT:  Let me just get there.  Hold on.  Yes?

D3E5dor4

1          MS. FONTIER:  I just want to make sure that when the

2     list goes in it includes the non-prosecution witnesses, that

3     they are included in the list of cooperating witnesses and it

4     is not simply Patrick Taylor but also Janiel Brown and -- did

5     they put in non-pros for Abdulla?

6          MR. ROTH:  They did.

7          THE COURT:  I think it should be -- well, the

8     accomplice witnesses are clearly Brown and Taylor, correct?

9     The government is not disputing that.

10          MS. LESTER:  No.  Correct.

11          THE COURT:  So it should say you have heard witnesses

12     testify that they were involved -- I could even name them.

13          MR. ROTH:  Yes.

14          MS. FONTIER:  Yes.

15          THE COURT:  So it is those two but Abdulla is not one

16     of those.

17          MS. LESTER:  But, your Honor, the instruction with

18     respect to pleading guilty and sentencing doesn't apply to

19     Ms. Brown so it's confusing to include her here.

20          THE COURT:  Well, I guess that's the issue.  Should I

21     be adding an instruction that talks about a non-pros?

22          MS. FONTIER:  I think so, your Honor.  I make that

23     request so that it is not confusing.

24          THE COURT:  I mean, I could maybe combine it and make

25     it testimony of cooperating witnesses and the witness who was

D3E5dor4

1   offered a non-prosecution agreement or something.

2           MS. MASELLA:  One suggestion.  You can leave the first

3   paragraph as is and make that related to Patrick Taylor.

4           THE COURT:  Right.

5           MS. MASELLA:  And then include a second paragraph:

6   You heard a witness, Janiel Brown, that testified pursuant to a

7   non-prosecution agreement, period.  And then who also, you

8   know, testified that she was involved in the planning and

9   carrying out of certain of the crimes charged, and then the

10  remainder of the instruction could apply to both of those.

11          THE COURT:  Yes.  I think that's what I'm going to do

12  but there should be the differentiation so I agree with that.

13  So, I will tweak that.

14          MS. FONTIER:  Okay.  Thank you, your Honor.

15          THE COURT:  Anything else?

16          MS. MASELLA:  With respect to the description of the

17  charges, because we said --

18          THE COURT:  What page?

19          MS. MASELLA:  Beginning on page 17, there still are

20  the names of defendants.

21          THE COURT:  Yes.

22          MS. MASELLA:  Who pleaded guilty after that.

23          THE COURT:  We will take that out and think about I

24  generally send the indictment back.  So, do we want to redact

25  out any names but those of the defendants?  That is typically

D3E5dor4

| | |
|---|---|
| 1 | what I would do. |
| 2 | MS. MASELLA:  We can prepare a redacted indictment |
| 3 | that doesn't have missing portions. |
| 4 | THE COURT:  Talk to defense counsel.  If the way you |
| 5 | redact is not the way they would redact we can talk about it. |
| 6 | MS. MASELLA:  Yes, your Honor. |
| 7 | THE COURT:  But my usual practice it is to send the |
| 8 | indictment back so they can see it, okay? |
| 9 | Ms. Fontier? |
| 10 | MS. FONTIER:  Does this include -- I'm asking because |
| 11 | I am quickly reading it which is probably a bad practice, but |
| 12 | when you send the indictment back does that include an |
| 13 | instruction, the instruction at the beginning that it is not |
| 14 | proof of anything? |
| 15 | THE COURT:  That it is not evidence, right. |
| 16 | MS. FONTIER:  Okay. |
| 17 | THE COURT:  All right? |
| 18 | MS. FONTIER:  Yes. |
| 19 | THE COURT:  Anything else? |
| 20 | Mr. Roth? |
| 21 | MR. ROTH:  Judge, I didn't weigh this on Ms. Schuster |
| 22 | but I would consent if she feels constrained by travel. |
| 23 | THE COURT:  She is going to leave Wednesday.  There is |
| 24 | no way she can deliberate past noon or 2:00 on Wednesday.  My |
| 25 | inclination is that's too constrained a time period. |

D3E5dor4

1          MS. FONTIER:  Your Honor, obviously I agree with your

2     inclination, but also I wanted to voice that it is my very,

3     very strong preference if we are going to replace her at some

4     point that it be prior to deliberations.

5          THE COURT:  Oh yes.

6          MS. FONTIER:  So we don't wade into that mess that

7     occurs.

8          THE COURT:  That's what we will talk about.  I don't

9     want to have a day and a half deliberations, have her leave and

10    we have to bring in an alternate and tell everybody to start

11    all over again.  So, I would be inclined to excuse her before

12    deliberations but I think I'll have her come and watch the

13    summations, even though it is probably a foregone conclusion

14    unless you think it is cruel and unusual.  She is not looking

15    to get out of here.  She has obligations to her mother and that

16    takes precedence.  I get that.

17         MS. FONTIER:  I have no doubt that she would like to

18    hear the defense, but.

