D3iWdor1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                        12 CR 45 (RJS)

JERMAINE DORE and DWAYNE
BARRETT,

             Defendants.

------------------------------x

                          March 18, 2013
                          9:25 a.m.

Before:

                HON. RICHARD J. SULLIVAN,

                          District Judge

                  APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JESSICA MASELLA
     AMY LESTER
     Assistant United States Attorneys

ALICE L. FONTIER
     Attorney for Defendant Dore
     -and-
LAW OFFICES OF YING STAFFORD
BY:  YING STAFFORD

HURWITZ, STAMPUR & ROTH
     Attorneys for Defendant Barrett
BY:  JAMES M. ROTH
     -and-
SIMON & PARTNERS, LLP
BY:  KENNETH C. MURPHY

D3iWdor1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Have a seat.

4          I sent last night, I guess early evening, a revised

5     charge and a couple of alterations and I wanted to see if

6     anybody had any comments or thoughts before we go into

7     summations.

8          Anyone?

9          MS. LESTER:  Your Honor, the government still objects

10    to the inclusion of the multiple conspiracies charge.

11         THE COURT:  Okay.

12         MS. LESTER:  We don't think it's supported by the

13    facts of the case that have been introduced at trial and also

14    we think on the law it's not necessary in a case like this and

15    will unnecessarily confuse the jury.

16         THE COURT:  All right.  I think we've already covered

17    that, so that's denied.  But anything about the new stuff that

18    I've added?

19         MR. ROTH:  Not from the defense, Judge.

20         THE COURT:  All right.  How are we doing with the

21    jury?  Is everybody here?

22         I spoke to Ms. Schuster on Friday.  That's the juror

23    whose mother is ill and is having, I think, surgery or starting

24    chemotherapy this week.  In any event, she's got to leave by

25    midday, or so, on Wednesday and so, as we discussed on

D3iWdor1

1    Thursday, I've decided to excuse her.  So she's not going to be

2    here today.  We'll move up the first remaining alternate into

3    her spot.  All right?  The other jurors don't know that yet,

4    but I'll tell them.  Mr. Halegua will check and then we'll

5    begin.

6              The government's using some kind of Power Point?

7              MS. MASELLA:  Yes, your Honor.

8              THE COURT:  That's fine.  Everybody's seen it and

9    knows what's coming?

10             MS. MASELLA:  We showed them the demonstrative

11   exhibit.  Everything else relates directly to the evidence that

12   was presented at trial.

13             THE COURT:  Anybody else using a Power Point?

14             MS. FONTIER:  I am, your Honor.  I just printed a full

15   copy of the slides and provided those to the government as

16   well.

17             THE COURT:  So if there's any objections then we

18   should deal with those outside of the presence of the jury,

19   obviously, if we can.  So no objections?  The government has

20   had a chance to look at Ms. Fontier's?

21             MS. MASELLA:  We have, your Honor, and we have no

22   objections.

23             THE COURT:  Good.

24             Mr. Roth, you're going old school?

25             MR. ROTH:  Old school.  Old school.

D3iWdor1

1              THE COURT:  We're going to bring in the jury.

2       Everybody set?

3              (In open court; jury present)

4              THE COURT:  Okay.  Have a seat.

5              Good morning, ladies and gentlemen.  I hope you had a

6       nice weekend.  You may notice that we're missing one of our

7       members.  Ms. Schuster is no longer going to be able to

8       continue due to a family situation.  With that then,

9       Ms. Belickis, you will become juror No. 12, so you should take

10      the seat in the next row.

11             Ms. Boykin, that leaves you all alone in the last row,

12      but don't give up hope yet.  I would watch and make sure

13      Ms. Boykin doesn't slip something into your sandwich at lunch.

14      Ms. Boykin, you can move down if you'd like.  If you're

15      comfortable, that's fine.  You're kind of nicely centered.  But

16      if you'd like to move down, that's also fine.

17             As I told you on Thursday, we're now going to begin

18      the summations.  The evidence has concluded so we're now going

19      to hear the closing arguments of the attorneys.  As I told you

20      before, closing arguments, the arguments of the lawyers, are

21      not evidence.  But this is the lawyers' opportunity to give you

22      their view of what the evidence demonstrated and to make their

23      arguments about the evidence, or the lack of evidence, in the

24      case.  So you should pay careful attention to those arguments.

25      They're important and they may be helpful to you as you sift

D3iWdor1

 1   through the evidence.  But bear in mind that nothing that the

 2   lawyers say is itself evidence.

 3           We'll start with the government because the government

 4   has the burden of proof here.  We'll then hear from each of the

 5   defendants and then the government will be entitled to a short

 6   rebuttal summation since, again, they have the burden of proof.

 7   After we've finished the summations, I expect we'll probably

 8   have lunch -- we took your lunch orders -- and then after that,

 9   I will instruct you on the law.  I think that will take a big

10   chunk of the day, but I do expect you'll get the case this

11   afternoon.

12           With that, I will invite Ms. Masella to give the

13   government's closing argument.

14           MS. MASELLA:  Thank you, your Honor.

15           Good morning, ladies and gentlemen.

16           These two men, Jermaine Dore, otherwise known as Blaqs

17   or St. Kitts, and Dwayne Barrett, otherwise known as Tall Man,

18   were the core members of a violent and dangerous robbery crew.

19   Dore and Barrett operated the robbery crew by gathering

20   detailed information about their victims, stalking their

21   victims like prey, and terrorizing them with threats, assaults,

22   and violence.  They worked nearly every day for months, 12

23   hours a day at a time, in order to carry out these robberies.

24           Now, at times, the robberies generated a lot of money

25   for Dore and Barrett.  You heard on some single occasions they

D3iWdor1                         Summation - Ms. Masella

1   made as much as $40,000 or $50,000 in cash from a single

2   robbery.  Other robberies did not go so well for Dore and

3   Barrett and they did not make any money on those occasions.

4   But whether or not they generated cash, make no mistake about

5   it, ladies and gentlemen, the victims that were the victims of

6   these robberies were terrorized by Dore and Barrett.  They were

7   frightened, they were assaulted, and they often suffered

8   serious physical injuries as well.  Some of the victims lost

9   consciousness.  Some of victims ended up in the hospital.  And

10  one particular victim, Gamar Dafalla, suffered the most serious

11  injury of all.

12          On December 12, 2011, Gamar Dafalla was shot and

13  killed during a robbery committed by Dore and Barrett.  On that

14  day, when Gamar Dafalla refused to give up the money from the

15  cigarette transaction that he had just completed, Dore shot and

16  killed him in cold blood.  And Barrett, who was the driver that

17  day, although he did not personally shoot Gamar Dafalla,

18  because of Barrett's critical role in the planning and carrying

19  out of that robbery, he too is responsible for the death of

20  Gamar Dafalla.

21          Now, part of the reason that Dore and Barrett were

22  able to be so successful in operating this robbery crew is that

23  they had an inside source, someone who provided them with

24  constant information about various victims, identifying for

25  them people who had been carrying large amounts of money,

D3iWdor1                        Summation - Ms. Masella

1  giving them critical information about where the victims lived

2  or worked, and allowing them to be followed and victimized, and

3  that person you heard a lot about during this trial was Fahd

4  Hussain.

5          Fahd Hussain was the operator of that 1M Stationary

6  store in the Bronx.  He had personal access to people who owned

7  businesses generating large amounts of cash, people who sold

8  telephone calling cards, people who sold cigarettes, and people

9  who sold other goods and merchandise at bodegas and other local

10 merchants.  He also had friends and family connections to

11 people who had cash businesses, people who used his store at

12 the 1M Stationary store to wire transfer large amounts of

13 money, therefore giving Hussain knowledge and access to this

14 cash.

15         Dore and Barrett had a close relationship with Fahd

16 Hussain.  They hung out at the 1M Stationary store nearly every

17 day.  They contacted him constantly by phone call and text

18 message using their cell phones, and although not all of Dore

19 and Barrett's victims in this case were directly connected to

20 Fahd Hussain, the fact that so many of them were is even

21 further proof of the robbery conspiracy in this case.

22         Ladies and gentlemen, over the past two weeks, you

23 have heard a great deal of evidence.  You have heard over 40

24 witnesses testify.  You have seen a lot of physical evidence,

25 documents, phone records, and other items.  And the

D3iWdor1                        Summation - Ms. Masella

1    significance of some of this evidence was likely obvious to you

2    as soon as you saw or heard it.  But like we said in our

3    opening statement, other parts of this evidence came in in bits

4    and pieces, and the importance of some of this evidence might

5    not have been so obvious to you when it was first presented.

6    So what I'm going to try to do during the summation is to

7    review the evidence with you, connect it to other pieces of

8    evidence in the case, and show you how it all fits together.

9            When you are able to see the whole picture that is

10   presented here, you will see that the evidence has proven

11   beyond a reasonable doubt that the defendants are guilty of all

12   the charges against them in the indictment.

13           Before I proceed, I just want to take a few moments to

14   review those charges with you.  Later on today, Judge Sullivan

15   is going to give you detailed instructions about the law and

16   he's going to tell you about these charges in great detail.

17   But I just want to briefly review them with you now so you can

18   keep them in your mind as you consider and review the evidence.

19           In count one, both defendants are charged with a

20   robbery conspiracy.  A conspiracy is simply an illegal

21   agreement, and the crime of conspiracy is the crime of the

22   agreement in this case.  In this case, it was an agreement to

23   commit robberies.  Judge Sullivan will instruct you that no

24   robberies need actually have been committed in order to fulfill

25   the conspiracy charge, but in this case, you heard proof that

D3iWdor1                    Summation - Ms. Masella

1   Dore and Barrett did commit numerous robberies, and that is

2   also certainly proof of the conspiracy charge.  Also keep in

3   mind that the planning for the robbery, the surveillance for

4   the robbery, and any other activities carried out in connection

5   with the robbery crimes also satisfy the conspiracy charge.

6         Counts three and five each charge Dore and Barrett

7   with a different substantive robbery, and by that I mean a

8   robbery that was actually carried out and committed by Dore and

9   Barrett.  The first one is the October 29, 2011, robbery on

10  Radcliff Avenue in the Bronx that we heard so much about.  And

11  count five relates to the December 12, 2011, robbery of Gamar

12  Dafalla that resulted in his death.

13        Moving on to counts two, four, and six, those counts

14  all contain firearms charges, and they are crimes related to

15  Dore and Barrett's possession, use, and carrying of firearms in

16  connection with different robbery crimes.  Count two relates to

17  the conspiracy.  Count four relates to the same October 29

18  robbery.  And count six relates to the December 12 robbery and

19  homicide.

20        Finally, count seven is a charge for the murder of

21  Gamar Dafalla on December 12, 2011.

22        Ladies and gentlemen, you heard from two inside

23  witnesses in this case, Patrick Taylor and Janiel Brown.  They

24  both told you how this conspiracy operated on a daily basis and

25  they gave compelling testimony about all of the players,

D3iWdor1                        Summation - Ms. Masella

1    including the critical roles played by Dore and Barrett.  They

2    told you that Dore and Barrett participated in robberies every

3    day for months, that they got much of their information about

4    the victims from Fahd Hussain.  And indeed, Janiel Brown told

5    you that when she first met Dore, she thought that he actually

6    worked for Fahd Hussain because he said he was going to work

7    every day when he went to hang out at Hussain's store, the 1M

8    Stationary store, in the Bronx.

9            These witnesses told you about the means and the

10   methods used by Dore and Barrett and the robbery crew to carry

11   out the robberies, that they often followed their victims for

12   days ahead of time in order to learn their routes and the

13   locations that they went, carrying large amounts of cash; that

14   they stalked them and picked the optimal time to rob them.

15   They also told you about the tools of the trade used by Dore

16   and Barrett to carry out these constant robberies.  They

17   described the cars that were most often used by the robbers:

18   Barrett's dark blue Mercedes; Janiel Brown's Isuzu Trooper; and

19   other rental cars that were rented by Fahd Hussain.  They

20   described the weapons that were kept and used by Dore and

21   Barrett, including knives, baseball bats, and guns.  They told

22   you that the robbers usually wore masks or gloves and that they

23   often obtained these masks and gloves from the same store, Fahd

24   Hussain's 1M Stationary store, in the Bronx.  They told you

25   that Dore and Barrett were in constant contact with Fahd

D3iWdor1                    Summation - Ms. Masella

 1   Hussain over their cell phones in order to receive and transmit

 2   critical information about the victims that they were stalking.

 3            Now, I want to take a moment to say a few words about

 4   these witnesses.  When I talk about inside witnesses, they're

 5   inside because they can give you very valuable information

 6   about the other members of the robbery crew and the defendants

 7   and what they did in this case.  But because both Patrick

 8   Taylor and Janiel Brown themselves participated in these crimes

 9   with the defendants, they are able to give you an especially

10   detailed and compelling view of exactly what happened every day

11   in the course of this robbery conspiracy.  They're able to tell

12   you how the robberies were planned.  They're able to tell you

13   what the defendants told them about other robberies that they

14   were not a part of, and they're able to tell you what they

15   directly saw and heard happen during the course of the

16   robberies that they were present for.

17            Now, you heard the defense lawyers in this case

18   cross-examine these witnesses at great length.  Those were the

19   longest cross-examinations in the case.  And I expect that you

20   will hear a lot from the defendants' lawyers during their

21   summations about these witnesses and their credibility, and

22   they're going to criticize the credibility of these witnesses.

23            The government agrees that you should carefully

24   scrutinize these witnesses' testimony and their credibility and

25   carefully weigh their credibility as it matches up or measures

D3iWdor1                    Summation - Ms. Masella

 1    up against the other testimony in the case.  But as you do so,

 2    I want to suggest three important things for you to consider in

 3    weighing these witnesses' testimony.

 4            First, recall the witnesses' demeanor on the witness

 5    stand.  How did they answer questions on direct and

 6    cross-examination?  Did they appear evasive, or did they answer

 7    directly?  Did they answer questions the same way on direct

 8    examination and cross-examination?  If you think about these

 9    things, I think you will find that the witnesses testified in a

10    candid and straightforward manner, that they did not dodge

11    questions.  They were not evasive.  They did not overexaggerate

12    their knowledge or their memory of events.  They did their best

13    to provide truthful and accurate answers to all of the

14    questions that were presented to them and they made no bones

15    about the fact that they had each committed crimes in the past.

16            Second, you should consider these witnesses'

17    incentives to tell the truth versus to lie here in their

18    testimony.  Both Patrick Taylor and Janiel Brown told you that

19    they had signed agreements with the government.  Patrick Taylor

20    has a cooperation agreement with the government and he's

21    pleaded guilty to various crimes in connection with his work

22    with this robbery crew as well as other crimes.  Janiel Brown

23    told you that she received a nonprosecution agreement from the

24    government.  Both witnesses were clear in telling you that they

25    had significant benefits from the government if they tell the

D3iWdor1                         Summation - Ms. Masella

 1    truth.  They also told you that they get nothing from the

 2    government if they lie.  They told you that their agreements

 3    get ripped up, that they could get prosecuted for perjury, and

 4    they get no benefit at all in connection with their criminal

 5    conduct.

 6              Although both Patrick Taylor and Janiel Brown admitted

 7    to telling certain lies to law enforcement in the past,

 8    remember that back then their motives were different.  Back

 9    then, they were trying to deflect attention from themselves and

10    they were trying to get away with criminal conduct.  They were

11    certainly trying at that time to act in their own

12    self-interests, which you'll remember was the focus of some of

13    the defense counsels' cross-examination of these witnesses.

14    But now, under their agreements with the government, the only

15    thing in their self-interests is to tell the truth.  So as you

16    consider their testimony, ladies and gentlemen, ask yourselves

17    which way their incentives cut, their own self-interests, and

18    ask yourselves which way they should be motivated to testify in

19    this case.  And if you do that, you'll find that they are

20    telling the truth.

21              Third, as you consider these witnesses' testimony,

22    think about the corroboration of their testimony.  And by

23    corroboration, I simply mean significant other independent

24    evidence that is consistent with what these witnesses testified

25    to.  The government is not asking you to believe these

D3iWdor1                    Summation - Ms. Masella

1   witnesses in a vacuum.  Instead, we're asking you to think

2   about their testimony carefully, look it over, and compare it

3   to the other evidence in the case, and consider whether it

4   matches up with the other evidence.

5        Now, throughout the closing, as I go through different

6   robbery incidents, I'm going to talk about many different

7   examples of corroboration, but I just wanted to highlight a few

8   here so that you know exactly what I mean.

9        Take Janiel Brown's testimony for a moment.  She

10  testified that Dore worked with Barrett to commit robberies,

11  and she said that Dore referred to robberies as a job, a food,

12  or on the move.  And when we looked at some of the text

13  messages in her phone, we found messages from Dore that said,

14  "We're going to do a job now," or "We're on the move now."

15  Now, the reason these messages are so important is because they

16  corroborate her testimony, that Dore was involved in robberies,

17  first of all, and second of all, that he communicated directly

18  with her about those robberies at the time they were occurring.

19  So they show that she had knowledge at the time the robberies

20  were committed, that she received text messages directly from

21  Dore about them, and that, therefore, her testimony here about

22  those robberies is credible and it's something you can rely on.

23       Let's look at Patrick Taylor's testimony for a moment.

24  Patrick Taylor told you that before he even met Dore and

25  Barrett around September 2011, they told him about robberies

D3iWdor1                        Summation - Ms. Masella

1    that they had done of two other people.  They told him that the

2    victims were of related businesses, one was in Westchester and

3    one owned a gas station in Pennsylvania.  Barrett and Dore told

4    Taylor that they had robbed those two individuals during the

5    summer of 2011, and that they had made approximately $40,000

6    during one robbery and $60,000 during another robbery.

7         Now, ladies and gentlemen, recall the testimony here

8    of Abdul Rauf, who was the victim of the Pennsylvania robbery.

9    He told you that he was robbed during 2011.  He told you that

10   it was approximately $46,000 that he lost during the course of

11   that robbery, and that he's the owner of a gas station in

12   Pennsylvania, and that his business partner, the owner of the

13   Bronx Trading Company, was robbed in Westchester County a few

14   days beforehand, and he told you that that robbery was a loss

15   of approximately $56,000, for his business partner.

16        This is corroboration.  What Patrick Taylor's told you

17   that he learned from Dore and Barrett about these robberies is

18   independently corroborated by what you heard from the

19   Pennsylvania victim, Abdul Rauf.  There's no reason at all that

20   Abdul Rauf would not be telling you the truth here in court

21   when he testified about being a victim of that robbery.  And

22   there's no reason at all that he and Patrick Taylor, who

23   otherwise have nothing in common, would somehow come up with

24   the same story, unless it were true.  So the only logical

25   conclusion, ladies and gentlemen, is that these two witnesses

D3iWdor1                        Summation - Ms. Masella

1    are both telling you the truth about those robberies.

2             Another reason that this corroborates Patrick Taylor's

3    testimony as a whole is that it proves to you that he was an

4    integral and important member of this robbery crew who had

5    detailed knowledge about what Dore and Barrett were doing on an

6    everyday basis during the time period that he talked about.  He

7    not only testified about robberies that he was present for, but

8    this testimony about the Pennsylvania robbery demonstrates that

9    he knew the truth about other robberies, even those that he was

10   not present for.  It shows you that he was truly an insider and

11   a member of this conspiracy and that Dore and Barrett told him

12   important, detailed, critical things about the workings of that

13   conspiracy, even for the incidents at which Patrick Taylor was

14   not present.

15             Now, ladies and gentlemen, in a moment, I'm going to

16   start to walk through the proof of the robbery conspiracy and

17   the various incidents you heard so much about during this

18   trial.  But before I do that, I want to take a quick moment to

19   look at the phone evidence because it's going to be important

20   as a foundation for much of the other evidence you'll hear.  In

21   this case, you heard about cell site evidence and phone records

22   from a lot of witnesses in great detail.  You heard from the

23   government's FBI witness who was the one who provided the

24   summary maps and charts to help you analyze the phone evidence.

25   But before you can truly appreciate the strength of the

D3iWdor1                    Summation - Ms. Masella

1    government's phone evidence, you have to first understand how

2    the government ties each of these relevant phones to the

3    defendants.  After all, it might not surprise you to learn that

4    the defendants did not subscribe to cell phones in their own

5    names.  And you also heard from Janiel Brown that Dore

6    frequently changed his phone number and used different phones

7    during the several-month period that she knew him.  So, if we

8    look at slide three, this is the phone number, 347-883-8414,

9    that was used by Dwayne Barrett throughout this time period,

10   and he pretty much used the same phone number at all times

11   during this period, so it's going to be easy to remember his

12   phone number, 8414.

13            There are several different ways that we know that

14   this is Dwayne Barrett's phone number.  He provided it to the

15   New York Police Department during the November 14 car stop.

16   Now, that was the occasion when he was stopped by officers

17   Villanueva and Segarra when he was following Jesse Singh, the

18   gas station owner, and they asked him for identification and

19   they asked him for his driver's license and phone number, and

20   that's the phone number he provided that day, November 14.

21   It's also the same phone number that was on the phone that was

22   seized by the police when he was questioned on January 9 of

23   2012, and that phone was kept by the police at that time.  And

24   so after January 9, Dwayne Barrett got another phone, which was

25   seized on January 19, when he was arrested in connection with

D3iWdor1                      Summation - Ms. Masella

1   this case.  And it had the same phone number, ending in 8414.

2   And if you're wondering, just on the slides where we have an

3   exhibit or a transcript cite, that is just where that material

4   might be found.  So Government Exhibit 87 is the actual phone

5   that was taken by the police on January 9.  87A is the CD

6   containing the contents of that phone, and the same for

7   Government Exhibits 83 and 84.

8           If you look at the next slide, these are two different

9   cell phone numbers used by Jermaine Dore during this period,

10  the first one ending in 5031.  Remember we heard testimony

11  about this when Janiel Brown testified.  This was one of the

12  numbers that she had text messages, numerous text messages

13  going back and forth with Jermaine Dore, and she remembered

14  this phone number, that that was the one used by Jermaine Dore.

15  Second, it was also listed in her phone seized by the agents,

16  Government Exhibit 73, and it was listed under the designation

17  Hon, which is what she testified she referred to him as.

18          The next phone number, 3929, was listed in two of

19  Dwayne Barrett's phones as Blaq, which is the name that we know

20  that the other coconspirators referred to Jermaine Dore by.  So

21  it's listed in the January 9 phone that was seized as well as

22  the January 19 phone.

23          If we look at the next slide, now, you heard a lot of

24  testimony about Biggs, another coconspirator in this case, and

25  he is not a defendant here on trial, but the reason that his

D3iWdor1                    Summation - Ms. Masella

1    phone numbers are important is because there are going to be

2    certain incidents in which you hear testimony that Biggs is

3    present, and Biggs is another one of the robbers, and his phone

4    number is going to show up at those same incidents, so let's

5    briefly review his phone numbers.

6            There are two of them, one ending in 3565, which is

7    listed in Barrett's contacts as Biggs, the name that they all

8    knew him by, and, second of all, this is the phone that is

9    actually found at the scene of the New Rochelle robbery.  You

10   heard all those New Rochelle police officers testify about a

11   phone that was found right outside the victim's car on the

12   ground and this is the phone that was dropped by Biggs at the

13   scene of that robbery.

14           Finally, the last phone number for him ending in 5867

15   was listed in Janiel Brown's contacts as Biggs, and she

16   testified that she had the phone number for a number of the

17   members of this robbery crew so that she could get in contact

18   with Dore if he wasn't answering his phone or they could get in

19   contact with her.

20           Now I want to turn to looking at the proof of all the

21   various robbery incidents that you've heard during the course

22   of this case.  Keep in mind that all of these incidents are

23   proof of a conspiracy charged in count one and that the October

24   29 and December 12 robberies are also charged separately as

25   substantive crimes.

D3iWdor1                    Summation - Ms. Masella

1           Now, ladies and gentlemen, I don't think it's
2    seriously in dispute that these robberies occurred and that the
3    victims suffered real fear, threats, violence, and in some
4    cases injuries.  It's not in dispute that their property was
5    taken, that their property was taken by force or threat of
6    force, and that that property at times included their business
7    proceeds and that some of these individuals are engaged in what
8    is known as interstate commerce or commerce including sources
9    outside of New York State.  So I'm going to focus, as we go
10   through the incidents, on the proof that Dore and Barrett
11   committed each of these robberies.

12           Turning now to the first incident that you heard
13   about, which is a robbery in Matamoras, Pennsylvania, of a
14   victim named Abdul Rauf, on August 22, 2011, early in the
15   afternoon, Abdul Rauf was robbed as he walked from his gas
16   station, the Go 24, to the local bank, the Wells Fargo Bank.

17           If we can have the next slide, please, this is where
18   it all started, ladies and gentlemen.  This is a photo of Abdul
19   Rauf's gas station, the Go 24.  He testified that he made
20   weekly cash deposit trips to the bank, that that day he was
21   carrying approximately $46,000, which is about half of the
22   normal amount of business proceeds.  He testified that he
23   usually carried 80,000 to a hundred thousand dollars every
24   Monday morning, but on this occasion, because his related
25   business, the Bronx Trading Company, had been robbed two days

D3iWdor1                     Summation - Ms. Masella

1    prior, he had kept back half of the cash in the office so that

2    he could take it back to the Bronx Trading Company and help

3    them restart their business.

4           Abdul Rauf told you he was assaulted by two robbers in

5    the parking lot that day, the parking lot of the Wells Fargo

6    Bank, and that they took his bag full of cash.  Rauf also told

7    you important information about his connections to Fahd

8    Hussain.  He told you that he had known Fahd Hussain for years,

9    that he had trusted him as a personal friend and business

10   associate, and that he had done several cash transactions with

11   Fahd Hussain in recent months.

12          In particular, Abdul Rauf told you that Fahd Hussain

13   had come to the Go 24 on five or six previous occasions and

14   given him a check and, in return, Abdul Rauf had given him

15   several thousand dollars in cash, anywhere from $4,000 to

16   $6,000.  So you know from this, ladies and gentlemen, that Fahd

17   Hussain knew and understood that Abdul Rauf had a cash business

18   at the Go 24, that he generated a lot of money in cash

19   proceeds, and that he kept a lot of cash on hand in his office

20   there.  You can infer from that that Hussain told Dore and

21   Barrett that and that Dore and Barrett may have even known

22   about Abdul Rauf's weekly Monday morning trips to the bank.

23   And reason I say that is because when you put together the

24   testimony of Abdul Rauf with Janiel Brown, which I'm get to in

25   a moment, it's clear that they knew about his trip to the bank

D3iWdor1                        Summation - Ms. Masella

1    and that they were watching him, surveilling him for some

2    period of time.

3            Let's remember what Janiel Brown said about this

4    robbery.  Remember, she testified that this was the first

5    robbery that she was present for.  She didn't have an

6    understanding of what was going on at the beginning of that

7    day, but by the end of the day, it was clear to her that

8    Jermaine Dore and Dwayne Barrett had participated in a robbery.

9            Now, what are the important things that you learned

10   from her testimony?  You learned that Barrett and another

11   coconspirator, Duff or Duffel, drove out to Matamoras,

12   Pennsylvania, in his car; that Janiel drove Dore in his car;

13   that they met up there.  They arrived in the early morning

14   hours and they waited in the area of a gas station and a

15   supermarket for several hours.  She told us that Dore went back

16   and forth between her car and Barrett's car, and that at some

17   point Dore quickly took off with Barrett and Duff.  And the

18   next thing she knows, she receives a phone call a short time

19   later telling her to go back to New York City.  And when she

20   gets back to New York City, she learns that Dore has a lot of

21   cash.  She estimates it to be about $15,000, which, when you

22   think about it, is about a three-way split from the 40,000 that

23   Abdul Rauf lost during that robbery.  So although she doesn't

24   see what happened at the exact moment of the robbery, when you

25   match it up together with the testimony of Abdul Rauf, the

D3iWdor1                         Summation - Ms. Masella

 1    victim, it fits in perfectly with what he says and it makes

 2    sense.  It's clear that Barrett, Duff, and Dore were watching

 3    Rauf, or his business, for hours; that they were waiting for

 4    him to leave the Go 24 Gas Station to make his weekly deposit

 5    trip to the bank, and, once they saw him move, they jumped on

 6    him.  They approached him, grabbed his money, and took his

 7    $46,000, and later that day they split the proceeds

 8    approximately three ways so that each of the robbers got

 9    $15,000.

10            Ladies and gentlemen, this testimony alone would be

11    devastating proof of that robbery, but there's even more

12    evidence.  If you look at this map, this is a cell site map

13    that the government's witness, David Magnuson, presented to you

14    during his testimony.  Now, remember, this is what we're

15    looking at.  The cell number ending in 8414 is that number that

16    was used by Dwayne Barrett throughout the course of this

17    conspiracy.  This map shows his phone using a cell tower a

18    short distance away from the Wells Fargo Bank in Matamoras,

19    Pennsylvania.  It shows that he was there on August 15, for

20    approximately two hours.

21            The cell site map is devastating evidence, ladies and

22    gentlemen.  It puts Barrett exactly at the scene of this

23    robbery, a small town, miles away, a remote distance from New

24    York City, for hours on end, the same hours during which

25    they're surveilling the victim and waiting for him to leave his

D3iWdor1                        Summation - Ms. Masella

1    business to make his trip to the bank.  There's no other

2    explanation for Barrett's phone to be in this area at that time

3    other than that he was conducting a robbery during that time.

4           There's even more evidence, ladies and gentlemen.  If

5    we turn to the next page, this is a segment of text messages on

6    Janiel Brown's phone, and remember, these take place in

7    December after a fight with Janiel Brown and Jermaine Dore.

8    And after this fight, Janiel Brown told you that she was

9    threatening to call the police on Dore and tell them about him

10   being a robber, and he threatens back.  He threatens to call

11   the police, and he says, and this is the second line down,

12   "Just so you know, if you call them, I will tell them you was

13   my driver."  And if you look down further to the second one

14   from the bottom, "Good, and tell them just know if they come to

15   my, I will tell them about PA and the other."

16          Ladies and gentlemen, he's talking about Pennsylvania.

17   He's talking about the Pennsylvania robbery.  I will tell the

18   police that you were my driver.  I will tell the police about

19   Pennsylvania.  This is direct proof, ladies and gentlemen, that

20   Janiel Brown was present at that robbery, that she knows that

21   Dore participated, and he admits that he participated by

22   saying, Just so you know, I will tell them you was my driver.

23   He wasn't saying he wasn't there, he didn't do it.  This is

24   devastating proof that the robbery in Pennsylvania happened

25   exactly the way Janiel Brown said that it did.

D3iWdor1                          Summation - Ms. Masella

```
 1              I want to turn now to the next incident that we heard
 2     about, which was on November 14, 2011.  The witnesses testified
 3     here about this incident, it was Jesse Singh, the victim, and
 4     the officers were police officers Villanueva and Segarra from
 5     the 52nd Precinct.  What they told you about was a robbery
 6     stopped just in the nick of time.  This was a robbery stopped
 7     due to an observant victim, who was being very careful, and the
 8     fact that he had a personal relationship with police officers
 9     who happened to be in the area.
10              So, remember, Jesse Singh was the manager of that gas
11     station in Mount Vernon.  He was traveling from that gas
12     station in Mount Vernon to the related gas station in the
13     Bronx, and he was carrying with him anywhere between $25,000 to
14     $30,000 in cash that day.  As he was driving his route, he
15     noticed a dark-colored Mercedes driving very erratically behind
16     him.  He noticed that it pulled over to the side of the road
17     every time he stopped for a light.  He noticed that it followed
18     him through several lights.  It followed him on to the highway,
19     it followed him off of the highway, and every time he looked
20     behind him, that dark-colored Mercedes was still there.  So
21     Singh, who had been a business person in that community for
22     nearly 18 years, called some police officers that he knew,
23     including Officer Villanueva, who knew Jesse Singh from his
24     business in that area, and he told him what was happening, and,
25     as a result, they pulled over the car.  Which car does it turn
```

D3iWdor1                     Summation - Ms. Masella

 1    out to be, ladies and gentlemen?  It turns out to be the same

 2    dark blue Mercedes that we've heard so much testimony about in

 3    this case, the one with the license plate FMB7467, the one

 4    driven by Dwayne Barrett every day for months and registered in

 5    the name of his girlfriend, Felicia Lake.

 6          On that day, the officers identified the passengers in

 7    the car.  They identified Dwayne Barrett as the driver, and

 8    Jermaine Dore is present there but gives a fake name.  He uses

 9    the name Jermaine Otto.  The officers search the car and they

10    find baseball bats and a mask inside the car, and while Officer

11    Villanueva had the distinct impression that something was wrong

12    and that a robbery was in progress, given how frightened Jesse

13    Singh sounded and what he found inside the defendant's car, he

14    didn't see enough to arrest anyone that day, so he let them go

15    on their way.

16          But later, from another witness, we hear the inside

17    view of this incident.  Patrick Taylor told you that he was

18    talking to Dwayne Barrett and Jermaine Dore later that day and

19    they told him about it.  They told him that they were stopped

20    that day by the police while they were on their way to do a

21    robbery.  They told him that the victim was the owner of a gas

22    station in Mount Vernon and that they had followed him from the

23    gas station in Mount Vernon.  He also told you that when they

24    were stopped, Jermaine Dore gave a fake name, and they were

25    even joking about the fact that Jermaine Dore cooked up his

D3iWdor1                          Summation - Ms. Masella

1      name and that he couldn't even remember how to spell it.

2              I want to turn to the next incident that you heard

3      testimony about, which was a robbery of Youssef Abdulkader.

4      This occurred on October 10, 2011, on Wallace Avenue, in the

5      Bronx, near Allerton and Arnow.

6              Now, remember Abdulkader is the owner of a convenience

7      store.  He testified he's known Fahd Hussain for many years and

8      that Hussain knows where his home is.  And he testified that on

9      October 10, 2011, the day of the robbery, he was traveling from

10     his store to his home, around midnight, which is what he

11     usually did nearly every day.  He told you that he parked near

12     his home, and, as he was walking down the street, he noticed

13     two individuals were sitting there almost as if they appeared

14     to be waiting for him.  He told you that he was approached by

15     the two robbers, that one of them had a knife, and that he was

16     so afraid he dropped his bag and ran off.  And that bag

17     contained his cell phone, his personal cell phone, and his

18     laptop computer.

19             If you look at the next slide, now, ladies and

20     gentlemen, these are items found on Government Exhibit 72.

21     Government Exhibit 72 is a cell phone.  It's a cell phone that

22     was seized from Jermaine Dore's apartment at the time of his

23     arrest in this case.  That was January 19, 2012, three months

24     after the robbery of Youssef Abdulkader.  The left side of the

25     slide shows photos of Youssef Abdulkader, which were contained

1    on that phone, Exhibit 72.  The right side shows photos of

2    Jermaine Dore and his girlfriend, Janiel Brown.  Janiel Brown

3    also testified that she recalled Jermaine Dore using that phone

4    to make phone calls and to take photos and for other things you

5    would use a phone for.

6          Ladies and gentlemen, this exhibit alone is

7    devastating proof of that robbery.  There's no other reasonable

8    explanation for Jermaine Dore to have this phone in his

9    apartment three months after the robbery of Youssef Abdulkader

10   and no other reason why this photo should be on that phone.

11         There's even further evidence of this incident.  If

12   you look at this map, this is a cell site map showing that

13   number 3565, which is the number used by Taijay Todd, or Biggs

14   rather, and 3929, a number used by Jermaine Dore.  On October

15   10, 2011, 20 minutes before midnight, which is the date and

16   time of the robbery and theft of Youssef Abdulkader, it shows

17   these two members of the robbery crew using a cell tower a

18   block and a half away from where the robbery happened.  Again,

19   there's no other reasonable explanation for this but that those

20   two were together at that time on that date about to carry out

21   the robbery of Youssef Abdulkader.

