D2KVDORN                          Arraignment

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           12 CR 45 (RJS)

5   JERMAINE DORE, DWAYNE BARRETT,
    TAIJAY TODD, SHEA DOUGLAS,
6
                    Defendants.
7
    ------------------------------x
8
                                        New York, N.Y.
9                                       February 20, 2013
                                        4:28 p.m.
10

11  Before:

12                      HON. RICHARD J. SULLIVAN,

13                                        District Judge

14                              APPEARANCES
15

16  PREET BHARARA,
         United States Attorney for the
17       Southern District of New York
    AMY LESTER
18  JESSICA MASELLA
         Assistant United States Attorneys
19
    JAMES ROTH
20       Stand-In Attorney for Defendant Dore
         Attorney for Defendant Barrett
21
    ALLISON McKENZIE
22       Attorney for Defendant Todd

23  ZACHARY GIAMPA
         Attorney for Defendant Douglas
24

25

D2KVDORN                        Arraignment

1              (In open court)

2              THE LAW CLERK:  This is 12 CR 45, United States V.

3    Hussain, et al.

4              THE COURT:  Can counsel just state their appearances.

5              MS. MASELLA:  Good afternoon, your Honor.

6              Jessica Masella and Amy Lester for the government.

7              THE COURT:  Okay.  Ms. Masella, Ms. Lester, good

8    afternoon.

9              And for the defendants, Mr. Hussain is not here,

10   right?  And his counsel requested that he be excused.

11             We have Mr. Dore.

12             MR. ROTH:  Your Honor, Mr. Dore is here.  I will stand

13   up for the limited purpose of arraigning Mr. Dore.

14             THE COURT:  Okay.

15             MR. ROTH:  I know that Ms. Frontier's associate was

16   unable to make it here today due to some personal medical

17   issue.  And that was communicated.  And I didn't have an

18   opportunity, because I wasn't certain it was on today, to find

19   out exactly what her position is with respect to several other

20   issues that may arise today.  But for the limited purposes of

21   the arraignment, I've provided a copy of the superseding

22   arraignment to Mr. Dore, and he's prepared to enter a plea of

23   not guilty today.

24             THE COURT:  Okay.  Thank you.

25             MR. ROTH:  And I, of course, appear on behalf of

D2KVDORN                        Arraignment

 1    Mr. Barrett, who's the second gentleman in.

 2                THE COURT:  Yes.  Mr. Barrett, good afternoon.

 3                Mr. Roth, you're representing Mr. Barrett, as always

 4                and then we have Mr. Todd who's here.

 5                Good afternoon, Mr. Todd.

 6                MS. McKENZIE:  Good afternoon, your Honor.

 7                Allison McKenzie from the law firm of Sullivan &

 8    Brill, standing up for Steven Brill.

 9                And I also spoke to my client, Taijay Todd, with

10    respect to the superseding indictment today.  And he also

11    enters a plea of not guilty.

12                THE COURT:  Okay.  Well, I'll take the formal pleading

13    then, but good afternoon to you.

14                And Mr. Singh has pled guilty.

15                And then we have Mr. Shea.

16                This is Mr. Shea's first appearance before me.

17                THE DEFENDANT:

18                DEFENDANT SHEA:  Yes.

19                THE COURT:  Okay.  And, counsel.

20                MR. GIAMPA:  Appearing for Mr. Shea Douglas, it's

21    Zachary Giampa, by the Law Offices of Richard L. Giampa, 860

22    Grand Concourse, Suite 1A, Bronx, New York, for the defendant

23    Shea Douglas.

24                Good afternoon, your Honor.

25                THE COURT:  Good afternoon.

1            Mr. Douglas, I'm sorry, I called you Mr. Shea.  I

2    apologize.

3            DEFENDANT DOUGLAS:  Don't worry about it.

4            THE COURT:  Good afternoon to you.  And good

5    afternoon, Mr. Giampa.

6            MR. GIAMPA:  Yes, your Honor.

7            THE COURT:  You've been appointed pursuant to the

8    Criminal Justice Act or you're retained?

9            MR. GIAMPA:  No, no, no, we're a privately retained

10   law firm.

11           THE COURT:  Retained.  Okay.

12           All right.  We're here because the government

13   unsealed -- or asked me to unseal -- a superseding indictment

14   that names Mr. Douglas, as well as the remaining defendants.

15           So the first thing we'll do is arraign the defendants.

16   The other defendants have been through this before, so they

17   know how this goes, but Mr. Douglas has not.

18           So I'll start with you, Mr. Douglas.  Have you

19   received a copy of the indictment in this case?

20           DEFENDANT DOUGLAS:  Not yet.

21           THE COURT:  You've not?

22           MR. GIAMPA:  Your Honor, I just got a copy of the

23   indictment about one minute before you walked in the door.  I

24   have it here if you --

25           THE COURT:  Oh, all right.

1        Mr. Douglas was presented yesterday, wasn't he?

2        MR. GIAMPA:  Yes, he was.  He was presented with a CJA

3   attorney.  I was on trial; I was unable to be there.

4        I did show up later that night, but he had already

5   been -- not arraigned, but he had already been presented.

