UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
UNITED STATES OF AMERICA
                                                        :
          - v. -                                                    S2 12 Cr. 45 (RJS)
                                                        :
JERMAINE DORE,
          a/k/a "St. Kitts,"                            :
          a/k/a "Blaqs," and
DWAYNE BARRETT,                                         :
          a/k/a "Tall Man,"                             :
                                                        :
                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S RESPONSE TO DEFENDANTS'
### MOTIONS FOR A NEW TRIAL


                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, New York 10007


Amy Lester
Jessica A. Masella
Assistant United States Attorneys
 -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                          :

  UNITED STATES OF AMERICA

                                                           :

       - v. -                                                        S2 12 Cr. 45 (RJS)

                                                           :

  JERMAINE DORE,
        a/k/a "St. Kitts,"                  :
        a/k/a "Blaqs,"
  DWAYNE BARRETT,                     :
        a/k/a "Tall Man,"

                                                           :

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS FOR A NEW TRIAL

        The Government respectfully submits this memorandum of law in opposition to the motions filed by counsel for Jermaine Dore and Dwayne Barrett for a new trial.  In particular (1) Dore requests a new trial based on his contention that the Court erred when it denied his request, during trial, to allow his trial counsel to withdraw from the case and to grant a mistrial; and (2) Barrett requests a new trial based on his argument that the Court improperly allowed the admission of the rap video, "The Joy," which was offered by the Government at trial.  For the reasons set forth herein, both motions should be denied in their entirety.

### I.      Background

        Jermaine Dore, a/k/a "St. Kitts," a/k/a "Blaqs," and Dwayne Barrett, a/k/a "Tall Man," were convicted on March 19, 2013, after a ten-day trial of all seven counts in Indictment S2 12 Cr. 45 (RJS) (the "Indictment").  The Indictment charged each of Dore and Barrett in seven counts with:

(1)     conspiring to commit Hobbs Act robberies from at least in or about 2010, up to and including in or about January 2012, in violation of Title 18, United States Code, Section 1951;

(2)     using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the robbery conspiracy charged in Count One, which firearms were discharged, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and (2);

(3)     committing a Hobbs Act robbery on or about October 29, 2011, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1951 and (2);

(4)     using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the robbery charged in Count Three, which firearms were brandished, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(C)(i), and (2);

(5)     committing a Hobbs Act robbery on or about December 12, 2011, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1951 and 2;

(6)     using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the robbery charged in Count Five, which firearms were discharged, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii), 924(c)(1)(C)(i), and (2); and

(7)     using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the robbery charged in Count Five, and in the course of that crime causing the death of a person through the use of a firearm, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(j) and (2).

The evidence at trial established that Dore and Barrett were the core members of a violent robbery crew, which operated from at least August 2011 up to and including January 2012. For many of these robberies, Dore and Barrett received information about the victims from another crew member, Fahd Hussain. Hussain operated two stores (one of which is One M

2

Stationery Store) located on White Plains Road near 233rd Street in the Bronx, and, in that

capacity, he had dealings with numerous individual business owners, such as telephone calling

card salesmen, bodega owners, gas station owners, and individuals who sold supplies to bodegas.

Dore, Barrett, and other members of crew were responsible for, among other things, a December

12, 2011 robbery in which one of the victims was shot and killed, an October 29, 2011 robbery

in which one victim was abducted and another victim was held down, with his two children, at

gunpoint, and numerous robberies during which victims were physically assaulted and threatened

with weapons.

   At trial, the Government presented the testimony of 42 witnesses – including the

testimony of two witnesses who were also members of the robbery crew, Patrick Taylor and

Janiel Brown – and admitted more than 200 exhibits, including physical evidence, documents,

photographs, video recordings, text messages, and summary maps and charts.  Taylor and Brown

both testified in detail about the day-to-day workings of the robbery crew, Dore's and Barrett's

roles in the crew, and about various robberies carried out by Dore, Barrett, and other crew

members.  The testimony of Taylor and Brown was corroborated by, among other things,

physical evidence, cellsite evidence, victims' testimony, video evidence, contemporaneous text

messages, ballistics evidence, and other physical and documentary evidence.

   The evidence at trial demonstrated Dore's and Barrett's participation in the

following robberies, among others:

(1) On August 22, 2011, Barrett, Dore, Shea Douglas, and Brown carried out the
robbery of Abdul Rauf, the owner of a gas station and convenience store located
in Matamoras, Pennsylvania, during which robbery they robbed Rauf of
approximately $46,000 in business proceeds.  Rauf was a family friend of
Hussain's who had engaged in several cash transactions with Hussain, each
involving several thousands of dollars.  The defendants assaulted and robbed Rauf
during the late morning or early afternoon of August 22, 2011 in the parking lot of

the Wells Fargo Bank in Matamoras, Pennsylvania.  August 22,2 011 was a Monday, the day on which Rauf routinely carried large amounts of business proceeds – usually $80,000 to $100,000 – from his gas station to the bank.  At trial, this robbery was proved through, among other evidence, the testimony of Rauf, Brown, and Taylor, as well as cellsite evidence showing that Barrett's phone was in the area at the time of the robbery, and text messages between Brown and Dore referring to the robbery.  (Tr. 545-60 (Rauf); Tr. 273-92, 323 (Brown); Tr. 1032-33 (Taylor); GX 3003 (cellsite map); GX 73A (text messages)).[1]

(2)     On October 10, 2011, Dore and Taijay Todd carried out the robbery of Youssef Abdulkader, who is the owner of a convenience store on Wallace Avenue in the Bronx.  Abdulkader has been a friend of Hussain's and Hussain's family for many years.  Dore and Todd approached Abdulkader at knifepoint, as Abdulkader was on his way home from work, and they took a bag from him containing his cellphone and laptop computer.  At trial, this robbery was proved through, among other evidence, the testimony of Abdulkader, cellsite evidence, and Abdulkader's cellphone, which was found in Dore's apartment at the time of Dore's arrest and contained photographs of Abdulkader as well as Dore.  (Tr. 222-27 (Abdulkader); GX 3004 (cellsite map); GX 72 (cellphone); GX 72A (contents of cellphone)).

