UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA
:
      - v. -                                      S2 12 Cr. 45 (RJS)
:
JERMAINE DORE,
    a/k/a "St. Kitts,"              :
    a/k/a "Blaqs,"
:
        Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                                    PREET BHARARA
                                                    United States Attorney for the
                                                    Southern District of New York
                                                    One St. Andrew's Plaza
                                                    New York, New York 10007

Amy Lester
Jessica A. Masella
Assistant United States Attorneys
 -Of Counsel-

The Government respectfully submits this memorandum in connection with the sentencing of Jermaine Dore, which is scheduled to take place on August 2, 2013, at 2:30 p.m. For the reasons that follow, the Government respectfully requests that the Court sentence Dore to a term of twenty years' imprisonment on Counts One, Three, and Five, and a term of life imprisonment on Count Seven, to be followed by a mandatory consecutive term of thirty years' imprisonment on Counts Two and Four.[1]

A sentence of life imprisonment followed by thirty years would be sufficient, but not greater than necessary, to account for the factors set forth at Title 18, United States Code, Section 3553(a). Such a sentence would take into account Dore's role as a core member of the violent robbery crew that committed more than ten robberies between August 2011 and January 2012, including the December 12, 2011 robbery that resulted in the death of Gamar Dafalla. In addition to accounting for the seriousness of the offenses of conviction and Dore's particular role in those offenses -- including shooting and killing Dafalla[2] -- the recommended sentence is necessary to punish Dore and to protect the public from him, because he is a dangerous and violent criminal who has demonstrated his utter lack of respect for the law and inability to refrain from repeated violent conduct.

---

[1] As indicated in the PSR, the Government's view is that the Court should not impose sentence on Count Six because it is a lesser-included offense of Count Seven. (PSR at 26 (Addendum)). *See Rutledge v. United States*, 517 U.S. 292 (1996); *United States* v. *Parkes*, 497 F. 3d. 220 (2d Cir. 2007).

[2] In Dore's sentencing submission, he contends that the Government presented no proof at trial that he actually killed Dafalla, and that, therefore, the jury convicted Dore of the murder based on a *Pinkerton* theory of liability. (Dore Sentencing Memo. at 2, 9). To the contrary, and as discussed in more detail below, the proof at trial established that Dore shot Dafalla with a 9-milimeter handgun that Dore personally owned and used in connection with other robberies during the course of the conspiracy. The footnote to which Dore refers in his submission has been omitted from the final PSR because it did not relate to Dore, but rather to his co-defendant Taijay Todd. (*See* PSR at 26).

**BACKGROUND**

Jermaine Dore, a/k/a "St. Kitts," a/k/a "Blaqs," and Dwayne Barrett, a/k/a "Tall Man," were convicted on March 19, 2013, after a ten-day trial of all seven counts in Indictment S2 12 Cr. 45 (RJS) (the "Indictment"). The jury found Dore and Barrett guilty of conspiring to commit Hobbs Act robberies between in or about 2010 and January 2012 (Count One); committing two specific robberies, on October 29, 2011 and December 12, 2011 (Counts Three and Five); and using firearms in connection with the robbery conspiracy and the October 29 and December 12 robberies, resulting in the death of Gamar Dafalla on the occasion of the December 12 robbery (Counts Two, Four, Six, and Seven). As a result, Dore faces a Sentencing Guidelines range of a term of life imprisonment on Counts One, Three, Five, and Seven, with a mandatory minimum term of thirty years' imprisonment on Counts Two and Four, which much run consecutive to any other sentence. (PSR ¶ 181).

As established at the trial, Dore was one of the core members of a violent robbery crew that committed more than ten robberies between August 2011 and January 2012, including the December 12, 2011 robbery that resulted in the death of one of the victims, Gamar Dafalla. Specifically, the Government proved Dore's participation in the following robberies, among others:

- The August 22, 2011 robbery of Abdul Rauf, the owner of a gas station and convenience store located in Matamoras, Pennsylvania, of approximately $46,000 in business proceeds. (PSR ¶ 25).

- The October 10, 2011 robbery of Youssef Abdulkader, the owner of a convenience store on Wallace Avenue in the Bronx, of his cellphone and laptop computer. (PSR ¶ 30).

- The October 11, 2011 robbery of Prashant Goel, a salesperson for a telephone calling card company, on Pelham Road in New Rochelle, of approximately $6,000 and several thousands of dollars in telephone calling cards. (PSR ¶ 31).

2

- The October 29, 2011 robbery of Ahmed and Kassim Salahi, two brothers who own several live poultry markets in the Bronx, of approximately $15,000 in business proceeds. (PSR ¶ 32).