19         MR. ROTH:  Maybe when she calls back about her flight

20    plans if it is appropriate you could ask her, your clerk could

21    ask her.

22         THE COURT:  Yes.  I don't want her obviously

23    discussing with the other jurors what's going on.  I don't want

24    anybody getting ideas.  Okay.  Well, I will let you know when

25    we hear from her and what we hear from her and if I have

D3E5dor4

1    excused her before Monday I will tell you that too.

2              Anything else we should cover now?

3              MS. FONTIER:  Your Honor, just of the exhibit that was

4    admitted with the modifications, obviously.

5              THE COURT:  Yes.

6              MS. FONTIER:  I think what is probably the best

7    solution is to just recreate the exact same map with the same

8    scale.

9              THE COURT:  A and B can stay where they are, just take

10   out the line.

11             MS. FONTIER:  I don't know how to do it on Google

12   Maps.  Is there any other way?

13             THE COURT:  Don't put in driving directions.  It is

14   easily done.

15             MS. FONTIER:  You just take out the line, put and A

16   and B?

17             THE COURT:  You can do it.

18             MS. FONTIER:  Ms. Stafford says she knows how to do

19   it.

20             THE COURT:  You can do it.

21             MS. FONTIER:  We will submit them to the government

22   and make sure they're okay with them before, obviously.

23             THE COURT:  I think that's fine.

24             For summations you told me your estimated lengths.

25   What about are you planning to use PowerPoints, planning to use

D3E5dor4

         exhibits I assume?  There is a lot of electronic exhibits which

         is fine.  If are you going to use something that is not in

         evidence, I think you should clear it with your adversaries

         unless there is some need for surprise, in which case you

         should let me know.  Okay?

                 MS. MASELLA:  Thank you, your Honor.

                 THE COURT:  But I think there is not much need for

         surprise on either side at this point.  The evidence is all in.

                 MR. ROTH:  We would like some surprise.

                 MS. FONTIER:  Sometimes I surprise myself when I

         speak.

                 THE COURT:  There is always unintended surprises so

         there will be some of those.

                 MR. ROTH:  Judge, you had great credibility with this

         jury until you predicted spring was here -- it was snowing in

         Westchester this morning.

                 THE COURT:  I'm not sure about my weather predictions.

         It is chilly but it is going to warm up again, though.

                 So, send me an exhibit list.  If you can send me a

         revised exhibit list by tomorrow like at 3:00?  Sooner would be

         better just because we need to make copies over the weekend.

                 MS. LESTER:  We will, your Honor.

                 Did you say that the Court will provide a verdict

         form?

                 THE COURT:  Yes.

D3E5dor4

1          MS. LESTER:  Okay.

2          THE COURT:  It will be pretty bare bones but I will

3    show it to you.

4          MS. FONTIER:  You want a single exhibit list?

5          THE COURT:  Yes.  I think you should use the

6    government's as the template because they have so many more

7    exhibits, and then you can clean page break if you want to have

8    defendants' exhibits.  If you want them separate documents it

9    wouldn't kill me but I want the exact same format so there is

10   no distinction to be made between one or the other.

11         MS. FONTIER:  We have managed to get along this far, I

12   think we can coordinate an exhibit list.

13         THE COURT:  It has been a model of professionalism and

14   courtesy and that is not lost on me so thanks for that.  Okay?

15         MS. FONTIER:  Thank you, your Honor.

16         THE COURT:  I will see you folks 9:15 or so on Monday.

17   If we need to talk before then, let me know.  If we need to

18   talk even tomorrow, let me know, we can have a conference or

19   something, okay?

20         Thanks a lot.

21         (Adjourned to 9:15 a.m. Monday, March 18, 2013.)

22

23

24

25

```
 1                       INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   JAMES MACEDONIO
 4   Direct By Ms. Stafford . . . . . . . . . . .1624
 5   Cross By Ms. Lester  . . . . . . . . . . . .1665
 6   DAVID MAGNUSON
 7   Direct By Ms. Lester . . . . . . . . . . . .1679
 8   Cross By Ms. Fontier . . . . . . . . . . . .1692
 9   Cross By Mr. Roth  . . . . . . . . . . . . .1701
10   Redirect By Ms. Lester . . . . . . . . . . .1705
11   Recross By Ms. Fontier . . . . . . . . . . .1708
12   Recross By Mr. Roth  . . . . . . . . . . . .1708
13                       DEFENDANT EXHIBITS
14   Exhibit No.                          Received
15    B and B1  . . . . . . . . . . . . . . . . .1623
16    C-1   . . . . . . . . . . . . . . . . . . .1638
17    D-1   . . . . . . . . . . . . . . . . . . .1647
18    D   . . . . . . . . . . . . . . . . . . . .1654
19    E   . . . . . . . . . . . . . . . . . . . .1654
20    F   . . . . . . . . . . . . . . . . . . . .1655
21    G   . . . . . . . . . . . . . . . . . . . .1716
22
23
24
25
```