22         Now, ladies and gentlemen, I want to talk to you about

23   the October 29, 2011, robbery, which is that snowy day robbery

24   on Radcliff Avenue that you heard a lot of testimony about from

25   a lot of different sources.  Remember that there are two

D3iWdor1                    Summation - Ms. Masella

1    relevant locations for this robbery.  The victim himself, the

2    first victim, Ahmed Salahi, is picked up outside a mosque on

3    Rhinelander Avenue and that his house keys are taken and that

4    his house on Radcliff Avenue is home invaded and monies are

5    taken from there.  Ahmed Salahi and Kassim Salahi, the two

6    victims in this case, remember, are brothers.  They're brothers

7    who own several live poultry markets in the Bronx.

8         Kassim testified he's known Fahd Hussain for many

9    years and he testified he had used Fahd's stores from which to

10   send large cash transactions or wire transfer transactions back

11   to family members in Yemen on several occasions.  So, from

12   that, ladies and gentlemen, you know that Hussain knew that the

13   Salahis had a business, that the business generated cash

14   proceeds, and that the cash proceeds might have been kept in

15   their home locations.

16        Ahmed Salahi testified that on Saturday, a Saturday in

17   October, that Saturday in October, October 29, he was in his

18   house from approximately three p.m. to six p.m. and that his

19   house was located at 2532 Radcliff Avenue in the Bronx.  Then,

20   he went to a local mosque on Rhinelander Avenue and White

21   Plains Road for evening prayers that day and that he was there

22   from about 6:00 until 6:30.

23        If you look at slide 16, this is a photo of the house

24   on Radcliff Avenue in the Bronx.  If we look at the next slide,

25   this is the same phone number, ladies and gentlemen, we looked

D3iWdor1                    Summation - Ms. Masella

1    at many times already, the phone number 8414, the phone number

2    used by Dwayne Barrett throughout this time period.  What this

3    map is showing us is if you look at the upper circle, the one

4    up here, that represents 2532 Radcliff Avenue, which is the

5    residence location of Ahmed Salahi in the Bronx.  If you look

6    at the title on this, we can tell from this evidence that

7    Dwayne Barrett's cell phone was using a cell tower only a block

8    away from that residence, between the hours of 1:24 and 5:36

9    p.m., four hours, ladies and gentlemen.  For four hours, Dwayne

10   Barrett was essentially sitting outside of that residence on

11   Radcliff Avenue in the Bronx, waiting for the victim to leave

12   and waiting for an opportunity to carry out that robbery.

13          We've heard about this also from Patrick Taylor.  You

14   heard that he was on Radcliff Avenue for hours that afternoon.

15   He told you that he was there with Dwayne Barrett and also

16   another coconspirator, Jaba, who helped him carry out that

17   robbery.  He told you that they had tried to carry out a

18   robbery of this residence on a prior location late in the night

19   and that it had failed because the neighbors had noticed too

20   much commotion in the backyard.

21          So what did they do?  On this day, they go back, and

22   they decide to sit outside the victim's house and wait, wait

23   for the victim to leave so that they can get him, get his keys,

24   and enter the house without causing any disruption.  So this is

25   proof of that, ladies and gentlemen.  This is proof that

D3iWdor1                          Summation - Ms. Masella

1    they're sitting outside the house for almost at least four

2    hours on that day.  And I just want to remind you that when you

3    see 1:24 p.m. through 5:36 p.m., we can only put the cell phone

4    using the cell tower at times during which Dwayne Barrett was

5    actually using the phone.  So, in other words, he may have been

6    there for even longer.  But what we can tell from this exhibit

7    is that he was at least there between 1:24 and 5:36, four

8    hours' waiting time.  What happens after that?  Around that

9    time, Ahmed Salahi goes to the local mosque on Rhinelander

10   Avenue in the Bronx.

11            If you look at the next slide, this is another cell

12   site map for Barrett's phone, 6:44 p.m. through 7:21 p.m.,

13   showing that Barrett is using a cell tower that is literally on

14   top of the same corner as where the mosque is located on

15   Rhinelander Avenue and White Plains Road.  What does this tell

16   you, ladies and gentlemen?  This tells you that Barrett

17   essentially followed the victim.  He followed the victim from

18   Radcliff Avenue to Rhinelander Avenue as the victim went to the

19   mosque for evening prayers.  That's roughly the same time that

20   Ahmed Salahi told you he was at the mosque and Barrett's phone

21   was right there, right on that corner, watching the victim.

22            Both Ahmed Salahi and Kassim Salahi told you what

23   happened after that.  Ahmed was attacked in his own car as he

24   was leaving the mosque.  He was held down in his car, jammed

25   between the seats of his minivan, and held down by two robbers,

D3iWdor1                    Summation - Ms. Masella

1    one with a gun, one with a knife.  After a short distance, a

2    short distance driving, Ahmed told you that one of the robbers

3    got out of the car, that they took his keys, and that that

4    robber left while the other robber held him down at knifepoint

5    for 15 or 20 minutes.

6              In the meantime, his brother, Kassim Salahi, is inside

7    his house.  Ahmed doesn't know that at that point because when

8    he left the house it was empty.  But it turns out that Kassim

9    and his two sons were in Ahmed's house waiting for their

10   brother and uncle to come home and waiting to share Saturday

11   evening dinner together and they're expecting Ahmed to come to

12   the door and when the door opens, the kids run over to greet

13   their uncle and instead they find two robbers at the door.

14             Now, remember what we learned from Patrick Taylor

15   about this incident?  Patrick Taylor heard about it the same

16   day.  Patrick Taylor was there as a lookout in a car nearby on

17   Allerton Avenue, which is the cross-street, and he doesn't see

18   what happens inside the house, but as soon as the robbery's

19   over and the group gathers to divide the proceeds and talk

20   about what happened, Patrick Taylor gets a detailed version of

21   what happened that day.  What Patrick Taylor says is that Dore

22   is the first robber to approach that house, used the keys to

23   get in, but he sees the kids and the commotion inside the

24   house.  Remember, he was expecting the house to be empty.  And

25   he goes back, essentially closes the door and goes back for

D3iWdor1                    Summation - Ms. Masella

1     reinforcement.  And who does he get?  Dwayne Barrett.

2              Now, this is important because remember Kassim

3     Salahi's description of the second robber.  He said that the

4     second robber was so tall that he literally had to stoop over

5     to fit inside the doorway of their basement apartment and that

6     when they were standing there in the basement he had to bend

7     his head down because he was too tall to fit inside.  That's

8     Dwayne Barrett, ladies and gentlemen.  We've all seen him stand

9     up in this courtroom and we know he's approximately six seven

10    or six eight in height.

11             Patrick Taylor told us other valuable information

12    about the robbery which lines up exactly with what the victims

13    said.  He said that Dore and Jaba are the ones that ran up on

14    Ahmed Salahi in his car.  He said that they took his keys and

15    that Jaba held Ahmed Salahi down at knifepoint while Dore got

16    out to conduct the robbery.  He said Dore went back to get

17    Barrett's help, which is corroborated again by Kassim Salahi's

18    description of the robber who was so tall he had to stoop

19    through the doorway.

20             We also know from Patrick Taylor that he saw Dore with

21    a gun that day.  He saw Dore inside Tall Man's car, Barrett's

22    car, earlier that day with the same nine millimeter, black with

23    a wood handle, that we've heard so much other testimony about

24    in this case and the two victims in the case testified, Ahmed

25    Salahi said he saw one gun and one knife.  And Kassim Salahi,

D3iWdor1                    Summation - Ms. Masella

1    the victim inside the house, testified that he saw each of two

2    robbers, Dore and Barrett, each holding guns when they were

3    inside the house rummaging for money.  We know from the victim

4    that they took about $15,000 in business proceeds, and Patrick

5    Taylor told you that he got approximately $1,000 of that and

6    that he saw Dore and Barrett and Jaba get their share of the

7    money after the robbery when they were back dividing up the

8    money.

9          Now, ladies and gentlemen, I want to turn next to the

10   Mount Vernon robbery and homicide of Gamar Dafalla.  I want you

11   to recall that this is not only part of the conspiracy charge

12   but is also separately charged as a substantive robbery and it

13   also has a separate firearms charge and a murder charge

14   associated with it.  This is obviously an important incident in

15   this case and you have heard a lot of different types of

16   evidence and testimony about it.  And it's important to look at

17   how all the evidence fits together and especially important to

18   understand the precise chronology of what happened that

19   morning.

20         So, in a moment, I'm going to walk through the

21   different evidence that demonstrates the chronology and the

22   time line, but for now, I want to take a moment just to focus

23   on the timing of what happened that morning.  It's important

24   because it tells you exactly what happened that day, about how

25   Barrett, Dore, and their other coconspirator, Biggs, planned to

D3iWdor1                    Summation - Ms. Masella

1   rob Gamar Dafalla, and how he was killed when the robbery went

2   bad.

3          Now, if you look at this, if you look on the left-hand

4   side, the red box near the top, 10:30 to 10:34 a.m., the

5   evidence places Dore near the Riverroad Motor Inn, and at the

6   same and overlapping time, 10:09 to 10:32, the evidence places

7   Barrett near the Riverroad Motor Inn.  And if you look at the

8   next box down, the orange one on the left, 10:32, that's the

9   time when Gamar Dafalla, the victim, is checking out of the

10  Riverroad Motor Inn.  So all three individuals, Dore, Barrett,

11  and Gamar Dafalla, are all at the Riverroad Motor Inn at

12  exactly the same time that morning.

13         Now, if you look at what happens next, these boxes are

14  on the right.  10:38 to 10:57, Barrett is near 267 South Fourth

15  Avenue in Mount Vernon, which is the scene of the later robbery

16  and the car jacking of Gamar Dafalla.  At 10:45 we have Biggs

17  in that area, and at 10:57, we have Dore in the same area, 267

18  South Fourth Avenue in Mount Vernon.  This cluster on the right

19  shows you where the victim, as well as Barrett, Dore, and

20  Biggs, all travel from the Riverroad Motor Inn to South Fourth

21  Avenue in Mount Vernon.  A few minutes later, the Toyota Sienna

22  minivan containing Gamar Dafalla and the two robbers speeds

23  away from South Fourth Avenue in Mount Vernon.  Approximately

24  50 minutes later, police officers discover Gamar Dafalla's body

25  in the back of that Toyota Sienna, which is still running,

D3iWdor1                    Summation - Ms. Masella

1    parked on a street corner, Strang and Duryea Avenue, in the

2    Bronx, and a short time after that, approximately an hour

3    later, Dore returns to the scene of Strang and Duryea Avenue in

4    the Bronx.

5         So I just want you to focus on this for one moment,

6    the chronology, and then I'm going to walk through with you the

7    evidence that supports each of these items on here.

8         If we look at the next slide, this is the Riverroad

9    Motor Inn.  This, remember, is the place, 4225 Webster Avenue,

10   where the taxi driver, Mr. Liang, told you that he dropped off

11   Gamar Dafalla the night before the robbery and the murder, and

12   he picked him up that morning around nine or ten a.m.  He told

13   you that they were there for some period of time loading up

14   cardboard boxes with cartons of cigarettes -- those were the

15   untaxed cigarettes that were the transaction that occurred

16   right before the murder -- and that they were carrying those

17   large boxes of cigarettes out to Mr. Liang's minivan.

18        Now, remember, the hotel clerk, Sterlin Sahadeo,

19   testified here and told you that he clocked out the victim

20   Gamar Dafalla from the Riverroad Motor Inn at exactly 10:32

21   that morning.  That's Government Exhibit 536, which is in

22   evidence, and if you turn it over to the back side, it has the

23   time clock stamp on the back of that showing the clock-out time

24   at 10:32.

25        If we look at the next slide, this is a cell site map

D3iWdor1                        Summation - Ms. Masella

1   for that same phone number, 8414, used by Dwayne Barrett

2   throughout the case, on December 12, 2011, from 10:09 to 10:32

3   showing him using a cell tower that is again only a couple

4   blocks away from that location.  The location is a spot on the

5   map up here.  It's 4225 Webster Avenue.  That's the Riverroad

6   Motor Inn.  During this time period, there's Barrett using his

7   phone a short distance away, watching the victim as he and the

8   taxi driver load up the van with those untaxed cigarettes.

9           If we look at the next slide, also December 12, 2011,

10  from 10:30 to 10:34, this is the 5031 number used by Jermaine

11  Dore, and again, this is the location of the Riverroad Motor

12  Inn, and there's the cell tower a short distance away.  Dore

13  and Barrett are together.  They're together at the Riverroad

14  Motor Inn and they're watching Gamar Dafalla and Mr. Liang, the

15  taxi driver, load up the van and waiting for them to leave.

16          What happens after this?  Dafalla and Liang travel

17  together to the area of Mount Vernon.  Mr. Liang told you that.

18  They pick up Jamal Abdulla, the other witness that day, in the

19  area of 267 South Fourth Avenue, which is Abdulla's store

20  location.  Abdulla then goes on to conduct a cigarette

21  transaction a few blocks away, which generates about $10,000 in

22  cash proceeds, and then the three of them return, Mr. Liang,

23  Jamal Abdulla, and Gamar Dafalla.  They return inside the

24  minivan to South Fourth Avenue where they start counting the

25  money from the transaction.

1          If we look at the next slide, this is a video, ladies

2     and gentlemen.  If you look at it, this is Dwayne Barrett's

3     Mercedes.

4          (Video recording played)

5          MS. MASELLA:  In a moment, we're going to see a car

6     with the license plate readers owned by George Drape pull by,

7     the license plate readers that captured Dwayne Barrett's

8     license plate.  There it is, and you see on the back of that

9     car the license plate readers that George Drape testified

10    about.  This is Jermaine Dore getting out of the Mercedes and

11    walking around the area.  And Barrett, in the Mercedes, is

12    waiting.

13         If we look at the next slide, this is the information

14    from the license plate reader.  Remember, this is what George

15    Drape testified about.  On 12/12, 2011, at approximately 10:54,

16    his license plate readers, mounted on top of the car that we

17    just saw in the video, drove by the Mercedes and captured this

18    license plate, FMB7467, the same license plate on Dwayne

19    Barrett's dark blue Mercedes.

20         If we look at the next slide, if there is any doubt

21    about whose car this is, we also saw the DMV registration from

22    the DMV witnesses.  It was registered in the name of Felicia

23    Lake, and we heard from the agent who was present for the

24    arrest of Dwayne Barrett that Felicia Lake lives with Dwayne

25    Barrett, that she's his girlfriend, and that they lived

D3iWdor1                    Summation - Ms. Masella

1    together.

2              If we look at the next slide, here's just a photo of

3    the car that was taken by the crime scene detectives when they

4    searched that car after the arrests in this case.  That's the

5    same car that Patrick Taylor and Janiel Brown both testified

6    was driven by Dwayne Barrett on a nearly everyday basis during

7    this period.  It's the same car that Dwayne Barrett and

8    Jermaine Dore were pulled over in on November 14, 2011, and

9    identified by those police officers as they were following

10   Jesse Singh.

11             If we look at the next slide, this is just a still

12   shot from a video, but this is the same corner in Mount Vernon,

13   that corner at South Fourth Street and South Fourth Avenue on

14   December 12, right around 11:00.  If you look in the upper

15   right-hand corner, you see two people, a shorter one and a

16   taller one, walking down the street, sort of pretending not to

17   be together here.  Walking down the street, a shorter

18   individual, it's Jermaine Dore.  And the taller one is Biggs,

19   his coconspirator in this robbery-homicide.

20             Let's look at the next slide and see what Dwayne

21   Barrett's doing at this time.  Sorry.  So this is the same

22   corner, South Fourth Street, South Fourth Avenue, and this is a

23   still shot from the video when Zhao Liang and Jamal Abdulla are

24   forced out of the minivan at gunpoint by Dore and Biggs.

25             If we look at the next slide, what is Barrett doing

D3iWdor1                    Summation - Ms. Masella

1    during this same time period?  This is, remember, 8414, same

2    number used by Barrett throughout the case.  This is the corner

3    near South Fourth Avenue and South Fourth Street in Mount

4    Vernon, 267 South Fourth Avenue, the address of Jamal Abdulla's

5    store, where the car jacking takes place.  And there's Dwayne

6    Barrett's cell phone using a tower a quarter-block away from

7    that location for an extended period of time, approximately 20

8    minutes, 10:38 to 10:57.  That's the 20 minutes during which

9    Dwayne Barrett's in the area inside his Mercedes that we just

10   saw in the previous video, waiting for the victim, Gamar

11   Dafalla, to complete the cigarette transaction, waiting for

12   them to get the cash so that they can rob him.

13        Where is Dore in this time period?  Exactly the same

14   place.  Here is that same location, 267 South Fourth Avenue in

15   Mount Vernon, and remember this is the 5031 number used by Dore

16   and identified by Janiel Brown, and there's his phone using a

17   cell tower a block away from that scene, 10:57 a.m., exactly

18   the same time as Dwayne Barrett.

19        If we look at the next slide, we can also put Biggs,

20   the third coconspirator that day, exactly in the same area.

21   This is a call that lasts from 10:37 to 10:45, and if you look

22   at this cell site information, it looks like he's actually

23   traveling from the Bronx to the Mount Vernon area.  The

24   beginning of the call starts out here and the end of the call

25   ends up here, about a block away from that address at 267 South

D3iWdor1                        Summation - Ms. Masella

1    Fourth Avenue.  So by 10:45, ladies and gentlemen, all three

2    coconspirators that day, Dore, Barrett, and Biggs, are right in

3    the area of South Fourth Avenue in Mount Vernon where the car

4    jacking and robbery is about to take place.

5            If we look at the next slide, this is the next fixed

6    point in time that we have, ladies and gentlemen.  This is

7    Strang and Duryea avenues in the Bronx.  This is the Toyota

8    Sienna minivan where Gamar Dafalla's body is found while it's

9    still running on this corner.  If you look at this corner in

10   particular, what do you notice about it?  There appears to be

11   little traffic in a quiet neighborhood.  There aren't many

12   windows or businesses facing this street, and it's an area

13   within the 47th Precinct in the Bronx, which is an area we

14   heard so much testimony about in this case.  That's the same

15   precinct where Fahd Hussain's store is located, where the

16   robbers hung out nearly every day.  That's the same precinct

17   where many of the robberies occurred.  And it's the same

18   precinct that is so familiar to Barrett and Dore where they

19   spent much of their time.  So it looks like they chose to dump

20   the body in this minivan on a quiet corner in an area in the

21   47th Precinct that was very familiar to them.

22           If you look at the next slide, this is also telling

23   evidence of Dore's participation in this crime.  He returns to

24   the scene.  This is the same phone number, 5031, at 12:47,

25   which is about one hour after the body is discovered.  This is

D3iWdor1                    Summation - Ms. Masella

Strang and Duryea Avenue in the Bronx, and this is Dore's cell
phone using a tower about a block or block and a half away.
Now, we don't know why exactly he returned to the scene.  We
don't know if he returned to see if the police had found the
body, if he thought he left something behind, or to check on
the status of the investigation, but it doesn't really matter
why.  The fact that he returns to the scene where he dumped the
body in a van less than an hour later is further proof of his
participation in this murder.

          If you review the cell site evidence for all of the
coconspirators that day, it's extremely powerful.  It places
Jermaine Dore at all three locations:  At the Riverroad Motor
Inn, when the victim's leaving; in Mount Vernon on South Fourth
Avenue when the victim's on South Fourth Avenue; and, finally,
at Strang and Duryea avenues about an hour after the body's
recovered.  And it places Dwayne Barrett at two of those
locations, at the Riverroad Motor Inn, when the victim is at
the inn, and South Fourth Avenue when the victim is there.
This is devastating proof of these defendants' participation in
that crime that morning, the robbery and murder of Gamar
Dafalla.  But that's not all, ladies and gentlemen.

          Let's talk about the gun that was used that day for a
minute.  If we look at the next slide, you have heard a lot of
descriptions about this gun in this case.  These are two that I
want you to focus on.  The one on the left was Zhao Liang, the

D3iWdor1                    Summation - Ms. Masella

1   taxi driver of the minivan that morning:

2   "Q.  This gun was not a revolver?

3   "A.  No.

4   "Q.  Can you tell us what color or colors the gun was?

5   "A.  So the gun itself is black and the handle is the color of

6   the wood."

7          Jamal Abdulla:

8   "Q.  An automatic gun?

9   "A.  Yes, and it has the color of this as the handle.

10  "Q.  Was the whole gun that color or just the handle?

11  "A.  Just the handle.  The rest is black.

12  "Q.  And again, just for the record, when you were describing

13  the gun and that that person was holding you were pointing to

14  the wood in front of you indicating the bench that you're

15  sitting at, is that correct?

16  "A.  Yes, like that color."

17          Both of the surviving victims the day talk about the

18  same gun, a black gun with wood-colored handle, which is an

19  automatic gun, not a revolver, and the reason that that's

20  important, if we look at the next slide, is that other

21  witnesses talk about this gun as well, other witnesses who were

22  even more familiar with this gun, who had seen Jermaine Dore

23  carry this gun on different occasions.

24          Janiel Brown:

25  "Q.  How many times have you seen Dore with the gun?

 1   "A.  Maybe two or three times.

 2   "Q.  Was it always the same gun?

 3   "A.  Yes.

 4   "Q.  Can you describe it?

 5   "A.  It has two types of material, so it's brownish, which

 6   would be like wooden, and then it's grayish, silverish.

 7   "Q.  Do you know whether it had a barrel?

 8   "A.  It didn't.

 9   "Q.  Do you know whether it had a clip?

10   "A.  It did."

11           Patrick Taylor.

12   "Q.  Starting with the nine millimeter Smith & Wesson, who did

13   you see with that gun?

14   "A.  Blaqs," which, if you remember, is his name for Jermaine

15   Dore.

16   "Q.  When did you see that?

17   "A.  Like around October 29, 2011.

18   "Q.  Where did you see him with that gun?

19   "A.  Inside Tall Man's car," which, remember, is the name for

20   Barrett.

21   "Q.  What did the gun look like?

22   "A.  It is a black gun, but the handle is brown like this brown

23   right here.

24   "Q.  When you say brown handles indicating them --

25   "A.  Wood.

D3iWdor1                        Summation - Ms. Masella

1    "Q.  The bench in front of you, you are describing wood?

2    "A.  Wood handle, yeah."

3            Ladies and gentlemen, the description of the gun used

4    in the robbery and homicide of Gamar Dafalla as described by

5    the two surviving victims at the scene, Jamal Abdulla and Zhao

6    Liang, is another piece of evidence that provides a strong link

7    between Dore and Barrett in this crime.  The two victims both

8    describe the black semiautomatic gun with a wood handle, and

9    that's the same gun Patrick Taylor and Janiel Brown have seen

10   Dore with a number of times.

11           We also know the nine millimeter gun which Patrick

12   Taylor says this gun is was, in fact, used in the murder, and

13   there's further evidence related to the gun used that is

14   important to the evidence in this case.  Remember, Government

15   Exhibit 267 is a shell casing that was recovered from

16   underneath Gamar Dafalla's body inside of that minivan that day

17   and the nine millimeter bullet, the bullet recovered from the

18   body, which Dr. Smiddy from the medical examiner's office

19   testified is a medium caliber bullet, which is consistent with

20   being a nine millimeter gun, if you look at the ballistics

21   evidence, there's even further proof linking this gun to

22   Jermaine Dore and Dwayne Barrett.

23           Now, remember, we heard the ballistics evidence

24   through Detective Fox.  And what you're looking at here, on the

25   left-hand side of this, is a shell casing, photo of a shell

D3iWdor1                    Summation - Ms. Masella

1  casing recovered from a December 5, 2011, robbery on Monticello

2  Avenue in the Bronx.  The right-hand side of these photos is a

3  shell casing recovered from a scene of a homicide in Mount

4  Vernon.

5           Now, Detective Fox testified that he matched these two

6  shell casings together.  He testified that in his opinion both

7  of these shell casings were fired from the same weapon.  In

8  fact, Detective Fox testified that this was a self-initiated

9  match, meaning that when he was reviewing the December 12,

10  2011, shell casing, he recalled that he had seen, several days

11  earlier, another shell casing which markings on the shell

12  casing reminded him of this one.  So what did he do?  He pulled

13  out that other shell casing from evidence in the firearms lab

14  and compared the two, and, based on this comparison and

15  particular individual markings on these shell casings, in his

16  opinion, he found that they were both fired from the same gun.

17          Now, that other robbery was only approximately a week

18  earlier.  It was also in the 47th Precinct, which, remember, is

19  the same stomping grounds for Dore and Barrett we have heard so

20  much about in this case.  But there's further evidence linking

21  Jermaine Dore to that incident.

22          Remember, the victim of that crime, if you look at the

23  next slide, was Fitzroy Cornwall.  He was the gentleman who had

24  been working at the hospital in White Plains.  He was on his

25  way home.  He stopped at a bar on the way home to his house on

D3iWdor1                    Summation - Ms. Masella

1    Monticello Avenue when he was robbed in the late evening hours.

2    Now, the police responded to that robbery around two a.m., but

3    the robbery itself had occurred 15 or 20 minutes earlier, and

4    remember what Fitzroy Cornwall said about that robbery.  He was

5    approached from behind.  He was pushed to the ground.  The

6    robbers took his personal items like his wallet, his chain,

7    things like that, and that they fired a bunch of shots into the

8    air.  When the police returned to the scene, they found seven

9    shell casings right in the area where Mr. Cornwall was robbed.

10   If you look at this slide, ladies and gentlemen, remember, this

11   is 5031, the cell phone number used by Jermaine Dore, December

12   5, 2011, at 1:14 a.m., which is a short time before the robbery

13   of Fitzroy Cornwall, and if you look, this is the location,

14   Monticello Avenue between Bussing and Edenwald, which is the

15   location of the robbery, and there's Jermaine Dore's phone

16   using a cell tower a couple of blocks away at 1:15 in the

17   morning, 1:14 in the morning.  From this evidence you can tell

18   that Jermaine Dore was present at the Fitzroy Cornwall robbery,

19   that he committed that robbery using the same gun that he used

20   only a week later in the robbery and murder of Gamar Dafalla.

21          Now, I want to turn now to look at the period of time

22   on December 12 to see what happens inside that Sienna minivan

23   after it leaves South Fourth Avenue in Mount Vernon and before

24   it ends up on Duryea and Strang Avenue with Gamar Dafalla's

25   body in it.  In order to do this, we have to look at the phone

D3iWdor1                    Summation - Ms. Masella

1    records and Janiel Brown's and Patrick Taylor's testimony.

2    Now, remember that it's right around 11:00 that the minivan

3    speeds off with Dore, Biggs, and Gamar Dafalla inside.

4    Barrett, remember, is the driver that day.  He's still inside

5    his Mercedes waiting in the area.  And you can tell that from

6    the videos we saw before, that there are times when Dore and

7    Biggs get out of the Mercedes and go back to the Mercedes

8    before the robbery is actually committed.  But this is the last

9    phone call on Jermaine Dore's phone records before the robbery

10   and murder, 10:57.  And who is he calling?  Dwayne Barrett.

11   He's calling Dwayne Barrett to tell him what's going on.  This

12   is the point at which they see the minivan and Dore and Biggs

13   approach the minivan and carry out the robbery.

14          Now, after that, there's a blackout period on the

15   phone records.  These two calls are exactly consecutive on the

16   phone records.  In between 10:57 and 11:17, Jermaine Dore does

17   not make a single phone call.  There is a blackout period.  No

18   calls to anyone.  If you look on the phone records earlier that

19   day, there are a lot of phone calls back and forth to Barrett

20   and Biggs, the other perpetrators in this crime.  During this

21   time, 20 minutes, no calls to anyone.  This is the time, ladies

22   and gentlemen, when Dore and Biggs are inside the minivan with

23   Gamar Dafalla.  It's the time when they are searching for the

24   money, when they're asking him for the money, when he's already

25   thrown the money out the window, which they don't know, and the

D3iWdor1                    Summation - Ms. Masella

1    time when Dore gets mad.  He gets upset that people are messing

2    up and he shoots and kills Gamar Dafalla.  It's also the same

3    time period when they're driving to Strang and Duryea Avenue to

4    leave the minivan on that corner with Dafalla's body inside.

5         Who is Dore's first phone call to after this period?

6    Who does he call?  He calls Dwayne Barrett.  And why is that?

7    He and Biggs, remember, are together with the victim.  Barrett

8    is still in his Mercedes, last seen in Mount Vernon.  The first

9    call that Jermaine Dore makes is to Dwayne Barrett, the other

10   perpetrator to this crime.  He has to tell Barrett what

11   happened after they left Mount Vernon, and this is consistent

12   with Janiel Brown's testimony as well as Patrick Taylor's

13   testimony, which I'll review with you now.

14        Now, remember Janiel Brown testified that she received

15   certain calls from Dwayne Barrett in the early afternoon hours

16   of December 12, which, at first, she wasn't able to answer

17   because she was in class taking a final examination.  But then

18   she did talk to him, and, if you look on this slide, December

19   12, at approximately 1:43, she talks to him for -- the duration

20   indication is in seconds, so 532 seconds -- almost nine

21   minutes.  And she testified here in this court about that

22   conversation.  She testified that he was very, very upset

23   during that conversation, that she'd never heard him sound like

24   that before, that she was concerned about him, that she was

25   worried about what happened, although she didn't find out at

D3iWdor1                          Summation - Ms. Masella

1    that time what had happened that day.

2              There's another call here a short time later that's

3    also several minutes long.

4              If we look at the next slide, we can tell that she was

5    upset and it corroborates her testimony because she sends a

6    text message.  Remember the times on this exhibit are Greenwich

7    Mean Time, which is five hours ahead, so the first line, 1711,

8    is really 2:11.  So it's right after those two phone calls she

9    just had with Jermaine Dore during which he was so upset like

10   she's never heard him before.  And what does she say?

11             "I was only asking about it now so that way when you

12   went to sleep it off, you wouldn't have to bring it up or talk

13   about it again when you sleep it off.  Like I always say, be

14   careful because I don't want to lose you to this mess, and, as

15   much as you act tough, you really are troubled when things like

16   that happen."

17             This is direct testimony for her testimony here in

18   court.  This text message sent at the time demonstrates that

19   she had already talked to Dore shortly after the murder and

20   she'd already heard him sound more upset than she's ever heard

21   him sound about any of these other incidents.  When Janiel

22   Brown gets home that night they do talk about it and she finds

23   out exactly what happened.  In fact, Dore confesses to the

24   murder.  When she gets home, she finds Jermaine Dore watching

25   the news and she recalls there's an item on the news about a

D3iWdor1                      Summation - Ms. Masella

1   robbery and murder that occurred in Mount Vernon.  She also

2   tells you Dore was on the phone with someone else, she doesn't

3   know who, but he's on the phone saying, It's on the news, it's

4   on the news right now.  He's referring to the robbery and

5   murder he had carried out earlier that day.  And they have a

6   conversation after that.

7          When he gets off the phone, Janiel Brown presses and

8   presses to find out what happened earlier that day in Mount

9   Vernon, and, finally, she asked him if what he had done

10  resulted in a duppee, and she told us that a duppee means when

11  someone is shot and killed, and Dore says yes.  He admits it to

12  her.  He confesses to the robbery and murder of Gamar Dafalla.

13  He says yes, and he further explains a little bit, complaining

14  that other people that day messed up and other people weren't

15  doing their jobs.

16         Now, this is corroborated further by Patrick Taylor's

17  testimony to you here.  Remember, Patrick Taylor was not

18  present that day.  He was home in Connecticut.  But he sees the

19  robbery and murder on the news.  A few days later, he's back in

20  the Bronx, and he has a conversation at which only three other

21  people are present.  So three other people who are the

22  perpetrators to the murder, Dore, Barrett, and Biggs.  During

23  that conversation, it's clear to Taylor that Barrett and Biggs

24  are blaming Dore for what happened that day.  They keep saying

25  that he's crazy and that they're not going to mess with him

D3iWdor1                        Summation - Ms. Masella

1   anymore.  They're upset about what happened that day and

2   they're worried about getting caught.

3          Barrett also says to Patrick Taylor that he's not

4   going to use his car anymore to do robberies, and we know why

5   that is, ladies and gentlemen.  At this point, several days

6   after the murder, Barrett and Biggs are stressed out about the

7   consequences of what happened.  They're worried about the

8   police coming after them.  They know that the police may

9   already be on to them or have some indication that Barrett's

10  car was at the murder scene.

11         These are further admissions from the other two

12  perpetrators that day, Barrett and Biggs, that they were there

13  and that they participated in the robbery and murder of Gamar

14  Dafalla.  These admissions make clear that Barrett and Biggs

15  were present that day and they're worried about the

16  consequences of what might happen after that.  But there's even

17  further testimony that helps us understand what happened that

18  day, the day of the murder, and that testimony was about the

19  destruction of evidence in this case.  There was no murder

20  weapon found and there were no DNA or fingerprints found in

21  Barrett's Mercedes of any relevance linking anybody to this

22  crime when it was searched by law enforcement officers.

23         But you have a clear explanation for those things, and

24  that's Janiel Brown's testimony.  She told you that several

25  days after the murder, Barrett and Dore were wiping down the

D3iWdor1                    Summation - Ms. Masella

1    Mercedes.  She told you that they wore latex gloves and used

2    rags and a cleaning solution to wipe down all of the surfaces

3    in the car, including the handles and other places where you

4    might expect to find fingerprints or DNA, and that was shortly

5    after the murder.  Remember, by this time, they already have

6    some idea that the police are looking for that car, and she

7    also told you about the destruction of the gun.  She told you

8    that a few days after the murder, Dore gets arrested and she's

9    nervous and suspicious about that because it doesn't seem like

10   he's really doing anything wrong at the time, so she's

11   wondering if it might not have something to do with the murder.

12   So she gets nervous.  And who does she call?

13          She calls Dwayne Barrett.  Dwayne Barrett's not a

14   friend of hers.  This is not some person she had personal

15   dealings with.  She calls Dore's business associate, his

16   partner in crime, and the other person who was involved in the

17   murder that day.  What does Barrett do in response?  He comes

18   over to her house.  He comes over, right away.  He talks to her

19   about Dore's arrest, and then he comes back a few hours later,

20   and together they destroy the murder weapon.  Barrett comes

21   back, he takes the gun from Janiel Brown.  He and Duffel drive

22   in his car and she drives in her car down the West Side Highway

23   into Manhattan, and Duffel throws the gun into the Hudson

24   River.

25          This is also crucial evidence in this case, ladies and

1   gentlemen.  The fact that Barrett is so concerned about

2   destroying any potential evidence linking him to the murder is

3   further proof that he's responsible for that crime.  Why else

4   would Janiel Brown call Dwayne Barrett and why else would

5   Dwayne Barrett show up at the house to get rid of the gun?

6   It's because he's worried about that gun and he's worried about

7   evidence of that crime coming back to him.  Now, although we

8   can't say based on all of this evidence exactly what happened

9   inside the minivan that day, this does not change the fact that

10  both Dore and Barrett are responsible for that crime.

11          Based on the evidence identifying the gun, including

12  the testimony and the ballistics, Dore's confession to Janiel

13  Brown, Barrett's and Biggs' admissions to Patrick Taylor, and

14  Barrett's role in disposing of the murder weapon shortly after

15  the murder, it seems clear that Dore was the shooter that day

16  and Barrett was the driver and Biggs was the other robber who

17  approached the minivan.

18          But, ladies and gentlemen, you don't have to decide

19  who pulled the trigger that day to find that these defendants

20  both committed murder.  You don't even need to find that they

21  planned to kill Gamar Dafalla in advance.  Judge Sullivan,

22  after these summations, is going to give you careful

23  instructions about the law that go into a lot of detail about

24  other ways, theories of liability that make the defendants

25  guilty of this charge.  And this also applies to the other gun

D3iWdor1                    Summation - Ms. Masella

1     charges in this case, the ones associated with the October 29

2     robbery and the other gun charges in this case, the December 12

3     robbery.  And these theories are called aiding and abetting and

4     Pinkerton liability, and, like I said, I'm not going to go into

5     detail about them now, but I want to point out a few things

6     about the facts and how they apply to these theories in order

7     to help you to think about the case.

8             Now, all of the evidence in this case makes it clear

9     that Dore and Barrett worked closely together constantly during

10    the course of these months, during the course of this robbery

11    conspiracy, and makes it clear that they both had an

12    understanding that weapons, including guns, would be used

13    during these robberies.  There's testimony that Dore carried

14    that black gun with the wood handles to several of the robbery

15    incidents, and there's also testimony that Dore possessed that

16    gun inside of Barrett's car for hours at a time while the two

17    conducted surveillance, planned robberies, and thought about

18    how these incidents were going to happen.