6        Now, I have spoken with Mr. Douglas prior to our court

7   appearance today, just prior -- I've just spent the last two

8   hours with him.  I have gone over the indictment, but he does

9   not have a copy in his possession.

10       THE COURT:  But prior to coming out here now, did you

11   have a chance to read the indictment with Mr. Giampa?

12       DEFENDANT DOUGLAS:  I haven't read it thoroughly, but

13   we went over it thought, most of it.

14       THE COURT:  Do you want to take a minute so you can

15   read it?  Why don't we do that.  I think that's appropriate.

16       Marshal, is that okay if we give Mr. Douglas a copy of

17   the indictment?

18       Mr. Giampa, why don't you give it to Mr. Douglas;

19   Mr. Douglas can read it.  If you need to confer, I'll give you

20   that opportunity.  But, in the meantime, I'll arraign the other

21   defendants on this new superseding indictment.

22       Before I do that, Ms. Masella, what is new about this

23   indictment other than it lists Mr. Douglas?

24       MS. MASELLA:  That's it, your Honor.  Mr. Douglas is

25   added into Counts One and Two, and numerous overt acts in Count

D2KVDORN                    Arraignment

1   One.  It does not change the charges at all with respect to the

2   remaining defendants.

3           THE COURT:  All right.

4           So then let's start with Mr. Dore.

5           Mr. Dore, have you seen a copy of this superseding

6   indictment?

7           You have to say yes or no, just so the court reporter

8   can get it.

9           DEFENDANT DORE:  Yes, sir.

10          THE COURT:  Yes.

11          And you had a chance to discuss it with your attorney

12  or, in this case, Mr. Roth, who's standing in for your

13  attorney?

14          DEFENDANT DORE:  Yeah.

15          THE COURT:  Would you like me to read it out loud?

16          DEFENDANT DORE:  No.

17          THE COURT:  Or do you waive the public reading?

18          DEFENDANT DORE:  No, I'm good.

19          THE COURT:  You're good.  You waive the public

20  reading.

21          DEFENDANT DORE:  Yeah.

22          THE COURT:  Do you have any questions about it, the

23  indictment?

24          DEFENDANT DORE:  No, I take at my lawyer.

25          THE COURT:  Do you plead guilty or not guilty to the

1    charges in the indictment?

2             DEFENDANT DORE:  Not guilty.

3             THE COURT:  Not guilty.  Okay.  Thank you.

4             All right.  Mr. Barrett.

5             Mr. Barrett, have you seen a copy of the superseding

6    indictment?

7             DEFENDANT BARRETT:  I seen a copy of the paper handed

8    to me.

9             THE COURT:  I'm sorry, I didn't hear you.

10            DEFENDANT BARRETT:  I seen a copy of the paper handed

11   to me.  I don't know what it is.

12            THE COURT:  Have you had a chance to read it?

13            DEFENDANT BARRETT:  Says the same thing --

14            THE COURT:  That's what they say.

15            DEFENDANT BARRETT:  -- what he's talking about.

16            THE COURT:  Have you had a chance to discuss it with

17   your attorney, Mr. Roth?

18            DEFENDANT BARRETT:  Discuss No. 4, so I don't know

19   it's the same stuff.

20            THE COURT:  Well, I mean it's been represented to me

21   that there's really no change other than it adds Mr. Douglas.

22   But this is the new charging instrument; so this is the one I

23   guess we're going forward on.

24            So would you like me to read it out loud or do you

25   waive the public reading of the document?

1          DEFENDANT BARRETT:  I don't need you to read it.

2          THE COURT:  Okay.  So you waive the public reading.

3          And how do you plead?

4          DEFENDANT BARRETT:  Waive nothing.  But I don't need

5   you to read it.  I don't waive anything, but I don't need you

6   to read it.

7          MR. ROTH:  We're just waiving him reading it out loud.

8          DEFENDANT BARRETT:  I don't waive anything.

9          THE COURT:  I can read it, if you'd like.  Do you want

10  me to read it?

11          DEFENDANT BARRETT:  I don't need you to read it

12  either.

13          THE COURT:  I'll deem that to be a waiver of the

14  public reading.

15          But, in any event, how do you plead, guilty or not

16  guilty?

17          DEFENDANT BARRETT:  Nonassumption.  I plead

18  nonassumption.

19          THE COURT:  Nonassumption?

20          DEFENDANT BARRETT:  Nonassumption, yeah.

21          THE COURT:  I'll take that as a not-guilty plea.

22          Mr. Todd, have you seen a copy of the indictment --

23  the superseding indictment?

24          DEFENDANT TODD:  No, your Honor.

25          THE COURT:  No?

1          MS. McKENZIE:  Your Honor, I can hand him a copy, if

2     he wants to.  But I spoke to him about it; it confirmed what

3     the prosecution said to the Court.

4          THE COURT:  I think we should give him a copy.

5          Mr. Todd, you're entitled to a copy; you should take a

6     look at it.  And then while you're looking at it, perhaps I'll

7     talk to Mr. Douglas.

8          Mr. Douglas, have you had a chance to look at the

9     indictment?