(3)     On October 11, 2011, Dore and Todd carried out the robbery of Praeshant Goel, who is a salesperson for a telephone calling card company, on Pelham Road in New Rochelle.  Goel had stopped at Hussain's store earlier that day to collect money owed on Hussain's account, and Goel told Hussain that he would be traveling to the New Rochelle area to make several deliveries.  At one of his stops in New Rochelle, Dore and Todd approached Goel as he was sitting inside his car; Todd broke the window of the car with a baseball bat while Dore stabbed one of the car tires with a knife.  The defendants took approximately $6,000 and several thousands of dollars in telephone calling cards from Goel.  At trial, this robbery was proved through, among other evidence, the testimony of Goel and Brown, a video recording made by a nearby surveillance camera, cellsite evidence showing that Dore's phone was in the area at the time of the robbery, and physical evidence, such as Todd's cellphone, which was dropped at the scene of the robbery.  (Tr. 1416-34 (Goel); Tr. 323-24 (Brown); GX 602 (video); GX 3005 (cellsite map); GX 604 (cellphone)).

---

[1]  Citations to "Tr." are to the trial transcript; citations to "GX" are to a Government exhibit admitted at trial.

(4)     On October 29, 2011, Barrett, Dore, and Damian Cunningham robbed Ahmed and
        Kassim Salahi, two brothers who own several live poultry markets in the Bronx.
        On that date, the robbers followed Ahmed Salahi from his house on Radcliff
        Avenue to a mosque on Rhinelander Avenue in the Bronx.  When Ahmed Salahi
        came out of the mosque, Dore and Cunningham assaulted him, pushed him into
        his car, and drove his car back towards his house.  They took his car keys, and
        Cunningham then held him down at knifepoint, while Dore went into his house.
        When Dore got inside, he found that Ahmed Salahi's brother, Kassim Salahi, was
        inside with his two sons.  Dore then got Barrett to assist him, and Dore and
        Barrett brandished guns at the victims while they searched the house for money.
        Dore and Barrett took approximately $15,000 from the house, which was
        proceeds from the Salahis' business.  At trial, this robbery was proved through,
        among other evidence, the testimony of Ahmed and Kassim Salahi, Taylor, and
        cellsite evidence showing that Barrett's phone was in the area at the time of the
        robbery.  (Tr. 572-93 (A. Salahi); Tr. 606-28 (K. Salahi); Tr. 1007-18 (Taylor);
        GX 3006 (cellsite map)).

(5)     On November 14, 2011, Barrett and Dore attempted to rob Jaspal Singh, the
        manager of two gas stations, one in Mount Vernon and one in the Bronx, on
        Jerome Avenue in the Bronx.  On that date, Dore and Barrett were following
        Singh as he drove from one gas station to the other, carrying approximately
        $25,000 to $30,000 in cash business proceeds.  However, Dore and Barrett were
        stopped by police officers before they could complete the robbery.  At trial, this
        attempted robbery was proved through, among other evidence, the testimony of
        Singh, New York City Police Department ("NYPD") Officers Carlos Villanueva
        and Luis Segarra, and Taylor.  (Tr. 70-78 (Singh); Tr. 90-101 (Villanueva); Tr.
        125-32 (Segarra); Tr. 1034-36 (Taylor)).

(6)     On December 5, 2011, Dore robbed Fitzroy Cornwall at gunpoint on Monticello
        Avenue in the Bronx.  Dore stole money from Cornwall's wallet and fired several
        gunshots at the robbery scene.  At trial, this robbery was proved through, among
        other evidence, the testimony of Fitzroy Cornwall, NYPD Officer Joseph Reeves,
        ballistics evidence, and cellsite evidence showing that Dore's phone was in the
        area at the time of the robbery.  (Tr. 1283-87 (Cornwall); Tr. 1343-50 (Reeves);
        GX 268 (shell casings); GX 269-72 (ballistics); GX 3007 (cellsite map)).

(7)     On December 12, 2011, Dore, Barrett, and Todd robbed three individuals, Jamal
        Abdulla, Zhao Liang, and Gamar Dafalla, inside a minivan located on South
        Fourth Avenue in Mount Vernon.  Dore and Todd approached the minivan after
        the victims had completed a transaction involving the sale of approximately

$10,000 in untaxed cigarettes.  Dore pointed a gun at the victims, and Liang and Abdulla got out of the minivan.  Dore and Todd drove away with Dafalla inside the minivan, and Dore shot and killed Dafalla.  They left the minivan in the Bronx, near the intersection of Strang and Duryea Avenues.  At trial, this robbery and murder was proved through, among other evidence, the testimony of Liang, Abdulla, Brown, and Taylor, text messages and phone records between Dore and Brown, video recordings made by nearby surveillance cameras, a license plate reader that captured Barrett's Mercedes near the scene, ballistics evidence, and cellsite evidence showing that Barrett's and Dore's phones were near Dafalla's hotel at the time that he checked out of the hotel that morning and that Barrett's, Dore's, and Todd's phones were in the area at the time of the robbery.  (Tr. 1244-59 (Liang); Tr. 1472-1503 (Abdulla); Tr. 326-44 (Brown); GX 1058-62 (Taylor); GX 73A (text messages); GX 501, 502, 505 (video); GX 528 (license plate reader); GX 267 (shell casing); GX 268 (shell casings); GX 269-72 (ballistics); GX 3008 (cellsite map)).