- The November 14, 2011 attempted robbery of Jaspal Singh, the manager of two gas stations, one in Mount Vernon and one in the Bronx. (Tr. 70-78 (J. Singh); Tr. 90-101 (C. Villanueva); Tr. 125-32 (L. Segarra); Tr. 1034-36 (P. Taylor)).

- The December 5, 2011 gunpoint robbery of Fitzroy Cornwall on Monticello Avenue in the Bronx. (Tr. 1283-87 (F. Cornwall); Tr. 1343-50 (J. Reeves); GX 268 (shell casings); GX 269-72 (ballistics); GX 3007 (cellsite map)).

- The December 12, 2011, robbery of Jamal Abdulla, Zhao Liang, and Gamar Dafalla, inside a minivan located on South Fourth Avenue in Mount Vernon which resulted in the death of Dafalla. (PSR ¶ 33).

- The December 12, 2011 robbery of Mohammed Althomory, a salesperson for a wholesale supplier of tobacco and over-the-counter medicine, of approximately $15,000 in business proceeds. (PSR ¶ 34).

- The December 31, 2011 robbery of Ayoub Mohammed, the owner of a wholesale business selling telephone calling cards and other supplies to bodegas, of approximately $3,000 in business proceeds and telephone calling cards worth several hundreds of dollars. (PSR ¶ 36).

- The January 7, 2012 robbery of Djujka Krco, the owner of a wholesale distributor to bodegas, of approximately $1,000 in business proceeds as well as other personal items. (PSR ¶ 37).

Dore was the only member of the crew who participated in each and every robbery about which testimony was presented at trial. The Government proved his involvement in these specific robberies through, among other things: (1) the testimony of Patrick Taylor and Janiel Brown, both of whom participated in robberies with Dore; (2) physical evidence seized from his residence, including a cellphone belonging to robbery victim Youssef Abdulkader, and gloves and masks consistent with those used by the robbers; (3) cellsite evidence demonstrating that

cellphones used by Dore were in the vicinity of many of the robberies at the time that the robberies took place; (4) the testimony of the robbery victims, many of whom described one of the robbers as a dark-skinned, muscular black male consistent with Dore's height and general physicality; (5) surveillance videos from the scene of the October 11, 2011 robbery of Prashant Goel in New Rochelle, the December 12 robbery/murder in Mount Vernon, and the December 31, 2011 robbery of Ayoub Mohammad in a Bronx parking garage, all of which showed a robber consistent with Dore's physical description; (6) contemporaneous text messages between Dore and Brown in which Dore openly discussed his commission of robberies; and (7) ballistics evidence matching the 9-millimeter shell casings from the scene of the December 5, 2011 robbery of Fitzroy Cornwall to the shell casing at the scene of the December 12, 2011 murder.

As the evidence at trial demonstrated, Dore was relentless, committing robbery after robbery over a six-month period, and remorseless, committing a second armed robbery, of Mohammad Althomory, just a few hours after murdering Dafalla on December 12.[3]  Dore's participation in these violent robberies was not the result of spur-of-the-moment decision-making.  Rather, many of these robberies involved hours of advance planning and surveillance of robbery victims.  Dore was indisputably the "muscle" of the crew, using brute force to obtain money from many of the victims by punching them or knocking them to the ground, including Abdul Rauf, the victim of the August 22, 2011 robbery (Tr. 558 (robber fitting Dore's description hit Rauf to effect robbery of $46,000 in business proceeds)), Ayoub Mohammad, the victim of the December 31, 2011 robbery (Tr. 892 (Mohammad beaten repeatedly by robbers, thrown on the ground); Testimony of P. Taylor at Tr. 1024 (Dore hit victim of December 31

---

[3] Indeed, Dore sent a text message to Janiel Brown shortly after the murder took place in which he stated, "Am cool. On it now again," referring to the fact that he was about to commit another robbery.  (Tr. 328 (J. Brown); GX 73A).

4

robbery)), and Djujka Krco, the victim of the January 7, 2012 robbery (Tr. 150 (one robber hit Krco repeatedly in the head while second robber threatened her with a knife)). Dore also used a knife during several robberies. (*See* Testimony of Y. Abdulkader at Tr. 225 (dark-skinned robber threatened Abdulkader with knife, causing him to drop cellphone and laptop computer); Testimony of P. Goel at Tr. 1427-29 (robber fitting Dore's description stabbed car tires with knife)).