19            There's testimony that Barrett also possessed a gun

20    during the robbery on Radcliff Avenue, the October 29 robbery.

21    Remember, the two robbers go into the house, and Kassim Salahi

22    says that both robbers had guns.  And then there's the

23    testimony that when Dore was arrested shortly after the murder

24    in this case, Janiel Brown calls Dwayne Barrett and it's

25    Barrett who retrieves the gun which is the murder weapon and

D3iWdor1                    Summation - Ms. Masella

1   helps dispose of it by taking it to the Hudson River.

2              Now, all of this evidence taken together shows you

3   that Dore and Barrett worked together as part of a common plan

4   to accomplish these robberies, some of which were carried out

5   at gunpoint.  Both had a role with respect to the firearms that

6   were used, and both certainly had to understand that when

7   loaded firearms were used during the course of a violent

8   confrontation, such as a robbery, that it is foreseeable that

9   someone would get shot or shot and killed.

10             So, as you hear the judge's instructions later on

11  these theories of liability, Pinkerton and aiding and abetting,

12  keep these facts in mind, and if you do so, you will find that

13  there are alternative ways that you can find that both

14  defendants are guilty of the murder charge and the firearms

15  charge without necessarily deciding who pulled the trigger that

16  day or carried the gun in each of those crimes.

17             Now, I want to follow up now to see what happens on

18  the rest of the day, December 12, after the murder in Mount

19  Vernon.  What does Dore do just after shooting and killing

20  Gamar Dafalla?  He's back on another robbery, and this is a

21  text message on the screen in front of you now.  It's at 1715,

22  the third line down, but remember that's approximately 2:15

23  when adjusting for the time difference, and he says, "Am cool,

24  on it now again."  And then he says to Janiel Brown, "We move

25  now and a food for 60G now."

D3iWdor1                         Summation - Ms. Masella

1              Remember, "move" and "food" are the terms he uses to

2     refer to robberies.  And she says, "Okay, well be careful with

3     it.  Uptown or South Bronx?"  And he says uptown.  This is the

4     robbery of the victim Mohammad Althomory, which occurred on

5     December 12, late that afternoon.  Remember, he is robbed near

6     Esplanade and Hone Avenue in the Bronx.  Mohammad is a victim

7     who testified here before you.  He said that he works for a

8     company called Bronx distributors, that he had made a delivery

9     to Fahd Hussain's store earlier that day, and that when he was

10    there, he described three individuals hanging out in the front

11    of the store.  He couldn't provide a very specific description

12    of them, but he said they were all three black male individuals

13    who all appeared to be reading the newspaper in the front of

14    Hussain's store.  His attention was drawn to these individuals

15    because Hussain sort of kept Althomory at the counter for a

16    period of time counting out the money that was owed to

17    Althomory while he continued to look over at these individuals

18    and gesture towards Althomory.  This is something he described

19    on the witness stand two or three times, that he was looking at

20    these people who seemed suspicious because they were standing

21    around reading the newspaper and gesturing towards Althomory as

22    he's paying him the money he owes.

23              After he leaves the store, Althomory makes one stop at

24    the grocery store and then he goes to his home, which was on

25    Esplanade Avenue near Hone.  When he gets there, he gets out of

D3iWdor1                    Summation - Ms. Masella

1    the car and two robbers confront him, one with a gun, one with

2    a knife.  He recognized the gun to be a black automatic gun,

3    but he can't say anything more about it and they take his money

4    and the money orders he had with him that day, which is

5    approximately $10,000 in cash and $5,000, or so, in money

6    orders.

7            If we look at the next slide, this is cell site

8    evidence placing Dwayne Barrett, number 8414, the same number

9    we've seen, at 4:38, within the area of where Althomory is

10   robbed.

11           Looking at the next slide, this is 5031, that's

12   Jermaine Dore, utilizing two cell towers, which are basically

13   on either side of the robbery location by two or three blocks

14   on each side.

15           If we look at the next slide, these are text messages

16   back to Janiel Brown after the robbery.  The last set of

17   messages told her that he was on his way to commit a robbery.

18   These messages confirm it.  If you look at the first one,

19   10:00, and remember that's approximately 5:00 p.m., he says:

20   "Yeah, I did a job, get money, yeah, at least 10G."  At least

21   $10,000, and, in fact, that's exactly what he got from Mohammad

22   Althomory, who lost $10,000 in cash and $5,000 in money orders.

23   And she says:  "Oh, wow.  Nice, baby.  I'm happy for you."  And

24   he replies" yeah, Ali ting."  And, remember, Ali is the name

25   Dore and Barrett used for Fahd Hussain.  He's telling Brown

D3iWdor1                    Summation - Ms. Masella

1    here we did a robbery, $10,000 and, oh, yeah, it's related to

2    Ali, it's one of the tips he gave, which she knows quite well

3    because that happened all the time.  He's talking about the

4    robbery of Mohammad Althomory, which just occurred.

5            If we look at the next slide, I want to walk through

6    another incident you heard about in some detail, which was a

7    robbery in New Rochelle, New York.  The victim was an

8    individual named Prashant Goel who testified here before you,

9    and Goel told you that he had a phone card business and that on

10   any given day he drove around on various delivery routes making

11   deliveries of phone cards to bodegas and small stores.  He told

12   you that he had been making deliveries to Fahd Hussain's store

13   for several years and that he knows him and that at the time of

14   the robbery Hussain owed him a balance of approximately $5,000

15   on his account.

16           On the day of the robbery, which was October 11, 2011,

17   Goel stopped by Fahd Hussain's store, the 1M Stationary store,

18   before continuing his delivery route, and he stopped by to

19   collect some of that balance.  Hussain told him that he didn't

20   have any money for him, but Goel told Hussain he was then going

21   to do his delivery route in New Rochelle and that he would be

22   back later.  So he provides information to Hussain telling him

23   exactly where he's going to go next, New Rochelle.  And Goel

24   then, in fact, does go to New Rochelle.  He makes three

25   different stops along the way, and, at the third stop in New

D3iWdor1                    Summation - Ms. Masella

 1    Rochelle, he's sitting in his car when three robbers approach

 2    him.  One bashes in the passenger's side window of his car with

 3    the baseball bat.  Another one stabs his front tire with a

 4    knife and the third one approaches his side of the car, and

 5    they're all rummaging around in his car for money.

 6           Now, Goel remembers one important thing about the

 7    robbers that day.  He remembers that one of the robbers had a

 8    bandage on his arm that went all the way from his hand up to

 9    his forearm.  And this, ladies and gentlemen, is Jermaine Dore.

10    Remember Janiel Brown's testimony about that bandage.  So

11    Prashant Goel says:

12    "Q.  The medium type person, what did he look like?

13    "A.  He had a bandage on his right arm.

14    "Q.  What type of bandage?

15    "A.  It was like a pale, light pinkish, one of those bandages

16    if you have like, I guess, swollen arm and collect some

17    medicine and wrap around it one of those arm bandages.

18    "Q.  So it is a bandage on his arm?

19    "A.  It was on his wrist going to his forearm."

20           Janiel Brown testified about Dore having a bandage on

21    his arm also in October, same time period as this robbery.  She

22    testified one night he came home in the middle of the night

23    with Biggs, that he had a hole in his hand the size of like a

24    quarter, that it was bleeding profusely and that they were

25    talking about the fact that Biggs had accidentally stabbed

D3iWdor1                    Summation – Ms. Masella

1    Jermaine Dore in the course of one of their other robberies.

2    And that night Janiel Brown takes him to the hospital, helps

3    him get medical treatment, and he gets this bandage.

4            Look at her testimony:

5    "Q.  Can you describe the bandage?

6    "A.  White.

7    "Q.  It was a white bandage?

8    "A.  Yes.

9    "Q.  How much of his hand did it cover?

10   "A.  It only left out his four fingers and his, everything else

11   up to the middle of his arm was covered."

12           That's Jermaine Dore, ladies and gentlemen.  He's

13   wearing the bandage.  He gets the bandage at some point early

14   in October.  He's still wearing it on October 11 when Prashant

15   Goel is robbed on October 11.

16           Look at the next slide.  There's a cell phone dropped.

17   Remember the New Rochelle police officers testified about the

18   phone that was picked up right outside the shattered glass?

19   The phone dropped is Government Exhibit 604, and this is one of

20   the contents of the phone.  This is Biggs' cell phone.  That's

21   a photo of Biggs, who was the one of the other coconspirators

22   who carried out the robbery that day with Jermaine Dore.  If

23   you look at slide 50, this is a video of the robbery.  It

24   happens just the way Prashant Goel says that it did, and you

25   can see the robbers approaching his car.  We're going to get to

D3iWdor1                    Summation - Ms. Masella

1    it in a moment.

2                    (Video recording played)

3              MS. MASELLA:  That's the victim's car.  These are the

4    robbers.  There's the shorter robber, Jermaine Dore, stabbing

5    the tire; the taller robber, Biggs, breaking the window,

6    reaching inside, rummaging for the cash.  And that's where

7    Taijay, Biggs, drops his cell phone on that day that's

8    recovered by the police.  And during that robbery, Prashant

9    Goel testified that he lost approximately six or $8,000 in cash

10   and about $6,000 in phone cards that were with him also.

11             If you look at the next slide, that's further evidence

12   putting Jermaine Dore exactly at the scene of this robbery.

13   Remember, this is in New Rochelle, yet another location not in

14   the Bronx, not close to where many of these other things occur,

15   and this is October 11, at 3:52 p.m., which is the exact date

16   and time that Prashant Goel is robbed in New Rochelle.  This

17   triangle indicates 123 Pelham Road, which is the location of

18   that strip mall where Goel was robbed, and there's Jermaine

19   Dore's cell phone using a tower that's literally right on top

20   of that location at the same exact date and time, placing him

21   there as one of the robbers that day.

22             I want to turn now to another incident that you heard

23   a lot of testimony about, and at the time you heard about it

24   from the victim, Djujka Krco, as well as Janiel Brown, and at

25   the time you may not have realized that both of them were

D3iWdor1                        Summation - Ms. Masella

1    talking about the same incident.  So I want to take some time

2    to go through the testimony and show you how we know that

3    Dwayne Barrett and Jermaine Dore both conducted this robbery as

4    well.

5              If we can look at the next slide, Djujka Krco,

6    remember, testified that she's the owner of a wholesale

7    business in the Bronx.  She testified on the day of the

8    robbery, January 7, 2012, which was a Saturday, she worked all

9    day until about 2:00 p.m.  She left her business and she did

10   some shopping, grocery shopping and other errands, for

11   approximately two hours in the area of Lydig Avenue and Pelham

12   Parkway from about 2:15 to 3:45.  She testified she was driving

13   a silver RAV-4, which is her personal car, and that after she

14   was done with her errands, she went back to her home on East

15   206 Street in the Bronx and that at that point she was

16   assaulted inside of her car by two robbers wearing masks, one

17   holding a knife, and that they tried to push her back into her

18   car and she struggled with them and fought back, and eventually

19   she's able to run away and that that day they took from her a

20   large amount of cash that were business proceeds from her

21   business, as well as other personal items.

22             Janiel Brown also testified about this robbery.  She

23   testified that there were times when she helped Jermaine Dore

24   carry out robberies when she was on a vacation from school or

25   during a weekend, and she recalled a robbery where they watched

D3iWdor1                        Summation - Ms. Masella

1    a woman victim get into and identify a silver RAV-4 for a

2    couple of hours while she did various shopping activities, that

3    she was shopping near Pelham Parkway, the same area that

4    Ms. Krco testified she was in, from the morning hours to the

5    midday hours and that eventually Dore got out of the car in the

6    same area where she saw Barrett's car, on a one-way street in

7    the Grand Concourse area.  And in a moment I'll show you a map

8    that shows you that East 206 Street is a one-way street in the

9    Grand Concourse area and Janiel Brown testified that Barrett,

10   Dore, and Duff conducted this robbery and that Dore was wearing

11   a mask during the robbery.

12          If you look at the next slide, this is another cell

13   site map, 5031, the same phone number used by Dore, January 7,

14   at 2:32 p.m., and this is during the time when Djujka Krco is

15   shopping and doing her errands.  And if you look here, this is

16   Lydig Avenue where she testified she was, and this is Jermaine

17   Dore's cell phone using a cell tower right in that area.  This

18   is one more indication, ladies and gentlemen, of another time

19   when Dore and Barrett were stalking their victims for hours

20   before actually conducting this robbery.

21          If we look at the next slide, this is Jermaine Dore's

22   phone, 3:37 and 3:45, approximately an hour and a half later,

23   and this is her location.  This is her home location, where she

24   parked right in that area, 185 East 206 Street, and here,

25   ladies and gentlemen, is the Grand Concourse, which is where

1  Janiel Brown said that they were.  She didn't remember the name

2  of the littler street, but she said they were right near the

3  Grand Concourse.  And here's Jermaine Dore's cell phone right

4  in that area where the victim is.

5           I want to turn now to another incident which was the

6  robbery of Ayoub Mohammed, which occurred on December 31 of

7  2011, the New Year's Eve robbery.  Ayoub Mohammed is the owner

8  of his own business, a business called A1 Distributors which

9  sells telephone calling cards and other items such as

10 over-the-counter medicine and batteries to bodegas and other

11 vendors.  He has known Fahd Hussain for many years.  He said

12 Fahd Hussain has ridden with him in his minivan.  He said he

13 keeps his proceeds from his delivery route in the glove

14 compartment of his minivan while he goes about his day making

15 his deliveries, and he said Fahd Hussain has been in his car

16 before when he's kept money in the glove compartment.

17          This robbery is actually several incidents in the

18 sense that Mr. Mohammed told you before he was robbed on

19 December 31, he also had an incident on September 29, during

20 which his car was broken into.  He said on that day, September

21 29, 2011, he made a delivery to Fahd Hussain's store.  Hussain

22 owed him money at that time, and Mohammed went to the store

23 around four p.m. to collect the money.  Hussain told him to

24 come back at about 7:00 p.m.  So that gave Hussain three hours,

25 plenty of time for Hussain to call Dore and Barrett and others

D3iWdor1                         Summation - Ms. Masella

1    and set up this incident.  So he goes back at seven p.m.

2              Mohammed Ayoub Mohammed goes back to Fahd Hussain's

3    store at 7:00 p.m. and collects a payment that Hussain owes

4    him.  He's carrying about $1,900 with him in total that day.

5    He gets back into his minivan.  He puts the money in the glove

6    compartment and he goes to run an errand, gets out of his car,

7    comes back 20 minutes later and finds the window of his car

8    broken and the money in the glove compartment gone.

9              On December 31, several months later, Ayoub Mohammed

10   again stopped at Fahd Hussain's store for payment.  Hussain

11   owes him money on his account.  He actually stops at the store

12   next door first, not 1M Stationary, but 4192 White Plains Road,

13   which is owned by a related owner.  And at this point, it seems

14   like Fahd Hussain actually goes out of his way to intercept

15   Ayoub Mohammed and to take over some of that payment, which

16   isn't even his in the first place.  Fahd Hussain does, in fact,

17   pay Ayoub Mohammed some money that day and he pays him a couple

18   hundred dollars but all in small bills, and Ayoub Mohammed told

19   you and he remembers waiting at the counter in the 1M

20   Stationary store for 20 or 25 minutes while he counted up $200

21   in small bills, which seemed suspicious to him.  But again,

22   ladies and gentlemen, this is giving Fahd Hussain the

23   opportunity to set up the robbery of Ayoub Mohammed.  It's

24   giving him the opportunity to call Dore and Barrett and set it

25   up so that he gets robbed when he leaves the store.

D3iWdor1                        Summation - Ms. Masella

1          Mohammed does leave the store and he goes to a parking

2     area in the area of Gun Hill Road and Jerome Avenue.  And by

3     the time he gets there, Barrett and Duffel as well as Dore and

4     Patrick Taylor are all there waiting for him, and this is the

5     incident that we've heard about from the testimony of Patrick

6     Taylor and we also saw a part of it on video.

7          (Video recording played)

8          MS. MASELLA:  Remember, Patrick Taylor told you that

9     he was with his cousin Duffel that day, they were hanging out,

10    they get a call from Dore and Tall Man telling them to meet

11    them in the area of Gun Hill Road and Jerome Avenue, that

12    something's about to go down, and they do, in fact, go to that

13    area.  Patrick Taylor identified this as himself.  So they get

14    to this area a few minutes before the victim does, it looks

15    like.  And they go into the parking lot to check it out, see

16    what's going on.  This is Jermaine Dore.  Patrick Taylor

17    identified him walking back away.  They walk into the parking

18    lot and walk back out again, and then a few minutes later,

19    there's the victim, Ayoub Mohammed, carrying his bag of cash

20    and phone cards.

21         Jermaine Dore, Patrick Taylor, and in a minute, we'll

22    see Duff sort of trailing behind.  Patrick Taylor identified

23    that as Duff.  And there they go.  They rob the victim and

24    they're running back to their cars.  There's Jermaine Dore,

25    Patrick Taylor, and we'll see Duff come last.  Remember --

D3iWdor1                        Summation - Ms. Masella

1    there he is.  Remember, there are two cars there that day.

2    Patrick Taylor said that Barrett was there in his Mercedes and

3    Duff and Patrick Taylor drove in their own car because they

4    were meeting up with them at the scene.

5           Ladies and gentlemen, you have heard a lot of

6    different incidents and a lot of different evidence, and what

7    I've tried to do is to put it together for you so you can see

8    how it all fits together and how all the different pieces make

9    sense when we look at them all together.  And in a few moments,

10   the lawyers for Dore and Barrett are going to stand up and they

11   will have an opportunity to make their arguments to you.  And I

12   suspect that they may have some arguments about evidence that

13   was not presented here today.  I suspect that they may argue

14   that there's no DNA or fingerprint evidence linking Dore or

15   Barrett to any of these crime scenes, and that's true.

16          They may also stand up and argue to you that there are

17   no eyewitnesses present at the scene of the murder of Gamar

18   Dafalla.  But I want you to think about the evidence that you

19   did see and hear during the course of this case.  I want you to

20   look to see whether they attempt to have any explanation

21   whatsoever for some of the most devastating evidence in this

22   case, whether they can explain, for example, why Youssef

23   Abdulkader's cell phone was in Dore's apartment with Dore's

24   photo on it; why Barrett's Mercedes was captured right at the

25   scene of the Mount Vernon robbery and homicide by George

D3iWdor1                    Summation - Ms. Masella

1    Drape's license plate reader just moments before that robbery

2    occurred; why Dwayne Barrett's cell phone uses the cell tower

3    in Matamoras, Pennsylvania, at the time and the date of that

4    robbery, or, for several hours, over four hours, on that snowy

5    day on Radcliff Avenue in the Bronx, which is the same day that

6    the Salahis were robbed outside of their mosque and inside of

7    their home; or why both Dore and Barrett's cell phones follow

8    the victim, Gamar Dafalla, from the Riverroad Motor Inn to

9    Mount Vernon Avenue at exactly the same time that the victim is

10   going to those locations on December 12.

11        Listen carefully to their arguments and see what

12   explanations they give for this and other devastating evidence

13   that you've seen and heard in this case.  And when you evaluate

14   those arguments, I'm asking you to use your common sense.  Ask

15   yourself whether those explanations make sense.

16        The government began this trial by asking you to use

17   your common sense, and now, as you listen to the arguments and

18   the evidence that's been presented and go back to the jury room

19   to deliberate, I'm again going to ask you to use your common

20   sense.  Your common sense is the best tool that you bring with

21   you to this jury box and the best tool that you bring back with

22   you to your deliberations.  Use your common sense to tell you

23   whether witnesses are credible, what people's words really

24   mean, what their actions really say, and how things really work

25   in the real world.  And I submit that if you do all of that, if

D3iWdor1                    Summation - Ms. Masella

1   you use your common sense, you will return the only verdict

2   that is consistent with the evidence in this case, consistent

3   with the truth, and you will find that the defendants are

4   guilty of all the charges in the indictment.

5          Thank you.

6          THE COURT:  All right.  Thank you, Ms. Masella.

7          Why don't we take a short break.  You can use the

8   restroom, maybe have a drink, and then we'll pick up with the

9   defense summations and the government's rebuttal summation

10  after that.

11         (Jury excused)

12         THE COURT:  Let's take like ten minutes.

13         MR. ROTH:  Judge, just for the record, I would object

14  to the last part of the government's summation as impermissible

15  shifting of the burden when she specifically posed what

16  possible explanations could the defense come up with for

17  various aspects of the evidence.

18         THE COURT:  All right.  The objection is noted.  What

19  are you asking me to do?

20         MR. ROTH:  A curative instruction.

21         THE COURT:  I'll take a look at it again, but let's be

22  prepared to just start the defense summations when we get back.

23         Who is going first?  Ms. Fontier?

24         MS. FONTIER:  Yes.

25         MR. ROTH:  If she goes for 35 to 45 minutes, did you

D3iWdor1                    Summation - Ms. Fontier

 1   want me to go?  I'll be about the same, about 45 minutes.

 2          THE COURT:  We've ordered lunch for the jury.  I

 3   expect it to get here around 12:45, 1:00, or so.  I think we'll

 4   probably break around then, if we get to a clean breaking

 5   point.  I won't interrupt in the middle of a summation.  I

 6   think we should be okay to take a break right around the time

 7   lunch gets here.  Either that's before yours or just after

 8   yours.

 9          MR. ROTH:  Thank you.

10          (Recess)

11          THE COURT:  Have a seat.

12          We now will have the defense summations.  As I told

13   you at the beginning of this trial and I think I've reminded

14   you since, the defense, of course, has no burden whatsoever in

15   this case.  The burden is on the government.  So the defense

16   has no obligation to explain or prove anything.  However,

17   they're certainly free to make arguments.  I expect they will

18   make arguments about what the evidence showed or did not show.

19   So you should pay careful attention, equal attention, to the

20   defendants during their summations as you showed to Ms. Masella

21   during the government's summation.

22          Ms. Fontier will go first and then we'll hear from

23   Mr. Roth.

24          MS. FONTIER:  Thank you, your Honor.

25          Good morning again, ladies and gentlemen.  You heard

D3iWdor1                    Summation - Ms. Fontier

1   from 13 victims, and there were exactly zero identifications.

2   The last time that I stood before you, I said you're going to

3   see and hear overwhelming evidence that these crimes occurred.

4   And you saw that.  We do not dispute that the people that came

5   here are victims, that these robberies occurred.  But what you

6   didn't hear proof beyond a reasonable doubt of is that Mr.

7   Dore, Jermaine Dore, is the person that committed these acts.

8          I'm going to focus on many different things while I

9   talk to you here, but the question that you're ultimately going

10  to have to decide when you go back in that room at the end of

11  today and get this case is whether the government has proved

12  beyond a reasonable doubt that Jermaine Dore is correctly

13  identified as the person who committed these crimes.  That's

14  really the only question.

15         Now, the government, I'm sure, perhaps on rebuttal,

16  they haven't said it yet, will say of course there were no

17  identifications.  They wore masks.  They introduced the masks

18  into evidence.  But it's not merely the face of a person that

19  you can use to identify them.  It is their size, their weight,

20  their height, their skin color.  And I'm going to go through

21  these 13 different victims and show you the descriptions that

22  they said, and every time you see Mr. Dore stand up in court,

23  you can look at him.  He's six feet tall.  Obviously he's

24  dark-skinned, and he's of average build.  Those are basic

25  features.  And now I'm going to start.

D3iWdor1                    Summation - Ms. Fontier

1              Ms. Brady, if you don't mind, you can turn that on.

2              I'm going to do these in chronological order.  The

3       first is an incident that occurred on August 22, 2011.  The

4       witness was Mr. Rauf.  The description that he gives of the two

5       people that robbed him were a black man who was five seven or

6       five eight.  That's not Mr. Dore.  And a chubby man who was

7       five three or five four.  That is not Mr. Dore.  And in this

8       incident, those two people that robbed him in daylight in a

9       parking lot were not wearing masks, and he told the police that

10      he would be able to identify them.  He sat in that chair,

11      looking directly at Mr. Dore, and he did not identify him.

12             The second incident occurs on 9/21, 2011.  The

13      witness, Mr. Muswara, never saw anyone.  He couldn't make any

14      identifications.

15             Similarly, now, Ayoub Mohammed is going to come up

16      three times, but in the 9/29/11 incident that was discussed,

17      his car was broken into, he didn't see anyone.  Obviously

18      there's no identification here either.

19             Mr. Tawfiq, who described an incident that occurred to

20      him on October 5, 2011, gives a description of two people that

21      were involved.  The first is a young black, fair-colored,

22      weighing around 160, 170, five nine to five ten, wearing a red

23      hoody.  This is, of all the descriptions we're going to talk

24      about, the most precise description that is given by any

25      witness, and it is a precise description of that man right

1    there, Patrick Taylor.  That's who is described by Mr. Tawfiq.

2    Patrick Taylor doesn't admit that he was here, doesn't say he

3    took part in this robbery, but he was precisely described by

4    Mr. Tawfiq.  That precise description is not Mr. Dore.  It's

5    Mr. Taylor.  The other guy was some Spanish guy who he also

6    described as white.  Either way, not Mr. Dore.

7            Mr. Abdulkader, on 10/10/11, says the two guys were

8    dark-skinned, about five 11, wearing hoodies.  Very average

9    description.

10           Mr. Goel, and I'm going to talk about this in a little

11   bit of detail, Mr. Goel is the individual who testified near

12   the end of this trial who was sitting in his car at 123 Pelham

13   Road when this robbery occurred.  He described the three men as

14   short, medium -- sorry, tall, medium, and short, with the

15   tallest being five eight or five nine, the next man down being

16   shorter than that, and the next man down even shorter than him.

17   So all of them significantly shorter than Mr. Dore.

18           Also, these men were not wearing masks.  He could see

19   their faces, and, most importantly, he testified that he

20   recognized all three of them as men he had seen earlier in that

21   day.  He recognized them.  He sat in that witness chair and he

22   did not identify Mr. Dore.

23           (Video recording played)

24           MS. FONTIER:  Now, this video is in evidence, and the

25   government just played a portion of it and they said that this

1    man here in the lighter pants is Mr. Dore.  That's the

2    government's theory.  So now Mr. Goel, during this video, is

3    sitting in this car.  This person here has his head, with no

4    mask, inside the car that Mr. Goel is sitting in.  And Mr. Goel

5    says he recognizes this person, and it is not Mr. Dore.

6          Now, just use your common sense.  That's what the

7    government just told you to do, and I agree.  If you're sitting

8    in a car and somebody sticks their head in the passenger's side

9    and you saw that person earlier in the morning, wouldn't you be

10   able to sit in that witness stand and see him again if he was

11   sitting at this table?  I think common sense dictates that,

12   yes, you would.  But Mr. Goel didn't identify Mr. Dore.  Why?

13   Because that is not Mr. Dore.  It is not Mr. Dore.  He would

14   have been identified if that was him.

15         Now, the government, instead of having a person who

16   looked this robber in the face identify him, relies instead on

17   their cell site evidence, saying Mr. Dore's cell phone was in

18   this area, so this has to be him.

19         Now, I'm going to talk about the cell site a bit more

20   in detail.  I believe Mr. Roth will talk about it in even more

21   detail and about the problems with it, but one of the things

22   that you should remember, especially for this incident when

23   this person with his head in the car supposedly is identified

24   by his cell phone, is that the Sprint agent said you can be

25   within two miles of a tower and still use that tower.  Think

D3iWdor1                    Summation - Ms. Fontier

1    about that for one second.  The island of Manhattan, at its

2    widest point, is just over two miles wide.  Two miles is a

3    really long distance.  It doesn't pinpoint your location.  It

4    doesn't mean you're sitting at the tower.  But we'll go into

5    that in more detail; Mr. Roth especially will do that.

6           To say that this person with his head in the car who

7    can't be identified is definitely proof beyond a reasonable

8    doubt Mr. Dore because his cell phone was somewhere in that

9    area, I don't think that holds up.  That's not proof beyond a

10   reasonable doubt.

11          Mr. Salahi, on 10/29/11, the first Mr. Salahi, the

12   person who was in the van, identifies a driver with a knife who

13   is a little bit taller.  The other guy had a revolver.  Those

14   are the two descriptions.  The person inside the house

15   describes somebody who is dark-skinned and six feet tall, and

16   lighter skinned, the second person, and extremely tall, but he

17   also did say that he was only a little bit taller than the six

18   foot tall person, so take that for what it's worth.

19          But what is important about this is that these people

20   were wearing half-fingered gloves.  Okay?  When you wear

21   half-fingered gloves, the part that sticks out is the tips of

22   your fingers, the part that leaves fingerprints.  They don't

23   recover a single fingerprint from this incident, despite the

24   fact that these robbers wearing half-fingered gloves open the

25   door, come inside, go through the house, looking for the money,

D3iWdor1                    Summation - Ms. Fontier

1    turning things over, I believe, was the testimony, and then

2    eventually find the money and leave.  They're in there for 15

3    minutes, or so, with their fingertips touching everything, and

4    not a single fingerprint.

5          Also, the government went through and described the

6    gun, the supposed gun, as if the descriptions are so matching.

7    But these are revolvers.  No one ever says that there was a

8    revolver involved in other offenses.  And the government's

9    description of the black gun with the brown handle was not a

10   revolver.

11         The next incident, Fitzroy Cornwall, this is December

12   5, 2011, he describes two men who were both five eight or five

13   nine and wearing hoodies.  He saw their size when they were

14   running away and they both had American accents.  Also, which

15   will come up about this incident, Mr. Cornwall heard two shots

16   fired and seven shell casings were recovered.  I'm no gun

17   expert, but I think we can all agree that if you have two

18   shots, you end up with two shells.  And this is the ballistics

19   that Detective Fox says they all came from the same gun.

20         Now, there's two incidents, obviously, on December 12

21   that are in evidence.  The first, which I'm going to talk about

22   in a lot of detail coming up, is the morning incident, December

23   12, at about 11 a.m.  Mr. Abdulla testified, and he was, if you

24   recall, rather entertaining.  He was the person who made a

25   million dollars working as a government agent, several hundred

D3iWdor1                    Summation - Ms. Fontier

1    thousand, I believe he said, coming from the ATF.  And part of

2    that was recovering guns, buying guns, working as an informant.

3    He recognizes guns, and what he saw on the driver's side of

4    that vehicle was a guy who he described as black, about five

5    feet six inches tall and carrying a .38 automatic.  If you

6    recall, the homicide, the person who was killed was killed with

7    a nine millimeter.  The other passenger's side was a tall guy.

8         Mr. Liang, similarly, says less than six feet tall and

9    doesn't know what the passenger looked like.

10        Later that afternoon, Mr. Althomory, now, there's a

11   couple things about this.  This robbery occurred on December

12   12, 2011, and, according to his testimony, it's at 5:30 p.m,

13   The two robbers, one was taller, skinny and had a knife.  The

14   other was five feet five or five six, chubby, and had a gun

15   that he described as not a revolver.  The most important thing,

16   now, the government says what are we going to do to explain

17   things.  What I think is very important is not just the

18   evidence that you've heard, but it's also the evidence that the

19   government chose to leave out of their presentation.  When

20   they're talking about Mr. Althomory, they conveniently ignore

21   this fact.  He viewed photo arrays and identified two people.

22   You know, there is one thing you know for certain.  The two

23   people Mr. Althomory identified as the people that robbed him

24   were not Mr. Dore or Mr. Barrett.  That would be in evidence if

25   that had occurred, but Mr. Althomory recognized people that

D3iWdor1                        Summation - Ms. Fontier

1    robbed him from the photo array, and it was not Mr. Dore.

2            December 31, again, this is Ayoub Mohammed.  He

3    describes people as African-American, tall, more than six feet,

4    and the other as heavyset, about five seven.  Patrick Taylor is

5    seen on the video, and he says he committed this offense.  Now,

6    he also says that Blaqs was with him, but I'm going to come

7    back to Mr. Taylor and about whether he is credible, whether

8    his testimony is proof beyond a reasonable doubt of anything.

9            I believe I spelled the name incorrectly, but

10   Ms. Krco, I believe is how it's said, the January 7, 2012,

11   incident, she just describes the two men as a little bigger

12   than five six.  The government said in their closing that

13   Ms. Krco's testimony is supported by Janiel Brown's, that they

14   corroborate each other.  But Janiel Brown, if you recall,

15   received every single page of discovery in this case.  She had

16   all of the evidence.  Up until January 31 of 2012, she was

17   receiving evidence.  She received the witness list in this

18   case.

19           Yes, she testified about this incident.  She testified

20   consistently with what she read in the discovery.  And how do

21   you know that that is true?  There is one fact that she could

22   not learn in discovery that she testified to.  She did not know

23   what Ms. Krco looked like.  She couldn't learn that from the

24   discovery.  So she had to make it up.  And you saw Ms. Krco.

25   She was the only female, but she, I guess, is probably of

D3iWdor1                    Summation - Ms. Fontier

1    Eastern European descent, a white woman.  Janiel Brown

2    described her as dark-skinned, Middle Eastern.  It's the one

3    fact she couldn't learn in discovery, the one fact she had to

4    make up because she didn't actually see it.  She's making these

5    facts up, and she got it wrong.

6            January 11, again, Ayoub Mohammed.  Ayoub Mohammed

7    describes this one individual in his apartment who he describes

8    as skinny, about five ten, wearing a mask that showed his hair.

9    Again, another general description.  This is not a match to Mr.

10   Dore.

11           So it's 13 victims over multiple incidents and not a

12   single one identifies him, and it is not for lack of an ability

13   in each of these cases to identify him.  At least two witnesses

14   said that they could identify the person.  One looked at a

15   photo array and picked people out.  They're not Mr. Dore.  The

16   other, sitting in the car staring his robber in the face, it's

17   not an identification of Mr. Dore, so it's not for lack of

18   ability.  Mr. Dore was not identified because he's not guilty.

19           There are obviously a lot of different charges, a lot

20   of different incidents that you're going to have to examine and

21   you're going to have to make a decision on, and that decision

22   again is whether the government has proved beyond a reasonable

23   doubt that Mr. Dore is actually the person that committed these

24   offenses.

25           There's a few instructions, obviously the Court's

1   instructions are all important, but there's a few obviously you

2   should focus on.  One of them relates to the fact that you must

3   consider the evidence against each of the defendants

4   separately.  If you find evidence pertains to Mr. Barrett but

5   not to Mr. Dore, you can't just roll it over.  You have to

6   separate them out.

7          That goes for the car, the Mercedes-Benz, if the only

8   person who actually puts Mr. Dore in that Mercedes-Benz at any

9   point is Patrick Taylor.  The police officers who stopped that

10  car on November 14 took the two men out of the car, processed

11  it, searched the person in the car, so obviously he's in very

12  close contact, and then released them because there wasn't any

13  evidence of any crime, that person took the stand and did not

14  identify Mr. Dore.

15         This also goes for the cell phones.  If you see one

16  cell phone somewhere, it doesn't necessarily mean that the

17  other cell phone is there.  You have to look at everything and

18  separate it out for who it belongs to and for which incident it

19  belongs to.

20         Now, I submit that there is a lack of evidence for any

21  of these charges, but I want to focus on the December 12, 2011,

22  homicide.  You also have to consider each of these charges

23  separately.  So even if you find there's evidence of other

24  incidents does not mean you can convict on the December 12

25  incident.  You have to look at this on its own.  So now

1   focusing on that, as we just saw, Mr. Liang and Mr. Abdulla did

2   not identify Mr. Dore.  And Mr. Abdulla, I will say, did seem

3   like he was trying to earn his million-dollar job back by

4   saying they looked about that size.  But that's not an

5   identity, it's not an identification.  It's not proof beyond a

6   reasonable doubt.

7          In fact, when Mr. Abdulla was not here performing for

8   all of you, he spoke with the government and he described the

9   shorter of the two as about five feet six inches.  And now I

10  submit that that's probably accurate, five feet six inches.