10          DEFENDANT DOUGLAS:  Yes.

11          THE COURT:  Have you discussed it before with

12     Mr. Giampa; is that correct?

13          DEFENDANT DOUGLAS:  Yes.

14          THE COURT:  Would you like me to read it out loud here

15     in court, or do you waive the public reading of the indictment?

16          DEFENDANT DOUGLAS:  That's all right.  You could waive

17     it.

18          THE COURT:  You waive it.

19          DEFENDANT DOUGLAS:  Yes.

20          THE COURT:  All right.  And how do you plead to the

21     charges in the superseding indictment, guilty or not guilty?

22          DEFENDANT DOUGLAS:  Not guilty.

23          THE COURT:  Not guilty.

24          And then, Mr. Todd, let me know when you're ready.

25     You can take as much time as you need.

1              Are you ready?

2              Okay.  So now you've got the superseding indictment,

3     which is S2 12 CR 45.  You discussed it with Mr.  --

4              MS. McKENZIE:  Ms. McKenzie, your Honor.

5              THE COURT:  Ms. McKenzie.  I apologize, Ms. McKenzie.

6              You've discussed it with her?

7              DEFENDANT DOUGLAS:  We spoke about it earlier.

8              THE COURT:  All right.  And do you waive the public

9     reading, or would you like me to read it out loud?

10             DEFENDANT TODD:  Waive it. your Honor.

11             THE COURT:  And how do you plead, guilty or not

12    guilty?

13             DEFENDANT TODD:  Not guilty.

14             THE COURT:  Not guilty.  Okay.

15             So that's all the arraignment is really, it's just

16    making sure that we have your plea, and that you've had a

17    chance to familiarize yourself with the charges.

18             For all but Mr. Douglas, this is just the same charges

19    as before.

20             Mr. Douglas, it's the first time you're appearing on

21    this indictment or any indictment that you're aware of, so I'll

22    tell you where we're at, okay.

23             We have a trial scheduled for March 4th.  And so

24    Mr. Giampa, I assume that's pretty short turnaround for you at

25    a trial.

1        MR. GIAMPA:  Your Honor, I will not be ready for trial

2   before March 4th.

3        THE COURT:  Okay.

4        MR. GIAMPA:  I don't know if you want me to go into

5   it, but I have an extensive trial schedule between now and

6   June.

7        THE COURT:  Okay.  So, well, I mean I think I'm

8   inclined to go forward with the March 4th trial.  Mr. Douglas

9   wasn't apprehended until yesterday.  I think the other

10  defendants have been in jail for over a year.  So I think we

11  should be going forward.

12       Does anybody disagree with that?

13       MR. GIAMPA:  Well, I would, your Honor.  I don't have

14  enough time to prepare.

15       THE COURT:  No, no.  I'm saying everybody but you.

16       MR. GIAMPA:  Oh, oh, oh.

17       THE COURT:  I'm saying that we go forward with the

18  three defendants who are here, who were previously named, who

19  have been in custody for some time, because they've been

20  waiting for this trial for some time.  So I'm inclined to go

21  forward.  And then if we have to try it again, we try it again.

22  That's just the way it goes sometimes when people are arrested

23  late in the game.

24       So does anybody disagree with that?

25       Ms. Masella.

1              MS. MASELLA:  Your Honor, and we don't do this

2    lightly, but we do want to oppose a severance of the defendants

3    in this case because of the nature of the case, the nature of

4    the witnesses, and the nature of the evidence that we expect to

5    present.

6              As may be clear from the indictment, Mr. Douglas is a

7    core member of this conspiracy.  He's named in at least six of

8    the 13 overt acts, and there are several other incidents that

9    we've provided notice of that he is also involved in.

10             A large majority of the evidence at the trial of Mr.

11   Todd, Mr. Dore, and Mr. Barrett will be -- it will be necessary

12   to duplicate much of that evidence at a second trial.

13             And I do just want to emphasize that, unlike some

14   other types of cases, where many of the witnesses are

15   cooperating witnesses or law enforcement witnesses which are

16   somewhat under the control of the government, we do have many,

17   many victim witnesses who will be testifying in this case.  And

18   it's a hardship for them, both sort of emotionally in the sense

19   that they are reluctant to testify, they face the violence in

20   this case, and they're hesitant and reluctant, and they are

21   also, for the most part, individual business owners for whom

22   taking time out of their business is also a financial hardship

23   to come down and testify.

24             So I understand that the other defendants are ready

25   for trial.  We are getting ready for trial; we've done all of

1   our pretrial submissions and witness lists and exhibit lists,

2   and we're all ready to go.  But Mr. Douglas has been indicted

3   in this case for over seven months.  And we were making -- with

4   the ATF and the marshals service we're making what we

5   considered rather vigorous efforts to find him.  And it was

6   just sort of happenstance that it happened 10 or 11 days before

7   the trial date in this case.

8           THE COURT:  I'm not blaming anybody, but it does seem

9   to me at this point we've had defendants who have been in

10  custody since last January, right?

11          MS. MASELLA:  That's correct, your Honor.

12          And I can't speak to what their position is now, but

13  in the past several weeks, there have been -- two of the three

14  trial defendants have made requests for adjournments based on

15  their own trial counsel's schedules.