(8)     On December 12, 2011, Dore and Barrett robbed Mohammed Althomory, a salesperson for a wholesale supplier of tobacco and over-the-counter medicine, on Esplanade Avenue in the Bronx.  Althomory had stopped at Hussain's store earlier in the day to make a delivery to Hussain.  Several hours after stopping at Hussain's store, Althomory was robbed by Dore and Barrett at gunpoint after he parked his car on the street near his home.  Two robbers approached Althomory, threatened him with a gun and a knife, and hit him in the neck and face.  The robbers took approximately $15,000 in business proceeds from Althomory.  At trial, this robbery was proved through, among other evidence, the testimony of Althomory, text messages between Dore and Brown, and cellsite evidence showing that Barrett's and Dore's phones were in the area at the time of the robbery.  (Tr. 668-96 (Althomory); GX 73A (text messages); GX 3008 (cellsite map)).

(9)     On December 31, 2011, Dore, Barrett, Douglas, and Taylor robbed Ayoub Mohammed, the owner of a wholesale business selling telephone calling cards and other supplies to bodegas, in the area of Gun Hill Road and Jerome Avenue.  On the day of the robbery, Mohammed stopped at Hussain's store in order to collect approximately $300 that was owed to him.  After Hussain paid him, Mohammed drove to the area of Gun Hill Road and Jerome Avenue, where he left his car in a parking garage.  After leaving his car, Mohammed was assaulted by Dore, Douglas, and Taylor, who took approximately $3,000 in business proceeds and telephone calling cards worth several hundreds of dollars.  At trial, this robbery was proved through, among other evidence, the testimony of Mohammed,

Taylor, and video recorded by a surveillance camera in the area.  (Tr. 880-98 (Mohammad); Tr. 1022-29 (Taylor); GX 1608 (video)).

(10)     On January 7, 2012, Dore, Barrett, Douglas, and Brown robbed Djujka Krco, the owner of a wholesale distributor to bodegas, in the area of 185 East 206th Street in the Bronx.  On the day of the robbery, the robbers surveilled Krco, as she closed her business for the day and ran some errands.  When she was parking her car on the street near her house, Dore and Douglas assaulted Krco at knifepoint, and took approximately $1,000 in business proceeds as well as other personal items.  At trial, this robbery was proved through, among other evidence, the testimony of Krco, Brown, and cellsite evidence showing that Dore's phone was in the area at the time of the robbery.  (Tr. 143-53 (Krco); Tr. 292-99 (Brown); GX 3001 (cellsite map)).

## II.     Legal Standards Governing Rule 33 Motions

Because Rule 33 "motions for a new trial are disfavored in the Second Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted." *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  In short, "[i]t is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'" *Id.*

The district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury.  *United States* v. *Autuori*, 212 F.3d 105, 120 (2d Cir. 2000).  Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414.

The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a "manifest injustice."  *Id.* (trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict).  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. The trial court must exercise its Rule 33 authority "sparingly" and in "the most extraordinary circumstances."  *Id.*

### III.    Dore's Motion For A New Trial Should Be Denied

Dore's motion for a new trial is based on his claim – which was raised and rejected by the Court during trial – that his trial counsel, Alice Fontier, Esq., should have been permitted to withdraw so that she could testify at a new trial to impeach the testimony of Janiel Brown.  However, for the first time Dore now asserts in his post-trial motion that Brown "perjured herself" during the trial about "the events of the day on which the homicide occurred," and that he is entitled to a new trial as a result.  (Dore Br. at 4).[2]  Dore claims that he should have had the opportunity to call Attorney Fontier as a witness at his trial in order to show how Brown's testimony "about the day of the homicide had developed and changed over time." (Dore Br. at 5).  But Dore has made no showing that Brown perjured herself during her trial testimony in this case.  Moreover, because Dore had an adequate opportunity to cross-examine Brown during the trial – and because Brown admitted during her trial testimony that she had previously lied to Attorney Fontier – the testimony proffered by Attorney Fontier would have been relevant only with respect to collateral issues.  Thus, Dore's motion to allow Attorney Fontier to withdraw was properly denied by the Court during the trial, and his current motion for a new trial should be denied as well.

---

[2] Citations to "Dore Br." are to the Memorandum of Law In Support Of Defendant Jermaine Dore's Motion For A New Trial, dated April 24, 2013.

A.      **Factual Background**

1.      **Janiel Brown's Testimony**

Dore's former girlfriend, Janiel Brown, testified as a Government witness at trial over two days: March 6, 2013 and March 7, 2013.  (Tr. 241-404, 491-544).  Brown's testimony discussed, in detail, the criminal activities of Dore and his co-defendant, including Brown's own participation in some of those activities, and was extensive.  Brown had previously testified in connection with a suppression motion that Dore made in this case.  She repeatedly admitted, during trial, upon examination by each of the parties, that she lied at that suppression hearing. (Tr. 246-47, 348, 528-29, 540-42).  Brown also testified that she lied to Attorney Fontier at one or more meetings regarding the case.  (Tr. 355).