But most seriously, Dore used a 9-millimeter semi-automatic handgun -- which was described by Patrick Taylor, Janiel Brown, and many of the victims -- to commit several of the robberies, and to shoot and kill Gamar Dafalla.[4] For example, on October 29, 2011, Dore and other members of the crew abducted Ahmed Salahi outside his mosque and forced him to turn over the keys to his home. Dore and Barrett then entered the home and held Ahmed Salahi's brother and nephews at gunpoint while they ransacked the house for money. (*See* Testimony of P. Taylor at Tr. 1002-03 (Dore had 9-millimeter gun on day of October 29 robbery); Testimony of A. Salahi at Tr. 585 (one robber had gun, one had knife); Testimony of K. Salahi at Tr. 620-21 (one dark-skinned robber and one light-skinned, both of whom had guns)). Dore also used his 9-millimeter gun on December 5, 2011 to fire at least seven shots while robbing Fitzroy Cornwall. (Tr. 1285 (F. Cornwall); 1347 (J. Reeves)). The ballistics evidence presented at trial established that the 9-millimeter shell casings discharged at the scene of the December 5 robbery were fired from the same gun as the 9-millimeter shell casings discharged at the scene of the December 12 murder. (Tr. 1372 (J. Fox)). This evidence, together with the cellsite charts showing that Dore's cellphone followed Dafalla from his hotel to the robbery location, the surveillance video of the robbery unfolding in Mount Vernon, and the inculpatory statements testified to by Janiel Brown

---

[4] Patrick Taylor testified that Dore also had an AK-47 rifle, but there was no testimony that it was used in connection with any of the robberies. (Tr. 1002-04).

5

and Patrick Taylor, proved that Dore was the person who shot and killed Dafalla.  (*See* GX 3008 (cellsite map); GX 501, 502, 505 (surveillance video of robbery); Tr. 326-44 (J. Brown); Tr. 1058-62 (P. Taylor); GX 73A (text messages between J. Brown and J. Dore)).

In sum, the Government's proof at trial established that Dore was a central member of the robbery crew who participated in more than ten robberies during a six-month period, including the murder of Dafalla, that Dore essentially conducted robberies, planned robberies, and engaged in surveillance of robbery victims on a full time basis during that period, and that Dore was unrelenting in his violence towards individual victims.

## ARGUMENT

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" -- that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing

6

Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."

*Gall*, 552 U.S. at 50.

**B.     The Court Should Impose a Sentence of Life Imprisonment, Followed by Thirty Years**

In the present case, a sentence of life imprisonment followed by the mandatory consecutive term of thirty years' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Consideration of several of the Section 3553(a) factors, in addition to the advisory Guidelines, warrants such a sentence for Dore. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offenses of conviction, the seriousness of those offenses, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of this defendant.

**1.     The Advisory Guidelines Range**

The Guidelines reflect the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

In this case, the correct Guidelines calculation yields the advisory range of life imprisonment on Counts One, Three, Five, and Seven, to be followed by a thirty-year mandatory and consecutive term of imprisonment on Courts Two and Four, as set forth in the PSR. (PSR ¶ 181). The Probation Office has recommended the statutory maximum sentence of twenty years' imprisonment on Counts One, Three, and Five; a mandatory consecutive term of imprisonment of thirty years on Counts Two and Four; and a sentence of life imprisonment on Count Seven.

8

(PSR at 30 (Sentencing Recommendation)).

### 2. The Nature and Seriousness of the Offense, and the Need To Provide Just Punishment

The most significant factor weighing in favor of a sentence of life followed by thirty years in this case is the "nature and circumstances of the offense[s]" of conviction. 18 U.S.C. § 3553(a)(1). Dore participated in more than ten violent robberies within a relatively short period of time, including one robbery that resulted in the ultimate act of violence -- the murder of another human being. As outlined above, the Government's proof at trial demonstrated Dore's central role in the crew. Dore was, without exception, the robber who employed the most violence against the victims in this case. And as the victims testified at trial, many of them suffered injuries, feared for their lives, and changed their business practices as a result of the robberies. (*See, e.g.*, Testimony of M. Althomory at Tr. 689-90 (Althomory hit repeatedly by the robbers in the head and neck, knocking him down, causing swelling and requiring hospitalization overnight); Testimony of A. Muswara at Tr. 716-18 (lost consciousness after hit by robbers, hospitalization and surgery required as a result; stopped working for company because felt unsafe after robbery); Testimony of D. Krco at Tr. 153 (closed business, unable to work because of fear resulting from robbery)). The brutality of the robberies carried out by Dore and his senseless murder of Dafalla overwhelmingly support a sentence of life imprisonment followed by thirty years.