11  Mr. Abdulla, for 16 years, worked as a government informant.

12  He knows what to do.  He knows how to observe people.  He knows

13  facts that are important.  He observed someone who was five

14  foot six, and that's what he told the government.  So there's

15  again no victim identifications.

16         You probably definitely cannot read this, but this is

17  a stipulation that I read at the very end of the defense case.

18  This is in evidence as Defendants' Exhibit G, and what it says,

19  in very brief, is that we all agree that the government seized

20  the Mercedes-Benz and the government seized the Toyota Sienna,

21  the car in which the body was found, that a forensic search was

22  conducted on both cars, meaning swabs for DNA, lifts for

23  fingerprints, and that Mr. Dore is not a match for any

24  fingerprints or any DNA evidence that were found in either one

25  of these two cars.

D3iWdor1                    Summation - Ms. Fontier

 1            I want to talk about again the cell site evidence, and

 2     I'm not going to go into great detail with the problems with

 3     it.  I think Mr. Roth will talk about that a little bit more.

 4     But the cell site evidence that the government has used,

 5     they're essentially plucking one call out of the air and

 6     putting it on a map and putting the scene of a robbery on that

 7     same map and asking you to follow it, like I said to you in

 8     opening, as if it were a road map of these crimes.  But if you

 9     look at the defense exhibits, now, this is practically

10     impossible to look at, but what this is is right in the center

11     of this mess is a cell tower.

12            The cell tower on this map corresponds to one of the

13     cell towers in a Government Exhibit.  So this is on December

14     12, 2011.  This is the cell tower that's at 233rd Street in the

15     Bronx, and what was done to create this image was that the

16     person that was looking at these went through the call records

17     that are all in evidence, the Government Exhibits, and took out

18     every single call by any of the phones that are in evidence

19     that used this cell phone tower during the course of this

20     indictment, over that period of time.  So from the government's

21     records, and what's in evidence, this was developed, and what

22     it shows you is that the cell tower was constantly in use.

23     Constantly in use.  There is absolutely nothing special about

24     the fact that this cell tower was used at or near the time of a

25     robbery.  It was constantly being used.

D3iWdor1                        Summation - Ms. Fontier

1          Again, the government very carefully selected which

2     calls and which slides to show you and what maps to show you.

3     They created that time line, if you recall, that you just saw

4     of December 12, 2011.  There was a hole in that map.  There was

5     a gap in their time line.  They put up a call at 11:17, at the

6     time when this homicide was actually occurring, but they didn't

7     show you where that was.

8          Oh, sorry.  Let me just go through.  This is not in

9     dispute either, but what this is is a screen shot of the video

10    that was showed at 11:02.  This is Mr. Abdulla running after

11    the van.  Shortly after this, he throws the money out here down

12    the block.  So at 11:03, Mr. Dafalla is very much alive.

13         Officer Diaz was the next who testified, and he said

14    he arrived on the scene by 11:50.  Mount Vernon police were

15    already there.  So what you know as facts is sometime between

16    11:03 and 11:50, this homicide occurred.  And what the

17    government did not show is what's in evidence as Defendants'

18    Exhibit E, but I'm not positive, slightly hard to see.  But

19    what is B?  That's up here.  It's a cell tower that was used by

20    Mr. Dore at 11:17 a.m.  So if you accept the government's cell

21    tower, cell site evidence that you can locate somebody, he's

22    here using this tower, and what point A is, across the block,

23    is his house.  That is Mr. Dore's home.  That is the phone

24    tower he was using at the time of this homicide.

25         Mr. Dore was at home.  He wasn't in a car.  He wasn't

1   shooting anyone.  He was at home at 11:17 a.m. on 12/12/11.

2           The government gave you a before and an after.  I

3   thought there was another slide in there.  It apparently did

4   not save.  But the government showed you, and I can't bring it

5   up at the moment, but they gave you a 12:47 phone call, and

6   what Ms. Masella said is that this demonstrates that it was Mr.

7   Dore because he went back to the scene of the crime.

8           First of all, who does that?  But, second of all, look

9   at that more carefully.  Look at that slide.  It's Government

10  Exhibit 3008.  Detective Magnuson testified about the vectors,

11  the arms, the little arms that are on his maps, and if you look

12  at that slide carefully, the arms of that map are facing south,

13  away from where this robbery actually occurred.  So, according

14  to their testimony and according to that slide, at 12:47, an

15  hour and a half after this incident occurs, Mr. Dore is

16  somewhere within two miles south of that point.  It's not proof

17  beyond a reasonable doubt certainly that he went back to the

18  scene of the crime.

19          So that's their cell site evidence for this offense.

20          What else do they have besides these cell towers?

21  They have their ballistics.  Now, it wasn't very long ago that

22  Detective Fox testified.  You can judge him for what he's

23  worth.  Detective Fox says he looked at the shell casings; they

24  were all the same.  That's basically his testimony, and you

25  heard him on cross-examination when he said essentially all

D3iWdor1                    Summation - Ms. Fontier

1   that matters is the parallel lines.  On these casings, you

2   should ignore the differences in the circles, you should ignore

3   the diagonal lines, you should ignore the granulation.  You

4   should just look at the parallel lines, but he had no

5   explanation for the fact that the lines looked different.  One

6   goes up, one goes down.  No explanation for that.  He said

7   ignore it.  He said it's sufficient, but he couldn't even tell

8   you what sufficient is.  He had no definition for that.  He

9   said I look at it and I know it, it's sufficient.

10          So judge that for what it's worth.  But even if you

11  accept his testimony, even if you believe that the shell

12  casings from December 5 were shot from the same gun as the gun

13  on December 12, it doesn't tell you that Mr. Dore had that gun.

14  It's not proof beyond a reasonable doubt of his identification.

15  In fact, if you go back and you look at December 5, the

16  description of the people by Mr. Cornwall that had that gun, he

17  said they were five eight and they had American accents.  And

18  Mr. Cornwall, of all people, I think can recognize a Jamaican

19  accent versus an American accent.  And while we asked other

20  witnesses about that, at least Mr. Cornwall was Jamaican.  So a

21  five eight guy with an American accent is not Mr. Dore.

22          So what does this leave you?  If the cell site is not

23  proof beyond a reasonable doubt, as the government would have

24  you believe -- in fact, they call it the foundation of their

25  case -- if it's not that and it's not witnesses and it's not

1    DNA and it's not fingerprints, it's not ballistics, what do you

2    have?  Out of all of this, after two weeks of testimony, after

3    40 different witnesses, what you are left with is Patrick

4    Taylor and Janiel Brown.  And you have to decide whether

5    Patrick Taylor's testimony and Janiel Brown's testimony is

6    proof beyond a reasonable doubt.

7              Patrick Taylor is someone who lies to the police.  He

8    lies to prosecutors.  He lied to you.  He lies about who he is.

9    He lies about what he's done.  He lies about who he says

10   committed these crimes.  And again, if you recall, this guy

11   over here, Jaba, is on this board because Patrick Taylor at

12   some point says, Oh, he really did commit one of these

13   offenses.  I was lying when I said it was this guy over here,

14   Biggs.  It's not.  His lies go to the heart of what his

15   testimony is.  He's here to testify about who committed

16   offenses.  When he says, Oh, that's Jermaine Dore on the video,

17   is that any more reliable than it was Biggs or it was Jaba or

18   it was Duffel?  His testimony is not proof beyond a reasonable

19   doubt.

20             Now, the government says think about what they have to

21   lose.  Patrick Taylor's facing 17 years to life on his plea,

22   what he actually says he did, what he pled guilty to.  And he's

23   not being prosecuted for a second gun, the gun that he used in

24   his marijuana deal.  That gun would add 25 more years minimum

25   on top of the 17.  And so the government says he doesn't want

1    to face these sentences so he's going to tell the truth.

2           Well, who decides what is the truth?  The government.

3    These two prosecutors decide whether he's told the truth.  So

4    what he really has a motivation to do is make them happy.  He

5    has to testify consistently with their preconceived notion of

6    what the truth is.  That is a motivation to make them happy.

7    It is not a motivation to tell the truth.  But as far as the

8    homicide is concerned, even if you accept Patrick Taylor's

9    testimony, he doesn't add anything to the homicide.  He

10   testified about what he heard on the news and then a week later

11   he has some vague conversation about using the car and making

12   mistakes.  That is not a confession.  It's not an

13   identification.  He didn't observe it, and he didn't hear an

14   actual statement about this.  He doesn't have anything.  So

15   ultimately when we're talking about this homicide, we're

16   talking about Janiel Brown.

17          Now, there's a few things.  I'm going to talk about

18   Janiel Brown in some great detail, but the government has said

19   she's credible and Patrick Taylor is credible because their

20   testimony is corroborated.  But what they have explained to you

21   as corroboration is not that.  It's bootstrapping.  Patrick

22   Taylor says that -- sorry.  I just lost my train of thought.

23          The government said in their closing that Patrick

24   Taylor's testimony was corroborated because he testified about

25   information that he says he got from Mr. Dore.  But the only

D3iWdor1                         Summation - Ms. Fontier

1    way that you know where he got any of this information is by

2    what he says.  What we know about Patrick Taylor is that he

3    committed at least one robbery and he knows Fahd Hussain.

4    Other than that, his basis for information is what he says.

5    That is bootstrapping.  It's not corroboration.

6              Similarly, Janiel Brown, the text messages, her

7    interpretation of these is not corroboration of her testimony.

8    She talks about jobs and moves and food and says that means

9    that Mr. Dore was committing robberies.  But Patrick Taylor

10   talked about jobs and moves in his testimony, and it was in

11   relation to moving drugs, doing a job, a sale of marijuana, a

12   $60,000 sale of marijuana.  But jobs, moves, the only

13   interpretation you have of that is, again, what Janiel Brown

14   says, and what she says something means is not corroboration;

15   it's bootstrapping.

16             Now, Janiel Brown claims that over the course of five

17   to six months, from August through January, she did

18   surveillance with Mr. Dore at least ten times.  She said she

19   brought him a gun on more than one occasion, and then she also

20   claims that she destroyed that evidence by taking his gun and

21   throwing it in the river.  She's claiming active participation

22   in these robberies.  She's claiming destruction of evidence.

23   The government would have you believe that the gun she

24   supposedly destroyed was a murder weapon.  And for that, for

25   admitting, saying on this stand that she's a coconspirator, an

1    accomplice to a murder, she's not being prosecuted at all.  She

2    has not been arrested.  She's not been charged.  She's not

3    working off anything.  She's not being prosecuted at all.  That

4    means she doesn't have to fear a conviction.  She doesn't have

5    to fear jail.  She doesn't even have to fear probation.  She's

6    not getting deported.  She's not getting kicked out of school.

7    Nothing is happening to Janiel Brown.  When she says from this

8    witness stand that she was an active participant in at least

9    ten different robberies or planning of robberies and a

10   destroyer of a murder weapon, that's her testimony, and this

11   government needs what she says so badly that they will not

12   prosecute her for that.  Scot-free, Janiel Brown.  If that's

13   not motivation to keep these people happy, I don't know what

14   is.

15           Ms. Brown claims that on December 12, 2011, Mr. Dore

16   confessed to murder, sat down in their living room and

17   confessed to murder.  And that's the evidence that you have, at

18   the end of all this, that really identified Mr. Dore as the

19   person who committed this murder, her statement that he

20   confessed.  Let's think about this for a moment, what she says.

21   I guess I got ahead of myself for a moment.  I'll come back to

22   that.

23           But Ms. Brown, what we know about her is several

24   things.  We know that from the moment of Mr. Dore's arrest, she

25   was communicating with me.  She got every single page of

D3iWdor1                    Summation – Ms. Fontier

1    discovery in this case.  She testified for Mr. Dore on a

2    previous occasion, and we know, according to her, that she sat

3    on that witness stand, took an oath, and lied.  She said she

4    did that.  We also know that she came to me and gave me an

5    alibi for Mr. Dore saying I was with him all day on December

6    12; he couldn't have committed this crime.  She brought me bank

7    records to show that she was with him that day.

8            Ms. Brown says, Yeah, yeah, yeah, I talked to you for

9    a year and a half.  I was sure he didn't commit this offense.

10   I helped him.  I said all those things that now I'm saying are

11   lies, because I didn't want to be alone.  That was her sole

12   motivation, she says, for being willing to sit in the witness

13   stand in a prior proceeding, swear to tell the truth, and

14   commit perjury.  If she admits to lying for that little, I'm

15   afraid to be alone, do you think the fear of conviction, jail,

16   deportation, is not sufficient motivation for her to tell the

17   government whatever it is they want to hear?

18           Now, Janiel Brown, after going through the discovery,

19   asking me questions about it, discussing these things, knew

20   exactly what it was that they didn't have, and she sat down

21   with them after they came to her and threatened her with

22   arrest, prosecution.  She said, oh, he confessed and I got rid

23   of the murder weapon.  How convenient that neither of these can

24   be demonstrated by any other evidence.

25           Now, how do you know besides the fact that this is

1   just all too convenient for Ms. Brown that she's not telling

2   the truth?  The government says that her testimony is

3   corroborated.  I submit to you that her testimony is consistent

4   with the discovery and the evidence that she reviewed.  But

5   every time she's faced with something that she has to make up

6   because she doesn't know it from the discovery, it's disputed

7   by something else.

8          I pointed out earlier her description of Ms. Krco.

9   That's one thing.  The other is that her testimony, she did not

10   know, she knew that Patrick Taylor was going to testify.  She

11   had the witness list.  But she did not know exactly what he was

12   going to say, and their testimony is inconsistent and they

13   cannot both be telling the truth.

14          If you recall, Patrick Taylor took the stand and said

15   that starting in September he was with Tall Man, Mr. Dore, and

16   Duffel every single day from six a.m. until six p.m., they did

17   a 12-hour shift of surveillance and over that period they did

18   four robberies.  That was his testimony.

19          Janiel Brown says I was with Mr. Dore, Tall Man, and

20   Duffel at least ten times.  Every time I had a school holiday

21   and every weekend.  But what do you know also occurred?  When

22   Ms. Brown was sitting in that seat and she was shown this

23   picture of Patrick Taylor, she could not identify him.  She did

24   not know who that was a picture of.  Patrick Taylor sat in that

25   seat and never mentioned in his full-time job, 12 hours a day

1    doing surveillance, when he says he was with these two men and

2    Duffel, he never mentioned Ms. Brown.  How is it, if Mr. Taylor

3    says he's with them every single day and Ms. Brown says she's

4    with them at least ten times, that their two paths never meet?

5    How is that possible?  It's not.  Because they're not telling

6    the truth.  Her testimony, you know that it is not true because

7    it is contradicted by the other testimony in this case.

8              Now, I want to go to the events of December 12, 2011.

9    You also know that she's not telling the truth because this

10   just plain doesn't make sense.  On December 12, 2011, she says

11   she received a call from Mr. Dore and he was upset and then in

12   order to make him feel better she has a conversation with him

13   that evening in which he confesses to a murder.  She then goes

14   shopping in Co-op City, goes to the bank that night, hangs out

15   with her boyfriend, who just confessed to murder.  Does that

16   make any sense?  Would anyone do that?  Would you sit in a

17   living room with somebody who says, Oh, yeah, bad day at work,

18   I killed somebody.  And then be like, Okay, babe, cool, let's

19   go shopping.

20             No, it did not happen.  She's making up this

21   confession.  If you take out that confession, the rest of the

22   day makes perfect sense.  The text messages make sense.  But if

23   you throw in the supposed confession, it doesn't work.  No one

24   does that.

25             Now, for a year and a half, she insisted that Mr. Dore

was with her, and when she took the stand and she talked about

having said that Mr. Dore was with her on December 12, that he

did not commit this murder, she says, Oh, I didn't know what

time the murder was.  But is that consistent with, on December

12, hearing a confession from Mr. Dore?  If he confessed to her

about this murder, what difference in the world would it make

what time the murder occurred?  This confession did not happen.

Janiel Brown lies.  She's good at it.  She's a smart

girl.  She's studying forensic psychology.  She looked at this

evidence.  She knew what the government needed, and her

self-interest in making sure that they didn't prosecute her,

didn't arrest her, when that took over, she had two choices:

Tell the truth that the government doesn't want to hear or fill

in the holes, and it was an easy choice for Janiel Brown.  It

was a really easy choice.  She said whoop, confession, and, Oh

yeah, I threw away the murder weapon.  And guess what?  For

that wonderful new testimony, she's not being prosecuted.  She

got exactly what she wanted.  She had a motivation to fill in

the holes in their case, and she knew exactly what those holes

were and she did it.  But that is not proof beyond a reasonable

doubt.  This so-called confession did not happen.  Mr. Dore did

not confess because he did not commit this homicide.  He didn't

do it.  He's not guilty.

Janiel Brown, ultimately, this so-called confession is

the only evidence that Mr. Dore is the person who committed

1   this homicide, and her testimony is not proof beyond a

2   reasonable doubt.  She is a person who does not tell the truth

3   and does what she needs to do to promote her own self-interest.

4   That's who she is.  The government has failed to prove that Mr.

5   Dore committed this homicide, just as they have failed to prove

6   that he is the person who committed any of these acts.  And

7   when you look at this evidence carefully and you look at it,

8   all of it, not just the single call here and the single call

9   there, when you look at all of it, you will see that the only

10  verdict that is supported by the evidence is a verdict of not

11  guilty.  Mr. Dore is not guilty, and I ask you to return that

12  verdict.

13          Thank you.

14          THE COURT:  Thank you, Ms. Fontier.

15          MR. ROTH:  I certainly will run past one.  It's up to

16  you, Judge.

17          THE COURT:  Let's see if the lunch is here.  Maybe

18  this is a decent spot to stop for lunch.  If it's not here, I

19  think we will start the next summation.

20          Let's then move through the summation and have a late

21  lunch perhaps because there's no point in stopping now because

22  it might be a while before the lunch comes.

23          MR. ROTH:  Thank you, your Honor.

24          THE COURT:  All right.  Mr. Roth.

25          MR. ROTH:  Please don't hold it against me if I keep

D3iWdor1                    Summation - Mr. Roth

1    you from your lunch.

2              THE COURT:  Hold it against me.

3              MR. ROTH:  First of all, let me thank you at this time

4    for the time you have already spent as jurors.  You have been

5    very attentive.  And for the additional time that I'm sure you

6    will spend in the course of your deliberations, I thank you on

7    behalf of Mr. Murphy, my partner, and on behalf of Mr. Barrett.

8              I said in the beginning in terms of my opening the

9    same thing Ms. Fontier said, that we never disputed and to this

10   day we don't dispute that there were robberies here.  We said

11   that we would dispute in some instances exactly how those

12   robberies happened, and I think we have.  I think we would

13   dispute the recall of some of the victims, and I think we have.

14   And I said that at the end of the day, I would establish for

15   you that the government has failed to prove their case against

16   Dwayne Barrett beyond a reasonable doubt.

17             The victim witnesses that you heard come in here

18   deserve a lot of credit.  Most of them were largely immigrants

19   who came over here, were hard working, and made a good life for

20   themselves.  On the other hand, that fact alone does not give

21   them a free pass when they testify.  It doesn't give them a

22   free pass when you assess their credibility on the questions

23   that I posed to them.  There were a few moments of levity in

24   this trial, but there's nothing funny about what happened here.

25   A man lost his life, Mr. Gamar Dafalla.  And another man's

1    life, Mr. Barrett's, is in your hands right now.

2            The government has tried to establish what I'm going

3    to characterize as a circumstantial case, and, as my cocounsel

4    pointed out, they've tried to shore it up with the testimony of

5    two cooperators:  Patrick Taylor and Janiel Brown.  Those are

6    sort of the pillars, the foundation of their case.  And I

7    suggest to you that if you reject either one of their

8    testimonies, their case crumbles.

9            There's something about their case which I think

10   symbolizes the government's case that they've brought against

11   Mr. Barrett, and I'm going to direct your attention to these

12   maps that were found in Mr. Barrett's car.  When they first

13   were presented, and you see that they have different locations

14   on them, in Connecticut and Rhode Island, and they have circled

15   spots, circled spots, which, undoubtedly, the government was

16   inviting you to speculate that perhaps they were casing

17   locations or casing victims at these locations, the reality is

18   there's been no testimony about that whatsoever.  It's like

19   much of the case that the government has brought against

20   Mr. Barrett.  They invite you to speculate.

21           When I go through the evidence now, I want you to

22   remember one thing that the judge told you, and he'll tell you

23   again:  Even at this juncture, Mr. Barrett enjoys the

24   presumption of innocence.  That presumption of innocence stays

25   with him now and goes right into the jury room when you begin

D3iWdor1                      Summation - Mr. Roth

1    your deliberations.  When I'm arguing, when I talk, I'm going

2    to talk about the complaining witnesses and their testimony.

3    Am I saying that any of them are venal or evil, the civilian

4    witnesses who were attacked and beaten in some instances?  I'm

5    not saying that, but what I'm saying to you, and you can use

6    your common sense, is that it's natural, there's a natural

7    tendency to try to get back at the people who you believe are

8    the ones who were the perpetrators.

9            Remember, when I talk about the various witnesses, the

10   government has brought out 40 witnesses.  It is not the

11   quantity of the witnesses.  It's the quality of the witnesses

12   that controls.  When I cross-examined them, I tried not to take

13   advantage of perhaps my more formal education, but their lack

14   of formal education does not give them a free pass to

15   exaggerate, to shade their testimony, or outright make

16   something up.

17           My colleague talked about Mr. Tawfiq.  He was the

18   fellow who was the phone card guy who was robbed in a store, in

19   a parking lot.  Now, I'm going to say he was a straight

20   witness, straight complaining witness, straight victim, didn't

21   make anything up.  And it's curious to me that the government

22   didn't bring up one aspect of that testimony because I thought

23   they did, and he's the one who fights back on the scene and

24   then ultimately tells you that he saw the two assailants flee

25   in a Mercedes.  Now, I'm not going to say that the government

D3iWdor1                    Summation - Mr. Roth

1    did a sleight of hand, but there certainly was that inference

2    that that Mercedes was Felicia Lake's Mercedes that Mr. Barrett

3    drives, but I invite you to look at the actual testimony that

4    Mr. Tawfiq gave in respect to that crime.  He said two people

5    committed that crime.  One guy was standing there, the Spanish

6    person, who to this day the government hasn't told who that is.

7    No testimony about a Spanish person.  And the other person who

8    committed the robbery fought with him and then fled in a

9    Mercedes.

10          Now, I would be more concerned and I would say that

11   that's really solid evidence that maybe, maybe links Felicia

12   Lake's Mercedes to this crime, but he didn't give a description

13   other than it was a Mercedes.  He didn't say it was a 500

14   series, an S series.  He didn't say there were tinted windows.

15   In essence, he described a generic Mercedes.  Beyond that, and

16   there's no question that the government, when they presented

17   that evidence, wanted you to believe that Mr. Barrett is the

18   wheel man driving that car, that they jumped out and jumped

19   back into the car.

20          But if you parse that testimony, you'll see something

21   very interesting.  He didn't say he saw either of those people

22   get into the back seat of the car or the front passenger's

23   seat.  You don't know who was driving that car or that either

24   one of these people wasn't driving that car.  And you know what

25   else the government didn't say?  And my colleague mentioned it,

1    that the description of the other fellow, not the Spanish guy,

2    who was in a red hoody that Patrick Taylor happened to be in,

3    identified himself in the video, remember an important piece of

4    evidence.  Mr. Taylor testified, it's a lot of evidence to

5    remember, you're going to have it at your disposal.  Mr.

6    Taylor, he owned a Mercedes.  He owned a Mercedes.  Check the

7    record.  He had that Mercedes that his benevolent cousin or

8    uncle gave him.  Could it have been him that was driving the

9    car that day?  Of course it could have been.

10            Let's discuss Kassim Salahi.  He's the fellow in the

11    Radcliff basement robbery.  And the government is desperate to

12    try to establish that Mr. Barrett, Tall Man, went into the

13    basement and committed the robbery.  But it doesn't establish

14    that fact.  He conceded that it was only for the first time

15    after a year and a half of talking to the police, talking to

16    the government, that he said from the witness stand that the

17    robber, one of the robbers was six feet 11.  I submit to you

18    that he grew that assailant right here while he sat in the

19    courtroom, right in front of you.

20            He admitted, after some cross-examination going back

21    and forth by me.  He said, this is my question to him at page

22    663, when I was referring to his interview that he had in

23    January of this year, with the government, before testifying.

24    My question:

25    "Q.  Sir, after having the document, 3517A, read to you, the

1    interview notes of the interview that you had with the U.S.

2    Attorney in January of this year concerning this incident,

3    isn't it your recollection you now remember saying that the

4    second male was slightly taller, maybe, than the dark-skinned

5    male that you described as five ten?

6    "A.  Yes.""

7            Is the fact that he said at some point in his

8    testimony, again, for the first time, that he saw that tall man

9    duck, or whatever it is, under his doorway of his basement, is

10   that dispositive?  Is that real proof?  You know what would be

11   real proof?  Real proof would be we had an actual measurement,

12   an actual reference of what the ceiling height was in his

13   basement or his doorway.  That would be real proof, a measure.

14           Height is a relative thing, I'll grant you that.  He

15   said slightly taller.  I'm going to ask Mr. Murphy to stand up

16   and Mr. Barrett to stand up for a moment.  I don't know whether

17   you'd call that height difference slight or not.  I wouldn't

18   call it slight.  You can sit down.

19           You had an opportunity to see, when the lawyers have

20   gone to the side bar and you probably have an idea from

21   watching us a few times, the difference in heights.  But I

22   don't think you would call, if you've seen Mr. Murphy when

23   we've seen him standing up here beside Judge Sullivan, who is

24   not quite the stature in terms of physical height as

25   Mr. Barrett, but I don't think you would describe the judge as

D3iWdor1                         Summation - Mr. Roth

1       just slightly taller than Mr. Murphy.  And you know what's

2       curious about the testimony about that other robber?  There's

3       two other people that fit that description of over six feet or

4       slightly higher than five ten.  And how do we know that there's

5       two other so-called co conspirators?  Because they're on the

6       board, and Patrick Taylor told us.  Patrick Taylor told us that

7       Jaba, his buddy, was six one.  That's at the transcript, page

8       1132.  And he told us Biggs, not surprisingly, because that's

9       the name he had, Biggs, was six three or six four.

10              The fact that he doesn't have an actual recall of the

11      events does not surprise me, and it shouldn't surprise you.

12      The fact that he gave different descriptions of the weapons

13      that were used that day doesn't surprise me.  Can you imagine

14      the terror, the sheer terror of people doing a home invasion in

15      your house when you have your children in there to protect?

16              I want to turn to Mr. Abdulla, the CI.  We know he

17      knows how to deliver to Federal agencies.  He's worked for the

18      ATF before.  We know he's made a million dollars, $6,000 a day

19      in some instances.  It's clear he conducts himself in his own

20      fashion.  It's clear that he doesn't consider that he beats his

21      wife, has domestic violence and goes to jail for a year, that

22      that's a crime.  He's told you that.

23              Beyond learning about his lucrative business as a CI,

24      there's some good what I call takeaways from what he had to

25      say.  He's been a professional witness in his capacity as a CI.

He knows that.  He explained to you the difference of making an
observation under the calm of a minute, like me standing here
talking to you, or the difference when he was confronted with a
gun.  That's the difference.  And notwithstanding that,
notwithstanding that, he came in here and he tried to suggest
that these were the two men who were involved in the robbery.

          I suggest to you that, one, even if he wasn't a CI,
people from television, anyone who walks in this courtroom and
looks at this defense table could know who the defendants are
in this case.  It's obvious.  Anyone who walked into this
courtroom could look and see that Mr. Barrett is taller than
Mr. Dore.  Even the government, even the government doesn't
support his notion that Mr. Barrett was the robber on the day
of the car jacking.  You can look at the video.  There's no six
foot seven, six foot eight man there.  He thought that he could
please with his testimony the feds who have been his pay
master, and it's absolutely clear that that's the pay day that
he wants to go back to.

          Why do I say that there's a takeaway or there's
something to be learned from his testimony?  Because he really
illustrated the dangers of a possible misidentification that
can lead to an injustice.

          Let me turn to Ms. Brown.  I suggest to you it took an
amazing amount of brazenness to come into this courtroom, this
very courtroom, the first time she did, take that very stand,

1   swear on the Bible, and testify falsely and commit perjury.

2   She did so in a bid to gain her freedom.  I dare say there's

3   not one of you who could possibly imagine coming into a

4   courtroom, a Federal courthouse, this solemn courtroom, and

5   taking the witness stand and lying before this judge.  But she

6   came back and she came back for a command performance.  And she

7   lied again.  And she lied this time in a bid for her freedom,

8   and Ms. Fontier explained the various things that she was

9   facing, the time in jail, 20 years in jail, perjury,

10  deportation, loss of her jobs.  I don't think I'm really going

11  out on a limb too far when I say her ability, it's beyond

12  chutzpa to come in here and swear and lie a second time.  I

13  suggest to you she's a sociopath.  And she should not be

14  rewarded for her lies, and Mr. Barrett should not be punished

15  for her lies.

16          Now, she came in here, and it wasn't for a lack of her

17  forensic degree that she testified.  That lack of degree only

18  emboldened her, I suggest.  Mr. Murphy, on cross-examination,

19  at page 395, asked her the question:

20  "Q.  Ms. Brown, have you learned how forensic psychologists can

21  be used in both civil and criminal matters to help fill in gaps

22  and build cases for lawyers litigating matters?

23  "A.  In an overview, yes.

24  "Q.  In an overview?  And that's an important, integral part of

25  what forensic psychologists do, from your point of view, is

D3iWdor1                        Summation - Mr. Roth

1     that correct?

2     "A.  Yes.

3     "Q.  And that's what you're studying now, correct?

4     "A.  Yes."

5           That was the foundation of her testimony.  She studied

6     this school of thought, this body of education, and she used it

7     to her advantage.  The first time that she came in and spoke to

8     the feds, she only admitted to being on two surveillances.

9     Shortly thereafter, it grew to ten surveillances.

10          The first time that she said anything about disposing

11    of the so-called murder weapon, her testimony was that she said

12    to the feds that Mr. Barrett came over to her house, took the

13    gun, and that was it.  Disappeared.  And then she came back and

14    told you this very elaborate tale, which between her forensic

15    mind and her viewing of television perhaps, about this

16    elaborate convoy that it took two cars to drive all the way

17    down the West Side Highway to throw the gun in the river.  I

18    suggest to you she knew that that testimony could not be

19    corroborated, could not be challenged in and of itself.  Why

20    did Mr. Barrett need her to go down there with him?  There's

21    absolutely no reason.  In her own testimony, she indicated she

22    never socialized with him.

23          She claimed that she went all the way to Pennsylvania

24    to commit a robbery, and yet she knew not what the purpose of

25    the visit was.  You know, we saw nice pictures of the food

D3iWdor1                        Summation - Mr. Roth

1    market there.  We don't have any receipts that show that she

2    was actually at the food market.  We don't have any toll

3    receipts from her visit.  We don't have any pictures from the

4    toll bridges which take pictures of the cars as they go by.  We

5    have a cell record.  We have a cell record from a call there on

6    August 22.  If you recall the cells, one of the providers

7    talked about that cell tower is in what we call a rural area

8    and that the coverage in a rural area could be at least ten

9    miles apart.

10           The government introduced another cell slide of a call

11   with the so-called Barrett phone a week before August 22.  Now,

12   why did they introduce that?  To show that Mr. Barrett was

13   going to the Poconos?  They want you to believe that he was

14   casing the joint there, but there is no evidence about that.

15   If you review the phone records, you'll find that there's

16   another telephone call with the phone on November 7, some

17   months afterwards, from the same cell tower, used at 1:55 to

18   4:36 p.m.  The government didn't introduce that.  It's not a

19   crime to be in Pennsylvania.

20           Ms. Brown talked about wiping down the Mercedes-Benz.

21   She described a very elaborate thing.  They had latex gloves

22   and they were using some solvent to wipe it down in the parking

23   lot of the motel, and that's when Mr. Dore got arrested.  Now,

24   interestingly, we have absolutely no corroboration of that.  We

25   have no testimony that Mr. Dore was arrested.  Indeed, when

1  they processed it, and you heard the detective who processed

2  the Mercedes, they didn't find anything.  Forget not finding

3  any blood or biological material there; they didn't find any

4  evidence that the car had been wiped down with any type of

5  solvents.  They have the Luminol light.  They have the other

6  lights.  CSI doesn't have a monopoly on investigative tools.

7  This is the FBI.

8          She's a manipulator of the truth.  She was not the one

9  who was manipulated, and it's important to point out that not

10  only did she have the discovery from Mr. Dore, she had the

11  discovery in respect to Mr. Barrett as well.  She was

12  essentially a spy in the camp, as though she was a paralegal in

13  my office.  She used that to her advantage in a bid for her

14  freedom.

15          Let's turn to Patrick Taylor.  I started out, first

16  question to him, in my very first questions, Are you a hustler

17  and a risk taker, and he laid it out.  Flatout denied that he

18  was either.  I suggest that you can conclude based on his

19  testimony that he was both.  He risked telling the government

20  what they wanted to hear and that they would overlook the lies

21  that he told them in his past and not discover the lies that he

22  told on the witness stand.  He did what he had to do to

23  survive.  It's interesting.  I asked him this question, page

24  1073, on my cross-examination:

25  "Q.  Are you telling the jury that you're somebody who always

D3iWdor1                        Summation - Mr. Roth

 1    owns up and takes responsibility and never points the finger at

 2    other people?"

 3          Mr. Taylor:  "I'm not saying that, nobody never,

 4    that's impossible for a person to own up to everything that he

 5    ever did. He got to point the finger at somebody." And that's

 6    exactly what he did in here, in a bid to save himself.  He

 7    learned very, very quickly that in this courtroom that

 8    cooperation like he did is what's called the coin of the realm.

 9    That's the way you pay your way out of jail.

10          He was well prepared for his testimony.  He said, when

11    the feds first came knocking on his door, he claimed to say --

12    he didn't claim.  He just flat out said I had no clue why they

13    were looking for Duff, his cousin, who he said he was

14    committing robberies with.  And he certainly said he didn't

15    know why they were looking for him.  He said that at the time

16    that they came, he Google'd already, with Shea Douglas, in

17    January, months before the feds were knocking on the door, the

18    two of them, when they heard that Mr. Barrett and Mr. Dore were

19    arrested, it's a wonderful age we live in, they Google'd

20    everything about the crime.  They Google'd the times, the

21    charges, the incidents of the crime.  They knew what was

22    happening.  They knew what was up.

23          In January, and he benefitted, as did Ms. Brown, from

24    the timing of this case and the weaknesses that the government

25    had and why the government needed them.  They were both making

1    their deal right at the brink of this trial, a month before, a

2    week before Mr. Douglas signed his and Mr. Taylor signed his

3    agreement.

4            Here's my question, at 1127:

5    "Q.  You knew when you first started talking to the feds in

6    January of this year that they wanted information about the

7    robberies, is that right?

8    "A.  Yes.

9    "Q.  They needed your help to help them try to fill in the

10   blank to make their case?

11   "A.  Right."

12           And that's what he proceeded to do, and he indicated,

13   he kept on meeting with them, and then, in February, when it

14   came closer, he said, my question to him on 1141:

15   "Q.  And this is in the middle of January when this trial was

16   beginning in a couple of weeks, is that right?

17   "A.  Yes.

18   "Q.  A couple weeks before, and you knew the feds wanted your

19   cooperation; they needed the information you were going to give

20   them.  Is that right?

21   "A.  Yes.

22   "Q.  You were going to try to help them, try to fill in pieces

23   of their case, is that right?

24   "A.  Yes.

25   "Q.  You knew that, right?

1    "A.  Yes."

2            There's one thing that I'm not sure is clear to you as

3    members of the jury, and it's in respect to the actual nature

4    and terms of the cooperation agreement.  And you have the

5    benefit of this and you can read this, but I'm going to read to

6    you an excerpt of it, and this is 3537D, the fourth page of the

7    agreement.  The pertinent paragraph here is:

8            "It is understood should this office," referring to

9    the U.S. Attorney's office, "determine that either the

10   defendant has not provided substantial assistance in

11   investigation or prosecution, or has violated," and then it

12   talks about some other stuff, "will not be entitled to withdraw

13   his plea" and the government will not give him the magic 5K1

14   letter which lets the penalties go from a minimum of 17 to life

15   to zero.  And the key words here are "substantial assistance."