16          THE COURT:  I know.  But I've denied those.  I mean

17  those were weeks ago that they made them.

18          Let me hear from the lawyers who are here.

19          Mr. Roth?  Ms. McKenzie?

20          MR. ROTH:  Your Honor, I can't speak for Mr. Dore, but

21  on behalf of Mr. Barrett, I think we'd like to proceed.

22          And I would also present the fact that, as I

23  understand it, there were six charged individuals in this

24  indictment.  From my reading of the discovery and the

25  disclosures to date, there's another six or so members of the

D2KVDORN                          Arraignment

1    conspiracy.  I don't know the status of all those people, but

2    if some haven't been arrested, I can see a situation where this

3    would keep on going on and on and on, and Mr. Barrett would

4    never get his day in court.  So we're prepared to go forward.

5            THE COURT:  All right.  Ms. McKenzie?

6            MS. McKENZIE:  Your Honor, on behalf of Steven Brill,

7    he will consent to an application for a trial after May 17th.

8    But he takes no position on whether or not there's an

9    adjournment.  He's ready for March 4th.

10           THE COURT:  I'm going to deny your request for an

11   adjournment.  I think we have to try this case.  These

12   gentlemen were waiting a long time.  And I understand it's an

13   inconvenience, and it's nobody's fault really; it's just the

14   way it happened.  But I don't think we can ask them to wait

15   until May or June or July.  I just think that that's asking too

16   much.

17           So we'll go forward on May 4th -- March 4th, excuse

18   me.  We'll try the case here.  We're going to have a final

19   pretrial conference next week, at which we'll cover the motions

20   *in limine*, and we'll discuss any other pretrial issues that the

21   parties raise between now and then.  And then we'll start

22   picking a jury on Monday, March 4th.  Okay?

23           Anything else, Mr. Roth?  Do you have a question?

24           We'll set a schedule for you now, Mr. Giampa.

25           MR. GIAMPA:  Okay.  So just so I'm straight, my

1    client, Shea Douglas, has now been severed from --

2          THE COURT:  That's right.  I'm denying a motion for an

3    adjournment.  I'm severing Mr. Douglas from the other

4    defendants, in light of the fact that there's no way that he or

5    you could be prepared for trial on March 4th.  But the other

6    defendants have been waiting for quite some time, and I just

7    think, given those circumstances, we can't go forward against

8    everybody, and we can't adjourn.  So I think the best thing to

9    do then is to sever Mr. Douglas.

10          Did you have a question Mr. Todd?  Do you want to

11    confer with your lawyer first?

12          DEFENDANT TODD:  Yes, please.

13          THE COURT:  I would advise you to do that.  I think

14    that's best.  If you want to speak, I'll give you that

15    opportunity.

16          MS. McKENZIE:  That's fine, your Honor.

17          THE COURT:  You can chat with Mr. Todd for a moment.

18          (Pause)

19          MS. McKENZIE:  Your Honor, my client wants to bring up

20    a CD of documents that was sent to an individual in his unit

21    that has something to do with this case.  I'm not sure what the

22    CD contains, but it was sent to Jermaine --

23          DEFENDANT TODD:  Jermaine Chambers.

24          MS. McKENZIE:  Jermaine Chambers.

25          MR. ROTH:  Judge, apparently -- and I mentioned this

D2KVDORN                    Arraignment

1    to the government earlier today -- Mr. Barrett, who's at the

2    MCC, not MDC, where the other gentleman is, he told me that an

3    individual was in the possession of one of the CDs that was

4    produced in discovery, the one that contained videos of the

5    defendants' post-arrest when they were in the holding cell of

6    ATF.

7            And apparently I learned today, too, that his

8    codefendant said in MDC, somebody else apparently had that.  I

9    brought that to the government's attention.  They said they

10   were not aware of any of those circumstances or how that may

11   have occurred.

12           THE COURT:  Is there a request associated with that or

13   just you wanted to bring it to my attention?

14           DEFENDANT TODD:  Bring it to your attention, your

15   Honor.

16           THE COURT:  Okay.  All right.

17           Well, I don't know the circumstances of if; I'm not

18   sure how it happened.  I think this is something the government

19   should inquire into to see just what's going on.

20           But if a particular defendant shares their material

21   with other people, I guess that -- was there any sort of

22   confidentiality provisions with respect to discovery in this

23   case?

24           MS. McKENZIE:  Your Honor, if I could talk to my

25   client.  I'm not sure what's in the CD, if he even saw the CD.

1          Can I just ask him?

2          THE COURT:  Yeah.  But it's been represented that's a

3   CD that was produced by the government in discovery in this

4   case.

5          MS. McKENZIE:  That's my understanding.

6          THE COURT:  And it ended up in the hands of somebody

7   who's not in this case, right?

8          (Pause)

9          MS. McKENZIE:  Your Honor, according to my client, it

10  is confidential information that has been given to

11  Mr. Chambers.  And he has an issue with it, especially since it

12  contains information pertaining to his case.