Attorney Fontier's co-counsel, Ying Stafford, cross-examined Brown.  One of the subjects that Attorney Stafford explored with Brown was whether Brown had initially provided Attorney Fontier with a potential alibi for Dore for the December 12, 2011 murder.  In particular, Brown told Attorney Fontier that Dore was with her while shopping in Co-Op City on December 12, 2011, including when Brown deposited money into and withdrew money from an ATM. (Tr. 351-52).  Brown provided Attorney Fontier with a bank record showing that Brown's ATM deposits/withdrawals occurred at approximately 11:59 p.m. (that is, a minute before midnight). (Tr. 351-53; DX A).[3]  Attorney Fontier had previously provided Brown with discovery in this case, which included police reports indicating that the murder occurred on December 12, 2011 at around noon (that is, approximately twelve hours before Brown visited the ATM in Co-Op City). However, Brown testified that, when she provided the ATM information to Attorney Fontier, she knew the date of the murder, but not the time.  (Tr. 358, 361-63).  Brown explained: "I knew it was in relation to December 12.  I didn't pay attention to the time at that point, no."  (Tr. 361-

---

[3] Citations to "DX" are to a defense exhibit admitted at trial.

62).  Brown explained that Attorney Fontier said she would have an investigator look into the

ATM transaction, and later told Brown that the ATM transaction occurred at a time that did not

create an alibi, and so did not pursue the matter further:

> I provided Ms. Fontier with the transaction information.  She said,
> okay, I'm going to have an investigator look into it.  When she
> came back she said it me that the times were not correct which is
> why it went no further.  There was no substance for it to say, okay,
> then Jermaine was with you at the time when this robbery took
> place.  There was no substance which is why it went no further and
> I had to keep trying to find other information and other alibis,
> supposedly, for him, which came to nothing.

(Tr. 364).

However, Brown explained – at length – that the reason that she provided

Attorney Fontier with this information was because she believed it could create an alibi for Dore,

and because Dore had asked her to do so:

> Q.   But you were convinced that he was with you at the time of
> the homicide?
>
> A.   At the time, yes.
>
> Q.   So you were convinced he had nothing to do with the
> murder?
>
> A.   At the time, yes.
>
> Q.   But you just provided testimony not too long ago that Mr.
> Dore told you that he was involved in a murder.
>
> A.   I was convinced to tell Ms. Fontier that he wasn't. After all,
> he is – she is his attorney.
>
> Q.   After all she is his attorney.
>
> A.   Yes.
>
> Q.   Can you please explain what that means?

> A.    Meaning I'm following Jermaine's direction of what I am and am not supposed to tell her.
>
> Q.    Let's see. You just said that you were convinced, yourself, that Jermaine was with you at the time of the murder?
>
> A.    Not knowing when it took place, yes.
>
> Q.    So, your testimony is Jermaine was with you at the time of the murder?
>
> A.    My testimony is he was with me on December 12.

(Tr. 364-65).

On cross-examination, Brown also explicitly testified that she lied to Attorney Fontier in certain conversations that Brown had with her about a potential alibi for Dore for the December 12, 2011 murder:

> Q.    So, when you went to Ms. Fontier to convince her that Mr. Dore was with you and was not involved in the murder, you were telling her the truth?
>
> MS. LESTER: Objection.
>
> A.    I was asked –
>
> THE COURT: Overruled.  Were you telling her the truth?  Yes or no.
>
> The Witness: No.
>
> Q.    You were not telling her the truth?
>
> A.    No.

(Tr. 355).

**2.    Dore's Motion For A Mistrial**

On March 11, 2013, Attorney Fontier moved to withdraw as counsel for Dore so that she could testify, and, on her client's behalf, for a mistrial predicated on her requested withdrawal and testimony.

Attorney Fontier submitted a declaration in connection with the mistrial motion, as she did in connection with Dore's motion for a new trial.  In each, Attorney Fontier sets forth the same factual assertions, disputing Brown's testimony regarding when Brown learned of the time of the murder, and stating that, during her meeting with Brown, Attorney Fontier "discussed the time and date of the homicide with Ms. Brown and we reviewed the discovery.  She was informed that the homicide took place at about noon somewhere between Mount Vernon and the Bronx."  (Decl. ¶ 7).[4]  According to the Declaration, "Ms. Brown informed me, during the meeting in my office, that if the murder took place at noon on December 12, 2012, Mr. Dore could not have been the person that committed the murder, because he was with her in Co-Op City shopping and going to the bank at that date and time."  (Decl. ¶ 8).  Although the Declaration does not say so, it is apparent that Brown provided Attorney Fontier with the bank records from December 12, 2011, as Attorney Fontier's notes referred to an "11:59 deposit." (Decl. ¶ 9).[5]  The Declaration also states that Attorney Fontier "never informed Ms. Brown that the alibi she had provided was incorrect, due to the time of the homicide."  (Decl. ¶ 19).

In the mistrial motion, Attorney Fontier argued that she should be permitted to withdraw and a mistrial granted so that she could testify, arguing that her testimony about the conversations that she had with Brown would be admissible to "rebut" Brown's testimony and to call into question Brown's credibility.  (*See* Memorandum Of Law In Support Of Defendant Jermaine Dore's Motion To Withdraw As Counsel And For A Mistrial, filed March 11, 2013, at

---

[4] Citations to "Decl." are to the Declaration of Alice L. Fontier, dated April 24, 2013, submitted in connection with Defendant Jermaine Dore's Motion For A New Trial, dated April 24, 2013. They are identical to the factual assertions set forth in the Declaration of Alice L. Fontier, dated March 11, 2013, submitted in connection with Defendant Jermaine Dore's Motion To Withdraw As Counsel And For A Mistrial, dated March 11, 2013.