Dore does not provide *any* explanation for his actions in this case. He provides no apology, he provides no justification, and he provides no excuse. Nor does Dore's conduct give any sign that he would have ever stopped committing violence absent his arrest in this case. Just the opposite -- until his arrest, Dore was unrelenting in his pursuit of robbery victims. In his sentencing submission, Dore maintains his innocence. While the law does not require Dore to

9

provide an explanation or to accept responsibility for his conduct, a complete lack of explanation or acceptance of responsibility by Dore counsels in favor of a Guidelines sentence. In short, Dore does not deserve leniency from the Court when he has demonstrated no remorse for the acts of violence he has committed, including the loss of another man's life at his hands.

### 3. The Need to Promote Respect for the Law, and the Need to Afford Adequate Deterrence

A term of life imprisonment followed by thirty years will promote respect for the law and ensure that Dore never has the opportunity to commit another crime. Such a term will also provide general deterrence to others. There is nothing in Dore's submission or in the information he provided to Probation that warrants anything other than a Guidelines sentence. Indeed, a defendant such as Dore, whose violent criminal conduct spanned more than a six-month period, and doubtless would have continued unabated but for his arrest in this case, clearly will not be deterred from future criminal conduct without a significant penalty.

Dore asks for a sentence of thirty years' imprisonment. Such a term of imprisonment would be an injustice to the many victims of his offenses, including Gamar Dafalla. A sentence of life imprisonment followed by thirty years will prevent Dore from harming another member of society, in addition to punishing him for his crime. Such a sentence will also provide deterrence to other young men who may consider using guns to rob others.

### 4. The History and Characteristics of the Defendant

For many of the reasons discussed above, the history and characteristics of this defendant do not counsel in favor of a lenient sentence. Dore is an unrepentant criminal who wrought violence not only on his victims, but even on someone close to him, his girlfriend Janiel Brown. Dore convinced Brown to be a part of his criminal ventures, and they spent much of their time together scouting robbery victims and locations. (Testimony of J. Brown at Tr. 310 (Dore and

10

Brown would conduct surveillance of robbery targets whenever Brown had a break from school and on the weekends)).  Even though Brown had a legitimate job at which she worked while she was in school, during the periods when she was on break, she testified that Dore pressured her into committing robberies or conducting surveillance with him by "mak[ing her] feel guilty for not having an income and not supporting him."  (Tr. 321).  Moreover when Dore physically abused Brown and she threatened to call the police, Dore threatened her in turn, telling Brown that he would inform the police that she drove him to robberies.  (Tr. 323).

Dore was so violent that when Barrett read in a newspaper about a robbery during which at least one of the victims was brutally stabbed, he assumed that Dore had committed it. (Testimony of P. Taylor at Tr. 1038-40).  And, in fact, Janiel Brown testified that Dore was involved in a robbery that resulted in his own hand being badly cut with a knife, requiring medical treatment.  (Tr. 302 (Taijay Todd accidentally stabbed Dore during a robbery they committed together)).  Similarly, when Patrick Taylor heard about a robbery in Mount Vernon that resulted in a murder, he assumed that Dore and Barrett were responsible.  (Tr. 1059-61). When Taylor confronted them about the incident, both Barrett and Taijay Todd commented that Dore was "crazy" and "did something wrong, . . . something messed up, that Tall Man [Barrett] and Biggs [Todd] didn't like."  (Tr. 1061).

In sum, Dore's history and characteristics weigh in favor of a Guidelines sentence of life imprisonment followed by a mandatory term of imprisonment of thirty years.

### 5. The Absence of Unwarranted Sentencing Disparities

It also bears noting that a Guidelines sentence in this case would not create "unwarranted disparities among defendants."  18 U.S.C. § 3553(a)(6).  None of the participants in this case has been sentenced yet.  Dore's role as the most prolific member of the robbery crew and the shooter

11

in the murder of Gamar Dafalla makes a sentence of life imprisonment followed by thirty years an appropriate and necessary sentence in this case.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose on Jermaine Dore a term of twenty years' imprisonment on Counts One, Three, and Five, and a term of life imprisonment on Count Seven, to be followed by a mandatory consecutive term of thirty years' imprisonment on Counts Two and Four.

Dated: New York, New York
       July 29, 2013

>                    Respectfully submitted,
>
>                    PREET BHARARA
>                    United States Attorney
>
>
> By:     s/ Amy Lester            _
>         Amy Lester / Jessica A. Masella
>         Assistant United States Attorneys
>         (212) 637-2416/2288