16           He doesn't get a pass and go home free if he just

17   talks in general, Hey, I know Mr. Barrett, we used to get high

18   together, I used to sell him pot.  He only gets that pass, if

19   in their minds, he provides information which is of substantial

20   assistance to the prosecution.  Filling in the blanks.  He

21   believed and he still believes, you heard his testimony, that

22   if he gets that 5K, he's only going to be inconvenienced

23   perhaps for a couple of months.  He believes that he, and it's

24   true, is eligible to get what's called time served, just the

25   time that he's been in jail, which is only since January of

D3iWdor1                        Summation - Mr. Roth

1    this year.

2            Now, why did I spend so much time cross-examining him

3    about his four-year marijuana conspiracy?  Because I think it

4    illustrates that he has a certain sophistication and certainly

5    is well wiser than his high school education, which he never

6    got.  He managed to sell enough thousands of kilos probably to

7    fill half of this courtroom and not be detected.  His first

8    drug arrest, what did he do?  It's very simple.  Did he own up

9    to it?  No.  He invented, with the collaboration of his cousin,

10   he gave his cousin's identification.  He didn't take

11   responsibility.  He cleverly got out of that case.

12           You can't credit his testimony in respect to anything

13   that he said that he heard that Mr. Barrett or other people

14   said about either Mr. Barrett said that he heard that his car

15   was seen, the Mercedes was seen on the homicide scene.  Doesn't

16   even mean that he was in it, but that it was seen or anything

17   else about the homicide itself because I asked him, when he

18   hung out at the party house, I asked him directly, were you a

19   close friend of Mr. Barrett's.  And he said no, I'm not a close

20   friend of Mr. Barrett's.  And the source of the information,

21   the way that these little sessions went, these rap sessions

22   when they were smoking pot in a party, I asked him

23   specifically, and this is group of people you're talking about,

24   you mentioned before, the pictures on the board, you say they

25   used to talk a lot about a lot of different things, is that

1   right?  Only robberies, that's it."

2            And this is at 1129, my cross of Mr. Taylor:

3   "Q.  When they were talking about other robberies, you told us,

4   did you not, sir, say that a lot of people in that group would

5   accuse others in that group of, frankly, bullshitting each

6   other?  Is that fair to say?

7   "A.  Yes.

8   "Q.  That was a constant what we call theme or constant thing

9   that happened, is that right?

10  "A.  There was no trust.

11  "Q.  No trust whatsoever?

12  "A.  Yes.

13  "Q.  Is that what we call no honor amongst thieves?  Is that

14  right?

15  "A.  Yes.

16  "Q.  Anybody had to watch their back, is that fair to say?

17  "A.  Sometimes, yeah.

18  "Q.  So if you told me you weren't a party to, you didn't

19  participate in a certain robbery, I might challenge you, is

20  that right?

21  "A.  Yes.

22  "Q.  And the reason I would challenge you is because if I

23  thought I might be entitled to a share in the proceeds, is that

24  right?

25  "A.  Yes.

1    "Q.  In turn, you might challenge me, or it goes on and on, is

2    that fair to say?

3    "A.  Yes.

4    "Q.  So nobody in some instances really knew who was telling

5    the truth about certain robberies, is that right?

6    "A.  Yes."

7           That's the kind of information that he is using as a

8    source to come into this courtroom and point the finger at

9    Mr. Barrett in regard to what happened on the day of the car

10   jacking.

11          By the way, it's obvious that other people used the

12   car that Mr. Barrett was using as well, his baby mother's car,

13   Ms. Lake's car.  But even Janiel Brown tells you that she was

14   aware that Mr. Barrett was not the exclusive user of that car,

15   and I'll refer to a series of text messages, Government Exhibit

16   73B, between Mr. Dore and Ms. Brown, and this is on 12/12,

17   2011:

18          "Mr. Dore:  Yo, I need you to come with me to go meet

19   Tall Man.

20          "Okay.  Ryan in here?

21          "Yeah.  The gal went to go talk to the cops.  1040.

22          "Yeah.  1040.

23          "She went to them?

24          "Yeah.  1040.  So he want me," Mr. Dore speaking, "to

25   meet him.  1040.

1        "They call for her to come to them?

2        "He left out.  1040.

3        "Oh.  Okay.  Explain to me when you get out."

4        Followed by Mr. Dore:  "He has the car or her?

5        "He do."

6        It's just simply something to show you that he was not

7   the only one to be driving that car and obviously saw other

8   items in there to indicate -- the baby's seat -- that other

9   people were using that car as well.

10       You know, Mr. Taylor, I suggest, had one moment of

11  honesty when he was on the witness stand in respect to my

12  cross-examination of him when I was talking about the Radcliff,

13  the basement robbery house, and I asked him about when he

14  changed his testimony and he took Biggs out of the house and

15  put Biggs out of the robbery and put Jaba in the robbery, and

16  his testimony was he lied.  He said he lied.

17       Here's my question to him on 1131:

18  "Q.  Getting back to the Radcliff robbery, the snowy-day

19  robbery, do you recall telling in one of the proffers that

20  Biggs was on the robbery?

21  "A.  At first I did, but then I realized I was lying because

22  Biggs wasn't there.  I was mixing up Biggs and Jaba, so I

23  recall.

24  "Q.  I'm sorry.  Can you sit a little bit closer?  I can't hear

25  you.

1    "A.  At first I told them Biggs was there, but then I didn't

2    want to put Biggs somewhere where he wasn't.  So then I told

3    him no, he wasn't there.

4    "Q.  You said you were lying?

5    "A.  Yes."

6            Now, it's true that the judge then asked him some

7    questions and he said, Well, I really wasn't lying; it was

8    mistake.  I suggest there could be a possible other reason of

9    why he took Biggs out of the equation, and, if he was there, he

10   knew what was happening.  It's not a mistake, it's a flat-out

11   lie.  But perhaps the other motivation was Biggs was already

12   arrested for the robbery.  He could not get credit, he could

13   not get substantial assistance for just saying Biggs was in the

14   robbery.  If he gave them, as he did, Jaba, a new person,

15   that's new information that constitutes substantial assistance.

16   He was filling in the blanks.

17           The only way that you know as jurors with solid proof

18   and can resolve the question of who was in the basement at

19   Radcliff Avenue that day committing that robbery, as my

20   colleague pointed out, is if you had fingerprints because, for

21   sure, with cutoff gloves those people rummaging through there

22   would, for sure, be leaving fingerprints.

23           I want to turn to the robbery concerning Mr. Mohammed.

24   It's one that we have the video of in the garage.  It's notable

25   that Mr. Taylor never admits to punching the victim on that

D3iWdor1                    Summation - Mr. Roth

1    day.  If you recall and you look at the testimony, Mr. Mohammed

2    said two assailants came up to him and pummeled him.  They beat

3    him so badly he had to require medical attention.  Mr. Taylor,

4    I suggest, omits that fact because he wants to sort of have

5    clean hands that he's only a lookout.  He doesn't want to get

6    dirty with the violence.  He's also clever enough to know from

7    looking at the video itself that the actual assault, you may

8    see him running up, guys running down, but you don't see the

9    actual assault and robbery that day.  And I dare say that if I

10   asked any of you on the jury as to whose testimony you would

11   believe, whose credibility you would support, would it be Mr.

12   Taylor's or the poor guy, Mr. Mohammed, who indicated he was

13   beaten by two people?  I don't think I need to ask for a show

14   of hands on that.

15          Remember, the judge is going to tell you, when you get

16   your jury instructions, if you believe that a witness lied

17   about a material fact in their testimony, you can -- you, with

18   the power that you have as jurors and fact finders -- disregard

19   that portion of the testimony or reject the entire testimony.

20   I suggest, based on the lie, the inconsistencies that you heard

21   from both Patrick Taylor and from Janiel Brown, that you are

22   qualified and you should reject both of their testimonies.

23          The car stop of the Mercedes, the whole Singh and

24   Villanueva incident, I'm going to go a little bit further than

25   my colleague did in respect to that car stop.  That was what's

1    known as a stop and frisk, where they had to fill out very

2    detailed police report forms.  There was a spot for contraband,

3    a spot for any suspicious activity.  That police report said

4    nothing about that.  Didn't say anything about masks, gloves,

5    baseball bats.  And beyond that, these are trained observers,

6    these police officers.  There's nothing differently than that

7    car stopping that they do every day, in their life, in their

8    professional duties, and they said that the passenger there was

9    around six feet.  And as Ms. Fontier pointed out, neither one

10   of these witnesses came in here and said Mr. Dore was the

11   passenger that day.

12        Well, who else told us about that car stop the

13   government wants you to believe as corroborating evidence of

14   that car stop?  Mr. Taylor.  Mr. Taylor, who is six feet tall,

15   could Mr. Taylor have been the passenger in the car?  I suggest

16   he could be and that's the basis of his knowledge for the

17   information that he provided.

18        I just want to go back to a point in terms of the

19   identification between Ms. Brown and the failure to identify

20   Patrick Taylor.  If you read the testimony carefully, you will

21   see Ms. Brown say that she's even been over to Squeaky's house

22   and yet she's unable to identify him.

23        Detective Fox is the ballistics guy.  I'm not going to

24   go over all the swirls and everything with you again.  You

25   heard that.  The bottom line is what you can take away from his

1    testimony is that ballistics, however experienced he is,

2    ballistics is not a science.  It is a subjective opinion that

3    he rendered.  It's not DNA and it's not fingerprints.

4         Let's assume for the purposes of this argument that

5    the seven shell casings match the shell casing that was found

6    in the minivan.  What does that tell us about the connection

7    between the two robberies?  I don't think it really tells us

8    too much.  First of all, the so-called car jacking was supposed

9    to involve three people, and the other robbery of Mr. Cornwall

10   was two people.  It was a regular, straight-up, looks like a

11   street robbery with absolutely -- there's no way that any

12   member of this jury can tell me or tell yourselves or your

13   fellow jurors what the connection to that Cornwall robbery was

14   to Hussain, the so-called tipster, because there was none.  I

15   suggest to you it's a weak link to two crimes.  And there's no

16   hard evidence, and that's what the government wants you to do,

17   go down a path, a road of conjecture and speculation.

18        You didn't see the rap video again, but you can look

19   at it in the jury room, your own thoughts about what it is.

20   But, again, it's suggesting, the government is again asking

21   you, inviting speculation, supposition that the guns that are

22   depicted there, the two guns, are real guns.  If they were real

23   guns and they could prove it, don't you think that they would

24   have had Detective Fox come in here, look at that video, and

25   say those were real guns?  They didn't because they couldn't.

D3iWdor1                      Summation - Mr. Roth

1    It's the same thing as the masks and the gloves that were used

2    there, that they were just simply props for a music video.

3              When they came to arrest Mr. Barrett, he consented to

4    a search of the house he was living in with Ms. Lake.  He

5    consented because he had nothing to hide, the same reason he

6    uses his same phone and he wasn't switching his phone.  They

7    didn't find any objects of the so-called crimes.  They didn't

8    find any jewelry.  They didn't find any stolen cell phones.

9    They found a whopping $1,700.  It's logical that that could be

10   rent money.  If you read Mr. Barrett's text messages to

11   Ms. Felicia Lake, you'll see she's a working woman.  There's

12   nothing to suggest ill-gotten gains there.  Certainly wasn't

13   living large.  They were using a 2003 Mercedes, sharing it,

14   driving the child around, and you can see that they were doing

15   normal chores with the car from their text messages.  But

16   certainly in his house, there were no weapons, no baseball

17   bats, no knives, no guns.  And when the car was searched, when

18   the car was taken, the Mercedes, all they found was a pair of

19   ordinary gloves, no other evidence that they found.

20             Why didn't we make a big deal about no forensic

21   evidence?  And why did we cross-examine the medical examiner

22   about how the unfortunate Mr. Dafalla died?  Because in that

23   van, the minivan, it was a bloody scene.  You saw the blood.

24   It looked like the perpetrators pushed that body or moved that

25   body around.  If, in fact, one of those perpetrators got in the

1    so-called getaway car that Mr. Barrett was allegedly driving,

2    it would leave some trace evidence.  They processed that

3    Mercedes, they processed the hoody, which in and of itself is

4    not a crime, for sure.  They processed shoes in there.  They

5    found no forensic evidence whatsoever.

6         In respect to the homicide, is it plausible that

7    somebody other than Mr. Barrett, and that's the only time, the

8    only time that Felicia Lake's Mercedes-Benz was established to

9    be at or about or around the crime scene, and I'm not clear on

10   the whole time line that the government showed in their

11   demonstrative exhibit that you saw this morning, but the plate

12   reader that they're referring to, Government Exhibit 528, it

13   shows on there two times.  It shows a local time of 11:54 and a

14   vehicle time of 10:54.  There's no explanation for the

15   difference in the hour that appears on the Government Exhibit

16   for the first time when they show that car at that location.

17   Indeed, where they then show the clip of the Mercedes driving,

18   that time starts at, the video starts at 1552, which is

19   approximately three or four hours after the plate reader itself

20   shows the car there.  Is there proof Mr. Barrett was the

21   driver?  Could it have been somebody else?  We've already heard

22   about another so-called Bonnie and Clyde team.

23        Beyond that, Janiel Brown testified, at page 274, that

24   she lent her car to Biggs, Mr. Dore, and to Tall Man, and

25   that's significant because obviously the cars were not just

1    used exclusively by one person.  And again, there was a very

2    interesting little piece of testimony there, when Ms. Brown was

3    talking about surveillance she was doing, so-called

4    surveillance one time.  She said she was following Tall Man's

5    car and the question posed to her was whether or not, she talks

6    about were you in the car at that time and I'm directing your

7    attention to page 314 of the transcript:

8    "Q.  Were you in your car at this time?"  This is the direct of

9    Ms. Brown by the government.

10   "A.  Yes, I was.

11   "Q.  Where was Mr. Dore?

12   "A.  In Tall Man's car.

13   "Q.  Do you know who was driving Tall Man's car?

14   "A.  No.

15   "Q.  Do you know whether Mr. Dore was driving his car?

16   "A.  No."

17          Although you've heard testimony that Mr. Dore doesn't

18   have a license, you've heard that he drives the car

19   notwithstanding.  Now, later in that line of questions, the

20   government asks and Ms. Brown volunteers, Well, it's my

21   understanding that Tall Man was driving the car.  Her

22   understanding.  An understanding is not hard, credible proof to

23   convict a man of murder.

24          Cell coverage, you heard a lot about cell coverage.

25   The one couple of things I want you to be clear about,

D3iWdor1                        Summation - Mr. Roth

1    Mr. Magnuson suggested that cell coverage, and he gave a little

2    example of a baseball diamond, that's really an unfair

3    characterization because a baseball diamond, all the bases are

4    90 feet apart, and you know where the pitcher's mound is.  And

5    what you don't have in respect of cell site evidence and what

6    you don't have because of a failure of proof by the government

7    is you don't have what we call predictive coverage maps, which

8    are made by the individual cell providers.  And why don't you

9    have them?  Well, you have the testimony.  Because these are

10   big companies, big capitalist companies that make a lot of

11   money, and they use the fancy word proprietary.  They don't

12   like to give out that information.  So the government didn't

13   bother to subpoena it, because they have the power to subpoena

14   that information.  This whole discussion about cell coverage

15   would not have taken up your time if they had done their job

16   because then you would know about the actual coverage there.

17          They didn't do that.  So instead we're left with, and

18   the reason we're harping on this, is because the government

19   still wants you to believe that the phone that was used to call

20   hit the closest cell tower.  You heard that at the end of the

21   day that in an urban area, such as we're talking about, that

22   this pie-shaped wedge, that the coverage area, the radius could

23   be as much as two miles away.  Well, for those of you who

24   remember your high school geometry, that would leave about a

25   four-square-mile area within that wedge of where that caller

1    could be.  It's not a precise science.  They chose not to drive

2    through.  The other way that they could have done it, without

3    subpoenaing Magnuson, who was qualified, or the other fellow,

4    is driven through the area, especially the area where the

5    homicide was, with an RF antenna and charted the area.  They

6    did not do that.

7         Cell site evidence is not like a wiretap.  It's

8    historical data.  This whole issue would be put to rest if you

9    were listening to wiretaps of the calls.  You would know

10   whether Mr. Barrett was talking with his so-called

11   coconspirators about committing crimes or whether he was

12   talking about social events, whether he was talking about, as

13   you'll see on his text messages, his rap aspirations.  You

14   would see if he was talking to Patrick Taylor about getting

15   pot -- he smoked pot a lot, every day -- about getting pot.

16   That's what you would hear instead of this speculation.

17        The judge is going to give you a charge on multiple

18   conspiracies.  He's going to say if you find with respect to

19   Mr. Barrett that some of the actions were not part of the

20   conspiracy charged, you can't convict him.

21        I suggest to you, and now I'll talk about whether it

22   be the Cornwall robbery, which absolutely seems to have no

23   connection, there's a Spanish fellow there and we have no

24   information about regular street robberies, but more

25   importantly, the homicide.  How is that connected to this

D3iWdor1                    Summation – Mr. Roth

1    conspiracy.  How is this connected to the hub, Mr. Hussain, the

2    fount of information, the tipster.  I suggest it's not.  In

3    fact, when you go back to the jury room, I defy you, any one of

4    you, to say who gave that information for that car jacking.

5             I can offer some suggestions.  Perhaps it was

6    Mr. Abdulla, the master of manipulation.  He knew money was

7    passing hands on the illegal cigarette deal that time.  He's

8    the one who actually said, as the van's being pulled away,

9    Throw the money.  And where'd the money wind up?  Under his

10   bed.  Could it have been Mr. B, the Dominican fellow who was in

11   the SUV Infiniti?  He knew that the money was coming down.  But

12   if that car jacking and robbery and homicide was an independent

13   free-lance job done by the perpetrators, it's not part of the

14   charged conspiracy.

15            The judge is going to give you an example of

16   circumstantial evidence, and I'm not going to repeat the entire

17   example for you now, only to say that it involves two people

18   walking into the courtroom, one with a wet umbrella, one with a

19   wet raincoat.  I ask when you consider that example, that even

20   if you assume in that example that the Mercedes Benz is the wet

21   umbrella or the wet raincoat, it's not enough to convict

22   Mr. Barrett.  You have to believe that he's the one walking

23   through the courtroom with that wet umbrella and with that wet

24   raincoat.

25            Some of you may have, as you sit here -- you've sat

1    here for a long time; I'm going into your lunch hour now.  But

2    you may have a gut feeling, I think Mr. Barrett did it, he must

3    have done something.  Well, a gut feeling is not enough.  It's

4    not a substitute for proof beyond a reasonable doubt, and in a

5    way that's why in England the verdicts are not as the verdict

6    sheet that you'll get, guilty or not guilty.  It's proven or

7    not proven.

8         Mr. Barrett didn't take the witness stand.  The judge

9    is going to give you another instruction before you deliberate.

10   He's under absolutely no obligation whatsoever to take the

11   witness stand.  He didn't take the witness stand because the

12   government did not prove their case beyond a reasonable doubt.

13   The judge will tell you that you can't hold that against him or

14   draw any adverse inference against him.  The judge is going to

15   explain to you what reasonable doubt is, the kind of doubt you

16   have to eliminate before you return your verdict.

17        In this courthouse, some people in years past used to

18   use the kind of example of the kind of doubt that would cause

19   you to hesitate in making an important life decision.  And

20   people used to use the example of like when you bought a house

21   or got married.  But through the course of time, we've seen

22   that people buy houses, they flip houses.  They get married, I

23   don't want to say they flip their wives, but the divorce rate

24   is high.  So I suggest when you think about what's an important

25   decision and the kind of doubt that you have to eliminate

1  before you return the verdict of guilty, you consider something

2  that hopefully never comes to you, a situation where, God

3  forbid, you have a loved one who is on a life support system,

4  and at some point there was a question about the vitality of

5  the person who was on the life support system.  And before you

6  made a decision to pull the plug, so to speak, you'd consult

7  probably not just one but two of the most preeminent doctors in

8  the field to find out whether that person had the vitality or

9  the chance of recovery before you made a decision.  Now I

10 suggest for a moment that one of those doctors was Patrick

11 Taylor and one of those doctors was Janiel Brown.  Is there any

12 question in your mind that you would not rely on their

13 testimony, on their information, to resolve that doubt?  I

14 don't think so.

15         I'm going to sit down shortly, and the government -- I

16 see the government is taking notes on my comments -- will have

17 an opportunity to do what we call rebuttal summation.  Very

18 capable, very experienced, beyond their years, both assistants.

19 And I ask, when they get up to address you finally, as they

20 must because it's their burden of proof, that you answer any

21 questions that they raise as you think I would if I had the

22 opportunity to respond to their questions as though I were on

23 the jury.

24         You've all been chosen from among many people who said

25 that they could not try this case fairly, on the facts and on

1    the evidence.  When you deliberate, I'm going to ask that you

2    remember the words of a famous trial lawyer, one who was

3    featured prominently in a film recently, Abraham Lincoln.  He

4    said, In a jury room, one is a majority.  If you have a

5    reasonable doubt, do not surrender it under the pressure of the

6    moment.  Do not surrender it for convenience because you may

7    have travel plans.  Hold on to it because each one of you

8    individually and collectively has the ability to save

9    Mr. Barrett from an unjust verdict.

10            After this case is over, the judge will go on and try

11   his next case, I'll go on to my next case, and you'll go back

12   to the affairs of your lives.  But Mr. Barrett is going to live

13   with the decision for the rest of his life, and I ask that you

14   render the verdict that's the only verdict that's consistent

15   with the law and the facts, a verdict of not guilty.

16            Thank you.

17            THE COURT:  Okay.  Thank you, Mr. Roth.

18            You folks must be hungry.  I think lunch is probably

19   in the jury room.  We'll pick up again probably in about a half

20   an hour, or so.  I'm going to give the lawyers and the parties

21   an opportunity to eat.  Don't discuss the case.  Don't discuss

22   anything yet.  The case will be yours soon enough, but not yet.

23   Continue to keep an open mind.  Do not discuss the case.  Talk

24   about sports or the weather, St. Patrick's Day, but not the

25   evidence or the arguments.

D3iWdor1                            Summation – Mr. Roth

1              (Jury excused)

2              THE COURT:  Have a seat.  I think if you're going to

3      get something to eat, get it from the cafeteria.  We'll pick up

4      again in about half an hour.  Great.  Have a good lunch.

5              (Luncheon recess)

D3itdor2

AFTERNOON SESSION

(2:10 p.m.)

(Jury not present)

MR. ROTH:  Judge, I don't know if the Court received what purports to be a letter response or a motion to quash my subpoena.

THE COURT:  Yeah, I mentioned I was going to talk to you about that.  My law clerk has it, but the New York City Police Department?

MR. ROTH:  Yes.

THE COURT:  I guess it's sort of academic at this point.

MR. ROTH:  I don't know.  Actually one case I had, when I pursued it, it wound up with the jury verdict being set aside.  I will look at it again, and then -- in other words, if the material that I subpoenaed actually contains something that is relevant or pertinent to the case or should have been turned over, obviously I would have a potential --

THE COURT:  I don't know whether that's true or not. Certainly we rested and already had now summations, or at least some of them, so I don't know that we'll be able to reopen the evidence, obviously.

MR. ROTH:  No, obviously.

THE COURT:  All right.  I'm still waiting for my law clerks, but one issue did come up, I noticed one of the jurors

D3itdor2

1   has provide an Astoria address as to where he's commuting from,

2   from, that's Mr. Mills.  During jury selection Mr. Mills

3   indicated that he resided in Westchester, that he lived in

4   Westchester his entire life.  So it may about that he's

5   crashing in Astoria with a friend because it's a better

6   commute, which would be fine, I don't think there's anything

7   wrong with that, but I think that we have to at least inquire

8   to see whether or not he is actually residing in Astoria, in

9   which case he obviously can't sit on the jury.  We can either

10  do that before or after the government's rebuttal.  Anybody

11  have a preference?

12          MS. FONTIER:  I have no preference, your Honor.

13          THE COURT:  Mr. Roth?

14          MR. ROTH:  No preference.

15          MS. MASELLA:  It doesn't matter to us.

16          THE COURT:  Well, let's see.  I think I probably would

17  rather do the rebuttal and then I'll take a short break before

18  I do the charge so people can leave who don't want to stick

19  around for it, and maybe at that point I will ask Mr. Mills to

20  come in before I begin the charge.

21          Let's bring in the jury.

22          (Jury present)

23          THE COURT:  I hope lunch was OK.  You can't beat the

24  price, right?

25          Anyway, if it didn't go right, if there were problems

D3itdor2                        Rebuttal - Ms. Lester

1   with the orders, always let Mr. Halegua know and we'll try to

2   correct.

3          We're now going to resume the summations.  As I said

4   before, because the government has the burden of proof, they

5   get an opportunity to give a second summation, what's called a

6   rebuttal summation, which is a little shorter than the others.

7   It's just responding to some of the points that have been made

8   in the defense summations.  So doing the government's summation

9   will be Ms. Lester.

10          Ms. Lester, you may proceed.

11          MS. LESTER:  Thank you, your Honor.

12          Good afternoon, ladies and gentlemen.  Now you heard a

13   lot of points made by the defense attorneys in their summations

14   over a period of more than an hour, and while I have responses

15   to each and every one of those points, I'm not going to take

16   the time to go through everything, I'm going to try to hit the

17   high points and respond to some of the more serious concerns I

18   have after hearing their summations.

19          Before I do, let me remind you as the judge told you,

20   of course the defendants have no burden in this case.  They

21   never have a burden.  They don't have to present any witnesses.

22   They don't have to make any arguments at all.  The burden is

23   always on the government.  We welcome that burden.  We submit

24   to you in this case we have satisfied that burden.  We have

25   proved that the defendants are guilty as charged beyond a

D3itdor2                         Rebuttal - Ms. Lester

reasonable doubt.  And I'm going to now go through a couple of

points again to show you why that is.

        Now the government has presented many different types

of evidence in this case.  You've heard from victim witnesses,

you've heard from the inside witnesses that Ms. Masella talked

about.  You heard from law enforcement witnesses who responded

to some of the scenes of the robbery.  Of course, you have seen

physical exhibits.  You have seen masks, gloves, you saw

ballistics evidence, and you saw cell site evidence.  There's a

mountain of evidence in this case that demonstrates the

defendants' guilt.

        But what did the defense counsel choose to focus on in

their summations?  They didn't really directly address the

evidence in the case.  Instead, they talked about distractions,

things that you didn't see.  What was the thing that they

emphasized the most?  Victim IDs, the lack of victim IDs.

        Now ladies and gentlemen, you heard from the victims

of these robberies.  They told you many of these robberies

happened at night, many of them happened in a matter of

seconds.  These victims feared for their lives while the

robberies were taking place.  They were approached sometimes

from behind by people who had weapons, knives, guns, sometimes

a baseball bat.  These victims were scared.  They thought that

their life could be over in an instant.  They weren't mentally

recording how tall one robber was in relation to the other.

D3itdor2                        Rebuttal - Ms. Lester

1   They did the best they could based on what they remember from

2   those events.  But you also have to remember that many of these

3   robberies took place a year and a half ago in 2011.  The

4   victims did the best they could based on what they recall, but

5   it shouldn't be surprising to you that they can't remember

6   specific details about the robbers.

7          And that's just assuming that some of those victims

8   were actually able to see the robbers' faces.  As you heard

9   time and time again, the robbers wore masks, they held hoodies

10  over their heads, they wore gloves, they concealed their

11  identities on purpose so they could avoid detection.  That's

12  why the victims were unable to identify them.

13         And we're not relying on the victims.  We're not

14  asking you to say:  Oh, the victims were able to identify the

15  defendants.  If we had done that, the defense counsel would

16  have said it's dark, they couldn't really see, you can't trust

17  the victims.  So they want to have it both ways.  In this case

18  we're not even asking you to rely on victim identification, we

19  have presented many other pieces of evidence linking these

20  defendants to the crime scenes.

21         Defense counsel also spent a lot of time talking about

22  the two inside witnesses in the case, Patrick Taylor and Janiel

23  Brown.  Again, this is not really a surprise, these two

24  witnesses provided devastating, devastating testimony about the

25  robbery conspiracy.  Think about what they both said.  They

1    said that between the period of August or September of 2011 and

2    January of 2012, they were with these people, in Ms. Brown's

3    case, every day, or in Mr. Taylor's case, almost every day.

4    And what were Dore and Barrett doing during that period?

5    Committing robberies.  That was their full-time job.  That's

6    how they made a living.  They didn't have legitimate jobs.

7    This was their only source of income during this time period.

8            If you believe these witnesses' testimony, the case is

9    over.  That's it.  The defendants are guilty as charged.  So

10   Ms. Fontier and Mr. Roth know that they have to attack these

11   witnesses.  That's the only way that they can gain a foothold

12   with you, the jurors.

13           But does attacking these witnesses help you to focus

14   on what was the actual evidence in the case?  No.  It doesn't.

15   The questions that they raised during the cross-examination of

16   those witnesses were meant to distract you from the devastating

17   nature of those witnesses' testimony.  Think back particularly

18   to the cross-examination of Patrick Taylor by Mr. Roth.  How

19   much time did he spend asking Patrick Taylor questions about

20   his marijuana dealing?  It was more than half of the

21   cross-examination.

22           And Patrick Taylor answered those questions in a

23   straightforward manner, just as he had answered Ms. Masella's

24   questions on direct.  He freely admitted that he sold thousands

25   of kilos of marijuana.  He wasn't trying to hide that from you.

D3itdor2                       Rebuttal - Ms. Lester

He admitted that he told the government about that even though,
as far as he knew, the government didn't know anything about
it.  He didn't think he was under investigation for marijuana
dealing.  He told you that prior to this case he had only been
arrested one time, and that was for possessing a minor amount
of marijuana, and he gave a false name on that occasion.  But
he wasn't exactly living in fear of the law, he told you that.
So when he came in and met with the government, he was
truthful.  He told the government about his prior criminal
conduct.  He was prepared to answer questions about it, and he
did so.  There was nothing to hide there.

        But why did Mr. Roth want to spend so much time on
that?  Because it has nothing to do with the defendants here.
The marijuana business is totally separate.  Mr. Taylor told
you that he sold marijuana with his cousin, Shea Douglas, from
a house where they were both living.  He did tell you that on
occasion he had sold some marijuana to Dwayne Barrett, but he
didn't say that Dwayne Barrett was a marijuana seller himself.
He didn't try to rope Barrett or Dore into his vast marijuana
conspiracy.  He focused on his own criminal conduct and he
testified truthfully.

        Now defense counsel tried to distract you.  They want
you to think about how bad Taylor and Janiel Brown are, how
they committed crimes, how they cut deals with the government
and tried to save themselves.  You heard time and time again

D3itdor2                          Rebuttal - Ms. Lester

1   what did they need to do?  They needed to please the

2   government, they needed to fill the gaps in the government's

3   case.  Ladies and gentlemen, the reason why defense counsel

4   spent so much time distracting you with these issues rather

5   than focusing on the facts of the case is that the facts are

6   not their friends.  If you focus on the facts, you will find

7   the defendants guilty as charged.

8           They're trying to have it both ways with these

9   witnesses.  They want to have their cake and eat it, too.  And

10  I will explain what I mean by that.  Now when Patrick Taylor

11  told you about his misdemeanor business at length under direct

12  examination and then cross-examination, again defense counsel

13  wants you to believe that aspect of his testimony, that was the

14  truth, he sold enough marijuana to fill up half this courtroom,

15  Mr. Roth said.  OK, so he was telling the truth about that.  So

16  what is he lying about?  Everything he said about the

17  defendants?  That doesn't make sense, ladies and gentlemen.

18  They embraced his testimony about his prior criminal conduct as

19  the truth, but as soon as he started talking about robberies

20  that he committed with these defendants, all the sudden he's a

21  liar.  That doesn't make sense.  You should not accept that.

22          What about Janiel Brown?  Ms. Fontier tried to paint

23  her as a person that can't be trusted, someone who has lied

24  before and will lie again.  But think about her testimony

25  during direct examination.  She freely admitted to you that she

D3itdor2                          Rebuttal – Ms. Lester

had lied previously when she was testifying on Jermaine Dore's

behalf.  She also told you when she presented information about

a supposed alibi to Ms. Fontier, she was lying, she wasn't

being truthful.

        Why did she lie?  She told you that, too.  Because she

was following Jermaine Dore's instructions.  He was her

boyfriend at the time.  That was the entire nature of her

relationship with Dore.  He told her what to do and she did it.

He told her to drive somewhere, and she did it.  He asked her

to sit in the car while he surveilled robbery victims, and she

did it.  When he needed her to get rid of the gun that he used

to commit a murder, she did it.  When he needed her to invent

an alibi for him, she tried to do it.  And when he needed her

to testify at a previous proceeding, she did it.  She told you

she did it out of love and out of fear.

        But as she also told you, things changed once she got

a lawyer who was representing her own interests and looking out

for her.  She decided to make a break with her past, accept

responsibility for what she had done, and cooperate with the

government.  She realized that her priority was no longer

Jermaine Dore, her priority was the truth.

        Now what could she be lying about at this point?  Why

would she need to, quote, save her own skin if she hadn't

actually committed any crimes?  She must have committed crimes,

right, under defense counsel's theory?  So if she did, she must

D3itdor2                    Rebuttal - Ms. Lester

1   have been committing the those crimes with Jermaine Dore.  I

2   don't think anyone would seriously contend -- and defense

3   counsel didn't argue -- that Janiel Brown was out there on her

4   own committing robberies just by herself and Jermaine Dore had

5   nothing to do with it.  That's ridiculous.

6           So your common sense tells you that she was committing

7   robberies, and if she was committing robberies, she was doing

8   it with Jermaine Dore.  You also know this because their

9   contemporaneous text messages between Jermaine Dore and Janiel

10  Brown that tells thank you exactly what was going on.  She

11  admits in those messages that she's helping him commit

12  robberies, and he's writing back to her confirming that's what

13  they're doing.  Those text messages are devastating, absolutely

14  devastating.  And Ms. Fontier couldn't really touch them.

15  There's not much you can do when a defendant is admitting his

16  own involvement in robberies at the time that those robberies

17  are happening.  So you know that Ms. Brown is not lying about

18  Mr. Dore's participation in robberies.

19          But what about the murder?  Defense counsel would have

20  you believe that Janiel Brown made up the conversation that she

21  told you about about the murder, the conversation where

22  Mr. Dore told her that what he had done resulted in a duppe,

23  meaning that he shot and killed someone.  And so when she

24  presented evidence of that supposed alibi with the bank

25  receipts to Ms. Fontier, she was doing it because she actually

D3itdor2                     Rebuttal - Ms. Lester

1    believed that he hadn't committed the murder.

2            Defense wants to you believe that Brown invented this

3    conversation because she knew the government's case, she knew

4    that there was this hole, and she wanted to give the government

5    information in order to save herself from being prosecuted for

6    her own conduct.  Now for the reason I just mentioned, that

7    doesn't really make sense, because if you believe Ms. Brown was

8    committing robbery, then you must believe that Jermaine Dore

9    was committing robberies.

10           But with respect to the murder, does it make sense

11   that she would be lying about this conversation?  We submit

12   that it doesn't.  First of all, if she was lying, wouldn't she

13   have the made the conversation much more detailed?  Wouldn't it

14   have been much more explicit?  Wouldn't Jermaine Dore have

15   provided details about exactly what happened during the

16   homicide?  You heard defense counsel harp on the fact that the

17   government doesn't have anyone who was inside that van who

18   could tell you exactly what happened after the carjacking

19   occurred.

20           Well, if Janiel Brown knew that, and she knew that

21   that was a hole in the government's case, wouldn't she have

22   told us what happened there if she was making up the story?

23   She could have made the lie a lot better if she was lying.  She

24   could have described the murder in painstaking detail.  But she

25   didn't.

D3itdor2                        Rebuttal - Ms. Lester

1          How else do you know she didn't invent that

2     conversation?  It's corroborated again by those damning text

3     messages.  Ms. Masella went over that excerpt with you.