13         THE COURT:  I guess the issue is -- there's nothing

14  that prevents any defendant, I don't think, from sharing the

15  discovery materials with other people if they want to.  I don't

16  know that that's what happened here, but that's -- is there a

17  confidentiality order that was entered into among the

18  government and the defendants in this case?

19         MS. McKENZIE:  From my client, what I'm gathering is

20  that it was given by prosecution, maybe not the prosecutors

21  here today, but someone on Mr. Chambers' case, given to his

22  attorney, and then his attorney gave it to Mr. Chambers.

23         THE COURT:  All right.

24         And does the government have any information to add on

25  this?  I don't know who Mr. Chambers is.

D2KVDORN                      Arraignment

1              MS. MASELLA:  We don't know either, your Honor.  I

2      can't imagine that would have happened.  There is no particular

3      confidentiality agreement in this case.  Discovery has been

4      provided to defense counsel and, in some cases, also placed in

5      the jails for the defendants to review, but not sent to other

6      defendants who are not part of the case.

7              THE COURT:  I have both Mr. Barrett and Mr. Dore

8      raising their hands as though they want to speak.

9              Do you want to speak yourself?

10             DEFENDANT BARRETT:  I said I seen the video myself.

11     Another inmate told me about it, and he said his lawyers going

12     to send it to him, Lawrence Schoebach, or whoever his lawyer

13     is.  And he showed it to me when he received the discovery.

14     And all it was was in the cell block or whatever.  Everything

15     that was going on that morning, that's what's on it.

16             THE COURT:  Okay.  I mean, look, I don't know how it

17     fell into the hands of people who are not in this case.  But,

18     again, these are not confidential materials, so I'm not sure

19     that it violates anybody's rights by having them out being

20     shared.  If there's something about it that undermines the

21     safety or undermines the privacy of the defendants, then that's

22     worth exploring.  But I don't know that that's the case.

23             Mr. Barrett?

24             DEFENDANT BARRETT:  Yes.  I mean if we ever have

25     nothing to do with their case or situation, then how would they

1    end up with our discovery?

2         THE COURT:  I don't know.  I think there's any number

3    of ways it could happen.  It could be that they were in the law

4    library and they were mistakenly given to someone who wasn't in

5    the case.  It could be that someone who's in the case decided

6    to share with someone else.  It could be -- I don't know.  It

7    could be any number of things.

8         Yeah.

9         DEFENDANT BARRETT:  That was obviously provided by the

10   prosecutor or the AUSA --

11        THE COURT:  Why is it obvious?

12        DEFENDANT BARRETT:  -- to their attorneys.

13        THE COURT:  But why do you say that?

14        DEFENDANT BARRETT:  Their attorneys sent it to them.

15        THE COURT:  But why do you say that's obvious?  What

16   information do you have about that?

17        DEFENDANT BARRETT:  Because their attorneys sent it to

18   them.  So somebody had to produce it to their attorney for the

19   attorney to send it to the defendants.

20        THE COURT:  Well, attorneys could get all of this kind

21   of thing in any number of ways.  So I don't know if -- look, if

22   any of the lawyers or the government lawyers want to inquire on

23   this and figure out what happened, if anybody is asking me to

24   do something about it, I'm all ears; but, otherwise, I'm not

25   sure what -- it's a piece of information that I was not aware

1    of.  But I don't know what anyone is asking me to do about it.

2          MS. McKENZIE:  Your Honor, since my client brought it

3    up, do you mind if I talk to Mr. Brill when he gets back with

4    regard to this, and maybe contact chambers and the prosecutors

5    so we could actually resolve this, whatever the issue is?

6          THE COURT:  That's fine.  Look, I think it's worth

7    knowing what happened.  If the law library or somebody else is

8    handing out materials to people who are not involved in a case,

9    that would be -- sounds improper.  I'm not sure if it's a

10   violation of anybody's rights, but it doesn't sound like it's

11   the way it ought to go.

12         I don't know what's on the video that it compromises

13   anybody's safety or privacy interests, but that's probably

14   worth knowing, as well.  And if it was a situation where the

15   prosecutors sent these materials to somebody who's not in the

16   case, then I guess that should be explained.  But I don't think

17   it's going to affect the trial.  The fact is the trial is going

18   to be going forward on the 4th of March.

19         So any lawyer who wants to follow up on this is

20   welcome to do that; I'm not saying that you can't, I just am

21   not sure what anybody would be asking me to do at this point..

22         MR. ROTH:  Judge, on another issue, I've raised with

23   the government today -- and hopefully we can work it out -- I

24   made a request for any *Brady* material specifically surrounding

25   the circumstances of I'll say the evolution of Singh's plea and

1    his situation in this conspiracy.

2             Singh was named in the overt acts and in the trial

3    instances of not just the one which they did disclose in terms

4    of *Brady* where there was a mis-ID or a wrong ID of him

5    participating in the so-called Newbold stabbing incident, but

6    he was named in the disclosures to us as being a participant in

7    several other acts of this conspiracy.

8             So I think the holding on the government to tell us

9    why this source of information, whichever it is one, or more

10   sources, now they believe them in terms of who was members of

11   this conspiracy, because it's central to our clients here who

12   are charged as members of the conspiracy.  They are saying

13   Singh was a central member of this conspiracy.

14             THE COURT:  Right.

15             MR. ROTH:  He's clearly not viewed that way, and

16   he's --

17             THE COURT:  I don't know if he's not viewed that way

18   or not.  I know he pled to something that didn't involve any of

19   the counts in the indictment.