[5] Notably, Attorney Fontier did not note that the deposit occurred at 11:59 p.m., approximately 12 hours after the homicide.  (Decl. ¶ 9).

3.)  Attorney Fontier did not explain in what way her "rebuttal" of Brown's testimony would be relevant, material, non-cumulative, or non-collateral.  Rather, having simply made the bald assertion that her testimony would be "admissible," Attorney Fontier sought to withdraw from the case because "Mr. Dore has [the] right to call his counsel as a witness on his behalf, and counsel may not be both a witness and trial counsel."  (*Id*. at 2).  From this, Attorney Fontier sought the extraordinary relief of a mistrial, "[a]s it is not possible for me to testify at this trial." (*Id*. at 4).

### 3.    The Court's Decision

After reviewing the parties' written arguments, the Court heard oral arguments from both sides.  Attorney Fontier argued that she should be permitted to withdraw as counsel, causing a mistrial, so that she could testify at trial for Dore.  In particular, Attorney Fontier argued that she would testify that Brown was not telling the truth when she testified that she did not know the date and time of the homicide, because Attorney Fontier "had told her the time of the homicide."  (Tr. 1558-59).  Attorney Fontier argued that such testimony would show that Brown "is either lying on the stand or she was lying to [Attorney Fontier]" when she attempted to provide an alibi for Dore for the murder.  (Tr. 1560).  Attorney Fontier argued that this would be significant, because "it goes directly to whether or not she is a credible witness."  (Tr. 1562).

The Court pointed out that if Attorney Fontier were trying to prove up the fact that Brown was lying to Attorney Fontier during those conversations about a potential alibi for Dore for the murder, then "the inference then is that Mr. Dore did commit the murder which is not an argument I think you want to make," to which Attorney Fontier agreed.  (Tr. 1568-69). Instead, Attorney Fontier continued to argue that, through her testimony, she would be trying to make a point about Brown's credibility in general, that she "cannot be trusted," and that "she

lie[d] to me." (Tr. 1568-69). The Court pointed out that Attorney Fontier "can make [that] argument with what you have now," given that Brown had admitted on the witness stand that (1) she had lied in her conversations with Attorney Fontier concerning a potential alibi; and (2) that she had lied under oath at a suppression hearing earlier in the case. (Tr. 1570). The Court further pointed out that "the only evidence that you are looking to introduce is that she was aware of the time of the robbery and so I'm not sure if a stipulation would do that, but it does seem to be largely duplicative of what is already in the record," to which Attorney Fontier agreed that a stipulation would suffice. (Tr. 1570). However, Attorney Fontier never requested such a stipulation from the Government and thus, no such stipulation was admitted.

Notably, Dore did not argue, at that time, that Brown had committed perjury on the witness stand during the trial. Instead, Dore's arguments were made in the alternative – that either Brown was lying in her conversations to Attorney Fontier or she was lying now in her trial testimony – and Dore conceded that Attorney Fontier's testimony would be relevant only as to the general credibility issues with respect to Brown as a witness.

After considering the parties' arguments, the Court made its decision. First, the Court noted that Dore's motion for a mistrial was "a pretty late motion," coming several weeks after Dore had notice that Brown had been served with a subpoena and one full week into the trial – during which the parties had selected a jury, given opening statements, and heard the testimony of over 15 witnesses, including Brown. (Tr. 1617). Second, the Court concluded that the "issues about which Ms. Fontier wishes to testify are really collateral," and that "they're impeaching the credibility of Ms. Brown generally." (Tr. 1618). The Court noted that the defense was not trying to show that the "alibi proffered by Ms. Brown to Ms. Fontier was, in fact, or is, in fact, valid." (Tr. 1618). Thus, the Court concluded that "the argument really is that

she was prepared to lie then and so she's lying now," which argument could already be made,

because there was already "a lot of other material to argue about her lack of credibility,"

including Brown's admission that she previously gave false testimony under oath in this case and

that she admitted lying to Attorney Fontier in her conversations with her.  (Tr. 1618-19).

Accordingly, the Court denied Dore's motion to allow Attorney Fontier to withdraw and to grant

a mistrial in the case.  (Tr. 1619).

### B.  Discussion

The Court properly denied Attorney Fontier's request to withdraw and Dore's

motion for a mistrial, and that denial cannot serve as the basis for a new trial under Rule 33.  As

set forth in more detail below:  (1) Attorney Fontier's proposed testimony would have been

inadmissable, and therefore it was unnecessary for her to withdraw as counsel; and (2) even if

Attorney Fontier's proposed testimony were admissible, there were alternative methods of

providing a basis for Dore's arguments short of having Attorney Fontier take the stand.  With

respect to Dore's most recent argument – made for the first time now, in his motion for a new

trial – that a new trial is warranted because Brown perjured herself during her trial testimony,

and that Attorney Fontier's proffered testimony would have demonstrated that perjury, that claim

is also meritless.  As a threshold matter, Dore has not shown any perjury by Brown during her

trial testimony.  Instead, any potential differences between Brown's testimony and the testimony

proffered by Attorney Fontier were merely differences in recollection or perception.  Moreover,

any such differences would merely have presented a credibility question for the jury, which was

already before the jury – the finder of fact charged with making credibility determinations –

based on Brown's admissions that she had lied several times in the past.  Thus, this provides no

basis for a new trial for Dore.