4     Mr. Dore is confused, upset, worried, concerned.  He's texting

5     and calling Ms. Brown asking her for support and help.  And she

6     texts him back and says I'm really worried for you, you act

7     like this doesn't bother you, but I know it does.

8          What are they talking about?  The murder.

9          Why did defense counsel spend so much time trying to

10    discredit Ms. Brown?  It's obvious.  Because her testimony,

11    again, is devastating against the defendants.  Both Taylor and

12    Brown are witnesses who were with the defendants almost every

13    day who committed crimes with them over a period of months.

14    And again, they didn't try to sugar coat their own criminal

15    conduct, they came right out and told you about it.

16          You may not like them, ladies and gentlemen, but it's

17    not a popularity contest, it's a federal criminal trial.  The

18    only question is whether you believe them.  Think about their

19    demeanor as they answered questions on the stand.  Did they

20    avert their eyes as they were talking?  Did they seem evasive?

21    Did they refuse to answer questions about their past?  No, they

22    got up on the witness stand, they laid it all out for you, and

23    they didn't hold anything back.

24          You should also think about what their incentives are

25    at this point.  They told you about their agreements with the

D3itdor2                        Rebuttal - Ms. Lester

1    government.  And the agreements themselves are in evidence, and

2    you can look at them yourself during your deliberations.  Those

3    agreements obligate Taylor and Brown to testify truthfully

4    about their own conduct and about the conduct of other people.

5    It's only if they do that that Taylor gets a 5K letter for his

6    sentencing and Brown receives the protection of not being

7    prosecuted for the robberies.  It's in their interest to tell

8    the truth.

9           Now you listened carefully to their testimony, and now

10   the time has come for you to weigh it against all of the other

11   evidence.  Is it corroborated by the other evidence that was

12   presented?  As Ms. Masella explained in the main summation, we

13   submit that it is.  The text messages, the cell site records,

14   the physical evidence, the testimony of the victims, they all

15   support what Taylor and Brown told you about how these

16   robberies took place, that the defendants here were core

17   members of robbery crew that committed robberies between

18   August 2011 and January 2012, including the December 12 robbery

19   that resulted in a homicide.

20          I want to talk briefly about another piece of evidence

21   that the defense counsel spent a lot of time on, which was the

22   cell site evidence.  Now like Mr. Taylor and Ms. Brown's

23   testimony, this is also very devastating evidence for the

24   defendants.  There is simply no logical explanation why their

25   cell phones would be at so many incidents over such a long

D3itdor2                         Rebuttal – Ms. Lester

1    period of time.  It doesn't make sense.  Your common sense

2    alone can tell you that.

3            But let me address some of the arguments they made in

4    a little more detail.  Ms. Fontier and Mr. Roth both mentioned

5    the two miles of coverage area for a cell tow tower.  If you

6    look back at the testimony of the Sprint custodian of records

7    who testified about the coverage area of the cell tower, he did

8    not say that it would usually be two miles as the defense would

9    have you believe.  He said in an urban area it can be up to two

10   miles, but it usually is more like a few blocks.  And you know

11   this because you saw numerous maps that had cell towers listed

12   out on them, and you could see how close they were.  In an

13   urban area like the Bronx or Mount Vernon, cell towers are

14   typically only a number of blocks away.

15           And you heard more than one witness, the Sprint

16   witness, the AT&T witness, and also Agent Magnuson testify

17   about how cellular network providers set up their cell towers

18   so there's overlapping coverage.  That means that the towers

19   are designed to have a smaller coverage area so that they

20   overlap with the towers right next to them so that people never

21   drop calls.  So it's not logical, and you do not have to accept

22   the argument of the defense that just because a defendant's

23   phone hit on a tower he has to be within that vicinity or he

24   could be up to two miles away.  That doesn't make sense, ladies

25   and gentlemen, and you know it.

D3itdor2                        Rebuttal - Ms. Lester

1            Based on what you heard from the cell phone witnesses,

2       you know that cell phones usually contact the closest tower

3       because that's usually the one with the strongest signal.  They

4       also don't leapfrog over a tower that is closer to one that's

5       further away.

6            The other arguments that the defense made about the

7       cell phone evidence are also a distraction.  Let's take a look

8       for a minute -- I'm going to hold it up -- at Defense Exhibit

9       C1.  This is one of the maps that Ms. Fontier showed to you

10      during her summation.

11           Now looking at this, at first glance it's incredibly

12      confusing.  There's no particular date listed in the heading

13      and there are three separate phone numbers.  So you have heard

14      already that the 8414 number belongs to Dwayne Barrett, and you

15      heard that the 3805 number belongs to Jermaine Dore, and this

16      location of the cell tower is at 233rd Street.

17           Well, during the trial, you heard a lot of testimony

18      about what is located at 233rd Street, Ali's store, 1M

19      Stationery is at 233rd Street and White Plains Road.  This

20      exhibit, as confusing as it is, is actually in accordance with

21      the government's evidence in this case, that is, that Barrett

22      and Dore hung out at Ali's store day in and day out to get

23      tips, information, about robbery targets that they were

24      following.  So it's no surprise that their phone numbers are

25      hitting off a cell tower that's located right there.  It

D3itdor2                              Rebuttal - Ms. Lester

1    actually makes perfect sense.

2            The larger point on the cell site evidence boils down

3    to this, the defendants would have to be the unluckiest men in

4    the world for their cell phones to hit at the towers where they

5    did.  Think about how many exhibits Ms. Masella showed you in

6    the main summation.  For nearly every robbery incident, there

7    was a cell phone hit for at least one of the defendants.  Most

8    often Barrett was there, and on other occasions Dore was there

9    as well.

10           It's particularly damning when you think about the

11   cell site evidence on the homicide.  And defense counsel

12   focused on this as well, as they need to, because, again, it's

13   very damning evidence.  On that day, as Ms. Masella showed you,

14   both Dore and Barrett were in the vicinity of the River Road

15   Motor Inn in the Bronx.  That's where the victim was, and they

16   were there, too.  Their phones were hitting off cell towers in

17   that area.

18           Then when the victim leaves that area, they do, too.

19   They go to 267 South Fourth Avenue right at the intersection,

20   right where that same camera is that showed the robbery

21   actually taking place.  What are the odds of that?  Ladies and

22   gentlemen, it just doesn't make sense.  They were obviously

23   following the victim.

24           Now Mr. Roth said well, OK, we know the car is there.

25   He had to concede that, it came up on the license plate reader.

D3itdor2                          Rebuttal - Ms. Lester

1   There's no real way to get around that.  But we don't know that

2   Barrett of driving it, he said.  Well, ladies and gentlemen,

3   did you really hear any evidence of anyone else driving that

4   car besides Dwayne Barrett?  Yes, it's registered in his

5   girlfriend's name, but whenever anyone else testified about

6   what car Barrett drove or who was driving the Mercedes, it was

7   always Barrett.  Patrick Taylor told you that he traveled in

8   that Mercedes with Dwayne Barrett.  Janiel Brown told you she

9   knew that was Barrett's car.  Barrett was pulled over by the

10  police in that car.  It was obviously his car.  He was there

11  that day.

12          Besides, if he wasn't there, what is Mr. Roth really

13  saying?  Felicia Lake was there in Mount Vernon conducting

14  surveillance of the victim?  That doesn't make sense, ladies

15  and gentlemen.  Use your common sense.  The car was there,

16  Dwayne Barrett was there, his phone was there.

17          Now after the robbery and homicide take place,

18  Ms. Masella also showed that you black-out period in Dore's

19  phone records.  It's about a 20-, 30-minute span where there

20  are no phone calls.  The last phone call that he make before

21  the robbery or right around the time of the robbery is to

22  Barrett, and the next phone call he makes is to Barrett again.

23          And defense counsel in their summation showed you

24  where the tower is that Dore's phone hit off for that call, the

25  11:17 phone call.  It's right by Dore's house.  He had come

D3itdor2                    Rebuttal - Ms. Lester

1   back home.  He committed the robbery, the murder, and he came

2   back home where he was calling Barrett, telling him what

3   happened, trying to get in touch with Janiel Brown looking for

4   consolation, concerned and worried about what he had just done.

5   It makes perfect sense that he would go home.  He needs a rest

6   period.  He just committed a murder.  He goes home, calls

7   Barrett, tells him what happens, regroups and goes out again on

8   a job, as Ms. Masella explained to you.

9            We're not talking about a large distance here.  And

10  some you may know, but also, as you can see from the cell site

11  maps that are in evidence, Mount Vernon is just over the border

12  of the Bronx.  Where the body was discovered at Strang and

13  Duryea Avenue is in the Bronx.  Jermaine Dore lives in the

14  Bronx.  It's not inconceivable, in fact it makes sense that

15  after dumping the body at Strang and Duryea, he would go back

16  home to regroup.

17           Again, the cell site evidence, it can't really be

18  contested.  It's computer-generated information about what a

19  cell phone is doing.  You heard the custodial witnesses

20  testify.  These records show for sure when a phone makes a

21  call.  It really can't be disputed.  That's why defense counsel

22  had to go out on a limb in trying to contest it.

23           Now going along with this idea of the lack of evidence

24  in the case, you heard Mr. Roth talk about circumstantial

25  evidence and that this is a circumstantial case.  Well, ladies

D3itdor2                        Rebuttal - Ms. Lester

and gentlemen, as Judge Sullivan will instruct you, there's

nothing wrong with circumstantial evidence.  You're free to

rely on both direct evidence and circumstantial evidence in

reaching your verdict.  Circumstantial evidence is simply

evidence that requires you to draw an inference from one or

more facts.

        So, for example, if you saw a little boy sitting at a

kitchen table, and he had chocolate on his face and there was a

box of cookies next to him that was empty, now you have no

direct evidence that he ate the box of cookies, you didn't see

him do it, but you can infer from two pieces of circumstantial

evidence, the chocolate on his face, maybe the guilty smile,

and the fact that the cookie box is empty that he did eat the

cookies.  It's a logical inference that can be drawn from those

two facts.  That's all circumstantial evidence is.  You can

rely on it.

        Let me give you another example of circumstantial

evidence that actually occurred in this case, and that's from

the robbery of Youssef Abdulkader.  Now he told you that two

men approached him late at night near his house, threatened him

with a knife, and took his cell phone and laptop.  Separately,

you heard from ATF Agent Jose Ruiz and from Janiel Brown that

Dore's cell phone was taken on the day that he was arrested.

        Now we showed both Mr. Abdulkader and Mr. Brown photos

from that phone which are in evidence.  Remember those

D3itdor2                        Rebuttal - Ms. Lester

1    pictures?  Ms. Masella put them up as well during her main

2    summation.  Some of the photos were of Mr. Abdulkader.  He took

3    those photos with that phone.  Some of the photos were of

4    Jermaine Dore and Janiel Brown.  Jermaine Dore took those

5    photos.  Based on those facts, the government submits that you

6    can draw the inference that Dore was one of the robbers who

7    took Youssef Abdulkader's cell phone and laptop on that night.

8    He participated in that robbery.  That's all there is to

9    circumstantial evidence, drawing a logical inference.

10           I want to talk for a minute again about another

11   distraction that the defense raised in their summation, and

12   that is about the lack of DNA evidence or the lack of

13   fingerprint evidence in the case.  Again, the government

14   submits that this is just a distraction from the mountain of

15   evidence that you do actually have putting the defendants in

16   these robberies, but nevertheless, we'll address it.

17           In terms of the DNA and fingerprint evidence, the

18   judge will tell you that there's no requirement that the

19   government prove its case in any particular way or undertake

20   any particular investigative technique.  So the fact that some

21   things weren't tested, for example, the Salahi residence for

22   fingerprint, you heard no evidence about that, and the defense

23   counsel pointed it out.

24           It actually proves nothing.  The government, the

25   police department aren't obligated to undertake any particular

D3itdor2                        Rebuttal - Ms. Lester

1   type of investigative test.

2          Second, we know why there wasn't any DNA or

3   fingerprint evidence recovered that could link these defendants

4   to the scene.  They took great pains not to leave anything

5   behind.  You heard time and time again that they wore masks,

6   and gloves, they took the time to wipe down the Mercedes inside

7   and out after the homicide specifically to make sure that no

8   biological evidence was recovered.  That's why nothing was

9   recovered in this case, because the defendants were savvy and

10  they took steps to make sure there wasn't anything there.

11         Now Mr. Roth also mentioned a little bit the judge's

12  instruction on reasonable doubt and what you need in order to

13  determine whether there is reasonable doubt in a case.

14  Mr. Roth basically applied a reasonable doubt is kind of an

15  impossible standard, it would have to be something that you

16  would take into account in making a very important decision in

17  your life, a decision that is more important than buying a

18  house or getting married.

19         But reasonable doubt is not an impossible standard.

20  It's not beyond any doubt.  It's beyond a reasonable doubt.

21  And from the time that this country was founded until now the

22  standard in criminal cases has always been beyond a reasonable

23  doubt.  If it was an insurmountable standard, no one would ever

24  be convicted of a crime.  So you know that that can't be the

25  case.  Is it a high burden?  Yes.  Is it an insurmountable

D3itdor2                        Rebuttal - Ms. Lester

1    burden?  No.  Have we met the burden in this case?  Absolutely.

2    The defendants are guilty as charged.

3          Now the time has come, ladies and gentlemen, for you

4    to begin your deliberations and evaluate the mountain of

5    evidence in this case, and because of the careful attention

6    that you paid over the past two weeks, the defendants have had

7    a fair trial.  And now it's time for you to do your duty, go

8    back to that jury room and decide the case based on the

9    principles that Judge Sullivan will instruct you on.  Decide

10   the case without fear, without prejudice, and without sympathy.

11   Decide the case based on the evidence that you have seen and

12   heard.  If you do that, we submit the one conclusion that is in

13   line with the evidence and with justice is that both defendants

14   are guilty beyond a reasonable doubt.

15         THE COURT:  Thank you, Ms. Lester.

16         OK, ladies and gentlemen, I'm going to instruct you on

17   the law, but I think that might take over an hour or more.  So

18   why don't we take a short break, you can go get a drink of

19   water, use the restroom, have a cookie, then I will instruct

20   you on the law and finally the case will be yours.  So don't

21   discuss the case, it's almost yours already, but not yet.  I'll

22   see you in ten minutes.

23         All rise for the jury.

24         (Jury not present)

25         THE COURT:  I think at this point I would like to

D3itdor2

1    bring out Mr. Mills and ask him about just where he resides and

2    get a little more information concerning the Astoria address

3    that he provided.   Anybody have a problem with that?

4              MS. FONTIER:  No, your Honor.

5              MS. MASELLA:  No, your Honor the.

6              THE COURT:  Let's bring him out.

7              (Juror present)

8              THE COURT:  Mr. Mills, I wanted to follow up with you

9    on something.

10             JUROR:  Sure.

11             THE COURT:  I understand that you mentioned to

12   Mr. Halegua that you're reside anything Astoria, or at least

13   staying there temporarily.

14             JUROR:  Yeah.

15             THE COURT:  So tell me about that.  You told me before

16   that the county of your residence was in Westchester.

17             JUROR:  Yeah.

18             THE COURT:  Are you now living in Astoria?

19             JUROR:  Yeah, I mean I live in Astoria but my official

20   residence is in Westchester.

21             THE COURT:  What do you mean by official residence?

22             THE JUROR:  That where I grew up.  That's where my

23   mail goes.  That's what I list as my official residence.

24             THE COURT:  How long have you been living in Astoria?

25             JUROR:  So I have been living in the city for the past

D3itdor2

two years.  At first I was living in Astoria for about eight
months, then I moved into Manhattan for about five months, then
I moved back to Astoria for about a year and a few months.

          THE COURT:  All right.  So you sleep in Astoria most
nights during the week?

          THE JUROR:  Yeah, but you certainly get why I keep my
official residence in Westchester, that's my permanent
residence.

          THE COURT:  All right.  But this creates a bit of an
issue just because in order to be on a jury in the Southern
District of New York you have to actually reside in the
Southern District of New York.  So one's residence can I guess
best interpreted or defined in a number of ways, but certainly
you haven't lived in Westchester for a couple of years, is that
what you're saying?

          THE JUROR:  Yeah.

          THE COURT:  All right.  Let me ask the lawyers if they
have any follow-up questions.

     So you have been in Astoria really for the last year or
more?

          THE JUROR:  Yeah.

          THE COURT:  All right.  I want to talk to the lawyers.
Don't discuss with anyone in the jury room what we have just
talked about, but I think I may need to follow up with them.

          THE JUROR:  OK.

D3itdor2

```
 1              THE COURT:  You may go back to the jury room.
 2          All rise for Mr. Mills.
 3          (Juror not present)
 4              THE COURT:  I'm not sure what one's official residence
 5      means exactly.  Residency for purposes of like diversity admits
 6      various definitions, but I think in terms of residence for jury
 7      service I think we have difficulty keeping Mr. Mills on this
 8      jury, but I want to hear from you folks.  Anybody think that
 9      because his mail goes to Westchester, even though he doesn't go
10      there, that he is in fact a residence of the Southern District
11      of New York as opposed to the Eastern District?
12              MS. FONTIER:  Your Honor, it seems to me that he is in
13      fact a residence of the Eastern District of New York, but I
14      don't pretend to know the rule on whether it's your domicile
15      versus your permanent residence that counts for jury service.
16      So I would leave it at your Honor's discretion because I don't
17      know that.
18              THE COURT:  OK.  Anyone else have any thoughts?
19      Mr. Roth?
20              MR. ROTH:  I would have thought it was the domicile,
21      which he's not domiciled in Westchester, but --
22              THE COURT:  Government?
23              MS. MASELLA:  We don't really know the details either,
24      your Honor.  It does seem clear that if his official residence
25      is Westchester he couldn't be served to serve in the Eastern
```

D3itdor2

1    District either, if that makes a difference.

2            THE COURT:  Couldn't or wouldn't be.  In other words,

3    if he didn't have any mailing address because he doesn't tell

4    anyone to send him mail there, he's not registered to vote

5    there.  I presume all his mail goes to Westchester is what he

6    said, so I don't think that's going to be sufficient.

7            I may take a minute just to do a little bit of

8    research, which may slow us down for a bit, but I think that we

9    need to resolve this obviously now.  I suppose I could ask

10   somebody in chambers to check this out while we're doing the

11   charge.  That might be the most efficient way.  But let me at

12   least take a break and discuss this with Mr. Halegua or others

13   in my chambers.

14           (Recess taken)

15           THE COURT:  We're going to read the charge, you folks

16   have a copy to follow along?

17           MS. MASELLA:  Yes.

18           THE COURT:  So I have got a law clerk checking out

19   what is it means to reside in the district.  28, USC, 1865

20   requires that to be eligible to serve on a jury you have to be

21   18 years of age and to have resided in the district for a

22   period of one year.

23           The answer to the question of what it means to reside

24   in a place as opposed to having your mail go to a place, my

25   inclination is that Mr. Mills is probably not going to be able

D3itdor2

```
 1    to serve.  I think we're going to be losing him, but I have

 2    another law clerk looking at this.

 3              So by the time the charge is over, we can take a short

 4    break, I will meet you folks at the side bar to see if I read

 5    anything wrong or there's some other mistakes or oversights in

 6    the charge.  At that point I think we'll probably talk about

 7    what we'll do with Mr. Mills.

 8              All right.  So let's bring in the jury.

 9              (Jury present)

10              THE COURT:  We're now at this point in the trial where

11    I instruct you on the law.  Because the law requires a certain

12    amount of precision, I'm going to end up reading much of this.

13    I am always reluctant to do that because it's hard to read a

14    document and maintain any kind of connection to your audience,

15    but the alternative is that I memorize 90 pages or something,

16    which is not an option.

17              Bear in mind that you will have a copy of these

18    instructions with you in the jury room, so you can refer to

19    them.  I invite to you do that.  And if you have any questions

20    about them, you can send me a note, but we'll spend a little

21    bit of time now, probably 60 to 90 minutes, on which I will

22    instruct you on the law.  So pay attention, give me as much

23    attention as you gave, bearing in mind if there are parts that

24    are complicated you will have the charge to look at yourselves.

25    And you'll be able to refer to it along with the indictment,
```

D3itdor2

1     the exhibit list, the witness list, and the verdict form.  So

2     you'll each have a copy.  I have a binder for each of you that

3     will have all of those documents.

4               So take a deep breath, sit back, here we go.

5               Members of the jury you have now heard all of the

6     evidence in the case, as well as the final arguments of the

7     parties.  We have reached the point where you're about to

8     undertake your final function as jurors.  You have paid careful

9     attention to the evidence, and I'm confident that you are act

10    together with fairness and impartiality to each a just verdict

11    in this case.

12              My duty at this point is to instruct you as to the

13    law.  It is your duty, as I told you before, to accept these

14    instructions of law and to apply them to the facts as you

15    determine them, just as it has been my duty to preside over the

16    trial and to decide what testimony and what evidence was proper

17    under the law for your consideration.

18              On these legal matters, my instructions, you must take

19    the law as I give it to you.  If any attorney or witness has

20    stated a legal principle that is different from any that I

21    state to you here in my instructions, it's my instructions that

22    you must follow.

23              Some of the lawyers gave you little previews of what I

24    may say.  I let them do it, some judges don't.  But the bottom

25    line is this:  If there is anything that they told you that is

D3itdor2

1   different from what I tell you, I win.  So you follow my

2   instructions on the law.

3         You are to consider these instructions together as a

4   whole; in other words, you are not to isolate or give undue

5   weight to any particular instruction or particular subset of

6   instructions.  It's the whole thing that is the instruction,

7   that is the charge.

8         Now as members of the jury you are the sole and

9   exclusive judges of the facts.  You pass upon the evidence.

10  You determine the credibility of the witnesses.  You resolve

11  such conflicts as there may be in the testimony.  You draw

12  whatever reasonable inferences you decide to draw from the

13  facts as you have determined them, and you determine the weight

14  of the evidence.

15        It is your sworn duty, and you have taken an oath as

16  jurors to determine the facts and to follow the law as I give

17  it to you.  So again, you must not substitute your own notions

18  or opinions of what the law is or ought to be.

19        I remind that you in reaching your verdict you are to

20  perform your duty of finding the facts without bias or

21  prejudice as to any party.  You must remember that all parties

22  stand as equals before a jury in the courts of the United

23  States.  You must also remember that it would be improper for

24  you to allow any feelings you might have about the nature of

25  the crimes charged to interfere with your decision-making

D3itdor2

1    process.

2              This case is important to the defendants who are

3    charged with serious crimes.  Equally, it is important to the

4    government, for the enforcement of criminal laws is a matter of

5    prime concern to the public.

6              The fact that the prosecution is brought in the name

7    of the United States, does not entitle the government or its

8    witnesses to any greater consideration than that accorded to

9    any other party.  By the same token, the government is entitled

10   to no less consideration.  The government and the defendants

11   stand as equals at the bar of justice.  Your verdict must be

12   based solely on the evidence or the lack of evidence.

13             Now I will instruct you on the presumption of

14   innocence and the government's burden of proof in this case.

15   The defendants before you have pleaded not guilty.  In so

16   doing, the defendants have denied every allegation charged

17   against them.  As a result of the defendants' pleas of not

18   guilty, the burden is on the prosecution to prove each

19   defendant's guilt beyond a reasonable doubt.  This burden never

20   shifts to the defendant for the simple reason that the law

21   never imposes upon a defendant in a criminal case the burden or

22   duty of calling any witness or producing any evidence.

23             The law presumes the defendants to be innocent of all

24   charges against them.  I therefore instruct you that the

25   defendants are to be presumed by you to be innocent throughout

D3itdor2

1    your deliberations.

2            The defendants began this trial here with a clean

3    slate.  The presumption of innocence alone is sufficient to

4    acquit each of the defendants unless you as the jurors are

5    unanimously convinced beyond a reasonable doubt of each

6    defendant's guilt after a careful and impartial consideration

7    of all the evidence in this case.  If the prosecution fails to

8    sustain its burden as to a particular defendant on a particular

9    count of the indictment, then you must find that defendant not

10   guilty on that particular count.  This presumption was with the

11   defendants when the trial began, remains with them even now as

12   I am speaking to you, and will continue with them during your

13   deliberations unless and until you are convinced that the

14   prosecution has proven them guilty beyond a reasonable doubt.

15           Now the question naturally presents itself:  What is a

16   reasonable doubt?  The words almost define themselves.  It is a

17   doubt that a reasonable person has after carefully weighing all

18   of the evidence.  It is a doubt that would cause a reasonable

19   person to hesitate to act in a matter of importance in his or

20   her personal life.  Proof beyond a reasonable doubt must,

21   therefore, be proof of such a convincing character that a

22   reasonable person would not hesitate to rely and act upon it in

23   the most important of his or her own affairs.  A reasonable

24   doubt is not caprice or whim.  It is not speculation or

25   suspicion.  It is not an excuse to avoid the performance of an

D3itdor2

unpleasant duty.  And it is not sympathy.

In a criminal case, the burden is at all times upon the prosecution to prove guilt beyond a reasonable doubt.  The law does not require that the prosecution prove guilt beyond all possibly doubt; rather, proof beyond a reasonable doubt is sufficient to convict.  The burden never shifts to the defendant, which means that it is always the prosecution's burden to prove each of the elements of the crime charged against the defendant beyond a reasonable doubt.

If, after a fair and impartial consideration of all of the evidence or the lack of evidence, you have a reasonable doubt as to the count and to the particular defendant you are considering, then must acquit the defendant on that count.  On the other hand, if after fair and impartial consideration of all the evidence you are satisfied of the guilt of each of the defendants beyond a reasonable doubt, it is your duty to convict the defendants.

Now in determining these facts, you must rely on your own recollection of the evidence.  And I want to remind you now what is evidence.  Evidence, as I told you at the beginning of the trial, consists of the testimony of witnesses, the exhibits that have been received in evidence, and the stipulations of the parties.

The statements and arguments made by the lawyers are not evidence.  Their arguments are intended to convince what

D3itdor2

you conclusions you should draw from the evidence or lack of

evidence.  As I said before, those arguments are important.

You should weigh them and evaluate them carefully, but you must

not confuse them with evidence.  As to what the evidence was at

this trial, it is your recollection that governs, not the

statements of the lawyers.

          With regard to this, you should also bear in mind that

a question put to a witness is never evidence.  It is the

answer to that question that is evidence.  One exception to

this is that you may not consider any answer that I directed

you to disregard or that I ordered be stricken from the record.

You are not to consider such answers.

          There are two types of evidence that may properly be

considered by you in deciding whether the defendant you are

considering is guilty or not guilty of the crimes with which he

is charged.

          One type of evidence is called direct evidence.

Direct evidence of a fact in issue is presented when a witness

testifies to that fact based on what he or she personally saw,

heard, or observed.  In other words, when a witness testifies

about a fact in issue on the basis of that witness's own

knowledge by virtue of what he sees, feels, touches or hears,

that is direct evidence of that fact.

          The second type of evidence is circumstantial

evidence.  Circumstantial evidence is evidence that tends to

D3itdor2

prove a disputed fact indirectly by proof of other facts.
There is a simple example that is used in this courthouse.  It
was used since I was a pup.  It was used for 50 years.  There
was an allusion to it.  You heard other examples, but I will
give you the one that I always give.

Assuming when you came in the courthouse today the sun
was shining, it was beautiful day outside, the green shade were
closed so you couldn't look outside.  Assume further that as
you were sitting here someone walked into the courtroom with an
umbrella that was dripping wet.  Soon after that, someone else
walked into the courtroom with a raincoat that was also
dripping wet.  Because you could not look outside the window
and because you couldn't go outside you couldn't see whether it
was raining, you would have no direct evidence of that fact.
But on the combination of facts that I asked to you assume, it
would be reasonable and logical for you to conclude that it was
raining based on the raincoat and the umbrella.  That's all
there is on circumstantial evidence.  You infer on the basis of
your reason, experience, and common sense from one established
fact the existence or the non-existence of another fact.

Now the matter of drawing inferences from facts in
evidence is not a matter of guesswork or speculation.  An
inference is a logical, factual conclusion that you might
reasonably draw from other facts that have been proven.

Many material facts, such as state of mind, are rarely

D3itdor2

1    easily proven by direct evidence.  Usually such facts are

2    established by circumstantial evidence and the reasonable

3    inferences you draw.  Circumstantial evidence may be given as

4    much weight as direct evidence.  The law makes no distinction

5    between direct and circumstantial evidence, but simply requires

6    that before convincing a defendant, the jury must be satisfied

7    that the defendant's guilt beyond a reasonable doubt, based on

8    all of the evidence in the case.

9              You should draw no inferences or conclusion for or

10   against any party by reason of lawyers making objections or by

11   my rulings on those objections.  Counsel not only have the

12   right, they have the duty to make legal objections when they

13   think such objections are appropriate.

14             Of course, as I told you before, nothing that I say is

15   evidence.  So if I commented on the evidence at any time, do

16   not accept my statements in place of your own recollection or

17   your own interpretation.  It is your recollection and your

18   interpretation that govern.

19             Similarly, you should not draw any inference from any

20   of my rulings.  The rulings I made during trial are no

21   indication of any view on my part.  You should not seek to find

22   any such view or opinion on my part, nor should you speculate

23   to what I might be thinking.

24             Further, don't concern yourself with what was said at

25   side bar conferences or during my discussions with counsel.

D3itdor2

Those discussions related to rulings of law, they're not
relevant to your deliberations on the facts.

Now certain exhibits, I think just a couple, will have
portions that are redacted or blacked out.  This is generally
because the material that was redacted was not sufficiently
relevant to the case.  You should not speculate as to what may
have been redacted or why.  Neither the content nor the fact
that it was redacted is relevant to the questions that you must
determine.

At times I may have admonished a witness or directed a
witness to respond to questions or keep his or her voice up.
At times I myself may have asked a question or two.  Any
questions that I asked, or any instructions that I gave, were
only intended only to clarify the presentation of evidence and
bring out something that I thought might be unclear.  Again,
you should draw no inference or conclusion of any kind,
favorable or unfavorable, with respect to any witness or any
party in this case, by reason of any comment, question or
instruction of mine.

Nor should you infer that I have any views as to the
credibility of any witness, as to the weight of the evidence,
or as to how you should decide any issue that is before you.
That is your role.  I respect your role.  I'm not going to
trespass on your role, just as I expect you will respect my
role, which is to instruct you on the law, and you will not

D3itdor2

1   substitute your views on the law for my instructions.  I

2   wouldn't presume to tell you anything about the facts, so don't

3   think that I even have opinions on the facts.

4           Finally, the personalities and the conduct of counsel,

5   the lawyers, are not in any way an issue in this case.  If you

6   formed opinions of any kind about any of the lawyers, favorable

7   or unfavorable, whether you approved or disapproved of their

8   behavior at trial, those opinions cannot and should not enter

9   into your deliberations.

10          Now I want to give you a few instruction as to how you

11  may determine whether witnesses are credible and reliable,

12  whether the witnesses told the truth at this trial, and whether

13  they knew what they were talking about.  How do you determine

14  that?  Well, it's really just a question of using your common

15  sense, your good judgment, and your experience.

16          First, you should be consider how well a witness was

17  able to observe or hear what he or she testified about.  The

18  witness may be honest, but mistaken.  How did the witness's

19  testimony impress you?  Did the witness appear to be testifying

20  honestly or candidly?  Were the witness's answers direct or

21  were they evasive?  Consider the witness's demeanor, manner of

22  testifying, and the strength and accuracy of the witness's

23  recollection.  Consider whether any outside factors might have

24  affected a witness's ability to perceive events.

25          Consider the substance of the testimony.  How does the

witness's testimony compare with other proof in the case?  Is
it corroborated or is it contradicted by other evidence?  If
there was a conflict, does any version appear reliable, if so,
which version seems more reliable?

In addition, you may consider whether a witness has
any possible bias or relationship with a party or any possible
interest in the outcome of the case.  Such a bias or
relationship does not necessarily make that witness unworthy of
belief, these are simply factors that you may consider.

If a witness made statements in the past that are
inconsistent with his or her testimony during the trial
concerning facts that are at issue here, you may consider that
fact in deciding how much of the testimony, if any, to believe.
In making this determination, you may consider whether the
witness purposefully made a false statement or whether it was
an innocent mistake.  You may also consider whether the
inconsistency concerns an important fact or merely a small
detail, as well as whether the witness had an explanation for
the inconsistency, and if so, whether that explanation appealed
to your common sense.

If you find that a witness has testified falsely as to
any material fact, or if you find that a witness has been
previously untruthful when testifying under oath or otherwise,
you may accept that witness's testimony in its entirety, or you
may accept only those parts that you believe to be truthful or

D3itdor2

1    that are corroborated by other independent evidence in the

2    case.  That's all up to you.

3         Now under your oath as jurors, you are not to be

4    swayed by sympathy.  You are to be guided solely by the

5    evidence in this case, and the crucial question that you must

6    ask yourself as you is sift through the evidence is this:  Has

7    the prosecution proved the defendant's guilt beyond a

8    reasonable doubt.

9         It's for you and you alone to the decide whether the

10   prosecution has proved that the defendants are guilty of the

11   crimes charged solely on the basis of the evidence and subject

12   to the law as I instructed you.  It must be clear to you that

13   once you let fear, prejudice, bias, or sympathy interfere with

14   your thinking, there is a risk that you will not arrive at a

15   true and just verdict.

16        If you have a reasonable doubt as to a particular

17   defendant's guilt, then you must render a verdict of acquittal

18   on the charge against that particular defendant.  On the other

19   hand, if you find that the prosecution has met its burden of

20   proving the guilt of a particular defendant beyond a reasonable

21   doubt with respect to a particular count, then you should not

22   hesitate because of sympathy or any other reason to render a

23   verdict of guilty on that charge against that particular

24   defendant.

25        I also caution you that under your oath as jurors, you

D3itdor2

cannot allow a consideration of the punishment that may be

imposed on the defendants if they are convicted to enter into

your deliberations.  The duty of imposing sentence in the event

of conviction rests exclusively upon the Court, and the issue

of punishment may not affect your deliberations as to whether

the government has proven the defendants' guilt beyond a

reasonable doubt.

Now your verdict must be unanimous with respect to

each count.  Each juror is entitled to his or her own opinion,

but you are required to exchange your views with your fellow

jurors.  This is the very essence of jury deliberation.  It is

your duty to discuss the evidence.  If you have a point of

view, and after reasoning with other jurors it appears that

your own judgment is open to question, then, of course, you

should not hesitate in yielding your own original point of view

if you're convinced that the opposite point of view is really

one that satisfies your judgment and your conscience.  However,

you are not to given up a point of view that you

conscientiously believe in simply because you're outnumbered or

outweighed.  You should vote with the others only if you

convinced on the evidence, the facts, and the law that it is

the correct way to decide the case.

Remember, at all times, not partisans.  You are

judges, judges of the facts.  Your sole interest is to seek the

truth from the evidence in this case.

D3itdor2

       Now I want to move from those general instructions to
the substantive instructions about the charges in the
indictment.

       As I told you before, the defendants are formally
charged in an indictment.  As I instructed you at the outset of
the case, the indictment is merely a charge or an accusation.
It's not evidence, and it does not prove or even indicate
guilt.  As a result, you are to give it no weight in deciding
the defendants' guilt.  What matters is the evidence you heard
at the trial.  Indeed, as I previously noted, the defendants
are presumed innocent, and it's the prosecution's burden to
prove each of the defendant's guilt beyond a reasonable doubt.

       Now the indictment in this case contains seven counts.
Each count charges a separate offense or crime.  Each count
must therefore be considered separately by you, and must return
a separate verdict on each count.

       Count One of the indictment charges that from in or
about 2010, up to and including in or about January 2012, the
defendants conspired or agreed with each other and with other
individuals to commit robbery, specifically to commit robberies
of individuals believed to possess business proceeds of
commercial establishments that sold goods and used materials
that had traveled in interstate commerce.

       Count Two charges that from in or about 2010, up to
and including in or about January 2012, during and in relation

D3itdor2

to the robbery conspiracy charged in Count One of the

indictment, the defendants knowingly did use and carry

firearms, and in furtherance of such crime, did possess

firearms and did aid and abet the use, carrying, and possession

of firearms which were discharged.