20             MR. ROTH:  Right.  And he was named not only in the

21   original indictment, but in the additional so-called trial

22   incidences when we got 30-odd whatever trial instances, and

23   perhaps six other instances where he was participating in acts

24   of robberies and etc.

25             And now, whatever that source is who was central and

1    was able to say Singh was not at the Newbold property, somebody

2    obviously who has information, and somebody else was supplying

3    information about Singh and possibly Mr. Barrett and others

4    that was faulty information or false information.

5              THE COURT:  I think what you're asking for then is to

6    the extent that there is a witness whose information or

7    testimony has been impeached by new witnesses, impeachment

8    which led to the plea deal that Mr. Singh got, that material

9    should be made available to you to the extent that such a

10   witness is going to be relying on a trial or even beyond that.

11             MR. ROTH:  I don't know how they are going to prove up

12   their case, Judge.

13             THE COURT:  Either do I.

14             MR. ROTH:  But I think that that's a fair statement.

15   I would put it in both categories.

16             THE COURT:  Okay.  Government, I mean you understand

17   you have *Brady* obligations; you also have an obligation to

18   produce impeachment material, *Giglio* and 3500 material.  They

19   are not all the same, but there's certain pieces of information

20   that could fall under the multiple headers; it could be *Brady*

21   and *Giglio* and 3500; it could be a number of things.

22             So what do you say to Mr. Roth on this point?

23             MS. MASELLA:  Your Honor, we are, of course, aware of

24   all those different obligations.  We've already produced to all

25   defense counsel the *Brady* material which was related to the

1    witness identification.

2              THE COURT:  I don't think I've seen that, have I?  I

3    mean if there was a letter related to *Brady*, it wasn't sent to

4    me.  You made some representation very generally that some

5    witness came forward and contradicted or undermined another

6    witness with respect to Mr. Singh, but I don't know anything

7    more than that.

8              MS. MASELLA:  That's correct, your Honor.  The

9    disclosure was not sent to the Court; it was sent to all

10   counsel for defendants.  First to counsel for Mr. Singh, and

11   then to the other defendants in the case.

12             MR. ROTH:  But that was the extent of the disclosure.

13             THE COURT:  What was the extent?

14             MR. ROTH:  Just a few, some witness said.

15             THE COURT:  Well, was it the disclosure that you may

16   want to talk to so-and-so witness or no?

17             MR. ROTH:  I would certainly like the opportunity --

18             THE COURT:  No, is that what the disclosure said?

19             MR. ROTH:  No.

20             THE COURT:  You got some letter from the government.

21             MR. ROTH:  No, there was no offer, no suggestion.  I'm

22   sorry, I didn't --

23             THE COURT:  No, I'm just confused.

24             There was a disclosure letter that just says what?  We

25   changed our mind with respect to somebody?  That's not *Brady*

1    disclosure.

2              MS. MASELLA:  No, that a witness who recently came to

3    our attention called into question the identification made of

4    Mr. Singh by the victim of the Newbold incident.  It also

5    invited further questions from counsel with respect to that

6    information.  If Mr. Roth wants to ask me a particular question

7    about the name of the victim witness or something else, I would

8    be happy to have those discussions with him.

9              THE COURT:  So why don't you do that, Mr. Roth.  And

10   then if you want to make a motion, make a motion.

11             MR. ROTH:  It's obviously not the victim witness, it's

12   the person who's giving them information who said Singh wasn't

13   there.

14             THE COURT:  Right.  I understand where you're going

15   with it.  I just think --

16             MR. ROTH:  We'll try to work it out.

17             THE COURT:  I mean I would take Ms. Masella up on her

18   offer.  And if you're not satisfied with what she's providing,

19   then you can make a motion for a Brady disclosure beyond what

20   you've got.  Okay.  And we can take this up, if need be, at our

21   conference next week.

22             Did you have a question?

23             MR. ROTH:  I'm sorry, I forgot.  Yes, I apologize.

24             Mr. Dore told me that he's just recently been

25   transferred over from MDC to MCC, which is the custom pretrial.

D2KVDORN                    Arraignment

1  And he's apparently in segregation, the box, which, from my

2  knowledge, is if they don't have a bed right away, he gets

3  stuck in the box.

4       But the problem is, aside from the fact of his

5  confinement conditions, he doesn't have his legal work with

6  him. So I don't know that there's a prohibition, that I can't

7  speak to a, prohibition of having legal work in segregation.

8       THE COURT: I don't either. And the trial is not for

9  another ten days or so. So it might be worth the government

10  just inquiring when they're going to have a bed or whether it's

11  something more than that, and at least let the Bureau of

12  Prisons know that he's missing his legal work. And, Mr. Roth,

13  you or Ms. Fontier should do the same.

14       The Bureau of Prisons has to be able to make

15  arrangements to ensure the safety within the prison, but they

16  also have to make sure that prisoners are able to access their

17  legal materials so they can prepare for a trial that's less

18  than two weeks away. So let's try to resolve that. If you

19  need the Court to get involved, then let me know. So hopefully

20  it will take care of itself.