Dore argues now, as he did in his mistrial motion mid-trial, that he could have impeached Brown's testimony in two regards: "Ms. Brown was well-aware of the time of the homicide prior to informing counsel that Mr. Dore had an alibi," and that "Ms. Brown was aware that an investigator was retained to attempt to corroborate the alibi." (Dore Br. at 2). As the Court found in rejecting this argument mid-trial, such impeachment would be collateral. As such, Attorney's Fontier's proffered testimony – which is extrinsic evidence of the purported falsehood of Brown's testimony – would have been inadmissible.

While it is proper to cross-examine a witness by asking the witness whether he or she has made statements in the past inconsistent with his or her trial testimony, *see* Fed. R. Evid. 613(b), where the allegedly inconsistent prior statement relates to a collateral topic – that is, one not relevant to the issues in the case – cross-examining counsel is bound by the answer given by the witness. The Second Circuit has held that "a witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral, *i.e.*, as to those matters which are relevant to the issues in the case and could be independently proven." *United States* v. *Blackwood*, 456 F.2d 526, 530 (2d Cir. 1972); *see also United States* v. *Purdy*, 144 F.3d 241, 245-46 (2d. Cir. 1998) ("Extrinsic evidence offered for impeachment on a collateral issue is properly excluded").

Attorney Fontier's proposed testimony had no relevance – much less material relevance – on non-collateral matters. Whether Brown knew the time of the murder before discussing the ATM transaction with Attorney Fontier is not material to what Dore did on December 12, 2011, whether it is commit the murder or admit to Brown that he had been involved with a murder. There can be no question that Dore's presence – or non-presence – at the ATM transaction does not, in fact, create an alibi, as the ATM transaction occurred

16

approximately 12 hours after the murder.  Second, both Attorney Fontier and Brown agree that

Brown attempted to provide an alibi for Dore when Brown met with Attorney Fontier by

claiming that Dore was with Brown at the time of the ATM transaction.  Accordingly, any

additional testimony intended to "rebut" Brown's testimony by demonstrating that she believed,

at one point, that she could find a working alibi for Dore would be immaterial, irrelevant,

cumulative, and confusing – not to mention collateral – and would therefore be inadmissible.

Because Dore cannot proffer a legitimate basis for the admissibility of Attorney Fontier's

proposed testimony, she could not have been a witness in this case.  No manifest injustice

occurred as a result of the Court's denial of Attorney Fontier's request to withdraw, and

therefore, a new trial is not warranted.

    Moreover, during the trial, in light of the limited nature of Attorney Fontier's

testimony, the Court proposed that the parties could consider a stipulation addressed to the

limited factual issue posed by Attorney Fontier's proffered testimony.  (Tr. 1570).  Counsel for

Dore agreed that she "would settle for a stipulation."  (Tr. 1570).  However, as counsel for Dore

never proposed such a stipulation to the Government, one was never entered.  Here, if there was

any testimony that "rebutted" Brown's testimony that could properly be presented to the jury,

Dore should have explored the alternative means of providing that testimony to the jury when he

had the chance – during the trial.  This also cannot provide the basis for a new trial for Dore now.

    Dore's new argument is that Brown gave perjured testimony at trial, which he

claims serves as a basis for a new trial under Rule 33.  To support this claim, Dore argues that

Brown perjured herself with respect to her testimony about "the events of the day on which the

homicide occurred," and "whether she had previously stated that Mr. Dore was innocent and had

an alibi" for the homicide.  (Dore Br. at 4-5).  However, Dore does not point to any actual

testimony at trial with respect to these issues – or any other – that is "perjured."  Instead, he relies on the same assertions as those described above in his prior motion; that Attorney Fontier, if permitted to testify, would have testified that she and Brown discussed the time of the murder and the fact that an investigator had been retained to investigate a potential alibi.  Neither of these assertions casts any light on Brown's testimony about the actual day of the murder, nor do they demonstrate that Brown had previously said that Dore was "innocent."  Instead, both are consistent with Brown's testimony at trial – that she had conversations with Attorney Fontier, during which she was attempting to help establish an alibi for Dore for the murder, that she did not recall learning the specific time of the murder at that point, but that, in any event, she had been lying during those conversations with Attorney Fontier.  Dore has put forth no proffered testimony that Brown stated that Dore was "innocent" of the murder.

As a threshold matter, therefore, the record makes clear that Dore has not established – nor can he – that Brown gave testimony at trial that was false.  Instead, Brown's testimony is consistent with her explanation and with the proffered testimony of Attorney Fontier, which is that she had been lying during those previous conversations with Attorney Fontier.  Contrary to Dore's assertion in connection with his motion, that Brown "previously stated that Mr. Dore was innocent," (Dore Br. at 5), there is nothing in the record to support that claim.  Attorney Fontier, in her proffer with respect to her testimony, does not state that Brown said that Dore was "innocent."  Instead, Attorney Fontier merely states here, as she did in support of Dore's argument for a mistrial, that she had conversations with Brown about an alibi and that the date and time of the murder were discussed with Brown.  To the extent that Attorney Fontier would have testified that she discussed the date and time of the murder with Brown, and Brown testified at trial that she did not recall learning of the time at that point, the law is clear

that "[d]ifferences in recollection alone do not add up to perjury."  *United States* v. *Bortnovsky*, 879 F.2d 30, 33 (2d Cir. 1989).