Count Three charges that on or about October 29, 2011,

the defendants Dore and Barrett committed robbery,

specifically, a gunpoint robbery of an individual who owns a

poultry market that sells goods in interstate commerce inside

of an apartment in the vicinity of Radcliff Avenue in the

Bronx.  During that robbery, approximately $15,000 in business

proceeds were taken.  That's Count Three.

Count Four charges that on or about October 29, 2011,

the defendants Dore and Barrett, during and in relation to the

robbery charged in Count Three, knowingly did use and carry

firearms, and, in furtherance of such crime, did possess

firearms, and did aid and abet the use, carrying, and

possession of firearms which were brandished.

Count Five charges that on or about December 12, 2011,

defendants Dore and Barrett committed robbery, specifically,

Dore and Barrett robbed at gunpoint three victims engaged in a

transaction involving the sale of cigarettes in the vicinity of

267 South Fourth Avenue in Mount Vernon, New York, during which

robbery one of the victims was shot and killed.

Count Six charges that on or about December 12, 2011,

D3itdor2

defendants Dore and Barrett, during and in relation to the

robbery charged in Count Five, knowingly did use and carry

firearms, and, in furtherance of such crime, did possess

firearms, and did aid and abet the use, carrying and possession

of firearms, which were discharged.

Finally Count Seven charges that on or about

December 12, 2011, defendants Dore and Barrett, during and in

relation to the robbery charged in Count Five of the

indictment, did use and carry a firearm, and in furtherance of

such crime, did possess a firearm, and did aid and abet the

use, carrying, and possession of a firearm, and in the course

of that crime, did cause the death of a person through the use

of a firearm, specifically, that Dore and Barrett robbed at

gunpoint three victims engaged in the transaction involved the

sale of cigarettes in the vicinity of 267 South Fourth Avenue

in Mount Vernon, New York, during which robbery one of the

victims was shot and killed.

As I just indicated, the indictment contains a total

of seven counts. Each count constitutes a separate offense or

crime, and you must consider each count of the indictment

separately. I'm going to send you a copy of the indictment.

It will be in your binder. So you don't have to write it all

down if you don't want to. You certainly are free to take

notes now, as you did during the trial, but I will give a copy

of the indictment.

D3itdor2

         We'll talk about Count One the robbery conspiracy.
The first count of indictment charges that the defendants
violated Section 1951 of Title 18 of the United States Code.
That section provides as follows.  I'm quoting now from the
code, the law passed by Congress:

         "Whoever in any way or degree obstructs, delays, or
affects commerce or the movement of any article or commodity in
commerce, by robbery or extortion or attempts or conspires to
do so, or commits or threatens physical violence to any person
or property in furtherance of a plan or purpose to do anything
in violation of this section, shall be guilty of a crime."

         Now Count One charges specifically, I'm now going read
from the indictment, as follows:

         "From at least in or about 2010, up to and including
in or about January 2012, in the Southern District of New York
and elsewhere, Jermaine Dore, also known as "St. Kitts," also
known as "Blaqs," and Dwayne Barrett, also known as "Tall Man,"
the defendants, and others known and unknown, unlawfully and
knowingly did combine, conspire, confederate, and agree
together and with each other to commit robbery, as that term is
defined in Title 18, United States Code, Section 1951(b)(1),
and would and did thereby obstruct, delay, and affect commerce
and the movement of articles and commodities in commerce, as
that term is defined in Title 18, United States Code, Section
1951(b)(3), to wit, Dore and Barrett agreed to commit robberies

1    of individuals and businesses involved in commercial activities

2    that affected interstate commerce."

3            So now let me instructed you on the law of conspiracy.

4    A conspiracy is a crime kind of criminal partnership, an

5    agreement of two or more persons to join together to accomplish

6    some unlawful purpose.

7            The crime of conspiracy to commit robbery is an

8    independent offense separate and distinct from an actual

9    robbery offense.  Indeed, you may find that the defendants

10   guilty of the crime of conspiracy to commit robbery even if

11   there was no actual robbery committed.  Congress has deemed it

12   appropriate to make conspiracy standing alone a separate crime,

13   even if a conspiracy is not successful and no robberies were

14   ever committed.

15           Now to meet its burden of proving the robbery

16   conspiracy charged in Count One, the prosecution must prove the

17   following two elements beyond a reasonable doubt:

18           First, the prosecution must prove the existence of the

19   robbery conspiracy charged in Count One.  And second, the

20   prosecution must prove that the particular defendant you are

21   considering knowingly became a member of the conspiracy.

22           Two elements, and I'm now going to through each of

23   these elements separately.  As to Count One, the first element

24   the prosecution must prove beyond a reasonable doubt is the

25   existence of a conspiracy that had as its object the illegal

D3itdor2

1  purposes charged in the indictment.

2          Now a conspiracy is a combination, agreement, or

3  understanding of two or more persons to accomplish by concerted

4  action a criminal or unlawful purpose.  The unlawful purpose

5  alleged to have been the object of the conspiracy charged in

6  Count One, is the commission of a robbery or robberies.

7          The gist or the essence of the crime of conspiracy is

8  an unlawful agreement between two or more people, not including

9  a government agent, to violate the law.  The first element of

10  the crime of conspiracy thus has two parts, first an agreement,

11  and second, an illegal object of the conspiracy, illegal object

12  of the agreement.

13          I'm now going to describe both parts of this element,

14  the first element to you.

15          First, to meet its burden of proof on this element,

16  the prosecution must show that there was an agreement.

17  However, the government is not required to show that two or

18  more people sat around a table and entered into a solemn pact,

19  orally or in writing, stating that they had formed a conspiracy

20  to violate the law and spelling out all the details of the

21  plans and the means by which the unlawful project was to be

22  carried out or the part that each of the persons who is a party

23  to the conspiracy was going to play.  Indeed, it would be quite

24  extraordinary if there were ever such a formal document or

25  specific oral agreement.

D3itdor2

 1          Common sense will tell you that when people in fact

 2     undertake to enter into a criminal conspiracy, much is left to

 3     the unexpressed understanding.  Conspirators do not usually

 4     reduce their agreements to writing.  They don't typically

 5     publicly broadcast their plans.  By its very nature, a

 6     conspiracy is almost always secret in its origin and execution.

 7          It is enough if two or more people in some way or

 8     manner impliedly or tacitly come to an understanding to violate

 9     the law.  Express language or specific words are not required

10     to indicate assent or agreement to form the conspiracy.  You

11     need only find that two or more people entered into the

12     unlawful agreement alleged in Count One in order to find that a

13     conspiracy existed.

14          In determining whether there has been an unlawful

15     agreement as alleged in Count One, you may judge the proven

16     acts and conduct of the alleged co-conspirators that were taken

17     to carry out the apparent criminal purpose.  The old adage,

18     "Actions speak louder than words," is applicable here.  Often

19     the only evidence that is available is that of disconnected

20     acts that, when taken together with one another, show a

21     agreement or conspiracy to secure a particular result just as

22     satisfactorily and conclusively as more direct proof.

23          When people enter into a conspiracy to accomplish an

24     unlawful end, they become agents or partners of one another in

25     carrying out the conspiracy.  In determining the factual issues

D3itdor2

1  before you, you may take into account against the defendant any

2  acts done or statements made by any of the alleged

3  co-conspirators during the course of conspiracy, even though

4  such acts or statements were not made in the presence of the

5  defendant, or were made with without his knowledge.

6      Of course, proof concerning the accomplishment of the

7  object of the conspiracy may be the most persuasive evidence

8  that the conspiracy itself existed, but it's not necessary, as

9  I said, that the conspiracy actually succeeded for you to

10  conclude that it existed.  In deciding whether the conspiracy

11  charged in Count One existed, you may consider all the evidence

12  of the acts, conduct, and statements of the alleged

13  conspirators, and the reasonable inferences to be drawn from

14  that evidence.

15      It is sufficient to establish the existence of a

16  conspiracy if, after considering all of the relevant evidence,

17  you find beyond a reasonable doubt that the minds of at least

18  two alleged conspirators met in an understanding way and that

19  they agreed, as I explained, to work together to accomplish the

20  object or objective of the conspiracy charged in Count One.

21      In short, the prosecution must prove beyond a

22  reasonable doubt that at least two alleged conspirators came to

23  a mutual understanding, either spoken or unspoken, to commit a

24  robbery or robberies in the manner charged in Count One.

25      Now the second part of the first element relates to

D3itdor2

the object or the objective of the conspiracy.  Count One of
the indictment charges that the object of the conspiracy was to
commit a robbery or robberies.  Specifically, I'm now going to
read from the indictment again, the prosecution alleged that:

"Dore and Barrett agreed to commit robberies of
individuals and businesses involved in commercial activities
that affected interstate commerce."

Now a robbery is the unlawful taking of personal
property from another against his or her will.  This is done by
threatening or actually using force, violence, or fear of
injury, immediately or in the future, to person or property.

In order to find the defendants conspired to commit
robbery, you must find that the government proved beyond a
reasonable doubt that the object of the conspiracy was to
either obtain or take personal property from another or from
the presence of another -- not either or, let me start over.

You must find the government proved beyond a
reasonable doubt that the object of the conspiracy was to:
(1), obtain or take the personal property of another, or from
the presence of another, or attempts to do so, (2), against the
intended victim's will by actual or threatened force, violence
or fear of injury, whether immediate or in the future, (3),
such that the co-conspirators' actions would have in any way or
degree obstructed, delayed, or affected interstate commerce.

Now I will discuss these elements in detail in a few

D3itdor2

minutes, when I explain the elements of the substantive robbery

counts, Counts Three and Five, so I will come back to that.

But for now we'll focus on the second element of the

conspiracy, membership in the conspiracy.

          If you conclude that the prosecution has proven beyond

a reasonable doubt that the conspiracy charged in the

indictment existed, and that the conspiracy had as its object

the illegal purpose charged in the indictment, then you must

next determine the second question, which is whether the

particular defendant you are considering participated in the

conspiracy with knowledge of its unlawful purpose and in

furtherance of issue unlawful objective.

          The prosecution must prove beyond a reasonable doubt

that each defendant unlawfully and knowingly entered into the

conspiracy, that is, with a purpose to violate the law, and

that each defendant agreed to take part in the conspiracy to

promote and cooperate in its unlawful objective.

          The terms "unlawfully"and "knowingly" are used because

if you find that the particular defendant you are considering

did join the conspiracy, you must also consider whether the

prosecution has proven beyond a reasonable doubt that in so

doing the defendant knew what he was doing.  In other words,

the government must prove beyond a reasonable doubt that the

defendant joined the conspiracy deliberately and voluntarily.

          "Unlawfully" simply means contrary to law.  The

D3itdor2

1    defendants need not have known they were breaking any

2    particular law, but they must have been aware of the generally

3    unlawful nature of their acts.

4         An act is done "knowingly" if it's done deliberately

5    and purposely; that is, the defendants' acts must have been the

6    product of the defendants' conscious objective rather than the

7    product of a mistake or accident or mere negligence or some

8    other innocent reason.

9         Knowledge, of course, is a matter of inference from

10   the proven facts.  Science has not yet determined a manner to

11   look into a person's mind and know what he or she is thinking.

12   You do have before you the evidence of acts alleged to have

13   taken place by or with the defendants or in their presence.

14   The government contends that these acts show beyond a

15   reasonable doubt the defendants' knowledge of the unlawful

16   purpose of the conspiracy.

17        Each of the defendants denies that he was a member of

18   the conspiracy.  Specifically, the defendants denied that they

19   committed the alleged acts -- excuse me, the acts alleged by

20   the prosecution to be sufficient that they knowingly joined the

21   charged conspiracy.  It is for to you determine whether the

22   prosecution has established beyond a reasonable doubt that the

23   defendants possessed such knowledge and such intent.

24        It's not necessary for the prosecution to show that

25   the defendants were fully informed as to all the details of the

D3itdor2

1    conspiracy in order for you to infer knowledge on the part of

2    the defendants.  To have guilty knowledge, the defendant did

3    not need to know the full extent of the conspiracy or all the

4    activities of all the conspiracy's participants.  Similarly,

5    it's not necessary for each of the defendants to have known

6    every other member of the conspiracy.  In fact, any particular

7    defendant may know only one other member of the conspiracy and

8    may still be considered a conspirator.  Nor is it necessary for

9    the defendants to have received any monetary benefit from their

10   participation in the conspiracy, or to have financial stake in

11   the outcome of the alleged joint venture.  It is enough if the

12   defendants participated in the conspiracy unlawfully and

13   knowingly, as I defined those terms.

14        The duration and extent of the defendants'

15   participation has no bearing on the issue of the defendant's

16   guilt.  The defendant you are considering need not have joined

17   the conspiracy at the outset.  The defendant may have joined

18   the conspiracy at any time in its progress and the defendant

19   will be held responsible for all that was done before he joined

20   and all that was done during the conspiracy's existence while

21   he was a member.  Each member of a conspiracy may perform

22   separate and distinct acts.  Some conspirators play major roles

23   while others play minor roles in the scheme.  An equal role is

24   not what the law requires.  In fact, even a single act may be

25   sufficient to draw the defendant you are considering within the

D3itdor2

scope of the conspiracy.

However, I want to caution you that a person's mere association with a member of a conspiracy does not make that person a member of the conspiracy, even when that association is coupled with knowledge that a conspiracy is taking place. Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.  In other words, knowledge without agreement and participation is not sufficient.  What is necessary is that the defendant you are considering joined in the conspiracy with knowledge of its unlawful purposes and with an intent to aid in the accomplishment of its unlawful objectives.

In sum, the prosecution must prove beyond a reasonable doubt that the defendant you are considering, with an understanding of the unlawful character of the conspiracy, knowingly engaged, advised, or assisted in the conspiracy for the purpose of committing a robbery or robberies.  The defendant thereby became a knowing and willing participant in the unlawful agreement, that is to say, he became a conspirator.

Once a conspiracy is formed, it is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by the members.  So too, once a person is found to be a member of a conspiracy, he or

D3itdor2

she is presumed to continue as a member of the conspiracy until
the conspiracy is terminated, unless it is shown by some
affirmative proof that the person withdraw or disassociated
himself or herself from it.

      Now Count One of the indictment contains a section
entitled "Overt Acts."  As I said, you'll have a copy of the
indictment while you're in your deliberations.  Although the
indictment lists overt acts, the prosecution need not prove
that the defendants or any accomplice committed any overt act.
As I told you, to prove a conspiracy, the prosecution need only
prove the unlawful agreement, and the defendants' knowing
participation in the conspiracy.

      Now the indictment charges that the alleged conspiracy
existed from in or about 2010 up to and including in or about
January of 2012.  It is not essential that the prosecution
prove that the conspiracy alleged started and ended on any
specific dates.  Indeed, it's sufficient if you find that the
conspiracy was formed, and that it existed for some time within
or around the dates set forth in the indictment.

      This is also a good opportunity to instruct you that
it does not matter if a specific event or transaction is
alleged to have occurred on or about a certain date and the
evidence indicates that it in fact occurred on another date.
The law only requires substantial similarity between the dates
alleged in the indictment and the dates established by the

D3itdor2

1    testimony and other evidence.

2            Now the government has alleged the existence of only

3    one overall conspiracy.  Whether there existed a single

4    unlawful agreement, or many such agreements, or indeed, no

5    agreement at all, is a question of fact for you the jury.  If

6    two or more people joined together to further one common

7    unlawful design or purpose, a single conspiracy exists.  By way

8    of contrast, multiple conspiracies exist where there are

9    separate unlawful agreements to achieve distinct purposes.

10           As I've explained, if you find that the single alleged

11   conspiracy did not exist, you cannot find any defendant guilty

12   of the single conspiracy charged in the indictment.  This is so

13   even if you find that some conspiracy other than the one

14   charged in this indictment existed, even though the purposes of

15   both conspiracies may have been the same, and even though there

16   may have been some overlap in membership.  Similarly, if you

17   find that a particular defendant was a member of another

18   conspiracy and not the one charged in the indictment, then you

19   must acquit the defendant on the conspiracy charged.

20           Therefore, what you must do is determine whether the

21   conspiracy charged in the indictment existed.  If it did, you

22   then must determine the nature of the conspiracy and who were

23   its members.

24           I'm now going to turn to Counts Three and Five of the

25   indictment which allege that the defendants committed two

D3itdor2

1  particular robberies.

2         Specifically, Count Three of the indictment charges

3  that on or about October 29, 2011, defendants Dore and Barrett

4  committed robbery, specifically a gunpoint robbery of an

5  individual who owns a poultry market that sells goods in

6  interstate commerce inside an apartment in the vicinity of

7  Radcliff Avenue in the Bronx, during which robbery

8  approximately $15,000 in business proceeds were taken.  That's

9  Count Three.

10         Count Five charges that on or about December 12, 2011,

11  defendants Dore and Barrett committed robbery, specifically

12  that Dore and Barrett robbed at gunpoint three victims engaged

13  in a transaction involving the sale of cigarettes in the

14  vicinity of 267 South Fourth Avenue in Mount Vernon, New York,

15  during which robbery one of the victims was shot and killed.

16         Both of these counts also alleged the defendants aided

17  and abetted with the commission of the robbery.  In considering

18  each of these counts, you should apply the instructions on

19  aiding and abetting that I will give you later on in my

20  instructions.

21         Now to sustain its burden of proof on Counts Three and

22  Five, the government must prove beyond a reasonable doubt each

23  of the following elements:

24         First, that the defendants obtained or took the

25  property of another, or for an attempted robbery, attempted to

D3itdor2

do so.

Second, that the defendants did so against the victim's will by actual or threatened force, violence, or fear of injury, whether immediate or in the future.

Third, that the defendants' actions actually or potentially, in any way or degree, obstructed, delayed, or affected interstate commerce.

And fourth, that the defendants acted unlawfully, and knowingly.

So let's take those one at a time.

The first element that the government must prove beyond a reasonable doubt for Counts Three and Five is that the defendants knowingly obtained the personal property of another, or from the presence of another, or for an attempted robbery, attempted do so. The term "property" includes tangible and intangible things of value. In this case, the government alleges that the object of the robbery charged in Count Three was the business proceeds from a poultry market, and that the object of the robbery charged in Count Four was the proceeds from a transaction involving the sale of cigarettes. So that's the first element.

The second element that the government must prove beyond a reasonable doubt in the robbery charges is that the defendants took or attempted to take -- for attempted robbery, attempted to take -- the personal property of another against

the victim's will by actual or threatened force, violence, or
fear of injury, whether immediate or in the future.

It is net necessary that the government prove that
force, violence, and fear were all used or threatened.  The
government satisfies its burden in this regard if it proves
beyond a reasonable doubt that any of these methods was
employed.

In considering whether the defendants, or those they
were aiding and abetting, used or threatened to use force,
violence, or fear, you should give those words their common and
ordinary meaning and understand them as you normally would.
The violence does not have to be directed at the person whose
property was taken.  The use of a threat or force or violence
might be aimed at a third person.  A threat may be made
verbally or by a physical gesture.  Whether a statement or
physical gesture by the defendants actually was a threat
depends on the surrounding circumstances.

Fear exists if at least one victim experiences
anxiety, concern, or worry over expected personal harm.  The
existence of fear must be determined by the facts existing at
the time of the defendant's actions.

Your decision as to whether the defendants, or those
that were aiding and abetting, used or threatened fear of
injury involves a decision about the victim's state of mind at
the time of the defendants' actions.  It is obviously

D3itdor2

1    impossible to ascertain or prove directly a person's subjective

2    feeling.  You cannot look into a person's mind to see what his

3    or her state of mind was, but a careful consideration of the

4    circumstances and the evidence should enable you to decide

5    whether fear would reasonably have been the victim's state of

6    mind.

7         Looking at the situation and the actions of people

8    involved may help you determine what their state of mind was.

9    You can consider this kind of evidence -- what I previously

10   referred to as circumstantial evidence -- in deciding whether

11   property was obtained by the defendants through the use or

12   threat of force.  You also heard the testimony of witnesses

13   describing their state of mind, that is, how they felt at a

14   certain moment of time.  This testimony was admitted to help

15   you in deciding whether their property was obtained by fear.

16   You should consider this testimony for that purpose only.

17        It is not necessary that the fear be a consequence of

18   a direct threat; it is sufficient that the surrounding

19   circumstances render the victim's fear reasonable.  You must

20   mind that a reasonable person would have been fearful under the

21   circumstances.

22        Let me now move to the third element for Counts Three

23   and Five.

24        The third element that the government must prove for

25   each of the robbery counts is that the robbery or attempted

D3itdor2

robbery affected interstate or foreign commerce.  The

requirement of showing an effect on commerce involves only a

minimal burden of proving a connection to interstate commerce

and is satisfied by conduct that affects commerce in any way or

degree.  The requirement may be satisfied by a showing of a

very slight effect on interstate commerce.  Even a potential or

subtle effect on commerce will suffice.

            With regard to this element, it is not necessary for

the government to prove that commerce actually was affected by

the defendants' conduct.  It is sufficient if the alleged

robbery or attempted robbery possibly or potentially would have

affected interstate or foreign commerce.

            It is also not necessary for you to find that the

defendants intended or anticipated that the effect of their

acts, or the acts of those whom they aided and abetted, would

be to affect interstate commerce, or that the defendants or

those whom they aided and abetted had or shared a purpose to

effect commerce.  All that is necessary is that the natural

effect of the acts committed by either of the defendants, or

those whom they aided and abetted, would affect interstate or

foreign commerce.

            Nor do you have to decide whether the effect on

interstate commerce was or would have been harmful or

beneficial to a particular business or to commerce in general.

The government satisfies its burden of proving an effect on

D3itdor2

commerce if it proves beyond a reasonable doubt any effect, whether harmful or not.

When considering this element, it's important for you to know that the commerce affected or potentially affected need not be lawful.  Activities affecting or potentially affecting unlawful interstate activity fall within the purview of this statute.

The fourth element that the government must establish beyond a reasonable doubt with respect to the robbery charges is that the defendants acted unlawfully and knowingly.  I have already explained those concepts to you, so you should follow my previous instructions on those charges.

All right.  I now want to turn to the firearms offenses charged in the indictment and instruct you on the elements of Counts Two, Four and Six.

Counts Two, Four and Six each allege a violation of Section 924(c) of the federal criminal code.  That provision makes it a crime for any person, "during and in relation to any crime of violence, to use or carry a firearm, or in furtherance of any such crime, to possess a firearm."

Count Two is a firearms count connected to the robbery conspiracy charged in Count One.  This means that you cannot consider Count Two unless you first determine that one or both of the defendants is guilty of the robbery conspiracy charged in Count One.

D3itdor2

1            Count Four is a firearms count connected to the

2     October 29, 2011 robbery charged in Count Three.  This means

3     that you cannot consider Count Four unless you first determine

4     that one or both of the defendants is guilty of the robbery

5     charged in Count Three.

6            Count Six is a firearms count connected to the

7     December 12, 2011 robbery charged in Count Five.  This means

8     that you cannot consider Count Six unless you first determine

9     that one or both of the defendants is guilty of the robbery

10    charged in Count Five.

11           Now to sustain its burden of proof with respect to

12    Counts Two, Four and Six, charging the defendants with

13    possession of a firearm during and in relation to a crime of

14    violence, the prosecution must prove the following three

15    elements beyond a reasonable doubt:

16           First, that on or about the dates alleged in the

17    indictment, the defendants used or carried or possessed a

18    firearm, or any combination of those acts, or aided and abetted

19    the use, carrying, and possession of a firearm by another.

20           And second, that the defendants used or carried the

21    firearm, or aided and abetted the use and carrying of the

22    foreman, during and in relation to the specified crime of

23    violence, or that the defendants possessed a firearm, or aided

24    and abetted the possession of a firearm, in furtherance of

25    those same crimes.

D3itdor2

         And third, that the defendants acted knowingly.

         Let's go to each one of these elements in turn.

         The first element that the government must prove
beyond a reasonable doubt on Counts Two, Four and Six is that
on or about the dates set forth in the indictment, the
defendants used, carried, or possessed a firearm.

         Now as used in the statute, the term "firearm" means
"any weapon which will or is designed to or may readily be
converted to expel a projectile by the action of an explosive."
I instruct you that a gun is a firearm.

         In considering the specific element of whether the
defendant used, carried, or possessed a firearm, it does not
matter whether the weapon was loaded or operable at the time of
the crime.  Operability is not relevant to your determination
of whether a weapon qualifies as a firearm.

         In order to prove that the defendants used the
firearm, the prosecution must prove beyond a reasonable doubt
that there was an active employment of the firearm by the
defendants during and in relation to the commission of a crime
of violence.  This does not mean that the defendants must have
actually fired or attempted to fire the weapon, although each
of those actions would obviously constitute use of the weapon.

         Brandishing, displaying or even referring to the
weapon so that others present knew that the defendants had the
firearm available, if needed, all constitute uses of a firearm.

D3itdor2

However, the mere possession of a firearm at or near the site
of the crime without active employment, as I just described
that term, is not sufficient to constitute use of a firearm.

In order to prove that the defendants carried a
firearm, the prosecution must prove beyond a reasonable doubt
that the particular defendant you are considering had a weapon
within his control so that it was available in such a way that
it furthered the commission of the crime.  The particular
defendant you are considering need not have held the firearm
physically or have had actual possession of it on his person.

If you find that the defendant you are considering had
dominion and control over the place where the firearm was
located, and had the power and intention to exercise control
over the firearm, and that the firearm was immediately
available to him in such a way that it furthered the commission
of the crime of violence, you may find that the prosecution has
proven that the particular defendant carried a firearm.

Now the legal concept of "possession" may differ from
everyday usage of the term, so let me explain that in some
detail.

Actual possession is what most of us think about as
possession.  That's having physical custody or control of an
object, like I have this pen.  That's actual possession.  If
you find that the defendant you are considering had the firearm
on his person, then you may find that the defendant had

D3itdor2

 1    possession of it.

 2           However, a person need not have actual physical

 3    possession, that is, physical custody of an object, in order to

 4    be in legal possession of it.  If a person has the ability to

 5    exercise substantial control over an object, even if he or she

 6    does not have the object in his physical custody, and that

 7    person has the intent to exercise such control, then the person

 8    is in possession of that article.  This is called constructive

 9    possession.

10           Control of an object may be demonstrated by the

11    existence of a working relationship between one person having

12    the power or ability to control the item and another person who

13    has actual physical custody.  A person having control possesses

14    the firearm because he or she has an effective working

15    relationship with a person who has actual physical custody of

16    the firearm, and because he or she can direct the movement or

17    transfer or disposition of the firearm.

18           In addition, an individual may have possession of an

19    item that is not found on his person because that individual

20    has a relationship to the location where the item is

21    maintained.  In this manner, for example, a business person may

22    possess things that are scattered throughout a number of stores

23    or offices or installations throughout the country.

24           More than one person can have control over the same

25    firearm.  The law recognizes that possession may be sole or

D3itdor2

1    joint.  If one person alone has actual or constructive

2    possession of a thing, possession is sole.  If more than one

3    person has possession of it, as I defined possession for you,

4    then possession is joint.  That's what is meant by

5    "possession."

6            Finally, possession and ownership are not the same

7    thing.  A person can possess an object and not be the owner of

8    the object.

9            Let me give you some examples of possession.  As I

10   said before, I have a pen in my hand.  There should be no doubt

11   that I physically possess this pen.

12           Another example:  Let's say I brought in some candy

13   today and I left it in my chambers across the street near my

14   other law clerks in my chambers.  Now my law clerks know they

15   can't eat all the candy, they need to leave some for me and

16   some for Aaron.  So I don't physically possess the candy, but I

17   do have control over.  Actually I brought a cake today, my wife

18   baked a cake over the weekend, so I brought it in.  There

19   better be some left.  That's the thing, I have control over the

20   cake.  I can be said to possess that cake jointly with my

21   clerks back in chambers.

22           Another example:  Say my grandmother left me some

23   jewelry when she died and it's now sitting in a safe deposit

24   box in the bank.  My siblings and I are the only ones that can

25   get into that box.  Do we have possession of the jewelry in the

D3itdor2

box?  Absolutely.  We have possession of it even though it's in

a safe deposit box miles from here.  It's not in our hands or

homes, but we have possession of it.

          I want to explain to you the concept of aiding and

abetting.  The defendants are charged with aiding and abetting

in each of the firearms counts in which they are charged.

Accordingly, it would be sufficient for this element if the

defendants aided and abetted another person in the use,

carrying, and possession of a firearm.  I'm going to instruct

you a little more fully on aiding and abetting in a few minutes

but for purposes of this element, I want to give you some

additional instruction that applies to aiding and abetting the

use, carrying of, or the possession of a firearm.

          In order to convict a particular defendant of aiding

and abetting another's use, carrying of, or possession of a

firearm, it is not enough to find that the defendant you are

considering performed an act to facilitate or encourage the

commission of the underlying crime of violence with only the

knowledge that a firearm would be used or carried in the

commission of that crime.  Instead, you must find that the

defendant performed some act that facilitated or encouraged the

actual using, carrying of, or possession of the firearm in

relation to the underlying crime.

          For example, if you find that the defendant you are

considering directed another person to use, carry or possession

D3itdor2

         a gun in the commission of the underlying crime, or made such a

         gun available to the other person, then the defendant aided and

         abetted the other person's use of the firearm.  Or if you find

         that a particular defendant was present at the scene during the

         commission of the underlying crime of violence, you may

         consider whether that defendant's conduct at the scene

         facilitated or promoting the carrying of a gun and thereby

         aided and abetted the other person's carrying of the firearm.

         These examples are only given only by way of illustration and

         are not meant to be exhaustive.

                The second element that the government must prove

         beyond a reasonable doubt with respect to firearms counts, Two,

         Four and Six, is that the defendant used, carried, or possessed

         a firearm during and in relation to a crime of violence or in

         furtherance of such a crime.

                "In relation to" means that the firearm must have had

         some purpose, role, or effect with respect to the crime of

         violence.

                The use, carrying, or possession of a firearm in

         furtherance of a crime of violence requires that the defendant

         used, carried, or possessed a firearm, and that it advanced or

         moved forward the crime.  The mere presence of a firearm is not

         enough.  The use, carrying, or possession in furtherance

         requires the use, carrying or possession was incident to and an

         essential part of the crime.  The firearm must have played some

D3itdor2

1   part in furthering the crime in order for this element to be

2   satisfied.

3            I instruct you that the robbery conspiracy alleged in

4   Count One and the robberies alleged in Counts Three and Five of

5   the indictment qualify under the law as crimes of violence for

6   which the defendants may be prosecuted in a court of the United

7   States.

8            Now the third element that the prosecution must prove

9   beyond a reasonable doubt with respect to Counts Two, Four and

10  Six is that the defendants knew that they were using, carrying,

11  or possessing a firearm, and that they acted knowingly in doing

12  so.

13           As I previously stated before, an act is done

14  knowingly if it is done purposely and deliberately.

15           So those are the gun counts.  I now want to turn to

16  Count Seven, the last count of the indictment.

17           Count Seven of the indictment charges that the

18  defendants violated Section 924(j) of Title 18 of the United

19  States Code.  That provision makes it a crime for any person,

20  "in the course of a violation of Section 924(c) to cause the

21  death of a person through the use of a firearm."

22           As I told you previously, Section 924(c) makes it a

23  crime for any person, during and in relation to any crime of

24  violence or drug trafficking crime, to use or carry a firearm,

25  or in furtherance of any such crime, to possess a firearm.

D3itdor2

1          Specifically, Count Seven charges, and I'm now reading

2     from the indictment:

3          "That on or about December 12, 2011, in the Southern

4     District of New York, Jermaine Dore, also known a "St. Kitts,"

5     also known as "Blaqs," and Dwayne Barrett, also known as "Tall

6     Man," the defendants, willfully and knowingly, during and in

7     relation to a crime of violence for which they may be

8     prosecuted in a court of the United States, namely a robbery

9     charged in Count Five of this indictment, did use and carry of

10    a firearm, and in furtherance of such crime, did possess a

11    firearm, and did aid and abet the use, carrying, and possession

12    of a firearm, and in the course of that crime, did cause the

13    death of a person through the use of a firearm, which killing

14    is murder as defined in Title 18, United States Code, Section

15    1111(a), to wit, in the vicinity of 267 South Fourth Avenue in

16    Mount Vernon, New York, Dore and Barrett robbed at gunpoint

17    three victims engaged in a transaction involving the sale of

18    cigarettes, during which robbery one of the victims was shot

19    and killed."

20         Now you may not consider Count Seven unless you first

21    determine that one or both of the defendants are guilty of the

22    robbery charged in Count Five, and the use, carrying, or

23    possession of a firearm in furtherance of that robbery charged

24    in Count Six.

25         There are prerequisites to Count Seven.  To convict

the defendants Dore and Barrett of Count Seven, the government

must prove each of the five following elements as to each

defendant.  You may recall that the first two elements are the

same as the first two elements of Count Six.

So the first element is on or about December 12, 2011,

the defendants used, carried, or possessed a firearm.

Second, the second element is that the defendants used

or carried a firearm during and in relation to a crime of

violence, or possessed a firearm in furtherance of such crime.

Third, the government must prove that the defendants

caused the death of a person through the use of a firearm.

Fourth, that the death of that person qualifies as a

murder, as I will define that term for you in a moment.

And fifth, that the defendants acted knowingly,

unlawfully and willfully.

The first element that the government must prove

beyond a reasonable doubt with respect to Count Seven is that

on or about December 12, 2011, the defendants used, carried, or

possessed a firearm.  I have already instructed you on the

definitions of these terms in my discussions on Counts Two,

Four and Six, so you should follow my instruction, it's the

same element.

The second element that the government must prove

beyond a reasonable doubt on Count Seven is that the defendant

you are considering used or carried of a firearm during and in

D3itdor2

relation to a crime of violence, or possessed a firearm in
furtherance of such crime.  I already instructed you on the
definition of these terms in my discussion of Counts Two, Four
and Six, so you should follow my instructions here, it's the
same.

          The third element that the government must prove
beyond a reasonable doubt on Count Seven is that the defendant
you are considering caused the death of another person through
the use of a firearm.  The defendant's conduct may be found to
cause the death of another individual if it had such an effect
in producing that individual's death as to lead a reasonable
person to regard the defendant's conduct as a cause of death.
The death of a person may have more than one cause.  You need
not find that the defendant are you considering shot the victim
or that he committed the final fatal act.  The government need
only prove that the conduct of the defendant you are
considering was a substantial factor in causing the victim's
death.

          The fourth element of Count Seven that the government
must prove beyond a reasonable doubt is that the death of the
person qualifies as a murder.  In considering Count Seven, you
should apply the following definition of murder which comes
from Section 1111 of the Federal Criminal Code.  That section
provides as follows, "Murder is the unlawful killing of a human
being with malice aforethought.  Every murder perpetrated by

D3itdor2

poison, lying in wait, or any other kind of willful,

deliberate, malicious, and premeditated killing, or committed

in the perpetration of or attempt to perpetrate certain crimes,

including robbery, qualifies as murder."

In this case, the government is proceeding on the last

theory of murder, also known as a felony murder, that is, the

killing took place while the defendants were perpetrating or

attempting to perpetrate the robbery on December 12, 2011.  To

be guilty of felony murder, the defendants do not have to set

out to the commit a murder.  It is enough if you determine that

the defendants set out to commit the robbery, and the death of

the victim occurred during the course of that robbery.

Now the final element that the government must prove

beyond a reasonable doubt on the firearm count alleged in Count

Seven is that the defendant you are considering knew that he

was using, carrying, or possessing a firearm, and that he acted

willfully in doing so.

To satisfy this element, you must find that the

defendant you are considering had knowledge that what he was

carrying or using was a firearm, as that term is generally

used.  An act is done knowingly if done purposefully and

voluntarily, as opposed to mistakenly or accidently.  You will

recall that I instructed you earlier that to determine that

someone acted knowingly requires you to make a finding as to

that person's state of mind.  In order for the government to

D3itdor2

1   satisfy this element, it must prove that the defendant you are

2   considering knew what he was doing.  For example, that he knew

3   that he was carrying or using a firearm in the commission of a

4   crime of violence.  It is not necessary, however, for the

5   government to prove that any defendant knew that he was

6   violating any particular law, nor is it necessary for the

7   government to prove that either defendant specifically intended

8   for the victim to be killed.