21       It usually is the case though, Mr. Dore, that

22  sometimes it takes a day or two to get the beds.

23       DEFENDANT DORE: It's been a week.

24       THE COURT: It's been a week?

25       All right. So let's see if we can resolve that or, if

D2KVDORN                    Arraignment

1   need be, then let's get Mr. Dore back to the MDC where he might

2   be able to better prepare for trial rather than at the MCC.

3           So can I ask the government to follow up on that?

4           MS. MASELLA:  I will inquire, your Honor.

5           THE COURT:  Good.  Thank you.

6           All right.  Anything else we should cover?

7           MR. ROTH:  Judge, so I assume you'll rule on the

8   pretrial motions at our last --

9           THE COURT:  Right.  At the conference I'll rule on the

10  motions.

11          MS. MASELLA:  Your Honor, just with respect to a

12  schedule for Mr. Douglas.

13          THE COURT:  We're going to do that now.

14          I was going to excuse the other defendants, unless

15  they want to stay while we set a schedule for Mr. Douglas.  I

16  don't feel strongly about it.  Do you want to stay?

17          MR. ROTH:  I don't have to stay.

18          THE COURT:  Okay.  So, marshals, is that okay if we

19  excuse the other defendants and their lawyers, and we just take

20  a minute, and then we'll proceed with Mr. Douglas, just to set

21  a schedule for discovery and motions.

22          Okay?  Thank you.

23          (Pause)

24          MS. McKENZIE:  Your Honor, we don't have to stay.

25          THE COURT:  You're welcome to stay, but you don't have

1    to stay.

2              MS. McKENZIE:  Thanks very much.

3              THE COURT:  Thanks very much, Ms. McKenzie.

4              Okay.  Mr. Roth, you're going to bolt?  You're going

5    to leave, right?

6              MR. ROTH:  I am going to leave, if I can find my

7    briefcase.

8              THE COURT:  All right.

9              Let's talk about a schedule for Mr. Douglas.

10             So, government, how long does it take to produce

11   discovery to Mr. Giampa and Mr. Douglas?

12             MS. MASELLA:  We can produce it by Friday, your Honor.

13             THE COURT:  By Friday.  Okay.  Good.

14             And then, Mr. Giampa, how long do you think it's going

15   to take you to review those materials with your client and then

16   decide what motions, if any, you want to make?

17             MR. GIAMPA:  I'm not sure how extensive the discovery

18   is, your Honor.  But from just speaking with co-counsel, it

19   appears as though there's something like 100 witnesses in this

20   case.

21             THE COURT:  I don't think that's going to get -- I

22   mean most of that's not getting produced in discovery.

23             Are there tapes or anything like that?

24             MS. MASELLA:  No, your Honor.

25             I can summarize briefly what the discovery consists

D2KVDORN                    Arraignment

1    of.

2            There's a large volume of phone records, including

3    call detail records and cell site information.  There is

4    information related to various incidents, such as police

5    reports, evidence vouchers, testing for DNA, and fingerprints,

6    things of that nature, crime scene photographs and sketches,

7    photographs of various locations, witness identification,

8    procedures where those were done.  There were no wiretaps,

9    there were no extensive --

10            THE COURT:  Were there any lineups or photo arrays of

11   Mr. Douglas?

12            MS. MASELLA:  Involving Mr. Douglas, I do not believe

13   so.  He was not asked -- he was not interrogated, and he did

14   not make a post-arrest statement.  I don't believe there were

15   any physical searches of Mr. Douglas at the time of his arrest.

16            THE COURT:  So it doesn't sound like it's terribly

17   voluminous, Mr. Giampa, in the sense that there is no wiretaps

18   and there's no lineups, no post-arrest statements.  The sorts

19   of things that would prompt motions are not here.  There might

20   be other motions that you think are appropriate, but it sounds

21   like it's not -- it's not too voluminous or not the sort of

22   thing that's going to have you hold up for two months looking

23   at this stuff.

24            MR. GIAMPA:  I understand, your Honor.

25            And, again, just being brought to the case last night,

1    it's very difficult to say, but I mean today's the 20th.  I

2    mean between 30 and 45 days.

3              THE COURT:  Okay.  I think that's fair.

4              So let's get you back here in the early part of April,

5    all right?

6              MR. GIAMPA:  Okay.  Just to let you know, I am

7    starting a trial in this courthouse on April 7th.

8              THE COURT:  April 7th.  That's before whom?

9              MR. GIAMPA:  Your Honor, it's very odd.  It was before

10   Judge Seibel in White Plains.  And she just kicked it back to

11   the calendar part, and it was reassigned to this courthouse,

12   but the name escapes me, the judge escapes me.  Let me just put

13   it this way:  It was originally on for April 22nd, and the

14   judge who has since taken it has accelerated it to April 7th.

15             THE COURT:  The 7th is a Sunday, so it must be a

16   different day.

17             MR. GIAMPA:  Maybe it's the 8th then.

18             THE COURT:  Why don't we schedule something here then

19   the week before.