Dore argues that he should have had the benefit of Attorney Fontier's testimony at trial, because it was necessary to prove up the "prior inconsistent statements," made by Brown. (Dore Br. at 5).  However, the only prior statements pointed out by Dore as arguably "inconsistent," are the ones made by Brown in her conversations with Attorney Fontier, relating to Brown's knowledge of the time of the murder and Brown's attempt to provide an alibi for Dore.  In his motion for a mistrial, Dore argued that proving these inconsistent statements was necessary in order to attack Brown's credibility generally.  Dore now argues that proving these inconsistencies was necessary for the additional reason that it would show that Brown's "testimony about the day of the homicide had developed and changed over time."  (Dore Br. at 5).  However, these statements do not shed any light on Brown's testimony about the day of the actual homicide, only about her subsequent attempt – months later – to help Dore attempt to construct an alibi for that day.  Moreover, because Brown admitted that she made these prior inconsistent statements to Attorney Fontier in conversations about that attempt to formulate an alibi, any testimony about those conversations from Attorney Fontier would merely have been cumulative.  In other words, Dore has not shown how Attorney Fontier's testimony would have enhanced his ability either to prove up the prior inconsistent statements or to prove the fact that Brown had lied – both of which were squarely admitted by Brown during her trial testimony.

Even if Dore had shown some false testimony by Brown – and the Government does not concede that he has – the Second Circuit has made clear that this would not provide the basis for a new trial for Dore.  This is because trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *United States* v. *LeRoy*, 687

19

F.2d 610, 616 (2d Cir. 1982).   Because the jury in this case had before it all of the relevant

information necessary for it to make credibility determinations about Brown, the jury could

properly fulfill its role in deciding how much, if any, of her testimony to credit.

Moreover, "[e]ven in a case where perjury clearly has been identified," the

Second Circuit has "indicted [its] reluctance to approve the granting of a new trial unless we can

say that the jury probably would have acquitted in the absence of the false testimony."   *United*

*States* v. *Sanchez*, 969 F.2d 1409, 1413-14 (2d Cir. 1992) (citations omitted) (finding district

court's granting of a new trial based upon alleged perjury by several witnesses to be an abuse of

discretion).   In order to grant a new trial based on allegedly perjured testimony, "it is only where

exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury

function of credibility assessment."   *Sanchez*, 969 F.2d at 1414.   "The test is whether 'it would

be a manifest injustice to let the guilty verdict stand.'"   (*Id*. (quoting *United States* v. *Reed*, 875

F.2d 107, 114 (7th Cir. 1989)).)   "Manifest injustice cannot be found simply on the basis of the

trial judge's determination that certain testimony is untruthful, unless the judge is prepared to

answer 'no' to the following question:  'Am I satisfied that competent, satisfactory and sufficient

evidence in this record supports the jury's finding that this defendant is guilty beyond a

reasonable doubt?'"   *Sanchez*, 969 F.2d at 1414.

In this case, there was ample evidence – even putting aside Brown's testimony in

its entirety – proving that Dore committed the December 12, 2011 robbery and murder.   Among

other things, this evidence was admitted at trial: (1) cellsite evidence showing phones used by

Dore and Barrett at several significant locations, including at the victim's hotel in the Bronx at

the exact time that the victim was checking out and on South Fourth Street in Mount Vernon at

the exact time of the robbery and carjacking; (2) video surveillance footage and a photograph

captured by a license plate reader camera, showing Barrett's Mercedes waiting in the area at the time of the murder; (3) testimony of Patrick Taylor relating to admissions made by Barrett, Dore, and Todd about the murder; (4) ballistics evidence linking the gun used in the murder to a gun used at another robbery in which Dore was present; (5) testimony of witnesses to other robbery incidents, describing a gun used by Dore on those occasions that closely matched the description of the gun used in the murder; (5) text messages and phone records corroborating Brown's account of contact with Dore on the day of the murder, which included his admissions to her about the murder; and (6) phone records showing calls between Dore and Barrett just before and after the time of the murder.  Thus, even if Dore had somehow shown that Brown's trial testimony was perjured, because there was ample evidence demonstrating his guilt of the murder and all other charges, he cannot show any "manifest injustice," and is not entitled to a new trial on this basis.

### IV.    Barrett's Motion For A New Trial Should Be Denied

Barrett contends that he is entitled to a new trial because the Court improperly admitted the music video entitled "The Joy," which depicted Barrett, Todd, and a third individual, Ruben Estrada, participating in a staged robbery using Barrett's Mercedes Benz sedan.  Prior to trial, Todd (joined by the other defendants) moved *in limine* to preclude admission of the video, on the grounds that it was not relevant, or, in the alternative, served only as propensity evidence, and was unfairly prejudicial.  The Court ruled that the video was admissible as relevant evidence of the charged robbery conspiracy because it showed an association among members of the conspiracy with each other, as well as with the dark blue Mercedes Benz sedan driven by Dwayne Barrett to many of the robbery locations.  The Court also found that the video was not unfairly prejudicial, given that it did not depict a level of

violence that would shock or overwhelm the jurors.  The Court's ruling was not in error and does not provide a basis for a new trial.

### A.    Relevant Facts

The music video, "The Joy," was posted by Taijay Todd on his Facebook page sometime prior to January 2012 and was still on that Facebook page as of January 2012.  The video depicts Todd, Barrett, and Estrada sitting inside of a dark blue Mercedes Benz sedan and then exiting the Mercedes and carrying out an armed robbery of a victim.  While the robbery itself is likely simulated, the video clearly shows both Todd and Estrada carrying handguns, which they both appear to rack and slide, in preparation for confronting the robbery victim. They then pull masks over their faces, run up to the victim, brandish their guns at the victim, and take a bag from him.  After that, Todd and Estrada run back to the Mercedes, in which Barrett is waiting to drive them away from the scene.  The video was admitted during the Government's case-in-chief as Government Exhibit 30.