9        Now I want to go back to the concept of aiding and

10  abetting.  I told you about that before.  I want to instruct

11  you on the concept aiding and abetting -- well, with respect to

12  Counts Three and Five, that's the robbery counts, and then

13  Counts Two, Four and Six, those are the firearms charges, and

14  Count Seven, which is the murder charge, the defendants can be

15  convicted under a theory of criminal liability known as "aiding

16  and abetting" liability.

17       Aiding and abetting liability is its own theory of

18  criminal liability.  In effect, it's a theory of liability that

19  permits a defendant to be convicted of a specified crime if the

20  defendant, while not himself committing the crime, assisted

21  another person or persons in committing the crime.

22       Under the federal aiding and abetting statute, whoever

23  "aids, abets, counsels, commands, induces or procures" the

24  commission of an offense is punishable as a principal.  In

25  other words, it's not necessary for the government to show that

D3itdor2

1   the particular defendant you are considering physically

2   committed the crime in order for you to find that defendant

3   guilty.

4        If you do not find beyond a reasonable doubt that the

5   particular defendant you are considering physically committed a

6   crime, you may, under certain circumstances, still find that

7   defendant guilty of the crime as an aider and abettor.  A

8   person who aids and abets another person to commit an offense

9   is just as guilty of that offense as if he personally committed

10  it.  You may find the particular defendant you are considering

11  guilty of the substantive crime if you find beyond a reasonable

12  doubt that the government has proven that another person

13  actually committed the crime, and that the defendant you are

14  considering aided and abetted that person in the commission of

15  the offense.

16       As you can see, the first requirement is that another

17  person has committed the crime charged.  Obviously, no one can

18  be convicted of aiding and abetting the criminal acts of

19  another if no crime was committed by the other person.  But if

20  you do find that a crime was committed, then you must consider

21  whether the defendant you are considering aided and abetted the

22  commission of the crime.

23       To aid and abet another to commit a crime, it is

24  necessary that the defendant you are considering willfully and

25  knowingly associated himself in some way with the crime, and

D3itdor2

1    that that particular defendant willfully and knowingly sought

2    by some act to help make the crime succeed.

3            Participation in a crime is willful if action is taken

4    voluntarily and intentionally, or in the case of a failure to

5    act, with the specific intent to fail to do something the law

6    requires to be done, that is to say, with a bad purpose either

7    to disobey or to disregard the law.

8            The mere presence of a defendant where a crime is

9    being committed, even coupled with knowledge by the defendant

10   that a crime is being committed, or the mere acquiescence of a

11   defendant in the criminal acts of others, even with guilty

12   knowledge, is not sufficient to establish aiding and abetting.

13   An aider and abettor must have some interest in the criminal

14   venture.

15           To determine whether the defendant you are considering

16   aided and abetted the commission of the crime with which the

17   defendant is charged, ask yourself these questions:

18           First, did the defendant participate in the crime

19   charged as something he wished to bring about?

20           Second, did the defendant associate himself with the

21   criminal venture knowingly and willfully?

22           Third, did the defendant seek by his actions to make

23   the criminal venture succeed?

24           If so, then the defendant is an aider and abettor, and

25   therefore guilty of the offense.  If not, then the defendant is

D3itdor2

1     not an aider and abettor.  That's aiding and abetting.

2              There is another method by which you may evaluate the

3     possible guilt of the defendants to Count Four, the firearm

4     charge in connection with the October 29th, 2011 robbery, and

5     Counts Six and Seven, which is the firearm and murder charges

6     in connection with the December 12, 2011 robbery, this is even

7     if you do not find the government has satisfied its burden of

8     proof with respect to each element of the substantive crime

9     you're considering against a particular defendant.

10             So if, in light of my instructions, you find beyond a

11    reasonable doubt that the defendant you are considering was a

12    member of the robbery conspiracy charged in Count One, and that

13    the conspiracy included the substantive robbery crime on

14    October 29, 2011 -- that's Count Three -- then you may also,

15    but are not required to find that the defendant was guilty of

16    the corresponding firearms crime on that date, Count Four,

17    provided you find the elements I will lay out for you beyond a

18    reasonable doubt.  Similarly, if you find that the defendant

19    you are considering was a member of the robbery conspiracy

20    charged in Count One, and that the conspiracy included the

21    substantive robbery crime on December 12, 2011 -- that's Count

22    Five -- then you may also, but again are not required to, find

23    that the defendant is guilty of the corresponding firearms

24    crime on that date, which is Count Six, and the murder on that

25    the date, which is Count Seven, again, provided that you find

D3itdor2

each of the following elements beyond a reasonable doubt.

Those elements are the following:

First, that the crime charged in the substantive count was committed;

Second, that -- there's five elements for this form of liability, which is referred to as Pinkerton liability.

First, that the crime charged in the substantive count was committed;

Second, that the person or persons that you find actually committed the crime were members of the conspiracy you found existed in Count One;

Third, that the substantive crime was committed pursuant to the common plan and understanding you found to exist among the co-conspirators;

Fourth, that the defendant you are considering was a member of the conspiracy at the time the substantive crime was committed;

And fifth, that the defendant you are considering could reasonably have foreseen that the substantive crime might be committed by his co-conspirators.

If you find all five of these elements to exist beyond a reasonable doubt, then you may find that particular defendant guilty of the substantive crimes charged against him in Counts Four, Six and Seven, even though he did not personally participate in the acts constituting the crimes, or did not

D3itdor2

have actual knowledge of them.

          The reason for this rule is a co-conspirator who commits a substantive crime as part of a conspiracy is deemed to be the agent of the other co-conspirators.  Therefore, all of the co-conspirators bear criminal responsibility for the commission of the substantive crimes.

          If, however, you are not satisfied as to the existence of any of these five elements, you may not find the defendant that you are considering guilty of the substantive crimes in Counts Four, Six and Seven, unless the government proves beyond a reasonable doubt that the defendant you are considering personally committed or aided and abetted the commission of the crimes charged.

          All right.  In addition to the elements of each of the charges I just described, with respect to each crime charged in the indictment, you must also consider the issue of venue, namely whether any act in furtherance of the unlawful activity occurred within the Southern District of New York.

          Now the government need not prove that the crime itself was committed in the Southern District of New York, or that the defendant himself was present here.  It's sufficient if any act in furtherance of the crime occurred in this district.

          In this regard, I instruct you that the Southern District of New York includes Manhattan, the Bronx, and

D3itdor2

Westchester.  It also includes all the waters surrounding

Manhattan, Brooklyn, Staten Island, and Long Island, and the

air and bridges over those waters and the tunnels under those

waters.

I should note that on this issue, and on this issue

alone, the government need not prove venue beyond a reasonable

doubt but only by a preponderance of the evidence.  A

preponderance of the evidence means that the evidence shows it

is more likely than not that something occurred.  Thus,

government has satisfied its burden under the venue element if

you conclude that it is more likely than not that the crime

charged or any act in furtherance of the crime occurred in the

Southern District of New York.

If, on the other hand, you find that the government

has failed to prove this venue requirement by the preponderance

of the evidence, then you must acquit the defendants.

So those are the substantive counts.  That's my

instructions on the substantive law.

I have some final instructions I want to share with

you.  First, the indictment in this case refers to various

dates and amounts.  As I noted previously, it does not matter

if the indictment provides that specific conduct is alleged to

have taken place on a certain date and in fact the evidence

indicates it was in fact on another date.  The law only

requires a substantial similarity between the dates alleged in

D3itdor2

the indictment and the dates established by the evidence.

In this case you heard of evidence in the form of stipulations, the evidence, the actual paper, and you have heard them read.  A stipulation is simply an agreement between the parties.  The stipulations that you heard contain facts that were agreed to be true.  As a result, you must accept as true the facts contained in those stipulations.  However, it's for you to determine the weight, if any, to be given to those facts.

Now you heard references to certain investigative techniques that were used or not used by law enforcement authorities in this case.  There is no legal requirement that the government prove its case through any particular means. While you are to carefully consider the evidence presented by the government, you need not speculate as to why certain techniques were used and why others were not used.  The government is not on trial, and law enforcement techniques are not your concern.

Your concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of each of the defendants has been proven beyond a reasonable doubt.

You have heard testimony about evidence seized in connection with certain seizures and at the time the defendants were arrested.  The evidence obtained from these searches was properly admitted in this case and may properly be considered

D3itdor2

by you.  Whether you approve or disapprove of how this evidence
was obtained should not enter into your deliberations, because
I now instruct you that the government's use of this evidence
is entirely lawful.

You must, therefore, regardless of your personal
opinions, give this evidence full consideration along with all
the other evidence in the case in determining whether the
government has proven the defendant's guilt beyond a reasonable
doubt.

Some of the persons who may have been involved in the
events leading to this trial are not on trial.  This does not
matter.  There is he requirement that all members of a
conspiracy be charged or prosecuted or tried together in the
same proceeding.  You may not draw any inference, favorable or
unfavorable, towards the government or the defendants from the
fact that certain persons other than the defendants were not
named in the indictment, nor may you speculate as to the
reasons why other persons are not on trial.  Those matters are
wholly outside of your concern and have no bearing on your
function as jurors.  Whether a person should be named as a
co-conspirator or indicted as a defendant in this case or
another separate case is a matter within the sole discretion of
the United States attorney and the grand jury.  Therefore, you
may not consider it in any way in reaching your verdict as to
the defendants.

D3itdor2

Now you have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you there's nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  In fact, it would be unusual for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or nature of a witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

There are persons whose names you heard during the course of the trial but did not appear to testify.  I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.  Therefore, you should not draw any inference or reach any conclusion as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.  You should

D3itdor2

remember my instruction, however, that the law does not impose
on the defendant in a criminal case the burden or duty of
calling any witness or producing any evidence, and that it is
the government's burden to prove beyond a reasonable doubt each
count in the indictment as to each of the defendants.

The defendants did not testify in this case.  Under
our Constitution, a defendant has no obligation to testify or
present any evidence, because it is the government's burden to
prove the defendant guilty beyond a reasonable doubt.  That
burden remains with the government throughout the entire trial
and never shifts to the defendant.  A defendant is never
required to prove that he is innocent.

You may not attach any significance to the fact that
the defendants did not testify.  No adverse inference against
the defendants may be drawn by you because the defendants did
not take the witness stand.  You may not consider this against
the defendants in any way in your deliberations in the jury
room.

Now you have heard testimony of what we call an expert
witness in this case.  Ordinarily, witnesses are restricted to
testify concerning matters of fact.  There are occasions,
however, where there is some technical or other specialized
area of knowledge that will assist the jury in deciding a
disputed fact.  On those occasions, a witness who is specially
qualified by training, knowledge, experience, or education may

D3itdor2

1  be called to testify about some evidence or facts at issue in

2  the form of an opinion.

3          In weighing expert testimony, you may consider the

4  expert's qualifications, the opinion given, the witness's

5  reasons for testifying, as well as all the other considerations

6  that ordinarily apply when you are deciding whether to believe

7  a witness.  You may give expert testimony whatever weight, if

8  any, you find it deserves in light of all the other evidence

9  before you.  You should not, however, accept a witness's

10  testimony merely because he is an expert in a field.  Nor

11  should you substitute your own reason, judgment, and common

12  sense.  The determination of the facts in this case, again,

13  rests solely with you.

14          You've heard the testimony of law enforcement

15  witnesses.  The fact that a witness may be employed as a law

16  enforcement official or employee does not mean that his or her

17  testimony is necessarily deserving of more or less

18  consideration, or greater or lesser weight, than that of an

19  ordinary witness.

20          And in this context, defense counsel are allowed to

21  try to attack the credibility of such a witness on the ground

22  that his or her testimony may be colored by personal or

23  professional interest in outcome of a case.

24          It is for you to decide, after reviewing all of the

25  evidence, whether to accept the testimony of the law

D3itdor2

enforcement witnesses, as it is with every other type of witness, and give to that testimony the weight that you find it deserves.

As with any witness, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion.  Even if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or may disregard all of it.  That determination is entirely for you, the jury.

You've heard witnesses testify that they were involved in planning and carrying out certain crimes charged in the indictment.  Patrick Taylor testified that he entered into an agreement to plead guilty and cooperate with the government which included testifying at trial.  The government has agreed to bring his cooperation to the attention of the Court at his sentencing.

You also heard that Janiel Brown entered into an agreement with the government in which she agreed to testify at trial, and the government agreed not prosecute her.

Experience will tell you that the government frequently must rely on the testimony of witnesses who admit participating in the alleged crimes at issue.  The government must take its witnesses as it finds them and frequently must use such testimony in a criminal prosecution, because otherwise it would be difficult or impossible to detect and prosecute

D3itdor2

wrongdoers.

You may properly consider the testimony of such an accomplice.  Indeed, it is the law in federal courts that the testimony of a single accomplice witness may be enough in itself for conviction if the jury believes that the testimony establishes guilt beyond a reasonable doubt.

It is also the case that accomplice testimony is of such a nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe.  The fact that a witness is an accomplice can be considered by you as bearing upon his or her credibility.  It does not follow, however, that simply because a person has admitted to participating in one or more crimes that he or she is incapable of giving a truthful version of what happened.

Like the testimony of any other witness, accomplice witness testimony should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor and candor, the strength and accuracy of his recollection, his background, and the extent to which the testimony is or is not corroborated by other evidence in the case.

You may consider whether an accomplice witness, like any other witness called in the case, has an interest in the outcome of the case, and if so, whether it affected his or her

D3itdor2

testimony.

I caution you that it is no concern of yours why the government made an agreement with the witness.  Your sole concern is whether a witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of an accomplice witness, you should ask yourself whether the accomplice would benefit more by lying or by telling the truth.  Was his or her testimony made up in any way because he believed or hoped that he or she would benefit or receive favorable treatment by testifying falsely?  Or did he or she believe that his interests would be best served by testifying truthfully?  If you believe the witness was motivated by hopes of personal gain, was the motivation one that would cause him or her to lie, or was it one that would cause him or her to tell the truth?  Did this motivation color his or her testimony?

If you find that the testimony of the accomplice witness was false, you should reject it.  However, if after a cautious and careful examination of the accomplice witness's testimony and demeanor upon the witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act upon it accordingly.

Again, as with any witness, let me emphasize the issue of credibility need not be decided in an all-or-nothing fashion.  Even if you find that a witness testified falsely in

D3itdor2

1    one part, you may still accept his testimony in other parts, or

2    may disregard all of it.  That determination is, again,

3    entirely for you, the jury.

4        You also heard that testimony that an accomplice

5    witness, Patrick Taylor, pled guilty to charges arising out of

6    the same facts that are at issue in this case.  You are

7    instructed that you are to draw no conclusions or inferences of

8    any kind about the guilt of the defendants from the fact that a

9    prosecution witness pled guilty to similar charges.  The

10   decision of that witness to plead guilty was a personal

11   decision that he made about his own guilt.  It may not be used

12   by you in any way as evidence against or unfavorable to the

13   defendants on trial here.

14       OK.  Just a couple more instructions.

15       When you go back in the jury room, the first thing you

16   should do is by your own vote select one of your own members to

17   sit as your foreperson.  The foreperson will send out any

18   notes, and when the jury has reached a verdict, the foreperson

19   will notify the court security officer, who will be outside

20   your door, that the jury reached a verdict.  And when you come

21   to open court, the foreperson will be asked to state what the

22   verdict is.  Again, notes should be signed, and they should

23   include the date and time they were sent; signed by the

24   foreperson with the date and time they were sent.

25       You also should be as clear and precise as possible.

D3itdor2

1    Bear in mind any notes from the jury will be part of the record

2    in this case, so be as clear and specific as you can be in the

3    notes that you send.  I will be formal in the notes I send, and

4    you should be formal in the notes that you send to me.  They

5    will be part of the case as court exhibits.

6          Many of you have taken notes, handwritten notes,

7    throughout the proceedings, and that's fine.  I want to again

8    emphasize, however, as you begin your deliberations, that notes

9    are simply an aid to memory.  Notes that any of you may have

10   taken should not be given any greater weight or influence in

11   determination of the case than the recollections or impressions

12   of other jurors, either from notes or from memory.  Any

13   difference between a juror's recollection and another juror's

14   notes should be settled by referring to the transcript, because

15   it's the transcript, the court record, rather than any juror's

16   notes upon which the jury must base its determination of the

17   facts and its verdict.

18         Now as I told you before, I'm going to give you a list

19   of the witnesses who testified at trial, and of the exhibits

20   that were introduced as evidence.  You'll have those in the

21   jury room.  I will also give you a copy of the indictment, a

22   copy of my instructions on the law, and a verdict form.

23         If you want to see any of the exhibits or hear or read

24   any of the testimony during your deliberations, that can be

25   arranged.  Please appreciate, however, it's not always easy to

D3itdor2

 1    locate the testimony that you might want, so be as specific as

 2    you can.  So if you want to hear a particular snippet of

 3    testimony, tell us what part you want.  You might want the

 4    entire direct examination or the entire cross-examination, and

 5    that's fine.  But if you only want a subset of that, tell us

 6    what you want about a particular subject or about a particular

 7    event.  We will then find the relevant portion and send it back

 8    to you so you can refer to the transcript.

 9          Again, any communication with the Court should be made

10    in writing, should be signed by your foreperson with the date

11    and time indicated on it, and then given to the court security

12    officer, who is that gentleman in the back.  If it's not him,

13    it will be someone dressed just like him.

14          Now I will respond to any questions that you send to

15    me or any requests that you send to me in notes as promptly as

16    possible.  I will send you a note myself, or I will bring you

17    out and talk to you in person on the record.  But in any event,

18    do not tell me or anyone else how the jury stands on the issue

19    of determining guilt until after the verdict is received.  So

20    don't send me a note saying we agreed on Counts Two, Six and

21    Seven and we're only working on Four.  Don't do that.  Don't

22    tell me anything about your deliberations.

23          When you reached a verdict, you send a note that says

24    we reached a verdict, period.  Your foreperson will send that

25    note.  I will then bring you out, I will then ask the

D3itdor2

foreperson to hand me the verdict form, I will look at it, I will hand it back, and then I will have the foreperson read the verdict into the record.

So don't tell the court security officer or me or anyone else where you stand in your deliberations. When you have a verdict, simply say: We reached a verdict.

All right. Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. You heard me say that a few times. In reaching your decision as to whether or not the government sustained its burden of proof, it would be improper for you to consider any personal feelings, positive or negative, that you may have about the defendant's race, religion, national origin, sex or age. The defendants are entitled to a trial free from prejudice, and our jury system cannot work unless you reach your verdict after a fair and impartial consideration of the evidence; both parties, not just the defendants.

Now as I said, we prepared a verdict form for you to use in rendering your decision. After you reached a verdict, the foreperson should fill out the verdict form and sign it, and then send out a note saying we reached a verdict, don't put the verdict form into the envelope with the note, send a note saying we reached a verdict, and bring the verdict form with you when you come into court.

OK. Give that note to the court security officer, who

D3itdor2

 1    will be outside your door.  He'll be out there to make sure no

 2    one is going to mess with you.  And that's true in every case,

 3    civil or criminal, I make sure I charge a court security

 4    officer to make sure the jury can deliberate freely without any

 5    interference.

 6          I want to stress to you that each of you must be in

 7    agreement with the verdict that's announced in court.  Once

 8    your verdict is announced by your foreperson in open court and

 9    officially recorded, it can't ordinarily be revoked.  So in

10    fact I will ask you if that is your verdict when we announce

11    the verdict in open court.

12          OK.  I'm going to take a drink of water and talk to

13    the lawyers at the side bar and see if I missed anything or if

14    there's additional instructions I need to give you.  A little

15    more patience and then it will be yours.

16          (At side bar)

17          THE COURT:  Any corrections or clarifications?

18          MS. FONTIER:  Your Honor, just one typo that you

19    corrected when you read it at page 50.  It's page 50 in

20    paragraph A, the first element of government must prove beyond

21    a reasonable doubt on -- it refers to Count Seven, and your

22    Honor corrected that when you read it.

23          THE COURT:  It says Count Three.

24          MS. FONTIER:  It gets changed.

25          THE COURT:  OK.

1          MS. FONTIER:  That was my only thing I noted.  I would

2     just renew my objection to the Pinkerton charge.

3          THE COURT:  Your objection is preserved.

4          Anything else?

5          MS. MASELLA:  No, your Honor.

6          MR. ROTH:  What do you want to do about --

7          THE COURT:  I haven't found any clear authority, but

8     it does seem to me that residence has to be here, and seems to

9     me that he hasn't been in Westchester for two years, probably

10    we should err on the side of him not being here.

11         MR. ROTH:  What's the government's position?

12         MS. MASELLA:  We had someone else doing research at

13    the same time.  We were not able to come up with an answer, but

14    the safer course seems to dismiss him and use the alternate.

15         THE COURT:  OK.

16         MR. ROTH:  I think that's true.

17         MS. FONTIER:  Me too.

18         THE COURT:  OK.  I will do that.

19         I will give this last instruction and then I will

20    excuse them, bring Mr. Mills back and then --

21         MR. ROTH:  Are you going to tell the other jurors why

22    he's getting the boot?

23         THE COURT:  No.  So I think I'll do that before I do

24    the last bit here.

25         MR. ROTH:  They may think you're prejudiced against

D3itdor2

people who wear hoodies.

            THE COURT:  They may.

            (In open court)

            THE COURT:  All right, ladies and gentlemen, I'm going
to excuse you for one second, ask you to go back to the jury
room while I follow up on something.  Then I'm going bring you
back out and give you the last really page of instructions.  So
don't discuss the case yet.  Very, very close, I will be with
you shortly.

            (Jury not present)

            THE COURT:  All right.  This is obviously something
that we hadn't foreseen when we got up this morning.  I don't
think there's dispute about the facts.  Mr. Mills has been
residing outside of Westchester for two years or more, he has
been residing for the better part of the last year -- for more
than a year in Astoria, and nevertheless he references his
Westchester address as his official residence and that's where
he gets his mail.

            I haven't found any case that exactly on point.
There's a 1991 case in the Second Circuit where there's a juror
whose stated residence had formerly been part of the Southern
District, but at the time of the trial was no longer in the
Southern District, and the Circuit held that he could still
serve since nobody made an objection, and noted had an
objection been made there could have been a substitution with

1    an alternate jurors.  But there's no claim otherwise the juror

2    wasn't otherwise qualified to serve, so it wasn't deemed to be

3    error.

4         This is a little different because we know about it

5    before deliberations and think each counsel have expressed

6    their view that we ought to strike the juror.  I'm inclined to

7    agree.  I think there is some issue as to whether there's an

8    intent component to being a resident of a district.  It's not

9    exactly clear what Mr. Mills' intent is going forward.

10         So I'm looking at the statute.  In all criminal

11   prosecutions the defendant shall enjoy the right to an

12   impartial jury of the state and district where the crime has

13   been committed.  That's the language.  As I said, 28, USC, 1865

14   requires that the juror be 18 years or older and have resided

15   for more than a year in the district of residence.  So here we

16   don't have anything to suggest that he's been living here for

17   the last year, so I'm going to excuse him.

18         But anybody have any thoughts before I do that?

19         MS. MASELLA:  No, your Honor.

20         MR. ROTH:  Judge, well, I'll abide by the Court's

21   ruling.  We don't object to him sitting.

22         THE COURT:  You don't object to what?

23         MR. ROTH:  Him sitting.

24         THE COURT:  But you object to him being excused?  I

25   thought you that you suggested I should excuse him.

D3itdor2

  1              MR. ROTH:  Hearing your Honor's position, I think that

  2     it would be appropriate.

  3              THE COURT:  I want to make sure.

  4              MR. ROTH:  But if you found otherwise, we would not

  5     have an objection to him sitting.  We hadn't had the actual

  6     benefit of the decision that you referred to.

  7              THE COURT:  I'm looking at <u>United States v. Novod</u>,

  8     N-O-V-O-D, 923 F.2d 970, 1991 case.  I don't think this comes

  9     up that often, understandably.  So I'm going to excuse him

 10     since there's no objection, and in fact everyone agrees this is

 11     the safest course.  So let's bring out Mr. Mills.

 12              I feel bad.  Poor guy.

 13              (Juror present)

 14              THE COURT:  How are you, Mr. Mills?

 15              JUROR:  Doing good.

 16              THE COURT:  Have a seat.  OK.  I talked to the lawyers

 17     and looked at the law a little bit, and this is a situation

 18     where you have been residing outside of Westchester for the

 19     last two years or more, is that right?

 20              JUROR:  Yeah.

 21              THE COURT:  And do you have any intention to leave

 22     Astoria and go back to Westchester any time soon?

 23              JUROR:  No.

 24              THE COURT:  All right.  Well, because of that, I think

 25     I'm going to have to excuse you, because the law requires that

D3itdor2

```
 1     it be a jury of peers and a jury of people who are in the

 2     district.  And Astoria is in a different district in the

 3     Eastern District of New York, Queens, Brooklyn, Long Island,

 4     Staten Island, and part of the Eastern District of New York.

 5              So it breaks my heart to do this because I know you

 6     have been working very hard and been here the whole time paying

 7     careful attention and being a very committed juror, but this is

 8     I think something that is a legal issue that could have

 9     implications going forward, so I think the better course is to

10     be safe.  So I'm going to excuse you.

11              Let me ask you to do this, just don't discuss the case

12     until we have a verdict.  I will get back to you when we have a

13     verdict, but let me take this opportunity to thank you for your

14     service.  This is real service.  You heard my spiel at the

15     beginning of this trial, but it wasn't just talk.  I mean this

16     system only works because people are willing to commit

17     themselves and be dedicated to this process, and you did do

18     that.  I think going forward you probably should clarify what

19     your residence is going to be so you don't get sort of caught

20     between districts again, but you should, whenever you get

21     called, certainly count this as your experience and explain

22     that you served for two solid weeks -- a little more than two

23     weeks on a jury and then were excused because of this issue.

24              But I know I speak for all the parties and for the

25     entire Court when I say I thank you for your service.  You did
```

D3itdor2

1    a public service here at great inconvenience to yourself, and

2    that's something that you should be proud of.  And I hope maybe

3    we'll see you again, but if not, at least you carry that pride

4    with you.

5              OK.  So thanks very much.  I'm going to send you back

6    to the jury room and bring them out.  In fact, I will bring

7    them out and send you back in to get your stuff, and you're

8    free to go.  And I will give instructions to the jury clerk so

9    you're free to go once I bring them back in.  OK?

10             JUROR:  OK.  Should I wait here?

11             THE COURT:  Yeah, wait right there.

12             Thank you.  Let's bring in the jury.

13             (Jury present)

14             THE COURT:  All right.  At this time I'm afraid I will

15   have to excuse Mr. Mills.  I already thanked him for his

16   service, but I'm going to excuse him and put Ms. Boykin in seat

17   number three.  So your time has come, Ms. Boykin, you're in the

18   front row.

19             Mr. Mills, as I said before, thanks very much for your

20   service.  I'm going to excuse you now and you can go back to

21   the jury room and get your stuff, and then you're free to

22   resume your life.  Don't discuss with the case with anyone

23   until I get back to you with a verdict, and we'll be in touch

24   with respect to that.

25             Thank you.  All rise for Mr. Mills.

D3itdor2

1          Ms. Boykin, come on down.  So you are twelve.

2          The last bit of instruction that I have for you is

3   simply your function is now to weigh the evidence in this case

4   and determine the guilt of each of the defendants with respect

5   to the charges that are contained in the indictment.  You must

6   base your verdict, as I said, solely on the evidence or the

7   lack of evidence and on my instructions as to the law.  And

8   you're obliged by your oath as a juror to follow the law as I

9   instructed you, whether or not you agree with the particular

10  law in question.

11         In conclusion, I'm sure that if you listen to the

12  views of your fellow jurors and apply your own common sense,

13  you will reach a fair and just verdict.

14         It's 5:05.  I thought we would go to 5:30.  If you

15  want to go later, you're certainly free to, but I think we'll

16  go to 5:30 and then send a note indicating -- or before,

17  whether you want to go later today or continue tomorrow at

18  9:30.

19         Let me know in a note who you selected as a foreperson

20  and how late you want to go today, and if there are any

21  particular exhibits, let us know.  In the meantime, we'll get

22  together the binders that I mentioned and send those in.

23         OK.  So with that, do your duty.  Take this seriously.

24  Now finally you can begin your deliberations, and so treat each

25  other with respect and care.

D3itdor2

1          Let me remind you that your deliberations involve all

2     twelve of you, and so if it turns out that one of you is in the

3     bathroom, or tomorrow morning eleven of you are here and one

4     person is not here yet, don't deliberate.  You have to have all

5     twelve of you be present to deliberate.  That's the nature of

6     jury deliberation.  The twelve of you are this animal that is a

7     jury.  The eleven of you without the 12th is just eleven

8     individuals, so you can't do anything until after you are

9     present and all of you are participating.  With that, do your

10    duty.

11          Let me swear the court security officer.

12          This is the court security officer.  It will be him or

13    someone else dressed like him.  So in every case, civil or

14    criminal, the court security officer is assigned to make sure

15    the jury deliberates free from any interfering, so any notes

16    will go to and from him.  And tomorrow we'll give you menus and

17    you can order lunch again and, that will be your home away from

18    home in the jury room.

19          (Court security officer sworn)

20          THE COURT:  OK.  With that, ladies and gentlemen, you

21    can begin your deliberations.  Thank you very much.

22          (Jury retired to deliberated, time noted 5:07 p.m.)

23          (Jury not present)

24          THE COURT:  We'll make one change, I guess, to one

25    page of the instructions, and then we'll send those to the

D3itdor2

1    jury.

2           Anything else we should discuss while we're here?

3    Mr. Mills didn't look happy.

4           MS. FONTIER:  Totally out of my curiosity, is it

5    accurate -- for the venue, is it accurate that all of the water

6    around Brooklyn is part of the Southern District?  Because if

7    you got off the beach in Coney Island, are you in the Southern

8    District?

9           THE COURT:  I think there's Second Circuit case law to

10   that effect, yes.

11          MS. FONTIER:  Then I have no objection to it

12   whatsoever.

13          THE COURT:  It's not really relevant in this case.

14          MS. FONTIER:  Not even a little bit.

15          THE COURT:  OK.

16          MS. LESTER:  Your Honor, I'm sorry, actually I did

17   notice one additional -- I think it's a typographical error on

18   page 33 of the charge with respect to the first element of

19   robbery.  In the last sentence the charge references Count

20   Four, but I believe --

21          THE COURT:  33.

22          MS. LESTER:  In the top paragraph, the charge

23   references Count Four, but I believe it should be Count Five,

24   Counts Three and Five are the substantive robbery counts.

25          THE COURT:  I'm not sure, what paragraph again?

D3itdor2

1        MS. LESTER:  In paragraph A at the top of page 33,

2   robbery first element.

3        THE COURT:  Property of another, yes.

4        MS. LESTER:  The last sentence it references Count

5   Three and then Count Four but it should be Count Five.  The

6   other substantive robbery charge is Count Five, not Count Four.

7        THE COURT:  Yeah, OK, that's right.

8        MS. LESTER:  I think your Honor said Count Five.

9        THE COURT:  I think I may have.  I'm using a larger

10   print version, so I will make that change, page 33.  And the

11   other change was to what page?

12        MS. FONTIER:  50, your Honor.

13        THE COURT:  I will make those changes.  Put them in

14   binders and get them to the jury.

15        So stick around, we may get a request.  My hunch is we

16   won't get too far, but don't go anyplace.

17        MS. FONTIER:  I don't know what your Honor's normal

18   practice is with the verdict form, did we do anything with that

19   on the record?  I didn't have any objections to that.

20        THE COURT:  I think I sent it to you.  Are there any

21   objections to what was in it?

22        MS. FONTIER:  No, your Honor.

23        MS. LESTER:  Not from the government, your Honor.

24        THE COURT:  So the verdict form will go back and we'll

25   see what they have to say.

D3itdor2

1          While we're doing that, let me say I thought the

2     summations were all very strong and people really knew what

3     they were talking about.  Good use of the evidence.  The whole

4     trial I thought has been well tried, good lawyers, who are

5     conscientious.  So thank you for that, it makes my job easier.

6          With respect to Mr. Dore and Mr. Barrett, the waiting

7     is hard, so that's not lost on me either, but I hope that at

8     least you feel you got a fair trial.  That was certainly my

9     hope was to make sure I called them the way I saw them, like an

10    umpire.

11         So what happens now with the jury is it's up to them.

12    It's a stressful thing to be waiting around, so I'm

13    sympathetic.  It could be a couple of days, who knows what

14    happens, but thank you for your demeanor.  Mr. Dore, that one

15    outburst kind of annoyed me, but otherwise you guys were good.

16         With that, we'll just wait.

17         MS. FONTIER:  Thank you very much.

18         THE COURT:  Thanks.

19         (Recess taken)

20         (Continued on next page)

21

22

23

24

25

D3iWdor3

           THE COURT:  I have a jury note.  I'll mark it Court
Exhibit 1.  It says, "We, the jury, select Mr. Plavsic to be
our foreman.  We agree to leave today at 5:30 and resume
tomorrow at 9:30."

           I just want to send them a quick note back just saying
that's fine, I will bring you back into the courtroom to excuse
you with further instructions at 5:30, just so they don't leave
early.

           Counsel, I'm going to read this aloud now.  This is
what I'm going to send in to the jury, Court Exhibit 2, at
5:15:  "I received your note concerning your selection of a
foreperson and your request to stop deliberating at 5:30.  That
is fine.  I will bring you back into the courtroom at 5:30 to
give you some additional instructions."

           I just don't want them to try to slip out before I
dismiss them.  Is everybody okay with that?

           MS. FONTIER:  Yes, your Honor.

           (Recess pending verdict)

           THE COURT:  Can we bring out the defendants?

           (In open court; jury present)

           THE COURT:  Okay.  Have a seat.

           Mr. Plavsic, I got your note indicating that you have
been selected to be the foreperson and indicating that the jury
wished to leave tonight at 5:30 and resume tomorrow at 9:30,
which is fine.  So I wanted to give you a couple of parting

D3iWdor3

1    instructions.

2           Don't obviously discuss the case with anyone.  While

3    you're deliberating, the only discussions should be taking

4    place in the jury room.  Let's be ready to go tomorrow at 9:30.

5    What I'll ask you to do is just assemble in the jury room, but

6    don't resume your deliberations until you send me a note, from

7    Mr. Plavsic, saying we're all here and ready to resume our

8    deliberations and then I'll send you a note saying, You may now

9    begin.  I think if we do it with that kind of formality, it

10   will avoid any temptation to start early or to do things before

11   everybody's there.  Wait until you get that green light from me

12   and then resume your deliberations.

13          We're just making a couple of photocopies.  We don't

14   have your binders yet because we had a typo, but you'll have

15   the binders tomorrow morning, for sure.  Then to the extent you

16   need anything tomorrow, you'll just send us a note and we'll

17   send it in to you.  Okay?

18          With that, let me thank you.  It's been a long day, I

19   know, but tomorrow we'll start fresh at 9:30.  Okay?  Have a

20   good night.

21          (Jury excused)

22          THE COURT:  Okay.  Have a seat.

23          I think I neglected to read the jury note into the

24   record.  It was March 18, today's date, at 5:10, and it simply

25   said, "We, the jury, select Mr. Plavsic to be our foreman.  We

D3iWdor3

1    agree to leave at 5:30 p.m. today and resume tomorrow at 9:30

2    a.m.," signed by Mr. Plavsic.

3              I've marked this as Court Exhibit 1, and in response

4    to this, I've sent in a note I've already read into the record

5    that just says that's fine, I will bring you back in for

6    further instructions before I excuse you, which is what I just

7    did.

8              With that, anything we need to cover tonight?  If

9    everybody could be here tomorrow by 9:15, or so, just make sure

10   you have exhibits ready in case the jury has requests for

11   specific exhibits, and then we'll see where we are.

12             Great.  Have a good evening.

13             (Adjourned to March 19, 2013, at 9:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25