20             MR. GIAMPA:  Okay.

21             THE COURT:  How about April 3rd, Wednesday, April 3rd,

22   at 2:30, okay?

23             And at that time you should let me know what motions,

24   if any, you're contemplating.  And if you are planning motions,

25   then we'll set a briefing schedule for the motions.  If you're

1    not, then we'll set a trial date.

2                MR. GIAMPA:  Okay, your Honor.  Thank you.

3                Now, just with regards to bail, I am working on a bail

4    package; I don't have a bail package yet, but I will provide it

5    to --

6                THE COURT:  Okay.  And there's no prejudice to seeking

7    it later.  If and when you have a proposal, just let me know

8    and we'll schedule a conference, and then I'll hear the

9    argument.

10               MR. GIAMPA:  Thank you, your Honor.

11               THE COURT:  I won't pre-judge it.

12               In the meantime, Mr. Douglas, you'll remain in custody

13   pending trial.  But, as I said, if you think you have a package

14   that you want to present to me, I'm happy to hear you, and

15   we'll make arrangements.  All right.

16               MS. MASELLA:  Your Honor, the government would request

17   an exclusion of speedy trial time from now until April 3rd.

18   It's already been excluded through the trial date in this case,

19   but for Mr. Douglas we'd like to exclude it through April 3rd

20   so that he can receive and review the discovery materials and

21   consider any motions.

22               THE COURT:  Yes.  And no objection to that,

23   Mr. Giampa?

24               MR. GIAMPA:  No objection, your Honor.

25               THE COURT:  Mr. Douglas, let me tell you what that

1    just meant.  Maybe you understand.

2              DEFENDANT DOUGLAS:  Speedy trial.

3              THE COURT:  Yeah, that's right.

4              I'll tell you just so it's clear.

5              Under the law, you have a right to a speedy trial.

6              DEFENDANT DOUGLAS:  Seventy days.

7              THE COURT:  Seventy days.  You know this stuff.

8         Now, as you probably know, as it's probably been

9    explained to you, the law allows that 70 days to be extended

10   for certain reasons, or if you think of it as a clock that's

11   ticking away with 70 ticks on it, the Court can stop the clock.

12   And one reason to stop the clock is because you or one of your

13   codefendants has filed a motion or has requested and received

14   an exclusion of time under the Speedy Trial Act for a valid

15   reason.

16        So in this case, trial against the other folks is

17   going to go forward on March 4th.  So I've excluded the time.

18   The clock is not going to tick between now and March 4th.  And

19   you are covered by that, as well.

20        But, in your case, you are in a very different spot,

21   so you need to review these discovery materials, this evidence

22   that we've talked about.  Your lawyer needs to look at those

23   things, discuss them with you, and then decide whether there

24   are motions to be made.

25        So it seems to me that there's valid reason to keep

1    the clock stopped from today until April -- what did we say,

2    April 3rd -- when we come in and talk about what's next.  Seems

3    to me that your interest and the public's interest in a speedy

4    trial is outweighed by your need to look at these materials,

5    have your lawyer look at the materials, and decide what you

6    want to do going forward.

7            So that's what we'll do.  I'm going to stop the clock

8    in the interest of justice.  The statute that covers this, you

9    seem pretty sophisticated, you've obviously been told or done

10   some research, is Title 18 of the United States Code, Section

11   3161.  I'm sure Mr. Giampa can explain more to you if you like,

12   but that's just where in the code book you can find it.

13           On April 3rd we'll come together; we'll see what's

14   what.  If at that point you say I want a quick trial, I'll give

15   you a quick trial, I promise.  But if it turns out, well, you

16   actually want to make some motions, that's another reason to

17   keep the clock stopped.  Once a motion has been filed, the

18   clock automatically stops, and that's to allow the Court time

19   to get briefs, hear argument, and resolve the motion.

20           So we'll see where we are on April 3rd.  But between

21   now and then, it sounds like you'll have enough to do, and it's

22   important stuff.  Okay?

23           DEFENDANT DOUGLAS:  Thank you, Judge.

24           THE COURT:  All right.

25           Anything else, Mr. Giampa?

D2KVDORN                    Arraignment

1           MR. GIAMPA:  No, your Honor.

2           THE COURT:  Anything else from the government?

3           MS. MASELLA:  No, your Honor.  Thank you.

4           THE COURT:  All right.  Thanks.

5           So I'll see you folks in April.  I'll see the

6    government folks before then.

7           Let me thank the marshals, and let me thank the court

8    reporter, as well.

9           Mr. Giampa.

10          MR. GIAMPA:  Just one other thing.  I was just hearing

11   about a pretrial conference next week.

12          THE COURT:  You don't need to be here.

13          MR. GIAMPA:  Me and Shea are not going to be needed to

14   be here.

15          THE COURT:  No.  If you want to come, you're welcome

16   to come, but it would seem to me that it probably doesn't make

17   sense, given where you are in the case.

18          MR. GIAMPA:  Okay.  Thank you.

19          THE COURT:  All right.  Thanks a lot.

20          Have a good day.

21          MS. MASELLA:  Thank you.

22                           *    *    *

23

24

25