The evidence at trial established that Todd and Barrett participated together in a robbery conspiracy spanning from at least August 2011 through January 2012.  Estrada, while not charged in this case, was another co-conspirator, who also participated in robberies with Todd.  In particular, there was testimony at trial that Estrada participated in the October 7, 2011 robbery on Newbold Avenue in the Bronx, New York, with Todd and Dore.  (Tr. 1037-40, 1065).

In addition, the evidence at trial demonstrated that Barrett and his co-conspirators used the dark blue Mercedes Benz, registered to Barrett's girlfriend, Felicia Lake – the same one pictured in the video – to carry out many of the robberies in the charged conspiracy.  Among other robberies, Barrett and his co-conspirators used the Mercedes to carry out the December 12,

2011 robbery and murder described in Overt Act (i) to Count One of the Indictment, as well as the related substantive robbery, firearms, and murder charges described in Counts Five, Six, and Seven, respectively.  Barrett and Dore were also stopped by police officers while driving in the Mercedes while surveilling a robbery victim on November 14, 2011.

### B.    Discussion

The Court's ruling permitting the Government to admit the video as part of its case-in-chief cannot serve as a proper basis for a motion for a new trial.  The purpose of Rule 33 is not to provide the defense with the opportunity to relitigate evidentiary rulings with which the defense disagrees.  *See, e.g.*, *United States* v. *Guerrero*, 882 F. Supp. 2d 463, 494 (S.D.N.Y. 2011) (rejecting motion for new trial based on admission of Rule 404(b) evidence because "in light of the applicable Rule 33 standard, letting [defendant's] guilty verdict stand would not represent a manifest injustice nor is there a real concern that an innocent person has been convicted"); *United States* v. *Smith*, No. 08 Cr. 390 (BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009) (defendant "seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees . . . [but] offers no authority to suggest that these allegedly erroneous evidentiary rulings would support his request for a new trial").  The video was properly admitted at trial in order to prove several critical facts that were material to the charges, including the defendants' relationship with each other, the criminal nature of that relationship, the defendants' connection to and use of the Mercedes, and the defendants' possession of and access to guns. Contrary to Barrett's assertion, the facts proven by the video are not unfairly prejudicial, but instead are facts that are relevant to the defendants' guilt with respect to the charged crimes.  *See United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (evidence is unfairly prejudicial

"only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence"*)*.

Barrett does not argue – as he must to meet the Rule 33 standard – that the trial resulted in a miscarriage of justice because he is actually innocent of the crimes of which he was convicted.  *See United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  Rather, the only argument not previously made *in limine* with respect to the video is Barrett's contention that at least one of the jurors was improperly influenced by the video's admission, and used it as propensity evidence in convicting Barrett.  This argument is based on a statement purportedly made by one of the jurors to defense counsel after the trial had ended, as set forth in a declaration submitted by counsel in connection with Barrett's Rule 33 motion.  (*See* Declaration of Kenneth C. Murphy ¶ 11).  This evidence is inadmissible, and cannot support a motion for a new trial.

Rule 606(b) of the Federal Rules of Evidence bars any post-verdict inquiry into "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b).  *See United States* v. *DiSalvo*, 34 F.3d 1204, 1225 (3d Cir. 1994) (precluding inquiry into alleged unfair inferences drawn from the evidence); *United States* v. *Voigt,* 877 F.2d 1465, 1469 (10th Cir. 1989) (precluding inquiry into alleged juror assumptions that if the defendant failed to take the stand, he must be guilty).  In fact, "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters."  *Id.*; *see also Anderson* v. *Miller*, 346 F.3d 315, 326 (2d Cir. 2003) (Rule 606(b) "broadly prohibits accepting into evidence juror testimony regarding the course of a jury's deliberations").  A narrow exception exists regarding juror testimony regarding "whether *extraneous* prejudicial information was improperly brought to the jury's attention."  Fed. R. Evid. 606(b)(2) (emphasis

added).  Information of which the jury becomes aware in the normal course of the trial is not "extraneous" information for purposes of Rule 606(b).  *See, e.g.*, *United States* v. *Stewart*, 433 F.3d 273, 308 (2d Cir. 2006) (barring inquiry where jurors were alleged to have relied on witness's testimony as evidence against defendant, contrary to court's limiting instructions to consider only as to co-defendant); *United States* v. *Tran*, 122 F.3d 670, 672-73 (8th Cir. 1997) (barring inquiry where jurors were alleged to have considered defendant's failure to testify "because it was known to the jurors as a result of their presence at the trial, not as a result of something disclosed to them that had not occurred in the courtroom").

In this case, the video did not "enter the jury room through an external, prohibited route" such as "publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and outside persons."  *United States* v. *Rodriguez*, 116 F.3d 1225, 1226 (8th Cir. 1997) (quotation omitted). Instead, the video admitted as an exhibit as trial, so that it "was part of the trial, and was part of the information each juror collected."  *Id.*  Accordingly, the video did not constitute extraneous information and the post-verdict statement purportedly made by a juror to defense counsel about his thoughts on the video should not be considered by the Court in reviewing the validity of the verdict.

**V.      Conclusion**

          Accordingly, for the reasons set forth above, Dore's and Barrett's motions for a new trial pursuant to Rule 33 should be denied in their entirety.

Dated:  New York, New York
        May 15, 2013

                                       Respectfully submitted,

                                       PREET BHARARA
                                       United States Attorney

                      By:    _s/Jessica A. Masella_____
                               AMY LESTER
                               JESSICA A. MASELLA
                               Assistant United States Attorneys
                               (212) 637-2416/2288